1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF KANSAS
 2

    STEVEN WAYNE FISH,
 3  on behalf of themself and
    all others similarly
 4  situated, et al.,              Docket No. 16-2105-JAR

 5      Plaintiffs,                Kansas City, Kansas
                                   Date:  04/14/16
 6  v.

 7  KRIS KOBACH,
    in his official capacity as
 8  Secretary of State for the
    State of Kansas, and
 9  NICK JORDAN,
    in his official capacity as
10  Secretary of Revenue for the
    State of Kansas,
11
        Defendants.
12  .........................

13
                         TRANSCRIPT OF
14            MOTION FOR PRELIMINARY INJUNCTION
         BEFORE THE HONORABLE JULIE A. ROBINSON
15             UNITED STATES DISTRICT JUDGE

16  APPEARANCES:
    For the Plaintiffs:
17
    Mr. Dale E. Ho              Mr. Neil A. Steiner
18  Mr. R. Orion Danjuma        Dechert, LLP - NY
    Ms. Sophia Lin Lakin        1095 Avenue of the Americas
19  American Civil Liberties    New York, New York 10036
    Union Foundation - NY
20  125 Broad Street
    New York, New York 10004
21
    Mr. Stephen D. Bonney
22  ACLU Foundation of Kansas
    6701 West 64th Street
23  Suite 210
    Overland Park, Kansas 66202
24

25  (Appearances continued on next page)

1    APPEARANCES:

2
    For the Defendant Kris Kobach:

3
    Mr. Kris Kobach
4    Mr. Garrett R. Roe
    Kansas Secretary of State
5    120 Southwest 10th Avenue
    Memorial Hall, First Floor
6    Topeka, Kansas 66612

7    For the Defendant Nick Jordan:

8    Mr. J. Brian Cox          Ms. M.J. Willoughby
    Kansas Department of Revenue  Office of Attorney General
9    915 Southwest Harrison    120 Southwest 10th Avenue
    Second Floor               Second Floor
10   Suite 230                 Topeka, Kansas 66612
    Topeka, Kansas 66612

11

12

13

14

15

16

17

18

19
    Court Reporter:       Kelli Stewart, RPR, CRR, RMR
20                        Official Court Reporter
                          259 U.S. Courthouse
21                        500 State Avenue
                          Kansas City, Kansas 66101
22

23

24

25

I  N  D  E  X

                                                    PAGE:

Argument by Mr. Ho                                    10
Argument by Mr. Kobach                                35
Argument by Mr. Cox                                  157
Argument by Mr. Ho                                   178
Argument by Mr. Kobach                               193


DEFENDANT KOBACH WITNESS:                           PAGE:

     Bryan Caskey
Examination by The Court                             123
Examination by Mr. Kobach                            130
Examination by Mr. Ho                                133
Examination by Mr. Kobach                            143
Examination by Mr. Cox                               148


DEFENDANT JORDAN WITNESS:                            PAGE:

     Tim Parks
Examination by Mr. Cox                               151
Examination by The Court                             156


EXHIBITS:                                         RECEIVED

Plaintiffs:
1                                                    179
2 through 7 (subject to redaction)                   179
8 through 18                                          179

Defendant Kobach:
1 through 10 (subject to redaction)                  180

Defendant Jordan:
1 and 2 (subject to redaction)                       181

```
 1                (9:10 a.m., proceedings commenced).

 2                THE COURT:  All right.  You can be seated.

 3   All right.  We are here in Fish versus-- Fish, et al.,

 4   versus Kobach, et al.  The case number is 16-2105.  Your

 5   appearances for the plaintiffs.

 6                MR. HO:  Good morning, Judge Robinson.  Dale

 7   Ho on behalf of the plaintiffs.

 8                MR. STEINER:  Good morning, Your Honor.

 9   Neil Steiner from Dechert on behalf of the plaintiffs.

10                MR. DANJUMA:  Good morning, Your Honor.

11   Orion Danjuma on behalf of the plaintiffs.

12                MR. BONNEY:  Good morning, Your Honor.

13   Steven Bonney on behalf of the plaintiffs.

14                MS. LAKIN:  Good morning, Your Honor.

15   Sophia Lakin on behalf of the plaintiffs.

16                THE COURT:  All right.  All right.  And for

17   the defendants.

18                MR. KOBACH:  Good morning, Your Honor.  Kris

19   Kobach on behalf of the Secretary of State defendants.

20                MR. ROE:  Garrett Roe on behalf of the

21   Secretary of State defendants.

22                MR. COX:  Good morning, Your Honor.  On

23   behalf of the defendant Secretary of Revenue Nick

24   Jordan, Brian Cox and M.J. Willoughby.

25                THE COURT:  All right.  Good morning
```

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

5

1    everyone.  All right.  This is set for a hearing on the

2    plaintiff's motion for preliminary injunction.  Several

3    matters I want to take up with you before we turn to

4    oral argument.

5           First, I have matters to take up with both

6    parties, all parties, about some of your filings.

7    Beginning with you, Secretary Kobach.  You filed a

8    motion for leave to file your responsive brief and

9    pleadings under seal.  You also filed a motion for leave

10   to file an excess number of pages.  I granted the motion

11   to file a-- a response that's longer than the page

12   limit.  I denied the motion for leave to file under

13   seal.

14          And I issued a memorandum, order, and

15   opinion on-- on these two motions, let's see, on

16   March 30th.  And I denied the motion to seal without

17   prejudice and suggested that the parties, all parties,

18   review the brief and exhibits and consider filing a

19   motion for leave to file redacted versions, with the

20   unredacted copies provided separately to the Court, kind

21   of an in camera procedure, so the clerk's office could

22   then file the unredacted copies as sealed attachments.

23   None of that has been done.

24          So procedurally, as we're here today, your

25   response is not filed.  And this is-- I mean, when

1    someone asks for leave to file something under seal or

2    leave to file excessive number of pages, whether the

3    relief is granted or denied, the actual pleading itself

4    is not filed.  I mean, the party is then required-- so

5    let's just say you hadn't asked to seal, you just asked

6    to file an excessive number of pages, and I granted

7    that, you'd still need to file that brief.  And that

8    hasn't been done.  And it hasn't been done in a redacted

9    fashion either.

10             Similarly, on plaintiffs' side, there was

11   a-- a motion to file excessive number of pages, which I

12   granted.  And you haven't filed your reply either.  So I

13   have your response, I have your reply.  But for the

14   record, you need to file your response, you need to file

15   your reply.  And I suggest you-- you file it in redacted

16   form because I'm not going to seal them.  There hasn't

17   been a good enough showing to seal.

18             I understand that there was a protective

19   order entered by Judge O'Hara that there's some

20   confidential information obviously in play.  But the way

21   that typically is handled is through redaction.  And

22   then if you need me to see an unredacted version, you

23   can-- you can give that to me in a chambers copy in

24   camera.  But we always strive-- and courts are

25   transparent.  The federal courts, you know, all of our

1    documents are available to the public.  And we strive to

2    continue that transparency, so we only seal for

3    compelling reasons.  Redaction usually can solve the

4    problem and-- and we don't have to seal complete

5    documents.

6              So that's where we're at.  I just want the

7    record to be clean.  This doesn't change anything.  I've

8    read your response and all its attachments, Secretary

9    Kobach and Secretary Jordan.  I've done the same with

10   the plaintiffs' reply.  But just for the record, all of

11   those things do need to be filed for the appellate court

12   record, as well as this court's record.

13             Okay.  So one other thing.  And plaintiffs,

14   you have filed some pleadings that don't redact

15   information that needs to be redacted pursuant to the

16   national policy.  And I know whoever is responsible for

17   your team in doing that has been in conversation with

18   the clerk's office.  I just want to reiterate to both--

19   all parties that it's not the Court's responsibility to

20   go through the pleadings and redact.

21             But just to remind you, and again, it's

22   because our pleadings are available to the world

23   electronically that we have this national policy that--

24   because identity theft, unfortunately, is rampant, that

25   we have this national policy that Social Security

1   numbers, EINs, financial account numbers are redactable.

2   And you can identify them by the last four digits of

3   those identifying numbers, but don't-- don't include in

4   your filings or even through witness testimony in open

5   court the entire numbers.  Similarly, home addresses and

6   names of minors are also subject to the redaction

7   policy.  So I just want to remind everybody about that.

8          Okay.  So my understanding is all parties

9   intend to proceed this morning with oral argument and no

10  presentation of evidence; is that correct?

11         MR. HO:  That's correct, Your Honor.

12         MR. COX:  Your Honor-- go ahead.

13         MR. KOBACH:  Your Honor, that's-- that's

14  correct.  We don't intend to bring any witnesses.  We--

15  we would ask that we could enter into evidence some

16  declarations so that the Court might formally take them.

17  And I think the plaintiffs may wish to do the same.

18         THE COURT:  All right.

19         MR. KOBACH:  Not actually any testimony

20  though.

21         THE COURT:  So the declarations, are those

22  the same as the-- that were the affidavits?

23         MR. KOBACH:  Yes, the same ones.  There's

24  one extra beyond the ones that are in your files

25  already.

1          THE COURT:  Okay.  And I-- I mean, I don't

2    have any problem with that procedure.  But I will tell

3    you that in going through the various affidavits, I

4    think there are some factual issues.  Maybe I won't

5    think that after I ask some questions, particularly

6    about the process that the state employs or questions

7    about the plaintiffs' situation.  But just in reading

8    through this, it seemed to me that there were some

9    factual issues.  And I wasn't clear on how I was going

10   to resolve those on the basis of competing declarations

11   without live testimony, but...

12          MR. KOBACH:  Your Honor, in case you did

13   want to have a witness testify, we have the Director of

14   Elections, Bryan Caskey, in the courtroom with us just

15   for that eventuality, if you wished to have a live

16   witness.

17          THE COURT:  All right.

18          MR. COX:  If it please.  Your Honor, I had

19   anticipated you were looking for Secretary Jordan's

20   argument about 11:50 this morning, and so we prepared

21   some declarations.  We do have two witnesses prepared to

22   testify, albeit in a somewhat limited fashion.  If we

23   reach the point where you would prefer to have

24   declarations, we have prepared those as well.  Those are

25   no part of anything that's been filed thus far in this

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

10

```
1   case.
2              THE COURT:  Okay.  All right.  And for
3   plaintiffs, what-- what do you anticipate?
4              MR. HO:  Your Honor, we don't anticipate
5   putting on any live testimony.  I will note that we
6   haven't seen the declarations that counsel-- or
7   Secretary Jordan has just indicated he'd like to put
8   into evidence.  And you know, I think we'd like an
9   opportunity to review those first to make sure that
10  we're not sandbagged here, Your Honor.
11             THE COURT:  All right.  So if you're going
12  to offer those, you need to provide a copy during the
13  hearing.  And then we'll revisit this issue at the end
14  of the hearing and decide if we need to keep the record
15  open or what we need to do.  Okay?
16             All right.  With that, Mr. Ho, are you going
17  to argue on behalf of the plaintiffs?
18             MR. HO:  Yes, Your Honor.
19             THE COURT:  All right.  All right.  Go
20  ahead.  I probably will have questions almost
21  immediately, but go ahead and get started.
22             MR. HO:  Okay.  Thank you, Your Honor.  Your
23  Honor, at least 16,000 Kansans, including our individual
24  clients, face the prospect of disenfranchisement in the
25  upcoming 2016 elections, absent a preliminary injunction
```

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

11

1    enjoining the documentary proof of citizenship law

2    that's being challenged here today.

3                This situation, Your Honor, is prohibited by

4    Section 5 of the National Voter Registration Act, which

5    provides that states may require only the minimum amount

6    of information necessary to enable state election

7    officials to assess the eligibility of applicants for

8    purposes of voting in federal elections.

9                Congress made clear, both in the text of the

10   statute and in the Conference Committee Report, that for

11   purposes of voting in federal elections that minimum is

12   a sworn attestation under penalty of perjury.  Such that

13   states are prohibited from imposing additional

14   documentation requirements on motor-voter registrants,

15   such as the requirement at issue today.

16                THE COURT:  What additional state

17   requirements wouldn't run afoul of the "no more than

18   minimum" requirement?

19                MR. HO:  States are free under the National

20   Voter Registration Act to ask for information that's not

21   expressly prohibited by the Act.  So, for instance, we

22   noted in our reply brief that eight states, for

23   instance, as part of their record-keeping matters,

24   request information about the racial background of

25   applicants for voter registration.

1        But with respect to establishing

2    citizenship, Congress spoke very clearly in the

3    conference report and, indeed, I think the Tenth

4    Circuit's decision in the *Kobach versus The EAC* decision

5    conclusively resolves this question.

6            In that case, as you know, the Tenth Circuit

7    ruled that the federal government may appropriately and

8    constitutionally, as an exercise of its powers under the

9    elections clause, require states to register people to

10   vote based solely on an attestation of United States

11   citizenship.  If that is true, and that's binding law in

12   this Circuit, then anything above that attestation must

13   exceed the minimum as prescribed in Section 5 of the--

14   the NVRA.

15           Now, defendants' position in this case is

16   that states have essentially unfettered discretion to

17   decide what's necessary to prove United States

18   citizenship for purposes of registering for federal

19   elections.  And that can't be correct for at least three

20   reasons.  First, as a textual matter, the defendants'

21   interpretation of the statute effectively reads the

22   phrase "only the minimum amount of information" out of

23   the statute.  And that violates basic principles of

24   statutory construction.

25           As a matter of precedent, it's foreclosed by

1    Tenth Circuit law.  And as a practical matter, it would

2    undermine the statute and render the motor-voter

3    registration process a patchwork of different laws

4    instead of a uniform national procedure, as was intended

5    by Congress.

6              The I think critical thing to look at here,

7    Your Honor, in attempting to discern congressional

8    intent beyond the plain language of Subsection

9    (c)(2)(C), which we would submit is clear on its face,

10   is the Conference Committee Report in which Congress

11   expressly rejected the Simpson amendment, which would

12   have provided the express authority for states to

13   require documentary evidence of citizenship which they

14   seek to do here.  Because it was, in Congress' words,

15   not necessary or consistent with the purposes of the Act

16   and would adversely affect registration.

17             Now, a basic principle of statutory

18   construction is when Congress rejects the very language

19   that would've achieved the result that the government

20   urges.  That weighs against the government's

21   interpretation of a statute.  That's the Supreme Court's

22   guidance in *Hamdan v. Rumsfeld*, which we cite in both

23   our opening brief and in our reply.  And the Tenth

24   Circuit in the *Kobach versus The EAC* case credited that

25   point.  It noted in Footnote 7 of the decision that both

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

14

1    houses of Congress debated, voted, and ultimately

2    rejected a proposal to permit states to improve-- to

3    impose documentary proof of citizenship requirements.

4            So this isn't a case where, as Secretary

5    Kobach has argued, that where Congress was silent about

6    a particular issue.  We would agree that if the statute

7    is silent with respect to certain kinds of questions,

8    for instance the race information question that I

9    mentioned earlier, then states are free to request that

10   kind of information.  But, in fact, here, Congress spoke

11   very clearly that documentation requirements are not

12   permissible under the statute.  Now--

13           THE COURT:  The Tenth Circuit's decision in

14   the *Kobach* case before the Tenth Circuit was in the

15   context of the states-- whether the state-- states, it

16   was both states, Arizona and Kansas, met their

17   evidentiary burden of proving that they cannot enforce

18   their voter qualifications because a substantial number

19   of non-citizens have successfully registered using the

20   federal form.  But that was a burden that was applied

21   under the Administrative Procedures Act.

22           So how does that holding translate to this

23   case, to this challenge to the motor-voter provision,

24   which is a different provision under the-- under the

25   NVRA?

1          MR. HO:  I would absolutely agree, Your

2    Honor, that the context of the *Kobach versus EAC*

3    decision is different.  The court was adjudicating a

4    case under the Administrative Procedures Act, and it

5    dealt with a different provision of the NVRA.  But the

6    logic of the case supports the interpretation of the

7    statute that we have put forward.

8          THE COURT:  Such as that the elections

9    clause trumps the qualifications clause, and that

10   preemption applies with respect to the elections clause.

11         MR. HO:  I would agree with that entirely,

12   Your Honor.  But I'd go even a step further.  In the

13   *Kobach versus the EAC* case, Secretary Kobach and also

14   the Secretary of State of Arizona sued the Election

15   Assistance Commission to demand that the Commission

16   change a federal form to include a documentary proof of

17   citizenship requirement.

18         When the Tenth Circuit said that the EAC had

19   no obligation to do that, the Tenth Circuit-- the effect

20   of the Tenth Circuit's decision was, in essence, that

21   states are required under Section 6 of the statute-- I'm

22   sorry, Section 6 of the Act, it's actually codified at

23   Subsection 20505 of the statute, that states are

24   obligated under that provision to register people to

25   vote based on the federal form, which did not have a

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

16

1  documentary proof of citizenship requirement.

2          If states can be required to do that and the

3  federal government has constitutional authority to do

4  that, and it's consistent with the NVRA to do that, then

5  it doesn't make any sense to say that, under Section 5

6  of the Act, states can do more than that.  If an

7  attestation of citizenship is adequate to verify

8  someone's citizenship status for purposes of Section 6

9  of the statute, then it follows logically that anything

10  beyond that is going to exceed the minimum amount of

11  information that states can impose under Section 5 of

12  the statute.  And-- I'm sorry.

13          THE COURT:  Well, so your argument is in

14  terms of the states-- and the Tenth Circuit was clear

15  that the states have a legitimate interest in ensuring

16  that eligible citizens are registered.  There are many

17  eligibility requirements, but obviously citizenship

18  being one of them.  I hear your argument being that the

19  state can effectively enforce the citizenship

20  qualification in the motor-voter context simply through

21  an attestation, as it does-- as the federal government

22  does through other forms of voter registration?

23          MR. HO:  That's right, Your Honor.  And--

24  and, in fact, that's how Kansas did it from 1995, the

25  inception of the National Voter Registration Act, all

1    the way up until January 1st of 2013.  It's how 48

2    states and the District of Columbia currently do it.

3    And there's absolutely been no showing that that has

4    somehow been inadequate to ensure the integrity of the

5    election system.

6             If anything, preventing 16,000 Kansans who

7    have completed the motor-voter registration process in

8    every way as prescribed by the statute, which means that

9    they've sworn under oath that they're, in fact, United

10   States citizens.  And there's no allegation or assertion

11   from the defendants that any of these 16,000 people

12   currently on the suspended list or whose registrations

13   have been cancelled is a non-citizen.  That preventing

14   these people from voting in the upcoming elections, that

15   is the threat to election integrity that we would submit

16   the Court needs to be concerned about today.

17             THE COURT:  Well, and it's one of the stated

18   purposes of the NVRA is to ensure the integrity of the

19   process.

20             MR. HO:  Well, we would agree with that

21   entirely.  And our position, Your Honor, is that the

22   integrity of the process is threatened when 16,000

23   eligible citizens are prevented from voting.  And the

24   Tenth Circuit I think noted in the *Kobach* case that--

25   looking at a record that's substantially and materially

1   identical with respect to non-citizen registration

2   that's before this Court, that that is insufficient to

3   establish that there's a substantial problem of

4   non-citizen voting.

5           The record that they've submitted includes--

6           THE COURT:  It was the same-- at least with

7   respect to Kansas, it would've been the same record,

8   just a different snapshot in time.  Correct?

9           MR. HO:  Well, I think-- and I would

10  hesitate to put words into Secretary Kobach's mouth.

11  But I think what the state is arguing here is that since

12  the time of that decision, they've looked-- they've

13  scoured the state and they've found a handful of

14  additional instances of non-citizens becoming registered

15  to vote.

16          We would submit that, you know, that is--

17  makes no material difference in light of the Tenth

18  Circuit's decision.  It's not like the Tenth Circuit's

19  decision would've gone the other way because in the last

20  two years Mr. Kobach has found five or six or seven

21  additional non-citizens who have registered to vote.

22  The record here is really, if not absolutely identical,

23  it's materially the same as what was before the Court in

24  the previous case.

25          We're talking about a-- a really small

1   handful of non-citizens who have ever registered to vote

2   in the state who have been identified by the defendants.

3   The defendants really, you know, I think at this point

4   are resorting to doing things like trotting out this

5   instance from Seward County in 1997, almost 20 years

6   ago, and which there was absolutely no evidence that

7   actually any non-citizens were voting in that particular

8   instance.  And our expert's report, Doctor Lorraine

9   Minnite from Rutgers, I think addresses this.

10          THE COURT:  That's the instance of-- that

11  there were a number of farm laborers on a hog farm in

12  Oklahoma.  And the state of Kansas took the position

13  they were Oklahoma residents and that someone

14  transported them to Kansas to vote.  But your position

15  is they were actually Kansas residents who were

16  transported to work in Oklahoma.

17          MR. HO:  Well, our position is there's no

18  evidence that-- there's no conclusive evidence that any

19  of these people were, in fact, non-citizens.  When you

20  look at what was in the record about the-- or not even

21  in the record, because all-- all that's in the record is

22  one sentence about this from one of the defendants'

23  affiants.  The whole notion that this was some sort of

24  massive conspiracy of non-citizen voting is based really

25  just on innuendo, an anonymous phone call to the Seward

16-2105-JAR   Fish, et al., v. Kobach, et al.   04.14.16

20

1   County clerk, some bad addresses on some voter

2   registration forms, and the fact that some of the voters

3   couldn't read English well enough to understand a ballot

4   question.

5         But, of course, you know, English

6   assistance-- you know, not every-- it goes without

7   saying I think that every-- not every United States

8   citizen commands English well enough to read the

9   detailed language of a ballot initiative.  And, in fact,

10   the Voting Rights Act protects the right of people with

11   limited English proficiency to vote.

12         So there's really no evidence that this

13   incident that occurred 20 years ago actually amounted to

14   a non-citizen registration and-- or any evidence that

15   any of these people registered to vote at a DMV, which

16   is really what's at issue in this case.  If we're

17   debating about something that happened almost two

18   decades ago, I think that speaks to the paucity of

19   evidence in the record about this being a substantial

20   problem that would merit the disenfranchisement of

21   thousands of Kansans.

22         THE COURT:  All right.  Is it your position

23   that the SAFE Act is a time, place, and manner

24   restriction that falls under the election clause?

25         MR. HO:  With respect to voting in federal

1  elections, Your Honor, yes.  And I think-- I think the

2  Supreme Court in the *Inter-Tribal* case spoke very

3  clearly to this point.  Citizenship is a qualification.

4  And obviously that's something within the state's

5  control.  But the quantum of evidence that a person must

6  put forth in order to establish a qualification, well,

7  the *Inter-Tribal* case, Justice Scalia's opinion in that

8  decision makes very clear that that is something that

9  the federal government has plenary authority over and

10  may preempt state law.

11         THE COURT:  All right.  Other than the

12  attestation requirement that the federal government

13  obviously blesses, are there any other measures that a

14  state could take to ensure that someone has citizenship

15  that would not run afoul of the Supreme Court's juris

16  prudence?

17         MR. HO:  Yes, Your Honor.  Both the

18  *Inter-Tribal* decision by the Supreme Court and the Tenth

19  Circuit's decision in the EAC litigation indicated that

20  there are other ways that states may go about ensuring

21  the integrity and accuracy of the voting rolls.

22         What the NVRA prohibits are front-end

23  requirements that prevent people from submitting

24  registration forms and getting registered at the DMV for

25  purposes of voting for federal elections based on

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

1    anything above an attestation.  But there are other

2    things that states can do, and the *EAC* decision and the

3    Tenth Circuit identified five different methods that

4    states can use to try to prevent non-citizens from

5    voting.

6              The first form that the-- of doing so that

7    was identified by the Tenth Circuit was the threat of

8    criminal prosecution, which, of course, Secretary

9    Kobach's office has the authority to do.  And I would

10   note that since that authority has been granted, not a

11   single prosecution has been brought for non-citizen

12   registration, attempted registration, or voting in the

13   state of Kansas, which I think really gives light of the

14   notion that there is some sort of pervasive problem in

15   the state.

16             THE COURT:  All right.  But in terms--

17   you're talking about the back-end measures that the

18   state can do to-- to enforce the citizenship

19   qualification.  But in terms of the front end, your

20   argument is that the NVRA by virtue of the language that

21   says that, you know, "no more than the minimum," was

22   intended to not require any more than the attestation

23   requirements that already existed?

24             MR. HO:  I-- I think that's right, Your

25   Honor.  I guess if I may qualify that a little bit.

1    What I would say is that of the methods that were

2    identified by the Tenth Circuit for preventing

3    non-citizen registration, the threat of criminal

4    prosecution, for instance, is a deterrent.  That even

5    though it's not a restriction on the front end of the

6    registration process, it's something that is designed to

7    prevent non-citizens from registering to vote.

8              So I guess what I would say-- what I would

9    say is I wouldn't want our position to be interpreted as

10   saying that the state has no recourse; they have to let

11   non-citizens gets on the rolls and then have to try to

12   scour the rolls to find non-citizens and-- and pull them

13   out.

14             There are ways, I think, that have been

15   identified by courts to prevent non-citizens from

16   getting on the rolls in the first place.  But what is

17   not permitted is to impose additional documentation

18   requirements of citizenship on applicants at the

19   motor-voter process.

20             THE COURT:  We're here, of course, on your

21   motion for preliminary injunction.  And one of the

22   issues is the standard that I am to apply.  There's a

23   heightened standard if it's a mandatory injunction or a

24   disfavored type of injunction.  There's the regular

25   standard if it's not.  I'd like to hear your views on

1   whether this is maintaining the status quo or changing

2   the status quo.  You and the defendants obviously look

3   at this very differently.

4           MR. HO:  Our view, Your Honor, would be that

5   this is not a mandatory injunction that would be subject

6   to a heightened standard for preliminary relief.  We

7   don't seek to affirmatively require the defendants to do

8   something.  We're asking them to stop doing something,

9   to cease enforcement of the documentary proof of

10  citizenship law with respect to motor-voter applicants.

11          And as to the question of whether or not

12  that's a change in the status quo, I think courts have

13  looked to-- in defining the status quo, what's the last

14  peaceable status quo between the parties?  And we would

15  submit that would be the 18 years between 1995, when the

16  NVRA went into effect, and 2013, when the state

17  registered people to vote at the DMV based on an

18  attestation of citizenship.  That, in our view, is the

19  last peaceable status quo that we would seek to

20  preserve.  And it worked fine for 18 years, and there's

21  no reason why the state can't return to that for the

22  upcoming election.

23          THE COURT:  There's not a timing issue here

24  because this case was brought after the law became

25  effective?  As opposed to I think the Keener case that

16-2105-JAR   Fish, et al., v. Kobach, et al.   04.14.16

25

1    was brought before the law became effective.

2              MR. HO:  The law was passed in 2011.  The

3    purge regulation went into effect in late 2015.  And the

4    defendants' position has been that we should've brought

5    this case in 2011.  And if I may, Your Honor, a few

6    points in response to that.

7              THE COURT:  Well, I'd like to address that,

8    because I'd like to address the whole notice question;

9    how people get notice, whether there's consistent

10   notice.  I have a lot of questions of Secretary Kobach

11   and Secretary Jordan along those lines, but I think this

12   goes to that issue as well.

13             MR. HO:  I agree.

14             THE COURT:  There's this argument, you know,

15   that plaintiffs delayed four-and-a-half years.  But at

16   the same time, they didn't-- from what these affidavits

17   say, some of them didn't have notice until fairly

18   recently.

