## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

STEVEN WAYNE FISH, et al.,

     Plaintiffs,

     v.

KRIS KOBACH, in his official capacity as
Secretary of State for the State of Kansas, et al.,

     Defendants.

Case No. 16-2105-JAR-JPO

## MEMORANDUM AND ORDER

This lawsuit challenges the Kansas documentary proof of citizenship requirement as it applies to those who apply to register to vote in federal elections during the driver's license application or renewal process. The individual plaintiffs filed their Complaint on February 18, 2016, on behalf of themselves and others similarly situated, against Kansas Secretary of State Kris Kobach, and Kansas Secretary of Revenue Nick Jordan. The Complaint alleges that the Kansas documentary proof of citizenship requirement and a related regulation are preempted by the National Voter Registration Act of 1993, and violate 42 U.S.C. § 1983 because they are unconstitutional under the Elections Clause and Privileges and Immunities Clause of the United States Constitution.[1] Before the Court is Plaintiffs' Motion for Preliminary Injunction, filed on February 25, 2016 (Doc. 19). Plaintiffs request a preliminary injunction barring Defendants from enforcing K.S.A. § 25-2309(l), which requires voters to provide proof of United States' citizenship when they apply to register to vote at the same time they apply for or renew a driver's license, and K.A.R. § 7-23-15, which allows cancellation of voter registration applications that

---

[1] Plaintiffs filed an Amended Complaint on March 17, 2016, adding an organizational plaintiff, The League of Women Voters of Kansas. Doc. 39.

are incomplete for more than 90 days after application due to failure to prove United States' citizenship, until the case can be determined on the merits.

The Court allowed the parties to conduct limited, expedited discovery, and heard evidence and argument on the motion on April 14, 2016.  At this time, the Court also considers Defendant Secretary of Revenue Nick Jordan's Motion to Dismiss (Doc. 64) to the extent it asserts lack of subject matter jurisdiction.  These matters are fully briefed.  The Court has considered the parties' briefs, the evidence adduced at the hearing, and the parties' oral arguments, and is prepared to rule.  As explained more fully below, Plaintiffs' motion for preliminary injunction is granted in part and denied in part.

## I.      Background

In 1993, Congress passed the National Voter Registration Act ("NVRA").  The NVRA has four stated purposes:

> (1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
> (2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;
> (3) to protect the integrity of the electoral process; and
> (4) to ensure that accurate and current voter registration rolls are maintained.[2]

The NVRA seeks to achieve these objectives by creating national registration requirements for federal elections through three methods: simultaneously with a driver's license application ("motor-voter"), by mail using the federal form approved by the Election Assistance Commission ("EAC"), or in person.[3]  This case deals with the first option only—applying to register simultaneously when applying for a driver's license.

---

[2] 52 U.S.C. § 20501(b).

[3] *Id.* § 20503(a).

Section 5 of the NVRA requires that every application for a driver's license, including license renewals, "shall serve as an application for voter registration with respect to elections for Federal office."[4]  Subsection (c) of section 5 provides:

> (1) Each State shall include a voter registration application form for elections for Federal office as part of an application for a State motor vehicle driver's license.
> (2) The voter registration application portion of an application for a State motor vehicle driver's license—
>
> (A) may not require any information that duplicates information required in the driver's license portion of the form (other than a second signature or other information necessary under subparagraph (C));
>
> (B) may require only the minimum amount of information necessary to—
>
> (i) prevent duplicate voter registrations; and
> (ii) enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;
>
> (C) shall include a statement that—
>
> (i) states each eligibility requirement (including citizenship);
> (ii) contains an attestation that the applicant meets each such requirement; and
> (iii) requires the signature of the applicant, under penalty of perjury;
>
> (D) shall include, in print that is identical to that used in the attestation portion of the application—
>
> (i) the information required in section 20507(a)(5)(A) and (B) of this title;
> (ii) a statement that, if an applicant declines to register to vote, the fact that the applicant has declined to register will remain confidential and will be used only for voter registration purposes; and
> (iii) a statement that if an applicant does register to vote, the office at which the applicant submits a voter registration application will remain confidential and will be used only for voter registration purposes; and
>
> (E) shall be made available (as submitted by the applicant, or in machine readable or other format) to the appropriate State election official as provided by State law.[5]

---

[4] *Id.* § 20504(a)(1).   "Federal office" is further defined in § 20502(2).

[5] *Id.* § 20504(c).

Section 8 of the NVRA provides for the administration of voter registration.  Under this section, each State shall

> (1) ensure that any eligible applicant is registered to vote in an election—
>
> (A) in the case of registration with a motor vehicle application under section 20504 of this title, if the valid voter registration form of the applicant is submitted to the appropriate State motor vehicle authority not later than the lesser of 30 days, or the period provided by State law, before the date of the election.[6]

Each State shall also:

> (3) provide that the name of a registrant may not be removed from the official list of eligible voters except—
>
> (A) at the request of the registrant;
>
> (B) as provided by State law, by reason of criminal conviction or mental incapacity; or
>
> (C) as provided under paragraph (4);
>
> (4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of—
>
> (A) the death of the registrant; or
>
> (B) a change in the residence of the registrant, in accordance with subsections (b), (c), and (d).[7]

The NVRA was passed after the House and Senate each passed voter registration bills and proceeded to conference committee.  The Senate's bill contained several Republican-proposed amendments, referred to as a "core" package of amendments that allowed the bill to pass the Senate.[8]  Another amendment to the Senate bill, which was not part of the core amendments, but was in the Senate bill that went to conference, was a rule of construction that

---

[6]*Id.* § 20507(a)(1)(A).

[7]*Id.* § 20507(a)(3).

[8]*See* 139 Cong. Rec. S5642-01 (daily ed. May 6, 1993) (statement of Sen. Ford).

had been proposed by Senator Simpson ("the Simpson Amendment").[9]  That amendment

provided "that nothing in this Act shall prevent a State from requiring presentation of

documentation relating to citizenship of an applicant for voter registration."[10]  At the time the

amendment was debated in the Senate, before it went to conference, Senator Ford, who

sponsored the legislation, stated that the amendment was redundant because the bill did not

preclude States from requiring documentary proof of citizenship.[11]  But the conference decided

to follow the House bill instead, which did not include this provision.  The conference report

explains:

> It is not necessary or consistent with the purposes of this Act.  Furthermore, there
> is concern that it could be interpreted by States to permit registration requirements
> that could effectively eliminate, or seriously interfere with, the mail registration
> program of the Act. It could also adversely affect the administration of the other
> registration programs as well. In addition, it creates confusion with regard to the
> relationship of this Act to the Voting Rights Act. Except for this provision, this
> Act has been carefully drafted to assure that it would not supersede, restrict or
> limit the application of the Voting Rights Act.  These concerns lead the conferees
> to conclude that this section should be deleted.[12]

When submitting the conference committee report on the Senate floor, Senator Ford

discussed the amendment.  After citing the same concerns raised in the report, he stated:

---

[9]*Id.*; 139 Cong. Rec. S5677-04 (daily ed. May 7, 1993) (statement of Sen. Simpson).

[10]H.R. Rep. No. 103-66, at 23 (1993) (Conf. Rep.).

[11]139 Cong. Rec. S2902 (daily ed. Mar. 16, 1993) (statement of Sen. Ford), attached as Kobach Ex. 7.   Just
two weeks before making this statement, however, Senator Ford responded to criticism of the NVRA that it would
allow noncitizens to register to vote:

> The safeguards in this bill are just as effective in preventing noncitizens from registering
> to vote.
>        Nothing in this legislation changes the requirements of eligibility to vote. You must still
> meet every requirement of eligibility. In fact, this bill specifically states in three separate places
> that the application for registration must set forth all the requirements for eligibility including
> citizenship. The applicant signs this attestation under penalty of perjury.

139 Cong. Rec. S2389-02, 1993 WL 56970 (Mar. 4, 1993) (statement of Sen. Ford).

[12]H.R. Rep. N. 103-66  at 23–24; 139 Cong. Rec. S5642-01 (daily ed. May 6, 1993) (statement of Sen.
Ford).

> Mr. President, every State mandates that you must be a citizen of the United States to be eligible to vote.  This bill requires that, on every application for registration, the requirements for eligibility must be clearly set forth, including citizenship.  And every applicant signs a statement that they meet each and every requirement, and that statement is signed under penalty of perjury.[13]

The NVRA was ultimately passed without the proposed rule of construction amendment.

In 2007, Kansas amended its driver's license statute to require all applicants to provide documentary proof of lawful presence.[14] As part of this requirement, the division of vehicles

> shall require valid documentary evidence that the applicant: (A) Is a citizen or national of the United States; (B) is an alien lawfully admitted for permanent or temporary residence in the United States; (C) has conditional permanent resident status in the United States; (D) has an approved application for asylum in the United States or has entered into the United States in refugee status; (E) has a valid, unexpired nonimmigrant visa or nonimmigrant visa status for entry into the United States; (F) has a pending application for asylum in the United States; (G) has a pending or approved application for temporary protected status in the United States; (H) has approved deferred action status; or (I) has a pending application for adjustment of status to that of an alien lawfully admitted for permanent residence in the United States or conditional permanent resident status in the United States.[15]

Under Kansas law, only United States citizens are eligible to register to vote.[16]  And legally qualified voters must register in order to be eligible to vote.[17]  The Secure and Fair Elections Act ("SAFE Act") became law in 2011.  It requires voter registration applicants to submit documentary proof of citizenship ("DPOC") at the time they apply to register to vote:

> (l) The county election officer or secretary of state's office shall accept any completed application for registration, but an applicant shall not be registered until the applicant has provided satisfactory evidence of United States citizenship. Evidence of United States citizenship as required in this section will be satisfied by presenting one of the documents listed in paragraphs (1) through (13) of subsection (l) in person at the time of filing the application for registration or by

---

[13]139 Cong. Rec. S5642-01 (daily ed. May 6, 1993) (statement of Sen. Ford).

[14]K.S.A. § 8-240(b).

[15]*Id.* § 8-240(b)(2).

[16]Kansas Constitution art. 5, § 1.

[17]K.S.A. § 25-2302.

including a photocopy of one of the following documents with a mailed registration application. After a person has submitted satisfactory evidence of citizenship, the county election officer shall indicate this information in the person's permanent voter file. Evidence of United States citizenship shall be satisfied by providing one of the following, or a legible photocopy of one of the following documents:

(1) The applicant's driver's license or nondriver's identification card issued by the division of vehicles or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver's license or nondriver's identification card that the person has provided satisfactory proof of United States citizenship;

(2) the applicant's birth certificate that verifies United States citizenship to the satisfaction of the county election officer or secretary of state;

(3) pertinent pages of the applicant's United States valid or expired passport identifying the applicant and the applicant's passport number, or presentation to the county election officer of the applicant's United States passport;

(4) the applicant's United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States bureau of citizenship and immigration services by the county election officer or the secretary of state, pursuant to 8 U.S.C. § 1373(c);

(5) other documents or methods of proof of United States citizenship issued by the federal government pursuant to the immigration and nationality act of 1952, and amendments thereto;

(6) the applicant's bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number;

(7) the applicant's consular report of birth abroad of a citizen of the United States of America;

(8) the applicant's certificate of citizenship issued by the United States citizenship and immigration services;

(9) the applicant's certification of report of birth issued by the United States department of state;

(10) the applicant's American Indian card, with KIC classification, issued by the United States department of homeland security;

(11) the applicant's final adoption decree showing the applicant's name and United States birthplace;

(12) the applicant's official United States military record of service showing the applicant's place of birth in the United States; or

(13) an extract from a United States hospital record of birth created at the time of the applicant's birth indicating the applicant's place of birth in the United States.[18]

---

[18]K.S.A. § 25-2309(l).

The DPOC requirement was made effective January 1, 2013.[19]  A person already registered to vote before January 1, 2013, is not required to resubmit evidence of citizenship.[20]

If an applicant is a United States citizen but unable to provide one of the thirteen forms of identification listed in subsection (l), the statute allows that applicant to submit another form of citizenship documentation by directly contacting the Secretary of State's Office.  In these cases, the state election board shall give the applicant an opportunity for a hearing before assessing the evidence of citizenship to determine whether it is satisfactory.[21]  The state election board is comprised of the Secretary of State, the Attorney General, and the Lieutenant Governor.[22]  Secretary Kobach represents that this hearing before the election board may be telephonic, that three people have so far availed themselves of this provision, and that all three were approved by the election board.  Examples provided by Secretary Kobach of alternative forms of citizenship documentation under subsection (m) include an affidavit from a sibling stating the date and place of birth, school records, or even an applicant's own affidavit.  Secretary Kobach stated:

> [H]e can also make the allegation himself, too.  He can file his own declaration. . . .  I would be willing to bet that the State Election Board would take simply his own declaration as sufficient.  The State Election Board has yet to tell anyone no.  And that's perfectly fine if a person is willing to make an attestation, a declaration to the State Election Board, "Here are my circumstances, here's why I don't have my document."[23]

The evidence submitted at the hearing on this matter shows that prior to the effective date of the SAFE Act, eleven noncitizens successfully registered to vote in Sedgwick County.[24]  Bryan Caskey, Assistant Secretary of State, Elections and Legislative Matters, avers in his

---

[19]*Id.* § 25-2309(u).

[20]*Id.* § 25-2309(n).

[21]*Id.* § 25-2309(m).

[22]K.S.A. § 25-2203(a).

[23] Doc. 115, Tr. Hrg. at 68:20–69:7.

[24]Kobach Ex. 8, attach.

declaration that his office has identified nineteen other cases of noncitizens registering to vote prior to 2013.[25]  Of these thirty noncitizens, the evidence shows that three actually voted, two in 2004 and one 2009.[26]  According to Mr. Caskey, the Seward County Clerk provided testimony before the Legislature when it deliberated over the SAFE Act that approximately fifty noncitizens were registered to vote in 1997, in the period preceding a county referendum on a proposed hog-farming operation.[27]  According to Caskey, the Clerk testified that these noncitizens voted in the referendum.  There is no other evidence about the details of this incident, nor any direct evidence from the Seward County Clerk.  Since the effective date of the DPOC requirement, fourteen noncitizens have unsuccessfully attempted to register to vote in Sedgwick County.

