**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

STEVEN WAYNE FISH, *et al.*, on behalf of
themselves and all others similarly situated,

      Plaintiffs,

v.

KRIS KOBACH, in his official capacity as
Secretary of State for the State of Kansas, *et
al.*,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 2:16-cv-02105-JAR-JPO

## <u>MEMORANDUM IN SUPPORT OF PLAINTIFFS'<br>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

### *Oral Argument Requested*

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................... i

**INTRODUCTION AND NATURE OF MATTER BEFORE THE COURT** ......................... 1

**PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS** ......................................... 3

   **I. BACKGROUND ON THE DPOC LAW** ..................................................... 3

   **II. SOS PROCEDURES REGARDING DPOC** ................................................ 6

   **III. THE BIRTH LINK MOU** ...................................................................... 8

   **IV. THE EFFECT OF THE DPOC LAW** ...................................................... 11

   **V. PARTIES** ........................................................................................ 12

      A. Individual Plaintiffs ................................................................ 12

      B. Organizational Plaintiff ........................................................... 15

      C. Defendant ............................................................................. 19

   **VI. PURPORTED NON-CITIZEN REGISTRATIONS** ..................................... 19

**LEGAL STANDARD** .................................................................................... 24

**ARGUMENT** ............................................................................................. 24

   **I. PLAINTIFFS HAVE STANDING FOR THEIR CLAIMS.** ............................... 24

   **II. THE DPOC REGIME VIOLATES THE FOURTEENTH AMENDMENT BY DISCRIMINATING AGAINST INTERSTATE MIGRANTS TO KANSAS.** ......... 27

      A. The Constitution Protects a Fundamental Right to Travel .......................... 27

         1. The Right to Travel Encompasses the Right to Be Treated Equally After Moving to Another State ...................................................... 28

         2. State Laws and Policies that Restrict the Right to Travel by Discriminating Against Interstate Migrants—Particularly in the Context of Voting—Are Subject to Strict Scrutiny. ...................................................... 32

      B. Defendant's DPOC Regime Establishes an Unconstitutional Voter Registration System that Favors Native-born Kansans and Imposes Particular Burdens on Interstate Migrants. ...................................................... 35

     1.   The DPOC Regime impermissibly discriminates against migrants based on their state of birth. ................................................................................................ 36

     2.   The DPOC Law Impermissibly Discriminates Against Migrants by Exempting Registered Residents as of January 1, 2013. ............................................................ 43

  C.  The DPOC Regime's Discrimination Against Interstate Migrants Is Not Narrowly Tailored to Further a Compelling State Interest. ........................................................ 46

**CONCLUSION** ................................................................................................................ 52

**CERTIFICATE OF SERVICE** ..................................................................................... 54

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) .................................................................................... 34

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................... 24

*Arcia v. Fl. Sec. of State*,
  772 F.3d 1335 (11th Cir. 2014) ................................................................. 26

*Argo v. Blue Cross & Blue Shield of Kansas, Inc.*,
  452 F.3d 1193 (10th Cir. 2006) ................................................................. 24

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
  133 S. Ct. 2247 (2013) .......................................................................... 22, 47

*Attorney Gen. of N.Y. v. Soto-Lopez*,
  476 U.S. 898 (1986) ........................................................................... passim

*Baldwin v. G.A.F. Seelig, Inc.*,
  294 U.S. 511 (1935) .................................................................................... 28

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993) .................................................................................... 29

*Buclary v. Borough of Northampton*,
  No. 90-7950, 1991 WL 133851 (E.D. Pa. July 17, 1991) ................................ 37, 38

*Carrington v. Rash*,
  380 U.S. 89 (1965) ...................................................................................... 46

*Colo. Taxpayers Union, Inc. v. Romer*,
  963 F.2d 1394 (10th Cir. 1992) ................................................................. 25

*Crawford v. Marion County Election Board*,
  553 U.S. 181 (2008) .................................................................................... 34

*Delaware River Basin Comm'n v. Bucks Cty. Water & Sewer Auth.*,
  641 F.2d 1087 (3rd Cir. 1981) ................................................................... 46

*Dred Scott v. Sandford*,
  60 U.S. 393 (1856) ...................................................................................... 30

*Dunn v. Blumstein,*

    405 U.S. 330 (1972) .................................................................. passim

*Evans v. Cornman,*

    398 U.S. 419 (1970) ........................................................................ 33

*Fish v. Kobach,*

    840 F.3d 710 (10th Cir. 2016) ................................................... passim

*Fish v. Kobach,*

    No. 16-2105-JAR-JPO, 2016 WL 2866195 (D. Kan. May 17, 2016) ............................. passim

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*

    528 U.S. 167 (2000) ........................................................................ 24

*Guinn v. United States,*

    238 U.S. 347 (1915) ........................................................................ 46

*Harper v. Va. State Bd. of Elections,*

    383 U.S. 663 (1966) ................................................................. 34, 50

*Havens Realty Corp. v. Coleman,*

    455 U.S. 363 (1982) ........................................................................ 25

*Hooper v. Bernalillo Cty. Assessor,*

    472 U.S. 612 (1985) ................................................................. passim

*Kobach v. Election Assistance Comm'n,*

    135 S. Ct. 2891 (2015) ..................................................................... 47

*Kobach v. Election Assistance Comm'n,*

    772 F.3d 1183 (10th Cir. 2014) .................................................. 47, 51

*Kramer v. Union Free Sch. Dist. No. 15,*

    395 U.S. 621 (1969) ................................................................. 34, 35

*League of Women Voters of United States v. Newby,*

    838 F.3d 1 (D.C. Cir. 2016) ............................................... 26, 41, 48

*Love v. Johnson,*

    146 F. Supp. 3d 848 (E.D. Mich. 2015) ........................................... 38

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*

    475 U.S. 574 (1986) ........................................................................ 24

*Mem'l Hosp. v. Maricopa Cty.,*

    415 U.S. 250 (1974) ........................................................................................... 31, 32

*Mixon v. State of Ohio,*

    193 F.3d 389 (6th Cir. 1999) ................................................................................. 35

*Passenger Cases,*

    7 How. 283 (1849) ................................................................................................ 28

*Paul v. Virginia,*

    75 U.S. 168 (1868) ................................................................................................ 28

*Reynolds v. Sims,*

    377 U.S. 533 (1964) .............................................................................................. 33

*Saenz v. Roe,*

    526 U.S. 489 (1999) ...................................................................................... passim

*Shapiro v. Thompson,*

    394 U.S. 618 (1969) ...................................................................................... passim

*Slaughter-House Cases,*

    83 U.S. 36 (1872) ............................................................................................ 30, 41

*Sosna v. Iowa,*

    419 U.S. 393 (1975) .............................................................................................. 31

*Spokeo, Inc. v. Robins,*

    136 S. Ct. 1540 (2016) .......................................................................................... 24

*Tandy v. City of Wichita,*

    380 F.3d 1277 (10th Cir. 2004) ............................................................................ 24

*Turner Broad. Sys., Inc. v. F.C.C.,*

    512 U.S. 622 (1994) .............................................................................................. 48

*United States v. Guest,*

    383 U.S. 745 (1966) .............................................................................................. 28

*Veasey v. Abbott,*

    830 F.3d 216 (5th Cir. 2016) ................................................................................ 48

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*

    429 U.S. 252 (1977) .............................................................................................. 25

*Weber v. Aetna Cas. & Sur. Co.*,

    406 U.S. 164 (1972)..................................................................................... 38

*Zobel v. Williams*,

    457 U.S. 55 (1982).............................................................................. passim


**Statutes**

Kan. Stat. Ann. § 25-1215 ............................................................................ 3

Kan. Stat. Ann. § 25-2203 ............................................................................ 6

Kan. Stat. Ann. § 25-2309 ..................................................................... passim

Kan. Stat. Ann. § 25-2352 ............................................................................ 3

Kan. Stat. Ann. § 25-2416 .......................................................................... 52

Kan. Stat. Ann. § 25-2908 .......................................................................... 44

Kan. Stat. Ann. § 65-2409a .................................................................... 9, 40

National Voter Registration Act ............................................................. 1, 47

**Rules**

Fed. R. Civ. P. 56....................................................................................... 24

**Regulations**

Kan. Admin. Reg. § 7-23-14......................................................................... 6

Kan. Admin. Reg. § 7-23-15......................................................................... 7

**Constitutional Provisions**

Kan. Const. Art. V, § 1 ........................................................................... 3, 44

U.S. Const., Amdt. 14, § 1 .......................................................................... 30

**Legislative History**

H.B. 2067, 84th Legis., Reg. Sess. (Kan. 2011) .......................................... 3

Kan. Leg. 2011-2012 Legis. Sess. HB 2026, http://www.kslegislature.org/li_2012/b2011_12/

    measures/hb2067/ (last visited Dec. 18, 2016). ........................................ 3

**INTRODUCTION AND NATURE OF MATTER BEFORE THE COURT**

Plaintiffs respectfully seek partial summary judgment on their claim that Kansas's documentary proof-of-citizenship requirement, Kan. Stat. Ann. § 25-2309(*l*) ("DPOC law" or "DPOC requirement"), as implemented and enforced, discriminates against those who have moved to Kansas from other states, in violation of the fundamental right to travel protected by the Fourteenth Amendment of the Constitution.[1]

In implementing the DPOC law, Defendant Kobach has created a "confusing and inconsistently-enforced maze of requirements," *Fish v. Kobach*, --- F. Supp. 3d ---, No. 16-2105-JAR-JPO, 2016 WL 2866195 at *28 (D. Kan. May 17, 2016) ("*Fish I*"), which has disenfranchised thousands of prospective voters without any legitimate reason.  These requirements are discriminatorily enforced against voters born in states other than Kansas. Pursuant to an in-state birth certificate verification system (the "Birth Link MOU"), Defendant effectively exempts individuals born in Kansas from the DPOC requirement, which is instead applied to Kansas residents who were born in other states.  Under the Birth Link MOU, if a voter registration applicant fails to present DPOC, Defendant will independently verify citizenship by cross-referencing the suspended application with birth certificates on file at the Kansas Department of Health and Environment ("KDHE").  But KDHE only maintains records of those born inside Kansas, and Defendant engages in no analogous efforts with agencies *outside* of Kansas to verify citizenship of those born in other states.  Furthermore, the DPOC law entirely

---

[1] On October 28, 2016, the Court granted Defendant's motion to reopen discovery as to Plaintiffs' claims under section 5 of the National Voter Registration Act ("NVRA"). Doc. No. 254.  As a result, the deadline for dispositive motions in the *Fish* case has now been set for July 7, 2017.  Doc. No. 258.  However, discovery on Plaintiffs' Fourteenth Amendment claim is now closed and a comparable claim is pending in *Bednasek v. Kobach*, Case. No. 2:15-cv-9300-JAR-JPO.  *Fish* Plaintiffs submit this partial motion for summary judgment so that the Court may consider the right to travel claims in both cases simultaneously.  *Fish* Plaintiffs reserve the right to bring a separate dispositive motion at a later date as to their remaining claims.

exempts established Kansans who were residents and registered voters as of January 1, 2013 (the "2013 Exemption") from needing to provide DPOC.  The result of these preferences is that individuals who have migrated to Kansas must present DPOC in order to become registered to vote; meanwhile applicants who were born in Kansas, or who were registered residents before 2013, are given preferential treatment and allowed to vote without ever having produced DPOC.  The discriminatory nature of the DPOC regime is not an accident: indeed, Defendant's legislative testimony and statements by his Director of Elections confirm that the express purpose of these policies was to provide a particular benefit for Kansas natives that categorically excludes those born in other states.

This regime is unconstitutional.  For decades, the Supreme Court has closely scrutinized and struck down laws that favor longer-term residents of a state while penalizing more recent arrivals, on the grounds that such laws violate the fundamental right to travel.  The DPOC regime is especially suspect under the Constitution because the differential treatment burdens not just any state benefit but the right to become a voter.  A state may not "fence off" its franchise from migrants by enacting discriminatory restrictions on voter registration that disadvantage those resettling from other states.  If Kansas enacted a law expressly mandating that persons born in Missouri must produce DPOC to register to vote but Kansas natives need not, the law would be plainly unconstitutional.  The DPOC regime's de facto system of in-state favoritism achieves the same result, and it is no less discriminatory.  The Constitution does not tolerate imposing burdens selectively on those who have relocated to Kansas from other states.

For these reasons and those further detailed below, this Court should grant partial summary judgment and enter an injunction barring Defendant from enforcing the DPOC law.

## PLAINTIFFS' STATEMENT OF UNCONTROVERTED FACTS

### I.   BACKGROUND ON THE DPOC LAW

1.      In Kansas, qualified voters can register to vote through: (1) a State form approved by the Secretary of State, Kan. Stat. Ann.§ 25-2309(a); (2) the NVRA's Federal Form for mail-in registration, *id.*; (3) an application made simultaneously with an application for a driver's license, *id*. § 25-2352(a); (4) an in-person application at a State agency that provides public assistance or other benefits, *see id*. § 25-2309(a),(c)(4);  and (5) for persons in federal services, a Federal Services Post Card Application, *see id*. § 25-1215.

2.      Per the Kansas Constitution, one must be a U.S. citizen, at least eighteen years old, and a Kansas resident in order to vote in federal and state elections.  Kan. Const. art. V, § 1.

3.      Each of the methods of registration requires an attestation as to the applicant's residence, age of majority, and U.S. citizenship, which applicants are required to sign under penalty of perjury.  *See, e.g.*, Kan. Stat. Ann. § 25-2309(b); Kansas State voter registration form, attached to Danjuma Decl. as Ex. A.

4.      Prior to 2013, Kansas did not require any further proof of citizenship.  *See* H.B. 2067, 84th Legis., Reg. Sess. (Kan. 2011).

5.      On January 24, 2011, the "Secure and Fair Elections (SAFE) Act" was formally introduced in the Kansas Legislature as House Bill No. 2067 (hereinafter "HB 2067").  Kan. Leg.  2011-2012  Legis.  Sess.  HB  2026,  Bill  History  3,  http://www.kslegislature.org/ li_2012/b2011_12/measures/hb2067/ (last visited Dec. 18, 2016).

6.      Among other things, the bill contained a provision that would become Kan. Stat. Ann. § 25-2309(*l*).  H.B. 2067, 84th Legis., Reg. Sess. (Kan. 2011).

7.     The Kansas House passed HB 2067 to take effect in 2012, but the Senate Ethics and Elections Committee amended the bill to push back the effective date of the DPOC requirement by one year, to January 1, 2013.  Kan. Stat. Ann. § 25-2309(u) (repealed 2016).

8.     Governor Sam Brownback signed the bill into law on April 18, 2011.

9.     The DPOC law, Kan. Stat. Ann. § 25-2309(*l*), took effect on January 1, 2013. Kan. Stat. Ann. § 25-2309(u) (repealed 2016).

10.    The DPOC law does not apply to individuals who were registered to vote as of the effective date of January 1, 2013.  *Id.* § 25-2309(n) ("Any person who is registered in this state on the effective date of this amendment to this section is deemed to have provided satisfactory evidence of citizenship and shall not be required to resubmit evidence of citizenship.").

11.    The DPOC law directs that "an applicant shall not be registered until the applicant has provided satisfactory evidence of United States citizenship."  *Id.* § 25-2309(*l*).

12.    Kan. Stat. Ann. § 25-2309(*l*) enumerates thirteen documents that constitute satisfactory evidence of citizenship under the SAFE Act.  These documents are:

> (1) The applicant's driver's license or nondriver's identification card issued by the division of vehicles or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver's license or nondriver's identification card that the person has provided satisfactory proof of United States citizenship;
>
> (2)   the applicant's birth certificate that verifies United States citizenship to the satisfaction of the county election officer or secretary of state;
>
> (3)   pertinent pages of the applicant's United States valid or expired passport identifying the applicant and the applicant's passport number, or presentation to the county election officer of the applicant's United States passport;
>
> (4)   the applicant's United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States

bureau of citizenship and immigration services by the county election officer or the secretary of state, pursuant to 8 U.S.C. § 1373(c);

(5)    other documents or methods of proof of United States citizenship issued by the federal government pursuant to the immigration and nationality act of 1952, and amendments thereto;

(6)    the applicant's bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number;

(7)    the applicant's consular report of birth abroad of a citizen of the United States of America;

(8)    the applicant's certificate of citizenship issued by the United States citizenship and immigration services;

(9)    the applicant's certification of report of birth issued by the United States department of state;

(10)    the applicant's American Indian card, with KIC classification, issued by the United States department of homeland security;

(11)    the applicant's final adoption decree showing the applicant's name and United States birthplace;

(12)    the applicant's official United States military record of service showing the applicant's place of birth in the United States; or

(13)    an extract from a United States hospital record of birth created at the time of the applicant's birth indicating the applicant's place of birth in the United States.

*Id.*

13.    Employees of motor vehicle offices of the Kansas Department of Revenue ("DMV") have offered voter registration to first time license applicants who have self-identified as noncitizens.  Transcript of April 14, 2016 Preliminary Injunction Hearing ("PI Hr'g Tr.") at 111:13-22, attached to Danjuma Decl. as Ex. D-1 (Defendant Kobach acknowledged that DMV employees erroneously offer voter registration to noncitizens); Deposition of Tabitha Lehman ("Lehman Dep. Tr.") 62:11-23; 63.20-64:13, attached to Danjuma Decl. as Ex. F-3

(acknowledging that DMV is mistakenly offering voter registration to people who self-identify as noncitizens).

14.     If an individual submits DPOC to his/her county election office by mail or in person by the close of business on the day before the election, or if the individual submits DPOC electronically (*e.g.*, by email or by facsimile) before midnight on the day before the election, then the individual will be able to vote in that election if: (1) the county election officer "[a]ccept[s]" the citizenship document provided, and (2) the county election officer either adds the individual's name to the poll book or communicates the name of the individual to the proper polling location before the polls open.  Kan. Admin. Reg. § 7-23-14(b).  If those actions are not taken by the county election officer, the applicant can only cast a provisional ballot.  *Id.*

## II.     SOS PROCEDURES REGARDING DPOC

15.     Per Kan. Stat. Ann. § 25-2309(m), applicants who are unable to produce one of the thirteen documents listed in Kan. Stat. Ann. § 25-2309(*l*), may request a hearing before the state election board—consisting of the Lieutenant Governor, the Attorney General, and the Secretary of State—during which such applicants can present "additional evidence" of their U.S. citizenship.  Kan. Stat. Ann. § 25-2309(m); Kan. Stat. Ann. § 25-2203(a) ("There is hereby established the state election board, the members of which shall be the lieutenant governor, the secretary of state and the attorney general.").

16.     The Secretary of State's Office ("SOS") does not inform individuals who fail to provide DPOC of their right to schedule a hearing to prove their citizenship.  *See*  06/15/2016 Deposition of Bryan Caskey ("06/15/2016 Caskey Dep. Tr.") 26:6-10, attached to Danjuma Decl. as Ex. F-1; *see also* Deposition of Donna Bucci ("Bucci Dep. Tr.") 90:7-19, attached to Danjuma Decl. as Ex. I-2 (stating that she was never told about a "different option other than [providing] a birth certificate" to satisfy the DPOC Law); 118:4-119:8.

6

17.     The SOS has not created any specific "list that could be provided to someone who is interested in having a hearing that would describe the types of proof of citizenship that would be sufficient for the hearing," Ex. F-1, 06/15/2016 Caskey Dep. Tr. 25:15-20, or "any samples of affidavits or declarations or anything that could be used by someone who would be participating in a hearing process." *Id.* at 25:21-25.

18.     As of June 15, 2016, over three and a half years after the DPOC law took effect, only three such hearings had taken place. Ex. F-1, 06/15/2016 Caskey Dep. Tr. 26:4-27-5.

19.     County election officers mark applicants who are unable to provide DPOC with the term "suspense" in the state's voter registration database. *See* 04/06/2016 Deposition of Bryan Caskey ("04/06/2016 Caskey Dep. Tr.") 34:16-35:8, attached to Danjuma Decl. as Ex. F-2.

20.     Applications can remain in suspense for up to 90 days. Ex. F-2, 04/06/2016 Caskey Dep. Tr. 36:17-37:7.

21.     Once the 90-day mark passes, the applications are canceled, Kan. Admin. Reg. § 7-23-15(b),(c); LEHMAN0000596, attached to Danjuma Decl. as Ex. K-2 (10/01/2015, Implementation Guide for Kan. Admin. Reg. § 7-23-14 and 7-23-15), requiring the applicant to restart the registration process in order to become registered to vote. Ex. F-2, 04/06/2016 Caskey Dep. Tr. 41:11-42:7; *see also* Kan. Admin. Reg. § 7-23-15(c).

22.     Individuals whose applications have been canceled after the 90-day period do not receive notice that their applications have been canceled. Ex. F-2, 04/06/2016 Caskey Dep. Tr. 46:18-47:12.

23.     The SOS and county election officers may develop processes for accepting proof of citizenship that are different from the time and manner in which voter registration applications are accepted.  *See* Kan. Stat. Ann. § 25-2309(t).

24.     The SOS has undertaken a policy to independently confirm the existence of citizenship documents for Kansas-born applicants who fail to provide acceptable proof of citizenship.  *See* Ex. F-2, 04/06/2016 Caskey Dep. Tr. 56:5-21, 64:15-19.  *Testimony of Secretary of State Kris Kobach*, House Elections Committee, (Jan. 22, 2014) ("Elections Comm. Testimony"), attached to Danjuma Decl. as Ex. C-1 (testifying that in order "to assist registrants born in Kansas" the SOS began a program with KDHE because "KDHE has birth certificate records for every person born in Kansas, and a substantial portion of the incomplete registrations are for people born in Kansas."), http://kslegislature.org/li_2014/b2013_14/committees/ctte_h_electns_1/documents/testimony/20140122_03.pdf; Ex. __ LEHMAN0000511 (01/23/2014, Office of the Kansas Secretary of State Processing Instructions for CEOs).

## III.    THE BIRTH LINK MOU

25.     On January 7, 2014, the SOS and KDHE entered into an Interagency Agreement titled the "Birth/Voter Registration Data Link."   Interagency Agreement Between the Kansas Secretary of State and the Kansas Department of Health and Environment, 1 – 6 (Jan. 7, 2014) ("Birth Link MOU"), attached to Danjuma Decl. as Ex. B.  Pursuant to this agreement, on an approximately monthly basis, the SOS sends a list of new additions to the suspense list to the Kansas Department of Vital Statistics (a part of KDHE).  Ex. F-1, 04/06/2016 Caskey Dep. Tr. 55:20-57:19, 64:15-19; 03/29/2016 Affidavit of Bryan Caskey ("03/29/2016 Caskey Aff.") ¶ 9, attached to Danjuma Decl. as Ex. E-1 (attesting "the Secretary of State's office checks approximately monthly with the Kansas Department of Vital Statistics to see if individuals

missing proof of citizenship were born in the State of Kansas to complete their registration for them"); Ex. B, Birth Link MOU.

26.     The Kansas Department of Vital Statistics has birth records only of individuals who were born in Kansas.  *See* Ex. F-2, 04/06/2016 Caskey Dep. Tr. 62:4-9 (acknowledging that KDHE does not maintain birth records for people who are born outside of Kansas); *see also* Kan. Stat. Ann. § 65-2409a(a) ("A certificate of birth for each live birth which occurs in this state shall be filed with the state registrar within five days after such birth and shall be registered by such registrar if such certificate has been completed and filed in accordance with this section.").

27.     The Kansas Department of Vital Statistics cross-references suspended voter registration applications to see if "there is proof that there's a Kansas birth certificate on file." Ex. F-2, 04/06/2016 Caskey Dep. Tr. 56:16-17. Ex. B, Birth Link MOU 1-6 (describing the arrangement where the SOS provides KDHE, Office of Vital Statistics, with applicant information and KDHE in turn runs six iterations of comparisons to determine if there is a matching Kansas birth certificate on file).

28.     The "Purpose" Section of the Birth Link MOU describes its purpose as follows:

> Subsequent to recent changes in Kansas voter registration requirements, there are voter registration applicants who have not provided citizenships documents as required by Kansas law. The [Secretary of State] and KDHE recognize a need for a Birth/Voter Registration data-matching process to facilitate documentation of citizenship for those who have submitted voter registration applications without the required citizenship documentation."

Ex. B, Birth Link MOU at 1.

29.     The Birth Link MOU's "Limitations and Caveats" section acknowledges that "The Kansas [Office of Vital Statistics] maintains records only on Kansas vital events occurring in the State of Kansas."  Ex. B, Birth Link MOU at 6.

30.     Kansas Elections Director Bryan Caskey testified that "generally speaking . . . between 40 and 50 percent of the records that we present to KDHE will come back with an affirmative response of yes, there is proof of citizenship on file."  Ex. F-1, 04/06/2016 Caskey Dep. Tr. 63:14-64:11.

31.     Defendant Kobach testified that during the first two weeks of implementation of the Birth Link MOU, of the 20,201 incomplete registrations, KDHE "found Kansas birth certificates for 7,716" and within a week, "those 7,716 registrations will be completed for them." Ex. C-1, Elections Comm. Testimony.

32.     Defendant Kobach further testified: "And I expect that as people start thinking about elections again, in September or October of 2014, we will see a large number of those people complete the registration process."  *Id.*

33.     The SOS does not have a procedure for checking new additions to the suspense list with out-of-state agencies.  *See* Kobach Responses to Plaintiffs First Request for Admissions ("Resps. to 1st RFAs") ¶ 20, attached to Danjuma Decl. as Ex. L-1; *see also* Ex. F-2, 04/06/2016 Caskey Dep. Tr. 62:4-9; *see also* Deposition of Douglas Hutchinson ("Hutchinson Dep. Tr.") 27:16-28:4, attached to Danjuma Decl. as Ex. I-5 (testifying "I don't know why it has to be so difficult for me, as an individual, to have to prove being born out of state to prove that I am a citizen" and noting that SOS verifies documents "for their own natural-born citizens of Kansas"), 125:6-17.

34.     Under a Kansas Department of Revenue policy, DMV offices may retain DPOC provided by a driver's license applicants regardless of their state of birth, which election officials may then access via secure webportal.  *See* 05/18/2016 Affidavit of Bryan Caskey ("05/18/2016

Caskey Aff.") ¶ 5, attached to Danjuma Decl. as Ex. E-2 ("[T]he DMV now accepts and scans DPOC provided by any Kansas driver's license holder or applicant, at any time").

## IV.   THE EFFECT OF THE DPOC LAW

35.   860,604 people registered to vote in Kansas between January 1, 2006 and March 23, 2016.  *See* Ex. E-1, 03/29/2016 Caskey Aff. ¶ 7.

36.   As of January 1, 2013, approximately 1,762,330 Kansans were registered to vote. *See* State of Kansas, Office of the Secretary of State, "January 1st (Unofficial) Voter Registration Numbers," http://www.kssos.org/elections/elections_registration_voterreg.asp, attached to Danjuma Decl. for the Court's convenience as Ex. M-4.

37.   The DPOC law led to a "significant" increase in the number of applicants placed on the suspense list at both the state and county levels "due to the applicants' failure to provide citizenship documents."  LEHMAN0000511, attached to Danjuma Decl. as Ex. K-1 (01/23/2014, Office of the Kansas Secretary of State Processing Instructions for CEOs) ("Since the proof-of-citizenship requirement of the SAFE Act went into effect on January 1, 2013, a significant number of records have been added to the Suspense file due to the applicants' failure to provide citizenship documents."); *see* LWVK-00001644, at 44, attached to Ahrens Decl. as Ex. N-8 (Ahrens Decl. attached to Danjuma Decl. as Ex. N) (11/16/2015, Email to Jill Quiqley from Rhonda Rudicel).

38.   244,699 voter registration applications were completed between January 1, 2013 and March 28, 2016.  Ex. E-1, 03/29/2016 Caskey Aff. ¶ 10.

39.   There were 1,744,866 total registered Kansas voters as of November 4, 2014.  Ex. E-1, 03/29/2016 Caskey Aff. ¶ 16.

40.   As of August, 2015, approximately 1,705,537 Kansans were registered to vote. *See* State of Kansas, Office of the Secretary of State, "2015 August (OFFICIAL) Voter

Registration   Numbers,"   http://www.kssos.org/elections/elections_registration_voterreg.asp, attached to Danjuma Decl. for the Court's convenience as Ex. M-3.

41.     As of March 28, 2016, at least 14,770 individuals were on the suspense list for failure to provide DPOC. Ex. F-2, 04/06/2016 Caskey Dep. Tr. 82:10-83:9; Ex. E-1, 03/29/2016 Caskey Aff. ¶ 15.

42.     As of March 23, 2016, 16,319 applications were canceled under K.A.R. § 7-23-15 for failure to provide DPOC.   Ex. F-2, 04/06/2016 Caskey Dep. Tr. 92:22-93:12; Ex. E-1, 03/29/2016 Caskey Aff. ¶ 10.

## V.     PARTIES

### A.     Individual Plaintiffs

43.     Plaintiff Steven Wayne Fish is a U.S. citizen, a resident of Kansas, and over eighteen years old.  Fish Decl. ¶¶ 2, 3, attached to Danjuma Decl. as Ex. G-1.

44.     Plaintiff Fish was born on the Chanute Air Force Base in the State of Illinois.  Ex. G-1, Fish Decl. ¶ 2

45.     In August, 2014, Plaintiff Fish applied to register to vote while renewing a Kansas driver's license at the DMV.  Ex. G-1, Fish Decl. ¶ 7.

46.     SOS's Election Voter Information System ("ELVIS") system recorded that Plaintiff Fish had not provided satisfactory evidence of citizenship.  Ex. Exhibit 24 to Fish Dep. ("Fish ELVIS record"), attached to Danjuma Decl. as Ex. H-1.

47.     The ELVIS system reflects that Plaintiff Fish's voter registration application was canceled for failure to provide DPOC. *Id.*

48.     Plaintiff Fish received a postcard from the County Clerk of Douglas County, Kansas, advising him that he needed to present DPOC in order to complete the voter registration

process.  Ex. G-1, Fish Decl. ¶ 9; Deposition of Steven Fish ("Fish Dep. Tr.") 39:12-17, attached to Danjuma Decl. as Ex. I-1.

49.     He searched through his files for his birth certificate and made efforts to look for the document at his stepfather's house but could not find it.  Ex. G-1, Fish Decl. ¶ 10; Ex. I-1, Fish Dep. Tr. 42:11-19, 53:22-54:12.

50.     Plaintiff Fish could not determine how to obtain a replacement birth certificate because the military base where he was born had been decommissioned.  Ex. G-1, Fish Decl. ¶ 10. Ex. I-1, Fish Dep. Tr. 54:13-25.

51.     In May 2016, Plaintiff Fish moved into his stepfather's house in order to save money.  Fish Suppl. Decl. ¶ 7, attached to Danjuma Decl. as Ex. G-2.

52.     During the move, he located a copy of his birth certificate that was issued when he was adopted by his stepfather as a young child.  *Id*.; Ex. I-1, Fish Dep. Tr. 31:24-32:4; *see also id*. 32:19-24; (testifying that the birth certificate "had been lost for quite a while [and] was finally located in a fire safe in my mom's old closet").

53.     The birth certificate had apparently been placed in the safe by Plaintiff Fish's mother who subsequently died of cancer before he had a chance to ask her where it was.  *Id*. 33:10-20

54.     Plaintiff Donna Bucci is a U.S. citizen, resident of Kansas and over eighteen years old.  Bucci Decl. ¶¶ 2, 3, attached to Danjuma Decl. as Ex. G-3.

55.     Plaintiff Bucci was born in the State of Maryland.  *Id*.; Ex. I-2, Bucci Dep. Tr. 14:22-24.

56.     Plaintiff Bucci applied to register to vote while renewing a Kansas driver's license at the DMV.  Ex. G-3, Bucci Decl. ¶¶ 5-7.

57.     The ELVIS system recorded that Plaintiff Bucci had not provided satisfactory evidence of citizenship.  Exhibit 12 to Bucci Dep. (Bucci ELVIS record), attached to Danjuma Decl. as Ex. H-2.

58.     The ELVIS system reflects that Plaintiff Bucci's voter registration application was canceled for failure to provide DPOC. *Id.*

59.     Plaintiff Bucci does not have a copy of her birth certificate or any other form of DPOC available.  Ex. G-3, Bucci Decl. ¶ 11; Ex. I-2, Bucci Dep. Tr. 42:13-23

60.     Plaintiff Bucci cannot afford the cost for a replacement birth certificate.  Ex. I-2, Bucci Dep. Tr. 42:24-43:3; 47:8-47:21 (testifying that Plainitiff Bucci cannot afford Starbucks coffee because she "only make[s] 27,000 a year" and "[e]very penny counts").

61.     Plaintiff Charles Stricker is a U.S. citizen, a resident of Kansas, and over eighteen years old.  Stricker Decl. ¶¶ 2, 3, attached to Danjuma Decl. as Ex. G-4.

62.     Plaintiff Stricker was born in the State of Missouri.  *Id.* at ¶ 2; Deposition of Charles Stricker ("Stricker Dep. Tr.") 32:12-14, attached to Danjuma Decl. as Ex. I-3.

63.     Plaintiff Stricker applied to register to vote while obtaining a Kansas driver's license at the DMV.  Ex. G-4, Stricker Decl. ¶¶ 6-8.

64.     The ELVIS system recorded that Plaintiff Stricker had not provided satisfactory evidence of citizenship.   Exhibit 17 to Stricker Dep. (Stricker ELVIS record), attached to Danjuma Decl. as Ex. H-3.

65.     The ELVIS system reflects that Plaintiff Stricker's voter registration application was canceled for failure to provide DPOC.  *Id.*

66.     Plaintiff Thomas Boynton is a U.S. citizen, a resident of Kansas, and over eighteen years old.  Boynton Decl. ¶¶ 3, 4, attached to Danjuma Decl. as Ex. G-5.

67.     Plaintiff Boynton was born in the State of Illinois.  *Id.* at ¶ 3; Boynton Dep. Tr. 22: 7-10, attached to Danjuma Decl. as Ex. I-4.

68.     Plaintiff Boynton applied to register to vote in Kansas. Exhibit 6 to Boynton Dep. (Boynton ELVIS record), attached to Danjuma Decl. as Ex. H-4.

69.     The ELVIS system recorded that Plaintiff Boynton had not provided satisfactory evidence of citizenship.  *Id.*

70.     The ELVIS system reflects that Plaintiff Boynton's voter registration application was canceled for failure to provide DPOC.  *Id.*

71.     Plaintiff Douglas Hutchinson is a U.S. citizen, a resident of Kansas, and over eighteen years old.  Hutchinson Decl. ¶¶ 2, 3, attached to Danjuma Decl. as Ex. G-6.

72.     Plaintiff Hutchinson was born in the State of Colorado.  *Id.* at ¶ 2.

73.     Plaintiff Hutchinson moved to Kansas as an infant and has lived in Kansas throughout his adult life.  *Id.* at ¶ 4.

74.     Plaintiff Hutchinson applied to register to vote while renewing a Kansas driver's license at the DMV.  *Id.* at ¶ 10.

75.     The ELVIS system recorded that Plaintiff Hutchinson had not provided satisfactory evidence of citizenship.  Exhibit 7 to Hutchinson Dep. (Hutchinson ELVIS record), attached to Danjuma Decl. as Ex. H-5.

76.     The ELVIS system reflects that Plaintiff Hutchinson's voter registration application was canceled for failure to provide DPOC.  *Id.*

**B.     Organizational Plaintiff**

77.     Plaintiff League of Women Voters of Kansas (the "League") is a nonpartisan, volunteer, community-based organization that, for more than 90 years, has encouraged informed and active participation of citizens in government and worked to influence public policy through

education and advocacy.  LWVK-00000210-213, attached to Ahrens Decl. as Ex. N-3 (Statement of Marge Ahrens, Co-President of the League, to the Kansas Commission on Civil Rights describing League); LWVK-00000084-85, attached to Ahrens Decl. as Ex. N-1 (League mission document noting that League works to "[i]nform citizens about public policy issues relevant at local, state and national levels" and "[a]ssist Kansans in Registering to Vote").  The League's primary mission is to "encourage [voter registration applicants] to complete their registration so they can vote."  Ahrens Dep. Tr. 205:11-206:1, attached to Danjuma Decl. as Ex. J; *see also id.* 24:19-25:19 (testifying that "bringing people into the voting process by assisting them with their voter registrations" is "philosophically at the core of our existence"); *id.* 58:4-59:3 (noting League's "mission is to attempt to get people fully registered to vote to participate in – in representative government"); 170:12-18 (agreeing that the League's "objective is to ensure that people complete the process and become fully registered to vote").

78.    Founded 95 years ago, the League is active throughout Kansas, with nine local affiliates and more than 800 members.  *See* Ex. J, Ahrens Dep. Tr. 14:6-16; 55:24-56:16.  The League is separately incorporated but affiliated with the League of Women Voters of the United States.  *Id.* 13:24-14:5; 21:8-15.

79.    The number of individuals the League has successfully registered has declined since the DPOC law went into effect.  LWVK-0015749, attached to Ahrens Decl. as Ex. N-10 (email from Carol Neal to Marge Ahrens noting that registration dropped significantly for the League after DPOC went into effect; registration for the League went from 4,000 the year prior to DPOC law going into effect to 400 in the year the law was implemented); LWVK-0015750, attached to Ahrens Decl. as Ex. N-11 (email from Carol Neal to Marge Ahrens regarding registration in Emporia dropping by at least 75% after the DPOC law went into effect); Ex. N-3,

LWVK-00000210-213 (statement to the Kansas Commission on Civil Rights from Marge Ahrens regarding a significant drop in registered Kansas voters since the DPOC law).

80.     The DPOC Law "directly" affects the League's "work, [its] mission and [its] members."  Ex. J, Ahrens Dep. Tr. 222:20-223:16.

81.     The League holds voter registration drives at various locations including schools, libraries, churches and community events.  LWVK-00000580, attached to Ahrens Decl. as Ex. N-6 (email discussing the League's plan for a drive at a high school); LWVK-00000880 (email discussing setting up voter registration at an Art in the Park and other public events), attached to Ahrens Decl. as Ex. N-7; LWVK-00000167-176, attached to Ahrens Decl. as Ex. N-4 (Lawrence-Douglas County League bulleting discussing registration event at Farmers' Market and upcoming registration events at public library and other community events); Ex. N-3, LWVK-00000210-213 (statement to the Kansas Commission on Civil Rights from Marge Ahrens noting that Leagues has registered voters "at public libraries, churches, community centers and naturalization ceremonies").

82.     Voters often do not arrive at voter registration drives with DPOC and, as a result, the League's work has become increasingly demanding, Ex. J, Ahrens Dep. Tr. 169:19-170:11, because one of the League's main objectives is to "encourage [voter registration applicants] to complete their registration so they can vote."  *Id*. 205:11-206:1.

83.     Once the DPOC law came into effect, the League "worried [about] and researched the issue of protecting [its] members . . . as well as the public" with respect to handling the requisite citizenship documents.  *Id*. 26:16-27:17.

84.     With respect to its members, the DPOC law was a "direct offense" against the League's practices given the League's concern for protecting volunteer members from potential issues due to improperly handling or copying other people's personal documents.  *Id.* 27:13-17.

85.     In addition, the DPOC law hindered the League's mission "[b]ecause of the large numbers of persons who registered or believe[d] they registered" but in fact, due to "the impact of the safe act," were on the suspense list.  *Id.* 58:4-59:3.

86.     As a result, the League has had to divert its focus away from other initiatives, such as taxation, public education funding, and juvenile justice, in order to focus on road blocks to voting.  *Id.* 91:6-24, 92:8-93:14.

87.     This focus has become a "multi-year policy and priority shift" over the course of three years, which entailed "directing resources, conducting policy discussions, and collecting data from local leagues."  *Id.* 92:8-93:14.

88.     The League will continue to invest more time and resources into helping people register to vote due to the DPOC law.  *Id.* 169:19-170:11 (testifying that the League's work has "gone from five minutes to help someone to register to vote in Kansas to an hour per person" because of the complicated and confusing contours of the DPOC Law); *see also id.* 199:20-200:10 (testifying that the League will, "to the best of [its] volunteer power … continue to try to reach [] voters and inform them" of the DPOC requirement).

89.     The League has spent "thousands of hours" of volunteer time on election law and DPOC issues surrounding voter registration.  *Id.* 183:9-19.

90.     For example, the League has "devoted countless hours to contacting a large number of the tens of thousands of voters on the suspense list and attempting to help them satisfy the DPOC Law."  Pl. LWVK Answers and Objections to Def. Jordan's Second Interrogs. to Pl.

("LWVK Resps. to 2nd Rogs") at 3, attached to Danjuma Decl. as Ex. O; *see also* LWVKID000001, at 8-20, attached to Ahrens Decl. as Ex. N-12; LWVK-00000116-119, attached to Ahrens Decl. as Ex. N-5 (Board minutes discussing plans to attack the suspense list); LWVK-0000091-95, attached to Ahrens Decl. as Ex. N-2 (Lawrence-Douglas County League's procedure for contacting voters "in suspense" to assist them in satisfying DPOC requirement).

91.     The League has also spent a considerable amount of member resources and money to understand the DPOC law, to develop policies to mitigate risks associated with handling DPOC, and to "explain it so that citizens could still participate in the law." Ex. J, Ahrens Dep. Tr. 28:11-29:6.

92.     For example, the League used $5,500 to produce a flier to educate the public about Kansas voter requirements in light of Defendant's implementation of the DPOC law, and it expended additional resources in mailing the fliers. *Id*. 33:10-34:25; *see also id.* 37:19-38:8; 112:4-9; *see also* Ex. N-12, LWVKID000001, at 8-20.

### C.     Defendant

93.     Defendant Kobach is the Chief Election Officer for the State of Kansas. *See* Answers and Defenses of Def. Kris Kobach, Doc. No. 141, at 2 ¶¶ 24-25.

## VI.     PURPORTED NON-CITIZEN REGISTRATIONS

94.     Defendant Kobach has cited reports of a "Muslim lady" who allegedly double voted in Wichita, "members of the Somali refugee community in the North Kansas City area," and "alien votes" by "hog farming" workers who were allegedly bussed in from Oklahoma to vote illegally in Kansas, as evidence of the threat of noncitizens voting. *See* Duane Schrag, *Voter Fraud Claims Prove Elusive*, Salina Journal, June 18, 2009 ("Salina Journal"), attached to Danjuma Decl. as Ex. M-1; U.S. House of Representatives, Committee on Oversight and Government Reform, *Hearing on "The President's Executive Actions on Immigration and Their*

*Impact on State and Local Elections,"* Testimony of Kris W. Kobach, Kansas Secretary of State, February 12, 2015 ("OGR Comm. Testimony"), attached to Danjuma Decl. as Ex. C-2; https://oversight.house.gov/wp-content/uploads/2015/02/Kobach-Testimony-House-OGR-21215.pdf.

95.     Defendant Kobach has also produced a spreadsheet (the "Lehman Spreadsheet") maintained by Tabitha Lehman, a Sedgwick County election official, which purports to identify instances of noncitizens being registered and noncitizens submitting voter registration applications in Sedgwick County.   Lehman Decl. (Prelim. Inj. Hr'g Ex. 8) ("Lehman Spreadsheet"), attached to Danjuma Decl. as Ex. M-2.

96.     Ms. Lehman testified that the Lehman Spreadsheet contains information collected by other people in her office and that she did not personally discover the purported instances of noncitizens being registered and submitting applications.  Perm. Inj. Hr'g Tr. 101:11-22, *Brown v. Kobach*, No. 16-CV-550 (Kan. Dist. Ct. Sept. 21, 2016), attached to Danjuma Decl. D-2.

97.     The Lehman Spreadsheet identifies 11 purported instances of noncitizens who were registered to vote between 2003 and 2010. Lehman Spreadsheet.   Ex. M-2, Lehman Spreadsheet.

98.     The Lehman Spreadsheet also shows that, of the 11 purported instances of noncitizens who were registered to vote, eight never voted.  *Id.*

99.     The Lehman Spreadsheet further identifies 14 purported instances of noncitizens who submitted voter registration applications between 2013 and 2016.  *Id.*

100.    These 25 recorded instances where noncitizens purportedly were registered to vote or submitted voter registration applications represent approximately 0.0092% of the

270,801 registered voters in Sedgwick County as of August 2015. *See* Ex. M-3, 2015 August (OFFICIAL) Voter Registration Numbers.

101.    Of those 25 individuals, three—approximately 0.0011% of the total registered voters in the county—voted in an election. *Id.*

102.    Bryan Caskey testified that, beyond the information compiled by Ms. Lehman, SOS has identified 19 other purported instances of noncitizens who were registered to vote. Ex. E-1, 03/29/2016 Caskey Aff. ¶ 28.

103.    These 44 recorded instances where noncitizens purportedly were registered to vote or submitted voter registration applications represent approximately 0.0026% of the 1,705,537 total registered voters in Kansas as of August 2015. *See* Ex. M-3, 2015 August (OFFICIAL) Voter Registration Numbers. SOS has not identified other instances of noncitizens who purportedly were registered to vote or submitted voter registration applications.

104.    The Lehman Spreadsheet does not indicate that any of the alleged instances of noncitizens being registered or submitting voter registration applications on the spreadsheet resulted in a court finding of fraudulent activity. Ex. D-1, PI Hr'g Tr. 104:3-8, 125:23-24.

105.    In the five years preceding January 2011, "Kansans . . . cast over <u>10 million ballots</u> in elections." LWVK-00002006, attached to Ahrens Decl. as Ex. N-9 (January 18, 2011 press packet) (emphasis in original).

106.    Between 1997 and 2012, one instance of a noncitizen registration and vote was prosecuted in Kansas. Kobach Responses to Plaintiffs' First Request for Production, Bates 761-765 ("SOS Spreadsheet"), attached to Danjuma Decl. as Ex. L-2, at 2**.**

107.    The defendant in this prosecution was granted a diversion.[2] *Id.*

108.    On July 1, 2015, Defendant Kobach was granted authority to bring criminal prosecutions for violations of Kansas election laws, including against noncitizens for attempts at illegal registration or illegal voting.  Ex. D-1, PI Hr'g Tr. 77:8-17.

109.    Between July 1, 2015, and June 21, 2016, Defendant Kobach has not brought charges against a noncitizen for illegal registration and/or voting.  *See* Ex. L-1, Kobach Resps. to 1st RFAs, ¶ 58 (admitting that none of the criminal cases brought by Defendant involve a noncitizen); *see also* Ex. D-1, PI Hr'g Tr. 78:8-17 (Kobach testifying that there have been no prosecutions of noncitizens).

110.    On June 18, 2013, following the Supreme Court's decision in *Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247 (2013) ("*ITCA*"), Defendant sent a letter to the U.S. Election Assistance Commission ("EAC") renewing a request that the agency modify the Federal Form to incorporate a DPOC requirement.  Alice P. Miller, U.S. Election Assistance Comm'n, *Memorandum of Decision Concerning State Requests to Include Additional Proof-of-Citizenship Instructions on the National Mail Voter Registration Form*, Jan. 17, 2014 (hereinafter "Miller Memo"), 4 http://www.eac.gov/assets/1/Documents/20140117%20EAC%20Final%20Decision%20on%20Proof%20of%20Citizenship%20Requests%20-%20FINAL.pdf, attached to the Danjuma Decl. for the Court's convenience as Ex. M-5.

111.    On January 17, 2014, the EAC issued a final decision denying Defendant's request.  *Id.* at 45.

---

[2] Between 1997 and 2012, eight of 235 incidents of purported election crimes led to convictions—seven for double voting and one for electioneering.  Ex. L-2.

112.    The agency concluded that a DPOC requirement was not necessary for election officials to assess whether a voter registration applicant was a qualified citizen and that the Federal Form's attestation of citizenship was a sufficient means for Kansas to enforce its citizenship qualification.  *Id*. at 28.

113.    The EAC observed that "Kansas's evidence at most suggests that 21 of 1,762,330 registered voters, approximately 0.001 percent, were unlawfully registered noncitizens around the time its new proof-of-citizenship requirement took effect."  *Id*. at 34.  It noted that a DPOC requirement was unnecessary because "[b]y any measure, these percentages are exceedingly small" and that "the administration of elections, like all other complex functions performed by human beings, can never be completely free of human error."  The EAC also noted that Kansas had various alternative means for preventing noncitizens from registering to vote.  *Id*. at 34-35.

114.    The EAC further concluded that Kansas had several alternatives to requiring DPOC, including: (1) deterring fraud by prosecuting cases where noncitizens have voted; (2) cross-referencing the records of prospective registrants with the proof-of-citizenship documents retained by DMVs; (3) examining prospective jurors' representation of their citizenship when being considered for jury duty; (4) cross-referencing the federal Systematic Alien Verification for Entitlements ("SAVE") database, which stores information regarding noncitizen residents in the United States; and (5) verifying birth data via the Electronic Verification of Vital Events system promulgated by the National Association for Public Health Statistics and Information Systems.  *Id*. at 36-41.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit . . . will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also id.* at 249-50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (citations omitted)). When "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted); *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

Judgment as a matter of law on this motion is warranted because the undisputed facts establish that the DPOC regime violates the Fourteenth Amendment.

## ARGUMENT

## I.    PLAINTIFFS HAVE STANDING FOR THEIR CLAIMS.

There is no genuine dispute that Plaintiffs have standing to bring their claims. "Standing requires that plaintiffs have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Fish v. Kobach*, 840 F.3d 710, 717 n.5 (10th Cir. 2016) ("*Fish II*") (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). "Standing must be analyzed from the facts as they existed at the time the complaint was filed." *Tandy v. City of Wichita*, 380 F.3d 1277, 1284 (10th Cir. 2004) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000)). If one plaintiff is determined to have standing, it is unnecessary to analyze the other plaintiffs' standing. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S.

24

252, 264 & n.9 (1977) ("[Because] we have at least one individual plaintiff who has demonstrated standing . . . , we need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit.").

The uncontroverted facts establish that the Individual Plaintiffs, all of whom were born out-of-state, were prevented from registering to vote at the time the complaint was filed and were blocked as a result of the discriminatory DPOC regime.[3] This injury confers on the Individual Plaintiffs the standing to challenge the DPOC requirement as unconstitutionally burdening their right to travel.  Because all of the Individual Plaintiffs (1) are eligible to vote; (2) applied to register to vote; and (3) were not registered due to the DPOC requirement, the Individual Plaintiffs have standing.[4]

There is also no genuine dispute that the League has standing to challenge the DPOC law. An organization has standing where, as here, the defendant's conduct has "perceptibly impaired" an organization's ability to accomplish its primary goals and activities.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Colo. Taxpayers Union, Inc. v. Romer*, 963 F.2d 1394, 1397 (10th Cir. 1992) (observing that *Havens* Court found organizational standing where "defendant's allegedly unlawful conduct could be tied directly to a concrete harm inflicted upon the primary activity of the plaintiff organization"). The DPOC regime "perceptively impair[s]" the League in at least two ways.  *Id.*

---

[3] Plaintiffs' Statement of Uncontroverted Facts ("SOF") ¶¶ 43-53 (Fish); ¶¶ 54-60 (Bucci); ¶¶ 61-65 (Stricker); ¶¶ 66-70 (Boynton); ¶¶ 71-76 (Hutchinson).

[4] Indeed, the Tenth Circuit has already concluded that the Individual Plaintiffs have standing to challenge the DPOC requirement with respect to Plaintiffs' other claims.  *See Fish II*, 840 F.3d at 716 n.5 (in affirming this Court's grant of a preliminary injunction, stating "[w]e are confident on the current record that [the Individual Plaintiffs] have standing to sue.").

25

*First*, the DPOC law indisputably impairs the League's primary mission to "encourage [voter registration applicants] to complete their registration so they can vote." SOF ¶ 77.  The DPOC regime raises significant barriers to voter registration that have prevented numerous eligible Kansans from completing their voter registration, simply because they were born out-of-state.  SOF ¶¶ 41-42, 81-85, 88.  These "new obstacles unquestionably make it more difficult for the League[] to accomplish [its] primary mission of registering voters," which establishes "injury for purposes … of standing."  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).  *See also* SOF ¶ 77. Indeed, since the DPOC law went into effect, the number of individuals whom the League has successfully registered has plummeted.  SOF ¶ 79.

*Second*, the uncontested facts show that the League has had to divert ever more resources into its registration activities to respond to the negative effects caused by the DPOC regime hindering so many citizens from becoming registered, leaving little time or resources for other priorities.  SOF ¶¶ 82, 86, 88-92-; *see also Arcia v. Fl. Sec. of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) (holding that organizational plaintiffs satisfied standing requirements by demonstrating that they diverted resources from other initiatives to combat challenged programs).  In particular, the League has had to "devote[] countless hours to contacting a large number of the tens of thousands of voters on the suspense list and attempting to help them satisfy the DPOC law."  SOF ¶ 90; *see also* SOF ¶ 41 (as of March 28, 2016, at least 14,770 individuals were on the suspense list for failure to provide DPOC). This increased demand on the League's resources aimed at registering individuals who would be registered but for the DPOC regime has injured the League by draining resources and attention from other core objectives, including initiatives in areas such as taxation, public education funding, and juvenile justice.  SOF ¶¶ 86-87.

## II.   THE DPOC REGIME VIOLATES THE FOURTEENTH AMENDMENT BY DISCRIMINATING AGAINST INTERSTATE MIGRANTS TO KANSAS.

The DPOC regime is unconstitutional because it discriminates against certain voter registration applicants based on whether they were born in Kansas and when they moved from other states.  But the Fourteenth Amendment requires that citizens who resettle in another state be treated on equal footing with established residents, and does not permit this type of discrimination.  In particular, the ability to vote in one's new state of residence is a crucial, defining right of state citizenship.  The DPOC law presents a barrier to the exercise of that right—one that, as the Tenth Circuit stated, has already caused a "mass denial of a fundamental constitutional right."  *Fish II*, 840 F.3d at 755.

That barrier is unconstitutional because the DPOC requirement is selectively applied to residents who have migrated to Kansas from other the states.  Established residents are afforded preferable treatment and exempted from the burden of complying with the law in at least two ways:  *First*, Defendant Kobach's Birth Link MOU establishes an unconstitutional in-state birth preference for voter registration.  Citizens who were born outside of Kansas must locate and produce DPOC in order to be permitted to vote.  But that burden is effectively waived for those born in Kansas because Defendant Kobach independently verifies citizenship documentation on file with KDHE, which only maintains records for those born within the state.  *Second*, the DPOC law's 2013 Exemption treats all previously registered residents as of January 1, 2013 as having satisfied the DPOC requirement; newcomers, however, are segregated into a secondary class of voters who must affirmatively comply with the law.

### A.   The Constitution Protects a Fundamental Right to Travel.

The Privileges or Immunities Clause of the Fourteenth Amendment protects the right to travel, which includes the right to become a resident of a new state and to be treated equally

27

alongside existing residents of that state.  *Saenz v. Roe*, 526 U.S. 489, 500 (1999).  The principle that U.S. citizens may freely move to another state and enjoy the same rights as other residents is a bedrock foundation of our constitutional structure.  The right to travel represents more than physical transit; it "occupies a position fundamental to the concept of our Federal Union" and "has long been recognized as a basic right under the Constitution."  *United States v. Guest*, 383 U.S. 745, 757-58 (1966); *see id.* at 758 ("a right so elementary was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created").[5]  The Supreme Court has emphasized that the right to travel stands for the broader national principle that "[f]or all the great purposes for which the Federal government was formed, we are one people, with one common country."  *Shapiro v. Thompson*, 394 U.S. 618, 630 (1969) (quoting *Passenger Cases*, 7 How. 283, 492 (1849)).  The Civil War Amendments to the Constitution restated and elevated this principle of national unity.  "The Fourteenth Amendment, like the Constitution itself, was . . . 'framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division.'"  *Saenz*, 526 U.S. at 511 (quoting *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523 (1935) (Cardozo, J.)).

### 1.    The Right to Travel Encompasses the Right to Be Treated Equally After Moving to Another State.

This principle of national unity depends upon equality of treatment for those who move and resettle in a new state.  In *Saenz v. Roe*, the Supreme Court comprehensively analyzed the contours of the right:

---

[5] *Cf. also Paul v. Virginia*, 75 U.S. 168, 180 (1868) ("Indeed, without some provision of the kind removing from the citizens of each State the disabilities of alienage in the other States, and giving them equality of privilege with citizens of those States, the Republic would have constituted little more than a league of States; it would not have constituted the Union which now exists.").

> The "right to travel" discussed in our cases embraces at least three different components. It protects the right of a citizen of one State to enter and to leave another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, f*or those travelers who elect to become permanent residents, the right to be treated like other citizens of that State*.

526 U.S. at 500 (emphasis added).[6]  The Supreme Court has consistently affirmed "this third aspect of the right to travel—the right of the newly arrived citizen to the same privileges and immunities enjoyed by other citizens of the same State." *Id*. at 502.  Thus, the right to travel precludes not only "actual barriers to interstate migration" but also "'being treated differently'" due to one's migration from another state.  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 277 (1993) (quoting *Zobel v. Williams*, 457 U.S. 55, 60 n.6 (1982)).

Equality of treatment means equality among residents of a state regardless of whether or when they moved from a different state.  That is because the Constitution defines state citizenship in terms of residency.  The Fourteenth Amendment provides:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are *citizens* of the United States and *of the State wherein they reside*. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; . . . .

---

[6] Prior to *Saenz*, Supreme Court cases have analyzed the right to travel under diverse constitutional provisions including the Equal Protection Clause, the Commerce Clause, or as implied from the overall structure of the Constitution.  *See Attorney Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 902 (1986) ("The textual source of the constitutional right to travel, or, more precisely, the right of free interstate migration . . . has proved elusive. . . . However, in light of the unquestioned historic acceptance of the principle of free interstate migration . . . we have not felt impelled to locate this right definitively in any particular constitutional provision.").  *Saenz* synthesized and consolidated earlier precedent by locating the third aspect of the right to travel within the Privileges or Immunities Clause of the Fourteenth Amendment.  *See* 526 U.S. 504-05; *see also id*. at 500  ("The debate about the appropriate standard of review . . . persuades us that it will be useful to focus on the source of the constitutional right on which respondents rely.").

U.S. Const., Amdt. 14, § 1 (emphasis added).[7]  An individual claims equal state citizenship

through the act of establishing residency.  *See Zobel*, 457 U.S. at 69 ("[T]he Citizenship Clause

of the Fourteenth Amendment expressly equates citizenship only with simple residence.").  As

the Supreme Court noted in *Saenz*, the earliest interpretations of the Privileges or Immunities

Clause in the seminal *Slaughter-House Cases* were unified in understanding that "a citizen of the

United States can, of his own volition, become a citizen of any State of the Union by a *bonâ fide*

residence therein, with the same rights as other citizens of that State."  *Saenz*, 526 U.S. at 503

(quoting *Slaughter-House Cases*, 83 U.S. 36, 80 (1872)).  This liberty lies at the foundation of

our government:

> The States have not now, if they ever had, any power to restrict their citizenship
> to any classes or persons.  A citizen of the United States has a perfect
> constitutional right to go to and reside in any State he chooses, and to claim
> citizenship therein, and an equality of rights with every other citizen; and the
> whole power of the nation is pledged to sustain him in that right.  He is not bound
> to cringe to any superior, or to pray for any act of grace, as a means of enjoying
> all the rights and privileges enjoyed by other citizens.

*Id.* at 503-504 (quoting *Slaughter-House Cases*, 83 U.S. at 112-113 (Bradley, J., dissenting)).

Consistent with this principle, the Supreme Court has repeatedly deemed unconstitutional

state laws and regulations that favor certain established residents or impose particular burdens on

interstate migrants.  *See*, *e.g.*, *Saenz*, 526 U.S. at 511 (striking down statute limiting welfare

benefits during an individual's first year of California residence to amounts available in prior

---

[7] The Citizenship and Privileges or Immunities clauses of the Fourteenth Amendment abrogated
the Supreme Court's decision in *Dred Scott v. Sandford*, 60 U.S. 393, 396 (1856), which held
that African Americans could not be considered citizens of the United States or any state.  *Dred
Scott* had warned that extending citizenship to free blacks "would give to persons of the negro
race, who were recognized as citizens in any one State of the Union, the right to enter every other
State whenever they pleased" and enjoy all the rights afforded other citizens.  *Id.* at 393.  The
Fourteenth Amendment was adopted to repudiate *Dred Scott* and guarantee that all persons born
in the United States, including free and emancipated African Americans, may claim national
citizenship and citizenship of the state where they reside.  *See Saenz*, 526 U.S. at 502 n.15.

state of residence); *Soto-Lopez*, 476 U.S. at 912 (striking down state constitutional provision granting civil service employment preference to residents who had lived in New York when they entered military service); *Hooper v. Bernalillo Cty. Assessor*, 472 U.S. 612, 624 (1985) (striking down tax exemption for military veterans who resided in New Mexico before statute's 1976 effective date); *Zobel*, 457 U.S. at 65 (striking down statutory scheme distributing income to individuals based on the date they became residents of Alaska); *Mem'l Hosp. v. Maricopa Cty.*, 415 U.S. 250, 270 (1974) (striking down statute requiring one year of Arizona residence before indigents would become eligible for free nonemergency medical care); *Dunn v. Blumstein*, 405 U.S. 330, 360 (1972) (striking down Tennessee's one-year residency requirement before a citizen would become eligible to register to vote); *Shapiro*, 349 U.S. at 642 (striking down one-year residency requirements for accessing welfare benefits).

Apart from adopting limited regulations to ensure that a newcomer is in fact a bona fide resident,[8] states are prohibited from making distinctions that deny migrants the full benefits of state citizenship.  Excluding newer residents from preferences granted to established ones is barred because the Constitution "does not provide for, and does not allow for, degrees of citizenship based on length of residence."  *Zobel*, 457 U.S. at 69.  "Citizens of the United States, whether rich or poor, have the right to choose to be citizens of the State wherein they reside . . . [but] [t]he States . . . do not have any right to select their citizens."  *Saenz*, 526 U.S. at 510–11 (internal quotation marks and citation omitted).

Critically, a law or policy runs afoul of the right to travel if it subjects interstate migrants to differential treatment, regardless of whether or not that effect was the challenged policy's goal

_____

[8] The Supreme Court has clarified that, as to certain "readily portable benefit[s]," *Saenz*, 526 U.S. at 505, like in-state college tuition and divorce decrees, states may implement durational residency requirements designed to determine whether new arrivals are indeed bona fide residents who "inten[d] to remain in the State[.]"  *Sosna v. Iowa*, 419 U.S. 393, 407 (1975).

and whether or not other citizens are actually deterred from moving to the state.  Discriminatory

animus is not required.  "A state law implicates the right to travel when it actually deters such

travel, . . . when impeding travel is its primary objective, . . . *or* when it uses any classification

which serves to penalize the exercise of that right."  *Soto-Lopez*, 476 U.S. at 903 (emphasis

added) (internal quotation marks and citation omitted).  As the Supreme Court has observed,

"right-to-migrate cases have principally involved the *latter, indirect* manner of burdening the

right."  *Id*. (emphasis added).  Thus, "a classification that *ha[s] the effect* of imposing a penalty

on the exercise of the right to travel violate[s]" the Constitution absent a compelling

governmental interest.  *Saenz*, 526 U.S. at 499 (emphasis added).[9]  This is in part because the

Supreme Court recognizes that the right to travel has a structural role in ensuring national unity

and freedom of movement and therefore unintended effects may be just as damaging as an

improper purpose.  "[S]ince the right to travel embraces the citizen's right to be treated equally

in her new State of residence, the discriminatory classification is itself a penalty."  *Saenz*, 526

U.S. at 505.

> **2.     State Laws and Policies that Restrict the Right to Travel by
> Discriminating Against Interstate Migrants—Particularly in the
> Context of Voting—Are Subject to Strict Scrutiny.**

---

[9] Discriminatory intent is therefore not a required element of a claim in this context.  *See, e.g.*,
*Saenz*, 526 at 506-7 (holding that, even if California's residency restriction for welfare benefits
was not motivated by a desire to "fence out the indigent," the state's nondiscriminatory
rationales were insufficient to justify unequal treatment); *Soto-Lopez*, 476 U.S. at 903 ("More
particularly, our recent cases have dealt with state laws that, by classifying residents according to
the time they established residence, *resulted in* the unequal distribution of rights and benefits
among otherwise qualified bona fide residents.") (emphasis added).  Similarly, evidence that the
challenged law or practice has actually deterred interstate migration is unnecessary to establish a
violation.  *See Mem'l Hosp.*, 415 U.S. at 257 (striking down law infringing on the freedom to
migrate even though "there [was] no evidence in the record . . . that anyone was actually deterred
from traveling by the challenged restriction"); *see also Dunn*, 405 U.S. at 339 ("It is irrelevant
whether disenfranchisement or denial of welfare is the more potent deterrent to travel.").

Strict scrutiny is appropriate where, as here, a challenged law or practice inequitably impacts out-of-state migrants.  And strict scrutiny is doubly warranted where, as here, the challenged law or practice restricts the right to vote.

The Supreme Court regards classifications favoring established residents over out-of-state migrants as inherently suspect.  The line of cases beginning with *Shapiro v. Thompson*, 394 U.S. 618 (1969), and culminating in *Saenz* struck down durational residency requirements for welfare benefits on the grounds that they interfered with the right to travel.  *Shapiro* acknowledged the state had "admittedly permissible state objectives" for restricting welfare benefits but "reject[ed the] argument that a mere showing of a rational relationship . . . will suffice" given the suspect nature of the classification.  394 U.S. at 634.  "[I]n moving from State to State . . . appellees were exercising a constitutional right, and any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional."  *Id*.  Thirty years later, *Saenz* went even further, holding that the "appropriate standard" of review under the Privileges or Immunities Clause "may be *more* categorical than that articulated in *Shapiro* . . . but it is surely no less strict."  526 U.S. at 504 (emphasis added); *see also id.* (observing that "[n]either mere rationality nor some intermediate standard of review should be used").

Strict scrutiny is further necessary here, in the context of a restriction that implicates a fundamental right such as the right to vote.  The right to vote is "a fundamental political right . . . preservative of all rights."  *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).  Laws that restrict who may register and access the franchise must therefore meet heightened constitutional scrutiny.  *See Dunn*, 405 U.S. at 336; *see also*, *e.g.*, *Evans v. Cornman*, 398 U.S. 419, 422 (1970) (applying "close constitutional scrutiny" to "election laws . . . [that] deny the[] the right to vote"); *Kramer*

33

*v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 630 (1969) (observing that "election in which

only some resident citizens were entitled to vote . . . would . . . call[] for our close review");

*Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966) (strict scrutiny applies when any

law "makes the affluence of the voter or payment of any fee an electoral standard.").

     Supreme Court precedent firmly establishes that a state cannot inequitably burden the

voting rights of bona fide residents who have moved from other states.  The Supreme Court's

analysis in *Dunn v. Blumstein* is particularly instructive because it emphasized the two

independent bases for strict scrutiny in the specific context of a law affecting the right to travel

and the right to vote.  In *Dunn*, the Court struck down a one-year residency requirement for

registration on the grounds that "[d]urational residence laws penalize those persons who have

traveled from one place to another to establish a new residence during the qualifying period."

405 U.S. 330, 360 (1972).  As the Court explained, every "citizen has a constitutionally protected

right to participate in elections on an equal basis with other citizens in the jurisdiction," *id.* at

336,[10] but "laws [that] divide residents into two classes, old residents and new residents . . .

discriminate against the latter to the extent of totally denying them the opportunity to vote."  *Id.*

at 334–35.  The Court concluded that a durational residency requirement is subject to strict

---

[10] Although the Supreme Court maintains that the personal "rights of voters are fundamental," it
has sometimes applied a more flexible balancing test to evaluate "reasonable, nondiscriminatory
restrictions" in election administration.  *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).  In
*Crawford v. Marion County Election Board*, the Court upheld an Indiana voter ID requirement at
the polls against a facial challenge on the grounds that the law appeared to be "a neutral,
nondiscriminatory regulation of voting procedure."  553 U.S. 181, 203 (2008).  Such a balancing
analysis would be misplaced in this case because the DPOC law is not "a generally-applicable
and evenhanded restriction[.]"  *Anderson*, 460 U.S. at 788 n.9; *cf. also Crawford*, 553 U.S. at
205 ("Ordinary and widespread burdens, such as those requiring 'nominal effort' of everyone,
are not severe.") (Scalia, J., concurring).  All voters were required to comply with the generally
applicable voter ID law considered in *Crawford*.  That contrasts with the DPOC regime which is
selectively enforced and exempts certain classes of established residents.  *See infra*, § II.B.

scrutiny because it implicates both a fundamental right— *i.e.*, "the opportunity to vote"—and an improper "classification (recent interstate travel)." *Id.* at 335.

Thus, "if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest," *i.e.*, that the law satisfied strict scrutiny. *Kramer*, 395 U.S. at 627; *see also Mixon v. State of Ohio*, 193 F.3d 389, 402 (6th Cir. 1999) ("strict scrutiny" applies "[i]f the challenged legislation grants the right to vote to some residents while denying the vote to others").

**B.     Defendant's DPOC Regime Establishes an Unconstitutional Voter Registration System that Favors Native-born Kansans and Imposes Particular Burdens on Interstate Migrants.**

Two aspects of Defendant's DPOC regime run directly afoul of the right to travel protected by the Constitution. *First*, the DPOC Law and the Birth Link MOU together form a system in which the DPOC requirement is, in effect, enforced almost exclusively against individuals born outside Kansas. Although the DPOC law, by its terms, ostensibly requires every voter registration applicant to produce DPOC, Kansas natives who do not comply can still be automatically registered simply by virtue of the fact that they were born in-state. The result is that the DPOC requirement is directed at citizens migrating to Kansas from elsewhere, who must "face[] . . . [the] confusing and inconsistently-enforced maze of requirements under the new DPOC law." *Fish I*, 2016 WL 2866195 at *28. That inequity violates "the citizen's right to be treated equally in her new State of residence[.]" *Saenz*, 526 U.S. at 505. Indeed, the discriminatory operation of the DPOC law is no accident, but rather the direct result of Defendant's explicit intent to favor Kansas-born residents and provide them a benefit that interstate migrants are excluded from receiving. *Second*, the DPOC regime applies only to

people registering to vote for the first time after January 1, 2013; by its plain terms it discriminates in favor of established residents who registered prior to that date, requiring only that newer registrants (who were born out-of-state) submit citizenship documents in order to become registered to vote.

     **1.**     **The DPOC Regime impermissibly discriminates against migrants based on their state of birth.**

     The DPOC regime discriminates in violation of the right to travel because being born in Kansas is treated as equivalent to satisfying the DPOC law.  SOF ¶ 24.  Pursuant to the Birth Link MOU, each month SOS sends KDHE a list of the voter registration applicants who have been suspended for failure to provide DPOC to see if "there is proof that there's a Kansas birth certificate on file."  SOF ¶ 25.  But the Birth Link MOU's "Limitations and Caveats" section expressly acknowledges that "[t]he Kansas [Office of Vital Statistics] maintains records only on Kansas vital events occurring in the State of Kansas."  SOF ¶ 29.  Defendant's policy of cross-referencing suspended applications with KDHE—but not with comparable out-of-state agencies—means that the DPOC requirements is effectively waived for voter registration applicants who were in Kansas at birth, and ensures they will be registered regardless of whether they themselves submit DPOC with their voter registration applications.  *Id*.  The burden is placed on out-of-state migrants to submit DPOC in order to become registered to vote.  That is unconstitutionally discriminatory.

     The situations of the Individual Plaintiffs in this case—none of whom were born in Kansas, and therefore did not benefit from the Birth Link MOU—demonstrate the discriminatory nature of the DPOC regime as Defendant has implemented it.  For example, Mr. Hutchinson was born in Colorado Springs, Colorado but moved to Kansas as an infant and has lived in-state for his entire adult life.  SOF ¶¶ 71-73.  Under Defendant's Policy, if Mr. Hutchinson and a Kansas-

born resident each submitted a completed voter registration form but neither provided DPOC, the native Kansan would be registered pursuant to the Birth Link MOU while Mr. Hutchinson would remain in suspense. *See* SOF ¶¶ 3, 24-28. Defendant Kobach would deem the Kansas-born resident to have "complied" with the DPOC requirement. *See* Kan. Stat. Ann § 25-2309(t). However, *Mr. Hutchinson would have done nothing differently than the native Kansan—*the only difference between them would be that Mr. Hutchinson was not born inside the state. *See* SOF ¶¶ 33 (Hutchinson testifying "I don't know why it has to be so difficult for me, as an individual, to have to prove being born out of state to prove that I am a citizen" and noting that SOS verifies documents "for their own natural-born citizens of Kansas"). Defendant's policy fundamentally penalizes the right to travel because citizens born elsewhere who move to Kansas cannot qualify for the preferential treatment afforded to natives; they cannot change their place of birth.

This sort of birth state discrimination is fundamentally unfair because an individual has no control over where she is born. In *Buclary v. Borough of Northampton*, No. 90-7950, 1991 WL 133851, at *10 (E.D. Pa. July 17, 1991), the district court reached the same conclusion in reviewing the plaintiffs' claims that a civil service commission "denied them employment, because they were not 'born and raised in the Lehigh Valley or Northampton, Pennsylvania.'" Candidates for open positions were required to list their place of birth on defendant's employment application. *Id*. at *11. The plaintiffs, who were born out of state, applied but were passed over in favor of Pennsylvania natives even though they were more qualified than the successful applicants. *Id*. The district court found these claims sufficient to state a claim under the right to travel:

> The discrimination alleged in this case functions to divide Borough residents into two classes: those born and raised in the Lehigh Valley and those who subsequently migrate there. Thus, . . . the discrimination acts as an uncodified residency requirement that the plaintiffs Buclary and York can *never* meet. The

fact that the discrimination is based on an immutable characteristic such as state of birth does not serve to remove this case from the protection of the right to travel; to the contrary, it adds a certain measure of invidiousness which offends "the principle that individuals should not be discriminated against on the basis of traits for which they bear no responsibility."

*Id*. (citation omitted).[11]

The Supreme Court has struck down laws that are considerably more limited in their impact on the right to travel than the DPOC law.  In *Saenz* and *Dunn*, the Supreme Court prohibited yearlong durational residency before new residents would be allowed to obtain welfare benefits or register to vote.  *Saenz*, 526 U.S. at 510; *Dunn*, 405 U.S. at 360.  Those durational requirements were clearly less burdensome than the restrictions challenged in this case: in those cases, a new resident would eventually have access to the benefit; she would just have to endure a year-long waiting period.  And yet the Supreme Court barred such restrictions on the theory that "even temporary deprivations of very important benefits and rights can operate to penalize migration."  *Soto-Lopez*, 476 U.S. at 907.  In this case, the discrimination is far more severe: an individual cannot obtain an exemption from the DPOC requirement by simply waiting a year after becoming a Kansas resident—he would need to have been *born* in the State of Kansas in order to avail himself of the Birth Link MOU.  *See* SOF ¶¶ 24, 29.  If he was not, then he is permanently barred from that benefit.  *See id.*

---

[11] In reviewing laws related to illegitimacy, the Supreme Court has raised similar considerations. *See Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175-76 (1972) (holding that the Constitution "enable[s] us to strike down discriminatory laws relat[ed] to status of birth" and that it is "illogical and unjust" to "impos[e] disabilities on the illegitimate child" because [o]bviously, no child is responsible for his birth."); *see also Love v. Johnson*, 146 F. Supp. 3d 848, 851–52 (E.D. Mich. 2015) (applying strict scrutiny based on privacy interests to state policy which "create[d] various subclasses based solely on an individual's state of birth").  Defendant's inequitable treatment based on a voter registration applicant's state of birth violates both the right to travel and fundamental fairness.

The Supreme Court's decision in *Soto-Lopez* is particularly instructive. *Soto-Lopez* struck down a provision of the New York State Constitution which granted a civil service employment preference to veterans who were residents of New York when they entered military service. The Court reasoned:

> New York's eligibility requirements for its civil service preference *conditions a benefit on New York residence at a particular past time in an individual's life*. It favors those veterans who were New York residents at a past fixed point over those who were not New York residents at the same point in their lives.
> 476 U.S. at 905 (emphasis added).

*Soto-Lopez* then evaluated the nature of the benefits being restricted, observing: "While the [employment preference] sought here may not rise to the same level of importance as the necessities of life and the right to vote, it is unquestionably substantial . . . . [and has] been *permanently* deprived." *Id*. at 908-09. The Court therefore concluded, "[s]uch a permanent deprivation of a significant benefit, based only on the fact of nonresidence at a past point in time, clearly operates to penalize appellees for exercising their rights to migrate." *Id*. at 909.

The DPOC regime is an even clearer infringement on the right to travel in comparison to the employment preference struck down in *Soto-Lopez*. Like New York's prohibited civil service scheme, Defendant's Birth Link MOU exempts voter registration applicants residing in Kansas "at a particular past time in [the] individual's life": their date of birth. *Id*. at 905. The DPOC law also operates as a complete restriction on a state benefit rather than a "temporary deprivation[]" or waiting period. *Id*. at 907. But the discriminatory aspects of the DPOC law are far worse because it operates to restrict the "right to vote," a right that *Soto-Lopez* expressly acknowledged has a much greater "level of importance" than employment preferences. *Id*. at 908. Furthermore, in order to qualify for the Birth Link MOU's exemption, an individual had to be in Kansas at the time of their birth—a circumstance over which no person has any control.

This birth-state discrimination is patently unconstitutional,  as "[t]he State may not favor established residents over new residents based on the view that the State may take care of 'its own,' if such is defined by prior residence."  *Hooper*, 472 U.S. at 623.

Defendant Kobach's policy cannot be defended on the grounds that he sends *all* suspended applications to KDHE for cross-referencing and thereby treats everyone equally. KDHE only maintains birth certificates for those born within Kansas.  *See* Kan. Stat. Ann. § 65-2409a(a) ("A certificate of birth for each live birth *which occurs in this state* shall be filed with the state registrar within five days after such birth and shall be registered by such registrar if such certificate has been completed and filed in accordance with this section.") (emphasis added); SOF ¶¶ 24-25, 29.  Therefore, coordination with KDHE inherently benefits native-born Kansans without benefiting citizens from other states.[12]

The discriminatory nature of the DPOC regime is not an insignificant matter – it is directly responsible for "the mass denial of a fundamental constitutional right" in Kansas.  *Fish II*, 840 F.3d at 755.  The undisputed facts demonstrate that as of late March 2016, more than 30,000 Kansans had their registrations canceled or suspended because they failed to provide DPOC.  SOF ¶¶ 41-42.  This Court observed in its preliminary injunction ruling that "[t]he sheer number of people cancelled or held in suspense because of the DPOC requirement since October 2015 evidences the difficulty of complying with the law as it is currently enforced."  *Fish I*, 2016 WL 2866195 at *20.  "It does not matter whether that is because they lack access to the requisite

---

[12] Nor can Defendant Kobach claim that his policy of checking to see if voter registration applicants have citizenship documents on file with the Department of Revenue (KDOR) – which operates DMV offices in the state – cures the DPOC regime's discrimination against interstate migrants.  KDOR retains any documents presented by any driver's license applicant regardless of their state of birth.  *See* SOF ¶ 34 ("[T]he DMV now accepts and scans DPOC provided by any Kansas driver's license holder or applicant, at any time").  In contrast, KDHE only retains vital records for individuals born in Kansas. *See* Kan. Stat. Ann. § 65-2409a(a); SOF ¶ 29.

documentary proof or simply because the process of obtaining that proof is so onerous that they give up. . . . The outcome is the same—the abridgment of the right to vote." *Newby*, 838 F.3d at 13. In fact, this 30,000 number dramatically *understates* the difficulty of complying with the DPOC law, because tens of thousands of Kansas-born registration applicants failed to produce DPOC but were registered anyway, via the Birth Link MOU. Kansas Elections Director Bryan Caskey testified that "generally speaking . . . between 40 and 50 percent of the records that we present to KDHE will come back with an affirmative response of yes, there is proof of citizenship on file." SOF ¶ 30. In other words, in addition to the more than 30,000 Kansans whose voter registrations are on suspense or have been canceled, there are tens of thousands more Kansans who similarly failed to comply with the DPOC law. But because they were born in Kansas, the DPOC requirement was waived for them, while the burden of compliance has been shouldered by Kansans who were born in other states.[13]

The discriminatory nature of the DPOC regime is no accident. Although discriminatory intent is unnecessary to establish a violation of the right to travel, Defendant Kobach's own

---

[13] Defendant has suggested that the burdens of the DPOC regime are defensible because an applicant without DPOC can request a hearing before the state election board to offer alternative evidence of citizenship, pursuant to Kan. Stat. Ann. § 25-2309(m). *See* SOF ¶ 15. This view misperceives the right at issue which bars *unequal treatment* due to a person's state of birth or interstate migration. Kansas natives do not have to subject themselves to the process of seeking an (m) hearing because they can be registered automatically under the Birth Link MOU. *See* SOF ¶ 24. In contrast, those born out of state should not have to petition the state election board for special dispensation in order to register to vote. Citizens retain "a perfect constitutional right" to migrate and are "not bound to cringe to any superior, or to pray for any act of grace, as a means of enjoying all the rights and privileges enjoyed by other citizens." *Saenz*, 526 U.S. at 505 (quoting *Slaughter-House Cases*, 83 U.S. at 112-113 (Bradley, J., dissenting)). And in any event, the purported safeguard is illusory because Defendant does not inform suspended applicants of the (m) procedure or provide any guidance regarding information sufficient to demonstrate citizenship. *See* SOF ¶¶ 16-17. It is no wonder that only a handful of individuals have ever sought an (m) hearing; the procedure remains "but one additional burdensome layer in the Kansas enforcement scheme that an applicant must navigate in order to become registered when all else fails." *Fish I*, 2016 WL 2866195, at *28; *see also* SOF ¶ 18.

testimony demonstrates that he adopted the Birth Link MOU with the discriminatory purpose of privileging Kansas-born residents over interstate migrants.  On January 22, 2014, Defendant Kobach testified before Kansas's House Elections Committee and answered questions from lawmakers regarding the implementation of the DPOC law.  In a statement to the Kansas legislature, Defendant announced that he had entered into an interagency agreement with KDHE expressly "to assist registrants born in Kansas," noting that "KDHE has birth certificate records for every person born in Kansas, and a substantial portion of the incomplete registrations are for people born in Kansas."  SOF ¶ 24.  Elections Director Caskey has similarly offered testimony in this case that the purpose of the Birth Link MOU is to provide special assistance to Kansas natives.  SOF ¶ 25 (explaining that "Secretary of State's office checks approximately monthly with the Kansas Department of Vital Statistics *to see if individuals missing proof of citizenship were born in the State of Kansas to complete their registration for them*") (emphasis added); *see also* SOF ¶ 26 (acknowledging that KDHE does not maintain birth records for people who live outside of Kansas).  Defendant does not engage in analogous efforts with agencies in other states to verify citizenship, leaving those born out of state to fend for themselves.  SOF ¶ 33.

As discussed *supra*, § II.A.1, Plaintiffs need only demonstrate that a challenged law or policy has the effect of treating migrants unequally.  But if a policy's primary, stated objective is to benefit those born within the state, it is plainly unconstitutional because its very purpose is to treat migrants inequitably.  *See Shapiro*, 394 U.S. at 631 ("If a law has no other purpose than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it is patently unconstitutional.") (internal quotation marks and alterations omitted).

##### 2.     The DPOC Law Impermissibly Discriminates Against Migrants by Exempting Registered Residents as of January 1, 2013.

The DPOC regime further discriminates in violation of the right to travel by favoring residents who were registered voters as of January 1, 2013.  The 2013 Exemption embeds unequal treatment in the text of the DPOC law and divides Kansans into two classes:  (1) Residents who submitted voter registration applications prior to January 1, 2013 qualify for the exemption; they are presumed to be citizens solely because of their past residence and registration status although they have never provided DPOC.  *See* Kan. Stat. Ann. § 25-2309(n) ("Any person who is registered in this state on the effective date of this amendment to this section is deemed to have provided satisfactory evidence of citizenship and shall not be required to resubmit evidence of citizenship.").[14]  (2) Those who attempt to register after January 1, 2103 cannot receive the exemption; they must prove they are citizens by presenting DPOC (unless, as detailed *supra*, § II.B.1, they were born in Kansas).  That is, established residents who registered before 2013 receive favorable treatment and are presumed to be citizens based on the attestation of citizenship made in their original voter registration application.  SOF ¶¶ 3-4.  But that same attestation of citizenship is insufficient for those who move to Kansas after 2013 and apply for voter registration.  Their applications will be suspended or canceled for lack of DPOC.

This differential treatment impermissibly creates a "classification which serves to penalize the exercise of th[e] right to travel."  *Dunn*, 405 U.S. at 340 (quoting *Shapiro*, 394 U.S. at 634) (internal alterations omitted).  As a general matter, states may enact nondiscriminatory laws that alter legal obligations or impose new requirements as of a given effective date.  But the

---

[14] Once a voter is deemed to have established proof of citizenship, she does not need to present it again if she moves or modifies her voter registration records.  *See* Kan. Stat. Ann. § 25-2309(p) ("A registered Kansas voter who moves from one residence to another within the state of Kansas or who modifies such voter's registration records for any other reason shall not be required to submit evidence of United States citizenship.").

Supreme Court has cautioned that a "State is not free to promote its interests through a preference system that *incorporates a prior residence requirement*." *Soto-Lopez*, 476 U.S. at 910 (emphasis added). Such laws inevitably discriminate against newer residents who cannot qualify for the preference extended to established residents. *Id*. at 905. The 2013 Exemption infringes on the right to travel because it incorporates precisely this type of prior residency requirement, insofar as an individual needs to have been a Kansas resident before 2013 in order to have been registered and qualify for the exemption.[15] *See* SOF ¶ 2; Kan. Const. Art. V, §1,

On three occasions, the Supreme Court has scrutinized state programs offering benefits or exemptions tied to a person's prior in-state residence. All three preference systems were held unconstitutional because they favored the state's established residents at the expense of newcomers. *See Soto-Lopez*, 476 U.S. at 911-12; *Hooper*, 472 U.S. at 623; *Zobel*, 457 U.S. at 65. These cases are instructive here. *Soto-Lopez* prohibited an employment preference conditioned on an individual having been a New York resident when she applied to join the military service. 476 U.S. at 905. The DPOC law's 2013 Exemption similarly conditions a benefit on a citizen having been a Kansas resident at a particular point in time: *i.e.*, before 2013, when she applied for voter registration. Similarly, in *Hooper*, the Supreme Court rejected a law granting tax exemptions to military veterans who were residents of New Mexico before the statute's effective date. The Court observed that the effective date restriction was unconstitutional because "it confers a benefit only on 'established' resident veterans, *i.e.*, those

---

[15] In this respect, the 2013 Exemption contrasts with other aspects of the SAFE Act. For instance, the Act imposes a separate requirement that registered voters produce "a valid form of identification" at the polls in order to vote. Kan. Stat. Ann. § 25-2908(c)(4). Following the SAFE Act's effective date, *all* voters must comply with the voter identification requirement without regard to the date they established residence in Kansas. *See id*. If instead the SAFE Act exempted voters who registered before 2013 from having to present identification at the polls, that system would present the same constitutional problem as the DPOC law's exemption for established registered voters.

who resided in the State before May 8, 1976." *Hooper*, 472 U.S. at 621.  The same is true here, where only "established" registered voters who were residents before 2013 may qualify for the exemption from the DPOC requirement under Kan. Stat. Ann. § 25-2309(n).  *See id*. at 623 (holding "[n]either the Equal Protection Clause, nor this Court's precedents, permit the State to prefer established resident veterans over newcomers"); *see also Zobel*, 457 U.S. at 65 ("[T]he only apparent justification for the retrospective aspect of the program, 'favoring established residents over new residents,' is constitutionally unacceptable.").

The Supreme Court has made clear that "[t]he analysis in all of these cases . . . is informed by the same guiding principle—the right to migrate protects residents of a State from being disadvantaged, or from being treated differently, simply because of the timing of their migration, from other similarly situated residents."  *Soto-Lopez*, 476 U.S. at 904.  Yet the DPOC regime treats newcomers to Kansas very differently based on the "timing of their migration." Established, registered voters benefit from a presumption that they "have provided satisfactory evidence of citizenship" because they resided in Kansas and registered before 2013.  Kan. Stat. Ann. § 25-2309(n).  By contrast, those who move to Kansas after 2013 are presumed *not to* be citizens and are barred from voting until they present DPOC.  That system contravenes the principle that "the Citizenship Clause of the Fourteenth Amendment . . . does not provide for, and does not allow for, degrees of citizenship based on length of residence."  *Zobel*, 457 U.S. at 69.

By exempting a large majority of registered voters and limiting the significant burdens of compliance with the DPOC law to newer registrants, the grandfather clause undoubtedly makes

the DPOC regime more acceptable politically.[16]  But the Fourteenth Amendment precludes a state from "favor[ing] established residents over new residents based on the view that the State may take care of 'its own,' if such is defined by prior residence."  *Hooper*, 472 U.S. at 623.  A state that seeks to alter its requirements for voter registration must do so on an equal basis.  It cannot "fence out" newer residents from its franchise or force them to shoulder the burden of restrictions while waiving those requirements for established residents.  *Shapiro*, 394 U.S. at 631; *cf. also Dunn*, 405 U.S. at 355 (finding it "constitutionally impermissible" to "'[f]enc[e] out' from the franchise a sector of the population'") (quoting *Carrington v. Rash*, 380 U.S. 89, 94 (1965).  Because the 2013 Exemption has this effect, it violates the right to travel.

### C.    The DPOC Regime's Discrimination Against Interstate Migrants Is Not Narrowly Tailored to Further a Compelling State Interest.

As explained *supra*, § II.A.2, "[l]aws which burden th[e] right [to migrate] must be necessary to further a compelling state interest."  *Soto-Lopez*, 476 U.S. 904 n.4.  The DPOC regime cannot withstand strict scrutiny for at least three reasons: *First*, there is no evidence of a compelling state interest because Kansas has, at most, a nominal problem of noncitizen voting.  *Second*, even if Defendant had established the existence of a compelling state interest, the DPOC regime is not narrowly tailored to address it because it is simultaneously *overinclusive*, by disenfranchising large numbers of qualified citizens, and *underinclusive*, by exempting the great majority of established registered voters.  *Third*, there are numerous far less burdensome alternatives to the DPOC regime.

---

[16] Outside of the context of right-to-travel claims, courts have carefully examined the constitutionality of grandfather clauses and warned against their abuse.  *See Guinn v. United States*, 238 U.S. 347, 364-65 (1915) (striking down Oklahoma grandfather clause which attempted to violate voting rights of black citizens under the Fifteenth Amendment); *see also Delaware River Basin Comm'n v. Bucks Cty. Water & Sewer Auth.*, 641 F.2d 1087, 1095-96 (3rd Cir. 1981) (recognizing various dangers of "'grandfather' clauses" which "possess especially strong potential for abuse of the political process.").

*First*: Though the DPOC law was enacted to address the purported problem of noncitizen

voter fraud, years of litigation demonstrate that there is at most a "nominal" issue of noncitizen

voting in Kansas.  *Fish I*, 2016 WL 2866195 at *21.  Following the Supreme Court's decision in

*ITCA*, Defendant sought to force the EAC to include a DPOC requirement on the NVRA's

federal mail-in registration form for Kansas.  SOF ¶ 110.  The EAC reviewed Defendant's

submissions and determined that such a change was unnecessary in light of the minimal evidence

of noncitizen registration.  In the memorandum detailing its decision, the EAC noted that

"Kansas's evidence at most suggests that 21 of 1,762,330 registered voters, approximately 0.001

percent, were unlawfully registered noncitizens around the time its new proof-of-citizenship

requirement took effect."  SOF ¶ 113.  The agency reasoned that a DPOC requirement was

unnecessary because "[b]y any measure, these percentages are exceedingly small" and that "the

administration of elections, like all other complex functions performed by human beings, can

never be completely free of human error."  *Id*. This determination was later upheld by the Tenth

Circuit.  *See Kobach v. Election Assistance Comm'n*, 772 F.3d 1183, 1196–97 (10th Cir. 2014),

*cert. denied*, 135 S. Ct. 2891 (2015) ("Kobach and Bennett have thus failed to carry the burden . .

. that the denial of their request precluded them from obtaining information that is 'necessary' to

enforce their respective states' voter qualifications.").

Defendant's submissions in this case remain materially identical to the minimal evidence

of noncitizen registration previously reviewed by the Tenth Circuit.  Defendant has recorded a

total of 44 purported instances of noncitizens being registered to vote or submitting voter

registration applications.  SOF ¶¶ 95-103.  Those 44 instances represent 0.0026% of the

1,705,537 registered voters in Kansas as of August 2015.  SOF ¶ 103.  This Court noted in its

preliminary injunction ruling that the "rates of noncitizen voter fraud prior to the [SAFE] Act's

passage are at best nominal" and that "none of the[] instances" where noncitizens subsequently submitted voter registration applications "appear to involve deliberate fraudulent conduct[.]" *Fish I*, 2016 WL 2866195, at *21. In affirming the preliminary injunction, the Tenth Circuit observed that "[t]hese numbers fall well short of the showing necessary to rebut the presumption that attestation constitutes the minimum amount of information necessary for Kansas to carry out its eligibility-assessment and registration duties." *Fish II*, 840 F.3d at 747; *see also id.* at 755 (finding that the "assertion that the 'number of aliens on the voter rolls is likely to be in the hundreds, if not thousands' is pure speculation."); *Newby*, 838 F.3d at 13 (finding that there is "precious little record evidence" of noncitizen registration, and that "only a tiny fraction of one percent of registered voters were non-citizens."); *Veasey v. Abbott*, 830 F.3d 216, 263 (5th Cir. 2016) (en banc) (finding that "undocumented immigrants are unlikely to vote as they try to avoid contact with government agents for fear of being deported.").

The meager evidence of noncitizen fraud directly undermines the DPOC regime's asserted state interest in preventing noncitizens from registering to vote. Even under intermediate levels of scrutiny, a state "must do more than simply 'posit the existence of the disease sought to be cured.' It must demonstrate that the recited harms are *real, not merely conjectural*, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) (emphasis added) (citation omitted). After years of litigation, across multiple cases, Defendant has offered only conjecture and speculation to prop up what remain "at best nominal" indications of any problem with noncitizen registration in Kansas. *Fish I*, 2016 WL 2866195 at *21.

*Second*: Even if Defendant could establish a compelling state interest, the DPOC requirement would fail under strict scrutiny because it is simultaneously overinclusive and

underinclusive.  The DPOC regime is overinclusive in that it has ensnared far too many citizens given the minimal evidence of noncitizen registration.  At the end of March 2016, more than 30,000 voters were canceled or suspended for failing to provide DPOC.  SOF ¶¶ 41-42*; see Fish II*, 840 F.3d at 755 (finding that the DPOC law resulted in "the mass denial of a fundamental constitutional right."); SOF ¶ 37 ("Since the proof-of-citizenship requirement of the SAFE Act went into effect on January 1, 2013, a significant number of records have been added to the Suspense file due to the applicants' failure to provide citizenship documents.").  A regulation that disenfranchises 30,000 prospective voters is plainly disproportionate when the state has only shown 30 noncitizens registered, almost all via avoidable accident or misunderstanding.  *See Dunn*, 405 U.S. at 360 (finding "durational residence requirements . . . much too crude" because "[t]hey exclude too many people who should not, and need not, be excluded").

Indeed, Defendant's implementation of the Birth Link MOU is, in effect, an acknowledgment of the DPOC law's indiscriminate sweep.  After checking KDHE's records, Defendant discovered that *nearly half* of the applications who are initially suspended each month for failure to provide DPOC can be confirmed as citizens by locating a Kansas birth certificate on record.  SOF ¶ 30 ("[G]enerally speaking . . . between 40 and 50 percent of the records that we present to KDHE will come back with an affirmative response of yes, there is proof of citizenship on file."); *see also* SOF ¶ 31.  Thus, the DPOC law has a confirmed 40-50% failure rate *from the outset*.

The experiences of Plaintiffs Fish and Bucci are illustrative of this problem.  When Plaintiff Fish learned his application was suspended, he searched for his DPOC but could not locate it.  SOF ¶ 49.  He tried to obtain a replacement but could not because he was born on a decommissioned Illinois military base.  SOF ¶ 50.  Mr. Fish eventually found a copy issued in a

49

safe in his stepfather's house *a year-and-a-half* after his initial voter registration application, having missed the opportunity to vote in the 2014 election. SOF ¶¶ 51-52. His mother had apparently placed it there before she passed away leaving Mr. Fish unable to find it. SOF ¶ 53. Plaintiff Bucci was born in Maryland and, like many people, has lost her birth certificate. SOF ¶ 59. The cost of obtaining a replacement would present a significant financial burden for her due to her limited resources. SOF ¶ 60 (Bucci testifying that she cannot afford Starbucks coffee because she "only make[s] 27,000 a year" and "[e]very penny counts"). The DPOC regime is not narrowly tailored because it disenfranchises the large numbers of qualified citizens who do not have DPOC at their fingertips and those for whom it would be a significant burden to find or obtain a replacement. *Cf. Harper*, 383 U.S. at 670 (striking down poll tax of $1.50).

The DPOC regime is simultaneously underinclusive because the 2013 Exemption operates to shield the large majority of established, registered voters from the "confusing and inconsistently-enforced maze of requirements" imposed by the DPOC regime. *Fish I*, 2016 WL 2866195 at *28. When Defendant Kobach testified in favor of the passage of the SAFE Act, he relied on anecdotal reports of noncitizens who were supposedly *already registered to vote*. SOF ¶ 94 (citing reports of a "Muslim lady" who allegedly double voted in Wichita, "Somali refugees" allegedly voting in North Kansas City, and "alien . . . hog farming" workers allegedly bussed in from Oklahoma to vote illegally in Kansas). And yet the DPOC law does nothing to confirm the citizenship status of people already registered as of 2013, who constitute the vast majority of registrants in Kansas. As of January 1, 2013 there were approximately 1.76 million registered voters in Kansas. SOF ¶ 36. Between January 1, 2013 and March 28, 2016, SOS completed an additional 244,699 voter registration applications, SOF ¶ 38, for a total of approximately two million. Thus, only a small fraction—12%—of the number of voters

50

registered as of 2013 have ever been required to present DPOC.  If the DPOC law was, as

Defendant has claimed, necessary because noncitizens have already registered to vote in Kansas,

then it is massively underinclusive and ill-suited to address this supposed problem.

*Third*: There are far less burdensome alternatives to the DPOC regime.  If a law burdens

the right to travel and "there are other, reasonable ways to achieve a compelling state purpose

with a lesser burden on constitutionally protected activity, a State may not choose the way of

greater interference. If it acts at all, it must choose 'less drastic means.'"  *Soto-Lopez*, 476 U.S. at

909-10 (1986).  In implementing the DPOC requirement, Defendant appears to have chosen the

*most drastic* means of addressing the nominal problem of noncitizen registration in Kansas.

As this Court noted in its preliminary injunction ruling, there are a number of "less

burdensome option[s] for the State of Kansas" to prevent noncitizen registrations.  *Fish I*, 2016

WL 2866195, at *21-22.  For example, the state can (1) rely on attestations of citizenship,

(2) train DMV workers and other staff to more clearly communicate voter qualifications, and

(3) prosecute noncitizens who commit voter fraud.[17]  *Id*. at *21-22.  The Tenth Circuit has held

that there is "not . . . substantial evidence of noncitizens registering to vote" under a system that

relies on an attestation of citizenship.  *EAC*, 772 F.3d at 1199.  Furthermore, Defendant Kobach

and Ms. Lehman have both acknowledged that the noncitizens end up on the voter rolls as a

result of human error by DMV personnel.  SOF ¶ 13.  Better training is clearly warranted and a

---

[17] In the *EAC* case, the Tenth Circuit also noted that the EAC had identified "no fewer than five alternatives to requiring documentary evidence of citizenship that states can use to ensure that noncitizens do not register using the Federal Form."  772 F.3d at 1197.  These alternatives included: (1) deterring fraud by prosecuting cases where noncitizens have voted; (2) cross-referencing the records of prospective registrants with the proof-of-citizenship documents retained by the DMVs; (3) examining prospective jurors' representation of their citizenship when being considered for jury duty; (4) cross-referencing the federal SAVE database, which stores information regarding noncitizen residents in the United States; and (5) verifying birth data via the Electronic Verification of Vital Events system promulgated by the National Association for Public Health Statistics and Information Systems.  SOF ¶ 114.

less burdensome alternative to avoid potential problems of noncitizen registration.  And finally,

Kansas may also prosecute noncitizens who register to vote under Kan. Stat. Ann. § 25-2416.

Prosecution is yet another less burdensome and narrowly tailored option because it is targeted

where there is specific evidence suggestive of misconduct.  In contrast, the DPOC regime sweeps

broadly and burdens qualified citizens—many of whom do not have, cannot locate, or cannot

submit the required DPOC—regardless of whether there are any specific indicia that they are not

eligible to vote.

In short, there are multiple, less burdensome alternatives available for preventing

noncitizen registration which make clear that the DPOC regime fails under strict scrutiny.

## CONCLUSION

For the above-stated reasons, Plaintiffs respectfully request summary judgment on their

Fourteenth Amendment claim and an order enjoining Defendant from enforcing the DPOC law.

Dated this 22nd day of December, 2016.

Respectfully submitted,

/s/ Stephen Douglas Bonney
STEPHEN DOUGLAS BONNEY (#12322)
ACLU Foundation of Kansas
6701 W. 64th Street, Suite 210
Overland Park, Kansas 66202
Phone: (913) 490-4102
Fax: (913) 490-4119
dbonney@aclukansas.org




NEIL A. STEINER*
REBECCA KAHAN WALDMAN*
ANNE GRUNER*
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Phone: (212) 698-3500

/s/ R. Orion Danjuma
R. ORION DANJUMA*
DALE E. HO*
SOPHIA LIN LAKIN*
American Civil Liberties Union Foundation, Inc.
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2693
odanjuma@aclu.org
dale.ho@aclu.org
slakin@aclu.org


ANGELA M. LIU*
Dechert LLP
35 West Wacker Drive
Suite 3400
Chicago, IL 60601-1608
Phone: (312) 646-5800
Fax: (312) 646-5858

Fax: (212) 698-3599                     angela.liu@dechert.com
neil.steiner@dechert.com
rebecca.waldman@dechert.com
anne.gruner@dechert.com

*Attorneys for Plaintiffs*


*admitted pro hac vice*

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on the 22nd day of December, 2016, I

electronically filed the foregoing document using the CM/ECF system, which automatically

sends notice and a copy of the filing to all counsel of record.

<u>/s/ Stephen Douglas Bonney</u>
STEPHEN DOUGLAS BONNEY (#12322)

*Attorney for Plaintiffs*