1                   UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF KANSAS
2

3    CODY KEENER, et al.,

4        Plaintiffs,

5    v.                           Docket No. 15-9300-JAR

6    KRIS W. KOBACH, et al.,

7        Defendants.
     _____     _____
8
     STEVEN WAYNE FISH, et al.,
9                                  Docket No. 16-2105-JAR
         Plaintiffs,
10                                 Kansas City, Kansas
     v.                            Date:  03/03/2017
11
     KRIS KOBACH, et al.,
12
         Defendants.
13   .............................................

14                       TRANSCRIPT OF
              MOTIONS FOR SUMMARY JUDGMENT HEARING
15          BEFORE THE HONORABLE JULIE A. ROBINSON
                 UNITED STATES DISTRICT JUDGE
16
     APPEARANCES:
17   For Case No. 15-9300 Plaintiffs:

18   Mr. Mark P. Johnson          Mr. Paul T. Davis
     Mr. Curtis E. Woods          Fagan Emert & Davis, LLC
19   Dentons US LLP               730 New Hampshire
     4520 Main Street             Suite 210
20   Suite 1100                   Lawrence, KS 66044
     Kansas City, MO 64111
21
     For Case No. 16-2105 Plaintiffs:
22
     Mr. Dale E. Ho               Mr. Stephen D. Bonney
23   Mr. R. Orion Danjuma         ACLU Foundation of Kansas
     Ms. Sophia Lin Lakin         6701 West 64th Street
24   American Civil Liberties     Suite 210
     Union Foundation - NY        Overland Park, KS 66202
25   125 Broad Street
     New York, NY 10004

```
1     APPEARANCES:
2     (Continued)

3     For the Defendant Kris Kobach:

4     Mr. Kris Kobach
      Mr. Garrett R. Roe
5     Kansas Secretary of State
      120 Southwest 10th Avenue
6     Memorial Hall, First Floor
      Topeka, KS 66612
7

8     Court Reporter:        Kelli Stewart, RPR, CRR, RMR
                             Official Court Reporter
9                            259 U.S. Courthouse
                             500 State Avenue
10                           Kansas City, Kansas 66101
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1          THE COURT:  All right.  You can be seated.

2     All right.  Good afternoon.  We are here for a

3     consolidated oral argument by agreement of all parties

4     on the summary judgment motions that were filed in Fish

5     versus Kobach, Case No. 16-2105.  And in that case, I'm

6     hearing plaintiffs' partial summary judgment motion on

7     its privilege and immunities clause claim under the

8     Fourteenth Amendment, as well as the defendant's

9     arguments concerning standing and mootness.

10          And then further oral argument then in

11     Bednasek versus Kobach, 15-9300.  And in that case, I'm

12     hearing cross summary judgment motions filed by both

13     plaintiff and defendant on the Fourteenth Amendment

14     privilege and immunities claim, as well as-- and that's

15     plaintiffs' summary judgment motion.  And then

16     defendant's summary judgment motion on the Fourteenth

17     Amendment equal protection claim, as well as defendant's

18     arguments on standing.

19          All right.  So appearing for the defendant

20     in both cases?  Oh, just announce your appearance at

21     this point.

22          MR. KOBACH:  Kris Kobach from the Secretary

23     of State's office, and Garrett Roe.

24          THE COURT:  All right.  And then appearing

25     for the plaintiff in the-- in the Fish case.

1            MR. DANJUMA:  Orion Danjuma on behalf of the

2    Fish plaintiffs, Your Honor.

3            THE COURT:  All right.  And then appearing

4    for the plaintiff in the Bednasek case.

5            MR. JOHNSON:  Your Honor, Mark Johnson of

6    the Dentons law firm.  And I'm here today with my law

7    partner, Curtis Woods; co-counsel, Paul Davis.  And our

8    client, Parker Bednasek, appears in person.

9            THE COURT:  All right.  All right.  So

10   here's how I'd like to proceed.  I think we have sort of

11   three distinct subject matters to hear argument about.

12   The first is plaintiffs' Fourteenth Amendment

13   right-to-travel claims under the privilege and

14   immunities clause.  And I have specific questions with

15   respect to all of these-- all of these claims and

16   defenses.

17            So the way I'd like to proceed is, we'll

18   start with that claim, the privilege and immunities

19   claim, and then I have some specific questions of

20   plaintiff.  And then I have some specific questions of

21   the defendant.

22            And then I'd like to proceed to the equal

23   protection claim, right-to-vote claim.  Again, I have

24   specific questions for plaintiffs.  And this, of course,

25   is only in Mr. Bednasek's case.  The right-to-travel

1    claims are in both cases.

2              So secondly, then I'd like to address the

3    right-to-vote claim.  I have specific questions of

4    plaintiffs, specific questions of defendant.

5              And then the third subject matter being the

6    standing and mootness challenge as brought by the

7    defendant.  Again, I'll start with questions of

8    plaintiffs and then questions of the defendants.

9              Some of these questions, not very many of

10   them, but some of these questions will ask you to point

11   us to certain things in the record.  If you're not

12   prepared to do that at the time I'm asking the

13   questions, hopefully by the time we leave this afternoon

14   or even by e-mail later on, I'll do that.  I'm not

15   trying to ambush anybody, and I didn't give you all

16   prior notice of that.  And I recognize that when you're

17   coming prepared for oral argument, you know, you may not

18   be prepared to cite off the top of your head references

19   to the record.  So we can deal with that at the end.

20             So in any event, I'll go through these

21   questions; so it will be plaintiff, defendant, plaintiff

22   defendant on three topics.  And then at that point I'd

23   like to give you all the opportunity to offer any oral

24   argument on anything that either you want to expand on

25   the answers or you think I haven't asked questions.

1          And the fact that I haven't asked questions

2     about a particular subject matter does not mean that I'm

3     disregarding it, it's just that I come with certain

4     questions, having reviewed the very good and extensive

5     briefing by all parties.

6          But again, I'd like to give you the

7     opportunity to just make more of a traditional oral

8     argument to me about anything that you'd like.  And

9     I'd-- I'd like to give plaintiffs 20 minutes to do that

10    and defendants 20 minutes to do that or-- you know,

11    we'll even it out.  There's two plaintiffs.  So if Mr.

12    Kobach needs more than 20 minutes to respond, that's

13    perfectly fine, too.  So let's-- let's proceed in that

14    way, if we will.

15          So let's start with the Fourteenth Amendment

16    privilege and immunities claim.  And I'll start-- and,

17    of course, this is-- well, I guess I'll hear-- unless

18    one of you is going to take the lead on the plaintiffs'

19    side, it's plaintiffs' summary judgment motion in Fish.

20    There were cross motions in Bednasek.

21          So on the privilege and immunities claim,

22    Mr. Danjuma, are you going to take the lead on that?

23          MR. DANJUMA:  Yes, I'm happy to do that.

24          THE COURT:  All right.  We'll start there.

25          MR. DANJUMA:  Okay.

 1              THE COURT:  All right.  And I have three

 2     questions essentially, but a little bit of follow-up

 3     with respect to each one.  The first question is:  Is

 4     this a facial or an as-applied challenge?  My

 5     interpretation is that it's an as-applied challenge, but

 6     I wanted to hear from you on that, given that the birth

 7     certificate verification procedure is not expressly in

 8     the statute, it's, you know, pursuant to a memorandum of

 9     understanding with the KDHE.  So is it facial,

10     as-applied, or both?

11              MR. DANJUMA:  Yes, Your Honor, I'm happy to

12     address that.  And thank you, Your Honor, again for

13     hearing argument on this this afternoon.

14              So the Fish plaintiffs are bringing a facial

15     challenge and as-applied challenge and perhaps, most

16     importantly, we want to emphasize that given the

17     experience in the record, given the evidence in the

18     record, we don't know that this statute can be applied

19     in a manner that would avoid constitutional violations.

20              And there's a reason why the statute is

21     unsound on its face.  And that's because it exempts

22     anyone who was a registered resident as of 2013.  And

23     there are three cases that the Supreme Court has decided

24     in this area that address grandfather clauses in

25     precisely this instance.

15-9300/16-2105   Keener v. Kobach/Fish v. Kobach   03.03.17      8

1              The defendant sort of has-- wraps himself in

2    the concept of grandfather clauses, but I want to

3    emphasize that these can be fatal to a statute.  The

4    very origin of the term "grandfather clause" comes from

5    discriminatory restrictions on the right to vote.  I

6    don't have to tell Your Honor that they originate from

7    attempts by southern states to apply new voting

8    restrictions in a racially-discriminatory manner.

9              So there are some grandfather clauses that

10   are legitimate, there are others that are not.  And we

11   don't have to speculate about what that test is in the--

12   in the case of a right-to-travel claim because the

13   Supreme Court has decided three cases on this very

14   issue.  The *Hooper* case that we cited in our briefs is a

15   classic grandfather exemption case.

16              THE COURT:  Okay.  I think you're getting a

17   little bit ahead of me here.

18              MR. DANJUMA:  Sorry.

19              THE COURT:  So with respect to the language

20   that applies this as of whatever date it is in 2013

21   going forward, you're saying it's a facial challenge.

22              MR. DANJUMA:  Yes.

23              THE COURT:  With respect to all else, I

24   suppose you're-- you're saying it's an as-applied

25   challenge?

1            MR. DANJUMA:  That's correct, Your Honor.

2            THE COURT:  Okay.  I understand.  How does

3    the analysis differ, if at all, between an as-applied

4    and a facial challenge under the privilege and

5    immunities clause?

6            MR. DANJUMA:  So an as-applied-- and just so

7    that I understand, Your Honor, the analysis of whether

8    there's been a violation or-- the analysis doesn't

9    differ in that the-- the unconstitutional restriction on

10   the privilege must be stopped.  And what we have here is

11   a-- is a legal regime, a restriction on the right to

12   vote, an underlying restriction on the privilege at

13   issue here, which is the right to vote, that is

14   discriminatory.  It only applies to certain classes.

15   And some classes in the state are exempted.

16            And that-- that procedure, that practice,

17   that system is discriminatory and cannot stand under the

18   privileges or immunities clause.

19            THE COURT:  Okay.  One other question along

20   these lines; and that is, there's a number of cases,

21   obviously, that address the right to travel in the

22   context of statutes that, you know, for example, have

23   durational requirements.  But can you point me to any

24   cases that discuss it in the context of an as-applied

25   challenge?

1          MR. DANJUMA:  So the best example that I

2    can-- I can cite for you, Your Honor-- and that's

3    exactly right.  Most of the right-to-travel cases are

4    about the language of the statute itself.  And again, we

5    are bringing the-- the facial challenge, as I noted, on

6    that ground against the 2013 exemption.  But we did cite

7    the case that's Buclary, and I believe I have a cite.

8    That this is from 1991, and it is a district court case.

9    And that was a hiring practice that a state had entered

10   into.

11          And the-- the district court found on the

12   record that basically the defendants in that case were

13   providing special benefits for people who were born in

14   the state of Pennsylvania.  And they said-- you know,

15   there was no statutory language at issue, but they said

16   that type of policy is unconstitutional and it's deeply

17   invidious and inherently discriminatory.

18          THE COURT:  All right.  And that's in your

19   papers?

20          MR. DANJUMA:  Yes.  It's B-U-C-L-A-R-Y.  And

21   I can get the cite in a little bit.

22          THE COURT:  Okay.  And while we're talking

23   about the grandfather clause, so the defendants - and

24   I'll be asking them what-- this as well - are arguing, I

25   think, that this is a separate claim that has not been

1    pled.

2              MR. DANJUMA:  Yes.  And-- and, Your Honor,

3    that-- that analysis is actually contrary to the Supreme

4    Court's rulings on the effective notice pleading.  It is

5    true that we didn't identify this theory in our initial

6    complaint, but the Supreme Court has said several times

7    that there's no need for plaintiffs to-- to identify a

8    theory at all.  And they can even identify the wrong

9    theory in their initial complaint, and that will not

10   prevent them from raising argument on that issue at a

11   later date in the case.

12             The main effect of the notice pleading is to

13   give the defendant notice of the claim that's been

14   brought against them.  And here, the claim is the

15   privileges or immunities clause claim.  There are

16   different theories on which we say we win, but this is--

17   this isn't a new claim.  There wouldn't be any new

18   version in the part of the constitution of the statute

19   that would give us a-- a basis for seeking that relief.

20             THE COURT:  And with respect to your theory

21   that the grandfather clause presents a facial challenge,

22   is there anything in the record that makes it evident

23   that before today-- or before-- I guess before the

24   summary judgment motions were filed actually, that the

25   defendants knew that that was one of the things that you

1    were pointing to under the privilege and immunities

2    clause, such as, I mean, interrogatories, requests for

3    admissions, I mean, anything in discovery?

4              MR. DANJUMA:  Your Honor, I'm trying to

5    think if there's anything that we would have identified

6    that would've flagged this.  And I'm not sure, I don't

7    believe so.

8              What I would say, however, though, is that

9    the theory is based on the text of the statute itself.

10   So there would be no discovery or interrogatories that

11   would be different in any manner, because it-- it's

12   based entirely on the language of the statute and

13   Supreme Court case law.  So I don't think there could or

14   would have been anything that the parties would've asked

15   about this that would've been different had this been

16   changed.

17             And I don't think there's-- in other words,

18   to be as concise as possible, I don't think there's any

19   factual predicate to this argument.  It's a purely legal

20   facial challenge.

21             THE COURT:  All right.  Okay.  Another

22   question I have, and I-- in part I think this question

23   was based on-- at least my understanding was that it was

24   totally an as-applied challenge.  I'm understanding now

25   you're saying it's both facial and as-applied.  But I--

1    I'd like to hear your thoughts on what the proper--

2    proper remedy would be if the claim is upheld, at least

3    on the as-applied piece of it.

4              MR. DANJUMA:  Yes.

5              THE COURT:  My sense is that if the

6    grandfather clause-- well, maybe facially as well, if

7    the-- if the grandfather clause is severed and the MOU

8    is declared to be violative, why would the entire

9    statute have to be invalidated?

10             MR. DANJUMA:  Yes, Your Honor, I'm happy to

11   address that.  So as you mentioned, we are bringing a

12   facial challenge based on the language of the statute.

13   And we provided Kansas Supreme Court state law that says

14   it's improper to sever a provision when it would change

15   the scope of the statute.

16             As the statute is currently written,

17   90 percent of registered voters are exempted from this.

18   If somehow the scope of the statute is changed such that

19   some large percentage of those individuals had to comply

20   with the DPOC requirement, that would vastly change the

21   scope of relief.  And I think we cited the *Gannon* case

22   in our brief, which I can also provide a case cite for

23   for you later.  But that says that when there's

24   something that changes the scope of a statute that

25   radically, it's improper to sever it.

1                But let's set aside the 2013 exemption

2    argument entirely and answer the question that you

3    raised just about the Birth Link policy.  If that's

4    unconstitutional, what's the appropriate relief?  And I

5    think it's a classic question, it's like do you go up or

6    do you go down?  Is everyone more burdened or is

7    everyone relieved from the burden?

8                And the one thing I want to emphasize is

9    that in every single case that the Supreme Court has

10   decided in the line of right-to-travel cases, with one

11   exception that I can give you, they have-- the Supreme

12   Court has enjoined the discriminatory restriction.  That

13   has meant that the newcomer or migrant has had equal

14   access to the benefit as the long-term resident, as the

15   person who was there for longer than a year, as the

16   person who arrived before the effective date.  That's

17   exactly the type of relief that we're looking for here.

18               And, Your Honor, what I want to emphasize is

19   that tens of thousands of Kansans have already been

20   prevented from registering to vote because of this

21   requirement.  The Tenth Circuit has already called this

22   a mass denial of a fundamental constitutional right.

23   And I'd say that in-- in considering relief, the-- the

24   first principle should be to do no harm.  You don't want

25   to swap out one constitutional violation for another

1    massively larger one.  You don't want to magnify the

2    extent of the constitutional problem.

3              Now, the Secretary might say, well, that

4    means you shouldn't do anything at all.  But I don't

5    think it's appropriate to leave a constitutional

6    violation in place and then-- because you're faced with

7    the dilemma of simply creating a larger one.  The

8    appropriate avenue, the appropriate response would be to

9    enjoin the restriction on the right to vote that is

10   giving rise to this mass denial of a fundamental

11   constitutional right in both instances.

12             Does that answer your question?

13             THE COURT:  It does.  Thank you.  I did also

14   want to ask both of you about this EVVE system, E-V-V-E

15   database, that apparently doesn't include all states but

16   includes 45, 46 states.  And I don't know, I'm asking

17   you this just to see what you can tell me about what's

18   in the record about this.

19             I'm also-- because one or both of you spoke

20   about a system that Wisconsin has recently adopted, I'd

21   be interested in hearing--

22             MR. DANJUMA:  Right.

23             THE COURT:  -- your explanation of how that

24   system works in conjunction with the EVVE database.

25             MR. DANJUMA:  Certainly, Your Honor.  So one

1    of the problems that we have here is that there's a

2    special preference that's given to people who were born

3    in the state of Kansas.  And a way to equalize that

4    would be if the defendant checked with other

5    out-of-state vital records departments in a manner

6    that's comparable to the way that's done in Kansas.

7              Now, one of those systems is the EVVE

8    system.  Defendant has said that that system is too

9    costly, it's too difficult to use.  And there isn't a

10   lot of information in the record about the efforts that

11   they've taken to-- to try to do that system.

12             But what we'd say is the burden on-- when

13   you have a-- a discriminatory restriction like this, the

14   burden is for the state to prove why it can't do another

15   system.  Whereas-- in other words, if the state of

16   Kansas had to pay some amount of money to enter into an

17   interstate exchange which would allow them access to

18   other state's birth certificates, it may need to pay

19   that money in order to apply a system like this.

20             In addition to that, though, Your Honor,

21   the-- there are other states that-- such as the state of

22   Wisconsin, which we've identified in our briefs, that

23   make sure that if an individual is from out of state,

24   these are people who are seeking to vote in an election

25   and can't obtain photo ID because they don't have

1    documentary proof, the state has offered to help find

2    their documentary proof by contacting officials in the

3    state that they've come from and by paying for the

4    individual if they have to pay money to obtain a

5    replacement.

6            Now, is that system perfect?  Would that

7    remedy the constitutional violation entirely?  It's a

8    little hard for me to say entirely in the abstract, but

9    I think it is appropriate to enjoin a policy that's

10   discriminatory at least until such time as the defendant

11   can show that it's engaged in-- in an effort that will

12   help people born out of state in a comparable manner.

13           Now, none of those solutions would resolve

14   the underlying facial issue with the language of the

15   state.  But if we're talking just about the Birth Link

16   MOU, that could be some step towards improving what's a

17   discriminatory system.

18           THE COURT:  All right.  Thank you for now.

19   That's all the questions I have--

20           MR. DANJUMA:  Thank you so much.

21           THE COURT:  -- on the privilege and

22   immunities claim.  And I'll turn to Mr. Kobach.  I have

23   some questions for him as well on this-- on this claim.

24           All right.  So let's start with-- you and

25   the plaintiffs are in disagreement about whether there

 1   was a need to plead separately the grandfather clause

 2   argument.  I'll hear from you on that.

 3             MR. KOBACH:  Thank you, Your Honor.  And I

 4   apologize in advance for my voice.  I've been fighting a

 5   cold, so I'll do my best.

 6             THE COURT:  That makes two of us.

 7             MR. KOBACH:  I listened with great interest

 8   as the way plaintiffs' counsel answered your question.

 9   He-- he quickly moved from claim to theory.  And his

10   notion is that the grandfather clause claim is not

11   really a separate claim, it's a-- it's a theory.

12             Well, let's just back up.  What was the

13   claim that was actually pled?  The claim that was

14   actually pled was that the MOU with KDH&E is invalid

15   because it treats different classes of people

16   differently.

17             Nothing in that claim is dependent upon the

18   grandfather clause or involves the grandfather clause.

19   They realized the weakness of their claim and then they

20   suddenly say, oh, a-ha, no, it's the grandfather clause

21   that is the greater problem.

22             So it is an entirely different section of

23   the laws and policies that they are changing now--

24   challenging now.  They cannot say that a challenge to a

25   separate policy that is not even in the statute or in

15-9300/16-2105   Keener v. Kobach/Fish v. Kobach   03.03.17   19

1    the MOU-- I'm sorry, that is in the statute but is not

2    in the MOU is-- is just a theory that supports their

3    original claim.  There's no way that the grandfather

4    clause claim is just a theory.  And that's the only way

5    they get around their problem with the pleading, is that

6    it's a theory that supports the original claim.

7             It's not.  It's an entirely different

8    challenge to a different part of our structure of laws

9    and policies.  So I-- you know, I admire their-- their

10   attempt to get around the problem, but it's a new-- it's

11   a new claim against an entirely new policy.

12            THE COURT:  All right.  It seems that you

13   argue that the right to vote, the fundamental right to

14   vote, is irrelevant to the analysis with respect to the

15   privilege and immunities claim.  And my reading of the

16   *Dunn* case is that the right at issue actually informs

17   the level of scrutiny that necessarily applies.  I'd

18   like to hear your thoughts about that.

19            MR. KOBACH:  So I might run back and grab

20   a-- oh, maybe I have the paper up here.

21            So the level of scrutiny in a-- in a case

22   involving the privileges and immunities clause right to

23   travel - here we go - was summarized by the Third

24   Circuit in the *Connelly versus Steel Valley* case.  And

25   that's in 706 F.2d [sic] at 2014-- at 214.  And

1   basically the Third Circuit does a good job of

2   summarizing *Saenz* and *Shapiro* and *Dunn*.

3            Here's what the Third Circuit stated, "In a

4   line of cases implicating the fundamental right to

5   travel, the Supreme Court has applied strict scrutiny

6   only to durational residency requirements."  And the

7   Third Circuit went on - and that's a quote - went on to

8   state that, "When the receipt of a government benefit is

9   conditioned on factors other than duration of residence,

10  we apply rational basis review to determine whether the

11  right to travel has been unconstitutionally burdened."

12  And so that's--

13            THE COURT:  So I understand that to be one

14  of your arguments, that this only applies in the context

15  of durational requirements.  But that argument

16  essentially comes from *Crawford*, does it not?

17            MR. KOBACH:  Right.  *Crawford* is the most

18  recent iteration of it, but it--

19            THE COURT:  But *Crawford* is an equal

20  protection claim and we're talking about a privilege and

21  immunities claim.  So one question I have for you is:

22  Aren't these claims distinct and why would--

23            MR. KOBACH:  They're very distinct.  And I--

24  I answered incorrectly just a moment ago.  It comes from

25  *Saenz versus Roe* too.  *Saenz versus Roe* from 1999 is the

 1   most recent privilege and immunities case involving the

 2   right to travel that the Supreme Court came up with.

 3             As you know, the privileges and immunities

 4   clause in 1872 was effectively rendered a dead letter in

 5   the *Slaughter-House* cases.  And it was limited to a very

 6   narrow set of claims, your right to go seek help at a

 7   U.S. embassy when you're abroad and also the right to

 8   travel freely among the states if you're a U.S. citizen.

 9             And then in *Saenz versus Roe*, we saw the

10   Supreme Court once again come back to privileges and

11   immunities and-- and very narrowly characterized it and

12   said this is only a right that is offended when a state

13   discriminates between the new-arrival resident and the

14   more long-term resident.  And the Court was very clear

15   about that.

16             So our argument is that their

17   right-to-travel claim under the privileges and

18   immunities clause doesn't even apply here, because there

19   is no distinction in our statutes or in our policies

20   between recently-arrived residents and longer-term

21   residents.

22             THE COURT:  But they're co-extensive to some

23   extent, because if you recently-- if you've arrived

24   since 2013, obviously you couldn't have been registered

25   before 2013 unless obviously you were somebody that left

1    and came back.  But for those class of people that are

2    new to Kansas and come before-- I mean after 2013,

3    they're new arrivals, they're new registrants as well.

4    So it's co-extensive to that extent.

5            MR. KOBACH:  Well, somewhat.  I would say

6    we've got to be careful in distinguishing between

7    registration and residency.  So the grandfather clause

8    only applies to whether you were registered on

9    January 1st, 2013.  If you had been a lifetime resident

10   for 60 years and never registered, you're not protected

11   by the grandfather clause.  It's not-- they're not

12   co-extensive, they're different.

13           And the P and I, the privileges and

14   immunities clause case law is very, very clear.  It's

15   about residency and the duration of your residency.

16   Nothing goes into it about timing of your registration.

17   There's nothing about place of birth in those cases.

18           Let me give you an example of how important

19   this distinction is to make.  Consider my-- consider my

20   case, my personal circumstances.  Let's imagine

21   everything about me is correct except that I'm not yet

22   registered to vote.  So I have lived in Kansas

23   continuously ever since-- I've been a Kansas resident

24   continuously ever since I left law school in 1995.  And

25   that was in the state of Connecticut.  So my-- I've been

 1    a Kansas resident for 22 years.  However, I was born in

 2    Wisconsin.

 3              So if I decide to register today, I-- there

 4    won't be any document at KDHE and there won't be any

 5    document at KDOR, the DMV, that establishes my

 6    citizenship.

 7              On the other hand, imagine the case of a

 8    person who was born in Kansas, goes away to school, goes

 9    away to law school and comes back today and seeks to

10    register to vote.  And his duration of residency in

11    Kansas is not 22 years, it's one day.  Well, he was born

12    in Kansas, so he has an advantage, an incidental

13    advantage in this policy over what I would have, even

14    though I'm a resident of 22 years.

15              And so it's not-- there is no disadvantage

16    on term of residency.  In fact, it could work the

17    opposite case-- way, as I've just described.  And if

18    we're going to look at the privileges and immunities

19    claim, we have to stay on the language of the Supreme

20    Court precedence.  And all of that language deals with

21    duration of residency.  The *Dunn* case is on duration of

22    residency.  And *Dunn*, of course, mixes equal protection

23    and-- and privileges and immunities.

24              THE COURT:  But this is even more egregious

25    in the sense that it's not based on how long somebody

 1    has been-- some fixed point in time or how long somebody

 2    has-- I mean, set aside the grandfather clause.  It's

 3    not based on duration at all, it's based on place of

 4    birth.

 5            And in that sense, it's far more egregious

 6    in terms of the third clause of-- of this right to

 7    travel; and that is, for those travelers who elect to

 8    become permanent residents, the right to be treated like

 9    other citizens of that state.  That's from *Saenz*--

10            MR. KOBACH:  Right.

11            THE COURT:  -- which describes the three

12    components of the right to travel.  But *Saenz* also says,

13    "The fact that a law may only incidentally implicate the

14    right to travel is not a defense."  So you've given me a

15    hypothetical and spoke of-- I mean, you used the word an

16    "incidental" effect.

17            MR. KOBACH:  I used the word "incidental" to

18    describe the KDHE checks.  Now, it is absolutely correct

19    that a KDHE check is only going to determine if you were

20    born in Kansas.  And so it is not the intent of the KDHE

21    check to help only people who were born in Kansas.  We--

22    we run all the names against the KDHE because our

23    registration application doesn't ask where you were

24    born, so we don't know.  So we just run and say, hey, if

25    they were born in Kansas, we will help them.

1           So incidentally-- or not-- we could say

2    indirectly, the law-- that policy does benefit people

3    who were born in Kansas more than it benefits people not

4    born in Kansas.  But note that the brief argumentation

5    of the other side, they keep going to KDHE, but they

6    don't mention KDOR.

7           We have the same policy now in place with

8    KDOR, and that is to say with our driver's license

9    documents.  That does not in any way prefer Kansas-born

10   individuals over others.  It is absolutely fair to all.

11   In fact, what is the first thing you do when you move to

12   another state?  Well, if you're someone other than Mr.

13   Bednasek, you actually get a driver's license in that

14   state, because state law requires you to get a driver's

15   license within four weeks or six weeks.  Some people,

16   like Mr. Bednasek, disobey that law.  But if you become

17   a resident of the state, you get that driver's license.

18           And in Kansas, all new driver's license

19   applicants from out of state, even if they had a

20   driver's license in their previous state, must provide

21   proof of citizenship if they are U.S. citizens.  And

22   so--

23           THE COURT:  All right.

24           MR. KOBACH:  -- KDOR has that.

25           THE COURT:  So if I disagree with you, and I

 1    think I probably will, but if I disagree with you with

 2    respect to whether the privilege and immunities right to

 3    travel only applies to statutes that invoke some sort of

 4    durational requirement, if I disagree with you on that

 5    and-- and decide that it goes beyond that, you would

 6    agree that the analysis and the test, if you will, that

 7    I will apply to the privilege and immunities claim is

 8    different than what *Crawford* applies in equal

 9    protection.

10                 MR. KOBACH:  Absolutely.  I agree.

11                 THE COURT:  Equal protection, there's the

12    balancing.

13                 MR. KOBACH:  You go rational basis, as I

14    just explained from the Third Circuit decision.  You

15    would apply a rational basis test and you would look at

16    the state's interests, so--

17                 THE COURT:  All right.  Let's set that

18    aside, because I'm going to have some specific questions

19    about the equal protection claim.  We're not there yet.

20    But with respect to the privilege and immunities claim,

21    it's not a balancing test.  It's define what the right

22    is and that, in turn, determines what the standard is,

23    would you agree?

24                 MR. KOBACH:  Well, right.  As I just quoted

25    from the Third Circuit case.  Yeah.

1           THE COURT:  Okay.

2           MR. KOBACH:  And here, we would have the

3    state's rational basis in a number of interests.

4           THE COURT:  Okay.  All right.  I think--

5    let's see.  A couple other things I want to ask you

6    about the right-to-travel claim.  I should just-- I

7    should ask you this, I asked Mr. Danjuma this.  So are

8    you telling me that you weren't on notice that

9    plaintiffs were arguing that the privilege and

10   immunities clause was-- was implicated through the--

11   through the 2013 requirement, the grandfather clause?

12          MR. KOBACH:  Correct.  We were not on

13   notice.  They didn't plead the grandfather clause

14   violated any provision of the Constitution.

15          THE COURT:  All right.  Even though they say

16   that it's-- that theory or claim - there's a dispute as

17   to what it is - is based on the language of the statute

18   itself as opposed to their other argument, which is an

19   as-applied argument.

20          MR. KOBACH:  Under that logic, Your Honor,

21   anytime I-- anytime I attack a big statute as a

22   plaintiff, I could sit here and attack this portion of

23   the statute all day long through all my briefings and

24   then finally at the very end attack this part of a

25   statute and say, oh, no, no, it's the same statute, it's

1  just a different theory.  That's ridiculous.  It's a

2  completely new claim.

3          And by the way, if-- if we were aware of

4  this and had notice of this, we would've certainly

5  addressed it in our opening motions.  We didn't address

6  it in our opening motions for summary judgment because

7  we had no idea that this was-- that they were going to

8  shift ground and now start talking about the grandfather

9  clause.  You know, frankly, I think their grandfather

10  clause claim is flawed for multiple reasons.  And I'd

11  love to go into those, if you want me to now or I can do

12  it later.

13          THE COURT:  Why don't you reserve that for

14  any further argument you want to make.

15          MR. KOBACH:  Sure.

16          THE COURT:  All right.  I think that-- yeah,

17  the third question-- well, plaintiff in pages I think 78

18  to 79 of their reply brief, there's a rather lengthy

19  string cite to other cases that have applied the right

20  to travel outside of the durational requirement context.

21  And so you're arguing it should only be applied in that

22  context.  What do you say about those other cases?

23          MR. KOBACH:  Yeah, what I say is that the

24  plaintiffs-- if you look at the cases, and they try to

25  rely especially on-- I'm trying to remember the names of

 1    the cases.  *Dunn* and *Soto-Lopez*.

 2            THE COURT:  Uh-huh.

 3            MR. KOBACH:  So those are the two Supreme

 4    Court cases they're trying to rely on.  So *Soto-Lopez*

 5    and *Dunn*-- *Soto-Lopez* came from the Supreme Court in

 6    1972.  Sorry, *Dunn* was 1972.  *Soto-Lopez* was 1986.  And

 7    the-- they try to suggest that if you go back to these

 8    older cases and not look just at *Saenz*, you could come

 9    up with a broader right-to-travel privileges and

10    immunities doctrine.

11            But if you actually look at the cases, you

12    can't get there.  In fact, the *Soto-Lopez* court in 1986

13    summarized the holdings of both *Soto-Lopez* and *Dunn* and

14    these other intervening cases and said the following,

15    and this is at 476 U.S. at Page 904, "The analysis in

16    all of these cases is informed by the same guiding

17    principle.  The right to migrate protects residents of a

18    state from being disadvantaged or from being treated

19    differently simply because of the timing of their

20    migration from other similarly-situated residents."

21            All of these cases are about whether you

22    migrated recently to the state or migrated in a more

23    distant past to the state.  And if you distinguish

24    between those two, yes, then you have a problem.  There

25    would definitely be a problem if our statute said that

1    you couldn't register to vote because you haven't lived

2    in Kansas long enough, which is why the Tennessee

3    statute was struck down by the Supreme Court.

4              THE COURT:  All right.  If that argument is

5    correct, then I suppose what you're telling me is that--

6    and aside from equal protection claims, if we're just

7    focused on a privilege and immunities claim, if there

8    were a state that enacted a statute that said you get a

9    tax exemption if you're born in Kansas, you don't get a

10   tax exemption if you're born in Wisconsin - and that's

11   what the-- I think the *Hooper* case was about - or-- or

12   some of the other benefits, you get to go on welfare

13   immediately if you're born in Kansas, you never get to

14   go on welfare if you're not born in Kansas.  I mean,

15   would that not be a violation of the right to travel?

16             MR. KOBACH:  I think you and I both say-- we

17   would say, well, yeah, that seems kind of unfair.  And I

18   would say that certainly seems unfair.  But the

19   privilege and immunities claim, and it goes all the way

20   back to *Slaughter-House*, is the right of citizens to

21   travel freely between the states.  It's not the right of

22   a person born in Kansas to be treated exactly the same

23   as a person born in California.

24             THE COURT:  Well, that's not what *Saenz*

25   says, because that third component-- *Saenz* says there's

1    three components.

2              MR. KOBACH:  Right.

3              THE COURT:  There's the right of a citizen

4    of one state to enter and leave another state.  They're

5    not going to stay, they just want to come back and

6    forth.  There's the right to be treated as a welcome

7    visitor rather than as an unfriendly alien--

8              MR. KOBACH:  Right.

9              THE COURT:  -- when temporarily present in

10   the second state.  But the third component is, and I

11   quote, "For those travelers who elect to become

12   permanent residents, the right to be treated like other

13   citizens of that state."

14             MR. KOBACH:  Right.

15             THE COURT:  And that-- why would that not

16   come up in the context of tax exemptions, welfare

17   benefits, as well as their right to vote?

18             MR. KOBACH:  Right.  I think if you-- if you

19   had a flat-out prohibition that said, you get this

20   welfare benefit if you were born in Kansas, and you

21   don't get this welfare benefit if you were born in

22   another state, you might get there.  You might.  Because

23   that would be getting close to *Saenz* itself.

24             Remember, *Saenz* was people will be-- you

25   can't discourage people from migrating to California

1  because they won't get something that people who have

2  been there for a longer period of time have.

3              THE COURT:  For one year.

4              MR. KOBACH:  Right.

5              THE COURT:  It was all by the one-year

6  restriction.  Yeah.

7              MR. KOBACH:  Right.  And so you-- you might

8  get there.  But that's not what we have here.  We don't

9  have any distinction based on the amount of time that

10  you've lived in Kansas.  And again, we have to consider

11  both of their MOUs.  We're not just doing MOU with KDHE,

12  which is looking for a Kansas birth certificate, we're

13  also doing the MOU with KDOR, which looks for any

14  citizenship document that virtually every new resident

15  has to provide to get their new Kansas driver's license

16  if they comply with our law requiring you to get a

17  Kansas driver's license within I believe it's six weeks

18  after you come to the state of Kansas.

19              So we do look for everybody.  Our searching

20  with other government agencies is equal opportunity

21  searching.  It is incidentally or indirectly more likely

22  that if-- when we do a search at KDHE, people born in

23  Kansas are obviously going to have documents at KDHE.

24  But when we search with KDOR, there is no advantage to

25  people born in Kansas.

1           THE COURT:  And where-- can you point me to

2    the record that-- the evidence that speaks to how the

3    KDOR works-- search works, and what the results of that

4    search has been?  Because I know--

5           MR. KOBACH:  We can.  We talk about it in

6    many of our--

7           THE COURT:  Okay.

8           MR. KOBACH:  I'll rely on my co-counsel to

9    start putting together a list of points.

10          THE COURT:  Well, because I know-- I think

11   it's based on the KDHE search, there's some evidence

12   that 40 to 50 percent of the-- of that search reveals

13   people born in Kansas, meaning 50 to 60 percent not born

14   in Kansas.  Are there similar-- similar evidence and

15   numbers with respect to what the KDOR search reveals and

16   in-- perhaps in conjunction with KDHE?

17          MR. KOBACH:  No.  The reason you don't have

18   something similar exactly to that is because with KDHE

19   we're just saying, okay, check and see if these people

20   are born in Kansas.  And it comes back that about

21   40 percent of them are and so we're able to confirm

22   citizenship that way.

23          With KDHE-- I'm sorry, with KDOR, the

24   driver's license division has documentation from people

25   born everywhere.  So the fact that we get a positive

1   response and say, yep, we've got a citizenship document

2   from this person doesn't imply that the person was born

3   in Kansas because they-- we have documents for people

4   born all over the country.

5          THE COURT:  So what do you do with that

6   then?  I mean, I-- I guess I was understanding you to

7   say that Kansas is not only determining citizenship

8   through KDHE searches, but they're also determining it

9   through KDOR searches.

10          MR. KOBACH:  Right.

11          THE COURT:  But you're telling me the fact

12  that somebody has a driver's license doesn't mean

13  they've got DPOC.

14          MR. KOBACH:  No, what I'm telling you is

15  that all newly-arrived-- all new applicants for Kansas

16  driver's licenses who are U.S. citizens must provide

17  proof of citizenship.  The statute reads they provide

18  proof of lawful residence.  But if you're a citizen,

19  that means proof of citizenship.

20          And so we already have hundreds of

21  thousands, perhaps more than a million, Kansans whose

22  data is in the KDOR database and there is a citizenship

23  document for you.  So if you move to Kansas and you--

24  instead of showing your birth certificate, you showed an

25  old passport, we have that image of the passport.  And--

1   and the Kansas Secretary of State's office can confirm

2   that image and say, okay, proof of citizenship has

3   already been obtained for this person, she is a-- we

4   will complete her registration to vote.

5           So the KDOR process does not give any

6   advantage to people born in Kansas.  Pretty much

7   everybody-- in fact, you might even argue, and we don't

8   have the statistics on this, but, you know, it's more

9   likely that-- for example, I was born in Kansas and--

10  I'm sorry, I grew up in Kansas, not born in Kansas, and

11  have had a Kansas driver's license for many years.  But

12  I got my driver's license, as I expect you did, before

13  the-- the Real ID Act came into place and started

14  requiring states to get proof of citizenship for new

15  driver's license applicants.

16          So it tends to be the newer driver's license

17  applicants who have the proof of citizenship in KDOR.

18  And that involves a lot-- that's not people like you and

19  me who have lived in Kansas for a long time, that's

20  people who are coming into Kansas and people who are

21  turning 18, those people, the newly-arrived individuals

22  in the last 12 years, since the-- well, no, the last ten

23  years, and people who have just turned 18 are the ones

24  most likely to have citizenship documents in KDOR.

25          THE COURT:  I mean, irrespective of the fact

1   that there's that subset of people that are not born in

2   Kansas but yet Kansas has record, yet there's, you know,

3   these thousands of people that have been struck from the

4   registration list, despite these measures you talk

5   about, the check with KDHE and the KDOR, there's still

6   people, including some of the plaintiffs.

7           MR. KOBACH:  No one has been struck from the

8   registration list.  These thousands of individuals are

9   people who haven't completed their registration.  And

10  plaintiffs continue to push an illogical conclusion upon

11  the Court.  And they say, well, because this person has

12  not completed his registration yet, he can't complete

13  his registration.  Because he has not yet done so, he

14  obviously is unable and, therefore, he is disfranchised.

15          That is not true.  And we have presented

16  evidence to the Court very early in this case, more than

17  a year-- a year ago of sampling done in Sedgwick County

18  where they looked at people on the suspense list and

19  they found that over 30 percent of them had moved away.

20  That's why they weren't responding.

21          THE COURT:  All right.  I think we're

22  getting far afield of what I wanted to ask at this

23  point.

24          MR. KOBACH:  Okay.

25          THE COURT:  I'll give you an opportunity, as

1    I did Mr. Danjuma, to explain how this EVVE works, if

2    you know, and why Kansas isn't using it and why you're

3    not at least attempting to do and take more measures to

4    help people like the state of Wisconsin is doing.

5          MR. KOBACH:  So the way the EVVE system

6    works is you have to have a place of birth for the

7    person you are searching if it's going to be of any use

8    at all.  You need to have state of birth.  One of the

9    reasons you need to have state-- and Kansas doesn't ask

10   for state of birth on the voter registration form.  In

11   fact, I'm not aware of any state that does.  There might

12   be one, but I'm not aware of it.  The federal form does

13   not allow for state of birth.  And one of the reasons

14   that they don't is when the-- they were considering that

15   when they first created the federal form back in the

16   '90s.

17         THE COURT:  Yet Wisconsin has figured out a

18   way.  And perhaps it is somebody is identified as not

19   having the requisite documentation, and that person can

20   then have a conversation with the state saying, oh, I

21   was born in Idaho, and then the state takes it from

22   there.

23         MR. KOBACH:  You know, I've been thinking

24   about-- I've heard about the Wisconsin situation and I'm

25   not entirely familiar with it, but it-- it does occur to

1   me that there's something possible that we could do.

2   And that is, if you have the individual provide--

3   because as I understand the Wisconsin arrangement - and

4   again I may be wrong - there is some communication

5   between the registration applicant and the state.  And

6   in that communication, the applicant tells the state,

7   oh, hey, I-- I don't have my birth certificate, but I

8   was born in Idaho, could you help me out?

9           We could do something like that in Kansas.

10   And thinking through it, it's something I-- I think it

11   might be feasible to do; and that is, you allow someone

12   to-- who has not yet proven their citizenship, they're

13   on the suspense list, they've started to register, and

14   they say, you know what, I can't find my birth

15   certificate.  I was born in Idaho, it's going to cost me

16   20 bucks to get a replacement birth certificate.

17           You could apply to Kansas, I'm just thinking

18   out loud here, you could apply to the state of Kansas

19   and say, I'm going to get my replacement birth

20   certificate from Idaho, will the state reimburse me?

21   And it's my understanding that I think Wisconsin does

22   something like that.  I think we could.  You know, this

23   is a new-- a new idea, but I think it's feasible.

24           And it would help people, which we'd love to

25   do, it would help people who are having trouble getting

1   their birth certificate.  That's why we give them a free

2   replacement birth certificate if you're born in Kansas

3   and we check for them.  We check-- you know, we're

4   trying to make this as easy as possible for people.  And

5   so that's certainly something we could look into.

6           I don't know if it's-- and you tell me, I

7   don't know if it's appropriate for the Court to enjoin

8   the state to do that, but it's certainly something that

9   is possible for us to do, if I understand the Wisconsin

10  program correctly.

11          THE COURT:  All right.

12          MR. KOBACH:  The other problem with EVVE,

13  real quickly before we leave that subject, is it only--

14  it doesn't involve all 50 states.  So you can't draw a

15  conclusion that a person is not a United States citizen

16  if you just submit a name to EVVE without knowing the

17  person's state of birth, because that person could've

18  been born in one of the four or five states that don't

19  submit any information.

20          And so you cannot-- so if the response comes

21  back, we don't have any birth certificate in the

22  participating states, you cannot conclude that the

23  person is not a U.S. citizen because he might've been

24  from one of those other four states, so--

25          THE COURT:  What about this other system, I

1   forget the acronym, but it searches by registered alien.

2           MR. KOBACH:  The SAVE system?  Systematic

3   Alien Verification for Entitlements?

4           THE COURT:  I think so, yeah.

5           MR. KOBACH:  Yeah.  So we have sought use of

6   the SAVE system in the past and the Department of

7   Homeland Security said no.  We wanted to balance our

8   voter rolls against the SAVE system.

9           And the-- the reason they said no at that

10  time was they said, well, we want-- in order to do a

11  massive data mash like this, we want you to give us an

12  alien number, an A number, which is the term DHS uses.

13  Well, we can't do that because we don't ask people for

14  alien numbers on their voter registration applications.

15  Indeed, it would be illogical to do so because only

16  aliens have alien numbers and aliens aren't supposed to

17  be registering to vote.

18          In the-- in this latest renewed discovery

19  that this Court is certainly aware of in the wake of the

20  Tenth Circuit opinion, we did have a sample of

21  non-citizens, a very small sample, that we sent to the

22  Department of Homeland Security and asked them if they

23  would consider looking at that small sample.  And they

24  did.  However, it was not an automated response, it was

25  a manual.  They had to go in and look at these names.  I

1  believe it was-- I think the total number of people was

2  about 150 or so.  And they did do that for us.

3          But the SAVE system, which is an automated

4  system, the federal government has not given access to

5  that.  And we have asked.  And so have other states,

6  including Colorado, Ohio, and Florida.

7          THE COURT:  Okay.

8          MR. KOBACH:  And they have not gotten

9  access.  They've been given a similar answer like, well,

10  you can have it if you can give us an A number.  Well,

11  we don't have A numbers, we can't use it.

12          THE COURT:  Okay.  All right.  That's it for

13  now on that claim.

14          MR. KOBACH:  Thank you.

15          THE COURT:  And so now I have some questions

16  of Bednasek case plaintiffs on their right-to-vote

17  claim.  Mr. Johnson.

18          MR. JOHNSON:  Thank you, Your Honor.

19          THE COURT:  The first thing I want to get

20  some clarification on is whether your claim is just

21  equal protection or also due process, because Mr. Kobach

22  has briefed pretty extensively a challenge to--

23          MR. JOHNSON:  It's just equal protection,

24  Your Honor.

25          THE COURT:  It's just-- okay.

1          MR. JOHNSON:  Yes, Your Honor.

2          THE COURT:  Only equal protection, not due

3    process.

4          MR. JOHNSON:  Right.  Right.

5          THE COURT:  Okay.  I'd like to hear your

6    thoughts on the similarities and differences between the

7    photo ID at the poll cases that you discuss in the

8    briefs and our case, this case.

9          MR. JOHNSON:  Right.  So in other words,

10   distinguishing the-- for example, the Marion County--

11   the *Crawford versus Marion County* case from our-- from

12   ours.

13         THE COURT:  Correct.  Because that's an

14   equal protection claim.  Right.

15         MR. JOHNSON:  Exactly.  Well, what we

16   believe the principal distinction is, is that in the

17   photo ID cases, such as the *Crawford* case, those are

18   uniform, not-- uniform and of non-discriminatory

19   application.

20         Everybody who votes, for example, in-- in

21   Indiana under the facts of the *Crawford* case, has to

22   bring with him or her a photo ID.  That's not the

23   situation here in Kansas with the DPOC law.  It only

24   applies, as-- as you well know, to certain

25   classifications.  It doesn't apply to anybody who was

1    registered before 2013, ironically, Your Honor,

2    including people whom the defendant argues were

3    illegally registered.  Those-- that grandfathering,

4    which was part of the statute, bakes illegal

5    registration to the extent it exists - and we don't

6    believe that it existed in any appreciable manner -

7    bakes that into the situation in Kansas.  And nothing

8    can be done about it absent a-- the type of remedy that

9    we're seeking.

10            So that's one classification of people that

11   do not have to comply with the DPOC law.  In other

12   words, have to affirmatively produce a piece of paper

13   demonstrating that they are citizens.

14            The same is true for anybody born in Kansas.

15   That's through the-- the agreement, the unilateral

16   terminable at-will agreement, that the-- the Secretary

17   of State and the KDHE have entered into, allowing the

18   Secretary of State to send lists of names to the KDHE, I

19   believe every month is when they do it, to find whether,

20   you know, people on that list have Kansas birth

21   certificates.  And the people on the list are

22   essentially those folks who are on the suspense list who

23   have sought to register within the past month.  In other

24   words, they didn't provide the documentary proof of

25   citizenship and so the-- the Secretary is trying to

1    establish citizenship through obtaining records from the

2    KDHE.

3              So you have a situation where you have a

4    classification, a class of people who have to comply

5    with the law, essentially somebody who wasn't born in

6    Kansas and who wasn't registered as of 2013.

7              THE COURT:  All right.  Sort of a corollary

8    question, because the Supreme Court spoke to the

9    inadequacy of the record in *Crawford*.

10             MR. JOHNSON:  Right.

11             THE COURT:  Could you compare the state of

12   this record to that record in *Crawford?*

13             MR. JOHNSON:  Well, one thing that I think

14   really distinguishes the record here is that we know how

15   many people are affected by this.  Oftentimes in cases

16   where you have voter restrictions of one type or another

17   at issue, you don't know how many people are affected by

18   it.  Here we do.

19             Those are the people-- that's the number of

20   people on the suspense list.  They are directly and

21   effectively prevented from registering to vote and,

22   therefore, voting, of course, because they haven't

23   provided the piece of paper showing that they are

24   citizens of the United States.

25             THE COURT:  Well, isn't there another--

1    there's another distinction, and that is between the

2    situation where someone is-- presents to vote and

3    doesn't have the proper photo ID.

4              MR. JOHNSON:  Right.

5              THE COURT:  These cases allow casting of

6    provisional ballots or they allow absentee ballots.

7              MR. JOHNSON:  And that's a very good point.

8    Here, you don't have the-- you might also-- you might

9    say almost the self-correction option that the photo ID

10   laws generally provide.  In other words, if you show up

11   to vote without the appropriate ID, whether it's your

12   driver's license or some other kind of photo

13   identification, the state laws generally allow you to

14   vote a provisional ballot and then give you a certain

15   period of time, three days, six days, ten days -

16   depending on the state - after the election to go to

17   the, for example, the county election officer, show them

18   your photo ID and your vote is then counted.  That would

19   not happen here because the people aren't registered in

20   the first place.

21             THE COURT:  So there's no-- although there

22   may be curative measures in Kansas in place in terms of,

23   you know, assuming they get notice and, you know, they

24   have an opportunity to cure their registration and

25   assuming they can do that before the cutoff--

1          MR. JOHNSON:  Right.

2          THE COURT:  -- they may be allowed to vote.

3          MR. JOHNSON:  The 90 days as set by K.A.R.

4    7-23-15, the-- the Secretary's rule on that.

5          THE COURT:  But the difference is, there's

6    no mitigation in terms of can this person vote.  If

7    there's-- if there's some-- in Kansas.  If there's some

8    issue with registration and they're, you know, not able

9    to cure that, they simply can't vote.  It's not a

10   situation in this state where they can cast a vote and

11   then it can be cured later.

12         MR. JOHNSON:  And that's-- that's correct,

13   Your Honor.  And that's why we firmly believe that the

14   rational scrutiny analysis that the defendant argues for

15   and as exemplified in the *Crawford* case doesn't apply

16   here.  It doesn't apply here because that is limited to

17   situations where there are non-discriminatory uniform

18   restrictions.  That's not the case in-- in this

19   situation.

20         This restriction doesn't apply to anybody

21   who's-- who was registered in Kansas before 2013.  It

22   doesn't apply effectively to someone who was born in

23   Kansas.  It applies only to people who weren't born in

24   Kansas and who weren't registered before 2013.

25         THE COURT:  All right.  I'd like you to

1    address Mr. Kobach's argument that I think appears to be

2    supported by *Crawford,* and that is that the relevant

3    evidence of burden would be the amount-- or the number--

4    the number of Kansans that lack proof of citizenship,

5    rather than the number of Kansans whose registrations

6    have been suspended, cancelled, whatever terminology you

7    want to use; in other words, they can't fully register

8    and vote.

9              MR. JOHNSON:  Well, in other words, he's

10   trying to turn this into a factual case so he avoids

11   summary judgment.  He's trying to turn this into a case

12   where we have to show precisely how many people are

13   affected by this, precisely many people-- excuse me, how

14   many people who are unable to come up with the

15   appropriate proof of citizenship.

16             We don't think you have to go there, Your

17   Honor.  We believe that the case can be decided in a--

18   in an examination of the statute in a facial manner.

19   Just as my co-counsel for the ACLU told you, we think

20   this is a-- you know, a combination of facial and

21   as-applied.  The problem being that we don't see a way

22   that this statute can be constitutionally enforced.

23             THE COURT:  So in other words, with respect

24   to your as-applied piece, you're saying that your burden

25   is to show that there are people that lack-- that have

1    proof of citizenship yet-- or that are otherwise

2    qualified to vote, whether they have proof of

3    citizenship or not in their hands, but that were denied

4    the right to register--

5                    MR. JOHNSON:  Right.

6                    THE COURT:  -- or denied registration.

7                    MR. JOHNSON:  And Mr. Bednasek is a perfect

8    example of that.  And-- and as Your Honor well

9    understands, the defendant has said, and we-- and we

10   concede that Mr. Bednasek could provide proof of

11   citizenship.  But because he has refused to do so, we

12   have a case.  A case that you can decide.

13                   If he provided that, his claim would be

14   mooted and the defendant would be able to walk out of

15   here.  What the-- and what the plaintiff-- pardon me.

16   What the defendant has done to our-- to two of our

17   clients has-- is something that we were concerned would

18   happen with Mr. Bednasek, and that is that the Secretary

19   would register these-- these people so their claims

20   would be mooted.

21                   And that-- that raises an interesting point

22   about the KDOR policy which, by the way, as far as--

23   there's nothing in the record that indicates that

24   there's any written documentation, there's no contract,

25   there's no agreement, such as a memorandum of

1  understanding, as far as we can tell that memorializes

2  the terms of the arrangement between the Secretary of

3  State's office and KDOR.

4          It was brought to the Court's attention

5  through a notice filed by the-- filed by counsel in May

6  of last year.  And a month later, they filed a notice

7  indicating that the first notice was incorrect.  And so

8  the terms of the policy seem to have changed or at least

9  certainly seem to have been misunderstood.

10          But let me-- let me point out what we view

11  as a-- as an infirmity in that policy.  And that is how

12  the defendant registered our client, Mr. Cromwell.  And

13  they did that through the KDOR system, or at least as

14  they-- as they have told us.

15          I deposed Mr. Caskey in December of 2015.

16  And this is in the record, this is actually a page from

17  a-- an excerpt from Mr. Caskey's deposition that is

18  included in-- in exhibits that the defendant has filed.

19  And-- and I asked him the following:  "And so does this

20  document, Exhibit 21, indicate to you that the DMV

21  provided proof of citizenship for Mr. Cromwell?"

22          "Answer:  Mr. Cromwell had sufficient

23  evidence with the Division of Motor Vehicles that a

24  valid proof of citizenship document was on file with

25  DMV."

1          "Question:  Do you know what that proof of

2    citizenship document was?"

3          "Answer:  I do not know what the source

4    document was."

5          Further, in his affidavit that was filed--

6    this is Document 150-5 filed with the Court on

7    January 5th, 19-- 2017, excuse me.  On Page 3,

8    Paragraph 9, he reiterated that.  They don't know what

9    documents the KDOR is relying on to tell the Secretary

10   of State that somebody has provided proof of

11   citizenship.  They don't know.  And if they don't know,

12   how could that possibly be admissible as evidence in any

13   proceeding?  So we think that that renders the KDOR

14   policy irretrievably infirm.

15          THE COURT:  Okay.

16          MR. JOHNSON:  On the other hand, the KDHE

17   policy is a unilateral-- pardon me, it's a bilateral

18   agreement between the Secretary of State's office and

19   KDHE, which is terminable at will on 30 days' notice.

20   If it's inconvenient for either party, they can

21   terminate it.  And that means that anybody who hadn't

22   registered before 2013 and who had not provided

23   documented proof of citizenship would not be registered

24   to vote.

25          THE COURT:  All right.  Mr. Johnson, I'd

1   like you to articulate for me how you think the-- the

2   burden ought to be framed for the balancing test on this

3   claim.

4          MR. JOHNSON:  Assuming the balancing test

5   applies, of course.  It seems to me that the-- the way

6   the Court should approach it is looking at the impact of

7   the statute on the plaintiffs or over-- more the-- on

8   people applying to register to vote.

9          And the impact is almost like an on-off

10  switch.  You provide proof of citizenship, you're

11  registered.  You don't, you're not, and you're put on

12  the suspense list.  You have 90 days to provide proof of

13  citizenship.  If you don't, and as the defendant has

14  pointed out, and I-- I fully concede this, you are not

15  stricken from the voter record, the voter rolls, but you

16  have to start the application process all over again.

17         In fact, in their-- in their briefing they

18  say that you can file an unlimited number of voter

19  applications.  But, Your Honor, let me ask you, how many

20  people are going to do that?  Nobody is going to do

21  that.  So it seems to me the burden has to be looked at

22  from the point of view of a denial of a fundamental

23  right.

24         If a fundamental right such as voting is

25  denied, then it seems to me that the state's burden in

1   demonstrating that the policy-- the statute and the

2   policy put together are-- their interests, the state's

3   interests are sufficiently important that it overcomes

4   the denial of a fundamental right.

5            Candidly, I think that that's one of the

6   reasons that summary judgment is appropriate here.  I

7   don't think the state can do that.  It certainly hasn't

8   been able to do that through the three interests that

9   it's articulated here; integrity of elections,

10  maintaining accurate voter rolls, and preventing voter

11  fraud.

12           The evidence of voter fraud that the state

13  has provided is at best ephemeral.  It's old, it's thin.

14  When you look at the number of people who have

15  registered to vote in Kansas supposedly illegally,

16  compared to the number of people who are-- who have been

17  on the suspense list, at any time since the suspense

18  list was created it's been between 10,000 and 40,000.

19  It may not have touched 40,000, but it's definitely been

20  in the 30s.

21           You compare that to the minuscule handful of

22  people who have allegedly registered improperly and

23  perhaps voted improperly, you can see the-- the

24  balancing, if you want to talk about scales, the

25  balancing definitely falls on the side of the people who

1   are-- who are registering to vote.

2           THE COURT:  And construing the evidence in

3   the light most favorable to Mr. Kobach on this issue--

4           MR. JOHNSON:  Sure.

5           THE COURT:  -- how many people are we-- how

6   many bodies in Kansas are we actually talking?

7           MR. JOHNSON:  People who've registered

8   illegally?

9           THE COURT:  Yes.

10          MR. JOHNSON:  A couple of dozen.

11          THE COURT:  Over what time frame?

12          MR. JOHNSON:  The last 20 years.  It may be

13  50.  I don't know, Your Honor.  That is assuming that

14  all of the-- the evidence that-- the tables that-- the

15  charts, excuse me, that the-- that the Secretary has

16  provided to the Court contain absolutely accurate

17  bullet-proof evidence.

18          THE COURT:  All right.  Let's see.  I think

19  that is the last question I have for you on-- on the

20  equal protection claim.  Thank you.

21          MR. JOHNSON:  Your Honor, thank you so much.

22          THE COURT:  We've been going at this an

23  hour.  I have more questions.  And then the final topic

24  I have is the standing and mootness, which I don't have

25  as many questions.  But do you want to take a break,

1    anyone, at this point or do you want to go ahead?

2              Mr. Kobach, I'll ask you first since you're

3    up next.

4              MR. KOBACH:  That's fine, we can keep going.

5              THE COURT:  Okay.  All right.  So my first

6    case -- first case -- my first question is what I asked

7    Mr. Johnson first I think, and that is:  Discuss the

8    similarities and differences between the voting ID at

9    the poll cases and-- that you all have briefed and this

10   case.

11             MR. KOBACH:  Yeah.  I'd like to do that.

12   And I would like to begin with the factual record, which

13   is where you began with Mr. Johnson.  The plaintiffs in

14   *Crawford* were essentially in the same position that the

15   plaintiffs are in here.  They couldn't show any

16   examples, according to the Supreme Court, of-- of a

17   specific individual who couldn't eventually get a photo

18   ID and be-- you know, because the law had various ways

19   to help them, just like our-- our law does as well.

20             But they did have a number, and their number

21   was 43,000 - and the Court recognized this number -

22   43,000 people that didn't at the present time have a

23   photo ID in Indiana.  And so they had a number of people

24   who it appeared potentially might be burdened, a very

25   large number.  And then-- but the Court said you

1    couldn't-- the Supreme Court said there was no proof

2    that any specific individual couldn't eventually comply

3    and get one.

4            Well, that's where we are in this case.

5    They have-- the plaintiffs have a large number, a

6    smaller number, but 20,000 people on the suspense list.

7    They can't point to a single individual on that list

8    who-- and say that individual can't comply with the

9    Kansas law.  Nor can they point to their own plaintiffs

10   and say those people can't comply.  Every one of the

11   plaintiffs either has a birth document in their

12   possession, or in the one case of Bucci, she said she

13   could comply with Subsection 2309(m) once she was

14   informed of it.  And similarly, they don't have specific

15   evidence of the-- of a person who can't comply with it.

16           So we're actually in a very similar

17   situation as far as what the plaintiffs have presented,

18   but we're in a very different situation as far as what

19   the defendants have prevented-- have presented.  Because

20   in Indiana, Indiana could not present a single case of

21   an individual who had committed voter impersonation,

22   which is the type of voter fraud that a photo ID stops.

23           Similarly, in the Tenth Circuit case of

24   *Santillanes,* that was the Albuquerque, New Mexico photo

25   ID law that applied *Crawford* in the Tenth Circuit, the

1    city of Santa Fe-- city of Albuquerque could not provide

2    a single case of a person who had committed that form of

3    voter fraud.

4              Here, in this case, the position of the

5    defendants is much stronger.  We have presented to this

6    Court the 25 cases from Sedgwick County alone.  And then

7    we have-- we have also in the companion case to this,

8    we've also been presenting-- we will be presenting a

9    total of-- a total of 115 known individuals who are

10   non-citizens who have registered or have attempted to

11   register, so--

12             THE COURT:  But that's not in this record.

13             MR. KOBACH:  That's not in this record on

14   this case.  You were asking generally what the numbers

15   were.

16             THE COURT:  I'm only-- I want to focus on

17   the record.

18             MR. KOBACH:  Okay.  But in this case--

19             THE COURT:  That's the problem-- the problem

20   in *Crawford* is there wasn't-- there was an insufficient

21   record.

22             MR. KOBACH:  Okay.  So if we focus only on

23   the record on this specific topic, then we have pointed

24   to the 25 individuals in Sedgwick County.  And so we

25   have 25 versus zero that the state of Indiana had.

1            THE COURT:  And tell me-- tell me a little

2   bit more about the 25.  What time frame are we talking?

3   When did they illegally register?

4            MR. KOBACH:  Those 25 were only-- all of

5   them but one were in the-- were collected over I believe

6   a three-year period when the Sedgwick County election

7   office started going to citizenship ceremonies and

8   started asking-- registering newly-- newly-naturalized

9   citizens and said, okay, you've got your naturalization

10  document right with you now, we'll go ahead and register

11  you.

12           And then they went back and found at the

13  office that, wait, this person has been registered for

14  12 years and has been voting.  And so that chart of 25

15  individuals from Sedgwick County is roughly half people

16  who are already registered as aliens, and then the other

17  half were people discovered since 2013.  So again, all

18  of this is pretty much 2013 onward, so the last three

19  years.  And those individuals were people who were

20  stopped by our proof of citizenship law.  And then in

21  subsequent communication with the Sedgwick County

22  election office, they acknowledged that they were not,

23  in fact, U.S. citizens.

24           So based on the statements of the

25  individual, or in a couple cases the individual's

 1  daughter, no, my mom is not a U.S. citizen, they were--
 2  they had confirmation that they were non-citizens who
 3  had attempted to vote.  So we have 25 cases of the
 4  specific type of fraud we are trying to prevent.
 5  Indiana had zero cases of the specific fraud.  But the
 6  Supreme Court in Indiana said it is not necessary for
 7  the state to show that they have a long list of this
 8  type of fraud.  It is enough for the state simply to say
 9  we want to try to prevent this type of fraud in the
10  future.  And--
11          THE COURT:  Okay.  Tell me this, given the
12  2013-- you know, if this only applies post-- to
13  post-2013 registrants, I mean, it seems to me that
14  plaintiffs do have an argument that it's under-inclusive
15  in the sense that this law wouldn't have prevented any
16  of that.
17          MR. KOBACH:  We acknowledge that we do not--
18  we are not able-- because of the way of the grandfather
19  clause, it is quite possible that, as Mr. Johnson said,
20  there are some non-citizens who are baked into the voter
21  rolls because we're not going-- going back and checking
22  people who are already registered.
23          But as the Tenth Circuit said in
24  *Santillanes*, addressing this very similar issue, a state
25  is not required to solve all of the problems at once.  A

1   state can approach the issues of voter integrity

2   incrementally and try to address-- and there the

3   question was, well, you're not-- you're dealing with

4   people who vote in person, but you don't try to deal

5   with people who commit fraud by mail.  And the city of

6   Albuquerque acknowledged that, said, well, yeah, you're

7   right, we-- we want to address this problem first.

8           Well, the same is here.  We've got a massive

9   complex voting system with so many people involved

10   across the state.  And we-- we explained this in our

11   briefs.  It would be virtually impossible to

12   constitutionally do this for the entire 1.6 million

13   people.  Because what you'd-- what they're essentially

14   suggesting is that if you don't have a grandfather

15   clause, you de-register the entire voter rolls of 1.6,

16   now it's 1.8 million people in Kansas, and tell

17   everybody, inform them - and we know that the U.S. Mail

18   doesn't work effectively enough - you inform all

19   1.8 million people, hey, guess what, you're not

20   registered anymore, you've got to come back in and prove

21   your citizenship.  It is practically impossible to do

22   that.

23           So we recognize what the Tenth Circuit has

24   said in *Santillanes*.  And we don't have to solve all the

25   problems.  It is enough that we try to solve the problem

1   going forward.  It would be unreasonable--

2           THE COURT:  All right.  So you've

3   articulated what the-- what the record evidence is

4   that-- that establishes what you say is the problems

5   from-- with respect to the state's interests being

6   impeded-- well, and the various interests that you've

7   articulated; the integrity of the process, et cetera.

8           But what about record evidence of the burden

9   on people?  Isn't there really a-- a great distinction

10  between what we're here to talk about and the voter ID

11  at the polling place when you consider that voter ID or

12  identification at all is much easier to obtain, it's

13  more universally held, and the fact that these are folks

14  who ultimately, if they were able to cure, could vote.

15  Whereas in Kansas, cure or not, not registered, can't

16  vote.

17          MR. KOBACH:  I do not think that the burden

18  is different.  In fact, I think the burden is much less

19  in this case because we allow a person-- in Indiana, you

20  had to go to not one but two government offices.  And

21  they talked about people who lacked citizenship

22  documents.  And this is very important.  The Supreme

23  Court in the *Crawford* case said that these individuals

24  who don't have photo ID are going to have to get a

25  passport or an underlying citizenship document to get

1    their photo ID.

2              And the Court in *Crawford* specifically held,

3    and this is quoting from *Crawford* at Page 198, "The

4    inconvenience of making a trip to a government office,

5    gathering the required documents, and posing for a

6    photograph surely does not qualify as a substantial

7    burden on the right to vote or even represent a

8    significant increase over the usual burdens of voting."

9              So gathering a citizenship document was part

10   of the burden.  And they had to go in person twice,

11   first to get your document and then in person present

12   that document at the polling place.  So the burden in

13   *Crawford* was greater really than the burden in our case.

14             THE COURT:  Well, but they're-- it's hard to

15   apply *Crawford* at this point because in *Crawford* there

16   wasn't any record.  I mean, that court talked about

17   that.  But the bottom line was, there was no record

18   evidence about burden in *Crawford*, as there is here.

19             MR. KOBACH:  I don't believe there is record

20   evidence of the burden here.  The burden-- the record

21   evidence that the Supreme Court pointed to as lacking in

22   *Crawford* was record evidence naming specific individuals

23   who could not comply.  The plaintiffs here have not

24   named or identified specific individuals in the state of

25   Kansas who cannot comply.  Not who do not wish to

1    comply, but who are-- are incapable of complying with

2    the law.

3              THE COURT:  *Crawford*, the Court said,

4    "Nothing in the record establishes the distribution of

5    voters who lack photo identification," and, "the record

6    does not provide even a rough estimate of how many

7    indigent voters lack copies of their birth

8    certificates."  Well, here we do.  We know how many

9    people are on that suspense list that are identified by

10   the state as not having produced proof of citizenship.

11             MR. KOBACH:  Your Honor, with respect, you

12   just made a jump there.  What-- the people who are on

13   the suspense list are not unable to provide birth

14   certificates.  The quote you read from *Crawford* said

15   that they are unable because they do not have a birth

16   certificate.  And so the-- the people--

17             THE COURT:  No, it says "who lack."

18             MR. KOBACH:  Right, "who lack."

19             THE COURT:  It didn't say "not able."  It

20   says, "who lack photo identification."

21             MR. KOBACH:  Right.

22             THE COURT:  Just like the suspense list

23   here, lack proof of citizenship.  It doesn't say whether

24   they can get it or not, but lack it.

25             MR. KOBACH:  Right.

1          THE COURT:  Presumably everybody can with a

2    lot of effort and maybe money and time--

3          MR. KOBACH:  It is impossible--

4          THE COURT:  -- and everything else.

5          MR. KOBACH:  -- for us to assume that the

6    20,000 individuals on the suspense list are-- lack the

7    documents.  We cannot assume that.  We know from

8    sampling that about a third of them have just left the

9    state.  We know that many of them have just-- have

10   decided that they don't have any interest in following

11   up and finishing the process.

12          And we did the-- we also did the polling,

13   which was presented in the other half of this case

14   involving the NVRA claim.  And the polling showed that

15   there was not a single individual who-- who was hit by

16   the poll that said, the reason I'm not registered is

17   because I don't have the documentation for our proof of

18   citizenship law.  Not a single one.  So the record

19   evidence is very similar.  They have not shown a single

20   individual.

21          THE COURT:  Other-- other than the people

22   that left, who presumably weren't going to be here to

23   vote anyway, the fact that somebody didn't want to

24   continue to take steps to get registered to vote tells

25   me nothing.  All I can tell from the record is that they

1    lacked proof of citizenship.  And on that basis, they

2    weren't able to register.

3              MR. KOBACH:  With respect to Your Honor, all

4    you can tell is that they have not provided proof of

5    citizenship, just like the plaintiffs in this case.

6    They're on the suspense list.  They didn't lack it, they

7    didn't want to provide it.

8              THE COURT:  Well, I think you're being-- I

9    think this is semantics, because in *Crawford* they lacked

10   it, they didn't provide it.  What's the difference?  I

11   mean, from the state's standpoint, looking through the

12   state's lens, if they didn't provide it, they lacked it.

13             MR. KOBACH:  I think it's almost identical.

14   In *Crawford* you had 43,000 people who did not yet have a

15   photo ID.  And the Supreme Court said you have-- you,

16   the plaintiffs, have failed to show us that any of those

17   43,000 can't do it and can't get the ID that the state

18   will provide.

19             Similarly, we have 20,000 people who have

20   not completed their registration.  And the plaintiffs

21   have failed to show a single person among those 20,000

22   who actually cannot comply with our law and eventually

23   provide proof of citizenship.  So I think it's-- it's

24   parallel.

25             THE COURT:  All right.  I'd also like you to

1    address this other I think discrepancy - distinction I

2    should say - in what's going on in the voter ID cases

3    and these cases.  In those cases, there's mitigation.

4    There's the potential for mitigation, someone can vote.

5           In this case, if someone either-- and we had

6    some-- at least at the PI stage, some evidence at that

7    point and-- that people didn't get notice and weren't

8    able to register or perhaps they did get notice, but

9    they couldn't cure in time because of the difficulties

10   in getting proof of citizenship.  They can't even cast a

11   vote that will provisionally be counted.

12           But in the photo ID cases, they can cast a

13   vote that may or may not be-- if they cure can be

14   provisionally counted.  It's two different things.  You

15   know, at least an opportunity to vote in those other

16   cases.  But in this case, no opportunity to vote.

17           MR. KOBACH:  Well, I think we're comparing

18   apples and oranges.  But there is a way we can compare

19   them.  You have the 10-day period in Indiana and that

20   was-- you failed to bring or photo ID, but you got ten

21   days to bring it after the fact.

22           In Kansas, registration closes 20 days

23   before election day.  We give them a 20-day grace

24   period.  You have handed in your card to register on day

25   21 before the election, but you didn't bring proof of

1    citizenship.  Our law and regulation gives you a 20-day

2    grace period to correct, to mitigate your failure to

3    provide your complete registration by the day you're

4    supposed to be registered.

5            So we have a 20-day mitigation period, and

6    you can get that free ID from the state of Kansas during

7    those 20 days.  You can go wherever you need to go to

8    get your passport and dig it up in those 20 days.  We

9    also do mitigation with KDHE and KDOR, which ironically

10   they're challenging with their other claim.  But our

11   KDHE and KDOR is-- the state will do its best to help

12   find the document for you if any state agency possesses

13   it.  That's mitigation.

14           THE COURT:  So all the mitigation, though,

15   is pre-voting booth.  So if someone is not on notice

16   that they have a problem and as-- at least at the PI,

17   there were plaintiffs that showed up at the-- at the

18   polling place and were denied the right to vote, their

19   20-day period to-- to mitigate has already expired at

20   the time they show up.

21           MR. KOBACH:  Well, I think you have to draw

22   the distinction between a registration law and a voting

23   law.  Those are conditions-- we have photo ID in Kansas,

24   as you know.  So that that photo ID is a voting law.

25   And we have a mitigation period similarly.  You have

1  about nine days to-- if you didn't bring your photo ID

2  in Kansas, just like the Indiana law, you can bring it

3  after the fact.  But the registration law-- the

4  registration deadline is not voting day.  It is in some

5  states like New Hampshire, where you have same-day

6  registration.

7          But in Kansas, the registration deadline is

8  20 days before the election, and so we do allow

9  mitigation after that deadline.  But getting registered

10  and voting are two different things.  Lots of people

11  register and don't vote.  But if you show up at the

12  polling place, and this happens in Kansas all the time,

13  even before our law, you show up-- a person just shows

14  up and said, I heard there's an election today, I've

15  seen all the commercials, I want to vote.  Well, sir,

16  you have to register before you can vote.  Oh, I didn't

17  know you had to register.

18          THE COURT:  But those are people that didn't

19  apply to register.  These-- the people in this case

20  applied to register.

21          MR. KOBACH:  Right.  They were-- they

22  applied to register and they were informed three times

23  that they have to get their-- they have to complete

24  their registration.  And we give them a 20-day grace

25  period.  Even after registration closes on that 20th

1  day, they still could have a grace period to get that

2  documentation.  So we have very similar mitigation.  And

3  we do more than Indiana did, we actually go and try to

4  get the document for them with KDHE and KDOR.  And so

5  ironically--

6          THE COURT:  Tell me about the fact that you

7  do this with KDOR, and plaintiff has told me there's no

8  memorandum of understanding or contract.  There's no

9  indication of how this works, whether it's applied

10  universally or not.  Why isn't this memorialized

11  somewhere?

12          MR. KOBACH:  We do-- we have several

13  descriptions of it in our affidavit, so we're going to

14  present that in the record.

15          THE COURT:  So why wouldn't you have it

16  memorialized, this agreement, between KDOR?  I mean,

17  you'll recall at the PI hearing when Secretary Jordan

18  was still in this case, they seemed to be very reluctant

19  to work with you at all on this.  So I just wonder, you

20  know, what has changed, and if something has changed,

21  why it's not memorialized.

22          MR. KOBACH:  The simple answer is that KDHE

23  wanted a memorialized formalized statement because with

24  KDHE you're talking about viewing birth certificates.

25  And it's a sensitive document and there's a Kansas

 1   statute that said that you-- that KDHE believed they

 2   could not show the actual birth certificate to someone

 3   outside the agency, KDHE, even if it's someone in

 4   another state agency.  So we put all this in very

 5   intricate language in the MOU so that this is how it's

 6   going to work.

 7            With KDOR, they haven't insisted upon a

 8   formalized describing how it's going to work.  We

 9   certainly could.  But as a practical matter, and this is

10   in both our briefing and in our affidavits, there are

11   two ways it happens.  There's the way that it's been

12   going ever since the law went into effect; and that is,

13   we just send over a batch of names, whether it be 10 or

14   1,000.  And KDOR goes through those names and looks into

15   each person's driver's license record to see if the

16   person has a birth-- has a citizenship document of any

17   sort.

18            The other way, which emerged later and was

19   the reference that Mr. Johnson pointed out, we notified

20   the Court that now that KDOR verification has expanded,

21   we now have portals where our personnel can go-- web

22   portals, can look at people's license databases--

23   driver's license database and can look into your

24   driver's license database and we can see, oh, yes, Judge

25   Robinson provided this document, citizenship document,

 1    or there's no citizenship document on file.

 2            So we-- we now have two ways of going into

 3    the KDOR database, both of which are described in

 4    affidavits.  It is correct we don't have an MOU.  We

 5    certainly could, it's just that neither agency has

 6    insisted upon it.

 7            THE COURT:  All right.  And is there

 8    evidence in the record that this check with KDOR

 9    captures people who were not first-time driver's license

10    registrants?  Because I know first-time driver's license

11    registrants have to provide proof of citizenship.  But

12    then there's this whole other class of people that

13    don't, they're not first-time registrants.  And so--

14            MR. KOBACH:  Yes, there is-- there should be

15    evidence I believe in the affidavit, perhaps from Mr.

16    Caskey or perhaps from the KDOR individuals.

17            So when you get your driver's license, you

18    have a list of-- there are a list of acceptable

19    documents you can provide to establish that you are who

20    you say you are.  And some of those acceptable documents

21    are birth certificate-- are citizenship documents.

22            And so many of the people who are not

23    first-time applicants who do have to provide proof of

24    citizenship will, nonetheless, use a citizenship

25    document in establishing who they are, even though

1   they're like you and me, we've had Kansas driver's

2   licenses for a long time.  So some of those individuals

3   will have a citizenship document on file, but not all.

4            THE COURT:  But not-- not at KDOR.

5            MR. KOBACH:  At KDOR, yes.  Because the--

6   when you-- say you moved into Kansas from another state,

7   you have to establish your identity when you walk into

8   the Kansas driver's license bureau.  And one way you

9   might establish your identity is by showing your other

10   state's driver's license.  Another way you might

11   establish your-- and this is-- well, this is a bad

12   example.

13            But anyway, another way you can establish

14   your identity is if you present a birth certificate or a

15   passport.  And those are citizenship documents.  The

16   driver's license from the other state is not a

17   citizenship document.  So sometimes previous applicants,

18   not first-time applicants, renewals will still have a

19   citizenship document on file.

20            THE COURT:  But not always.

21            MR. KOBACH:  But not always.

22            THE COURT:  Sometimes.

23            MR. KOBACH:  Not always.

24            THE COURT:  All right.  Is there any

25   evidence in the record that demonstrates the state's

 1   efforts to educate and advertise the DPOC requirements

 2   and procedures?  For example, at the PI hearing you'll

 3   recall I asked you about, you know, what if somebody

 4   just can't get it, and I think I gave you a hypothetical

 5   that, you know, maybe me being a military brat may be

 6   near and dear to me; and that is, there are people that

 7   are born overseas, but they're American citizens.  And

 8   there are people that are over 100 years old and they

 9   don't have-- I mean, on and on and on.

10            MR. KOBACH:  Yeah.

11            THE COURT:  And you talked about a situation

12   where someone could get an administrative hearing before

13   you and two other rather high officials in the Kansas

14   government, but-- so is there any evidence in the record

15   that educates and advertises potential voters of all of

16   these requirements and procedures?

17            MR. KOBACH:  I believe my co-counsel is

18   looking for the place in the record.  But the answer is

19   yes, the state spent a great sum of money on a public

20   service advertisements campaign when the law first went

21   into effect.  The state also--

22            THE COURT:  But you'll recall there was some

23   problem with that.  In fact, we had another hearing

24   about-- I thought that there was some problems with

25   the-- there was some problems with the information.  I

1    recall we had sort of a supplemental hearing, there was

2    a problem with the way the website read.

3              MR. KOBACH:  That's something-- I'm not even

4    talking about that.  I'm talking about public service

5    ads, like radio and TV ads.  So there's that.  And then

6    we did the web-- the information on the web.

7              Now, the-- I believe the hearing you may be

8    referring to was the telephonic one after the

9    preliminary injunction went into effect because the slip

10   of paper handed to the person at the DMV said-- you

11   know, said you-- we had a disagreement between the

12   parties.

13             The plaintiffs wanted to say to the person,

14   you are completely registered now, you never need to

15   worry about anything, in so many words.  We wanted to

16   say, well, for the time being you're registered, but

17   based on the current court litigation, you may not be

18   registered in the future.

19             So there was, you're absolutely right,

20   disagreement about whether that notice handed to the

21   person physically at the DMV and similar notices on the

22   websites of the state and the counties accurately

23   conveyed the state of affairs with the preliminary

24   injunction.

25             THE COURT:  But that's not the PSA campaign

1    you're talking about.

2                 MR. KOBACH:  That's not the PSA.

3                 THE COURT:  Okay.  I understand.

4                 MR. KOBACH:  The PSA campaign was in the

5    year 2013.  Right when the requirement went into effect

6    we did this massive campaign.

7                 THE COURT:  And that's-- that's in the

8    record?

9                 MR. KOBACH:  I hope it is, but we're

10   looking.

11                THE COURT:  Okay.  If you can find it by the

12   end of the hearing, you can just hand it to Ms. Wiest or

13   - and this goes for everybody - you can send us an

14   e-mail, copy the other parties obviously, and say

15   here's-- here's our citations to the record.

16                Okay.  Let me turn to the last topic and

17   then I'll open it up for any additional argument you all

18   have on any of these matters.

19                Why don't we take about a 10-minute break,

20   and then I'm just-- we're going to return to talking--

21   just a few questions I have about the standing and

22   mootness challenges brought by the defendant.  And

23   then-- and then I'll open it up for any additional

24   argument you all want to offer.

25                All right.  So let's be in recess until 10

1    after 3:00.

2              (Recess).

3              THE COURT: All right. You can be seated.

4    Okay. So now I have some questions for plaintiff about

5    Mr. Kobach's standing and mootness challenges. Who's

6    going to take the lead on that?

7              Okay. Are you going to-- well, you're going

8    to talk about Mr. Fish, and then Mr. Thompson [sic] is

9    going to talk about Mr. Bednasek's case?

10             MR. DANJUMA: Yes. Should I go first or--

11   either way.

12             THE COURT: Yes, you can go first because my

13   first question is about the Fish case.

14             MR. DANJUMA: Okay.

15             THE COURT: And it's simply this: How do

16   you define standing on the right-to-travel claim?

17             MR. DANJUMA: Well, standing is the--

18   standing on the right-to-travel claim is the same as

19   standing is for all constitutional claims. An

20   individual has to identify a concrete injury that is

21   traceable to the defendant that would be likely to be

22   redressed by a favorable judicial decision.

23             And that applies-- that's true for all of

24   our plaintiffs on the right-to-travel claim. And I'm

25   happy to discuss each in turn. I'm not sure if there's

1    specific questions that are-- are sort of at the top of

2    the Court's mind, but I-- I would say that there is no

3    challenge that the defendant brings to the plaintiffs on

4    standing except as to the League of Women Voters.

5    Instead, they make an argument about mootness.  And I

6    can address that if that's the-- the easiest thing for

7    the Court to consider.

8                 THE COURT:  But I guess my general question

9    is, do you take the position that any new registrant

10   that's born outside of Kansas would have standing to

11   allege this claim, to bring this claim?

12                MR. DANJUMA:  Any-- any registrant who's

13   injured by the practice, who can show that there's a

14   concrete, injury.  That they haven't been able to

15   register.

16                THE COURT:  Okay.

17                MR. DANJUMA:  Or an organization that is

18   attempting to assist people in registering who can't

19   register because of that restriction.  That is the basis

20   for standing for all of the plaintiffs in this case.

21                THE COURT:  Okay.  And actually, I don't

22   have any questions of Mr. Thompson, because my other

23   question about this relates to plaintiffs Boynton,

24   Stricker, and Hutchinson's registration status.

25                MR. DANJUMA:  Yes.

1          THE COURT:  And I know-- I understand your

2    argument that they are on a suspense list with an

3    asterisk because of-- you know, I guess as a consequence

4    of what I ordered at the preliminary injunction stage.

5    Correct?

6          MR. DANJUMA:  Yes.  Why don't I try to-- I

7    think the best way to understand this is for me to sort

8    of go through the timeline.  We understand-- perhaps it

9    makes sense for me to voice some frustration at this

10   point about the defendant raising an argument about

11   this, because he's waived this argument already in the

12   class certification proceeding.

13         The reason why the Court didn't certify a

14   class was because the Court determined that a class

15   wasn't necessary because each of the plaintiffs'

16   application were cancelled after they attempted to

17   register to vote.  And let me just walk through the

18   timeline to try to just make sure we're all on the same

19   page with what happened.

20         All five of the individual plaintiffs in

21   this case applied to register to vote in 2013 or 2014.

22   And after that, the defendant passed an administrative

23   regulation that said if your application was pending for

24   90 days and you haven't provided DPOC, you're going to

25   be cancelled.  He started administering-- enforcing that

1    in October of 2015.  All of our plaintiffs were

2    cancelled for failure to provide DPOC within that--

3    those 90-day periods-- within the 90-day period.

4            And then after the Court issued its

5    preliminary injunction, the Court ordered them to be

6    registered.  So the only reason that they could be

7    registered is because of the Court's own preliminary

8    injunction order.  If they weren't, they would've been

9    put back into their initial cancellation status where

10   there would be no pending application that they would

11   have.

12           And the Court-- the Supreme Court has said

13   consistently that obedience to an injunction against

14   enforcement of a statute does not moot an appeal since

15   the statute remains to be enforced in the future.  And

16   there-- there's a *Gray v. Sanders* case that says but for

17   the-- and that's at 372 U.S. 368.  And it says, "But for

18   the injunction issued below, the 1962 Act remains in

19   force.  And if the complaint were dismissed, it would

20   govern future elections."

21           So the reason why the plaintiffs aren't moot

22   here - whatever the defendant has done, and we think

23   it's highly questionable what he's done, we don't know

24   and he hasn't explained it - is because until they reach

25   a final judgment, they will not have an order from the

1   Court saying they are fully registered.  And that means

2   they can be returned to the status quo when they weren't

3   registered, when they had just had a cancelled

4   application.

5            THE COURT:  Is there a place in the record

6   that actually shows, I don't know, through some printout

7   or something that they are still in that status of

8   having an asterisk by their name, so to speak?

9            MR. DANJUMA:  So, Your Honor, let me respond

10   to that in a few ways.  Well, the direct response is we

11   have provided evidence in the record - and I can show

12   you - that demonstrates that their status is cancelled.

13            I would say, however, that it doesn't matter

14   whether or not the defendant has decided to put an

15   asterisk or to remove the asterisk in his own internal--

16   in his own internal system.  Because if he wanted to get

17   rid of the case through voluntary cessation, he could

18   just put them into a status that deems them fully

19   registered.

20            What's relevant here is that until they get

21   a final judgment-- like if a higher court says this case

22   was decided incorrectly, all of those plaintiffs could

23   be returned to the status quo, however the defendant

24   chooses to treat them, one way or the other.

25            THE COURT:  Okay.

1            MR. DANJUMA:  And that-- that is the core of

2    why they can't be moot.  And that is actually--- the

3    reasoning that the Court employed in its class

4    certification decision, it said, you know, we really

5    don't need a class here because they're not going to be

6    moot because they were cancelled.  And until the case is

7    complete, they could be returned to that position.

8            So there's nothing in the defendant's paper

9    that even addresses the whole point of why the Court

10   didn't institute a class.

11           The broader concern that I would say the

12   plaintiffs have on this issue is a type of gamesmanship

13   and a type of picking off of plaintiffs in cases that

14   we've seen that is designed to insulate the system from

15   constitutional review.  It's not the first time we've

16   seen this.  This is a pattern that we've witnessed from

17   the defendant.

18           And the problem with that is if-- if there's

19   a-- if there ever were a system that were crying out for

20   constitutional review, it would be this one, where tens

21   of thousands of Kansans have been-- have not been

22   registered to vote.  The individual plaintiffs, we've

23   talked to all of them.  Every single one of them was

24   interested in ensuring that everyone in Kansas would be

25   able to be registered without facing this barrier.

1              And it's simply-- I feel like the defendant

2     feels like if he is able to engage in enough sort of

3     artful dodging and sort of unique sort of construction

4     of-- of registering certain individuals, he can

5     perpetually evade constitutional review of deeply

6     constitutionally problematic policies.  That's just not

7     the way a constitutional democracy works.

8              So the defendant is wrong just as a matter

9     of law.  They're not moot because they could be returned

10    to the status quo.  There's some examples of additional

11    cases that I can offer the Court.  One is from the Sixth

12    Circuit in the *AlDabagh v. Case Western Reserve*

13    *University*, that's 777 F.3d 355.  And in that case,

14    there was an individual who was a medical student and

15    was seeking a medical degree.

16             And on appeal, the defendant essentially

17    said, well, the case is moot because you've got the

18    degree.  You continued through all of your program and

19    you've got the-- you got the medical degree.  And the

20    Court said, no, the case is not moot because until

21    there's a final judgment, you don't-- we don't know if

22    you can keep that medical degree.  You could be returned

23    to the position where you never had it in the first

24    place.  Because that's true here as well, none of those

25    individual plaintiffs are moot.

1           THE COURT:  All right.  Just for the record,

2   though, would you-- can you cite me to where in the

3   record you point in terms of what the registration

4   status is that--

5           MR. DANJUMA:  Yes.  Yes.  And I have those

6   record citations.  Give me just one moment.  Your Honor,

7   I-- I apologize.  I think it might be easier for me to

8   come up at the end and provide you with a list of each

9   of them.

10          THE COURT:  That's fine.  That's fine.  No

11  problem.  All right.  Thank you.  That's all the

12  questions I have.

13          MR. DANJUMA:  Okay.  Thank you much.

14          THE COURT:  All right.  And I have some

15  questions of you, Mr. Kobach.

16          MR. KOBACH:  And, Your Honor, before you

17  begin, I do-- we actually do have the-- what you were

18  just asking Mr. Danjuma about.  Exhibits D-1 through D-5

19  are the ELVIS readouts for the five individual

20  plaintiffs in the Fish group.  So we actually brought an

21  extra copy along if you want one or you can just look at

22  them at your leisure.

23          THE COURT:  Okay.  That's helpful.  Thank

24  you.  So what is their current status?

25          MR. KOBACH:  So the status of plaintiffs

1   Boynton, Hutchinson, and Stricker is that they are now

2   fully registered.  The opposing counsel has suggested

3   that there is some sort of gamesmanship going on.

4   That's far from the truth.

5         What is happening is an automatic process

6   where, as we notified the Court, once our ability to do

7   checks with KDOR expanded where we got the web portal--

8   our counties have the web portal now, so the counties

9   are constantly looking, all 105 counties are looking at

10   suspense list people in their county and they're going

11   in and looking at the driver's license database to see

12   if there's a citizenship document on file.

13         And all of those three individuals, Boynton,

14   Hutchinson, and Stricker, had a-- have a citizenship

15   document on file with KDOR, with the DMV.  And so Mr.

16   Boynton's ELVIS file...

17         (Defense counsel confer).

18         MR. KOBACH:  Okay.  Co-counsel has informed

19   me that it's in Caskey's-- Mr. Caskey's affidavit how

20   each of them was specifically done.  I believe that all

21   three of these were done by the counties.  It's

22   conceivable that they could've been done through the

23   other process where we send names to KDOR.

24         THE COURT:  So you're telling me it wasn't

25   in response to my preliminary injunction order?

1          MR. KOBACH:  No.  In fact, we were rather

2   surprised to learn that these individuals suddenly were

3   fully registered because we had not been taking any

4   steps to complete their registration.

5          THE COURT:  Why wasn't-- I guess I don't

6   understand why that wasn't caught at the outset then.

7          MR. KOBACH:  Because we didn't have the

8   expanded KDOR ability until the point when we notified

9   the Court, however many months ago that was.  So we--

10  all we had initially was the ability to give KDOR lists

11  of names, saying here are some names we have, we think

12  these people might have documents on file.  Here's 100

13  names.  Here's 300 names.  But that obviously doesn't

14  check the entirety of the suspense list.

15         Then we gained later in the course of this--

16  not due to this litigation or perhaps-- perhaps KDOR,

17  who knows why they did, but KDOR said, hey, you can have

18  your own web portals and you can do this yourself.  And

19  so we gained that capacity.  And so now the counties are

20  doing this automatically.  And so we learned of these

21  individuals, like I say, somewhat surprisingly, you

22  know, they're now registered.  We found that they had a

23  document, a citizenship document, already on file with

24  KDOR.

25         THE COURT:  All right.  So then with respect

```
 1   to plaintiffs Bucci and Fish--
 2               MR. KOBACH:  So--
 3               THE COURT:  -- do you concede that they have
 4   standing-- aside from your grandfather clause argument,
 5   do you think that they have standing to bring a travel
 6   claim?
 7               MR. KOBACH:  We do concede that they have
 8   standing to bring the NVRA challenge because they had
 9   not provided satisfactory evidence of citizenship when
10   they registered to vote.  However, we do not believe
11   that they have standing to bring the-- the grandfather
12   clause provision.  Both Bucci and Fish were residents of
13   Kansas on January 1, 2013.  Therefore, they can't assert
14   any injuries stemming from the grandfather clause.
15               It's important to note that the Supreme
16   Court case law is clear, we've got it in our briefs.
17   Quote, "Standing is not dispensed in gross.  A plaintiff
18   must demonstrate standing for each claim he seeks to
19   press and for each form of relief that is sought."  And
20   that's, of course, from Davis versus FEC on Page 734.
21               THE COURT:  And it is established as of the
22   time of filing, not affected by later events.
23               MR. KOBACH:  I believe that's correct, Your
24   Honor, yes.
25               THE COURT:  Okay.
```

1          MR. KOBACH:  And so the-- they would have

2     standing to raise the-- the claims, other than the

3     privileges and immunities claim.  And we do not

4     dispute--

5          THE COURT:  Wait.  Other than the

6     grandfather clause argument, not all of the privilege

7     and immunities claim.  Correct?

8          MR. KOBACH:  Correct.  They do have

9     standing-- we do not challenge their standing with

10    respect to the status-- the citizenship document checks

11    with KDOR and KDHE.

12          We also want to point out that the standing

13    of the League of Women Voters is crystal clear, their

14    lack of standing to bring the privileges and immunities

15    claim.  This is-- this is really fundamental

16    constitutional law doctrine.

17          The privileges and immunities clause uses

18    the word "citizens."  The equal protection and due

19    process clauses of the Fourteenth Amendment use the word

20    "persons."  And the Supreme Court has long held, it was

21    the case of *Hague versus Community For Industrial*

22    *Organization*, I'll just read from the Court, quote,

23    "Natural persons, and they alone, are entitled to the

24    privileges and immunities which Section 1 of the

25    Fourteenth Amendment secures for 'citizens of the United

 1     States.'  Only the individual respondents-- only the

 2     individual respondents may, therefore, maintain this

 3     suit."

 4               And then a subsequent case in the Tenth

 5     Circuit echoed this and said-- and this is the *Smith*

 6     *versus Paulk* case cited in our brief.  "It is clear that

 7     a corporation does not have the benefit of the

 8     privileges and immunities clause of Article IV or of the

 9     Fourteenth Amendment."  Again, because a-- an

10     organization can be considered a person, a corporation

11     can be considered as a person, as you're well aware.

12     But an organization or a corporation cannot be

13     considered a citizen, and so they do not have standing

14     to bring that claim.

15               THE COURT:  All right.  I think--

16               MR. KOBACH:  One final-- one final point on

17     the privileges and immunities claim.

18               THE COURT:  Okay.

19               MR. KOBACH:  As you know, the third

20     constitutional requirement of standing is

21     redressability.  Now, the redress, the relief that they

22     have sought, is that we enter into agreements with other

23     states to perform the same verifications that we perform

24     with the two Kansas agencies.  However, as you know, the

25     defendant has attempted to do so, and we were refused

1    when we asked other states to do these verifications for

2    us.

3              And so without relevant agencies from all 50

4    states in this courtroom as defendants whom this Court

5    could then enjoin, the Court cannot issue the injunction

6    that the plaintiffs seek.  So their-- their injuries

7    cannot be redressed and, therefore, the claim must

8    both-- both be dismissed for lack of standing and for

9    lack of joining indispensable parties under Rule 19.

10             Now, we were interested to see what their

11   response would be in their briefs to this.  And the

12   Bednasek plaintiff brief reply responded, well, that

13   might be-- I'm paraphrasing, but it said, well, that may

14   be true, but if those people aren't parties to this

15   case, if those agencies aren't party to this case, then

16   you're just going to have to throw the whole law out

17   because that's the only available remedy we have now.

18   Well, that's--

19             THE COURT:  Why does it hinge on you

20   striking agreements with 50 states when there's a

21   database at least that covers 46 of them?

22             MR. KOBACH:  Well, the-- what they asked for

23   is that we have agreements with the other states.  The

24   database we can't use because we don't have place of

25   birth.  So you-- if you don't have place of birth,

1   you're dead in the water using that database.  It's not

2   required by Kansas, and I don't believe it's required by

3   any state on their voter registration form.

4            THE COURT:  All right.  I think that

5   completes my questions.  Thank you.

6            MR. KOBACH:  Okay.

7            THE COURT:  Okay.  So as promised, I'd like

8   to give you all an opportunity to tell me anything else

9   that you think I need to focus on that we haven't

10  focused on, I think we've been pretty comprehensive, but

11  I'll give each side 20 minutes.  And plaintiffs, however

12  you want to split that is fine.  And then I'll give you,

13  Mr. Kobach, 20 minutes to respond, if you choose to use

14  all of that time.

15           Are you all going to split time or how are

16  you going to--

17           MR. DANJUMA:  Just one moment.

18           THE COURT:  You're going to go in the

19  opposite order here?  Okay.  That's fine.

20           MR. JOHNSON:  Yeah, Your Honor.  You covered

21  things so thoroughly, you have gutted my argument down

22  to the bare nub.

23           THE COURT:  Aren't you glad I did that on

24  the front end rather than--

25           MR. JOHNSON:  I'm so happy you did, and I'm

1    sure you're happy as well.

2           THE COURT:  Well, all right.  Better on the

3    front end than in the middle of your argument.  There's

4    nothing worse.

5           MR. JOHNSON:  Exactly, Your Honor.  Let me--

6    there are actually a couple things I wanted to-- to

7    raise in response to something I think I heard from the

8    defendant.  And that is, I believe I heard Mr. Kobach

9    say that presently and using the KDOR policy, the

10   Secretary of State and the county election officers can

11   actually see the KDOR file.

12          Now, that seems to be inconsistent with Mr.

13   Caskey's affidavit of January 5th of this year, which

14   I've already cited to the Court, in which he says-- and

15   it starts at Paragraph 9 of his affidavit, "The

16   Secretary of State's office and the KDOR have

17   established two interagency practices for verifying

18   whether voter registration applicants have citizenship

19   documents on file with KDOR."

20          Jumping down a couple of sentences.  "The

21   Secretary of State's office does not know which specific

22   document is on file with KDOR, but instead, merely

23   allows confirmation if any K.S.A. 25-2309(l)-compliant

24   document is on file with KDOR."

25          In other words, it sounds to me like they're

1    relying on KDOR to tell them there's-- there's a

2    document that's compliant with 25-2309(l).  It strikes

3    me as hearsay, Judge.  They don't see the document, at

4    least that's what they said as of January 5th.  If the

5    process has changed again, that just shows how we have a

6    moving ball here.  We have a moving target.  The

7    Secretary-- if that's the case, the Secretary keeps

8    changing the rules to stay ahead of us.  A good

9    argument, Your Honor, for simply enjoining the statute

10   while the Secretary gets his house in order.

11          I want to read one excerpt, and actually I--

12   I should give credit to Mr. Ho, my co-counsel with the

13   ACLU, for bringing this to my attention from the recent

14   decision by the D.C. Circuit in the *Newby* case, which is

15   one of the cases I'm sure you're aware of.  And it's--

16   this is on Page 93, Footnote 19 of I believe the ACLU's

17   latest brief, the League of Women Voters latest brief.

18          Quote, and this is from the D.C. Circuit,

19   "It does not matter whether they lack access to the

20   requisite documentary proof or simply because the

21   process of obtaining that proof is so onerous that they

22   give up, the outcome is the same, the abridgement of the

23   right to vote."

24          So whether it's they lack the documentation,

25   they can't get it, or they won't get it, the result is

1    the same.  They're not allowed to register and they

2    can't vote.

3           Now, from time to time as a lawyer I feel

4    like I need to protect my client.  And here's one where

5    I think I needed to protect my individual client, Parker

6    Bednasek.  The Secretary made a couple of what I

7    consider to be snide remarks concerning my client

8    refusing to get a Kansas driver's license.  Let me clear

9    something up; my client is under no obligation to get a

10   Kansas driver's license.

11          THE COURT:  He has a Texas driver's license,

12   he's a student from Texas.

13          MR. JOHNSON:  That's exactly the point.

14          THE COURT:  His car is insured in Texas, his

15   parents probably pay for everything.

16          MR. JOHNSON:  Under-- under Kansas law, and

17   it is 8-- K.S.A.-- excuse me, let me find it here.  Here

18   we go.  K.S.A. 8-236(a), "The following persons are

19   exempt from the license requirements of the motor

20   vehicle drivers' license act:"

21          "(1) A non-resident who is at least 16 years

22   of age and who has in such person's immediate possession

23   a valid license issued to such non-resident in such

24   person's home state or country may operate in this state

25   any motor vehicle in Class C."  Class C is any vehicle

1    under 26,000 pounds.

2           Now, you may hear from the defendant that if

3    he wants to register to vote, he has to have a driver's

4    license.  And here is where you see a great catch-22,

5    Judge.  This is from 8-234(a).  Mr. Bednasek is for

6    driver's license purposes a non-resident.  For voting

7    purposes, he's a resident.  It's defined differently in

8    the voting statute, 25-407.  Can he become a resident of

9    Kansas for driver's license purposes?  Here's how it

10   happens.

11          "For the purposes of the motor vehicle

12   drivers' license act any person who, one, owns, rents,

13   or leases real estate in Kansas as such person's

14   residence and," that's important, this is conjunctive,

15   "and engages in a trade, business, or profession within

16   Kansas."  He's a student, he's not engaged in a trade,

17   business, or profession.  So that doesn't apply to him.

18          Or, two, registers to vote in Kansas, which

19   he attempted to do, or, three, enrolls such person's

20   children in a school in this state.  I don't think

21   Parker has any children.  Or four, purchases Kansas

22   registration for a motor vehicle.  So four ways he can

23   become a resident of Kansas for driver's license

24   purposes.  And the one that's at issue is registering to

25   vote.

1           Here's the catch-22.  90 days after, after

2  registering to vote, he shall be deemed a resident of

3  the state.  I'll just read it to you.  "For purposes of

4  the motor vehicle drivers' license act any person who...

5  registers to vote in Kansas... shall be deemed a

6  resident of the state of Kansas 90 days after the

7  conditions stated in this subsection commence."

8           He can't apply for a Kansas driver's license

9  because the Secretary's rule prohibits him from

10  registering to vote.  The law of unintended consequences

11  strikes again.

12           I guess the last point I'd like to make has

13  to do with the remedy.  And-- and I think that that's

14  one that is absolutely crucial here.  Absent enjoining

15  enforcement of the statute, no remedy is possible.  The

16  defendant has repeatedly since the-- this litigation has

17  commenced, now two-- two years ago, changed the rules to

18  try to avoid the inevitable remedy, which is injunction,

19  an injunction against enforcement of this statute.

20           Absent that, where are we going to go?

21  He's-- he sounds today like he's offering to enter into

22  agreements with as many states as possible to avoid

23  injunction-- your enjoining the statute.  Where do we go

24  from there, Judge?

25           I think the best way to get this problem

1    resolved is to stop everything with an injunction, allow

2    the Secretary the time that's necessary to put together

3    a comprehensive plan to deal with this-- this situation.

4    And perhaps some-- sometime down the line, somewhere

5    down the line he can put something into place that's

6    satisfactory to-- to you.  That's obviously the most

7    important thing, whatever it is, it has to be

8    satisfactory to you, after consulting with the

9    plaintiffs in this case.

10              Absent that, unless you have any questions,

11   which I'd be more than happy to answer, it's Friday

12   afternoon.

13              THE COURT:  I agree.  No other questions.

14              MR. JOHNSON:  Thank you, Your Honor.

15              MR. DANJUMA:  Thank you, Your Honor.  And

16   I'll-- I'll also try to be as brief as possible.  I just

17   wanted to quickly give you the record citations that you

18   were requesting before.  That's Exhibit H-1, which is

19   the ELVIS record for Fish, H-2 for Ms. Bucci, H-3 for

20   Mr. Stricker, H-4 for Mr. Boynton, and H-5 for Mr.

21   Hutchinson.

22              Each of those records shows that they-- that

23   those individuals were cancelled pursuant to their-- to

24   the defendant's regulatory policy.  And that means that

25   if a final judgment is-- goes against them, they will

1    have-- they will be in an unregistered status because

2    there was never a-- a active registration system that

3    was on file.

4           The defendant noted that they were verified

5    through a KDOR cross-referencing policy, but the only

6    reason why that KDOR cross-referencing was happening is

7    because of this Court's preliminary injunction.  If it

8    hadn't been happening, their applications would've just

9    been cancelled and they would've been left alone.  So

10   there is no-- for just the reasons why this Court

11   concluded on-- at the class certification phase, there

12   is no mootness issue.  And that was the reason for why

13   class certification wasn't necessary.

14          We're more than happy to return to that,

15   amend the complaint, and request a new class

16   certification motion if we-- if we are forced to, but I

17   don't see why that would be necessary here.

18          So, Your Honor, there's a few things that I

19   wanted to address in terms of the merits.  And the first

20   is about the 2013 exemption, the grandfather clause that

21   I discussed with Your Honor earlier.  This is crucial

22   because it-- it emphasizes why the statute is

23   unconstitutional on its face.  There is no way to save

24   an exemption like this.

25          And the-- the defendants-- just as a

1    preliminary matter, I want to note that the defendants

2    say that this is a different claim.  But that's directly

3    contrary to binding Supreme Court authority.  What

4    they're essentially saying is they wanted us to file a

5    complaint that would've had Count X, privileges or

6    immunities, and here's the plaintiffs' theory on that.

7    And Count Y, privileges or immunities, and here's the

8    plaintiffs' new theory on that.

9            The Supreme Court, and we've cited cases in

10   our brief, has reversed courts that have said-- that

11   have dismissed a plaintiff's argument on those grounds.

12   And they've said you only need to have one count that is

13   the claim at issue.  And the first time we've raised

14   this issue at all is in this current brief.  The

15   defendant had a month-and-a-half to respond to it.

16   There's no prejudice.  They didn't move for-- to dismiss

17   on our case at any point.

18           So this issue was never raised before.  And

19   we are now here at summary judgment and it is wholly

20   valid for us to raise a legal fallibility with the

21   essence of this claim at this stage.  So that's

22   something I'd like to say just to start out.

23           But the second issue is what is happening

24   with the 2013 exemption.  Your Honor, you've already

25   read the cases *Hooper* and *Soto-Lopez* and *Zobel*.  And you

1    know, I think from your colloquy with Mr. Kobach, that

2    the Supreme Court has specifically said that the right

3    to travel does not solely apply to durational residency

4    requirements.  In *Soto-Lopez,* they said this is not a

5    durational residency requirement.  They looked at it and

6    they said it still violates the right to travel.

7           The defendant has cited a Third Circuit case

8    called *Connelly*, and there is language in that case that

9    is sort of-- I would say is slightly imprecise.  But

10   obviously if there's a Supreme Court case that says one

11   thing and the Third Circuit that in a different context

12   is analyzing a separate issue says a different thing, we

13   have to go with the Supreme Court's analysis.

14          And the second thing I want to say is,

15   there's no tension whatsoever between the plaintiffs'

16   position and the issue-- the statute at issue in the

17   *Connelly* case.  So basically the-- the defendant is just

18   relying on dicta that doesn't apply here.

19          But I'd like to explain what's wrong with an

20   exemption like this.  What happens under the 2013

21   grandfather clause is the statute essentially carves out

22   a class of Kansans who are permanently in a separate

23   status for the rest of their life.  They will never need

24   to show DPOC if they-- if they move to-- to another

25   location, if they move out of state and vote for 40

1     years in a different place and come back.  If they are

2     purged from the rolls and start to vote again, they will

3     always be in this permanent class that says you never

4     need to comply with this law.

5          The Supreme Court considered circumstances

6     almost indistinguishable from those cases.  In the

7     *Hooper* case, you had a classic grandfather clause.  The

8     state said, you know, we have a limited amount of

9     benefits, we can't provide military veterans with

10    benefits perpetually, so we're going to say you have to

11    have been here before the effective date of this statute

12    and performed this condition precedent of retire from

13    the military with an honorable discharge and then you

14    get this exemption.  The state was, who could ever

15    object to that?  Who could ever say there was a problem

16    with that?  The Supreme Court did.

17         The Supreme Court says a system like that

18    automatically disadvantages anyone who ever comes into

19    the state later.  It infringes on the right to travel.

20    It denies later newcomers access to that same benefit.

21    If a state sets up a preference with that prior

22    residence requirement, it's inimicable to the

23    fundamental structure of our country, which allows and

24    promotes freedom of movement.

25         You can't have a state that has classes of

1    people that gives you seniority based on when you were

2    in the state before and did a separate and subsequent

3    thing.  So for that reason, the grandfather clause is

4    unconstitutional under binding Supreme Court authority.

5            The second thing I'd like to discuss briefly

6    is the Birth Link policy which we've noted.  The Birth

7    Link policy is, in our view, a constitutional smoking

8    gun.  You have an-- an inherently invidious

9    classification, being born in the state of Kansas.  You

10   have express intent, explicit statements that the intent

11   of this policy was to favor individuals born in the

12   state of Kansas, knowing it would exclude people born

13   elsewhere.  And you have finally the-- the unavoidable

14   effect of preferencing those individuals by virtue of

15   the policy.  Any of those standing alone would infringe

16   on the right to travel.

17           But one of the reasons why I want to raise

18   this is that even setting aside the evidence of kind of

19   discriminatory intent here, there's a fundamental

20   difference between providing an automatic benefit to

21   someone because they have-- they were born in the state

22   versus cross-referencing with KDOR.  We've all been

23   discussing this KDOR policy.  And I-- I think in the

24   course of litigation, the defendant was like, oh, we--

25   we have a problem with this, we better do something to

1   solve it.  Here's another Kansas agency, we can say

2   we're looking there too, and that solves the problem.

3            Your Honor, it doesn't.  And it can't solve

4   the problem because the-- the database that they're

5   relying on is an intrinsically discriminatory database.

6   There's nothing wrong at all with the fact that the

7   Kansas Department of Vital Records records people who

8   were born in the state.  The problem is when the state

9   starts to distribute benefits based on whether or not

10  you're in that database or not.

11           There's a few times in the brief, in the

12  defendant's briefs where they say, well, it would make

13  no sense for us to pay attention to this, these

14  individuals complied with the statute.  I think that's a

15  somewhat strange and Orwellian term.  They didn't do

16  anything.  They were just born in Kansas.  The state

17  recorded the fact that they were born in Kansas.  But

18  that's not enough to say now that they've complied and

19  now they're in a separate class of individuals who we

20  should automatically exempt from this incredibly

21  burdensome requirement.

22           And I think there's an example that might

23  help highlight this.  If the state of Kansas said, you

24  know, you need a birth certificate on file in order to

25  register to vote, and that's it, that would be

1    unconstitutional.  Only people with Kansas birth

2    certificates would be able to register.

3            If the state said, well, you need a birth

4    certificate on file, but if you don't have one, you can

5    pay us $50 and we will do a background check on you to

6    make sure you're a non-- or you're a citizen.  That

7    would also be unconstitutional because it would be a

8    poll tax that would discriminate just against newcomers,

9    people who were not born in the state.

10           So the third question is, well, what about

11   this, where the state says, well, you can effectively be

12   automatically exempted from this requirement, but if you

13   were born in the-- in another state, you're on your own.

14   You have to find your birth certificate, you've got to

15   pay the money for the birth certificate.  You've got to

16   go through all of these steps in order to-- to be

17   registered in a way that is, if it works as the

18   defendant intends it to, is relatively seamless for

19   Kansas natives.

20           That system-- that discriminatory system is

21   no [sic] distinct from those other two examples that

22   favor Kansas natives over newcomers.  And that's the

23   reason why it's fundamentally incompatible with the

24   Supreme Court doctrine in this area.

25           Your Honor, there's a couple of issues that

 1    I just want to note really quickly.  The defendant noted

 2    at a few moments that-- the tens of thousands of

 3    individuals in this case who have been disfranchised,

 4    there's no evidence that they couldn't comply at some

 5    point in the future.  But we do have evidence about the

 6    burden of this law on our individual plaintiffs and on

 7    the organizational client.

 8            Mr. Fish and Ms. Bucci had to look for their

 9    documents, and for years they were disfranchised for

10    this period.  Maybe it will-- someone could eventually

11    comply.  But the fact is, there are people who are

12    remaining suspended for years and missing their

13    opportunity to be a part of the political process in

14    that-- during that critical period.  And that is also a

15    fundamental discrimination that impacts-- that only

16    impacts migrants.

17            And finally, I just want to talk for a bit

18    about the-- about the defendant's reliance on the

19    *Crawford* case.  Your Honor, I think we welcome the

20    comparison to *Crawford*, because it emphasizes how

21    radically different this system is than from *Crawford*.

22            *Crawford*, you had a system where everybody

23    had to do the same thing.  And the Supreme Court said,

24    you know, it's-- that system is going to burden some

25    people in a different manner.  And depending on how

1  severe that burden is, especially if you can have

2  evidence, record evidence about that, that might create

3  constitutional problems, but we can't say it definitely

4  does in the face of the statute.

5           Imagine if Kansas did what the Secretary

6  says it could do.  If they exempted everyone who was a

7  registered resident as of 2013 or who had a Kansas birth

8  certificate on file from ever having to show photo ID at

9  the polls, they just said, you know, new people who come

10 in, you are the ones who have to show a photo ID.

11 Nobody else has to do that, just you.  That system

12 wouldn't be uniform, wouldn't be evenhanded.  It

13 wouldn't even really make sense.  Why would the state

14 want to only check the identity of newcomers to the

15 state?

16           And that's the same thing that's true here.

17 Why would the state say that there's this huge problem

18 with fraud, but then exempt all of these individuals who

19 are automatically on the rolls?  It's just-- there's no

20 way for the state to justify it in light of that

21 circumstance.

22           The other just small note I want to make

23 about *Crawford* is that - and I may need to find this

24 quote - is that the Supreme Court said that if the state

25 was charging people for the privilege to get an ID, that

1    would run afoul of the court-- of the-- of the decision

2    in *Harper*, the problem with the poll tax, as Your Honor

3    noted.

4              And the problem we have here is we have a

5    discriminatory application of that very charge.  Donna

6    Bucci has to pay $15.  Someone who's born in Kansas

7    doesn't.  She's got to pay that money in order to

8    register to vote.  And that is the difference.  If you

9    have-- a poll tax is already a problem.  But if you have

10   a discriminatory poll tax, it's a compounded

11   constitutional problem.

12             The last very quick point, if you'll allow

13   me to-- to add, is the organizational standing issue.

14   We've noted this in our brief, but the cases cited by

15   the defendant are wholly in apposite.  They're about

16   cases where the organization was seeking to be treated

17   the same as in-state organizations.  The organization

18   itself was attempting to invoke a privilege or immunity

19   or a right to travel.

20             Here, there's-- this is the League of Women

21   Voters of Kansas.  They are-- they are-- they exist in

22   the state of Kansas.  They aren't seeking to invoke a

23   right to travel for themselves.  They are saying they

24   can identify concrete injuries on their-- to their own

25   mission and from their own times for the -- the impact

1    of the defendant's illegal policies on other individuals

2    who are attempting to vote.

3              That's identical to the theory of

4    organizational standing that the D.C. Circuit found when

5    it said that the organization was not-- didn't just have

6    standing but was irreparably harmed by the same

7    conducts.  The same plaintiff in the same case-- I'm

8    sorry, the same plaintiff on the same facts, the D.C.

9    Circuit already recognized that this organization had

10   standing.  The theory is identical to that-- to that

11   theory.

12             If Your Honor has no further questions, I

13   will-- I thank you for your time.

14             THE COURT:  Thank you.

15             MR. KOBACH:  Your Honor, I'd like to just

16   begin on a couple of points to clarify that we've been

17   going back and forth on.  One is the three individuals,

18   Boynton, Hutchinson, and Stricker, whose documents

19   were-- citizenship documents were subsequently found.  I

20   stated erroneously that Hutchinson's was found by a

21   county official checking through the DMV portal.

22             His actually-- we say this correctly in our

23   brief.  His was actually found when he apparently,

24   unbeknownst to his counsel, just walked into the Johnson

25   County election office and presented a passport.  So his

1   was not done by a passive checking by the county, his

2   was done by an active act himself.  And that was

3   Hutchinson.  But the other two, Boynton and Stricker,

4   were passive checking.

5           The opposing counsel have suggested that,

6   oh, these three individuals, they could get switched

7   back and their registration status could be cancelled

8   again once-- once this case is outside of this

9   courtroom.  That's absolutely false.  The National Voter

10  Registration Act prohibits us from taking people who are

11  registered voters and just cancelling them for any of

12  the reasons that would be relevant in this case.  They

13  are on.  Once you are on as a fully registered voter,

14  you stay on.

15          And you may recall in the first hearing that

16  we had in this case, I was cautioning the Court against

17  granting injunctive relief that would render these

18  people fully registered voters because if it was

19  subsequently overturned at the Tenth Circuit, we

20  wouldn't-- we wouldn't be able to comply with the NVRA

21  and take them off the list.  So they're-- they're on.

22  There's no going back, contrary to what they suggest.

23          Mr. Johnson suggested that Mr. Caskey's

24  deposition about how we look at the records is somehow

25  hearsay and somehow invalid or unclear.  I'd just

1    suggest that Mr. Johnson re-read Paragraph 9 of that

2    deposition.  And I'll just-- this is Mr. Caskey's--

3    sorry, not deposition, affidavit.  This is Mr. Caskey's

4    statement.  "The website states whether there is a proof

5    of citizenship document on file and the type of K.S.A.

6    2309(l)-compliant document that is on file with KDOR.

7    Among other documents, this would include birth

8    certificates issued by other states and United States

9    passports.  If citizenship is confirmed, the county

10   election official will update a voter's ELVIS file."

11         So we do see when we use the web portal what

12   the type of document is.  When we do the earlier method

13   of verification where we send lists over to KDOR, there

14   they just send us back "citizenship document on file,"

15   they don't specify which document it is.  But when we

16   use our web portal, we can actually see which document

17   it is.  I hope that clarifies.

18         Mr. Johnson also said with regard to Mr.

19   Bednasek, and this gets into the whole question of is he

20   a resident or is he not because of his Texas driver's

21   license, et cetera, the very statute that he quoted said

22   that Mr. Bednasek is a non-resident for driver's license

23   purposes.  And then he quoted a second statute which had

24   several categories, and he said Mr. Bednasek does not

25   fit into each of-- any of those categories.

1           That doesn't establish that he's a non--

2    that he is a resident for voting purposes.  All that it

3    establishes is that he is okay and he doesn't have to go

4    get his Kansas driver's license right away, but it does

5    not make him a resident for Kansas voting purposes.

6           Now, looking at some of the bigger issues on

7    the merits, leaving standing and mootness behind.  There

8    are two high obstacles, one you brought up at the very

9    beginning of this hearing, and that is a facial

10   challenge.  If it is a facial challenge, which they

11   concede that it is, then-- you know, they kind of mix

12   and they say, well, it's both facial and as-applied.

13   But if it's a facial challenge, the standard that the

14   Supreme Court established in *Washington State Grange*

15   *versus Washington Republican Party* is a-- is a very high

16   one.  The plaintiff has advanced a broad attack on the

17   constitutionality of the law, seeking relief that would

18   invalidate the statute in all of its applications.

19   Plaintiff bears a heavy burden of persuasion.

20          They have to show that every application of

21   the law would be unconstitutional.  Not that it would be

22   unconstitutional with regard to this person or that

23   person, but that in a facial challenge you have to show

24   that the law is unconstitutional in all of its

25   applications.  I don't think they meet that burden in

1  this case.

2           The other obstacle that we point out in our

3  briefs is this is a-- this is a-- they're now making a

4  constitutional challenge.  The NVRA challenge was just

5  to federal elections.  Now they're bringing a

6  constitutional challenge to federal, state, and local

7  elections that are all affected by this law.  There,

8  they raise the bar again, because where you-- a

9  plaintiff seeks to invalidate the law regarding all

10 elections, federal courts have a-- a higher standard.

11 And this comes from the *Logan* case that we cite.

12          "In general, federal courts must exercise

13 great caution when interfering with state elections."

14 And, of course, Congress, the federal legislative

15 branch, does not have the power to alter the time,

16 place, and manner of state elections.  They only have

17 the power to alter the time, place, and manner of

18 federal elections.

19          So those two things, the fact that it's a

20 facial challenge and they have to show every single

21 application of the law would be unconstitutional and

22 that they're also now asking you to invalidate state and

23 local election procedures raises the bar considerably

24 for them.  And I think there's no way that they can

25 possibly succeed on either of these claims.

1          First of all, let's call it the *Crawford*

2    claim, because that's what it is.  That's the equal

3    protection claim burden on the right to vote.  Again, I

4    think we've established that strict scrutiny does not

5    apply.  And I think plaintiffs essentially concede that

6    the balancing test of *Crawford* is what applies.

7          And the balancing test says that,

8    "Evenhanded restrictions that protect the integrity and

9    reliability of the electoral process itself are not

10   invidious and satisfy the standards set forth in

11   *Harper*."  And then it goes-- then Justice Stevens goes

12   on and says that the balancing test applicable for

13   reasonable non-discriminatory restrictions is that a

14   court must look at the alleged burden-- burden on the

15   right to vote and that burden, quote, "must be justified

16   by relevant and legitimate state interests sufficiently

17   weighty to justify the limitation."  And that's from

18   Page 191 at *Crawford*.

19         And as you know, the Tenth Circuit was one

20   of the circuits that applied the *Crawford* standard after

21   it was iterated by the Supreme Court in 2008 in the

22   *Santillanes* case.  And the-- again, the Tenth Circuit

23   adopted the Stevens test as opposed to the Scalia test

24   from *Crawford* and said, "Restrictions that are generally

25   applicable, evenhanded, politically neutral, and which

 1    protect the reliability and integrity of the election

 2    process are generally not considered severe restrictions

 3    and are upheld."

 4            Well, those certainly describe the

 5    restriction here.  It's generally applicable, it's

 6    evenhanded.  It's applied to everyone.  And the Tenth

 7    Circuit in that case reversed the district court and

 8    upheld the Albuquerque photo ID law and said that the

 9    district court in requiring the city to provide past

10    examples of voter fraud that this would've stopped was

11    imposing too high a burden on the city.

12            Just as the-- and to quote from the-- the

13    Tenth Circuit, "In requiring the city to present

14    evidence of past instances of voting fraud, the district

15    court imposed too high a burden on the city.  Just as

16    the Supreme Court did not require Indiana to present

17    specific instances of past conduct to justify its photo

18    identification requirement, we do not require

19    Albuquerque to make such a showing."  And that's at

20    Page 1323 of *Santillanes*.

21            That's really important because you'll

22    notice the plaintiffs keep coming back to the number of

23    non-citizens that the state has found.  We can only see

24    the tip of the iceberg.  In this case we presented the

25    25 instances from Sedgwick County.  And then, of course,

1    in the other case we have more instances that are

2    presented.  But that's more than the zero that were

3    presented in *Crawford* or in *Santillanes*.  But it doesn't

4    matter.

5            The job of this Court is not to compare the

6    number of people on the suspense list, 20,000, assume

7    that all 20,000 of those people are actually unable to

8    comply and then say, look, it's 20,000 versus 25.  The

9    job of this Court is to not look at the number of cases

10   of fraud at all, but simply look at the justifications

11   that the state actually presents.  And so we present

12   actually the same justifications that the state of

13   Indiana does, plus additional ones that-- Indiana

14   presented justification of presenting [sic] future

15   occurrences of the fraud, even though they hadn't found

16   any past occurrences.

17           We also present the justification that there

18   can be errors through the-- that the state may be

19   involved in creating, because the state may assume that

20   someone is a citizen when, in fact, they are a

21   non-citizen.  The proof of citizenship requirement

22   creates a-- a process that prevents those areas-- errors

23   from occurring.  And the state also has an interest in

24   ensuring the integrity of the process to the public and

25   showing the public that we are preventing non-citizens

1    from voting in elections.  And those-- and when a few

2    non-citizens vote, those can swing a close election.

3            I want to throw out one more point on this

4    *Crawford* case.  I just-- it would be extraordinary to me

5    if plaintiffs were able to prevail on this one.  The

6    factual conditions of the Kansas case today are so much

7    stronger than the situation Indiana prevailed in.  But

8    there's one more twist to all of that, and that is that

9    *Arizona versus Inter Tribal Council,* which we're all

10   familiar with, came down since *Crawford*.

11           And you-- you may recall in *Arizona versus*

12   *Inter Tribal Council*, the Court looks at the so-called

13   constitutional doubt issue.  And so the Court, although

14   there was not a direct challenge like this one at issue,

15   the Supreme Court did say, we need to look if this

16   interpretation of the NVRA would raise any

17   constitutional doubts.

18           And so the only constitutional provisions

19   that they saw as potentially butting up against the NVRA

20   proof of citizenship question were Article I, Section 2

21   and Article I, Section 4.  And then the Court concluded

22   at the end of the case that it would invite on Page 22--

23   133 Supreme Court 2260, it invited the state of Arizona

24   to once again apply to the Election Assistance

25   Commission and ask them to include proof of citizenship

 1    on its-- on the federal form state instructions.

 2            How could the Supreme Court possibly come to

 3    that conclusion if plaintiffs are correct and it is, per

 4    se, unconstitutional for a state to require proof of

 5    citizenship in the registration to vote process?  The

 6    Supreme Court never would've-- at least would've said,

 7    well, this is a possible constitutional infirmity that

 8    would raise constitutional doubt.  We have to think

 9    about this valid claim under the Fourteenth Amendment.

10            But the-- it would be very odd to sustain

11    their constitutional argument under *Crawford* that

12    there's an unconstitutional burden on the right to vote,

13    and somehow square that with the Supreme Court's

14    decision in ITCA, which said, go ahead, ask to put the

15    proof of citizenship requirement on your registration

16    form.

17            Let me just skip ahead here.  The other

18    point I wanted to make on *Crawford,* and then I'll leave

19    that behind, is the quote from *Crawford* where they look

20    at the burden.  And it's so important to remember that

21    in *Crawford* the Supreme Court notes that in order to get

22    this photo ID, you have to provide proof of citizenship.

23    And the Court said, "The inconvenience of making a trip

24    to a government office, gathering the required

25    documents, and posing for a photograph surely does not

1  qualify as a substantial burden on the right to vote, or

2  even represent a significant increase over the usual

3  burdens of voting."  I don't see how that language can

4  be squared by the-- by the plaintiffs with their claim

5  that somehow this is a greater burden than that assessed

6  by the Supreme Court in *Crawford*.

7           Now, let me-- let me turn to the privileges

8  and immunities clause claim.  I want to get back to a

9  point that I made earlier; and that is, *Saenz* and *Soto*

10  and *Dunn* all deal with this basic principle that the

11  constitutional protection afforded by the third prong of

12  the right to travel under the privileges and immunities

13  clause is that you cannot treat recent arrivals

14  differently than earlier arrivals to the state.  A state

15  may not discriminate between long-term residents and

16  newly-arrived residents in the allocation of welfare

17  benefits was the holding.

18           It is important to recognize that this

19  claim-- their claim fails for three reasons.  The first

20  is, there's no distinction in the Kansas law or in the

21  Kansas verification procedures that would affect or

22  discriminate between new arrivals and more distant

23  arrivals.  Does the KDHE check give a better probability

24  of finding a document to someone who was born in Kansas?

25  Yes.  But it makes no difference whether you're a new

1    arrival or a-- or a long-term-- long-time-ago arrival.

2    It doesn't discriminate on that basis that the *Saenz*

3    *versus Roe* and *Dunn* and all of the cases they cite.

4    They are trying to get you to expand the privileges and

5    immunities doctrine beyond long-term residents-- or new

6    arrivals versus long-term residents and take it into a

7    whole new realm.

8              Now, maybe, maybe that would be a good thing

9    as a matter of policy if our Constitution did protect

10   that and said that people born in a state-- if a state

11   makes a distinction that might help someone who's born

12   in the state more than someone who was born in another

13   state, yeah, maybe that would be good if our

14   Constitution prohibited that.  But that is not what the

15   privileges and immunities clause does.  There's no case

16   law that says that.

17             So they're asking you to-- to plow new

18   ground and to be the first court in America to say that

19   the privileges and immunities clause goes here too.  I

20   would caution you against doing that.  Because this is--

21   the Court has been so careful to - the Supreme Court -

22   to combine privileges and immunities clause doctrine for

23   new residents versus longer-term residents.  And that's

24   all that it was.

25             Secondly, the-- the second point I want to

1    make is, of course, they're trying to blur place of

2    birth versus duration of residence.  And we've talked

3    about that already.  And the Pennsylvania case goes in

4    great depth on that.  The Pennsylvania-- the *Connelly*

5    case in the Third District [sic]-- I'm sorry, not the

6    Pennsylvania case, the Third District case, talked about

7    the Supreme Court, and it said, "Nonetheless, the Court

8    refused to apply strict scrutiny and explained that a

9    mere impediment to plaintiffs' freedom of movement,

10   which has some deterrent effect on non-residents who

11   wish to migrate to Pennsylvania, is not enough to give

12   rise to strict scrutiny.  The right to travel simply is

13   not implicated when there is no discrimination based on

14   duration of one's residency."

15            If we accept that as a correct standing--

16   statement of Supreme Court doctrine, then we go to

17   rational basis.  And the state has a rational basis.

18   The rational basis is, first of all, that we have

19   attempted to do similar procedures with states outside

20   of Kansas and they have declined.

21            Second, there's a rational basis to conclude

22   that if a-- an individual who wants to register in

23   Kansas already has a document with some Kansas agency,

24   then it is rational to do a favor to a voter if we can.

25   And remember, with KDOR we're doing a favor to voters

1    who are not born in Kansas as well.  In fact, a large

2    percentage of the KDOR documents are by individuals who

3    have a Kansas driver's license and were not born in

4    Kansas.

5           It is rational for us to say that's good

6    government, to not take-- make people provide a document

7    and-- and find it in their home and take a picture of it

8    with their phone when we could-- we've already got a

9    document on file.  In effect, they've already satisfied

10   the requirement because they haven't-- although they

11   haven't provided it to the Secretary of State's office

12   or to the county election office, they have provided the

13   document to the state of Kansas, either by being born in

14   the state or by at some point getting a Kansas driver's

15   license and showing a qualifying document when they did

16   so.

17          And so in-- in conclusion on the privileges

18   and immunities clause claim, there is-- there is no

19   burden on the travel from state to state.  And I'll

20   quote this Court-- this Court, as you know, in *Elmer*,

21   this Court itself dealt with a *Saenz* right-to-travel

22   claim.  And this Court said in *Elmer*, quote, a

23   reasonable-- "It is a reasonable burden or mere

24   inconvenience on plaintiff's ability to travel from

25   state to state and, therefore--" sorry, it is not in

1   that case "a reasonable burden or mere inconvenience on

2   plaintiff's ability to travel from state to state and,

3   therefore, does not violate his constitutional right to

4   travel."  Excuse me.  It said it is a reasonable burden

5   and, therefore, it does not violate his constitutional

6   right to travel.

7            With respect to their reliance on *Dunn* and

8   *Soto-Lopez*, I've mentioned originally that the

9   *Soto-Lopez* court summarized those holdings and said all

10   these-- these cases stand for is, again, the guiding

11   principle that the right to migrate protects residents

12   of a state from being disadvantaged or being treated

13   differently because of the timing of their migration.

14            There's another clarification I'd like to

15   make; and that is, after the Court handed down the *Dunn*

16   case, the Supreme Court then handed down *Rosario versus*

17   *Rockefeller* which explained *Dunn* and said that it is not

18   the broad case the plaintiffs assert it is.  Despite its

19   broad language, the Supreme Court in the very next year

20   in *Rosario versus Rockefeller* explained what *Dunn* was

21   really about.  It only involved a statute which quote,

22   "Totally disenfranchised newly-arrived residents, i.e.,

23   those who had been residents of the state less than a

24   year or residents of the county less than three months."

25            *Rockefeller* then went on-- and that's

1   *Rockefeller* at Page 757.  *Rockefeller* then explained

2   that cases like *Dunn* involved statutes which, quote,

3   "Totally deny the electoral franchise to a particular

4   class of residents and there was no way in which the

5   members of that class could have made themselves

6   eligible to vote."

7           This is important.  They are trying to get

8   you to look away from *Saenz versus Roe* and look at the

9   older cases of *Dunn* and *Attorney General of New York*

10  *versus Soto*.  But the-- but the point is, the Supreme

11  Court has clarified these are not the broad precedents

12  that they suggest, that the plaintiffs suggest.

13          Finally, let me go to the grandfather clause

14  challenge.  Again, the challenge was not raised in their

15  briefs.  They cannot now say it's just a theory that

16  somehow backs up their previous claim.  It's a new

17  claim.  And their new claim is that the grandfather

18  clause violates the privileges and immunities clause.  I

19  think that's an extraordinary claim.  And the-- there

20  are many problems with it.

21          First of all, that the-- the Kansas law

22  requires everyone not registered to vote on January 1,

23  2013, to comply with its provisions.  It applies equally

24  to people who are residents of Kansas on January 1,

25  2013, and people who were not residents on January, '13.

1   So the resident, regardless of when he arrived in

2   Kansas, is treated equally.  There's no discrimination

3   based on the timing and how the grandfather clause

4   affected you.  Whether you were registered on January 1,

5   2013, absolutely the grandfather clause affects that,

6   but it does not affect you based on whether you were a

7   resident of Kansas at that time.

8        If plaintiffs' theory were correct, then

9   virtually every state law that included a grandfather

10  clause would violate the privileges and immunities

11  clause.  Think about it.  I'm not just talking about

12  cases that involve voting, but all kinds of statutes

13  that involve benefits, that involve penalties, that

14  involve taxes.  If there's a grandfather clause and says

15  this only applies forward, not past, then there would be

16  all kinds of privileges and immunities clause challenges

17  because people-- people would say, well, I wasn't a

18  resident at the time, now I am a resident of Kansas, and

19  it looks like that grandfather clause treats me badly

20  because I came to the state late.

21        The courts have repeatedly upheld challenges

22  to the grandfather clause on rational basis scrutiny; in

23  others words, they have applied or reviewed challenges

24  based on rational basis scrutiny.

25        The Seventh Circuit case we cite, *Sklar*

 1    *versus Byrne* considered a similar issue, and that was

 2    the grandfather clause of the Chicago gun law.  And in

 3    the Seventh Circuit, the grandfather clause was deemed

 4    permissible because, quote, "new residents are merely

 5    one group among several who do not benefit from the

 6    clause.  New residents have not been singled out for

 7    discriminatory treatment."  Again, the Seventh Circuit

 8    correctly applied the doctrine that we've been talking

 9    about.  The simple question is, does it discriminate

10    between new residents and older residents?  And it

11    doesn't.

12            And the state obviously has a rational basis

13    here.  We've talked about it already.  It would be

14    nearly impossible to de-register 1.6 million people,

15    have confidence that you could inform all of them before

16    the next election that, hey, you have to re-register and

17    we have to apply this new standard to you as well.  And

18    as the Tenth Circuit said in *Santillanes*, quote, "States

19    may take one reform step at a time and need not cover

20    every evil that might conceivably be attacked."

21            While it might be nice that we address the

22    non-citizens who are baked into the system, as-- as Mr.

23    Johnson suggests, it's not practical.  And so we address

24    one evil at a time, and that is the evil of future

25    non-citizens registering to vote in Kansas.

1           Finally, let's talk about the appropriate

2    relief.  If this Court were somehow to conclude that the

3    plaintiffs have prevailed on their privileges and

4    immunities claim, that now the question is one of

5    relief, the remedy that they seek expressly in their

6    pleadings, that we enter into agreements with other

7    state agencies, is impossible because they're not

8    present and they haven't been enjoined as defendants.

9    And so you cannot enjoin them to agree with Kansas and

10   enter into these agreements that we've already tried to

11   do.

12           So knowing that that's a problem, the

13   plaintiffs then in their briefing declared that you

14   should just strike down the whole law then because those

15   people aren't in court, those other state agencies

16   aren't in court.  You should be able to strike it all

17   down.  But the-- but that's nonsensical for multiple

18   reasons.  One of the most important is that the checking

19   for documents with state agencies isn't even written in

20   the Kansas law at issue in this case.  That's a policy

21   that we adopted after the fact to help people.

22           And, of course, no good deed goes

23   unpunished.  We adopt this policy to help people to

24   get-- to obtain their proof of citizenship for them.

25   And then, of course, the plaintiffs bring-- bring this

1   additional claim and say, well, now you've got a

2   privileges and immunities clause challenge.  Well, the

3   privileges and immunities clause doctrine does not go

4   where they say it goes.

5        But I would say that if there's any

6   appropriate relief, if you believe that there really is

7   a privileges and immunities clause doctrine violation

8   here, and you-- and I'm setting aside the grandfather

9   clause, I just don't think that's even plausible and it

10  wouldn't be proper to address the claim.

11       But on the-- on the checking with other

12  agencies, it seems to be the only appropriate remedy you

13  could possibly grant would be to prevent us from

14  checking with KDHE because indirectly KDHE only allows

15  us to find Kansas-born people, and allow us to keep on

16  checking with KDOR because KDOR helps-- we have people

17  born in Kansas, people not born in Kansas, where we

18  could find that citizenship document at KDOR.  I don't

19  think that they have presented a valid claim, but that

20  would be the only sensible relief that you could grant

21  that would involve parties who are actually before the

22  Court today.

23       So in summary, I would simply urge the Court

24  not to expand *Crawford* and not to expand *Saenz versus*

25  *Roe*.  Treat-- read those cases as they are, and note

1    that we don't transgress the-- either of the

2    constitutional limits set in those cases.  But if-- if

3    you find that we do in the P and I, privileges and

4    immunities instance, then the appropriate remedy would

5    just be to say, well, Secretary of State's office, keep

6    checking with KDOR but don't check with KDHE anymore, if

7    you're going to expand the doctrine that way.  Thank

8    you.

9              THE COURT:  All right.  Thank you.

10             All right.  This has been very helpful.  So

11   I'll consider this matter under advisement at this

12   point.  We'll be issuing a written decision.  Thank you

13   all and have a good weekend.

14             MR. HO:  Your Honor, if I may.  There are--

15             THE COURT:  Yes.  Yes.

16             MR. HO:  With your indulgence, Dale Ho on

17   behalf of the Fish plaintiffs as well.  There are two

18   ancillary matters that I, with your indulgence, would

19   like to bring to the Court's attention very briefly.

20   And with just five minutes, I think I could save

21   everyone substantial time in the future and some motions

22   practice, if-- if Your Honor has time.

23             THE COURT:  Go ahead.

24             MR. HO:  The first relates to compliance

25   with Your Honor's preliminary injunction for the

 1    upcoming special election, and it gets at a question

 2    that you asked during the hearing about advertising.  We

 3    sent a letter to Secretary Kobach about a month ago

 4    asking to ensure that the-- the preliminary injunction

 5    would continue to be adhered to for purposes of the

 6    upcoming special election for former Congressman

 7    Pompeo's seat.  And we're very grateful that Secretary

 8    Kobach gave us assurances that, in fact, the special

 9    election would be conducted under the same rules as the

10    November election.

11            But there's one issue that still remains out

12    there, and it has to do with information on the

13    Secretary of State's website which continues to refer to

14    the preliminary injunction and mentions the November

15    2016 election.  And our concern is that that information

16    could be confusing to voters who think that the

17    preliminary injunction only applies to that particular

18    election and that they don't remain registered for all

19    future elections, including the special election.

20            Now, we asked Secretary Kobach's team about

21    this and they've again given us assurances that they're

22    going to change that, but it's been about a month and

23    there are at least three web pages on the Secretary of

24    State's various websites that continue to refer to the

25    November 2016 election.  And rather than sort of

1   repeating to, you know, ask about this or file a motion

2   to enforce the preliminary injunction, just some sort of

3   assurance from the Secretary that those websites would

4   be changed say within a week, or something like that, I

5   think would obviate the need for any further work on

6   this.

7            The election is just about a month away at

8   this point and we think the public would be best served

9   by that change being made.

10            THE COURT:  All right.  Thank you, Mr. Ho.

11   Mr. Kobach.

12            MR. KOBACH:  My understanding, Your Honor,

13   is that the notice on the front page of our website has

14   already been changed in accordance with the plaintiffs'

15   request.  I'm not sure if the other two places in our

16   various web pages have been changed or not, but it is

17   our intention to change all of it.

18            THE COURT:  Okay.  Can you get that

19   accomplished within seven days?

20            MR. KOBACH:  Mr. Caskey tells me we can.

21            THE COURT:  Okay.  Wonderful.

22            MR. ROE:  Just tell me what pages they are,

23   you've never told me.

24            MR. HO:  Sure.  Actually, I mentioned the

25   URLs in the letter.  I can send it to you again.

1          MR. ROE:  All right.

2          MR. HO:  Thank you.  Thank you for that,

3    Your Honor.  And then one other very quick point, Your

4    Honor, and it relates to the ongoing discovery with

5    respect to the NVRA claim.

6          As you know, Your Honor, after the Tenth

7    Circuit affirmed your ruling granting a preliminary

8    injunction, the Court re-opened discovery with respect

9    to a couple of issues, the extent of non-citizen

10   registration and whether or not certain alternatives to

11   the documentary proof of citizenship requirement could

12   prevent non-citizen registration.  Now, that includes

13   double-- cross-referencing with the SAVE database and

14   the EVVE databases, the ones that Your Honor asked about

15   at this hearing.  There's ongoing discovery about that.

16         The defendants have given us a new

17   declaration from their Director of Elections and various

18   documents that relate to both of these issues, the

19   extent of non-citizen registration and alternatives to

20   identifying them.  We have noticed several depositions

21   in connection with these documents, including a

22   deposition of the declarant himself.  And we've worked

23   with the defendants to try to agree on some dates.

24         But we've been told just recently that the

25   defendants may object or file a motion for protective

 1   order with respect to these depositions.  And it seems

 2   to us that if the defendants are dropping new documents

 3   and new declarations on us, that there really shouldn't

 4   be any question that we should be permitted to take

 5   depositions with respect to that declaration and these

 6   new documents.  And I thought if we could just discuss

 7   this right now, that would obviate any need for motions

 8   practice on that issue.

 9           THE COURT:  All right.  Mr. Kobach.  Mr.

10   Roe.

11           MR. ROE:  Your Honor, yes, I sent an e-mail

12   back saying that I'm not sure that the depositions they

13   were asking about were within the scope of the order and

14   we could talk about it at a later date.  At this point

15   we haven't talked about it.

16           I also wanted to clarify that if they are

17   going to do depositions, we've already had two

18   depositions of Mr. Caskey in the Fish case, one

19   deposition of Mr. Caskey in the Keener case, one of

20   which Mr. Caskey was a 30(b)(6) declarant, which

21   states-- as Your Honor knows, that's the positions of

22   our office generally.

23           I just wanted to make sure that any

24   depositions that occur are going to be within the scope

25   of the new discovery.  That was what-- my point.  And I

1    said that I am going to reserve the right to move for

2    protective order if I feel like that's not what's

3    happening.

4              THE COURT:  And so have you noticed up the

5    depositions and the depositions speak to the scope of

6    what you're inquiring about?

7              MR. HO:  We have noticed the depositions,

8    Your Honor.  We haven't specified particular limitations

9    within those notices of depositions, but I'm happy to

10   represent that they're going to be about the subject

11   matter of the new documents that we've received from the

12   defendants pursuant to the new discovery.

13             THE COURT:  All right.  So I think-- I mean,

14   so in other words, there's not going to be any

15   duplication or back-- re-treading.  It's just with

16   respect to new discovery received and only with respect

17   to that?

18             MR. HO:  Yes, Your Honor.

19             THE COURT:  All right.  Is that anything

20   that you would object to, Mr. Roe?

21             MR. ROE:  I mean, the only other issue at

22   this point, and I haven't looked into it, is that

23   they've noticed the deposition of somebody in Oklahoma

24   at this point who's a-- my understanding is a-- somebody

25   with the Oklahoma Department of Health I think.  I mean,

1    I'm looking at that.

2                But as far as the actual individuals they

3    are seeking to depose, I'm not sure necessarily the

4    reason for it at this point.  But again, obviously

5    they-- they have their reasons and that's-- we have to

6    deal with it.  But yeah, I mean, they're asking for a

7    deposition not only of Mr. Caskey and they're asking for

8    a deposition of assistant election-- not assistant, but

9    his assistant essentially, our assistant Secretary of

10   State, and as well as somebody who doesn't work for the

11   office anymore.

12               Again, at this point I-- I don't have a

13   reason to object.  I just wanted to note for them that

14   if I saw a reason, I may have to do so.  That was all

15   the e-mail was about.

16               THE COURT:  All right.  All right.  I

17   understand.  And Judge O'Hara has been managing

18   discovery and managing it well.  So hopefully this will

19   obviate the need for motions practice.  But if not, I

20   don't know how he'll want to handle it.  He may want to

21   get you all on the phone pretty quickly since the

22   discovery deadline is approaching.  And, you know,

23   motions practice kind of wastes time.

24               So I'll mention this to him.  And if there

25   is an issue, I would suggest that the two of you get

1    together and call his office and see if he wants to

2    proceed on paper or just schedule a hearing and hear

3    from you orally.  Okay?  Because the discovery cutoff is

4    in April.

5              MR. HO:  That's correct, Your Honor.

6              THE COURT:  Right?  Yeah.  So, yeah, we

7    probably need to-- need to move on it pretty quickly if

8    you're not able to resolve it.  Okay?  All right.

9              MR. HO:  Thank you, Your Honor.

10             THE COURT:  Thank you, everyone.

11             (4:23 p.m., proceedings recessed).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3

4      I, Kelli Stewart, a Certified Shorthand Reporter and

5   the regularly appointed, qualified and acting official

6   reporter of the United States District Court for the

7   District of Kansas, do hereby certify that as such

8   official reporter, I was present at and reported in

9   machine shorthand the above and foregoing proceedings.

10      I further certify that the foregoing transcript,

11   consisting of 133 pages, is a full, true, and correct

12   reproduction of my shorthand notes as reflected by this

13   transcript.

14      SIGNED March 17, 2017.

15

16

17

18             /s/ Kelli Stewart
                                              _____

19             Kelli Stewart, CSR, RPR, CCR, RMR

20

21

22

23

24

25
```