# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

STEVEN WAYNE FISH, et al.,

     **Plaintiffs,**

     **v.**

KRIS KOBACH, KANSAS SECRETARY OF
STATE,

     **Defendant.**

Case No. 16-2105-JAR-JPO

## MEMORANDUM AND ORDER

The individual Plaintiffs in this case are United States citizens who attempted to register to vote at the time they applied for a Kansas driver's license. Under a 2011 Kansas Documentary Proof of Citizenship ("DPOC") law, Plaintiffs' voter registration applications were deemed "incomplete," and under a 2015 regulation passed by Kansas Secretary of State Kris Kobach, some of these applications were cancelled in the Kansas voter registration database. These Plaintiffs, along with the Kansas League of Women Voters, bring several claims against Secretary Kobach for constitutional violations under 42 U.S.C. § 1983, and for statutory violations of the National Voter Registration Act ("NVRA"). On May 17, 2016, the Court issued an extensive Memorandum and Order granting in part Plaintiffs' motion for a preliminary injunction barring enforcement of the Kansas DPOC law until this case could be decided on the merits.[1] It was effective on June 14, 2016.[2] The Tenth Circuit affirmed that ruling on October 19, 2016.[3]

---

[1] 189 F. Supp. 3d 1107 (D. Kan. 2016).

[2] Doc. 145.

[3] 840 F.3d 710 (10th Cir. 2016).

After the Tenth Circuit's decision, the court reopened discovery. Although the parties' dispositive motions are not due until July, Plaintiffs filed a Motion for Partial Summary Judgment (Doc. 267) on the Fourteenth Amendment Right to Travel claim, arguing that the DPOC law on its face, and as enforced, violates the Privileges or Immunities clause. That motion is fully briefed, and the Court heard oral argument on March 3, 2017.[4] Having fully considered the arguments and evidence presented by the parties on the briefs and at the hearing, the Court denies Plaintiffs' motion for summary judgment, as explained more fully below.

## I.     The Kansas Documentary Proof of Citizenship Law

Under Kansas law, legally qualified voters must register in order to be eligible to vote,[5] and only United States citizens over the age of eighteen are eligible to register to vote.[6] Before 2013, Kansas voter registration applicants met the citizenship requirement by signing an attestation of United States citizenship on the registration application. The Secure and Fair Elections Act ("SAFE Act") became law in April 2011. It requires voter registration applicants to submit documentary proof of citizenship ("DPOC") at the time they apply to register to vote:

> (l) The county election officer or secretary of state's office shall accept any completed application for registration, but an applicant shall not be registered until the applicant has provided satisfactory evidence of United States citizenship. Evidence of United States citizenship as required in this section will be satisfied by presenting one of the documents listed in paragraphs (1) through (13) of subsection (l) in person at the time of filing the application for registration or by including a photocopy of one of the following documents with a mailed registration application. After a person has submitted satisfactory evidence of citizenship, the county election officer shall indicate this information in the person's permanent voter file. Evidence of United States citizenship shall be

---

[4]The Court allowed a consolidated oral argument on these motions with the cross motions for summary judgment in the related case of *Bednasek v. Kobach*, No. 15-9300. Although the Court consolidated the oral argument, it has been careful to evaluate these cases separately. The Court has not cross-referenced or relied upon the record or brief in the *Bednasek* matter in deciding the instant motions in this case.

[5]K.S.A. § 25-2302.

[6]Kansas Constitution art. 5, § 1.

satisfied by providing one of the following, or a legible photocopy of one of the following documents:

(1) The applicant's driver's license or nondriver's identification card issued by the division of vehicles or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver's license or nondriver's identification card that the person has provided satisfactory proof of United States citizenship;
(2) the applicant's birth certificate that verifies United States citizenship to the satisfaction of the county election officer or secretary of state;
(3) pertinent pages of the applicant's United States valid or expired passport identifying the applicant and the applicant's passport number, or presentation to the county election officer of the applicant's United States passport;
(4) the applicant's United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States bureau of citizenship and immigration services by the county election officer or the secretary of state, pursuant to 8 U.S.C. § 1373(c);
(5) other documents or methods of proof of United States citizenship issued by the federal government pursuant to the immigration and nationality act of 1952, and amendments thereto;
(6) the applicant's bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number;
(7) the applicant's consular report of birth abroad of a citizen of the United States of America;
(8) the applicant's certificate of citizenship issued by the United States citizenship and immigration services;
(9) the applicant's certification of report of birth issued by the United States department of state;
(10) the applicant's American Indian card, with KIC classification, issued by the United States department of homeland security;
(11) the applicant's final adoption decree showing the applicant's name and United States birthplace;
(12) the applicant's official United States military record of service showing the applicant's place of birth in the United States; or
(13) an extract from a United States hospital record of birth created at the time of the applicant's birth indicating the applicant's place of birth in the United States.[7]

In addition to this DPOC requirement, each registration application in Kansas requires an

attestation by the applicant as to the applicant's residence, age of majority, and United States

---

[7]K.S.A. § 25-2309(l).

citizenship, signed under penalty of perjury. The registration application does not contain fields for an applicant's place of birth, maiden name, or mother's maiden name.

The DPOC requirement was made effective on January 1, 2013.[8] A person already registered to vote on the Act's effective date is not required to submit evidence of citizenship.[9] Defendant later promulgated K.A.R. § 7-23-14(c), which provides that "[a] registered voter who has previously provided sufficient evidence of United States citizenship with a voter registration application in this state shall not be required to resubmit evidence of United States citizenship with any subsequent voter registration application."

If an applicant is a United States citizen but unable to provide one of the thirteen forms of identification listed in subsection (l), the statute allows that applicant to submit another form of citizenship documentation by directly contacting the Secretary of State's Office. In these cases, the state election board shall give the applicant an opportunity for a hearing before assessing the evidence of citizenship to determine whether it is satisfactory.[10] The state election board is composed of the Secretary of State, the Attorney General, and the Lieutenant Governor.[11]

If a voter registration applicant fails to submit the requisite DPOC before the registration deadline in Kansas, that applicant can still submit DPOC to the county election office in person, by mail, or electronically (including by text message) before midnight on the day before an election.[12]

On June 25, 2015, Defendant Kobach promulgated K.A.R. § 7-23-15, which became effective on October 2, 2015. The regulation applies to registration applications that have been

---

[8]*Id.* § 25-2309(u) (repealed 2016).

[9]*Id.* § 25-2309(n).

[10]*Id.* § 25-2309(m).

[11]K.S.A. § 25-2203(a).

[12]K.A.R. § 7-23-14(b).

deemed "incomplete." Such applications are "cancelled" if they do not produce DPOC, or otherwise cure the deficiency in the application, within 90 days of application. The applicant must submit a new, compliant voter registration application in order to register to vote.

On July 1, 2015, the legislature granted the Secretary of State authority to prosecute election crimes, including attempts by noncitizens to register to vote, or cast a ballot.[13]

## II.    Uncontroverted Facts

The following material facts are either uncontroverted or viewed in the light most favorable to Defendant as the nonmoving party.

### *Implementation and Enforcement of DPOC Law*

As of January 1, 2013, there were 1,762,330 registered voters in Kansas. Between January 1, 2013, the day the DPOC law went into effect, and January 3, 2017, 389,058 Kansans successfully registered to vote. For the Presidential election in 2016, the number of registered voters in Kansas was over 1.8 million, a new record.

Kansans may apply to register to vote in person, by mail, through a voter registration agency, in conjunction with applying for a Kansas driver's license, or "by delivery to a county election officer to be registered."[14] The individual Plaintiffs in this case all applied to register at the time they applied for a Kansas driver's license.

The Kansas Election Voter Information System ("ELVIS") is a database that contains every registered voter, every voter registration applicant, and everyone who used to be a registered voter but was subsequently cancelled. If an applicant has not provided DPOC, or if the application is otherwise missing required information, the record is deemed "incomplete,"

---

[13] K.S.A. § 25-2435(a).

[14] K.S.A. §§ 25-2309(a), -2352(a)(1).

and designated with a reason code of "in suspense" until the application is completed.  After  90 days, an incomplete application is cancelled under K.A.R. § 7-23-15.[15]

Defendant and county election officers may accept DPOC at a different time or in a different manner than an application for voter registration, as provided in (l), "so long as the applicant's eligibility can be adequately assessed by the secretary of state or county election officer as required by this section."[16]  Under this authority, Defendant has established interagency agreements with two Kansas agencies to verify whether one of the thirteen forms of DPOC listed in § 25-2309(l) may be on file.  First, on January 7, 2014, Defendant and Robert Moser, MD, Secretary of the Kansas Department of Health and Environment ("KDHE"), entered into an Interagency Agreement called the "Birth/Voter Registration Data Link," whereby the KDHE agreed to crosscheck the names of incomplete voter registration applicants with the database of birth certificates and marriage licenses on file with the Kansas Department of Vital Statistics, and provide Defendant with the results.  Defendant sends a list of new voter registration applicants on the suspense list to the KDHE on approximately a monthly basis.  The agreement makes clear that "The Kansas OVS maintains records only on Kansas vital events occurring in the State of Kansas.  The voter registration form does not collect State of birth for the voter."[17]

The KDHE maintains birth records only of those individuals born in the State of Kansas.  Kansas Elections Director Bryan Caskey testified that "generally speaking . . . between 40 and 50 percent of the records that we present to KDHE will come back with an affirmative response

---

[15]In addition to the Court's order in this case requiring Defendant to register all motor voter registrants who had been deemed incomplete or cancelled for failure to provide DPOC, there is a preliminary injunction in place prohibiting state-specific instructions on the Federal mail-in that would require an applicant to produce DPOC. *League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016), *rev'g* 195 F. Supp. 80 (D.D.C. 2016).

[16]K.S.A. § 25-2309(t).

[17]Doc. 269-2 at 7 (Pl. Ex. B).

of yes, there is proof of citizenship on file. That information is provided to the counties."[18]
Indeed, according to Defendant, as of January 22, 2014, just a few weeks after implementing the
KDHE verification policy, 7716 registrations were completed out of a total of 20,201 that had
been deemed incomplete at the time due to lack of DPOC.

Defendant does not cross-reference birth certificate information with any state other than
Kansas. Caskey has contacted several neighboring states in an attempt to obtain birth certificate
information, but either their state laws prohibit such information sharing, or it would be cost-
prohibitive—"in the thousands of dollars per record."[19] Defendant has been unable to utilize the
Electronic Verification of Vital Events ("EVVE") system to verify citizenship of Kansans who
were not born in Kansas because that system requires a person's state of birth for cross-
referencing. This information is not collected on the voter registration application. Additionally,
Defendant determined that the EVVE system would cost the State between $5 and $30 per
record to use.

Second, in May 2016, Defendant implemented two new interagency policy changes for
coordinating with the Kansas Department of Revenue ("KDOR") to verify citizenship documents
that may have been provided by voter registration applicants when they applied for a Kansas
driver's license. The Division of Vehicles ("DMV"), a subdivision of the KDOR, accepts and
scans DPOC provided by any Kansas driver's license holder or applicant, at any time. Also,
Defendant and the county clerks have been given access to a secure internet portal whereby they
may check the DMV records of any registration applicant on the incomplete list to determine if
the DMV possesses DPOC for that resident. Defendant has instructed the counties to check for
every applicant on their incomplete lists to determine whether incomplete voter registration

---

[18]Doc. 269-10 at 63:20–25 (Pl. Ex. F-2).
[19]Doc. 281-4 at 142:3 (Def. Ex. C).

applicants may have provided acceptable DPOC to the DMV when applying for a driver's license. If the web portal does not return confirmation that a citizenship document is on file, KDOR will manually run a secondary verification of its system for those names. Caskey contends that in addition to those confirmed through the KDHE process, "others" are confirmed through the KDOR, and "most" provide their own DPOC within the 90-day period provided under K.A.R. § 7-23-15.

As of January 3, 2017, there were 22,053 voter registration applications either cancelled or deemed incomplete for failure to provide DPOC under K.A.R. § 7-23-15.

### *Individual Plaintiffs*

Plaintiff Steven Wayne Fish is a United States citizen, a resident of Kansas, and over eighteen years old. He was born on the Chanute Air Force Base in the State of Illinois, which was decommissioned and closed in 1993. In August 2014, Fish applied to register to vote while renewing his Kansas driver's license at the DMV. ELVIS reflects that Plaintiff did not provide DPOC and his application was cancelled in January 2016, pursuant to K.A.R. § 7-23-15. Upon learning that his voter registration application was deficient for lack of DPOC, Fish searched for his birth certificate but was unable to find it. He attempted to obtain a copy of his birth certificate from the Chanute Air Force Base where he was born, to no avail. In 2016, Fish discovered a copy of his birth certificate in a safe at his stepfather's house. He was deemed registered in June 2016, after the Court's preliminary injunction order became effective.

Plaintiff Donna Bucci is a United States citizen, a resident of Kansas, and over eighteen years old. She was born in the State of Maryland. Bucci applied to register to vote while renewing her Kansas driver's license at the DMV on August 14, 2013. The ELVIS records show that Bucci failed to provide proof of citizenship. She has testified that obtaining a copy of her

Maryland birth certificate would be a financial burden for her. Bucci's application was cancelled on October 15, 2015 pursuant to K.A.R. § 7-23-15. She was deemed registered in June 2016, after the Court's preliminary injunction order became effective.

Plaintiff William Stricker, III is a United States citizen, a resident of Kansas, and over eighteen years old. He was born in the State of Missouri. Stricker went to the DMV office in October 2014 to obtain a driver's license and register to vote. He was told that he had insufficient documentation to obtain a driver's license and was sent home to retain his social security card. Stricker returned to the DMV with his out-of-state driver's license, social security card, and utility bills to show proof of lawful presence.[20] Stricker's ELVIS records show that he was notified that his voter registration application was incomplete due to failure to provide DPOC, and that it was cancelled on November 6, 2015, pursuant to K.A.R. § 7-23-15. He was deemed registered on June 22, 2016, after the Court's preliminary injunction order became effective. On July 7, October 15, and October 28, 2016, "registrant attachments" were added to his ELVIS file. On October 28, 2016, Stricker's status in ELVIS was changed from "S" to "A."

Plaintiff Thomas Boynton is a United States citizen, a resident of Kansas, and over eighteen years old. He was born in the State of Illinois. In early August 2014, Mr. Boynton went to a driver's license office in Wichita, Kansas to apply for a Kansas driver's license and to register to vote. At the preliminary injunction hearing, there was a factual dispute about whether Boynton applied to register at a DMV office, or in person at his polling station. Regardless, the ELVIS records reflect that his voter registration application was cancelled on November 5, 2015, pursuant to K.A.R. § 7-23-15. He was deemed registered on June 20, 2016, after the Court's preliminary injunction order became effective. A screen shot in his ELVIS file dated June 20,

---

[20]*See* K.S.A. § 8-240(b)(2).

2016 indicates that a certified U.S. birth certificate was provided, with a "date added" of August 4, 2014.

Plaintiff Douglas Hutchinson is a United States citizen, a resident of Kansas, and over eighteen years old. He was born in the State of Colorado. Hutchinson applied to register to vote in the spring of 2013 when he renewed his driver's license at a DMV. In late 2014 or early 2015, he received a telephone call from a volunteer with the League of Women Voters advising him that his name was not registered to vote because he had not provided DPOC. Mr. Hutchinson obtained a passport, and in the summer of 2015 attempted to take a copy of his passport to the DMV office. Nonetheless, Hutchinson's application was cancelled under K.A.R. § 7-23-15. It appears from the updated ELVIS records that Hutchinson reapplied to register to vote on July 29, 2016.[21] The document attached to his voter registration card is completely redacted.

## III.    Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[22] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[23] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[24] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[25] An issue

---

[21]Doc. 281-8 at 10–11 (Def. Ex. D-3).

[22]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[23]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[24]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[25]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[26]

To prevail on a motion for summary judgment on a claim upon which the moving party also bears the burden of proof at trial, the moving party must demonstrate "no reasonable trier of fact could find other than for the moving party."[27] The facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[28] Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[29] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[30]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[31] In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[32]

## IV. Standing and Mootness

Defendant challenges certain Plaintiffs' standing to raise the right to travel claim, and argues that the claim is moot with respect to other Plaintiffs. Article III of the Constitution gives

---

[26]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[27]*Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015).

[28]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

[29]Fed. R. Civ. P. 56(c)(4).

[30]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[31]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[32]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

federal courts the power to exercise jurisdiction only over "Cases" and "Controversies." As the Supreme Court has explained:

> In limiting the judicial power to "Cases" and "Controversies," Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law. Except when necessary in the execution of that function, courts have no charter to review and revise legislative and executive action.[33]

One of several doctrines reflecting Article III's case-or-controversy limitation on the judicial power is the doctrine of standing. That doctrine requires federal courts, before considering the merits of an action, to "satisfy themselves that the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant [the plaintiff's] invocation of federal-court jurisdiction."[34] Standing considers whether there is a case or controversy at the time the action is filed, while "mootness ensures it remains one at the time a court renders a decision."[35] "Failure to satisfy the requirements of either doctrine places a dispute outside the reach of the federal courts."[36] Although the Plaintiff bears the burden of showing standing, Defendant bears the burden of demonstrating mootness.[37]

### A.     Standing Challenges to League of Women Voters, Fish, and Bucci

The Supreme Court has found the "irreducible constitutional minimum of standing" to contain three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to

---

[33] *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009).

[34] *Id.* at 493 (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)).

[35] *Brown v. Buhman*, 822 F.3d 1151, 1163 (10th Cir. 2016).

[36] *Id.* at 1164.

[37] *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1183 (10th Cir. 2012).

be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result of the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."[38]

Plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing each element of standing "with the manner and degree of evidence required at the successive stages of the litigation."[39] Standing is evaluated based on the facts as they exist at the time the Complaint is filed.[40] At the summary judgment stage of the proceedings, "the elements of standing must be set forth, through specific facts, by affidavit or other evidence. Furthermore, a plaintiff must demonstrate standing separately for each form of relief sought."[41]

The Court easily finds that Plaintiffs Fish and Bucci have standing to raise the right to travel claim asserted in this case. The right to travel claim has two components: (1) a facial challenge to the grandfather clause in the statute, which makes the law effective on January 1, 2013; and (2) an enforcement challenge to the KDHE agreement that allows Defendant to verify the birth records of native-born Kansans who appear on the list of incomplete voter registration applicants. Plaintiffs Fish and Bucci both applied to register to vote after January 1, 2013, so they have standing to claim that the law discriminates against them as newer Kansas residents. Plaintiffs Fish and Bucci were born outside of Kansas, so their incomplete applications could not be verified by the KDHE. For purposes of the standing analysis, they both suffered an injury in the form of discriminatory treatment on the basis of the length of their residency and their place of birth. If the law was invalidated on this basis, the barrier to completing their registration applications would be removed.

---

[38]*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted).

[39]*Id.* at 561; *Tandy v. City of Wichita*, 380 F.3d 1277, 1284 (10th Cir. 2004).

[40]*Tandy*, 380 F.3d at 1284.

[41]*Id.* (citations omitted).

While it is true that "standing is not dispensed in gross,"[42] the Supreme Court has repeatedly observed that if one individual plaintiff has demonstrated standing to raise a claim for relief, it need not consider whether the other plaintiffs have standing.[43]  Here, all of the individual Plaintiffs have standing to raise the  right to travel claim asserted in the Complaint.  As such, the Court need not consider whether the League of Women Voters has standing to raise this particular claim.[44]

### B.    Moottness Challenge to Boynton, Hutchinson, and Stricker

Defendant argues that Plaintiffs Boynton, Hutchinson, and Stricker's claims are moot because since the time of the preliminary injunction order last year, the State has located DPOC for each of these Plaintiffs and deemed them registered to vote.  "If an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the action can no longer proceed and must be dismissed as moot."[45]  Defendant argues that Boynton and Stricker were registered to vote after their DPOC was verified through the KDOR database, and that Hutchinson was registered because he presented a passport to the Johnson County Elections Officer, which was then used to verify his citizenship.  Plaintiffs respond that these Plaintiffs' claims are not moot because the only reason they became registered was by virtue of the preliminary injunction ruling requiring Defendant to register them.  Otherwise, since their applications had been cancelled, they would have been required to reapply to register to vote in order for any verification process to apply to them.  Plaintiffs also point to

---

[42]*Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).

[43]*Horne v. Flores*, 557 U.S. 443, 446–47 (2009); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977); *see also Thiebaut v. Colo. Springs Utils.*, 455 F. App'x 795, 802–03 (10th Cir. 2011) ("courts retain discretion to analyze the standing of all plaintiffs in a case and to dismiss those plaintiffs that lack standing").

[44]At this time, Defendant does not contest the League of Women Voters' standing to raise the other claims of relief asserted in this case.

[45]*Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016).

contradictory evidence submitted by Defendant in support of these Plaintiffs' recent registrations.

The Court agrees with Plaintiffs. Prior to this Court's May 2016 preliminary injunction order, Hutchinson and Stricker's voter registration applications had been cancelled.[46] As to Plaintiff Boynton, Defendant took the position when litigating the preliminary injunction motion that Boynton had never applied to register to vote. Yet, the record reflected that he had been notified that he lacked DPOC after applying for his driver's license, and that his voter registration application had been cancelled.[47] The Court's order directed Defendant "to register for federal elections all otherwise eligible motor voter registration applicants that have been cancelled or are in suspense due solely to their failure to provide DPOC."[48] Therefore, but for the preliminary injunction order, these Plaintiffs were required to reapply to register to vote in order for any post-application verification procedure to be available to them. Instead, the Court's order directed Defendant to register those who had been cancelled or held in suspense to vote, despite the fact that no DPOC had been submitted. The Court will not allow Defendant to use its preliminary injunction order as a justiciability sword to pick off Plaintiffs whose citizenship he would not have verified otherwise.

Defendant's evidence of citizenship verification supports Plaintiffs' assertion that Stricker and Boynton were only registered because of the Court's previous Order, and supports their allegation that this mootness argument is pure gamesmanship—a tactic Defendant has

---

[46]189 F. Supp. 3d at 1122–23.

[47]*Id.* at 1123.

[48]*Id.* at 1152.

employed in other cases to avoid reaching the merits of challenges to the SAFE Act.[49]  Stricker's

ELVIS records show that his application was cancelled on November 6, 2015 pursuant to K.A.R.

§ 7-23-15, for failure to provide DPOC.[50]  Defendant cites Exhibit D-4, which appears to be an

updated ELVIS record for Stricker, for the proposition that his "citizenship was confirmed with

the Division of Vehicles."[51]  The Court notes that Defendant has not provided the Court with an

affiant to help explain the many and varied codes in the ELVIS records.  This document

indicates that Stricker's status changed from cancelled to "S" on June 22, 2016—after the

preliminary injunction order was issued, which the Court infers to mean that he was registered on

that date in compliance with the Court's order.  It appears that Stricker's citizenship was later

verified on October 28, 2016.[52]

Defendant claims that Hutchinson presented a passport to the Johnson County Election

Office, which allowed them to confirm his citizenship and register him.  Of course, it was part of

the record during the preliminary injunction hearing that Hutchinson, upon learning that he was

not in fact registered to vote from the League of Women Voters, attempted to prove his

citizenship by presenting his passport in person at the DMV office in Mission, Kansas.  He had

been told this was sufficient to register him to vote.  Yet, he later discovered that his application

was incomplete and eventually cancelled.[53]  Discrepancies and holes in Hutchinson's updated

ELVIS record prevent this Court from determining that Hutchinson's claim is moot.  First,

although this exhibit is largely the ELVIS record for Hutchinson, the detail log on pages 5 and 6

---

[49]*Cromwell v. Kobach*, 199 F. Supp. 3d 1292 (D. Kan. 2016); *Belenky v. Kobach*, No. 2013CV1331, slip op. at 9–10 (Shawnee Cty. D. Ct. Jan. 15, 2016)  ("Plaintiffs' current registration status under the Kansas SAFE act was accomplished by the actions and choice of the Secretary, not at the choice of these two Plaintiffs.").

[50]*See* Pl. Ex. H-3.

[51]Doc. 280 at 32.

[52]Doc. 281-9 at 5 (Def. Ex. D-4).

[53]There is a notation on his ELVIS file that a DMV check was performed on "6-21-16" and no document was found.  Doc. 281-8 at 19 (Def. Ex. D-3).

are for Stricker.  It is therefore impossible for this Court to determine the history of status

changes or documents provided for this Plaintiff.  Second, the exhibit does not even infer that

Plaintiff provided a passport to the Johnson County Election Office, allowing for independent

registration after the Court's preliminary injunction order.  There is a copy of a voter registration

card signed by Hutchinson on July 29, 2016,[54] but the following page is redacted and Defendant

has not provided the Court with an unredacted copy.  There is a notation of "Proof of

Citizenship" on August 8, 2016, but the note does not indicate the manner or type of DPOC

provided.[55]

Boynton's ELVIS record shows that his application was cancelled on November 5, 2015,

pursuant to K.A.R. § 7-23-15, for failure to provide DPOC.  On June 20, 2016, his registration

status changed to "A."  A screenshot of a voter check in this ELVIS record from June 20, 2016,

shows that Boynton had a certified birth certificate on file as of August 4, 2014—the date he

claimed at the preliminary injunction hearing to have applied to register to vote, which

Defendant had denied.

This evidence does not suggest that in the normal course of administering the DPOC law,

Defendant located and verified these Plaintiffs' DPOC, leading to their completed registrations.

Instead, Plaintiffs' cancelled applications were revived and registered by operation of the Court's

preliminary injunction order.[56]  Only then did Defendant search the KDOR records for Boynton

and Stricker's citizenship documents to verify.  Defendant's burden to demonstrate mootness is

---

[54]Doc. 281-8 at 10 (Def. Ex. D-3).

[55]Doc. 281-8 at 7 (Def. Ex. D-3).

[56]On September 23, 2016, Shawnee County District Court Judge Larry D. Hendricks ordered Defendant to provide notice to all voters impacted by this Court's preliminary injunction ruling that they would be "deemed registered and qualified to vote for the appropriate local, state, and federal elections for purposes of the November 8, 2016 general election, subject only to further official notice."  *Brown v. Kobach*, No. 2016-CV-550, slip op. at 3–4 (Shawnee Cty. Dist. Ct. Sept. 23, 2016).

greater when he "moots the case by voluntarily ceasing [his] offending conduct."[57] Under such circumstances, Defendant "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."[58] Here, the Court cannot find that the allegedly wrongful behavior could not be expected to recur. Apparently, Defendant is now taking the position that his office will independently review cancelled applications for DPOC submitted to other State agencies, rather than forcing those individuals to reapply.[59] Of course, at the preliminary injunction phase, many of the Plaintiffs complained that they had provided citizenship documents when they registered to vote, but were held in suspense or cancelled anyway. It was not until this Court issued its Order granting preliminary injunctive relief on the NVRA claim that Defendant attempted to find these documents. While the Court is mindful that "the withdrawal or alteration of administrative policies can moot an attack on those policies,"[60] Defendant has made no effort to prove how his office's policies have changed since last May that would explain his unilateral attempts to verify citizenship documents for cancelled applicants. As such, the Court cannot find that he has met his burden of demonstrating mootness.

The Court encourages Defendant to review the Court's previous order denying class certification in this matter. The Court's decision last year turned on its finding, at Defendant's

---

[57] *WildEarth Guardians*, 690 F.3d at 1183.

[58] *Id.* (quoting *Laidlaw*, 528 U.S. at 190).

[59] The Court notes that this is directly contrary to Defendant's statement of fact that "once an individual's application is cancelled, the regulation requires individuals to provide a new voter registration application." Doc. 280 at 9 ¶ 21.

[60] *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1117 (10th Cir. 2010) (quoting *Bahnmiller v. Derwinski*, 923 F.2d 1085, 1089 (4th Cir. 1991)).

urging, that class certification is not necessary because for one thing, "there has been no showing of a risk that the remaining name Plaintiffs' claims will become moot."[61]  This court explained:

> None of the named Plaintiffs were born in Kansas, so it is unlikely that Defendant could verify their citizenship through its coordinated efforts with the DVS.  All of the named Plaintiffs applied to register to vote at the DMV, and the evidence presented at the preliminary injunction hearing showed that all but two failed to present DPOC during the driver's license renewal process.  So the risk that the State could independently verify their citizenship and register these Plaintiffs is low. . . .  In fact, for those applicants cancelled in ELVIS, there is little chance that their claims could become moot unless they move out of state, as with Mr. Ortiz.[62]

The revelation that Defendant has since verified citizenship for Plaintiffs Boynton and Stricker calls into question the Court's previous findings on necessity, and are troubling to say the least.[63]  If Defendant continues his pattern of picking off Plaintiffs through targeted back-end verifications in an attempt to avoid reaching the merits of this case, the Court may be inclined to revisit its previous decision denying Plaintiffs' motion for class certification.

Having found that the right to travel claim is justiciable, the Court proceeds to consider Plaintiffs' summary judgment motion on the merits of that claim.

### B.        Right to Travel Claim

Plaintiffs claim that the DPOC statute, and the State's efforts to verify Kansas birth records for individuals on the incomplete list, apply differently to Kansas citizens depending on their length of residency and state of birth, burdening their fundamental right to travel under the Privileges or Immunities Clause of the Fourteenth Amendment.  Defendant argues that there is no legal basis for either a facial or as-applied challenge to the law.  The right to travel is a

---

[61]Doc. 200 at  7.

[62]*Id.* at 7–8.

[63]Because Defendant does not make an absolutely clear showing on the status of Hutchinson's application—that he in fact reapplied in person, armed with DPOC, after the Court's preliminary injunction order became effective—the Court denies the motion to dismiss without prejudice.  Even if Hutchinson's claim is moot, the remaining individual Plaintiffs have demonstrated that they have justiciable claims.

fundamental right under the Constitution, and "protects residents of a State from being

disadvantaged, or from being treated differently, simply because of the timing of their migration,

from other similarly situated residents."[64]  In *Saenz v. Roe*,[65] the United States Supreme Court

explained that the right to travel has three components:

> It protects the right of a citizen of one State to enter and to leave another State, the
> right to be treated as a welcome visitor rather than an unfriendly alien when
> temporarily present in the second State, and, for those travelers who elect to
> become permanent residents, the right to be treated like other citizens of that
> State.[66]

As with the durational residency requirement at issue in *Saenz*,[67] this case implicates the third

category of the right to travel.

The fact that a law may only incidentally implicate the right to travel is not a defense

because "since the right to travel embraces the citizen's right to be treated equally in her new

State of residence, the discriminatory classification is itself a penalty."[68]  Supreme Court cases

dealing with indirect burdens on the right to travel address "state laws that, by classifying

residents according to the time they established residence, resulted in the unequal distribution of

rights and benefits among otherwise qualified bona fide residents."[69]  Strict scrutiny is most

frequently applied in the context of durational residency requirements.  In *Saenz* for example, the

Court invalidated a California statute that made new California residents ineligible to receive

welfare benefits during their first year of residency.[70]  During that first year, new residents could

---

[64]*Atty. Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 901, 904 (1986).

[65]526 U.S. 489 (1999).

[66]*Id.* at 499.  Plaintiffs do not bring this claim under Article IV, § 2 Privileges and Immunities Clause ("The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.").

[67]*Id.* at 502.

[68]*Id.* at 505.

[69]*Soto-Lopez*, 476 U.S. at 903.

[70]*Saenz*, 526 U.S. at 510–11.

only obtain welfare benefits equivalent to what they would have received in their prior State of residence.[71]  The State's interest in deterring welfare applicants from migrating to California was impermissible and unsupported by the record.[72]  The Court also found that California's fiscal justification for the law did not justify its decision to discriminate against new residents from certain states.[73]

In 1972, the Court struck down Tennessee's one-year durational residency requirement on the right to vote in *Dunn v. Blumstein*.[74]  Finding that the Tennessee law deprived new residents the fundamental political right to vote, the Court applied a "strict equal protection test: [durational residence laws] are unconstitutional unless the State can demonstrate that such laws are 'necessary to promote a compelling governmental interest.'"[75]  Strict scrutiny applied because the law "forc[ed] a person who wishes to travel and change residences to choose between travel and the basic right to vote."[76]  The Court found that the statute was not narrowly tailored to further either the State's interests in preventing voter fraud, or having knowledgeable voters, and thus invalidated the law.[77]  The Court made clear that the State must demonstrate that the law is narrowly tailored to meet the State's legitimate objections, and that "if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference.  If it acts at all, it must choose 'less drastic means.'"[78]

---

[71] *Id.* at 492–93.

[72] *Id.* at 506.

[73] *Id.* at 507.

[74] 405 U.S. 330 (1972).

[75] *Id.* at 342 (quoting *Shapiro*, 394 U.S. at 634).

[76] *Id.* at 341.

[77] *Id.* at 344–61.

[78] *Id.* at 343 (quoting *Shelton v. Tucke*, 364 U.S. 479, 488 (1960)).

In *Zobel v. Williams*,[79] the Court addressed a slightly different law tied to length of residency. The Alaska statute at issue in that case provided for dividend distributions to State residents from a Fund the State established to deposit a portion of its mineral income each year. The statute distributed the dividends based on each adult resident's length of residency. Given the fixed, permanent residency classifications created by the statute, the Court held that the law was subject to strict scrutiny.[80] The Court determined that the State's interests in creating incentives for individuals to maintain residence in Alaska, and to prudently manage the Fund, were not even rationally related to its classifications.[81]

Plaintiffs argue that two aspects of the DPOC law violate their right to travel: (1) the law only applies to those registering to vote for the first time after January 1, 2013, which favors established residents who registered before that date; and (2) the DPOC law and the Birth Link MOU together form a system in which the DPOC requirement is enforced exclusively against those born outside of Kansas. The Court considers each in turn.

### 1. The Grandfather Clause (Facial Challenge)

Plaintiffs offer a theory of relief in their motion for summary judgment that was not explicitly pled in the Amended Complaint: that the grandfather clause in K.S.A. § 25-2309(n) discriminates against new Kansas residents by exempting from its requirements Kansas residents who were already registered to vote as of January 1, 2013.[82] Defendant first objects that because this right to travel theory was not pled, Plaintiffs may not seek summary judgment on this ground. Plaintiffs respond that they are not required to plead every legal theory on which their

---

[79]457 U.S. 55 (1982).

[80]*Id.* at 60.

[81]*Id.* at 60–65.

[82]*See* Doc. 268 at 43–46.

right to travel claim is based. Plaintiffs are correct that under notice pleading standards, the complaint only requires "a short and plain statement of the claim showing that the pleader is entitled to relief."[83] It does not require the plaintiff to set forth legal theories.[84] Nonetheless, a complaint "must 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"[85] The question in this case is whether Defendant was provided notice of what the right to travel claim encompassed, and the grounds upon which it rested.

The Court has reviewed the Amended Complaint and concludes that it did not place Defendant on notice that Plaintiffs were pursuing a facial challenge based on the effective date of the statute under the Privileges or Immunities Clause of the Fourteenth Amendment. This is not a case where the Privileges or Immunities claim was so broadly worded that this theory of relief could be inferred if liberally construed. Plaintiffs spent considerable time alleging specific facts in support of their contention that "Defendants selectively register voters born within the State of Kansas."[86] Count 6 of the Amended Complaint alleges their right to travel claim:

> 95. Plaintiffs re-allege and incorporate all of the allegations contained in the previous paragraphs of this complaint as though fully set forth herein.

> 96. The Privileges and Immunities Clauses in Article IV and the Fourteenth Amendment to the U.S. Constitution protect a fundamental [right] to travel. In *Saenz v. Roe*, the Supreme Court recognized that "for those travelers who elect to become permanent residents" of another state, the right to travel encompasses "the right to be treated like other Citizens in that State." 526 U.S. at 500.

---

[83]Fed. R. Civ. P. 8(a)(2).

[84]*Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 347 (2013); *Zokari v. Gates*, 561 F.3d 1076, 1084 (10th Cir. 2009).

[85]*Zokari*, 561 F.3d at 1084 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1090–91 (10th Cir. 1991) ("As a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, 'provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits.'" (quoting 5C Wright & Miller, *Federal Practice & Procedure* § 1219 at 194 (1990))).

[86]Doc. 39 at 28-30.

97. Defendants' <u>discriminatory application</u> of the DPOC law violates the right to travel protected under the Privileges and Immunities Clauses of the Constitution. When a Kansas registrant purportedly fails to provide documentary proof of citizenship, Defendants take affirmative steps to register voters born in Kansas by checking birth and marriage records retained by the KDHE. Defendants do not typically verify suspended registrants' citizenship with agencies outside of Kansas. Citizens who have moved to Kansas and become permanent residents are therefore not treated equally to citizens born or married in the State in violation of the Constitution.[87]

These allegations did not place Defendant on notice that Plaintiffs advanced a facial challenge to the statute. The Amended Complaint repeatedly discusses the KDHE policy and articulates Plaintiffs' claim as an as-applied challenge only. The fact that it was not disclosed until this summary judgment motion certainly caused him prejudice. Notice that the scope of Plaintiff's Privileges or Immunities claim went beyond the verification procedure with the KDHE would have certainly affected Defendant's discovery strategy—the Court assumes he would have marshalled statistical information about the types of Kansas residents affected by the grandfather clause, for example. The Court agrees with Defendant that this claim was not pled.

Even assuming the grandfather clause claim was properly pled, the Court also denies Plaintiff's motion for summary judgment on the merits for failure to demonstrate that no reasonable trier of fact could find other than for the moving party. It is true that durational residency laws are subject to strict scrutiny because they have been deemed a "classification which serves to penalize the exercise of" the right to travel.[88] But the Court agrees with Defendant that there are important differences between the DPOC law's grandfather clause and durational residency requirements such as those in *Saenz* and *Dunn*.

---

[87]*Id.* ¶¶ 95–97 (emphasis added).

[88]*See, e.g.*, *Dunn v. Blumstein*, 405 U.S. 330, 339 (1972); *Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 497 (10th Cir. 1998).

As an initial matter, the DPOC law does not amount to the outright denial of a benefit or right to new residents.  The law creates an additional requirement on voter registration applicants who register for the first time after January 1, 2013.  But unlike the durational residency requirements subject to strict scrutiny in the cases relied on by Plaintiffs, the DPOC law's grandfather clause is not defined by length of residency.[89]  Instead, the grandfather clause states that the new law will not apply to <u>any person</u> who was already <u>registered to vote</u> in Kansas on or before January 1, 2013.

Plaintiffs argue that like the laws invalidated in *Soto-Lopez*, *Hooper*, and *Zobel*, the grandfather clause here conditions a benefit on becoming a Kansas resident at a certain point in time.  These cases are all distinguishable.  In *Soto-Lopez*, the Court considered a New York law that granted a civil service employment preference to New York residents who are honorably discharged veterans of the Armed Forces and served during a time of war, if they were residents of New York at the time they entered military service.[90]  The Court determined that the plaintiffs in that case had been denied "a significant benefit that is granted to all veterans similarly situated except for State of residence at the time of their entry into the military."[91]  Importantly, the Court found that the denial of this benefit was a permanent deprivation because the residence

---

[89]*See Saenz v. Roe*, 526 U.S. 489, 505 (1999) (explaining that the subject law's classifications "are defined entirely by (a) the period of residency in California and (b) the location of the prior residence of the disfavored class members.");  *Dunn*, 405 U.S. at  334 (reviewing law that denied right to vote to Tennessee residents who resided in the State for less than one year); *Hooper v. Bernalillo Cty. Assessor*, 472 U.S. 612 (1985) (reviewing tax exemption law that favored Vietnam veterans that have lived in New Mexico for a fixed minimum period); *Zobel v. Williams*, 457 U.S. 55, 61 (1982) (reviewing law that distributed benefits based on "fixed, permanent distinctions between an ever-increasing number of perpetual classes of concededly bona fide residents, based on how long they have been in the State."); *see also Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 214 (3d Cir. 2013) ("When the receipt of a government benefit is conditioned on factors other than duration of residency, we apply rational basis review to determine whether the right to travel has been unconstitutionally burdened.").

[90]*Atty. Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 900 (1986).

[91]*Id.* at 908.

requirement could never be satisfied.[92]  In *Hooper*, the Court considered a New Mexico tax exemption statute that applied only to Vietnam veterans residing in New Mexico on or before a certain date.[93]  The Court determined that this law contained a "fixed-date residence requirement," and thus created fixed, permanent distinctions between similarly situated residents.[94]  As already discussed, *Zobel* considered a law that tied the amount of Alaska residents' dividend distributions from the State's mineral income to length of residency.[95]  Again, the Court found that the statute "creates fixed, permanent distinctions between an ever-increasing number of perpetual classes of concededly bona fide residents, based on how long they have been in the State."[96]

Here, Plaintiffs have not been penalized solely based on their right to migrate.  There is no permanent and fixed classification that is tied to the date of a person's residence.  Plaintiffs in this case were penalized for failure to register prior to January 1, 2013.[97]  Two bona fide residents of Kansas prior to January 1, 2013, may be subject to different requirements: one who had registered before the effective date would not be required to submit DPOC and re-register to vote, while a person who had been eligible but had not registered before would be subject to the new law.  Therefore, unlike the classifications in *Soto-Lopez*, *Hooper*, and *Zobel*, the grandfather clause here does not create a permanent, fixed deprivation tied to a person's State of residence at a particular point in time.

---

[92]*Id.* at 909.

[93]472 U.S. at 614.

[94]*Id.* at 616–17.

[95]457 U.S. at 60–61

[96]*Id.* at 60.

[97]There are no statements of fact  in the summary judgment record about whether these Plaintiffs were residents before January 1, 2013.  The preliminary injunction record included evidence that Fish, Bucci, and Hutchinson were residents before January 1, 2013, while Stricker and Boynton moved to Kansas after January 1, 2013.  *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1121–24 (D. Kan. 2016).

To be sure, the grandfather clause effectively requires all residents who move to Kansas after January 1, 2013, to submit DPOC when registering to vote for the first time. Based on the figures provided on summary judgment, more than 1.4 million registered voters in Kansas were thus exempted from the DPOC requirement by operation of the grandfather clause. But it treats nonresidents and residents equally if they were not registered prior to the effective date. Importantly, newly established residents are not the only group impacted by the grandfather clause. The law also affects all Kansas residents who were not yet eighteen years old on January 1, 2013, and all Kansas residents who were eligible to vote but chose not to register prior to the effective date.

As the Seventh Circuit has explained:

Grandfather provisions always grant preferences to a special group, and newcomers or those who never arrive in the favored area rarely share the benefits. We recognize that such clauses create a risk of political exploitation working to the disadvantage of unfavored classes, and courts must certainly scrutinize grandfather clauses to learn whether they are masks for exploitation or invidious discrimination.

However, in challenging a grandfather clause such as that incorporated in the handgun ordinance here, plaintiffs cannot invoke compelling governmental interest scrutiny by showing only that new residents will not share its benefits. Grandfather clauses almost always favor established residents or businesses over newer ones. Where the purpose of the grandfather clause is the protection of reliance interests, only established residents or businesses will have relied on prior laws and thus will have reliance interests to protect.

If compelling governmental interest scrutiny were appropriate based merely on a showing that newer residents would not benefit from the provision, then virtually any grandfather clause would be vulnerable under that exacting standard. Few would be likely to withstand scrutiny. Yet grandfather provisions are a familiar means in the law for protecting reliance interests, and we are reluctant to unsettle these provisions by applying an unnecessarily demanding standard of review. Where plaintiffs can show that a grandfather provision impinges on a fundamental personal right (other than through its indirect effects on those who travel), or that the provision is a substitute for a suspect form of discrimination, courts should apply the compelling governmental interest standard.[98]

_____

[98]*Sklar v. Byrne*, 727 F.2d 633, 639 (7th Cir. 1984) (citations omitted).

The Court finds that the grandfather clause in the Kansas DPOC law itself does not impinge on a fundamental right other than the indirect effect on the right to travel, and that it is not masking a suspect form of discrimination.[99]  It does not create a strict classification based solely on residency.  Thus, the Court applies rational basis review.

On rational basis review, the Court considers whether the DPOC law's grandfather clause "rationally furthers a legitimate governmental purpose."[100]  Defendant argues that the state had a compelling interest in avoiding logistical difficulties with deregistering and then re-registering over one million voters when the DPOC law became effective.  He further asks the Court to rely on the Seventh Circuit's analysis in *Sklar*, which includes a finding that Chicago had a legitimate interest in protecting those who relied upon the prior law allowing residents to possess, purchase, and register handguns.[101]  The Court agrees that these are legitimate state interests.

The Court also agrees that the grandfather clause here rationally furthers the State's legitimate purposes by restricting the law's applicability to those residents who registered to vote after January 1, 2013.  Again, the law does not apply a durational residency requirement, or a permanent, fixed classification based on residency.  It applies only to those who had not previously availed themselves of the prior law.  The DPOC law, which was passed in 2011, thus

---

[99]While Plaintiffs certainly challenge § 25-2309(l) as infringing on the fundamental right to vote, the grandfather clause in subsection (n) is not part of that challenge.  In *Dunn*, the Court found that the durational residency requirement represented "a separate voting qualification imposed on bona fide residents."  405 U.S. at 344.  Strict scrutiny applied because the law at issue imposed a penalty only on those who recently exercised their right to travel.  *Id.* at 3412.  Here, the grandfather clause is not a separate voting qualification for nonresidents.  It exempts from the  law only those residents who complied with the prior law before the effective date.  Residents who did not comply, whether by choice or not, are subject to the law.  Moreover, the DPOC law, unlike the durational residency requirement in *Dunn*, is not a prohibition on the right to vote for new residents; it is an additional registration requirement.  *See id.* at 341 (explaining "[t]he right to travel is merely penalized, while the right to vote is absolutely denied."); *Connelly*, 706 F.3d at 214 ("strict scrutiny applies when the state conditions the receipt of certain government benefits on the duration of the recipient's residence in the state.").

[100]*Sklar*, 727 F.2d at 639 (citing *Dukes*, 427 U.S. at 303).

[101]*Id.* at 641–42 ("the city's purpose in protecting the reliance interests of those who purchased and registered handguns in Chicago was a legitimate purpose."); *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 531 (6th Cir. 1998) ("the governmental interest at stake here is clearly legitimate.").

allowed Kansas residents who had already complied with the prior registration law not to deregister and re-register, but instead to rely upon the law as it existed at the time of their registration.[102]  And the law allowed those who had not yet registered a grace period of almost two years between the law's passage in 2011, and its effective date in 2013, to register without providing DPOC.  Although the grandfather clause indirectly affects new residents, among other groups of eligible voters, the Court easily finds that the provision is rationally related to the state's legitimate purpose of protecting the reliance interests of those who had already registered to vote when the law was passed, and the administrative interests in reducing the amount of applicants that must be processed when the law became effective.  The Court thus denies Plaintiff's motion for summary judgment on this claim.

### 2.      Interagency Cooperation with the KDHE  (As-Applied Challenge)

Plaintiffs maintain that Defendant's interagency agreement with the KDHE (the "Birth Link/MOU"), whereby he verifies incomplete voter registration applicants' citizenship by cross-referencing Kansas birth and marriage records, discriminates against individuals not born in Kansas and therefore violates the Fourteenth Amendment.  This is an as-applied challenge to the law because the interagency agreement is not part of the statute itself.  Plaintiffs argue that strict scrutiny applies to determine whether Defendant's enforcement of the DPOC law violates the Privileges or Immunities clause because the interagency practice only benefits applicants born in Kansas, and because, like *Dunn*, it implicates the right to vote.  Defendant argues that his enforcement efforts treat all Kansas citizens equally and therefore, they should be subject to rational basis review.

---

[102]Although not discussed by Defendant, the Court is also cognizant that an attempt by Defendant to deregister Kansas residents would have likely run afoul of the NVRA, which governs the circumstances under which a State may remove a person's name from its official list of voters.  *See* 52 U.S.C. § 20507 (providing the limited circumstances under which the name of a registrant may be removed from the official list of eligible voters).  The State has a compelling interest in complying with federal election law.

Before determining the appropriate standard of review, the Court notes the limits of Plaintiff's as-applied challenge. Despite Plaintiffs' characterization of Defendant's interagency agreement with the KDHE as an "exemption" to the DPOC law, Plaintiff does not argue that the law on its face exempts native-born Kansans. It is undisputed that the DPOC law applies and is enforced against all Kansas residents who apply to register to vote after January 1, 2013, regardless of the length of their residency. All Kansas residents are placed in suspense status if they fail to provide DPOC with their voter registration application, regardless of their state of birth. Those born in Kansas are not "deemed to have complied" with the law.

Instead, Plaintiff challenges the "back end" verification efforts used by Defendant to whittle down the list of applicants on the incomplete list. Defendant has exercised his statutory authority[103] to obtain and verify citizenship documents for incomplete applicants by entering into agreements with both the KDHE and the KDOR. These agreements allow Defendant to periodically run the list of incomplete applications through those agencies' databases to determine if they have qualifying citizenship documents on file. Additionally, the KDOR has created a web portal so that Defendant's office and county election offices can manually query for citizenship documents. If they are able to confirm DPOC through one of these sources, the incomplete application is deemed completed and the applicant is registered to vote. Defendant argues that because he attempts to verify citizenship for everyone on the incomplete list, regardless of where they are born, his enforcement efforts cannot be construed to discriminate against those not born in Kansas. He also points out that the KDOR verification process would apply to any resident that had submitted DPOC during the driver's license application process, with no limitation on length of residency or place of birth.

---

[103] K.S.A. § 25-2309(t).

To trigger strict scrutiny, Plaintiffs need to demonstrate that Defendant's agreement with the KDHE discriminates against Kansas residents who were not born in Kansas.[104] It is undisputed that the KDHE only maintains birth records for individuals born in the State of Kansas. And the evidence demonstrates that between 40 and 50% of applicants who are deemed incomplete are eventually completed automatically after Defendant runs the list of names against the KDHE's database. Regardless of whether Defendant is aware of the state of birth for each applicant, the face of the interagency agreement makes clear that he could only expect to find matches to Kansas-born citizens through this verification process.

Perhaps if KDHE verification happened at the time of application and was Defendant's only effort to verify DPOC, this Court would review Defendant's enforcement efforts under strict scrutiny because the enforcement scheme would essentially exempt those who were born in Kansas from manually providing DPOC at the time of application. But the procedure does not apply automatically at the time of application, and the Court declines to evaluate Defendant's KDHE agreement in a vacuum. All Kansas citizens, regardless of the duration of their residency, are required to produce DPOC at the time they apply to register to vote. The individual Plaintiffs in this case were not subject to a different requirement than a Kansas resident who was born in Kansas. Defendant also verifies citizenship documents on file with the KDOR as part of his efforts to confirm citizenship of those on the incomplete list. The KDOR verification process is not limited to those born in Kansas, nor to established residents.

Given Defendant's evidence that his efforts to verify citizenship for incomplete voter registration applicants include verifying any Kansas resident that obtains a Kansas driver's license, the Court cannot find that Defendant creates an enforcement classification based on

---

[104] *Saenz v. Roe*, 526 U.S. 489, 504 (1999).

length of residency.  Again, there is no facial residency requirement in the statute.  Instead,

Plaintiff challenges an interagency memorandum that applies only to Kansas residents who lack

DPOC and thus find themselves in incomplete status.  But Defendant has interagency agreements

with both the KDHE and the KDOR to attempt to verify DPOC that may be on file for any

individual on the incomplete list.  Although the KDHE only maintains records for Kansas-born

citizens, the KDOR maintains records without regard to state of birth or length of residency.  The

Court therefore finds that Defendant's KDHE agreement is subject to the rational basis test.[105]

The policy will survive rational basis scrutiny if it "rationally furthers a legitimate state

purpose."[106]

The Court must evaluate the State's interests furthered by the KDHE policy—the policy

challenged by Plaintiff on this claim—not the DPOC law in general.  While the State's interests

in combatting voter fraud or ensuring the integrity of the election process may or may not be

served by the DPOC law, Defendant does not contend that the KDHE policy furthers that goal.[107]

To be sure, while the agreement certainly allows Defendant to verify citizenship of individuals

born in Kansas, there are at least 20,000 individuals who could not be verified through this

effort.  There is no evidence that Kansas-born citizens are any more qualified than citizens born

in other states.  But Defendant does contend that the State's interest in administering the DPOC

law efficiently is compelling.  County election officers save time and resources attempting to

obtain DPOC from individuals held in suspense status by verifying batches of names from these

other Kansas agencies, rather than pursuing DPOC through repeated contacts with the applicants.

And applicants are relieved from producing their DPOC to Kansas agencies twice.

---

[105]*See, e.g.*, *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 214 (3d Cir. 2013).

[106]*Hooper v. Bernalillo Cty. Assessor*, 472 U.S. 612, 618 (1985).

[107]Evidence of voter fraud either before or after the effective date of the SAFE Act, is therefore not material to the inquiry on this claim.

The Court finds that Defendant has demonstrated a legitimate and important State interest in administering the DPOC law efficiently, and that verifying birth records in other states is not feasible. First, the State undoubtedly has a legitimate interest in efficiently administering the DPOC law, and also in ensuring that qualified applicants for whom the State already possesses citizenship documents are registered to vote. While it may be true that it is more burdensome for a non-Kansas born citizen to have an incomplete voter registration application in Kansas, the Court finds that this burden is not unreasonable in the context of the law's enforcement as a whole. And this slightly more onerous burden on incomplete voter registration applicants not born in Kansas is justified by the State's legitimate interest in administering the DPOC law efficiently and verifying citizenship for those qualified applicants for whom the State already possesses DPOC. Moreover, Defendant has demonstrated that he has explored other methods of verifying birth records for Kansas citizens born in other States, but that these options are not feasible. These showings are sufficient to demonstrate that the State's interest in efficiently administering the DPOC law is rationally related to the KDHE policy.

The Court denies Plaintiffs' motion for summary judgment on this Privileges or Immunities claim because there is no genuine issue of material fact that either the law's grandfather clause or Defendant's attempts to verify citizenship of Kansas residents on the list of incomplete voters unreasonably burdens the right to travel. Because neither the statute nor Defendant's enforcement of the statute create classifications that discriminate against Kansas citizens based on their length of residency or state of birth, the Court applies rational basis review to these provisions.[108] Under this review, the Court finds that the State's legitimate interest in administering the DPOC law efficiently is furthered by its policy to verify DPOC that

_____

[108]Because the Court applies rational basis review to these claims, it does not reach the question of whether there are "less drastic means" available to the State to achieve the State's interest with a lesser burden on the right to travel. *See, e.g.*, *Atty. Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 900 (1986).

may be on file in Kansas, whether it is on file with the KDHE or the KDOR.  And the State's

legitimate interest in reducing administrative burdens and in the reliance interests of Kansas

residents already registered to vote are rationally related to the grandfather clause.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiffs' Motion for Partial

Summary Judgment (Doc. 267) is **denied**.

**IT IS SO ORDERED.**

Dated: May 4, 2017

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE