EXHIBIT L

United States Government Accountability Office

# GAO

## Report to Congressional Requesters

June 2005

# ELECTIONS

# Additional Data Could Help State and Local Elections Officials Maintain Accurate Voter Registration Lists



**G A O**
Accountability * Integrity * Reliability

GAO-05-478



# GAO
Accountability · Integrity · Reliability

# Highlights

Highlights of **GAO-05-478**, a report to congressional requesters

June 2005

## ELECTIONS

# Additional Data Could Help State and Local Elections Officials Maintain Accurate Voter Registration Lists

## Why GAO Did This Study

Reports of ineligible persons registering to vote raised concerns about state processes for verifying voter registration lists. States base voter eligibility generally on the voter's age, U.S. citizenship, mental competence, and felon status. Although states run elections, Congress has authority to affect the administration of elections. The Help America Vote Act of 2002 (HAVA) sets a deadline for states to have a statewide voter registration list and list verification procedures. For this report, GAO selected seven states (AZ, CA, MI, NY, TX, VA, and WI) to represent a range of characteristics relevant to voter registrations, such as whether a statewide voter list existed prior to HAVA. This report discusses how these states verify voter registration eligibility; the challenges they face in maintaining accurate voter lists; the progress toward implementing HAVA registration requirements; and identifies federal data sources that might be used to help verify voter registration eligibility.

## What GAO Recommends

To help assure voter lists are accurate, GAO recommends that U.S. Attorneys provide notices of federal felony conviction in a standardized format, and that the Administrative Office of the U.S. Courts study the feasibility of sharing certain citizenship-related U.S. district court juror information with state election officials. Officials at these federal agencies agreed with our recommendations.

www.gao.gov/cgi-bin/getrpt?GAO-05-478.

To view the full product, including the scope and methodology, click on the link above. For more information, contact William O. Jenkins, Jr., at (202) 512-8777 or JenkinsWO@gao.gov.

## What GAO Found

The methods used in seven selected states to verify voter eligibility and ensure accuracy of voter registration lists were varied and include relying on registrant self attestation, return mailings, and checking against lists of felony convictions or deceased individuals. Election officials from the selected states described some challenges that may be resolved when HAVA is fully implemented, such as reducing duplicates within the state. Other challenges—identifying duplicate registrations in other states or having insufficient information to match other data sources with voter registration lists—may continue to be issues.

The seven states are in different phases of implementing HAVA statewide voter registration lists and eligibility verification requirements. Arizona implemented its statewide voter list by the January 1, 2004, deadline, and the other six states applied for a January 1, 2006, waiver. Of those six states, Texas, Virginia, and Wisconsin awarded contracts to develop new voter lists that are designed to address HAVA requirements. Michigan has had a statewide list since 1998, and officials believe it is near HAVA compliant. California election officials are still considering how to meet these HAVA requirements, and in New York, legislation was passed in May 2005 to create the state voter registration lists.

Federal data sources have the potential to help state election officials identify registrants who may be convicted felons or non-citizens. While the potential number identified may be small, an election can be decided by a few votes. Regarding felons, U.S. Attorneys are required to notify state election officials of federal felony convictions, but the information was not always easy for election officials to interpret or complete. Federal jury services generally do not now, but might feasibly be able to notify elections officials when potential jurors drawn from local voter registration lists claim to be non-citizens.

**Federal Juror Qualification Questionnaire**



Source: U.S. District Court, Eastern District of Virginia.

_____ **United States Government Accountability Office**

# Contents

**Letter**                                                                                              1

    Results in Brief                                                                 4
    Background                                                                       6
    States Have Taken Steps to Verify Voter Registration Eligibility, but
        Methods Vary by State                                       13
    Election Officials Identified Challenges to Verify Voter Registration
        Eligibility                                                 22
    The Seven States Are in Different Phases of Implementing HAVA
        Statewide Voter Registration Lists and Eligibility Verification
        Requirements                                                29
    Information from Federal Sources Could Assist Election Officials
        in Identifying Ineligible Felons and Non-Citizens on Voter
        Registration Lists                                          38
    Conclusions                                                                     49
    Recommendations for Executive Action                                            50
    Agency Comments and Our Evaluation                                              50

**Appendix I**      **Objectives, Scope, and Methodology**                                              52

**Appendix II**     **Department of Homeland Security Automated
                Systems That Include Information on Non-Citizens**             57

**Appendix III**    **Voter Registration Fraud Allegations Identified at
                Selected States and at the Federal Level**                    59

**Appendix IV**     **Comments from the Administrative Office of the
                United States Courts**                                        62

**Appendix V**      **Comments from the U.S. Department of Justice**                                     63

**Appendix VI**     **GAO Contact and Staff Acknowledgments**                                            65

## Tables

Table 1: Seven States' Voter Registration Eligibility Qualifications    10

Table 2: Selected Activities to Help Implement HAVA Voter
Registration Requirements in Six States    30

Table 3: State Selection Factors    53

## Figures

Figure 1: Arizona Draft Voter Registration Application Requiring
Proof of Citizenship    16

Figure 2: Virginia and Wisconsin Voter Registration Attestations
Regarding Criminal Status    19

Figure 3: Process for Verifying Voter Registration Applicant
Information with SSA    35

Figure 4: Federal Jury Qualification Questionnaire Requests
Citizenship Information    41

## Abbreviations

| | |
|---|---|
| AAMVA | American Association of Motor Vehicle Administrators |
| AOUSC | Administrative Offices of the U.S. Courts |
| DHS | Department of Homeland Security |
| DOJ | Department of Justice |
| DMF | Death Master File |
| EAC | Election Assistance Commission |
| FEC | Federal Election Commission |
| HAVA | Help America Vote Act |
| HAVV | Help America Vote Verification program |
| INS | Immigration and Naturalization Service |
| MVA | motor vehicle agency |
| NCOA | National Change of Address |
| NVRA | National Voter Registration Act of 1993 |
| OIG | Office of the Inspector General |
| QVF | Qualified Voter File |
| SAVE | Systematic Alien Verification for Entitlements |
| SSA | Social Security Administration |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**G A O**
Accountability * Integrity * Reliability

**United States Government Accountability Office**
**Washington, DC 20548**

June 10, 2005

The Honorable F. James Sensenbrenner
Chairman
Committee on the Judiciary
House of Representatives

The Honorable John N. Hostettler
Chairman
Subcommittee on Immigration, Border
 Security and Claims
Committee on the Judiciary
House of Representatives

Reports of ineligible persons registering to vote raised concerns about
state election administration and processes for verifying voter registration
lists. In managing the voter registration process and maintaining voter
registration lists, state and local election officials must balance two
goals—(1) minimizing the burden on eligible persons of registering to vote
and (2) ensuring that voter lists are accurate, i.e., limited to those eligible
to vote and that eligible registered voters are not inadvertently removed
from the voter registration lists. This report focuses on the second goal—
the efforts of state and local election officials in seven states to ensure that
voter registration lists are accurate.

In addition to this report, we also plan to issue reports this year on other
specific election issues—voter access to the polls; how the nine states
without Help America Vote Act (HAVA) waivers[1] have implemented voter
registration requirements as of January 1, 2004; electronic voting security;
and the Department of Defense's implementation of the Federal Voting
Assistance Program for Overseas Military Personnel in 2004. These reports
respond to congressional requests made prior to the November 2004
election. In addition, given concerns raised about the November 2004

---

[1]While HAVA established a deadline of January 1, 2004, for states to have a statewide voter
registration list and verification procedures, it also provided that states could request a
waiver to extend the deadline to January 1, 2006. Nine states did not request a waiver, 40
states and the District of Columbia did request and receive waivers, and 1 state (North
Dakota) is not covered by the HAVA requirement because it does not have a voter
registration requirement for individuals voting in federal elections.

GAO-05-478 Elections

election process, we are undertaking a broader, more comprehensive study of election administration and processes related to the November 2004 general election. This more comprehensive study will address activities and challenges—people, processes, and technology—associated with each major stage of election administration to include registration, absentee and early voting; Election Day preparation and activities, and vote counting and certification, similar to a report we issued in October 2001.[2]

All states set certain eligibility requirements to register and vote. States establish voter eligibility requirements that generally include that the voter is at least 18 years of age on the day of the election, is a citizen of the United States, is mentally competent, and meets state requirements regarding felon status. Ensuring that only eligible persons are registered to vote is an ongoing challenge for election officials and is complicated by factors such as jurisdiction size, mobility of voters, and community diversity. In larger jurisdictions the task of identifying and removing registrants who have died can be substantial. For example according to Centers for Disease Control and Prevention records, almost 300 persons died in the first week of 2005 in the city of Los Angeles. Communities with large student or military populations must manage registrants constantly moving in or out of a jurisdiction, and communities with diverse populations must handle substantial numbers of new citizens and face language challenges in communicating voter registration requirements.

After the events surrounding the November 2000 election, HAVA was enacted.[3] It requires states, among other things, to (a) implement an interactive computerized statewide voter registration list; (b) perform regular maintenance by comparing the voter list against state records on felons and deaths; (c) match applicant information on voter registration lists with information in state motor vehicle agency's records; and (d) match voter registration applicant information on voter registration lists with Social Security Administration (SSA) records, as appropriate.

This report addresses current and planned voter registration processes in seven selected states for verifying voter registration lists. Specifically, this report answers the following questions: (1) How do state election officials

---

[2] GAO, *Elections: Perspectives on Activities and Challenges across the Nation,* **GAO-02-3** (Washington, D.C.: Oct. 15, 2001).

[3] Pub. L. No. 107-252, 116 Stat. 1666 (2002).

verify voter registration eligibility and ensure voter registration lists are accurate? (2) What challenges do they face in maintaining accurate voter lists? (3) What progress have these states made toward meeting HAVA requirements to have voter registration verification procedures? (4) What federal data sources, other than those identified in HAVA, might be used to help verify voter registration eligibility?

To address the first three objectives, we selected a nonprobability sample of seven states—Arizona, California, Michigan, New York, Texas, Virginia, and Wisconsin to represent a range of voter-registration factors. Our selection includes states in various stages of development of their statewide databases, variations in election administration, a range in the percent of the population of foreign born, and is geographically diverse. We also considered other characteristics that might affect the implementation of HAVA, such as same day registration in Wisconsin, or New York, with a large population who live in New York City who may not have driver's licenses for verification. Our goal was not to target a particular state, but rather to identify a range of issues facing states in implementing HAVA requirements and assuring accurate voter registration lists. In these seven states, we interviewed state election officials and election officials in 14 local voting jurisdictions—two in each of these states. Additional information on our scope and methodology is presented in appendix I.

In these seven states, we also interviewed motor vehicle agency (MVA)[4] officials because voters can submit voter registration applications at MVA offices, and MVAs have a role under HAVA to assist states with verification of voter registration information. In addition, we reviewed relevant state voting laws, voter registration documents, and reports related to voting processes. We interviewed officials at the SSA and obtained documentation on how they are addressing SSA's HAVA verification requirements. To identify potential federal data sources to verify voter registration, we gathered information from state election and county jury administrators, and from officials at the Department of Homeland Security (DHS), the Department of Justice (DOJ), the Election Assistance Commission (EAC), and the Administrative Offices of the U.S. Courts (AOUSC), and we reviewed relevant reports. We also obtained information on voter fraud allegations from DOJ, from U.S. Attorneys in

---

[4]States may refer to their motor vehicle agencies by different names. For purposes of this report, we will generically refer to them as "motor vehicle agencies."

our selected states and from state and local election officials and District Attorneys for the local election jurisdictions we visited. See appendix I for additional information on our objectives, scope, and methodology. Our work was done between January 2004 and May 2005 in accordance with generally accepted government auditing standards.

## Results in Brief

State and local election officials we interviewed in the seven states said they use a combination of methods and information to verify voter eligibility and ensure the accuracy of voter registration lists. These included using computer programs that only accept registrants of an eligible age and those who live at an address within the jurisdiction, confirmation mailings to registrants, and information from state vital statistics or court officials on persons who are deceased or have been convicted of a felony.

HAVA provisions, when fully implemented, should help address some challenges state election officials face in obtaining timely, accurate, and complete information to identify ineligible voter registrants, but other challenges may remain. Having a statewide voter registration list and matching the list with state vital statistics and felon data, as required by HAVA provisions, could reduce the number of duplicate registrations within a state and provide more timely identification of ineligible registrants. HAVA provisions may not affect other data challenges, such as identifying registration duplications or deceased individuals outside the state, or identifying non-citizens.

Progress to meet HAVA requirements in the seven states we visited varied. One state, Arizona, implemented its statewide voter list by the January 1, 2004, deadline, and the other six states applied for and received a waiver to defer their implementation of these provisions until January 1, 2006. Of those six states, Michigan has a statewide list that has been operational since 1998 and state officials believe they are near compliance with HAVA requirements. Texas, Virginia, and Wisconsin awarded contracts to develop the voter lists intended to encompass HAVA requirements. California and New York are working toward meeting the January 2006 deadline, but California is still evaluating its strategy for creating a statewide database that is HAVA compliant, and legislation approving the creation of New York's state voter registration list was not passed until May 2005. The extent to which states verified applicant information with state motor vehicle agencies and compared voter lists with state records for deaths and felons varied in that some had agreements to verify information and some did not. As of March 2005, six of the states we

visited still needed to sign an agreement with SSA to verify voter registrant information against Social Security records. The seventh state, Virginia, is not subject to this HAVA requirement because it is permitted to require voter registrants to provide their full social security number. This number can be used with SSA's online verification system.

We identified two federal data sources that have the potential to help state and local election officials ensure that their voter lists are accurate. The number of potentially ineligible voter registrants identified by these two federal sources may be small but could be important in determining the outcome of a close election.

First, U.S. Attorneys are, by law, to send notice to state election officials upon conviction of felonies in federal court. State officials, in turn, are to forward it to local election officials in the jurisdiction where the convicted offender resides.  The law does not establish a standardized time frame or format for forwarding the federal felony conviction information. Of the 19 U.S. Attorneys' offices covering the seven states we visited, 16 reported that the notices were being sent to election officials but not in a standardized format and 3 reported that they were implementing or modifying their processes to provide this information on felony convictions in U.S. district courts. According to state and local election officials with whom we spoke in the seven states, federal felony information was not always provided in a standard format or timely, and the information was sometimes difficult to interpret, such as the length of the sentence, or incomplete.

Second, federal jury administrator questionnaires identify individuals who claim to be non-citizens when asked to serve as a juror in federal district court.[5] The federal district courts are not required to provide election officials with this information, but 1 of the 14 federal district courts we surveyed does so.  One source that the federal district courts use to draw the potential jurors' names is local voter registration lists that should only contain names of citizens. Federal jury administrators were mixed in their opinions on the feasibility of providing this information, some citing staff resource constraints.

---

[5]Potential jurors for a U.S. district court are chosen by federal jury administrators in each of the 94 district courts from a jury pool generated by random selection of citizens' names from lists of registered voters, or combined lists of voters and people with drivers' licenses, in the judicial districts. The potential jurors complete questionnaires to help determine whether they are qualified to serve on a jury. U.S. citizenship is a qualification to be a juror.

To assist state election officials in maintaining accurate voter registration lists, we are recommending that U.S. Attorneys provide information on felony convictions in U.S. district courts in a more standardized format to make it easier for election officials to interpret the conviction information, such as the length of the sentence, and help ensure that information is complete and timely. We also recommend that the Administrative Office of the U.S. Courts[6] study the feasibility of sharing certain citizenship-related U.S. district court juror information with state election officials.

We provided a draft of this report to DOJ and AOUSC for review and comment. In their responses, officials at both DOJ and AOUSC acknowledged the importance of maintaining accurate voter registration lists, and agreed with our report recommendations. Sections of the report were also provided to other federal agencies and states we visited to confirm the accuracy of the information. Clarifications and specific technical comments on the draft were incorporated as appropriate into the final report.

## Background

The constitutional framework for elections contemplates both state and federal roles. States are responsible for the administration of both their own elections and federal elections. States regulate various aspects of the elections process, including, for example, ballot access, registration procedures, absentee voting requirements, establishment of polling places, provision of election day workers, and counting and certifying the vote. The states in turn incur the costs associated with these activities. Although the states are responsible for running elections, Congress has authority to affect the administration of elections. Congress' authority to regulate elections depends upon the type of election. With regard to federal elections, Congress has constitutional authority over both congressional and presidential elections. In addition, with respect to federal, state, and local elections, a number of constitutional amendments authorize Congress to enforce prohibitions against specific discriminatory acts.

Congress has passed legislation regarding the administration of elections, both for federal elections and in certain cases at the state level. Most recently HAVA was enacted in 2002. HAVA established, among other

---

[6]The AOUSC is the administrative arm of the federal judiciary. The agency provides service to the federal courts in three essential areas: administrative support, program management, and policy development.

things: (1) a program to provide funds to states to replace punch card or lever voting systems used in federal elections, (2) the EAC to assist in the administration of federal elections and to otherwise provide assistance with the administration of certain federal election laws and programs, and (3) certain minimum election administration standards for states and units of local government with responsibility for the administration of federal elections. The act fixed enforcement authority on the Attorney General to bring a civil action against any state or jurisdiction as may be necessary to carry out the specified uniform and nondiscriminatory election technology and administration requirements under HAVA.[7]

Regarding the administration of elections, HAVA created federal mandates, staggered deadlines for implementing these mandates, and authorized about $3.86 billion over several fiscal years in election reform appropriations. HAVA required that states create plans detailing how they will meet the requirements and guidelines of the act. Among the requirements, section 303 mandated a computerized statewide voter registration list to serve as the official voter registration list for conducting elections for federal office in each state. States and territories were to implement a computerized statewide voter registration database by January 1, 2004. States could apply to the EAC by January 1, 2004, for a waiver of the effective date until January 1, 2006. Nine states and one territory—Alaska, Arizona, Georgia, Hawaii, Kentucky, Minnesota, South Carolina, South Dakota, West Virginia, and Guam—did not apply for a waiver.

Section 303 also requires states to perform list maintenance on a regular basis by removing ineligible voters from the voter registration list. States are to coordinate the computerized list with state agency records on felony status and death. In addition, states are required to verify voter registration information. For federal elections, a voter registration application may not be processed or accepted by a state unless it contains the applicant's driver's license number, the last 4 digits of the social security number if there is no driver's license number, or the state must create a unique identification number if the voter has neither number. Certain state laws allow voter registration applications to require the

---

[7]These sections relate to voting system standards (section 301), provisional voting and voting information requirements (section 302), computerized statewide voter registration list requirements, and requirements for voters who register by mail (section 303).

applicant to provide their full social security numbers on applications.[8] Voter registration information is to be matched with motor vehicle records or social security records, depending on the information provided by the applicant. The state motor vehicle authority must enter into an agreement with SSA to verify the applicant information when the last 4 digits of the social security number are provided rather than a driver's license or state identification number. SSA must develop methods to verify the accuracy of information provided and whether the name, date of birth, and the last 4 digits of a social security number match SSA records, including whether the individual is deceased.

HAVA is not the first federal legislation affecting the administration of elections. The National Voter Registration Act of 1993 (NVRA),[9] for example, was enacted to establish registration procedures designed to "increase the number of eligible citizens who register to vote in elections for Federal office…," "protect the integrity of the electoral process…" and "ensure that accurate and current voter registration lists are maintained." NVRA contains provisions regarding what information is sought on the voter registration application for federal elections. To enable state election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process, the act requires that the voter registration application include a statement about each eligibility requirement to be able to vote, specifically including citizenship. It further requires an attestation that the applicant meets each such requirement to vote and requires the signature of the applicant under penalty of perjury.

In addition, NVRA created requirements for how states maintain voter registration lists for federal elections. The act requires states to keep such voter registration lists accurate and current, such as identifying persons who have become ineligible due to death or change of residence to outside the jurisdiction. At the same time, the act requires list maintenance programs to incorporate specific safeguards, for example, that they be uniform, non-discriminatory, and in compliance with the Voting Rights Act. The removal of registrants for non-voting or for having moved can

---

[8]Seven states—Georgia, Hawaii, Kentucky, New Mexico, South Carolina, Tennessee, and Virginia—require full social security numbers on applications for voter registration. HAVA provides that for states using full social security numbers on applications in accordance with section 7 of the Privacy Act of 1974, the HAVA voter registration verification requirements are optional.

[9]Pub. L. No. 103-31, 107 Stat. 77 (1993).

only be done after meeting certain requirements provided in the act. The act also allows for removal of registrants from registration lists at their own request, when a registrant has been convicted of a disqualifying crime, or by reason of mental incapacity where such removals are allowed by state law.

Voter registration qualifications based on age, citizenship, criminal status, mental competence, and residence were established in all seven states we reviewed, except for Michigan, which does not have a mental competency requirement. Table 1 summarizes the eligibility qualifications in the selected states.

**Table 1: Seven States' Voter Registration Eligibility Qualifications**

| | Age | Citizenship | Felon status[a] | Mental competence | Reside in election jurisdiction |
|---|---|---|---|---|---|
| **AZ** | At least 18 years old on or before the next general election | U.S. citizen | Felony conviction will generally prohibit a person from being eligible to register or trigger the cancellation of the felon's pre-existing registration. 1st time felons otherwise eligible may reregister when discharged, or probation is complete. With more than 1 felony conviction after an absolute discharge, a felon must have a judge reinstate voting rights. | Not be currently declared an incapacitated person by a court of law | State resident in county at least 29 days before election |
| **CA** | At least 18 years of age at the time of the next election | U.S. citizen | A person in prison or on parole for the conviction of a felony is not entitled to register and cancellation of the felon's pre-existing registration will be triggered. Once the sentence is complete, including parole, a felon who is otherwise eligible may reregister. Voting rights may also be restored by the governor. | Not currently judged mentally incompetent by a court of law | California resident and registered at least 15 days prior to an election |
| **MI** | At least 18 years old by the next election | U.S. citizen | Persons confined in jail after conviction and sentencing are not eligible to register or vote. Prior to trial or conviction and sentence, persons confined in jail may register at their prior address. Upon release, person who is otherwise eligible may register or reregister.[b] | Not a state eligibility disqualification | Michigan resident and at least a 30-day resident of the city or township, by election day |
| **NY** | At least 18 years old by the date of the election | U.S. citizen | Felony conviction will generally prohibit a person from being eligible to register or trigger the cancellation of a pre-existing registration. Felons who are otherwise eligible may register or reregister after a pardon or restoration of rights by the governor of the state where such conviction took place (or the President for federal felony conviction), completing the maximum sentence of imprisonment, or when they are discharged from parole. | Not currently judged incompetent by order of a court of competent judicial authority | A resident of the state and of the county, city, or village for at least 30 days before an election |

| | Age | Citizenship | Felon status[a] | Mental competence | Reside in election jurisdiction |
|---|---|---|---|---|---|
| TX | At least 17 years and 10 months old to register and must be 18 to vote | U.S. citizen | Felony conviction will generally prohibit a person from being eligible to register or trigger the cancellation of a pre-existing registration. Felons who are otherwise eligible may reregister when their sentence has been fully discharged or have been pardoned or otherwise released from the resulting disability to vote. | Have not been declared incompetent by final judgment of a court of law | Be a resident of the county in which the application for registration is made |
| VA | At least 18 years old by the next general election | U.S. citizen | Felony conviction will generally prohibit a person from being eligible to register or trigger the cancellation of a pre-existing registration. Felons who are otherwise eligible may qualify to register or reregister if their civil rights have been restored by the governor or other appropriate authority. | Not currently declared mentally incompetent by a court of law | A resident of VA and of the precinct in which he/she wants to vote and registered no later than 29 days before the general election |
| WI | At least 18 years old | U.S. citizen | Persons convicted of a felony are disqualified from voting. Voting rights are restored upon completion of the term of imprisonment, probation, or parole, or through a pardon. | Not have been found by a court to be incapable of understanding the objective of the electoral process | A resident in an election district or ward of the state for at least 10 days before an election |

Source: GAO summary of information verified by states.

[a]This table may not reflect the full range of possible measures available under state law. Other measures, such as reversals, set-asides, or pardons may be available under specific state laws to restore civil rights for convicted felons. In addition, this table does not reflect other non-felony convictions, such as bribery, that may serve to disenfranchise an individual under state law.

[b]This provision of Michigan law applies not just to convicted felons who are confined in a jail but to all persons who are confined in a jail as a result of non-felony offenses for which they have been convicted and sentenced.

Registering more than once is explicitly addressed in some state laws. For example, under Virginia law, the intentional registration to vote at more than one residence address at the same time, whether such registrations are within Virginia or in Virginia and any other state or U.S. territory, is prohibited.[10] In New York, it is illegal to register or attempt to register as an elector in more than one election district for the same election, or more than once in the same election district.[11] While federal law does not explicitly prohibit being registered to vote more than once, such as in more than one state, various federal laws could apply to certain types of

[10]Va. Code Ann. § 24.2-1004.

[11]NY CLS Elec. § 17-104.

wrongful activities that might result in such multiple registrations related to a federal election. For example, knowingly or willfully providing false information (e.g., name, address, or period of residence) to establish eligibility to register to vote with respect to a federal election is prohibited.[12]

Voters are not now required to register in all jurisdictions in Wisconsin. Currently, only municipalities with a population of 5,000 or more are required to register voters.[13] About 75 percent of the voting age population lives in the municipalities that have some form of voter registration. Voters may also register in Wisconsin on Election Day at the polling place. Under "same-day registration" potential voters are required to complete a registration form that includes a certification as to their eligibility[14], and present an acceptable proof of residency. The municipal clerk for a jurisdiction is responsible for verifying that each person allowed to vote was properly registered, and sends a postcard confirming registration to the person, or a 1st class letter if the registration cannot be confirmed. If the letter is undelivered or an improper address was provided, municipal clerks are to notify the district attorney.[15] In jurisdictions without registration, the voting officials enter the full name and address of voters on a poll list in the order they voted.

---

[12]42 U.S.C. § 1973i(c).

[13]Changes made in 2003 to Wisconsin's election laws will require voter registration in every municipality, regardless of size. This registration requirement first applies to the 2006 spring primary election.

[14]Wisconsin has voters self-certify as follows: "I (name) hereby certify that to the best of my knowledge, I am a qualified elector, having resided at (address) for at least 10 days immediately preceding this election, and that I am not disqualified on any grounds from voting, and I have not voted, at this election." In addition to Wisconsin, Idaho, Maine, Minnesota, New Hampshire, and Wyoming allow same day registration.

[15]The Wisconsin Joint Legislative Audit Committee has an ongoing audit of voter address verifications based on allegations of inappropriate election procedures in Milwaukee to verify same day voter registration eligibility in the November 2004 election. According to Joint Legislative Audit Committee official, the report is due for completion by the fall of 2005.

## States Have Taken Steps to Verify Voter Registration Eligibility, but Methods Vary by State

State and local election officials in the seven states we reviewed reported that specific steps are taken to verify eligibility when an applicant applies to register and that voter registration lists are also reviewed periodically to identify registrants who may no longer be eligible, such as those who have moved, have been convicted of a felony, or are deceased. Officials in the seven states use a combination of methods, including computer programming, return mailings, and information from state vital statistics to identify registrants who should be removed from voter rolls. Self-attestation is included in every voter registration application in the seven states we visited but varies by the terms used and format of the attestation. All voter registration application forms in the seven states we visited asked applicants to certify with their signature that the information provided is correct and true. The forms ask the applicant to attest to their age, citizenship, and residency. The format asking for additional information varied in the seven states.

### Verification of age

To determine eligibility based on age, all states we reviewed, except Texas, required applicants to declare, swear, affirm, or attest on the voter registration application that they meet state age requirements. In addition, officials in Arizona, Texas, Virginia, and New York City said that their voter registration computer system is programmed to calculate the age of the applicant, based on the date of birth the registrant provides, and reject applications of individuals who will be younger than 18 years of age on the day of the next election. Michigan's computer system accepts registrations from voters who are at least 17-½ years of age; however, the names will not appear on a precinct list until the voter has reached the age of 18. In addition, Arizona and Michigan election officials match their voter registration applications against the state motor vehicle agency's records to verify the information.

California's MVA procedure manual instructs clerks to "flag" voter registration applications for election officials if they have concerns about a voter registration applicant's age. According to the MVA manual, if the birth date on the voter registration form does not agree with the birth date on documentation, clerks are to note "BD" on the voter registration form so election officials will know to verify the birth date. However, neither of the local election officials we spoke with in this state recalled having an application flagged by the MVA for closer review of an applicant's age. None of the officials in other states (excluding Wisconsin, which is not currently subject to the NVRA requirement to register voters at motor vehicle agencies because of certain NVRA exemption provisions for states

allowing voters to register on Election Day) reported having a policy for motor vehicle agency clerks to share eligibility concerns.

## Verification of citizenship

All election officials we spoke with told us that non-citizens are not permitted to vote in elections, including non-federal elections.[16] Citizenship eligibility was based on applicant self-attestation in all seven states, with application blocks that must be checked by the applicant specifically affirming U.S. citizenship. Five of the states require applicants to swear, affirm, or attest that they are U.S. citizens in addition to checking the block. In Texas applicants affirmed that they understood giving false information is perjury and a crime under state and federal law. In Wisconsin, applicants are to certify that they meet all the voter registration requirements, and, according to Wisconsin state law, the municipal clerk or board of election commissioners may require naturalized applicants to show their naturalization certificates. New York State election officials said that their state law entitles any voter to challenge a person's right to vote if they think that voter is not a citizen.

As with age, California's MVA procedure manual instructs clerks to "flag" voter registration applications if citizenship status is in question by writing "US" on the corner of the form. According to the manual, when immigration documents provided to a MVA staff do not confirm citizenship, the staff is to remind the customer of the voter registration eligibility requirements. If the customer still desires to submit a voter registration application, the staff places the notation on the form. No other state that we visited has this provision. Many of the motor vehicle officials we spoke with stated a view that it was up to state election officials to determine a registrant's eligibility to vote, not the motor vehicle agency, and that all applications are forwarded to election officials.

In Arizona, a ballot initiative passed in November 2004 that will require proof of citizenship to register to vote (and identification upon voting). The registration requirement does not apply to those who are currently registered, or when a registrant changes their registration address within a single county. Arizona's Secretary of State, as of March 4, 2005, was determining which forms of identification will be acceptable as proof.

---

[16]New York state election officials said that until 2003, when the administration of school elections was transferred to the New York City Department of Education, non-citizens with a student in a New York City school were allowed to vote in school board elections.

According to Arizona draft procedures released for public comment, acceptable identification included

- a copy of a birth certificate that verifies citizenship,
- a copy of pertinent passport pages of a U.S. passport,
- a copy of naturalization documents,
- selected Bureau of Indian affairs documents, and
- Arizona driver's license or non operating license issued after October 1, 1996, or the equivalent government document from another state if the agency indicates on the applicant's driver license or nonoperating license that the person has provided satisfactory proof of U.S. citizenship.

Figure 1 shows sections of the draft proposed application requiring citizenship information that was made available for public comment. According to local election officials in one Arizona jurisdiction, mail applications will not be processed without citizenship documentation. The applicants will be sent a letter asking for documentation, and the letter will include a list of documents that are acceptable as proof of citizenship.

**Figure 1: Arizona Draft Voter Registration Application Requiring Proof of Citizenship**



Source: Arizona Secretary of State website (www.azsos.gov) for public comment.

Some local election jurisdictions receive information from county jury administrators to help identify potential non-citizens on voter registration lists. County jury pools are drawn from a variety of sources, which may include voter registration lists. In five of the states we visited, county jury administrators use voter registration lists, and potential jurors are asked to indicate citizenship status on jury service screening questionnaires. In 4 of the 10 local jurisdictions in those five states, election officials said they receive notification from county jury administrators when a potential juror claimed to be a non-citizen as a justification for being excused from jury

duty. None of the local election officials said that they receive notifications from federal jury administrators.

In addition to the state or local election jurisdiction efforts to help ensure registrants are eligible based on citizenship, Federal Election Commission (FEC)[17] officials noted that some federal measures have been adopted to discourage non-citizens from registering to vote. Measures include:

- possible deportation, under immigration laws, for knowingly making a false statement about citizenship status to register;

- the NVRA requirement that applications list eligibility requirements (including citizenship);

- the prohibition in federal law on governmental use of a voter registration card for a federal election as proof of U.S. citizenship; and

- the HAVA requirement that a statement identifying eligibility requirements, including citizenship, be included on voter registration applications.

Nevertheless, the FEC officials noted that non-citizens may be encouraged to register to vote because the I-9 form used to provide proof of employment eligibility and its implementing regulations[18] includes, among other documents, the voter registration card as an acceptable document for employment identity purposes.

## Verification of criminal status

In six of the seven states we visited, the eligibility of applicants, in terms of criminal status, was based on the self-certification signed by registration applicants. In Arizona, Texas, and Virginia, the application includes language specifically certifying eligibility based on criminal status. In New York and Wisconsin, applicants certify to a general statement that they meet all the requirements to register for their state, which includes a restriction based on criminal status. California uses both specific and general attestations. Michigan applicants do not attest to their criminal status, but voting is prohibited only for those serving time in prison or jail.

---

[17] Prior to HAVA, the FEC's Office of Election Administration was the federal focal point for election administration issues. This office was transferred to the EAC as part of HAVA.

[18] 8 C.F.R. § 274a.2–Verification of Employment Eligibility.

According to election officials, they do not accept voter registrations or absentee ballots from prison addresses. Examples of the at testation language used on voter registration applications are presented in figure 2.

**Figure 2: Virginia and Wisconsin Voter Registration Attestations Regarding Criminal Status**



Source: Voter registration forms provided by Virginia and Wisconsin election officials.

Officials in Arizona, California, New York, Texas, and Virginia said they receive state court information on felony convictions to remove voter registrants no longer eligible to vote based on a criminal conviction. Court information on felons in these states was provided to election officials in different formats and at different intervals. The data came in either paper or electronic format depending on the location. State election officials in two states said that the format varied by county within their states. Election officials in the five states reported receiving information at different intervals, such as weekly, monthly, intermittently, or biannually.

State election officials in six of the seven states and 9 of the 14 local election officials said that they received information on federal felony

convictions. Most election officials said the information was received on a sporadic or intermittent basis, in a paper format.

Michigan election officials do not receive information from state courts on felony convictions. Officials there told us that state felony conviction information was not needed because they only restrict the right to vote while the person is incarcerated. Local election officials in Wisconsin said they do not receive state felony conviction information. The Wisconsin state election official said that felon records are diffused and difficult to compare with voter lists. Wisconsin plans to create a statewide database that will consolidate criminal records from 17 different correctional databases, the state election official said. However, the system will not be available by the January 1, 2006, HAVA deadline, according to the state election official.

The laws in five of the states we visited (California, New York, Texas, Wisconsin, and Arizona), for first-time felony convictions, allow felons to gain eligibility to vote when a felony sentence is completed—which can include time on probation, parole, payment of fines, or supervision related to the conviction. States do not require proof that the non-incarcerated segments of a sentence be completed, according to all of the officials we spoke with and state regulations we reviewed in those states.

## Verification of mental competence

Six of the seven states we visited have a state law that disqualifies persons legally declared to be mentally incompetent or incapacitated from registering to vote and cancels the voter's registration upon such adjudication. Michigan's constitution has provided that the legislature may, by law, exclude persons from voting because of mental incompetence, but no such law has been enacted. Wisconsin limits disqualifications based on mental incompetence to those where a court specifically determines that the registrant is incapable of understanding the objective of the electoral process. State and local election officials in Arizona, California, New York, Texas, and Virginia reported that courts notify registrars periodically when adjudications on mental incompetence are made. Two rural jurisdictions reported that family members or caretakers sometimes notify the registrar of mental competency adjudications. In one Texas jurisdiction, the election official said that the court sends a notice to the county elections office, which in turn sends a letter to the voter confirming the voter's removal from the registration list.

| | |
|---|---|
| **Verification of residency** | Officials we spoke with in the seven states said that in addition to initially checking that an applicant resides in the jurisdiction (either by using an automated address file or manually checking), they also use a variety of sources to periodically verify their voter lists for registrants who may have moved. The National Change of Address (NCOA) list[19] is used by Virginia state officials on a yearly basis and used in at least one of the local election jurisdictions we visited in Arizona, California, New York, and Virginia. How often the national list was checked varied, but of the eight jurisdictions using this source, five said they checked on an annual basis. Twice a year, New York county election officials send their voter lists to state officials for comparison with the NCOA list, according to a state election official. Election officials in every state said returned mail was used, either at the state or local election level—some on a daily basis, others intermittently, annually, or before a major election. Ensuring that registrants live in an election jurisdiction is generally a task for local election officials but can be part of a statewide system, as in Michigan, where the voter registration system electronically assigns the voter's jurisdiction based on the address provided by the registrant. Residency is further verified by the mailing of a non-forwardable voter identification card to each new registrant in Michigan.[20] |
| **Identification of duplicate registrations** | For duplicate registrations, election officials said that existing voter lists are checked by election officials before adding a new registrant or are checked periodically. In the case of Arizona, Michigan, and Virginia, the statewide voter registration system enables jurisdictions to identify duplicates statewide. California and Texas state election officials said they compare local jurisdiction records and will notify local officials of potential duplicates. New York and Wisconsin primarily check for duplicates within the election jurisdiction. Some officials also reported periodically checking against other data sources, noted below. Officials reported using varying combinations of name, address, and other identifying information collected on the application to identify existing registrations, such as social security number in Virginia. In Michigan, |

---

[19]The U.S. Post Office National Change of Address list is compiled from change of address forms filed by individuals who have moved and want their mail forwarded to their new address.

[20]In Michigan, the address for a state identification card or license and voter registration must be the same. These files are linked to automatically update each file of the addresses changes.

election officials demonstrated how the states voter registration file has computer software with a search capability to identify similar names as potential duplicates. These similar names are researched manually to determine whether they are actually duplicates.

The data sources state and local election officials reported checking to identify duplications and ensure that registrants reside in the election district varied in terms of what information was used, and the frequency of use. Sources included

- National Change of Address List,
- return mailings of non-deliverable mail,
- individuals reporting an address change,
- notice from other election jurisdictions or state election officials of a change, and
- a check against state MVA records.

## Identification of deceased registrants

State vital statistics offices in six of the seven states reported that they provide data periodically—from weekly to quarterly—to election officials to identify registrants who have died. In addition to state vital statistics, state and local officials said they use various sources of data to identify deceased voter registrants on their registration lists. Data sources included

- county Vital Statistics Office records,
- newspaper obituaries, and
- miscellaneous sources, such as family members, city vital statistics offices, funeral homes, the U. S. Postal Service, probate courts, and MVAs.

Wisconsin local and state election officials said that state vital statistics are not currently used to identify deceased registrants. Local election officials said they review obituaries to identify deceased persons.

## Election Officials Identified Challenges to Verify Voter Registration Eligibility

Ensuring that voter lists are accurate is a task that has challenged election officials across the country for some time and was also a concern of election officials in the seven states we visited. Officials in one jurisdiction characterized voter registration lists as dynamic and constantly changing. In larger jurisdictions the task of identifying and removing registrants who died can be substantial; for example, according to Center for Disease Controls and Prevention records, almost 300 persons died in the first week of 2005 in the city of Los Angeles. If verification information is available to

officials at all, then quality considerations become a factor, such as the timeliness, accuracy, and completeness of the data. Some challenges faced by election officials, particularly identifying duplicates in other jurisdictions within the state, may be reduced with the implementation of the HAVA-required statewide, computerized voter registration lists; but the data availability and quality considerations may continue to be issues.

FEC reports have documented problems in maintaining accurate voter registration lists. The reports are mandated by Congress to document the impact of NVRA provisions, including provisions to ensure that voter lists are accurate by removing those who are no longer eligible.[21] The number of states identifying problems has diminished since the NVRA was first implemented. The FEC reported in 1998 that officials in 26 states reported problems including duplicate registrations, inaccurate information for matching, and the difficulty of removing names without confirmation.[22] The number of states identifying voter list maintenance challenges to FEC dropped from 26 in 1998 to 6 states in the 2001-2002 report, with the most commonly reported change being that states implemented or enhanced their computerized voter registration lists.

Some of the concerns highlighted below remain problems for election officials and may not be addressed by a statewide voter list. Based on a national survey of local election officials, we reported in 2001[23] on the challenge of continually updating and deleting information from voter registration lists, and the concerns of election officials in obtaining accurate and timely information to keep voter lists accurate.

Voter registration list maintenance challenges that were identified by officials in the seven states we visited, and in the prior reports are described below.

---

[21]Section 9 of the NVRA requires the FEC to report to Congress by June 30 of each odd-numbered year. *A Report to the 108th Congress: The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office,* 2001-2002, is the most recent report. HAVA transferred responsibility for the report to the EAC.

[22]NVRA covers 44 states and the District of Columbia, according to DOJ. In the 1998 FEC survey, 43 of the 45 responded. The report was silent regarding whether similar issues existed beyond the 26 states' reporting problems.

[23]GAO, *Elections: Perspectives on Activities and Challenges across the Nation,* **GAO-02-3** (Washington, D.C.: Oct. 15, 2001).

- *Deceased Persons*: The timeliness of death data was a concern identified by state level election officials in all but Wisconsin and Arizona and by local election officials in three of the jurisdictions we visited.[24] Concerns echoed many of the same issues raised in earlier reports. For example, Texas officials said that the health data they receive identifying deaths is about 3 to 4 months old, resulting in some deceased voters remaining on the voter registration list possibly through an election period. Another concern raised by a local Michigan official was the lack of birth dates on some state death records, resulting in difficulty identifying which voter of several with the same name actually passed away. Identifying deaths occurring outside of the state was a problem raised by election officials at the state and local levels in New York, and by local officials in one Arizona jurisdiction. Local New York officials said that when residents spend part of the year in other parts of the country and pass away there, they may not get a record of death in a timely manner. The 1998 FEC report highlighted this as an issue, noting the problem of identifying residents who die outside of the state or local jurisdiction because they may not be identified in vital statistics reports they receive.[25]

- *Citizenship*: The concern for election officials we spoke with regarding a registrant's eligibility based on citizenship was the reliance on self-attestation. As stated by the FEC, the challenge for states is to develop procedures that maintain the integrity of the election process without penalizing the majority of applicants, who are law abiding citizens.[26] Two types of standard sources of identification, such as a driver's license, state identification or social security numbers are not useful because neither are evidence of citizenship. Other sources, such as a passport or birth certificate more clearly indicate citizenship. However, these sources may not be available, or conveniently at hand for all who would like to register to vote, according to a review by election officials in Philadelphia.[27]

---

[24]Officials were asked in general terms about data considerations. We did not determine if the same issues existed in other jurisdictions if it was not mentioned.

[25]*Implementing the NVRA: A Report to State and Local Election Officials on Problems and Solutions Discovered 1995-1996.*, Federal Election Commission, March 1998, pp.5 -19.

[26]Federal Election Commission March 1998, pp 5 - 25.

[27]*Administration of Voter Registration, Qualification of Applicants and Registrants Verification of Citizenship*, March 2001, City Commissioner's Office, Philadelphia County.

- *Criminal Information:* Criminal information is often incomplete, not timely, or difficult to decipher. One state official and six local election officials we visited stated concerns about the timeliness or accuracy of the criminal information they receive for removing ineligible persons from the voter registration list. For example, New York officials said that the birth date on conviction notifications was sometimes not included, which meant there could be multiple matches on the same name. Wisconsin officials do not receive data from state courts on felony convictions, the state and local officials in one jurisdiction said. Lack of complete information is a concern that has been raised in jurisdictions outside the ones we visited. For example, a recent audit of the voter list in the City of St. Louis reported identifying over 900 possible voting felons on the City's voters list that were not identified by city election officials, primarily because the information they had to identify the felons was incomplete.[28] Auditors reported that a primary reason so many were not removed was that election officials only received conviction reports from the local court and not from other sources, such as the state or county. Other officials we interviewed stated that the information they did receive on felony convictions, particularly from federal sources, was not useful because it was old, had limited matching criteria, or was in different formats and hard to decipher.

In addition to a need for more complete or useful information on convictions, it may be difficult for election officials to determine when a convicted felon is eligible to reregister. In five of the seven states we visited, and many others around the country, [29] felons may reregister after serving their sentence, which could include parole or probation if applicable under that state's law. Arizona (for one felony conviction), California, New York, Texas, and Wisconsin officials cancel a voter's registration based on court notification of a felony conviction, but officials noted that they relied on an applicant's attestation of eligibility to reregister because no verification is required to document the

---

[28] *Board of Election Commissioners, City of St. Louis.*, Office of the State Auditor of Missouri, May 26, 2004. Potential felons on the City of St. Louis voter list were identified by matching the voter list with convictions outside the City, based on matches of name, date of birth, and full or partial SSN where available. Auditors noted that each instance had to be investigated thoroughly before taking legal action or removing registrants from the voter list.

[29] *Felony Disenfranchisement Laws in the United States.*  The Sentencing Project, April 2005, identifies 35 states where felons may reregister after the completion of their sentence.

completion of a felon's sentence. Arizona (for persons convicted of two or more felonies) and Virginia require that felons have their rights restored before they can register to vote—by a judge in Arizona after more than one felony conviction and by the Governor in Virginia. Arizona does not require proof of restoration. Virginia's application asks specifically if voting rights have been restored and the date when they were restored. Arizona officials said they looked into the feasibility of the court system notifying the Secretary of State when someone was released from prison, completed probation, and paid any fine or restitution. However, all three events are not clearly defined according to these Arizona officials, and no workable solution was found. Michigan restores voting rights upon release from incarceration.

- *Duplicate Registrant*: Officials in 7 of the 21 state and local election jurisdictions we spoke with had some concern with the timeliness or accuracy of the data they receive to identify duplicate registrants or verify registrants reside within the jurisdiction. The matching and validation of names are complex and made more so when considering aliases and name changes, as are matches such as "Margie L. Smith" with "Margaret Smith" according to a Wisconsin study.[30] The study estimated that even a 1 percent error rate on a match validating names, driver license numbers, etc., could generate tens of thousands of bad matches. Officials from several states that do not have a statewide database noted that there was no way to identify duplicates outside their jurisdiction. New York state election officials said there is currently no way to systematically clear duplicates in the state. Officials rely on voters to identify if they have registered elsewhere. This problem was documented in the review of the City of St. Louis voter registration list, where auditors reported identifying about 13,600 potential duplicates on voter lists in other election jurisdictions in Missouri.[31] Followup would be needed to determine which registrations were actual duplicates.

None of the officials we spoke with reported that they check for voter registration duplication in other states. Texas state election officials said they only received information from other states when the other state's application asks where the person was previously registered, the

---

[30]*Project Charter: Statewide Voter Registration System* prepared for the Wisconsin State Election Board, May 15, 2003, by Virchow Krause and Company.

[31]Office of the State Auditor of Missouri, May 26, 2004.

person completes that portion of the form, and the information is forwarded to Texas. Texas does not forward information on new applicants from other states because the Texas application only asks for prior city and county in Texas. Local election officials in Arizona, Michigan, and Texas said they sometimes get reports of registrants relocating from other states. According to an EAC Commissioner in April 2005 (also the Chair for the EAC) making statewide voter registration systems compatible would be extremely costly, and HAVA does not address interactivity among states.[32]

- *Residency of Registrants*: Election officials we contacted identified a number of challenges to ensuring voter registrants reside within an election jurisdiction, including matching problems based on missing information or variation in how an address is listed, no street numbers in rural areas, new streets, redistricting, or untimely forwarding of new addresses. Officials in one local Arizona jurisdiction said residency issues are complex because not all the properties in the county have addresses. In one Wisconsin jurisdiction, election officials said they may not get notice for 4 or 5 months that a registrant within their jurisdiction has moved to another jurisdiction and, therefore, no longer meets the residency requirement (during this time the voter could also be registered twice). Michigan officials are considering using a Geographic Information System to improve their ability to identify and map eligible addresses for specific jurisdictions. Election officials reported to the FEC in 1998 and 2002 that the process required for removing registrants who have moved from the jurisdiction was a problem, for example, citing the cost of confirmation mailings and people not providing forwarding addresses.[33] Furthermore, some state officials surveyed for our 2001 report stated that matches with the Postal Service's NCOA or information from state motor vehicle agencies had potential drawbacks, such as the verification costs or incomplete information. For example, the NCOA files may not identify registrants who have moved if the voter did not submit a change of address form. In addition, according to some of these state officials, the names of ineligible registrants remained on the list because officials could not obtain verification required to remove them.

---

[32]EAC Commissioner and Chair Gracia Hillman, speaking at the Commission on Federal Election Reform hearing held on April 18, 2005, at American University, Washington, D.C.

[33]Federal Election Commission, March 1998, pp.5 - 43; Federal Election Commission, 2001-2002, pp.19 - 20.

Four local election officials believed that self-certification is sufficient because of the penalties for falsely registering, or did not believe that ineligible voters were of concern. State and local election officials who we interviewed said that they have had few voter registration fraud[34] allegations pertaining to eligibility requirements. Many of the jurisdictions we visited said that they have reported instances of voter registration fraud allegations to appropriate agencies for investigation. We contacted District Attorneys covering election jurisdictions in the seven states, and they reported that they prosecuted some cases related to ineligible registrants or voter fraud. For example, in California, a state with an investigative unit dedicated to voter fraud issues, 15 cases of the 108 allegations for fraudulent voter registration opened from January 2001 to May 2004 were sent to the District Attorney for prosecution. Of the 15 cases, the outcome had been determined in 11 cases (6 cases declined for prosecution, 5 were prosecuted and the individuals were convicted). In four cases, the outcome is yet to be determined. See appendix III for additional information on allegations of voter registration fraud.

HAVA requirements for having a statewide voter registration list and matching with other state databases are expected to improve the accuracy of voter lists, particularly for identifying duplicates in other jurisdictions within the state. Election officials we spoke with for our 2001 report and those we spoke with recently for this report stated that statewide voter lists helped in solving some accuracy problems. Michigan officials stated that when its statewide database was first created in 1998, over 600,000 duplicate voter registration records were eliminated. Arizona local officials said that their concerns about the timeliness and accuracy were less, now that state election officials managed the process through the statewide voter list. For example, state Vital Statistics data are received more frequently so that registrants who have died can be more quickly removed. For some jurisdictions, such as those in Wisconsin that do not receive death or felony information, the HAVA requirements to match the statewide voter list with state records on felons and death are to provide information not now available for removing ineligible registrants.

---

[34]Election fraud is conduct that corrupts the electoral processes for (1) registering voters; (2) obtaining, marking, or tabulating ballots; or (3) canvassing and certifying election results. Types of fraudulent conduct include, among others, voting by ineligibles, voting more than once, voter impersonation, intentional disruption of polling process either physically or by corrupting tabulating software, or destroying ballots or voter registrations.

Some concerns, such as timeliness, accuracy, and completeness of the data used to match against voter lists, may continue to be issues, even after the HAVA requirements are fully implemented. For example, the 1998 FEC report noted that states making good faith attempts to remove from the registry the names of persons no longer eligible to vote (e.g., deceased persons, ineligible felons, and those who have moved) are stymied when they receive inaccurate, incomplete, or out-of-date information. These concerns might continue with the voter registration lists as, for example, Virginia officials stated that there is a 3-month delay in receiving vital statistics data on deceased persons because that is how long it takes for processing. Virginia officials also identified a need for state standards for the exchange of information from state to state regarding voters who move from one state to another.

Even in states with a statewide system for comparison, duplicate registrations can be added. As one local Michigan election official stated, if the system does not recognize that the registrant is already on the registration list, a new voter record is created. For example, Micky Jones and J. William Jones, Jr., might not be recognized as the same individual. A 2003 audit by the Michigan Office of the Auditor General identified approximately 24,000 potential duplicates in the state voter registration list, and about 10,000 registered voters with inaccurate birth dates. State agency officials attributed the duplicates as registrations that remain to be verified as the result of inaccurate or incomplete data received during the conversion of records to the state voter list in 1998, and the federal and state requirements that must be followed before records can be removed. Further, officials noted that tens of thousands of duplicates from voters moving within Michigan have been prevented by the voter registration system.

## The Seven States Are in Different Phases of Implementing HAVA Statewide Voter Registration Lists and Eligibility Verification Requirements

In the seven states we visited, progress varied in carrying out HAVA requirements to (1) implement a computerized statewide voter registration list; (2) verify voter application information with state MVA or SSA records and (3) match the voter list with state records on deaths and felony convictions. Six of the seven states (except Arizona) applied for a waiver of these requirements until January 1, 2006. The six states that applied for a waiver said they plan to meet the 2006 requirements deadline; however, their progress varies.

Computerized Voter
Registration List
Completion Closer in
Some States Than Others

Arizona, which did not request a waiver, implemented a statewide voter list which became operational in December 2003, prior to the HAVA January 1, 2004, deadline. Of the six states visited that requested a waiver until 2006, Michigan had a statewide voter registration database, called the Qualified Voter File (QVF) that has been operational since 1998. According to a state election official, Michigan has about 90 percent of the changes in place to meet HAVA requirements. Still remaining is a change to match QVF data to SSA data. Contracts have been awarded for development of statewide computerized voter registration lists in Texas, Virginia, and Wisconsin, with completion by the January 1, 2006, deadline as part of the contracts. Virginia currently has a statewide database but is replacing it to be fully compliant with all state and federal laws governing voter registration and elections, according to the request for proposals for the new system. States are eligible to receive federal payments to meet HAVA requirements (which may be used to develop or modify a statewide voter registration list) after complying with certain requirements, such as filing a state plan and appropriating funds to match up to 5 percent of the federal funding the state would receive. Table 2 details selected activities that the six states are to implement related to the statewide voter registration list.

**Table 2: Selected Activities to Help Implement HAVA Voter Registration Requirements in Six States**

| States we reviewed that requested waiver from HAVA 2004 database deadline | EAC approved HAVA state plan in fiscal year 2004 | State authorized "matching" funds to receive HAVA funding | State issued request for proposal to develop computerized list | State awarded contract (date of contract) |
|---|---|---|---|---|
| CA | Yes | Yes | To be determined | To be determined |
| MI | Yes | Yes | Not applicable (there will be no request for proposal) | Not applicable |
| NY | Yes | Yes | No | No |
| TX | Yes | Yes | Yes | Yes (Oct. 2004) |
| VA | Yes | Yes | Yes | Yes (Mar. 2004) |
| WI | Yes | Yes | Yes | Yes (Nov. 2004) |

Source: GAO analysis.

The contracts in Texas, Virginia, and Wisconsin have been designed to help the states implement functions specified under HAVA for creating a unified statewide voter list, as well as other functions. For example, Virginia's contract for a new system supports the conduct of elections as well as voter registration functions. Texas' voter registration database is to include additional capabilities that can create jury summons, jury lists, and track jurors and jury payments. Wisconsin's contract includes poll worker

management requirements, including for example, poll worker training information, certification level, and attendance.

California may not meet the HAVA voter registration list deadline, according to the California State Auditor. A December 2004 state audit concluded that California is at risk of failing to meet certain HAVA requirements, for example, to provide a fully functioning statewide voter registration database by the HAVA deadline, and questioned the use of some HAVA funds.[35] Based on the state report, the EAC initiated a special audit in January 2005 to investigate potential misuse of HAVA funds in California.

California's Final HAVA Plan[36] identified a need to modify the existing statewide database or establish a new database to be in compliance with HAVA. The state issued a request for information in July 2004 to gather information on alternatives to replace the current statewide list "Calvoter" with a system that meets HAVA requirements. In late April 2005, the plan was to modify the Calvoter system rather than replace it. However, according to the state's new HAVA Coordinator, as of May 11, 2005, the new Secretary of State is revisiting the earlier HAVA plans and evaluating the approach they will take in meeting HAVA compliance. The administrator said they realize there is a January 1, 2006, deadline, and the statewide database is a priority.

In New York, legislation directing the creation of a statewide voter list was signed May 3, 2005. The next step, according to a state election office official, is to obtain consultant services to develop a request for proposal for a contractor to create the statewide voter list. The state board of elections is to establish rules and regulations needed for compliance by July 1, 2005. While state officials will give their best effort to meeting the January 1, 2006, deadline, it will be difficult, the official said. According to the legislation, New York's voter list will be created by combining the existing voter lists maintained by each local board of election into a single integrated list, and the state will update it regularly.

---

[35]Office of the Secretary of State: Clear and Appropriate Direction Is Lacking in Its Implementation of the Federal Help America Vote Act, California State Auditor, December 2004, report number 2004-139.

[36]My Vote Counts, California's Plan for Voting in the 21st Century,. Secretary of State, September 2003.

**Progress to Verify Voter Applications with MVA Has Been Made in Most of the Seven States We Visited, but Verification Has Not yet Taken Place with SSA**

HAVA requires that voter registration applicants for federal elections provide an identification number that can be matched with other records for verification.[37] Applicants are to be asked for their state driver's license or state identification number obtained through state MVAs, or (if an applicant does not provide either state number) the last 4 digits of their social security number for this purpose. An eligible applicant who does not have a state driver's license, state identification card, or a social security card can still register to vote. In those cases, election officials are required to assign the registrant a unique identification number. Of the six states we reviewed that requested waivers, several have moved forward in arranging for verification of voter registration applicants with state MVA records. Election and MVA officials in Arizona, Michigan, and New York have agreements for voter registration applications to be verified with motor vehicle agency records. In Michigan, because both functions are under the Secretary of State, the agreement is between units within the Secretary of State's office and has been in place since 1997. Arizona election officials and the state MVA agreed in June 2002 to verify information from voter registration applicants. Depending on how the Arizona county decides to proceed, the entire voter list or just information on new applicants is to be sent to the Secretary of State and matched with MVA records on a daily basis. The match is sent back to each county to resolve any discrepancies. Each record is to be given a code indicating the type of follow-up needed, if any, for that voter registrant.

In fall 2004, election officials said that New York began matching voter registration applications under an interim process where counties send the information for verification to the MVA. According to these officials, when the statewide list is in operation the matching will be done by state officials, but the results will be sent to local election officials for resolving any discrepancies, as is the case now under the interim process. California's HAVA Administrator said the connectivity of the statewide database with other state agency records was part of the strategy being considered by the Secretary of State.

Texas, Virginia, and Wisconsin included matching with motor vehicle agency records as part of their database development contracts. Texas defines the validation of voter driver's license numbers by the MVA as a

---

[37]HAVA section 303 (a)(5)(A). Section 303 (a)(5)(B) requires state election officials to verify the accuracy of the voter registration application information by matching it with the state motor vehicle agency database records.

key feature of their new system. Virginia's contract requires matching voter applicant information with the MVA records on a real-time basis. The MVA is 1 of 10 agencies that the Virginia system is to interface with. Wisconsin's voter registration system contract requires the contractor to prepare a document describing the interface strategy for matching the voter registration list with other state agencies' data.

HAVA requires that MVAs enter into an agreement with SSA to match selected voter registrant information with SSA records when a voter registration applicant provides their 4-digit social security number for verification purposes. Of the seven states we reviewed, Virginia is not subject to this HAVA requirement because of a HAVA exemption for certain states such as Virginia that require applicants to provide their full social security number on their voter registration application, and the state can decide to use SSA's online verification system.[38] None of the remaining six states have signed agreements with the SSA to verify voter applicant information. An Arizona motor vehicle agency official said that they expect the agreement with SSA will be signed in June 2005,[39] and the remaining five states requested a waiver from this requirement until January 2006. A Social Security administrator reported that, as of February 2005, only Iowa and Idaho had signed agreements.

To implement the HAVA verification requirement, SSA developed a new program using only 4 digits. This program—called the Help America Vote Verification program (HAVV)—receives voter registration "transactions" through an arrangement with the American Association of Motor Vehicle Administrators (AAMVA). All requests from states for voter registration verification are electronically sent to AAMVA, which then sends them to SSA.[40] For each transaction, SSA compares a voter registration applicant's name, date of birth, and last 4-digit social security number against SSA records. SSA records have a "death indicator" if SSA has been notified that

---

[38]Georgia, Hawaii, Kentucky, New Mexico, South Carolina, Tennessee, and Virginia require full social security numbers on voter registration applications and the state MVAs have existing agreements with SSA for verifying against SSA records using the complete number. The agreements would need to be modified to reflect use for voter registration verification purposes.

[39]An Arizona Department of Transportation official said the agency computer programmers needed to implement the Memorandum of Understanding and are working on other projects that they expect will be available in June 2005.

[40]With the exception of the covered U.S. territories, such as Guam and Puerto Rico, that do not have connections with AAMVA.

the person with that social security number is deceased. Based on the match, a result code is assigned for the transaction, and the result is returned to AAMVA, which forwards results to state motor vehicle agencies who, in turn, provide the results to election officials. Only one of the codes indicates a one-to-one match between the voter registrant information and SSA records. However, six other codes may be generated for the registrant indicating some combination of multiple matches with the registrant or that the matching records indicate at least one of the matches is deceased. Figure 3 graphically describes the HAVV process.

**Figure 3: Process for Verifying Voter Registration Applicant Information with SSA**



Source: GAO analysis of SSA data.

SSA stated that there were too many variables to predict the number of SSA verifications that might be processed, but based on the numbers in Iowa, the only state to use HAVV as of February 2005, about 1 percent of applicants provided the 4-digit number. The HAVV verification service is for new voter registration applicants, not for voters already on state voter registration rolls. Of the 7,231 voter registration transactions sent to SSA by Iowa in 2004 for verification, 4,631 (64 percent) were returned as "*one unique match-no death indicator present*," and another 14 transactions were "*one unique match—death indicator*." No unique match was found for the remaining 2,586 transactions, according to SSA records. According

to SSA, agency records and verification procedures are normally based on using the full 9-digit social security number. When that number is paired with specific individual information, the result is a unique match. With only the last 4 digits of the social security number, the match results may not be unique. Iowa officials said that the biggest problem they are facing is that SSA is not specifying what voter information was not matching, (i.e., was the mismatch in name, date of birth, or 4-digit social security number). Without this information they are not able to efficiently resolve the non-matching problems. An SSA official said that the HAVV system is not able to provide this detail.

Most state election officials we spoke with were still determining the process they would follow when a voter registration sent to SSA (or to their MVA) for verification was returned with something other than one live match (e.g., several live matches or a death indicator for the match). In Iowa, the only state to have used the SSA verification system as of February 2005, officials said they first tried reentering the data with variations of the name and date of birth (i.e., Bill for William) and ensuring numbers that can be mistaken are correct. Iowa officials said that they send a letter to registrants asking them to clarify or come in and reregister. Arizona and Wisconsin said that a matching protocol still needed to be worked out, but any inconsistent or questionable matches would be resolved by local election officials. AAMVA officials and some of its members identified the variation in names as a factor in finding no match with SSA records. For example, the Virginia MVA representative said that when the MVA matched its entire driver's license database with SSA using the full social security number, most of the 3 percent of mismatches were women who had registered using their married name but had not changed their name with the SSA.

SSA is to be reimbursed by the states and territories required to verify voter applicants with SSA for certain HAVV costs, which could include, for example development, start-up, and maintenance, as well as for voter registration applicant verifications.[41] HAVV development and start-up costs estimated by SSA are approximately $1.3 million, and yearly maintenance is estimated to be about $200,000. Development and ongoing costs are divided among the entities based on the proportionate share of national HAVA funds received by the state or territory. For verification, SSA's current fee is $0.0062 per record. In addition, a fee for AAMVA services is

---

[41] 42 U.S.C. § 405(r).

to be added by AAMVA. SSA estimated HAVV development reimbursement costs for Arizona, California, Michigan, New York, and Wisconsin to be approximately $25,000, $163,000, $49,000, $95,000, and $27,000, respectively. (States that collect full social security number for voter registration, including Virginia, are exempt from HAVV costs because they may take advantage of existing verification programs.)

## Some States Already Meet HAVA Requirement to Match Registration List with State Records on Deceased Persons and Felons

Election officials in four of the states we visited—Arizona, Michigan, New York, and Texas—foresaw no need to change their processes to meet HAVA requirements regarding identifying registrants who are deceased.[42] State officials in all of these states but Wisconsin reported receiving State Vital Statistics information on deceased individuals for matching against voter lists. Arizona reported that the State Department of Health Services provides monthly death data via computer-to-computer match of records to the statewide voter database. Arizona, California, Michigan, New York, and Texas state officials said the vital statistics information is forwarded to each jurisdiction for verification. Virginia officials said that, once the new database is in place, there will be an automated interface with state vital statistics and with the SSA Death Master File (DMF). Jurisdictions in Michigan receive information on deceased individuals from the county and state vital statistics offices.

In California and Wisconsin, officials reported that the match of state death records with the state voter registration list would be addressed when their statewide database was complete. California is still determining its strategy for database matching, according to a state official. Wisconsin's request for proposal states that information from the state vital statistics office will be integrated using a system the state recently implemented for integrating state databases, but the details are to be defined with input from the vendor selected to develop the voter registration database.

To identify ineligible registrants based on felon status, New York and Texas election officials said they already compare voter registration records and state information on felons. Michigan election officials said that they are in compliance because voting is restricted only for those who are incarcerated. Arizona election officials said they receive some felony

---

[42]HAVA requires the state to coordinate the computerized list with state agency records on felony status and death.

information in a paper format now and are working with the Arizona State Supreme Court to obtain information on felonies electronically on a weekly basis. Similarly, Virginia has an electronic matching component in its statewide voter registration database contract. Wisconsin officials told us that records of felony convictions are diffused among 17 different correctional databases with some in paper form. A state official said that the state has plans to create a single state prison database that would be matched against the state voter registration list, but the database might not be complete by January 1, 2006. An election official in California said that the connectivity of state databases with a state voter list is part of what is currently being considered in planning for the state list.

## Information from Federal Sources Could Assist Election Officials in Identifying Ineligible Felons and Non-Citizens on Voter Registration Lists

Some federal data sources may help election officials identify ineligible registrants. Although the number of ineligible registrants may be small, identifying these ineligible voters may be important when an election is close. To assist in identifying ineligible felons, federal law requires U.S. Attorneys to notify state election officials of felony convictions in district courts. In the district courts serving the seven states we visited, 16 U.S. Attorney offices report sending notices to election officials and 3 offices reported that they were implementing or modifying their processes to provide this information on felony convictions in U.S. district courts. According to state and local election officials with whom we spoke in the seven states, federal felony information was not always provided in a standard format and the information was sometimes difficult to interpret, untimely, or incomplete. A second source to identify ineligible voter registrants could be the federal jury administrators. Although not required to share information with election officials, the jury administrators could help identify potential voter registrants who are non-citizens on the basis of information potential jurors provide when identifying themselves as non-citizens on their jury service questionnaire. Other federal data sources—DHS databases and SSA's Death Master File—might identify additional ineligible voter registrants; however, the potential is limited because of difficulties such as matching information from these sources with voter registrant information.

**U.S. Attorneys Are Required to Provide Information on Felons Convicted in Federal Court to Election Officials but Have Not Done So Consistently**

Under federal law,[43] U.S. Attorneys are required to give written notice of felony convictions in federal district courts to the chief state election official of the offender's state of residence upon conviction of the offender. The law also requires the state election officials to notify the election officials of the local jurisdiction in which an offender resides of federal felony convictions. In the year ending March 31, 2004, 74,642 criminal defendants were convicted and sentenced in U.S. district courts. According to the U.S. Sentencing Commission, of the 69,023 federal offenders for whom sentencing data were available, 59,554 were sentenced to prison in fiscal year 2003.

The U.S. Attorney notification to state officials is required to include

- the name of the offender,
- the offender's age and residence address,
- the date of entry of the judgment,
- a description of the offenses of which the offender was convicted, and
- the sentence imposed by the court.

EOUSA provided us information on how 19 U.S. Attorneys' offices in the seven states we visited were implementing the law, which became effective in 1993. Sixteen of the offices reported that they were sending notices of certain felony convictions in U.S. district courts to state election officials. Officials in three U.S. Attorneys' offices reported that they were implementing or modifying their processes to provide this information on felony convictions in U.S. district courts. According to an EOUSA official, one U.S. Attorneys' office expects to have a fully functioning notification system in place in the future but no specific time frame was provided. A second U.S. Attorneys' office is instituting a policy to consistently provide conviction data, according to EOUSA. In the third U.S. Attorneys' office, EOUSA said the support staff person assigned to each felony case will e-mail required information to the state election official. This U.S. Attorneys' office reported to EOUSA that it has modified the criminal case intake form to include the defendant's state of residence to help ensure that the information is available upon conviction. The same office also reported that it is now working on new quality control procedures for case management data. When completed, a list of felons is to be created and

---

[43] 42 U.S.C. § 1973gg-6(g). This provision was enacted into law in 1993 in section 8 of the National Voter Registration Act.

felony conviction notices are to be sent to state election officials. In all of the above cases no timeframe for implementation was provided.

The law does not require standardized formats or time frames for reporting the federal felony conviction data.  In the 16 U.S. Attorneys' offices that reported sending notices to state election officials, when the information was sent varied, for example monthly, bi-weekly (when there are a significant number of convictions to report), bi-monthly, quarterly, several times a year, upon receipt of the judgment and commitment order, and 6 months from the date of sentencing or later if the case is on appeal, according to these U.S. Attorney's office officials.  What information was sent to election officials also varied (the judgment and commitment order or the judgment and commitment order with a notification letter) as did the process.  For example:

- The designated paralegal prepares a monthly printout of the required information, which is forwarded to the responsible assistant U.S. Attorney to produce and send the information to the appropriate state officials.

- The supervisory legal assistant collects judgment and commitment orders and mails them to the appropriate state agency.

- The judgment and commitment order is copied and then routed to the first assistant U.S. Attorney, who reviews the order and then sends it to the secretary to the U.S. Attorney. The secretary forwards the judgment and commitment order directly to the election board of the secretary of state.

- The judgment and commitment orders are collated by month of imposition, sorted for approximately 6 months, and then compared to the appellate docket to determine whether a defendant has appealed. If the defendant has appealed, the judgment and commitment order is retained and periodically checked to determine the outcome of the appeal. If there is no appeal or when the appellate process is completed, the judgment and commitment order is sent to the state election authority for the state the defendant claims as his or her last residence.

State and local election officials in 7 of the 14 jurisdictions we visited told us that they had concerns about the timeliness or accuracy of the federal felony conviction notices they received. Election officials told us that notices are not easy for them to use, such as determining the length of

sentence. They also said birth dates on records were sometimes missing, which can lead to multiple matches on the same name.

## Federal Jury Administrators in the U.S. District Courts Have Information about Non-Citizens Taken from Voter Registration Lists That Could Be Shared with Election Officials

Jurors must be U.S. citizens to serve on a jury in U.S. district court. The federal jury administrators we surveyed by phone in all 14 U.S. court districts that cover the local election jurisdictions we visited asked about citizenship status on questionnaires sent to prospective jurors.[44] Figure 4 provides an example of a juror qualification questionnaire from the Eastern District of Virginia.

**Figure 4: Federal Jury Qualification Questionnaire Requests Citizenship Information**



Source: U.S. District Court, Eastern District of Virginia.

All of the jury administrators[45] for the U.S. district courts told us they use voter registration lists to draw names for the jury pool. Ten of the 14

---

[44]County courts commonly used the term jury services to describe the officials responsible for jury selection, whereas U.S. district courts generally used the term jury administrators to describe the officials responsible for the juries, according to AOUSC officials. For the purposes of the report, we will use the term county jury administrators for county jurisdictions and federal jury administrators for the federal court system.

[45]Potential jurors for a U.S. district court are chosen by jury administrators in each of the 94 district courts from a jury pool generated by random selection of citizens' names from lists of registered voters, or combined lists of voters and people with drivers' licenses, in the judicial districts. The potential jurors complete questionnaires to help determine whether they are qualified to serve on a jury. U.S. citizenship is a qualification to be a juror.

district court administrators said they use only voter registration lists, while the other 4 use voter lists in conjunction with other sources.[46]

According to officials of the AOUSC, it would be under penalty of perjury to deliberately make false statements about citizenship on the questionnaire, although the extent to which the matter is pursued is up to each U.S. district court. Generally, districts we surveyed did not verify claims of non-citizenship; however, two districts verified prospective juror claims of non-citizenship. The Eastern District of Virginia called prospective jurors to gather verbal confirmation of citizenship status and the Eastern District of Michigan requires that immigration documentation be provided to verify non-citizen status.

AOUSC officials and federal jury administrators we spoke with generally did not have exact data on the number of people called for jury service that responded that they were non-citizens. Consequently, no information was available from federal jury administrators in six U.S. district courts, but federal jury administrators in eight U.S. district courts provided either exact numbers or estimates. Of the eight district courts, four federal jury administrators said no one had been disqualified from jury service because they were not U.S. citizens. In the other four district courts:

- a federal jury administrator in one U.S. district court estimated that 1 to 3 percent of the people out of a jury pool of 30,000 over 2 years (about 300 to 900 people) said they were not U.S. citizens;

- a federal jury administrator in a second U.S. district court estimated that less than 1 percent of the people out of a jury pool of 35,000 names each month (less than 350 people) said they were not U.S. citizens;

- a federal jury administrator in a third U.S. district court estimated that about 150 people out of a jury pool of 95,000 names over 2 years said they were not U.S. citizens; and

---

[46]Of the remaining courts, three use both voter registration lists and MVA records. One uses voter registration, MVA, and state identification records. Officials in each of the four federal district courts that use more than one source for selecting jurors stated that they can identify from which source(s) a name is drawn. As currently configured, the jury pool lists do not specify sources, therefore, to determine whether a name was taken from a particular source, such as the voter registration list, would require manually comparing the jury pool list to each source.

- a federal jury administrator in a fourth U.S. district court estimated that annually about 5 people typically claimed non-citizenship in a jury pool of about 50,000 individuals.

Of the 14 U.S. district courts contacted, only the jury administrator for the Eastern District of Virginia provided feedback to voter registration authorities if a prospective juror claimed not to be a U.S. citizen. Of the 13 U.S. district courts that do not currently provide feedback, none planned to do so in the future. However, the federal jury administrators' opinions on the feasibility of providing this form of feedback were mixed. For example, 7 of the 11 district officials who commented on feasibility indicated that providing feedback to election officials regarding non-citizens is currently possible while 4 other federal jury administrators claimed the responsibility would be difficult due to staffing resource constraints. According to an AOUSC official, there is no Judicial Conference[47] policy that instructs the courts to notify election officials when it is determined that a potential juror is not a U.S. citizen.

At the county level, some county jury administrators share information with election officials about people who ask to be excused from jury service because they are not U.S. citizens. Jurors for county courts are also drawn from a variety of sources, sometimes including voter registration lists. Other sources county officials cited for their jury pools included state drivers' licenses, state identification cards, social services department information, employment department information, and state tax rolls. Similar to federal district courts, county jury administrators determine if a person qualifies for jury service based on citizenship by specifically asking on a form if the person is a citizen. Jury officials in three county court jurisdictions in New York and Texas require people who claim non-citizenship to furnish proof in the form of immigration documents. One of those jurisdictions will allow a notarized statement in lieu of immigration papers, and another jurisdiction would accept a letter from an immigration attorney.

---

[47]The fundamental purpose of the Judicial Conference is to make policy with regard to the administration of the U.S. courts. The Director of AOUSC implements the policies of the Judicial Conference as part of the performance of his duties as the administrative officer of the courts of the United States.

Of the 10 locations we visited where county jury administrators[48] draw the names of potential jurors from a pool that includes names taken from voter registration lists, five county jury administrators said they provided feedback to election officials when a potential juror claimed not to be a citizen as a reason to be excused from jury duty. With respect to county jury administrators who use more than one source for their jury pool, one county jury administrator said that she could not determine if the potential juror was drawn from the voter registration list or the other sources used for selection, and therefore could not provide feedback. However, a county jury administrator for another county court in the same state that also used multiple sources for the jury pool said they provide feedback to election officials on all people who claim non-citizenship as a reason to be excused from jury duty.

In one local election jurisdiction that receives feedback from county jury administrators, election officials estimated that they have removed about 500 people who were self-identified as non-citizens during jury selection from the voter registration lists since 2000. This jurisdiction had 889,000 registrants in 2004. For example, during 2003, the county jury administrator for this jurisdiction had 1,693 people ask to be excused from jury duty because they were not citizens. Of those, election officials sent letters requesting documentation of citizenship to 413 people. As a result of the process, they removed 83 people who were identified as non-citizens from the voter registration lists. Other examples include:

- A county jury administrator for one county court estimated they annually refer to election officials about 2,000 names of jurors who identified themselves as non-citizens to be excused from jury duty. The election officials in this jurisdiction said that they remove about 400 to 500 names a year from the voter registration list because the registrants are not citizens (out of between 3 and 4 million registrants).

- In another county court, a county jury administrator estimated that, annually, about 5 people at most who were drawn from the voter registration lists (which includes about 130,000 registrants in November 2004) claim non-citizenship as a reason to be excused from jury duty.

---

[48]Jury services officials in the other four court jurisdictions in two states—Michigan and Wisconsin—said that the jury pool is drawn only from their state's department of motor vehicles driver's licenses and state identification cards, and they do not use voter registration lists.

In one jurisdiction, election officials receiving jury service information commented that they must follow up on each referral, and sometimes people may have wrongly claimed non-citizenship in order to be excused from jury duty. Election officials will generally mail a notification to the registrant asking them to verify the information to remain on the voter registration list. Those who do not reply are removed. Non-response on the part of a registrant does not necessarily mean that they are not citizens.

## DHS Databases Contain Selected Information on Non-Citizens, but the Usefulness May Be Limited

Federal law provides a statutory framework that requires non-citizens entering or residing in the United States to provide certain identification information. This information was historically provided to the Immigration and Naturalization Service (INS), which when abolished, had its functions transferred to various components within DHS on March 1, 2003. DHS maintains multiple databases containing information on non-citizens within its component agencies: the U.S. Citizenship and Immigration Service, the U.S. Immigration and Customs Enforcement, and the U.S. Customs and Border Protection. Appendix II shows examples of the databases identified by DHS officials.

DHS officials said that the usefulness of their information to identify non-citizens on voter registration lists may be limited because of system constraints for commonly used data matching identifiers (such as name, birth date, address, social security number, and alien number) that are needed for a match and the need for law enforcement to verify the information. For example, the matching of databases may not always be reliable because matching on names alone may produce multiple matches on the same name, depending on whether there is middle initial, middle name, or simply the same common name. As an example of restrictions on usage for data matching identifiers, DHS officials said that address information on non-citizens in some DHS databases, which these officials believe is important for voter registration, was not always reliable in the databases because it was self-reported information and would require verification. We recently reported on the limited usefulness of self-reported address information by non-citizens in some DHS databases.[49] We reported that 16 of 17 Immigration and Customs Enforcement agents interviewed did not use the change of address data in one of the DHS

---

[49]GAO, *Alien Registration: Usefulness of a Nonimmigrant Alien Annual Address Reporting Requirement Is Questionable,* **GAO-05-204** (Washington, D.C.: January 2005).

databases to help locate the non-citizens as part of their investigations because the agents said that the change of address information, which is self-reported data, is often unreliable.

We identified two instances where DHS databases were used to help identify non-citizens for voter eligibility purposes. In the first instance, in the late 1990s, DHS officials noted that a match was performed between information on non-citizens in then INS files and voter registration records at the request of a House Committee that oversaw the results of a California congressional election being contested. The data-matching effort sometimes produced multiple name matches in INS databases for a single name from the voter registration list. For example, in documentation of the California matching effort, 1 name from the voter registration list matched with 44 names in the INS databases. According to DHS officials, the effort to investigate those matches was extremely labor intensive and required immigration officials to manually pull non-citizen records from around the world to determine the identity of the individual from the match. DHS officials said the initial matching of the database was unreliable because of the lack of common data identifiers, usually only name and date of birth, and the accuracy of those identifiers. Common names were especially problematic in producing multiple matches on the same name. Address information, which DHS officials believe is important for voter registration, was not always reliable in the databases on non-citizens, as mentioned previously.

In the second instance, California state election officials said that they tried a database-sharing pilot program with INS in the mid-1990s to investigate allegations of ineligible voters. At the time, the state election officials said that INS officials advised them that their data might not be reliable for their purposes. In a letter to the House Chairman regarding the matching of voter registration information and INS data, the INS Commissioner wrote that the data sharing was by names and date of birth, and there would be no match if the person's name on the state voter registration rolls is different that what it is in the INS system. In addition, the INS Commissioner wrote that a match does not necessarily mean the person is not eligible to vote. According to California state election officials, their experience confirmed that indeed the reliability of the data was poor for their purposes and that they could not use them.

While matching of voter registration lists with DHS databases could be problematic, the California Secretary of State's office has been exploring the possibility of using the DHS Systematic Alien Verification for Entitlements (SAVE) program to pursue specific allegations of voter

ineligibility. The SAVE Program was developed to allow federal, state, and local government agencies to obtain information they need on immigration status in order to determine an applicant's or recipient's eligibility for many public benefits. The SAVE Program also administers an employment verification pilot program, in cooperation with SSA, to help employers verify the work authorization of their newly hired employees. As proposed by the California Secretary of State, the use of SAVE would involve querying individual voter names on the basis of specific allegations or challenges that a registered voter was a non-citizen. This proposal does not involve matching entire voter registration lists with DHS databases.

SAVE is more inclusive than other databases (containing over 60 million alien records) and could provide election officials the means to identify some non-citizens; however, according to DHS officials, it has limitations. For example, DHS officials said that the SAVE Program is set up to query information based on the number on the alien's Arrival and Departure Record form (I-94) or an alien's DHS assigned "A" number. It is a web-based system, and records are normally queried one at a time, although processing multiple records using the SAVE program is possible. Because voter registration is limited to U.S. citizens, voter registration records would not contain alien or form I-94 numbers. The SAVE Program can be queried by a social security number, name, and date of birth if the alien's "A" number or I-94 number are unknown. However, DHS officials emphasized that the system is alien-number-driven. Also, DHS officials opined that using the SAVE Program would require additional verification of the person's identity, either automated or manual, as a precautionary measure before removing a person from a voter registration list based on a match.

To facilitate investigations of alleged non-citizens having registered to vote, the California Secretary of State's Office has proposed accessing the SAVE Program. An official in the State's Election Fraud Investigation Unit saw this as a time- and effort-saving tool. Rather than contacting a DHS agent to obtain information and waiting for a response that, according to this official, sometimes could be months in coming, the unit could make direct queries through the SAVE Program. DHS has provided the California Secretary of State with a memorandum of understanding to allow this process to proceed, but as of February 2005, California officials said that the Secretary of State had not signed the memorandum.

**Use of SSA Database to Identify Deceased Registrants Has Matching and Timeliness Limitations**

The DMF consolidates death records across the country and potentially could be used by election officials to identify voters on their registration lists that died in another state.[50] While about 2.7 million people die in the United States each year and about 2 million are SSA beneficiaries, matching difficulties and the timeliness and completeness of the data may lessen DMF's usefulness to election officials.

Matching voter registration records with DMF records requires that the sets of records contain at least some of the same identifiers for an individual. The social security number is the primary way to identify a unique individual in SSA's databases, but only seven states allow the full social security number to be collected for voter registration purposes. One of the states we visited (Virginia) collects the 9-digit social security number as part of the voter registration application, and election officials there said that they plan to use the DMF for verification when the statewide, computerized voter registration list has been developed. Even without the full social security number, matching can still be done with other identifiers in the DMF, such as name, date of birth, or address, but problems, such as people using different names for voter registration than on social security records, currency of addresses, and the number of people on a national basis with similar names, may make matching difficult. One study[51] of the DMF suggested that without a correct social security number, researchers would need to consult other sources of mortality information.

Timeliness and completeness may also lessen the usefulness of the DMF for identifying deceased voter registrants. According to a 2001 SSA Office of the Inspector General (OIG) report, some states had been taking over 200 days to report.[52] SSA officials told us that the information is untimely for a number of reasons, such as manual recordkeeping or outdated computer systems at the state level. Under SSA's ongoing Electronic Death Registration initiative, SSA plans to receive death reports within 5 days of

---

[50]The DMF contains over 76 million records of deceased individuals enrolled in the U.S. Social Security program. For an individual, the DMF record can contain the person's social security number, name, date of birth, date of death, state or county and zip code of last payment residence, and zip code for the lump sum payment, if the information is available.

[51]Use of the Social Security Administration Death Master File for Ascertainment of Mortality Status Population Health Metrics: 2004; 2:2,. March 5, 2004.

[52]Effectiveness of the Social Security Administration's Death Termination Process (A-09-02-22023), September 2001. State and federal sources supply some death information to SSA, but most deaths are reported to SSA by friends, relatives, and funeral homes.

death. SSA estimates the initiative will be complete in 2012, but recent federal legislation may provide grants for computerizing state records that could affect SSA's ability to meet the completion date sooner. In addition to timeliness considerations, a 2003 OIG report stated that the completeness of the DMF is not consistent, citing research indicating younger deceased persons were less likely to be included.[53] The OIG report further stated that the DMF does not contain every decease social security number holder and also includes individuals who are not actually deceased.

## Conclusions

State and local election officials face many challenges in maintaining accurate voter registration records. Because voter registration lists are dynamic and constantly changing, officials turn to a variety of sources to identify registrants who may be ineligible to vote. HAVA included provisions directed at maintaining accurate voter registration lists that included, among other things, requirements for states to develop a computerized, interactive statewide voter registration list and to match that list against other state databases and records. However, after provisions are implemented, states will continue to face challenges to maintain accurate voter registration lists and verifying voter eligibility, particularly identifying out-of-state registration duplicates and deceased registrants. Thus, the effect of HAVA's voter registration reform initiatives is yet to be determined.

Election officials we contacted in seven selected states noted that they experienced specific problems verifying voter registration application information related to felony convictions and citizenship status. We found two federal information sources that could provide election officials information on federal felony convictions or citizenship status requirements. The number of potentially ineligible voter registrants identified by these two federal sources may be small but could be important in determining the outcome of a close election. One, the U.S. Attorneys, is already required to provide state election officials with information about felony convictions, but the information could be provided in a more standardized format to ensure that the information is easier for election officials to interpret and more complete and timely.

[53]*The Social Security Administration's Efforts to Process Death Reports and Improve its Death Master File,* January 2003, Office of the Inspector General, Social Security Administration.

The second information source that could help identify potential ineligible voters is federal jury administrators. Although not required to share information with election officials, the jury administrators could help identify potential voter registrants who are non-citizens on the basis of information potential jurors provide when identifying themselves as non-citizens on their jury service questionnaire.

## Recommendations for Executive Action

To assist state election officials in identifying individuals on voter registration lists who may be ineligible to vote because of their felon or non-citizen status, we are recommending the following two actions:

We recommend that the Attorney General direct the U.S. Attorneys to provide information on felony convictions in U.S. district courts in a more standardized format to make it easier for election officials to interpret the conviction information, such as the length of the sentence, and to help ensure information on felons is complete and timely.

We recommend that the Administrative Office of the U.S. Courts determine the feasibility and steps necessary to implement a requirement that U.S. district court jury administrators provide notice to state election officials of potential jurors who identify themselves as non-citizens on their jury qualification questionnaire.

## Agency Comments and Our Evaluation

We provided a draft of this report to DOJ and AOUSC for review and comment. The Director of EOUSA in her comments agreed with our recommendation. She acknowledged that maintaining accurate voter lists is an important goal and that an EOUSA working group has been tasked to develop a standardized process for the 94 U.S. Attorneys' Offices to send felony conviction information in the best format for use by state election officials. AOUSC's Director agreed with our recommendation and stated that this matter would be brought to the attention of district courts. Despite resource shortages in the federal courts and the fact that most juror are screened by local and state courts, the AOUSC Director acknowledged the public interest in ensuring that non-citizens are not afforded the privilege of voting. Written comments from AOUSC and DOJ are included in appendices IV and V. Sections of the report were also provided to SSA, DHS, and states we visited to confirm the accuracy of the information. Technical comments from the federal agencies and states that we reviewed were incorporated, as appropriate, in the report.

As we agreed with your office, unless you publicly announce the contents of this report earlier, we plan no further distribution of it until 30 days from the date of this letter. We then plan to provide copies of this report to the Attorney General, Department of Justice; Director, Administrative Office of U.S. Courts; Ranking Minority Members, House Committee on the Judiciary and Subcommittee on Immigration, Border Security and Claims; Chairman and Ranking Minority Member, Senate Committee Homeland Security and Governmental Affairs; Chairman and Ranking Minority Member, House Committee on Government Reform; Chairman and Ranking Minority Member, Senate Committee on Rules and Administration; and Chairman and Ranking Minority Member, House Committee on House Administration. Copies of this report will also be made available to others upon request. In addition, this report will be available at no charge on GAO's Web site at **http://www.gao.gov**.

If you or your staffs have any questions about this report, please contact me on (202) 512-8777 or at jenkinswo@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report.  GAO staff contributing to this report are listed in appendix VI.

William O. Jenkins, Jr.
Director, Homeland Security and Justice Issues

# Appendix I: Objectives, Scope, and Methodology

Our objectives were to describe: (1) the processes in selected states to verify that voter registration applicants met state eligibility criteria and to help ensure that voter registration lists are accurate; (2) the challenges officials face in maintaining voter lists; (3) the implementation status of the Help America Vote Act of 2002 (HAVA) voter registration verification procedures in selected states; and (4) potential data sources for verifying voter registration eligibility.

We selected the following states using a non-probability sample: Arizona, California, Michigan, New York, Texas, Virginia, and Wisconsin. Our selection of states took into consideration several voter registration-related factors. We sought to select states that represented differences in terms of the stage of development of their statewide databases and had unique characteristics that might affect the implementation of HAVA. For example, Wisconsin has same day registration; Arizona has on-line voter registration; Michigan has a reputation as a model for registration practices; and New York State may have to rely on social security number verification procedures more than other states because it has a large population who live in New York City and may not have driver's licenses for verification. We also selected states to provide geographic diversity and variation in election administration—some administer elections at the county level and others at lower levels such as city or townships. States also varied in the size of the immigrant populations, of interest because of the citizenship requirement for voter registration. Our goal was not to target a particular state, but rather to identify a range of issues facing states in implementing HAVA requirements and assuring accurate voter registration lists. Information from these seven states is not generalizable to all states. Table 3 describes characteristics in each state.

Appendix I: Objectives, Scope, and
Methodology

**Table 3: State Selection Factors**

| State | Voter registration-related characteristics |
|-------|--------------------------------------------|
| Arizona | • No statewide database prior to HAVA. <br> • Did not request a waiver from HAVA database and verification requirements deadline of January 1, 2004. <br> • Census 2000 percent of population foreign born: 12.8. <br> • Voter registration administered at county level. <br> • Has implemented an on-line voter registration process. |
| California | • Statewide database prior to HAVA that is compiled from local election lists.  Local jurisdictions can access entire list. <br> • Requested a waiver from HAVA database and verification requirements deadline of January 1, 2004. <br> • Census 2000 percent of population foreign born: 26.2. <br> • Voter registration administered at county level. |
| Michigan | • Unified statewide database. <br> • Requested a waiver from HAVA database and verification requirements deadline of January 1, 2004. <br> • Census 2000 percent of population foreign born: 5.3. <br> • Voter registration administered at township, city, and village level. <br> • Secretary of State responsible for election and motor vehicle licensing functions. |
| New York | • No statewide database prior to HAVA. <br> • Requested a waiver from HAVA database and verification requirements deadline of January 1, 2004. <br> • Census 2000 percent of population foreign born: 20.4. <br> • Voter registration administered at county level. <br> • Expected higher use of social security records for registrant verification due to fewer drivers in New York City. |
| Texas | • Statewide database prior to HAVA that is compiled from local election lists.  Local jurisdictions do not have access to entire list. <br> • Requested a waiver from HAVA database and verification requirements deadline of January 1, 2004. <br> • Census 2000 percent of population foreign born: 13.9. <br> • Voter registration administered at county level. |
| Virginia | • Unified statewide database. <br> • Requested a waiver from HAVA database and verification requirements deadline of January 1, 2004. <br> • Census 2000 percent of population foreign born: 8.1. <br> • Voter registration administered at county level. <br> • May use 9-digit social security number for voter registration verification (rather than 4 digits outlined by HAVA). |
| Wisconsin | • No statewide database prior to HAVA.  Some jurisdictions currently do not maintain voter registration rolls. <br> • Requested a waiver from HAVA database and verification requirements deadline of January 1, 2004. <br> • Census 2000 percent of population foreign born: 3.6. <br> • Voter registration administered at municipal level. <br> • Allows Election Day voter registration. |

Source: GAO.

Within each state, we selected two local jurisdictions using a
nonprobability sample. Our selection criteria included population size, the
proximity of the locations to our site visits with state election officials,
suggestions by state election officials, and proximity to a motor vehicle
office. Local jurisdictions included

- Mariposa County, Arizona;
- Gila County, Arizona;
- Los Angeles County, California;
- Yolo County, California;
- Detroit, Michigan;
- Delta Township, Michigan;
- New York City, New York;
- Rensselaer County, New York;
- Bexar County, Texas;
- Webb County, Texas;
- Arlington County, Virginia;
- Albemarle County, Virginia;
- Madison, Wisconsin; and
- Franklin City, Wisconsin.

To describe state voter registration processes and challenges (objectives 1
and 2), we conducted semi-structured on-site interviews with state and
local election officials, and supplemented the interviews with phone and
email updates. We are relying on testimonial evidence because most states
(all but Arizona in our sample) obtained an extension for implementing
HAVA and, therefore, data were not available to assess the status of
implementation. Our interviews included questions on registration
processes, any voter registration fraud allegations, and discussion of
challenges identified by officials in maintaining voter roll accuracy.
Because so many voter registrations originate with applications from
motor vehicle agencies, interviews were conducted with motor vehicle
agency officials in the same jurisdictions regarding their voter registration
procedures. In Michigan, where we spoke only with Secretary of State
officials, the Secretary of State's office is responsible for elections and
driver's licenses. We also reviewed current HAVA plans, relevant reports,
and documents related to the voter registration process in seven states.

State level election officials were provided an opportunity to verify the
accuracy of information regarding their particular state. All but one state
responded.

In addition to asking state election officials about allegations of voter
registration fraud, we interviewed Department of Justice (DOJ) Criminal
Division officials, and obtained a list of election fraud active matters from
2002-2004, filed by U.S. Attorneys and Public Integrity section attorneys
(the section that handles election issues within DOJ). We also contacted
U.S. Attorneys responsible for the states we reviewed for any additional
cases handled locally by those offices. We contacted District Attorneys in
the counties for the local election districts we visited and asked for
information regarding actions related to ineligible voter registration. We
also asked state and local election officials if they had referred any
reported incidents of voter registration fraud or irregularities to county,
state, or federal officials since January 2003. District attorney and state
and local election official reports of fraud related to voter registration
were based on the recall of the officials, except in California, where the
state fraud unit routinely catalogs allegations and their disposition.

To describe the HAVA implementation status in the seven states
(objective 3), we reviewed HAVA plans to develop a statewide voter
registration database and to verify voter registration lists against motor
vehicle agency and Social Security Administration records. We also
included questions on the status of the database and verification
procedures in the semi-structured interviews with state and local election,
and state motor vehicle officials. We interviewed and obtained documents
from the Social Security Administration on how that agency was
addressing HAVA verification requirements.

To identify potential data sources for verifying voter registration eligibility
(objective 4), we reviewed and summarized sources currently used for
verification in the selected states and localities, and discussed potential
verification sources with state and local election officials.

We then gathered additional information on the forwarding of federal
felony convictions to state election officials from the Executive Office for
U.S. Attorneys. We requested information from the 19 U.S. Attorney
Offices corresponding to the seven selected states—Arizona, California,
Michigan, New York, Texas, Virginia, and Wisconsin—we visited. The 19
U.S. Attorneys' Offices were the District of Arizona, the Central District of
California, the Eastern District of California, the Northern District of
California, the Southern District of California, the Eastern District of
Michigan, the Western District of Michigan, the Eastern District of New
York, the Northern District of New York, the Southern District of New
York, the Western District of New York, the Eastern District of Texas, the
Northern District of Texas, the Southern District of Texas, the Western

Appendix I: Objectives, Scope, and
Methodology

District of Texas, the Eastern District of Virginia, the Western District of
Virginia, the Eastern District of Wisconsin, and the Western District of
Wisconsin.

We contacted federal jury administrators by phone in the 14 U.S. court
districts that covered those same local election jurisdictions and requested
information on reporting between federal jury administrators and election
officials. The 14 district courts were: District of Arizona, Central District of
California, Eastern District of California, Eastern District of Michigan,
Western District of Michigan, Eastern District of New York, Southern
District of New York, Northern District of New York, Southern District of
Texas, Western District of Texas, Eastern District of Virginia, Western
District of Virginia, Eastern District of Wisconsin, and Western District of
Wisconsin.

We also contacted 14 county court jurisdictions by phone that covered the
same election jurisdictions and requested information on reporting
between county jury administrators and election officials. The 14 local
courts were: Superior Court of Arizona, Maricopa County; Gila County
Superior Court; Superior Court of California, Los Angeles County;
Superior Court of California, Yolo County; Third Judicial Circuit Court of
Michigan; Eaton County Courts; New York County Courts; Rensselaer
County Courts; Texas Office of Court Administration, Bexar County;
Texas Office of Court Administration, Webb County; 17th Judicial District
of Virginia; 16th Judicial Circuit of Virginia; Dane County Courts; and
Milwaukee County Courthouse.

We requested information on data regarding citizenship from officials in
the Department of Homeland Security's Customs and Border Protection,
Immigration and Customs Enforcement, and U.S. Citizenship and
Immigration Services. We also reviewed selected federal and local agency
reports with relevant information.

Our work was performed between January 2004 and May 2005 in
accordance with generally accepted government auditing standards.

# Appendix II: Department of Homeland Security Automated Systems That Include Information on Non-Citizens

| Name | Description |
|------|-------------|
| Asylum Pre-screening System | The Asylum Pre-screening System provides case tracking for asylum pre-screening credible fear claims that are presented during the expedited removal process. |
| Computer-Linked Application Management Information System, Version 3 | The Computer-Linked Application Management Information System, Version 3, is a high-speed transaction processing system with client server and mainframe components. It is designed to support the processing (receipt, adjudication, and notification) pertaining to all U.S. Citizenship and Immigration Service benefits applications and petitions, except naturalization (see Computer Linked Application Information System, Version 4 ). Pertinent information is uploaded to the Central Index System. |
| Computer Linked Application Information System, Version 4 | The Computer Linked Application Information System, Version 4, is a nationally-deployed Client-Server, workflow-driven case management system that supports the processing of naturalization applications. Pertinent information is uploaded to the Central Index System. |
| Central Index System | The Central Index System provides automated information on individuals of interest and identifies the location of an alien's hardcopy A-file. It also provides information for federal and state entitlement programs and is a single centralized source of data for many mission functions. Data is routinely captured in the Central Index System via daily data uploads from the Computer-Linked Application Management Information System, Versions 3 and 4. |
| Employment Authorization Document System | The Employment Authorization Document System is an antiquated stand-alone personal computer system used to capture data at U.S. Citizenship and Immigration Service field offices. In combination with Polaroid camera pictures, it generates a standardized identification document issued to aliens who are authorized to be temporarily employed in the U.S. Data is electronically consolidated from the stand-alone devices throughout each workweek and uploaded to the Computer-Linked Application Management Information System, Version 3, and subsequently to the Central Index System (see above) for nationwide terminal inquiry access. |
| Marriage Fraud Amendment Act System | A centralized, mainframe case tracking system that supports the adjudication of petitions covered by the Immigration Marriage Fraud Amendment Act of 1986. |
| Refugee, Asylum & Parole System | A centralized mainframe system that provides full case tracking and management capability for asylum casework. |
| Reengineered Naturalization Application Casework System | A centralized, mainframe system reengineered from the Naturalization Application Case-processing System. It no longer takes new naturalization applications (see Computer Linked Application Information System, Version 4), but continues to process applications for citizenship (N600), and applications for duplicate certificates (N565). |
| Deportable Alien Control System | One nationwide database of deportation and detention information that operates on computer hardware owned by the federal government and is accessible through the network of user terminal across the country. It automates many of the clerical docket control functions associated with the arrest, detention, and deportation of illegal aliens. |
| The Juvenile Alien Management System | This database tracked juvenile aliens in the removal process. This system is no longer used and supported. Juvenile case tracked in the Juvenile Alien Management System had been recorded in DACS. |
| Student and Exchange Visitor Information System | An internet-based system that provides tracking and monitoring functionality, with access to accurate and current information on nonimmigrant students and exchange visitors and their dependents and the approved schools and designated programs sponsor in the United States that host these individuals. |

Appendix II: Department of Homeland
Security Automated Systems That Include
Information on Non-Citizens

| Name | Description |
|------|-------------|
| The Student and School System | With the implementation of the Student and Exchange Visitor Information System , this database previously utilized by legacy Immigration and Naturalization Service fell into disuse.  The data in this system has not been updated since the Student and Exchange Visitor Information System came online.  The Student and School System was official retired on September 30, 2004, and is no longer available. |
| Arrival and Departure Information System | The Arrival and Departure Information System provides a Department of Homeland Security intranet accessible web-based browser application that correlates information from multiple sources to show the person's travel history, current immigration status, and overstay information.  The Arrival and Departure Information System  currently receives, filters, processes, matches and stores biographic and biometric border crossing information for all non-citizens, air and sea travelers entering and departing the United States and status update information for aliens within the United States. |
| Non-Immigrant Information System | An online, automated central repository of information designed to track and maintain the status of all foreign visitors and immigrants. This system provides information on arrivals and departures, to support the controlled admission of non-immigrants to the United States through ports of entry and to track non-immigrant departures for identifying information. |
| Enforcement Case Tracking System | An automated system that supports the Border and Transportation Security in the accomplishment of its law enforcement mission.  The Enforcement Case Tracking System comprises numerous modules for specific processing needs—needs such as identifying, apprehending, detaining, and removing aliens illegally in the United States, filing administrative and criminal charges against aliens who commit illegal acts; and seizing contraband associated with illegal alien activity. |
| United States Visitor and Immigrant Status Indicator Technology[a] | An automated system that collects, maintains, and shares information, including biometric identifiers, on selected foreign nationals who travel to the United States.[a] Among other things, the program is designed to identify foreign nationals who (1) have overstayed or violated the terms of their visit; (2) can receive, extend, or adjust their immigration status; or (3) should be apprehended or detained by law enforcement officials. On January 5, 2004, Department of Homeland Security began operating the first stage of its planned United States Visitor and Immigrant Status Indicator Technology at 115 air and 14 sea ports of entry. |
| Systematic Alien Verification for Entitlements (SAVE) | An automated system responsible for administering programs involving customer access to information contained in the Department of Homeland Security's Verification Information System database.  The Verification Information System database is a nationally accessible database of selected immigration status information on over 60 million records. The SAVE Program enables federal, state, and local government agencies to obtain immigration status they need in order to determine an applicant's or recipient's eligibility for many public benefits. The SAVE Program also administers, in cooperation with SSA, employment verification pilot programs that enable employers to quickly and easily verify the work authorization of their newly hired employees. |

Source: GAO summary of Department of Homeland Security information provided by United States Citizenship and Immigration Service, Immigrations and Customs Enforcement, and Customs and Border Protection officials.

[a] For more information on this program, see GAO, *Homeland Security: First Phase of Visitor and Immigration Status Program Operating, but Improvements Needed*, GAO-04-586 (Washington, D.C.: May 11, 2004).

# Appendix III: Voter Registration Fraud Allegations Identified at Selected States and at the Federal Level

In California, the only state with an investigative unit dedicated to voter fraud issues, 15 cases of the 108 allegations for fraudulent voter registration opened from January 2001 to May 2004 were sent to the District Attorney for prosecution. Of the 15 cases, the outcome had been determined in 11 cases (6 cases declined for prosecution; 5 were prosecuted and the individuals were convicted). In four cases, the outcome is yet to be determined. Similarly, the California investigative unit opened for investigation 29 allegations of non-citizens either registering or voting, 1 case of a non-citizen voting was sent to a District Attorney for prosecution, but the District Attorney declined it. At the federal level, DOJ attorneys initiated at least 61 election fraud investigations or matters (an alleged possible criminal occurrence that still has to be investigated) from 2000 to 2003. Of those cases, 15 involved voter registration or ineligible voters

Election officials in seven of the locations we visited reported that they have referred reported instances of voter registration fraud allegations to appropriate agencies, such as the District Attorney and the U.S. Attorney for investigation. Election officials referred allegations of voter registration fraud such as the following to the appropriate agencies for investigation:

- A Texas local jurisdiction referred to the State Board of Elections an allegation that state officials investigated where 27 people were registered at one address. The investigation revealed that the location was an orphanage, and the registrants were resident workers.

- Texas local jurisdictions reported referring to their local District Attorney instances of (1) an individual trying to register using the names of 42 deceased individuals, (2) the receipt of many voter registration applications from the same address, and (3) a non-citizen who incorrectly believed she could vote in a school board election if she was a property owner.

- One Arizona local jurisdiction reported that between 1997 and 2003, 23 cases had been prosecuted by local District Attorneys or the U.S. Attorney for election-related violations and petition forgeries. Eleven of the 23 cases were for petition forgery.

- Local jurisdictions in California and Michigan each reported instances of voter registration drive irregularities such as altering or falsifying registration forms. Election officials in California referred the matter to

Appendix III: Voter Registration Fraud
Allegations Identified at Selected States and
at the Federal Level

the Secretary of State's office for investigation and Michigan officials
referred the matter to the local county prosecutor.

- One New York jurisdiction reported referring an allegation made by an
  ex-spouse to the U.S. Attorney that the former spouse was not a citizen.

- One Arizona local jurisdiction official referred to the District Attorney
  an instance of a person trying to vote before being officially sworn in as
  a U.S. citizen.

In deciding to investigate allegations of voter registration fraud given the
competing demands for investigative and prosecutorial resources, local
and federal prosecutors reported they take various factors into
consideration. District Attorneys in jurisdictions we visited gave various
reasons for not pursuing allegations. One District Attorney reported that
they were unable to investigate the allegations of voter registration fraud
because they could not compel a person to provide proof of citizenship
based only on an allegation. A District Attorney in another jurisdiction
reported that registration allegations are not pursued because they are
victimless and non-violent crimes. Another District Attorney said that
registration issues are not one of the county's priorities.

District Attorneys in the local jurisdictions we visited reported initiating
matters or cases since January 1, 2004, pertaining to ineligible persons
registering to vote. Three jurisdictions reported prosecuting one case
each, two reported having matters still under investigation, and two
reported that they did not prosecute the matter.

Within the Department of Justice, the U.S. Attorneys and the Public
Integrity Section (PIN) are responsible for enforcing federal criminal laws
applicable to federal election fraud offenses, among other things. PIN is
also responsible for overseeing the U.S. Attorneys' investigations and
prosecution of federal election fraud. A senior PIN official said the
decision to pursue an allegation depends on a number of factors. When an
allegation is received, it is evaluated in terms of factors such as quality of
the witnesses, quality of evidence, historical problems in the area,
resources, coordinating with state Attorney General's office priorities, and
the priority of election crimes within the responsibilities of the
Department of Justice. U.S. Attorneys and PIN attorneys initiated at least
61 election fraud matters, or investigations, related to election years 2000
through 2003. Most of the 61 matters related to elections held in 2002.
(Matters were initiated in 28 states and 1 U.S. territory and ranged from 1
to 7 matters per state/territory over the 4-year period.) Of these election
fraud matters, 15 related to voter registration or ineligible voters.

**Appendix III: Voter Registration Fraud
Allegations Identified at Selected States and
at the Federal Level**

According to PIN, many of the 61 matters resulted in indictments and
subsequent convictions.  A PIN official told us that 43 voter registration
matters are currently under investigation and another 7 have been closed
related to the November 2004 federal election.  According to the Criminal
Division, the information provided by PIN does not include all election
fraud investigations that the U.S. Attorneys have initiated because (1) U.S.
Attorneys are not required to consult with PIN for preliminary
investigations as opposed to grand jury investigations, which require
consultations; (2) PIN did not track election fraud investigations prior to
October 2002; and (3) election fraud investigations are sometimes initiated
under non-election statutes.

In addition to the PIN election fraud matters, we asked the 19 U.S.
Attorney Offices that cover the seven states we visited the number of fraud
matters or investigations they had in 2003 and 2004 relating to ineligible
voter registration. Five offices reported investigating allegations. Three
offices reported that among them there were four ongoing investigations.
One office reported that they investigated a matter, but no prosecution
arose from the investigation. Another office reported that they declined to
prosecute a number of investigations (number not tracked) that involved
aliens who registered to vote. Rather than prosecute, they allowed
administrative procedures regarding deportation to occur.

# Appendix IV: Comments from the Administrative Office of the United States Courts



LEONIDAS RALPH MECHAM
Director

CLARENCE A. LEE, JR.
Associate Director

**ADMINISTRATIVE OFFICE OF THE
UNITED STATES COURTS**

WASHINGTON, D.C. 20544

May 31, 2005

Mr. William O. Jenkins, Jr.
Director, Homeland Security and Justice Issues
U.S. Government Accountability Office
441 G Street, NW, Room 6482
Washington, DC  20548

Dear Mr. Jenkins:

Thank you for the opportunity to review and comment on the draft report entitled *Elections: Additional Data Could Help State and Local Elections Officials Maintain Accurate Voter Registration Lists* (GAO-05-478).

We appreciate the public interest in ensuring that those who are not citizens and are ineligible to vote are not afforded that privilege.  As the report indicates, the vast majority of potential jurors are screened in the state and local courts rather than in federal courts, and thus it is through their own court systems' juror pools that these courts are likely to identify registered voters who are not citizens.  Nevertheless, despite resource shortages in the federal courts, as recommended, the Administrative Office of the U.S. Courts will bring this matter to the attention of the district courts and encourage them to identify and report to appropriate election officials instances when persons identify themselves to the federal courts as non-citizens through the juror qualification process.

Sincerely,

Leonidas Ralph Mecham
Director

A TRADITION OF SERVICE TO THE FEDERAL JUDICIARY

GAO-05-478  Elections

# Appendix V: Comments from the U.S. Department of Justice



**U.S. Department of Justice**

*Executive Office for United States Attorneys*
*Office of the Director*

*RFK Main Justice Building, Room 2261*      *(202) 514-2121*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

Mr. William O. Jenkins, Jr.
Director, Homeland Security and Justice Issues
U.S. Government Accountability Office
441 G. Street, NW, Room 6482
Washington, DC 20548

Dear Mr. Jenkins

    This letter provides comments from the Executive Office for United States Attorneys (EOUSA) on the Government Accountability Office's (GAO) report regarding the maintenance of accurate voter registration lists. We appreciate the opportunity to provide comments for publication in the final report.

    Maintaining accurate voter registration lists is an important goal. The United States Attorneys take seriously their obligations under Section 8(g) of the National Voter Registration Act, 42 U.S.C. § 1973gg-6(g), to provide felony conviction data and other information to appropriate state election officials. While your report correctly notes that the law does not require any standardized format or time frame for providing the conviction information, your report also notes that the sampling of United States Attorneys' Offices that were surveyed utilized a variety of data formats and time frames to provide conviction data to election officials. Each of the 94 United States Attorneys' Offices is unique, and they range in size from twenty to 350 lawyers. Therefore, it is not surprising that different offices may use different administrative procedures to comply with this obligation. However, we understand that some data formats may be more accessible to state election officials than others, and we appreciate that finding the best format to provide this data to state election officials is important. As a result, EOUSA has tasked a working group to develop a standardized process for the 94 United States Attorneys' Offices to provide complete and timely information to state election officials in order to ensure accurate voter registration lists.

    Thank you for the opportunity to comment on the draft report. If you have any questions regarding the above, please contact David L. Smith, Legislative Counsel, Counsel to the Director's Staff, at (202) 514-2121.

**Appendix V: Comments from the U.S.
Department of Justice**

Mr. William O. Jenkins, Jr.
Page 2

Sincerely,

Mary Beth Buchanan
Director

# Appendix VI: GAO Contact and Staff Acknowledgments

| GAO Contact | William O. Jenkins, Jr., (202) 512-8777 |
|---|---|
| **Staff Acknowledgments** | In addition to the contact mentioned above, Orin B. Atwater, Carla Brown, Grace Coleman, Michele Fejfar, Daniel Garcia, Richard Griswold, Geoffrey Hamilton, Monica Kelly, Jean McSween, Jean Orland, Emmy Rhine, Sandra Sokol, and Linda Watson contributed to this report. |

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (**www.gao.gov**). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to **www.gao.gov** and select "Subscribe to Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:<br><br>U.S. Government Accountability Office<br>441 G Street NW, Room LM<br>Washington, D.C. 20548<br><br>To order by Phone:  Voice:  (202) 512-6000<br>                     TDD:    (202) 512-2537<br>                     Fax:    (202) 512-6061 |
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact:<br><br>Web site: **www.gao.gov/fraudnet/fraudnet.htm**<br>E-mail: **fraudnet@gao.gov**<br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| **Congressional Relations** | Gloria Jarmon, Managing Director, **JarmonG@gao.gov** (202) 512-4400<br>U.S. Government Accountability Office, 441 G Street NW, Room 7125<br>Washington, D.C. 20548 |
| **Public Affairs** | Paul Anderson, Managing Director, **AndersonP1@gao.gov** (202) 512-4800<br>U.S. Government Accountability Office, 441 G Street NW, Room 7149<br>Washington, D.C. 20548 |

PRINTED ON ♻ RECYCLED PAPER