## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| STEVEN WAYNE FISH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **Case No. 16-2105-JAR-JPO** |
| v. | ) | |
| | ) | |
| KRIS KOBACH, in his official capacity as | ) | |
| Secretary of State for the State of Kansas, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION <u>TO EXCLUDE THE TESTIMONY AND REPORT OF JESSE T. RICHMAN</u>

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ ii

BACKGROUND ...................................................................................................... 1

LEGAL STANDARD ............................................................................................... 4

ARGUMENT ............................................................................................................ 4

    I.     Richman Is Not Qualified to Offer an Opinion on Noncitizen Registration
         Based on Survey Data .................................................................................... 4

    II.    The Many Methodological Flaws in Richman's Analyses Render His
         Opinion Unreliable......................................................................................... 7

         A.    Richman's Estimates of Noncitizen Registration are Based on
            Unreliable Data .................................................................................. 9

            1.    Richman's Registration Data Are Flawed and Render
                 Several of His Estimates of Noncitizen Registration
                 Fundamentally Unreliable............................................................ 10

            2.    Richman's Citizenship Data Are Flawed and Render
                 Several of His Estimates of Noncitizen Registration
                 Fundamentally Unreliable............................................................ 14

         B.    Richman's Estimates of Noncitizen Registration in Kansas Rely
            On Sample Sizes that are Too Small to Generate Statistically
            Reliable Results ................................................................................ 16

         C.    Richman's Samples are Not Representative of Noncitizens in
            Kansas and Cannot Form the Basis for Reliable Estimates of
            Noncitizens Registration in Kansas ...................................................... 20

            1.    Richman Failed to Weight Three of His Four Samples to
                 Account for Differences Between the Samples and the
                 Noncitizen Population of Kansas................................................. 21

            2.    The Response Rates for Richman's Surveys Are Too Low
                 to Form Representative Samples of the Noncitizen
                 Population of Kansas ................................................................... 26

         D.    Richman's Meta-Analysis Suffers from the Same Fundamental
            Flaws as Each of the Individual Estimates Comprising the Meta-
            Analysis............................................................................................. 28

CONCLUSION........................................................................................................ 29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
 No. 2:07-CV-591 CW, 2010 WL 5186393 (D. Utah Dec. 15, 2010) ............................... 20-21

*In re: Autozone, Inc.*,
 No. 3:10-md-02159-CRB, 2016 WL 4208200 (N.D. Cal. Aug. 10, 2010) ...........................26

*Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.*,
 402 F. Supp. 2d 1312 (D. Kan. 2005) ...................................................................................20

*Blackwell v. Strain*,
 496 F. App'x. 836 (10th Cir. 2012) ......................................................................................16

*Casey v. Home Depot*,
 No. 14-2069 JGB, 2016 WL 7479347 (C.D. Cal. Sep. 15, 2016) .........................................26

*Cooper v. Harris*,
 137 S. Ct. 1455 (2017) ...........................................................................................................6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
 509 U.S. 579 (1993) ...................................................................................................... *passim*

*Fish v. Kobach*,
 840 F.3d 710 (10th Cir. 2016) ..............................................................................................19

*Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*,
 82 F.3d 1533 (10th Cir. 1996) ..............................................................................................20

*Harris v. McCrory*,
 159 F. Supp. 3d 600 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 1455 (2017) .....................................6

*Hodgdon Power Co. v. Alliant Techsystems, Inc.*,
 512 F. Supp. 2d 1178 (D. Kan. 2007) .............................................................................7, 20

*Ireland v. Dodson*,
 No. 07-4082-JAR, 2007 WL 2461609 (D. Kan. Aug. 22, 2007)...........................................20

*Johnson v. Barnhart*,
 449 F.3d 804 (7th Cir. 2006) ..................................................................................................9

*Kumho Tire Co. v. Carmichael*,
 526 U.S. 137 (1999)............................................................................................................4, 7

*League of Women Voters of Florida v. Detzner*,
  172 So. 3d 363 (Fla. 2015).........................................................................................6

*McCall v. Skyland Grain LLC*,
  No. 08-CV-01128, 2010 WL 1435369 (D. Colo. Apr. 9, 2010)........................... 8-9

*Milne v. USA Cycling Inc.*,
  575 F.3d 1120 (10th Cir. 2009) ...............................................................................7

*Nat'l Credit Union Admin. Bd. v. RBS Securities, Inc.*,
  Nos. 11-2340-JWL, 11-2649-JWL, 12-2591-JWL, 12-2648-JWL, 13-2418-
  JWL, 2014 WL 1745448 (D. Kan. Apr. 30, 2014) ................................................18

*Opal Fin. Grp., Inc. v. Opalesque, Ltd.*,
  634 Fed. App'x 26 (2d Cir. 2015)..........................................................................18

*Perez v. Texas*,
  891 F. Supp. 2d 808 (W.D. Tex. 2012).....................................................................6

*Student Marketing Group, Inc. v. College Partnership, Inc.*,
  257 Fed. App'x. 90 (10th Cir. 2007) ......................................................................13

*Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*,
  427 F. Supp. 2d 1022 (D. Kan. 2006) .....................................................................13

*Taber v. Allied Waste Sys., Inc.*,
  642 F. App'x 801 (10th Cir. 2016) ...................................................................4, 5, 7

*Texas v. Holder*,
  888 F. Supp. 2d 113 (D.D.C. 2012) ........................................................................27

*Texas v. United States*,
  887 F. Supp. 2d 133 (D.D.C. 2012) ..........................................................................6

*United States v. James*,
  257 F.3d 1173 (10th Cir. 2001) ..............................................................................16

*United States v. Medina-Copete*,
  757 F.3d 1092 (10th Cir. 2014) ................................................................................4

*United States v. Nacchio*,
  555 F.3d 1234 (10th Cir. 2009) ....................................................................4, 7, 28

*Univ. of Kan. v. Sinks*,
  No. 06-2341-JAR, 2008 WL 755065 (D. Kan. Mar. 19, 2008).............................26

*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) (en banc), *cert. denied*, 137 S. Ct. 612 (2017)...............6, 22, 25

*Veasey v. Abbott*,
  796 F.3d 487 (E.D. Va. 2015), *aff'd*, 137 S. Ct. 788 (2017) ....................................................6

*Vigil v. Burlington Northern and Santa Fe Railway Co.*,
  521 F. Supp. 2d 1185 (D. N.M. 2007) ....................................................................................8

*Wallace v. Countrywide Home Loans Inc.*,
  No. SACV 08-1463-JST, 2012 WL 11896333 (C.D. Cal. Aug. 31, 2012) ...........................28

*York v. Starbucks Corp.*,
  No. CV 08-07919 GAF, 2011 WL 8199987 (C.D. Cal. Nov. 23, 2011)................................28

**Rules**

Fed. R. Evid. 702 ..................................................................................................................................4

Fed. R. Evid. 704 ................................................................................................................................20

**Other Authorities**

David H. Kaye & David A. Freedman, *Reference Guide on Statistics*
  (Federal Judicial Center, 3d ed. 2011),
  https://www.fjc.gov/sites/default/files/2012/SciMan3D07.pdf ...............................................16

Glossary of Statistical Terms, Dep't of Statistics at Berkeley Univ.
  (Aug. 6, 2016), https://www.stat.berkeley.edu/~stark/SticiGui/Text/gloss.htm.....................26

Pursuant to Federal Rules of Evidence 401, 403, and 702, Plaintiffs Steven Wayne Fish, Donna Bucci, Charles Stricker, Thomas Boynton, Douglas Hutchinson, and League of Women Voters of Kansas (collectively, "Plaintiffs") respectfully submit this memorandum of law in support of their *Daubert* motion to exclude the proposed testimony and report of Jesse Richman regarding noncitizen registration in Kansas.

## BACKGROUND

In his reports, Richman offers a variety of analyses, including database matching efforts and telephone surveys, about topics ranging from document possession rates to the citizenship status of voter registrants in Kansas.  For purposes of summary judgment, Defendant relies on Richman solely for his estimates of the number of noncitizens in Kansas who have registered or "have attempted to register" to vote.  Specifically, Richman's report describes four estimates of noncitizen registration rates in Kansas based on four different data sources:

> (1) 14 purported noncitizens in Kansas who responded to the internet-based Cooperative Congressional Elections Study ("CCES"), 4 of whom indicated that they were registered to vote, *see* Ex. A, Richman Report at 5;
>
> (2) 791 newly-naturalized citizens in Sedgwick County, 8 of whom apparently already had a record of voter registration prior to naturalization, *see id.*;
>
> (3) 37 purported noncitizens who were contacted in a telephone survey of temporary driver's license ("TDL") holders, 6 of whom stated that they were registered or had "attempted to register" to vote, *see id.* at 10; and
>
> (4) 19 "incidentally contacted" noncitizens—that is, people whom Richman accidentally contacted during his telephone survey and who indicated that they were noncitizens—just 1 of whom stated that he or she was registered or had attempted to register to vote, *see id.* at 11-12.

In addition to these four individual estimates, Richman produced a "meta-analysis" that combines the data from all four sources.  *See* Ex. B, Richman Rebuttal at 11-12.

To produce his estimates, Richman took the percentage of purported noncitizens in each of these samples who indicated that they were registered (and/or had attempted to register to vote), and then simply multiplied that proportion by the total noncitizen adult population in Kansas.  Ex. C, Richman Dep. Tr. at 137:7-138:1; 139:16-140:1.  Richman's various estimates of noncitizen registration or attempted registration can be summarized as follows:

| Richman's Estimates of Noncitizen Registration (or Attempted Registration) | | | | |
|---|---|---|---|---|
| Data Source | Sample Size | Number Registered (or Attempted to Register) | Percent Registered (or Attempted to Register) | Estimate of Kansas Noncitizens Registered (or Attempted to Register) |
| CCES[1] | 19 | 4 | 28.6% | ~32,000 |
| Sedgwick Naturalization[2] | 891 | 8 | 1.0% | 1,153 |
| TDL Survey[3] | 37 | 6 | 16.5%[4] | ~18,000 |
| Incidental Contacts[5] | 19 | 1 | 5.3% | ~6,000 |
| Meta-Analysis[6] | 966 | 19 | 1.1% | 1,265[7] |

Based on these estimates, Richman opines that there is "a substantial number of registered noncitizens" in Kansas.  Ex. A, Richman Report at 10.

His opinion should be excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), for two reasons.  *First*, Richman's estimates are based primarily on survey

---

[1] Ex. A, Richman Report at 5.

[2] *Id.*

[3] *Id.* at 10.

[4] The correct calculation here appears to be 16.2%, but Richman reports it as 16.5%.

[5] Ex. A, Richman Report at 11-12.

[6] Ex. B, Richman Rebuttal at 11-12.

[7] This estimate is based on Richman's assumption in his rebuttal report that Kansas has a total adult noncitizen population of 115,000.  *See* Ex. B, Richman Rebuttal at 28.  Richman's other estimates are set forth in his initial report, where he assumes that Kansas has a total adult noncitizen population of 114,000.

samples, but Richman is not qualified to offer an expert opinion based on survey data.[8]  He has

limited experience with implementing or analyzing surveys, and has not published any peer-

reviewed research on a survey that he himself has designed or implemented.  The one peer-

reviewed article that Richman has written on noncitizen registration and voting rates—which is

based on an internet survey that *others* designed and implemented (the CCES)—has been heavily

criticized as unreliable by hundreds of political scientists, including the very political scientists

who designed and implemented that survey.

 *Second*, Richman's utter lack of qualifications is reflected in the many methodological

flaws in his work that render his opinion unreliable.  Richman's underlying data is riddled with

errors about both the voter registration and citizenship status of his survey respondents; his

sample sizes are (with perhaps one exception) far too small to generate statistically reliable

estimates; and because his samples are not representative of the noncitizen population of Kansas

as a whole, reliable estimates cannot be drawn from them.

 In his previous peer-reviewed research on noncitizen registration, Richman recognized

the existence of these various issues—data errors, sample size concerns, and the

representativeness of his samples—and attempted to account for them.  But for whatever reason,

he failed to apply the same degree of scientific rigor to his analyses in this case, rendering his

opinion entirely unreliable.  In sum, Richman's opinions as to noncitizen registration fall far

short of "the same level of intellectual rigor that characterizes the practice of an expert in the

---

[8] Because, in his summary judgment briefing, Defendant relied on Richman solely with respect to Richman's estimates of noncitizen registration in Kansas and Richman's opinion based on those estimates, Plaintiffs' *Daubert* motion, which is filed solely for purposes of summary judgment, is limited to those issues.  Should Plaintiffs' motion for summary judgment be denied, Plaintiffs reserve the right to file a pre-trial *Daubert* motion with respect to other analyses and opinions in Richman's report, which may be the subject of Richman's trial testimony.

relevant field" and should be excluded in their entirety.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

## LEGAL STANDARD

An expert witness must be qualified "by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  "If the expert is sufficiently qualified, the district court must then consider whether the expert's opinion is both relevant and reliable."  *Taber v. Allied Waste Sys., Inc.*, 642 F. App'x 801, 807 (10th Cir. 2016).  This means that "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

Under the framework established in Federal Rule of Evidence 702 and *Daubert*, district courts perform a "gatekeeping" function to ensure that Rule 702 is met by assessing if "'an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"  *United States v. Medina-Copete*, 757 F.3d 1092, 1101 (10th Cir. 2014) (quoting *Kumho Tire*, 526 U.S. at 152).  As the proponent of the expert testimony, Defendant "bears the burden of showing that [his] proffered expert's testimony is admissible."  *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

## ARGUMENT

### I.     Richman Is Not Qualified to Offer an Opinion on Noncitizen Registration Based on Survey Data

"To qualify as an expert, a proposed witness must possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial

foundation and would tend to aid the trier of fact in his search for truth." *Taber*, 642 F. App'x at 807 (internal quotation marks omitted).  "Proposed expert testimony must therefore fall within the reasonable confines of [the witness's] expertise." *Id.* (internal quotation marks omitted).

Here, Defendant offers Richman as an expert on noncitizen registration and attempted registration in the state of Kansas.  *See* Ex. C, Richman Dep. Tr. at 17:5-9.  As noted, Richman largely bases his opinions on various surveys—including a national internet survey on voting behavior (the CCES), and a telephone survey that he designed and implemented, through which he contacted 37 purported noncitizens who hold TDLs and 19 "incidentally-contacted" noncitizens.  Ex. A, Richman Report at 10-12.  But Richman plainly lacks the qualifications to offer an expert opinion—and in particular, an opinion on noncitizen voter registration rates— based on survey research.

As an initial matter, Richman has never been qualified to testify as an expert witness.  Ex. C, Richman Dep. Tr. at 17:10-23.  Although his opinion is based primarily on his telephone survey, he has never published any peer-reviewed research based on a survey that he designed or implemented; nor has he published any research assessing the accuracy of survey responses (which, as explained below, is a serious problem here given the many reasons to doubt the accuracy of Richman's underlying data).  *See* Ex. C, Richman Dep. Tr. at 19:14-25; *id.* at 20:15-21:8 (admitting he has never published peer-reviewed research on the accuracy of survey responses or on comparing survey responses to government data).  Prior to this case, Richman had never implemented a survey on citizenship rates—either peer-reviewed or otherwise.  Ex. C, Richman Dep. Tr. at 24:10-13.

Richman has written one article on noncitizen registration rates at the national level, based on data from the CCES.  But this article has been criticized by the principal investigator of

the CCES who designed and implemented the study, Plaintiffs' expert Stephen Ansolabehere,[9] in a peer-reviewed article.  Dr. Ansolabehere concluded that Richman misinterpreted the CCES data and vastly overestimated the rate of noncitizen registration and voting because Richman failed to account for "measurement error" in the study—*i.e.*, the fact that people who identified themselves in the survey as noncitizen registered voters were *actually U.S. citizens* who mistakenly clicked the wrong box and misidentified themselves as noncitizens.  Ex. D, Ansolabehere Article at 409-10; Ex. E, The Washington Post, Methodological Challenges Affect Student of Non-citizens' Voting; Ex. F, The Washington Post, What Can We Learn About the Electoral Behavior of Non-citizens from a Survey Designed to Learn About Citizens?; Ex. G, The Washington Post, Are Non-citizens Following American Election Laws?  More than three hundred political scientists signed an open letter criticizing the article as "driven by measurement error" and as "not accurately reflect[ing] the rates of non-citizen voting in the United States," which Richman acknowledged was a virtually unprecedented response to an academic paper.  Ex. H, Open Letter to Richman at 1; *see also* Ex. C, Richman Dep. Tr. at 274:14 – 275:4.  *Cf. Daubert*, 509 U.S. at 593 ("[S]ubmission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected.").

---

[9] Dr. Ansolabehere is a Professor of Government at Harvard University.  He has been qualified as an expert witness in many voting rights cases, and his testimony has been cited with approval in the following cases: *Cooper v. Harris*, 137 S. Ct. 1455 (2017); *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc), *cert. denied*, 137 S. Ct. 612 (2017); *Harris v. McCrory*, 159 F. Supp. 3d 600 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 1455 (2017); *Veasey v. Abbott*, 796 F.3d 487 (E.D. Va. 2015), *cert. denied*, 137 S. Ct. 788 (2017); *League of Women Voters of Florida v. Detzner*, 172 So. 3d 363 (Fla. 2015); *Texas v. United States*, 887 F. Supp. 2d 133 (D.D.C. 2012); *Perez v. Texas*, 891 F. Supp. 2d 808 (W.D. Tex. 2012).  Richman himself concedes Ansolabehere is knowledgeable about statistics and has a "good reputation."  Ex. C, Richman Dep. Tr. at 83:4-24; 84:13-17.

Richman is therefore unqualified to offer an opinion based on survey research in this case.  He "lacks specific knowledge" about survey research and methods.  And his one previous attempt to estimate noncitizen registration—based on a survey that someone else designed and implemented—has been roundly criticized in the political science community as shoddy and unreliable.  For those reasons alone, his proposed testimony and report should be excluded under Rule 702 and *Daubert*.  *Taber*, 642 F. App'x at 807 (affirming exclusion of proffered testimony on the cause of plaintiff's fall, where expert had conducted 1,000 investigations of injury-producing accidents but had only worked on one case involving a fixed ladder); *Milne v. USA Cycling Inc*., 575 F.3d 1120, 1133 (10th Cir. 2009) (affirming exclusion of proffered mountain bike racing expert as unqualified despite expert having "experience organizing and supervising paved road bike races" and "participated in one or two mountain bike races").

## II.      **The Many Methodological Flaws in Richman's Analyses Render His Opinion Unreliable**

This Court has an "obligation" to "'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire*, 526 U.S. at 147 (citing *Daubert*, 509 U.S. at 589).  In determining if an expert opinion is reliable, a court must "assess[] the underlying reasoning and methodology."  *Nacchio*, 555 F.3d at 1241.  "Reliability questions may concern the expert's data, method, or his application of the method to the data," and "any step that renders the expert's analysis unreliable . . . renders the expert's testimony inadmissible.  This is true whether the step completely changes a reliable methodology or merely misapplies that methodology."  *Id.* Where the technical and methodological deficiencies in a survey "are so substantial as to render the survey's conclusions untrustworthy, a court should exclude the survey from evidence."  *Hodgdon Power Co. v. Alliant Techsystems, Inc.*, 512 F. Supp. 2d 1178, 1181 (D. Kan. 2007).

Richman's analyses suffer from serious methodological errors that render his estimates completely unreliable, which is unsurprising given his lack of qualifications in survey research. Specifically, (1) Richman's data is riddled with errors in the form of erroneous answers to survey question, but he did nothing to account for this problem, for example, by "validating" the responses to his surveys—*i.e.*, comparing them to official government records to ensure the accuracy of the response; (2) Richman used sample sizes that were far too small to generate statistically reliable estimates—and, in his initial report, generally did not even bother to calculate margins of error for his estimates; and (3) Richman did not attempt to ensure that his tiny samples of a few dozen noncitizens were representative of the noncitizen population of Kansas as a whole (with the exception of a single attempt to weight one of his estimates in his rebuttal report, which had the effect of causing that particular estimate of noncitizen registration to drop precipitously).

Failing to "assist the trier of fact with scientific, technical, or other specialized knowledge" in compiling and analyzing survey data, *Vigil v. Burlington Northern and Santa Fe Railway Co.*, 521 F. Supp. 2d 1185, 1205 (D. N.M. 2007), Richman offers this Court nothing more than basic (and, in some cases, erroneous) arithmetic: he simply took the percentage of people in each of these unreliable samples who indicated that they were registered (and/or had attempted to register to vote), and then multiplied that proportion by the total noncitizen adult population in Kansas.  Ex. C, Richman Dep. Tr. at 137:7-138:1; 139:16-140:1.  By Richman's admission, this so-called analysis is something "any person with a calculator can [do]."  Ex. C, Richman Dep. Tr. at 139:16-140:1.  Were this grade-school math the sum total of Richman's "expert" analysis that would itself be grounds for exclusion under *Daubert*.  *See McCall v. Skyland Grain LLC*, No. 08-CV-01128, 2010 WL 1435369, at *3 (D. Colo. Apr. 9, 2010)

(finding expert's "testimony provides nothing of assistance and, therefore, will be excluded"). But Defendant has proffered Richman as an *expert*, who seeks to offer an *opinion* on the basis of these basic calculations.  That Richman has done so—without addressing errors in his underlying data, without using samples large enough to be statistically reliable, and without ensuring that his samples are representative of the noncitizen population of Kansas—under the guise of expert analysis renders Richman's opinion not just unreliable, but misleading.

A.     **Richman's Estimates of Noncitizen Registration are Based on Unreliable Data**

Survey data based on self-reported answers from survey respondents are susceptible to "measurement error"—*i.e.*, incorrect answers to the survey that skew both the data collected and any extrapolations to the population made from such data.  *See, e.g.*, *Johnson v. Barnhart*, 449 F.3d 804 (7th Cir. 2006) (noting patient self-reports are "prone to response bias like all self-reports").  In order for estimates and opinion based on self-reported survey data to be reliable, an expert must account for the possibility of such measurement error.

Here, however, Richman failed to account for two forms of measurement error in his data.  *First*, he failed to account for registration "over-reporting"—*i.e.*, the fact that survey respondents sometimes state that they are registered to vote when in fact they are not, which inflates estimates of registration based on survey data.  In fact, Richman was aware that this problem pervades at least some of the data on which he relies, and had even sought to account for this problem in his published research; but he made no such effort to do so for his estimates of noncitizen registration in this case.  *Second*, Richman failed to account for the fact that survey respondents sometimes misstate their citizenship status, which means that estimates about noncitizen voter registration rates based on survey data can be unreliable.  Again, Richman was aware that this problem infects at least some of his data—in fact, these data errors completely

accounted for all of his estimates of noncitizen voting in his previous research on the topic—but he did nothing to account for that problem here.

1. _Richman's Registration Data Are Flawed and Render Several of His Estimates of Noncitizen Registration Fundamentally Unreliable_

Three of Richman's estimates as to noncitizen registration—those based on: (1) the CCES, (2) the TDL survey, and (3) the 19 incidentally contacted noncitizens—relied on individuals self-reporting their voter registration status. Ex. A, Richman Report at 5, 10-12. But as Richman acknowledged, there is a well-known phenomenon in political science research of "over-reporting" registration status—*i.e.*, people responding to surveys on voter registration often state that they are registered to vote when in fact they are not. Ex. C, Richman Dep. Tr. at 236:15-237:8. *See also* Ex. I, Ansolabehere & Hersh Article at 454 ("Like with voting, there seems to be a trend of nonparticipants claiming to be participants."). Given this problem of over-reporting registration status, surveys that attempt to measure registration rates by relying on self-reported registration status—like the surveys relied on by Richman in this case—tend to overestimate registration rates. Ex. J, Ansolabehere Report at 12 (noting that "the registration rates reported in surveys are much higher than actual registration rates").

There is a simple way to account for this problem, one that Richman himself has used previously. When he published his article on noncitizen registration, Richman accounted for registration over-reporting by "validating" his survey responses—that is, by "match[ing] . . . survey responses" against "public records" such as official state registration records to analyze the number of purported noncitizens whose registrations could be confirmed by linking their names to an actual voter registration record. Ex. I, Ansolabehere & Hersh Article at 438; Ex. K, Richman Article at 150. In other words, for his published research, Richman did not simply take survey respondents' self-reported registration status at face value and report estimates based

solely on those survey responses; he also looked behind the survey responses to see who was actually registered to vote according to official state records, and produced estimates of noncitizen registration based on those records.  *See* Ex. K, Richman Article at 151-52.  These "validated" estimates of noncitizen registration were lower than those based purely on survey responses, *see id.* at 152, reflecting the fact that survey respondents—even noncitizens—sometime say that they are registered when they really are not.

But Richman did not exercise the same level of care for his report in this case.  Here, Richman made no effort to account for survey respondents' over-reporting of registration by checking their survey answers against official state records—even though he had access to the Kansas registration voter file, which lists all individuals who registered or attempted to register to vote, including those whose registration applications were unsuccessful for lack of documentary proof of citizenship.  *See* Ex. C, Richman Dep. Tr. at 239:5 – 241:13; 244:5-14.  That is, Richman could have easily checked the Kansas voter file to see whether his survey respondents who said that they were registered to vote could in fact be linked to a record of registration or attempted registration in the Kansas voter file, but, inexplicably, he never did so.  *See* Ex. C, Richman Dep. Tr. at 239:21-241:13.

This failure fatally infects three of Richman's four estimates of noncitizen registration.  For example, Richman's suggestion that 32,000 noncitizens may be registered to vote in Kansas, *see* Ex. A, Richman Report at 5, is demonstrably erroneous.  As noted, this estimate is based on a total of 14 CCES survey respondents from Kansas who are purportedly noncitizens, 4 of whom indicated that they were registered to vote.  *See* Ex. A, Richman Report at 5.  But as Dr. Ansolabehere has documented in a peer-reviewed paper, the CCES suffers from registration over-reporting, with CCES respondents frequently stating that they are registered to vote when in

fact they are not. Ex. I, Ansolabehere & Hersch Article at 446. Richman conceded in his

deposition that he has no reason to doubt Dr. Ansolabhere's conclusion that CCES respondents

sometimes erroneously indicate that they are registered to vote. *See* Ex. C, Richman Dep. Tr.

253:11-23. And here, of the 4 CCES respondents on whom Richman bases this estimate, only

*one* could actually be linked to a registration record in the official Kansas voter file. *See* Ex. J,

Ansolabehere Report at 21-22. Richman did not dispute this fact in his deposition. *See* Ex. C,

Richman Dep. Tr. at 253:24 – 254:10. It is unclear why, in his published research, Richman

validated the CCES survey responses, but failed to do so here.

Richman's failure to correct for registration over-reporting is particularly damning with

respect to his estimate that 18,000 noncitizens are registered to vote. Ex. A, Richman Report at

10. This estimate is based entirely on a survey sample of 37 TDL holders who are apparently

noncitizens, 6 of whom indicated during Richman's telephone survey that they were registered or

had attempted to register to vote. *See id.* Again, Richman simply took these survey responses at

face value, and never bothered to look these 6 individuals up in the Kansas voter file to confirm

whether they in fact had actually attempted to register to vote. But one of Plaintiffs' experts, Dr.

Eitan Hersh,[10] did so—and he found that these 6 TDL holders who supposedly registered or

attempted to register to vote are *not in the Kansas voter file at all*. Ex. L, Hersh Report at 12;

Ex. M, Hersh Second Supplement Report at 5. Richman does not dispute that this is so: in his

deposition, Richman did not contest Dr. Hersh's assessment that these 6 individuals—on whom

Richman's entire estimate that 18,000 noncitizens are registered to vote is based—do not appear

---

[10] Dr. Hersh is an assistant professor of political science at Yale University. Dr. Hersh's research focuses on U.S. elections, specifically voter behavior, election administration and political campaigns. He has published several peer-reviewed articles utilizing voter registration records to study U.S. election, voter behavior and politics. He has also written about the quality of records in state voter systems and the use of voter registration database in campaigns.

in the Kansas voter file.  Ex. C, Richman Dep. Tr. at 237:9-18.  Given what the data actually

shows, *zero* would be a more accurate estimate of noncitizen registration based on the TDL

survey respondents.

Similarly, Richman's estimate that 6,000 noncitizens are registered to vote is based on a

sample of 19 "incidentally contacted" noncitizens, only one of whom indicated that he or she

was registered, or had attempted to register, to vote.  Ex. A, Richman Report at 11-12.  But,

again, Richman never bothered to confirm whether this one individual is actually listed in the

Kansas voter file as ever having submitted a voter registration form.  *See* Ex. C, Richman Dep.

Tr. at 244:5-14.

Richman's failure to correct these errors in his underlying registration data render the

three estimates of noncitizen registration on which they are based wholly untrustworthy.

*Daubert*, 509 U.S at 590, 593 (expert testimony must be "derived [from] the scientific method"

and must be "good science"); *Student Marketing Group, Inc. v. College Partnership, Inc.*, 247 F.

App'x. 90, 102, 103 (10th Cir. 2007) (finding that an inaccurately compiled database "lacked

sufficient indicia of reliability to meet the *Daubert* standard" when it inserted "an unknown error

rate into the analysis"); *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1022,

1031 (D. Kan. 2006) (sustaining motion to exclude expert whose "methodology is simply a

house of cards" despite being "mathematically accurate, but he has not shown that it is sound or

reliable" and finding that "[a]ny probative value of his opinion . . . is substantially outweighed by

the danger of misleading the jury and unfair prejudice resulting from his unsupported

assumptions and failure to consider other circumstances").

2.     _Richman's Citizenship Data Are Flawed and Render Several of His_
       _Estimates of Noncitizen Registration Fundamentally Unreliable_

Two of Richman's estimates of noncitizen registration (the estimates based on the CCES and the sample of "incidentally contacted" noncitizens) rely on the self-reported citizenship status of the survey respondents.  *See* Ex. A, Richman Report at 5; 11-12.  That is, these estimates are not based on any information about the citizenship status of the survey respondents other than what these individual's survey responses indicate.  The accuracy of these estimates is thus premised on the assumption that the survey respondents correctly reported that they were noncitizens.  Indeed, Richman acknowledged that, if survey respondents misstated their citizenship status, his conclusions would be unreliable.  *See* Ex. C, Richman Dep. Tr. at 203:9 – 204:11; 259:24 – 261:14.

Richman further acknowledged that people do sometimes misstate their citizenship status when responding to survey questions.  *See* Ex. C, Richman Dep. Tr. at 236:15 – 237:8.  People who identified as noncitizens when responding to his surveys may in fact be U.S. citizens who were either careless in answering the survey or misunderstood the question.  This is precisely the criticism that hundreds of political scientists lodged against Richman's prior work on noncitizen voting, which was based on CCES data.  In a peer-reviewed paper, Dr. Ansolabehere, the principal investigator of the CCES study, explained that responses to the citizenship question on the CCES are not always accurate.  Ex. D, Ansolabehere Article at 410.  Specifically, Dr. Ansolabehere found that numerous people who respond to the CCES have stated that they are U.S. citizens, only to take this internet survey again in later years and indicate that that are *noncitizens*.  *See id.*  But it is not possible that all of these people somehow lost their U.S. citizenship in the interim; rather, as Dr. Ansolabehere explained, these CCES respondents are U.S. citizens who have, at some point, erroneously checked the wrong box in response to the

CCES citizenship.  Critically, these erroneous responses account for the *entirety* of Richman's purported findings about noncitizen voting in his published research.  *See id.*  Richman himself acknowledged Dr. Ansolabehere's conclusion, Ex. C, Richman Dep. Tr. at 263:9-16; 266:3-17, and agreed that this is a "cogent" criticism of his published work.  Ex. C, Richman Dep. Tr. at 257:13 – 258:14.[11]

There was a simple way to address citizenship status measurement error: Richman could have sent the names and identifying information of his self-reported noncitizen survey respondents to U.S. Immigration and Customs Enforcement ("ICE") in order to confirm their noncitizen status.  Indeed, that is precisely what Richman did for one of the analyses in his report.  When producing an estimate of noncitizen registration based on the TDL survey, Richman did not simply assume that all 37 of the self-reported noncitizen respondents from this survey were in fact noncitizens; rather, he testified that he sent their names to ICE in order to confirm that fact.  Ex. C, Richman Dep. Tr. at 233:15-24.

But Richman did not engage in the same efforts for his estimates based on the CCES or the incidentally contacted noncitizens.  *See id.* at 271:5-16; 243:11- 244:2.  Given the known errors in citizenship data in surveys like the CCES, these noncitizen registration estimates are undoubtedly "contaminated by measurement error."  Ex. J, Ansolabehere Report at 21.  It would have been a simple matter for Richman to send the names and information of the 19 "incidentally-contacted" survey respondents to ICE along with the 37 noncitizens from his TDL survey sample.  His failure to do so—in light of his firsthand knowledge about the existence of

_____

[11] In his report, Richman claims to have "comprehensively responded to this critique," citing an unpublished working paper that he drafted and posted on his website.  This self-serving paper has not been subjected to peer-review and should not be credited.  *Daubert*, 43 F.3d at 1317-18 (expert testimony should generally be supported by analysis that "has been subject to normal scientific scrutiny through peer review and publication.").

such measurement errors and his ability in other contexts to address the problem—is inexplicable.

### B. Richman's Estimates of Noncitizen Registration in Kansas Rely On Sample Sizes that are Too Small to Generate Statistically Reliable Results

Even if Richman's underlying data did not suffer from various known errors, his opinions about noncitizen registration should still be excluded because three of his four samples—namely his samples of 14 CCES respondents; 37 TDL holders; and 19 incidentally-contacted noncitizens—are too small to generate statistically reliable estimates about the noncitizen population of Kansas as a whole, which is approximately 115,000 people. Statistical estimates about a larger population based on a smaller sample are always associated with a margin of error or a "confidence interval." David H. Kaye & David A. Freedman, *Reference Guide on Statistics* at 241 (Federal Judicial Center, 3d ed. 2011) ("FJC Statistics Guide"), https://www.fjc.gov/sites/default/files/2012/SciMan3D07.pdf. Generally speaking, the smaller the sample size, the greater the margin of error, and thus, the greater the uncertainty associated with any estimate based on that sample. *Id.* at 243, 248 fn. 94. The Tenth Circuit has repeatedly held that sample sizes must be "sufficiently large to be reliable." *Blackwell v. Strain*, 496 Fed. App'x. 836, 843 (10th Cir. 2012) (finding seven data points unreliable due to the small sample size); *United States v. James*, 257 F.3d 1173, 1180 (10th Cir. 2001).

Usually, when political scientists make an estimate about a larger population based on a smaller sample, they publish the margin of error alongside the estimate, in part because doing so allows a reader to determine how certain the estimate is. In his one peer-reviewed article on noncitizen registration and voting rates, Richman made sure to calculate and publish margins of error for his various estimates. *See* Ex. C, Richman Dep. Tr. at 96:17-24. He also acknowledged

that failing to do so would be inconsistent with generally-accepted standards of peer-review in political science.  *See id.* at 96:21-97:3.

And yet, once again, Richman did not employ the same standards for his report in this case that he used in his published research.  In his initial report, Richman did not include margins of error for three of his four estimates of noncitizen registration (the one exception being his estimate based on the 19 incidentally-contacted noncitizens).  *See* Ex. A, Richman Report at 12 (reporting a margin of error for the estimate based on the 19 incidentally-contacted noncitizens). In fact, during his deposition, Richman could not recall if he had ever even *calculated* the margins of error for his other noncitizen registration estimates.  Ex. C, Richman Dep. Tr. at 181:14-183:4.  It is therefore uncontested that his initial report was inconsistent with what Richman himself describes as generally-accepted standards in political science concerning that calculation and publication of margins of error.

In his rebuttal report, Richman attempted to address that omission by finally calculating margins of error for his various estimates, using a variety of different methods.  But those calculations revealed only that three of his four noncitizen registration estimates are incredibly uncertain—which is hardly surprising given that they are based on extremely small sample sizes:

| Confidence Intervals for Richman's Four Estimates of Noncitizen Registration in Kansas[12] | | | | | |
|---|---|---|---|---|---|
| Data Source | Sample Size | Number Registered (or Attempted to Register) | Percent Registered (or Attempted to Register) | Richman's Calculation of Error Margin (Wilson (Score) Method)[13] | |
| | | | | Confidence Interval | Total Margin of Error |
| CCES (2006-2012) | 14 | 4 | 28.6% | 11.7% - 54.6% | 32.9 percentage points |
| Sedgwick Naturalization | 791 | 8 | 1.0% | 0.5% - 2.0% | 1.5 percentage points |
| TDL Survey | 37 | 6 | 16.5% | 7.7% - 31.1% | 23.4 percentage points |
| Incidental Contacts | 19 | 1 | 5.3% | 0.9% - 24.6% | 23.7 percentage points |

As the above table illustrates, Richman's use of small samples to extrapolate to a much broader population of approximately 115,000 noncitizen adults in Kansas produces large margins of error that exceed 20 percentage points. These margins render the estimates at best meaningless and at worst misleading. *See Nat'l Credit Union Admin. Bd. v. RBS Securities*, *Inc.*, Nos. 11-2340-JWL, 11-2649-JWL, 12-2591-JWL, 12-2648-JWL, 13-2418-JWL, 2014 WL 1745448, *6 (D. Kan. Apr. 30, 2014) (pointing to small sample sizes, large margins of errors and unreliable stratification as examples of unreliable methodology); *Opal Fin. Grp., Inc. v. Opalesque, Ltd.*, 634 Fed. App'x 26, 29 (2d Cir. 2015) (affirming district court's decision to accord "little to no weight" to an estimate of 17.6% with error margin of plus or minus 10%). Indeed, in his initial report, Richman himself admitted that a survey of approximately 500

---

[12] *See* Ex. N, Exhibit 14 to Richman Deposition.

[13] In his rebuttal report, Richman advocated a particular methodology for calculating statistical margins of error known as the "Wilson (Score) Method." Notably, this was not the same methodology that Richman used in his one peer-reviewed article on noncitizen registration, Ex. B, Richman Rebuttal at 4-12; Ex. C, Richman Dep. Tr. at 97:4 – 98:5, or the one that he used in his initial report, *see* Ex. C, Richman Dep. Tr. at 155:17-25; and Richman had never used that method (or any of the others that he employed in his rebuttal report) prior to drafting his rebuttal report in this case. *Id.* at 27:25-28:22; 183:18-22. Richman also used several other methods for calculating error margins in his rebuttal report, all of which produced similarly large error margins. *Id.* at 150:3-22.

registered voters had a "small sample size," and that "the power of [a] test" based on such a sample "is not very strong."  Ex. A, Richman Report at 11.  Richman also conceded in his deposition that three of his "estimates of noncitizen registration" have "weak statistical power."  Ex. C, Richman Dep. Tr. at 169:15 – 170:10.  He has even acknowledged the weakness of his estimates due to small sample size in a media interview.  *See* Ex. O, Think Progress Article at 5 (stating that, Richman "admit[ed] that many of [his] estimates have 'weak statistical power'").  These "weak" estimates should be excluded as unreliable.

Rather than confronting this shortcoming, Richman focuses on the fact that these the "confidence interval[s]" of his three weak estimates "do[] not include zero," and that they are "statistically significant estimates."  Ex. B, Richman Rebuttal at 13.  In other words, notwithstanding the large margins of error, Richman is satisfied with his estimates because they suggest that the level of noncitizen registration in Kansas is greater than zero.  In Richman's opinion, *any* amount of noncitizen registration above zero is "substantial," Ex. C, Richman Dep. Tr. at 179:18 – 181:1, because close elections can be decided by only a handful of votes.

Leaving aside the validity of that opinion, it is directly contrary to the Tenth Circuit's preliminary injunction ruling in this case.  There, the Tenth Circuit characterized the preliminary record—which indicated that 30 noncitizens registered to vote in Kansas—as "fall[ing] well short" of the requisite showing to rebut the presumption that nothing other than an attestation under penalty of perjury is required to establish the citizenship of voter registration applicants.  *Fish v. Kobach*, 840 F.3d 710, 746 (10th Cir. 2016).  In any event, one of the central questions before the Court in this case is whether "substantial numbers of noncitizens have successfully registered to vote under the NVRA's attestation requirement."  *Fish*, 840 F.3d at 717.  But rather than simply providing information to the Court about noncitizen registration rates, Richman

attempts to make that final determination as to substantiality himself.  *See* Ex. A, Richman

Report at 10 (opining that there are, in fact, "a substantial number of registered noncitizens" in

Kansas).  Such an opinion—which seeks to dictate "what result to reach"—is not admissible.

Fed. R. Evid. 704 advisory committee's note; *see also Ireland v. Dodson*, No. 07-4082-JAR,

2007 WL 2461609, at *2 (D. Kan. Aug. 22, 2007) ("Expert testimony is admissible so long as

the expert does not attempt to define the legal parameters within which the jury must exercise its

fact-finding function.") (internal quotation marks omitted).

C.  **Richman's Samples are Not Representative of Noncitizens in Kansas and Cannot Form the Basis for Reliable Estimates of Noncitizens Registration in Kansas**

Richman's estimates suffer from yet another methodological flaw: they are based on

samples that are not representative of the noncitizen population of Kansas.  In general,

conclusions about a population cannot be reliably drawn from a sample unless the sample is

representative of the larger population, or has been weighted in some manner to account for the

differences between the sample and the larger population.  *See Hodgdon Power Co.*, 512 F.

Supp. 2d at 1181 (noting that the reliability of survey data is determined by factors including

whether "the sample chosen was representative of [the population]").  In his deposition, Richman

acknowledged this basic principle.  *See* Ex. C, Richman Dep. Tr. at 38:10 - 39:21 ("Weights are

used very frequently in the survey field" to adjust for differences between the "set of respondents

you get and . . .  the population" as well as "for differences in response rates.").  Thus, where a

survey's "sample is clearly not representative of the universe it is intended to reflect," a "court

should exclude [it]."  *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533 (10th Cir.

1996); *see also Big Dog Motorcycles, L.L.C. v. Big Dog Holdings, Inc.*, 402 F. Supp. 2d 1312,

1334 (D. Kan. 2005); *1-800 Contacts, Inc. v. Lens.com, Inc.*, No. 2:07-CV-591 CW, 2010 WL

5186393, at *6 (D. Utah Dec. 15, 2010) ("Identification of the proper universe is recognized

uniformly as a key element in the development of a survey.  The definition of the relevant population is crucial because there may be systematic differences in the responses of members of the population and nonmembers . . . .") (internal quotation marks omitted).

Here, Richman's samples are not representative of the noncitizen population in Kansas, and thus cannot form the basis for reliable estimates about that population.  This is true for two reasons.  *First*, despite obvious differences between his samples and the noncitizen population of Kansas, Richman did nothing to weight three of his four samples (the CCES, the Sedgwick naturalization data, and the incidentally-contacted noncitizens) to match the characteristics of the noncitizen population in Kansas as a whole.  *Second*, because Richman failed to disclose the rate at which respondents failed to respond to the telephone survey (from which two of his samples are derived), the survey suffers from an unknown magnitude of "nonresponse bias."  Therefore, Richman is unable to establish that the sample is representative of the broader non-citizen population.

> 1. <u>Richman Failed to Weight Three of His Four Samples to Account for Differences Between the Samples and the Noncitizen Population of Kansas</u>

Richman's four estimates of noncitizen registration are based on non-representative samples, and cannot form the basis for reliable estimates about noncitizen registration in Kansas. Non-representative samples can be weighted to correct for imbalances between the sample and the population it is supposed to represent. But even though Richman performed weighting for other samples not at issue in this *Daubert* motion, he did not do so in his initial report for any of the four samples used to estimate non-citizen registration.  Indeed, in his rebuttal report, when he eventually weighted one (but not the rest) of his samples—the 37 TDL survey respondents—it caused his estimate of noncitizen registration based on that survey to drop precipitously.

For example, take Richman's estimate that "roughly 32,000" noncitizens are registered to vote in Kansas, which is based on a sample of 14 respondents to the online CCES survey.  Ex. A, Richman Report at 5.  As noted, Richman simply takes the percentage of these 14 individuals who indicated that they were registered to vote (4 of the 14, or about 16%), and multiples that percentage by the total number of noncitizens in Kansas, to arrive at an estimate of 32,000.  *See id.*  In order for this estimate to be reliable, one has to assume that these 14 CCES respondents are somehow representative of the noncitizen population of Kansas as a whole.  But there is no basis for that assumption; in fact, there is every reason to assume that the opposite is true.  As Dr. Ansolabehere explained in his expert report, the CCES data is not representative of noncitizens as a whole.  *See* Ex. J, Ansolabehere Report at 14-15 (noting that the CCES data is "not representative of non-citizens in the population as a whole," for example, "ten percent of the reported non-citizens in the CCES 2008 sample did not have a high school degree or equivalent [compared to] 41 percent of the non-citizens adults in the US in 2008").  Richman acknowledged this point in his deposition.  Ex. C, Richman Dep. Tr. at 249:6-12.

One reason that survey samples should be weighted is that registration rates vary by race and ethnicity.  *Veasey*, 830 F.3d at 259 (crediting evidence, including testimony by Dr. Ansolabehere, that African-Americans and Hispanics register and turn out for elections at rates that lag far behind Anglo voters).  One cannot draw valid statistical estimates from a smaller sample to a larger population without accounting for differences in the racial and ethnic composition between the sample and the population as a whole.  It is for precisely that reason that, in his peer-reviewed paper on noncitizen registration, Richman weighted the CCES data by race and ethnicity to adjust for differences between the smaller CCES sample of noncitizens and the noncitizen population as a whole.  Ex. C, Richman Dep. Tr. at 98:16 – 99:13; 251:20 – 252:2.

Richman employed similar weighting processes for some of the estimates in his report. For example, Richman conducted a survey of more than 1,300 people on the suspense list for failure to provide documentary proof of citizenship, querying the number of noncitizens, *see* Ex. A, Richman Report at 7-8, and the number of citizens without citizenship documents or otherwise lacking access to such documents, *see id.* at 9.  For purposes of these estimates, he did not simply assume that his survey sample of 1,300 suspended voters was representative of the larger population of approximately 18,000 people on the suspense list.  Rather, he applied weights to control for various demographic and political characteristics such as gender, age, party affiliate, geographic location, year or registration and "foreign name," in order to ensure that his estimates based on the survey sample matched up with the suspense list as a whole.  Ex. A, Richman Report at 8.[14]

But Richman did not perform any similar weighting for his noncitizen registration estimates in Kansas.  This is a particularly glaring omission with respect to his estimate based on the CCES.  Although Richman weighted the CCES data by race and ethnicity for his published research, he did *not* apply a similar weighting process for race and ethnicity when making

---

[14] Defendant has not, for purposes of summary judgment, relied on Richman's estimates about the characteristics of people on the suspense list.  They are therefore not subject to this particular *Daubert* motion.  But that does not mean that these estimates are reliable.  One variable that Richman purportedly controlled for was "foreign name"—that is, he attempted to weight his survey sample based on the number of people on it who had "foreign names," to try to match the suspense list as a whole Ex. A, Richman Report at 8.  "Foreign name" status was coded by Richman and a graduate student, neither of whom have any experience identifying foreign names, in a process that Richman himself admitted was "subjective," and thus, not replicable by others.  Ex. C, Richman Dep. Tr. at 45:22 – 47:3.  Indeed, the absence of scientific rigor in this process resulted in inconsistent and erroneous coding of "foreign names."  Some names, such as Hernandez, were sometimes coded as foreign, but sometimes not.  *Id.* at 47:20 – 48:11.  When given a hypothetical, Richman admitted he would have coded Kansas-born D.C. Circuit judge Sri Srinivasan as "foreign."  *Id.* at 48:15-23.  This is not the kind of scientifically rigorous methodology on which a reliable opinion can be based.

estimates based on the CCES data for his report in this case. Ex. C, Richman Dep. Tr. at 252:3-9. And, despite the fact that he employed weights for age and ethnicity when making estimates about document possession rates for the suspense list, Richman did not employ similar weights for gender or age when making estimates about noncitizenship registration rates based on the CCES data. *See id.* at 252:20 – 253:5.

Richman's estimate of noncitizen registration rates based on naturalization data suffers from the same flaws. That estimate is based on 891 newly-naturalized citizens who registered to vote in just one county—Sedgwick County—yet Richman failed to provide any evidence that newly-naturalized noncitizens who apply to register to vote are representative of all noncitizens, or that the noncitizen population of Sedgwick County is representative of the noncitizen population of Kansas as a whole. He never attempted, for example, to account for differences between the racial and ethnic composition of the two populations, despite the fact that such demographic data is readily available from the Census Bureau. *Id.* at 283:9 - 284:6. Nor did Richman seek to obtain any demographic data such as the age and gender of his sample of 791 newly-naturalized citizens in Sedgwick County, to see if that population matched up with the broader noncitizen population of Kansas. *Id.* at 282:3-14.

Richman's estimates in his initial report based on the TDL survey and the sample of incidentally-contacted citizens are similarly non-representative of the noncitizen population of Kansas as a whole. For example, Richman acknowledged that the TDL list is not representative of noncitizens because it does not include noncitizens who never applied for a TDL, and it only includes noncitizens on temporary visas (*i.e.*, it excludes both legal permanent residents and

undocumented immigrants[15]).  *Id.* at 222:21-224:8; 335:20 – 336:12; *see also* Def.'s S.J. Br. at

75 (noting that the TDL database excludes various categories of noncitizens).  Similarly, there is

no reason to think that Richman's sample of incidentally-contacted noncitizens—19 people

whom he accidentally contacted in the course of his work for this case—is somehow

representative of the approximately 115,000 noncitizen adults in Kansas.  Ex. C, Richman Dep.

Tr. at 241:20 – 243:22.

Yet, once again, Richman did nothing to account for this problem despite having had

ample tools at his disposal.  Richman admitted that, in the course of conducting these surveys, he

collected data on various demographic characteristics such as gender, age, race and ethnicity.  *Id.*

at 206:4-12.  But inexplicably, in his initial report, he did not apply any weights for these

characteristics.  *See, e.g.*, *id.* at 242:12 – 243:22 (acknowledging that he never "weight[ed] the

sample of incidentally-contacted" noncitizens).  To be sure, in his rebuttal report, Richman

finally applied some demographic weights to one of his survey samples—the 37 noncitizen TDL

holders.  Ex. B, Richman Rebuttal at 17; Ex. C, Richman Dep. Tr. at 229:8 – 230:18.  But upon

weighting the TDL survey data, Richman's estimate for noncitizen registration based on that data

dropped by about one-third: from 16.5% (or approximately 18,000 people), Ex. C, Richman Dep.

Tr. at 229:8 – 230:18, down to 11.4% (or about 13,000 individuals), which is roughly equal to

0.73% of all registered voters in Kansas.  *See id.*

---

[15] Richman speculates that undocumented immigrants are even more likely to be registered to
vote than TDL holders, but admits he has no basis for this assertion other than a FOX news
interview with a single ICE agent who asserted that undocumented immigrants are "often"
registered to vote.  Ex. C, Richman Dep. Tr. at 225:11 – 228:23.  And, in any event, that
speculation is belied by the Fifth Circuit's recent finding that "undocumented immigrants are
unlikely to vote as they try to avoid contact with government agents for fear of being deported."
*Veasey*, 830 F.3d at 263.

Richman never bothered to perform similar work for his three other estimates of noncitizen registration. Weighting the data appropriately would have been a simple matter, something that Richman has done in his published research and for other estimates in this case. His failure to do so here renders three of his estimates on noncitizen registration unreliable. *Casey v. Home Depot*, No. 14-2069 JGB (SPx), 2016 WL 7479347, at *21-22 (C.D. Cal. Sep. 15, 2016) (excluding survey for expert's failure to "ensure that the survey results are representative of the sample of individuals surveyed").

2. *The Response Rates for Richman's Surveys Are Too Low to Form Representative Samples of the Noncitizen Population of Kansas*

Richman's telephone surveys—from which his TDL sample and his sample of incidentally-contacted noncitizens are drawn—suffer from the additional defect of low response rates, which renders them unrepresentative of the larger population and inappropriate for statistical estimates. In survey methodology, a "response rate" refers to the proportion of "usable responses" obtained from the entire sample of individuals surveyed. *In re: Autozone, Inc.*, No. 3:10-md-02159-CRB, 2016 WL 4208200, at *17 (N.D. Cal. Aug. 10, 2010); Glossary of Statistical Terms, Dep't of Statistics at Berkeley Univ. (Aug. 6, 2016), https://www.stat.berkeley.edu/~stark/SticiGui/Text/gloss.htm. A "low response rate could point towards non-response bias or diminish the validity of the results." *Univ. of Kan. v. Sinks*, No. 06-2341-JAR, 2008 WL 755065, at *4 (D. Kan. Mar. 19, 2008). Generally-accepted standards in political science require survey researchers to calculate and report the responses rates to a survey. FJC Statistics Guide at 226. Indeed, Richman himself acknowledged that it would be inconsistent with generally-accepted standards in his field to publish survey research without also reporting the response rates to the survey. Ex. C, Richman Dep. Tr. at 212:19 – 213:5.

The concern with low response rates is that the survey results may be subject to "nonresponse bias"—*i.e.* a situation in which the individuals who have responded are systematically different from the individuals who did not respond, such that the survey sample, regardless of its demographic characteristics, is not truly representative of the larger population. FJC Statistics Guide at 290; *Texas v. Holder*, 888 F. Supp. 2d 113, 135 (D.D.C. 2012) (noting that "a low response rate increases the probability that the people who actually responded are in some relevant way different than the target population."). The Pew Research Center found response rates of 9% as a permissible minimum, and at least one court has excluded survey data based on lower response rates. *See Texas*, 888 F. Supp. 2d at 131 (rejecting survey evidence in voting rights case as methodologically unsound because the reliability was "seriously undermined by [expert] survey's extraordinarily low response rates. Just over 2% of the individuals . . . contact[ed] ultimately responded" rendering the survey "scientifically invalid."). Even Richman admits low response rates are problematic, Ex. C, Richman Dep. Tr. at 213:16 – 214:9, and testified that he is unaware of a single peer-reviewed article using a survey where the response rate was lower than 6%. Ex. C, Richman Dep. Tr. at 216:9-13.

And yet, while Richman acknowledged the importance of having high response rates, his telephone survey—from which his TDL respondents and incidentally contacted estimates are drawn—appears to have had a response rate of about 5%. *See* Ex. P, Exhibit 18 to Richman Deposition.[16] But it is impossible to tell because Richman *never even calculated* the response rate to his telephone survey, and, even with the call log from the survey in front of him during his deposition, he was *unable* to calculate it. *See* Ex. C, Richman Dep. Tr. at 216:18 – 220:16.

---

[16] The overall survey response rate was determined by dividing the total number of calls made across Richman's surveys, about 40,000, by the number of completed interviews resulting from those calls, about 2,300. Ex. C, Richman Dep. Tr. at 216:18 – 219:1.

An opinion based on a survey that makes a "departure[] from established survey procedures and practices" by failing to report a response rate is inherently unreliable. *York v. Starbucks Corp.*, No. CV 08-07919 GAF PJWX, 2011 WL 8199987, at *13 (C.D. Cal. Nov. 23, 2011) (finding a survey unreliable for failure to state "the response rate, the number of potential interviewees not reached, and the number of incomplete or terminated interviews"); *see also Wallace v. Countrywide Home Loans Inc*., No. SACV 08-1463-JST, 2012 WL 11896333, at *4 (C.D. Cal. Aug. 31, 2012) (finding a "lower response rate . . . generally requires an analysis of the determinants of nonresponse" and refusing to conclude a survey was reliable where expert failed to ensure that non-responses were random).

The proponent of expert testimony bears the burden of demonstrating its admissibility. Given Richman's inability to demonstrate that the survey has an acceptably-high response rate, his estimates based on the TDL survey sample and the incidentally-contacted noncitizens should be excluded as non-representative of the noncitizen population of Kansas.

### D. Richman's Meta-Analysis Suffers from the Same Fundamental Flaws as Each of the Individual Estimates Comprising the Meta-Analysis

Richman's meta-analysis is comprised of noncitizen registration estimates from the following data: (1) CCES data, (2) Sedgwick County naturalization data, (3) TDL list respondents, and (4) incidentally contacted respondents.  As shown above, each one of these estimates is subject, to varying degrees, to the unreliability resulting from Richman's flawed "data, method, [and] his application of the method to the data," rendering each such estimate and the corresponding testimony unreliable. *Nacchio*, 555 F.3d at 1241.  As such, the meta-analysis is inexorably riddled with the very same unreliability that is found in each comprising estimate. As with the individual estimates, this Court should find the meta-analyses and corresponding testimony inadmissible.

## <u>CONCLUSION</u>

Richman's estimates in this case are not materially different than if he had set up a table outside of this courthouse and tried to interview people entering the building, until he managed to talk to 10 individuals who told him that they were noncitizens; that, of these 10 people, 1 person indicated that he was registered to vote; and that the corresponding proportion (1 out of 10, or 10%) was then multiplied by the noncitizen population of Kansas (115,000 individuals) to produce an estimate that 11,500 noncitizens in the State are registered to vote.  Further, imagine that Richman provided that estimate knowing full well:

- that people sometimes misstate their registration status, but, despite having complete access to the Kansas voter file, he made no effort to determine whether this one person who said that she was registered was in fact actually registered to vote;

- that people sometimes misstate their citizenship status, but, despite being able to confirm citizenship status via ICE, he made no effort to do so;

- that his sample of 10 individuals is so small it will only produce a "weak" estimate about a population of more than 100,000 people, but he chose to omit the margins of error associated with the estimate, arguing instead that the total number of noncitizens registered to vote is "substantial" because it is more than zero;

- that his 10 interviewees differed from the noncitizen population of Kansas as a whole along various demographic characteristics such as race, ethnicity, gender, and age, but he made no effort to adjust for those differences; and

- that about 95% of the people entering and leaving the courthouse refused to talk to him, rendering his sample a tiny subset of all the people he encountered that day, but he omitted that fact when reporting his results.

The scenario described above is not materially different from the "analysis" that Jesse Richman performed in this case.  To be sure, not all of Richman's estimates suffer from all of the flaws described above.  Rather, the flaws in his estimates can be summarized as follows:

| Methodological Flaws in Richman's Estimates | | | | | |
|---|---|---|---|---|---|
| Data Source | Erroneous Data | | Sample Size is Too Small | Representativeness | |
| | Registration Over-reporting | Citizenship Misreporting | | Failure to Weight Data | Response Rates Too Low |
| CCES | X | X | X | X | |
| Sedgwick Naturalization | | | | X | |
| TDL Survey | X | | X | | X |
| Incidental Contacts | X | X | X | X | X |
| Meta-Analysis | X | X | | X | X |

These estimates epitomize unreliability.  For all of the foregoing reasons, Plaintiffs respectfully

request that the Court exclude Richman's opinion on noncitizen registration rates in Kansas.

Dated this 25th day of August, 2017

Respectfully submitted,

/s/ Stephen Douglas Bonney
STEPHEN DOUGLAS BONNEY (#12322)
ACLU Foundation of Kansas
6701 W. 64th Street, Suite 210
Overland Park, Kansas 66202
(913) 490-4102
dbonney@aclukansas.org

/s/ Dale E. Ho
DALE E. HO*
SOPHIA LIN LAKIN*
R. ORION DANJUMA*
American Civil Liberties Union Foundation, Inc.
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2693
dale.ho@aclu.org
odanjuma@aclu.org
slakin@aclu.org

NEIL A. STEINER*
REBECCA KAHAN WALDMAN*
DAPHNE T. HA*
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Phone: (212) 698-3500
Fax: (212) 698-3599
neil.steiner@dechert.com
rebecca.waldman@dechert.com

ANGELA M. LIU*
Dechert LLP
35 West Wacker Drive
Suite 3400
Chicago, IL 60601-1608
Phone: (312) 646-5800
Fax: (312) 646-5858
angela.liu@dechert.com

*Attorneys for Plaintiffs*

*admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on the 25th day of August, 2017, I electronically filed the foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

/s/ Stephen Douglas Bonney
STEPHEN DOUGLAS BONNEY (#12322)

*Attorney for Plaintiffs*