19             MR. HO:  That's-- that's absolutely correct,

20   Your Honor.  One of our plaintiffs, Mr. Ortiz, his

21   affidavit-- his declaration is Exhibit 3.  And another

22   one of our plaintiffs, Mr. Hutchinson, his declaration

23   is at Exhibit 7.  Mr. Boynton, his declaration is

24   Exhibit 6.  Those three didn't learn about their

25   suspense status until 2015.  In Mr. Ortiz' case, it was

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

26

1    in September of-- it was in September of 2015.

2            Now, we sent our notice letter to the state

3    indicating that we intended to sue over this if they did

4    not cure these violations in November.  So I don't think

5    there's an argument that we sat on our rights here.  We

6    waited the requisite 90 days.  And on the first day that

7    we could sue, we did.  In February.

8            The notion that we could've filed suit back

9    in 2011 I think is really belied by that record.  Two of

10   our plaintiffs didn't even live here in 2011.  And the

11   purge regulation, as I noted earlier, Your Honor, didn't

12   go into effect until October of 2015.  So I think it's

13   fair to say that we moved with reasonable speed here.

14   And that the amount of time that it has taken for us to

15   file this case shouldn't weigh against us.

16           THE COURT:  Are there some voters that did

17   not have notice that they were placed on the incomplete

18   list and didn't-- weren't aware until they got notice

19   from the state that they were on the cancellation list--

20   or that they had been cancelled rather?

21           MR. HO:  Mr. Hutchinson's declaration, which

22   is Exhibit 7, indicates that he never received any

23   notice from the state that he was on the suspense list.

24   It was only when one of our other clients, our

25   organizational client, the Kansas League of Women

16-2105-JAR   Fish, et al., v. Kobach, et al.   04.14.16

27

1  Voters, obtained a suspense list, found his name and

2  contacted him to let him know, hey, you're on the

3  suspense list, you may not be able to register to vote

4  unless something happens here.

5            THE COURT:  So they were able to find him,

6  but the state apparently hadn't been able or hadn't

7  tried to find him.

8            MR. HO:  According to Mr. Hutchinson's

9  testimony.  And that's at Paragraph 12 of his

10  declaration, which is Exhibit 7.

11            THE COURT:  All right.  Go back to your

12  argument.  I'll have more questions.

13            MR. HO:  Well, if I could stay on the

14  injunction factors for just a moment, Your Honor.

15  Obviously one of the things that the Court has to weigh

16  is the balance of the equities here.  And we think that

17  this is not a close case when you look at the equities.

18  We're talking about 16,000 eligible Kansans who are

19  blocked from voting.  There-- the defendants have said

20  that their injuries are self-inflicted and, therefore,

21  that they are not entitled to any relief.  Well, we

22  would dispute that for several reasons, not the least of

23  which is that two of our clients don't have citizenship

24  documents and can't obtain it-- obtain them without a

25  substantial burden.  Mr. Fish--

1              THE COURT:  I'm particularly interested by

2      the one plaintiff that was born on a military

3      installation that no longer exists.

4              MR. HO:  Yes.

5              THE COURT:  That resonates with me, having

6      been an Army brat.  And I can guarantee you I can't

7      prove that I was at certain places at certain times in

8      my life because the United States no longer owns the

9      ground on which I lived in Germany and, you know, Panama

10     Canal Zone, et cetera.  So that's one of your-- that's

11     Mr.-- is that Mr. Boynton?

12             MR. HO:  That's Mr. Fish.

13             THE COURT:  Mr. Fish.  All right.  And he

14     can't-- he's tried, and he can't obtain documents?

15             MR. HO:  He's looked around and he doesn't

16     even know how he could try to find his birth

17     certificate.  He tried to look about how-- he tried to

18     look for how he could find a citizenship-- or a birth

19     certificate document from the Air Force and from

20     Illinois, and he-- he couldn't find it.  And then his--

21     his efforts are set forth in his declaration.

22             THE COURT:  Well, the state of Kansas has

23     these 13 different documents that they say suffice.  And

24     so some of them go to I think American citizens that are

25     born overseas, like John McCain was born in the Panama

 1    Canal Zone while his father was stationed there.  But

 2    Mr. Fish was born in the United States, on a military

 3    installation in the United States.  He can't find his

 4    birth certificate.  He can't get-- was he born in a

 5    military hospital?

 6              MR. HO:  He was born on the base is my

 7    understanding, Your Honor.  So I-- I would assume that

 8    that is the case.  I'd probably have to look at his

 9    declaration again to see if there's sufficient details

10    to determine whether or not it was the military hospital

11    itself.

12              But he's seen the list of citizenship

13    documents that are acceptable in this state, and he

14    doesn't possess a single one of them.  The most common--

15    we-- we talked about the birth certificate because

16    that's the most common way that people I think who are

17    United States citizens try to establish citizenship, but

18    that he doesn't have.

19              Ms. Bucci, one of our other clients, doesn't

20    have a birth certificate either.  And her home state,

21    Maryland, charges $20 for birth certificates.  And

22    that's a significant financial hardship for her.  That

23    may not sound like a lot of money to a lot of people,

24    but the Supreme Court has ruled that a poll tax of $1.50

25    is unconstitutional.

1          These are not minor barriers for our

2    clients, they are significant problems.  They're also

3    significant problems for several of our clients who

4    tried to comply with the law.  They went to the DMV,

5    they thought that they were registered to vote.  But Mr.

6    Boynton and Mr. Stricker showed up at the polls in the

7    2014 midterm elections only to be told, "You're not on

8    the rolls."

9          We even have two clients who gave

10   citizenship documents to the DMV.  Mr. Boynton did and

11   Mr. Hutchinson.  And yet, they still are on the suspense

12   list.  Now, the defendants say that Mr. Boynton declined

13   to register to vote.  That's not what Mr. Boynton says

14   in his declaration, and maybe this is one of those

15   factual questions that Your Honor alluded to earlier,

16   but--

17          THE COURT:  And this has to do with when you

18   go to register to vote, whether you check the box yes or

19   no that you want to vote and whether the clerk-- whether

20   there's perhaps a-- a failure of communication between

21   the clerk that takes the paperwork or not.  Correct?

22          MR. HO:  It's possible.  My understanding of

23   the DMV process, and perhaps Mr. Cox can clarify this,

24   is that the DMV worker is looking at a screen which

25   prompts the DMV worker to ask questions, including the

1    voter registration question, and then inputs the answer

2    into the screen when someone responds.

3              What's interesting about Mr. Boynton's

4    situation is that the DMV records indicate apparently,

5    according to what's been produced to us by the

6    defendants, that he declined to register to vote.  And

7    yet, Mr. Boynton has ended up on the suspense list.  And

8    the defendants' own statements in this case indicate

9    that you can't end up as a voter registration applicant

10   on the suspense list--

11             THE COURT:  Is that the--

12             MR. HO:  -- unless you want to register to

13   vote.  And he received a notice from the state that his

14   registration was suspended.

15             THE COURT:  Yeah, in the record there's a

16   screenshot.  Is that-- is that Mr. Boynton?  There's a

17   screenshot of the-- what the clerk took in-- took down

18   or what the screen showed that says no.  But is that--

19   is that Mr. Boynton's?

20             MR. HO:  I believe that Mr. Cox can probably

21   clarify this.

22             THE COURT:  Okay.

23             MR. HO:  But I believe that is a screenshot

24   of Mr. Boynton's record.  But what we also have and have

25   produced to the defendants - we haven't put this in the

1   record, but we can.  Mr. Cox actually indicated that he

2   may put it in the record himself today - is a letter

3   that Mr. Boynton received indicating that his

4   registration was in suspense.  Well, he can't have had a

5   registration application if he hadn't asked to register

6   to vote in the first instance.

7            THE COURT:  All right.

8            MR. HO:  So when we look at the-- the

9   burdens to our clients and the injury to their right to

10  vote, we have to weigh that against obviously the

11  administrative burden to the state and look at what's in

12  the public interest.

13           We would submit, Your Honor, that the

14  administrative burdens that the state is facing here are

15  insufficient to form a basis for denying preliminary

16  relief.  The Sixth Circuit in one case that the parties

17  have discussed in their briefs, the *Obama For America*

18  case from 2012, has held that administrative burdens

19  can't justify disenfranchising voters unless the state

20  is, quote, "unable to cope with those burdens."

21           And here, we know that it's relatively

22  simple.  The state simply has to stop enforcing its

23  documentary proof of citizenship law with respect to

24  motor-voter applicants, the same way that they did for

25  18 years up until December 31st, 2012.  Identifying the

1    voters who are suspended or cancelled will take,

2    according to Mr. Caskey in his 30(b)(6) deposition, will

3    take approximately one hour.  This is not a significant

4    problem.

5         Now, Mr. Kobach has raised a few issues

6    which, if I may, I'd like to address.  He said that if

7    we obtained relief, that the state would be forced to

8    adopt a dual two-tiered registration system in which

9    case-- under which some people could only vote for state

10   elections and other people could-- I'm sorry.  Some

11   people could only vote for federal offices, whereas

12   other people could vote for both state and federal.

13        And I guess the two things I would say to

14   that, Your Honor, is that, first, Kansas is already

15   doing that.  There's already a list of voters who are

16   federal-only voters and they administered elections on

17   that basis in 2014.

18        And second, I would say that this is really

19   a problem of the state's own making.  There is a

20   declaratory judgment from a state judge, Franklin Theis

21   in Topeka, who has ruled that a two-tiered voter

22   registration system in which some people are only

23   permitted to vote for federal offices violates state

24   law.

25        Now, I understand there's a motion for

1    reconsideration in that case that Mr. Kobach has filed.

2    But as things stand right now, there's a declaratory

3    judgment saying:  Don't operate your voter registration

4    system this way.  If it's, in fact, a burden for the

5    state to do this, all you have to do is comply with

6    Judge Theis' order.

7              So when we look at the burdens to the state

8    and the burdens to our client, we think that the

9    equities tilt pretty decisively in our favor.  And the

10   public interest we would submit, Your Honor, favors

11   permitting as many eligible voters to participate as

12   possible.

13             If Your Honor has no further questions-- I'm

14   happy to answer any other questions that Your Honor

15   might have.  If not, I-- I can yield my-- the podium to

16   our adversaries.  I would just request having an

17   opportunity to respond to some of their arguments

18   afterwards.

19             THE COURT:  Certainly.  You'll get the final

20   word.  We'll hear from the defendants now.  Mr. Kobach,

21   do you want to go first?

22             MR. HO:  Thank you, Your Honor.

23             THE COURT:  Thank you, Mr. Ho.

24             MR. KOBACH:  May it please the Court.

25             THE COURT:  Yes.

1           MR. KOBACH:  Thank you, Your Honor.  What

2    I'd like to do, and I understand you may interrupt with

3    questions along the way, is I'd like to address five

4    dispositive arguments, three of which don't even go to

5    the merits, which I think would allow the Court to

6    dispose of this preliminary injunction motion

7    independently, any one of them.  And then I'd like to

8    address some of the claims made by the plaintiffs.

9           The first dispositive motion is one you've

10   already talked about.  A preliminary injunction that

11   alters the status quo is heavily disfavored.  And as you

12   know, the Tenth Circuit has three categories of heavily

13   disfavored preliminary injunctions.  One that alters the

14   status quo, one that is mandatory, and one that affords

15   the movant all the relief that he would get at the end

16   of a full trial on the merits.

17           Now, this-- this requested preliminary

18   injunction falls into all three categories.  The proof

19   of citizenship law took effect on January 1st of 2013.

20   It was--

21           THE COURT:  But some of it didn't take

22   effect on January 1st, 2013.  The purging component of

23   it didn't take effect until late 2015.  So it's a much

24   harder thing to I guess determine what the parameters of

25   the status quo were at the time that this case was

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

36

1    filed.  Would you agree?

2              MR. KOBACH:  If I may, Your Honor, they--

3    their use of the term purging and their description of

4    the regulation completely mischaracterizes it.

5              THE COURT:  All right.  Let's not say

6    purging, let's say cancellation.

7              MR. KOBACH:  Okay.  The cancellation.  It

8    doesn't actually remove anyone from any voter roll.  All

9    it does is it-- the record in the Election Voter

10   Information System, ELVIS, is simply changed from

11   suspense to cancelled.  But the record is still there,

12   it can be changed back, from cancelled back to suspense.

13   Now, we're--

14             THE COURT:  But we're not talking about the

15   record.  We're talking about them going to the polls and

16   not being able to vote.

17             MR. KOBACH:  They couldn't vote prior to

18   that either.  None of these individuals' ability to vote

19   was changed by the regulation of September, 2015.  Not a

20   single-- it didn't change their voting whatsoever.  All

21   it was was-- the database was there.  And what it

22   changed was whether the county was going to continue to

23   send notice after notice after notice.  In most cases,

24   they received four notices in that three-month period.

25             THE COURT:  So if they went to the polls and

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

37

```
 1    they were in suspense status, they couldn't even lodge a

 2    provisional ballot?

 3             MR. KOBACH:  You can go to vote in any

 4    status, even if you've never even been to Kansas before,

 5    and-- and vote a provisional ballot.  Kansas law allows

 6    you to--

 7             THE COURT:  All right.  So if you vote with

 8    a provisional ballot and you're on the suspense status,

 9    you have the hope and prayer that your provisional

10    ballot will be-- will ultimately be counted.  But if

11    you're in cancelled status and you have lodged a

12    provisional ballot, you might as well throw it in the

13    trash?

14             MR. KOBACH:  That's incorrect, Your Honor.

15    And we could have Bryan Caskey, the elections director,

16    talk with us if you wish.  But no, you're in the same

17    state.  In neither case have you completed your

18    registration.  It's just-- cancelled simply means that

19    you've gone past the 90 days, but it doesn't change your

20    ability to vote.  Under no circumstances if you haven't

21    provided proof of citizenship is your vote going to be

22    counted.  The elections standards of the state and the

23    election law of the state at 25-2309 prohibit the

24    counting of that ballot until you have provided proof of

25    citizenship.
```

1          THE COURT:  But I thought there was a

2     distinction.  I thought when you're in the cancellation

3     status, you have to start all over again.  Whereas if

4     you're in the suspense status, you have to complete your

5     registration with whatever is missing.

6          MR. KOBACH:  There-- there is that minor

7     distinction, so you-- right.  Once you're cancelled, you

8     have to fill out the five-line voter registration card

9     all over again to be moved to an actively registered

10    voter.  But if you are in suspense, you-- you don't have

11    to write the five lines all over again.  But in both

12    cases, you have to provide proof of citizenship.

13          And one other thing to note.  In both cases

14    when the voter shows up at the polls, whether he's in

15    suspense or cancelled, he is not on the voter rolls.  So

16    to the poll worker, it looks the same.  You're not on

17    the voter rolls.  And in Kansas law, when you fill out

18    a-- under any circumstances, you can go ahead and fill

19    out a provisional ballot, but then you are also asked to

20    fill out a registration card.

21          And that's what happened to the one

22    individual they allege-- they said how did he end up--

23    how did he end up on the suspense list when they-- when

24    Kansas says that he declined to register three times at

25    the DMV?  It's because he declined to register three

1    times, according to the DMV records.  Then he showed up

2    on election day.  The poll worker said:  You're not on

3    the list of registered voters, but here you go, here's

4    your voter registration application.  And according to

5    the Kansas records, he applied to register on that day.

6    So that's why he subsequently showed up on the suspense

7    list.

8            THE COURT:  And did that poll worker tell

9    him all of the eligibility requirements, that he needed

10   to have a birth certificate with him that day?

11           MR. KOBACH:  The application--

12           THE COURT:  Not that he-- it wouldn't have

13   mattered.  I mean, if he had showed up and they said:

14   You're not on the-- you're not on the roll, here's

15   some-- here's the registration card.  Let's just say he

16   had a birth certificate with him, he would not have been

17   able to-- to vote that day.

18           MR. KOBACH:  Correct.

19           THE COURT:  Or if he did, I mean, it-- it

20   still wouldn't have been counted.

21           MR. KOBACH:  Still would've been too late.

22           THE COURT:  Right.  Okay.

23           MR. KOBACH:  Correct.  The registration card

24   itself notifies the applicant that your-- your

25   registration will not be completed until you've provided

1   proof of citizenship, and here are the 12 forms of

2   providing proof of citizenship.  So the application card

3   itself was the day he got notice that he had a further

4   requirement to satisfy.

5        THE COURT:  Now, which-- which plaintiff is

6   that?  Remind me.

7        MR. KOBACH:  That's Boynton.

8        THE COURT:  Okay.

9        MR. KOBACH:  So going back to these three--

10  these three categories.  Now, the law has been

11  implemented for three years and three months and they

12  are-- if they wanted to preserve the status quo, they

13  should've brought this case prior to the law being

14  implemented.

15       THE COURT:  But how would they even have

16  standing if they didn't-- if they hadn't even tried to

17  register to vote at that point?

18       MR. KOBACH:  At that point, they could argue

19  that they are-- they could go ahead and register the day

20  they want to bring the lawsuit and say:  Here I am, I've

21  registered without providing my proof of citizenship,

22  which is exactly where they are right now.

23       THE COURT:  Well, what if they had

24  registered or thought they had registered, but it turns

25  out later they hadn't?  In other words, how-- how would

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

41

1    somebody know they had standing when this law was passed

2    without going through the process of registration?

3          MR. KOBACH:  Assuming that their allegations

4    are correct and assuming that all of these plaintiffs

5    are in the situation they claim, the moment that they

6    request-- they fill out an application card and they are

7    notified at that point that they still have to provide

8    proof of citizenship, and then also they get a

9    subsequent notice within a few weeks from the county

10   saying - a letter to them - you have to provide proof of

11   citizenship.  At that point they have standing.

12          As soon as you register, you have been given

13   notice of this additional requirement and you have--

14   then within a few weeks, you get the subsequent

15   registration.

16          THE COURT:  But some of them-- some of them

17   said they didn't get notice.

18          MR. KOBACH:  Well, we would like to

19   introduce into evidence-- the one who claims he didn't,

20   which I guess is Boynton, he got a notice on

21   December 5th from the county, according to the election

22   voter information records.  So when the county sends out

23   a-- a subsequent letter saying:  You have-- you haven't

24   yet provided proof of citizenship, you're on the

25   suspense list, that, according to our records, was sent

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

42

1    out on December 5th of 2014.

2              THE COURT:  You can't say that he received

3    it, you just know you mailed it to that address.

4              MR. KOBACH:  You-- you know you mailed it.

5    But we can also say this, he filled out his-- his

6    registration card on election day, and that card gave

7    him notice.  So assuming he read what he was filling

8    out, he got notice right there when he filled out the

9    registration.  So he got two notices.

10             THE COURT:  But he couldn't vote.  I mean,

11   he couldn't-- his vote didn't count.  So that's-- it's

12   too late to do anything at that point.

13             MR. KOBACH:  Correct.  But he received-- the

14   question is, did he receive notice?  And the answer is

15   yes.  He received notice that he would not be registered

16   until he provided proof of citizenship.

17             THE COURT:  As I indicated with Mr. Ho, I

18   want to ask you more about just the mechanics of how

19   this works because there's allegations on the

20   plaintiffs' side that they didn't get notice.  There--

21   in reading through the record, I'm confused about how

22   this ELVIS system works and whether it's really

23   reliable.  Because it seems like there was a-- a

24   declaration, maybe it was from Mr. Caskey, about ELVIS

25   sending out a notice.  But then somewhere else in the

1    record, I thought I read something about three notices.

2               I'm not clear that it works the same

3    everywhere.  There's the declaration-- or the affidavit

4    rather, from the person in Sedgwick County.  And it

5    sounds like to me like Sedgwick County is perhaps doing

6    more to give notice.  I'm not clear if that's consistent

7    across the counties or not.  I mean, is every county

8    doing robo-calling and-- and e-mailing?  And so educate

9    me, if you will, on that.

10              MR. KOBACH:  Yes.  And if you have any

11   questions, I'd be happy to bring Mr. Caskey and put him

12   on the stand and answer your questions.

13              So immediately upon registering, if the

14   person hasn't yet provided proof of citizenship, the

15   county is supposed to send out a notice at that time.

16   So as soon as they process the registration card, they

17   send a letter to the person saying:  Hey, you haven't

18   provided your proof of citizenship.  Here are the

19   documents that do.  And if you don't have a document -

20   and this is something plaintiffs keep omitting -

21   Subsection (m) of the law allows you to simply present

22   any evidence you want to the State Election Board.  This

23   has happened three times since the law has been in

24   effect.

25              It can be an affidavit from your sister,

1    your older sister saying you were born on such and such

2    a date and was born in the United States.  It could be

3    some school records or something like that.  And then--

4    and in every case, the State Election Board has said,

5    okay, that's sufficient proof of citizenship.

6            THE COURT:  How often has that-- I mean, I

7    saw that there was this provision for a hearing.  Is

8    that what you're talking about?

9            MR. KOBACH:  Yeah.  It's telephonic.  The

10   person doesn't even have to leave their home.  They

11   simply provide whatever evidence they wish.  And in

12   every case so far, the State Election Board has said,

13   yeah, that's fine, we-- we acknowledge that you're a

14   U.S. citizen.  There's been three cases so far.  And the

15   plaintiffs--

16           THE COURT:  Only three?

17           MR. KOBACH:  Only three.  And that I think

18   speaks to the fact that proof of citizenship is pretty

19   easy to come by.  Most people do keep their birth

20   certificate, which is the most common form of proof of

21   citizenship.

22           THE COURT:  I don't know about that, Mr.

23   Kobach.  I really don't know about that.  I think it's

24   easy to think about those things in-- in-- when you're

25   looking through the lens of someone who's educated, who

1   grew up in a family that keeps documents, who is over

2   the age of 21, who, you know, maybe was born in this

3   country and is not a naturalized citizen.  I mean,

4   there's-- there's a lot of reasons why people don't have

5   these documents.

6           MR. KOBACH:  And that's why--

7           THE COURT:  And there are a lot of people I

8   think that don't have these documents.

9           MR. KOBACH:  And that's why we-- precisely

10  for that reason, that's why we included Subsection (m)

11  in the law.  If you don't have one of the 12 documents,

12  you can provide whatever evidence you want.  And that

13  evidence will be evaluated by the board.  And by the

14  way--

15          THE COURT:  So the same people that don't

16  have a birth certificate and maybe their parents don't

17  have it or their parents aren't alive and who don't have

18  any of these other types of documents, they're simply

19  going to be able to figure out that they get an

20  affidavit from their sister and they mail it to the

21  Secretary of State's Office, and then they call the

22  Secretary of State's Office?  Again, you're suggesting a

23  level of sophistication that a lot of people just don't

24  have.

25          MR. KOBACH:  Well, the-- the Subsection (m)

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

46

1    just says you can contact the Secretary of State's

2    Office and arrange to have a hearing.  We explain it all

3    to them.

4            To give you an example of someone who

5    actually used this successfully, it was a lady who was a

6    foster child.  She was born in the Chicago area.  She

7    subsequently, I believe, had a fire or something.  There

8    was some reason why the birth-- her birth certificate

9    was lost.  And so she didn't have anything left.  And in

10   her own childhood, she had been passed through several

11   custodial adults, so it wasn't as if her parents kept

12   her birth certificate.

13           But she was able to provide plenty of

14   information documenting that she was a child in school

15   in Chicago that substantiated her claim.  She was able

16   to submit her own affidavit saying these are my

17   circumstances, here's why.  She was able to document

18   that she was in foster care at that time.  And the State

19   Election Board said:  That's good enough.  We-- we

20   believe you were a child in Chicago and this is

21   sufficient to prove your citizenship for the purposes of

22   Kansas law.

23           So if a person is in that unusual situation,

24   that subsection of the law allows them to present

25   whatever evidence they have.  And so far, the state has

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

47

1   always said yes, that's enough, we acknowledge that you

2   are here.

3            THE COURT:  It seems like a lot of work.

4   And it would not be that much work for maybe you and me,

5   but it seems like a lot of work to the population that

6   we're talking about here, that I'm talking about here,

7   that doesn't have the documentation to begin with.  And

8   it seems like it suggests a level of sophistication that

9   they know how to call, they know how to present

10  themselves, they know how to draft an affidavit.

11           And we get back to the language in the NVRA.

12  This is supposed to be a simple process.  That's why

13  there is this language, is there not, that, you know, no

14  more than the minimum requirement.  It's supposed to be

15  simple because there are people that can't handle more

16  than the simple.  Would you agree?

17           MR. KOBACH:  No, I-- I would disagree, Your

18  Honor, with respect to your characterization of the

19  NVRA.  The NVRA doesn't say the process needs to be as

20  simple as possible.  What the NVRA was trying to do was

21  to streamline the DMV application.  So you didn't have--

22  remember, this was before the Internet age, this was

23  before computers that self-populated all the fields.  So

24  that when you were at the DMV and you were filling out a

25  form, you didn't have to fill out two forms.  You could

1    fill out one form, write your name and address and all--

2    and all that information on your voter-- on your

3    driver's license form, and you didn't have to fill out

4    another form to vote.  That was the purpose.  It nowhere

5    says the purpose was to simplify this and remove all

6    barriers that a state might impose.

7              For example, the-- the requirements vary

8    from state to state dramatically.  In Louisiana, you

9    have to provide additional documentary evidence that you

10   are who you say you are at the time of registration.  I

11   mean, I'm not talking about photo ID on election day.

12   But at the time of registration, you've got to produce

13   this additional information.

14             Some states, not Kansas, ask for your race

15   at the time.  Now, that's not difficult, but they--

16   there's-- that's information I believe is completely

17   irrelevant to a person's entitlement to vote.  So

18   they're asking for all kinds of things beyond the

19   absolute minimum necessary.  If you were to think, well,

20   what could a-- a nation do at the very minimum, maybe it

21   would just be your name and address and age.  There are

22   many things beyond that minimum that the-- that the NVRA

23   permits.

24             But back to your original question.  You get

25   notice when you fill out the registration card.  The

1   card itself has that.  If you register at the DMV, you

2   get notice when you walk away from the desk where you're

3   talking to the clerk at the DMV, you get a little slip

4   of paper that is a-- a receipt that notifies you your

5   registration will not be complete until you have proof

6   of citizenship.  So that's No. 1.

7            THE COURT:  All right.  So you-- you present

8   at the DMV, you fill out the form.  I know there's these

9   measures that if you say, no, I don't want to register

10  to vote, they're supposed to walk you through some

11  additional steps.  But if you say that yes, I do want to

12  register to vote, then the procedure is?

13           MR. KOBACH:  Then the procedure is it auto

14  populates.  They don't have to go through and state

15  their name, state their address all over again.  That's

16  the no duplication part of it.  It automatically

17  populates the voter registration data stream.

18           And then the next thing is they'll be asked,

19  "Are you a citizen of the United States?"  And the

20  question will appear on the screen.  "Are you 18 years

21  of age or older?"  That will appear on the screen.  Then

22  they also have the question appearing on the screen, "Do

23  you wish to register to vote?"  You have to decline, you

24  have to expressly decline.  And that's where the "no"

25  case came before in the case of the individual who

1   declined three times.  And so these questions are

2   presented to them and then they're handed a slip of

3   paper saying you have to provide proof of citizenship as

4   well.

5            Now, in the case of people who are

6   registering for the first time at the DMV to get their

7   first driver's license in Kansas, they have to provide

8   proof of citizenship right then and there to get their

9   driver's license.  And so that information is

10  transmitted to the election data stream too, which goes

11  to the state-- goes technically to the state-- Secretary

12  of State's Office, and then we-- and then it's

13  disseminated to the 105 counties.  So the proof of

14  citizenship for every new driver's license applicant is

15  already in the data stream that comes to the election

16  officials.

17           So you get your-- your notice the day you

18  register or when you fill out the card.  You get your

19  notice within-- usually within a week or two when the

20  county election office populates the ELVIS system with

21  your new registration record.  Then at 30 days, every

22  county is advised to send a third notice or technically

23  a second one that they have sent to the individuals.

24  And then they are-- every county is asked to send a

25  fourth notice, or from the county's perspective a third

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

51

1  mailing, to every individual before they are taken off

2  the suspense category and moved into the cancelled

3  category.  So they're instructed to get these four

4  notices in written form.  And in addition, our office

5  instructs all of the counties to call the person as

6  well.

7            So they get four written notices and one

8  phone call before they are moved from suspense to

9  cancelled, but the registration-- the record never

10  disappears.  And so technically, this Court could

11  reverse the 90-day rule by ordering us to put all the

12  cancelled back into suspense.

13            THE COURT:  And how do you record the

14  noticing attempts?

15            MR. KOBACH:  It's actually in the ELVIS data

16  field.  And we have-- we should probably introduce that

17  into evidence right now.  We have the ELVIS printouts.

18  And it has a-- a notes section.  And it will say:

19  Notice sent for proof of citizenship was mailed on such

20  and such date.  And so you'll see that for each of the

21  plaintiffs.  What the date-- what the date was that they

22  were sent the notice, according to the county.  And, you

23  know, a plaintiff may allege in a declaration, well, I

24  never received it in the mail, but that may or may not

25  be true.

1          THE COURT:  What about bounce-back mails,

2    return mail?

3          MR. KOBACH:  That is also noted as well.  In

4    fact, when something bounced back, that's something the

5    counties take very seriously because that indicates that

6    the person may have moved.  And the procedure under the

7    NVRA, if a person moves, is you're supposed to-- well, a

8    couple of things.  One is you send-- you immediately

9    send a letter out to the person at the new address, if

10   you have it, saying it appears that you are no longer

11   registered at the old address, can you please correct

12   and tell us what is the correct information.  Oftentimes

13   they'll move out of state and the notice will be sent

14   out of state.

15          If the county gets an answer back from the

16   voter, then the voter's record is changed.  If the

17   county doesn't get an answer back from the voter, then

18   they go on what's called the inactive file.  Their

19   status goes from active to inactive.  So your possible

20   statuses are:  Active voter, inactive voter, suspense,

21   or cancelled.  And at that point you go inactive.

22          And if two federal election cycles occur, so

23   2016 elections and the 2018 elections, and you still

24   haven't voted, then at that point under the NVRA, the

25   county may - in Kansas terminology - cancel the record

1    and say, hey, you're no longer on the voter rolls.

2    You're on the voter rolls if you're active or inactive.

3    You're off the voter rolls that the-- that the poll

4    workers see if you are suspended or cancelled.

5                THE COURT:  So it's possible to move from

6    suspense to inactive if it looks like there's been an

7    address change?

8                MR. KOBACH:  Yes.

9                THE COURT:  Somebody that would've been on

10   the suspense list is now on the inactive list?

11               MR. KOBACH:  It is possible.  It would be

12   less likely.  Because usually when a person comes from

13   suspense to active or inactive, they're going straight

14   to active.  Usually they've provided their proof of

15   citizenship.  And so they've just had a-- a transaction

16   of some sort with the state.  So usually you go from

17   suspense to active.

18               THE COURT:  Okay.  So what about the phone

19   call?  How is that recorded?

20               MR. KOBACH:  I believe that that is also in

21   the notes field of the ELVIS file.  I'm not-- I'm

22   90 percent certain that that is also recorded as well,

23   that a phone call was made on such and such a date.

24               THE COURT:  So on Mr. Boynton, that

25   screenshot, I don't recall there being any notes about

16-2105-JAR    Fish, et al., v. Kobach, et al.   04.14.16

54

1  Mr.-- somebody calling Mr. Boynton's number.  And what
2  I-- the reason I ask is, I mean, a number may be called
3  and somebody-- I mean, some people have landlines or
4  whatever, somebody else may answer the phone.  I mean, I
5  would assume the notes would say:  We didn't talk to Mr.
6  Boynton, we talked to somebody else.  But I mean, is
7  that something that ELVIS is supposed to capture through
8  human input into the notes section?
9        MR. KOBACH:  Every contact made with the
10 voter is supposed to be captured by some input into the
11 notes section.  I am not 100 percent that all of the
12 phone calls are also logged in.  If you wish, we can
13 bring up Mr. Caskey, and I'm sure he could answer that
14 question.  And he is the-- the custodian of the ELVIS
15 system for the state, if you want to ask him that
16 question.
17        THE COURT:  All right.  What about these
18 plaintiffs that say they presented at the DMV and that
19 no one orally or apparently with this slip of paper
20 advised them that they had to produce citizenship
21 documents to register?
22        MR. KOBACH:  Every single one of them
23 received a slip of paper from the DMV.  That has been
24 the process for the state that was established in 2012
25 before the law went into effect on January 1st, 2013.

1    So they all--

2                THE COURT:  Can you say that, though?  I

3    mean, it sounds like there were some that didn't.

4                MR. KOBACH:  They may have forgotten they

5    received a piece of paper, but--

6                THE COURT:  Well, I mean, it sounds like

7    there were some DMV clerks that didn't follow this

8    procedure.

9                MR. KOBACH:  We haven't--

10               THE COURT:  And I'm going to ask Mr.

11   Jordan's counsel about this, but he's not really-- it

12   sounds to me like there is-- he's not really taking

13   ownership of this.  He just says:  We passed on the

14   paperwork.  It sounds to me like he doesn't want to own

15   the problem as-- as to whether the DMV clerks are

16   following the procedure.

17               MR. KOBACH:  Well, we-- it is certainly

18   possible that there is human error on the part of the

19   clerk.  But if there were human error on the part of one

20   or more clerks, I don't think that that would justify

21   shutting down the entire law as in violation of the NVRA

22   if the state procedures and the state laws require

23   compliance with everything that the NVRA demands.

24               So there may be a dispute as to the facts of

25   what certain plaintiffs allege that they did and what

1   they didn't.  But as far as the-- you know, enjoining

2   the entire law of Kansas because of an allegation that a

3   plaintiff claims I-- I did this or I didn't-- for

4   example, the individual who registered three times, who

5   claims he registered at the DMV, but the DMV records

6   indicate every time he was there, every one of the three

7   times, he said no, no, and no to the question.  You

8   know, we'll never know what-- what actually happened.

9           But can I get to this point I want to make

10   about the status quo?

11           THE COURT:  Go ahead.

12           MR. KOBACH:  They say they want us to return

13   to the prior status quo before January 1st, 2013.

14   That's false.  They aren't asking us to go back to the

15   pre-January 1, 2013.  Their entire-- they're asking you

16   to create through a preliminary injunctive power an

17   entirely new situation where the DMV path is treated

18   differently than the registering in person, the

19   registering by mail, or the registering by Internet

20   path.

21           They are-- all of their allegations are

22   based on the DMV path of registering.  And they say the

23   DMV, through their I think strange and strained

24   interpretation of the NVRA, is a special magical path

25   that you don't have to provide proof of citizenship.

1   The state can still require proof of citizenship in

2   these other areas, which are approximately 50 percent of

3   registrants, but the DMV will be treated different.

4           And after this-- after this preliminary

5   injunction will go into effect, everyone who registers

6   at the DMV would be in a sort of privileged status.

7   They would automatically be registered for federal

8   elections only, because the NVRA only purports to

9   require registration for federal elections.  And then

10  everybody else who uses the other provisions-- or the

11  other paths would have to provide proof of citizenship

12  to vote in either federal or state elections.

13          And so this is not the status quo.  This is

14  a new situation that this Court will be ordering in an

15  extraordinary use of preliminary injunctive relief.  I

16  think that's really important because they-- they have

17  not established that they're going back to the status

18  quo.  In fact, they've-- I think they've admitted

19  they're not going back to the status quo.  Secondly--

20          THE COURT:  Well, this is brought only in

21  the context of the motor-voter registration provisions.

22  It's not brought in the context of the register by mail.

23  I mean, you know, that's-- that was what your case was--

24  in front of the Tenth Circuit was.  That was the, you

25  know, register by mail case.  I mean, this case only has

1    to do with--

2                  MR. KOBACH:  If we want---

3                  THE COURT:  -- those provisions of

4    motor-voter--

5                  MR. KOBACH:  If we want to wear blinkers and

6    say we're not going to pay attention to the other paths,

7    we're only going to pay attention to the DMV

8    registrants--

9                  THE COURT:  Well, we're paying attention to

10   those sections of that statute that talk about what you

11   can and can't do.  And, of course, you know, you can

12   make arguments that it's silent on this and it-- it

13   speaks to that.  But it's also clear that it's silent on

14   a lot of things.  A lot of provisions that-- or a lot of

15   methods that may be fine, may be constitutionally

16   appropriate, the statute doesn't speak to those.

17                  So you-- I don't understand your argument.

18   Because the statute, it doesn't speak to specifically

19   this citizenship eligibility, proof of citizenship, that

20   must mean that you-- you know, King's X, you can-- you

21   can ask for anything you want to prove that and-- and

22   put any hurdles in place to-- to make sure that that

23   happens.

24                  We're dealing with specific-- I mean, we're

25   dealing with a very tight universe of issues here.  And

1    it has to do with the plaintiffs' claims under the NVRA,

2    and it's Section 5, Section 6, and Section 8, I believe.

3    Correct?

4              MR. KOBACH:  If I might just complete my

5    point and then we can go to that legislative history.

6    Even if you ignore the other path and you just focus on

7    the DMV registrants, which are approximately half of the

8    registrants, they're not going back to the prior status

9    quo of pre-January 1, 2013.  They're going to a

10   different situation where now the state must register

11   those people for federal elections immediately.  And

12   then with respect to state elections, the state can

13   require proof of citizenship at a future point.  That

14   has never been the case in Kansas.  That was not how

15   they were treated before January 1, 2013.

16             Before January 1, 2013, you were registered

17   for all elections when you completed your transaction at

18   the DMV.  And then the county went on and ensured that

19   your application was in order and complete.  So this is

20   not the prior status quo.  They are going to a new

21   situation and, therefore, it is a higher standard for

22   this Court to issue a preliminary injunction.

23             THE COURT:  Aren't they asking for this

24   Court to enjoin the state from requiring citizenship

25   documents at the DMV at the time of-- of, you know, the

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

60

1    attempt to register?  And isn't that consistent with

2    what was happening before January 1, 2013?  I mean,

3    you're talking about the effect of, is it registration

4    for federal and/or state.  I mean, another-- that's a

5    different issue.  But the issue is, what-- what was in

6    place at the DMV on December 31st, 2012.  And my

7    understanding--

8                    MR. KOBACH:  If they were all for that, then

9    we would be--

10                   THE COURT:  -- is you could walk in and you

11   could register to vote and you could-- you could renew

12   your driver's license and you would not have to produce

13   citizenship documents.  Correct?  You could just attest

14   that you were a United States citizen.

15                   MR. KOBACH:  Right.  You could register for

16   everything.  But their briefing and their injunctive

17   request asks that you allow them after they exit the DMV

18   to be registered to vote in federal elections, because

19   the NVRA only speaks to federal elections.  And the *ITCA*

20   case only says-- it reiterates that the NVRA is only

21   about federal elections.  So state law still is in place

22   with regard to voting in state elections.  They cannot

23   claim that the NVRA trumps what is required to vote in

24   state elections.

25                   And so that's why it's not what would

1    happen-- it doesn't take us back to the pre-January 1st,

2    2013.  It takes us to a new situation where now when you

3    leave the DMV area, you have special treatment regarding

4    the federal elections only, because that is--

5            THE COURT:  But that's-- that's a situation

6    of the state's making, because the state of Kansas has

7    these other requirements that the federal government

8    doesn't have.  I mean, it's the state--

9            MR. KOBACH:  That may--

10           THE COURT:  -- it's the state that's created

11   this two-tier, it's not the NVRA that's created the

12   two-tier.

13           MR. KOBACH:  That may be true, but the

14   question we are asking is, is this the prior status quo?

15   It is not.  It is a different situation that existed.

16   They are not preserving the status quo and they are not

17   even returning to the prior status quo.

18           Secondly, it's not mandatory-- it is

19   mandatory.  They say, well, it's not really mandatory

20   because we're asking-- all we're saying is to the state,

21   well, don't do this then.  Now, according to *Schrier*

22   *versus The University of Colorado*, it's a Tenth Circuit

23   case, 427 F.3d 1253, mandatory-- an injunction-- "We

24   characterize an injunction as mandatory if the requested

25   relief affirmatively requires the non-movant to act in a

1   particular way and, as a result, places the issuing

2   court in a position where it may have to provide ongoing

3   supervision to assure the non-movant is abiding by the

4   injunction."

5           They're asking us to do two things.  With

6   regard to the-- they say 16,000, it's actually 12,000

7   people who have already either been-- been placed in

8   suspense or cancelled.  We have to go into their

9   records, we have to order the 105 counties to do it, go

10  in and change their records to active and registered to

11  vote in federal elections.  So for all the people that

12  have happened so far, we have to take an affirmative

13  action.  You would be mandating that the state do this

14  for thousands upon thousands of records.

15          And then for future people who register

16  from-- from this day onward or from the day of the

17  preliminary injunction onward, then you would be saying,

18  we-- you don't have to require proof of citizenship for

19  federal elections, but you'd still have to be-- the

20  Kansas DMV officials would still have to be explaining,

21  okay, this is-- if you want to vote in federal

22  elections, this is sufficient, you should be registered

23  at this point.  If you want to vote in all elections,

24  you're going to still have to comply with the state law

25  requiring proof of citizenship.

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

63

1              So there would be many changes that would

2    have to be mandatory in order for voters not to be

3    confused and to understand what this strange

4    interpretation of the NVRA would now change in Kansas

5    law.  It would completely transform how elections are

6    done in Kansas.  This would be the first time that any

7    court in America would've ever issued such an

8    interpretation of the NVRA.  No state has ever

9    interpreted the NVRA this way, as to create a special

10   path where you have a narrow or limit of qualifications

11   that are applied at the DMV.

12              And then thirdly, the relief sought by the

13   plaintiffs is exactly what they would get after

14   prevailing after a trial on the merits.  They say, oh,

15   no, no, no, we also want declaratory judgment on the

16   constitutional claim we're making under the privileges

17   and immunities clause.  That's irrelevant.  The question

18   is, is the injunctive relief that you're getting at the

19   preliminary injunction the same as an injunctive relief

20   that you would get after a trial on the merits?  And it

21   is exactly the same.

22              Furthermore, the Tenth Circuit has also held

23   that you-- in a preliminary injunction context where

24   there hasn't been a class yet certified, the preliminary

25   injunctive relief should only affect the individual

1   plaintiffs presently before the Court.  Until a class is

2   certified, you can't do a statewide injunction.  At that

3   point, now, we could hold class-- we could brief the

4   class certification and you could decide at that point.

5   But it's premature at this point to do any statewide

6   injunction until a class is actually certified.

7           The second point.  Plaintiffs cannot

8   demonstrate irreparable harm that is imminent because

9   they've delayed four-and-a-half years.  And you already

10  asked plaintiffs' counsel about this.

11          THE COURT:  Well, denial of a right to vote

12  if you're eligible is irreparable harm.  How can you

13  argue that it's not irreparable?  It's not compensable

14  and it's irreparable if you walk into a polling place

15  and you're not allowed to vote and you are eligible to

16  vote.  But for whatever reason, because of changes in

17  the way the state does this or human error or otherwise,

18  you're not allowed to lodge your vote, what more

19  fundamental right is there than the right to vote?

20          MR. KOBACH:  Well, the Court has said it's

21  not quite-- the Court-- the Tenth Circuit has said,

22  well-- and the Supreme Court has said, well, it's not--

23  that's not all that you look at.  In alleging

24  irreparable harm, you have to bring your claim quickly,

25  you can't sit on your rights.

1          THE COURT:  All right.  Let's talk about

2   that.  Let's talk about that.

3          MR. KOBACH:  They let the 2014 election

4   cycle completely go.  They knew about this as early as

5   2011--

6          THE COURT:  What about-- what about a person

7   that has never voted before, they are-- they're coming

8   into the DMV to renew their license, they've never voted

9   before but now they want to vote.  They didn't have-- I

10  mean, they had no reason to bring a lawsuit until now.

11  So I-- I don't think the delay argument is a good one.

12         MR. KOBACH:  I hear your point.  When does

13  that individual receive notice?  Well, let's go-- let's

14  go there.  I'll debate when the individual received

15  notice.  In the instant case, the individuals received--

16  the first plaintiff to receive notice was Bucci, who

17  registered in-- on-- in June of 2013 at the DMV.  She

18  was handed a piece of paper, giving her that personal

19  notice that she still needed to provide proof of

20  citizenship.

21         Then according to the DMV records, on the

22  24th of June, 2013, she was sent an additional notice by

23  Sedgwick County.  So that would be their first plaintiff

24  at that point.  June of 2013.  She could've sent her

25  90-day letter at that point saying:  I-- I disagree with

1   this proof of citizenship requirement.  That would've

2   taken her into September, 2013.  That's two years and

3   seven months ago.  Two years and seven months ago.

4           Now, the last plaintiff to register was

5   Boynton, who was the one who registered in November of

6   2014 when he went to vote.  He received notification on

7   the date of the November 6th election and then he

8   received notice sent by the county on December 5th,

9   2014.  That was two years and four months ago.  So

10  between two years and ten months and two years and four

11  months ago, all six plaintiffs got direct personal

12  notice in two forms; on the actual registration card or,

13  in the DMV case, they got that receipt.  And they were

14  sent notice.

15          Now, the Tenth Circuit has said that seven

16  months' delay is too much for a preliminary injunction.

17  If a preliminary injunction were to issue from this

18  Court after they had received notice two years and ten

19  months ago, that would set an all-time record, I think

20  not only for the Tenth Circuit but maybe for the

21  country, in the issuance of a preliminary injunction for

22  a plaintiff who had sat on his or her rights.

23          THE COURT:  How does-- how does your delay

24  argument square with your argument that the plaintiffs

25  do not suffer imminent harm since the next primary

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

67

1   election isn't until August of 2016?

2          MR. KOBACH:  Our argument there is that they

3   can-- that there's plenty of time between now and August

4   of 2016, four months, for those individuals to simply

5   complete their own registration.  None of them allege

6   that they are unable to meet the requirements of Kansas

7   law.  They can-- most of them have a proof of

8   citizenship document, and they even acknowledge that.

9   And so they can simply send it in and complete their

10  registration.

11         As for the individual who was born on the

12  military base, as you-- I assume you've reviewed the 12

13  documents, there are multiple documents that would

14  suffice from the U.S. military.  If he still doesn't

15  have it, he can simply call the state and we-- and--

16  from his home and the State Election Board will review

17  whatever evidence he has from his home.  And in all

18  likelihood, they will say, okay, you're fine.

19         THE COURT:  What if he doesn't have any-- he

20  says he has no evidence.

21         MR. KOBACH:  Like I said, the evidence

22  doesn't have to be paper.

23         THE COURT:  Maybe he doesn't have a

24  sibling-- maybe he doesn't have a sibling that can give

25  an affidavit.  I mean, maybe he doesn't have any

```
 1   evidence.  Maybe he's tried and-- military records are
 2   hard to come by.
 3               MR. KOBACH:  If he can--
 4               THE COURT:  They're in salt mines, they're--
 5   nobody can retrieve them, the VA can't find them.  I
 6   mean, let's just talk realities here for people like
 7   that.
 8               MR. KOBACH:  Well, an individual in that
 9   case might be able to say that he didn't-- if his
10   parents served in the military, he might be able to
11   contact somebody who knew his parents at the time.  Any
12   family member who can say-- if he's got any relative who
13   could say, yeah, his father served in the military and
14   was stationed at such and such base in these years when
15   and they had a child.  It doesn't have to be a sibling,
16   it could be a distant relative.  So there are--
17               THE COURT:  You won't take his word for it?
18               MR. KOBACH:  What's that?
19               THE COURT:  You won't take his word for it?
20               MR. KOBACH:  Well, his-- he can also make
21   the allegation himself, too.  He can file his own
22   declaration.
23               THE COURT:  Well, he has.  He has.  He's
24   done that.
25               MR. KOBACH:  Well, not-- not to the State
```

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

69

 1    Election Board.  And I would be willing to bet that the

 2    State Election Board would take simply his own

 3    declaration as sufficient.  The State Election Board has

 4    yet to tell anyone no.  And that's perfectly fine if a

 5    person is willing to make an attestation, a declaration

 6    to the State Election Board, "Here are my circumstances,

 7    here's why I don't have my document."

 8              THE COURT:  You know, on the surface it

 9    sounds reasonable.  But, you know, the whole backdrop of

10    all the voting-- all of these voting acts is this

11    country's tragic history of denying people that

12    should've had the right to vote the right to vote.

13    Women, African-Americans.  Even after the Voting Right

14    Acts that gave African-Americans the right to vote, we

15    still had to have poll watchers, we still had to have

16    people monitoring.  We still had people whose rights

17    were chilled.

18              And the chilling comes not so much in

19    telling somebody you can't vote, as in telling them,

20    okay, you've got to do Step 1.  And then if Step 1

21    doesn't work, then Step 2, then Step 3.  And then

22    finally, call the Secretary of State's Office and we'll

23    talk to you on the phone.  I mean, you're talking about

24    hurdles, institutional hurdles that chill people's

25    rights to vote.  That's the backdrop of all of our

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

70

1    voting rights legislation.

2            And when I look at the NVRA and it talks

3    about "not more than the minimum requirement," that's

4    what it's speaking to.  It doesn't want states or any--

5    the federal government for that matter, to impose

6    hurdles.  Which you can-- you can, you know, I suppose

7    articulate some basis for that and-- and it is a

8    legitimate basis, that you don't want non-- none of us

9    want non-citizens voting.  But you have to think of this

10   in terms of the chilling effect and are you really doing

11   more than the minimum required.

12           And so, you know, the plaintiffs I think

13   have done a pretty good job of presenting a record that

14   just talks about the numbers of people that are Kansans,

15   presumably United States citizens, some of them maybe

16   are not, but that are not going to be able to vote in

17   August because of this procedure.  And then when you

18   compare that with the numbers of identified people

19   that-- that, you know, you're intending to keep from

20   voting legitimately, I mean, that-- it's minuscule

21   compared to the number of people that are sitting here

22   in suspense or cancelled status at this point that

23   probably ought to be able to vote.

24           MR. KOBACH:  Your Honor, the argument that

25   the plaintiffs have made and that you have effectively

 1    summarized is an excellent policy argument.  It's a

 2    policy argument for maybe the state shouldn't have done

 3    this, maybe the state shouldn't have passed the SAFE Act

 4    because it is a set of additional steps that perhaps an

 5    unsophisticated person might find challenging to pass.

 6            But the-- we are here in a court of law to

 7    address the legal requirements of the NVRA.  And I would

 8    respectfully submit that *Young versus Fordice* has

 9    already foreclosed that argument.  In *Young versus*

10    *Fordice* on Page 286, the Supreme Court said this, and

11    they were talking about the motor-voter section of the

12    NVRA.  "Nonetheless, implementation of the NVRA is not

13    purely ministerial.  The NVRA still leaves room for

14    policy choice.  The NVRA does not list, for example, all

15    of the other information the state may or may not

16    provide or request."  That's 520 U.S. at 286.

17            The Supreme Court has already held that the

18    silence of the NVRA on what the other information the

19    state may or may not require leaves room for the states

20    to make that policy choice.  You're right, it is a

21    policy choice.  And reasonable people can disagree.

22            THE COURT:  But is there any court that has

23    extrapolated that language from *Young versus Fordice*

24    in-- in holding in the manner that you're asking this

25    Court to hold?

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

72

1              MR. KOBACH:  The Court has just-- in this--

2    in this language interpreted what the meaning of that

3    text is.  Now, were they making the exact same claim?

4    No, there isn't a precedent directly on point that this

5    claim-- is this claim-- this is a case of first

6    impression with respect to this specific claim of the

7    NVRA creating a magical separate path for DMV

8    applicants.  And it is extraordinary.

9              Never in the legislative history, and they

10   can't point to a single sentence, do they say the DMV is

11   going to be set aside and be special, different from the

12   way people register in person and people who register by

13   mail.  That was not the intent of the NVRA to create a

14   special, distinct path.  It was supposed to be equal.

15   The same requirement in all different circumstances.

16             THE COURT:  Well, as I read this language,

17   it leaves this-- this is a completely open question

18   because it says, "The NVRA does not list, for example,

19   all the other information the state may or may not-- the

20   state may or may not provide or request."

21             MR. KOBACH:  No, may choose not to.  The

22   state has policy discretion.  The state has room for

23   policy choice.

24             THE COURT:  In other words, it's saying--

25   the Supreme Court is saying this is not dispositive of

1   this-- of the issue that's before us now.

2            MR. KOBACH:  The silence--

3            THE COURT:  The silence is not dispositive

4   one way or the other.

5            MR. KOBACH:  Right.  The states-- the states

6   can ask for other information.  That's what the Supreme

7   Court has said.

8            THE COURT:  But-- but that does not mean in

9   asking for other information they don't run afoul of--

10  of the Constitution.

11           MR. KOBACH:  Then I would direct Your Honor

12  to Page 2260 of the *ITCA* decision, *Arizona versus*

13  *Inter-Tribal Council.*  On 2260, Justice Scalia on behalf

14  of the Court invites the state of Arizona to request

15  again to the EAC documentary proof of citizenship.  If

16  as they claim - grossly incorrectly - that *ITCA* came to

17  the conclusion that you can't require proof of

18  citizenship, why in the world would Justice Scalia have

19  invited Arizona to once again ask the EAC if you can

20  request proof of citizenship?  And why on Page 2258 of

21  the decision would Justice Scalia, writing for the Court

22  say, "It is beyond dispute that the states have the

23  authority to set the qualifications for voting in

24  Article I, Section 2"?  And he says, "The-- the ability

25  to set the qualifications for voting would be of little

1    effect if it did not also include the ability to enforce

2    those qualifications."

3              THE COURT:  And that's something the Tenth

4    Circuit has acknowledged as well.  But it also has ruled

5    that the qualifications clause does not trump the

6    elections clause.  And while the state has a legitimate

7    interest in ensuring that only qualified, eligible

8    people vote, the state also is bound by, you know, the--

9    the constitutional juris prudence that you have to

10   ensure, you have to-- you not only maintain the

11   integrity of the process, but you have to ensure that

12   qualified and eligible voters can vote without-- without

13   placing all of these obstacles and hurdles in their way.

14   It's really a balance, is it not?

15             MR. KOBACH:  With all due respect, Your

16   Honor, I don't think that is quite correct in-- in

17   characterizing *Kobach versus EAC*.  As you correctly

18   noted, it's an APA case.  And in that instance, Kansas

19   and Arizona went back to the EAC and said, hey, would

20   you please require proof of citizenship on the federal

21   form?  And we argued you have a ministerial duty.

22   Whatever we ask for, you have to do.  And the-- the EAC

23   did not have a commissioner, did not have an executive

24   director at the time.  And so initially they said, well,

25   we can't do anything.

1                    Judge Melgren here in Kansas said, no, we're

2      going to order you to do something because the *ITCA*

3      decision seems to indicate you have to give them an

4      answer.  And they said no.  And Judge Melgren ruled that

5      the states' view of your authority, EAC, is that you

6      have to-- it's ministerial.  Whatever the states ask

7      for, you have to give.

8                    So that was the question presented to the

9      Tenth Circuit.  Does the EAC have discretion to tell a

10     state no, or is it like Judge Melgren said, it's just

11     ministerial?

12                    The Tenth Circuit ruled - with Judge Lucero

13     writing - that, no, it's not ministerial.  The EAC has

14     the discretion to say no.  But the Tenth Circuit did not

15     hold that no is the correct answer.  The EAC could also

16     say yes, Kansas, that is a reasonable requirement, that

17     you would ask to prove citizenship to enforce that

18     qualification.  So they have mischaracterized the *Kobach*

19     *versus The EAC.*  Never did they say that the correct

20     answer-- never did the Tenth Circuit say the correct

21     answer is proof of citizenship is not necessary.

22                    THE COURT:  Well, the Tenth Circuit--

23                    MR. KOBACH:  They said the EAC could

24     reasonably reach that conclusion under the APA.

25                    THE COURT:  You're right.  The Tenth Circuit

1   also said, though, that there are at least five

2   alternate means available to states to enforce their

3   laws.  And that the states in front of them had not

4   provided substantial evidence of non-citizens

5   registering to vote using the federal form because it

6   was the federal--

7          MR. KOBACH:  Could not provide it to the

8   EAC.  And therefore, the EAC could rationally conclude

9   that maybe these other five are good enough for you,

10  Kansas.

11          THE COURT:  Right.

12          MR. KOBACH:  And now, the EAC--

13          THE COURT:  How is the record-- how is the

14  record now any different than it was?  And I asked-- I

15  asked plaintiff is there a different standard.  I

16  understand that we're under the preliminary injunction

17  standards.  But given that this was an Administrative

18  Procedures Act and a review of that before the Tenth

19  Circuit, and the Administrative Procedures Act is not in

20  play here, is there a-- is there a different analysis?

21  I asked plaintiff that, I'll ask you that as well.

22          MR. KOBACH:  Yes.  Completely different.

23  We've tried all five of the things that the EAC-- now,

24  when we initially went up to the-- went to the District

25  Court of Kansas and then to the Tenth Circuit, our view

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

1  was, well, the EAC doesn't have authority to tell us to

2  check out these other five things.  You have a

3  ministerial duty.  So the-- so the record there did not

4  show that we had done the other five things.

5          Since then, and this is in our briefing to

6  the Court and it's in our declaration from Mr. Caskey,

7  which I would ask-- well, I'll ask it later.

8          THE COURT:  Is it the same as his affidavit?

9  I've read his affidavit, Mr. Caskey's affidavit.

10          MR. KOBACH:  Yeah.  We have since done all

11  five of those things.  So we have, No. 1, prosecution on

12  the back end.  We have sent cases to-- and that was

13  actually already done.  We-- but we reiterated that we

14  have sent cases to be prosecuted.  The county attorneys

15  had very little time.  Now the Secretary of State's

16  Office for the past nine months has had the authority to

17  prosecute those cases.

18          THE COURT:  None of which were based on

19  citizenship eligibility.

20          MR. KOBACH:  And that's another misleading

21  allegation by plaintiffs.  We have prosecuted six cases

22  since we got the authority on July 1st of 2015.  All six

23  were cases where there was a statute of limitations

24  running up, so we had to get those cases out the door

25  the fastest.  So it was 2010, double voting in those

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

78

1    elections.  And so the statute would run on October or

2    November of 2015, and so we had to get those cases out

3    first.  It was not because there has never been a case--

4    a proof of citizenship case that we could not prosecute.

5         THE COURT:  So you have-- you currently have

6    prosecutions on proof of citizenship-- of non-citizens

7    voting?

8         MR. KOBACH:  We're still-- we're still

9    working the six cases that we got out the door quickly.

10   And that is, of course, because we don't have a huge

11   staff, we only have two attorneys that are doing the

12   prosecutions.

13        THE COURT:  So you do have cases or you

14   don't have cases that involve non-citizens voting that

15   you're prosecuting criminally?

16        MR. KOBACH:  We have potential cases.  We

17   don't have any cases involving non-citizens.

18        THE COURT:  All right.  So that's one means.

19        MR. KOBACH:  That's one.  Let's go through

20   all of them.  The second one was the SAVE system.  The

21   SAVE system-- and perhaps the deposition-- asking Mr.

22   Caskey these questions, he's done much of this work

23   himself, but I can quickly summarize.

24        The SAVE system, the Systematic Alien

25   Verification for Entitlement system maintained by the

 1    Department of Homeland Security, we asked the Department

 2    of Homeland Security for permission to use that and run

 3    our suspense list to see if you have-- it matches any

 4    aliens who are legally in the country, which is what

 5    SAVE tells you.  And they said, no, we are not going to

 6    allow you to use the system unless you can give us

 7    individual examples of an A number, an alien number, and

 8    only then will we run it.

 9          Well, the state doesn't ask for alien

10    numbers when you register to vote, it wouldn't even make

11    sense because only aliens possess alien numbers.  So

12    they said-- effectively told us no, you can't use the

13    system.

14          Well, then we looked at the EVVE system.

15    That's No. 3.  That's looking for birth certificates.

16    EVVE is a consortium - Electronic Verification of Vital

17    Events - where participating states send in their

18    database of birth certificates.  The EVVE system won't

19    work because you need to have the mother's maiden name

20    of the individual you're checking.  We don't ask for

21    that on the form.  And you have to have the state of

22    birth of the person you're checking.  We don't have that

23    on the form.  So the EVVE system won't work for us.

24          And then they said check against the DMV

25    records.  Well, we've done that three times.  2009,

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

80

1    2011-- 2010 and 2011.  And we're doing it again in 2016

2    where you ask for the Department of Motor Vehicles to

3    give you the list of all the known aliens who have

4    temporary driver's licenses, so we know those people are

5    non-citizens, check them against the voter rolls.

6              We've already done that.  And it's yielded a

7    few names.  It's yielded, you know, a dozen here, a

8    dozen there.  But it-- it doesn't get people who are

9    here on temporary visas.  You get-- or sorry, it doesn't

10   get people who are here on green cards.  The driver's

11   license-- so you think of it this way; when you get a

12   driver's license, you're either a U.S. citizen, you're

13   here forever or - you can be - you're a lawful permanent

14   resident and a green card holder, which means you are

15   here permanently and you get the same-- your license is

16   classified the same way as a U.S. citizen.  Or you are a

17   non-citizen here temporarily on a visa, other than a

18   green card.  Those people get temporary driver's

19   licenses.

20             So we can only use the DMV system to get

21   that segment, people here temporarily.  Not green card

22   holders.  And the majority of aliens in the state of

23   Kansas and-- in roughly half I think it works out, are

24   about-- are green card holders.  So we can't even check

25   against green card holders by taking the DMV's records.

1    But anyway, we're doing that as well.

2           THE COURT:  But if you ask for their alien

3    number, you could.

4           MR. KOBACH:  Well, the DMV won't necessarily

5    have their alien number, because I don't believe they

6    request it to get a driver's license.

7           THE COURT:  No, I'm saying if the law-- if

8    the Kansas law required disclosure of the A number, you

9    could-- you could figure that out.

10          MR. KOBACH:  If the-- it would be kind of

11   nonsensical - with respect, Your Honor - for us in a

12   voter registration card to say only a U.S. citizen can

13   vote, but please provide your alien number.

14          THE COURT:  But don't you ask for that when

15   somebody with a green card registers to drive?

16          MR. KOBACH:  No.  They-- you can ask the DMV

17   witness here, but I believe the DMV asks for proof of

18   lawful presence.  And so the lawful presence for an

19   alien is going to be the green card itself, which isn't

20   going to have the alien--

21          THE COURT:  Doesn't it have an A number?

22          MR. KOBACH:  I don't think the alien number

23   is a green card number.  The alien number is a number

24   assigned by the Department of Homeland Security to the

25   individual.  And so-- and similarly, the visa number,

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

82

1    the A number is not going to be on the face of the visa

2    either.

3              So that has limited-- it has allowed us to

4    find a small handful, but it has not allowed us to find

5    a large number.  And it doesn't even cover the people--

6    the aliens here permanently.  So those are the four-- I

7    think those are all five of the methods that were

8    offered and--

9              THE COURT:  All right.  So the-- the SAVE

10   system, the database that some-- states' consortium--

11             MR. KOBACH:  Yeah.  Prosecution.

12             THE COURT:  -- of birth certificates, the

13   temporary residents--

14             MR. KOBACH:  Temporary driver's license.

15             THE COURT:  -- and--

16             MR. KOBACH:  Prosecution on the back end.

17             THE COURT:  That's four.

18             MR. KOBACH:  What am I forgetting?  Those

19   are-- those are the principal ones.  I'm not sure if

20   the-- I can't remember if they did identify another one.

21             THE COURT:  Okay.

22             MR. KOBACH:  Would it be-- would it be

23   instructive for Your Honor to have Bryan Caskey, to ask

24   him any questions you might have?

25             THE COURT:  It probably would.  Why don't we

1   take a break for about ten minutes.

2              MR. KOBACH:  Okay.

3              THE COURT:  And we'll do that.  All right.

4              MR. KOBACH:  And then if-- with leave of the

5   Court, could I continue to add a few more points I want

6   to make after we have Mr. Caskey on the stand?

7              THE COURT:  Certainly.  Whatever order you

8   want to do it in is fine.  You can finish your argument

9   and then if you want to put him on, that's fine, too.

10             MR. KOBACH:  Okay.  Thank you.

11             THE COURT:  All right.  We'll be in recess

12  for 10 minutes.

13             (Recess).

14             THE COURT:  All right.  You can be seated.

15  Mr. Kobach.

16             MR. KOBACH:  Thank you, Your Honor.

17             Right before we took a break, Your Honor,

18  you asked about the five methods that were identified as

19  alternatives.  So we recalled the fifth one, and that is

20  matching against jury information where a court receives

21  information from a potential juror that, no, I can't

22  serve because I'm an alien.

23             We-- we tried that.  We passed a statute, we

24  got the Legislature to pass a statute in 2013 to give us

25  the authority to get that information from the courts.

1    In 2014, we started implementing that.  And to date,

2    that has not been useful in identifying a single alien

3    on the voter rolls.  It's kind of amusing, you might

4    find it amusing, the cases that have been identified

5    were all U.S. citizens who falsely claimed that they

6    were aliens in order to get out of jury duty.  But there

7    has yet to have been a case that serves the purpose that

8    the EAC thought that might actually serve.

9            THE COURT:  I mean, I think it is

10   interesting, though, that you assume because you don't--

11   I mean, I understand that some of these methods are

12   incomplete or that you don't have access.  But I think

13   it's interesting that you assume if you don't get much

14   feedback, that means the system-- I mean, that the

15   method-- the methodology doesn't work.  When maybe, in

16   fact, that proves that there's really not a problem.

17           MR. KOBACH:  But what I've explained with

18   regard to all of them, and I can explain with regard to

19   this one, it only gets a very small subset.  It would

20   only get the subset of aliens who are actually called to

21   jury duty.  And that's going to be really small.  And so

22   you're-- you know, of the aliens on our voter rolls,

23   those who are called for jury duty.

24           THE COURT:  I understand.  They're all

25   subsets of something.  But I just think that it seems

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

85

1    like you're interpreting all of this to mean it's not a

2    meaningful way to enforce the law because, with respect

3    to whatever subsets you get, there's-- there's either

4    zero or very small numbers.  And so that means there

5    must be something wrong with the methodology.

6              I mean, I can tell you, having tried a

7    number of jury cases, I've never had an alien show up

8    and attempt to get on a jury.  I just never have.  I

9    would be surprised if that would happen.

10             MR. KOBACH:  Yeah.  But the point being,

11   that the state has tried all of those.  And then if you

12   look at exhibit-- I guess I'll move - if the plaintiffs

13   don't object - or move the introduction into evidence

14   the Exhibits 1 through 8, which are in your notebook.

15   If I can-- I'd like to refer to that.

16             THE COURT:  Certainly.

17             MR. KOBACH:  They've all seen all these.

18   These are affidavits, most of which have been already

19   included in--

20             THE COURT:  All right.  You're going to file

21   your response.  But then I think it's a better-- it is a

22   better record if the exhibits come in during the

23   hearing.  So I'll ask plaintiffs to do the same with

24   theirs, but-- okay.  So what did you say, Exhibits 1

25   through 8?

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

86

1          MR. KOBACH:  1 through 8, which are in your

2     notebook.  And then I'll get this done now.  Then

3     Exhibit 9 I'd like-- it's not in your notebook, but I'll

4     give it to you now.  It's the ELVIS printouts for the

5     six plaintiffs.  And we'll give these to the--

6          THE COURT:  All right.  Has the plaintiff

7     seen those?

8          MR. HO:  We have not seen these, Your Honor.

9          THE COURT:  Okay.  So Exhibits 1 through 8

10    admitted.  Do you want a chance to review those before I

11    admit them?  Or we can leave the record open and I'll

12    admit them at the end, but I do think you ought to have

13    a chance to look at them.  And that's Exhibit 9.

14         MR. HO:  Thank you, Your Honor.

15         THE COURT:  So Exhibits 1 through 8 are

16    admitted.  I'll go ahead and hear from you on Exhibit 9,

17    Mr. Kobach, during the hearing, but...

18         MR. KOBACH:  And then we'd like to introduce

19    as Exhibit 10 the deposition of Bryan Caskey, which the

20    plaintiffs were present at.  And he's marking a Bates

21    stamp right now.  And you'll obviously have the

22    opportunity to question Mr. Caskey as well.

23         THE COURT:  All right.

24         MR. KOBACH:  A lot of these issues were-- we

25    went into pretty thoroughly at the deposition of Mr.

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

87

1   Caskey.

2              THE COURT:  Okay.  Exhibit 10 admitted.

3              MR. KOBACH:  Okay.  The third argument, Your

4   Honor, is one that, I apologize, we didn't brief

5   substantially in our-- in our one response brief

6   because, frankly, we realized it only after the fact,

7   but it's a pretty important one.

8              And that is, a preliminary injunction should

9   not be issued when-- when it would prevent the Court

10  from going back and ruling in favor of the defendants.

11  And we've realized that there's a problem here that

12  might prohibit you, if you issued this preliminary

13  injunction, from subsequently ruling in favor of the

14  plaintiffs.  And that-- that barrier is the NVRA itself.

15             The preliminary injunction would order us to

16  take all of those 12-and-a-half thousand people who have

17  already been on the suspense list or have been moved to

18  cancelled status, to move them into the-- onto the voter

19  rolls for federal elections.

20             Once you're on the voter rolls-- right now,

21  they're not on the voter rolls.  Suspense or cancelled,

22  you're not on the rolls.  Once you are on the voter

23  rolls and you are an active voter for federal elections,

24  then-- then the NVRA cancellation provision-- or

25  provisions regarding removal of people from the lists

1    kick in.

2         And we can't take them back off the list if

3    the Court says-- after a full trial says:  You know

4    what, defendants are right in their interpretation.  The

5    only way we can take someone off a voter list is if the

6    person dies and that's confirmed, or if the person tells

7    us in writing that they wish to be removed from the list

8    or we have that two federal election cycle process where

9    they're inactive and they don't vote.  There's no

10   authority under the NVRA for us to just take them off.

11   Now, you could argue-- and indeed, it says we can't take

12   them off - cannot take them off - unless one of these

13   things is true.

14        You could argue, and maybe they would argue

15   that, well, an Article III court has extraordinary power

16   and an Article III court could order the defendants to

17   do something that's in violation of the NVRA.  I don't

18   know.  I'm not sure what the answer is on that question.

19        But it seems to me that it would be an

20   extraordinary interpretation of Article III powers to

21   say that a court can order a state to do something that

22   is in violation of-- of congressional statute.  So I

23   think the statute creates a one-way ratchet.  You can

24   certainly order us to-- to put people into fully

25   registered status, but you can't order us to take them

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

1    off without violating the NVRA.

2            THE COURT:  Well, couldn't I order to put

3    them on, subject to final determination?

4            MR. KOBACH:  Well, they'd be on the voter

5    rolls.

6            THE COURT:  Subject to final determination,

7    though.  That's a new status I suppose, but--

8            MR. KOBACH:  Yeah.

9            THE COURT:  -- a status that's--

10            MR. KOBACH:  But they would be--

11            THE COURT:  -- perhaps necessary given the--

12            MR. KOBACH:  -- they would be registered

13    voters at that point.

14            THE COURT:  -- litigation.

15            MR. KOBACH:  I'm not sure if that caveat

16    would be sufficient.

17            THE COURT:  All right.  I understand.

18            MR. KOBACH:  Okay.  But let's go to the

19    merits now.  And that's my fourth general point.  The

20    plaintiffs have no likelihood of success on the merits.

21    We really think their interpretation of the NVRA-- NVRA

22    is strange.  No court has ever adopted it.  No state has

23    ever interpreted the NVRA this way in the 23 years that

24    it's existed.

25            They're asking this Court to go out on a

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

90

1    limb and go where no state or court has ever gone

2    before.  And they claim that the NVRA was intended to

3    create a special process for registering at the DMV,

4    different from registering by mail or in person.  And

5    that this process prohibits the state from requiring

6    proof of citizenship, even though - and this is where

7    plaintiffs do not correctly cite the NVRA - nowhere in

8    the NVRA does it say states are expressly prohibited--

9            THE COURT:  Well, let me ask you about this

10   magic language in Section 5 of the NVRA, "no more than

11   minimally required," I'm paraphrasing.  That language

12   doesn't appear in the other sections.

13           MR. KOBACH:  It does appear in the language

14   regarding federal form.  The federal form also says no

15   more-- that the-- no more than the minimum necessary

16   that the state official-- to enable the state official

17   to implement the voter registration requirements.  And

18   so that's-- that's why I think we need to go to the

19   actual language of the statute.

20           If you read the language of the statute, it

21   says they require the minimum information, "necessary to

22   enable state election officials to assess the

23   eligibility of the applicant, to-- and to administer

24   voter registration and other parts of the election

25   process."

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

91

1              THE COURT:  And that-- and that exists, does

2    it not, to effectuate what Section 5 is trying to

3    effectuate, and that is simultaneous registration at the

4    time someone gets a driver's license or a renewal of a

5    driver's license, that they're also simultaneously able

6    to vote.  A one-step system.  I mean, that's what this

7    is all about.  Correct?

8              MR. KOBACH:  With one caveat.  There-- it's

9    not simultaneous registration.  It's an application.

10   And that's the other important point.

11             THE COURT:  All right.  Simultaneous

12   application.

13             MR. KOBACH:  Application.  Right.  So you

14   can apply in both cases, but it doesn't mean that you--

15   you fully are registered.  And as the Court in *Fordice*

16   recognized, the state can ask for other stuff in

17   addition to the things that you provided with your DMV

18   application form.

19             THE COURT:  So you read this language as

20   allowing for a state to effect-- to effectively require

21   a two-step registration process?

22             MR. KOBACH:  That's what *Fordice* said.

23   *Fordice* said the state can ask for more stuff, other

24   than what is on the form.

25             THE COURT:  But it didn't say, though, the

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

1   state can create a two-step registration process.

2           MR. KOBACH:  Well, by-- by definition, if

3   you-- if you're requiring things on the form at the DMV,

4   which are just things that the DMV needs, and then there

5   are other things you're asking for, in effect, you can--

6   and it's not two-step-- the individual can do it all in

7   one step.  If he has his proof of citizenship when he's

8   at the DMV, it's-- it's all one step.  He's provided it

9   all there.

10          THE COURT:  All right.  Let me ask you a

11  couple of questions about that, and maybe these are

12  better questions for Mr. Caskey.  So let's start with

13  you've got a first-time registrant for a driver's

14  license, they're going to necessarily show up with proof

15  of legal presence, which oftentimes is proof of

16  citizenship.  And they're going to show up for that--

17  with that documentation at the DMV if they want to get a

18  driver's license.

19          In that instance, how does that work?

20  They-- they present their documentation, the clerk at

21  the DMV asks them if they would like to vote.  And if

22  they say yes, that's recorded.  Correct?

23          MR. KOBACH:  Yes.

24          THE COURT:  Are there instances-- incidences

25  where there the-- human error, where the DMV clerk

1    doesn't ask them or misunderstands or in some way-- I

2    mean, that may be what's implicated with some of these

3    plaintiffs.  Either doesn't ask them-- even though

4    they've got the citizenship document with them, they're

5    not asked the question?

6              MR. KOBACH:  The process in those situations

7    where you've got a first-time applicant for a driver's

8    license is pretty much automated.  So as soon as there

9    is a "yes" answer on "Do you wish to register to vote,"

10   and in the same transaction the individual provided-- by

11   getting the driver's license, provided the proof of

12   citizenship, then that all comes over to the state - and

13   you can ask Mr. Caskey about this - in the data stream.

14   And there will be a field or a-- a note, said that the

15   applicant provided proof of citizenship when getting a

16   driver's license.  And we accept that as sufficient.

17             THE COURT:  All right.  But what I'm asking

18   are, are there incidences where someone says yes or

19   thinks they're indicating yes, but it's not recorded as

20   a yes?  Are there incidences of that?  And maybe I

21   should ask Mr. Caskey about that.  Because that person

22   is ready and prepared to present proof of citizenship,

23   yet isn't allowed to simultaneously apply to register to

24   vote because the clerk didn't ask them or they didn't

25   answer in a way the clerk understood what they were

1    saying.  Are you aware that there are those instances?

2         MR. KOBACH:  I'm not aware of any instances

3    like that.

4         THE COURT:  Okay.

5         MR. KOBACH:  And again, we're talking about

6    first-time driver's licenses applicants.

7         THE COURT:  Right.

8         MR. KOBACH:  So they had to have that proof

9    of citizenship with them.

10        THE COURT:  All right.  Next question are

11   the renewals.  Nothing tells them to show up with

12   citizenship documents to renew their driver's license.

13   So I-- what I heard you say before is that they're asked

14   by the DMV clerk, "Do you want to register to vote?"

15   And it's recorded as a "Y" or an "N" on the data input

16   screen.  And then they're handed the piece of paper that

17   tells them how to do that.  Correct?

18        MR. KOBACH:  Uh-huh.  That they have to

19   provide proof of citizenship, yes.

20        THE COURT:  But are they also asked if they

21   have citizenship documents with them?

22        MR. KOBACH:  I do not believe they are in

23   the case of a renewal since the DMV is looking at its

24   own purposes and it doesn't need proof of citizenship

25   for a renewal.

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

95

1          THE COURT:  So they're not asked, they're

2     just said-- they're asked, "Do you want to register to

3     vote?"  "Yes."  That person may have a citizenship

4     document with them, but they're not allowed to present

5     it to the DMV clerk because the DMV clerk doesn't even

6     ask them if they have such documentation?

7          MR. KOBACH:  If they provided proof-- we

8     have a-- an arrangement with the DMV that if they

9     provide it at that time, they say, "I want to provide my

10    proof of citizenship right now while I'm renewing--"

11         THE COURT:  Well, why would they do that if

12    the DMV clerk didn't even ask them for it?

13         MR. KOBACH:  Well, I think we're talking

14    about a person who wants to register to vote.  The

15    person has just received a-- a certificate from the

16    person behind the desk, you need to provide proof of

17    citizenship.  If the person says, "Here's my proof of

18    citizenship, go ahead and take it--" and actually, the

19    DMV does allow you the option of providing proof of

20    citizenship.

21         THE COURT:  Okay.  But my question is, does

22    the DMV clerk, affirmatively ask, "Do you have your

23    citizenship paperwork with you?"

24         MR. KOBACH:  I'm not certain.  And you might

25    be able to--

1            THE COURT:  Okay.  I'll ask Mr. Caskey that.

2    Okay.  And I want to ask Mr. Caskey more questions about

3    this ELVIS system, too, but I'll save that for him.

4    Okay.

5            MR. KOBACH:  Okay.  So back where I was on

6    the-- the way that NVRA phrases it, it says, "The

7    information necessary to enable state election officials

8    to assess the eligibility of the applicant and

9    administer voter registration and other parts of the

10   election process."

11           Again, it's the state's election process.

12   It's defined by state law.  So by definition, the-- the

13   DMV portion of the NVRA registration process has to be

14   designed by the state.  And it varies from state to

15   state.  What you experience at the DMV in Kansas won't

16   be the same as in Missouri or in Texas or in any other

17   state.  So it is a state process designed to achieve the

18   goals of that state necessary to implement the state's

19   process.  And that same language does appear in the

20   federal form version of the-- of the NVRA.

21           And so-- jump ahead here.  So the other

22   problem with their theory on the merits is that it

23   cannot be squared with *Arizona versus Inter-Tribal*

24   *Council*.  The Court said in *Arizona versus Inter-Tribal*

25   at 2257, 133 Supreme Court 2257, "The election clause

1    empowers Congress to regulate how federal elections are

2    held, but not who may vote in them."  And then we

3    mentioned this quote earlier, the Court went on on

4    Page 2258, it says, "The power to establish voting

5    requirements is of little value without the power to

6    enforce those requirements.  It would raise serious

7    constitutional doubts if a federal statute precluded a

8    state from obtaining the information necessary to

9    obtain-- to enforce its voter qualifications."

10              And remember, the Court was talking in *ITCA*

11   about proof of citizenship.  And so that's why the Court

12   in *ITCA* says, all right, so we've got this problem, the

13   state has to follow the NVRA, which says you have to

14   accept and use the federal form.  And Arizona was saying

15   we're just not going to accept it.  If you use a federal

16   form without proof of citizenship, we won't accept it.

17   And the Court said, no, you have to accept and use the

18   federal form.  But the Court also recognized the state

19   has the constitutional authority to require additional--

20   to enforce the-- the qualification of citizenship and do

21   as it deems necessary.

22              So that's where Justice Scalia writing for

23   the Court says, "Happily, we are able--" and he uses the

24   word "happily," we're able to resolve this by saying,

25   look, Arizona, just go back to the EAC, ask them to

1    change the federal form.  You are required by the NVRA

2    to use that form, but they can change the instructions

3    for Arizona on the federal form.  And so we can

4    interpret the NVRA in a way that doesn't create

5    constitutional doubt by prohibiting a state from

6    enforcing the vote-- the citizenship qualification in

7    the manner that it wants to.

8            That's the constitutional doubt that they

9    are asking you now to raise by interpreting the NVRA in

10   a way that would prohibit the state from enforcing the

11   voter qualification, which we have the authority under

12   Article I, Section 2 of the Constitution, in the manner

13   we choose, which is to require proof of-- documentary

14   proof of citizenship.  Either the state finds it for you

15   if you are-- a birth certificate in Kansas or you can

16   provide it yourself in the case of others.

17           THE COURT:  Well, if you truly want to

18   enforce that, I guess, you know, I'll ask Mr. Caskey

19   this, why wouldn't you determine whether someone has

20   citizen documents with them at the time they present to

21   renew and say that they want to register to vote?  You

22   talk about the burden on the state of, you know, doing

23   all these things and tracking and monitoring and

24   checking and-- why wouldn't you-- why wouldn't you not

25   have the DMV personnel ask for proof of citizenship

1    right then and there, just as they do for the first-time

2    registrants?

3              MR. KOBACH:  Actually--

4              THE COURT:  That's enforcement on the front

5    end.  And then if-- if ultimately what you're telling me

6    is if they are a person that cannot for whatever reason

7    produce it, we'll take their word for it, we just need

8    to talk to them over the phone, sight unseen.  We don't

9    even know if it's them.

10             I don't understand how you can argue that

11   you're precluded from enforcing when ultimately that's

12   what it comes down to, a situation where a DMV clerk may

13   not even ask for proof of citizenship, and then you make

14   the person jump through hoops to provide it later, or--

15   and if they can't, you just talk to them on the phone

16   and then that solves the problem and you say you get a

17   pass.

18             MR. KOBACH:  Well, we agree completely that

19   it would be easiest if the DMV asked for proof of

20   citizenship at all driver's license transactions, both

21   original first-time application and renewal.  We asked

22   the DMV when they made the step of requiring proof of

23   citizenship-- or proof of lawful presence, would they--

24   would they consider doing that at-- at the renewal stage

25   as well.  It just-- it just makes more sense I think

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

1    from the voter perspective, maybe not from the DMV's

2    perspective.

3              From our perspective, yeah, let's-- let's

4    ask the person at both junctures.  And you could read

5    the Real ID Act as potentially requiring that.  The DMV

6    said, you know, that's going to be a burden that we

7    can't-- we don't feel we have the administrative

8    capacity to undertake right now.  And so they declined.

9              But we agree that it would make more sense

10   to get it from all driver's licenses applicants.  But

11   that is a policy decision that the Department of Revenue

12   made, that they said we're only going to do it for--

13   we're only going to make it mandatory for first-time

14   driver's licenses.  And we'll make it optional, you can

15   provide-- can provide proof of citizenship to have a

16   Real ID-compliant driver's license at the time of

17   renewal if you wish, but you don't have to.

18             So the-- if I may continue.  The statement

19   from the Supreme Court in *ITCA* would make no sense if

20   plaintiffs were correct and the form of registration--

21   or the form of application that 44 percent of applicants

22   use in Kansas, which is the DMV, that one you don't have

23   to provide proof of citizenship because the NVRA

24   prohibits it.  Now, it doesn't expressly prohibit it,

25   but just implicitly prohibits it by using the words

1    "necessary."

2          And remember, the Supreme Court interpreted

3    those same words in *ITCA* as allowing the EAC to come to

4    the conclusion that, yes, this is information that is

5    necessary to enable the state election official-- that's

6    where Scalia invites-- on Page 2260, invites Arizona,

7    "Just ask the EAC again."  And, of course, we have

8    subsequently asked the EAC a second time after that.

9    And the EAC now does require proof of citizenship on the

10   federal form, and that's important to note, since

11   February 1st, 2016.

12         And so it-- it would be a truly odd reading

13   of *ITCA* to say, yeah, the Supreme Court acknowledged

14   that you can require proof of citizenship by just asking

15   the EAC again to put it on there.  But, oh, by the way,

16   44 percent of applicants who use the DMV, yeah, you

17   can't require proof of citizenship there.  The Supreme

18   Court never even hinted at that.  There's nothing in the

19   NVRA that says that motor-voter-- people who are--

20   register at the DMV are to be treat differently.  This

21   is a really extraordinary reading they're urging you

22   to-- to take.  And I think it's extremely problematic to

23   do it in a preliminary injunction context.

24         As to the constitutional doubts, there's

25   actually two constitutional doubts that it would raise.

1    It would first raise the constitutional doubt that I

2    alluded to of violating the state's right to enforce its

3    qualifications as it sees fit, which the Supreme Court

4    recognized on Page 2258 of *ITCA*.  The second-- and the

5    Court even said it would raise severe constitutional

6    doubts if-- if the NVRA were interpreted this way.

7              But the second constitutional doubt is with

8    respect to the dual election.  The U.S. Constitution in

9    Article I, Section 2 says, "The electors in each state

10   shall have the qualification--" you know, for

11   congressional elections, "shall have the qualifications

12   requisite for electors in the most numerous branch of

13   the state legislature."  And then the 17th Amendment

14   says the same thing for the federal Senate.

15             Now, this was done so that you would have

16   the identical standard adopted for federal elections

17   that you have for state elections.  But what was created

18   in-- in an interim period in 19-- in 2014 when the EAC

19   had not yet changed the federal form, was you had this

20   oddity, which was arguably in violation of Article I,

21   Section 2, where you had the criteria for voting in a

22   federal election being different than the criteria for

23   voting in a state election until the EAC subsequently

24   made the change, as they did in 2016.

25             What their injunctive they're asking--

 1    injunction they're asking you to issue would do is for

 2    approximately 20,000 people, we know it's going to be at

 3    least 12-and-a-half thousand, and approximately 20,000

 4    by the time we get to the election, these 20,000 people

 5    who have registered at the DMV but not yet provided

 6    proof of citizenship, they're going to be voting in

 7    state-- in federal elections because of a judicial order

 8    interpreting the NVRA their way.  But the rest of

 9    Kansas, you people who didn't register at the DMV, state

10    law still applies to you because the NVRA doesn't--

11    doesn't purport to affect registration for state

12    offices.

13              And now they say, well, that's a situation--

14    that's a-- and that would violate Article I, Section 2.

15    You would have different qualifications for an

16    extraordinary number of people.  And their answer is,

17    well, the state created that situation.  You guys passed

18    your law to require proof of citizenship.  But that

19    would be extremely odd.  If a-- if a court issues an

20    injunction saying that for these individuals, there is a

21    different level of requirements for establishing your

22    right to vote, but for the-- and your state law is still

23    in place with regard to everyone else, so you, state,

24    you're going to have to change your law to match what

25    the federal-- what a federal court has said is an

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 104 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
104

1    interpretation of federal law so that everything is the

2    same.

3              Well, then you've turned Article I, Section

4    2 on its head.  Now the federal law really has changed

5    the qualifications for voting, and the states are no

6    longer able to set it if this Court were to rule, well,

7    the states-- you know, you're going to have to just do

8    whatever the district court says in terms-- and match--

9    and have the same qualifications for state elections

10   that the court now say apply to federal elections - but

11   only for the DMV - federal elections for the DMV, not

12   federal elections for people who register by mail or in

13   person.

14             THE COURT:  Well, I don't see how the-- I

15   don't see how it differs.  The qualifications are the

16   same, federal or state.  You have to be a United States

17   citizen.  It's just in terms of how does the sovereign

18   determine whether someone is a United States citizen.

19   The federal government is satisfied with attestation

20   under oath that-- well, or--

21             MR. KOBACH:  The EAC is not satisfied with

22   that.  The EAC changed that now.  The EAC said, no,

23   proof of citizenship can be required.  So they have

24   not-- they keep mischaracterizing *ITCA* as saying somehow

25   the Supreme Court and the federal government reached the

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 105 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
105

1    conclusion that mere attestation is enough.  That is not

2    what the--

3              THE COURT:  That's the recent development

4    Mr. Newby-- under Mr. Newby's direction?

5              MR. KOBACH:  Correct.  So the-- what you

6    would have is a-- there's several-- I would say several

7    problems with that.  One is the NVRA never says that

8    mere attestation is enough.  It doesn't-- Mr. Ho used

9    the word "solely," that solely attestation.  That word

10   "solely" does not appear in the NVRA.  Doesn't say that

11   solely attestation is enough and no state may require

12   any more.  The NVRA is silent on that question.  So it

13   would be a extraordinary reading of the NVRA to-- to

14   reach that conclusion.

15             Let's go now to the weighing of the

16   equities.  The injury that the plaintiffs are

17   asserting-- well, first of all, they say look at these

18   13,000 people, and they're talking about the number of

19   people who are currently-- I believe they're talking

20   about the number currently on the suspense list, they

21   will be prevented from voting.

22             A couple of things.  One is, in Kansas, you

23   are not qualified as an elector until you have completed

24   all the registration requirements.  And we cite state

25   law on that point, and they don't provide any law to the

1    contrary.  And this is something that is important to

2    note about *ITCA*.  In a footnote, I think it's Footnote 8

3    in *ITCA*, the Supreme Court did not address-- the-- the

4    other assertion, which we in Kansas make but Arizona did

5    not make, that registration itself is a qualification.

6    Citizenship is a qualification and providing proof of

7    citizenship through the registration process is also a

8    qualification.

9            So we would argue that the proof-- having

10   the ability to provide proof of citizenship is also a

11   qualification for voting, or at least going through the

12   registration process.  And the Kansas Supreme Court has

13   interpreted our law and our Constitution in Kansas that

14   the registration process is itself a qualification.  You

15   are not a qualified elector until you have done all the

16   things sufficient to register you.  And so that's an

17   important distinction to make.  And it was not-- and it

18   was something that the Supreme Court expressly declined

19   to rule on in *ITCA* because it wasn't asserted by

20   Arizona.

21           But these individuals, these 13,000

22   individuals, it's actually 12-- well, just pick a

23   number, it varies, but say 13,000 at the current time.

24   These individuals who are in suspense, at the end of the

25   day 94 percent of them are going to complete the

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

107

1    registration process.  Many of these individuals who are

2    on the suspense list, they're only there for a few days

3    or for a few weeks.

4              THE COURT:  So tell me more about that.

5    Where does that number come from?

6              MR. KOBACH:  So that's the-- at any given

7    time, those are the individuals who have written out an

8    application card in person or have registered at the DMV

9    on a renewal perhaps, but without providing proof of

10   citizenship.  And they've gotten their notice saying,

11   hey, you need to provide proof of citizenship.  The vast

12   majority of them do.  94 percent of-- and this is in the

13   declarations.  94 percent of them eventually, before the

14   end of the 90-day period, provide proof of citizenship.

15   Or if the state already has a birth certificate, we talk

16   to the Department of Vital Statistics and get that for

17   them.  So 94 percent of them complete it.

18             When they keep saying to you, oh, these

19   13,000 people are-- are not going to be able to vote.

20   No, 94 percent of those 13,000 are eventually going to

21   come off the suspense list.  They do.  That 13,000 is

22   just a moving number on any given day.  Some people will

23   be on that list, but most of those people will be on

24   that list for a very short period.  They'll get the

25   notice--

16-2105-JAR   Fish, et al., v. Kobach, et al.   04.14.16

1          THE COURT:  So of the 94 percent you're

2   talking about, how many of them come off the list

3   through Kansas' efforts through matching through your

4   vital statistics?  In other words, how many of them are

5   born in Kansas?

6          MR. KOBACH:  Approximately-- and you can ask

7   Bryan Caskey about this, but approximately 40 percent is

8   my understanding.  We send over-- every month we send

9   over the list of all the people on the suspense list to

10  Department of Vital Statistics.  And they run that

11  against their records of birth certificates for people

12  in Kansas.  And about 40 percent come off the list that

13  way.  And the other 54 percent come off by, on their

14  own, providing some proof of citizenship that they may

15  have.

16          And so you're then left with the remaining

17  6 percent.  Well, the remaining 6 percent, a lot of them

18  move away.  And we've found-- and we've presented

19  evidence from Sedgwick County where they did a study of

20  700 people on the suspense list.  They found that about

21  30 percent of those 700 had already moved to a different

22  address.  We're such a transitory society that a lot of

23  people register and then a couple months later they get

24  a job transfer or they see a nicer home or an apartment

25  and they move to a different place.  So many of the

16-2105-JAR   Fish, et al., v. Kobach, et al.   04.14.16

109

1    people on that list have actually moved.

2              And then another subsection of that

3    6 percent are going to be non-citizens, who either

4    intentionally or unintentionally register to vote.  And

5    we see that a large number do so unintentionally.  They

6    subsequently say, oh, I didn't know I couldn't register

7    to vote.  I thought-- I thought as a green card holder I

8    could do that.

9              THE COURT:  When you see that in statistics,

10   and there aren't very many, but people that are

11   naturalized and you determine that they were already

12   registered to vote, these are people that are on the

13   pathway to citizenship and made an honest mistake, they

14   weren't fraudsters, so to speak.

15             MR. KOBACH:  Right.

16             THE COURT:  But so of-- so the 94 percent,

17   do they all get that first notice that they're in

18   suspense, or do you check against the database before

19   you give anybody notice?

20             MR. KOBACH:  They will get that first notice

21   immediately.  And then the checks against the database

22   occur within that first month.  We-- the state takes the

23   entire list every roughly 30 days and sends it over.  So

24   some of them might have that check made almost

25   immediately after they send the notice.  But the policy

1   of the state is to have that notice sent out

2   immediately.

3           THE COURT:  All right.  And just so I'm

4   clear, and again, if this is a better question for Mr.

5   Caskey, do all the counties do the same thing?  You've

6   told me that there's three notices.  There's the notice

7   that presumably the person gets in a written form at the

8   DMV, and then they get three more notices and then

9   there's a phone call.  All of the counties do that?

10          MR. KOBACH:  All of the counties are

11  instructed to do that.  There are some counties who do

12  more.  And there may be, I'm not aware of any, and there

13  may be some counties who are not following the

14  instructions from the Secretary of State's Office.  But

15  we instruct all of the counties as chief election

16  officer for the state to follow these procedures.  And

17  we do know that some counties do more, and Sedgwick

18  County is one that has done more on some occasions.

19  When-- when the regulation was going into effect, they

20  sent out an additional notice saying, hey, by the way,

21  this 90-day regulation is about to take effect.  We're

22  going to let you know another time.  So they-- there are

23  some counties that have gone on further.

24          Let me quickly, while we're on the subject

25  of Sedgwick County, talk about the number of aliens that

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

111

1  we have discovered.  Exhibit 8, which we just admitted

2  into evidence, is an update of the spreadsheet that was

3  sent to the EAC in November of 2015.  The one that was

4  sent to the EAC included 18 cases of aliens who either

5  successfully registered or attempted to register.  This

6  new update includes seven more cases that the Sedgwick

7  County election office discovered between November of

8  last year and today.  And so now we're up to 25 cases in

9  one county.  25 cases of aliens we've discovered who got

10  on the voter rolls and were subsequently-- in most cases

11  we-- Sedgwick County learned of it when they finally

12  became a naturalized citizen.

13          Of those 25 cases, approximately two-thirds

14  registered at the DMV.  And what appears to be happening

15  is that there might be some human error at a-- when a

16  DMV agent says at the end of transaction, and maybe it's

17  her 400th transaction that day:  Oh, and now would you

18  like to register to vote?  And maybe doesn't think, wait

19  a minute, I just saw from this person a green card, that

20  would mean that he's not-- he's not a citizen.  For

21  whatever reason, a lot of them are registering at the

22  DMV.

23          And this is important too.  Of those 25,

24  three actually voted.  And this is just Sedgwick County

25  alone.  And many of them voted multiple-- two of them

1    voted multiple times.  And they're on the first page of

2    this expanded chart.  And they voted in the special

3    election of 2007, which was an election that was so

4    close it had to go to a mandatory recount.  It was

5    regarding gambling machines in Sedgwick County.  So

6    these are close elections, although that doesn't

7    necessarily have to be true for this to be a problem.

8    But this is 25 aliens discovered in roughly the last two

9    years in one county in Kansas.

10            And this is just the tip of iceberg.  We

11   only discover most of them if they become naturalized.

12   And many of these instances, they were on the voter

13   rolls for eight or more years before they finally

14   naturalized.  And that's-- so the 25 is not the

15   entirety.  We keep discovering more every month in

16   Sedgwick County.  But Sedgwick County is the one county

17   that's tracking this carefully.

18            But Sedgwick County is about one-sixth of

19   the population of Kansas.  So you multiply that times

20   six, if all of our counties were tracking this data,

21   we'd be talking about 150 discovered in just the last

22   two months-- or last two years.  So we're talking about

23   a-- the tip of the iceberg is itself substantial.

24            Now, you-- you make the point, which is a

25   very good one, that this is-- some of these individuals

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 113 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
113

1    is through no fault of their own.  The nice person

2    behind the desk at the DMV asked me if I wanted to vote,

3    I thought I could do it.  One lady, she actually-- in

4    one of these cases who voted multiple times, she was a

5    green card holder and she thought it would help her

6    application to eventually become a U.S. citizen to-- to

7    say that, yeah, I've been voting a lot and that shows

8    she would be a good citizen.  And indeed, maybe in some

9    respect it does.  But the point is, it's-- it's

10   prohibited by law.

11           Every time an alien votes, it effectively

12   cancels out the vote of a U.S. citizen.  And federal law

13   and state law prohibit aliens from voting.  So even

14   though they accidentally get on the rolls, the problem

15   that the state needs to solve at the front end-- and

16   that's the only way you can actually stop-- you can

17   actually make this problem go away is at the front end

18   where you do not allow the person to come on the voter

19   rolls at all.

20           Once they get on the voter rolls as a

21   non-citizen, we've tried all these five mechanisms,

22   you're probably not going to discover it until and if

23   that person eventually naturalizes and becomes a U.S.

24   citizen.  And then eight or ten years later, you realize

25   that for the last eight or ten years this person has

1    been on the voter rolls, in many instances has been

2    voting.  That's why the state has determined it's

3    necessary to do something at the front end, not to do

4    prosecutions and-- I mean not to only do prosecutions

5    and all of these other things at the back end.

6              So it is a substantial problem.  And it's

7    not weighed against 13,000.  Most of those 13,000,

8    94 percent of them, are going to be registered at the

9    end of the day.  They're just temporarily on the

10   suspense list and they'll come right off as soon as they

11   send in or text in-- and by the way, you can text it in

12   in many counties, you can e-mail it, take a picture of

13   it with your smart phone, do it from your couch.  You

14   can send it in, you can fax it in, you can bring it in

15   by person.  It's so easy to provide this proof of

16   citizenship.  And the state really does bend over

17   backward to-- to make it easy and to continually notify

18   the person.  And then in the case of someone born in

19   Kansas, we go the extra step and say we're going to

20   contact another state agency and get it for you.

21             But let's go back to the weighing of

22   equities.  So first, the Secretary of State's Office

23   would face significant administrative burdens.  So we're

24   talking about identifying all of these 12,500 people

25   right now that this-- an injunction would affect and

Case 2:16-cv-02105-JAR  Document 115  Filed 05/06/16  Page 115 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
115

 1    changing their status.  Now, identifying them is the

 2    part that would take less than an hour.  But then every

 3    one of the county election officials would have to go

 4    through each one of those 12-and-a-half thousand

 5    records, go in and manually change the status from

 6    suspense to active, federal elections only.

 7              THE COURT:  But you're telling me the lion's

 8    share of them are going to do that anyway.

 9              MR. KOBACH:  What's that?

10              THE COURT:  But you're telling me the lion's

11    share of them, they're going to change their status

12    anyway.

13              MR. KOBACH:  Eventually.  But in these-- in

14    these-- you still have to--

15              THE COURT:  No, within 30 days.  I mean,

16    you're telling me in very short measure, most of these

17    people's status are going to be change.

18              MR. KOBACH:  But you're changing it from a

19    one-step process to a two-step.  If they eventually

20    provide their proof of citizenship, they will be active

21    for all elections.  What this preliminary injunction

22    would do is make-- right now make them active for

23    federal elections only.  Then for 94 percent of them,

24    you go in again and make them active for all elections.

25    So now two transactions occur in the record instead of

1    one.

2            But then on top of this, you've got to send

3    them notice at that point and say here's-- pursuant to a

4    court order from the District of Kansas, you are now

5    registered to vote in federal elections only.  Now,

6    they've already been sent a mail-- a notice that was

7    contradictory to that, saying you're not going to be

8    registered to vote in any elections until you provide

9    proof of citizenship.

10           Now we're going to have to notify them.

11   That's costly, 58 cents per mailing to print and send

12   it.  And we're going to notify them all, okay, your

13   status has changed now.  That's where all the time and

14   the money comes in, and the confusion comes into the

15   voters.

16           And then if the Court were to rule in favor

17   of defendants, assuming you legally have that authority

18   under the NVRA to tell us, okay, you can change them

19   back, then they're going to be yo-yo-ing back again with

20   another notice.  Oh, sorry, the case went the other way,

21   now you're still required to provide proof of

22   citizenship to vote-- to vote in any elections.

23           So it is administratively burdensome.  We

24   can do it.  At the end of the day, if at the end of a

25   hearing on the merits, the plaintiffs prevail, we can do

 1    it.  But doing-- but going back and forth will be

 2    extremely confusing and I think potentially in violation

 3    of the NVRA.  I think very likely in violation of the

 4    NVRA because you'd be ordering us to take someone off

 5    the list that was added to the voter rolls.  And the

 6    NVRA is pretty clear on that point, you can't take

 7    someone off the voter rolls except under very limited

 8    circumstances.

 9              We've talked about the other harm to the

10    state would be of administering a two-tiered election,

11    which is not-- we only had about 300-and-some, 383 in

12    2014 during that interim period when the federal form

13    had not yet changed.  Now we'd be talking about a

14    federal-only election with 20,000 or more individuals.

15    That's a massive administrative undertaking.  You're

16    going to have lots of people in that status.

17              In-- in the 2014 instance, only three of

18    those 383 people actually showed up to vote.  When

19    you've got 20,000, now you're going to be having a much

20    larger percentage showing up to vote.  And you're going

21    to have to make sure that those votes, those ballots are

22    processed separately and treated according to the

23    federal-only rules.  So that's going to be a significant

24    burden, and also increase the chances of error.

25              And then you also have the -- the simple

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 118 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
118

1   interest of the state in assuring that aliens don't get

2   on the rolls in the first place.  What we are

3   essentially going to do is create a huge loophole in the

4   NVRA in the process-- a huge loophole in the proof of

5   citizenship law by interpreting the NVRA this strange

6   way, where now 44 percent of all people who vote,

7   everyone who uses the DMV, you've got this massive

8   loophole that now you don't have to provide proof of

9   citizenship if you-- if you register this way, as

10   opposed to registering by mail.  It's a strange reading

11   of the NVRA.

12          But the problem is, now our ability to use

13   that screen on the front end to prevent citizens (sic)

14   from getting on the voter rolls is largely ineffective

15   because we've taken approximately-- we've taken the

16   No. 1 way people register and we've made that an

17   exception to the rule of Kansas law.

18          And I think overall, we're talking about

19   plaintiffs having legitimate policy disagreements.  They

20   make policy arguments of why the Legislature of Kansas

21   shouldn't have done this.  They can-- you know, it adds

22   another step in the registration process.  Absolutely

23   they can make those policy arguments and-- and those

24   arguments were made in front of the Kansas Legislature.

25   But at this point, the law is the law and the state is

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 119 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
119

1   within its authority.

2          Now, the final-- the-- finally I want to go

3   to the legislative history.  I think the statutory text

4   is clear enough.  The statutory text says it's only an

5   application and that it's an application for the state

6   officer to determine what is necessary to satisfy the

7   state election process.  And then we have the Supreme

8   Court in *Fordice* and in *ITCA* both-- in *Fordice* saying

9   there can be more information required beyond what's on

10  the DMV form.  And in *ITCA*, the Court contemplating

11  proof of citizenship.

12         Plaintiff says, well, let's go to the

13  legislative history.  Well, as you know, you only go to

14  legislative history when the statutory text is unclear.

15  And if we go to the legislative history, let's do that

16  for a second.  He says the Simpson amendment was

17  proposed to permit states to require proof of

18  citizenship.  That is false.  We have included in your--

19  in these exhibits Exhibit No. 7, which is a

20  congressional record.  And there's highlighted on that

21  the statement-- the discussion of this.  It's on

22  Page 22-- it's 2902.  S2902.

23         What Mr.-- what Senator Simpson's amendment

24  did was not a permitting the states to do something, it

25  was an interpretation clause.  And the clause simply

 1    said this, "Nothing in this Act shall be construed to

 2    preclude a state from requiring presentation of

 3    documentary evidence of citizenship of an applicant for

 4    voter registration."  Nothing shall be construed to

 5    preclude a state from doing this.  Now, the plaintiffs

 6    misleadingly suggest that this was-- that this amendment

 7    was later removed in the Conference Committee because

 8    Congress was opposed to proof of citizenship.  Well, if

 9    you read the legislative history, it makes quite clear

10    that the opposite is true.

11            Senator Wendell Ford, who was one of the

12    principal sponsors of the NVRA in the Senate answered

13    Senator Simpson, and this is found on the bottom of the

14    first column of Page S2902.  He says, "I say there is

15    nothing in the bill now that would preclude the states

16    requiring presentation of documentary evidence of

17    citizenship.  I think basically this is redundant."  And

18    then he goes on, "There is nothing in there now that

19    would preclude it."

20            So the principal sponsor answered Mr.

21    Simpson by saying there's nothing-- it's silent on proof

22    of citizenship.  Nothing in the NVRA precludes a state

23    from requiring it.  Mr. Simpson, we don't need your

24    interpretation amendment.  It's not a permitting

25    amendment, as the plaintiffs incorrectly claim.  We

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 121 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
121

1    don't need your judicial interpretation amendment

2    because nothing in the NVRA could be read as prohibiting

3    a state from doing so.

4            So I think the statutory history, the

5    legislative history supports the defendants here.  And

6    remember, also, it would violate the canons of

7    construction anyway to find a congressional command in

8    congressional silence.  And we cited numerous Supreme

9    Court cases on that topic.  And that's pretty much an

10   elementary principle.  You don't-- when a statute is

11   silent on something, you don't infer that it prohibits.

12           But even more importantly, the NVRA itself

13   does list one thing that a states-- that states cannot

14   do.  It did prohibit states in any registration form,

15   whether it be on the federal form or in the state form--

16   mail form or any form, you cannot require notarization

17   of the registration application.  So that shows that the

18   drafters of the NVRA understood how to expressly

19   prohibit something.  No notarization.

20           Therefore, you cannot assume that when they

21   are silent on the question of documentary proof of

22   citizenship, they were also prohibiting it.  No.  They

23   were express about what they were prohibiting,

24   notarization.  So the silence is doubly problematic as

25   a-- as an argument for the conclusion that there is a

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 122 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
                                                                  122

1    prohibition of proof of citizenship in the NVRA.

2           I wanted to give you the cite for what I

3    asserted earlier, that a-- that a district court can't

4    do a statewide injunction in a case like this prior to

5    class certification.  That's from *Everhart versus Bowen*,

6    833 F.2d 1539 (sic).  "Absent class certification, the

7    district court should not have treated the suit as a

8    class action by granting statewide injunctive relief."

9           And then quickly I'll just answer a couple

10   of points that Mr. Ho made.  He said that *ITCA* held that

11   the federal government has plenary authority over what

12   can be used to prove citizenship.  Again, that was not

13   what *ITCA* held.  The Court said it would raise

14   constitutional doubt if we held that the state cannot

15   require proof of citizenship.  And so, therefore, we're

16   going to instruct Arizona, yeah, if you want, go ahead

17   and ask the EAC again.  That's our way out of this

18   conundrum.

19          He also mentioned that the-- the NVRA

20   expressly prohibits proof of citizenship.  Again, you

21   will find that nowhere in the NVRA.  It never says this

22   is prohibited.  The only thing that's prohibited is

23   notarization of the form.

24          With that, I think now would be a good time,

25   if the Court so concludes, to have Mr. Caskey come up.

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 123 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
123

1           THE COURT:  That's fine.  Yes.

2           MR. KOBACH:  So this is Mr. Bryan Caskey.

3  He is the Director of Elections for the State of Kansas.

4  And he is the chief custodian of the ELVIS, Election

5  Voter Information System.

6                   BRYAN CASKEY,

7  called as a witness on behalf of the Defendant Kobach,

8  having been first duly sworn, testified as follows:

9           MR. KOBACH:  Do you want to ask the--

10                    EXAMINATION

11  BY THE COURT:

12     Q.  I do-- I do have some questions, Mr. Caskey.  The

13  ELVIS system records notice of mailing, but not notice

14  of receipt.  Correct?

15     A.  Yes, Your Honor, that is correct.

16     Q.  Okay.  And then the ELVIS system, and I'm looking

17  at Exhibit 9, which I had not seen before, which are

18  printouts I think from the ELVIS system.  It does

19  provide an area for note-taking if there are

20  communications with the applicant; is that correct?

21     A.  That is correct.

22     Q.  So if there is, in fact, a phone call, an oral

23  conversation, would that always be recorded in the

24  notes?

25     A.  I would state that it probably is not always

1    corrected (sic).  It is a best practice that we've

2    instructed the 105 counties.  But there are 105 counties

3    that have approximately 500 users, and I certainly would

4    not state that they all do that correctly 100 percent of

5    the time.

6        Q.  All right.  I'm looking at Mr. Ralph Ortiz, and

7    there's a note that indicates the date, "first notice

8    sent."  And then there's a notation that says,

9    "2-27-2015, called to regarding suspense status."  I

10   can't tell whether this means the clerk called or

11   received a call, but-- and then there's another date

12   that says, "Proof of citizenship required, first notice

13   sent."  So it has two notations of first notice sent.  I

14   can't tell if it was to two different addresses or not.

15   But essentially your best practice is all

16   communications, written or oral, are recorded in some

17   way?

18       A.  Yes.  That would be a best practice and one that

19   we have instructed all 105 counties to follow.

20       Q.  Okay.  And then-- all right.  So you heard me ask

21   Mr. Kobach these same questions.  But let's start with

22   the first-time driver's license registrant who presents

23   at the DMV and they have proof of presence.  And if

24   they're a citizen, that probably means they've got proof

25   of citizenship with them which they have to show to get

1   the driver's license.

2       Are the clerks at the DMV affirmatively trained

3   to ask, "Do you want to register to vote" to that

4   first-time driver's license registrant?

5       A.  That is my understanding.  Keeping in mind that I

6   am not an employee of the Division of Revenue and I-- I

7   work in the state election office.

8       Q.  Okay.

9       A.  But my-- my-- to the best of my ability, every

10  transaction at the Division of Motor Vehicles that

11  involves applying for or renewing a driver's license

12  requires the driver's license examiner to ask the person

13  at the conclusion of the driver's license part of the

14  examination, "Do you also want to register to vote?"

15      Q.  Okay.  So that-- my next question was; in the

16  renewal situation where the person isn't going to

17  necessarily show up with proof of legal presence, proof

18  of citizenship, the clerk asks them, "Do you want to

19  vote?"  And if they say yes, the clerk records that on

20  the screen.  Does the clerk go the next step of saying,

21  "Do you have proof of citizenship with you?"

22      A.  It is my understanding that after the person is

23  asked, "Do you want to register to vote," that they are

24  not currently asked for proof of documentary citizenship

25  as part of the renewal application process at DMV.

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

126

1    Q.  So instead, if they said yes, what would happen

2    is what?  What would happen?  They're not asked if they

3    have the documentation, so what does happen next?

4    A.  From the driver's license perspective or--

5    Q.  Right.

6    A.  -- from the voter registration applicant's

7    perspective?

8    Q.  What does the clerk do?  The clerk has been told,

9    yes, I want to register vote.  The clerk puts yes.  And

10   then what?

11   A.  Then there are I believe three questions that are

12   asked of the voter registration applicant to complete

13   the voter registration application process.  And those

14   three questions have to do with things that are not

15   asked during the driver's license application process.

16   I believe the questions have to do with party

17   affiliation and have you been previously registered to

18   vote before.  And off the top of my head I can't

19   remember the third one, but it's something that's not

20   asked.

21   Q.  "Are you a United States citizen," is that asked?

22   A.  I believe so.  But off the top of my head, I-- I

23   would want to do some checking first.

24   Q.  All right.  But they're definitely not asked if

25   they have proof of citizenship?

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 127 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
127

1    A.  It is my understanding that they are not asked,

2   "Do you have documentary proof of citizenship," at that

3   point in time.

4    Q.  All right.  So after they run through those three

5   questions, what next does the clerk do?

6    A.  Then at the conclusion of that, the driver's

7   license applicant then signs a statement saying that

8   they understand what they're signing is-- is true and

9   correct.  And so they sign a digital thing to complete

10  the application.  And then they are handed a receipt of

11  the transaction.  And on that receipt, there's a

12  statement that says, "If you have not already provided

13  proof of citizenship, you must do so before you are

14  registered to vote."  And then it gives some contact

15  information for the state election office, I believe.

16   Q.  And why does it say, "If you have not already

17  provided proof of citizenship," if they're not even

18  asked for it in the renewal situation?

19   A.  I would have to look at the exact language.  I

20  haven't seen that form, it's not one that I personally

21  drafted.  I would answer that because the-- the person

22  would have no way of knowing if they are a first-time

23  voter registrant application or not.  That statement,

24  you are only required to provide proof of citizenship if

25  you're registering to vote for the first time.  And the

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 128 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
128

1   driver's license office will have no way of knowing that

2   at the time that the person applies to register to vote.

3   So the statement may be generic enough to cover all

4   circumstances of applicants when the driver's license

5   office will not know the specific status for that

6   applicant.

7       Q.   All right.   So the person leaves the DMV with a

8   receipt of their transaction.   And on that receipt is

9   information about what they have to do next to

10  register-- to apply to register to vote?

11      A.   Yes.

12      Q.   Okay.   In your affidavit, you indicated that--

13  you gave, I think, a date of notice for each of these

14  plaintiffs.   But my understanding now is that the system

15  provides more than one notice?

16      A.   The system itself does not provide that notice.

17  Each of the 105 county election offices provide the

18  notice.   They reflect the transmittal of the notice

19  within the system.   The system itself does not

20  automatically kick out a notice.

21      Q.   Okay.

22      A.   Our instructions to all the 105 county election

23  officers are:   Immediately upon receipt of a voter

24  registration application that is incomplete for any

25  reason, not just proof of citizenship, then you

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

129

 1   immediately send a notice saying that your voter

 2   registration application is incomplete and this is what

 3   steps you need to take to complete your application.

 4        That-- to my knowledge, each of the 105 counties

 5   does that promptly.  Our instructions to each of the 105

 6   counties then goes on to say:  We recommend if you have

 7   not received anything, then send another notice a couple

 8   weeks later, approximately two weeks later, to give them

 9   time to respond to the first notice.  But if they

10   haven't responded, send another reminder.

11        And then our instructions are, if they still

12   haven't responded to the notice, then approximately two

13   weeks before the 90 days expires, when they-- when the

14   administrative regulation allows you to complete your

15   application, to send one final notice saying:  This is

16   your final notice before your application will be

17   cancelled.  Please submit, you know, whatever is

18   required, including documentary proof of citizenship.

19        We also recommend that if the county has the

20   resources, to use whatever means they have available to

21   contact the voter; by phone, by e-mail, any way possible

22   we recommend.  You know, I can't force the county to do

23   it, but that's what our-- our recommendations are.

24   Q.  Okay.  All right.  That answers my questions.

25            THE COURT:  And Mr. Kobach, if you have any

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 130 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
130

1    follow-up questions.  And Mr. Ho, if you have any

2    questions.  And also Mr. Cox, if you have questions.

3                    MR. KOBACH:  Sure.

4                         EXAMINATION

5    BY MR. KOBACH:

6      Q.  Mr. Caskey, this is to perhaps clarify something

7    that-- that the Court was asking.  What happens when a

8    person who was previously registered to vote in Kansas,

9    but then perhaps left the state and then comes back and

10   gets a Kansas driver's license and is asked if he wants

11   to register, if he was previously registered to vote

12   prior to January 1, 2013, under those circumstances does

13   he have to-- have to provide proof of citizenship again?

14     A.  Let me make sure I have the-- the timeline

15   correct.  Was the person registered to vote on

16   January 1, 2013?

17     Q.  Yes.  And my question, he was registered to vote

18   when the law went into effect and, therefore,

19   grandfathered in.

20     A.  Okay.  That person would not be required to

21   provide proof of citizenship with their subsequent

22   application.  Once you have provided proof of

23   citizenship and once the state has deemed you to have

24   provided proof of citizenship, you do not have to

25   provide it again in the future.  Everyone that was

1    registered to vote on January 1, 2013, was grandfathered

2    in as having been provided proof of citizenship.

3         If after that point in time, you cancelled your

4    registration because you moved out of state, then moved

5    back into Kansas and subsequently applied to register to

6    vote, that previous application would come back and

7    you'd have to-- you would not be required to again

8    provide proof of citizenship.

9    Q.   And so similarly, if a person registered to vote

10   in Kansas after the proof of citizenship law went into

11   effect and say in-- sometime in the year 2013 provided

12   proof of citizenship, left the state and cancelled their

13   voter registration, perhaps voluntarily by themselves,

14   and then came back in and at the DMV registered to

15   provide proof of citizenship-- registered to vote--

16   applied to register to vote, would they have to provide

17   proof of citizenship again?  Or would--

18   A.   They would not.

19   Q.   Okay.  And you're-- I'm sort of surprising you,

20   Bryan, with this question.  But looking at the six

21   plaintiffs, is it your understanding that only-- that

22   only one of them actually provided citizenship?  And I

23   believe that was Mr. Boynton; is that correct?

24   A.   I would want to look at the record real quick.

25   I'm not sure I could say-- remember that off the top of

1   my head.

2       Q.  Okay.

3       A.  May I?

4           MR. KOBACH:  No further questions, Your

5   Honor.

6           THE COURT:  All right.  Thank you.  Mr. Cox.

7           MR. COX:  Thank you, Your Honor.  No

8   questions.

9           THE COURT:  Mr. Ho.

10          MR. HO:  Just a few questions, Your Honor.

11          THE COURT:  That completed your argument as

12  well, Mr. Kobach?

13          MR. KOBACH:  Yes.

14          THE COURT:  Okay.

15          MR. KOBACH:  Oh, actually, Your Honor, I did

16  have one point to make.  Do you want me to make it now

17  before Mr. Ho gets up?

18          THE COURT:  Yeah, go ahead.  And then he can

19  ask questions and then-- then we'll hear from Mr. Cox.

20          MR. KOBACH:  Okay.  The-- this line of

21  questioning we're getting into right now is whether the

22  state has a duty to provide notice with-- at the DMV

23  about the person's-- to request at the DMV, "Do you have

24  proof of citizenship on you now," and to also make a

25  verbal statement to the individual about the obligations

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 133 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
133

1   of proof of citizenship.  That particular claim was not

2   in the plaintiffs' 90-day letter.

3              Under the NVRA, you can't bring a lawsuit

4   until you first lay out your objections under the NVRA

5   for 90 days.  So that particular claim is beyond the

6   scope of what we're currently jurisdictionally able to

7   address right now.

8              THE COURT:  All right.  Thank you.

9              MR. HO:  Just a few questions, Your Honor.

10                    EXAMINATION

11  BY MR. HO:

12     Q.  Good morning, Mr. Caskey.

13     A.  Good morning.

14     Q.  Mr. Kobach during his argument made reference to

15  a hearing process by which people purportedly can

16  establish their citizenship even without documentation.

17  Were you in the courtroom for that?

18     A.  Yes, I was.

19     Q.  Okay.  And that is a hearing that takes place in

20  front of the State Board of Elections; is that correct?

21     A.  That is correct.

22     Q.  And who sits on the State Board of Elections?

23     A.  It is the Secretary of State, the Attorney

24  General, and I believe it's the Lieutenant Governor is

25  the third member of the body.  There's a couple

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

134

1    different statewide boards and sometimes it's the

2    Governor, sometimes Lieutenant Governor.  And I believe

3    off the top of my head that in this case it's--

4    Lieutenant Governor is the third member of the board.

5        Q.  So if I understand you correctly, if someone

6    wants to establish that they are a citizen without

7    providing one of the documents enumerated in the

8    statute, that person has to petition a body that

9    consists of the Secretary of State, Mr. Kobach himself,

10   the Lieutenant Governor of the state.  And I'm sorry,

11   who else?

12       A.  The Attorney General is the third member.

13       Q.  And the Attorney General of the state.  I believe

14   that's Mr. Schmidt right now.  Correct?

15       A.  That is correct.

16       Q.  Okay.  Now, if one were trying to establish their

17   proof of citizenship at that hearing, would a document

18   attesting to the fact that that person is a citizen

19   suffice?

20       A.  I am not qualified to answer on behalf of either

21   of the Secretary of State, the Attorney General, or the

22   Lieutenant Governor in their capacity as the hearing--

23   the State Election Board.

24       Q.  Sorry.

25       A.  So I-- I don't feel like I could answer on their

1    behalf.

2        Q.   Are you aware of any standards that the board

3    applies with respect to assessing whether or not someone

4    is, in fact, a United States citizen?

5        A.   I do not have personal knowledge of each of their

6    stances on that standard.

7        Q.   All right.  But you're aware of the fact that

8    there were a total of three of these hearings; is that

9    correct?

10       A.   To this point in time that is correct, yes.

11       Q.   Okay.  I want to ask you a few questions, Mr.

12   Caskey, about the process for contacting people on

13   suspense.  I believe you described a process whereby the

14   individual counties are supposed to contact people on

15   the suspense list; is that correct?

16       A.   That is the policy, yes.

17       Q.   The Secretary of State's Office doesn't make

18   those contacts.  Correct?

19       A.   That is correct.

20       Q.   And the process is something that's suggested to

21   the counties, it's not mandatory that the counties

22   engage in that process.  Correct?

23       A.   It is the official policy of this state and one

24   that we have provided written guidance on.  I would say

25   in my capacity as the Director of Elections, when I

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

136

1    provide training to the counties, that if I say it, that

2    yes, it's mandatory.  But I cannot point to a law that

3    says thou shalt do this.

4        Q.   Okay.   There are no consequences for a county if

5    they don't follow your guidance on this, are there, Mr.

6    Caskey?

7        A.   There is not in the law.  That is correct.

8        Q.   And you don't know if the practices that counties

9    engage in with respect to contacting people on the

10   notice list are uniform across the state, do you, Mr.

11   Caskey?

12       A.   I do not have personal knowledge of each of the

13   105 counties.

14       Q.   And you do not directly supervise those county

15   election officials.  Correct?

16       A.   I provide training and education to all 105

17   counties.  I am not their supervisor.

18       Q.   Okay.  I want to ask you some questions about

19   what the Secretary of State's Office has labeled

20   Exhibit 9.  I believe these are some ELVIS printouts.

21   Do you have a copy of them at-- with you up there?

22       A.   I have some ELVIS printouts, yes.  I cannot swear

23   that what you have is what I have.

24       Q.   Does the first page relate to Mr. Steven Wayne

25   Fish?

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

137

1    A.  Yes, mine does.

2    Q.  Okay.  I think we have the same documents.  Let's

3    go through this and if there's a discrepancy, we'll--

4    we'll try to sort it out.

5    A.  Okay.

6    Q.  So about halfway through these printouts, and

7    there's no page numbers here, so it may take a few

8    minutes to find it, but there's an entry for a Donna

9    Jean Bucci, one of the plaintiffs in this matter.  And

10   the notes field where I believe you testified earlier

11   that county election officials are supposed to record

12   their contacts with suspended voters.  Try to find that.

13   Like I said, it's about halfway-- a little less than

14   halfway through.

15   A.  I believe I found the page that you're

16   referencing, yes.

17   Q.  Okay.  And this box at the bottom, is that the

18   notes field where the county election official is

19   supposed to record contacts with suspended voters?

20   A.  There is a notes field.  When you refer to the

21   box at the bottom, I'm not sure what you're looking at.

22   But in the system, the last tab contains a note field--

23   a notes field that is free-flowing where elections

24   staff-- free flow of-- enter information.

25   Q.  Okay.  It looks like according to the-- and I'm

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

138

1    sorry.  And you indicated that the practice that

2    elections officials are supposed to follow is to record

3    every contact with suspended voters in the notes field.

4    Correct, Mr. Caskey?

5        A.   I believe that is a best practice, yes.

6        Q.   Okay.  And they're supposed to do that.  That's

7    your advice to them.  Correct, Mr. Caskey?

8        A.   That is a best practice that we've set, yes.

9        Q.   Now, this first entry here indicates that in-- on

10   August 16, 2013, there was a contact or a notice sent to

11   Ms. Bucci about proof of citizenship.  Correct?

12       A.   I do see that, yes.

13       Q.   Okay.  And then the third line down indicates

14   that approximately two years later on September 28th,

15   2015, a proof of citizenship notice was sent to her

16   again.  Correct?

17       A.   That is what the document reflects, yes.

18       Q.   And the document does not reflect any contacts

19   asking Ms. Bucci to submit documentary proof of

20   citizenship during the two-year intervening period.

21   Correct?

22       A.   There is a notation in between those that's dated

23   9-25-2013 that states, "Will get information to us on

24   POC when she gets items unpacked."  From my perspective,

25   I would assume that was a result of some sort of contact

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

139

1   between the election office and the applicant.  I am

2   unable to determine how, when, or where that contact

3   took place.

4       Q.   Okay.  But this document does not indicate that

5   between September of 2013, September 25th of 2013, and

6   September 28th of 2015, over two years, any contact was

7   made by the county clerk's office with Ms. Bucci

8   regarding her documentary proof of citizenship.

9   Correct?

10      A.   This piece of paper does not reflect that.  You

11  are correct.

12      Q.   And the best practice would be if there had been

13  any such contacts, to reflect that in this spread-- in

14  this notes field.  Correct?

15      A.   That would be a best practice, yes.

16      Q.   So Ms. Bucci received a notice on September 28th,

17  2015, that she needed to send proof of citizenship.  And

18  it looks like just over two weeks after that, on

19  October 15th, 2015, her voter registration form was

20  cancelled.  Correct?

21      A.   There is a note that is dated 10-15-15 that says,

22  "Cancelled due to K.A.R. 7-25-15."

23      Q.   So she is recorded now as being cancelled in the

24  ELVIS system.  Correct?

25      A.   That is correct.  Well, when this piece of paper

16-2105-JAR   Fish, et al., v. Kobach, et al.   04.14.16

140

1  was printed off, that is correct.  I cannot speak to

2  what the record says right now.

3     Q.  Okay.  So just so that the record is clear here,

4  fewer than three weeks between her last notice about

5  proof of citizenship and her cancellation.  Correct?

6     A.  That would be correct according to the notes in

7  this record, yes.

8     Q.  Okay.  I just want to ask you about one other

9  plaintiff's records here.  It's towards the end.  It's

10  Mr. Boynton's records.  Just let me know when you find

11  it.

12     A.  I am on the first record that has his name on it.

13     Q.  Can you turn I believe it's to the second page

14  that has the notes field?

15     A.  I have that page, yes.

16     Q.  Okay.  Sorry, it wasn't the second page.

17     A.  It's okay.

18     Q.  About six or seven in.  According to the notes

19  field here for Mr. Boynton's record in the ELVIS system,

20  and again, Mr. Boynton is one of the plaintiffs in this

21  matter, he was a new registrant as of November 21st,

22  2014.  Correct?

23     A.  That is the date listed in the application date,

24  you are correct.

25     Q.  And he did not submit documentary proof of

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

141

1    citizenship at that time and that's why he ended up on

2    the suspense list.  Correct?

3        A.  That is correct.

4        Q.  Okay.  I'd like to show you an exhibit that

5    Defendant Jordan has given to us.

6             MR. HO:  Permission to approach, Your Honor.

7             THE COURT:  Yes.

8        Q.  (BY MR. HO)  This has been marked as Jordan

9    Exhibit 1.  It appears to be a printout of Mr. Boynton's

10   DMV records.  Does that look correct to you, Mr. Caskey?

11       A.  Give me a minute to look over it real quick.

12       Q.  Sure.

13       A.  I believe that to be the case.  It's actually

14   been several years since I've sat in front of a training

15   session at DMV to see the screens.  So to the best of my

16   knowledge that is correct.

17       Q.  Okay.  And there are three boxes on the second

18   page of this DMV record.  Correct, Mr. Caskey?

19       A.  That is correct.

20       Q.  And the second and third boxes both indicate that

21   Mr. Boynton presented documentary proof of citizenship

22   to the DMV at some point in 2015.  Correct, Mr. Caskey?

23       A.  I cannot come to that conclusion just sitting

24   here reading this on its face.  I see a box that says

25   "voter" in both Box 2 and Box 3.  And in both cases that

1    has an "N" next to it, which I assume means no.  And I

2    do not see anything in either box that references any

3    type of proof of citizenship.

4        Q.  Do you see "birth certificate" in the second box,

5    Mr. Caskey?

6        A.  I see a notation that says, "Replacement KS DL

7    with BC and lease for address."

8        Q.  Uh-huh.  So--

9        A.  And there are notes-- I presume that that's in

10   their notes field.

11       Q.  So fair to read that as Mr. Boynton sought a

12   replacement driver's license in 2015 and presented a BC.

13   Correct?

14       A.  That is-- I would say that is correct, yes.

15       Q.  Would-- do you think it's reasonable to infer

16   that a BC is a birth certificate, Mr. Caskey?

17       A.  In the context of this conversation, I would say

18   yes.  But in the context of issuing a driver's license,

19   I have no idea what possible definitions of all of the

20   acronyms that DMV uses.

21       Q.  Okay.  So according to this document, sometime

22   after Mr. Boynton was suspended, after-- in 2014, in

23   2015 he appeared at the DMV and presented a BC.

24   Correct?

25       A.  Yes.  That appears to be correct.

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 143 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
143

1    Q.  And as far as you know, Mr. Boynton's voter

2  registration has been cancelled, despite submitting a BC

3  to the driver's license office in 2015.  Correct?

4    A.  Based on the documents in front of me, yes, that

5  would be correct.

6    Q.  Okay.

7         MR. HO:  No further questions from the

8  plaintiffs at this time, Your Honor.

9         THE COURT:  All right.  Thank you.  Any

10  further questions of Mr. Caskey?

11         MR. COX:  No, Your Honor.

12         THE COURT:  Okay.  Thank you.

13         MR. KOBACH:  Your Honor, may I do a quick

14  redirect?

15         THE COURT:  Yes, go ahead.

16                    EXAMINATION

17  BY MR. KOBACH:

18    Q.  Mr. Caskey, could you look again at the records

19  regarding Ms. Bucci.

20    A.  Yes, give me a minute here.  I have them here in

21  front of me.

22    Q.  Okay.  If you-- if you look at the "source" space

23  on her record, where does it indicate that she

24  registered?

25    A.  The application source would be the motor vehicle

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 144 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
144

1    office.

2    Q.   Okay.  And what would be the registration date on

3    that?

4    A.   The date the application was processed by the

5    election office would've been August 14th, 2013.

6    Q.   And is it the policy of the state, and

7    specifically the DMV, to hand a receipt to the person

8    saying you still have to provide proof of citizenship if

9    you haven't done so?

10    A.   Yes.  That is correct.

11    Q.   So would it be fair to say she received written

12    notice on that date about her proof of citizenship

13    requirement?

14    A.   The policies of the state of Kansas would reflect

15    that, yes.

16    Q.   Then in the notes field, did she receive a second

17    notice, at least according to what the county entered,

18    where it says, "Proof of citizenship required, notice

19    sent" on-- three days later on August 16th?

20    A.   Yes.  There is a-- a note in the notes field

21    dated 8-16-2013 stating, "Proof of citizenship required,

22    notice sent."

23    Q.   And then in the next line where it says,

24    "9-25-2013.  Will get information to us on proof of

25    citizenship," or POC, "when she gets unpacked."  Is it

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

145

1    reasonable to conclude that that would be a notation

2    describing the phone call that Sedgwick County made to

3    her?

4        A.   I would state that there was some contact.  I'm

5    unable to state definitively that was a phone call, but

6    there clearly was some type of contact between the

7    applicant and the election office.

8        Q.   So would it be fair to say that there was a third

9    time the election office discussed with her proof of

10   citizenship?

11       A.   From the face of this, I would say yes.

12       Q.   And then the next line where it says, "9-28-2015,

13   final notice sent," would it be fair to say that that

14   was the fourth time there was some contact made by the

15   election office regarding proof of citizenship?

16       A.   Yes.

17       Q.   With respect to the Boynton case you were just

18   asked about, could we go back to that document.  You're

19   going to have to help me.  Is that before or after

20   Bucci?

21       A.   I believe it was after, although mine are--

22   I've-- I've moved mine around and they're out of order.

23       Q.   Okay.  You're right.  It is after Bucci.  When

24   does it appear that Mr. Boynton first registered to

25   vote?

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

146

1    A.   According to the face of the record, the

2  application was processed by the election office on

3  November 21, 2014.

4    Q.   Does it indicate that he registered to vote at

5  the DMV?

6    A.   The source of application is listed as in person.

7    Q.   Is it reasonable to conclude that if it was in

8  person in November of 2014, that that was an individual

9  who was provided a registration card when he cast a

10 provisional ballot?

11      Or let me rephrase the question.  If he

12 registered when he was provided-- registered for the

13 first time when he was provided a provisional ballot in

14 the 2014 election, would this likely be the result you

15 would see in the-- in the notes field?

16   A.   The time frame that you described is consistent

17 with that procedure, yes.

18   Q.   I'm sorry.  What was your answer again?

19   A.   The time frame that you described is consistent

20 with that procedure, yes.

21   Q.   Okay.  This was the individual we-- we were

22 looking at earlier where you saw the-- the DMV printout,

23 too, or the DMV screen.  Does the DMV screen indicate

24 that he said he wanted to register to vote at the DMV?

25   A.   There is a notation on all three boxes listed

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 147 of 196
16-2105-JAR     Fish, et al., v. Kobach, et al.    04.14.16
147

1   that states the word "voter" on three different dates.

2   And on each of the three dates, there is an "N" next to

3   the notation, presumably meaning no, they do not want to

4   register to vote.

5       Q.  So if he-- if it is correct that he declined to

6   register to vote when he was at the DMV, but then he

7   subsequently was handed a voter registration card when

8   he showed up at the election in November, 2014, and

9   was-- and began the application process, at that point

10  does the-- does the individual have-- is there a-- does

11  the individual automatically become registered to vote

12  when he-- when he provides the application at the-- at

13  the election time?

14      A.  No, that's the-- simply an application.  The

15  election office still must review the eligibility

16  requirements under Kansas law that adds him into the

17  voter registration list.  That's just an application,

18  not a registration.

19      Q.  And what is the policy of the Secretary of

20  State's Office, and jointly the policy held with the

21  DMV, when it is discovered that an individual may have

22  registered to vote and at some point after he provided a

23  proof of citizenship document to the DMV unrelated to

24  registering to vote?

25      A.  I'm sorry.  Would you repeat the question?

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 148 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
148

1    Q.  If it is learned that the individual-- that the

2    DMV might be in possession of a document that confirms

3    this person's citizenship, what is the process that's

4    in-- in place between the two agencies?

5    A.  If there is an allegation that a person attempted

6    to register to vote at DMV that is brought to the

7    attention of our office, then we will reach out to DMV--

8    DMV and confirm the circumstances-- confirm the

9    circumstances of the transaction at DMV, including if

10   there's any documentation that was provided as part of

11   that transaction.

12   Q.  And what if, as in this case, the individual

13   didn't attempt to register at DMV but it's just learned

14   that DMV may possess a citizenship document?  Is there a

15   process to allow DMV to transmit that to the Secretary

16   of State's Office?

17   A.  DMV would transmit as confirmation on-- if proof

18   of citizenship had been provided or not in that

19   instance.

20              MR. KOBACH:  No further questions.  Thank

21   you.

22              THE COURT:  All right.

23              MR. COX:  Very-- very briefly.

24              THE COURT:  Yes.

25                        EXAMINATION

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

149

1    BY MR. COX:

2      Q.  Mr. Caskey, in terms of any transmission by the

3    Department of Revenue, Division of Vehicles, of

4    citizenship verification, that transmission doesn't

5    include any suggestion or direction to the Secretary of

6    State's Office as to what-- as to what you should do

7    insofar as registering citizens to vote?

8      A.  It does not include any information on the-- the

9    direction that the county election officers have to do

10   when processing that application.  It's information-- it

11   is an application and information with the application.

12   A final determination is made by each of the 105 county

13   election officers on whether or not to add someone to

14   the voter registration list.

15     Q.  And I think Mr. Kobach asked the question,

16   correct me if I'm wrong, about what the Division of

17   Vehicles would do, not the Secretary of State's Office

18   would do, if it subsequently became aware of a

19   citizenship document.  Would you defer to the Division

20   of Vehicles in terms of what we would do on that?

21     A.  Yes, I would.

22          MR. COX:  Okay.  Thank you.  No further

23   questions, Your Honor.

24          THE COURT:  All right.  Thank you, Mr.

25   Caskey.  Mr. Cox, do you have any argument?

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 150 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
150

1              MR. COX:  Your Honor?

2              THE COURT:  Argument or evidence on behalf

3    of Mr. Jordan?

4              MR. COX:  I do.  And it's going to take some

5    time.  I wonder if I might have a five-minute break.

6              THE COURT:  Sure.

7              (The Court and courtroom deputy confer).

8              THE COURT:  We have another hearing from

9    1:30 to 2:30.  So let's take a very brief break.  And

10   how long do you think your case will take?

11             MR. COX:  I think argument is easily going

12   to take 40 minutes.

13             THE COURT:  Okay.  You're not intending to

14   call anyone to the stand, or you are?

15             MR. COX:  I think we may be able to

16   substitute the declarations I indicated at the

17   beginning.

18             THE COURT:  Okay.  And then Mr. Ho, I'll let

19   you have any final reply argument.

20             MR. HO:  I think I can be finished in five

21   to ten minutes, Your Honor.

22             THE COURT:  Okay.  All right.  Let's take a

23   break for ten minutes.

24             (Recess).

25             THE COURT:  All right.  You can be seated.

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 151 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
                                                              151

1    Yes, Mr. Cox.

2              MR. COX:  If it please the Court.  Your

3    Honor, I changed my mind, if that's acceptable.  I

4    thought I'd put Tim Parks on at the beginning.  During

5    your questions of counsel, you had quite a number of

6    questions, so I thought I'd put him on the stand at the

7    start.

8              THE COURT:  Okay.

9              MR. COX:  I'd call Tim Parks at this time.

10                   TIM PARKS,

11   called as a witness on behalf of the Defendant Jordan,

12   having first been duly sworn, testified as follows:

13                   EXAMINATION

14   BY MR. COX:

15      Q.  Would you identify yourself?

16      A.  My name is Tim Parks, and I've worked with the

17   Department of Revenue in driver's licensing since 1994.

18      Q.  Okay.  I may expedite in terms of a few things.

19   What-- your supervision at the Department of Revenue

20   includes supervising other employees?

21      A.  That's correct.

22      Q.  You supervise the driver's license examination

23   station in the Docking State Office Building?

24      A.  Correct.

25      Q.  You update our handbook on driver's licenses?

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

152

1    A.   Correct.

2    Q.   And you research and handle customer complaints?

3    A.   Yes, sir.

4    Q.   And, in fact, you, yourself, were a driver's

5    license examiner for a period of - if my notes are

6    correct - 20 years?

7    A.   That's correct.

8    Q.   Do you have personal knowledge of the process

9    that persons go through when they come to a driver's

10   license examination station to apply for a driver's

11   license or identification card?

12   A.   Yes, I do.

13   Q.   And also the voting processes?

14   A.   Correct.

15   Q.   All right.  Starting first-- and I think the

16   Court has already heard a great deal of information

17   about this for-- the process for an original driver's

18   license for a person who is a citizen.  It's correct, is

19   it not, that we would require certain sorts of

20   documentation?

21   A.   Yes.  We would include proof of lawful presence,

22   which may include citizenship documents.

23   Q.   Insofar as the documentation that is required as

24   part of the driver's license part of the transaction,

25   proof of lawful presence, which may include proof of

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

153

1    citizenship, that's not required on the voting part of

2    the transaction; is that correct?

3        A.  That's correct.

4        Q.  If the person does not bring in documentation

5    sufficient to go through the driver's license part of

6    the transaction, you won't proceed to the voting part of

7    the transaction?

8        A.  That's correct.

9        Q.  Okay.  And going-- and the Court had some

10   questions and heard some evidence and arguments about a

11   renewal.  On a renewal of a driver's license or

12   identification card, what sort of proof is required of a

13   person on the driver's license part?

14       A.  As far as just for the voting or--

15       Q.  The driver's license part, to renew a--

16       A.  For the driver's license part.  If they're just

17   renewing their license, it will basically just be their

18   driver's license.

19       Q.  Okay.  It's correct, is it not, the person

20   applying for renewal of a driver's license, for example,

21   is already in our system?

22       A.  Correct.

23       Q.  And so the requirements of lawful presence are

24   somewhat lessened; is that fair?

25       A.  Yes.  Yes.

16-2105-JAR   Fish, et al., v. Kobach, et al.   04.14.16

154

1     Q.   Okay.  If the person does not bring in

2  documentation sufficient to prove that to the license

3  examiner, the process doesn't go any further?

4     A.   Correct.

5     Q.   It's correct, is it not, that there is no proof

6  required of the person on a renewal of a driver's

7  license for them to register to vote part of the

8  transaction?

9     A.   That's correct.

10    Q.   All right.  I-- I guess the Court had a question.

11 We see some screens that come up?

12    A.   Uh-huh.

13    Q.   Is that a yes?

14    A.   Yes.

15    Q.   It's better to answer yes or no.

16    A.   Yes.

17    Q.   On the voting part of the transaction, the

18 driver's license examiner has the screen, is there a box

19 to click yes or no?

20    A.   Yes.

21    Q.   Okay.  These applications, if they are completed,

22 and I mean the voter part of the application, if that's

23 completed, do we send that on to the Secretary of

24 State's Office?

25    A.   Yes, we do.

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

155

1      Q.   Okay.  I think the Court has before us-- and you

2   were present in the courtroom the entire time about

3   Mr.-- Mr. Boynton.  And I think I probably should've

4   moved to admit Boynton-- I'm sorry, Jordan's Exhibit

5   No. 1, which is some screenshots concerning Mr. Boynton.

6   And I think Mr. Ho referred to that in his examination

7   of Mr. Caskey.  You've examined that previously, have

8   you not?

9      A.   Yes, sir.

10      Q.   Is it correct that insofar as our records

11   reflect, Mr. Boynton came in on three separate

12   occasions?

13      A.   He did.

14      Q.   And he declined to register on each one of those

15   occasions?

16      A.   That's correct.

17      Q.   I want to ask you a question about Mr.

18   Hutchinson, one of the named plaintiffs in this case.

19   And you've had a chance to read his declaration where he

20   went in on a particular transaction and then came back

21   later with a U.S. passport.

22      A.   Uh-huh.

23      Q.   And according to his declaration, he was told

24   that the driver's license examiner said:  You've done as

25   much as you-- you need to do.  How do you interpret

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 156 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
156

 1   that?

 2       A.   That's correct.  He had already registered to

 3   vote.  He had already been issued a credential.  And so

 4   bringing something in afterwards was of no-- no

 5   assistance.

 6       Q.   All right.  The passport would not have been

 7   required for him to have done what he wanted to do?

 8       A.   No, sir.

 9       Q.   Including registering to vote?

10       A.   Correct.

11            MR. COX:  I have no further questions of the

12   witness at this time.  And, of course, I'll have

13   argument after there's any cross-examination.

14                        EXAMINATION

15   BY THE COURT:

16       Q.   All right.  So I take it from your testimony that

17   the DMV does not think they're responsible to collect

18   citizenship documents either at the time someone is

19   registering to vote or subsequently, if they're trying

20   to just complete their application for registration?

21       A.   Right.  If it's a renewal or a-- or an address

22   change or something like that, then they're not going to

23   require citizenship documents to vote.

24       Q.   All right.  They're not asked if they have them,

25   they're not asked to see them, anything like that?

Case 2:16-cv-02105-JAR  Document 115  Filed 05/06/16  Page 157 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
                                                          157

 1      A.  No.  But there is a-- there is a-- part of the

 2  application process, there is a screen that comes up

 3  that says, "Are you a U.S. citizen?"  Yes or no.  And

 4  then there's also a voter oath that they are supposed to

 5  read.  And then when they do the electronic signature,

 6  that confirms that what they've read is true and

 7  correct.

 8      Q.  All right.  And so the Secretary of State has not

 9  instructed you to ask for citizenship documents, to

10  orally instruct that you need citizenship documents,

11  to-- to accept citizenship documents after the fact if

12  someone chooses to produce them to the DMV?  None of

13  that?

14      A.  Not unless it's an original application.

15              THE COURT:  Okay.  I understand.  All right.

16  Any questions from plaintiff?

17              MR. HO:  No questions, Your Honor.

18              THE COURT:  Mr. Kobach?

19              MR. KOBACH:  No questions, Your Honor.

20              THE COURT:  All right.  Thank you.

21              MR. COX:  If it please the Court.  I was

22  obviously very wrong on the time on my arguments when

23  I-- when I came in and announced my appearance.  Brian

24  Cox obviously, deputy general counsel for defendant,

25  separate defendant, Secretary of Revenue Nick Jordan.

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 158 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
158

1          Judge, if you'd indulge me.  Secretary

2  Jordan, as a defendant in this case, has consistently

3  attempted to preserve his-- his claimed immunity from

4  suit.  We filed various pleadings in this-- in this

5  court.  The magistrate has ruled recently on part of

6  that.  We have a motion to dismiss.  I don't want to do

7  or say anything today which could be taken in any

8  fashion as a waiver of those immunities which we are

9  claiming.

10          THE COURT:  I understand.

11          MR. COX:  And-- and the Court will have a

12  chance to address those.

13          You have the Secretary Jordan's response

14  memo concerning the plaintiffs' motion for preliminary

15  injunction, which is far more articulate than I am.  And

16  I want to hit a few high points today, if I may.  First

17  off, let me hit a couple of high points which I consider

18  important on the Court's standard of review.  And Mr. Ho

19  and Mr. Kobach I think have plumbed the depths rather

20  more than I want to go into on some of the specificity

21  about the balance of harm and the equities and the

22  timeliness.  But I want to hit a couple real quick.

23          It's perhaps the-- the foremost point is

24  that no injunctive relief, including this preliminary

25  injunction that's sought, should be granted absent the

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 159 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
159

1    plaintiff proving entitlement to such relief clearly and

2    unequivocally.  The Court, in fact, has identified

3    some-- at the very beginning you identified some

4    potential factual disputes that exist in this case.  And

5    I think that bears on the Court's responsibility in

6    determining whether to grant the rather momentous step

7    of enjoining government entities.

8              The second point we want to make about this

9    is that no injunctive relief should be granted absent

10   the plaintiffs' claimed injury being fairly traceable to

11   the actions of our defendant, Secretary Jordan.

12   Further, no injunctive relief should be granted without

13   the prospect that the injury that's claimed in this case

14   will be redressed by an order against Secretary Jordan.

15   I note-- I'm going to refer to this later.  The

16   plaintiffs' first amended complaint in this case

17   articulates two proposed classes.  The second class, I

18   think it's fair to say, does not relate to Secretary

19   Jordan, it relates to a claim against Secretary Kobach's

20   failure to investigate out-of-state records or whatnot.

21             As I read the first amended complaint, the

22   first class that's proposed in this case is of persons

23   who have already long walked out the door of the DMV.

24   They're well past the DMV and they're on some sort of

25   list with the Secretary of State's Office.  So this is

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 160 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
160

1    all past conduct to the extent that you are going to

2    order any injunctive-- any injunctive relief against us.

3    And we have certain-- certain Eleventh Amendment

4    concerns about that.

5           And Mr. Ho I think has said in his reply

6    brief, in his two pages that he spends talking about

7    Secretary Jordan's response, that they are not seeking

8    any sort of prospective-- I'm sorry, retrospective

9    relief.  It's prospective relief only.  But with respect

10   to our people and insofar as they've pleaded it, it

11   appears that that is, in fact, retrospective.

12          Finally, there's some authority, Judge, that

13   says no injunctive relief should be granted on the basis

14   of mere affidavits, let alone the numerous newspaper

15   articles that are contained in the first amended

16   complaint and the plaintiffs' memorandum.

17          Finally, and, of course, you've-- the

18   parties have plumbed the depths of this about the higher

19   standard of review, which we agree with.  I won't spend

20   any further time on that.

21          Judge, there-- there was an argument made in

22   the plaintiffs' reply memorandum, which I read for the

23   first time the morning after it was filed a couple of

24   days ago, about the Court taking into account the

25   situations of the class.  And they cited certain

1    authorities.  We believe that's incorrect.  We believe

2    what you are concerned with today is the six named

3    plaintiffs because the-- the additional plaintiff, the

4    League of Women Voters of Kansas, who joined by the

5    first amended complaint, it does not appear they joined

6    in this request for preliminary injunction.

7              We have-- it's not cited in the papers, and

8    I apologize, but a case I found late last night, *Baxter*

9    *versus*-- and I'll spell this, P-A-L--

10   P-A-L-M-I-G-I-A-N-O, 425 U.S. 308 at 310, Note 1, 1976

11   case.  The Supreme Court states, "Without such

12   certification and identification of the class, the

13   action is not properly a class action."  We don't

14   believe as such, Judge, that the-- the rights and

15   interests and alleged injuries of persons other than the

16   people presently before the Court should be considered.

17             Judge, to take nothing away-- Secretary

18   Jordan certainly takes nothing away from the-- the

19   right, indeed the obligation of all American citizens

20   to-- to have the franchise, the right to vote.  But what

21   I do urge the Court to carefully consider is the rather

22   momentous step that the plaintiffs have asked the Court

23   to-- to engage in this case, which is to enjoin

24   Secretary of Revenue.

25             I think very significant in that regard is

1    for you to take a very close look at-- at what has not,

2    in fact, been alleged against Secretary Jordan.

3    Secretary Jordan is mentioned only twice, only twice in

4    the first amended complaint in this case by name; in the

5    caption and in the throw-away paragraph that describes

6    him generally as the-- the head of the Department of

7    Revenue.  He's mentioned only once in the plaintiffs'

8    preliminary injunction memorandum.

9            By contrast, by my count, the term

10   "defendants," and we have two defendants in this case,

11   are mentioned no less than 36 times in the plaintiffs'

12   preliminary memorandum and 41 times in the first amended

13   complaint.

14           We believe, both as a matter of Rule 8

15   pleading, which we've raised in our motion to dismiss,

16   and generally insofar as Rule 65's requirement that a

17   litigant has to come in and ask you-- to state

18   specifically this is what we want you to do, we simply

19   don't know what allegations have been made against us.

20           THE COURT:  Well, isn't it critical to the

21   enforcement of the SAFE Act that the-- the DMV--

22   Secretary Jordan's purview is the DMV coordinate and

23   elicit information and transmit information to the

24   Secretary of State?  Aren't you a key player in all of

25   this?

1           MR. COX:  Your Honor, we're a-- we're

2    charged by federal law under the NVRA with certain let's

3    call it motor-voter duties.  Nobody has made any

4    allegation in this case today, or in the papers, that we

5    failed to comply with any of those duties.  The NVRA

6    does not require the transmission of citizenship

7    verification to the Secretary of State's Office, nor

8    does it prohibit the transmission of those

9    verifications.

10          THE COURT:  But that's the mechanism the

11   state of Kansas has set up.

12          MR. COX:  A voluntary--

13          THE COURT:  Aren't you a key player in terms

14   of Kansas enforcing the SAFE Act and in compliance with

15   the strictures of the NVRA in that you take the

16   information from people that are applying for licenses,

17   renewal or new or otherwise, and you ask if they are

18   wanting to vote at the same time, because the NVRA, you

19   know, provides for simultaneous registration.  And then

20   you in some way communicate that to yourself, another

21   arm of the state.  We're talking about the State of

22   Kansas.  Is not the DMV a critical player in the-- in

23   making this all work?

24          MR. COX:  I-- I don't agree with that, Your

25   Honor.  The-- we are two separate defendants in this

1    case the way the plaintiffs have pleaded the case.  And

2    in light of the Court's argument, it does raise a point

3    which-- which is important.  We believe, and we briefed

4    the point, that the only proper defendant in this case,

5    the only proper defendant against whom you could or

6    should or may grant injunctive relief is the chief

7    election officer for the State of Kansas.  And that's

8    Secretary Kobach, not Secretary Jordan.

9           We briefed that.  We believe that's the law.

10   We cited a case that says as much, says the Secretary of

11   State in that particular state is the stand-in for the

12   state.  We believe that duty, the duty to ensure

13   compliance with the NVRA, is Secretary Kobach's

14   obligation, not Secretary Jordan's.  We're-- we're

15   merely a conduit, Your Honor.

16          The procedures that we have-- I mean, I

17   don't even know why we're in this case.  We're a

18   driver's license agency and a tax collecting agency.

19   And the federal government has given us these duties

20   under motor-voter, which we fully complied with.  This

21   information we send over to the Secretary of State's

22   Office, they get it.  What they do with that

23   information, Your Honor, is entirely up to Secretary

24   Kobach and the state election officials, because-- and I

25   hope I've answered the Court's question.  I don't-- I

1    don't agree with that premise.

2           THE COURT:  Well, the-- some of the

3    plaintiffs claim that they articulated that they wanted

4    to register to vote, yet somebody at the DMV input that

5    they said no.  That's one allegation in this case.  Some

6    of the plaintiffs say that they presented at the DMV

7    with proof of citizenship, but nobody told them, hey,

8    let me see your proof of citizenship, you're going to

9    need that to register to vote.  Let me see if you have

10   it here onsite.  None of that happened.

11          MR. COX:  Well, Mr. Boynton-- the evidence

12   conflicts.  The evidence conflicts about that.  Mr.

13   Boynton declined to register to vote, so there was no

14   reason to proceed ahead with a-- a voter transaction and

15   no reason to forward any of that to the Secretary of

16   State's Office.

17          The other individual, Mr. Hutchinson, you

18   see his declaration, I think it's Declaration 7, says

19   that he went in, he got done what-- what he needed to

20   do.  He left there thinking he had done everything he

21   needed to do.  He read-- claims to have read something,

22   so he went back and displayed a U.S. passport

23   apparently.  There's nothing further Revenue would need

24   to do with respect to him, because state law doesn't

25   allow that.  It's not-- it's not part of the process.

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 166 of 196
16-2105-JAR     Fish, et al., v. Kobach, et al.     04.14.16
166

1   He's already done the driver's license part.  He's

2   already done the voter part of the transaction.  Any--

3   any further aspect of his status as a voter-- I mean,

4   the Kansas Department of Revenue is not a voter

5   registration entity.  And I hope I've answered the

6   Court's question.

7            THE COURT:  You have.

8            MR. COX:  Secretary Jordan is not part of

9   the Secretary of State's Office.  He is not an election

10  official.  As I've said, he does not determine the

11  eligibility of persons to vote.  He does not register

12  persons to vote.  He has no power to place persons on

13  the voting rolls.  He has no power to place persons--

14  and you've heard various descriptions, and I may be

15  using them incorrectly and I apologize to the Secretary

16  of State's Office.  Secretary Jordan has no power to

17  place persons on a suspense, incomplete, purged, or

18  suspended list.  He has no duty--

19            THE COURT:  I understand-- I understand--

20  and, of course, I have pending in front of me your

21  motion to dismiss.  And it's, you know, raising Eleventh

22  Amendment immunity and-- and some other grounds.  I

23  understand that.

24            But the way this-- the way this-- this

25  Kansas law operates, from what I've heard today, is that

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 167 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
167

1    it's relying upon the DMV to be the front line.  It's,

2    you know, to-- being the front line to collect certain

3    information at the time somebody registers to get a

4    license.  I mean, that's what this is all about.  It's

5    motor-voter registration, it's both.

6              And the Secretary of State is not on the

7    front line, DMV is.  And so it's just odd to me that-- I

8    understand that Secretary Jordan may not think he's a

9    proper party.  But it's odd to me-- I mean, it seems to

10   me that I'm hearing that the DMV and Secretary Jordan

11   are not taking ownership of any piece of this process

12   and they're placing it all at the feet of Secretary

13   Kobach.

14             MR. COX:  Well, Your Honor, I-- I shouldn't

15   presume that you-- you meant the NVRA when you asked

16   that question.  We do take ownership of what we're

17   required by federal law to do under the NVRA, which is

18   when a person comes in on particular types of driver's

19   license transactions, and you've heard them described

20   today - original application, renewal - we're required

21   to ask a person:  Okay, Mr. Cox, you've been living

22   under a rock.  Would you like to register to vote or

23   update your voter registration?  Sure.  And we process

24   that.

25             And as I say, at the risk of repeating, no

1    claim has been made that we have failed to comply with

2    that process.  The rest of this is something that's sent

3    to the Secretary of State's Office to accommodate-- to

4    accommodate their needs.  It's not-- I hope I don't go

5    too far by urging this again, Your Honor.  It is neither

6    required by, nor prohibited by the National Voter

7    Registration Act.

8              The-- the plaintiffs' complaint as pleaded

9    in this case articulates two things.  It cites

10   25-2309(l), it's been referred to as the DPOC law,

11   D-P-O-C, the acronym for documentary proof of

12   citizenship.  By its terms, it has no reference to the

13   Department of Revenue.  They also cite the

14   administrative regulation K.A.R. 7-23-15.  That's a

15   Department of-- I'm sorry, a Secretary of State

16   regulation.  It's not a Department of Revenue

17   regulation, doesn't require that Revenue do anything in

18   that regard.

19             Judge, I think we're stuck with how the

20   plaintiffs have pleaded the case.  And to answer your

21   question, we've done our part under NVRA.  The rest of

22   it, insofar as what we provide to the Secretary of

23   State's Office, is entirely what they do with it.

24             And the Court had a question earlier about

25   whether it would be easier for this process to exist

1    if-- if we required everybody at the get-go for an

2    original driver's license or a renewal driver's license

3    to-- to provide proof of citizenship.  And maybe at some

4    point with new federal legislation, I'm not intimately

5    familiar with it, that may be required.  But we're not

6    presently permitted to do that for renewal applications.

7    We don't have statutory authority to do that.  So that's

8    where we're at, Judge.

9            There is nothing that's been alleged in the

10   first amended complaint which alleges specifically that

11   Secretary Jordan has done anything which has affected

12   the rights of these six plaintiffs.  If the Court enters

13   an order enjoining Secretary Jordan in some fashion, it

14   will do absolutely nothing to these six named

15   plaintiffs.  They are well outside the DMV door.  You're

16   not-- you're not talking about past, retrospective

17   relief, you're talking about forward-looking relief.

18   Obviously there's certain federalism concerns with

19   retrospective relief.

20           In fact, insofar as the plaintiffs have

21   alleged it, they went to the DMV a long time ago, they

22   got their driver's license part of the transaction done.

23   The DMV clerk did not require them to present any

24   documentary proof of citizenship to register to vote.

25   And they left thinking that they were fully registered,

1   that everything was fine.  And the thing that happened

2   to them next was a communication.

3           You have in front of you, I think it's

4   Jordan's-- it's in my book of exhibits, hopefully it's

5   Jordan's Exhibit No. 2.  It was material provided to me

6   by Mr. Ho for the plaintiffs, which may not be complete,

7   but this reflects-- hopefully I have it on the cover of

8   that white notebook, our exhibits, they're pretty--

9           THE COURT:  It's Mr. Fish's declaration

10  that's your Exhibit 2.

11          MR. COX:  Sure, Your Honor.  And I also put

12  the six declarations in there as well.  They're all part

13  of the record anyway.  As you page down, hopefully

14  you'll get to the exhibit.

15          THE COURT:  What's the exhibit again?  It's

16  not 2, because 2 is Fish's declaration.

17          MR. COX:  Maybe it's 4 or 3.  It's the last

18  one in there.  It's the one with the page-- the e-mail

19  from Mr. Ho.  I apologize, Your Honor.  This is going to

20  be materials that--

21          THE COURT:  Oh, okay.  I found it.  It's--

22  oh, it does say Jordan Exhibit No. 2.  I'm confused,

23  because I have three binders up here.  One says

24  defendant, one I thought was solely you, and the other

25  one is plaintiff, but--

```
 1                MR. COX:  Forgive me for not--

 2                THE COURT:  All right.  Jordan Exhibit 2,

 3     I'm looking at it now.

 4                MR. COX:  This-- this appears to be material

 5     that was received by two-- two perhaps of the plaintiffs

 6     from people other than the Department of Revenue.  And I

 7     guess the point I'm trying to make here is the

 8     Department of Revenue is not involved with what happens

 9     with these people out-- after they walk outside the

10     Department of Revenue door at the driver's license

11     station.

12                Our responsibility under the NVRA, that's--

13     that's what's claimed here, is to forward these

14     applications to election officials, which we do.  If you

15     take a look at the allegations that are actually made in

16     this case, they actually agree with us.  Although, to be

17     quite honest, Judge, the reply brief that I received

18     appears to change the plaintiffs' theory of the case.

19     And maybe Mr. Ho will concede this.  The way I thought

20     this case started out was that I thought that Mr. Ho's

21     claim was that the Department of Revenue was requiring

22     at the driver's license station that persons present

23     documentary proof of citizenship to register to vote.

24     That's not the case.  That's what you heard from Tim

25     Parks.  If-- and I think we've probably pointed out in
```

16-2105-JAR   Fish, et al., v. Kobach, et al.   04.14.16

172

1   our response brief the various points in the plaintiffs'

2   preliminary injunction motion memorandum that agrees

3   with that.

4          In addition, Judge, you've got two expert--

5   claimed expert witnesses that came into this case in

6   support of their preliminary injunction motion, a Doctor

7   McDonald and a Doctor Minnite.  I hope I'm pronouncing

8   it correctly.  Those experts agree with us, that the

9   problem is at the election office, not the Department of

10  Revenue.

11         And finally, Judge, as I've alluded to,

12  you've got the-- the declarations of the six-- the six

13  named plaintiffs in this case, none of whom says that

14  the Department of Revenue asked them for any documentary

15  proof of citizenship to register to vote.  Of course, on

16  an original driver's license, if you're a citizen, one

17  of the items that you're going to present is documentary

18  proof of citizenship.  I don't even think the plaintiffs

19  bark about that.

20         And, Judge, a point I did want to make; the

21  NVRA-- let me-- let me start over again.  Neither the

22  NVRA, nor the plaintiffs' allegations in this case

23  challenge the Department of Revenue's driver's license

24  regulations.  I mean, what we require for a person to

25  get a ID card or a replacement, renewal, instruction

1    permit, CDL, that's all state law stuff.  None of that

2    is challenged in this case.  So it's legitimate to

3    request documentary proof of citizenship for an original

4    license for a citizen.

5              By contrast, Judge, in addition to the three

6    things I pointed out; the plaintiffs' own papers, the

7    plaintiffs' own experts, the plaintiffs' own

8    declarations, you've also heard the extensive

9    allegations today from Mr. Ho.  And I-- I listened very

10   carefully and I-- I did not hear Mr. Ho in his-- in his

11   arguments today pin anything on Secretary Jordan.  And

12   if you look at his reply memorandum, he spends all of

13   two pages in that case.  And he very carefully pointed

14   out that he's going to continue to refer to the

15   defendants because we supposedly joined in Secretary

16   Kobach's brief, which we-- we really didn't do that.

17             Judge, there are some procedural rules, and

18   I don't presume to suggest that the Court is not aware

19   of these, These juris prudential rules in terms of

20   ordering injunctive relief; standing, correct party.  Is

21   Secretary Jordan the correct party under the NVRA?  Are

22   the notices correct in this case?  Eleventh Amendment

23   immunity.  Lack of a case or controversy.  I mean, can

24   you do anything for these six named plaintiffs now that

25   they're on the suspense list and they've been purged?

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 174 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
174

1    There's nothing you can do with respect to Department of

2    Revenue.

3              In addition, Judge, as I alluded to this,

4    there is a real lack of specificity.  What-- what

5    exactly is it that the Court-- that Mr. Ho, the

6    plaintiffs, want the Court to order the Department of

7    Revenue to do?  Shut down driver's license stations?

8    It's unclear.  There is no specificity beyond - and I

9    think it's in the reply brief - stop enforcing the DPOC

10   law.  That doesn't tell the Court-- it doesn't tell us

11   in the initial part of it, but it doesn't tell the Court

12   what you should do.  And as this Court knows, probably

13   better than anybody in this room, because you mete-- you

14   mete out these injunction orders, Rule 65 requires that

15   your order be very specific.  It requires chapter and

16   verse.

17             We cited in our-- in our response brief that

18   this is a serious matter because violating a federal

19   court's injunctive order for the contemptuous parties is

20   serious business.  And that's why it's only fair for us

21   to know what do they want from Secretary Jordan and for

22   you to know what sort of order do they want you to

23   impose on Secretary Jordan.  I don't see anything in the

24   papers they've filed that gives us much more notice than

25   that.

1              A couple of points.  And I'm just about

2    done, I understand you've got afternoon affairs.  With

3    regard to the reply brief that was filed in this case, I

4    have a couple of comments.  This reply brief, and I've

5    already said this, the reply brief, it was just filed a

6    couple of days ago, consistently and persistently refers

7    - except for those two pages - to the defendants

8    together.

9              You know, there's lots of law out there

10   under 42 U.S.C. Section 1983 that says when you've got

11   multiple defendants in a complex case, you've got to--

12   the plaintiff has got to plead who, what, where, how,

13   and why.  And that's the law of the Tenth Circuit.

14   You've got to put-- and it's only fair, Judge.  You've

15   got to put the defendant on notice.  Well, what is it--

16   what is it the plaintiffs are claiming you did?  And I

17   don't see that anywhere in this case, because we get

18   lumped together with-- with Secretary Kobach.  And

19   indeed, Judge, looking at the-- the pleadings, we also

20   get lumped in with the State of Kansas generally, and

21   there is also reference to culpable activity by local

22   election officials.

23              The second point.  I don't really know, and

24   maybe Mr. Ho can clear this up, I-- it seems like, given

25   what they've said in their reply brief, they're

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 176 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
                                                                    176

1   jettisoning all the other claims they've made against

2   the Department of Revenue in their first amended

3   complaint.  There are six or seven counts.  But if you

4   take a look at that reply, it looks like they've

5   jettisoned that and they've relied upon this stream of

6   information issue that goes from Revenue to Secretary of

7   State's Office.  And I also note, Judge, they have--

8   they've ignored most of the arguments, ignored,

9   literally ignored most of the arguments that we've made

10  in our response brief.

11          Finally-- well, almost finally, Judge.  This

12  stream of information argument is really a-- a new

13  issue.  It's raised at the eleventh hour.  There's--

14  it's raised in a reply brief.  There's-- there's ample

15  authority in this Circuit about new-- new arguments

16  being raised and a reply brief not being considered.  We

17  would ask for the chance to file a-- a rebuttal or

18  surrebuttal with respect to that, because we think

19  that's a new issue that's come-- that's come into the

20  case.

21          Bottom line, Judge, on this reply brief,

22  three things that-- three things that the plaintiffs are

23  not arguing or not telling the Court.  They're not

24  telling the Court that we tell-- by-- by "we," I mean

25  Secretary Jordan.  They're not arguing that we tell

1    Secretary Kobach or local election officials what to do

2    with this-- this information that's sent.  They're not

3    arguing that we tell the Secretary of State's Office to

4    register people to vote or not.  And they certainly do

5    not argue, as I've said, that the transmission of this

6    information is either required or prohibited by the

7    NVRA.

8            Bottom line, Judge, and in conclusion, and I

9    appreciate your patience, there is no sufficient

10   information before the Court to find that there is an

11   enjoinable violation of federal law by Secretary Jordan.

12   That's the argument I want to make.  I appreciate your

13   patience.  And I'm sure the Court is going to read the--

14   the papers in this case.  And I'll stand for any

15   questions.

16           I have some subject matter experts in

17   addition to Mr. Parks, if the Court has other questions

18   about the process.  It's not the sort of process that--

19   that Joe Sixpack off the street would intuit.  But if

20   you have further questions, I'll certainly stand for

21   those.

22           THE COURT:  No, I don't.  I thank you.

23           MR. COX:  Thank you.

24           THE COURT:  It's been very helpful.

25           MR. COX:  Thank you, Your Honor.

1          THE COURT:  All right.  Mr. Ho, you have the

2    final word, final argument.

3          MR. HO:  Thank you, Your Honor.  And I will

4    do my best to keep it brief.  Before starting, Your

5    Honor, I did want to address some housekeeping matters

6    that you raised earlier with respect to the admission of

7    exhibits.

8          THE COURT:  I was going to ask at the close

9    of all of this, remind everyone I need Mr. Kobach to

10   file his response brief redacted and the exhibits, and

11   you to do the same with your reply brief.  I was going

12   to give Mr. Jordan leave to file a surreply.  I'm going

13   give you the leave to file a surreply.  And then admit

14   all the exhibits, because they haven't been identified

15   for the record.  I think we need to make a clean record.

16   So we can do that now or wait until you're finished

17   arguing.

18         MR. HO:  I'm-- I'm happy to do it now, Your

19   Honor.  With respect to the plaintiff's exhibits, we

20   have 18 that we have submitted.  We would move to admit

21   Exhibit 1 and Exhibits 8 through 18 at this time.  The

22   reason I am not mentioning Exhibits 2 through 7, those

23   are the declarations of our clients and they have dates

24   of birth in them.  So we would request leave to redact

25   those and file them and move them into admission shortly

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 179 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
179

1    after the hearing.

2              THE COURT:  All right.  I'll admit

3    Plaintiff's Exhibits 1, 8 through 18.  I'll also admit

4    Exhibits 2 through 7, but subject to redaction.

5              MR. HO:  Thank you, Your Honor.

6              THE COURT:  All right.  And you'll need to

7    file your reply brief as well.

8              MR. HO:  Yes, Your Honor.

9              THE COURT:  Okay.  Mr. Kobach, what are your

10   exhibits you're offering?

11             MR. KOBACH:  Your Honor, I think we're just

12   standing on the exhibits that we gave you, which are

13   Exhibits 1 through 8, which are in that notebook, and

14   then Exhibits 9 and 10, which are the two additional

15   ones.  9 being the ELVIS readouts for the plaintiffs and

16   10 being the deposition of Mr. Caskey.

17             THE COURT:  All right.  The ELVIS readouts

18   contain redactable material however.

19             MR. KOBACH:  They do contain redactable

20   material, you're correct, Your Honor.  They contain

21   dates of birth, in some cases they may contain last four

22   of social.

23             THE COURT:  I'm going to see how pervasive

24   this information is.

25             MR. KOBACH:  Yeah, there's also in some of

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 180 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
180

1    the other exhibits there-- among the 25 aliens that

2    either registered or attempted to register to vote,

3    there are some redactable information in there, too,

4    including birth certificates and things like that.

5              THE COURT:  All right.  I'll admit your--

6    all of your exhibits as well, but subject to redaction.

7    You can give-- all of you can give an unredacted version

8    to me as a chambers copy, but I think they need to be

9    redacted in the public record.  So I'll ask you all to

10   police your exhibits.  Kobach Exhibits 1 through 8, 9,

11   and 10 admitted subject to redaction.

12             And then Mr. Cox, as far as Secretary

13   Jordan's exhibits?

14             MR. COX:  I believe it's-- with the

15   exception of the first part of that notebook, which are

16   the plaintiff's declarations 1 through 6, our two sole

17   exhibits are the ones that were referred to, the

18   information on Mr. Boynton, B-O-Y-N-T-O-N, and then the

19   information that came from Mr. Ho's initial disclosures

20   to the Court.  Several pages.

21             THE COURT:  All right.

22             MR. COX:  I'm not sure of the numbers,

23   Judge.

24             THE COURT:  Jordan Exhibits 1 and 2.  And

25   I'm not sure they need redaction.  1 doesn't.  I don't

 1    think 2 does either.  All right.  Jordan Exhibits 1 and

 2    2 admitted.

 3              MR. COX:  Thank you, Your Honor.

 4              MR. HO:  If I may, Your Honor, I believe

 5    that Jordan Exhibit 2 may have some personal identifying

 6    information in it such as addresses.

 7              THE COURT:  Okay.

 8              MR. COX:  You might take a look at that.

 9              THE COURT:  If it's home addresses, those

10    need to be redacted.

11              MR. HO:  Am I incorrect?  I apologize if I

12    misunderstand.

13              THE COURT:  Yes, Mr. Ortiz'-- it looks like

14    his home address is on one of these letters.  That needs

15    to be redacted.

16              MR. COX:  Oh, okay.  That exhibit, I

17    apologize.

18              THE COURT:  Actually, there's two pages that

19    have different home addresses for him it looks like.  So

20    those two addresses need to be redacted.  But

21    otherwise-- that's on Exhibit 2.

22              MR. COX:  Your Honor, may I inquire?  In

23    terms of our duty by all counsel to redact those,

24    mechanically speaking how do we do that?  Just

25    substitute?

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 182 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
182

 1            THE COURT:  When we're done with this

 2  hearing, I'll have you talk to Ms. Wiest.  And you can

 3  literally just-- I need to get an unredacted version,

 4  but you can literally just use a-- a black felt tip pen

 5  or whatever and obscure it that way.

 6            MR. COX:  I can do that, Your Honor.  Thank

 7  you.

 8            THE COURT:  Yeah, because they're in paper

 9  form so you can do it that way.

10            Okay.  Mr. Ho.

11            MR. HO:  Thank you, Your Honor.  I'd like to

12  address very briefly three issues.  And that is-- those

13  are the harm to voters, the balance of the equities, and

14  the merits arguments, in particular the case law that

15  Mr. Kobach discussed.

16            I already stated that we believe that a more

17  lenient or the standard four-factor test for issuance of

18  a preliminary injunction applies in this case.  But we

19  believe that even under the heightened standard, we've

20  made a strong showing based on the injury here.

21            So with respect to the injury that's being

22  asserted, there are I think four points.  The first is

23  I'd like to address the number of voters that are

24  affected, because there may be some confusion about

25  that.  We've represented that there are at least 16,000

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 183 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
183

 1    voters who are affected.  And that figure comes from the

 2    defendants' discovery responses, which are Exhibits 11

 3    and 12.

 4             Exhibit 11 indicates that over 11,000

 5    motor-voter registrants have seen their applications

 6    cancelled because of the documentary proof of

 7    citizenship law.  Exhibit 12 indicates that there are

 8    about 5,000 motor-voter registrants currently in

 9    suspense because of the motor-voter-- because of the

10    documentary proof of citizenship law.  So we totalled

11    those numbers together and come up with about 16,000.

12             THE COURT:  But the majority of them are in

13    cancellation status?

14             MR. HO:  Yes, that's correct, Your Honor.

15    And that's a very important point, because Mr. Kobach

16    made a comment about 94 percent of people who are on the

17    suspense list eventually completing the process.  And he

18    cited-- I think he's relying on a statement from Mr.

19    Caskey's declaration, which is Kobach Exhibit No. 1.

20    Well, what Mr. Caskey was saying in his declaration in

21    Paragraph 10 was that 94 percent of people on the

22    suspense list eventually make their way off.

23             Now, even if that's correct, that 94 percent

24    figure isn't meant to apply, at least as Mr. Caskey has

25    written it, to people whose registrations have already

1   been cancelled.  Those people are done.  If they want to

2   try to register now, they have to start the process all

3   over again.  So it's I think misleading to say that of

4   the 16,000 currently affected voters, 94 percent of them

5   are somehow going to have their situations resolved.

6              THE COURT:  So it's more like 94 percent of

7   5,000 of them is what you're saying?

8              MR. HO:  I think if-- if that 94 percent

9   figure is correct, then that's what it would mean.  But

10  we would at least still be talking about 11,000 voters

11  whose registrations have been cancelled.  Additionally,

12  Mr. Caskey doesn't tell you how long it takes for them

13  to resolve those voters on the suspense list.  And the

14  August election is just a few months away.  If it takes

15  years, then these voters are going to be disenfranchised

16  in the upcoming elections.

17             The second point that I want to make about

18  harm is Mr. Kobach made a comment about a study that was

19  done in Sedgwick County that found that I think

20  30 percent of the 700 oldest registration applications

21  on the suspense list involve people who had changed

22  address.  What Mr. Kobach didn't mention and which we

23  address in our reply brief is that under Kansas state

24  law, if you move, you are still entitled to vote.

25             So everyone on the suspense list, whether

1   they've moved or not, if you've validly registered, you

2   still have your voting rights and you are a part of the

3   affected class.  So we can't discount the figure of

4   affected voters by 30 percent, which I think is what was

5   the implication of that comment.

6              The third point that I want to make here is

7   that Mr. Kobach raised this issue of whether or not

8   you're a qualified elector in Kansas without having

9   registered to vote.  And I-- I think that comment misses

10  a distinction in the *Inter-Tribal* case that a person can

11  be qualified by virtue of their citizenship.  And that's

12  a state law issue.  But federal law prescribes the means

13  by which one proves their qualifications for purposes of

14  voting in federal elections.

15             If Mr. Kobach were correct that our clients

16  have no voting rights because they are not registered to

17  vote, well, that would mean that no one could ever

18  challenge any registration restriction because ipso

19  facto someone who's not registered to vote has no voting

20  rights.  And that can't be the law.  And indeed, federal

21  court cases granting relief under the National Voter

22  Registration Act I think contradict that view.

23             The fourth and last point I want to make

24  about the injury here is that the hearing alternative

25  that Mr. Kobach mentioned for people who lack

1    documentation is really no alternative at all.  The fact

2    that it's been used three times only in the history of

3    this documentary proof of citizenship requirement, while

4    11,000 voter registration applications of motor-voter

5    applicants alone have been cancelled, there are also

6    other people who have tried to register to vote and seen

7    their applications cancelled, shows that it's not a real

8    alternative.

9              And I think it misreads the NVRA to suggest

10   that states can condition voting rights on citizens

11   going hat-in-hand to three of the highest officials in

12   this state and begging those people for their voting

13   rights.  That is not the simultaneous application at the

14   DMV that the statute contemplates.  It also doesn't help

15   the vulnerable populations that Congress sought to reach

16   with the NVRA.

17             And the undisputed testimony of our expert,

18   Doctor Michael McDonald, at Exhibit 1 is that these

19   requirements disproportionately affect young voters, not

20   just in terms of blocking them from participating in

21   elections that are immediately upon us, but really it

22   affects their long-term propensity to participate when

23   you put these kinds of hurdles in their way.  That's

24   undisputed in this case, and I think worth noting when

25   assessing the injury here.

16-2105-JAR   Fish, et al., v. Kobach, et al.   04.14.16

187

1           I'd like-- next like to turn to the equities

2    and just make three points.  With respect to the

3    administrative burdens that Mr. Kobach is complaining

4    about, it seems like these arguments essentially boil

5    down to the notion that the defendants have built a very

6    unwieldy system in terms of voter registration here in

7    Kansas.  And that it is very difficult and complicated

8    to unwind that system, which has been unnecessarily

9    layered onto what's supposed to be a simple process

10   under the NVRA.  And that doesn't seem to be a basis for

11   denying relief.

12           A second point is one that Mr. Kobach raised

13   about whether or not the state can put voters in

14   active-- whether or not the Court can order that voters

15   be put on active status, but then at a subsequent time

16   take them off if the Court were to rule in their favor

17   after a preliminary injunction.  And I guess what I

18   would say to this, Your Honor, is that this is an issue

19   in every NVRA case where a preliminary injunction is

20   sought.  And that argument that we shouldn't put voters

21   on the rolls if there's a possibility we might take them

22   off again has been rejected repeatedly.  It's been

23   rejected by the Sixth Circuit in the *United States*

24   *Student Foundation Association case versus Land*, which

25   we cite in our brief.  It's also been rejected by the--

 1   a district court in Georgia in the *Charles H. Wesley*

 2   *Foundation case versus Cox.*  And that decision was

 3   affirmed by the Eleventh Circuit.

 4          THE COURT:  Well, what about the context of

 5   this case where there's a pending motion for class

 6   certification that obviously I'm not going to rule upon

 7   before I rule on this motion for preliminary injunction,

 8   and the effect of that?

 9          MR. HO:  Well, I don't believe either of

10   those two cases that I mentioned, Your Honor, were

11   class-- were class actions.  I guess what I would say is

12   that regardless of whether or not we brought this case

13   on behalf of our individual clients or bringing it-- or

14   that we brought it as a class action, we would be

15   seeking the exact same relief, which is to enjoin this

16   law.

17          And whether or not there's a class action,

18   you know, class certification motion pending doesn't

19   really affect the scope of the relief that we're

20   seeking.  And it would be I think odd to simply order

21   the registration of our clients based on the notion that

22   the defendants' statute violates federal law, but not

23   afford that same relief to other people who are affected

24   in precisely the same way.

25          Now, we filed our class certification

1    motion, Your Honor, before we filed our preliminary

2    injunction motion.  We filed it on the day that the

3    complaint was filed.  And had the defendants not sought

4    and we consented to an extension of their time to

5    oppose, that motion would have either been adjudicate--

6    I mean heard by Your Honor now or concurrently with this

7    motion.  So we think it's a little bit of gamesmanship

8    for the defendants to say:  Give us more time to oppose

9    class certification.  And now, oops, you can't get the

10   relief you want because you've done us the courtesy of

11   giving us more time.  And there isn't really any dispute

12   that there are 16,000 people who are affected in

13   precisely the same way as our clients.  And I think that

14   the Court can take notice of that evidence in fashioning

15   relief.

16           The last subject I'd like to turn to

17   briefly, Your Honor, is the merits and the arguments

18   that Mr. Kobach raised about the case law.  And I'd like

19   to start by talking about the *Inter-Tribal* decision from

20   the Supreme Court.  What the Supreme Court stated at

21   Page 2257 was that, "The NVRA forbids states to demand

22   that an applicant submit additional information beyond

23   that required by the federal form."  And that's in

24   reference to the federal mail-in form which required

25   nothing more than an attestation of citizenship.

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 190 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
190

1            Now, the Court did not express one-- a view
2    one way or the other as to whether or not documentary
3    proof of citizenship can ever be permitted.  It opened
4    the door to the states requesting such a change from the
5    Election Assistance Commission.  Again, not pre-judging
6    what the outcome of that process was.  That's what the
7    case held.  We acknowledge that, we understand the
8    limitations of the-- of the case's holding.
9            But Secretary Kobach brought that challenge.
10   He brought it in the-- in this-- in the District Court
11   of Kansas, and he lost in the Tenth Circuit when the
12   Court held that the United States has authority under
13   the elections clause to set procedural requirements for
14   registering to vote in federal elections, and that
15   documentary evidence of citizenship may not be required.
16   If that is correct and it's the binding law in this
17   Circuit, then it follows that such a requirement of
18   documentary evidence exceeds the minimum amount of
19   information necessary under Section 5.
20           If we go back to the *Inter-Tribal* case, the
21   view that the defendants are expressing here is
22   essentially identical to the one that Justice Alito
23   expressed in dissent.  He wrote that the NVRA, quote,
24   "lets states decide for themselves what information is
25   necessary to assess the eligibility of the applicant by

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

191

 1    requiring that applicants provide supplemental

 2    information when appropriate."

 3              So Alito's view was that-- Justice Alito's

 4    view was that states can request anything from people

 5    when they're registering to vote.  But the Supreme Court

 6    in Justice Scalia's opinion rejected that view.  And as

 7    the Tenth Circuit explained in the *Kobach* case, this is

 8    one of those instances where the dissent tells us

 9    clearly what the law is not.

10              The third point here, Your Honor, addresses

11    *Young versus*-- I just would like to address *Young versus*

12    *Fordice*.  It's true that *Young v. Fordice* says that

13    states have some room for policy choice.  But it also

14    says that the NVRA imposes certain mandates on states,

15    describing those mandates in detail.  So with respect to

16    things that the statute is silent about, certainly

17    states have some discretion.  But with respect to

18    documentary proof of citizenship, the statute is not

19    silent for the reasons that we have articulated.

20              The very last point that I'd like to make,

21    Your Honor, has to do with the congressional record.

22    Mr. Kobach cited some statements from the floor debate

23    in the Senate that were in reference to the Simpson

24    amendment and said that the Simpson amendment was

25    unnecessary because the NVRA permits these documentation

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 192 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
                                                                      192

1    requirements.

2              Two things about this, Your Honor.  First,

3    it's a statement from someone who supported the

4    amendment.  And as you know, a month later, after this,

5    Congress rejected that amendment in the Conference

6    Committee Report.  And it's stated very clearly, "It is

7    not necessary or consistent with the purposes of this

8    Act.  There is concern that it could be interpreted by

9    states to permit registration requirements that could

10   effectively eliminate or seriously interfere with the

11   mail registration program of the Act.  It could also

12   adversely affect the administration of the other

13   registration programs as well.  In addition, it creates

14   confusion."

15             So this floor debate from March of 1993

16   doesn't really shed light on what Congress intended and

17   what Congress explained a month later in the official

18   Conference Committee Report.  To the extent there's any

19   confusion about what the statutory language is, the

20   conference report I think makes very clear that these

21   kinds of requirements are preempted by the statute.

22             THE COURT:  All right.  Thank you, Mr. Ho.

23             MR. HO:  Thank you, Judge Robinson.

24             THE COURT:  Mr. Jordan, how much time would

25   you like to present your surreply?

Case 2:16-cv-02105-JAR   Document 115   Filed 05/06/16   Page 193 of 196
16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16
                                                                    193

 1              MR. COX:  If acceptable to the Court, seven

 2    days.

 3              THE COURT:  That's fine.

 4              MR. KOBACH:  Your Honor?

 5              THE COURT:  All right.  We'll consider this

 6    matter under submission.  Yes, Mr. Kobach?

 7              MR. KOBACH:  May I briefly speak for just

 8    two minutes?  One to correct a misstatement of my own

 9    and one to briefly respond to something?

10              THE COURT:  All right.  Go ahead.

11              MR. KOBACH:  With regard to my misstatement;

12    when I was talking about the plaintiffs' delay, I said

13    that the first plaintiff to receive personal notice

14    about her requirement to provide proof of citizenship

15    was Bucci.  I misspoke.  It was Hutchinson on May 24th,

16    2013.  Bucci was the second plaintiff to receive

17    individualized notice on August 14th, 2013.

18              So doing the calculation then, if a 90-day

19    letter was sent right after Hutchinson received it, that

20    would take us to August of 2013.  And so plaintiffs

21    would then have technically sat on their rights from

22    August of 2013 until February of 2016, two years and six

23    months.  So it would be a 30-month delay.  And noting

24    again that the-- this Court, the District of Kansas,

25    held in *Prime Media versus Technology Marketing* that

1    seven months was too long a delay for a preliminary

2    injunction.

3              And then the other point I wanted to mention

4    was Mr. Ho said that federal law prescribes what is

5    allowed to prove citizenship and does not allow

6    documentary proof.  He has said that several times, but

7    nowhere does the NVRA actually say proof of citizenship

8    is prohibited.  And furthermore, as the NVRA sponsor,

9    Mr. Wendell Ford, said on the floor of the Senate, that

10   would make no sense-- what he said on the floor of the

11   Senate is nothing in here prevents a state from

12   requiring proof of citizenship.  So the understanding of

13   the principal sponsor of the NVRA was exactly contrary

14   to what Mr. Ho has just said.

15             And he finally ended on the point the Tenth

16   Circuit held that the documentary proof of citizenship

17   may not be required.  I would just direct the Court to

18   Pages 1196 and 1197 of the Tenth Circuit's decision.

19   The Tenth Circuit lays out that what it is reviewing is

20   whether the EAC's conclusion was arbitrary and

21   capricious under the standard of the APA.  It was not

22   reviewing the question of whether in the Tenth Circuit a

23   state may or may not under any circumstances require a

24   proof of citizenship.  It was simply was the EAC's

25   decision about the federal form arbitrary or capricious,

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

195

```
 1    Your Honor.  So again, he's vastly overstating what the
 2    Tenth Circuit held.  Thank you, Your Honor.
 3              THE COURT:  All right.  Thank you, Mr.
 4    Kobach.
 5              All right.  We will consider this under
 6    submission.  We'll look for your surreply a week from
 7    now, if not before, Mr. Cox.
 8              MR. COX:  Thank you, Your Honor.
 9              THE COURT:  And thank you everyone.  This
10    has been helpful.
11              MR. COX:  Thank you.
12              MR. KOBACH:  Thank you, Your Honor.
13              MR. HO:  Thank you, Your Honor.
14              THE COURT:  We'll be in recess until 1:30.
15              (1:15 p.m., proceedings recessed).
16
17
18
19
20
21
22
23
24
25
```

16-2105-JAR    Fish, et al., v. Kobach, et al.    04.14.16

196

C E R T I F I C A T E

   I, Kelli Stewart, a Certified Shorthand Reporter and
the regularly appointed, qualified and acting official
reporter of the United States District Court for the
District of Kansas, do hereby certify that as such
official reporter, I was present at and reported in
machine shorthand the above and foregoing proceedings.
   I further certify that the foregoing transcript,
consisting of 195 pages, is a full, true, and correct
reproduction of my shorthand notes as reflected by this
transcript.
   SIGNED May 6, 2016.



            /s/ Kelli Stewart
            Kelli Stewart, CSR, RPR, CCR, RMR