Plaintiffs offered the expert testimony of Dr. Lorraine Minnite to controvert Secretary Kobach's argument that there is a widespread problem of noncitizen voter fraud in Kansas.  Dr. Minnite is an associate professor of Public Policy and Administration at Rutgers University who specializes in elections; she has extensively researched and studied incidents and effects of voter fraud in American elections.  She has reviewed allegations of voter fraud nationally, and Secretary Kobach's allegations of voter fraud in Kansas.[28]  She contends that there is no

---

[25]Kobach Ex. 1 ¶ 28.

[26]Kobach Ex. 8, attach .

[27]Kobach Ex. 1 ¶ 29.  Defendants provide no other evidence or citation regarding this testimony.  There is no affidavit from the Seward County Clerk, or other direct evidence of her testimony.

[28]The Court confines its analysis of Dr. Minnite's report to incidents of noncitizen voter fraud in Kansas, and specifically, to the incidents of voter fraud identified by Defendants in response to this motion.  Defendants do not raise or rely upon the vast majority of evidence that Dr. Minnite impeaches in her report, thus the Court finds her general discussion of voter fraud is not relevant.  The Court acknowledges that the district court in *N.C. State Conference of the NAACP v. McCrory*, –F. Supp. 3d–, 2016 WL 1650774, at 97–98 (M.D.N.C. Apr. 25, 2016), recently rejected Dr. Minnite's conclusion that there is no voter impersonation fraud in North Carolina, and her conclusion that the North Carolina photo-ID law did not serve a legitimate State interest in reducing the risk of voter impersonation fraud.  These findings have little bearing on the case at hand.  This case considers an NVRA challenge to a registration requirement that applicants provide DPOC, not to a law requiring registered voters to present photo-ID at the polls.  Further, the *McCrory* case considers constitutional and Voting Rights Act challenges to the State's photo-ID statute, claims not at issue in this case.

evidence of a persistent problem of noncitizens fraudulently voting in Kansas. With respect to the details of the Seward County incident, Dr. Minnite points to Secretary Kobach's discussion of the incident before the United States House of Representatives Committee on Oversight and Government Reform on February 12, 2015.[29] There, Secretary Kobach characterized this as "[t]he most notorious case of aliens voting in Kansas."[30] The county referendum would have prohibited large hog farming operations in Seward County. Investors in a proposed hog farming operation hoped to raise hogs in a Kansas plant and render them at a processing plant in Oklahoma.

> More than 50 employees of the Guyman, Oklahoma, hog processing plant sent in voter registration applications in a single envelope addressed to the county clerk's office in Seward County, Kansas. Many of the registration forms contained made-up addresses in Seward County. However, the clerk had no legal authority to reject the registration applications.[31]

Secretary Kobach then told the House Subcommittee that these Oklahoma workers were bussed in to Seward County on Election Day to vote. "The county clerk strongly believed that the registrants were non-citizens."[32] He lamented that the county was powerless to disqualify the voters.[33]

Mr. Caskey testified at the hearing, and submitted a lengthy declaration documenting the administration of motor-voter registration in Kansas.[34] As part of his duties, Mr. Caskey administers the Kansas Election Voter Information System ("ELVIS") database and works with

---

[29]*Hearing on "The President's Executive Actions on Immigration and Their Impact on State and Local Elections" Before the Subcomm. on Nat'l Sec. and Subcomm. on Health Care, Benefits, and Admin. Rules*, 114th Cong. (2015) (statement of Kris W. Kobach, Kansas Secretary of State), https://oversight.house.gov/wp-content/uploads/2015/02/Kobach-Testimony-House-OGR-21215.pdf.

[30]*Id.* at 2.

[31]*Id.*

[32]*Id.*

[33]*Id.*

[34]Kobach Ex. 1.

the individual counties to manage voter registration.  The ELVIS system is a statewide list of every registered voter, every voter registration applicant, and everyone who used to be a registered voter but was subsequently cancelled.  All 105 county election offices are "plugged in" to the system.  Mr. Caskey provides instruction to the counties for handling elections.  He discussed in his declaration, during his deposition, and at the hearing the procedure for assessing citizenship eligibility for those who apply at the DMV.  The Kansas DMV clerks are instructed to ask each driver's license applicant, whether it is an initial application or a renewal, if that person wants to register to vote.  If the applicant says yes, the DMV clerk is prompted to ask questions about the applicant's eligibility to vote, including asking whether the person is a United States citizen.

Mr. Caskey describes the relationship between the Department of Revenue and the Secretary of State's Office as follows:

> The Secretary of State's Office and the DMV have established an interagency practice whereby the DMV sends verification of documentary proof of citizenship to the relevant county election official.  In instances where it is learned that the DMV has failed to forward such information to the county election official, the Secretary of State's Office obtains the relevant documentation from the DMV and instructs the county election officer to complete the registration of the individual.[35]

But the evidence at the hearing establishes that the DMV clerks do not request DPOC from driver's license renewal applicants.  They request proof of lawful presence for initial applicants only, which often constitutes proof of citizenship.  When this documentation is provided by initial applicants, the DMV clerk makes an annotation in the DMV database about the type of documentation provided by the applicant. But the Department of Revenue has made a policy

---

[35] *Id.* ¶ 24.

decision not to request DPOC from renewal applicants, claiming it lacks the administrative capacity to undertake that effort.

At the end of the motor voter application process, the applicants sign a digital form that includes the NVRA-required attestation clause that what they are signing is true and correct, and that they are a United States citizen.  Once that is complete, the applicants are handed a receipt that apparently includes a statement about the DPOC requirement and that instructs the applicants that if they have not already provided proof of citizenship, they must do so before they will be registered.[36]  Mr. Kobach characterized this receipt at the hearing as an applicant's "first notice."

The DMV database information about each voter registration application is uploaded nightly in batch format into the state-wide ELVIS system, which then disseminates the information to the 105 county election offices based on the applicant's address.  For each voter registration application, there is electronic data, and a separate certification from the DMV stating whether acceptable DPOC was provided to the DMV at the time of registration.  Once the county election official opens the batch, the county begins creating individual records.

If an applicant has not provided DPOC, or if the application is otherwise missing required information, the record is designated as "in suspense" or "incomplete" in the ELVIS system until the applicant provides the remaining information.  Secretary Kobach promulgated K.A.R. § 7-23-15 to become effective on October 2, 2015.  The regulation provides that applications deemed "incomplete" are to be "cancelled" from the State's list of applicants if the applicant does not

---

[36]This receipt was not offered into the record with the briefs or at the hearing.  The testimony suggested that this is a transaction receipt.  There was no evidence about where the DPOC requirement appears or how conspicuous it may or may not be.

produce DPOC within 90 days of application.[37]  When an application is cancelled due to lack of DPOC, that record is not removed from the ELVIS database; there remains a record of all cancelled applications.

The county election offices populate the ELVIS system with new registration records, and maintain records of the notices sent to applicants deemed incomplete for failure to provide DPOC or for some other reason.  The first mailed notice is sent within one or two weeks of application.  The counties are advised to send out a third notice after about thirty days, and a fourth notice before cancellation.  Thus, the counties have been instructed by the Secretary of State's Office to send three written notices and to make one telephone call to applicants on the incomplete list before cancelling their applications.[38]  Each written and oral communication is to be entered into the ELVIS database.

A person who receives notice of an incomplete voter registration application due to failure to provide DPOC can provide their DPOC in person at the county election office for inspection, by mailing a copy of the document to the county election officer or to the Secretary of State's Office, or by faxing, emailing, and in some counties, texting a copy of the documents.  In addition, the Secretary of State's office checks approximately monthly with the Kansas Department of Vital Statistics ("KDHE") to see if individuals missing DPOC were born in the State of Kansas, and will complete those registrations if so.  Almost half of the voter registration applications on the suspense list have had citizenship confirmed through these monthly checks; many others submit their DPOC after receiving notice.

---

[37]The parties use different language to describe the applicant's status under this regulation.  Plaintiffs refer to a cancelled application as a "purged" application.   Because cancelled is the word used in the regulation and database, the Court uses that term throughout this opinion.

[38]No example of a written notice was offered into the record with the briefs or at the hearing.

If information is provided to the Kansas Secretary of State's Office suggesting that an initial applicant presented DPOC to the DMV at the time of application, but that information was not conveyed into the ELVIS system, Mr. Caskey will confirm whether or not the DMV has in its possession a proof of citizenship record for the applicant. Given the DMV policy not to request DPOC for renewal applicants, this confirmation process would never occur with renewal applicants. Also, Mr. Caskey avers that the Kansas Secretary of State's Office contacts other States to verify that a birth certificate exists confirming citizenship, and contacts voters by telephone or in person to determine eligibility.

Many registered voters in Kansas have registered to vote at DMV offices—between January 1, 2006 and March 23, 2016, 43.7% of Kansas voters registered at a DMV office. The individual Plaintiffs and the proposed class they represent are Kansas residents and citizens who are "motor-voter registrants": that is, they submitted voter registration applications at DMV offices in Kansas. These Plaintiffs were not registered to vote because they failed to meet the documentary proof-of-citizenship requirement imposed under K.S.A. § 25-2309(l). Some of these voters' applications are considered "in suspense" in the ELVIS system, while others have been cancelled under K.A.R. § 7-23-15.

Soon after the original complaint was filed, the originally-named plaintiffs moved for class certification. That motion is not yet fully briefed, and a hearing has been scheduled on that motion on June 16, 2016.

Plaintiff Steven Wayne Fish is a United States citizen who currently resides in Lawrence, Kansas. He first moved to Kansas as a young person, obtaining his first Kansas driver's license in 1995. He has continuously possessed a Kansas driver's license since then. On August 21, 2014, Mr. Fish went to the driver's license office in Lawrence to renew his driver's license. The

DMV clerk asked him at that time if he wanted to register to vote.  He had never registered before, but decided to register at this time.  The clerk did not ask Mr. Fish for DPOC and did not tell Mr. Fish that Kansas law requires DPOC.  Soon after applying to register, on August 27, 2014, Fish received a postcard from the Douglas County, Kansas County Clerk, informing him that his name had not been entered onto the voter rolls and that he needed to submit DPOC in order to complete the registration process.  Mr. Fish searched his records but could not find any documents that would be sufficient to prove his citizenship under § 25-2309(l).  Mr. Fish was born on an Air Force Base in Chanute, Kansas that was decommissioned and closed in 1993; at the time he received notice of his incomplete registration, he did not know how to obtain a copy of his birth certificate.  Mr. Fish has a modest income and could not afford to obtain a copy of his birth certificate.  He was unable to vote in the 2014 election.  Mr. Fish's original affidavit stated that his application was in suspense, but the ELVIS records appear to show that his application was cancelled.  On May 11, 2016, Mr. Fish submitted a supplemental declaration attesting that he recently found his birth certificate in a safe in his stepfather's house.[39]  Nonetheless, Fish will not be able to vote in the upcoming primary or general elections of 2016 unless he reapplies to register and submits this document.[40]

Plaintiff Donna Bucci is a United States citizen who currently resides in Wichita, Kansas.  She has lived in Kansas for about five years.  On August 14, 2013, Ms. Bucci went to the driver's license office in Wichita, Kansas to renew her driver's license.  The DMV clerk asked her at that time if she wanted to register to vote.  Bucci wanted to register in order to vote in the next election cycle.  The clerk did not ask Ms. Bucci for DPOC and did not tell Ms. Bucci that Kansas law requires DPOC.  Ms. Bucci left the driver's license office believing that she had

---

[39]Doc. 121.

[40]Pls. Ex. 2; Kobach Ex. 1 ¶ 34; Kobach Ex. 9 at 1–8.

successfully registered to vote.  Ms. Bucci states in her declaration that she did not learn that she was not registered to vote until six or seven months later when she received a notice in the mail telling her that she needed to show proof of citizenship in order to be a registered voter.  The ELVIS records show that Ms. Bucci was sent two notifications that proof of citizenship was required—the first on August 16, 2013, and a "final notice" on September 28, 2015.  There is also a notation in the database from September 25, 2013: "Will get information to us on POC when she gets items unpacked."[41]  Ms. Bucci does not have any documents that would be sufficient to prove her citizenship under § 25-2309(l).  Obtaining a copy of her Maryland birth certificate would cost $24, and this would be a financial burden for her.  Ms. Bucci's application was cancelled on October 15, 2015 pursuant to K.A.R. § 7-23-15.  Ms. Bucci will not be able to vote in the upcoming primary or general elections of 2016.  And she stated that this experience discourages her from attempting to register to vote in the future.[42]

Plaintiff William Stricker, III is a United States citizen who currently resides in Wichita, Kansas.  Mr. Stricker was a Kansas resident from 2006–08, resided in Chicago from 2008–13, and moved back to Kansas in 2013.  He previously voted in the 2010 and 2012 mid-term and Presidential elections.  Mr. Stricker went to the DMV office in October 2014 to obtain a driver's license and register to vote.  He was told that he had insufficient documentation to obtain a driver's license and was sent home to obtain his social security card.[43]  Mr. Stricker returned to the DMV with his out-of-state driver's license, social security card, and utility bills to show proof of lawful presence.  The DMV clerk asked him at that time if he wanted to register to vote, and he said yes.  The clerk did not ask Mr. Stricker for DPOC and did not tell him that he lacked

---

[41]Kobach Ex. 9 at 22.

[42]Pls. Ex. 4; Kobach Ex. 1 ¶ 36; Kobach Ex. 9 at 15–22.

[43]Plaintiffs claim in the Reply brief that Mr. Stricker was treated as a renewal applicant at the DMV since he previously resided in Kansas and held a Kansas license at that time.

the necessary documentation to register to vote.  Mr. Stricker left the driver's license office

believing that he had successfully registered to vote.  On Election Day in November 2014, Mr.

Stricker went to his polling place and provided his Kansas driver's license to the polling place

volunteer.  The volunteer could not find Mr. Stricker's name on the voting roll; he was given a

provisional ballot.  Several weeks after the election, Mr. Stricker received a notice in the mail

telling him that he was not registered because he lacked sufficient proof of citizenship.  The

ELVIS database shows that Mr. Stricker was sent notices on October 21, 2014, December 5,

2014, and a final notice on September 25, 2015, and that he was called regarding his suspense

status on February 27, 2015.  Due to his schedule, he was unable to submit the necessary

documentation to county election officials.  His voter registration application was cancelled on

November 6, 2015, pursuant to K.A.R. § 7-23-15.[44]

Plaintiff Thomas Boynton is a United States citizen who currently resides in Wichita,

Kansas.  He first moved to Kansas in July 2014.  In early August 2014, Mr. Boynton went to a

driver's license office in Wichita, Kansas to exchange a valid out-of-state driver's license for a

Kansas license, and to register to vote.  The DMV clerk asked him at that time if he wanted to

register to vote, and he said yes.  Mr. Boynton brought several documents with him to the DMV

office that day: his out-of-state license, social security card, original birth certificate, utility bill,

bank statement, and house lease.  He does not recall which of these documents the DMV clerk

asked to see, but he provided the clerk with each document as she requested it.  He left the DMV

believing he was registered to vote.  On Election Day in November 2014, Mr. Boynton went to

his polling place to vote but the poll volunteer did not find him on the voter roll.  The volunteer

told Mr. Boynton that this was common and told him he could cast a provisional ballot instead

---

[44]Pls. Ex. 5; Kobach Ex. 1 ¶ 37; Kobach Ex. 9 at 23–42.

that would be counted once his voter registration was validated.  Mr. Boynton cast a provisional ballot and assumed it would be counted.  In early 2015, Mr. Boynton received a notice from the Sedgwick County Board of Elections informing him that he needed to provide DPOC in order to register to vote.

Other than the cases of Mr. Stricker and Mr. Boynton, there is no evidence that provisional ballots have been offered to accommodate motor voter registrants that lack DPOC. And unless DPOC is provided at least one day before the election by applicants on the suspense list, they are ineligible to vote.

The ELVIS database shows no record of Mr. Boynton applying to register at a DMV office in August 2014.  The database shows that Mr. Boynton tried to register in person at his polling station on November 4, 2014, Election Day.  He was sent two written notices that proof of citizenship was required on December 5, 2014, and on September 28, 2015.  There is also a record that he was called regarding his suspense status on February 27, 2015.  His voter registration application was cancelled on November 5, 2015 pursuant to K.A.R. § 7-23-15.[45]

.[46]

---

[45]Pls. Ex. 6; Kobach Ex. 1 ¶ 38; Kobach Ex. 9 at 42–48.

[46]Kobach Ex. 6; Doc. 115, Hrg. Tr. at 155:10–16.

Plaintiff Douglas Hutchinson is a United States citizen who currently resides in Mission, Kansas.  He has lived in Kansas since infancy.  He first obtained a Kansas driver's license in the mid-1980's and has continuously possessed a Kansas driver's license since then.  Mr. Hutchinson first registered to vote in 1987, but stopped voting many years ago.  About two years ago, he decided he wanted to vote again.  Mr. Hutchinson went to the DMV office in Mission, Kansas in the spring of 2013 to renew his license and told the clerk he wished to register to vote. The DMV clerk did not require him to provide DPOC.  In late 2014 or early 2015, he received a telephone call from a volunteer with the League of Women Voters advising him that his name was not registered to vote because he had not provided DPOC.  He attests that he never received prior notice from any government office advising him that his registration was incomplete.  Mr. Hutchinson obtained a passport, and in the summer of 2015 attempted to take a copy of his passport to the DMV office.  The clerk at the DMV office told him that he had done all that was necessary to complete his voter registration.[47]  He received another call later from the League of Women Voters, advising him that his voter registration was still incomplete.  He has not had time to present the necessary documentation to complete his application.  The ELVIS database shows that notices were sent to Mr. Hutchinson on June 24, 2013, and on December 11, 2015.  It reflects that his application was cancelled pursuant to K.A.R. § 7-23-15.[48]

Between January 1, 2013 and March 28, 2016, there were 244,699 voter registration applications completed in Kansas.  According to Plaintiffs' expert analysis of the ELVIS data, between January 1, 2013 and March 23, 2016, there were 12,717 motor voter registration

---

[47]Included in the ELVIS record is a screen shot of what appears to be a scanned hard copy of Stricker's Kansas Voter Registration Application that is date stamped June 30, 2015, and was signed on June 28, 2015.  It includes an attestation above his signature that he is a United States Citizen.  Kobach Ex. 9 at 56.  There is no indication in the record that the county election officials received notice that he had provided a passport to a DMV clerk.

[48]Pls. Ex. 7; Kobach Ex. 1 ¶ 39; Kobach Ex. 9 at 49–59.

applications cancelled under K.A.R. § 7-23-15 for failure to provide DPOC.[49]  As of March 28, 2016, there are 5655 motor voter applications that are in "incomplete" status due to failure to provide DPOC.[50]

Kansas's voter participation rate in the November 2012 presidential election was 66.8%; in the 2014 midterm election it was 50.8%.  Kansas was one of fourteen states that increased voter turnout from 2010 to 2014.  The next statewide election is the primary election of August 2, 2016.  Advanced voting for this election begins on July 13, 2016.  This ballot will include federal, state, county, township, and precinct offices.  The registration deadline for this election is twenty-one days prior to election day; however, DPOC may be provided by an applicant on the suspense list up to one day before the election, August 1, 2016.[51]

Plaintiffs' Amended Complaint alleges claims under: (1) NVRA § 5 because it preempts the Kansas DPOC law; (2) NVRA § 8 because Defendants fail to ensure that voter registration applicants who completed and submitted a valid voter registration form with their driver's license application are registered to vote; (3) NVRA § 8 because the regulation allowing applicants to be cancelled in the ELVIS system removes otherwise eligible voters from the voting rolls; (4) NVRA § 10 for failure to coordinate the State's responsibilities under the Act; (5) 42 U.S.C. § 1983, based on violations of the Elections Clause in Article I, § 4, cl. 1; and (6) 42 U.S.C. § 1983, based on violations of the Privileges and Immunities Clauses.  Plaintiffs seek a declaratory judgment that the DPOC law and K.A.R. § 7-23-15 are  invalid with respect to motor-voter registrants, and preempted by the NVRA.  They also seek injunctive relief that:

---

[49]Plaintiffs Ex. 15 at 8. Mr. Caskey asserts that 16,319 applicants have been cancelled since the regulation went into effect for lack of DPOC, but his declaration did not isolate motor voter applicants. *See* Kobach Ex. 1 ¶ 10.

[50]Kobach Ex. 1 ¶ 15.

[51]K.S.A. § 25-2311(e); K.A.R. § 7-23-14 (providing factors for elections officials to consider when assessing documents submitted as evidence of United States citizenship, and allowing voter registration applicants to submit documentation on the day before Election Day).

requires Defendants to register for federal elections Plaintiffs and all similarly situated motor voter registrants who are otherwise eligible to vote but have been either cancelled or held in suspense due to the DPOC law; enjoins Defendants from enforcing the DPOC law and K.A.R. § 7-23-15 with respect to motor voter registrants who are otherwise eligible to vote in federal elections; and that orders Defendants to verify DPOC on file with other state agencies in the same manner as they work with the KDHE to confirm citizenship of suspended voters.  Plaintiffs seek attorneys' fees and costs.

In their motion for preliminary injunctive relief, Plaintiffs ask the Court to require the Secretary of State to identify and register all otherwise eligible voters on the incomplete and cancellation lists in ELVIS for federal elections, and to enjoin Defendants from enforcing K.S.A. § 25-2309(l) and K.A.R. § 7-23-15, until the case can be determined on the merits.

## II.    Subject Matter Jurisdiction

Defendants each raise subject matter jurisdiction challenges in their responses to the motion for preliminary injunction.  Secretary Jordan challenges subject matter jurisdiction based on: (1) lack of standing; and (2) Eleventh Amendment immunity.  Secretary Kobach argues that Plaintiffs lack standing to raise the duplication of information component of the § 5 violation in Count I because no named plaintiff has alleged injury associated with that claim.   Federal courts are courts of limited jurisdiction and, as such, must have a statutory or constitutional basis to exercise jurisdiction.[52]   A court lacking jurisdiction must dismiss the case, regardless of the stage

---

[52]*Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002); *see United States v. Hardage*, 58 F.3d 569, 574 (10th Cir. 1995) ("Federal courts have limited jurisdiction, and they are not omnipotent.  They draw their jurisdiction from the powers specifically granted by Congress, and the Constitution, Article III, Section 2, Clause 1.") (internal citations omitted).

of the proceeding, when it becomes apparent that jurisdiction is lacking.[53]  The party who seeks

to invoke federal jurisdiction bears the burden of establishing that such jurisdiction is proper.[54]

"Thus, plaintiff bears the burden of showing why the case should not be dismissed."[55]  Mere

conclusory allegations of jurisdiction are not enough.[56]

### A.    Eleventh Amendment Immunity

Secretary Jordan first argues that the claims against him are barred under the doctrine of

sovereign immunity.  Under the Eleventh Amendment, States and State agencies are immune

from private suits unless they consent to suit, or Congress validly abrogates the States'

immunity.[57]  A narrow exception to sovereign immunity has been carved out under the *Ex parte*

*Young* doctrine, which holds that private litigants may seek prospective injunctive relief against a

state official for ongoing violations of federal law in federal court.[58]  The Supreme Court has

explained that "[i]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh

Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the]

complaint alleges an ongoing violation of federal law and seeks relief properly characterized as

prospective."[59]  Under a straightforward analysis, the Amended Complaint alleges ongoing

violations of the NVRA and 42 U.S.C. § 1983 and ongoing constitutional violations.  To the

extent the Amended Complaint seeks prospective declaratory and injunctive relief barring

---

[53]*Laughlin v. Kmart Corp.*, 50 F.3d 871, 873 (10th Cir. 1995).  The Court defers ruling on the remainder of Secretary Jordan's motion to dismiss, based on failure to state a claim upon which relief may be granted under Fed. R. Civ. P. 12(b)(6).

[54]*Montoya*, 296 F.3d at 955.

[55]*Harms v. IRS*, 146 F. Supp. 2d 1128, 1130 (D. Kan. 2001).

[56]*United States ex rel. Hafter, D.O. v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 (10th Cir. 1999).

[57]*Hans v. Louisiana*, 134 U.S. 1, 10 (1890); *Hill v. Kemp*, 478 F.3d 1236, 1255–56 (10th Cir. 2007).

[58]*Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167–68 (10th Cir. 2012) .

[59]*Va. Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)).

enforcement of the Kansas DPOC law and a related regulation promulgated by the Secretary of State, the *Ex parte Young* doctrine therefore applies under the straightforward analysis required by Supreme Court precedent.

Secretary Jordan argues that *Ex parte Young* does not apply to him because his agency does not enforce the NVRA, citing cases where the exception did not apply to a defendant without the power to enforce the law in question.  These cases are easily distinguishable.  In *Peterson v. Martinez*, the Tenth Circuit explained that the State official "must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state a party,"[60] and that "state officials must have a particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty."[61]  In *Klein v. University of Kansas Medical Center*, the plaintiff-employee sought reinstatement, but because the individual defendant lacked the power to provide him with that relief, the *Ex parte Young* doctrine did not overcome the Eleventh Amendment's jurisdictional bar.[62]  Finally, in *National Coalition for Students with Disabilities Education & Legal Defense Fund v. Taft*, the Southern District of Ohio determined that because Ohio law delegated the power to enforce the NVRA to the Secretary of State, the Governor of Ohio had no connection to its enforcement.[63]

The NVRA provision at issue in this case addresses motor voter registration only, requiring a simultaneous application process for registering to vote when applying for or renewing a driver's license.[64]  Section 5 of the NVRA provides for transmittal of all voter

---

[60] 707 F.3d 1197, 1205 (10th Cir. 2013) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)).

[61] *Id.* (quoting *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007)).

[62] 975 F. Supp. 1408, 1417 (D. Kan. 1997).

[63] No. C2-00-1300, 2001 WL 1681115, at *4 (S.D. Ohio Sept. 24, 2001).

[64] 52 U.S.C. § 20504.

registration applications accepted at "a State motor vehicle authority" "to the appropriate State election official."[65]  The DMV is a division of the Department of Revenue,[66] led by Secretary Jordan, which governs driver's license administration in Kansas.[67]  The parties have submitted evidence that the Secretary of State's Office and the DMV have established an interagency system for registering motor voters in Kansas in compliance with the NVRA.[68]  The Election Manual submitted with Plaintiffs' response explicitly provides that state agencies other than county election officials play a role in collecting DPOC under the Kansas law.[69]  It provides that DMV workers will collect DPOC from motor voter applicants.[70]  And Mr. Caskey testified at length about the batches of information submitted by the DMV to the ELVIS database each day, which are used by county election officials to create voter registration records.  Plaintiffs allege NVRA violations in part stemming from this interagency arrangement.  Unlike in *Peterson*, there is evidence that the Kansas Department of Revenue has both a duty to enforce the motor voter provisions of the NVRA, and has demonstrated a willingness to exercise that duty.[71]

### B.    Standing

Article III of the Constitution gives federal courts the power to exercise jurisdiction only over "Cases" and "Controversies."  As the Supreme Court has explained, "[i]n limiting the

---

[65]*Id*. § 20504(e).

[66]K.S.A. § 75-5110 (it is now called the Division of Vehicles; the Court refers to it by "DMV," the name that many Kansans have come to refer to the Division, as it  used to be called Division of Motor Vehicles).

[67]*Id.* § 75-5101

[68] Doc. 95, Ex. A at 14 ("These programs were established by the Secretary of State and DMV in a cooperative effort"); Kobach Ex. 1 ¶ 24.

[69]Doc. 95, Ex. A at 11–14.

[70]*Id.* at 14.

[71]Secretary Jordan complains that the Court cannot consider matters outside the pleadings on a motion to dismiss.  While that is the general rule for motions to dismiss brought under Fed. R. Civ. P. 12(b)(6), on a Rule 12(b)(1) motion to dismiss, the Court has "wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts."  *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).

judicial power to 'Cases' and 'Controversies,' Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law.  Except when necessary in the execution of that function, courts have no charter to review and revise legislative and executive action."[72]

One of several doctrines reflecting Article III's case-or-controversy limitation on the judicial power is the doctrine of standing.  That doctrine requires federal courts, before considering the merits of an action, to "satisfy themselves that 'the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [the plaintiff's] invocation of federal-court jurisdiction.'"[73]

Plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing each element of standing "with the manner and degree of evidence required at the successive stages of the litigation."[74]  Standing is evaluated based on the facts as they exist at the time the Complaint is filed.[75]  At the pleading stage, the Court "'presume[s] that general allegations embrace those specific facts that are necessary to support the claim,'"[76] and "general factual allegations of injury resulting from the defendant's conduct may suffice.'"[77]  Nonetheless, the Court is "not bound by conclusory allegations, unwarranted inferences, or legal conclusions."[78]

The Supreme Court has found the "irreducible constitutional minimum of standing" to

---

[72]*Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009).

[73]*Id.* at 493 (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)).

[74]*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Tandy v. City of Wichita*, 380 F.3d 1277, 1284 (10th Cir. 2004).

[75]*Tandy*, 380 F.3d at 1284.

[76]*Lujan*, 504 U.S. at 561 (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990)).

[77]*Id.*

[78]*Hackford v. Babbitt*, 14 F.3d 1457, 1465 (10th Cir. 1994) (citations omitted).

contain three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result of the independent action of some third party not before the court."  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."[79]

To establish standing for prospective injunctive relief, "a plaintiff must be suffering a continuing injury or be under a real and immediate threat of being injured in the future."[80]

### 1. Secretary Jordan

Secretary Jordan argues that Plaintiffs lack standing to challenge any action taken by the Department of Revenue in this case because their claims are not redressable by his agency.  This argument is similar to his immunity argument—that his agency is not tasked with enforcing the NVRA so any relief sought by Plaintiffs must be directed instead to the Secretary of State's office, which has exclusive authority to enforce the NVRA as the State's chief election officer.  It is true that there is no evidence that the DMV plays a role in determining voter eligibility after the applications leave the DMV database.  But as already described, the DMV and Secretary of State's Office are engaged in a cooperative effort to process motor voter registration applications.  And § 5 of the NVRA specifically tasks the DMV with transmittal of voter registration applications to the chief election official for the State.[81]  As explained later in this opinion, the evidence demonstrates confusing enforcement efforts with respect to the DPOC law

---

[79]*Lujan* , 504 U.S. at 560–61 (internal quotation marks and citations omitted).

[80]*Tandy*, 380 F.3d at 1283.

[81]*See Harkness v. Brunner*, 545 F.3d 445, 455 (6th Cir. 2008) (finding Director of the Department of Job and Family Services for the State of Ohio could be sued under the NVRA, along with Secretary of State, because that department was subject to the requirements of the NVRA as a Voter Registration Agency).

in Kansas, both at the time of application at the DMV, and after the records shift to the Secretary

of State and county election officials.  The evidence suggests that the DMV transmits DPOC for

initial driver's license applicants to the extent the documentation is submitted as proof of lawful

presence required to obtain a driver's license, but the DMV apparently has declined to request

DPOC from driver's license renewal applicants seeking to register to vote for the first time.

Therefore, if the Court grants Plaintiffs' requested injunctive relief prohibiting enforcement of

the DPOC law to motor voter registration applications, it will certainly be redressable in part by

the DMV: DMV clerks will no longer be required to transmit DPOC to the ELVIS system along

with the nightly batches of motor voter registration applications, at least insofar as those

applicants seek to register to vote for federal offices.  To the extent those clerks are already

requesting proof of lawful presence from initial applicants, that practice will not be affected by

the requested injunction.  There is no retrospective injunctive relief requested of the Department

of Revenue.  Accordingly, Plaintiffs have suffered an ongoing injury that is redressable by

prospective injunctive relief directed at Secretary Jordan.

## 2. Section 5 Duplication Claim

Under § 5(c)(2)(A), the voter registration portion of the simultaneous motor voter

application "may not require any information that duplicates information required in the driver's

license portion of the form (other than a second signature or other information necessary under

subparagraph (C))."[82]  Plaintiffs' duplication challenge to the Kansas DPOC law is two-fold: (1)

two of the named Plaintiffs were required to submit DPOC twice—once at the DMV and again

to a county election official; and (2) a Kansas statute explicitly authorizes requests for

duplicative information.  Secretary Kobach argues that Plaintiffs lack standing to raise this claim

---

[82]52 U.S.C. § 20504(c)(2)(A).

because none of the named Plaintiffs provided DPOC at the time they applied to register at the DMV.

The Court agrees with Plaintiffs that they have standing to raise the duplication claim. Kansas law explicitly provides that it may require duplicate information on each portion of the application, which Plaintiffs argue is in direct conflict with the NVRA provision prohibiting such. Because Plaintiffs claim that Kansas law requires every initial and renewal applicant to provide proof of lawful presence, which is the same for United States citizens as the DPOC required on the voter application, every motor voter applicant would have standing to raise the claim.[83]  Moreover, Plaintiffs allege that Mr. Boynton attempted to register to vote at the DMV, provided DPOC, was not registered and was required to resubmit DPOC in order to complete his voter application. While the Court recognizes that there is a question of fact regarding this Plaintiff—███████████████████████████████████████████████████████ ███████████████████████████████████████████—the Court must evaluate standing at the time the Complaint is filed, and presumes as true Plaintiff Boynton's allegations that he attempted to register to vote, that he provided a copy of his birth certificate to the DMV clerk, and that he was nonetheless not registered and required to resubmit DPOC in order to become registered after he applied. He has alleged injury in the form of disenfranchisement, which is a continuing injury that is redressable if Plaintiffs obtain the relief they seek in this case. Plaintiffs therefore have fulfilled their burden of establishing standing to challenge the DPOC law under § 5 of the NVRA under a duplicate information theory.

---

[83] Although Kansas has apparently waived the proof of lawful presence requirement for renewals for the time being, it is still statutorily required. *See* K.S.A. §§ 8-240(b)(2), 8-247(d)(1).

### C.      Notice to Secretary Jordan under the NVRA

The NVRA requires a person aggrieved by the Act to "provide written notice of the violation to the chief election official of the State involved."[84]  If no corrective action is taken within 90 days of receipt, the aggrieved person may file a civil action as to the violations specified in the notice.  Here, Plaintiffs provided written notice on November 20, 2015, to Secretary Kobach.  Plaintiffs copied Kansas Attorney General Derek Schmidt and Secretary Jordan on that notice.  Secretary Jordan complains that he was entitled to separate notice under the NVRA.  The Court disagrees.  The plain language of the statute requires notice only to the chief election official.  The Secretary of State is the designated chief election official in the State of Kansas.[85]    Moreover, the purpose of the requirement is "to give the state the opportunity to remedy NVRA violations."[86]  Here, the State of Kansas was placed on notice of the alleged NVRA violations.  The notice was directed to the chief election official, and Secretary Jordan was provided with a copy of this notice.   The notice was sufficient under the statute.

## III.    Preliminary Injunction Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[87]  The moving party must meet a heightened standard when requesting one of three types of disfavored injunctions:

> The three types of disfavored injunctions are "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary

---

[84] 52 U.S.C. § 20510(b).

[85] K.S.A. §§ 25-2504, 25-2355.

[86] *Scott v. Schedler*, 771 F.3d 831, 839 (5th Cir. 2014).

[87] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." When a preliminary injunction falls into one of these categories, it "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." A district court may not grant a preliminary injunction unless the moving party "make[s] a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms."[88]

The parties dispute whether the requested preliminary injunction is a disfavored injunction, requiring application of the heightened standard. Defendants argue that the injunction would alter the status quo—enforcement of the SAFE Act and regulation—and that it would require both agencies to take specific action. Defendants also suggest that the requested injunction would provide all of the relief sought by Plaintiffs in their Amended Complaint. Plaintiffs disagree, arguing that they do not seek a disfavored injunction because they seek merely to preserve the status quo before the law went into effect, that the injunction would not require Defendants to act affirmatively, and that the relief sought in this case exceeds what is sought by the preliminary injunction because the First Amended Complaint seeks declaratory relief and a permanent injunction as to the law.

The Court need not resolve this dispute because, as described in this opinion, under the heightened standard, Plaintiffs have made a strong showing on both likelihood of success on the merits, and on the balance of harms as to their § 5 claim.

---

[88] *Summum v. Pleasant Grove City*, 483 F.3d 1044, 1048–49 (10th Cir. 2007), *rev'd on other grounds*, 555 U.S. 460 (2009) (quoting *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc); *aff'd and remanded, Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418 (2006)).

**IV.    Preliminary Injunction Analysis**

   **A.    Likelihood of Success on the Merits**

   **1.    Section 5 of the NVRA**

Plaintiffs allege that the SAFE Act violates § 5 of the NVRA in two ways: (1) it demands more than the "minimum amount of information necessary" to assess an applicant's citizenship eligibility; and (2) it duplicates the proof of lawful presence documentation required by the driver's license portion of the application.

   **a.    Minimum Amount of Information Necessary to Enable State Election Officials to Assess the Eligibility of the Applicant and to Administer Voter Registration**

The word "minimum" is not defined in the NVRA.  Plaintiffs urge that the minimum amount of information necessary to assess United States citizenship eligibility is defined by subsection (a)(2)(C), which requires that the registration application include an attestation, signed under penalty of perjury, that the applicant meets each eligibility requirement, including citizenship.  Plaintiffs argue that the plain meaning of the statute, coupled with Congress' failure to include the Simpson Amendment in the final bill, supports this interpretation.  Plaintiffs further argue that the Supreme Court's decision in *Arizona v. InterTribal Council of Arizona, Inc.(ITCA)*,[89] and the Tenth Circuit Court of Appeals' decision in *Kobach v. U.S. Election Assistance Commission*,[90] support their interpretation of the statute.  Defendants argue that states are permitted under the NVRA to design their own application forms for motor voter registration; there is no "federal form" that requires approval by the EAC as there is with registration by mail.  Defendants urge that State law informs the analysis of what is necessary

---

[89]133 S. Ct. 2247 (2013).

[90]772 F.3d 1183 (10th Cir. 2014), *cert. denied*, 135 S. Ct. 2891 (2015).

under § 5.  Second, Defendants contend that the Supreme Court in *Young v. Fordice*[91] rejected the argument that the States cannot require more information than the sworn attestation.  Finally, Defendants contest Plaintiffs' interpretation of the *ITCA* and *Kobach* decisions, and challenge the significance of the legislative history cited by Plaintiffs.

The Court must begin its analysis with the plain language of the statute, reading "the words of the statute in their context and with a view to their place in the overall statutory scheme."[92]  If the words in the statute are clear, the Court's analysis ends and the plain meaning controls.[93]  If, instead, the Court finds that the words in the statute are ambiguous, the Court can look beyond the terms of the statute to determine legislative intent and statutory construction.[94]  "A statute is ambiguous if 'it is capable of being understood by reasonably well-informed persons in two or more different senses.'"[95]

Plaintiffs urge that the term "minimum" in § 5(c)(2)(B) has an ordinary meaning that is readily understood.  The Court agrees.  Black's Law Dictionary defines "minimum" as: "Of, relating to, or constituting the smallest acceptable or possible quantity in a given case."[96]  Similarly, Merriam Webster defines "minimum" as "the least quantity assignable, admissible, or possible."[97]  Section 5 of the NVRA pertains to motor voter registration only.  Section 6 pertains to registration by mail, which is the form of registration dealt with in *ITCA* and *Kobach*.  Under § 6, the states may develop their own voter registration application that meets all of the criteria

---

[91]520 U.S. 273 (1997).

[92]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1161 (10th Cir. 2011) (quoting *Wright v. Fed. Bureau of Prisons,* 451 F.3d 1231, 1234 (10th Cir. 2006)).

[93]*Id.*

[94]*Id.*

[95]*Id.* (quoting *United States v. Hinckley*, 550 F.3d 926, 932 (10th Cir.2008)).

[96]Black's Law Dictionary 1010 (7th ed. 1999).

[97]Merriam Webster's Collegiate Dictionary 741 (10th ed. 1996).

stated in § 9(b).  Section 9(b) contains similar, but not identical, provisions for the contents of the

state form for mail-in voter registration as it does for motor voter registration in § 5:

> The mail voter registration form developed under subsection (a)(2)--
> (1*)* may require only such identifying information (including the signature of the
> applicant) and other information (including data relating to previous registration
> by the applicant), as is necessary to enable the appropriate State election official
> to assess the eligibility of the applicant and to administer voter registration and
> other parts of the election process . . . .[98]

In contrast, the motor voter provision is that a state "may require only the *minimum amount of*

information necessary to . . . enable State election officials to assess the eligibility of the

applicant."[99]  Plaintiffs argue that the absence of "minimum amount of" from § 9(b) is evidence

that, of the three registration methods provided for in the NVRA, Congress intended for motor

voter registration to involve the least possible barriers.

Secretary Kobach does not argue that the term "minimum" is susceptible to more than

one meaning.  Instead, he urges the Court to focus on the phrase "necessary to enable State

election officials to assess the eligibility of the applicant" in § 5, and claims that State election

officials may require any information they deem necessary to assess citizenship eligibility.

While the "necessary" phrase is identical in §§ 5 and 9 of the NVRA, in both sections it is

preceded by words that must be given some meaning; the word "minimum" appears in § 5, but

not in § 9, which suggests that Congress intended for a stricter standard to apply in § 5.  "It is a

cardinal principle of statutory construction that if it can be prevented, no clause, sentence, or

word shall be superfluous, void, or insignificant."[100]  To read the "information necessary to

enable State election officials to assess the eligibility of the applicant" phrase in § 5(c)(2)(B) as

controlling would effectively read out of the statute the preceding qualifier: "only the minimum

---

[98] 52 U.S.C. § 20508(b) .

[99] *Id.* § 20504(c)(2)(B).

[100] *Rajala v. Gardner*, 709 F.3d 1031, 1038 (2013) (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)).

amount of."  The ordinary meaning of the term "minimum" is that the State may require only the least possible amount of information necessary to enable State election officials to assess whether the applicant is a United States Citizen.

The plain meaning of a statute should be given meaning unless it "will produce a result demonstrably at odds with the intentions of its drafters."[101]  Secretary Kobach suggests that Plaintiffs' reading of the statute would create an absurd result by allowing different standards to apply depending on the method of registration.  He argues that Plaintiffs' reading would create a "special path" to registration through motor voter registration that is easier than other forms of registration, and suggests that this would be contrary to Congress' intent.  But Defendants point the Court to no evidence that Congress intended the three forms of registration to be uniform; indeed, Congress made separate provisions for each of the three forms.  The legislative history of the NVRA suggests that Congress intended to simplify the registration process for voting in federal elections, and to increase voter participation in federal elections by eliminating barriers to voting.[102]  Giving meaning to the word "minimum" in § 5, which does not appear in other provisions of the statute, is consistent with the statute's stated purpose because it acts to remove barriers to voting and increase voter participation in federal elections.[103]

Secretary Kobach argues that his interpretation of § 5, that the States have wide discretion to determine how to enforce eligibility requirements, is mandated by the Supreme

---

[101]*Id.* (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989)).

[102]52 U.S.C. § 20501(a)–(b) (providing Congressional findings and purposes of NVRA); *Young v. Fordice*, 520 U.S. 273, 275 (1997) ("The NVRA requires States to provide simplified systems for registering to vote in federal elections . . . .  The States must provide a system for voter registration by mail . . . a system for voter registration at various state offices . . . , and, particularly important, a system for voter registration on a driver's license application."); *see also Dobrovolny v. Nebraska*, 100 F. Supp. 2d 1012, 1028–29 (D. Neb. 2000) (analyzing Congressional intent of the NVRA).

[103]The Court need not wade into the significance of Congress' failure to include Simpson Amendment in the final bill because the plain meaning of the statute controls the analysis.  *See Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1161 (10th Cir. 2011).

Court's holding in *Young v. Fordice*.[104]  In *Young*, the Court considered whether § 5 of the Voting Rights Act ("VRA") required preclearance of Mississippi's voting registration procedures that were implemented in order to comply with the NVRA.[105]  The Court considered the types of voter registration changes that require preclearance under the VRA, noting that even minor changes required preclearance.[106]  The Court discussed the changes to Mississippi's registration practices, noting "[i]nsofar as they embody discretionary decisions that have a potential for discriminatory impact, they are appropriate matters for review under § 5's preclearance process."[107]  Secretary Kobach relies upon the following language from *Young* to support his interpretation of § 5 of the NVRA:

> In saying this, we recognize that the NVRA imposes certain mandates on States, describing those mandates in detail. The NVRA says, for example, that the state driver's license applications must also serve as voter registration applications and that a decision not to register will remain confidential.  It says that States cannot force driver's license applications to submit the same information twice (on license applications and again on registration forms).  Nonetheless, implementation of the NVRA is not purely ministerial. The NVRA still leaves room for policy choice. The NVRA does not list, for example, all the other information the State may—or may not—provide or request. And a decision about that other information—say, whether or not to tell the applicant that registration counts only for federal elections—makes Mississippi's changes to the New System the kind of discretionary, nonministerial changes that call for federal VRA review. Hence, Mississippi must preclear those changes.[108]

The Court does not read *Young* as broadly as Secretary Kobach.  Although it is certainly true that implementation of the NVRA is not ministerial and that it involves some policy choice, the Court in *Young* did not say that the States have unfettered discretion under the NVRA to request information in conjunction with a motor voter registration application.  Instead, *Young*

---

[104]520 U.S. 273 (1997).

[105]*Id.* at 275.

[106]*Id.* at 284–85 (collecting cases).

[107]*Id.* at 285.

[108]*Id.* at 286 (citations omitted).

observed that the NVRA imposes certain mandates on the States.  Indeed, § 5 of the NVRA specifically addresses several items that the State may and may not require on the motor voter registration application.  One of those provisions is directly at issue in this case—the meaning of "may require only the minimum amount of information necessary to . . . enable State election officials to assess the eligibility of the applicant."[109]  While the Court did state in the above-quoted passage that the "NVRA does not list, for example, all the other information the State may—or may not—provide or request," the operative word in this sentence is "other."  As Plaintiffs correctly note, the NVRA is silent as to some information that a State may or may not require in conjunction with a voter registration application, such as demographic information.[110]  But the NVRA is not silent about information needed by State officials to assess eligibility on the motor voter application.  As to that information, the NVRA explicitly provides that a State may require "only the minimum amount of information necessary."

Likewise, the Court does not find reasonable Secretary Kobach's reading of *Young* and § 5 as placing no ceiling on information a State may require, so long as it is *in addition to* the application form itself.  The statute refers to "[t]he voter registration application portion of an application for a State motor vehicle driver's license."[111]  The statute does not distinguish between information required to be provided on the form itself, and information required by the application form that must be produced separate from the form.  As Secretary Kobach states, the application is required to include certain information necessary for county election officials to

---

[109]52 U.S.C. § 20504(c)(2)(B).

[110]The example provided by the *Young* Court—that States may decide whether or not to tell an applicant that the registration only counts for federal elections—is not a topic specifically addressed in § 5(c)(2).  In contrast, information necessary to assess eligibility requirements is specifically addressed by the statute.

[111]§ 20504(c)(2).

ascertain whether an applicant is eligible to register to vote.  As already explained, the NVRA

governs the amount of information the States can require of applicants for this purpose.[112]

### b. Whether the Kansas DPOC Law Constitutes the "Minimum" Amount of Information Necessary for State Election Officials to Assess Citizenship Eligibility

Having determined that the word "minimum" in the NVRA should be given its ordinary

meaning of  "least possible" to quantify the information necessary for State election officials to

assess an applicant's citizenship eligibility, the Court must determine whether the Kansas DPOC

law conflicts with this NVRA mandate, and if so whether the NVRA preempts.  The NVRA

requires each motor voter application to include a list of the eligibility requirements, including

citizenship, and an attestation that the applicant meets each requirement.[113]  It also requires a

signature of the applicant, under penalty of perjury.[114]  Secretary Kobach contends that a

signature executed under penalty of perjury, in conjunction with an attestation of United States

citizenship is insufficient to allow State election officials to assess citizenship eligibility.  He

essentially contends that K.S.A. § 25-2309(l) and (m) require the "least possible" amount of

information necessary to properly assess an applicant's citizenship eligibility.  The Court finds

that Plaintiffs have made a strong showing that the information required under the Kansas DPOC

exceeds the minimum amount of information necessary for State election officials to assess

citizenship eligibility.

First, Plaintiffs have made a strong showing that the process of submitting DPOC for

motor voter applicants is burdensome, confusing, and inconsistently enforced.  The law provides

---

[112]*See Arizona v. ITCA*, 133 S. Ct.  2247, 2257 (2013) ("while the NVRA forbids States to demand that an applicant submit additional information beyond that required by the Federal Form, it does not preclude States from denying registration based on information in their possession establishing the applicant's ineligibility." (quotation omitted)).

[113]*Id.* § 20504(c)(2)(C)(i)–(ii).

[114]*Id.* § 20504(c)(2)(C)(iii).

for thirteen forms of acceptable identification to show citizenship, including a birth certificate or passport.  In practice, an applicant is only required to submit proof of lawful presence for new driver's license applications.  Usually, proof of lawful presence for citizens who apply for a new driver's license will suffice as DPOC on the voter registration application.[115]  But the DMV has decided not to require proof of lawful presence if an applicant is renewing a driver's license.  The DMV has also decided not to request nor inform voter registration applicants that DPOC is required to complete the registration process if the applicant is renewing a driver's license.  The evidence establishes that renewal applicants that also apply to register to vote are automatically forwarded to the ELVIS system without proof of citizenship, and are therefore guaranteed to be in "suspense" at the outset.  Defendants rely upon a receipt that registrants are apparently provided at the DMV at the conclusion of their application process that advises them of the proof of citizenship requirements.  But that notice is not part of the record, and none of the named Plaintiffs were made aware of this information; they believed they had successfully registered to vote when they left the DMV office.

Therefore, a person who applies to register to vote at a Kansas DMV office will have a different application process depending on whether they are renewing their driver's license, or applying for a new license, which is illustrated by several of the named Plaintiffs' experiences.  Ms. Bucci and Mr. Hutchinson both applied for renewal driver's licenses and were asked if they wanted to register to vote.  Both Plaintiffs said "yes," and believed they had completed the application process.  Mr. Hutchinson learned about the DPOC law after he attempted to register at the DMV without DPOC; he then tried to return to the DMV and provide his passport.  He was told by the DMV clerk that he had successfully registered when in fact he was on the suspense

---

[115]*See* K.S.A. 8-240(b)(2) (requiring "valid documentary evidence" of lawful presence, which may be valid documentary evidence of United States citizenship).

list.  In contrast, those applying for new licenses are required to provide proof of lawful

presence.  Mr. Stricker's experience underscores how confusing this process is.  He went home

to retrieve a social security card because he did not bring sufficient proof of lawful presence with

him.  Again, he told the DMV clerk that he wanted to register to vote and was not advised that he

lacked the necessary documentation to complete that process.  He left the DMV believing that he

was registered and unsuccessfully attempted to vote in the November 2014 election.

The named Plaintiffs' experiences also illustrate the difficulty faced by citizens in

obtaining the proof of citizenship documents itemized in K.S.A. § 25-2309(l).  Lost birth

certificates are difficult to obtain and often cost a not-insignificant amount of money to replace,

as Ms. Bucci and Mr. Fish attest.  Passports involve a lengthy application process, as evidenced

by Mr. Hutchinson's experience applying for a passport upon learning of his suspense status, and

then several months later attempting to provide that passport to the DMV.   It is true that the

Supreme Court in *Crawford v. Marion County Election Board*, concluded that "the

inconvenience of making a trip to the [D]MV, gathering the required documents, and posing for

a photograph surely does not qualify as a substantial burden on the right to vote, or even

represent a significant increase over the usual burdens of voting."[116]  But this case represents

burdens that go beyond the inconvenience of obtaining a photo-ID by adding another layer onto

the procedure already required at the DMV for motor voters.  Moreover, in *Crawford*, the Court

was persuaded that curative provisions in the challenged Indiana law mitigated the

inconvenience to the most burdened voters.[117]  Those who live in an elder residential facility

could vote without photo-ID, and people without photo-ID could cast provisional ballots that

would be counted if a photo-ID was either presented to the circuit court clerk's office within ten

---

[116]553 U.S. 181, 198 (2008).

[117]*Id.* at 199–200.

days of election, or if a voter is indigent, that voter could execute an appropriate affidavit before the circuit court clerk within ten days of the election.[118]

Mr. Caskey and Mr. Kobach referred to standard guidelines the Secretary of State's Office has established for counties to provide notice to applicants on the suspense list that they must submit DPOC.  The counties have been trained to send three written notices, and ideally contact the applicant by phone, before cancelling the application under K.A.R. § 7-23-15.  Mr. Caskey testified that the first notice should be sent immediately after the county processes the application record, and that another notice should be sent thirty days later.  He said a final notice should be sent before cancellation.  But the ELVIS records do not show consistent application of these noticing efforts.  Mr. Fish's ELVIS records show that a single notice was sent to him by Douglas County within a week of applying to register.  He was cancelled more than two years later and there is no evidence that a final notice was sent to him.  Ms. Bucci was sent two notices by Sedgwick County almost two years apart, with notes about one phone call the month after the first notice was sent in August 2013.  Mr. Stricker was sent three notices over the course of eleven months by Sedgwick County, and election officials made one attempt to call him about his suspense status.  Mr. Boynton received two notices over a ten month period of time from Sedgwick County and election officials attempted one phone call.  Mr. Hutchinson appears to have been sent two notices from Johnson County, more than two years apart, before his application was cancelled.  Importantly, the ELVIS records show only notations that these notices were sent.  There is no evidence in the record that they were actually received.  Plaintiffs' declarations assert that many of these notices were not received.  Some Plaintiffs admit to

---

[118]*Id.* at 186.

receiving one notice, but others did not learn that they were not registered until they either attempted to vote, or received notice of their suspense status from a third party.

The sheer number of people cancelled or held in suspense because of the DPOC requirement since October 2015 evidences the difficulty of complying with the law as it is currently enforced. Between January 1, 2013 and March 28, 2016, there were 244,699 voter registration applications completed. Defendants assert that between January 1, 2013 and March 23, 2016, there were 16,319 voter registration applications cancelled under K.A.R. § 7-23-15 for failure to provide DPOC. 12,717 of these cancellations were from motor voter applicants. Since K.A.R. § 7-23-15 did not go into effect until October 2015, the cancellation figure actually involves cancellations between October 1, 2015 and March 23, 2016—over an almost six-month period of time. As of March 28, 2016, there are 5655 motor voter applications that are in "incomplete" status due to failure to provide DPOC. Secretary Kobach touts this figure as a 94% success rate. But 18,372 motor voter applications have been held in suspense or cancelled due to the DPOC law. There is no evidence that these applications are incomplete for any other reason. Therefore, as a direct result of the DPOC law and enforcement scheme, over 18,000 otherwise eligible motor voter applicants in Kansas have been prohibited from registering to vote. Eight percent of all voter registration applications is not an insignificant amount.

When asked at the hearing about the bureaucratic barriers that obtaining DPOC can present, Secretary Kobach assured the Court that where individuals lack DPOC, subsection (m) could provide a safety net. Under that provision, if a person cannot obtain a birth certificate, passport, hospital record, or one of the other forms of identification listed in the statute, the person can simply call the Secretary of State's office to submit some alternative form of DPOC, and arrange for a telephonic hearing to determine the sufficiency of that alternative. Secretary

Kobach characterized this process as quite easy, giving examples of the types of alternative forms of citizenship documentation and emphasizing that the hearing can be telephonic.  But the state election board is comprised of three members: the lieutenant governor, the secretary of state, and the attorney general—three of the highest Kansas state officials.  A person wishing to utilize this procedure would be required to (a) learn about the existence of the procedure; (b) divine and then generate some alternative form of proof of citizenship; (c) contact the Secretary of State's Office; and then (d) obtain a hearing date with three very busy high-level state officials.  Unsurprisingly to the Court, only three Kansas citizens have availed themselves of this procedure in the more than three years that the statute has been in effect.  Certainly, the current administrative maze that greets motor voter registrants at the DMV office, and then follows them long after that application is completed, is not a requirement that constitutes the "minimum" amount of information necessary to enable state officials to assess citizenship eligibility.

Second, Plaintiffs have made a strong showing that there is at least one less burdensome alternative to assessing United States citizenship—an attestation along with an applicant's signature under penalty of perjury.  The NVRA requires that the attestation and signature under penalty of perjury be included on every motor voter application.  It also requires that the application include all eligibility requirements, including citizenship.  And the State can prosecute noncitizens who register to vote under K.S.A. § 25-2416.

The evidence shows that the DMV clerks currently ask applicants if they are United States citizens, and they check a box if the applicant responds affirmatively.  This was the method Kansas used to assess citizenship eligibility prior to the effective date of the SAFE Act in 2013.  Between January 1, 2006 (seven years before the DPOC law became effective), and March 23, 2016, 860,604 people registered to vote in the State of Kansas.  Between April 16,

2003, and the effective date of the DPOC law in 2013, there is evidence that thirty noncitizens registered to vote, about three noncitizens per year.  Of those thirty people, there is evidence that three actually cast votes under the mistaken belief that they were entitled to vote.  The evidence submitted by Defendants in support of the 1997 Seward County hog farming referendum incident is insufficient to show that noncitizens actually voted in that referendum.  In fact, the only evidence submitted at all is Mr. Caskey's affidavit referring to the testimony of a witness before the Legislature as it was deliberating over the SAFE Act.  There is no direct evidence of her testimony, nor is there any evidence in the Court's record to support her opinion that noncitizens voted in that election.[119]

This evidence supports the conclusion that very few noncitizens in Kansas successfully registered to vote under an attestation regime.  Importantly, there is no evidence that under that regime, thousands of otherwise eligible applicants were cancelled or held in suspense for failure to establish eligibility requirements.  On this record, Plaintiffs make a strong showing that the DPOC law cannot be justified as the minimum amount of information necessary to assess citizenship eligibility, where the rates of noncitizen voter fraud prior to the Act's passage are at best nominal.

Since the effective date of the SAFE Act, there is evidence that fourteen noncitizens attempted to register to vote in Sedgwick County, Kansas.  Defendants submit Tabitha Lehman's affidavit, who is the Sedgwick County election official charged with maintaining that county's

---

[119]The Court acknowledges that there is some evidence of noncitizen voter fraud outside of Kansas.  *See* Doc. 80, Ex. A.  The Court further acknowledges that in *Crawford*, when discussing the State's interest in preventing voter fraud, the Court considered evidence of voter impersonation fraud in other parts of the country. 553 U.S. at 195 & nn. 11–12.  But this analysis was in the context of an equal protection challenge to the Indiana law at issue; the Court was called upon to assess the State's legitimate interest in counting only the votes of eligible voters, balanced against the burden of Indiana's law on voters.  *Id.* at 189.  Here, the Court must determine whether the State of Kansas has required the minimum amount of information necessary to assess a motor voter applicant's eligibility to vote under the NVRA—a different inquiry.

voter rolls.[120]  Ms. Lehman generated a spreadsheet of noncitizens in that county that either registered to vote before January 1, 2013, or attempted to register after that date.  The fourteen individuals who attempted to register after the DPOC law was passed fall into two categories: (1) applicants who applied to register at a voter registration drive after a naturalization ceremony and were discovered to have already attempted to register prior to naturalization; and (2) applicants who responded to the county's written notice that they must provide DPOC in order to complete their voter registration application that they were not in fact citizens.  Of these fourteen applicants, twelve applied in person or online through the DMV.  None of these instances appear to involve deliberate fraudulent conduct, but instead, involve mistaken understandings of the eligibility requirements.  So this evidence presents yet another less burdensome option for the State of Kansas: provide better training to DMV workers who are charged with asking applicants if they are United States citizens, and with advising applicants that they are signing an attestation of citizenship under penalty of perjury.  One thing is clear from the evidentiary hearing on this matter: the coordination between the Secretary of State's office and the Department of Revenue is lacking.  Although Secretary Kobach has publicly identified human error by DMV workers as one of the reasons the DPOC law is necessary in Kansas,[121] there is no evidence that better training was attempted with the old law, and it appears that little has been done to train DMV employees to comply with the new law.  The Court also notes that, despite having prosecutorial power to enforce the citizenship requirement under Kansas law, there is no evidence that county attorneys prosecuted the individuals suspected of voter fraud in the 1997 hog farming incident,

---

[120]Kobach Ex. 8.

[121]Doc. 19, Ex. 10; Sari Horwitz, *Want to vote in this state?  You have to have a passport or dig up a birth certificate*, Wash. Post, Feb. 19, 2016, available at  https://www.washingtonpost.com/news/post-nation/wp/2016/02/19/how-kansas-has-become-a-battleground-state-for-voting-rights/.

or in any case since.  Secretary of State Kobach admitted at the hearing that his office has not prosecuted any cases of noncitizen voter fraud.

Secretary Kobach himself made a strong case that an attestation of United States citizenship is the minimum amount of information necessary for Kansas election officials to assess an applicant's citizenship.  As an example of an acceptable form of DPOC under subsection (m) of the law, which may be triggered when an applicant is unable to obtain one of the thirteen forms of DPOC listed in subsection (l), Mr. Kobach suggested that a person's own declaration of citizenship would satisfy the state election board.[122]  Aside from the sheer number of steps an applicant must go through to get to the point of the process where the state election board could make this determination, the Court sees little difference between this method of proving citizenship and an attestation clause on the application form itself.

### c.     Preemption

The Court determines that because the Kansas DPOC law conflicts with § 5(c)(2)(B) of the NVRA, federal law preempts the Kansas DPOC law under the Elections Clause of the United States Constitution as to registrations for federal elections.  The Court further determines that the NVRA motor voter application requirements do not run afoul of the States' right to establish voting qualifications for federal office.  Under the Elections Clause, Congress may preempt state laws governing "Times, Places and Manner" of holding congressional elections.[123]  Its scope is broad.[124]  "Time, Places and Manner" "are 'comprehensive words,' which 'embrace authority to provide a complete code for congressional elections,' including, as relevant here . . . regulations

---

[122]Doc. 115, Hrg. Tr. at 68:20–69:7.

[123]U.S. Const. art. I, § 4, cl. 1.

[124]*Arizona v. ITCA*, 133 S. Ct. 2247, 2253 (2013).

relating to 'registration.'"[125]  Where Congress regulates under the Elections Clause, such laws "supersede those of the State which are inconsistent therewith."[126]  As described above, the Kansas DPOC law, which governs the voter registration process and is thus a regulation relating to registration, conflicts with § 5 of the NVRA because it requires more than the minimum amount of information necessary to allow Kansas election officials to assess an applicant's citizenship eligibility.  Under the Elections Clause, the NVRA preempts the Kansas DPOC law.

Secretary Kobach insists that preemption of the DPOC law would infringe on Kansas's right under the Qualifications Clause to regulate who may vote in federal elections.  Indeed, the Constitution provides that voting qualifications are to be set by the States: "the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."[127]  The Supreme Court's decision in *ITCA* dealt with the uniform federal form that the NVRA requires States to "accept and use" to register voters for federal elections by mail.[128]  The federal form is developed by the EAC and requires an averment under penalty of perjury that the applicant is a United States citizen.[129]  The Arizona law in question required voter registration officials to reject any application that is not accompanied by DPOC.  The Supreme Court considered whether this DPOC requirement, as applied to federal form applicants, is preempted by the NVRA's requirement that States "accept and use" the federal form.[130]  The Court found that Arizona's registration law could not be reconciled with the NVRA

---

[125]*Id.* (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)); *see also Ass'n of Comm'y Org. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995) ("the "Manner" of holding elections has been held to embrace the system for registering voters.").

[126]*Id.* at 2254 (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)).

[127]U.S. Const. art. I, § 2, cl. 1; *see also* Art. II, § 1, cl. 2 (presidential electors); amend. 17 (senatorial electors).

[128]52 U.S.C. § 20505(a)(1).

[129]*Id.* § 20508(b).

[130]133 S. Ct. at 2251.

requirement that states accept and use the federal form, and found that under the Elections Clause, the NVRA preempted the Arizona law.[131]

But the Supreme Court in *ITCA* admitted that the power to establish voting qualifications under the Qualifications Clause would be of little value without the power to enforce them—if a federal law precluded a State from "obtaining the information necessary to enforce its voter qualifications," "it would raise serious constitutional doubts."[132]  The Court was able to avoid a constitutional conflict under the Qualifications Clause because the NVRA provided a way for Arizona to obtain the information it deemed necessary to enforce its citizenship requirement. Arizona was permitted under the NVRA to request that the EAC alter the state-specific instructions on the federal form to require applicants to submit DPOC, and the State may challenge any rejection of that request under the Administrative Procedures Act ("APA").[133]  If the EAC did not act on Arizona's request, Arizona could establish in a reviewing court "that a mere oath will not suffice to effectuate its citizenship requirement and that the EAC is therefore under a nondiscretionary duty to include Arizona's concrete evidence requirement on the Federal Form."[134]

In *Kobach v. U.S. Election Assistance Commission*,[135] Arizona and Kansas and their secretaries of state brought suit under the APA against the EAC, its acting executive director, and its chief operating officer, and sought a writ of mandamus to order defendants to modify the state-specific instructions on the federal mail voter registration form to require applicants to submit DPOC in accordance with state law.  The district court determined that the EAC had a

---

[131]*Id.* at 2257.

[132]*Id.* at 2258–59.

[133]*Id.* at 2259.

[134]*Id.* at 2260.

[135]772 F.3d 1183 (10th Cir. 2014).

nondiscretionary duty to grant their requests, but the Tenth Circuit reversed.[136]  Reviewing the EAC's decision under the APA, the Tenth Circuit determined that the States "failed to advance proof that registration fraud in the use of the Federal Form prevented Arizona and Kansas from enforcing their voter qualifications."[137]  The court held that the EAC is not required to approve state-specific changes to the Federal Form, largely relying on the *ITCA* decision, and that the EAC's decision was not arbitrary and capricious, nor unconstitutional under the Qualifications Clause.[138]

The Tenth Circuit explained the difference between authority under the Elections Clause and the Qualifications Clause as follows: "the United States has authority under the Elections Clause to set procedural requirements for registering to vote in federal elections (i.e., that documentary evidence of citizenship may not be required), . . . [and] individual states retain the power to set substantive voter qualifications (i.e., that voters be citizens)."[139]  In dismissing the States' Qualifications Clause challenge, the Tenth Circuit considered *ITCA* and explained that the States' Qualifications Clause powers do not "trump" Congress' Elections Clause powers governing "Times, Places, and Manner" of federal elections, "including voter registration laws."[140]  The court did not credit the States' argument that the EAC's decision as to the federal form "unconstitutionally precludes them from enforcing their laws intended to prevent noncitizen voting.  As discussed . . . , there are at least five alternate means available to the states

---

[136]*Id.* at 1188.

[137]*Id.*

[138]*Id.* at 1188–99.  After this decision, the EAC regained a quorum of commissioners and an Executive Director was appointed.  Kansas again asked the EAC to modify the state-specific instructions to the federal form, and this time, the EAC agreed.  *See* Kobach Ex. 4.  That decision is being challenged under the APA in a case now pending before the United States District Court for the District of Columbia.  *League of Women Voters of the United States v. Newby*, No. 16-236-RJL, Doc. 1 (D.D.C. Feb. 12, 2016).

[139]*Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1195 (10th Cir. 2014).

[140]*Id.* at 1199.

to enforce their laws, and they have not provided substantial evidence of noncitizens registering to vote using the Federal Form."[141]

Here, the substantive qualification is that voters must be United States citizens. Plaintiffs do not dispute the States' power to set this qualification. The NVRA's "minimum amount of information necessary" requirement for motor voter registration does not implicate the Qualifications Clause because it does not alter the citizenship qualification set by the State of Kansas, nor does it make it impossible for the State to enforce that qualification.[142] The Court has determined that at least one less burdensome alternative exists—an attestation of citizenship coupled with the applicant's signature under penalty of perjury—and that there is scant evidence this less burdensome alternative leads to any significant number of noncitizens voting. Plaintiffs have made a strong showing that, while there may be a handful of isolated cases of noncitizens voting without the DPOC law, Kansas can enforce its citizenship requirement without the DPOC law, thereby permitting approximately 18,000 otherwise eligible voters to be registered to vote in state or federal elections.

Secretary Kobach argues that Plaintiffs' position is unconstitutional because it would allow two sets of electors to exist, one for federal and one for state elections, despite the Qualification Clause's reference to one set of electors. He argues that it creates an untenable situation where the qualifications are different in Kansas depending on whether an registrant is voting in state or federal elections. First, as described above, there is no dispute that Kansas has properly deemed United States citizenship a qualification for voter registration. That qualification applies regardless of whether the applicant seeks to vote in federal or state elections. The only difference is that in order to meet that qualification, motor voter applicants

---

[141]*Id.*

[142]*See Ass'n of Comm'y Org. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 794–95 (7th Cir. 1995).

would not be required to submit DPOC to be registered to vote in federal elections, while those who wish to register in state elections would be required to submit DPOC.

Second, Secretary Kobach's argument was considered and rejected by *ITCA*, as evidenced by Justice Thomas and Justice Alito's dissents in that case.  Justice Thomas disputed the majority's holding that the Elections Clause provides Congress with the authority to set rules for voter registration in federal elections.[143]  He urged that the Elections Clause instead governs "regulating the casting of ballots and related activities,"[144] and the States have the exclusive authority to determine voting qualifications, "which includes the corresponding power to verify that those qualifications have been met."[145]  Justice Alito argued that "[w]e could avoid this nonsensical result by holding that the Act lets the States decide for themselves what information 'is necessary . . . to assess the eligibility of the applicant'—both by designing their own forms and by requiring that federal form applicants provide supplemental information when appropriate."[146]  But in the majority opinion, Justice Scalia explained that while the NVRA's requirement that the States "accept and use" the federal form gives States the flexibility to develop their own registration application form, the Federal Form "provides a backstop: No matter what procedural hurdles a State's own form imposes, the Federal Form guarantees that a simple means of registering to vote in federal elections will be available."[147]  The Court sees little constitutional difference between the two-tiered system permitted for registration by mail in *ITCA*, and the two-tiered system that would result if Plaintiffs prevailed on the merits of their challenge to the motor voter provision in this case.  Here too, the NVRA guarantees that to vote

---

[143]133 S. Ct. at 2262–63 (Thomas, J., dissenting).

[144]*Id.* at 2268 (Thomas, J., dissenting).

[145]*Id.* at 2270 (Thomas, J., dissenting).

[146]*Id.* at 2274 (Alito, J., dissenting).

[147]*Id.* at 2255 (footnote omitted).

in federal elections, only the minimum amount of information may be required by the State to assess an applicant's eligibility. This is in keeping with the stated purpose of the Act to increase the number of eligible citizens who register to vote in federal elections.[148] The NVRA does not prohibit States from requiring more than the minimum amount of information necessary to assess eligibility to vote in state elections. The two-tiered system that results is of the State's own making; it is neither unprecedented,[149] nor required by the NVRA.

In sum, the Court finds that Plaintiffs have made a strong showing that they are likely to succeed on their claim that the NVRA preempts the Kansas DPOC law as it applies to motor voter registrants under § 5. Plaintiffs have also made a strong showing that preemption under the Elections Clause would not violate the State's power under the Qualifications Clause to set and enforce its citizenship requirement for elections to federal office. The State is not precluded from enforcing its citizenship requirement. It simply must do so by requiring the "minimum amount of information necessary" to assess whether the citizenship requirement has been met. Plaintiffs have made a strong showing that the Kansas DPOC law as enforced does not meet this standard.

**b.  Duplication**

Plaintiffs allege that the DPOC law further violates § 5 as to initial driver's license applicants because they are required to provide duplicate information on the driver's license application and the voter registration application: the same documentation serves to establish proof of lawful presence at the DMV and DPOC by county election officials. The Court cannot

---

[148]*See id.*; 52 U.S.C. § 20501(b)(1).

[149]Prior to the EAC's January 29, 2016 decision to modify the state-specific rules for the Kansas Federal Form, the State was required to conduct a two-tiered system for those who registered by mail. Under *Kobach*, the EAC's earlier decision to reject the state-specific instructions requiring DPOC was upheld, but the State form continued to require DPOC.

find on this record that Plaintiffs have made a strong showing that they are substantially likely to succeed on the merits of this theory of relief. Based on the current record, it appears DMV clerks are recording in the DMV database whether DPOC has been submitted at the time of application when such documents also meet the proof of lawful presence requirement. To the extent this is not happening, it appears to be in error rather than an enforcement policy. The only Plaintiff that applied for an initial driver's license is Mr. Boynton. Although it does appear that he was required to provide DPOC at the DMV, and again to county election officials, there is a strong factual dispute about whether Mr. Boynton affirmatively told the DMV clerk that he wanted to register to vote. ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████ His application was cancelled when he failed to provide DPOC after receiving two written notices in the mail and one phone call. Moreover, Defendants have submitted evidence that as to initial applications for driver's licenses, the DMV accepts DPOC to the extent it is duplicative of the proof of lawful presence required obtain a driver's license. On the occasions when the Secretary of State's Office is made aware that the DMV has not properly logged these documents at the time of application, the Secretary of State's Office will contact the DMV to confirm that this documentation was submitted.

Plaintiffs further point to the language in K.S.A. § 25-2352(b)(1) that explicitly conflicts with § 8 of the NVRA by providing that the voter registration section of the application

> [m]ay require a second signature or other information that duplicates, or is in addition to, information in the driver's license or nondriver's identification card section of the application to prevent duplicate voter registrations, and to enable Kansas election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process.

Although Plaintiffs make a strong argument that this provision is at odds with § 5 of the NVRA, they have not made a strong showing for the purposes of this preliminary injunction motion, that the DPOC law, as enforced, requires duplicate submissions of DPOC for initial driver's license applicants.

In sum, the Court finds close factual questions about the extent to which the State requires duplicate proof of citizenship information from initial driver's license applicants on the driver's license and voter registration application forms.

### 2.      Section 8 of the NVRA

Plaintiffs allege that K.A.R. § 7-23-15 violates § 8 of the NVRA by removing otherwise eligible voters from the State's ELVIS system for failure to provide DPOC.  Plaintiffs assert that in September 2015, more than 32,000 applicants were trapped "in limbo" on the suspense list, and that the regulation was designed by Defendants to "automatically remove registrants from the State's voter rolls."  Plaintiffs urge that § 8 sets forth the exclusive grounds for removing a registrant from the voter list, and that failure to provide DPOC is not one of them.  Secretary Kobach responds that § 8 does not apply here because none of the individuals deemed "incomplete" in ELVIS are "registrants" since those applications have not yet been accepted by county election officials.  Defendant further notes that there are other reasons, such as a missing signature, why a person's application would be deemed "incomplete," so there is no way to assert that these people are all otherwise eligible to register.

Plaintiffs admit in the reply brief that the viability of this claim hinges on the success of their § 5 claim—if the Court determines that Plaintiffs' are likely to succeed in showing that the DPOC law runs afoul of § 5, then applicants that were cancelled or placed in suspense solely based on their failure to provide DPOC are otherwise eligible voters that should have been

registered to vote.  Cancelling the applications of eligible voters is enough to constitute removal of registrants from the system, according to Plaintiffs.

The Court does not agree that Plaintiffs' likelihood of success on the § 5 claim necessarily means they are likely to succeed on the § 8 claim challenging the regulation.  The record reflects that an applicant is not "purged" from the voter rolls in the manner described by Plaintiffs.  Instead, applicants who lack DPOC are placed in an incomplete status for a period of time to allow them to submit their DPOC, or to allow the State to confirm the applicants' citizenship by other means.  Under the regulation, if an applicant has not submitted DPOC within 90 days of the application, the applicant's record is "cancelled," which does not mean that the applicant is removed from the database.  Instead, cancellation means the applicant must repeat the application process in its entirety, including providing DPOC, before registration can be completed.  Mr. Caskey attests that voter records in the ELVIS system may be changed from "incomplete" or "cancelled," to "active," which would reflect the designation of a fully registered voter.

Giving credence to Mr. Caskey's declaration and testimony, Plaintiffs have not made a strong enough showing that they are substantially likely to succeed on their § 8 claim because § 8 only governs the removal of "a registrant" from the State's official list of eligible voters.[150] None of the applicants on the suspense list, nor those cancelled under the regulation, were ever registered to vote, so they are arguably not "registrants" on the State's official list of eligible voters.  To be sure, there are other reasons an application may be deemed incomplete, such as a failure to sign the application.  To the extent an application is deemed incomplete or cancelled

---

[150] *Compare U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 382–83 (6th Cir. 2008) (holding federal and not state law defines the term "registrant"), *with Common Cause of Colo. v. Buescher*, 750 F. Supp. 2d 1259, 1273 (D. Colo. 2010) (discussing *Land* and finding its holding that federal law governs the term "registrant" "bafflingly circular.").

due to lawful eligibility determinations, Plaintiffs have not challenged the regulation.  But regardless of whether Plaintiffs can make a strong showing of success on their § 8 claim, the record makes clear that Mr. Caskey can easily determine which applicants have been deemed incomplete or cancelled solely due to their failure to provide DPOC.  Therefore, it is unnecessary for Plaintiffs to succeed on their challenge to K.AR. § 7-23-15 in order to obtain injunctive relief stemming from enforcement of the DPOC law itself.  The ELVIS database can assist the State in determining which voters have been wrongfully denied registration in federal elections solely due to the DPOC law.  And going forward, only applicants that have otherwise deficient applications may be deemed incomplete or cancelled under the regulation.

### B.    Irreparable Harm

To constitute irreparable harm, the injury "must be both certain and great."[151]  It "is often suffered when 'the injury can[not] be adequately atoned for in money,' or when 'the district court cannot remedy [the injury] following a final determination on the merits.'"[152] The Supreme Court has consistently held that "all qualified voters have a constitutionally protected right to vote, and to have their votes counted."[153]  "When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."[154]

The Court finds that Plaintiffs have made a strong showing of irreparable harm.  There is uncontroverted evidence that thousands of qualified Kansas motor voter registration applicants have not been registered to vote by county elections officials solely based on their failure to

---

[151]*Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (quoting *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

[152]*Id.* (quoting *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (1980)).

[153]*Reynolds v. Sims*, 377 U.S. 533, 554 (1964) (citing *Ex parte Yarbrough*, 110 U.S. 651 (1884)).

[154]*Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995)); *see also Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote therefore constitutes irreparable injury.").

submit DPOC.   Several named Plaintiffs averred that they registered in 2013 and 2014 in order to vote in the 2014 elections, and that they desire to vote in the 2016 elections.  Plaintiffs Stricker and Boynton both attempted to provide DPOC at DMV offices, believed they had successfully registered, tried to vote in the 2014 election, but were only allowed to cast provisional ballots that were not counted.  Between January 1, 2013 and March 23, 2016, there were 12,717 motor voter registration applications cancelled under K.A.R. § 7-23-15 for failure to provide DPOC. As of March 28, 2016, there are 5655 motor voter applications that are in "incomplete" status due to failure to provide DPOC.   Certainly, many of the applicants that were cancelled lost the opportunity to vote in the 2014 elections.  All of these otherwise qualified applicants run the risk of losing the right to vote for federal offices in the 2016 primary and general election.  Early voting for the August primary begins on July 13, 2016—less than two months from now.  This injury cannot be compensated for, either by money, or after a final determination on the merits, which is unlikely to occur before the 2016 elections take place.  And the harm is not speculative—the applicants in "incomplete" or "cancelled" statuses in ELVIS will not be allowed to vote in the upcoming election without injunctive relief.  Those votes cannot be recast in the event that the Plaintiffs later prevail on the merits.  There is also evidence that the DPOC law has caused a chilling effect, dissuading those who try and fail at navigating the motor voter registration process from reapplying in the future.[155]

Secretary Kobach suggests that Plaintiffs' harm is reparable because each has the ability to submit DPOC and become registered before the next election.  In fact, his position is that it is Plaintiffs' fault entirely that their applications have been placed in incomplete or cancelled

---

[155]Plaintiff Bucci stated that she was discouraged from trying again to register to vote based on her experience.  And Plaintiff submitted the expert opinion of Michael McDonald, who concludes that applicants who are denied registration due to the DPOC requirement are less likely to participate in the electoral process going forward.  Plaintiffs Ex. 1 at 19; Ex. 15 at 1.

status.  He argues that the DPOC was well advertised, and that Plaintiffs received notice of their deficient applications.  He attempts to distinguish this case from others where plaintiffs were entirely precluded from registering to vote.[156]  But, as the Court has already determined, Plaintiffs have presented strong evidence that otherwise eligible voters in Kansas have been entirely precluded from registering to vote based solely on the DPOC law.  As far as advertising goes, there is no evidence in the record about the State's efforts to educate voters about the change in law.  And there is no evidence in the record to support the State's contention that Plaintiffs actually received all of the notices recorded in the ELVIS system in a timely manner.  Mr. Boynton and Mr. Stricker, for example, did not receive notice of their incomplete status until after the 2014 election.  Mr. Hutchinson did not receive notice of his incomplete status until late 2015, within a few months of the effective date of K.A.R. § 7-23-15.

Moreover, Ms. Bucci attested that she does not have DPOC and that it would be a hardship for her to obtain it.  Plaintiffs have demonstrated a financial and administrative burden to obtaining the two most common forms of DPOC.  The cost of obtaining a birth certificate or passport is often prohibitive; both Ms. Bucci and Mr. Fish attested to this financial burden.  And simply navigating the administrative landscape to replace a lost birth certificate, or to apply for a passport, requires time and diligence.

In *Crawford*, the Supreme Court considered the burden on voters associated with obtaining photo-ID that state law required be presented at the polling place for in-person voting.[157]  In considering whether there was an equal protection violation, the Court weighed the

---

[156]*See Husted*, 697 F.3d at 436 (challenging law that would preclude in-person early voting for non-military voters); *Williams v. Salerno*, 792 F.2d 323, 325 (2d Cir. 1986) (challenging state residency requirement that precluded students from registering to vote); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 324 F. Supp. 2d 1358, 1368 (N.D. Ga. 2004) (challenging state's practice of rejecting registrations by mail under the NVRA).

[157]553 U.S. 181 (2008).

burden on voters against the State's interest in protecting the integrity and reliability of the electoral system. It determined that the evidence in the record was insufficient "to quantify either the magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that is fully justified."[158] The Court does not find that *Crawford* controls under the facts of this case. First, in *Crawford*, the Court found that the severity of the burden of obtaining a photo-ID was mitigated by the fact that Indiana allowed voters to cast a provisional ballot that would be counted after the election if the voter later obtained a photo-ID.[159] There is no such safe harbor provision under the Kansas statute because the DPOC law prevents qualified voters from being registered in the first instance. Second, there is evidence of the magnitude of the harm here. There are 18,372 motor voter applicants that have been denied registration due to the DPOC law.

Secretary Kobach's reliance on subsection (m) as safety net for those individuals who lack one of the thirteen forms of DPOC required under the statute is overstated. As already described, that procedure is but one additional burdensome layer in the Kansas enforcement scheme that an applicant must navigate in order to become registered when all else fails. It requires knowledge that the exception exists, and of how to obtain some alternate form of documentation. Although Secretary Kobach states in the brief that this method would not require the applicant to even leave his or her house, the examples of acceptable documentation provided during the hearing (such as affidavits or old school records) invariably require some additional step to obtain. There are no directions or suggested alternatives provided in the statute, so the applicant must divine that a sibling's affidavit, for example, is acceptable, and then determine how to draft and execute such a document. Moreover, the applicant then must obtain

---

[158]*Id.* at 200–01.

[159]*Id.* at 199.

a hearing, by phone or otherwise, with three State executive officials, including Defendant Kobach.  The fact that only three individuals in more than three years have availed themselves of this procedure, out of the thousands of applicants rejected for lack of DPOC, is evidence that the average voter does not view this as an easy and obvious choice when they otherwise lack DPOC.

Secretary Kobach insists that Plaintiffs cannot show irreparable injury because they delayed filing this action to vindicate their rights.  It is true that delay is one factor that sometimes "cuts against finding irreparable injury."[160]  But where the delay is due to the plaintiff's attempts to negotiate before bringing a claim, or to document the harm, delay is not fatal.[161]  The named Plaintiffs in this action all attempted to register to vote in 2013 and 2014; the latest application was made in October 2014 by Mr. Stricker.  However, the record demonstrates that many of these Plaintiffs believed they had successfully registered at the time of their application, and did not learn until much later that they were not in fact registered.  As described earlier in this opinion, motor voter applicants were faced with a confusing and inconsistently-enforced maze of requirements under the new DPOC law.  And the regulation that changes their applications from "incomplete" to "cancelled," and therefore requires them to resubmit their voter applications, did not become effective until October 31, 2015, approximately three and one-half months before the original Complaint was filed.  Soon after the regulation became effective, Plaintiffs provided the State with the statutorily-mandated 90-day notice, and then promptly filed suit.[162]  The Court disagrees that Plaintiffs were required to file suit earlier in order to prove they suffered irreparable harm.  Any delay is attributable to the lengthy

---

[160]*RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009); *see also Gordon v. Holder*, 632 F.3d 722, 725 (D.C. Cir. 2011) ("a delay in filing is not a proper basis for denial of a preliminary injunction.").

[161]*RoDa Drilling*, 552 F.3d at 1211.

[162]52 U.S.C. § 20510(b).

application scheme in place after the law changed, the passage of the 2015 regulation, and the lack of notice among the Plaintiffs that they had not successfully registered to vote.

Secretary Kobach argues that the Court should not consider classwide harm, and argues that the Court is without power to fashion injunctive relief that applies beyond the named Plaintiffs in this lawsuit.  To be sure, the Court has not yet considered Plaintiffs' pending motion for class certification.  That motion is set for hearing on June 16, 2016.  But Plaintiffs allege that the Kansas DPOC law, on its face and as enforced, is preempted by the NVRA, and that its enforcement has resulted in thousands of otherwise qualified voters in Kansas being kept off the voter rolls.  While the named Plaintiffs' individual experiences are each slightly different, the Court has explained that they are illustrative of the burdensome enforcement scheme necessitated by the Kansas DPOC law.  The injunctive relief in this case does not require individualized remedies.  Moreover, case law supports this Court's authority to issue classwide injunctive relief based on its general equity powers before deciding the class certification motion.[163]

In sum, the Court finds Plaintiffs have made a strong showing that they will suffer irreparable harm without a preliminary injunction.

### C.    Balance of Harms

Under this factor, the Court must "balance the competing claims of injury and consider the effect of granting or withholding the requested relief" on both parties.[164]  Here, the Court must weigh the degree to which individual voters will suffer the irreparable harm of disenfranchisement, as discussed above, against the State's interest in precluding ineligible

---

[163] *See, e.g., Rodriguez v. Providence Comm'y Corr., Inc.*, –F. Supp. 3d–, 2015 WL 9239821, at *6 (M.D. Tenn. Dec. 17, 2015); *Lee v. Orr*, No. 13-cv-8719, 2013 WL 6490577, at *2 (N.D. Ill. Dec. 10, 2013).  *See generally* Newberg on Class Actions § 4:30 (5th ed. 2015) ("Rule 23(b)(2) authorizes certification of a class solely for the purpose of final injunctive or declaratory relief. Hence, a case seeking only a provisional remedy like a preliminary injunction cannot be certified under Rule 23(b)(2) on that basis alone.").

[164] *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 9 (2008).

noncitizens from voting in federal elections, and the administrative burden on the State if the injunction issues.

As an initial matter, the Court finds no distinct burden associated with the Department of Revenue's compliance with the proposed injunction. The injunction appears to require nothing more than the status quo enforcement efforts by DMV employees, who currently do not affirmatively request DPOC from motor voter registration applicants. The competing burdens associated with the preliminary injunction are all associated with the Secretary of State's enforcement of the DPOC law.

The Secretary of State first urges that the State has an interest in preventing noncitizen registration, in preserving its own laws, and in ensuring voters in Kansas are not confused, which they would be by changing the law again. The Court recognizes "the legitimacy [and] importance of the State's interest in counting only the votes of eligible voters,"[165] and the State's "broad interests in protecting election integrity."[166] But on this record, the Court cannot find that the State's interest in preventing noncitizens from voting in Kansas outweighs the risk of disenfranchising thousands of qualified voters. There is evidence of only three instances where noncitizens actually voted in a federal election between 1995 and 2013. And while there is evidence that about fourteen noncitizens attempted to register to vote during that time, this number pales in comparison to the number of people not registered as a result of the DPOC law. Approximately 18,000 otherwise qualified motor voter applicants have not been processed solely because they have failed to produce DPOC.

The Court is unpersuaded that the State's interest in ensuring that Kansas voters are not confused is strong enough to counterbalance the irreparable harm that thousands of

---

[165]*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008).

[166]*Id.* at 200.

disenfranchised voters will suffer if the DPOC prevents them from voting in federal elections. As discussed in detail earlier in this opinion, the record suggests that Kansas motor voters are already confused about the current DPOC law and how to meet its requirements.  To the extent the State has a strong interest in preventing voter confusion, the Court cannot find that the status quo enforcement efforts further that State interest.

Mr. Kobach concedes that it is possible for it to comply with a preliminary injunction, but argues that the State would suffer severe administrative burdens due to: (1) changing voter registration records, including providing notice, for those applicants on the "incomplete" list or in cancelled status; (2) administering a two-tiered election with a large number of federal-only voters; and (3) contacting voters on the incomplete list who no longer reside at their last known addresses.

As to the first administrative burden identified by the State, Mr. Caskey testified that he could fashion reports in the ELVIS system to identify all motor voter applicants who have been classified as incomplete or cancelled based on the DPOC requirement.  He testified that these two reports would take about thirty minutes each to run.  Once these lists are generated, the State would be required to change those applicants' statuses back to active, and send them a notice that their registration is complete.  The Court cannot find that the State's time spent changing applicants' statuses back to active is unduly burdensome.  It is a wholly automated process. Further, the Court cannot find that the cost to the State to notify voters of their completed registrations is unduly burdensome.  As compared to the many notices the State would otherwise send to voters who lack DPOC, the burden is substantially less.  For those applicants who are newly on the incomplete list, for example, this may end up saving the State money otherwise

spent repeatedly contacting the applicants to notify them that their applications are incomplete and directing them to submit DPOC.

Next, the Secretary of State complains that the proposed injunction would create a two-tiered election regime in Kansas that would create separate requirements for registering to vote for federal and state elections. But, as previously discussed, the Court agrees with Plaintiffs that this two-tiered system is a problem of the State's own making.[167] If the State wishes to change voter registration laws that directly contradict the provisions of the NVRA, it does so at its own risk. To the extent such laws are preempted by the NVRA, they may not apply to registration for federal elections. Moreover, this two-tiered system is not without precedent. In 2014, the State was required to administer a statewide election in which 383 voters who used the federal mail registration form and did not provide DPOC were registered to vote for federal offices only.[168] While the Court finds that the scale of voters affected by the instant injunction is substantially higher—the State estimates that about 10,000 voters would be affected—there is no evidence of significant administrative burdens with the 2016 election stemming from the dual forms of registration that would outweigh Plaintiffs' irreparable harm.[169]

Finally, Defendants point to the administrative burden of locating applicants who have moved since the time of application. But as Plaintiffs point out, this burden is largely unnecessary because Kansas law does not prohibit a registrant from voting because they have

---

[167]The Court notes that this two-tiered registration procedure has been challenged under State law in *Belenky v. Kobach*, No. 2013CV1331 (Shawnee Cnty. Dist. Ct). The district court granted summary judgment to the plaintiffs in that case, holding that the Secretary of State lacks legal authority under Kansas law "to compromise or limit 'Federal Form' registrants, such as Plaintiffs, right to register and vote in Kansas elections." *Id.*, Mem. Op. & Order at 25 (Jan. 15, 2016). The Secretary of State's Motion for Relief from Judgment or Order is pending in that matter.

[168]*See Arizona v. ITCA*, 133 S. Ct. 2247, 2255 (2013).

[169]The only evidence of administrative burden is Mr. Caskey's conclusory assertion in his declaration that "[t]he administrative burdens on the State and counties in conducting a two-tier election would be severe." Kobach Ex. 1 ¶ 23.

moved.[170]  Instead, the registrant can vote at the precinct assigned to their old address and submit

a new voter registration form at the time of voting.  Moreover, because the Court is not enjoining

at this time enforcement of the regulation, county officials are not prohibited from cancelling

applications that have been incomplete for more than 90 days for reasons other than lack of

DPOC.  The survey conducted by the State shows that in a sample of the oldest applications in a

single county, approximately 30% of the applicants had moved.[171]  But this list only surveyed the

oldest applications on the suspense list, which would of course be more likely to include

applicants that have moved.  There is no indication that these results could be extrapolated

statewide.

In sum, while the Court acknowledges the Secretary of State will assume some

administrative burdens in ceasing enforcement of the DPOC law as to federal elections, it simply

cannot find that these burdens outweigh the real and imminent threat of disenfranchisement that

Plaintiffs and those similarly situated will suffer without an injunction.[172]

### D.       Public Interest

Defendants argue that the public interest is best served by enforcing duly enacted Kansas

law.  Plaintiffs urge that the public interest is best served by enfranchisement, and by

enforcement of federal voter registration requirements under the NVRA.  The Court agrees that

the public interest in enforcing State law must give way under these circumstances to the federal

interests outlined in the NVRA and described in detail earlier in this opinion.  As the Sixth

Circuit has succinctly explained:

---

[170]*See* K.S.A. § 25-2316c(b).

[171]Kobach Ex. 8

[172]*See Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) (balancing the harm to the State in enjoining an election law, and noting that the State had not shown that "local boards will be unable to cope with three extra days of in-person voting).

> While states have "a strong interest in their ability to enforce state election law requirements," the public has a "strong interest in exercising the 'fundamental political right' to vote." "That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful."[173]

This conclusion is bolstered in this case by the Court's earlier analysis that even if instances of noncitizens voting cause indirect voter disenfranchisement by diluting the votes of citizens, such instances pale in comparison to the number of qualified citizens who have been disenfranchised by this law. Accordingly, the Court finds granting injunctive relief would be in the public interest.

### E.    Security

Secretary Jordan asks that the Court require Plaintiffs to post a security bond if it issues a preliminary injunction in this matter. Defendant Kobach does not argue that a bond is required. Fed. R. Civ. P. 65(c) provides that "[t]he Court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Court may exercise its discretion and determine a bond is unnecessary "if there is an absence of proof showing a likelihood of harm."[174] Given the Court's finding of constitutional preemption and the strong public interest in allowing qualified individuals to register to vote that outweighs any purely administrative burdens to the State, the Court waives the bond requirement.

## V.   Conclusion

Under the heightened preliminary injunction standard, Plaintiffs have sustained their burden of making a strong showing that they are likely to succeed on the merits of their claim

---

[173]*Id.* 697 F.3d 423, 436–37 (6th Cir. 2012) (quoting *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2012); *Purcell v. Gonzalez*, 549 U.S. 1, 4, (2006)).

[174]*Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987).

that the Kansas DPOC law violates the NVRA provision that a motor voter registration application can require only the minimum amount of information necessary to enable state officials to assess an applicant's eligibility to vote, and that they will suffer irreparable harm without an injunction.  Without the injunction, approximately 18,000 Kansas motor voter registration applicants will be precluded from registering to vote solely based on their failure to provide DPOC.  The record in this case suggests that there is a less burdensome way for the State to assess whether applicants meet the citizenship eligibility requirement; namely, by asking applicants to complete an attestation of citizenship under penalty of perjury.

The injunction requires the Secretary of State to register to vote those applicants whose only infirmity was not having the opportunity to produce DPOC contemporaneously with their driver's license applications, or later because of lack of consistent notice or reasonable opportunity to cure that infirmity.  Although the Court is cognizant that the injunction will cause some administrative burden to the State, it is a burden that is outweighed by the risk of thousands of otherwise eligible voters being disenfranchised in upcoming federal elections.  On balance, the public interest in the enfranchisement of otherwise eligible voters, the irreparable harm to prospective voters, the balance of harms, and Plaintiffs' strong showing that they are likely to succeed on their claim that the DPOC law is preempted by NVRA § 5's provision that the State only require the minimum amount of information necessary for the State to assess citizenship of the applicant, justifies entry of this preliminary injunction.

## VI.    Stay

Under Fed. R. Civ. P. 62(c), during pendency of an appeal from an interlocutory order that grants an injunction, "the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights."  Given the administrative

challenges to the State that will be necessitated by the Court's injunction, the Court will grant a short stay of this preliminary injunction in order to allow the State time to coordinate enforcement efforts, and to file any appeal to the Tenth Circuit Court of Appeals and obtain emergency relief from that Court, if desired.  The injunction will therefore go into effect at midnight on May 31, 2016.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiffs' Motion for Preliminary Injunction (Doc. 19) is **granted in part and denied in part**.  Defendants are hereby enjoined from enforcing K.S.A. § 25-2309(l) as to individuals who apply to register to vote in federal elections at the same time they apply for or renew a driver's license.  The Secretary of State is directed to register for federal elections all otherwise eligible motor voter registration applicants that have been cancelled or are in suspense due solely to their failure to provide DPOC.  Plaintiff's motion to enjoin enforcement of K.A.R. § 7-23-15 is denied.

**IT IS SO ORDERED.**

Dated: May 17, 2016

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE
