# EXHIBIT C

# In The Matter Of:

*Steven Wayne Fish, et al. v.*
*Kris Kobach*

---

*Jesse T. Richman, Ph.D.*
*April 21, 2017*

---



208 E. Plume Street, Suite 214
Norfolk, Virginia 23510
*tel:* 757 627 6554  *fax:* 757 625 7077
*email:* info@zahncourtreporting.com

*Original File 042117kzjr.txt*
*Min-U-Script® with Word Index*

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

---

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF KANSAS

3

4

5   STEVEN WAYNE FISH, et    )
    al., on behalf of        )
6   themselves and all others)
    similarly situated,      )
7                            )
            Plaintiffs,      )
8                            )
    V.                       )  NO. 16-2105-JAR-JPO
9                            )
    KRIS KOBACH, in his      )
10  official capacity as     )
    Secretary of State for the)
11  State of Kansas, et al., )
                             )
12          Defendants.      )
                             )
13

14

15

16   VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

17            JESSE T. RICHMAN, Ph.D.

18        TAKEN ON BEHALF OF THE PLAINTIFFS

19             Norfolk, Virginia

20           Friday, April 21, 2017

21

22

23

24

25

---

Page 2

1  Appearances:

2

3              AMERICAN CIVIL LIBERTIES UNION FOUNDATION
               By:  DALE HO, ESQUIRE
4              By:  SOPHIA LIN LAKIN, ESQUIRE
               125 Broad Street
5              New York, New York  10004
               dale.ho@aclu.org
6              slakin@aclu.org
               -and-
7              DECHERT, LLP
               By:  MARGARET MORTIMER, ESQUIRE
8                   (via telephone)
               1095 Avenue of the Americas
9              New York, New York  10036
               Counsel for the Plaintiff
10

11

12

13              KANSAS SECRETARY OF STATE'S OFFICE
                By:  GARRETT ROE, ESQUIRE
14              Memorial Hall, 1st Floor
                120 S.W. 10th Avenue
15              Topeka, Kansas  66612
                garrett.roe@ks.gov
16              Counsel for Defendants

17

18

19  Also Present:  Gary Payne, Jr., Videographer

20

21

22

23

24

25

---

Page 3

1                    I N D E X

2

3   DEPONENT                                  PAGE

4   JESSE T. RICHMAN, Ph.D.

5      Examination by Mr. Ho                    6

6      Examination by Mr. Roe                 337

7

8

9                 E X H I B I T S

10  NO.      DESCRIPTION                      PAGE

11  1    Expert Report of Dr. Richman            5

12  2    Curriculum Vitae of Jesse T. Richman,   5
         Ph.D.

13

13  3    Questionnaire                           5

14  4    Compilation of names                    5

15

16  5    "Can the College Vote Turn out?:       51
         Evidence from the U.S. States, 2000-
         -08" by Richman and Pate

17

18  6    Virginia Capitol Connections, Spring   60
         2013 edition

19  7    "Do non-citizens vote in U.S.          82
         elections?" by Richman, Chattha, Earnest

20

21  8    "Could non-citizens decide the        106
         November Election"? by Richman and Earnest

22  9    "Some thoughts on non-citizen         112
         voting" by Richman

23

24  10   "Is it plausible that non-citizen votes 117
         account for the entire margin of Trump's
         popular vote loss to Clinton?" by Richman

25

---

Page 4

1                 E X H I B I T S

2

3   11   "Why I would sign the 'open letter'   121
         if it were true," by Richman

4

5   12   Supplemental Expert Report            140

6   13   Meta-Analysis of Richman's Estimates  145
         of Non-Citizen Registration

7   14   Confidence Intervals for Richman's four 157
         Estimates of Non-Citizen Registration
8        in Kansas

9   15   "The 'farcical' stats Republicans     157
         use to claim millions voted illegally"
10       by Joshua Eaton

11  16   "Does Your Vote Count?" by the        157
         Heritage Foundation

12

13  17   Spreadsheet, 2 pages                  197

14  18   Interview breakdown dated 1/20/17     216
         from Brittani Marston

15  19   "The perils of cherry picking low     261
         frequency events in large sample
16       surveys" by Stephen Ansolabehere,
         Samantha Luks, Brian Schaffner

17

18  20   Expert Report of Dr. Stephen          264
         Ansolabehere 3/15/17

19  21   Letter from professional political    273
         scientists, 3 pages

20

21  22   "A Valid Analysis of a Small Subsample: 275
         The Case of Non-Citizen Registration
         and Voting" by Richman, Earnest, Chattha

22  23   Richman's Estimate of Document        312
         Possession Based on Suspense List
23       Survey (Weighted Estimates)

24  24   1/13/16 email string re:  Proposed    347
         non-citizen follow-up question for CCES

25

---

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 5

1          Videotaped deposition upon oral
2  examination of JESSE T. RICHMAN, Ph.D., taken on behalf
3  of the PLAINTIFFS, before Kerry E. Zahn, Registered
4  Merit Reporter, a Notary Public for the Commonwealth of
5  Virginia at large, taken pursuant to notice, commencing
6  at 8:38 a.m. on Friday, April 21, 2017, at the offices
7  of Zahn Court Reporting, 208 East Plume Street, Suite
8  214, Norfolk, Virginia.
9
10          (Expert Report of Dr. Richman marked as
11          Richman Exhibit Number 1)
12          (Curriculum Vitae of Jesse T. Richman,
13          Ph.D., marked as Richman Exhibit   Number
14          2)
15          (Questionnaire marked as Richman Exhibit
16          Number 3)
17          (Compilation of names marked as Richman
18          Exhibit Number 4)
19          THE VIDEOGRAPHER:  This is the video
20  deposition of Dr. Jesse T. Richman, in the matter of
21  Stephen Wayne Fish, et al., versus Kris Kobach, et al.,
22  U.S. District Court, District of Kansas, case number
23  16-2105-JAR-JPO.
24          This is held at 208 East Plume Street,
25  Norfolk, Virginia.  The time is 8:38 a.m., April 21,

Page 6

1  2017.
2          My name is Gary Payne, Jr., on behalf of
3  Zahn Court Reporting, located in Norfolk, Virginia.
4          Will the counsel please introduce
5  themselves.
6          MR. HO: Dale Ho for the plaintiffs.
7          MS. LAKIN: Sophia Lakin for the
8  plaintiffs.
9          MR. ROE: Garrett Roe for the defendants.
10          THE VIDEOGRAPHER: We are now on the
11  record.
12          Would you please swear in the witness.
13          (Discussion off the record)
14          MS. MORTIMER: Margaret Mortimer from
15  Dechert.
16          THE COURT REPORTER: Thank you.
17
18          JESSE T. RICHMAN, Ph.D., was sworn and
19  deposed on behalf of the Plaintiff as follows:
20
21          EXAMINATION
22  BY MR. HO:
23     Q    Good morning, Professor Richman.
24     A    Good morning.
25     Q    Could you state and spell your name for

Page 7

1  the record, please?
2     A    Yes.  My name is Jesse, J-E-S-S-E, T.,
3  Richman, R-I-C-H-M-A-N.
4     Q    I'm just going to go over really quickly
5  some basic ground rules for the deposition.
6     A    Thank you.
7     Q    The first is that when I ask you a
8  question, if you could please give a verbal answer --
9     A    Of course.
10     Q    -- rather than a gesticulation or a head
11  nod or something like that, because the court reporter
12  can't get that down.
13     A    Undoubtedly.
14     Q    I'm going to ask you to let me finish my
15  questions before you start answering, and I'll try to
16  do the same for you.
17     A    Thank you.
18     Q    Again, that's for the court reporter.
19  She can't record it if we're cross-talking over each
20  other.  Is that okay?
21     A    That's fine.
22     Q    It's okay to take a break whenever you
23  want.  The only thing that I would ask is that if I've
24  posed a question to you, that you answer that question
25  before the break.  Is that okay?

Page 8

1     A    I -- in most circumstances.  I can
2  imagine some circumstances in which I might object to
3  that, but in general, yes, that sounds reasonable.
4     Q    Okay.
5          You understand that you're under oath
6  today under penalty of perjury?
7     A    Yes.
8     Q    Is there any reason you can't give
9  truthful answers to questions that I pose to you today?
10     A    Not that I'm aware of.
11     Q    Okay.  What did you do to prepare for
12  today's deposition?
13     A    I, I spent a little bit of time reviewing
14  the documents that I had provided in this case, my
15  reports, and that was about it.
16          About a month ago, I borrowed from the
17  library a book on depositions which I leafed through,
18  so I guess that was also deposition preparation of a
19  sort.  So primarily what I've done is a little bit of
20  review of my notes.
21     Q    Did you meet with anyone to prepare for
22  today's deposition?
23     A    Not really.  I -- I did have breakfast
24  with Garrett.  We mostly talked about other things, but
25  we did speak for a couple of minutes about the

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

---

Page 9

1 deposition.
2    Q    Is that the only meeting that you've had
3 in preparation for today's deposition?
4    A    Yes.
5    Q    And by "Garrett," you mean defense
6 counsel in the room today?
7    A    Exactly.
8    Q    About how long did you meet this morning?
9    A    Breakfast started at about 7:45 or so and
10 concluded at about 8:15, 8:20.
11    Q    Okay.
12         I'm going to show you what's been marked
13 as Exhibit Richman 1.
14    A    Thank you.
15    Q    Do you recognize this -- it already has
16 a, a sticker on it.  You don't need to --
17    A    Okay.  I see it there.
18    Q    I'll give copies to others.
19         Do you recognize this as the initial
20 expert report that you provided in this case?
21    A    That's what it looks like, yes.
22    Q    How much were you compensated for this
23 report?
24    A    I was compensated at a rate of $100 per
25 hour for my time writing the report.  I don't remember

---

Page 10

1 exactly how many hours it took.
2    Q    Do you have a rough sense of how many
3 hours that it took?
4    A    I --
5    Q    And I mean all of your work in this case.
6    A    All of -- not just this report?
7    Q    Not just that report.
8    A    Okay.  So I prepared two reports.  The
9 first one I think took about, a little bit over 60
10 hours.  The second one, a little under 60 hours.
11    Q    Okay.  So a total of about 120 hours in
12 this case?
13    A    Something on that order.
14    Q    I notice that your compensation is not
15 listed in your report.  Is there a reason for that?
16    A    I thought I had listed it.  I am sorry if
17 it wasn't.  I meant to include that.
18         Yeah, it's in -- it's on the final page,
19 page 14.
20    Q    Oh, okay.
21    A    It is listed there:  "Statement of
22 compensation.  My rate is $100 per hour for my work
23 preparing this expert report.  I will charge a rate of
24 $250 per hour for time associated with deposition and
25 testimony, exclusive of travel and other expenses."

---

Page 11

1    Q    Great.
2    A    So that --
3    Q    Could you at a very high level summarize
4 your opinions in this case?
5    A    Well, I, I discussed a range of different
6 sources of evidence.  The general charge I was given
7 was to investigate the question of whether a
8 substantial number of non-citizens were registering to
9 vote or attempting to register to vote in the state of
10 Kansas, and so I focused my investigation and report on
11 those issues primarily.
12         The -- I began by reviewing some evidence
13 from national-level data, looking at broadly the
14 question of the prevalence of non-citizen registration
15 to vote, including specific evidence such as evidence
16 from the Cooperative Congressional Election Study
17 suggesting that a certain, not large, but potentially
18 substantial and significant position -- portion of
19 non-citizens nationwide do register to vote.
20         And I discussed in the report, in the
21 attachments, evidence that kind of confirms this, in
22 terms of people who were asked twice that -- whether
23 they were non-citizens or not and twice said they were
24 non-citizens; asked whether they were registered to
25 vote, said they were; also had a verified voter file

---

Page 12

1 match.
2         So, you know, especially in those cases,
3 we can be, I think, really quite confident that there
4 are non-citizens registered to vote nationwide.  And I
5 provided various estimates of the prevalence of
6 non-citizens registration to vote nationwide.
7         For the evident -- the estimate I just
8 referred you to, that would be an estimate of something
9 like -- between 2 and 3 percent of non-citizens
10 nationwide.  So it -- most non-citizens aren't
11 registered to vote, and I think if you've gone through
12 some of the things I -- I've put on my blog and other
13 things, I've really tried to push back against people
14 who have taken the notion that most non-citizens are
15 registered to vote.  No, most non-citizens aren't
16 registered to vote.  Only -- we're talking about a
17 potentially substantial number, but, you know, modest
18 percentage overall.
19         And then I talked about several lines of
20 evidence from the state of Kansas.  And, so, that's --
21 those are all in the report; analysis of various file
22 matching efforts, analysis of several survey data sets,
23 and then drew some overall conclusions.
24    Q    Great.
25         We'll talk about all those specific

---

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 13

1  analyses later today.
2      A   I'm sure we will.
3      Q   I want to show you what's been marked
4  Richman Exhibit 2.
5      A   Thank you.
6      Q   Do you recognize this as your C.V.?
7      A   Yes.  This is a C.V. I supplied with my
8  report.
9      Q   Has it been updated since you supplied
10  your report?
11      A   I haven't actually gone through and
12  updated it.  There, there might be one or two things to
13  add.  For example, I published an op-ed on filibuster in
14  the local newspaper, The Virginian-Pilot, about two
15  weeks ago.  That, that would be the main thing to, to
16  update.
17      Q   And your current job title is still
18  associate professor of political science at Old
19  Dominion University?
20      A   That's correct.
21          To be clear, political science, I also
22  have a -- it's not reflected on here -- a joint
23  appointment with international studies.  So my, my home
24  department is political science and geography, but I
25  also teach some graduate courses in the international

Page 14

1  studies program.
2      Q   Looking at your C.V., it looks like
3  you've published about a dozen or so peer-reviewed
4  articles.  Does that sound right?
5      A   That sounds roughly right.  I don't know
6  the exact count, but that sounds approximately right.
7      Q   Are all of your peer-reviewed
8  publications listed here or is there anything missing?
9      A   I think all of them are listed here.
10      Q   And what do you understand by the term
11  "peer-review"?
12      A   Well, peer-reviewed journals are journals
13  that subject works to external review.  They typically
14  send out blinded copies of manuscripts to other
15  scholars in a field of study and ask them to assess the
16  works on their merits, and then, as a result of this
17  process of peer-review, they make decisions about
18  whether to publish or not.
19      Q   What's the significance of peer-review in
20  the field of political science?
21      A   Well, so, the role of peer-review in the
22  field of political science is, as in all science, to
23  provide a degree of a, a check on the quality of
24  scholarly work.  It's an effort to ensure that work
25  that's published is of sub -- significant quality.

Page 15

1  That's the primary role.  It's imperfect, obviously,
2  but it does its best to assess the value of, of work.
3          One of the key ideas in peer-review is
4  the idea of -- often, there are various versions -- but
5  the anonymity of the article, the author, so that the
6  article is assessed on the basis of its merits, as
7  opposed to some kind of predisposition concerning the
8  authors of the piece.
9      Q   Do you serve as a peer-reviewer for any
10  political science journals?
11      A   Yes.
12      Q   Which ones?
13      A   I served as a peer-reviewer for many
14  journals.  I think I've listed some of that on the C.V.
15  But maybe not.  I think this was a shorter version that
16  doesn't list all of that.
17          I served for -- I was on the editorial
18  board of Legislative Studies Quarterly for several
19  years; I've done many reviews for them.  State Politics
20  & Policy Quarterly.  American Political Science Review.
21  American Journal of Political --
22          THE COURT REPORTER: Excuse me.
23          THE WITNESS: Am I going too fast?
24          THE COURT REPORTER: I just want to slow
25  you down.

Page 16

1          THE WITNESS: I'm sorry.
2          American Journal of Political Science.  I
3  mentioned American Political Science Review previously.
4  State Politics & Policy Quarterly was another one I
5  mentioned a moment ago.  Legislative Studies Quarterly.
6          There are a variety of other journals.
7  The Journal of Politics, I've done many reviews for
8  them.  American Politics Research.  Just a range of
9  different journals in the field of political science.
10      Q   And you've published one peer-reviewed
11  article on non-citizen voting; is that correct?
12      A   That's correct.
13      Q   That's the article that was published in
14  Electoral Studies?
15      A   That's right.
16      Q   Other than your article in Electoral
17  Studies, have you published any other articles about
18  non-citizens registration or voting?
19      A   No, that's the article I've published to
20  date on non-citizens registration and voting.
21      Q   Now, you understand that you are here as
22  an expert witness today; right?
23      A   That's right.
24      Q   And what's your understanding of the role
25  of an expert witness?

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

---

Page 17

1    A    The role of the expert witness is to
2  bring to a case knowledge and expertise that might
3  otherwise not be available in the context of, of a
4  case.
5        In the context of this particular case, I
6  was asked to assess issues concerning registration or
7  attempted registration by non-citizens in the state of
8  Kansas. And, so, that's my role, particularly in this
9  case.
10   Q    And you've been an expert witness at
11 least one other time before; right?
12   A    That's right. I've been an expert
13 witness once previously.
14   Q    And that was in litigation over
15 Virginia's voter ID law?
16   A    Yes. Lee versus Virginia State Board of
17 Elections.
18   Q    And you were deposed in connection with
19 that case; correct?
20   A    I was.
21   Q    You did not testify at the trial in that
22 case; correct?
23   A    That's correct.
24   Q    And, to your knowledge, the Court did not
25 rely on your opinion in that case; correct?

---

Page 18

1    A    I have no basis for assessing that.
2    Q    Other than the Virginia voter ID case,
3  have you been deposed before?
4    A    Yes. I was deposed -- when I was an
5  intern in D.C. in 1998, I helped apprehend a mugger on
6  Capitol Hill, and I was deposed in that case.
7        So that would have been -- the deposition
8  would have been in either '98 or '99, I don't remember
9  exactly, and I ended up testifying in trial -- the
10 trial as well.
11       And I think I was also deposed many --
12 when was this -- early 2000 or so. I was in grad
13 school. There was a, a case involving some issue with
14 the construction of the road outside the place where I
15 lived, and I had ended up talking with an investigator
16 for one side of the case or another and they asked me
17 to come in for a deposition related to that as I guess
18 a witness or something like that.
19   Q    Okay. But the Virginia voter ID case was
20 the only other time you've been deposed as an expert?
21   A    That's correct.
22   Q    Okay. Do you understand yourself to be
23 an expert in survey research?
24   A    I've done a variety of work involving
25 survey research. I was the faculty director of the Old

---

Page 19

1  Dominion Social Science Research Center from 2012
2  through 2015. I have conducted a number of surveys in
3  that capacity, and so I, I have substantial experience
4  with survey research. And a -- so my sense of -- and I
5  have substantial background in the area.
6    Q    Roughly how many surveys have you
7  designed?
8    A    Let me see. It depends on what you count
9  as designed.
10       So there are probably about, about nine
11 or ten when I've been the principal person writing the
12 survey, and then there are a number of others where
13 I've played some more minor role.
14   Q    Have you published peer-reviewed research
15 based on a survey that you've designed?
16   A    No, I have not. Principally, the surveys
17 that I have designed have been targeted at more of a
18 popular audience. We did the Life in Hampton Roads
19 local quality of life survey annually. We did a number
20 of political polls in the State of Virginia. So the
21 primary aim in those studies was more of a public
22 service than publication in peer-reviewed journals.
23       I do have a couple of projects that are
24 awaiting time to wrap them up that have to do with
25 pieces of data drawn from some of that survey work.

---

Page 20

1    Q    Have you ever tested survey questions
2  that you've written in order to assess whether or not
3  they generally produce accurate responses?
4        MR. ROE: Objection, vague as to may have
5  tested. Can you explain that?
6        MR. HO: You can answer if you
7  understand.
8        THE WITNESS: Well, so, I'm not sure
9  exactly what you're getting at.
10       One does a variety of approaches to
11 validating the results of survey questions. And, so,
12 I've engaged in various kinds of validation analyses
13 related to survey questions.
14 BY MR. HO:
15   Q    Have you ever published peer-reviewed
16 research concerning the accuracy of survey responses
17 for a survey that you've written?
18   A    No.
19   Q    Have you ever compared survey responses
20 to government records in order to assess whether or not
21 the responses are accurate?
22   A    Yes. In the context of this study we did
23 that, for instance.
24       In the, in the paper I published in
25 Electoral Studies, I didn't do that, but we did

---

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 21

1  analyses based on some matching efforts that were
2  conducted by the authors of the CCES data set.
3       Q    Have you ever published any peer-reviewed
4  research based on your own efforts to compare survey
5  responses to government records in order to assess the
6  validity of those survey responses?
7       A    I have not published research on that
8  issue specifically.
9       Q    Have you ever designed or implemented a
10 survey that sought to measure voter registration rates?
11 Other than for this case.
12      A    We've -- I've included questions on voter
13 registration in a variety of other surveys.
14      Q    Have you, other than in this case, ever
15 designed or implemented a survey to measure citizenship
16 rates?
17      A    No.  I have suggested questions for the
18 CCES on that particular issue.  A focus of the, the
19 issue -- the criticism offered by Stephen Ansolabehere
20 and his colleagues of my analysis of the CCES involved
21 the question of whether the individuals who said they
22 were non-citizens in the CCES study were, in fact,
23 non-citizens.  And I specifically spoke to both Stephen
24 Ansolabehere and Brian Schaffner, the principal co-
25 investigators of that study, at a conference in early

Page 22

1  2016 and then followed up with an email proposing a set
2  of question language specifically targeting the issue
3  of the accuracy of those citizen status self-reports.
4            If, I have a copy of that email with me if
5  you'd like to see it.  And Brian Schaffner replied that
6  they would -- they would attempt to revise the question
7  to, to specifically address that issue.
8            Unfortunately, it doesn't appear that
9  they did.  In his testimony, Stephen Ansolabehere
10 seemed to suggest that nobody in the research community
11 had asked them to do anything about this, which
12 surprised me because I specifically had done that.
13           And, so, I would be happy to show you
14 copies of that email train.
15      Q    That's okay.  Professor Richman, my --
16 Richman, my question for you was a lot simpler than
17 what you just answered; it was whether or not you,
18 outside of this case, have ever designed or implemented
19 a survey to measure citizenship rates.  I didn't ask
20 you a question about Professor Ansolabehere's
21 deposition.
22           So in the future, when I ask you a
23 question -- you will have plenty of time with your
24 counsel to say whatever you want after we've talked.
25 When I ask you a question, could you please respond to

Page 23

1  the question that I've asked.
2       A    I attempt to respond to each question as,
3  as appropriate.  And I am -- I, I was speaking around
4  issues of assessing citizenship rates.  This is
5  something -- and the reason I brought this up is
6  because this was an instance of designing and proposing
7  questions specifically around the issue of measuring
8  citizenship rates.  So I thought it was relevant.  I am
9  sorry that, in your view, it wasn't.
10           I have also discussed -- my co-author --
11      Q    I didn't ask you a question just now,
12 Professor Richman.  So when you speak, it will be in
13 response to questions that I ask.  Is that okay with
14 you?
15      A    I will continue -- I was merely
16 continuing to attempt to answer the question -- your
17 previous question, which I have not yet finished
18 answering.
19      Q    My previous question was:  Other than in
20 this case, have you designed or implemented a survey to
21 measure citizenship rates?
22           And the answer to that question is no;
23 correct?
24      A    No, that is incorrect.
25      Q    When have you designed or implemented a

Page 24

1  survey that attempts to measure citizenship rates?
2       A    My co-author on the 2014 study and I,
3  David Earnest, spent some time working on various
4  proposed -- so this is designed, rather than
5  implementation, until this case, in which case I did
6  design a series of questions aimed at implementing
7  citizenship status reports.  But we've designed various
8  other survey instruments that we've -- working on
9  developing various plans for investigating those.
10      Q    Other than this case, you have never
11 implemented a survey that attempts to measure
12 citizenship rates; is that correct?
13      A    That is correct.
14      Q    Okay.
15           Outside of this case, have you ever
16 published peer-reviewed research based on database
17 matching that you yourself have performed?
18      A    I have conducted matching analyses of a
19 variety of kinds in many of the studies I have
20 published; but I have done a variety of kinds of
21 matching.
22           I tell my students in undergraduate and
23 especially graduate statistics and quantitative methods
24 classes that matching is a, really an essential skill
25 for a qual -- quantitative researcher, because it's

Page 25

1 rare that everything you want to analyze in the context
2 of a study is all neatly packaged for you by someone
3 else in a single data set. And, so, you need to match
4 different, different pieces of information.
5    Q    Can you just give me one example of a
6 peer-reviewed article that you've published that
7 involved some database matching that you yourself
8 performed?
9    A    So the -- let me, let me go through
10 various ones. The --
11    Q    One example will suffice.
12    A    Certainly.
13       In the piece published in American
14 Political Science Review, I matched survey responses
15 from members of Congress with voting records in order
16 to assess their perceptions of where policy status quo
17 are in American politics.
18       So based on the survey responses by
19 members of Congress, where do they perceive current
20 policy to be on defense spending, on capital gains
21 taxation, and so forth. So I used those survey
22 responses in conjunction with their voting records to
23 assess status quo locations, and I used that to test
24 theories of how the legislative process operates.
25    Q    Have you ever published a peer-reviewed

Page 26

1 article based on a matching to a state's voter
2 registration file that you yourself performed?
3    A    I have not done that previously.
4    Q    In your previous publications, you
5 sometimes publish statistical estimates; right?
6    A    Yes.
7    Q    And generally when you publish articles
8 featuring statistical estimates, you include standard
9 error calculations?
10    A    I do typically do that. And in the -- in
11 many of these studies, I'm performing various kinds of
12 regression analyses. You know, the basic idea of null
13 hypothesis testing resolves around issues of whether an
14 effect or a finding can be statistically distinguished
15 from some null hypothesis. And, so, I've done that in
16 a variety of contexts in most of the articles I have
17 published.
18    Q    As a peer-reviewer, if you received an
19 article that included statistical estimates but did not
20 include tests for statistical significance, that is, to
21 project the null hypothesis, would you accept that
22 article for publication as is?
23    A    This would depend a great deal upon the
24 specific context of the estimates and the article. In
25 many situations, it would be appropriate to include

Page 27

1 confidence intervals, and I typically do include them.
2       At the time I wrote my initial report for
3 this case, I was -- and I regret the decision now, but
4 I was feeling rather aggravated at the way the
5 confidence intervals I provided in the 2014 study were
6 being twisted by some people, taking the top end of
7 confidence intervals and that sort of thing to claim
8 that, oh, this is -- this is what they are saying,
9 when, in fact, that's not.
10       And, so, I only reported some confidence
11 intervals, particularly only for the one estimate that
12 was -- where there was a doubt about whether it was
13 statistically significantly different from zero. And
14 for the others, I did not include confidence interval
15 estimates, but focused simply on the -- the point
16 estimate, while verbally saying that there was a range
17 of uncertainty around the estimate.
18    Q    For the --
19    A    That was probably -- that was probably a
20 mistake. I probably should have provided the full
21 range, and I have in my second report provided a full
22 range of confidence interval estimates based on a
23 variety of different statistical techniques to assess
24 confidence intervals.
25    Q    Have you, in a peer-reviewed publication,

Page 28

1 ever utilized the Score Wilson method for calculating a
2 confidence interval?
3    A    No, I have not.
4    Q    Have you in a peer-reviewed publication
5 previously used the Exact method for calculating a
6 confidence interval?
7    A    No, I have not. I've -- principally,
8 when I've discussed confidence intervals in my
9 research, as I said, I'm reporting results of
10 regression analyses and related types of analyses.
11       Typically, in those cases, we're not
12 dealing with tasks of binomial proportions, and so the
13 appropriate calculations for confidence intervals are,
14 are different.
15    Q    In peer-reviewed publication, have you
16 ever used the Agresti method for calculating a
17 confidence interval?
18    A    No.
19    Q    Have you ever used the Jeffreys method in
20 a peer-reviewed publication for -- before, for
21 calculating a confidence interval?
22    A    No.
23    Q    I'd like to talk about Exhibit 1, your
24 report in this case --
25    A    Sure.

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

---

Page 29

1    Q    -- a little bit.
2         And could you turn to page 7 in the
3  report?
4    A    Certainly.
5         MR. ROE: Dale, is this Exhibit 1?
6         MR. HO: Yes.
7         MR. ROE: Okay.
8  BY MR. HO:
9    Q    Now, on this page at the bottom, into
10 page 8, this is where you describe a telephone survey
11 of a sample of individuals from the suspense lists in
12 Kansas; is that right?
13   A    Among other groups, yes.
14   Q    Let's just start with the suspense list.
15   A    Okay.
16   Q    Is it accurate to say that you obtained
17 responses from 1,380 individuals on the suspense list?
18   A    That's my best estimate.  As I discuss in
19 the report, we reached more than that from the, the
20 calling numbers from the suspense list, but I, I used a
21 number of criteria to reduce that number to an estimate
22 of people we were -- I was confident were in fact the
23 individuals that we were intending to reach.
24   Q    So your best estimate is that you
25 successfully received responses from 1,380 individuals

---

Page 30

1  on the suspense list; correct?
2    A    Let me check the report for that specific
3  number.
4         It, it says here a total of 1380.
5    Q    And of those 1380 individuals, 7 of them
6  reported being non-citizens; is that correct?
7    A    That is correct.
8    Q    And you estimated in your report that 161
9  individuals out of 17,905 people on the suspense list
10 are non-citizens; is that right?
11   A    Sorry, I lost you there.  Could you go
12 over that a second time?
13   Q    Sure.
14        You ultimately estimated in your report
15 here that 161 individuals out of 17,905 people on the
16 suspense list are non-citizens; is that right?
17   A    Yes, that's the estimate I gave there.
18   Q    All right.  I'm going to hand you a
19 calculator.
20   A    Um-hum.
21   Q    7 divided by 1,380 is equal to about
22 .5 percent; is that right?
23   A    7 divided by 1380?  .005.
24   Q    That's .5 percent; correct?
25   A    Yes.

---

Page 31

1    Q    And even though .5 percent of your survey
2  respondents indicated they were non-citizens, you
3  didn't take that .5 percent and just apply it to the
4  suspense list as a whole to reach your estimate of
5  people on the suspense list who were non-citizens;
6  right?
7    A    I -- there was a waiting process, which I
8  engaged in prior to that, that exercise.  The concern
9  was that different groups within the suspense list
10 might be more likely or less likely to respond and that
11 this could bias the estimates.
12   Q    So when you made your calculation, your
13 estimate of the number of people on the suspense list
14 who were non-citizens, you used 9 out of 1,380 rather
15 than 7 out of 1,380?
16   A    That is what I intended to do.
17   Q    Okay.
18   A    However, I believe that there was a error
19 on this in the calculation that I reported.  When I, I
20 meant to report .65 percent, I reported .009, which
21 would be a different quantity.  So I think there was a
22 typo there that led to a degree of error in the
23 calculations.
24        So if, if done correctly, the number
25 should have been 116.7 as the estimate of the number of

---

Page 32

1  suspense list individuals, rather than the number that
2  was reported there, and I realized that error after I
3  had sent in the report.  And I was -- I think what
4  happened is I got the -- I had the 9, and somehow the 9
5  ended up down there, which was a, a mistake.
6    Q    So, just to clarify:  Your best estimate
7  is that there are 117 people on the suspense list who
8  are non-citizens?
9    A    Yeah, 116.77, so round up to 117.
10   Q    And that constitutes 0.65 percent of the
11 suspense list?
12   A    Yes.
13   Q    So there was an error in your initial
14 report?
15   A    There was an error, an error in that
16 calculation.
17   Q    Because your initial report said 161;
18 but, actually, your better estimate is about 117.
19   A    That's right.  There was an error in that
20 report.
21   Q    You didn't note that error in your
22 rebuttal report, did you?
23   A    I don't know.  I don't remember.
24   Q    Okay.
25   A    I'm not sure when I, when I realized that

---

Page 33

1 there was that error.
2    Q    Now, the suspense list that you're using
3 of close to 18,000 individuals, I just want to clarify
4 what that list is.
5        Is that a list of all people whose
6 registrations have been held in suspense in Kansas for
7 failure to provide documentary proof of citizenship, or
8 is it limited only to those people who attempted to
9 register to vote through a DMV office?
10    A    I don't believe it is limited to any
11 particular source of registration.
12    Q    Do you know one way or the other?
13    A    My sense is that, but I'm not an expert
14 on the specific processes underlying construction of
15 the suspense list, my sense is that the list is a list
16 of all individuals who have been requested to provide
17 proof of citizenship and haven't done so.
18    Q    What's that sense based on?
19    A    That sense is based upon what I've been
20 told to a degree, what I've read in the media about the
21 Kansas case. That's my sense of what it is.
22        I don't -- I don't know the precise
23 nuances of exactly who and how and under what
24 circumstances individuals are added or removed from
25 that list.

Page 34

1    Q    You made a reference to what you've been
2 told.
3        Do you have a recollection of being told
4 whether or not this was the complete universe of people
5 in Kansas whose registrations have been suspended for
6 failure to provide proof of citizenship or if it was a
7 list limited to only such people who applied to
8 register to vote at DMVs?
9    A    I was not told that it was limited to
10 people who applied to vote at DMVs. I don't recall
11 that I was specifically told something else either. I
12 assumed it was more general than that.
13    Q    Why did you conduct a telephone survey of
14 people on the suspense list?
15    A    There were -- there were a couple of
16 different things that I thought this could be useful
17 for.
18        One aspect would be to assess the
19 frequency, as we were just discussing, the frequency of
20 non-citizens on the suspense list. And the other would
21 be to sus -- to assess the degree to which citizens on
22 the suspense list had access to the kinds of documents
23 that are requested to document citizenship. And those,
24 those documents are -- were, were asked about in the
25 later part of the survey.

Page 35

1    Q    Was it your idea to conduct a survey of
2 people on the suspense list?
3    A    I -- we -- this was a survey that was
4 conducted of suspense-list individuals. I thought
5 about a variety of different tactics in terms of trying
6 to conduct some surveys for this project in the context
7 of limitations on resources and time. I thought that
8 issues involving the suspense list would be worth
9 spending some time investigating.
10    Q    So it was your idea to have a survey of
11 people on the suspense list, not someone else's idea?
12    A    You know, I don't remember exactly.
13 There were some discussions that were held by --
14 between myself and the Kansas Secretary of State's
15 office, both the Secretary and Garrett Roe, about the
16 various directions that we might look in terms of doing
17 some kind of survey work.
18        And, so, one of the possibilities that we
19 discussed was the suspense list, but I don't remember
20 the exact -- those conversations were several months
21 ago now, and I don't remember exactly what the sequence
22 was.
23    Q    Would it be a fair description to say
24 that the suspense list survey was the product of a
25 joint collaboration between you and the Secretary of

Page 36

1 State's office?
2        MR. ROE: Objection, vague.
3        THE WITNESS: I, I would say that that
4 would be incorrect. The, the survey -- once, once the
5 basic data set was -- the list was, was sent to me and
6 I -- we worked out the -- and the Kansas Secretary of
7 State's office contracted with issues and answers, the
8 specific design of the survey questions was done by me
9 in conjunction with issues-and-answers staff.
10 BY MR. HO:
11    Q    Well, we'll talk about the survey design.
12 I just mean the decision to take a survey of people on
13 the suspense list; whose decision was that?
14    A    Ultimately, the decisions on where to
15 direct the surveys I think were done by me.
16    Q    And the process for choosing the wording
17 of questions, who was responsible for that?
18    A    I was principally responsible for that.
19 As I said, I also consulted with staff at Issues &
20 Answers as, as the question wording was, was shaped.
21    Q    I'm going to show you what's been marked
22 as Richman Exhibit 3.
23    A    Yes.
24    Q    Do you recognize this as the survey
25 instrument you utilized for your survey for your report

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 37

1  in this case?
2      A    Yes.
3      Q    And you recorded the gender of all of the
4  survey respondents; is that right?
5      A    It was recorded by observation.  So this
6  was the, the interviewer recorded their impression of
7  the gender of the respondent.
8      Q    And the interviewer also recorded whether
9  or not each respondent was of Hispanic or Latino
10  dissent; is that correct?
11      A    That was -- that was recorded on the
12  basis of asking them a question.  So the specific
13  question there was, do you consider yourself to be of
14  Hispanic or Latino descent.
15      Q    There's also a question on there about
16  the race of each survey respondent; is that correct?
17      A    That is correct.
18      Q    There's also a question about the age
19  group of each survey respondent; is that right?
20      A    That is correct.
21      Q    Can you tell me why you decided to weight
22  the results of your survey respondents indicating that
23  they were non-citizens rather than just taking the
24  straight percentage of survey respondents who said they
25  were non-citizens and applying it to the suspense list

Page 38

1  as a whole?
2      A    Well, so, I reported both numbers
3  because -- and I also reported the weights in the data
4  set that I provided as one of my exhibits.
5          The purpose of weighting data is to
6  adjust for differences in the frequency -- differences
7  between the frequency with which individuals appear in
8  some population and the frequency with which they
9  appear in the sampling frame.
10      Q    So would it be accurate to say that if
11  you want to make estimates based on a sample to a
12  larger population, you want to try to account for
13  differences in the composition of those two pools?
14      A    Generally, that's, that's a good idea.
15  There are a series of arguments in the literature about
16  just how far one ought to go.  The unambiguous and
17  totally clear case for weighting happens when the
18  differences the sampling frame and set of
19  respondents you get and the the, population are by
20  design.
21          So, for instance, sometimes surveys are,
22  are designed to over-sample minority groups in order to
23  facilitate more accurate estimates of those groups.  In
24  that case, there's an entirely unambiguous case for
25  weights.  Weights are used very frequently in the

Page 39

1  survey field today to adjust as well for differences
2  that arise, not from the sample design, but from
3  differences in response rates.  And, so, I -- that's
4  why I did the weighting here, to adjust for differences
5  in response rates or from the -- from the survey.
6          To a degree, those differences in terms
7  of people on the suspense list may have also, but I
8  didn't do extensive analysis of this, been on the basis
9  of differences in the free -- the incidence of
10  telephone numbers and that sort of thing on the list.
11          But the primary, the primary purpose here
12  was more on that secondary side, in terms of
13  differences in response rates.
14      Q    So in your opinion as a political
15  scientist, if I'm trying to assess how many
16  non-citizens are on the suspense list, and I'm trying
17  to use your survey to estimate that, do you believe
18  that the weighted or the unweighted number is more
19  likely to be accurate?
20      A    I think the weighted is more likely to be
21  accurate.
22      Q    And the reason you think the weighted
23  number is more likely to be accurate is because --
24  primarily because of differences in response rates in
25  your survey sample among particular demographics;

Page 40

1  correct?
2      A    Differences among response rates and/or
3  differences in the incidence of telephone numbers.  So,
4  so those are the two factors that play into it here.
5      Q    Why do you choose gender as something
6  that you would control for in that weighting?
7      A    Well, because gender was -- I, I weighted
8  on most of the variables I had available in the -- in
9  the list, in the suspense list.  Gender was one of
10  them.
11      Q    But you chose those variables?
12      A    I chose those variables because those are
13  the ones I had available.  I weighted on more or less
14  all of the variables I had available, including gender,
15  because my sense was -- I didn't have a particular
16  theory there would be a disproportionate response by
17  gender.  In this case there didn't seem to be much of
18  one.  The weight on gender was a pretty modest
19  difference.
20          But it, it was one of the demographic
21  characteristics I had available, and in some instances
22  there are differences in response rates between men and
23  woman on surveys.
24      Q    But you didn't just happen to have gender
25  available.  You designed the survey and decided to make

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 41

1 gender one of the variables that you wanted surveyors
2 to record about respondents; correct?
3     A    That's right.  It's a standard
4 demographic variable.  It was also one of the measures
5 that we had available in, I believe in the suspense
6 list, if memory serves.
7     Q    Why did you choose age as a variable to
8 control for?
9     A    Well, again, sometimes there are
10 differences in response rates across different ages.
11 This is a common issue in survey research, and so I
12 thought it would be important to include age.  It was
13 also a variable that we had available in the suspense
14 list.  We had, we had ages.
15     Q    Why did you choose race and ethnicity as
16 a variable?
17     A    Again, these are potentially important
18 demographic characteristics.
19         Sometimes there are differences in the
20 degree to which people from different races and
21 ethnicities respond to surveys, and so this was one
22 that I would have very much liked to be able to weight
23 on in this case.
24         The suspense list did not have -- the
25 broader suspense list data set did not have information

Page 42

1 on race, and so in this particular case, for this
2 particular purpose, we were not able to use race as
3 part of the waiting, if I remember correctly, because I
4 don't believe that race was recorded in the suspense
5 list.
6     Q    Did you use Hispanic ethnicity as a
7 variable that you controlled for?
8     A    Again, we didn't have that in the
9 suspense list, if I recall correctly.  It's been
10 several months since I've looked closely at that, but
11 my memory is we didn't have it.  And I don't believe
12 we -- I weighted on that, because I don't believe that
13 was in the list.
14         If we look -- if you look specifically at
15 my discussion of weighting, I think I have a list of
16 the particular, particular items we weighted on.
17         Let me see.
18         Yes.  So (inaudible) response waited to
19 match the overall --
20         THE COURT REPORTER: I'm sorry, I missed
21 a few words in there.
22         THE WITNESS: Sorry.  I was simply
23 saying -- let me see.
24         "The suspense list respondents" -- I'm
25 reading now from the paragraph on page 8 -- "were

Page 43

1 weighted to match the overall list across the following
2 variables:  Gender, age group, party affiliation,
3 geographic location, first three digits of their zip
4 code, year of registration and foreign name."
5     Q    And why did you decide to weight on the
6 basis of foreign name?
7     A    My concern there was that there could be
8 a differential response rate from individuals who --
9 for whom perhaps English was not a first language.  We
10 had the survey being conducted in both Spanish and
11 English, but, nonetheless, there might be an issue with
12 differential response rates.  And, so, this was an
13 effort to, to assess and to weight for that, that
14 issue.
15     Q    How did you identify foreign names?
16     A    This was a coding which was conducted by
17 both myself and I hired a graduate student to help me
18 with it.  We coded 5,000 or so cases, both of us, and
19 then each of us coded some of the cases separately.
20         If --
21     Q    Did you code -- you didn't code all the
22 names in the suspense list?
23     A    We coded all the names.
24     Q    So --
25     A    There were 5,000 that we jointly coded

Page 44

1 them.
2         So both of us coded 5,000; that was the
3 basis for calculation of the intervener agreement.
4 Then I don't recall exactly how many each of us coded
5 separately, but each of us coded -- I think he coded
6 something like 9,000 total and I coded the rest.
7     Q    Who is the grad student who assisted you
8 with this project?
9     A    His name is Ryan Nixon.
10     Q    Did anyone else --
11     A    No, I'm sorry, not Ryan Nixon.  Ryan
12 Roberts.
13     Q    Did anyone else assist you with this
14 project?
15     A    No.
16     Q    I'm going to show you what's been marked
17 as Richman Exhibit 4.
18     A    Nice thick one here.
19     Q    Yes.  This is a list of your foreign name
20 coding.
21     A    Um-hum.
22     Q    Does that look accurate to you?
23     A    Yeah, this looks vaguely familiar.  It
24 was several months ago now, but I think this is it.
25     Q    Could you turn to page 77?

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

1     A    Page 77, okay.
2     Q    We've highlighted some of the names here
3  on page 77.
4     A    Okay.
5     Q    At the top of page 77, the top six rows
6  are all individuals with the last name Hernandez.
7  These are respondents to your survey.
8          Three -- the first three Hernandez's are
9  coded as not having a foreign name.  The second three
10 Hernandez's are coded as having a foreign name.
11         Is that right?
12    A    Let me try and find my coding here.
13 Where it is the coding on foreign name?
14    Q    I believe it is the second column and
15 then --
16    A    Foreign name -- second column?  Oh, over
17 here, okay.  That's for rater one.
18         Yeah.  So -- and for rater two, so we
19 both agreed on this.
20         You're, you're curious about why one was
21 code and not the other?
22    Q    Try not to anticipate my questions, but
23 that is in fact my question this time:  Why did you
24 code three Hernandez's as non-foreign and three
25 Hernandez's as foreign?

1     A    Our criteria was that we needed to
2  have -- typically, and I'm sure we made some mistakes
3  in applying this across so many names, which I was
4  rating as quickly as I could.  We got the -- this was,
5  this was something that was done rapidly.
6          But the criteria was that we needed to
7  have at least two names that were, that appeared to us
8  to be foreign names, foreign origin.
9     Q    And what do you mean -- and, I'm sorry,
10 what do you mean by appears to you to be foreign?
11    A    Well, that was a very subjective coding,
12 so this is an aspect of whether the name looked like a
13 sort of anglophone name or not, primarily.  But I'm
14 sure we made many mistakes within the specific coding.
15         The goal here was to get some sense of
16 whether we had unequal response rates across different
17 groups of respondents.
18    Q    Prior to this project, had you done any
19 peer-reviewed research that involved coding names for
20 foreign or not foreign?
21    A    No, I had not.
22    Q    What experience, if any, are you aware of
23 that Mr. Nixon -- is that his name?
24    A    No, I'm sorry.  Roberts.
25    Q    -- that Mr. Roberts has for identifying

1  foreign or non-foreign names?
2     A    I don't think he has specific experience
3  with that either.
4     Q    The sixth name on this list is Sophia
5  Hernandez.  Do you see that?
6     A    Sophia Magdolyn Hernandez.
7     Q    And "Sophia" is spelled with a P-H here.
8  Do you see that?
9     A    Yes.
10    Q    Do you know how "Sophia" is spelled in
11 Spanish, with a P-H or an F?
12    A    My guess is that in this case the coding
13 was based on "Magdolyn" rather than "Sophia."
14    Q    The bottom of this page, there are five
15 Lopez respondents, three of whom are coded by one of
16 the coders as non-foreign and two are coded as foreign.
17         Do you see that?
18    A    Let's see.
19         Yes.
20    Q    What accounts for the difference?
21    A    Well, so I think in this case -- let's
22 see, so what do we have as far as the coding?  We have
23 two coded as foreign; right?  Allandra and Henrique
24 were coded as foreign, and then the two -- Maria Lopez
25 and the Henrique Angelo Lopez -- okay, Ellie Lopez was

1  not.
2          So what accounts for the differences?
3  Again, these are subjective judgments about names.  So
4  this was on the basis of, I suppose, the assessment was
5  that Allandra and Henrique seemed more likely to be
6  names that were less common anglophone names than some
7  of the others.
8     Q    Than Maria, for instance?
9     A    Obviously, these are judgment calls that,
10 I wouldn't be surprised if at some point one of us
11 coded Maria as a foreign name.
12    Q    But you didn't code Maria as a foreign
13 name here?
14    A    Whoever coded this didn't.
15    Q    If you came across the name Shree
16 Sherenovossen, would you code that as foreign name?
17    A    Shree Sherenovossen?
18    Q    Yes.
19    A    Yes, I generally would code that as a
20 foreign name.  I wouldn't be terribly surprised if, in
21 going through this entire data set, there were some
22 names of that sort that we missed, but I would have
23 coded that as a foreign name.
24    Q    Now, with respect to the seven
25 individuals from your suspense list survey who

Page 49

1  indicated that they were non-citizens, did you do
2  anything to confirm whether or not their reports of
3  non-citizenship status were in fact accurate?
4      A    So, with those individuals, a couple of
5  things. So on the survey itself, we had two questions
6  on citizenship status.
7          The first question asked purely: Are you
8  a citizen of the United States? The response
9  categories were yes and no.
10         The second question was an open-ended
11 question: Of what country or countries are you a
12 citizen?
13         And, so, in the context of the survey, we
14 evaluated citizenship status on that basis.
15     Q    Did you do anything to assess the
16 non-citizenship status of your seven survey respondents
17 from your suspense list survey who indicated that they
18 were non-citizens, other than taking their survey
19 responses at face value?
20     A    We did, I think -- I can't remember if we
21 did it for this group or not. For some groups we --
22 the Secretary of State's office was able to get matches
23 with Department of Homeland Security. I don't know if
24 we did that for this group, because I don't, I can't --
25 I can't recall.

Page 50

1      Q    Well, we'll talk about the other matches
2  and the other surveys that you did.
3          But my recollection is that for this
4  survey of the suspense list, you did not do anything to
5  confirm the citizenship status of your respondents or
6  non-citizenship status in this case, other than taking
7  their survey responses at face value.
8          Do you have a different recollection?
9      A    I don't -- I'm not sure whether or not
10 that is the case. I'm going -- I would have to look
11 back at my notes.
12     Q    Do you mind just looking at your report
13 for a second and telling me whether or not there's
14 anything in your report indicating one way or the other
15 whether you did anything to assess the non-citizenship
16 status of your 7 survey respondents from the suspense
17 list, other than taking their survey responses at face
18 value?
19     A    Well, as far as this report goes, I don't
20 see any discussion of that, so I guess we didn't do
21 that for these individuals. I'm not -- I'm not
22 absolutely certain of that though.
23         If I was -- so I think you're right, but
24 I'm not certain.
25     Q    If you had done that, if you had

Page 51

1  validated their citizenship status through means
2  outside of the survey, you wouldn't have left that out
3  of your report --
4      A    No.
5      Q    -- would you, Dr. Richman?
6      A    I don't believe I would have.
7      Q    I'd like to mark something as I think
8  Richman Exhibit --
9      A    Unless it was inadvertent and accidental.
10 That is possible. I was writing this report in a hurry
11 at that point and also ill, so I might have left
12 something out, but I would not have intended to.
13         MR. HO: I'd like to mark something as
14 Richman Exhibit 5.
15         ("Can the College Vote Turn out?:
16         Evidence from the U.S. States, 2000-08"
17         by Richman and Pate, marked as Richman
18         Exhibit Number 5)
19         THE WITNESS: Thank you.
20 BY MR. HO:
21     Q    Do you recognize this article?
22     A    Yes.
23     Q    This is an article that you published in
24 State Politics & Policy Quarterly; is that correct?
25     A    Yes. This was published with Andrew

Page 52

1  Pate.
2      Q    And this article was peer-reviewed;
3  correct?
4      A    Yes.
5      Q    Could we look at the first page of the
6  article.
7      A    Okay.
8      Q    Page 51. And I want to look at the last
9  full paragraph and the last sentence: "Higher costs
10 should lead to lower turnout."
11         The next sentence: "The electoral
12 participation literature has studied extensively the
13 effect of other institutional variables on voter
14 turnout."
15     A    Um-hum.
16     Q    Electoral rules that increase the costs
17 of voting are expected to diminish participation.
18         Did I read your words correctly?
19     A    Yes.
20     Q    What do you mean by "higher costs"?
21     A    Well, so, costs can arise from a variety
22 of things. In this particular paper, we were studying
23 differences in whether or not state policies
24 facilitated registration by college students in their
25 college town. And our argument was that if students

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 53

1   were not allowed to register in their college town,
2   this would make it more difficult for students to
3   register to -- or less likely that students would vote,
4   rather, because the cost of participation would be
5   higher in the sense that they couldn't vote in the
6   place where they were living.  They would have to send
7   off for an absentee ballot, and also, informationally,
8   where they were living they're more likely to be able
9   to get information on local races than in the context
10  of races that are potentially halfway across the
11  country.
12       Q    So I understand that's what this article
13  is about specifically.  But I just want to back up a
14  second and ask you more broadly:  What do you mean when
15  you say "higher costs"?  Is that a reference to the
16  costs of voting framework?
17            Have you heard that before?
18       A    Yeah.
19            MR. ROE: Dale, real quick, I'm going to
20  register an object -- a couple objections here.  One is
21  relevance; two is it's out -- outside the scope of
22  discovery; three, it's outside what he was retained as
23  to be an expert in this case.
24            You can go ahead and answer.
25            THE WITNESS: So there is a long line of

Page 54

1   literature in political science on electoral
2   participation.
3            And one of the famous frameworks -- this
4   originates with Downs and then was revised by Riker and
5   Ordeshook, involves thinking about electoral
6   participation through a framework kind of utility
7   function for the costs and benefits of voting.
8   BY MR. HO:
9        Q    And when you say that electoral rules
10  that increase the costs of voting are expected to
11  diminish participation, what do you mean by that?
12       A    Well, so, there have been various studies
13  that have looked at various kinds of electoral rules.
14  For example, I think we have a discussion in here at
15  some point about some natural experiments that were
16  analyzed involving the implementation of voter
17  registration requirements.
18            And if you require people to register to
19  vote, this creates -- this means that they have to
20  register to vote ahead of the election potentially,
21  depending on states.  Some states have
22  same-day-of-registration rules, others don't.
23            And, so, the literature has found some
24  modest-sized effects of requiring voter registration on
25  participation, and the argument is that this creates a

Page 55

1   cost for voters, potentially leads to decrease in
2   participation.
3            MR. ROE: Dale, real quick, just -- I'm
4   not trying to be a pain here, but after every question
5   I'm going to have to probably say the same objection as
6   this, not because I'm trying to be a pain, but because
7   I think under the rules, there are no standing
8   objections.
9            MR. HO: Well --
10           MR. ROE: So if I object, don't think
11  that I'm trying to be argumentative.  I'm just -- I
12  need to raise those objections.  Okay?
13           MR. HO: Okay.
14           Is, is your objection relevance, Garrett?
15           MR. ROE: Three:  Relevance; scope of --
16  outside the scope for which discovery is real; and,
17  three, that he's not a -- he's not retained as an
18  expert to discuss those.
19           MR. HO: Okay.
20           So I remember lots of questions for
21  Professor Ansolabehere and Professor Hersh about their
22  views on registration requirements and election day
23  specifically.  Are you withdrawing all those questions
24  now?
25           MR. ROE: Well, no.  I wasn't part of the

Page 56

1   deposition.
2            MR. HO: Okay.  So --
3            MR. ROE: I'm just letting you know that
4   I'm going to be -- I'm just letting you know I'm making
5   objections.  I am not trying to do it to cause
6   problems.  It's just that I think, under the Rules, I
7   have to make those objections every time.
8            MR. HO: I think under the Rules you're
9   actually prohibited from making that objection.  I'm
10  going to give you the Kansas local rules on deposition
11  objections; and, specifically, rule 5A about
12  objections.
13           "The only objections to be asserted are
14  those involving privilege or work product protection or
15  some matter that may be remedied if" present --
16  "presented at the time, such as an objection to the
17  form of the question or the responsiveness of the
18  answer."
19           So I'm going to ask you not to make any
20  more of those objections.  And if you do, you are on
21  notice that it's an improper objection and I may move
22  for sanctions.
23           Okay?
24           MR. ROE: Can we take a break?  Just two
25  minutes.

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 57

1    MR. HO: Sure.  Let's go off the record.
2    THE VIDEOGRAPHER: Going off the record
3  at 9:45 a.m.
4    (Recess)
5    THE VIDEOGRAPHER: We are back on the
6  record at 10:01 a.m.
7  BY MR. HO:
8    Q    Professor Richman, could you turn to page
9  64 of your article?
10   A    This is the Richman and Pate article?
11   Q    Um-hum.
12   A    All right.
13   Q    Do you see the header "conclusion"?
14   A    No.  Wait, 64 or 65?
15   Q    64.
16   A    Yes, okay, here we are.
17   Q    Do you see the header "conclusion"?
18   A    Yes.
19   Q    And the first sentence under that header
20  reads: "We know that registration requirements and
21  long pre-election registration deadlines can decrease
22  participate."
23       When you write that "registration
24  requirements and long pre-election registration
25  deadlines can decrease participate," what do you mean

Page 58

1  by that?
2    A    That's -- that was a -- that was based on
3  the literature review which was earlier in the paper.
4  There's a writing evidence in the field concerning
5  those issues.
6    Q    And how do registration requirements
7  decrease participation?
8    A    Well, the specifics vary.  I have a
9  working paper that I'm hoping to get out the door
10  sometime soon on -- using search data to try to
11  identify people who are searching for voter
12  registration information in particular states after the
13  deadline has passed.
14       And, so, you can, in a sense, using
15  search data, observe the presence of these people who
16  are, you know, trying to find information on how do I
17  register to vote.  That's what they are searching for.
18       And you know that's not going to work out
19  for them in that election cycle because the state
20  deadline is gone.
21   Q    Alex Street did some research on that;
22  right?
23   A    I wouldn't know specifically.  I don't --
24  I don't recall.  We might have cited that work in this
25  paper.  I don't -- I don't know.

Page 59

1    Q    So I understand what you are saying about
2  the evidence that there may be that registration
3  requirements prevent people from registering to vote,
4  but my question was more about how that happens.
5       How is it the case that a registration
6  deadline decreases participation?
7    A    Well, as I was just talking about, the --
8  one way is that people decide they want to register to
9  vote after the deadline has passed.
10       And one of the things I found in that
11  paper was that it looked like this was -- a larger
12  share of the searches for registration to vote happened
13  after the deadline in mid-term elections.  So those
14  were situations in which the -- there was a lower
15  intensity of information early in the season.  So more
16  people were likely to sort of realize, oh, there's a
17  congressional election coming up, you know, a week, two
18  weeks before the election, which in some states would
19  mean they'd missed the registration deadlines.
20       In -- whereas, in presidential election,
21  there's a lot more -- you know, you've got the
22  conventions, there's a lot more intensity early, so it
23  looked like a smaller portion of the searches happened
24  after the deadline in that situation.
25   Q    So I want to show you another exhibit.

Page 60

1  We'll mark this as Richman Exhibit 6.
2    (Virginia Capitol Connections, Spring
3    2013 edition, marked as Richman Exhibit
4    Number 6)
5    (Discussion off the record)
6  BY MR. HO:
7    Q    This is a copy of the Virginia Capitol
8  Connections quarterly magazine, spring of 2013, and on
9  page 10 there's an article by you; right?
10   A    Right.
11   Q    The title of your article is:  "How Photo
12  Identification Can Increase Turnout."
13       Do you see that?
14   A    Yes.
15   Q    And on the left-hand column, the fourth
16  paragraph down reads:  "At minimum, passage of photo ID
17  eliminates nearly all justifications for not allowing
18  same-day registration at the polls."
19       Is, is it still your view that having a
20  photo ID requirement "eliminates nearly all
21  justifications for not permitting same-day registration
22  at the polls"?
23   A    I rethought that a little bit.  I think
24  when I wrote that I didn't realize the degree to which
25  state-issued photo identification, for example,

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 61

1  driver's licenses, were available to people who were
2  ineligible to vote by reason of not being citizens, for
3  example.
4       On the other hand, in the con -- in the
5  context of some kind of implementation of real ID that
6  did provide that kind of information, I would believe
7  that if you have a, a state that has done -- that, you
8  know, where you know that these are people who are
9  citizens and they have the state ID card, I think that
10 there's little reason to require any delay in
11 registration. You know that they are who they are.
12 The ID has their, their address. I would be in favor
13 of same-day registration in that context.
14      Q    So in a state that has implemented the
15 REAL ID Act and has photo ID law, you would be in favor
16 of same-day registration?
17      A    Not quite. That's not quite what I said.
18      Q    Okay.
19      A    Because there are a variety of meanings
20 of implementation of the REAL ID Act, and so forth.
21      What I said is, a state that has
22 implemented The REAL ID Act in such a way that --
23      THE COURT REPORTER: I'm sorry?
24      THE WITNESS: I'm sorry.
25      If a state has implemented the REAL

Page 62

1  ID Act in such a way that the identification being
2  issued may -- is aligned with or has some notation
3  designating individuals as being eligible to --
4  eligible to vote, so some notation of people who are
5  non-citizens, for instance, I would be in favor of
6  using that as a -- more or less, I advocate here nearly
7  a substitute for, for voter registration.
8       Q    Now the fifth paragraph, the next
9  paragraph down, you write: "Shifting to same-day
10 registration would allow thousands of additional
11 Virginians access to the ballot."
12      Is it still your view that shifting to
13 same-day registration would increase ballot access in
14 Virginia for thousands of voters?
15      A    I -- that's still my view on the basis of
16 the evidence that I discuss, yeah.
17      Q    I think in the right-hand column you talk
18 about potentially 40,000 voters in Virginia who might
19 be able to participate with same-day registration; is
20 that correct?
21      A    That was the estimate. Of course, that
22 could be wrong.
23      Q    Now the -- still in the fifth paragraph
24 on the left-hand column -- your next sentence reads:
25 "Many studies show that voter registration requirements

Page 63

1  and preelection registration deadlines reduce turnout."
2       When you reference "many studies" showing
3  that preelection registration requirements reduce
4  turnout, what are you referring to?
5       A    Well, so I think in the working paper
6  that this was partly based on, I had some citations to
7  those studies, and some of them are probably cited in
8  the paper we were previously discussing. I don't have
9  that list of citations ready for you right off the top
10 of my head.
11      Q    Any of them come to mind? It's okay if
12 you don't.
13      A    I don't have them in mind. I'll start
14 listing studies and miss some and be -- get some -- the
15 date of some study wrong, and so forth.
16      Ben Highton has done various studies on
17 this. A wide range of people have done studies on
18 these kinds of issues.
19      As Professor Ansolabehere talked about in
20 his deposition, there's been a lot of work on
21 cost-of-voting kinds of issues and not much work on
22 voter-fraud issues. And, so, there's a pretty large
23 literature on these, these kinds of issues.
24      Q    Now, you're aware that most states permit
25 registration by mail, right, Professor Richman? All

Page 64

1  states do, in fact.
2       A    I, I am not an expert on the current,
3  most, most up-to-date set of state laws on registration
4  status. We had a set of variables for registration
5  status and it was covered in the study with Andrew
6  Pate, for example, but that was a number of years ago.
7       I don't follow it exhaustively. But most
8  states have a variety of ways for voters to register,
9  including, increasingly, online registration.
10      Q    And by mail; right?
11      A    And by mail.
12      Q    Would you agree that for almost all
13 eligible voters, it's possible to register either by
14 mail or online in advance of election day?
15      A    I don't know the specifics, but most
16 likely it's possible. I know it's going to be
17 individual- and context-dependent, I suppose, the
18 particular person's circumstances; but usually.
19      Q    So what I'm trying to understand is, if
20 most people can register to vote either by mail or
21 online in advance of election day, how would having
22 registration available on election day actually
23 facilitate participation?
24      A    Well, so let me -- if you look at, for
25 example, the figure here for searches in 2010, there

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 65

1 were a lot of searches for "register to vote" that
2 happened after the registration deadline.
3          Presumably, those were people who were
4 interested in registering to vote, at least a good
5 number of them likely were.  And, so, at that point,
6 the option of registering to vote by mail or on the
7 internet is not available, and neither is, in most
8 states, though it varies, the option of same-day
9 registration.
10    Q    So would you agree then that a
11 registration requirement that most people can comply
12 with can still increase the cost of voting and
13 therefore decrease overall participation?
14    A    As I argued here, in this case, it's a
15 matter of timing.  There are people who realize they
16 want to register to vote in a, in a particular election
17 after the deadline has passed.  That's the issue with
18 registration deadlines.
19          And, so there -- so the issue there is
20 some kind of balancing of various states' interests in
21 terms of the security of the electoral process and
22 verifying the information provided by registrants and
23 access to the ballot.
24    Q    Right.
25    A    Ultimately, I think what we should aim

Page 66

1 for is an electoral system that is both very secure and
2 very accessible.
3    Q    So my question wasn't about balancing and
4 it wasn't about the timing of registration deadlines
5 specifically.  It was sort of just a more broad
6 question about the costs of voting framework, and it's
7 this:  If a registration requirement is something that,
8 for most people, it's relatively easy to comply with,
9 can that requirement still increase the costs of voting
10 for some people and thereby decrease overall
11 participation?
12    A    I think I already answered that question.
13    Q    Well, you told me something about timing.
14    A    Yes.
15    Q    But I'm not talking just about the timing
16 of registration requirements.  I'm talking more broadly
17 about whether or not registration requirement,
18 generally speaking --
19    A    Um-hum.
20    Q    -- whether it's you fill out a particular
21 form or you do it at a particular time or you do it in
22 a particular place or you provide certain information,
23 just registration, generally, requirements, whether or
24 not a requirement that is easy for most people to
25 comply with can still increase the costs of voting for

Page 67

1 some people and thereby decrease participation?
2    A    The -- you're asking a, a broad -- I
3 think it would be contingent a bit on what the specific
4 requirements we're talking about are.
5    Q    Um-hum.
6    A    The -- but -- the example I gave you
7 before in answering this question was, yes, there are
8 some people who, because of the timing and because of
9 their relative inattention to the electoral process,
10 may be shut out of participation by a registration
11 deadline that has passed at the time that they realize
12 they want to register to vote in that particular
13 election.
14          So it's going to be context specific,
15 particular people in particular contexts, and so
16 sometimes the costs associated with some election rule
17 or requirement are born broadly and across lots of
18 people in the same small degree; other times they are
19 concentrated on some people.  So there's going to be
20 variability in the way it plays out across different
21 specific contexts.
22    Q    And as a political scientist, if you're
23 trying to assess whether or not a registration rule
24 affects voter participation, you wouldn't just -- well,
25 you wouldn't just ask yourself whether, in the

Page 68

1 abstract, it sounds like the kind of requirement that
2 most voters can comply with; right?
3    A    Ultimately, it's going to be contextually
4 dependent.  So, for example, some rules look like they
5 will have a larger effect than they end up having
6 because the kinds of people affected by those rules are
7 people who wouldn't be participating in elections in
8 general already.
9          So the context matters a lot in terms of
10 assessing what the impact is, and it might end up being
11 larger or smaller than one thought it would be
12 pre-examination of any evidence.
13    Q    And if you want to examine that context
14 that you're referring to about how a law actually might
15 affect voter participation, you'd want to have some
16 sense about how that law actually affects voters in
17 practice; right?
18    A    That's what the empirical literature
19 attempts to do in a variety of ways.  It's sometimes
20 challenging to get an accurate assessment because
21 sometimes things are correlated with each other, so --
22 and you have to try to find ways to control for that.
23 So maybe states that have tougher voter registration
24 rules, for example, maybe the effects -- the
25 differences in turnout that you are observing are not

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 69

1 due to the registration rules but due to various other
2 factors that might be co-associated, including just a
3 state political culture that puts less emphasis on
4 voting by everybody above and beyond any particular
5 effective rules. And, so, the specific empirical
6 assessment can be done in a variety of ways, and it's
7 always -- you know, it's always a process of marshaling
8 of a variety of evidence and assessment of that
9 evidence. And that's what the literature attempts to
10 do in various ways.
11    Q   Now, as a political scientist, if you
12 wanted to assess the effect of a new registration rule
13 on voting, do you think it would be methodologically
14 sound to simply compare total turnout numbers in one
15 election before the law was enacted to total turnout
16 numbers in a similar election after the law was
17 enacted?
18    A   I think that that would be a useful
19 strategy. In fact, that's -- one of, one of the
20 articles I think we cited in here was an experiment --
21 was a quasi-experimental analysis of some counties in a
22 couple of states that hadn't had voter registration
23 requirements when nearby counties did, and then rules
24 were changed that forced those counties to add
25 registration requirements.

Page 70

1        And, so, the examination was both between
2 comparable counties that had and hadn't previously, and
3 then post. So this allowed for, potentially, a fairly
4 good assessment.
5        With looking purely within states, the
6 one challenge is there could be changes in the overall
7 election environment that might make a difference. But
8 it's a reasonable place to go in terms of trying to
9 assess.
10        There was recently a study published on
11 the Virginia photo identification requirement, for
12 example, which suggested that turnout went up after
13 identification -- after implementation of that
14 requirement.
15    Q   Well, let me ask you about the county
16 example that you just listed.
17        That was a comparison of multiple
18 counties, some of which had the registration
19 requirements --
20    A   That's right.
21    Q   -- some of which didn't; right?
22    A   That's right, yes.
23    Q   Would you think it would be a
24 methodologically sound way to assess the effect of a
25 new registration rule by simply taking turnout in an

Page 71

1 election statewide --
2    A   Um-hum.
3    Q   -- before the rule was enacted, and then
4 comparing it to turnout in that same state in an
5 election after the registration requirement was enacted
6 and saying that that constituted evidence, all by
7 itself, just those two numbers, of the effect of the
8 registration rule?
9    A   It would seem to be one relevant piece of
10 evidence. It's not the only kind of evidence one could
11 examine, and so my confidence in any conclusion would
12 depend upon a variety of other evidence as well.
13    Q   What other evidence would you want to
14 know in order to have some confidence in a conclusion
15 drawn from the comparison that I just described?
16    A   Well, so, for instance, one could look
17 at -- one could try to examine nearby states that were
18 similar and see what -- you know, try to look at -- you
19 know, the concern in that kind -- in the kind of
20 analysis you just laid out would be that perhaps there
21 was some -- something else that happened that drove an
22 increase or a decrease. And, so, you want to try to
23 look for various ways to get some control over that.
24        Absent any kind of control, the evidence
25 doesn't come in two shades, black and white; it comes

Page 72

1 in various shades of certainty. And, so, I would
2 consider evidence comparing the election before and
3 election after as one potentially useful piece of
4 evidence, but I don't think it's the last or the only
5 kind of evidence one could examine.
6        And, so, ultimately, I'd want to look at,
7 in terms of -- you know, so that would influence my
8 assessment to a degree, but I'd want to see what other
9 kinds of evidence could be assessed potentially as
10 well.
11    Q   Let me give you a hypothetical of a kind
12 of evidence that we could use to assess --
13    A   Okay.
14    Q   -- the effect of, we'll just say same-day
15 registration. Okay?
16    A   Okay.
17    Q   And here's the hypothetical: Let's say
18 we live in a state with same-day registration. Let's
19 say there are a hundred thousand voting-age people in
20 the state and -- voting-age citizens. Okay?
21        Feel free to write it down.
22        And let's say we do a survey, and we
23 contact 50 voting-age citizens in the state. Let's say
24 half of them, 25, tell us that they are registered to
25 vote, and let's say 5 of those people say that they

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 73

1  became registered to vote in time for the last election
2  because of same-day registration.  They give us this
3  information in the survey.
4       So 10 percent of our survey sample of
5  voting-age people tell us that they use same-day
6  registration.
7       A    Wait, I thought -- okay, sample is 50,
8  yeah.  Right, okay.
9       Q    Got the hypo?
10      A    Yeah, I got the hypothetical.
11      Q    Okay.  Great.
12      So now assuming these facts --
13      A    Um-hum.
14      Q    -- would you take that 10 percent number
15  from our sample of 50 and then apply it to the total
16  voting-age population of a hundred thousand and
17  conclude that 10,000 people in the state were able to
18  register to vote because of same-day registration?
19      A    Well, I -- as I articulated to you
20  before, I -- in any context, the more information you
21  can get, the better.
22      If this is -- this is an odd hypothetical
23  in the sense that if we think about same-day voter
24  registration, there's good data on how many -- likely
25  to be good data on how many people actually registered

Page 74

1  same day.  And, so, in that case, using a survey of
2  this sort in order to estimate effects might not be the
3  most powerful approach.
4       It's a -- lot is going to depend upon
5  what other kind of data is available.  So in your
6  hypothetical, it seems implausible that this is the
7  only kind of information that was available.
8       If this was, however, in a context in
9  which, for some reason, no other information is
10  available, there's going -- you have to -- it's
11  obviously very uncertain, but it would indicate that a
12  portion of people were advantaged by same-day
13  registration.
14      So it's information.  It's imperfect
15  information, very much so.
16      In the context of your hypothetical,
17  there's probably a lot of other information that one
18  could use because your hypothetical with same-day
19  registration where, presumably, any kind of reasonable
20  state recordkeeping would provide some specific
21  numbers.
22      There are other contexts in which less
23  other information is available, in which case one has
24  to rely on, to the extent one can draw conclusions, one
25  has to rely on the information that is available.

Page 75

1       Q    Let me add one more fact to the
2  hypothetical.  There's a hurricane.  All right?  We're
3  in a coastal state, and it wipes out the state's
4  registration records, no backups; it's all gone in the
5  flood.  And we wanted to find out how many people used
6  same-day registration in the last election.
7       Do you think it would be methodologically
8  sound to take the 10 percent figure from your sample of
9  50 and apply it to the full state's population of a
10  hundred thousand and say, I believe that 10,000 people
11  were able to register and vote because of same-day
12  registration based on my sample of 50?
13      A    Well, so, again, a lot depends upon the
14  context.  You said a sample of 50.  Is that for some
15  reason all that one can sample?  Ideally, if there are
16  opportunities to get a larger sample, one might well
17  want to try to do that.  And, so, if we're thinking
18  about all state -- all hundred thousand state
19  residents, are you going to add also there are only 50
20  who have phones left?
21      In that case, I would worry about --
22  worry about why they had phones.  But --
23      Q    There's going to be some response bias
24  there; right?
25      A    So --

Page 76

1       Q    But let's just say, this is what you got.
2       A    Right.
3       Q    Someone comes to you, you're a
4  peer-reviewer for an article.  Someone says, hey, look,
5  I did this survey, hurricane, we don't know how many
6  people actually used same-day registration in the last
7  election, but I got a sample of 50 through a phone
8  survey.
9       A    Um-hum.
10      Q    Those are the responses I got.  I tried
11  calling more, but this is what I got, and I want to
12  publish this article and say that 10,000 people
13  registered to vote in this state using same-day
14  registration.
15      Would you accept that article for
16  publication?
17      A    The standards for peer-review include a
18  variety of things, including novelty.  In this context,
19  there's a lot -- there has been a lot of study of the
20  issue of same-day registration.  And, so --
21      Q    Let's leave other --
22      A    A lot of uncertain -- a lot of
23  uncertainty would be associated with an estimate based
24  on such a small sample.
25      My guess is, in the context of that

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 77

1  uncertainty, this wouldn't provide much new
2  information.  Novelty is an important criteria in terms
3  of peer-review.  I doubt that this hypothetical study
4  would have sufficient novelty to warrant publication
5  because there's been so much other work done using
6  better data than that.  So I think a lot depends upon
7  what's available.
8           So in my graduate statistics class last
9  week, we were talking -- we were examining an instance
10 of a study that was published in the Journal of
11 Politics, which is one of the leading journals in
12 political science in America, looking at the issue of
13 what happens to coalitions that win wars, do they start
14 fighting with each other.
15          The overall sample is only, in the
16 article, is only about 26 cases or something like that.
17 Why is it so small?  My -- basic -- my sense is that's
18 because that's basically the universe of cases.  And,
19 so, that's a small sample size.
20          But it got published in a leading journal
21 because in the context of this question, that is about
22 as good a sample as one can get.  And, so, if you're
23 going to try to learn about this interesting and
24 potentially important issue, you're going to have to
25 learn from the kinds of data that are available.

Page 78

1      Q    Okay.  Let's forget about the novelty
2  question and stick with my hypothetical here for a
3  second.  Okay?
4           Leaving aside the novelty issue, would
5  the hypothetical that I gave you, where someone tried
6  to extrapolate the effect of same-day registration
7  based on a sample of 50 survey respondents to a
8  population of a hundred thousand people, would a
9  straight mathematical extrapolation be methodologically
10 sound?
11     A    This is the sort of thing that polls do
12 all the time.  The basic technology of polling is you
13 sample -- you sample a portion of some population.
14 It's typically very small.  The naive sense among the
15 public is, well, so this poll only had -- only surveyed
16 a thousand people, how in the world can it tell us
17 anything about what people nationwide think about
18 something.
19          But, but there -- you know, it provides
20 some information.  It's imperfect.  Depending on how
21 precise you want the information to be, you need a
22 larger sample size.  So, for ex -- for instance --
23     Q    Is 50 people --
24     A    -- the current population survey --
25          I'm sorry.  I, I hadn't quite finished.

Page 79

1  I do respect you have a follow-up question, but I'm not
2  quite done with my answer.
3           The current population survey, which is
4  used to assess nationwide unemployment, has a sample
5  size well over a hundred thousand per month.  That's
6  because we want pretty precise estimates.  We want it
7  to mean something when we say the unemployment rate
8  moved by 2 -- .2 percent.
9           The American Community Survey, which is
10 used to assess various aspects of the populations of
11 different communities across the country, has an annual
12 sample size of several million.  The five-year estimate
13 is more than 10 million.  That's because we need more
14 precise estimates.  So it's really, as I said before,
15 it's extremely context-dependent what -- and it depends
16 upon partly how much information is already known.
17          That affects -- and how much -- how large
18 the sample sizes potentially can be, all of that
19 affects the question of whether a result based on 50
20 observations is publishable or not.
21          The example I gave from the Journal of
22 Politics was a sample of less than 30 observations.
23 That was published in a leading journal because, in the
24 context of that particular research area, that was a
25 good sample.  Obviously, there's uncertainty associated

Page 80

1  with working from such a small sample, but it -- a lot
2  is, as I said, context dependent.
3      Q    Okay.  You have told me a lot about other
4  different contacts, like the ACS, the CCES, and the
5  study about wars, but I'm asking you about this
6  context.
7           Your answer to my last question was
8  nonresponsive, so I'm going to ask it to you again.
9           Leaving aside the novelty question, is a
10 sample of 50 people to determine whether or not they
11 used election-day registration a methodologically sound
12 sample from which to estimate how many of a population
13 of 100,000 used same-day registration, Professor
14 Richman?
15     A    So you're leaving -- are you including
16 the issue of publishability or not?  That was part of
17 your earlier question; I didn't hear that this time.
18     Q    It's not.  It's just about is it
19 methodologically sound, as a political scientist?
20          MR. ROE:  Dale, real quick, can you
21 clarify something?  Is this the same hypothetical you
22 gave earlier?
23          MR. HO:  Yes.
24          MR. ROE:  Is this about all the same --
25          THE WITNESS:  This is election day, and

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 81

1  so forth.  As I said before, one might -- well, you
2  know, we're in a -- we're down a rabbit hole in this
3  hypothetical where somehow there isn't much other
4  information available.
5         In that context, yes, we're learning
6  something about the effectiveness of the election day
7  registration requirement by looking at this data.
8  BY MR. HO:
9     Q     And I believe you at one point said that
10  an estimate drawn in this context from 50 survey
11  respondents to a population of 100,000 would be very
12  uncertain.  Do you remember using that expression?
13    A     I don't specifically, but I did use
14  expressions about uncertainty previously.
15    Q     And what do you mean when you say it
16  would be very uncertain?
17    A     Well, it's because of sampling error.
18         Now, this is what the -- this is what
19  confidence intervals attempt to put some balance on.
20         And in my response to Professor
21  Ansolabehere, which I imagine is another exhibit that
22  we'll be seeing at some point today, I provided a range
23  of different confidence intervals using a variety of
24  different methods for the various estimates.
25         These are attempts to quantify that

Page 82

1  uncertainty, which I, I mentioned.  Right?  You're
2  sampling -- the smaller the sample, the less precise,
3  and I talked about this in the context of the different
4  size samples for different purposes.
5         The smaller your sample, the less precise
6  the information is that you can draw from it.
7     Q     I want to show you something we'll mark
8  as Richman Exhibit 7.
9         ("Do non-citizens vote in U.S.
10         elections?" by Richman, Chattha, Earnest,
11         marked as Richman Exhibit Number 7)
12         THE WITNESS: Thank you.
13  BY MR. HO:
14    Q     This is your Electoral Studies article on
15  non-citizens registration; correct?
16    A     Yes.
17    Q     And your estimates for non-citizens
18  registration in this paper are based on the Cooperative
19  Congressional Election Study or CCES; correct?
20    A     Correct.
21    Q     And who designed the CCES?
22    A     The CCES was designed by a group of
23  researchers.  Stephen Ansolabehere and Brian Schaffner
24  are two of the principal investigators for the study.
25  It was -- I believe the first round of it was conducted

Page 83

1  in 2006.  It has been conducted for each congressional
2  election since; so 2006, 2008, 2010, 2012, 2014, and
3  most recently in 2016.
4     Q     Do you consider Professor Ansolabehere to
5  be an expert on survey research?
6     A     I think that he is to --
7         MR. ROE: Objection, calls for legal
8  conclusion.
9         THE WITNESS: Professor Ansolabehere is a
10  political scientist I've known for some time.  When I
11  did the summer program in empirical implications of
12  theoretical models at Harvard in 2002, I think it was,
13  Professor Ansolabehere was one of the faculty members
14  there and I got to know him a little bit.
15         I, I think that this, their construction
16  of this survey instrument has done a great service to
17  the political science community, and I, I appreciate
18  the tremendous efforts that he and his colleagues went
19  through to get that project to work.
20  BY MR. HO:
21    Q     Do you consider him to be knowledgeable
22  about survey research?
23    A     On the whole, I think he is knowledgeable
24  about survey research.
25    Q     Do you consider Professor Ansolabehere to

Page 84

1  be knowledgeable and qualified to offer an opinion
2  about statistics?
3         MR. ROE: Objection, calls for legal
4  conclusion.
5         THE WITNESS: I don't know in detail his
6  statistics background.  I was struck by some of the
7  choices he made in his response to my piece, which
8  seemed inappropriate.  That surprised me to a degree.
9         Nonetheless, on the whole I think he has
10  a reasonable background in, in survey research and in
11  statistical analysis.
12  BY MR. HO:
13    Q     What is your knowledge of
14  Professor Ansolabehere's reputation as a political
15  scientist amongst other political scientists?
16    A     My impression is that he has a good
17  reputation.
18    Q     All right.  Let's talk about your article
19  here for a moment.  Can you turn to page 150, which I
20  think is the second page?
21    A     150, page number -- yes.
22    Q     Can you look at the left-hand column, the
23  second full paragraph of the last sentence: "We find
24  that non-citizen participation in U.S. elections is low
25  but non-zero, with an unusual set of covariants with

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 85

1 participation and the potential to change important
2 election outcomes."
3    A    I'm sorry. I'm having trouble finding
4 that here. Which, which paragraph are you on? Okay.
5 You're on the left side.
6    Q    The left column, second full paragraph
7 before the header data --
8    A    Okay.
9    Q    -- the last sentence. Do you see that
10 last sentence there?
11    A    I see it.
12    Q    What do you mean when you say that
13 "non-citizen participation in U.S. elections is low"?
14    A    That it's modest compared to
15 participation by other groups. So our estimates vary
16 widely and -- but the -- because it's -- they are based
17 on small samples, as we talked about, more -- larger
18 samples lead to tighter confidence intervals.
19         But -- and there are also -- there are
20 also various ways of assessing whether someone is
21 registered to vote or not, which lead to different
22 estimates, as we discuss in the paper.
23         So what I meant was, it's modest; it's
24 not, not large compared to, well, for instance,
25 naturalized citizens or all citizens.

Page 86

1    Q    Is it your -- still your view that
2 non-citizens participation in U.S. elections is low?
3    A    Absolutely. As I articulated in various
4 contexts, it's not high. It's modest. It's low. I
5 have tried to push back in various places against
6 narratives that have tried to use this study to take
7 the view that extremely large numbers of non-citizens
8 are registered in voting. For example, the claim by
9 some people associated with Trump's team that several
10 million -- I wrote some pieces on my blog, and they got
11 some circulation in terms of trying to push back
12 against that notion.
13         The level of non-citizens participation
14 is not high. At the same time, it's large enough, as
15 we also argue in this paper, to tip sufficiently close
16 elections.
17         And, so, it's been a -- it's been hard to
18 communicate that to, in a public and media environment
19 which tends to either want there to be none or want
20 there to be as many millions as one needs to make up
21 for whatever electoral deficit one wants to claim is
22 due to non-citizens participation.
23         Although the estimates are very
24 uncertain, at the same time, there are things that they
25 aren't, and I've tried to push back against attempts to

Page 87

1 argue that they are things that they weren't.
2    Q    Is it your view that non-citizens'
3 participation in elections in Kansas is at a similar
4 level to the national rate of non-citizens'
5 participation, or is there a difference?
6    A    Well, I think a relevant aspect might
7 involve the time period that one is looking at, also.
8         I discussed a little bit in my report
9 data from the CCES from 2012 to prior. That was before
10 Kansas implemented the requirements which I believe are
11 the focus of litigation in this case.
12         My sense from that data is that I didn't
13 see any particular evidence that Kansas was unique.
14         Given that we've had several years now of
15 a lot of publicity around the issue of non-citizens not
16 being allowed to vote and of variable degrees of
17 enforcement of requirements that people provide proof
18 of citizenship to register to vote, my guess would be
19 that at this point, those requirements have had some
20 effect in terms of diminishing the degree to which
21 non-citizens are registering or attempting to register
22 to vote in the state of Kansas.
23    Q    When you say that non-citizens
24 participation is non-zero in this article, that means
25 you calculated statistical significance for purpose of

Page 88

1 this article; correct?
2    A    We have -- we have some confidence
3 intervals that are included at some points in the
4 article. We didn't include very many, but we did
5 include some.
6    Q    And just to back up so that I understand
7 what --
8    A    But --
9    Q    -- "confidence intervals" mean. That's a
10 range within which you have a certain degree of
11 statistical confidence that the true value of the thing
12 you're trying to estimate lies. Is that an accurate
13 way of describing a confidence interval?
14    A    More or less, yes.
15    Q    And it's standard in political science to
16 use a confidence interval with a 95 percent
17 probability; is that right?
18    A    That's conventional.
19    Q    Did you use a 95 percent probability
20 range in this article when you calculated your
21 confidence intervals?
22    A    I believe we did.
23    Q    And what does it mean when you have two
24 estimates for the same thing but the confidence
25 intervals -- and the confidence intervals overlap?

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 89

1  That means that, statistically speaking, you can't
2  really distinguish between those two estimates; is that
3  right?
4      A    Potentially, but not always.  Sometimes
5  when confidence intervals do overlap, they are still
6  statistically distinguishable, because you have to
7  calculate the confidence interval for the difference
8  and see whether that confidence interval for the
9  difference is larger than the difference or not.
10     So, so that's, that's one aspect.
11     I, I think it's important, also, in the
12  context of the study, we have a report, for example,
13  estimates of registration based upon both on the low
14  end, most conservative count, which is people who said
15  that they were registered and had a verified
16  registration status by catalyst; that's the low end
17  estimate, here on table 1 on page -- the page number is
18  obscured here, but I think it's 152.
19         That's the low end estimate, so that's
20  the most conservative estimate.
21         And then we have an estimate which is the
22  least conservative estimate, which is people who gave
23  some indication that they were registered to vote.
24  That could be that they, that they reported that they
25  were registered to vote; it could be that they had

Page 90

1  verified registration status; it could be that they had
2  both; it could be that they had contradictory evidence
3  in terms of, for instance, they said they weren't
4  registered to vote, but then they had verify -- they
5  had a voter file match.
6         So that's the least, that's the least
7  certain high-end estimate, so the least conservative
8  estimate.
9         Those are two very different estimates.
10  There's no -- you know, it's not necessarily the case
11  that these confidence intervals are going to intersect
12  with each other, because they are confidence intervals
13  for two different estimates based upon different ways
14  of operationalizing the concept of a non-citizen who is
15  registered to vote.
16     Q    Let me just unpack some of the different
17  things that you said there.  You have one estimate
18  that's conservative, which is non-citizens who could be
19  linked to a voter registration file with a state;
20  correct?
21     A    No.  And who also at the same time said
22  they were registered to vote.
23     Q    Okay.
24     A    So it's both of those together.
25     Q    Got it.

Page 91

1         And you have another estimate that's the
2  high-end estimate, that is, people who said they were
3  non-citizens and either said they were registered to
4  vote or could be linked to an official voter
5  registration record; correct?
6      A    Right.
7      Q    As a political scientist, which of those
8  two estimates do you think is more likely to give you
9  an approximation of the actual value?
10     A    I think that the actual value is likely
11  to be somewhere between them.  The high-end estimate, I
12  think, is almost surely too high, in the sense that I'm
13  not confident that someone who said they were
14  registered but doesn't have a voter file match -- or,
15  rather, has a voter file match which says they are not
16  registered, or vice versa, I'm not that confident that
17  that person has voted.
18         On the other hand, matching is imperfect
19  and people don't always tell the truth in surveys and,
20  in particular, I think one might want to be concerned
21  about whether someone who said they are a non-citizen
22  is going to self-report that they are also registered
23  to vote or that they voted, because that's admission of
24  a -- an activity that is a violation of election laws.
25         So the low-end conservative estimate is

Page 92

1  probably too low.
2      Q    Do you think that the true value for
3  non-citizen registration is closer to the low-end
4  estimate or the high-end estimate?
5      A    You know, I don't know.  This is
6  something that hopefully subsequent research will help
7  us get a stronger handle on.
8         THE VIDEOGRAPHER: Excuse me, Counsel,
9  your microphone fell off.
10        MR. HO: Thank you.
11        THE WITNESS: Do you need to rerecord
12  anything or we're okay?
13  BY MR. HO:
14     Q    So getting back to this broader question
15  about confidence intervals, is it a good rule of thumb
16  that if you have confidence intervals for two estimates
17  that do not overlap, that those estimates are
18  statistically distinct?
19     A    Yes, that's -- that's typically what that
20  means.  And, so, in the case of these two estimates,
21  what that means is they are distinct, which is hardly a
22  surprise because they are different estimates.
23     Q    So if you have two estimates for the same
24  phenomenon and they are statistically distinct, both
25  estimates can't be correct; would you agree with that?

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 93

1  In terms of telling us what the true value is.
2      A    Well, as we were just talking about -- I
3  think I already answered this, more or less -- you are
4  going to have -- but to generalize that response,
5  because we're talking more in the abstract now, in that
6  kind of context, you want to look at how each measure
7  is being operationalized, what is the specific way that
8  the estimate is being constructed and what are the
9  potential limitations, flaws, biases of the different
10  estimates.
11      Q    If you calculate an estimate and the
12  confidence interval for that estimate overlaps with
13  zero, what does that mean?
14      A    So if you calculate an estimate and the
15  confidence interval overlaps with zero, what that means
16  is -- there's some ambiguity about what that means. If
17  you have a -- if you have identified actual cases, my
18  personal view is that any fully valid case demonstrates
19  that the actual value can't be zero.
20          But in terms -- and some methods --
21  methods of calculating confidence intervals handle this
22  in various ways. Some methods include -- create
23  confidence intervals that go to the other side of zero.
24  For a binomial proportion, that's a little bit odd.
25          In general, when you -- you're conducting

Page 94

1  hypothesis testing. So let's say you have a regression
2  coefficient, you're asking -- the question you're
3  interested in is, is the slope of the effect of one
4  variable on another variable non-zero or not; right?
5  The question is, does the confidence interval include
6  zero. If the confidence interval includes --
7          Sorry. I'll slow down. Do you need me
8  to go back?
9          THE COURT REPORTER: Yes.
10          (Discussion off the record)
11          THE WITNESS: The slope of one variable
12  over another variable, say from a regression analysis,
13  you'll construct an estimate of the confidence interval
14  and your interest is, is this slope zero or not. So
15  you will examine does the confidence interval include
16  zero. If the confidence interval includes zero, then
17  we don't -- you don't have 95 percent confidence that
18  the slope is non-zero.
19          Conventionally, that means you don't have
20  enough evidence to reject the null hypothesis that the
21  slope is zero.
22  BY MR. HO:
23      Q    So let's unpack that null hypothesis
24  terminology for non-political scientists who don't know
25  as much about this as you.

Page 95

1          If we calculate an estimate and the
2  confidence interval overlaps with zero, that means we
3  can't reject the null hypothesis; right?
4      A    That's typically what it means.
5      Q    And, typically, the null hypothesis means
6  the hypothesis that the phenomenon that we're trying to
7  observe, in fact, does not exist; is that correct?
8      A    The null hypothesis takes on a variety of
9  forms. It's usually more a matter of whether we can
10  distinguish the phenom -- whether we have confidence at
11  95 percent level that the true value is not some value.
12          So if the confidence interval includes
13  zero, we're not confident at 95 percent level that the
14  true value is different from zero.
15          Now in the context of a binomial
16  proportion, as I articulated in my result, my report, I
17  think it is odd to conclude that when one has valid
18  cases above zero, that the true percentage is zero.
19          But clearly a confidence interval that
20  includes zero suggests that the proportion could be
21  very close to zero, and so that's -- that's more what
22  it would likely indicate.
23      Q    Back to your article.
24          I want to ask you about -- I think you're
25  on page 152 there -- the right-hand column, the last

Page 96

1  full paragraph, or the only full paragraph in the
2  right-hand column.
3      A    Okay.
4      Q    It reads: "How many non-citizen votes
5  were likely cast in 2008? Taking the most conservative
6  estimate" -- I think that's supposed to be "of" --
7  "those who both said they voted and cast a verified
8  vote, yields a confidence interval based on sampling
9  error between 0.2 percent and 2.8 percent for the
10  portion of non-citizens participating in elections."
11          I read that -- did I read that correctly?
12      A    I think that must be a typo in the 2.8
13  percent, but 0.2 to some upper level. But I think
14  that's probably a typo --
15      Q    Okay.
16      A    -- the 2.8, because the estimate was 3.3.
17      Q    Just to be clear, you, you made sure to
18  calculate your margin of error before you published
19  this article; right?
20      A    Yes.
21      Q    You wouldn't have submitted this article
22  for publication without calculating your margin of
23  error, would you?
24      A    No.
25      Q    Would it have comported with accepted

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 97

1  standards in political science to submit this article
2  without calculating a margin of error?
3      A    No.
4      Q    And in this article, what method did you
5  use for calculating the margin of error for your
6  estimate of non-citizen voting?
7      A    I, I believe that what I used was the
8  conventional Wald met -- approach.
9           At that point, I was not yet aware of
10  some of the literature that I discussed in my response
11  to Ansolabehere concerning the limitations of the Wald
12  approach.  It is the conventional approach and remains
13  so in spite of substantial criticism.
14      Q    So in your lone peer-reviewed article on
15  non-citizen registration, you used the Wald method for
16  calculating the margin of error for non-citizen
17  registration; correct?
18      A    I believe I did.
19      Q    And when you published this article, you
20  believed that that was the methodologically appropriate
21  method for calculating the margin of error for
22  non-citizen registration; correct?
23      A    Yes.
24      Q    You didn't use a method that you thought
25  was methodologically inappropriate at the time?

Page 98

1      A    That's right.
2      Q    And the method that you used for
3  calculating the margin of error was adequate for
4  peer-review?
5      A    Yes.
6      Q    What value did you use for P when you
7  used the Wald method for calculating the margin of
8  error at 0.5?
9      A    The value I used for P was the observed
10  proportion.  So the observed proportion in the survey.
11      Q    I'd like to turn back to the previous
12  page in your article, the left column.
13      A    The previous page?
14      Q    Yeah, page 151.
15      A    Okay.
16      Q    The second full paragraph reads:  "It is
17  impossible to tell for certain whether the non-citizens
18  who responded to the survey were representative of the
19  broader population of non-citizens, but some clues can
20  be gained by examination education levels."
21           Now, am I right in reading you here as
22  making the point that the non-citizen sample from the
23  CCES may not be representative of non-citizens as a
24  whole, and that, therefore, you want to investigate
25  that before applying the percentage of CCES respondents

Page 99

1  who say they've participated in elections to the
2  non-citizen population as a whole?
3      A    And later in that paragraph, we say we
4  confront this issue primarily by weighting the data,
5  and discuss the way we use the CCES weights and then
6  supplemented those with additional weighting as well.
7      Q    And one of the additional weights that
8  you applied, correct me if I'm wrong, is that you
9  weighted the CCES respondents for race --
10      A    That's right.
11      Q    -- in order to match up with the
12  non-citizen population as a whole; is that correct?
13      A    Um-hum.
14      Q    And you did that because there might be
15  some variation in terms of registration by race, and so
16  you wanted to make sure that your survey sample was
17  weighted appropriately when you applied -- when you
18  made an estimate about the overall population; is that
19  right?
20      A    I'm sorry, you said -- you suggested that
21  we thought there might be differences in registration
22  by race?
23      Q    Yes.
24      A    Okay.
25           Our concern was more with the

Page 100

1  representativeness of the sample.
2      Q    Okay.
3      A    And so our -- so the CCES sample in the
4  appendix of this paper provides the unweighted
5  proportions.  You'll note that the proportions don't
6  match fully the racial demographic estimates for the
7  country on race for non-citizens.  Some groups are
8  over-represented.  And, so, on that basis, the -- we
9  wanted to correct for the -- by re-weighting on race.
10      Q    So just to be clear, before you made an
11  estimate of non-citizen registration based on the CCES
12  sample that you have in this article, you wanted to
13  weight by race in order to adjust for differences
14  between your sample and the non-citizen population as a
15  whole; correct?
16      A    We weren't purely weighting by race.  We
17  also -- we took the regular current -- the regular
18  weights from the CCES, and then we re-weighted those to
19  have the non-citizen sample match the appropriate
20  current population survey or American Community Survey,
21  I can't remember exactly which, since this data set we
22  were using, but to match overall country level
23  estimates of the racial demographics of non-citizens in
24  the United States.
25      Q    And an additional weight that you

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 101

1  applied, correct me if I'm wrong, was to try to ensure
2  that the education -- was to account for differences in
3  the education levels of the CCES sample and the
4  non-citizen population as a whole; is that correct?
5       A    We did not specifically reweight for
6  education --
7       Q    Okay.
8       A    -- but what we did note was that when we
9  reweighted by race, other characteristics seemed to
10 swing closer to appropriate levels.
11      Q    Were there other variables that you
12 reweighted the CCES data by, other than race?
13      A    No.
14      Q    And I believe you use an expression,
15 "best guess," in this article from time to time.  For
16 example, page 151, right-hand column, last paragraph,
17 first sentence.
18      A    Um-hum.
19      Q    So you provide throughout this paper a
20 best guess at rates of non-citizen participation;
21 right?
22      A    Yeah, we do.  That's correct.
23      Q    Okay.
24           Now, on page 155 of the article, the
25 left-hand column, first full sentence, you write:  "In

Page 102

1  any case, such measures would come with significant
2  costs for some citizens for whom the necessary
3  documentation could be challenging to provide."
4           Did I read that correctly?
5       A    I'm sorry.  I'm having trouble finding
6  where you are.
7           155?  Which paragraph?
8       Q    155, first full sentence.
9       A    Oh, first full sentence, okay.
10      Q    Did I read that correctly?
11      A    Yes.
12      Q    And when you say "significant costs,"
13 that's a reference to the costs of voting framework we
14 discussed earlier; right?
15      A    Yes, that is a reference to that
16 framework.
17      Q    And when you refer to "measures" that
18 could come with significant costs for some citizens,
19 you're referring to, for example, requirements that
20 people show documentary proof of citizenship when
21 registering to vote; correct?
22      A    That's what this paragraph is about, I
23 believe.
24      Q    Okay.
25           Going down to the last paragraph in this

Page 103

1  column, the first sentence of that last paragraph
2  starts with "given."
3           Do you see that?
4       A    First sentence of the last paragraph
5  of --
6       Q    We're on -- still on 155, left-hand
7  column --
8       A    Okay.
9       Q    -- last partial paragraph on the page.
10      A    Oh, we're in the appendix now.  Okay.
11      Q    Yes.
12           "Given confidentiality and legal issues,
13 it is not" ethical -- "ethically possible to directly
14 verify whether individuals who voted were/are
15 non-citizens."
16           Did I read that right?
17      A    Yes.
18           In the context of this survey, we had no
19 access to any information about the survey respondents
20 beyond completely anonymized survey data set, and
21 the -- and I did not think it was going to -- it would
22 be possible, given confidentiality and legal issues, to
23 get access to that kind of --
24      Q    What are those --
25           THE COURT REPORTER: I'm sorry; to get

Page 104

1  access to that kind of --
2           MR. HO: Sorry, I apologize.
3           THE WITNESS: -- to get access to that
4  kind of information.
5  BY MR. HO:
6       Q    What do you mean when you refer to
7  ethical issues here?
8       A    Well, so, my one concern involved what --
9  and if -- the principles of, of research involves the
10 question of harm to participants.  And, so, a concern
11 would be that specifically identifying individuals
12 would violate the trust, in terms of the anonymity or
13 confidentiality that they were guaranteed in the
14 context of completing a survey.  To then unmask them in
15 some way would be unethical.  If they were promised
16 anonymity or confidentiality, that would be a violation
17 of the expectations they had when they entered into the
18 process of completing the survey.
19      Q    Why do you offer people anonymity and
20 confidentiality when you conduct surveys sometimes?
21      A    Well, offering anonymity or
22 confidentiality is to protect individuals from being
23 harmed by people using the survey research data set in
24 some way that would take advantage of them, and it's
25 also as an incentive for people to participate in

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 105

1  research because it provides a, perhaps a little bit
2  more comfort about the ways in which whatever they say
3  will be used.
4      Q    So the thinking is you might get a better
5  response rate when you promise confidentiality in a
6  survey?
7      A    Potentially.
8      Q    Do you also believe you're more likely to
9  get accurate results when you promise confidentiality
10  in a survey?
11      A    No, I haven't thought about that in
12  detail.
13      Q    Are you familiar with any research that
14  suggests one way or the other whether you're likely to
15  get --
16      A    I think the general expectation is that,
17  particularly involving sensitive matters, you're more
18  likely to have people respond honestly about some
19  sensitive matter if they are offered more protections.
20          My impression of the empirical literature
21  on that matter is that the degree of trust that people
22  actually put in those assurances and the degree to
23  which you actually get more honest answers is somewhat
24  in doubt, but that's the hope.
25      Q    Can you cite specific research, sitting

Page 106

1  here today?
2      A    Not sitting here today.
3      Q    I want to show you something.  We'll mark
4  this as Richman Exhibit 8.
5          ("Could non-citizens decide the November
6          Election"? by Richman and Earnest, marked
7          as Richman Exhibit Number 8)
8  BY MR. HO:
9      Q    This is a blog post that you co-authored
10  for The Washington Post's Monkey Cage blog; is that
11  correct?
12      A    Yes.
13      Q    And it's dated October 24th, 2016 --
14  2014, I'm sorry; is that correct?
15      A    Yes, that's what it's dated.
16      Q    And this blog post refers to your
17  research, the same research described in your Electoral
18  Studies article about non-citizen registration and
19  voting; is that right?
20      A    That's right.  So this blog post
21  discusses -- provides a kind of popular summary of some
22  of the results that are discussed in that article.
23      Q    And that's the same research based on the
24  CCES; correct?
25      A    Correct.

Page 107

1      Q    Could you turn to the second page --
2      A    Certainly.
3      Q    -- of this post?
4          And the third paragraph reads: "An
5  alternative approach to reducing non-citizen turnout
6  might emphasize public information.  Unlike other
7  populations, including naturalized citizens, education
8  is not associated with higher participation among
9  non-citizens.  In 2008, non-citizens with less than a
10  college degree were significantly more likely to cast a
11  validated vote, and no non-citizens with a college
12  degree or higher cast a validated vote.  This hints at
13  a link between non-citizen voting and lack of awareness
14  about legal barriers."
15          Did I read that correctly?
16      A    Yes.
17      Q    Now, is it an accurate statement of your
18  views that public education about the fact that
19  non-citizens are not permitted to vote could help
20  prevent non-citizen electoral participation?
21      A    Exactly.  And I think that that's part of
22  what I articulated in terms of, when you asked about
23  whether I thought non-citizen voting rates were -- or
24  registration rates were lower in Kansas than the
25  country as a whole.

Page 108

1          I suspect that the law in Kansas and the
2  controversy surrounding it has played an educated role
3  in terms of increasing awareness among non-citizens, of
4  the law which is in place more or less nationwide, a
5  couple of mail-in counties may be an exception, but
6  more or less nationwide, that non-citizens are not
7  supposed to register and vote in U.S. elections.
8      Q    Besides adopting a law that requires
9  people to show physical citizenship document when
10  registering to vote, is it your view that public --
11  other kinds of public education measures could be
12  effective in preventing non-citizen electoral
13  participation?
14      A    I think it's possible.  Now, in any kind
15  of public information campaign, the challenge is to get
16  the information out there.
17          And, so, it would be interesting.  And I
18  hope ultimately the literature develops in ways like
19  this, where we, we investigate aspects like, like that.
20          Like what we talked about, here was some
21  evidence based on inform -- on education, which is
22  obviously associated with a lot of different things.
23  It's not evidence specifically about some kind of
24  public information campaign.
25          Getting the population that most perhaps

Page 109

1  needs this information access to it might be difficult
2  through simply public information ads or something like
3  that.
4      Q    But is it --
5      A    One would have to be careful about how
6  those were phrased, because one certainly wouldn't want
7  to have things phrased wrong or mistranslated in some
8  way that led naturalized citizens to get the
9  misimpression that they're not allowed to vote.
10 Something like that would be, would be very
11 problematic.
12     Q    But it's an accurate statement of your
13 views that lack of awareness about the rule that
14 non-citizens can't vote is a contributing factor in
15 non-citizen electoral participation; correct?
16     A    I think it's a factor.  I don't think
17 it's a factor in all cases.
18         So, for example, the father of a very
19 good friend of mine from college was a French citizen
20 for many years before he naturalized and registered to
21 vote years before he became a naturalized citizen, in
22 full awareness, I think, of the law.  So I think
23 there's a mix of different reasons non-citizens
24 register to vote.
25     Q    Outside of anecdotes, are you aware of

Page 110

1  any empirical information suggesting that factors other
2  than lack of awareness contribute to non-citizen
3  electoral participation?
4      A    There was a case very recently, highly
5  publicized, in Texas involving a non-citizen who was
6  registered to vote in one jurisdiction, moved to
7  another jurisdiction, attempted to reregister to vote,
8  this time checking a box indicating non-citizenship
9  status, was told you're -- if you are a non-citizen,
10 you are not allowed to register to vote.  Subsequently
11 reregistered, this time checking the citizen box, and
12 ultimately led to a series of litigation, and so forth.
13         I think it's pretty clear in that case
14 that this is someone who was informed that -- this is
15 my impression from the news accounts, I'm not a legal
16 expert on the details of the case -- but it certainly
17 looked like an instance where someone was, was informed
18 of the law and nonetheless pursued voter registration
19 anyhow.
20     Q    You would agree that the statistical
21 research you did on the CCES suggests that lack of
22 awareness about the rule against non-citizen
23 registration is a contributing factor in non-citizen
24 electoral participation; correct?
25     A    It suggests that it's possible that lack

Page 111

1  of awareness is a role.  Certainly -- we talked about
2  the association with education again, and so I think it
3  suggests that's one of the factors.
4          Whether and to what extent and to how --
5  you know, in terms of magnitudes, this is something I'd
6  love to be able to give you a much more concrete sense
7  of, but the field of studying both fraud in general and
8  non-citizen voting in particular is still relatively
9  young, and I don't think we have that level of
10 precision.
11     Q    Staying on this same page of the
12 Washington Post blog that we were talking about
13 earlier, the last full paragraph on this page that
14 starts with the word "finally."
15     A    Um-hum.
16     Q    The first sentence reads:  "Finally,
17 extrapolation to state specific level or district level
18 election outcomes is fraught with substantial
19 uncertainty."
20         Did I read that correctly?
21     A    "Fraught with substantial" -- yes.
22     Q    And when you say "extrapolation," you
23 mean extrapolation from the CCES survey data; is that
24 correct?
25     A    Extrapolation from the national level

Page 112

1  survey aggregates that we reported in the study.
2      Q    And your view is that extrapolation from
3  those national-level estimates of non-citizen
4  participation to specific state elections is fraught
5  with substantial uncertainty; is that right?
6      A    That's right.
7      Q    I'd like to move to another document.
8  We'll mark this Richman Exhibit 9.
9          ("Some thoughts on non-citizen voting,"
10         by Richman, marked as Richman Exhibit
11         Number 9)
12         THE WITNESS: Could we take just a
13 one-minute break and then come back?
14         MR. HO: It could be more than a minute.
15         MR. ROE: A couple minutes.
16         MR. HO: Sure.
17         MR. ROE: I'd like to stretch and use the
18 bathroom.
19         MR. HO: Of course.  Yeah, it's a good
20 time to take a break.
21         THE VIDEOGRAPHER: Going off the record
22 at 11:13 a.m.
23         (Recess)
24         THE VIDEOGRAPHER: Back on the record at
25 11:23 a.m.

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 113

1   BY MR. HO:
2       Q    So before the break, we handed you
3   Richman Exhibit 9.  Do you have that in front of you?
4       A    I do.
5       Q    And this is a post for your blog;
6   correct?
7       A    That's correct.
8       Q    And you wrote this post?
9       A    Yes.
10      Q    And it's dated October 31, 2016; is that
11  correct?
12      A    Yeah, I think that's what it's dated,
13  yup.
14      Q    And this blog post also refers to your
15  research based on the CCES about non-citizen
16  registration and voting; correct?
17      A    That's correct.
18      Q    So on the first page, the last paragraph,
19  I want to ask you about the third sentence, which
20  reads: "But one should keep in mind that such
21  elections can be swayed by any number of factors that
22  arguably bias election results toward or against
23  particular parties and candidates.  Put another way,
24  our results suggest that almost all elections in the
25  U.S. are not determined by non-citizen participation,

Page 114

1   with occasional and very rare potential exceptions."
2           Did I read that correctly?
3       A    Yes.
4       Q    So as a political scientist, is it still
5   your opinion that almost all elections in the U.S. are
6   not determined by non-citizen participation?
7       A    It is.
8       Q    And when you say "almost all elections,"
9   what are you referring to?
10      A    Most elections aren't close enough, for
11  one thing, based on the estimates of non-citizen
12  participation that we gave.
13          Some people have -- for example, The
14  Washington Times had a piece that fall which
15  misinterpreted our work, suggesting that when we found
16  certain percentage of non-citizens voted, that that
17  meant a certain percentage of voters were non-citizens,
18  which is orders of magnitude off, because non-citizen
19  are a modest share of the overall adult population.
20          And, so, there are many elections that
21  simply are not close, enough given the kinds of
22  estimates we reached, for it to be plausible that
23  non-citizen participation changed the outcomes.
24          In the Electoral Studies paper, we
25  discussed an analysis of all house and Senate elections

Page 115

1   over the course of a couple of election cycles, and we
2   have a table summarizing the ones that were closest to
3   being in a range where our estimates would suggest
4   potentially non-citizen votes could change the outcome.
5           Most were not in that range.  Most were
6   not even in the range where a hundred percent
7   participation by non-citizens would potentially have
8   changed the outcome.  So there are some elections which
9   are in that range, and there are many elections which
10  are not, and that's what I was trying to convey here.
11      Q    On the second page of the printout of
12  this blog post, you write: "On this vein, we would
13  also like to remind readers that we were merely raising
14  the Minnesota Senate race and the North Carolina
15  electoral college outcome as examples of the types of
16  races that could be swayed by non-citizen
17  participation.  The survey data we use provides no way
18  at all to determine whether, in fact, the outcomes of
19  these races were or were not, in fact, swayed by
20  non-citizen participation.  We used terms like
21  'plausible' rather than anything more definitive."
22          Did I read that correctly?
23      A    Yes.
24      Q    So is it accurate to say that you are not
25  expressing the opinion that the Minnesota

Page 116

1   Franken/Coleman Senate race was in fact decided by
2   non-citizen participation?
3       A    I think it's plausible that it was.  But
4   to know for sure, one would have to have addition -- to
5   know for sure, you would have to have identified the
6   specific non-citizens who voted in that race and, also,
7   somehow have identified how they voted.
8           That kind of information is not available
9   through survey research.
10      Q    So you are not saying that it is your
11  opinion that the Minnesota Franklin (sic) Coleman
12  Senate race was in fact decided by non-citizen
13  participation?
14      A    I answered that question a moment ago.
15  Do you have some clarification you need from my answer?
16      Q    Yes, I do.
17          My question is:  Are you saying, that in
18  your opinion, the Minnesota Franken/Coleman Senate race
19  was in fact decided by non-citizen registration?
20      A    I think it is plausible, but I do not
21  know whether it was or not.
22      Q    And you do not know -- I'm sorry, let me
23  try that again.
24          You are not saying that you know that the
25  North Carolina presidential contest in 2008 was in fact

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 117

1 decided by non-citizen participation; correct?
2     A    Again, I think it's -- there's a
3 reasonable probability, lower in that case, because the
4 level of non-citizen participation would have to be
5 substantially higher for that to have been the case.
6 So there's a probability that it was, but, again, I
7 don't know for sure, because, again, survey data simply
8 cannot provide the kind of specific information on
9 particular people voting and how they voted that would
10 be required to make a determination like that. That
11 would be more a matter for some kind of court
12 proceeding than survey research.
13    Q    I'm going to show you something we'll
14 mark as Richman Exhibit 10.
15         ("Is it plausible that non-citizen votes
16          account for the entire margin of Trump's
17          popular vote loss to Clinton?" by
18          Richman, marked as Richman Exhibit
19          Number 10)
20 BY MR. HO:
21    Q    Do you recognize this?
22    A    Yes.
23    Q    This is a post for your blog?
24    A    Yes.
25    Q    You wrote this post?

Page 118

1     A    Yes.
2     Q    And it is dated January 24th, 2017?
3     A    That was an update on an earlier post.
4     Q    And if we turn to page 2, in the under the
5 December 1st update, in the first bullet, number 1, you
6 write in the third sentence: "My goal was to show that
7 an extrapolation from my co-authored work on the 2008
8 election to the 2016 election did not support the
9 arguments some seem to be making that the entire
10 popular vote margin for Clinton was due to illegal
11 votes by non-citizens."
12         Did I read that correctly?
13    A    Yes.
14    Q    In your opinion, does your research based
15 on the Cooperative Congressional Election Study support
16 the notion that Hillary Clinton's winning the national
17 popular vote margin over Donald Trump in the 2016
18 presidential election -- can be attributed to
19 non-citizen voting?
20    A    I do not believe that the entire margin
21 can be attributed to that. I think it's very unlikely.
22 What's the popular margin now? Almost 3 million votes?
23 For that to be the case, you would have to have a
24 substantially higher level of non-citizen voting than
25 we estimated, and you would have to have non-citizens

Page 119

1 voting for Clinton over Trump at a high rate, probably
2 higher than we estimated as well. I think it's quite
3 unlikely.
4     Q    Are you aware of any research indicating
5 that the popular vote margin in the 2016 presidential
6 election could be attributed to non-citizen voting?
7     A    Let me try to make sure we're being clear
8 that we're talking about the same thing.
9         There's a difference between -- my
10 argument here is that the entire margin would not
11 plausibly be.
12         You used the words "the margin." I think
13 it is quite possible that some portion of that margin
14 was due to the votes of non-citizens. The evidence
15 that I've seen suggest that non-citizens tend to, in
16 recent elections, favor democratic candidates over
17 Republican candidates. For example, in 2012, among
18 non-citizens -- self-reporting non-citizens who cast a
19 validated vote, more than 90 percent reported
20 supporting Barrack Obama.
21         So it's quite plaus -- I think that
22 there's evidence from a variety of sources that some
23 non-citizens participate in U.S. elections, and there's
24 evidence from the CCES that non-citizens tend to favor
25 democratic candidates at the presidential level. So I

Page 120

1 think it is entirely plausible that some fraction of
2 that margin was due to the votes of non-citizens, but I
3 do not think that it's plausible that the entire margin
4 was due to those votes.
5     Q    And are you aware of any research out
6 there supporting the notion that the entire margin in
7 the popular vote for president in 2016 can be
8 attributed to non-citizen voting?
9     A    I am not aware of any.
10    Q    On page 3 of this blog post, before
11 bullet number 3, so just going up from there --
12    A    Okay.
13    Q    -- the last sentence reads: "The
14 underlying study on which the extrapolation is based
15 has been the subject of some cogent criticisms, and
16 this leads me to believe that the actual rate of
17 non-citizen involvement is on the low end of our
18 initial estimates rather than anywhere close to the
19 high end."
20         MR. ROE: Dale, what exhibit are you
21 looking at now?
22         THE WITNESS: This is still that blog
23 post.
24         MR. HO: Same exhibit. Exhibit 10.
25         MR. ROE: You said page 3?

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 121

1    MR. HO: Page 3, near the top.
2    THE WITNESS: 3 of 12, just above
3    bullet -- or number 3. It's about seven lines from --
4    MR. ROE: Thank you. Sorry.
5    MR. HO: Sure.
6    BY MR. HO:
7    Q    Did I read that correctly?
8    A    Yup.
9    Q    Is it still your view that the actual
10   rate of non-citizen involvement in elections is at the
11   low end of your estimates from the Electoral Studies
12   article?
13   A    It remains largely my view. I've done
14   some initial -- additional analyses since then, which
15   have shifted my perceptions up somewhat. This is an
16   ongoing thing, as I -- as more information becomes
17   available, but I think if you look at our low-end
18   estimates, that was 3.3 percent of non-citizens
19   registered to vote. I think it's closer to that than
20   to the high end of, what was it, 19 percent or
21   something like that.
22   Q    I'll show you another document we'll mark
23   as Richmond Exhibit 11.
24       ("Why I would sign the 'open letter' if
25   it were true," by Richman, marked as

Page 122

1    Richman Exhibit Number 11)
2    THE WITNESS: Okay.
3    BY MR. HO:
4    Q    This is another post for your blog;
5    correct?
6    A    That's correct.
7    Q    It is titled "Why I would sign the 'open
8    letter' if it were true"; is that correct?
9    A    Yup.
10   Q    And you authored this blog post?
11   A    Yes.
12   Q    And it is dated --
13   A    I don't know. I don't see a date on
14   this.
15   Q    I think on the last page there's a date
16   of March 10, 1017. Do you see that?
17       MR. ROE: It's at the very bottom.
18       THE WITNESS: Yeah, I got it.
19   BY MR. HO:
20   Q    So, let's look at the first page, last
21   paragraph here, the third sentence.
22   A    Okay, the third sentence.
23   Q    You write: "My study," and then, all in
24   caps, "does not" -- end of caps -- "support Trump's
25   claim that millions of non-citizens voted in the 2016

Page 123

1    election."
2    Did I read that right?
3    A    That's right, and that's what we were
4    just talking about. As I said before, I don't think
5    that it's plausible that the entire margin was
6    accounted for by non-citizen votes.
7    Q    And, specifically, you do not believe
8    that your research supports the notion that millions of
9    non-citizens voted in the 2016 president --
10   A    Not that -- not that --
11       THE COURT REPORTER: Excuse me. Could
12   you let him finish the question.
13       THE WITNESS: Sorry.
14       Are you finished with the question?
15   BY MR. HO:
16   Q    I don't think so. Let me try it again.
17       Specifically, you do not believe that
18   your research supports the notion that millions of
19   non-citizens voted in the 2016 presidential election;
20   correct?
21   A    I do not believe that three to five
22   million non-citizens voted in the presidential
23   election.
24   Q    Well, you here write that your research
25   does not, in all caps, support Trump's claim that

Page 124

1    millions of non-citizens voted in the 2016 election.
2    A    That's right.
3    Q    So you don't think it's millions of
4    non-citizens that voted; correct?
5    A    I think it's probably less than millions.
6    As I walked through, in one of the
7    earlier pieces that we've been talking about, if you
8    extrapolate from our kind of middle estimate based on
9    an effort to combine the two estimates in that -- the
10   low and high end, that got to an estimate of about
11   800,000 or so.
12   Q    Is that your best estimate for the number
13   of non-citizens that have voted in a recent
14   presidential election?
15   A    You know, I've been -- various people
16   have tried to claim that I have an estimate of the
17   number of non-citizens who voted in 2016; I don't yet
18   have one, and that's because I'd like to analyze, once
19   the voter-verified -- the data matches with the 2016
20   CCES are out, I'd like to be able to look at that with
21   some care.
22       There are several factors in play. One
23   is, have there been any changes in the level of
24   non-citizen participation over the last four years
25   since the 2012 election. And, two, how did the fact

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 125

1  that Donald Trump was on the ballot and saying some
2  pretty incendiary things about immigration policy alter
3  the proportions of people supporting the Republican and
4  Democratic versus other candidates among the
5  non-citizen population.  Those are things I haven't yet
6  had a chance to look at.
7          And I think one can extrapolate from the
8  previous estimates, but one should be very cautious
9  about doing that.  And I don't have an estimate for
10  2016 that I have substantial confidence in because of
11  those kinds of sources of uncertainty.
12      Q    Would it be an accurate representation of
13  your research, Professor Richman, to suggest that it
14  supports the notion that 11.3 percent of non-citizens
15  voted in the 2016 presidential election?
16      A    I think that would be one of the issues
17  that we've seen, which is taking relatively high
18  estimates.
19          So that number from this paper, if you
20  look at -- let's see, which table -- I'm returning here
21  to Exhibit 7.  Let's see, table 2.
22          The 11.3 percent number is the high-end
23  estimate based on all individuals who said either that
24  they voted or had a voter file match or both.
25          As we articulate -- as I articulated when

Page 126

1  we were discussing table 1 about voter registration, we
2  offer high- and low-end estimates, based on either a
3  conservative way of looking at this in terms of
4  self-reported and verified, and a -- and a much less
5  conservative way of looking at it, high-end estimate,
6  that's based on anybody for whom we have some
7  indication that they may have voted.
8          As I said before, I think there are
9  reasons to think the conservative estimate is probably
10  too conservative, and the, the other estimate, the
11  highest estimate, is too high.
12      Q    Okay.  So I understand the differences
13  between the low and the high estimates; I understand
14  your article.
15          My question to you is, if someone cited
16  your work and said that it supports the notion that
17  11.3 percent of non-citizens voted in the 2016
18  presidential election, would that person be accurately
19  representing your work?
20      A    2016.
21      Q    Yes.
22      A    Again, the -- I would much rather if they
23  read the article as carefully as you probably have, in
24  terms of understanding that that high estimate is very
25  much a high estimate based on people from whom we have

Page 127

1  some indication that they voted.
2          And I would argue that someone who merely
3  quoted the high-end estimate would potentially be
4  misleading people, because that estimate is the
5  high-end estimate, and we were clear about the way in
6  which each of those estimates was constructed, I
7  believe, in the paper.
8          And, so, I would -- I would want to
9  caution anybody trying to draw that conclusion from the
10  study that they should be careful about letting any
11  consumers of their, their analysis, their
12  extrapolation, know that that's the particular sort of
13  estimate, and there are other -- there are other ways
14  of looking at it.  And I've tried to do that in some of
15  the pieces that we've looked at lately.
16      Q    So let's talk about Exhibit 11 again,
17  this blog post, "Why I would sign the 'open letter.'"
18      A    Okay.  Let me find it.  Sorry.
19          Okay.
20      Q    Let's turn to page --
21      A    Wait.  I haven't found it yet.
22          Okay.
23      Q    Let's turn to page 4.  Last paragraph,
24  last sentence.
25          You write:  "I share your concern with

Page 128

1  the way Richman, et al., 2014 study has been abused by
2  those who would like to cherry-pick upper-end
3  estimates, but there are more measured and accurate
4  responses available than this one."
5          Did I read that correctly?
6      A    Yes.
7      Q    So is it your view that if someone is
8  describing non-citizen participations in elections and
9  cherry picks your high-end estimate without describing
10  the full range of estimates that we're talking about
11  here, that that would constitute an abuse of your
12  research?
13      A    I think it would potentially mislead
14  people about the research.  This research -- it's been
15  a very, as you may get a sense from these blog posts,
16  it's been very much -- through the last couple of years
17  with this research, I've been trying to fight a
18  two-front battle with distortions of it:  On the one
19  hand, weak, sometimes baseless efforts to debunk it,
20  mixed sometimes with some reasoned analyses that I
21  appreciate and have sought to address; and, on the
22  other hand, people who have taken it as a demonstration
23  of levels of non-citizen participation that go well
24  beyond what I think our results warrant.
25          And, so, I've, I've --

Page 129

1      Communication -- this has deepened my
2  appreciation of the challenges of scientific
3  communication.  It's been, been an interesting
4  experience.
5      Q    So you mentioned The Washington Times
6  article before.  Besides that Washington Times article,
7  can you give me other examples specifically of people
8  who have abused your work?
9      A    Not off the top of my head.
10     Q    Well, would citing your work and saying
11 it supports the notion that millions of non-citizens
12 voted in 2016 constitute an abuse of your work?
13     A    I think it would depend upon the way in
14 which it was cited, but, as you can see, I've objected
15 to the way that it's been used by the Trump
16 administration.  So there are certainly contexts in
17 which -- again, it's going to be a matter of
18 contextualizing in part.
19     Q    And would citing your work and saying
20 that it supports the notion that 11.3 percent of
21 non-citizens voted in the 2016 presidential election
22 constitute what you would describe as an abuse of your
23 work?
24     A    I would particularly object if somebody
25 gave the impression that I had some new study of the

Page 130

1  2016 election, specifically on that election.
2      As I articulated to you before, I think
3  there are reasons why one might -- potentially 2016
4  could be different from previous elections, on high or
5  low ends, and I -- I don't have a 2016 analysis of
6  national level data at this point.
7      Q    You've done no analysis of non-citizen
8  voting rates in the 2016 election specifically;
9  correct?
10     A    Not entirely true.  I recently got a copy
11 of the 2016 CCES.  I haven't had a chance to do much
12 with it.  I don't intend to do much with it until the
13 validated voting data is out, which it isn't yet.
14     But I have run one or two cross tabs
15 looking at the self-reported voting rates, which look
16 broadly consistent with previous years.
17     Q    So you have not performed any analysis or
18 seen any data at this point to suggest that non-citizen
19 Electoral Studies participation in 2016 was
20 significantly different from previous elections;
21 correct?
22     A    Not yet, but I haven't done -- I just got
23 that data recently, and I have not done very much
24 analysis of it.  I've been busy with other things.
25 It's the end of the semester, and so there's a lot of

Page 131

1  grading and teaching and other things like that to do.
2      Q    One last question about this, Professor
3  Richman.
4      Would citing your research and saying it
5  supports the notion that the entire popular vote margin
6  in the 2016 presidential election can be attributed to
7  non-citizen participation constitute what you would
8  describe as an abuse of your work?
9      A    I, I don't -- you keep using the term
10 "abuse."  I'm not sure exactly how I would define that.
11 But to offer a definition, I think it would be
12 misleading people about the implications of the work.
13     Q    Okay.  Let's talk again about your
14 report, which is Exhibit 1.
15     A    Let me find this.  It's at the bottom of
16 this now.
17     Q    Maybe during the break we'll try to
18 organize these.
19     A    Yeah, it's beginning to get a little
20 bit -- okay, back to the report.
21     Q    Now, in your reports in this case, and
22 particularly your first one, you produced, is it
23 accurate to say, four estimates of non-citizen
24 registration based on, first, the CCES; second,
25 naturalization data from Sedgwick County; third, a

Page 132

1  survey of temporary driver's license holders, or TDL
2  holders; and, fourth, a sample of incidentally
3  contacted non-citizens.  Is that correct?
4      A    Those are the primary pieces of evidence
5  examined in that report.  There was also a match of the
6  TDL filed with the suspense list.  There was also a
7  table provided by the Kansas Department of Vehicles.  I
8  discussed both of those.
9      In the second report, I also did some
10 additional analyses of Sedgwick County.
11     In addition, there's the analysis of the
12 suspense file survey itself, which is not specifically
13 a survey of, of non-citizens, obviously, and a survey
14 of registered voters in some select Kansas counties.
15 So there were those analyses as well.
16     Q    There's a lot of analysis in your
17 reports, Professor Richman.
18     I'm wanting to discuss a specific subset
19 of your analyses.
20     And what I'm asking about is the subset
21 of analyses that you used to produce estimates as to
22 the percentage or number of non-citizens in Kansas who
23 are registered to vote.
24     Do you understand what I'm referring to?
25     A    Okay.  Yes.

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

---

Page 133

1    Q    And my understanding is that you rely on
2  four data sources to produce your estimates of the
3  number or percentage of non-citizens registered to vote
4  in Kansas:  The CCC -- CCES; the Sedgwick County
5  naturalization information; the TDL survey; and the
6  incidentally contacted non-citizens; is that correct?
7    A    Those are the primary ones that I
8  examined.  As I mentioned, there are the another
9  analyses as well.
10   Q    Okay.
11        In your view, are the four estimates that
12 I described, based on those four different data
13 sources, in your view as a political scientist, are all
14 of those estimates methodologically sound in the way
15 that they were calculated?
16   A    Like all social science research, there
17 are potential issues with, with the analyses.  I
18 addressed a number of the issues that were raised by
19 Ansolabehere and others in my second report.
20        On the -- but taken as a whole, I think
21 that they do provide valid information about -- though
22 with substantial uncertainty, about the degree to which
23 non-citizens are registered or attempting to register
24 to vote in the state of Kansas.
25   Q    Now, in your reports, you're not

---

Page 134

1  providing an estimate as to the number of non-citizens
2  in Kansas who have registered or attempted to register
3  to vote through a DMV office specifically; correct?
4    A    The -- as far as -- all of the analyses
5  we just talked about, I don't believe those are.  We
6  talked earlier about how exactly individuals get on the
7  suspense list.  It's possible that if I -- my
8  understanding of how individuals get on the suspense
9  list was incorrect, I might have inadvertently provided
10 such an analysis.
11        The table from the Kansas Department of
12 Vehicles is specifically about their efforts to provide
13 information to the Secretary of State's office about
14 individuals they were able to match in their data
15 files, as I understand it.  So when individuals passed
16 a certain year it appears, or perhaps in certain
17 contexts, I'm not sure exactly when and under what
18 circumstances the DOV has or does not have information,
19 but for a portion of individuals in the driver's
20 license files, the Department of Vehicles has
21 information about the sort of documentation of legal
22 precedence, I guess it is, that was provided to them.
23        So some individuals in that table, for
24 example, provided what's globally called a "green card"
25 when they were identifying themselves to apply for

---

Page 135

1  driver's license.
2    Q    We'll talk --
3    A    And that particular table is about those,
4  those individuals and their portion of the suspense
5  list for particular years that are -- that were in that
6  category of individuals.
7         And then broken down further on the basis
8  of when they provided that documentation.
9    Q    Professor Richman, I don't think you
10 understood my question.
11   A    I'm sorry.
12   Q    It wasn't about the range of data in your
13 report.  It's a very simple question.
14        Are you providing in your reports an
15 estimate as to the number of non-citizens in Kansas who
16 registered to vote or attempted to register to vote
17 through a DMV office specifically?
18   A    I said that at the beginning; I'm not
19 aware that I was.
20   Q    Okay.  And you are not in your reports
21 providing an estimate as to the number of non-citizens
22 in Kansas who have actually cast a ballot; correct?
23   A    My analysis was focused on registration.
24 The charge I was given by the Secretary of State's
25 office was to examine the issue of how many

---

Page 136

1  non-citizens have registered to vote or attempted to
2  register to vote; that was my focus in this report.
3  And, so, in the Kansas-specific analyses, I focused on
4  that issue.
5    Q    So, for each of your estimates of the
6  number of non-citizens in Kansas who are registered or
7  who have attempted to register to vote, is it accurate
8  to say that you start with a sample; is that right?
9    A    Yes, more or less.
10   Q    And we described essentially the four
11 samples that you start with; right?
12   A    Well, as we discussed previously, there
13 are a variety of other estimates as well that we might
14 want to talk about, but in the case of the survey data
15 sets, we started with a sampling frame and surveyed
16 individuals from that sampling frame.
17        In the case of Sedgwick County, it's the
18 group of -- the sampling frame is, I guess, the group
19 of individuals who naturalized and then filled out
20 voter registration forms at the naturalization
21 ceremony.
22   Q    So for each of your estimates of the
23 number of non-citizens in Kansas who are registered to
24 vote, you start with a sample and you take the
25 percentage in that sample that you determined were

---

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 137

1  registered or had attempted to register to vote; is
2  that the first step?
3      A    The percentage of non-citizens who we --
4  there's some filtering in, in various cases first to
5  eliminate individuals who gave some indication they
6  were citizens.
7      Q    Okay.
8           So you take the percentage of
9  non-citizens in each of your four samples, and, in
10  turn, you apply that percentage to the total
11  non-citizen population of Kansas; correct?
12     A    I take the percentage of non-citizens who
13  registered -- who indicated that they had registered to
14  vote or attempted to register to vote, or for whom we
15  had evidence that they had attempted to register to
16  vote or had registered to vote, and then I calculate a
17  percentage.
18          And then, ultimately, the question is one
19  of the extent to which this is a level of registration
20  that is potentially substantial.  And, so, to examine
21  the question of the size of the level of registration,
22  to give a sense of that, which is another way -- so I
23  then extrapolated from those specific estimates from
24  those samples to the current -- American Community
25  Survey five-year estimates of the non-citizen adult

Page 138

1  population in the state of Kansas.
2      Q    Now, let's just start -- let's just stay
3  there.  When you apply the percentage of non-citizens
4  in one of your samples who say that they are -- or you
5  determine that they are registered or have attempted to
6  register to vote to the total non-citizen population of
7  Kansas as a whole, what expertise as a political
8  scientist are you bringing to bear to that
9  extrapolation?
10     A    So in the, in the second report, I
11  provided additional details.  The first report aimed to
12  give a, a succinct statement of, of the estimates and
13  their levels.
14          There are, there are various things that
15  one can do in terms of this extrapolation.  One, the
16  most basic is to assume that the sample is
17  representative of the broader population and
18  extrapolate on that basis.  That's primarily what I did
19  in this report, with some weighting so try to ensure
20  that I had appropriately estimated from the various
21  samples.
22          In the rebuttal report, I did some
23  additional analyses.  I had more time.  You may notice
24  on the survey data set, we've got the -- the column
25  finished a short period of time before the report was

Page 139

1  due.  So I had limited time.
2           I've done a variety of other analyses.
3  Waiting to match the, the demographics of the
4  non-citizen population in the state of Kansas arguably
5  can provide a further assurance that any estimate from
6  the sample isn't being biased in some way by
7  differences between the relative frequency of different
8  demographic groups within the sample and in the
9  population.  Those estimates led to results that were
10  quite similar to the ones that I reported in the
11  initial report as well.
12          So that kind of weighting can be a way to
13  potentially explore whether there's some kind of
14  sampling or response bias that might be leading to --
15  leading to some sort of bias in the estimates.
16     Q    Well, let's leave aside your rebuttal
17  report for a moment.  We'll get to it in a second.
18  Let's just talk about your initial report.
19          When you take the percentage of
20  non-citizens who you believe are registered to vote or
21  have attempted to register to vote from each of your
22  samples and you apply that percentage to the
23  non-citizen population of Kansas as a whole, in your
24  initial report, that's a calculation that any person
25  with a calculator can make; right?

Page 140

1      A    It should be, yes.
2      Q    Okay.
3      A    And, so, it's a calculation that I hope I
4  made accurately.
5           But I think there was one place where it
6  was confusing, and I might have made that -- if you're
7  looking for your calculator, it's over here.
8      Q    Nope.
9      A    So it's a pretty straightforward
10  calculation.
11     Q    Let's talk a little bit about your
12  rebuttal report, which I think we can mark as
13  Exhibit 12.
14          (Supplemental Expert Report marked as
15          Richman Exhibit Number 12)
16  BY MR. HO:
17     Q    Exhibit 12 is your rebuttal report in
18  this case; correct?
19     A    Yes.
20     Q    And can you turn to page 12, paragraph
21  23?
22     A    Yes.
23     Q    Now, in this paragraph, you described
24  what you refer to as a meta-analysis of your various
25  estimates of non-citizen registration; correct?

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 141

1    A    That is correct.
2    Q    And would you agree with this
3  description, that a meta-analysis aggregates the data
4  of individual estimates to derive a single pooled
5  estimate?
6    A    That's what it aims to do.
7    Q    And in the second line in this table, you
8  are aggregating the four individual estimates of
9  non-citizen registration that we described -- discussed
10  earlier and present a meta-analysis of that
11  aggregation; correct?
12    A    Correct.
13    Q    Okay.  Now, from your perspective as a
14  political scientist, your view is that the second line
15  in this table, which has -- which aggregates four
16  estimates, is a methodologically superior meta-analysis
17  than the first line in this table which aggregates
18  those four estimates, in addition to one other one; is
19  that right?
20    A    Well, so, the issue with the one other
21  one is that it's -- it is an estimate derived from a
22  sample that primarily is of citizens.  And, so, that
23  sample provides some evidence concerning the degree to
24  which non-citizens are registered, in the sense that if
25  that rate of registration was very high, one would have

Page 142

1  probably identified some non-citizens in that sample.
2          On the other hand, it's a sample of about
3  530 or so, I can't remember the precise numbers, of
4  individuals who are on the registration lists in four
5  counties.  If the non-citizen registration rate was,
6  say, 1 percent in those counties in those years,
7  leaving aside issues of mobility and other things which
8  might have made the phone numbers in the list
9  particularly problematic for non-citizens, since
10  non-citizens tend to be a much more mobile population,
11  the -- finding zero would be quite likely, given the
12  size of the sample and the number of -- the -- a low
13  rate of non-citizen participation.
14    Q    So because the fifth sample consists
15  largely of citizens, maybe all of citizens, your view
16  is that it's methodologically more appropriate when
17  conducting a meta -- meta-analysis of your work to do
18  an aggregation of the four samples that we have
19  discussed, rather than including a fifth one?
20    A    I think to include the fifth one, one
21  would have wanted to do some additional post processing
22  first in terms of adjusting for the nature of that
23  sampling frame.
24    Q    Okay.
25          Now, just so I understand what's in this

Page 143

1  table, in the column that reads "pooled effect size,"
2  that's the -- that's the second column in this table;
3  correct?
4    A    Um-hum.
5    Q    And this column, for each of your
6  meta-analyses, this gives the point estimate for the
7  percentage of non-citizens in Kansas registered to vote
8  once we aggregate your different data sources; correct?
9    A    That is correct.
10    Q    And the next two columns have the lower
11  confidence and upper confidence bounds for that
12  estimate, aggregating your various analyses of
13  non-citizen registration; correct?
14    A    Correct.
15    Q    And did you use a 95 percent confidence
16  interval for this?
17    A    Yes.
18    Q    So your point estimate for your
19  aggregation of your four estimates of non-citizen
20  registration in Kansas is that 1.1 percent of
21  non-citizens in Kansas have registered or attempted to
22  register to vote; correct?
23    A    That's correct.
24    Q    Now, in your initial report, I remember
25  you taking these point estimates and then calculate --

Page 144

1  calculating actual numerical values.
2          Do you remember that?
3    A    Calculating what this would extrapolate
4  to for the state of Kansas, in terms of non-citizen
5  registration rates.
6    Q    Do you remember doing that?
7    A    Yes.
8    Q    And you used a figure, I believe, of
9  114,000 non-citizen adults in Kansas; right?
10    A    Right.  That was based on slight rounding
11  down of the 2010 through 2014 American Community Survey
12  five-year estimates.  The, the 2011 to 2015 estimates
13  are now out, so, arguably, the more correct figure
14  would be 115,000; but give or take a thousand, it's not
15  going to make much difference.
16    Q    Well, you're the political scientist,
17  which number would you prefer to use, 114,000 or
18  115,000?
19    A    I'd use -- I'd use the newer number,
20  since that is out now.  The data storage that I was
21  getting the estimate from was updated on I think
22  February 2nd of 2017.
23    Q    Okay.
24    A    So I have those estimates now.
25    Q    So let's assume about 115,000 non-citizen

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 145

1 adults in Kansas; is that fine?
2    A    Sure.
3    Q    Great.
4         MR. HO: Let's -- let me hand you another
5 exhibit.
6         (Meta-Analysis of Richman's Estimates of
7         Non-Citizen Registration marked as
8         Richman Exhibit Number 13)
9         MR. HO: Okay.  It should be --
10        THE COURT REPORTER: 13.
11        MR. HO: -- 13.
12 BY MR. HO:
13   Q    So this is a blank worksheet I've created
14 just to try to understand your numbers.  Let's ignore
15 the first row, all five samples, since you think that
16 that is methodologically inferior to all four -- just
17 using the four samples.  Okay?  I just want to walk
18 through some numbers here.  Is that fine?
19        Now, you've said that your estimate for
20 non-citizen registration or attempted registration when
21 we aggregate your four estimates is 1.1 percent of
22 non-citizens in Kansas; right?
23   A    Right.
24   Q    And what does that translate to in terms
25 of absolute numbers, assuming there are -- and let's

Page 146

1 say 115,000 non-citizens in Kansas.
2    A    All right.  So, thank you for the
3 calculator.
4    Q    Sure.
5    A    And you want all sales in this table
6 filled out or --
7    Q    Let's just do them one at a time?
8    A    One at a time?
9    Q    Yeah.
10   A    Okay.  So --
11        I usually do calculations in Excel rather
12 than on a calculator.
13   Q    Sure.
14   A    I keep hitting the wrong buttons.
15        Here we go.
16        That would be 1265.
17   Q    So your estimate of 1.1 percent of
18 non-citizens registered or attempting to register to
19 vote in Kansas, based on a meta-analysis of your
20 various estimates, produces a figure of 1,265?
21   A    Um-hum.
22   Q    And you're aware that there are about
23 1.8 million registered voters in Kansas?
24   A    I didn't know the specific figure, but I
25 guess I'll take your word for it.

Page 147

1    Q    Okay.  If I told you that the director of
2 elections in this case for the state of Kansas has
3 submitted a declaration saying that there are about
4 1.8 million registered voters in Kansas, would you have
5 any reason to think that might be inaccurate?
6    A    No.
7    Q    So let's use that 1.8 million figure.
8    A    Okay.
9    Q    1,265 people is equivalent to what
10 percentage of the 1.8 million registered voters
11 approximately in Kansas?
12   A    It's equal to 0.07 percent.
13   Q    So the point estimate for your
14 meta-analysis of non-citizen registration in Kansas,
15 which aggregates your various individual estimates of
16 non-citizen registration in Kansas, produces a figure
17 of non-citizen registration or attempted registration
18 that's equal to about 0.07 percent of the registered
19 voters in Kansas; correct?
20   A    That's correct.  And, you know, so this
21 gets to the point of what I've been trying to explain
22 to people reading my estimates too high, in the sense
23 that this is a small fraction.
24        On the other hand, in the conclusion of
25 my initial report, I think it was, I -- I had a

Page 148

1 paragraph at the bottom of page 12 which discusses
2 close elections in the state of Kansas.
3         And, so, we just came to an estimate of
4 .07.  That's higher than the .04 and .036 percent
5 margins in those two elections that I discussed.
6    Q    Okay, we'll talk about those elections in
7 a second.
8         Leave that aside and just calculate the
9 numbers first, but I definitely want to hear about your
10 views about those elections.
11   A    Okay.
12   Q    So the lower bound of your estimate here
13 of non-citizen registration and attempted registration
14 from your meta-analysis of all your individual
15 estimates is 0.4 percent of non-citizens in Kansas;
16 correct?
17   A    That's correct.
18   Q    And that translates into how many
19 non-citizens in Kansas who have registered or attempted
20 to register to vote?
21   A    460.
22   Q    Can you record that?
23   A    (Complying)
24   Q    And 460 individuals is equivalent to
25 approximately what percentage of the approximately

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 149

1  1.8 million registered voters in the state of Kansas?
2      A    It's 0.026 percent.
3      Q    Now, the upper bound of your estimate for
4  non-citizen registration or attempted registration in
5  Kansas, from the meta-analysis, based on the
6  aggregation of your individual estimates, is
7  1.8 percent of non-citizens in the state; correct?
8      A    Correct.
9      Q    And what does that translate into in
10 terms of total numbers of the 115,000 non-citizens in
11 Kansas?
12     A    2,070.
13     Q    And 2,070 individuals is equivalent to
14 approximately what percentage of the registered voters
15 in Kansas?
16     A    0.115 percent.
17     Q    So, just to be clear, when we aggregate
18 all of your data and perform a meta-analysis of the
19 number of non-citizens in Kansas who have registered or
20 attempted to register to vote, the upper bound of that
21 estimate translates to about 0.115 percent of the total
22 number of registered voters in Kansas; correct?
23     A    That's correct.
24     Q    When you calculated the margin of error
25 for your meta-analysis, you used the Score Wilson

Page 150

1  method; correct?
2      A    I believe that's the method that I used.
3      Q    And is it your view that the Score Wilson
4  method is appropriate for calculating the margins of
5  error for your various estimates of non-citizen
6  registration in your report?
7      A    Yes.  I provided a couple of citations to
8  articles from the literature which suggest that,
9  particularly in this kind of context, that is an
10 appropriate methodological choice.
11     Q    Do you think it is the most appropriate
12 methodological choice for calculating the margins of
13 error for your estimates of non-citizen registration,
14 or do you think there's a different method that is more
15 appropriate?
16     A    I don't have a really strong view.  I
17 cited the literature on this issue, but the -- those
18 articles recommend -- both of them recommend multiple
19 methods.  I report in my meta-analysis a number of
20 times several different methods, which I'll come to, as
21 you'll see in that report, largely the same intervals,
22 but some small variations.
23     Q    Okay.
24         Could we talk about your initial report
25 for a moment, if you can find it?

Page 151

1      A    I have it right here.
2      Q    Great.  This is Exhibit 1.  And could you
3  turn to page 11.
4      A    (Complying)
5          Um-hum.
6      Q    So at the bottom of page 11 through page
7  12, you describe your estimate of non-citizen
8  registration or attempted registration in Kansas based
9  on incidentally-contacted non-citizens; is that right?
10     A    Yes.
11     Q    And that estimate is based on 19
12 incidental contacts with non-citizens; correct?
13     A    Correct.
14     Q    And just so I understand what's happening
15 here, in the course of performing your various surveys,
16 the surveyors unintentionally ended up in contact with
17 19 self-identified non-citizens who then completed the
18 survey; correct?
19     A    Exactly.
20         So, for instance, if the surveyor called
21 a number and reached someone other than the named
22 individual they were looking for, they would then ask
23 if -- you know, there was some query as an indicator in
24 the survey data file, sometimes the person who they
25 were looking for would come to the phone.

Page 152

1          But in other cases, they wouldn't, and
2  then the surveyor would ask the individual who had been
3  contacted whether they were willing to complete the
4  survey.
5          And, so, that's what -- how these
6  individuals were a part of that group.
7      Q    And there were 19 of these individuals;
8  correct?
9      A    There were 19 individuals incidentally
10 contacted who also indicated on the two questions
11 involving citizenship status that they were
12 non-citizens.
13     Q    And, so, it's accurate to say that this
14 estimate is based on a sample of 19; correct?
15     A    That's right, and so it's very uncertain.
16         I reported a confidence interval in that
17 initial report for this estimate, which includes zero,
18 because this is a -- a very uncertain estimate relative
19 to only one individual who indicated that they had
20 registered to vote or attempted to register to vote.
21         It's a very small number of individuals
22 sampled overall.
23         So this is a highly uncertain estimate,
24 and this is the one instance in the, in the set of
25 estimates we've been talking about in which an

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 153

1 inappropriately calculated confidence interval includes
2 zero among those four estimates.
3      Q    So let me just unpack some of those
4 things you just said there.
5           Of the 19 people in the sample, one of
6 them indicated that they were registered to vote;
7 correct?
8      A    Had registered to vote or attempted to
9 register to vote.
10     Q    And that translates to about 5.1 percent
11 of your sample; correct?
12     A    Yes.
13          Well, 5.3 maybe?  I'm not sure.  Might
14 not be quite 5.1, but close, anyhow.
15     Q    Okay.
16          And you describe this sample of 19
17 individuals as "extremely small" in your report.  I'm
18 looking at the first full paragraph on page 12.  Is
19 that right?
20     A    Sample size is -- I say:  "Although the
21 sample size is extremely small and any estimates are
22 accordingly very uncertain," and then I give the
23 estimate, after some further caveats.
24     Q    So your opinion is that, for purposes of
25 the calculations that you're performing here, a sample

Page 154

1 of 19 is extremely small; correct?
2      A    As we discussed some hours ago, the
3 larger a sample size is, the more certain the estimates
4 are.  In this case, we have a sample size of 19;
5 consequently, a lot of uncertainty.
6           As I noted in the rebuttal report,
7 depending on which methodology you use to calculate a
8 confidence interval for this sample, some versions the
9 confidence intervals include zero, some versions
10 (inaudible) --
11          THE COURT REPORTER: "Some versions" --
12          THE WITNESS: Some versions, some ways of
13 calculating a confidence interval, the confidence
14 interval includes zero; other approaches to calculating
15 the confidence interval, the confidence interval does
16 not include zero.
17          But the, the basic fact of the matter is,
18 with a sample of 19, you're going to have a lot of
19 uncertainty.  And, so, if you have a low estimate as
20 well, the confidence interval is going to include very
21 low values because of that uncertainty.
22 BY MR. HO:
23     Q    Now, you calculate a confidence interval
24 in your initial report for this estimate with a total
25 margin of error of 10.1 percentage points; correct?

Page 155

1      A    Yes.
2      Q    And you describe this confidence interval
3 as -- sorry.
4           You describe this estimate with a 10.1
5 percentage point confidence interval as "very
6 uncertain"; correct?
7      A    It is very uncertain that, as we
8 discussed earlier, in terms of the question of whether
9 we have statistically significant evidence of
10 non-citizen participation, because the estimate --
11 point estimate itself is quite low and the confidence
12 interval is quite large, we not only have a lot of
13 uncertainty, as with several of the other estimates as
14 well, but the point estimate is low enough that the
15 confidence interval includes, or comes very close to,
16 zero.
17     Q    Now, in your initial report when you
18 calculated the margin of error as 10.1 percentage
19 points, what method did you use for calculating the
20 margin of error?
21     A    I don't recall.  I think it was the -- I
22 think it was the Wald method, but it might have been
23 the Agresti method.
24     Q    You did not use the Score Wilson method?
25     A    I did not use that method.

Page 156

1      Q    So your initial report when you
2 calculated the margin of error that you reported here,
3 you did not use what you currently believe is the
4 appropriate method for calculating the margin of error
5 for these estimates; correct?
6      A    That's correct.  Professor Ansolabehere's
7 rather dramatically-inappropriate estimates led me to
8 do some deeper reading in the statistical literature on
9 issues of calculating confidence intervals and to
10 realize that, like many people in the field, I'd been
11 relying upon a Wald approach, which is problematic.
12          MR. HO: Okay.  I think now would be a
13 good time to take a break for lunch, if you'd like to.
14          (Discussion off the record)
15          THE VIDEOGRAPHER: Going off the record
16 at 12:25 p.m.
17          (Lunch recess 12:25 p.m. until 1:17 p.m.)

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 157

1    Afternoon Session
2    (Confidence Intervals for Richman's four
3    Estimates of Non-Citizen Registration in
4    Kansas marked as Richman Exhibit
5    Number 14)
6    ("The 'farcical' stats Republicans use to
7    claim millions voted illegally," by
8    Joshua Eaton, marked as Richman Exhibit
9    Number 15)
10   ("Does Your Vote Count?" by the Heritage
11   Foundation, marked as Richman Exhibit
12   Number 16)
13   THE VIDEOGRAPHER: Back on the record at
14   1:17 p.m.
15   BY MR. HO:
16   Q    Professor Richman, I'd like to start by
17   talking again about Exhibit 12, your rebuttal report;
18   and, specifically, you have it there on page 9 -- or 8,
19   rather.  I'm sorry.  Table 2.
20   A    Yes.
21   Q    Which continues onto page 9.
22        Now, this table lists various ways --
23   sorry.
24        This table lists various estimates for
25   non-citizen registration and attempted registration in

Page 158

1    Kansas and different ways for calculating the margin of
2    error for each of those estimates; correct?
3    A    Correct.
4    Q    Okay.
5         I'd like to show you a demonstrative
6    exhibit, a chart that we've labeled Exhibit 14.  I just
7    want to make sure that the information we've compiled
8    in Exhibit 14 is an accurate reflection of your work;
9    and maybe you can tell me if there's anything in here
10   that looks incorrect as we go.  Okay?
11   A    Okay.
12   Q    So, we talked about your estimate based
13   on incidentally-contacted non-citizens; that's on the
14   bottom row on this chart.
15        Do you see that?
16   A    Yes.
17   Q    And there's a sample size of 19; is that
18   correct?
19   A    Yup.
20   Q    And the number of registered or attempted
21   to register is one; is that correct?
22   A    Yes.
23   Q    And your estimate of non-citizens
24   registered or attempted to register in this sample is
25   5.3 percent; is that right?

Page 159

1    A    Yes.
2    Q    And I have here in our chart as your
3    confidence interval, using the Score Wilson method, for
4    this estimate, of 0.9 percent to 24.6 percent; is that
5    right?
6    A    Yes, that's right.
7    Q    And if that's your confidence interval
8    that you calculate using the Score Wilson method, then
9    that means you have a total margin of error of 23.7
10   percentage points; is that correct?
11   A    That's, I think, an incorrect way to use
12   the term margin -- "margin of error" is typically used
13   for symmetrical confidence intervals, and, typically,
14   the margin of error is one-sided.  So how far is it
15   from the estimate to the -- to the edge of the
16   confidence interval for a symmetric estimate.
17        The, the confidence intervals here, as
18   Professor Ansolabehere talked about actually in his
19   deposition and briefly in a footnote in his report, are
20   not symmetric because these are estimates for
21   confidence intervals that are quite close, where the
22   point estimate is relatively close to zero.
23        That said, the total range, it looks like
24   you have correctly taken the upper end of the
25   confidence interval and subtracted the lower end, so I

Page 160

1    think it would be correct to say the total size of the
2    confidence interval is, is that quantity, 23.7.
3    Q    So, so, if we relabel the last column
4    "size of confidence interval" --
5    A    Total size, yeah.
6    Q    -- that would be accurate in your
7    assessment?
8    A    I think that would be a reasonable way to
9    title it.
10   Q    Okay.  So we'll call the last column
11   "total size of confidence interval."
12   A    Okay.
13   Q    And with that relabeling, does all of the
14   information in the fourth row look correct to you?
15   A    Yes.
16   Q    Now, just to be clear, if we look at your
17   table 2 here on page 9, you also list other methods for
18   calculating the confidence interval, including the
19   Exact method and the Jeffreys method; correct?
20   A    That's right, the Agresti, the Exact, and
21   the Jeffreys method are all listed.
22        I'd also note the value
23   Professor Ansolabehere estimated, which was based upon
24   assuming that half -- that it was a confidence interval
25   appropriate for a situation which half of non-citizens

Page 161

1  are believed to be registered to vote, which is an odd
2  assumption, given that he's written in other places
3  that he thinks almost none are.
4      Q    You believe that the Jeffreys and Exact
5  methods are also appropriate methods for calculating
6  the confidence interval for your estimates; correct?
7      A    These are -- there are a range of
8  different methods for calculating confidence intervals.
9  These are some of the others.  The Agresti method as
10 well is another method for calculating confidence
11 interval.
12     Q    Do you believe the Agresti method is an
13 appropriate way to calculate the confidence interval
14 for your estimates in this case?
15     A    I think it's a little bit problematic
16 because of the small proportion; however, there are
17 contacts in which arguably this is an appropriate
18 method.
19     Q    So, for your purposes as an expert in
20 this case, you believe the Wilson Score method is
21 appropriate; correct?
22     A    I believe that is an appropriate method.
23     Q    And do you also believe that the Exact
24 and Jeffreys methods are appropriate in this case?
25          MR. ROE: Objection, compound.

Page 162

1          THE WITNESS: I, I included all of these
2  methods for the purpose of illustrating a range -- how
3  a range of different assumptions about the specific way
4  to calculate a confidence interval would lead to
5  broadly similar conclusions about what that confidence
6  interval looked like.
7  BY MR. HO:
8      Q    So that wasn't my question.
9          My question was not why did you include
10 these methods.
11         My question was:  Do you believe that the
12 Exact method, for example, is an appropriate way to
13 calculate the confidence interval for your estimates in
14 this report?
15     A    The Exact method tends to produce
16 confidence intervals that are a little bit too large,
17 typically, so, arguably, that's a particularly
18 conservative confidence interval.
19     Q    So I don't think you answered my
20 question.
21         Do you believe that the Exact method is
22 an appropriate method, methodologically, for
23 calculating the confidence intervals for your estimates
24 in this case?  It's a simple yes or no.
25     A    As I said, it is one of several methods

Page 163

1  that are used in the field for calculating confidence
2  intervals.  It is known to be a conservative method, so
3  depending upon whether one wants a particularly
4  conservative confidence interval, that is, large
5  confidence interval or not, perhaps it's more or less
6  appropriate.
7      Q    All of the methods for calculating a
8  confidence interval listed in this table have a total
9  size of confidence intervals for this estimate of
10 larger than 15 points; correct?
11     A    Yes, they do.
12     Q    And --
13     A    In this part we're looking at, the
14 (inaudible).
15         THE COURT REPORTER: I'm sorry, what was
16 the word --
17         THE WITNESS: We're looking at
18 particularly this part of the table.  You said "in this
19 table"; I'm assuming you mean just this part --
20 BY MR. HO:
21     Q    Correct.
22     A    -- the one of 19.
23     Q    Yes.
24     A    They, they all have total confidence
25 interval of greater than 15.

Page 164

1      Q    So let's leave aside
2  Professor Ansolabehere's calculations of the confidence
3  intervals because you don't believe that they are
4  methodologically appropriate.  Okay?
5      A    Okay.
6      Q    All of the methods that you used for
7  calculating the confidence interval for your estimate
8  of non-citizen registration or attempted registration,
9  based on the incidentally-contacted non-citizens, are
10 larger in size than 20 percentage points; correct?
11     A    They are.
12     Q    Let's look at the second line from the
13 bottom, labeled "TDL survey."
14         Now, this is another of your estimates of
15 non-citizen registration based on your survey of TDL
16 holders; correct?
17     A    Yes.
18     Q    And your sample size is 37; is that
19 accurate?
20     A    Yes.
21     Q    Of those 37 people, six indicated that
22 they were registered or had attempted to register to
23 vote; correct?
24     A    Yes.
25     Q    And that gives you a point estimate of

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 165

1  16.5 percent of non-citizens who are registered or
2  attempted to register to vote; correct?
3      A    Yes.
4      Q    And your calculation of the confidence
5  interval for non-citizen registration or attempted
6  registration using the TDL survey is from 7.7 percent
7  to 31.1 percent; correct?
8      A    Correct.
9      Q    And that yields a total size of the
10 confidence interval of 23.4 percentage points; is that
11 right?
12     A    Yes, I believe so.
13     Q    And if we look at your various methods
14 for calculating the confidence interval for your
15 estimate based on the TDL survey, all of the methods
16 that you use generate a confidence interval of over 20
17 percentage points in total size; correct?
18     A    That is correct.
19     Q    Okay.  Moving up one line to the Sedgwick
20 County naturalization information.
21          Here you had a sample size of 789;
22 correct?
23     A    Yes.
24     Q    And of those 789 individuals, 8 were
25 identified as having registered or attempted to

Page 166

1  register to vote prior to naturalization; correct?
2      A    Correct.
3      Q    And that gives you an estimate of
4  1 percent of non-citizens who have registered or
5  attempted to register to vote; correct?
6      A    Yup.
7      Q    And using the Score Wilson method for
8  calculating the margin of error, you get a range from
9  0.5 percent to 2 percent of non-citizens who are
10 registered to vote or attempted to register to vote;
11 correct?
12     A    Correct.
13     Q    And that gives you a total size of a
14 confidence interval of 1.5 percentage points; correct?
15     A    Correct.
16     Q    So all the information on the second line
17 here is correct; yes?
18     A    Yes.
19     Q    And let's finally talk about the top
20 line.  This is your estimate based on the CCES
21 respondents from 2006 through 2012?
22     A    Yes.
23     Q    You looked at the CCES respondents and
24 isolated people who were from Kansas and indicated on
25 the CCES that they were registered to vote; correct?

Page 167

1      A    And that they were a non-citizen.
2      Q    Right.
3          And there were 14 such individuals in the
4  CCES, pooling the election -- pooling the surveys from
5  2006 through 2012; correct?
6      A    Yes.
7      Q    And four of those 14 individuals stated
8  that they had registered to vote; correct?
9      A    Correct.
10     Q    And that gives you an estimate of
11 28.6 percent of non-citizens who have registered to
12 vote in the state of Kansas; correct?
13     A    Correct.
14     Q    And using your Score Wilson method for
15 calculating the confidence interval, you get a
16 confidence interval of between 11.7 percent and
17 54.6 percent of non-citizens registered to vote in
18 Kansas based on the CCES respondents; correct?
19     A    Yes.
20     Q    And that means that you have a total size
21 of a -- of your confidence interval, based on this
22 estimate, of 32.9 percentage points; is that right?
23     A    That's correct.
24     Q    And if -- so all of the information on
25 the top line here looks correct?

Page 168

1      A    As far as I can tell.  I haven't put
2  it -- punched into a calculator every one of your
3  subtractions, but I'm assuming -- eyeballing it, they
4  all look right.
5      Q    Okay.  And if we look just at your table
6  2 and your estimate based on the 2006 through 2012 CCES
7  respondents, for the margins of error that you
8  calculate, every one of them has a total con -- has a
9  confidence interval of total size of more than 40
10 percentage points; is that correct?
11     A    That's correct.  This reflects the high
12 degree of uncertainty with a small sample size.
13     Q    Okay.  I want to show you something; it's
14 been marked as Exhibit 15.  This is an article from a
15 website called "ThinkProgress."  Do you see that?
16     A    Yes.
17     Q    It's written by Joshua Eaton.
18          Do you see that?
19     A    Yes.
20     Q    It is dated April 7, 2017.
21          Do you see that?
22     A    Yes.
23     Q    The title is "Exclusive:  The 'farcical'
24 stats Republicans use to claim millions voted
25 illegally.  Kris Kobach claims fraudulent voters in the

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 169

1   millions, but the data he cites doesn't back him up."
2       Do you see that?
3   A   I see that.
4   Q   You were interviewed by Mr. Eaton for
5   this article; correct?
6   A   I answered a couple of questions for him.
7   I don't know if they count it as a full interview; I
8   can't remember exactly how long we talked, or if it was
9   by email or just -- or in person.  I think it was
10  primarily by email.
11  Q   Have you seen this article before?
12  A   I have not.
13  Q   Could you turn to page 5, please.
14  A   Yes.
15  Q   And the first paragraph, first sentence
16  on page 5, reads, while admitting that many of his
17  estimates have, quote, weak statistical power, end
18  quote, Richman defends his conclusions.
19      Did I read that accurately?
20  A   Where are you?
21      Oh, yeah.
22  Q   Is that an accurate quote from you about
23  weak statistical power?
24  A   I -- it was taken somewhat out of
25  context.  What I said was that the -- given that they

Page 170

1   have weak statistical power, it's remarkable that they
2   are mostly finding evidence of non-citizen
3   registration.
4   Q   And when you say "they" have weak
5   statistical power --
6   A   The analyses.
7   Q   -- that's a reference to the estimates of
8   non-citizen registration that are described in your
9   reports in this case; correct?
10  A   That's right.  It appears that somebody
11  leaked the reports in this case to the media, and that
12  seems to be what this article was based on.
13  Q   Well, let's look at Exhibit 14, the
14  demonstrative that we talked about before --
15  A   This one?
16  Q   -- that lists all of your estimates --
17  A   Um-hum.
18  Q   -- and your calculations for the margins
19  of error.
20      And when you say that many of your
21  estimates have weak statistical power, which of these
22  estimates are you referring to?
23  A   Most of them are based on small sample
24  sizes.  And, consequently, as we just discussed, the
25  confidence intervals are very large.  That reflects the

Page 171

1   uncertainty associated with a small sample size.
2       The only one with a much tighter
3   confidence interval would be the Sedgwick County
4   analysis.  That's -- that has a much larger number of
5   observations.
6   Q   So is it your testimony that your
7   estimate based on the CCES has weak statistical power?
8   A   All of -- these three estimates are based
9   on small samples.  As a result, they have a great deal
10  of uncertainty associated with them.
11      Consequently, you know, they, they could
12  indicate, though I don't believe this to be the case,
13  that as much as from the CCES 2012 -- 2006 to 2012,
14  that 54.5 percent of non-citizens were registered to
15  vote in Kansas.  I think that the high end of the
16  confidence interval in general is -- it's a top
17  estimate.  We know that 97-point -- if the confidence
18  interval is right, 97.5 percent probability that the
19  true value is below that.
20      Given the small sample size, the
21  confidence intervals are large; however, the confidence
22  intervals are not -- generally don't include zero, with
23  the possible exception of the incidentally-contacted
24  non-citizens analysis.
25      What this suggests to me is that,

Page 172

1   although we don't have a particularly precise estimate
2   of the rate of non-citizen participation in the state
3   of Kansas, we do have evidence that there is
4   potentially substantial -- quite substantial -- very
5   large, actually, if you take the top end of the
6   estimates, which, again, I'm reluctant to do for
7   obvious reasons, which I just stated, we have evidence
8   of non-citizen registration in the state of Kansas.
9   Q   So let me just clarify.  My question
10  wasn't about statistical significance or non-zero
11  estimates.
12      It's a very simple question, which was:
13  When you say that many of your estimates have weak
14  statistical power, among those estimates that you say
15  have weak statistical power, you're including the
16  estimate of non-citizen registration based on the CCES;
17  is that right?
18  A   For Kansas --
19      MR. ROE: Dale, I am going to object as
20  it mischaracterizes prior testimony.
21      THE WITNESS: I believe I already
22  answered this.
23      As I mentioned, several of these are --
24  have small numbers in the sample size, and,
25  consequently, large uncertainties.  That includes the

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 173

1 CCES 2006 to 2012.
2 BY MR. HO:
3    Q    Okay.  Among the estimates that you are
4 quoted as saying have weak statistical power in this
5 ThinkProgress article, would you include your estimate
6 based on incidentally contacted non-citizens?
7    A    I would.
8         It's, again, a sam -- small sample size.
9 What "weak statistical power" means is the capacity of
10 the, the estimate to identify the positive effect is
11 modest.
12        With a sample size of 19, if the
13 non-citizen registration rate is a mere 1 percent or
14 2 percent or 5 percent or, you know, some other
15 relatively low value, the probability of getting a
16 false negative, in terms of finding no effect, when, in
17 fact, there is one, finding no non-citizens when in
18 fact there are some, is fairly high.
19        That didn't happen in the context of this
20 particular estimate, but that -- that is -- could have
21 happened, given the size of the sample.
22    Q    Among the estimates that you describe as
23 having weak statistical power, would you include your
24 estimate of non-citizen registration or attempted
25 registration in Kansas based on the TDL survey?

Page 174

1    A    Again, it's a very modest sample size,
2 and so what that means is that there's substantial
3 uncertainty.
4         Again, that uncertainty creates a range,
5 an interval in which, you know, we're not exactly sure
6 where the true population value is.  It might be as low
7 as 7.7 percent; it might be as high as 31.1 percent.
8 We're not sure, but this estimate suggests it's
9 somewhere in that range, based on data in that sample.
10    Q    Given the substantial uncertainty that
11 you described the estimate based on the TDL survey as
12 having, would it be accurate to say that your view is
13 that the estimate based on the TDL survey has weak
14 statistical power?
15    A    I think in this context, the fact that it
16 has relatively small sample size and finds substantial
17 evidence of non-citizen registration speaks to the
18 prevalence of the phenomena in question.
19        My point in this, in this quote, which
20 was taken rather out of context and which I've tried to
21 explain a couple of times to you now, is that the fact
22 that there's relative -- these are small sample sizes
23 and we've found in these samples non-citizens who twice
24 confirmed that they were non-citizens and said that
25 they had registered to vote or attempted to register to

Page 175

1 vote, or in other ways had their registration
2 documented, emphasizes that this is, in fact, a real
3 phenomenon.
4    Q    Well, my question again, Professor
5 Richman, was not whether or not, or what conclusions
6 you draw from the TDL survey.  It's a much simpler
7 question.
8         You describe some of your estimates as
9 having weak statistical power.
10    A    Yes.
11    Q    Is the estimate based on the TDL survey
12 among those estimates that you describe as having weak
13 statistical power?
14    A    It is.
15    Q    Is your estimate based on the Sedgwick
16 County naturalization data the only estimate that you
17 produce for non-citizen registration that you would not
18 describe as having weak statistical power?
19    A    That one has many more observations, and,
20 consequently, the confidence intervals are much
21 tighter.  The -- and so in this case, we have
22 substantially more information.
23    Q    Now, in your Electoral Studies article,
24 you frequently described a best guess about non-citizen
25 registration nationally.

Page 176

1         Do you remember that?
2    A    Um-hum.
3    Q    As you look at demonstrative 14, do you
4 have a best guess as for the percentage of non-citizens
5 in Kansas who are registered to vote?
6    A    I haven't calculated one beyond the meta
7 analysis we already described; however, I think in
8 looking at all of these estimates, it's important to
9 think about the limitations that each one possesses.
10        So the, the Sedgwick County data is
11 limited to individuals who are naturalizing, so these
12 are individuals who are presumably legal permanent
13 residents and not individuals who are undocumented
14 immigrants, and so forth.
15        So there are some -- and not people who
16 are here on some temporary visa, at least not at the
17 conclusion of their time as non-citizens.
18        And, so, that's focused on one -- one
19 group.  The other estimates have more potential to
20 capture a wider range of non-citizens, including groups
21 who I argued in the report, in those two reports, may
22 be more likely to have strong incentives to register to
23 vote.  The CCES sample is not conditioned in any way on
24 the basis of different types of immigrant status.
25        There -- the TDL survey includes

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 177

1   individuals who have a variety of visa status, though
2   all would be, I think, though I'm not absolutely
3   certain of Kansas law on this, I think all would be
4   individuals who are -- have some kind of documented
5   status.
6            The incidentally contacted non-citizens
7   could have any -- any kind -- any type of status.  So
8   the -- if we think about different estimates, different
9   estimates have different kinds of strengths and
10  weaknesses.
11           The Sedgwick County has more statistical
12  power; on the other hand, some of the other estimates
13  may have different and usefully different kinds of
14  coverage of the population of interest.
15  Q    So, just to be clear, my question was not
16  weighing the relative merits of your different
17  estimates.
18           Much simpler question:  You had a best
19  guess in your Electoral Studies article, your
20  peer-reviewed article about non-citizen registration as
21  to the percentage of non-citizens registered to vote in
22  the United States; do you have a best guess as to the
23  percentage of non-citizens registered to vote in
24  Kansas?
25  A    I already answered that question.

Page 178

1            What I said was, I think all of the
2   estimates have strengths and weaknesses.  I have not
3   computed a single best guess.
4            To the extent -- as I said already, to
5   the extent I have put the estimates together, it was in
6   the meta analysis.  That puts a lot of weight, more
7   weight on studies with more observations.  But that
8   ignores differences potentially in the coverage of
9   different populations, which might add to the value of
10  some of the other samples.
11  Q    Let's keep talking about the
12  ThinkProgress article for a moment.
13           Could you -- so let's stay on page 5, and
14  the second paragraph under the header, "almost
15  farcical."
16           Do you see:  "Almost any evidence of
17  non-citizens voting is significant, Richman's analysis
18  claims, because of the small margins of victory that"
19  sometimes -- "that can sometimes occur in state and
20  local elections."
21           But is this an accurate statement of your
22  views that almost any evidence of non-citizens voting
23  is significant?
24  A    I think that's an attempt to -- we
25  didn't -- I don't remember talking about this with the

Page 179

1   journalist.  I think this is an attempt to summarize my
2   argument from the, the initial report to the -- from
3   January 30th, and I had a section discussing the
4   question of substantial; what counts as substantial.
5            The question of statistical significance
6   is distinct from the question of substantial, although
7   perhaps one could try to draw a connection between
8   them.
9            The question -- the issue of whether a
10  substantial number of non-citizens are participating or
11  registering or attempting to register in the elections
12  in the state of Kansas, that is a question which I
13  think has to be considered, as I argued in the report,
14  in the context of the nature of our electoral system,
15  which can magnify small levels of participation to
16  potentially have substantial effects in terms of
17  changing election outcomes.
18  Q    Is there a level of non-citizen
19  participation in elections, other than zero, that you
20  would describe as insubstantial?
21  A    I think that any level of non-citizen
22  participation has a potential to change election
23  outcomes.  And, consequently, any level is arguably
24  substantial.  Different levels of participation have
25  different probabilities of affecting election outcomes,

Page 180

1   obviously, and so, ultimately, I, I hope that -- data
2   on this is hard to -- precise data, as we have been
3   discussing, is difficult to get in this context.
4            But, hopefully, we can get increasingly
5   accurate estimates so that we can get more of a
6   specific sense of exactly which and how close -- as I
7   discussed in the 2014 paper, as my co-authors and I
8   discussed, some estimates are -- we -- there are some
9   elections that are clearly close enough that it seems
10  plausible that they're within a range where non-citizen
11  participation could have altered the outcomes.
12  Q    And when you say that non-citizen
13  participation in elections can alter the outcomes, by
14  non-citizen "participation," you mean voting; right?
15  A    That would be voting at that point,
16  right.
17  Q    Non-citizen registration without voting
18  would not affect an election outcome; correct?
19  A    Of course.  The, the ultimate issue is
20  the full range of involvement in elections.
21           In this particular study, I focused on
22  the issue of registration because that was the question
23  that was raised.  Registration is an essential
24  precondition for voting.  So a non-citizen who is not
25  registered to vote, in most -- in most parts of this

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 181

1 country, is not able to subsequently vote.
2    Q    So, staying with this ThinkProgress
3 article, the next line reads:  "The analysis only
4 provides a margin of error for one of its estimates,
5 which Richman now says, 'wasn't a good decision.'"
6        Did I read that correctly?
7    A    That's right, and I mentioned that
8 earlier in our discussion early on today.
9        I was at the -- in January, I was getting
10 rather tired of upper-ends of confidence intervals
11 being wrenched out of context to support overstatements
12 of what my work indicated.  And, so, I didn't include a
13 full set of confidence intervals here.
14    Q    What do you mean when you say that it was
15 not a good decision to not include confidence intervals
16 for your estimates, other than the incidentally
17 contacted non-citizens.
18    A    I should have included the full range of
19 estimates simply for completeness.  I included only the
20 estimate for the -- for the particular group, the
21 particular analysis where the question of whether the
22 confidence interval included zero was in doubt.
23    Q    And to be clear, are you saying that you
24 did, in fact, calculate confidence intervals for each
25 of your estimates prior to completing your initial

Page 182

1 report?
2    A    I may have.  I don't know if I calculated
3 confidence intervals for the estimates or not.  I can't
4 remember specifically.
5        I know I did for that particular one,
6 because it looked like the -- like one where there
7 was -- where that confidence interval including zero
8 seemed quite likely.
9    Q    So --
10    A    I probably did include -- calculate
11 confidence intervals for some of the others.  I can't
12 remember whether I calculated them for all.
13    Q    Can you remember one way or the other
14 whether you calculated a confidence interval for your
15 estimate based on the CCES before you submitted your
16 initial report?
17    A    I think I did, but I'm not certain.
18    Q    Can you remember one way or the other if
19 you calculated a confidence interval for your estimate
20 based on the TDL survey before you submitted your
21 report?
22    A    I think I did, but, again, I'm not
23 certain.
24    Q    Can you remember one way or the other if
25 you calculated a confidence interval for your estimate

Page 183

1 based on the Sedgwick County naturalization information
2 before you submitted your report?
3    A    I'm not certain whether I did or not.  I
4 don't recall.
5    Q    Before you submitted -- let me start that
6 one again.
7        Before you worked on your rebuttal
8 report, had you used the Score Wilson method for
9 calculating a confidence interval?
10    A    No.
11        So the confident -- confidence intervals
12 I would have calculated for the other estimates would
13 have most likely been the Wald confidence intervals.
14 However, unlike Professor Ansolabehere, I would have
15 taken more plausible point estimate from the survey as
16 a basis for calculating the proportions heading into
17 the confidence interval.
18    Q    So is it accurate to say that your
19 rebuttal report in this case is the first time you have
20 calculated confidence intervals using the Wilson -- the
21 Score Wilson method?
22    A    Yes.
23    Q    Did anyone help you calculate the Score
24 Wilson confidence intervals for your estimates?
25    A    No.

Page 184

1    Q    If we could go back to your initial
2 report in this case, Exhibit 1.
3        Could you turn to --
4    A    Hold on just a moment.
5    Q    Sure.
6    A    I'm shuffling papers.
7    Q    Could you turn to page 13.
8        Just let me know when you're there.
9    A    Yes.
10    Q    And can we look at the first sentence.
11    A    Okay.
12    Q    It reads:  "In conclusion, the estimated
13 number of non-citizens registered to vote or attempting
14 to register to vote in Kansas is arguably substantial."
15        Did I read that correctly?
16    A    Yes.
17    Q    Is the number of non-citizens registering
18 to vote or attempting to register to vote, in your
19 opinion, arguably insubstantial?
20    A    I think it is clearly substantial.  I
21 have made an argument in this report concerning that.
22    Q    Can you turn to page 4 in this report.
23    A    (Complying)
24    Q    And look at the second paragraph.  The
25 last two sentences.

Page 185

1     "In a close or disputed election, and
2 there are many, a small amount of fraud could make the
3 difference.  Hence, a number need not be large to be
4 substantial as the electoral system can magnify the
5 influence of even a small amount of fraud."
6         Did I read your words correctly?
7     A    Yes.
8     Q    And you cite to the Carter-Baker
9 Commission Report for this proposition; is that right?
10    A    Yes.
11    Q    Was it your idea to cite to the
12 Carter-Baker Commission Report?
13    A    This language came orig -- this
14 discussion was adapted from my analysis in the -- my
15 previous expert report for the Lee versus Virginia
16 case.  It's an argument I've made before.  I adapted it
17 from my -- my expert report in that case.
18    Q    In your view, is all non-citizen
19 registration fraud?
20    A    In my view, the -- and this is -- this is
21 an issue that was raised by one of the expert witnesses
22 for the other side, the definition of "fraud."
23        In my view, the -- all non-citizen
24 registration is a violation of election law, in the
25 sense that non-citizens are not permitted to register

Page 186

1 to vote in the United States, with -- I think there are
2 a couple of counties in Maryland that are exceptions to
3 that.
4        So, in that context, all of it is
5 illegal, and, as such, it is a concern for the
6 operation of elections.
7     Q    Does your definition of the word "fraud"
8 include a non-citizen who registers to vote by mistake,
9 either her own or a government official's mistake?
10    A    The -- I don't believe I talk very much
11 about fraud.  Are you referring to a definition that I
12 offered of fraud?
13    Q    When you use the word "fraud" --
14    A    When do I use the word "fraud"?
15    Q    In -- on page 4, in the second paragraph,
16 the last two sentences.
17    A    Okay.
18    Q    I read a sentence from your report.
19    A    "Even a small amount of fraud"; yes.
20    Q    "Even a small amount of fraud."
21    A    Right.  Which was paraphrasing the
22 Carter-Baker Commission.
23    Q    Has --
24    A    Even a small amount of non-citizen
25 participation, whatever the specific motives or reasons

Page 187

1 for that participation, has the potential to lead to
2 election outcomes that would not be those that would
3 have occurred otherwise; that is my argument.
4     Q    Would you also agree that preventing a
5 small number of votes cast by -- from being cast by
6 eligible voters could also affect the outcome of an
7 election?
8     A    Obviously, it also has that -- there's
9 also that potential.  And, so, that's why states weigh
10 competing interests in constructing their election
11 laws.
12    Q    Staying on page 4 of your report, if you
13 go to the third paragraph, the second sentence reads:
14 "Indeed, it is not hard to find instances in which
15 fraud has been confirmed as the cause of an election
16 outcome, and election outcomes have consequently been
17 overturned by courts."
18        What are some examples of these, what you
19 describe as "not hard to find" examples of elections
20 that have been overturned by courts due to fraud?
21    A    Well, so I, I don't have those at the top
22 of my head at the moment, but I do have a link there to
23 a document which summarizes a variety of instances.
24    Q    Okay.
25        The document that you cite to is a report

Page 188

1 by the Heritage Foundation; correct?
2     A    Yes.
3     Q    Who wrote that report?
4     A    I don't know.
5     Q    Do you know the date of that report?
6     A    The date downloaded is given here.
7     Q    Do you know the date that the report was
8 written?
9     A    I don't.  I imagine -- I believe they
10 continue to update it, actually.
11    Q    Do you know if that report was, by the
12 Heritage Foundation, was peer-reviewed?
13    A    The Heritage Foundation is a think tank.
14 Typically, think tank reports are not peer-reviewed.
15    Q    How do you know the information in the
16 Heritage Foundation report is accurate?
17    A    My impression, if I recall -- and, again,
18 this is a report I read more than a year ago -- is that
19 they have a variety of information linked to the
20 particular instances discussed.
21        So that -- I believe that was part of
22 the, part of the report.
23    Q    Can -- well, would it be, in your
24 opinion, as a political scientist, appropriate to rely
25 on a Heritage Foundation report in an article that

Page 189

1  you're submitting for peer-review for the proposition
2  that it's not hard to find instances in which fraud has
3  been confirmed as the cause of an election outcome?
4      A    It would depend upon the context.
5          If you're -- obviously if I was simply
6  summarizing a report from the Heritage Foundation, it
7  would be an inappropriate article to submit for
8  peer-review in general, in the sense there wouldn't be
9  much new there.
10     Q    Can you think of an example of an
11 election where the outcome was overturned because of
12 non-citizen voting?
13     A    I don't know of any instances in which
14 that has been proven.  Non-citizen voting is a
15 relatively difficult-to-detect kind of fraud because --
16 or illegal activity, depending on how one defines fraud
17 and illegal activity, because it's typically election
18 officials have limited means to discover whether
19 individuals who are on the voter rolls are
20 non-citizens, and, typically, non-citizens have little
21 motive to disclose that status.
22         So it would be extremely difficult to
23 prove.
24         Furthermore, the ballot is private and
25 anonymous.  One casts a vote and nobody can tell how

Page 190

1  one has voted.
2          So I think it would be very difficult to
3  demonstrate, except perhaps in the context of absentee
4  ballots where one might be able to identify the
5  individuals and how they voted.  It would be very
6  difficult to know for certain, to the level that would
7  be perhaps required to overturn an election outcome,
8  whether an election was altered by the votes of
9  non-citizens, because the ballot is sacrosanct and
10 private.  Once someone costs a vote, that vote is
11 intermixed with all of the other votes, and so there's
12 no way to identify with any level of certainty how
13 somebody voted.  Of course, one could ask them, but
14 that would be about all.
15     Q    Let's try this again, Professor Richman.
16         The report you submitted to the Court
17 under oath, under penalty of perjury, is -- says that
18 it is not hard to find examples of elections that were
19 overturned as a result of fraud; is that right?
20     A    That's what I said in the report.
21     Q    Okay.  Can you --
22     A    I was referring to a broad class of
23 different kinds of fraud.
24     Q    And can you think of one election that
25 was overturned as a result of a specific kind of fraud,

Page 191

1  non-citizen voting?
2          The answer is no; correct?
3      A    That is correct.  As I articulated to you
4  a moment ago, it would be very difficult, even in the
5  context of an election that was determined by the votes
6  of non-citizens, to prove conclusively that it was
7  because one would have to know how the non-citizens
8  voted.
9      Q    But it's not hard to find examples of
10 other elections that have been overturned as a result
11 of other kinds of fraud.  That's your testimony;
12 correct?
13     A    My testimony was that there are a variety
14 of elections which have been overturned because of
15 various types of fraud.
16     Q    Can you think of a single federal
17 election that was overturned as a result of fraud?
18     A    Federal election as in election for
19 House, Senate, or president?
20     Q    Correct.
21     A    Well, I can go back through American
22 political history, there have been a variety of
23 elections where fraud have been prominent
24 in, in election outcomes.
25     Q    Well, let's just limit it to the 21st

Page 192

1  century.  Can you think of a single federal election
2  since the year 2000 that was overturned as a result of
3  fraud?
4      A    This is -- this is something I don't have
5  at the top of my head.  I can research this and get
6  back to you.
7          As I said, I examined that report some
8  time ago, and I don't recall the specific set of, of
9  cases that were discussed.
10         Many of the instances, I think, were
11 lower -- were non-federal cases, state elections, local
12 elections, and so forth.  There are many more such
13 elections, and so they -- the -- and they tend to
14 involve smaller numbers of voters.  So, for a variety
15 of reasons, they -- you are more likely to encounter
16 those kinds of elections in the context of elections
17 getting overturned by fraud.
18     Q    Well, since you're having trouble
19 recall -- recalling --
20     A    Thank you.
21     Q    -- here is the Heritage Foundation
22 report, which I think is the only -- this is the only
23 document that you cite in your report for the
24 proposition that it's not hard to find examples of
25 elections overturned as a result of fraud; correct?

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 193

1      A    That is the link I cite, yes.
2           MR. HO: Okay.  It's been marked as --
3           MR. ROE: I was going to ask what
4  exhibit.
5           MR. HO: It's been marked as Exhibit 16.
6  BY MR. HO:
7      Q    There's another --
8      A    I believe, there's another -- I don't
9  think this is the report in full that I, I remember
10 looking at.
11     Q    There's not a single --
12     A    This looks like --
13     Q    -- example of a --
14     A    There's a, there's a more-detailed
15 database that goes through -- that I believe goes -- I
16 don't think this is the, this is the full set of data
17 that I was referring to.
18     Q    Well, this is what was down -- this is --
19 you include a link to the Heritage Foundation report in
20 your report in this case, and this was downloaded from
21 that link, Professor Richman.  Is there something else
22 that you relied on for your report that you didn't
23 bother to put in the footnotes of your report?
24     A    I don't know.
25     Q    Okay.

Page 194

1      A    It was -- here's an example from '96 that
2  is mentioned here:  Election Dodge, County, Georgia,
3  commission race won by 31 votes --
4           THE COURT REPORTER: I'm sorry,
5  "commission" --
6           THE WITNESS: Yes, so I'm just looking
7  through this.
8           THE COURT REPORTER: I just need you to
9  repeat what you said, because I have to understand what
10 you're saying.
11          THE WITNESS: Yes.  Sure.
12 BY MR. HO:
13     Q    This is not responsive to one of my
14 questions, Professor Richman.
15          Did I ask you something about Dodge City?
16     A    You asked me about instances of elections
17 being overturned because of vote fraud; this is an
18 instance of a race that was overturned by vote fraud.
19     Q    Okay.
20     A    Which I, which I came to just flipping
21 open one of the pages in the document you just handed
22 me.
23     Q    There was not a single instance of an
24 election overturned as a result of non-citizen voting
25 in the Heritage Foundation report that you cite in your

Page 195

1  expert report in this case; correct?
2      A    I just flipped to one that's from
3  California 2012 City Council election in Vernon,
4  California, in which a candidate won by four votes; it
5  was overturned after it was discovered that five
6  registered voters had falsely claimed they were
7  residents of the city when they were registered to
8  vote.
9           "In 2002, nine citizens testified under
10 oath that they had voted in the mayor's election" --
11          THE COURT REPORTER: Professor, I need
12 you to just slow down when you're reading.
13          THE WITNESS: Sorry.  I will slow down.
14 I'm sorry.
15          So in 2002, non-citizens testified under
16 oath that they had voted in a mayor's election in
17 Compton, California, and it was elected to the Compton
18 City Council, was permanently disqualified by a court
19 from holding public office for soliciting non-citizens
20 to register and vote.
21 BY MR. HO:
22     Q    Okay.  So that does not indicate that the
23 election results were overturned as a result of
24 non-citizens voting.  That says that someone was barred
25 from office for soliciting votes from non-citizens;

Page 196

1  correct?
2      A    That's correct.
3      Q    Okay.
4           So this report does not include an
5  instance in which election results were overturned
6  because non-citizens had accounted for the margin of
7  victory in an election; correct?
8      A    Again, it's been some time since I've
9  read through this.  It is possible that my recall is
10 faulty.  If you want me to read through the entire
11 report to confirm that, I could do that.
12     Q    You've read the entire report before;
13 right?
14     A    It was -- I read the report more than a
15 year ago.
16     Q    And this is a case about non-citizen
17 registration and voting; correct?
18     A    Yes.
19     Q    If there were an example of an election
20 being overturned as a result of non-citizen voting,
21 surely you would have mentioned that in your expert
22 report on non-citizen voting?
23     A    It is very likely I would have.
24     Q    Okay.
25     A    My impression is that there are no cases

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 197

1  which are directly in that category.
2      Q     All right. I'm going to show you a
3  document; we'll mark it as Richman Exhibit 17.
4           (Spreadsheet, 2 pages, marked as Richman
5           Exhibit Number 17)
6  BY MR. HO:
7      Q     This is the spreadsheet of close
8  elections that you identify in your report in Kansas,
9  33 elections decided by one hundred votes or fewer;
10 correct?
11     A     Yes, this looks like that spreadsheet.
12     Q     Okay.
13          Who compiled this list?
14     A     I was provided initially with a list of
15 close elections by the Secretary of State's office.  I
16 then independently and individually looked up each of
17 the elections to identify the number of votes for each
18 side and to calculate the percentages and the winner.
19     Q     Are you opining that any one of these
20 elections in particular was determined by non-citizen
21 electoral participation?
22     A     I think that there are variations in the
23 probability that that could have happened.
24          In most cases, I think that probability
25 is low.

Page 198

1           The probability is higher in the case of
2  some of these.  I particularly highlighted in my report
3  the two cases that are at the top of this spreadsheet
4  where the vote margin was very small and the winning
5  candidate was a Democrat, because the evidence I've
6  seen suggests non-citizens tend to vote more for
7  Democrats than for Republicans.  So if non-citizen
8  participation was going to have altered an election, I
9  think those are the ones that are most likely to have
10 been altered.
11          However, again, the challenges of
12 identifying non-citizens who have voted and so forth
13 mean that I can -- I think I can only speak in terms of
14 higher or lower probabilities, rather than any kind of
15 certainty about what drove the particular -- what may
16 have contributed to particular election outcomes.
17     Q     You are not offering the opinion,
18 Professor Richman, that any of these elections in
19 particular was, in fact, determined by non-citizen
20 voting; correct?
21     A     I am offering the opinion that some of
22 these elections were close enough that the kind -- the
23 levels of non-citizen participation that I identified
24 in this study could have tipped the outcome in the
25 election.

Page 199

1      Q     Do you agree that any of these elections
2  could have been affected by a law that prevents
3  thousands of eligible people from registering to vote?
4      A     That is obviously a possibility as well.
5  Close elections, as I articulated in some of the other
6  things I've said, can be tipped by a variety of
7  factors, and so one of the -- one of the factors may be
8  non-citizen participation.
9           There could be a variety of other things
10 that could have tipped an election outcome.  Maybe it
11 was -- there's some literature which suggests that rain
12 makes a difference for which side supporters turn out.
13 It's not very robust literature, but if an election is
14 very close, many things can contribute to the outcome
15 being what it is.
16     Q     Of the 33 elections that you identify as
17 close elections, 32 are non-federal elections; correct?
18     A     We have -- yes.  There are two here that
19 are federal elections.  The rest are -- the rest appear
20 to be -- or is it three?  It's three, because there's a
21 primary.  United States -- wait, no, no, just one.  I'm
22 sorry, I was reading it wrong.
23          Yeah, I think there's only one that is a
24 federal election, if I'm reading this correctly.
25     Q     So let's just clarify that.

Page 200

1           There are 33 elections on this sheet;
2  correct?
3      A     Yes.
4      Q     32 out of 33 of these elections are not
5  for federal office; correct?
6      A     That's correct.
7      Q     So for the elections that are not for
8  federal office, 32 of the 33 here, could the outcomes
9  of these elections be affected by a court ruling that
10 affects the requirements for registering to vote for
11 purposes of federal elections only?
12     A     I would like to ask you to clarify your
13 question.
14     Q     You understand that this case is about a
15 requirement of documentary proof of citizenship for
16 voter registration; correct?
17     A     Yes.
18     Q     The plaintiffs' claim in this case, if
19 this helps you, is that, for purposes of registering to
20 vote for federal elections under the NVRA, that proof
21 of citizenship requirement is not permitted for motor
22 voter applicants.
23          Did you understand that before I
24 explained that to you?
25     A     I hadn't been fully aware of the

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 201

1  limitations of the plaintiffs' argument.
2      Q    The defendants' position in this case, I
3  believe, is that a ruling in this case would only
4  affect a person's ability to register to vote for
5  purposes of voting in federal elections.
6          Were you aware of that?
7      A    I, I had not been following details of
8  the arguments on one side or the other of the case. My
9  focus was, as an expert witness, on the specific
10 questions I was asked to address.
11     Q    Given what I've explained to you about
12 how a ruling on the claim in this case would only
13 directly affect registration for purposes of voting in
14 federal elections, is it correct that a ruling in this
15 case, one way or the other, would not affect 32 --
16 could not affect 32 out of 33 elections on this page?
17     A    Well, if, if the way you've described it
18 is correct, and I, I had not been paying attention to
19 those nuances previously, then most of these elections
20 would seem to be beyond the scope of this particular
21 ruling; however, I think they are relevant to the
22 broader issue of closeness and influence on elections.
23         As I noted before, there are simply many
24 more state and local elections than there are federal
25 elections.

Page 202

1          And, so, as you move to more
2  disaggregation, more elections, the probability of
3  observing, as I've argued, quite a low frequency event,
4  an election close enough that there's a plausible
5  probability that non-citizens' vote participation,
6  non-citizens' votes, could have changed the outcome,
7  you have to think you're going to find more instances
8  as you look to lower aggregation.
9          So I guess the question would really be
10 whether there's something distinctive about federal
11 elections in the state of Kansas that would lead one to
12 think the, the probabilities are different.
13         We just -- now, there are many more
14 districts for the Kansas House of Representatives and
15 Kansas Senate put together than you have for House of
16 Representatives coming from Kansas. And, so, the total
17 number of elections that were in the background of
18 these cases, in terms of the total number that weren't
19 this close, there are just many -- you know, there's no
20 evidence here about differences in the base rate of
21 closeness.
22         In fact, my guess is that we have one out
23 of 32. That's probably about the ratio in terms of the
24 term of federal elections to state elections.
25     Q    You compiled as many elections as you

Page 203

1  could find in Kansas that were decided by fewer than
2  one hundred votes; correct?
3      A    Yes.
4      Q    And of those, you found one federal
5  election that was decided by fewer than one hundred
6  votes; correct?
7      A    Yes.
8      Q    Okay.
9          Let's talk about your surveys a little
10 bit, Professor Richman.
11         Now would you agree that for any estimate
12 of non-citizen registration based on a survey, the
13 reliability of that estimate depends in some measure on
14 whether or not individuals who say that they are
15 non-citizens on your survey report that status
16 correctly?
17     A    Yes.
18     Q    And would you agree that if the
19 respondents on a survey report their citizenship status
20 incorrectly, that that would tend to undermine the
21 reliability of a survey that attempts to measure rates
22 of non-citizen registration to vote?
23     A    Yes, that's why I had two questions on
24 non-citizen status in the survey I conducted. I also
25 discuss in my reports analyses of CCES data where --

Page 204

1  not individuals indicated they were non-citizens across
2  two different survey years. Those kinds of approaches
3  can increase our certainty.
4          We -- I also discuss in various places in
5  the report efforts to assess whether -- whether
6  individuals were non-citizens, based on various other
7  data sources. So -- contact with Homeland Security,
8  the Secretary of State, I was able to initiate to get
9  some names checked and so forth; right?
10         The -- all of these are efforts to
11 increase the reliability of the estimates.
12     Q    We'll talk about all of those efforts
13 specifically, but you agree that if you have inaccurate
14 information in your survey about whether or not someone
15 is, in fact, a citizen, that would tend to undermine
16 the reliability of any estimates from that survey about
17 non-citizen registration rates; correct?
18     A    That's the reason why one addresses
19 issues of reliability, is to try to reduce the degree
20 to which any estimate is biased in any way or
21 influenced by some kind of reliability issues in the
22 measures.
23     Q    And you would agree that for your
24 estimates of non-citizen registration, if respondents
25 are inaccurately reporting whether or not they are

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 205

1 registered to vote, that would tend to undermine the
2 reliability of your estimates based on those surveys;
3 correct?
4   A   So it -- it depends a little bit on the
5 specific context.
6         So one of the things that I discuss is in
7 the 2014 -- sorry, the CCES 2010 to 2012 panel study.
8 There are individuals who both said they were
9 registered to vote and had cast a validated vote; that
10 increases our confidence that these individuals are, in
11 fact, registered to vote.
12         Similarly, in the context of the -- that
13 survey, one can look at individuals who twice reported
14 they were non-citizens, increasing one's confidence
15 that these are in fact non-citizens. So one attempts
16 to improve the reliability. All estimates in -- based
17 on survey work are potentially affected to some degree
18 by issues of reliability, and this is why one has to
19 try to be careful about analyzing the extent to which
20 that may have biased estimates.
21   Q   Let's go back to Exhibit 3, which is your
22 survey instrument --
23   A   Yes.
24   Q   -- Professor Richman.
25         Is this the same survey instrument that

Page 206

1 you used for the TDL survey and for the
2 incidentally-contacted non-citizens?
3   A   Yes.
4   Q   Okay.
5         And you recorded the gender, age, race
6 and ethnicity of all of the respondents of the TDL
7 survey and the incidentally-contacted non-citizens;
8 correct?
9   A   All of them were asked these questions.
10   Q   When people were given this survey, were
11 they guaranteed anonymity and confidentiality?
12   A   No.
13   Q   Did you clear this survey with Old
14 Dominion's IRB?
15   A   I did not. This survey was paid for by
16 the State of Kansas, which contracted with the company
17 Issues & Answers.  I --
18   Q   Is it consistent with professional norms
19 in political science when conducting a survey of this
20 nature not to guarantee confidentiality to survey
21 respondents?
22   A   In this con -- in the context of this
23 case, I did not feel that I could ethically promise
24 that because, in the context of the case, demands for
25 disclosure and so forth could compromise my capacity to

Page 207

1 offer such assurances.
2   Q   I'd like to ask you about question number
3 3 on the survey.
4         The question here is:  "Have you
5 registered to vote or attempted to register to vote in
6 the state of Kansas?"
7   A   Yes.
8   Q   Did I read that correctly?
9   A   Yes.
10   Q   Did you draft this question?
11   A   Yes.
12   Q   So the survey asks two different things;
13 right?  Whether or not someone is registered or if they
14 have attempted to register to vote; is that right?
15   A   It asks for both whether they've
16 attempt -- whether they've registered to vote or
17 attempted to register to vote. So it's asking for
18 respondents to indicate, yes, if they fall into either
19 of those two categories.
20   Q   And this is an example of what survey
21 research -- researchers would call a double-barreled
22 question; correct?
23   A   I think that, that argument was made by
24 Professor Ansolabehere in his report. A classic
25 double-barreled question asks about two distinct

Page 208

1 things.
2         If one -- in this case, it's really more
3 of a matter of two things that are on the same, same
4 dimension. They are both about registering. One could
5 have registered to vote, attempted to register to vote,
6 or neither attempted to register to vote, or -- or
7 registered to vote.
8         The issue with double-barreled questions,
9 when those become problematic, is when someone could
10 have contradictory answers to the two, the two elements
11 of it that would, that would lead to unreliable
12 responses.
13   Q   You'd expect someone to say yes in
14 response to this question if they had registered to
15 vote; right, Professor Richman?
16   A   That's right.
17   Q   And you'd expect someone to say yes to
18 this question if they had attempted to register to vote
19 but hadn't actually registered to vote; correct?
20   A   That's correct.
21   Q   Now, from this survey, you don't know
22 when someone says yes which of those two categories
23 they fall into; right?
24   A   That's correct.
25   Q   You don't know if that person actually

Page 209

1  registered to vote or if that person tried to register
2  to vote but failed; correct?
3      A    That's correct.  And that reflects what I
4  was told was the, the aim of my analysis, which was to
5  assess whether a substantial number of non-citizens
6  were registering to vote or attempting to register to
7  vote in the state of Kansas.
8      Q    You could have separated this question
9  into two pieces and asked someone, first, have you
10 registered to vote, gotten an answer to that question;
11 and then, second, have you attempted to register to
12 vote, and gotten an answer to that question.
13     Right?
14     A    I could have done that.
15     Q    And then you would have been able to
16 distinguish?
17     A    Then I would have been able to
18 distinguish between those categories.
19     Q    But as things stand from the TDL survey
20 respondents, you don't know --
21     A    You can't distinguish --
22          THE COURT REPORTER: Wait, I'm sorry --
23          MR. HO: Just let me finish my question,
24 for purposes of the transcript.
25          THE WITNESS: Of course.

Page 210

BY MR. HO:
1
2      Q    As things stand from the TDL respondents,
3  you don't know how many of them actually registered to
4  vote; correct?
5      A    This question does not provide
6  information on how many actually registered as opposed
7  to attempted to register.
8      Q    Okay.  Now, back to your initial report,
9  Exhibit 1.  If we could turn to page 11.
10     A    Okay.
11     Q    The first full sentence:  "Hence,
12 respondents are not necessarily asserting that they are
13 currently registered; indeed, being informed about
14 Kansas requirements concerning documentation of
15 citizenship status may have prevented some from
16 completing a registration application."
17         Did I read that right?
18     A    I believe so.
19     Q    Okay.  So the first sentence here, that
20 reflects the conversation that we were having, that
21 when someone says yes to question 3 on their survey,
22 they are not necessarily asserting that they are
23 currently registered to vote; correct?
24     A    That's correct.
25     Q    And if someone attempted to register to

Page 211

1  vote but was unsuccessful, the survey doesn't tell us
2  anything about why that person was unsuccessful;
3  correct?
4      A    That's correct.  The survey does not
5  provide that information.  And we might have gotten a
6  little bit of information, but we hadn't -- no, not
7  really -- the survey doesn't provide information.
8      Q    You hypothesize, in the sentences that I
9  just read, that being informed about Kansas
10 requirements concerning documentation may have caused
11 some people not to register to vote; correct?
12     A    Yes.
13     Q    But you don't know one way or the other
14 whether it's actually the case that any of your survey
15 respondents tried to register to vote but failed as a
16 result of the documentary proof-of-citizenship
17 requirement; correct?
18     A    That's correct.
19     Q    It just as easily could have been the
20 case that some of your survey respondents who answered
21 yes to this question failed to register to vote after
22 trying, simply because they were informed about the
23 requirement that one be a citizen in order to register
24 to vote; right?
25     A    That's possible.

Page 212

1      Q    You just don't know one way or the other?
2      A    I don't know, yeah.
3      Q    When someone in your survey indicates
4  that they attempted to register to vote but failed, is
5  there any information about when they attempted to
6  register to vote?
7      A    No.
8      Q    So you don't know, if someone attempted
9  to register to vote and failed, whether or not their
10 attempt and failure happened before the documentary
11 proof-of-citizenship law went into effect in 2013;
12 correct?
13     A    That's right, we don't know.
14     Q    They could have been stopped by something
15 other than the documentary proof-of-citizenship law;
16 correct?
17     A    They could have been stopped by something
18 other.
19     Q    Now, as a political scientist, when you
20 rely on a survey, do you want to know anything about
21 the response rate of your survey?
22     A    Yes.
23     Q    If, in political science research, you
24 rely on a survey and fail to publish your response
25 rate, would that be inconsistent with generally

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 213

1  accepted standards in the field?
2      A    Generally, one would provide response
3  rate. I provided a spreadsheet which gave a summary of
4  the outcomes of calling in my -- as an attachment in my
5  initial report.
6      Q    Okay. Let's --
7          MR. ROE: Can we take a two-minute break?
8  Is that okay?
9          MR. HO: Okay.
10          THE VIDEOGRAPHER: All right. Going off
11  the record at 2:29 p.m.
12          (Recess)
13          THE VIDEOGRAPHER: Back on the record
14  2:38 p.m.
15  BY MR. HO:
16      Q    Professor Richman, do you agree that,
17  generally speaking, if a survey has a low response
18  rate, that that increases the likelihood that the
19  people who actually responded to the survey are in some
20  relevant sense different from the larger population?
21      A    That's an increasing concern in the field
22  of survey research. WIRED published a piece this year
23  suggesting that the response rates are below 1 percent
24  for some of the large political polls.
25          When you get response rates -- the lower

Page 214

1  the response rate, the larger a concern that
2  potentially is.
3          And that's been addressed in the field of
4  public opinion research to varying degrees of success
5  through weights to adjust for any differences in
6  demographic characteristics between those who responded
7  and those who didn't. Sometimes that works well. On
8  the whole, it's worked pretty well, but on the other
9  hand, we've seen instances where it hasn't.
10      Q    If I use the expression "non-response
11  bias," will you understand that I'm referring to this
12  problem of low response rates potentially resulting in
13  a biased sample?
14      A    Yes.
15      Q    That's a version of the selection bias
16  problem we've been talking about throughout this
17  deposition; right?
18      A    It's a case of selection bias.
19      Q    What do you consider to be an acceptable
20  response rate for a survey attempting to measure,
21  measure registration rates in order to be confident
22  that non-response bias is not a significant problem?
23      A    You know, I don't know. The, the field
24  of public opinion research has done remarkably well
25  with some very low response rates. Pew had a report a

Page 215

1  couple of years ago looking at that issue, and it's --
2  it's a concern, but I don't think, I don't think
3  there's a hard-and-fast threshold.
4      Q    As a peer-reviewer, would you accept for
5  publication an article that relied on a survey in which
6  the response rate was 6 percent --
7      A    Yes.
8      Q    -- for example.
9          The Pew report that you mentioned, do you
10  know how low the response rates were in that report
11  that the Pew report considered produced reliable
12  results?
13      A    I don't remember precisely. It was done
14  in 2012. Response rates have dropped somewhat further
15  in survey research since that point, but I don't
16  remember the specific percentages.
17      Q    Does 9 percent sound right to you?
18      A    It might be. I don't remember.
19      Q    Can you give me an example of an article
20  that was based on a survey in which the response rate
21  was 6 percent or lower that was accepted for
22  peer-reviewed publication?
23      A    Frequently in published surveys -- the
24  published studies, rather, in the peer-review journals,
25  the response rates aren't discussed very much. But it

Page 216

1  varies.
2          I can't recall -- it's not something
3  where I've -- I keep -- I pay such close attention to
4  it that I have articles like that readily at hand to,
5  to give you examples.
6      Q    So you can't think of an example, sitting
7  here, of a peer-reviewed publication based on a survey
8  where the response rate was 6 percent or lower?
9      A    No. Generally, when I think about
10  articles in the literature, I'm thinking about them on
11  the basis of variety of other, other elements. I
12  don't -- I don't usually try -- memorize response
13  rates.
14          (Interview breakdown dated 1/20/17 from
15          Brittani Marston marked as Richman
16          Exhibit Number 18)
17  BY MR. HO:
18      Q    I'm going to give you what's been marked
19  as Exhibit 18.
20          I believe this is the call log that you
21  provided --
22      A    Yes.
23      Q    -- with your initial report for your
24  surveys.
25          Is that right?

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 217

1    A    Yes.
2    Q    Now, I believe this is a call log for all
3  of your surveys --
4    A    That's right.
5    Q    -- aggregated together?
6    A    That's correct.
7    Q    There's no way, from the data that you've
8  provided, to break out the response rates for your
9  different samples; for instance, your TDL sample
10  response rate or your suspense list response rate;
11  right?
12    A    That's right.
13    Q    If I were to add up all of the numbers in
14  column B, that would give me the number of total calls
15  you made; right?
16    A    I think there might be -- well, be some
17  overlap between these.
18        So, for instance, Spanish call-back, some
19  of those, many of them hopefully, ended up as completed
20  interviews.
21        Answering machine -- and, so, I don't
22  think that -- I think that there are some instances in
23  which numbers appear more than once.  Phone busy, so
24  forth.
25        So I think that that -- that would

Page 218

1  probably be incorrect.
2        If you add up all of them, I think you'll
3  end up with a total number of numbers that's probably
4  larger than we -- than the total number of numbers that
5  were given to issues and answers, but I'm not
6  absolutely certain of that.
7    Q    Well, if I add up all the numbers in
8  column B, I get a number over 40,000.  Do you know how
9  many calls were made for your surveys?
10    A    I don't know specifically how many calls
11  were made.
12    Q    Do you know what the response rate was
13  for your survey?
14    A    I don't know the specific response rate.
15  The overall 2300 completed interviews suggests that,
16  that, you know, if there were about 40,000 total
17  numbers reached, we had at least the response rate that
18  would suggest.
19        But some of these categories are ones
20  that are typically removed in the calculation of
21  response rates.
22        So, for instance, disconnected phones
23  would not be considered as a -- as a -- in the
24  denominator in calculating response rates.
25    Q    So you haven't --

Page 219

1    A    Same thing for a computer tone.
2    Q    So you haven't provided a response rate
3  for your survey?
4    A    I did not.  I provided this table, on
5  which basis one could make some inference about
6  response rates.
7    Q    Is there any way to calculate the
8  response rate for your surveys based on the information
9  in this table?
10    A    I believe there is.  I think you could
11  take the information in this table and calculate it on
12  the basis of the, the various criteria for different
13  response rate calculations provided by the American
14  Association for Public Opinion Research.
15    Q    Okay.  According to AAPOR standards,
16  which one of these numbers would you include and which
17  ones would you not include?
18    A    I would have to double-check the specific
19  standards.  As I just talked about, some of these would
20  not be included, such as disconnected phone.
21    Q    Do you know what the AAPOR standards are
22  for --
23    A    I have worked with them before --
24    Q    -- including these --
25    A    -- but I don't have --

Page 220

1        THE COURT REPORTER: I'm sorry.
2  BY MR. HO:
3    Q    Can you wait until I finish my question?
4    A    Yes.
5    Q    Do you know what the AAPOR standards --
6  that's A-A-P-O-R standards -- would be for including
7  the numbers in these rows in calculating your response
8  rate?
9    A    I don't have them memorized.
10    Q    You don't know your response rate,
11  sitting here today, do you?
12    A    Not precisely.
13    Q    Did you ever calculate the response rate
14  for your survey?
15    A    I have not calculated the precise
16  response rate.
17    Q    Let's talk about your TDL survey.
18        Now, do you have any basis for assuming
19  that TDL holders are representative of all non-citizens
20  in the state of Kansas?
21    A    TDL holders are a group of individuals
22  who received a temporary driver's license in the state
23  of Kansas.  There are some groups of non-citizens in
24  the state of Kansas who might not fall under this
25  group.

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 221

1      In my second report, I did a weighted
2  analysis which extrapolates on the basis of weighting
3  the TDL respondents to match the demographic
4  characteristics in the amount of citizen population of
5  the state of Kansas.
6      So that's one way to, to address this
7  issue.
8      The results were quite similar to the
9  ones that I offered here.
10     In my initial report, I discussed a
11 couple of different extrapolations.  One was to the
12 entire TDL list, of which it seems reasonable to assume
13 that this is a fairly representative sample.  And then
14 to the broader Kansas non-citizen population, for which
15 one could raise the issue you just raised, the
16 weighting is one way of addressing that concern.
17     Q    Well, let's look at page 10 of your
18 report, initial report Exhibit 1, where you talk about
19 your temporary driver's license list survey.
20     The last full paragraph here reads:  "The
21 TDL non-citizen list does not include all non-citizens
22 of Kansas.  My impression is that it is composed of
23 legal permanent resident aliens and aliens possessing
24 temporary visas, nonimmigrant aliens" -- in parentheses
25 -- "who applied for a temporary driver's license."

Page 222

1      Did I read that correctly?
2      A    You read that correctly.
3      I'm not -- I'm no longer as sure that
4  that's right concerning legal permanent residents.
5  I --
6      Q    Well, let's talk about --
7      A    I think that it may, it may be the case
8  that legal permanent residents are able to get driver's
9  licenses that are not -- that do not lead them to be on
10 the TDL list.
11     Q    At the time you wrote this, you believed
12 that legal permanent residents and temporary visitors
13 to the United States who were here legally could obtain
14 TDLs; correct?
15     A    That's what I believed.
16     Q    And what was the basis for that belief?
17     A    That belief was -- the basis of that
18 belief was my impression that this was a list which
19 included a range of non-citizens who were in the United
20 States legally.
21     Q    Okay.
22     Now, we know for a fact that the TDL does
23 not include people who never -- non-citizens who never
24 applied for a TDL; right?
25     A    Right.

Page 223

1      Q    Okay.
2      The TDL list, do you now understand, does
3  not include any legal permanent residents?
4      A    I do.
5      Q    So the TDL only consists of people here
6  on temporary visas who have applied for a temporary
7  driver's license; correct?
8      A    That's my current understanding.
9      Q    You also understand that in order to
10 obtain a driver's license in Kansas, you have to show
11 some form of a legal presence document; right?
12     A    That's my, my understanding as well,
13 though that hasn't always been the case, I think, in
14 the state.  I don't know exactly when that became the
15 case.
16     Q    So is it your understanding that, as a
17 general matter, someone here who is undocumented and
18 does not have a legal presence document would be unable
19 to obtain a TDL in Kansas?
20     A    Yes, I think that's probably the case.
21     There are some states where licenses are
22 available to such individuals.  I don't believe Kansas
23 is the case, though I'm not an expert on the specifics
24 of Kansas driver's license law.
25     Q    Okay.  So just to be clear, the

Page 224

1  non-citizen populations that the TDL list excludes are:
2  Legal permanent residents; correct?
3      A    That -- that appears to be correct, yes.
4      Q    People here on temporary visas who never
5  apply for driver's licenses; correct?
6      A    Correct.
7      Q    And undocumented immigrants; correct?
8      A    Yes.
9      Q    And -- okay.
10     Now, you address some of these
11 representativeness issues in your rebuttal report,
12 Exhibit 12, and I want to ask you about page 26,
13 paragraph 64.
14     Let me know when you're there.
15     A    I'm there.
16     Q    Okay.
17     The last full sentence in this paragraph
18 reads: "On the other hand, non-citizens who have no
19 prospect of naturalizing (e.g." --
20     A    Which page are we on?  Because 64 appears
21 to continue to the -- to --
22     Q    I'm on page 26.  The last full sentence
23 on page 26.
24     A    Oh, okay.  I got it.
25     Q    It reads:  "On the other hand,

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 225

1  non-citizens who have no prospect of naturalizing
2  (e.g., undocumented immigrants) have strong incentives
3  to register to vote as voter registration provides a
4  document useful for establishing the appearance of
5  citizenship and a right to work in the United States.
6          "A former ICE staffer stated in
7  interviews last fall that he often encountered voter
8  registration cards on undocumented immigrants."
9          Did I read that correctly?
10     A   Yes.
11     Q   Are you offering an expert opinion that
12  undocumented immigrants are more likely to be
13  registered to vote than legally present non-citizens?
14     A   I am speculating here.  This is in the
15  context of thinking about what is the nature of the
16  bias arising from the imperfect coverage of the TDL
17  list that we were just talking about.
18          One element of that bias, I'm suggesting,
19  may well be, although this is speculative, toward a
20  lower estimate rather than a higher estimate.
21     Q   You are not aware of any empirical
22  evidence, one way or the other, suggesting that
23  undocumented immigrants are more likely to be
24  registered to vote than legally present non-citizens,
25  are -- do -- are you?

Page 226

1      A   At this point, there's very little
2  concrete evidence one way or another on that issue.
3          The CCES survey doesn't distinguish
4  between different types of -- of non-citizens and
5  the -- so there's, there's limited empirical evidence.
6  This is based on -- an argument based on logic and an
7  example.
8      Q   And when you speculate that undocumented
9  immigrants may want to register to vote so that they
10  can -- it's, it's -- the reason that you speculate that
11  undocumented immigrants may want to register to vote is
12  that they will be able to obtain a document; correct?
13     A   Right.
14     Q   Can you quantify how often undocumented
15  immigrants have voter registration cards?
16     A   No, I cannot.
17     Q   For your assertion that undocumented
18  immigrants often have voter registration cards, you
19  cite an interview with a former ICE officer; correct?
20     A   I am paraphrasing his statement when I
21  say "often."
22     Q   And you did not conduct that interview of
23  the ICE officer; correct?
24     A   That's right.  I have a link there to a
25  video of the interview.

Page 227

1      Q   The interview took place on Fox News;
2  correct?
3      A   I believe so.
4      Q   Would relying on a Fox News interview for
5  the proposition that undocumented immigrants are often
6  registered to vote be acceptable for the purposes of a
7  peer-reviewed publication in political science?
8      A   As with a variety of the questions you've
9  asked, you're asking a question which appears to be a
10  yes or no question, but it's actually a question that
11  requires more than a yes or no answer.  I apologize if
12  that seems argumentative, but it does.  It would depend
13  on the context in which that was being used.
14     Q   How did you become aware of this Fox News
15  interview?
16     A   I believe I saw a link to it on the -- on
17  Rick Hasen's election log blog, but I'm not certain.  I
18  might have found out about it some other way.
19     Q   This is the only thing that you cite in
20  your report for the proposition that undocumented
21  immigrants often have voter registration cards in this
22  Fox News interview; correct?
23     A   That's the only thing I cite, though
24  there are some other sources that do make a similar
25  argument.

Page 228

1      Q   So you are aware of other sources to
2  support the proposition that undocumented immigrants
3  often have voter registration cards, but you opted not
4  to include those other sources in your report?
5      A   I believe there are some -- there are
6  other sources.  I didn't have them immediately at hand
7  and I did not cite them here, but --
8      Q   Why did you not cite them?
9      A   I just stated the reason.  I didn't have
10  them immediately at hand.
11     Q   Can you think of them today, sitting
12  here, any other sources other than a Fox News interview
13  for the proposition that undocumented immigrants,
14  quote, often, end quote, have voter registration cards?
15     A   I'm trying to remember the -- if it
16  hadn't been so -- if we weren't so many hours in
17  already, I think I'd have an easier time recalling the
18  book I'm thinking of.
19          Sorry.  Maybe we can come back to it.
20     Q   The answer is no, you can't think of any
21  other sources?
22     A   Not immediately, but I, I can provide
23  that to you later if you wish.
24     Q   Okay.  Let's turn to page 17 of your
25  rebuttal report; and, specifically, paragraph 38.

Page 229

1      A     Page 17?
2            All right.
3      Q     Now, here in this paragraph, 38, this is
4  where you describe some of the weighting that you were
5  talking about earlier of your TDL survey sample;
6  correct?
7      A     Correct.
8      Q     Now, your unweighted estimate that you
9  reported in your initial report in this case, of
10  non-citizen registration based on the TDL, gave us an
11  estimate of 16.5 percent; correct?
12     A     I believe that was the case, yes.
13     Q     And when you weighted your TDL sample,
14  you weighted it to account for age, gender, race, and
15  ethnicity; correct?
16     A     Age, gender, race, and Hispanic
17  self-ident -- Hispanic identification.
18     Q     And once you weighted for those factors,
19  your new estimate of non-citizen registration or
20  attempted registration, based on the TDL survey, is
21  11.4 percent; correct?
22     A     Correct.
23     Q     So once you weighted your survey results,
24  that reduced your estimate of non-citizen registration
25  or attempted registration by about a third; is that

Page 230

1  right?
2      A     It reduced it from the figure of 16.5 to
3  the figure of 11.4.
4      Q     Now, 11.4 percent of approximately
5  115,000 non-citizens in Kansas is how many people,
6  Dr. Richman?
7      A     Let me use the calculator.
8            MR. ROE: Dale, what page are we on at
9  this point?
10           MR. HO: 17, paragraph 38.
11           THE WITNESS: That would be 13,110, I
12  believe.
13  BY MR. HO:
14     Q     And 13,110 is equivalent to approximately
15  what percentage of the approximately 1.8 million
16  registered voters in Kansas?
17     A     That is approximately .73 percent, or
18  .728 percent.
19     Q     Now, when you weight your TDL survey
20  responses, your confidence intervals change too, not
21  just the point estimate; right?
22     A     Yes, that's one of the effects that --
23  that weighting has; you're putting more weight on some
24  observations than on others.
25     Q     So whereas before your confidence

Page 231

1  interval for the TDL survey unweighted was 7.7 percent
2  to 31.1 percent, here in paragraph 38, you report that
3  once you weight the results, your confidence interval
4  shifts downwards to 4.4 percent to 25.3 percent;
5  correct?
6      A     That's what I report.
7      Q     And the confidence interval for this
8  estimate, based on the TDL sample, is still more than
9  20 percentage points; correct?
10     A     Yes.
11     Q     As a political scientist, which estimate
12  do you think is more reliable, the weighted or the
13  unweighted one?
14     A     I would -- if we're trying to make an
15  inference about the frequency of non-citizen
16  registration among TDL list members specifically, then
17  I'd want to use the TDL list weighted estimate.  But if
18  we're trying to generalize to the entire non-citizen
19  population in the state of Kansas, I would prefer the
20  weighted estimate.
21     Q     The lower estimate you think is more
22  accurate?
23     A     Yes.
24     Q     Now, we established earlier -- let me
25  start that again.

Page 232

1            Just because someone is on the TDL, do
2  you know for a fact that that person is a non-citizen?
3      A     No.
4      Q     Someone could have been a non-citizen
5  when they applied for a TDL and then naturalized;
6  right?
7      A     Potentially; though, on the other hand,
8  people who are on the TDL are people who are not legal
9  permanent residents.  So, presumably, it will take --
10  it would take some period of time, I don't know exactly
11  how long, for them to reach eligibility for
12  naturalization.  But, yeah, somebody could have
13  naturalized.
14     Q     And one of the ways you try to account
15  for that possibility is that the non-citizen status of
16  the TDL survey respondents was verified with the United
17  States Immigration and Customs Enforcement, or ICE;
18  correct?
19     A     That's -- that's right.
20           Now, as I discuss in the report, not --
21  in some cases, the response was unknown, which doesn't
22  really help clarify specifically the status, but it
23  would suggest.
24           But we did -- but I think we got more
25  unknown responses with some of the other lists.

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 233

1    Yes, we, we -- this list was reviewed by
2  ICE and they gave a report on status. My recall of the
3  TDL list specifically was that all but one of the
4  respondents, we got a, a status from, and there was one
5  who -- for whom they were un -- they indicated
6  uncertainty, and that individual was dropped from this
7  analysis.
8    Q    What information was sent from the Kansas
9  Secretary of State's office to ICE in order to verify
10  that the TDL survey respondents continued to be
11  non-citizens?
12    A    I think I provided an exhibit at some
13  point with that. I don't remember the, the exact
14  details right now.
15    Q    But broadly speaking, the Kansas
16  Secretary of State's office sent a list of names over
17  to ICE of the TDL survey respondents, and based on that
18  list, ICE was able to confirm for the Kansas Secretary
19  of State's office whether or not these people, as best
20  as ICE knew, continued to be non-citizens; correct?
21    A    That's right. So the list contained
22  names, and I think it had address and date of birth.
23  And I don't -- I'm not sure if there was any other
24  information.
25    Q    We talked about ethical concerns with

Page 234

1  confidentiality. Does the fact that your survey
2  respondents who may have been non-citizens and may have
3  been registered to vote, that their information was
4  transmitted by the Kansas Secretary of State to ICE,
5  does that raise any ethical concerns for you as a
6  political scientist analyzing this survey?
7    A    The -- it is something that I have
8  thought about as a -- as one of the challenges of
9  taking on this project in general, is that various of
10  the analyses that I might do could potentially identify
11  individuals who were non-citizens and illegally
12  registered to vote.
13    Q    If you were to conduct this kind of
14  survey and analysis, apart from this case, but in your
15  academic capacity, verifying the citizenship status or
16  non-citizenship status of survey respondents in this
17  manner, would that pass the Old Dominion IRB process?
18    A    I don't know. I think, when David
19  Earnest and I were working on developing plans for
20  other surveys, what we were hoping to do is to obtain,
21  for respondents, the high levels of confidentiality
22  protections that the Federal Government makes available
23  for respondents in some classes of surveys; for
24  example, surveys on drug use and that sort of thing.
25    Outside of the context of a case like

Page 235

1  this, I would want to pursue those kinds of levels of
2  protection.
3    In the context of this case, I believe
4  there is -- there are some protective orders, but I --
5  so -- but this is a different circumstance.
6    Q    Would sending the names of survey
7  respondents in a survey that you've conducted of people
8  who identify as non-citizens and indicate that they are
9  registered to vote, would sending the names of those
10  people to United States ICE be consistent with the
11  confidentiality protections typically employed in a
12  university IRB process.
13    The answer is no; right?
14    A    We did not provide any information to ICE
15  about whether the individuals whose names they were
16  being sent had indicated that they had registered to
17  vote or not.
18    Q    Would sending their names to ICE to try
19  to confirm their non-citizenship status be consistent
20  with the confidentiality protections typically
21  associated with a university IRB process?
22    A    I don't know.
23    Q    The answer is no; right?
24    A    I don't know.
25    Q    You don't know the answer to that

Page 236

1  question?
2    A    I, I am -- I think it would be dependent
3  upon a range of considerations.
4    Q    Okay. So your non -- your TDL
5  respondents, you attempted to validate their
6  non-citizenship status through ICE.
7    Did you attempt to validate the
8  citizenship status or non-citizenship status of your
9  suspense-list survey respondents?
10    A    I -- I'm trying to remember which groups
11  we sent names from.
12    I know we -- I provided a, a set of
13  the -- of information about what we sent and received.
14  I, I can't recall at this point.
15    Q    Are you familiar with the phenomenon of
16  registration over-reporting?
17    A    Yes.
18    Q    And that's a phenomenon where, in
19  surveys, survey respondents typically report being
20  registered at a higher rate than government records
21  indicate people are actually registered to vote;
22  correct?
23    A    Yes; I'm aware of that phenomenon.
24    Q    And you, you know that that phenomenon
25  exists; right?

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

---

Page 237

1    A    Yes.
2    Q    You don't dispute the existence of that
3 phenomenon; right?
4    A    No.
5    Q    And what essentially it means is that
6 some people in survey say that they are registered to
7 vote when in fact they are not; correct?
8    A    Yes.
9    Q    Okay.  Did you, when you calculated your
10 estimate of non-citizen registration based on the TDL
11 survey, did you do anything to account for the
12 possibility of registration over-reporting?
13    A    Well, the subsequent -- the matching that
14 Hersh performed suggested that he wasn't able.  Now,
15 the list he had apparently was incomplete, but given
16 the list he had, albeit incomplete, I don't believe he
17 was able to match the names of those individuals to the
18 voter files.
19        So that would suggest that one of two
20 things was true for those individuals:  Either they had
21 attempted to register to vote but had not completed
22 voter registration or -- well, one of three things;
23 they weren't on the list -- incomplete list that Hersh
24 received of the voter file in the state of Kansas; or
25 they had claimed to have registered to vote or

---

Page 238

1 attempted to register to vote when perhaps they hadn't.
2    Q    What's your understanding of when -- what
3 happens when someone submits a voter registration form
4 in Kansas but the form is incomplete in some respect?
5 Is it your understanding that that person does not get
6 entered into the Kansas voter registration file?
7    A    I don't know the details of how the
8 Kansas voter registration systems work.
9    Q    Okay.  So if I told you that the director
10 of elections for the state of Kansas has testified
11 that, generally speaking, when someone submits a voter
12 registration form but it's incomplete in some respect,
13 for example, it's lacking documentary proof of
14 citizenship, that that person is supposed to be entered
15 into the Kansas voter registration file, would you have
16 any reason to believe that that was incorrect?
17    A    No.
18    Q    Okay.
19        So, if someone successfully registers,
20 registers to vote, they're going to be in the Kansas
21 voter registration file; correct?
22    A    If somebody successfully registers to
23 vote, they should be in the file.  The only caveat is
24 that the file that Hersh received apparently was
25 incomplete.

---

Page 239

1    Q    I'm not talking about Professor Hersh's
2 file.  I'm just talking about the Kansas voter
3 registration file.
4    A    It should be there.
5    Q    If someone attempts to register to vote
6 but their form is incomplete, for instance, because
7 they lack documentary proof of citizenship, they are
8 going to be in the file but marked as in suspense.
9        Do you understand that?
10    A    Yes.
11    Q    Okay.  Did you do anything to check to
12 see whether or not the six TDL survey respondents who
13 told your surveyor that they were registered or had
14 attempted to register to vote, were actually, in fact,
15 in the Kansas voter registration file?
16    A    So, I did not analyze the, the file that
17 Hersh looked at.  I may have done some comparison with
18 the list of matched names from the TDL to the suspense
19 file.  I don't believe that any of these individuals
20 were on that list of matched names.
21    Q    Right.  You're aware that Bryan Caskey,
22 the director of elections for Kansas, performed a match
23 of the TDL -- or analyzed a match of the TDL --
24    A    Yeah.
25    Q    -- to the entire Kansas voter

---

Page 240

1 registration file?
2    A    Yes, I am.
3    Q    And did you check to see whether or not
4 any of the six TDL survey respondents from your survey
5 who said they were registered to vote or had attempted
6 to register to vote, appeared in Mr. Caskey's list of
7 names matched from the TDL database to the voter
8 registration file?
9    A    I don't believe I've seen the full list
10 from Caskey's matching.
11    Q    Did you ask for the full list from
12 Caskey's matching?
13    A    I have not.
14    Q    Did you ask anyone to verify whether or
15 not your six TDL survey respondents who said that they
16 were registered to vote or had attempted to register to
17 vote were actually in the Kansas voter registration
18 file?
19    A    I have not asked anybody to do that.
20    Q    So your only basis for thinking that your
21 TDL survey respondents registered or actually
22 registered to vote is their response on the survey;
23 correct?
24    A    Registered or attempted to register to
25 vote, and on the basis of the various evidence that

---

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 241

1  we've just been discussing, I think it's likely that
2  they would fall more into the category of either having
3  asserted that they were registered to vote when they
4  weren't or having attempted to register to vote without
5  reaching a point where they submitted a document that
6  would have gotten itself into the, the voter
7  registration list.
8      Q    And you understand that everyone who
9  submits a voter registration form that is complete but
10 for the submission of documentary proof of citizenship
11 is supposed to be in the Kansas voter file; correct?
12     A    That's -- I believe that is how it
13 operates.  Again, I'm not an expert on this.
14     Q    Okay.  Let me ask you about your
15 estimates based on incidentally-contacted non-citizens.
16     A    Okay.
17     Q    Now, we talked about how you weighted
18 your TDL sample.
19     A    Um-hum.
20     Q    Did you weight your sample of 19
21 incidentally-contacted citizens for gender?
22     A    I -- let me see.  I think in the -- do I
23 have a discussion of that in here?
24     Q    Well, I'll tell you, I believe the answer
25 is that you did not.

Page 242

1          Do you think that's wrong?
2      A    Not in the original report, that's true.
3      Q    In your rebuttal report, I believe, and
4  you can correct me if I'm wrong, that you did not
5  weight your sample of 19 incidentally-contacted
6  non-citizens for gender; is that right?
7      A    I don't think so.  I don't know for sure.
8  I'm trying to remember --
9      Q    Okay.
10     A    -- whether I, whether I included a
11 weighted analysis at all in the rebuttal report.
12     Q    You could have performed a weighting of
13 the -- of the incidentally contacted non-citizens for
14 gender; right?
15     A    Yeah.
16     Q    But you didn't; right?
17     A    I, I can't -- I don't believe I did.
18     Q    Okay.  You did not weight the sample of
19 incidentally-contacted non-citizens for age; correct?
20     A    That's correct.
21     Q    You could have done that, but you didn't;
22 right?
23     A    I -- I'm trying to recall whether I
24 included such an analysis in here or not.  I guess I --
25 I guess I didn't.

Page 243

1      Q    And you could have weighted your sample
2  of incidentally-contacted non-citizens for race and
3  Hispanic ethnicity in the same way that you did for the
4  TDL survey respondents; right?
5      A    That's correct.
6      Q    But you did not weight your
7  incidentally-contacted non-citizen sample for race and
8  ethnicity in the same manner that you did for the TDL
9  sample; correct?
10     A    I don't believe I did.
11     Q    Now, did you do anything to check whether
12 or not your 19 incidentally-contacted non-citizens
13 were, in fact, non-citizens, the same way that you did
14 with the TDL survey?
15     A    That was not possible in this case
16 because we had no, we had no identifying information
17 about these individuals.  They were incidentally
18 contacted.  They were not on the -- their names were
19 not on the list that we were calling, and so all that
20 was available in the survey data set about these
21 individuals was the phone number they were reached at
22 and their responses.
23     Q    You didn't have name and age for these
24 individuals?
25     A    Well, we had age category, but we didn't

Page 244

1  have any way to, to do any kind of matching of identity
2  because we didn't know their identity.
3      Q    Did you have their names?
4      A    No.
5      Q    Now, we established earlier that one of
6  your 19 incidentally-contacted non-citizens indicated
7  that they were registered or had attempted to register
8  to vote; right?
9      A    That's right.
10     Q    Did you check to see if this one person
11 was actually in the Kansas voter file?
12     A    I have no way to do that since I do not
13 know name or other identifying information for this
14 person.
15     Q    Okay.  Let's talk about the CCES estimate
16 in your report.
17     A    Which one, the Kansas?
18     Q    The Kansas one.
19         MR. ROE: What page, Dale?  Is this
20 Exhibit 1 or Exhibit 12?
21         THE WITNESS: Yeah, which exhibit are we
22 in?
23         MR. HO: One.  But, actually, if you use
24 14, which has the point estimates and the confidence
25 intervals --

Page 245

1      THE WITNESS: All right, let me find
2 that.
3      MR. HO: -- I think that would be
4 sufficient.
5      THE WITNESS: Okay.
6 BY MR. HO:
7      Q     Now, the confidence interval for your
8 CCES-based estimate of non-citizen registration in
9 Kansas does not overlap with the confidence interval
10 for the Sed -- for the estimate based on the Sedgwick
11 County naturalization data; right?
12      A     Yes, that's correct.
13      Q     And we established earlier that if the
14 confidence intervals for two estimates do not overlap,
15 that means they are in some sense incompatible; right?
16      A     Yeah.  And in this case one of the
17 differences is, the Sedgwick County analysis is based
18 purely on -- there are two, two key differences.
19      Sedgwick County is based purely on
20 individuals who naturalized.  That was how Sedgwick
21 County identified that these individuals had been
22 non-citizens at the time of their registration or
23 attempted registration.
24      And, furthermore, the Sedgwick County
25 numbers are based on only those individuals who chose

Page 246

1 to ask for voter registration at the ceremonies.
2      It's quite plausible that some
3 non-citizens who were -- knew they were registered to
4 vote prior to the ceremony would not choose to
5 reregister at that point.
6      And, so, those are some of the
7 differences.
8      Another difference is that the Sedgwick
9 County numbers are unlikely to be in any way biased by
10 issues of over-reporting of registration because, in
11 this case, we're dealing with matches of individuals in
12 the, the voter file.  And, so, there are a variety of
13 ways in which the Sedgwick County numbers may be --
14 might be expected to be distinct.
15      The CCES sample includes a wide range of
16 different kinds of non-citizens potentially, including
17 undocumented citizens, citizens who for one reason or
18 another are not likely to be in a position to
19 naturalize.
20      Q     So let me just hone in on one of the
21 things that you identified.
22      The Sedgwick-County-based estimate is
23 less likely to have a problem with registration
24 over-reporting than the CCES-based estimate.  That's
25 your view; correct?

Page 247

1      A     The Sedgwick County estimate doesn't
2 include any kind of reporting of registration status;
3 it's based on observation and matching.
4      Q     Okay.
5      Now, if we look at your original report
6 in this case, Exhibit 1.
7      A     Okay.
8      Q     In the conclusion, you discuss various
9 numbers for estimates of non-citizen registration in
10 Kansas.
11      And what I noticed was that you did not
12 mention an estimate of 32,000 non-citizens registered
13 to vote in Kansas based on the CCES survey.  And I'm
14 wondering if there's a reason why you omitted that from
15 your conclusion.
16      A     I don't recall why it was omitted from
17 the conclusion.
18      Q     Okay.  Now, your other estimates, the TDL
19 survey, the incidentally-contacted non-citizens, and
20 the Sedgwick-County-based estimate, all of those
21 estimates are for percentage of non-citizens in Kansas
22 who have registered or attempted to register to vote;
23 correct?
24      A     The Sedgwick, the TDL, and the
25 incidentally, yes.

Page 248

1      Q     Okay.  But your survey sample -- I'm
2 sorry, your CCES-based estimate, that's specifically an
3 estimate for people who say they are registered to
4 vote, not attempted; right?
5      A     That's right.  So that is a question
6 that's specifically about indicating that they are
7 registered.
8      Q     You would expect the number of
9 non-citizens who are registered to vote in Kansas to be
10 smaller than the number of non-citizens who have
11 registered to vote or attempted to register to vote;
12 right?
13      A     So all else equal, one would.  Of course
14 these are different samples in a variety of ways, as
15 we've discussed.  And, so, that could account for some
16 of the difference.
17      The CCES sample is also, as you can see
18 from its confidence interval index, the estimate is
19 extremely uncertain, and that confidence interval does
20 overlap with the confidence interval -- to a large
21 degree with the confidence intervals for the other
22 survey-based estimates.
23      So I, I didn't think it was -- it's --
24 the point estimate is higher, but I'm not sure there's
25 a whole lot to be made of that.

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 249

1    Q    Now, you've read Professor Ansolabehere's
2  report in this case; correct?
3    A    The one in response to my report?
4    Q    Yes?
5    A    Yes.
6    Q    And do you recall Professor Ansolabehere
7  making a point about the CCES respondents who indicate
8  that they are non-citizens, that that group not being
9  representative of non-citizens as a whole in the United
10  States?
11    A    Yes, he made that point with a couple of
12  different lines of argument.
13        One of the -- well, I'll, I'll let --
14  I'll let you ask your next question.
15    Q    Okay.
16        Now, you correct me if I'm wrong here,
17  but I believe one of the points you were making in your
18  rebuttal was that differences in the education level
19  amongst self-identified non-citizen respondents in the
20  CCES and non-citizens as a whole in the United States
21  aren't relevant to registration rate estimates amongst
22  non-citizens because registration status does not vary
23  among non-citizens on the basis of education; is that
24  an accurate representation of your view?
25    A    That was part of my argument.  The other

Page 250

1  part was that the -- yeah, that was my primary argument
2  on that issue.
3    Q    Now, other than your own research based
4  on the CCES data, are you aware of any other research
5  by anyone suggesting that registration rates do not
6  vary on the basis of education amongst any
7  sub-population?
8    A    The typical pattern in American politics
9  is that people with higher levels of education register
10  and vote at higher rates, and that's true in analyses
11  of naturalized citizens, as well as other
12  sub-populations.
13        I think that the -- there are reasons why
14  -- to think that the results that -- what we found that
15  there's very modest association, no association, that
16  you -- we talked earlier about, in the 2014 paper we
17  had an analysis looking at voting rates, validated
18  voting, which suggested, if anything, the direction of
19  the effect was in the opposite direction from what one
20  would typically expect, with those with higher levels
21  of education being more likely not to cast a validated
22  vote.
23        I think this potentially reflects, as we
24  were talking about earlier, the intersection between
25  education and awareness of the barriers to non-citizen

Page 251

1  voting and the inappropriateness of registering to vote
2  in the United States as a non-citizen.  There's quite a
3  bit of variation across the world in the degree to
4  which non-citizens are allowed to participate in
5  elections.  The United States doesn't allow much, but
6  there's quite a bit of variation.
7    Q    Let me just stop you right there, because
8  my question was really simple.  I don't think it
9  required this detour.
10        Other than your own research, are you
11  aware of any research suggesting that registration
12  rates do not vary on the basis of education levels
13  amongst a particular sub-population?
14    A    So in the context of the non-citizen
15  population, in the context of other sub-populations,
16  I'm not aware of research indicating that in the
17  context of U.S. elections.  It's possible there's some
18  sub-population that that's the case, but the general
19  pattern is, is the opposite.
20    Q    Okay.
21        Now, we established earlier that in the
22  context -- in your Electoral Studies article, you
23  weighted the CCES respondents on the basis of race and
24  Hispanic ethnicity when making an estimate of
25  non-citizen registration nationally from the CCES;

Page 252

1  correct?
2    A    That's right.
3    Q    Okay.  For your report in this case --
4    A    Yes.
5    Q    -- you did not weight the CCES
6  respondents on the basis of race and Hispanic ethnicity
7  when making an estimate on the basis of the CCES about
8  non-citizen registration rates in Kansas; correct?
9    A    That's correct.
10        Frankly, with so few respondents, I
11  thought that attempting to construct weights may be
12  difficult with such a small number of individuals.
13    Q    You did weights for the 37 individuals in
14  the TDL survey; right?
15    A    I did weights for the 37, but by the time
16  one gets below that level, I think that it -- you're,
17  you're getting to have such a small sample that
18  constructing weights potentially would become
19  difficult.
20    Q    And we talked about how with your TDL
21  survey sample you weighted by gender, but you did not
22  weight your CCES sample by gender when using it as a
23  basis for making estimates about non-citizen
24  registration in Kansas; correct?
25    A    The sample of 14 individuals, no.

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 253

1   Q    And you also did not weight the CCES
2 sample by age when extrapolating from it to make an
3 estimate as to the number of non-citizens registered to
4 vote in Kansas; correct?
5   A    That's correct.
6   Q    Now, your estimate of non-citizen
7 registration based on the CCES in this report is based
8 on self-reported registration rather than validated
9 registration; correct?
10   A    That's correct.
11   Q    And are you aware that Professors
12 Ansolabehere and Hersh have documented registration
13 over-reporting in the CCES?
14   A    Yes.
15   Q    So there are people in the CCES who say
16 they are registered to vote but in fact are not
17 registered to vote; correct?
18   A    That's their analysis.  I've read one of
19 their published papers on that issue.
20   Q    Do you have any reason to doubt their
21 analysis, that there are people in the CCES who say
22 they are registered to vote but, in fact, are not?
23   A    No, I don't.
24   Q    The four respondents from Kansas in the
25 CCES that said they were registered to vote --

Page 254

1   A    Um-hum.
2   Q    -- the ones that you rely on for your
3 CCES-based estimate, three of those four individuals
4 cannot be linked to a voter registration file; correct?
5   A    That's my impression, yes.
6       So one of the things -- so what does that
7 mean in terms of those individuals?  It could mean that
8 the matching process failed, or it could mean that they
9 were not in fact registered and they asserted
10 registration.
11   Q    Do you know one way or the other whether
12 these people were amongst the over-reporters who say
13 they are registered to vote but are not?
14   A    There's no way to know with certainty,
15 but it's certainly a possibility.
16       This is another reason why the, the CCES
17 sample is a -- we're, we're looking here at a subset of
18 a national sample.  It's a very small sample of
19 non-citizens.
20       THE COURT REPORTER: I'm sorry.  "It's a
21 very small sample" --
22       THE WITNESS: It's a very small sample of
23 non-citizens.
24       And this is potentially an, an issue with
25 that sample.

Page 255

1       The -- so let's say we take the 1 out of
2 14.  We're pretty confident this person is actually
3 registered to vote.  So that gets -- you know, there
4 are a range of estimates here.  I, I would expect that
5 some of the estimates are biased in one way and some
6 may be biased in another way.
7 BY MR. HO:
8   Q    So let's just be clear about this.  Of
9 the 14 Kansas respondents to the CCES from 2006 to 2012
10 who indicated that they were non-citizens, only one out
11 of those 14 people could be linked to an actual voter
12 registration file; correct?
13   A    That's my impression.
14   Q    Okay.  Did you check to see whether or
15 not the four individuals who said that they were
16 registered to vote in the CCES, whether or not those
17 individuals could be linked to a voter file?
18   A    Professor Ansolabehere discussed that
19 analysis, I think, in his report.
20   Q    Okay.  When you published your Electoral
21 Studies article, you published numbers of non-citizen
22 registrants.  And you published one number for people
23 who could be linked to a voter file and said they were
24 registered to vote; you published a different number
25 for people who said they were registered to vote but

Page 256

1 couldn't be linked to a voter file.  Correct?
2   A    Yes.
3   Q    So when you published your Electoral
4 Studies article, you made sure to determine which of
5 the CCES respondents could actually be linked to a
6 voter file; correct?
7   A    That was the discussion we had earlier.
8   Q    And you thought that that was an
9 important analysis to perform before you published your
10 peer-reviewed article on non-citizen registration;
11 correct?
12   A    Yes.
13   Q    Now, did you perform that analysis before
14 you submitted your expert report in this case to
15 determine whether or not the four individuals from the
16 CCES who reported that they were non-citizens and
17 registered to vote in Kansas could be linked to a voter
18 file?
19   A    I don't recall.
20       I don't believe I did, but it's possible
21 I did and I've forgotten.
22   Q    Now, we talked about a post on your blog
23 before; it was Exhibit 10.  I just want to return to it
24 for a moment.
25   A    All right.

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 257

1    Q    It starts with the title:  "Is it
2  plausible that non-citizen votes" --
3    A    I'm working through this.  It's --
4    Q    I think it's -- I think it was right
5  here.
6    A    And is it --
7    Q    This one.  This one.
8    A    Yup, here it is.
9    Q    Great.
10       So I'd like to turn to page 3 of your
11  blog post here.
12    A    Okay.
13    Q    And the last sentence before item number
14  3 here is:  "The underlying study on which the
15  extrapolation is based has been the subject of some
16  cogent criticisms, and this leads me to believe that
17  the actual rate of non-citizen involvement is on the
18  low end of our initial estimates, rather than anywhere
19  close to the high end."
20       Did I read that right?
21    A    Yes.
22    Q    And the "underlying study" that you are
23  referring to here is the Electoral Studies article;
24  correct?
25    A    Yes.

Page 258

1    Q    And when you say that it -- that the
2  Electoral Studies article "has been the subject of some
3  cogent criticisms," what are you referring to?
4    A    I'm referring to, most specifically, the
5  Ansolabehere, Luks, and Schaffner paper, which raise --
6  makes an argument about the potential that
7  non-citizens -- people who said they were non-citizens
8  on the IMMSTAT question on the survey were actually
9  citizens who mistakenly provided that response.
10    Q    And you believe -- and I know you have
11  some responses to it, and we'll talk about them, but
12  you believe that this criticism is cogent?
13    A    I think that this criticism was a, a --
14  that's what I said.
15    Q    And does that same cogent criticism apply
16  to your estimates of non-citizen registration based on
17  the CCES Kansas respondents that you are performing in
18  this case?
19    A    Well, let's -- I think we have to go a
20  little bit deeper now into the nature of the criticism
21  and my assessment of it.
22       The criticism as stated initially, I
23  think, was -- in their paper, overstated the, the
24  issue.  One of the elements of the response working
25  paper that I included as an attachment in my -- with my

Page 259

1  report was the -- we have their paper coming, I see --
2  was the issue of the degree to which there's response
3  error on the IMMSTAT question.
4       And using the three year -- three, three
5  wave panel studied, we estimated the response error to
6  be much, much higher among individuals who are most
7  likely non-citizens and much lower among individuals
8  who appear to be citizens.
9       That -- and so the caveat that I would
10  add is that that and a variety of other evidence which
11  is reviewed in that working paper lead me to think that
12  the actual rate of response bias on the IMMSTAT
13  question derived from citizens erroneously indicating
14  that they are non-citizens is substantially lower than
15  was suggested by Ansolabehere and co-authors in that
16  paper.
17    Q    I want to ask you about something you
18  wrote in your Electoral Studies article, which gets at
19  this issue.  This is back to be Exhibit Number 7.  And
20  you can use my copy of it if you want.
21    A    Let me turn these over so it's easier to
22  see the Exhibit Numbers.
23       Okay.
24    Q    So here's your Electoral Studies article,
25  and on page 150, the second column on the right, the

Page 260

1  last paragraph, the first sentence, you write:  "A
2  critical question for this project is whether
3  respondents' self-identification as non-citizens was
4  accurate.  If most or all of the 'non-citizens'" -- in
5  quotes, non-citizens -- "who indicated that they voted
6  were in fact citizens who accidentally misstated their
7  citizenship status, then the data would have nothing to
8  contribute concerning the frequency of non-citizen
9  voting."
10       Did I read that accurately?
11    A    Yes.
12    Q    Okay.  So I know you think that a lot of
13  these non-citizens in the CCES self-reported
14  non-citizens are, in fact, non-citizens; right?
15    A    That's my opinion.
16    Q    Okay.  But let's say you were wrong about
17  that.  Is it still your belief that, if, in fact, a
18  significant number of the survey respondents in the
19  CCES who indicated that they were non-citizens were
20  actually citizens, that that would mean that the
21  analysis that you performed based on the CCES would, in
22  your words, quote, have nothing to contribute
23  concerning the frequency of non-citizen voting?
24    A    I, I still believe that if most or all
25  non-citizens -- self-reported non-citizens were at --

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 261

1   who voted were, in fact, citizens, that the analysis
2   would not have much to contribute.
3           I, I believe that one of the innovations
4   that Ansolabehere, Here (sic) and Schaffner had --
5   there was actually a Monkey Cage blog post responding
6   to our piece that had it first by somebody else.
7           The innovation of looking at the panel
8   data study was a very useful one because by looking at
9   the panel data study, even if there's a response
10  rate -- response error rate that's problematic for the
11  cross-sectional studies, one can still get to a pretty
12  reliable sense of whether individuals are non-citizens
13  based on multiple requests that they respond to the
14  same question.
15      Q    Okay.  I'm going to show you what's been
16  marked as Richman Exhibit 19.
17      A    Thank you.
18           ("The perils of cherry picking low
19           frequency events in large sample
20           surveys," by Stephen Ansolabehere,
21           Samantha Luks, Brian Schaffner, marked as
22           Richman Exhibit Number 19)
23  BY MR. HO:
24      Q    Are you familiar with this article?
25      A    Yes.  I believe I cited it in one of the

Page 262

1   attachments, at least, to my report.
2       Q    Now, this was an article that was
3   co-authored by Professor Ansolabehere; correct?
4       A    Yes.
5       Q    And this is the article that you describe
6   as having some cogent criticisms of your research?
7       A    It has some cogent criticisms, with
8   substantial flaws as well.
9       Q    Now, is it fair to say, based on your
10  reading of this article, that Professor Ansolabehere's
11  view is that nearly all of the self-identified
12  non-citizens in the CCES who said that they voted were,
13  in fact, citizens who clicked the wrong box on this
14  survey?
15      A    That's the general impression I get,
16  though I, I've been somewhat confused by some of the
17  other decisions Professor Ansolabehere made.
18           So, for example, in calculating these
19  confidence intervals, he assumed that 50 percent of the
20  non -- of non-citizens were registered to vote.  But
21  most of his statements have seemed to be along the
22  lines that non-citizen voting at least -- and that's
23  the focus of this paper, it says nothing about
24  registration -- non-citizen voting is a very low
25  frequency phenomenon and there -- they draw some

Page 263

1   conclusions somewhere here.  They say the likely
2   percent of non-citizen voters in recent U.S. elections
3   is zero.
4       Q    So, you know, we can talk about the
5   margins of error and everything, but I just want to
6   talk about, for now, the measurement error issue.  All
7   right?
8       A    Okay.
9       Q    And is it your understanding that
10  Professor Ansolabehere, who designed the CCES, is of
11  the view that almost all of the evidence of non-citizen
12  voting in the CCES is a result of measurement error,
13  meaning people who identify as non-citizens on the CCES
14  clicking the wrong box on this internet survey, because
15  they are, in fact, citizens?
16      A    That seems to be his opinion.
17      Q    Okay.
18      A    I can't speak to his opinion with more
19  preciseness than what I can derive from some of the
20  things he's written.
21      Q    And that's the opinion expressed in his
22  peer-reviewed article in Electoral Studies responding
23  to your Electoral Studies?
24      A    I just read you the quote from the piece,
25  which seems to give that impression.

Page 264

1       Q    Okay.  I'm going to hand you what I'm
2   marking as Richman Exhibit 20.
3           (Expert Report of Dr. Stephen
4           Ansolabehere, 3/15/17, marked as Richman
5           Exhibit Number 20)
6           THE WITNESS: Thank you.
7   BY MR. HO:
8       Q    Do you recognize this?
9       A    Yeah, this is Professor Ansolabehere's
10  expert report, dated March 15th, 2017.
11      Q    Okay.  Let's turn to page 15 in his
12  report.
13           You've reviewed this report; right?
14      A    Yes.
15      Q    Okay.  Page 15, paragraph 31.
16  Professor Ansolabehere writes: "A third problem with
17  Professor Richman's analysis of the CCES is that he
18  takes no account of known measurement error in the
19  survey question on citizenship status.
20           "Professor Richman uses question V263
21  from the 2008 CCES to determine who indicates that they
22  are non-citizens.
23           "The question asks respondents: 'Which
24  of these statements best describes you? One, I am an
25  immigrant to the USA and a naturalized citizen; two, I

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 265

1  am an immigrant to the USA but not a citizen; three, I
2  was born in the USA but at least one of my parents is
3  an immigrant; four, my parents and I were born in the
4  USA but at least one of my grandparents was an
5  immigrant; five, my parents, grandparents, and I were
6  all born in the USA.'  Eight skipped."
7       Did I read that correctly?
8    A    Yes.
9    Q    This is the citizenship question on the
10  CCES; correct?
11   A    Correct.
12   Q    And this is the question that
13  Professor Ansolabehere believes some actual citizens
14  answered incorrectly by clicking the wrong box and
15  mistakenly indicating that they are non-citizens;
16  right?
17   A    That appears to his -- be his belief, and
18  I -- unfortunate -- it's unfortunate that, although he
19  appears to hold this belief, he did not include the
20  questions I suggested when I spoke with Ansolabehere
21  and Schaffner at a conference in early 2016 and then
22  sent a follow-up email, to which Bryan Schaffner
23  replied, we'll try to get this on the 2016 common
24  content.
25       They did not include any questions to

Page 266

1  provide further evidence concerning the degree to which
2  this question is being answered correctly.
3    Q    Let's talk about the next page in
4  Professor Ansolabehere's report, page 16.  And I'm
5  looking at paragraph 33, subparagraph C.
6       Professor Ansolabehere writes:  There
7  were two -- "There were 20 respondents who stated that
8  they were citizens in 2010 but" not citizens --
9  "non-citizens in 2012.  That is impossible."
10       Did I read that correctly?
11   A    That is a what he said.
12   Q    And is your understanding here that
13  Professor Ansolabehere is saying, if you look at a
14  panel of CCES respondents, there are 20 people who say
15  they are citizens in 2010 and then two years later say
16  they are not citizens; right?
17   A    Right.
18   Q    And Professor Ansolabehere says that's
19  impossible, that's got to be a mistake; right?
20   A    I would agree.  And the question is what
21  kind of mistake is it.
22       The working paper that I included as an
23  attachment with my initial report looks at the subset
24  of individuals who responded to both the 2010, 2012 and
25  2014 panel study, and the pattern we observe is

Page 267

1  consistent with much higher levels of mistakes on this
2  question being made by individuals who are
3  non-citizens.
4       So my -- my assessment would be that many
5  of these 20 individuals are people who were
6  non-citizens in 2010, but asserted that they were
7  citizens.
8    Q    Looking at your sample of 14 CCES
9  respondents from Kansas who indicated that they were
10  non-citizens, did you do anything in order to try to
11  determine whether or not they were in fact
12  non-citizens?
13   A    No, I did not.  The -- this is an
14  analysis of the -- of data from the cross-sectional
15  studies.  I probably should have, but I don't think I
16  did look at the paneled study.  It's a much smaller
17  sample size than these, but it could have been
18  potentially useful in this -- in this analysis.
19       Overall, one of my purposes for including
20  this discussion of the Kansas CCES data was in terms of
21  assessing whether it looked like the Kansas CCES data
22  was dramatically different from CCES data from other
23  parts of the country.
24   Q    So you didn't check to see whether or not
25  the Kansas CCES respondents gave consistent answers as

Page 268

1  to citizenship from year to year --
2    A    These individuals were not asked --
3       THE COURT REPORTER: I'm sorry, what was
4  the end of the question?
5       -- "from year to year" --
6  BY MR. HO:
7    Q    -- did not give consistent answers as to
8  citizenship from year to year in the CCES?
9    A    My impression is that none of these
10  individuals were asked to respond to the CCES in more
11  than one year.
12   Q    And you didn't do anything to confirm
13  their citizenship status, other than to take their
14  citizenship answers at face value; correct?
15   A    That's right.
16       And, so, as I said -- you asked me
17  earlier why didn't I include this, this particular
18  analysis in the conclusion; I think one -- upon further
19  reflection, I think it's coming back to me, one of the
20  reasons I did not include this is my main purpose in
21  including the Kansas CCES data was specifically to
22  evaluate the -- whether the broad patterns in the CCES
23  nationally seemed to appear as well in the Kansas CCES.
24       So this gets to one of the issues you
25  raised earlier, quoting from the 2014 article, I think

Page 269

1  it was, or maybe it was one of my blog posts, about not
2  having specific state-level information. This was --
3  was Kansas unusual? If anything, Kansas is unusual on
4  the high end in this survey data set. 28 percent is
5  higher than the, the nationwide estimate, but, of
6  course, there's so much uncertainty in this
7  28.6 percent estimate, given it's such a small sample
8  that it's difficult to know for certain that it's
9  higher.
10        I don't think the difference would be
11  statistically significant at .05 level, but it seems
12  like, if anything, it's on the high end, and certainly
13  not significantly different on the low end.
14     Q    So I want to just see if I understand
15  what you said about why you didn't include your
16  estimate based on the CCES in your conclusion.
17        You're saying that you used the Kansas
18  CCES respondents to see if they were consistent with
19  the national CCES estimates; is that right?
20     A    That was one of my purposes.
21     Q    But you didn't include it in the
22  conclusion where you discussed --
23     A    Kansas -- the other Kansas-specific
24  estimates.
25        And I think one of the reasons may have

Page 270

1  been that I'm not certain that was the only reason; it
2  could have also been something else that I -- that -- I
3  think that I was -- one of the reasons was that I was
4  conceiving of this partly, the analysis of the CCES, as
5  partly about looking at the issue of whether national
6  CCES patterns seemed to apply in the state of Kansas.
7        And my impression is this, this data set
8  does -- from Kansas, the Kansas CCES non-citizens
9  registration rates, are, if anything, on the high end
10  of the national pattern.
11     Q    Well, our conversation up until this
12  point, the way that we got here was we were talking
13  about validation of citizenship status; right?
14     A    Yup.
15     Q    And I noted earlier that you had
16  validated the citizenship or non-citizenship status of
17  your TDL respondents; right?
18     A    Right.
19     Q    And for your Sedgwick County information,
20  you know that your Sedgwick County sample consists of
21  non-citizens because these are people who were
22  naturalizing; right?
23     A    Right.
24     Q    So with those two samples, you know
25  you're dealing with non-citizens; right?

Page 271

1     A    Well, more or less. You know, the TDL we
2  did our best effort to validate. I think probably the
3  Sedgwick County has the lowest possibility of an error
4  in terms of assessing citizenship status.
5     Q    With both the Sedgwick County information
6  and the TDL survey, you have an independent basis for
7  believing that these people are non-citizens beyond a
8  self-report; correct?
9     A    Yes, that's correct.
10     Q    And I was asking you about whether or not
11  with the CCES-based estimate, you had any basis beyond
12  a self-report --
13     A    No.
14     Q    -- for thinking these people are
15  non-citizens, and the answer is no; right?
16     A    That's correct.
17     Q    And that's the question that I think from
18  which you pivoted to explaining why the CCES-based
19  estimate for Kansas non-citizen registration is not
20  included in your conclusion; right?
21     A    That jogged my memory about one of the
22  considerations, which was that this estimate was
23  included, as I said, partly in terms of comparing with
24  the nationwide rates. And at the nationwide level with
25  the CCES, I have some discussion in the reports and

Page 272

1  more in the attached documents, about, for example --
2  building off of the analysis that Ansolabehere and
3  Schaffner did -- there's some individuals who twice
4  said they were non-citizens and said they were
5  registered to vote and had a validated registration
6  status.
7        So the national -- now, that provides
8  fairly reliable evidence at the -- on the basis of that
9  panel data of a level of non-citizen registration.
10     Q    Now, is it accurate to say that one of
11  the reasons why you included the estimate based on the
12  TDL survey and the Sedgwick-County-based estimate in
13  the conclusions but did not include the CCES-based
14  estimate in your conclusion, is that with respect to
15  the former two, you had an independent basis beyond a
16  self-report for believing that your respondents were
17  non-citizens or, as in the case of the CCES, all you
18  had was a self-report?
19     A    No, I don't think that's accurate,
20  because I believe I did mention the
21  incidentally-contacted non-citizens group in that
22  conclusion, and that's a group for which I did not have
23  a capacity to engage in -- in that type of validation.
24     Q    Okay. I'm going to show you what I've
25  marked as Richman Exhibit 21.

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 273

1    (Letter from professional political
2    scientists, 3 pages, marked as Richman
3    Exhibit Number 21)
4 BY MR. HO:
5    Q    Have you seen this document before?
6    A    I don't know if I've seen this particular
7 version, but I think I have.  I wrote a -- one of the
8 earlier exhibits is my response to it.
9    Q    This is an open letter criticizing your
10 Electoral Studies article; correct?
11    A    Yeah.
12    Q    And it's signed by about two hundred of
13 your fellow political scientists; does that sound about
14 right?
15    A    I don't know the exact count.
16    Q    This open letter makes essentially the
17 same points as the Ansolabehere article about
18 measurement error and whether or not the non-citizen
19 respondents in the CCES who say they voted are, in
20 fact, citizens who just clicked the wrong box on this
21 internet survey; right?
22    A    It makes the -- it makes a very similar
23 argument.  That seems to be the primary basis for this,
24 this piece.  It cites the article from Electoral
25 Studies and focuses in at least two of the paragraphs

Page 274

1 on that, on that basis.
2    Q    In your experience as a political
3 scientist, can you think of another example of a group
4 of several hundred political scientists writing an open
5 letter, criticizing another political scientist's work?
6    A    I, I've seen some discussions.  I can't
7 remember exactly what the -- what the book was, but I,
8 I read some reviews of it last fall or early -- maybe
9 during the winter, talking about the way that this kind
10 of tactic of an open letter is fairly often used in
11 various areas of academia to try to shut out dissenting
12 views.  So when I saw this letter, I wasn't
13 particularly surprised.
14    Q    But have you seen another -- can you
15 think of another specific example of an open letter by
16 hundreds of political scientists criticizing the
17 political science research of a colleague?
18    A    I can't think of any particular ones,
19 but, as I mentioned, with the book, I indicated that
20 this is -- this is a phenomena that happens with some
21 regularity in various parts of academia.
22    Q    Now, you say you responded to the
23 Ansolabehere criticism in a working paper; correct?
24    A    That's right.
25    Q    And that working paper has not been

Page 275

1 accepted for publication in a peer-reviewed journal;
2 correct?
3    A    It has not been accepted for publication
4 at this point.
5    Q    Okay.
6       I'm going to hand a copy of it to you;
7 we've marked it as --
8    A    Okay.
9    Q    -- Richman Exhibit 22.
10    ("A Valid Analysis of a Small Subsample:
11    The Case of Non-Citizen Registration and
12    Voting," by Richman, Earnest, Chattha,
13    marked as Richman Exhibit Number 22)
14 BY MR. HO:
15    Q    This is your response to
16 Professor Ansolabehere; correct?
17    A    Yes.
18    Q    And could you turn to page 3.
19       In the third paragraph, you write:  "This
20 response to Ansolabehere, Luks," "and
21 Schaffner's critique of Richman, et al., 2014 has three
22 sections.  After we point out that their tests was
23 badly underpowered, the second section presents
24 evidence that the citizen status variable in the CCES
25 is more accurate than Ansolabehere, et al., 2015 claim

Page 276

1 it is, with much of the error accounted for by
2 intentional or unintentional errors made by
3 non-citizens who claim to be citizens."
4       Did I read that correctly?
5    A    Yes.
6    Q    I want to focus on the first of your
7 criticisms here -- or responses, rather, and that's
8 that you believe their test was badly underpowered.
9       Now, their analysis was based on a panel
10 of 85 repeat CCES survey respondents; correct?
11    A    Correct.
12    Q    And your view is that an analysis based
13 on a sample of 85 survey respondents is badly
14 underpowered; correct?
15    A    In this con -- in the context of the
16 argument they are trying to make from it, yes.
17    Q    Now, do you believe the question on the
18 CCES internet survey about citizenship produces
19 accurate information as to the respondents' citizenship
20 status?
21    A    I just articulated, in what you just
22 read, I didn't make that statement and I don't believe
23 that.
24       What I believe is that there is
25 substantial variability in the degree to which it is

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 277

1  answered accurately, and it is answered much less
2  accurately by non-citizens than by citizens.
3       Q    You did not use the same wording that the
4  CCES uses for citizenship in your survey; correct?
5       A    That's correct.
6       I used -- as Professor Ansolabehere
7  articulated in his deposition, one of the reasons why
8  they have all of the different categories on that
9  survey involved testing various sociological theories
10  about how time of arrival in the United States might
11  affect engagement of various kinds with the political
12  process.
13       That wasn't my purpose.
14       And, so, I included two questions, which,
15  the first one was simply asking whether an individual
16  was a citizen; the second was following up with an
17  open-ended response about what country or countries
18  individuals were citizens of.
19       That was aimed at addressing, in a way
20  that I attempted, unsuccessfully it would appear, and
21  Ansolabehere claimed that nobody in the research
22  community asked him to do it, which simply isn't true,
23  because I did, attempted to get the CCES to include
24  some follow-up questions to increase the capacity to
25  evaluate the reliability of responses to the question.

Page 278

1       Q    Would it be an accurate characterization
2  of your views to say that, even if
3  Professor Ansolabehere is correct about measurement
4  error, that that might explain the CCES respondents who
5  said they were non-citizens and voted, but it can't
6  explain all of the CCES respondents who said that they
7  are non-citizens and they are registered to vote?
8       A    That -- one of the elements in this
9  argument involves looking at higher frequency levels of
10  engagement with the political process.
11       The -- and so even -- one of the things
12  we demonstrate there is even if one assumes that they
13  are right, I don't think they are, but if we assume
14  that they are right about the rate of error -- response
15  error by citizens on the survey, that rate of error is
16  insufficient to account for the observed level of
17  responses on the registration question.
18       Q    But you agree that if they are right
19  about measurement error in the CCES with respect to
20  citizenship status, that that would fully account for
21  your findings about non-citizen voting based on the
22  CCES; correct?
23       A    No.
24       It only would, I think, if one takes the
25  most restrictive measure of voting.

Page 279

1       So, if one focuses on individuals who --
2  for whom we have evidence that they said they voted and
3  they also have validated voter status, with that most
4  conservative estimate, yes.
5       For the -- for estimates based on other
6  combinations of responses, that isn't the case.
7       Q    Assuming that Professor Ansolabehere is
8  correct about measurement error as to citizenship
9  status in the CCES, you'd agree that that would
10  significantly reduce your estimate about non-citizen
11  registration; correct?
12       A    If he's correct, that would substantially
13  reduce the size of those estimates.
14       Q    I want to ask you a little bit about your
15  Sedgwick-County-based estimate.
16       THE WITNESS: Before we go there, could
17  we take just a couple-minute break?
18       MR. HO: Sure.
19       THE WITNESS: It sounds like we're at a,
20  a sort of --
21       MR. HO: That's fine.
22       THE WITNESS: -- shift point in terms of
23  the focus.
24       THE VIDEOGRAPHER: Going off the record
25  at 4:07 p.m.

Page 280

1       (Recess)
2       THE VIDEOGRAPHER: Back on the record at
3  4:17 p.m.
4  BY MR. HO:
5       Q    I'd like to talk about your
6  Sedgwick-County-based estimate, Professor Richman.
7       A    Okay.
8       Q    Let's look at your initial report,
9  Exhibit 1, and turn to page 5.
10       A    Okay.
11       Q    Now, as described in your initial report,
12  your estimate of non-citizen registration or attempted
13  registration based on information from Sedgwick County
14  is that 1,153 non-citizens in Kansas may have
15  registered or attempted to register to vote; correct?
16       A    I'm sorry, I'm -- yup.
17       MR. ROE: Page number, Dale.
18       MR. HO: 5.
19  BY MR. HO:
20       Q    If I could ask you to use the calculator
21  again.
22       Your Sedgwick-County-based estimate of
23  1,153 non-citizens registered or attempted to register
24  to vote would amount to about what percentage of the
25  1.8 million registered voters in Kansas?

Steven Wayne Fish, et al. v.                                      Jesse T. Richman, Ph.D.
Kris Kobach                                                              April 21, 2017

Page 281

1    A    Okay, so -- that would be roughly
2  .064 percent.
3    Q    Now, did you do anything in terms of
4  weighting to try to ensure that your estimate based on
5  Sedgwick County information accounted for any lack of
6  representativeness of the Sedgwick County sample as
7  compared to the non-citizen population in Kansas as a
8  whole?
9    A    I did not.
10       Unfortunately, all -- the only
11 information I had was some information about the
12 individuals who were identified by Sedgwick County as
13 non-citizens who had previously registered.
14       In order to do a weighting analysis, I
15 would have needed information on all of the individuals
16 on the other side of this as well, the 791 others, for
17 instance, who had -- who had also registered at the
18 naturalization -- the whole set who registered at the
19 nationalization ceremony, including both those who had
20 prior records and those who didn't.  I did not have
21 that information available to me.
22    Q    So the sample from Sedgwick County, these
23 slightly fewer than 800 people, are all people who
24 submitted voter registration forms; correct?
25    A    My impression is they were all

Page 282

1  individuals who submitted voter registration forms at
2  the naturalization ceremony.
3    Q    Did you ask election officials in
4  Sedgwick County or the Kansas Secretary of State for
5  demographic information about this pool of individuals
6  who submitted voter registration forms at
7  naturalization ceremonies in Sedgwick County?
8    A    I did not.
9    Q    You didn't ask for the dates of birth of
10 these individuals so you could calculate their ages?
11    A    I did not.
12    Q    And you didn't ask for their genders;
13 right?
14    A    I did not.
15    Q    And, so, you did nothing to weight your
16 pool of people from Sedgwick County by age or gender to
17 try to make sure that they were, at least on those two
18 variables, representative of non-citizens as a whole in
19 Kansas; correct?
20    A    That's correct.
21    Q    Did you do anything to try to weight or
22 account for differences in race and ethnicity, say, in
23 Sedgwick County or the surrounding counties, as
24 compared to the state as a whole?
25    A    I did not do any weighting on that basis.

Page 283

1  I did --
2    Q    You could have gotten from the census
3  information on the race and ethnicity of non-citizens
4  in Sedgwick County and maybe the other counties where
5  people go to Sedgwick County for naturalization
6  ceremonies; right?
7    A    I don't think that that information would
8  have been sufficient to construct weights.
9    Q    But you could have gotten information
10 about the non-citizen population in Sedgwick County
11 about race and ethnicity from the census; right?
12    A    I could have gotten information about the
13 Sedgwick County race and ethnicity, but in the absence
14 of information about specific ways that any distinctive
15 aspects of Sedgwick County were associated with voter
16 registration, it -- that information would not have
17 allowed me to construct the kinds of weights that it
18 sounds like you're suggesting would have been useful.
19    Q    Well, I'm just asking if you did anything
20 to compare demographic information of non-citizens --
21    A    I did do some --
22    Q    -- in Sedgwick County to the non-citizen
23 population of Kansas as a whole?
24    A    I believe I offered some discussion of
25 that in my response to the Minnitte report.

Page 284

1    Q    But you did not try to incorporate any
2  demographic breakdown information of the non-citizen
3  population in Sedgwick County when extrapolating from
4  your Sedgwick County data to the non-citizen population
5  of Kansas as a whole; correct?
6    A    I -- in that extrapolation, I did not.
7    Q    If we look at your rebuttal report,
8  Exhibit 12.
9    A    Okay.
10    Q    I'd like to turn to page --
11    A    Wait, is this Exhibit 12 or -- okay,
12 yeah.  Where is it?  It's in here somewhere.
13    Q    No, I think you have it.
14    A    Do I have it here?  Oh.
15    A    It's underneath this.
16    A    Oh, it's under there.  There it is.
17 Thank you.
18    Q    Um-hum.
19    A    It's been a long day.  Okay.
20    Q    Could you turn to page 23, please.
21    A    Sure.
22    Q    Paragraph 58.
23       In this paragraph, you present a revised
24 estimate based on the Sedgwick County information as to
25 the percentage of non-citizens who have registered or

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 285

1  attempted to register to vote in Kansas; correct?
2      A    I would not characterize it that way.  I
3  would say I present an additional analysis.  This is of
4  a different group of non-citizens from the Sedgwick
5  County database.  The previous estimate was based
6  primarily on 2016 data; this analysis is based on 2015
7  and 2014 data.
8      Q    And you describe this in the first
9  sentence in paragraph 58 as a "more valid estimate";
10  correct?
11      A    I did.
12      Q    So, is it your view that this estimate
13  here in your rebuttal, based on some Sedgwick County
14  data, is a more valid estimate than the
15  Sedgwick-County-based estimate in your initial report?
16      A    I'm surprised I used that language,
17  frankly.
18          It's more -- I think the way I was
19  thinking about this is, this is more valid in this
20  context, the context of the previous paragraph.  In the
21  previous paragraph, I was discussing an estimate that
22  included 2013 data, but I noted that Sedgwick County
23  had begun to attend naturalization ceremonies partway
24  through 2013.
25          And so when I, when I said -- used the

Page 286

1  language a "more valid estimate," I was specifically
2  referring to that previous estimate which was offered
3  in paragraph 57.
4      Q    I see.
5          Are you not saying that this estimate is
6  more valid than your Sedgwick-County-based estimate in
7  your initial report?
8      A    I am not making that assertion.  Both
9  estimates have, have different limitations.  This one
10  is more conservative, but I'm not sure that makes it
11  more valid.  In fact, that might make it less valid.
12  This one is conservative in the sense that the, the
13  basis now for the estimate is all naturalizations in
14  the Wichita CSA, as opposed to the denominator in the
15  other analysis, which was individuals who naturalized
16  in Sedgwick County ceremonies and completed a voter
17  registration form.
18      Q    So this is just an alternate estimate
19  based on Sedgwick County information, not necessarily a
20  more valid one than the one you present in your initial
21  report?
22      A    It is another estimate.
23      Q    Okay.  So let's talk about this other
24  estimate.
25          On the following page, the table you have

Page 287

1  here continues.  And when you extrapolate this Sedgwick
2  County sample to the non-citizen population in Kansas,
3  you get an estimate of 1,067 non-citizens in Kansas who
4  are registered or who have attempted to register to
5  vote; correct?
6      A    That's correct.
7      Q    And this estimate is now based on 2014
8  and 2015 naturalization data; correct?
9      A    This is based on 2014/2015 naturalization
10  data and Sedgwick County counts of individuals who, at
11  the naturalization ceremony, registered to vote.
12      Q    And that's the difference between this
13  estimate and the one in your initial report.  This one
14  is based on 2014 and 2015 in Sedgwick County.  The one
15  in your initial report is based primarily on 2016 in
16  Sedgwick County.  Correct?
17      A    That, that's the primary difference.
18      Q    Okay.
19      A    In addition to a different baseline, in
20  terms of dividing by, you know, the total
21  naturalizations as opposed to total individuals who
22  registered.
23      Q    All right.  So let's take a look at your
24  estimate based on the 2014 and 2015 naturalization
25  information in Sedgwick County of 1,067 non-citizens in

Page 288

1  Kansas who have registered or attempted to register to
2  vote.
3          That total, 1,067 is equivalent to what
4  percentage of the approximately 1.8 million registered
5  voters in Kansas?
6      A    That is equal to approximately
7  .059 percent.
8      Q    Let's turn to page 31 of this report;
9  and, in particular, paragraph 76.
10          And in this paragraph, and in other parts
11  of your reports, you describe information that was
12  provided to you by the Kansas Department of Vehicles,
13  or DOV; correct?
14      A    That's my impression of what the acronym
15  is; I'm not absolutely certain.
16      Q    Now, the information that the DOV
17  provided you was about driver's license applicants who
18  had submitted a non-citizen permanent residency
19  document at the DMV at some point; correct?
20      A    Yes, that was the initial table; and then
21  it was broken down, as we'll probably discuss in a
22  moment, in terms of individuals who provided that
23  document in close proximity to their voter
24  registration.
25      Q    So the Kansas DM -- DOV took a list of

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 289

1  people who had provided non-citizenship document, legal
2  permanent residency document, at the DMV and matched it
3  up with the suspense list, people who tried to register
4  to vote but were not registered for failure to provide
5  documentary proof of citizenship; right?
6      A    That's my impression of what they did.
7          I think this is probably used in the
8  state of Kansas in part to identify individuals who can
9  be removed from the suspense list on the basis of
10  having provided that evidence, but I don't know
11  specific procedures.
12      Q    Do you think that everyone who appears in
13  the Kansas DOV database as having presented a
14  non-citizen permanent residency document, and who also
15  appears on the suspense list of people who have tried
16  to register to vote, do you think everyone who appears
17  on both of those lists is a non-citizen who has tried
18  to register to vote?
19      A    No, because, as was noted in my report,
20  individuals will not necessarily update their DOV file
21  after naturalizing.  And, so, in some instances,
22  individuals who provided to DOV proof of permanent
23  residency status, for instance, may have subsequently
24  naturalized.
25      Q    To your knowledge, is there anything that

Page 290

1  prevents the state of Kansas from performing this kind
2  of analysis comparing people who have prevent --
3  presented non-citizenship documents to the DMV to the
4  list of voters in the state on an ongoing basis?
5      A    I don't know anything about issues in
6  terms of cooperation between different agencies in
7  Kansas.
8          As a practical, empirical matter, it
9  would seem like it's something that could physically be
10  done on a regular basis.
11      Q    Did you ask that this analysis be
12  performed?
13      A    The original analysis in my initial
14  report was not one I asked for.  This was one that was
15  provided to me.
16          In my rebuttal report, I asked for some
17  additional analyses.  I discussed in the report how I
18  did not receive a response that was really addressing
19  what I wanted, but I did receive a, a spreadsheet which
20  I attached as one of the attachments for my rebuttal
21  report, which did allow me to accomplish some of the
22  tasks that I had asked the state DOV to perform.
23      Q    Do you know who requested that this
24  analysis be performed in the first instance?
25      A    I do not.

Page 291

1      Q    So it was something that you didn't
2  request but was simply provided to you?
3      A    Yes.
4      Q    Do you know who performed the match
5  between the driver's license records and the voter
6  registration records?
7      A    I believe I included in -- I don't
8  remember the name, but it's under the materials I
9  provided, because I included the, the email which I
10  received which had these revised tables, and I believe
11  that came from the individual who did that match.
12      Q    An individual at the Kansas Department of
13  Vehicles; correct?
14      A    I think that -- I think that department
15  is part of a broader unit; the Department of Revenue.
16      Q    And do you know what criteria that person
17  used for matching the driver's license database to the
18  voter registration records?
19      A    I do not know what criteria were used.  I
20  was not provided a description of the specific matching
21  approach that was taken.
22      Q    As a peer-reviewer, would you accept an
23  article from an author who relied on a database match
24  performed by a state official but who had no knowledge
25  of the criteria that was used for that database match?

Page 292

1      A    In general, I would consider state
2  officials to be relatively credible sources of
3  information.  So, depending upon the specific
4  context --
5      Q    Do you know anything about the
6  reliability of the match process that was used by the
7  person from the Kansas DOV to compare the driver's
8  license records to the voter registration file?
9      A    I do not, but my impression is that this
10  kind of matching is something that is performed with at
11  least some regularity.  And, so, presumably, this is --
12  this is a process which has been developed in a
13  professional way, but I do not know the details of how
14  the matching is performed.
15          I received this document with the matches
16  roughly five hours -- no, roughly seven hours before
17  the midnight deadline for my report, so I did what I
18  could with the information I received.  Had I had more
19  time, I might well have wanted to do some additional
20  follow-ups, but I did the best I could with the
21  information I had.
22      Q    Since you received the information, have
23  you done anything to assess the accuracy of the
24  matching process conducted by the Kansas DOV between
25  the driver's license database and the voter

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 293

1 registration file?
2      A    I have not yet done that.
3      Q    Okay.  Page 31 of your report, paragraph
4 76, which I was asking you about, your rebuttal report.
5           "Like Dr. Minnitte, I was unsatisfied
6 with this analysis and asked the Kansas Secretary of
7 State office to inquire whether the Kansas DOV or DOR
8 would be willing to perform an additional analysis that
9 included identification of all individuals who provided
10 documentation of permanent residency status after they
11 registered to vote."
12          Did I read that correctly?
13     A    Yes.
14     Q    And you were unsatisfied with the initial
15 analysis performed by the DOV that matched the voter
16 registration files to the driver's license databases;
17 correct?
18     A    My concern was that, although it -- I had
19 two concerns.  One is that, as we discussed, the broad
20 indicator of, well, at some point documentation of
21 permanent residency status was provided is too vague.
22 As we have discussed, people may naturalize; and, in
23 fact, it was mentioned in the initial report.
24          And the second, the more restrictive
25 analysis, was focused on within 45 days, plus or minus;

Page 294

1 the documentation was provided within 45 days of
2 registration.
3           One of the things I was interested in is
4 the degree to which, you know, even going out beyond a
5 45-day window, on the side of providing the
6 documentation after voter registration, that would seem
7 to be relatively strong evidence that somebody was
8 still relying on this document after they registered.
9 That would seem to indicate rather strongly that they
10 might well still be a non-citizen.  If they had
11 naturalized, presumably they would have documentation
12 of having recently naturalized.  And my expectation
13 would be that that that would be more the appropriate
14 documentation to provide in that context.
15          So I was interested in, in looking at it
16 on that side.
17          And, also, there's, you know, some chance
18 that within this 45-day window, someone -- you know,
19 there was a very tight passage to -- between driver's
20 license, naturalization and voter registration, so I
21 wanted to see only the people who naturalized -- who --
22 not -- who presented the documentation after
23 registering to vote.
24     Q    So, to be more satisfied with the
25 analysis here, you wanted to look at people who

Page 295

1 registered to vote and then, either on the same day or
2 subsequent to that date, provided a non-citizen legal
3 permanent residence document to the DMV.  You wanted to
4 focus on that pool of people; correct?
5      A    I wanted to see what the analysis looked
6 like with that pool of people.
7      Q    And if we look at page 32, table 8, this
8 is the starting point.  This is not everything; right?
9           This is people who, at some point,
10 provided a legal permanent residency document to the
11 DMV and are on the suspense list; right?
12     A    That's right.
13     Q    And there are 213 such individuals;
14 correct?
15     A    Not for these particular years.  This was
16 restricted to these years.  I'm not certain why it was
17 restricted to those particular years.  It might have
18 something to do with when -- my best, my best guess,
19 assuming that there was a strong basis for this, is
20 that these were years where people would likely have
21 been registering for driver's licenses after Kansas
22 began requiring individuals to provide documentation
23 of, of citizenship or legal presence when they got
24 driver's licenses.
25          But I don't know Kansas law and practices

Page 296

1 well enough to know if that's, in fact, the reason for
2 this particular selection.
3           If you look at all of the individuals who
4 I was able to, to match and analyze, there's a larger
5 number who fall into this category.
6      Q    Okay.  So let's turn to page 34 of your
7 report.  And I'm looking at subparagraph A, the first
8 sentence.
9           Of these 459 individuals, 12 registered
10 to vote on the same day that they provided
11 documentation of permanent residency, and another 15
12 registered to vote prior to providing this
13 documentation.
14          Did I read that right?
15     A    Yes.
16     Q    Okay, so let's break this down.
17          You have 459 individuals who both
18 registered to vote and at some point provided a
19 permanent residency document to the DMV; correct?
20     A    That's right.
21     Q    And of those 459 individuals, 12 people
22 registered to vote on the same day that they provided a
23 permanent residency document to the DMV; correct?
24     A    That was what, what I was able to infer
25 from the analysis I did.

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 297

```
 1     Q    And 15 of these individuals registered to
 2   vote, and then at some point subsequent to that,
 3   provided a legal permanent residency document to the
 4   DMV; correct?
 5     A    Yes.
 6     Q    So we have a total of 27 individuals who
 7   applied to register to vote and then, either on the
 8   same day or subsequently, provided a non-citizen legal
 9   permanent residency document to the DMV; correct?
10     A    That's correct.
11     Q    These 27 people applied to register to
12   vote; they did not successfully register to vote;
13   correct?
14     A    Well, they were on the suspense list.
15   That's how -- that was the basis of this match.  So,
16   presumably, that mechanism prevented them from
17   succeeding and registering to vote.
18     Q    Is there any way to determine from your
19   analysis how many of the 12 individuals who registered
20   to vote on the same day that they provided a legal
21   permanent residency document to the DMV were offered a
22   voter registration opportunity by a DMV worker after
23   showing that same DMV worker that they were legally --
24   they were legal permanent residents rather than
25   non-citizens?
```

Page 298

```
 1     A    Potentially, there could be a way to do
 2   that.  I don't believe that the copy of the suspense
 3   file that was made available to me had the requisite
 4   codes, but someone who had the requisite codes -- I
 5   think there is a code in the, in the voter file for
 6   where people registered to vote.  I think there's a
 7   motor voter code, so presumably one could do that
 8   analysis and determine how many.
 9     Q    But you don't know from --
10     A    I don't know.
11     Q    -- from your analysis how many of these
12   27 individuals applied to register to vote at a DMV;
13   correct?
14     A    I don't know.
15     Q    And did your analysis take into account
16   or consider in any way the possibility that some of
17   these individuals may have self-identified as a legal
18   permanent resident non-citizen while applying for a
19   driver's license and then were subsequently, during the
20   same transaction, offered voter registration by a DMV
21   worker?
22     A    Again, I don't have evidence on that, so
23   I don't know.  It's, it's possible.
24         I -- my guess is that would -- and there
25   are variations in terms of the kinds of consent decrees
```

Page 299

```
 1   and limitations that individuals are -- that --
 2   involved with voter registration at DMVs are required
 3   to work under.
 4         There's recently been some discussion on
 5   Rick Hasen's blog about Nevada, and there's been
 6   controversy there.  It appears that in Nevada, there
 7   was an order to -- that required DMV -- my impression,
 8   from reading a couple of pieces that were put up there,
 9   may have required the DMV to provide voter registration
10   forms in that context.
11     Q    Do you have any reason to believe that
12   there's a policy in Kansas of providing voter
13   registration opportunities to people who self-identify
14   as non-citizens in the course of a driver's license
15   transaction?
16     A    I would be very surprised if there was,
17   but it's --
18     Q    In fact --
19     A    I don't know specifics of Kansas rules.
20     Q    Would it surprise you to learn that
21   there's, in fact, a policy of not offering voter
22   registration when someone self-identifies as a
23   non-citizen in Kansas?
24     A    That would not surprise me.  That would
25   seem to be the more sensible approach to, to the policy
```

Page 300

```
 1   situation, because non-citizens are not supposed to be
 2   registering to vote.  If you know they're not a
 3   citizen, you should not register them to vote.
 4     Q    Well, look, we agree on something.
 5         If someone self-identifies as being a
 6   non-citizen in the course of a driver's license
 7   transaction but the DMV worker subsequently offers that
 8   person a voter registration opportunity, would you
 9   agree that, in absence of a situation like the one
10   you're describing in Nevada where there's a requirement
11   to give everyone non-citizen registration -- give
12   everyone registration opportunities purportedly, would
13   you agree that in a situation like that, that's a bad
14   practice for the DMV?
15     A    I would agree that's a bad practice.
16         Now, I don't know the specific ways in
17   which they operate, so sometimes -- motor voter gets
18   implemented in various ways.
19         It could be that there's simply a set of
20   voter registration forms available to people to fill
21   out, and so people fill out the voter registration form
22   and drop that off in a way that's not directly
23   connected with a transaction involving the driver's
24   license.  I don't know how that, how that operates.
25     Q    Now, are you aware that Bryan Caskey, the
```

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 301

1  director of elections, has submitted a declaration
2  purporting to identify 125 non-citizens in Kansas who
3  have either registered or attempted to register to
4  vote?
5      A    I haven't seen the declaration itself,
6  but I've seen some of the discussions back and forth
7  about it in some of the rebuttal reports.
8      Q    Have you tried to determine whether or
9  not any of these 27 individuals who registered to vote
10  and then later supplied a non-citizen document at DMV,
11  whether any of these 27 individuals are among the 125
12  individuals who Bryan Caskey has purported to identify
13  as non-citizens who have registered or attempted to
14  register to vote in Kansas?
15      A    I have not done that.  As I said, I don't
16  have Caskey's list.
17          The -- my sense is that that list was
18  composed of matches with the TDL, of information from
19  Sedgwick County, and a few other cases.
20          I don't believe these individuals are on
21  that list, but I don't know for sure.
22      Q    You haven't --
23      A    I haven't done any matchings.
24      Q    You haven't looked at the list to see if
25  your 27 individuals are on his list; right?

Page 302

1      A    I don't have his list.
2      Q    And you haven't given your list to him
3  and you don't -- correct?
4      A    I have not done that at this point.
5      Q    So we don't know one way or the other
6  whether or not your 27 are included amongst his list of
7  125; correct?
8      A    That's right.
9          Perhaps at some point I will be asked to
10  provide the names of these 27 for comparison with that
11  list, but I have not been asked to do that at this
12  point, and I have not provided that.
13      Q    Now, you also performed a different
14  analysis, a match of the TDL list to the voter
15  registration file; correct?
16      A    That's right.
17      Q    And --
18      A    Well, TDL to suspense file.
19      Q    Got it.
20      A    Not voter registration.  I did not do
21  that match.  That was a match Caskey performed.
22      Q    Right.
23          And you found what you believe are 16
24  individuals who are both on the TDL list and among the
25  almost 18,000 people on the suspense list; correct?

Page 303

1      A    That is correct.
2      Q    So, of the people on the suspense list,
3  fewer than 0.1 percent of them you believe are on the
4  TDL list; correct?
5      A    I, I can't remember the exact fraction,
6  but that seems roughly right.
7      Q    And you're aware that Bryan Caskey also
8  performed -- or has discussed his own match of a TDL
9  list to the voter registration file more generally;
10  right?
11      A    That's right.
12      Q    And he's found, I believe, 79 individuals
13  in the voter file who are also on the TDL?
14      A    Yeah, it appears that Hersh identified a
15  few additional individuals.
16      Q    Do you know whether or not the 16
17  individuals that you found on the suspense list and the
18  TDL are included among the 79 individuals that Bryan
19  Caskey found on the voter registration file and the
20  TDL?
21      A    As I said before, I have not -- I do not
22  have a copy of Caskey's list, and so I do not know.  I
23  would presume that they, in most cases, would be.
24          On the other hand, matching is -- on the
25  margins, there are judgment calls.  It could be that

Page 304

1  there was somebody who didn't appear on one list and
2  did appear on the other list on the basis of some of
3  those judgment calls.
4      Q    The suspense list is a subset of the full
5  voter registration file; correct?
6      A    That's my impression.
7      Q    And your match is based on the suspense
8  list; correct?
9      A    Exactly.
10      Q    So assuming both lists are general --
11  generally accurate, you would expect that your matches,
12  from the suspense list to the TDL, would fall within
13  Bryan Caskey's matches from the broader voter
14  registration file to the TDL; correct?
15      A    Exactly.
16      Q    And we established earlier that you do
17  not believe that everyone in the TDL was currently a
18  non-citizen; correct?
19      A    That's right.
20      Q    You do, however, believe that everyone
21  that you matched from the suspense list to the TDL is
22  currently a non-citizen; right?
23      A    So, what we did to follow up was to --
24  wait, did we do -- I don't think so.
25          I'm not sure I have that basis.

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 305

1    We did have some individuals from the TDL
2 had their status verified, but I don't think these
3 individuals were.  What we looked at was individuals
4 from the survey, not from this matching analysis.
5    Q    Well, if we look at your rebuttal report,
6 page 17 --
7    A    Let me find that.
8    Q    Paragraph 39.
9         In this paragraph, you're saying that
10 everyone from the TDL survey who self-identified as a
11 non-citizen, there were some sort of verification
12 performed with ICE to determine that they were, in
13 fact, at least as far as ICE knows, still currently
14 non-citizens; correct?
15    A    So this is -- this paragraph is in the
16 context of a discussion of Ansolabehere's analysis of
17 the survey of the TDL list.
18         For that group, we did engage in a
19 matching; for the other group, we did not.
20    Q    So you checked to see if your TDL survey
21 respondents, if ICE had any information about them
22 being non-citizens, but you didn't check to see whether
23 or not ICE had any information about the citizenship
24 status of your TDL match list; correct?
25    A    That's right.  The TDL match analysis was

Page 306

1 a very minor piece of my overall analysis, and I did
2 not -- I included it in the report and -- for
3 completeness as much as anything else, in terms of this
4 is one thing I did.
5         But I did not think to -- I, I think it
6 would have been a good idea -- I wish I had included
7 those names when, when I put together the list for ICE
8 to check.  But I did not think to at that point.
9 Because it was such a minor piece in my overall
10 analysis, and Caskey was doing the more complete
11 analysis there, I did not think to include those names
12 with the list that went to ICE.
13    Q    So for your match between the suspense
14 list and the TDL list, you don't know one way or the
15 other whether or not those individuals were
16 non-citizens at the time that they applied to register
17 to vote; correct?
18    A    That's right.
19         I asked, subsequently asked the Secretary
20 of State if it might be possible to get a second set of
21 names sent to ICE, but I don't think that I got a reply
22 to that request.
23    Q    I want to ask you a few questions -- I
24 think we're in the home stretch.
25         I want to ask you a few questions about

Page 307

1 your survey of registered voters --
2    A    Okay.
3    Q    -- in your initial report.
4    A    Um-hum.
5    Q    Now, you conducted a survey of registered
6 voters from four counties in your initial report;
7 correct?
8    A    That's right.
9    Q    And you contacted a total of 576
10 registered voters at all -- in all; correct?
11    A    I think that's correct.  Let me --
12    Q    Sure.
13    A    Let me find the --
14    Q    Take a look at page 11 in your initial
15 report.
16    A    Sorry, I've got to find the report in
17 these stacks.
18         Okay.
19    Q    I think page 11 is what you're looking
20 for.
21    A    Yeah, that's the primary place, but there
22 is also a table of number of respondents.
23         Okay.
24    Q    So you contacted total of 576 registered
25 voters spanning four counties; correct?

Page 308

1    A    That's the total number contacted from
2 the list of numbers to call.  Not all of those
3 individuals were the named individual that the survey
4 company was looking for, and so some of those
5 individuals ended up in the category of
6 incidentally-contacted people who had -- were not part
7 of the, the registered voter file.
8         My recall, which is somewhat fuzzy, is
9 about 530 or so who were in the -- who were on the
10 registration list and we got the named person.
11    Q    Okay.  So of your survey of about 530
12 registered voters, a total of zero of those registered
13 voters indicated that they were non-citizens; correct?
14    A    That's correct.
15    Q    And using that sample, you would get an
16 estimate that zero of the registered voters in Kansas
17 are non-citizens; correct?
18    A    That would be the, the point estimate
19 there.
20         There's a confidence interval around
21 that, because it's possible that with a sample of a bit
22 over 500 registered voters, if the incidence of
23 registration is 1 percent, 2 percent, if you survey --
24 even if non-citizens and citizens are responding with
25 equal frequency from the file, which seems unlikely

Page 309

1  given that mobility is higher among non-citizens and
2  that's going to tend to lead to more failures to
3  contact individuals at the numbers from the voter file,
4  these were people who registered between like 2007 or
5  2008 and 2012, so it's a group that's -- that
6  registered prior to the implementation of the current
7  Kansas law.  So there's some time for that to fade.
8          But if you assume equal response rates,
9  and so forth, you'd expect to find zero even in the
10  context of 1 percent of non-citizens being registered
11  at fairly high probability.
12      Q   So your point estimate for the percent of
13  registered voters who are non-citizens is zero, and if
14  you calculate the margin of error for that estimate
15  using the Score Wilson method, what confidence interval
16  do you get?
17      A   So I believe that was in the, in the --
18  in Exhibit 12.
19      Q   My recollection is that figure is not in
20  Exhibit 12, but if you can -- you can correct me if I'm
21  wrong.
22          Did you calculate a margin of error using
23  the Score Wilson method for your point estimate of zero
24  percent of the registered voters being non-citizens?
25      A   I did, and as you just saw, I thought I

Page 310

1  had included that in the table, but apparently I
2  somehow left it out.
3      Q   You know a lot more about margins of
4  error than I do, Professor Richman, but if you use the
5  Wilson, the Score Wilson method for calculating margin
6  of error for a point estimate of zero of the registered
7  voters who are non-citizens, don't you get a confidence
8  interval of zero?
9      A   No.
10     Q   What confidence interval do you get?
11     A   Well, I don't recall the precise
12  interval, but it includes more than zero.
13     Q   Did you include that calculation in your
14  report?  No; right?
15     A   No, it was just discussed.  I thought I
16  had, but I seem to have omitted it.
17     Q   For your survey of registered voters --
18  you know what?  Never mind.
19         Now, you say that -- you know what?
20  Let's skip that as well.
21         I want to ask about one more survey
22  sample from your initial report, your survey of the
23  self-identified citizens on the suspense list.
24     A   Okay.
25     Q   Now, you asked the self-identified

Page 311

1  citizens on the suspense list about their possession
2  and access to citizenship documents; correct?
3      A   That's right.
4      Q   All right.  So I'm looking at page 9 of
5  your report, initial report, Exhibit 1.
6      A   Yes.
7      Q   And the first full paragraph, the third
8  sentence, about four lines down, you write:  "Among
9  self-reported citizens on the suspense voter list,
10  88.5 percent (89.7 percent unweighted) reported
11  possessing at their home, office, or other location at
12  least one of the three most common identifying
13  documents, a U.S. Passport, a U.S. birth certificate,
14  or a U.S. naturalization document."
15         Did I read that correctly?
16     A   Yes.
17     Q   Now, as a political scientist, do you
18  think it's more appropriate to use your weighted
19  estimate or your unweighted estimate about the -- as to
20  the number or percentage of people on the suspense list
21  who have certain documents?
22     A   I think the weighted estimate is more
23  appropriate.  I included both, partly to illustrate how
24  similar the weighted and unweighted estimates were
25  overall, so that one would not be left in the belief

Page 312

1  that somehow the weighting process was badly distorting
2  the results in some way that perhaps would make the
3  results more favorable for the -- for one side or
4  another in this case.
5      Q   So if your -- let's focus on your
6  weighted estimates, since I think those are -- you said
7  those are your preferred ones?
8      A   Yes.
9      Q   If your estimate is that 88.5 percent of
10  the suspense list lacks a passport, birth certificate,
11  or naturalization document, then the corollary is that
12  your estimate is that 11.5 percent of the suspense list
13  does not possess a U.S. passport, U.S. birth
14  certificate, or U.S. naturalization document; is that
15  correct?
16     A   That would be the corollary; now, keep in
17  mind this is Bissette.  There was another group that
18  noted that someone else kept this for them.
19     Q   Right.
20     A   So there's a few more there.
21     Q   So we'll talk about those people.
22         I want to -- I'll hand you one more
23  exhibit.  I lied when I said we were done.
24         MR. HO:  Mark this as Richman 23.
25         (Richman's Estimate of Document

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

---

Page 313

1       Possession Based on Suspense List
2       Survey (Weighted Estimates) marked as
3       Richman Exhibit Number 23)
4 BY MR. HO:
5    Q    This is a demonstrative that we put
6 together that collects some information about our
7 survey here.  I just want to make sure that we've done
8 this accurately.  You can tell me if we have this
9 wrong.
10     So, the first two rows we just discussed.
11 Those two rows look accurate, right, Professor Richman?
12    A    Yes.
13    Q    Okay.  So the next sentence in this
14 paragraph reads, in your report, on page 9, reads:
15 "This number rises to 91.3 percent, 93 percent
16 unweighted, if those who indicated that 'someone else
17 keeps this for you' are included."
18     Did I read that right?
19    A    Um-hum.
20    Q    So what you're saying is, weighted, using
21 weighted numbers, if we take the people who say they
22 possess a birth certificate, passport, or
23 naturalization document, and we add the people who say
24 that someone else has that document for them, then we
25 get a total of 91.3 percent of the suspense list; is

---

Page 314

1 that right?
2    A    This is focused exclusively on the
3 self-reported citizens on the suspense list.
4    Q    Okay.  So if we look at our demonstrative
5 here, Exhibit 23, the third line looks accurate to you;
6 correct?
7    A    Yes.
8    Q    And the corollary to this estimate is
9 that you estimate that, of the citizens on the suspense
10 list, 8.7 percent do not possess a U.S. birth
11 certificate, U.S. passport, U.S. naturalization
12 certificate, and no one else keeps that document for
13 them; correct?
14    A    That's correct.
15    Q    So the fourth line on this demonstrative
16 is correct; right?
17    A    Yes.
18    Q    Now, if we just skip a line, we'll come
19 back to it -- I just want to skip a line in the first
20 paragraph on page 9 -- you write:  "An additional
21 0.7 percent indicated that they had at least one of the
22 items from a long list of other types of
23 documentation."
24     Did I read that right?
25    A    Yes.

---

Page 315

1    Q    So, is it accurate to say that your
2 survey results showed that 0.7 percent of the
3 respondents indicated that, although they lack birth
4 certificate, passport, or naturalization certificate,
5 and although no one has those documents for them, these
6 people have one of the other documents that can be used
7 to satisfy the documentary proof of citizenship
8 requirement for voter registration in Kansas or someone
9 else has that document for them; right?
10    A    That's correct.
11    Q    Okay.  So if we add that number, right,
12 we get 92 percent of the people -- of the citizens on
13 the suspense list who either have one of the
14 citizenship documents or someone else has that document
15 for them, that's your estimate; right?
16    A    Yes, I think that would be the estimate.
17    Q    Okay.  And the corollary to that estimate
18 then is that 8 percent of the citizens on the suspense
19 list, you estimate, do not have a citizenship document
20 that can safe the proof of citizenship law in Kansas,
21 and no one else keeps such a document for them;
22 correct?
23    A    Not quite correct, actually.  I'm
24 rethinking my response to the previous question.
25     The order of questions mattered in the

---

Page 316

1 survey, because, in each case the subsequent question
2 was only asked of individuals who, who had not answered
3 that they had a -- one of the earlier methods of
4 proving citizenship.
5     So I'd like to double-check.  I'm not
6 sure which exhibit number it was.
7     Here, I think I found it.
8    Q    I think it's Exhibit 3, your survey.
9    A    Yeah, I got it.
10     So if you look at the -- if you look at
11 the set of questions here, the -- question 10 came
12 before the question about other documents.  So some of
13 the people who responded in the affirmative to question
14 2 may have had one of the other documents; they were
15 not asked if they had one of the other documents,
16 because they had already noted a way of providing proof
17 of citizenship.
18    Q    Okay, great.  That's why we do this.
19     So you do not have an estimate of the
20 number of citizens on the suspense list who lack one of
21 the documents that can be used to satisfy the proof of
22 citizenship requirement or have someone who holds such
23 a document for them; correct?
24    A    What I have is an estimate of the last
25 number here, which is -- was the goal of the exercise,

---

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 317

1  which was an estimate of the number of self-reported
2  citizens on the suspense list who had access to one or
3  another of the various ways of demonstrating their
4  citizenship status.
5          My impression was, when I designed this
6  survey, and this was based on conversations with
7  individuals in the Secretary of State's office, that
8  one of the mechanisms that they had in operation in
9  Kansas to identify people as citizens, involved a free
10 option to request a birth certificate for individuals
11 born in Kansas.  And, so, that's why I included that as
12 one of the questions.
13     Q    Okay.  So your final estimate then is
14 2.2 percent of the citizens on the suspense list do not
15 have a citizenship document that can satisfy the proof
16 of citizenship law, do not have someone who keeps such
17 a document for them, and were not born in Kansas;
18 correct?
19     A    Right.
20     Q    And if there are about 2 million adult
21 citizens in Kansas, then if we take your estimate of
22 the citizens on the suspense list of 2.2 percent and
23 apply it to the total adult citizen population in
24 Kansas, we would arrive at an estimate of over 40,000
25 citizen adults in Kansas who do not possess a

Page 318

1  citizenship document that could satisfy the proof of
2  citizenship law, do not have someone who keeps such a
3  document for them, and were not born in Kansas;
4  correct?
5      A    That's incorrect.
6          Professor Ansolabehere's report did such
7  an analysis, but that analysis has an inappropriate
8  calculation of the percentage.
9          To do this analysis, you would need to
10 look at the overall number of individuals who
11 registered to vote in Kansas during the time period
12 that this suspense list was in operation, because there
13 are thousands of people who provide -- registered to
14 vote and provided proof of citizenship.  So the
15 suspense list is a subset of the total number who
16 registered to vote.
17          The proper percentage would be the --
18 would be based upon that larger population of
19 individuals, individuals who registered to vote and
20 provided documentation.  The suspense list is
21 individuals who registered to vote and did not provide
22 that documentation.
23     Q    So the point that you're making is,
24 correct me if I'm wrong, that the suspense list is not
25 representative of the adult citizen population in

Page 319

1  Kansas; correct?
2      A    The point I'm making is that the suspense
3  list is a selected subset of the adult population in
4  Kansas, because the suspense list is specifically
5  selected on people who have not yet, to some point,
6  provided proof of citizenship.  And, so, we would
7  expect to have a much more concentrated rate of non-
8  provision of that proof in the suspense list than we
9  would observe in the overall population of people who
10 have registered to vote in Kansas over the last several
11 years.
12     Q    So the point that you're trying to make
13 is that, if we try to extrapolate from the suspense
14 list, citizens on the suspense list, to the total adult
15 citizen population of Kansas, we have a selection bias
16 problem here; right?  Because the suspense list
17 citizens may be different in a relevant way from the
18 adult citizen population as a whole of Kansas; correct?
19     A    In particular, we know the selection
20 mechanism.  So the select mechanism is based precisely
21 on the thing we're measuring -- we're assessing here.
22 The selection mechanism is based upon providing one of
23 these mechanisms of proof of citizenship.
24     Q    Is it your opinion that when you have a
25 selection bias problem, that when you try to generalize

Page 320

1  from a sample to a larger population, that means that
2  that kind of generalization gives you no information
3  about the larger population?
4      A    No.  This gives us some information,
5  information that there are some individuals who lack,
6  lack this documentary proof.  We -- I think we have a
7  reasonably -- you know, we have an estimate for the
8  suspense list of the portion of people on the suspense
9  list without a means to provide such evidence.
10          So I would be entirely comfortable with
11 extrapolating from the sample to the suspense list as a
12 whole in terms of what portion of people on the
13 suspense list are citizens who don't have a means to
14 prove their citizenship.
15          Where I become uncomfortable is when one
16 neglects the fact that some of the individuals over the
17 last several years who registered to vote in the state
18 of Kansas are not on the suspense list, and those
19 individuals are not on the suspense list because, in
20 one way or another, they have documented that they are
21 citizens.
22     Q    So because of this selection bias problem
23 that we've identified, you think it would be
24 methodologically inappropriate to take your percentage
25 estimate from the suspense list citizens and apply it

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

---

Page 321

1  to the entire adult citizen population of Kansas;
2  correct?
3      A   If we did that without first adjusting
4  for the overall rate of registration in Kansas, I
5  believe we would end up with an estimate that was too
6  high.
7      Q   Do you have any estimates for that latter
8  number, the percentage of adult citizens in Kansas who
9  don't have a citizenship document that can satisfy this
10 law, don't have someone who has such a document for
11 them and were not born in Kansas?
12     A   I attempted to get the information.  I
13 would need to do that estimate.  I asked -- it was one
14 of the things I, I believe I mentioned to the Secretary
15 of State's office as I was working on preparing this
16 report.  Unfortunately, I did not receive that
17 information, partly because I realized I needed it very
18 late in the day, so they did not have time to put that
19 together.
20     Q   So the Secretary of State's office did
21 not give you the information that you need to make an
22 estimate of the percentage of citizen adults in Kansas
23 who lack a citizenship document, don't have someone who
24 has such a document for them, and were not born in
25 Kansas; correct?

---

Page 322

1      A   I don't have that information at this
2  time.  Perhaps they'll provide it to me at some point.
3      Q   Okay.
4      A   And, so, in my -- in my response to
5  Ansolabehere on this issue, I pointed out the bias, but
6  I did not provide my own estimate.
7      Q   Now, back to your report, your initial
8  report, Exhibit 1, on page 9.
9          The last sentence of the first full
10 paragraph reads:  "Thus, only" 2.2 percent --
11 "2.3 percent, unweighted, of self-reported citizens on
12 the suspense list indicated that they did not have
13 immediate access to the documentation required to prove
14 their citizenship status to the state of Kansas."
15         Did I read that correctly?
16     A   You did.
17     Q   And did you use the word immediate -- the
18 words "immediate access" in your survey instrument?
19     A   No, I did not.  That was a extrapolation.
20     Q   So, from the fact that someone says that,
21 on your survey, there's someone else who holds a
22 citizenship document for them, you interpret that to
23 mean that the person has immediate access to a
24 citizenship document; correct?
25     A   That was probably an overstatement, but

---

Page 323

1  they certainly would have access within some period of
2  time consistent with acquiring it to provide that
3  evidence, I would expect.
4      Q   You say it's an "overstatement."  What do
5  you mean by that?
6      A   "Immediate" might have been too strong a
7  choice of word.
8      Q   When you asked the question, does someone
9  else have such a document for you, and a respondent
10 says yes, do you know anything about what that someone
11 who has that document for them is?
12     A   No.
13     Q   Do you know anything about where the
14 person who has the citizenship document for the survey
15 respondent is?
16     A   No.
17     Q   It's possible that the person -- that the
18 respondent who says yes in response to this question is
19 referring to someone who lives in another state; right?
20     A   That is possible.  Upon reflection,
21 looking at this language right now, I would have
22 preferred if I had left out the word "immediate."
23     Q   It's possible when someone answers
24 affirmatively that someone else has their citizenship
25 documents that they could be referring to a relative;

---

Page 324

1  right?
2      A   Why not?
3      Q   You don't know one way or the other
4  though; right?
5      A   Yeah.
6      Q   Could be a friend who has the citizenship
7  document for them; right?
8      A   Could be.
9      Q   Could it be a government official who has
10 the citizenship document for them?
11     A   The question does not specifically
12 address this issue, so my answer to any sequence of
13 queries about who it could be is, I suppose, the
14 specific language of the questions where someone else
15 keeps documents for you, that kind of thing.  So that
16 was the -- that was the category.
17     Q   When you say, when a survey respondent
18 says that someone else keeps the documents for them, do
19 you have any information about how difficult it would
20 be for the survey respondent to obtain that document
21 for purposes of complying with the Kansas voter
22 registration requirement?
23     A   I do not for those individuals.  And, so,
24 for, for those individuals, it's possible that in some
25 cases that would be more challenging than for others.

---

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 325

1    Q    And you'd agree that getting a
2  citizenship document from someone else constitutes an
3  additional step in the voter registration process that
4  someone who already possesses the documents wouldn't
5  have to engage in; correct?
6    A    Yes.
7    Q    And you would agree that that's an
8  increase in the marginal cost of voter registration,
9  trying to get a document from someone else, rather than
10 simply getting a document that you already have; right?
11   A    In most instances it would be.
12   Q    You included estimates about people who
13 are born in Kansas, and you say you did that because
14 your understanding is that people who are born in
15 Kansas can obtain free birth certificates; correct?
16   A    Yes.
17   Q    What is the basis of that understanding?
18 Who is the source of your information for that?
19   A    I believe the source was Garrett Roe in
20 the Secretary of State's office, but it could have been
21 the Secretary of State himself or -- but I think it was
22 one of those.
23        It may have also been partly through my
24 examination of an earlier survey, which was done I
25 think last year, which included that category.  I may

Page 326

1  have asked about what it meant.
2    Q    Why did you decide to include a question
3  about being born in Kansas and free birth certificates
4  in your survey instrument?
5    A    Because that is one of the ways that an
6  individual can obtain the relevant document.
7    Q    Now, if -- would you agree that if
8  someone doesn't have a citizenship document and they
9  have to apply for a free birth certificate in order to
10 comply with the proof of citizenship requirement for
11 voter registration in Kansas, that's an extra step
12 that person would have to take in order to register to
13 vote, above and beyond what someone who already has
14 such a document would have to take?
15   A    Yes.
16   Q    And would you agree that that would
17 increase the marginal cost of voter registration for
18 that individual?
19   A    Potentially to a, to a degree.  I don't
20 know the specific mechanics of how they request for a
21 birth certificate.  It may well be automated in the
22 sense that it provides -- has very little marginal
23 cost.  I don't know the details of that policy.
24   Q    Do you know anything about the process of
25 obtaining a free birth certificate in Kansas for the

Page 327

1  purposes of voter registration?
2    A    I, as I already stated, I do not know
3  details of that process.
4    Q    Do you know what information is available
5  to voter registration applicants about obtaining a free
6  birth certificate for purposes of registering to vote
7  in Kansas?
8    A    I have not examined that material.
9    Q    Now, I think -- if we turn back to your
10 rebuttal report.
11   A    Okay.
12   Q    Almost there.
13        Page 16.  Paragraph 36.  The final
14 sentence in -- on this page that continues to the next
15 page.
16        You write:  "I would note that this
17 survey did not include a question about the final
18 option available to individuals in order to demonstrate
19 citizenship, an appeal based on this form."
20        And then you give a link.
21   A    That's right.
22   Q    Why did you include this sentence in your
23 rebuttal report?
24   A    Because I thought it was relevant to
25 understanding the overall question of whether

Page 328

1  individuals are excluded from the electoral process.
2        So my understanding, based on
3  conversations with Garrett Roe, is that this process is
4  another option for individuals who have difficulty
5  documenting citizenship status.  There's a form, they
6  explain what the circumstance is, and then he described
7  to me sitting in on a telephone hearing where somebody
8  provided the form and then, on a conference call, they
9  explained to the relevant officials what the situation
10 was, and he was taken off the suspense list.
11   Q    Were you aware of this appeals process at
12 the time that you completed your initial report in this
13 case?
14   A    I was aware of the appeals process, and I
15 believe there was some mention of it on the previous
16 survey, but I'm not certain of that.
17   Q    The survey?  You didn't mention the
18 appeals process as a question in your survey, did you?
19   A    No, no.  The survey that was conducted
20 for the state of Kansas last year, I think.  It was
21 probably part of this litigation process.
22        I received a, a report that I think
23 included questions from that survey.
24   Q    Was --
25   A    It may have been mentioned there, I'm not

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 329

1  sure.
2      Q    Was it your idea to include a reference
3  about the appeals process in your rebuttal report?
4      A    Yes.
5      Q    And you say you learned about it from
6  Garrett Roe?
7      A    Yes, last winter sometime.
8      Q    Do you know if eligible voters in Kansas
9  are aware of this appeals process?
10     A    It's on the Secretary of State's website.
11  So I do not know the degree of awareness.
12     Q    Do you know where on the Secretary of
13  State's website?  Is it like on the banner or is it --
14  I mean, the link.
15     A    There's a link.
16     Q    So there's a link?
17     A    I found a link from working my way
18  through the website, so --
19     Q    Roughly, how long did it take you to find
20  that link working your way through the website?
21     A    Maybe a minute.
22     Q    And you have a Ph.D.; right?
23     A    I do.
24     Q    Do you know if this form is -- do you
25  know how this form for an appeal to establish

Page 330

1  citizenship is submitted?
2      A    I don't, I don't know the details.  I
3  imagine that's on the form.
4      Q    Do you know anything about the appeals
5  process itself and how it functions?
6      A    I do not know much.  I, I mentioned
7  already one of the things that I know, which was the
8  vignette that Garrett Roe shared with me in terms of
9  his experience sitting in on one of them.
10     Q    Do you know how many of these appeals
11  processes to establish citizenship have taken place in
12  the state of Kansas?
13     A    I don't know.
14     Q    Would you agree that if someone has to
15  apply for an appeal to establish that they are a U.S.
16  citizen before the Attorney General, the Secretary of
17  State, and the Lieutenant Governor of Kansas, that that
18  would constitute an additional step above and beyond
19  what is necessary to register to vote in most states?
20     A    Yes.
21     Q    Would you agree that that appeals process
22  increases the marginal cost of voting as compared to
23  the voter registration process in most states?
24     A    It is a, an additional step.
25     Q    For the 32 individuals on the suspense

Page 331

1  list who indicated that they were citizens but were
2  within that 2.2 percent who you describe as not having
3  access to citizenship documents, you sought to
4  ascertain whether or not there was any government
5  information about whether or not these individuals are,
6  in fact, citizens; correct?
7      A    Yes.
8      Q    Are you expressing the opinion that these
9  32 individuals who, in your words, lack access to
10  citizenship documents, are in fact non-citizens?
11     A    I, I noted the breakdown of different
12  categories of response that were received in my report.
13  This was on page 9.  It's the second full paragraph.
14         And it -- I note that all received the
15  code "unknown," which is defined as "individuals that
16  have never been encountered by DHS or are possible U.S.
17  citizens but databases lack information to verify,
18  therefore these individuals could either be noncitizens
19  who are unlawfully present in the United States or they
20  could be United States citizens."
21         My impression is if they were lawfully
22  present, most likely they would be in the database.  So
23  that -- my, my inference was not that these were in one
24  of those categories or another; I indicated that they
25  could be in either of those categories.

Page 332

1      Q    When you say "either of those
2  categories," what categories are you referring to?
3      A    Either be -- the language of my report
4  was either be non-U.S. citizens who are unlawfully
5  present in the United States or they could be United
6  States citizens.
7      Q    Is that your view for every person we've
8  discussed in this report whose citizenship status you
9  never verified with ICE, that these could be citizens,
10  they could be undocumented immigrants?
11     A    No.  This is based upon the categories of
12  response from ICE.  So this was the group from the
13  suspense list that we did send to ICE.  We discussed
14  earlier the group that we didn't.  But this group did
15  get sent to ICE and, and the response from ICE was not
16  particularly illuminating in this case, in terms of
17  identifying the status of these individuals.
18         So the only inference I think one can
19  make, which is what I tried to articulate there, is
20  that these are individuals that ICE has not
21  encountered.  It could be that these are individuals
22  that ICE has not encountered because they're U.S.
23  citizens and ICE has never had any reason to encounter
24  them; or it could be, conversely, that these are
25  individuals that ICE has not encountered because,

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 333

1  although they are not U.S. citizens, they have avoided
2  having specific visas or other documents that ICE might
3  be aware of.
4      Q    You are not drawing the inference that
5  the respondents on your suspense list survey who
6  indicated that they were non-citizens were within
7  the 2.2 percent that you describe as not having access
8  to citizenship documents, you are not making the
9  inference that these people are, in fact, non-citizens;
10 correct?
11     A    That is not the inference I'm making.
12 There are several possibilities in terms of who they
13 are.  It's also possible that ICE was not able to
14 match, but perhaps these are individuals who were in
15 the ICE database.  So I, I suppose that's another
16 category.
17     Q    Looking at page 9, the last paragraph, is
18 it correct to say that of the survey respondents on the
19 suspense list who indicated they were citizens and did
20 not, as you described them, have ready access to
21 citizenship documents, that of those individuals,
22 18.8 percent are African-American?
23     A    That is one of the numbers I, I noted
24 here, yes.
25     Q    Are you aware that according to recent

Page 334

1  census data, the -- Kansas's population is about
2  6 percent black?
3      A    I wasn't aware of the specific
4  demographic -- I didn't have that right at the top of
5  my head.
6      Q    Does that sound wrong to you?
7      A    No.
8      Q    Okay.
9           So if about 6.3 percent of Kansas's
10 population is black, comparatively speaking,
11 African-Americans are represented at about three times
12 their rate in the overall population among the citizens
13 on the suspense list whom you describe as lacking ready
14 capacity to document their citizenship; correct?
15     A    Well, this is based on an estimate which
16 has -- would have, consequently, a degree of
17 uncertainty.  It appears that they are present on the
18 suspense list at a higher rate.
19           On the other hand, for a sample of about
20 this size, as we were discussing before, the size of
21 the confidence intervals is very large.  So my guess is
22 that if one did a, a test to see whether the estimate
23 was significantly higher than the overall rate in the
24 state, one would not be able to reject the null
25 hypothesis.

Page 335

1      Q    It's always dangerous to try to make
2  definitive statements for a large population based on a
3  sample of, in this case, 32 individuals; right,
4  Professor Richman?
5      A    As I articulated before, you encounter
6  large degrees of uncertainty when you do that.
7      Q    Okay.
8           One last question about people who apply
9  for and obtain TDLs.
10          Someone who -- or --
11     A    Is there a particular place in this
12 report that --
13     Q    No.
14     Q    Okay.
15     Q    Non-citizens who are here temporarily but
16 never apply for a driver's license are not on the TDL;
17 correct?
18     A    That's my impression.  That's a temporary
19 driver's license list.
20     Q    And, so one difference between people in
21 the TDL and people not on the TDL -- and here I'm
22 talking just about non-citizens who are in the United
23 States temporarily, legally -- is that we know for a
24 fact that people who have obtained a TDL have had an
25 interaction with the DMV where voter registration is

Page 336

1  offered, whereas we don't know whether or not
2  individuals who are similarly situated but haven't
3  applied for a TDL have had such an interaction with the
4  state; correct?
5      A    Yes, that's true.
6      Q    And that would be a difference between
7  temporarily present non-citizens, here legally, in the
8  TDL, and those temporarily present non-citizens here
9  legally who are not in the TDL; correct?
10     A    Yes, that would be a difference between
11 those groups.  I would -- so that could be a difference
12 that would lead to differences in results.
13          MR. HO: Could we just take two minutes
14 and -- I don't think I'm going to have questions after
15 the break, so you can start, I think, right after the
16 break with whatever you might have.  But I just want
17 to, before I rest, just check with my co-counsel.
18          MR. ROE: Why don't we take ten minutes.
19          MR. HO: Yeah.
20          THE VIDEOGRAPHER: Going off the record
21 at 5:35 p.m.
22          (Recess)
23          THE VIDEOGRAPHER: Back on the record at
24 6:27 p.m.
25          MR. HO: We do not have any other

Page 337

1 questions for you right now, Professor Richman.
2        THE WITNESS: Thank you.
3
4        EXAMINATION
5 BY MR. ROE:
6    Q    So, Professor Richman, I just have a few
7 questions based on questions that were asked by Mr. Ho
8 earlier.
9        First off, you were asked about using the
10 term "immediate access" regarding proof of citizenship
11 documents.  Are you an expert on --
12       THE COURT REPORTER: I'm sorry; involving
13 what documents?  I didn't understand.
14       MR. ROE: Proof of citizenship documents.
15       THE COURT REPORTER: Thank you.
16 BY MR. ROE:
17    Q    Are you an expert on election
18 administration in Kansas?
19    A    No, I'm not.
20    Q    Were you hired to be an expert on
21 election administration?
22    A    No.
23    Q    So do you know the different methods in
24 which a person can provide their citizenship documents
25 to election officials?

Page 338

1    A    No, I have not studied that.
2    Q    Do you know whether somebody has to
3 provide it in person?
4    A    I do not know.
5    Q    Do you know whether somebody else can
6 provide it for that person?
7    A    I do not know.
8    Q    Okay.  On page 5 of your initial report,
9 you discussed the individuals who were not in the DHS
10 database.
11       Do you know whether there is a federal
12 database that includes all U.S. citizens that states
13 can query?
14    A    My impression is that there is no such
15 database.
16    Q    Page 34 of your rebuttal earlier, you
17 were asked about whether it was bad practice to offer
18 an opportunity to register to vote to someone who
19 showed a non-citizen document.  Do you remember that?
20    A    Yes.
21    Q    Do you know when somebody applies to
22 register to vote whether they have to attest to being a
23 United States citizen?
24    A    Yes.  The federal voter form, and I
25 believe the Kansas form as well, require individuals to

Page 339

1 attest they are citizens.
2    Q    So if an individual provides a
3 non-citizenship document, it would be your
4 understanding that they would still have to attest to
5 being a citizen before they could register to vote;
6 correct?
7    A    That would be my understanding.
8    Q    Regarding Sedgwick County, in your
9 initial report you discuss, I think a 2016 data, and
10 then your rebuttal report, you discussed the 2014/2015
11 data; is that correct?
12    A    That's correct.
13    Q    And in your rebuttal report you mentioned
14 findings -- you mentioned, I think you used the term
15 the "more valid" approach; is that correct?
16    A    That was in talking about another
17 possible analysis, which I did not emphasize in the
18 report, which was looking at the full set of data from
19 2013 through 2015.  The, the reason for not including
20 2013 is that Sedgwick County only began to attend
21 naturalization ceremonies partway through the year,
22 based on the information that was provided to me.
23    Q    Were the findings between your initial
24 report and your rebuttal report, were there -- were
25 they similar or were they different?

Page 340

1    A    They were very similar, so in one report
2 the estimate was 1 percent, in the other report the
3 estimate was .9 percent.
4    Q    Okay.  Exhibit 22 would be
5 Professor Ansolabehere's rebuttal report -- I'm sorry,
6 his report.
7        In that report --
8    A    I don't think that's Exhibit 22, but --
9 that's my response to his paper.
10       20 is, I believe, his rebut -- his
11 report.
12    Q    Okay.  Okay.  Sorry.  Let me rephrase
13 that.
14       Ans -- Professor Ansolabehere mentions in
15 your -- in his criticism of you, I think first in his
16 paper and then in his rebuttal -- in his report that
17 you don't take into account individuals who may have
18 reported being a citizen and then a non-citizen.  I
19 think the term he used in his report was that that would be
20 impossible that somebody would be a citizen in 2010 and
21 a non-citizen in 2012; is that correct?
22    A    That's what he stated.
23       And, so, I think what, what he's trying
24 to imply there is that, you know, his argument is that
25 these are principally citizens who misstated their

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

---

Page 341

1   citizenship status.
2           Based on a variety of other analyses I've
3   run, I think there's -- that a much larger proportion
4   than one would expect, based on assuming that the -- as
5   Professor Ansolabehere does in his electoral studies
6   paper, that the same portion of citizens and
7   non-citizens make a mistake on that question, I think
8   there's -- there are a variety of sources of evidence
9   that non-citizens are more likely to misstate
10  citizenship status.
11      Q    Okay.
12          Exhibit 21, I think was a letter that
13  co-counsel -- opposing counsel showed you from various
14  political scientists.
15      A    Yes.
16      Q    Is there anything in this letter you take
17  exception to?
18      A    So, another of the exhibits was
19  specifically my response to this.  There are a number
20  of, of limitations and problems with this letter that I
21  took exception to.
22          I titled that response -- let me find
23  which exhibit it is.
24          This is -- that was Exhibit 11.  I titled
25  it:  "I would sign the 'open letter' if it were true."

---

Page 342

1           My sense was that, in a variety of ways,
2   the open -- the text of the open letter was misleading
3   and that -- and inaccurate.  And in my response, I
4   raised a number of different ways in which I thought
5   that was the case.
6           For example, in the second paragraph,
7   they quote -- they cherry pick a quote about only one
8   of the confidence intervals that was provided in the
9   study, and that was a confidence interval for the
10  estimate that was less precise, giving the sense that
11  we were claiming a much higher and more precise rate of
12  non-citizen participation in elections than in fact
13  were.
14          And then they make some very strong
15  claims about the Ansolabehere, Luks, and Schaffner
16  paper.  And the, the -- there are a number of issues
17  that I think are raised, problems with taking such
18  strong claims from that paper.
19          One of the key ones, as I articulated in
20  this letter, in response -- in my response to this
21  letter, is that the -- if, if one believes that the
22  estimated rates of non-citizen voting that were
23  reported in the CCES analyses that we did are exactly
24  right, one would expect to get precisely the responses
25  that Ansolabehere, Luks, and Schaffner got a

---

Page 343

1   substantial portion of the time in their analysis of
2   individuals who twice confirmed that they were
3   non-citizens.
4           So, for instance, I noted that, analyzing
5   the binomial distribution, with one set of assumptions,
6   one would get the null value 57.4 percent of the time;
7   with another set of assumptions, one would get it
8   72.4 percent of the time.  So that suggests there's
9   quite a substantial probability that one would get
10  exactly the results they got in their analysis of
11  individuals who twice said they were non-citizens if
12  the estimates in our original paper were, were right.
13          And then going beyond that, there were a
14  number of -- there were a number of other things I
15  objected to in this, in this letter.
16          One of the -- one, one of the other
17  issues involves the assertions about response error in
18  the CCES.
19          The additional analyses that I've done on
20  the issue of response error suggests that response
21  errors tend, on the immigration status question, tend
22  to be concentrated among non-citizens; and there's also
23  some indications that these errors are particularly
24  prevalent in contexts where not making a response error
25  would be -- would involve an admission of registration

---

Page 344

1   or voting that would be inappropriate, given
2   citizenship status.
3           And the, the final thing I, I objected to
4   was the language in the final paragraph, which attempts
5   to assert that the study -- 2014 study by myself,
6   Gulshan Chattha, and David Earnest should not be cited
7   or used in any debate over fraudulent voting.
8           I think that as one -- I have attempted,
9   as I noted in my response to their letter, I have
10  attempted to frequently mention the Ansolabehere study.
11          I believe that, ultimately, there should
12  be a public dialogue in which all sides are considered,
13  and I've tried to ensure that people are aware of both
14  my work and the work of critics of that study.
15          And, so, the -- my, my sense is that
16  if -- as -- and I quote here from another of the pieces
17  I wrote, that we stand by our study but we encourage
18  people to read the critiques too.
19          I think that the public debate on the
20  issue of the frequency of non-citizen registration and
21  voting should not be shut down on the basis of a study
22  like the Ansolabehere, Luks, and Schaffner study, which
23  provides, as I have said in various forums, potentially
24  a constructive contribution to the literature, but it
25  is by no means the appropriate last word on, on this

---

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 345

1 question.
2          They raise some issues; but at the same
3 time, the issues that are raised are ones that are --
4 that in, for example, in the working paper that's one
5 of -- I don't remember which number it is here, 23, or
6 something like that -- no, it's not 23, it's one of the
7 exhibits that we discussed, a working paper with
8 Gulshan Chattha and David Earnest -- a number of the
9 hypotheses that would arise that would be true if their
10 suggestion that non-citizens who said they voted are
11 actually all or very nearly all citizens just don't
12 bear out.
13     Q    Okay.
14          So, regarding the CCES study then, it
15 seems like his hypoth -- Ansolabehere's hypothesis in
16 his report is that the incidence of (inaudible) --
17          THE COURT REPORTER: I'm sorry.
18          -- "the incidence of" --
19 BY MR. ROE:
20     Q    -- the incidence in the -- in your report
21 can be based entirely on response error; is that
22 correct?
23     A    That's -- that seems to be the argument
24 they are making, and --
25     Q    Well, have you done other analyses to

Page 346

1 investigate the -- that claim?
2     A    Yes.
3          So if they are right that individuals who
4 said they -- all or nearly all of the individuals who
5 said they are non-citizens in the CCES and for whom we
6 have indications that they voted are actually citizens,
7 then in a variety of ways we might expect them to look
8 more like citizens and less like non-citizens.
9          In fact, across a range of comparators --
10 we looked at, for instance, a number of different
11 questions on immigration policy. The people who said
12 they were non-citizens and cast validated votes, for
13 example, were very similar to the other individuals who
14 said they were non-citizens and quite distinct from
15 naturalized citizens or all citizens. And, so, that's
16 not what you would expect; similarly on presidential
17 preference.
18          There were a number of other analyses
19 that we did which all aligned in the same way, in terms
20 of indicating that these individuals were very much
21 like other non-citizens and very much not like
22 citizens, which is directly contrary to what one would
23 expect in the -- if Ansolabehere, Luks, and Schaffner
24 were correct.
25     Q    I think a few times in your -- in this

Page 347

1 deposition you've mentioned that you wanted certain
2 follow-up questions on the CCES or on immigration
3 status questions; is that correct?
4     A    Yes.
5     Q    And I think you also mentioned that you
6 had, you have maybe spoken to Professors Schaffner and
7 Professor Ansolabehere on this?
8     A    I believe I spoke with both of them at a
9 conference, the Southern Political Science Association
10 conference, in 20 -- early 2016, and then I sent up a
11 follow-up -- sent a follow-up email to Professor
12 Schaffner based on that conversation proposing specific
13 questions.
14          And his response was that -- it was,
15 thanks, Jesse, we'll try to get this on the 2016 common
16 content.
17     Q    Is that a copy of the emails?
18     A    These are a copy of the emails, yes.
19     Q    Let's put them into evidence then.
20          What was the last exhibit?
21     A    I believe it was 23.
22          MR. ROE: Okay, this is going to be
23 Exhibit 24.
24          (1/13/16 email string re:  Proposed
25          non-citizen follow-up question for CCES

Page 348

1          marked as Richman Exhibit Number 24)
2          (Discussion off the record)
3 BY MR. ROE:
4     Q    And this is an email from you to
5 Professor Schaffner; correct?
6     A    That's right.  It's an email from me to
7 Professor Schaffner with the email chain below that, in
8 terms of Professor Schaffner's reply to my initial
9 email and then my reply to Professor Schaffner's email.
10     Q    And have you received any more emails
11 from Professor Schaffner after January 13, 2016?
12     A    I received no further emails from him
13 about this issue.
14          I followed up recently with him about the
15 issue of inclusion of the question, and he, he did not
16 specifically address my query on that.
17     Q    Do you know who designs the survey
18 questions for the CCES?
19     A    My impression is that it's done by a
20 group of people, but the leaders on the, the survey
21 design are Professors Schaffner and Ansolabehere.  They
22 are the principal investigators for the study.
23     Q    So if these questions were to be included
24 in the survey, it is likely that Professor Schaffner
25 and Professor Ansolabehere would make that decision?

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 349

1     A   I, I would imagine they would play a key
2   role in that decision making.
3     Q   Okay.
4         Earlier, you were asked about
5   professor -- confidence intervals quite a bit, and you
6   mentioned that Professor Ansolabehere's confidence
7   interval used -- confidence intervals used were, quote,
8   wildly inappropriate?
9         Do you remember that?
10    A   Yes.
11    Q   Why do you believe they were wildly
12  inappropriate?
13    A   Professor Ansolabehere's confidence
14  intervals are based on an assumption that 50 percent of
15  individuals who were asked or otherwise assessed on the
16  issue of non-citizen registration were registered.
17  They were based on that 50 percent assumption.  I have
18  a graph in my, my second report which depicts what the
19  confidence interval looks like as you -- the size of
20  it -- as you shift across the different assumptions.
21        I think it was an odd assumption to make
22  for a number of reasons, including that
23  Professor Ansolabehere's is in print in other places
24  asserting no or almost no non-citizens participate in
25  voting U.S. elections.  It would seem odd to assume

Page 350

1   that 50 percent do, and more appropriate, I would
2   argue, to take as a base starting position, that the
3   observed proportion is, is the relevant proportion for
4   calculating confidence intervals.  That's how
5   confidence intervals for specific probability, binomial
6   estimates are typically calculated.
7     Q   If you go back to Exhibit 21, which is
8   the letter signed by the various political
9   scientists --
10    A   Yes.
11    Q   -- the last sentence in the second to
12  last paragraph, it quotes:  We agree with Ansolabehere,
13  et al., that, quote, the likely percent of non-citizen
14  voters --
15        THE COURT REPORTER: I'm sorry?
16        MR. ROE: -- the likely percent of
17  noncitizen voters in recent U.S. elections is zero, end
18  quote.
19  BY MR. ROE:
20    Q   You know what?  Scratch that.  Never
21  mind.
22    A   Yeah, this is an example of what I was
23  just talking about.  It makes the 50 percent assumption
24  surprising.
25    Q   Okay.

Page 351

1         Now, earlier you were asked about public
2   education in Kansas with non-citizens.
3     Q   Do you know whether Kansas law prevents
4   non-citizens from registering to vote?
5     A   I believe it does.
6     Q   In your research in this case, have you
7   found that noncitizens are registering to vote
8   nevertheless?
9     A   Yes.
10    Q   Do you know whether Kansas law has speed
11  limits?
12    A   I do.  I drove through Kansas in 2015 and
13  there were speed limits.
14    Q   Do you know whether Kansas -- speed
15  limits in Kansas are violated?
16    A   My impression from driving through Kansas
17  is that that does happen.
18    Q   Okay.  Going back to the CCES regarding
19  education, there's some questions regarding that
20  specific point, that I think counsel was asking about
21  the differences in voting between education levels of,
22  I think naturalized citizens; is that correct?
23    A   I'm sorry, please restate the question.
24    Q   Earlier you were asked questions about --
25  this goes back to the issue of education and

Page 352

1   non-citizens.
2     A   Oh, yeah.
3     Q   I think you were asked questions about
4   the different rates of -- was it voting of naturalized
5   citizens?
6     A   That's right, yeah.  I was asked about
7   voting by non-citizens.  And I mentioned a study that I
8   think is cited in the -- my --
9     Q   I'm sorry.  Real --
10    A   -- 2014 paper --
11    Q   Sorry.
12        (Talking over)
13        THE COURT REPORTER: Excuse me.  You have
14  to speak one at a time.
15  BY MR. ROE:
16    Q   You were asked about voting by
17  naturalized citizens or by non-citizens?
18    A   I think I was asked questions relating to
19  voting by non-citizens.
20    Q   Okay.
21    A   I think I was also asked a question about
22  whether patterns of vote -- the level of voting or
23  registration not being associated with --
24    Q   Oh, okay.
25    A   -- education occur in other groups.

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

---

Page 353

1  Q    Okay.

2  A    And in that context, I mentioned studies

3  of non -- of naturalized citizens.

4  Q    So going to the issue of non-citizens, so

5  you discussed differences in, in the voting rate of

6  non-citizens; correct?

7  A    Yes.

8  Q    But you were not asked about the

9  differences in rates of non-citizens registering to

10  vote; correct?

11  A    Yes.

12      And in my rebuttal report, I talk about a

13  number of analyses looking at the association between

14  registration rates and education, and I did not

15  identify any analyses that were -- that showed a

16  statistically significant association in either

17  direction between non-citizen registration and

18  education.

19  Q    Okay.

20      MR. ROE: Can we take just a two-minute

21  break?  I think I'm done.  But I just want to check one

22  thing.

23      THE VIDEOGRAPHER: Going off the record

24  at 6:51 p.m.

25      (Recess)

---

Page 354

1      THE VIDEOGRAPHER: Back on the record at

2  6:53 p.m.

3  BY MR. ROE:

4  Q    Okay.  I just have one last question.

5      Going back to Exhibit 21, which is the

6  letter of the political scientists, the third

7  paragraph, where it starts -- I think it's the one,

8  two, three -- the fourth sentence starts:  "Stephen

9  Ansolabehere, Samantha Luks, and Bryan Schaffner

10  demonstrated in a 2015 paper the response error

11  explains nearly all of this is posed at non-citizens in

12  Richman's, et al., sample who voted."

13      Do you agree that that paper demonstrated

14  that as a fact?

15  A    No, I do not.

16      MR. ROE: Okay.  I'm done.

17      MR. HO: No more questions from us.

18      THE VIDEOGRAPHER: Okay.  This deposition

19  is complete at 6:53 p.m.

20      (Whereupon, the deposition was concluded

21      at 6:53 p.m.)

22

23

24

25

---

Page 355

1      I, JESSE T. RICHMAN, PH.D., do hereby certify

2  that I have read the foregoing transcript of my

3  testimony and further certify that said transcript,

4  with the corrections noted below, is a true and

5  accurate transcript of said testimony.

6      Dated at _____ this _____ day of _____,

7  2017.

8

9

10          ERRATA SHEET

11  PAGE  LINE    CORRECTION        REASON FOR CHANGE

12  ____  ____  _____  _____

13  ____  ____  _____  _____

14  ____  ____  _____  _____

15  ____  ____  _____  _____

16  ____  ____  _____  _____

17  ____  ____  _____  _____

18  ____  ____  _____  _____

19  ____  ____  _____  _____

20  ____  ____  _____  _____

21  ____  ____  _____  _____

22  ____  ____  _____  _____

23  ____  ____  _____  _____

24  ____  ____  _____  _____

25

---

Page 356

1
2
3      _____

4          JESSE T. RICHMAN, PH.D.

5

6

7

8

9  COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

10

11

12      Subscribed and sworn to before me this _____

13  day of _____, 2017.

14

15

16

17

18

19      _____

20          Notary Public

21  MY COMMISSION EXPIRES:

22  _____

23

24

25

---

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

Page 357

1  COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2      I, Kerry E. Zahn, RMR-CRR, Notary Public for

3  the Commonwealth of Virginia at Large, of qualification

4  in the Circuit Court of the City of Norfolk, Virginia,

5  and whose commission expires March 31, 2021, do hereby

6  certify that the within named deponent, JESSE T.

7  RICHMAN, PH.D., appeared before me at Norfolk,

8  Virginia, as hereinbefore set forth, and after being

9  first duly sworn by me, was thereupon examined upon his

10  oath by counsel for the parties; that his examination

11  was recorded in Stenotype by me and reduced to computer

12  printout under my direction; and that the foregoing

13  constitutes a true, accurate and complete transcript of

14  such proceeding.

15      I further certify that I am not related to nor

16  otherwise associated with any counsel or party to this

17  proceeding, nor otherwise interested in the event

18  thereof.

19      Given under my hand and notarial seal this

20  26th day of April, 2017, at Norfolk, Virginia.

21

22

23

24  Kerry E. Zahn RMR-CRR
    Notary Registration No. 209810

25

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

## $

**$100 (2)**
9:24;10:22
**$250 (1)**
10:24

## A

**AAPOR (3)**
219:15,21;220:5
**A-A-P-O-R (1)**
220:6
**ability (1)**
201:4
**able (24)**
41:22;42:2;49:22;
53:8;62:19;73:17;
75:11;111:6;124:20;
134:14;181:1;190:4;
204:8;209:15,17;
222:8;226:12;233:18;
237:14,17;296:4,24;
333:13;334:24
**above (4)**
69:4;95:18;121:2;
326:13;330:18
**absence (2)**
283:13;300:9
**Absent (1)**
71:24
**absentee (2)**
53:7;190:3
**absolute (1)**
145:25
**absolutely (5)**
50:22;86:3;177:2;
218:6;288:15
**abstract (2)**
68:1;93:5
**abuse (5)**
128:11;129:12,22;
131:8,10
**abused (2)**
128:1;129:8
**academia (2)**
274:11,21
**academic (1)**
234:15
**accept (4)**
26:21;76:15;215:4;
291:22
**acceptable (2)**
214:19;227:6
**accepted (5)**
96:25;213:1;
215:21;275:1,3
**access (20)**
34:22;62:11,13;
65:23;103:19,23;
104:1,3;109:1;311:2;
317:2;322:13,18,23;

323:1;331:3,9;333:7,
20;337:10
**accessible (1)**
66:2
**accidental (1)**
51:9
**accidentally (1)**
260:6
**accomplish (1)**
290:21
**According (2)**
219:15;333:25
**accordingly (1)**
153:22
**account (13)**
38:12;101:2;
117:16;229:14;
232:14;237:11;
248:15;264:18;
278:16,20;282:22;
298:15;340:17
**accounted (4)**
123:6;196:6;276:1;
281:5
**accounts (3)**
47:20;48:2;110:15
**accuracy (3)**
20:16;22:3;292:23
**accurate (43)**
20:3,21;29:16;
38:10,23;39:19,21,23;
44:22;49:3;68:20;
88:12;105:9;107:17;
109:12;115:24;
125:12;128:3;131:23;
136:7;152:13;158:8;
160:6;164:19;169:22;
174:12;178:21;180:5;
183:18;188:16;
231:22;249:24;260:4;
272:10,19;275:25;
276:19;278:1;304:11;
313:11;314:5;315:1;
355:5
**accurately (7)**
126:18;140:4;
169:19;260:10;277:1,
2;313:8
**acquiring (1)**
323:2
**acronym (1)**
288:14
**across (13)**
41:10;43:1;46:3,16;
48:15;53:10;67:17,
20;79:11;204:1;
251:3;346:9;349:20
**ACS (1)**
80:4
**Act (4)**
61:15,20,22;62:1
**activity (3)**
91:24;189:16,17

**actual (11)**
91:9,10;93:17,19;
120:16;121:9;144:1;
255:11;257:17;
259:12;265:13
**actually (35)**
13:11;32:18;56:9;
64:22;68:14,16;
73:25;76:6;105:22,
23;135:22;159:18;
172:5;188:10;208:19,
25;210:3,6;211:14;
213:19;227:10;
236:21;239:14;
240:17,21;244:11,23;
255:2;256:5;258:8;
260:20;261:5;315:23;
345:11;346:6
**adapted (2)**
185:14,16
**add (11)**
13:13;69:24;75:1,
19;178:9;217:13;
218:2,7;259:10;
313:23;315:11
**added (1)**
33:24
**addition (4)**
116:4;132:11;
141:18;287:19
**additional (19)**
62:10;99:6,7;
100:25;121:14;
132:10;138:11,23;
142:21;285:3;290:17;
292:19;293:8;303:15;
314:20;325:3;330:18,
24;343:19
**address (9)**
22:7;61:12;128:21;
201:10;221:6;224:10;
233:22;324:12;
348:16
**addressed (2)**
133:18;214:3
**addresses (1)**
204:18
**addressing (3)**
221:16;277:19;
290:18
**adequate (1)**
98:3
**adjust (5)**
38:6;39:1,4;100:13;
214:5
**adjusting (2)**
142:22;321:3
**administration (3)**
129:16;337:18,21
**admission (2)**
91:23;343:25
**admitting (1)**
169:16

**adopting (1)**
108:8
**ads (1)**
109:2
**adult (10)**
114:19;137:25;
317:20,23;318:25;
319:3,14,18;321:1,8
**adults (4)**
144:9;145:1;
317:25;321:22
**advance (2)**
64:14,21
**advantage (1)**
104:24
**advantaged (1)**
74:12
**advocate (1)**
62:6
**affect (8)**
68:15;180:18;
187:6;201:4,13,15,16;
277:11
**affected (4)**
68:6;199:2;200:9;
205:17
**affecting (1)**
179:25
**affects (5)**
67:24;68:16;79:17,
19;200:10
**affiliation (1)**
43:2
**affirmative (1)**
316:13
**affirmatively (1)**
323:24
**African-American (1)**
333:22
**African-Americans (1)**
334:11
**Afternoon (1)**
157:1
**Again (33)**
7:18;41:9,17;42:8;
48:3;75:13;80:8;
111:2;116:23;117:2,
6,7;123:16;126:22;
127:16;129:17;
131:13;157:17;172:6;
173:8;174:1,4;175:4;
182:22;183:6;188:17;
190:15;196:8;198:11;
231:25;241:13;
280:21;298:22
**against (6)**
12:13;86:5,12,25;
110:22;113:22
**age (33)**
37:18;41:7,12;43:2;
206:5;229:14,16;
242:19;243:23,25;
253:2;282:16

**agencies (1)**
290:6
**ages (3)**
41:10,14;282:10
**aggravated (1)**
27:4
**aggregate (3)**
143:8;145:21;
149:17
**aggregated (1)**
217:5
**aggregates (5)**
112:1;141:3,15,17;
147:15
**aggregating (2)**
141:8;143:12
**aggregation (5)**
141:11;142:18;
143:19;149:6;202:8
**ago (13)**
8:16;13:15;16:5;
35:21;44:24;64:6;
116:14;154:2;188:18;
191:4;192:8;196:15;
215:1
**agree (27)**
64:12;65:10;92:25;
110:20;141:2;187:4;
199:1;203:11,18;
204:13,23;213:16;
266:20;278:18;279:9;
300:4,9,13,15;325:1,
7;326:7,16;330:14,
21;350:12;354:13
**agreed (1)**
45:19
**agreement (1)**
44:3
**Agresti (5)**
28:16;155:23;
160:20;161:9,12
**ahead (2)**
53:24;54:20
**aim (3)**
19:21;65:25;209:4
**aimed (3)**
24:6;138:11;277:19
**aims (1)**
141:6
**al (5)**
128:1;275:21,25;
350:13;354:12
**albeit (1)**
237:16
**Alex (1)**
58:21
**aliens (3)**
221:23,23,24
**aligned (2)**
62:2;346:19
**Allandra (2)**
47:23;48:5
**allow (3)**

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

62:10;251:5;290:21
**allowed (7)**
  53:1;70:3;87:16;
  109:9;110:10;251:4;
  283:17
**allowing (1)**
  60:17
**almost (14)**
  64:12;91:12;
  113:24;114:5,8;
  118:22;161:3;178:14,
  16,22;263:11;302:25;
  327:12;349:24
**along (1)**
  262:21
**alter (2)**
  125:2;180:13
**altered (4)**
  180:11;190:8;
  198:8,10
**alternate (1)**
  286:18
**alternative (1)**
  107:5
**Although (10)**
  86:23;153:20;
  172:1;179:6;225:19;
  265:18;293:18;315:3,
  5;333:1
**always (6)**
  69:7,7;89:4;91:19;
  223:13;335:1
**ambiguity (1)**
  93:16
**America (1)**
  77:12
**American (14)**
  15:20,21;16:2,3,8;
  25:13,17;79:9;
  100:20;137:24;
  144:11;191:21;
  219:13;250:8
**Among (24)**
  29:13;39:25;40:2;
  78:14;107:8;108:3;
  119:17;125:4;153:2;
  172:14;173:3,22;
  175:12;231:16;
  249:23;259:6,7;
  301:11;302:24;
  303:18;309:1;311:8;
  334:12;343:22
**amongst (7)**
  84:15;249:19,21;
  250:6;251:13;254:12;
  302:6
**amount (7)**
  185:2,5;186:19,20,
  24;221:4;280:24
**analyses (32)**
  13:1;20:12;21:1;
  24:18;26:12;28:10,
  10;121:14;128:20;

132:10,15,19,21;
  133:9,17;134:4;
  136:3;138:23;139:2;
  143:12;170:6;203:25;
  234:10;250:10;
  290:17;341:2;342:23;
  343:19;345:25;
  346:18;353:13,15
**analysis (82)**
  12:21,22;21:20;
  39:8;69:21;71:20;
  84:11;94:12;114:25;
  127:11;130:5,7,17,24;
  132:11,16;134:10;
  135:23;171:4,24;
  176:7;178:6,17;
  181:3,21;185:14;
  209:4;221:2;233:7;
  234:14;242:11,24;
  245:17;250:17;
  253:18,21;255:19;
  256:9,13;260:21;
  261:1;264:17;267:14,
  18;268:18;270:4;
  272:2;275:10;276:9,
  12;281:14;285:3,6;
  286:15;290:2,11,13,
  24;293:6,8,15,25;
  294:25;295:5;296:25;
  297:19;298:8,11,15;
  302:14;305:4,16,25;
  306:1,10,11;318:7,7,
  9;339:17;343:1,10
**analyze (4)**
  25:1;124:18;
  239:16;296:4
**analyzed (2)**
  54:16;239:23
**analyzing (3)**
  205:19;234:6;343:4
**and/or (1)**
  40:2
**Andrew (2)**
  51:25;64:5
**anecdotes (1)**
  109:25
**Angelo (1)**
  47:25
**anglophone (2)**
  46:13;48:6
**annual (1)**
  79:11
**annually (1)**
  19:19
**anonymity (6)**
  15:5;104:12,16,19,
  21;206:11
**anonymized (1)**
  103:20
**anonymous (1)**
  189:25
**Ans (1)**
  340:14

**Ansolabehere (57)**
  21:19,24;22:9;
  55:21;63:19;81:21;
  82:23;83:4,9,13,25;
  97:11;133:19;159:18;
  160:23;183:14;
  207:24;249:6;253:12;
  255:18;258:5;259:15;
  261:4,20;262:3,17;
  263:10;264:4,16;
  265:13,20;266:6,13,
  18;272:2;273:17;
  274:23;275:16,20,25;
  277:6,21;278:3;
  279:7;322:5;340:14;
  341:5;342:15,25;
  344:10,22;346:23;
  347:7;348:21,25;
  350:12;354:9
**Ansolabehere's (15)**
  22:20;84:14;156:6;
  164:2;249:1;262:10;
  264:9;266:4;305:16;
  318:6;340:5;345:15;
  349:6,13,23
**answered (14)**
  22:17;66:12;93:3;
  116:14;162:19;169:6;
  172:22;177:25;
  211:20;265:14;266:2;
  277:1,1;316:2
**anticipate (1)**
  45:22
**apart (1)**
  234:14
**apologize (2)**
  104:2;227:11
**apparently (3)**
  237:15;238:24;
  310:1
**appeal (3)**
  327:19;329:25;
  330:15
**appeals (8)**
  328:11,14,18;
  329:3,9;330:4,10,21
**appear (10)**
  22:8;38:7,9;199:19;
  217:23;259:8;268:23;
  277:20;304:1,2
**appearance (1)**
  225:4
**appeared (2)**
  46:7;240:6
**appears (14)**
  46:10;134:16;
  170:10;224:3,20;
  227:9;265:17,19;
  289:12,15,16;299:6;
  303:14;334:17
**appendix (2)**
  100:4;103:10
**applicants (3)**

200:22;288:17;
  327:5
**application (1)**
  210:16
**applied (14)**
  34:7,10;99:8,17;
  101:1;221:25;222:24;
  223:6;232:5;297:7,
  11;298:12;306:16;
  336:3
**applies (1)**
  338:21
**apply (16)**
  31:3;73:15;75:9;
  134:25;137:10;138:3;
  139:22;224:5;258:15;
  270:6;317:23;320:25;
  326:9;330:15;335:8,
  16
**applying (4)**
  37:25;46:3;98:25;
  298:18
**appointment (1)**
  13:23
**appreciate (2)**
  83:17;128:21
**appreciation (1)**
  129:2
**apprehend (1)**
  18:5
**approach (9)**
  74:3;97:8,12,12;
  107:5;156:11;291:21;
  299:25;339:15
**approaches (3)**
  20:10;154:14;204:2
**appropriate (29)**
  23:3;26:25;28:13;
  97:20;100:19;101:10;
  142:16;150:4,10,11,
  15;156:4;160:25;
  161:5,13,17,21,22,24;
  162:12,22;163:6;
  164:4;188:24;294:13;
  311:18,23;344:25;
  350:1
**appropriately (2)**
  99:17;138:20
**approximately (11)**
  14:6;147:11;
  148:25,25;149:14;
  230:4,14,15,17;288:4,
  6
**approximation (1)**
  91:9
**April (1)**
  168:20
**area (2)**
  19:5;79:24
**areas (1)**
  274:11
**arguably (8)**
  113:22;139:4;

144:13;161:17;
  162:17;179:23;
  184:14,19
**argue (4)**
  86:15;87:1;127:2;
  350:2
**argued (4)**
  65:14;176:21;
  179:13;202:3
**argument (20)**
  52:25;54:25;
  119:10;179:2;184:21;
  185:16;187:3;201:1;
  207:23;226:6;227:25;
  249:12,25;250:1;
  258:6;273:23;276:16;
  278:9;340:24;345:23
**argumentative (2)**
  55:11;227:12
**arguments (3)**
  38:15;118:9;201:8
**arise (3)**
  39:2;52:21;345:9
**arising (1)**
  225:16
**around (6)**
  23:3,7;26:13;27:17;
  87:15;308:20
**arrival (1)**
  277:10
**arrive (1)**
  317:24
**article (80)**
  15:5,6;16:11,13,16,
  19;25:6;26:1,19,22,
  24;51:21,23;52:2,6;
  53:12;57:9,10;60:9,
  11;76:4,12,15;77:16;
  82:14;84:18;87:24;
  88:1,4,20;95:23;
  96:19,21;97:1,4,14,
  19;98:12;100:12;
  101:15,24;106:18,22;
  121:12;126:14,23;
  129:6,6;168:14;
  169:5,11;170:12;
  173:5;175:23;177:19,
  20;178:12;181:3;
  188:25;189:7;215:5,
  19;251:22;255:21;
  256:4,10;257:23;
  258:2;259:18,24;
  261:24;262:2,5,10;
  263:22;268:25;
  273:10,17,24;291:23
**articles (9)**
  14:4;16:17;26:7,16;
  69:20;150:8,18;
  216:4,10
**articulate (2)**
  125:25;332:19
**articulated (12)**
  73:19;86:3;95:16;

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

107:22;125:25;130:2;
191:3;199:5;276:21;
277:7;335:5;342:19
**ascertain (1)**
331:4
**aside (6)**
78:4;80:9;139:16;
142:7;148:8;164:1
**aspect (4)**
34:18;46:12;87:6;
89:10
**aspects (3)**
79:10;108:19;
283:15
**assert (1)**
344:5
**asserted (4)**
56:13;241:3;254:9;
267:6
**asserting (3)**
210:12,22;349:24
**assertion (2)**
226:17;286:8
**assertions (1)**
343:17
**assess (25)**
14:15;15:2;17:6;
20:2,20;21:5;25:16,
23;27:23;34:18,21;
39:15;43:13;49:15;
50:15;67:23;69:12;
70:9,24;72:12;79:4,
10;204:5;209:5;
292:23
**assessed (3)**
15:6;72:9;349:15
**assessing (7)**
18:1;23:4;68:10;
85:20;267:21;271:4;
319:21
**assessment (9)**
48:4;68:20;69:6,8;
70:4;72:8;160:7;
258:21;267:4
**assist (1)**
44:13
**assisted (1)**
44:7
**associate (1)**
13:18
**associated (12)**
10:24;67:16;76:23;
79:25;86:9;107:8;
108:22;171:1,10;
235:21;283:15;
352:23
**association (7)**
111:2;219:14;
250:15,15;347:9;
353:13,16
**assume (6)**
138:16;144:25;
221:12;278:13;309:8;

349:25
**assumed (2)**
34:12;262:19
**assumes (1)**
278:12
**assuming (10)**
73:12;145:25;
160:24;163:19;168:3;
220:18;279:7;295:19;
304:10;341:4
**assumption (5)**
161:2;349:14,17,
21;350:23
**assumptions (4)**
162:3;343:5,7;
349:20
**assurance (1)**
139:5
**assurances (2)**
105:22;207:1
**attached (2)**
272:1;290:20
**attachment (3)**
213:4;258:25;
266:23
**attachments (3)**
11:21;262:1;290:20
**attempt (9)**
22:6;23:2,16;81:19;
178:24;179:1;207:16;
212:10;236:7
**attempted (74)**
17:7;33:8;110:7;
134:2;135:16;136:1,
7;137:1,14,15;138:5;
139:21;143:21;
145:20;147:17;
148:13,19;149:4,20;
151:8;152:20;153:8;
157:25;158:20,24;
164:8,22;165:2,5,25;
166:5,10;173:24;
174:25;207:5,14,17;
208:5,6,18;209:11;
210:7,25;212:4,5,8;
229:20,25;236:5;
237:21;238:1;239:14;
240:5,16,24;241:4;
244:7;245:23;247:22;
248:4,11;277:20,23;
280:12,15,23;285:1;
287:4;288:1;301:3,
13;321:12;344:8,10
**attempting (10)**
11:9;87:21;133:23;
146:18;179:11;
184:13,18;209:6;
214:20;252:11
**attempts (10)**
24:1,11;68:19;69:9;
81:25;86:25;203:21;
205:15;239:5;344:4
**attend (2)**

285:23;339:20
**attention (2)**
201:18;216:3
**attest (3)**
338:22;339:1,4
**Attorney (1)**
330:16
**attributed (5)**
118:18,21;119:6;
120:8;131:6
**audience (1)**
19:18
**author (2)**
15:5;291:23
**authored (1)**
122:10
**authors (2)**
15:8;21:2
**automated (1)**
326:21
**available (30)**
17:3;40:8,13,14,21,
25;41:5,13;61:1;
64:22;65:7;74:5,7,10,
23,25;77:7,25;81:4;
116:8;121:17;128:4;
223:22;234:22;
243:20;281:21;298:3;
300:20;327:4,18
**avoided (1)**
333:1
**awaiting (1)**
19:24
**aware (30)**
8:10;46:22;63:24;
97:9;109:25;119:4;
120:5,9;135:19;
146:22;200:25;201:6;
225:21;227:14;228:1;
236:23;239:21;250:4;
251:11,16;253:11;
300:25;303:7;328:11,
14;329:9;333:3,25;
334:3;344:13
**awareness (9)**
107:13;108:3;
109:13,22;110:2,22;
111:1;250:25;329:11

## B

**back (37)**
12:13;50:11;53:13;
57:5;86:5,11,25;88:6;
92:14;94:8;95:23;
98:11;112:13,24;
131:20;157:13;169:1;
184:1;191:21;192:6;
205:21;210:8;213:13;
228:19;259:19;
268:19;280:2;301:6;
314:19;322:7;327:9;
336:23;350:7;351:18,

25;354:1,5
**background (4)**
19:5;84:6,10;
202:17
**backups (1)**
75:4
**bad (3)**
300:13,15;338:17
**badly (4)**
275:23;276:8,13;
312:1
**balance (1)**
81:19
**balancing (2)**
65:20;66:3
**ballot (8)**
53:7;62:11,13;
65:23;125:1;135:22;
189:24;190:9
**ballots (1)**
190:4
**banner (1)**
329:13
**Barrack (1)**
119:20
**barred (1)**
195:24
**barriers (2)**
107:14;250:25
**base (2)**
202:20;350:2
**based (132)**
19:15;21:1,4;24:16;
25:18;26:1;27:22;
33:18,19;38:11;
47:13;58:2;63:6;
75:12;76:23;78:7;
79:19;82:18;85:16;
89:13;90:13;96:8;
100:11;106:23;
108:21;113:15;
114:11;118:14;
120:14;124:8;125:23;
126:2,6,25;131:24;
133:12;144:10;
146:19;149:5;151:8,
11;152:14;158:12;
160:23;164:9,15;
165:15;166:20;
167:18,21;168:6;
170:12,23;171:7,8;
172:16;173:6,25;
174:9,11,13;175:11,
15;182:15,20;183:1;
203:12;204:6;205:2,
16;215:20;216:7;
219:8;226:6,6;
229:10,20;231:8;
233:17;237:10;
241:15;245:10,17,19,
25;247:3,13;250:3;
253:7,7;257:15;
258:16;260:21;

261:13;262:9;269:16;
272:11;276:9,12;
278:21;279:5;280:13;
281:4;284:24;285:5,
6,13;286:19;287:7,9,
14,15,24;304:7;
313:1;317:6;318:18;
319:20,22;327:19;
328:2;332:11;334:15;
335:2;337:7;339:22;
341:2,4;345:21;
347:12;349:14,17
**baseless (1)**
128:19
**baseline (1)**
287:19
**basic (7)**
7:5;26:12;36:5;
77:17;78:12;138:16;
154:17
**basically (1)**
77:18
**basis (47)**
15:6;18:1;37:12;
39:8;43:6;44:3;48:4;
49:14;62:15;100:8;
135:7;138:18;176:24;
183:16;216:11;219:5,
12;220:18;221:2;
222:16,17;240:20,25;
249:23;250:6;251:12,
23;252:6,7,23;271:6,
11;272:8,15;273:23;
274:1;282:25;286:13;
289:9;290:4,10;
295:19;297:15;304:2,
25;325:17;344:21
**bathroom (1)**
112:18
**battle (1)**
128:18
**bear (2)**
138:8;345:12
**became (5)**
73:1;109:21;223:14
**become (4)**
208:9;227:14;
252:18;320:15
**becomes (1)**
121:16
**began (3)**
11:12;295:22;
339:20
**beginning (2)**
131:19;135:18
**begun (1)**
285:23
**behalf (2)**
6:2,19
**belief (7)**
222:16,17,18;
260:17;265:17,19;
311:25

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

**believes (2)**
  265:13;342:21
**believing (2)**
  271:7;272:16
**below (5)**
  171:19;213:23;
  252:16;348:7;355:4
**Ben (1)**
  63:16
**benefits (1)**
  54:7
**Besides (2)**
  108:8;129:6
**best (18)**
  15:2;29:18,24;32:6;
  101:15,20;124:12;
  175:24;176:4;177:18,
  22;178:3;233:19;
  264:24;271:2;292:20;
  295:18,18
**better (4)**
  32:18;73:21;77:6;
  105:4
**beyond (12)**
  69:4;103:20;
  128:24;176:6;201:20;
  271:7,11;272:15;
  294:4;326:13;330:18;
  343:13
**bias (16)**
  31:11;75:23;
  113:22;139:14,15;
  214:11,15,18,22;
  225:16,18;259:12;
  319:15,25;320:22;
  322:5
**biased (7)**
  139:6;204:20;
  205:20;214:13;246:9;
  255:5,6
**biases (1)**
  93:9
**binomial (5)**
  28:12;93:24;95:15;
  343:5;350:5
**birth (15)**
  233:22;282:9;
  311:13;312:10,13;
  313:22;314:10;315:3;
  317:10;325:15;326:3,
  9,21,25;327:6
**Bissette (1)**
  312:17
**bit (23)**
  8:13,19;10:9;29:1;
  60:23;67:3;83:14;
  87:8;93:24;105:1;
  131:20;140:11;
  161:15;162:16;
  203:10;205:4;211:6;
  251:3,6;258:20;
  279:14;308:21;349:5
**black (3)**

**blank (1)**
  145:13
**blinded (1)**
  14:14
**blog (23)**
  12:12;86:10;106:9,
  10,16,20;111:12;
  113:5,14;115:12;
  117:23;120:10,22;
  122:4,10;127:17;
  128:15;227:17;
  256:22;257:11;261:5;
  269:1;299:5
**board (2)**
  15:18;17:16
**book (4)**
  8:17;228:18;274:7,
  19
**born (12)**
  67:17;265:2,3,6;
  317:11,17;318:3;
  321:11,24;325:13,14;
  326:3
**borrowed (1)**
  8:16
**both (33)**
  21:23;35:15;38:2;
  43:10,17,18;44:2;
  45:19;66:1;70:1;
  89:13;90:2,24;92:24;
  96:7;111:7;125:24;
  132:8;150:18;205:8;
  207:15;208:4;266:24;
  271:5;281:19;286:8;
  289:17;296:17;
  302:24;304:10;
  311:23;344:13;347:8
**bother (1)**
  193:23
**bottom (8)**
  29:9;47:14;122:17;
  131:15;148:1;151:6;
  158:14;164:13
**bound (3)**
  148:12;149:3,20
**bounds (1)**
  143:11
**box (6)**
  110:8,11;262:13;
  263:14;265:14;
  273:20
**break (15)**
  7:22,25;56:24;
  112:13,20;113:2;
  131:17;156:13;213:7;
  217:8;279:17;296:16;
  336:15,16;353:21
**breakdown (3)**
  216:14;284:2;
  331:11
**breakfast (2)**
  8:23;9:9

**Brian (4)**
  21:24;22:5;82:23;
  261:21
**briefly (1)**
  159:19
**bring (1)**
  17:2
**bringing (1)**
  138:8
**Brittani (1)**
  216:15
**broad (5)**
  66:5;67:2;190:22;
  268:22;293:19
**broader (8)**
  41:25;92:14;98:19;
  138:17;201:22;
  221:14;291:15;
  304:13
**broadly (7)**
  11:13;53:14;66:16;
  67:17;130:16;162:5;
  233:15
**broken (2)**
  135:7;288:21
**brought (1)**
  23:5
**Bryan (8)**
  239:21;265:22;
  300:25;301:12;303:7,
  18;304:13;354:9
**building (1)**
  272:2
**bullet (3)**
  118:5;120:11;121:3
**busy (2)**
  130:24;217:23
**buttons (1)**
  146:14

**C**

**Cage (2)**
  106:10;261:5
**calculate (25)**
  89:7;93:11,14;95:1;
  96:18;137:16;143:25;
  148:8;154:7,23;
  159:8;161:13;162:4,
  13;168:8;181:24;
  182:10;183:23;
  197:18;219:7,11;
  220:13;282:10;
  309:14,22
**calculated (18)**
  87:25;88:20;
  133:15;149:24;153:1;
  155:18;156:2;176:6;
  182:2,12,14,19,25;
  183:12,20;220:15;
  237:9;350:6
**calculating (40)**
  28:1,5,16,21;93:21;

  96:22;97:2,5,16,21;
  98:3;7;144:1,3;150:4,
  12;154:13,14;155:19;
  156:4,9;158:1;
  160:18;161:5,8,10;
  162:23;163:1,7;
  164:7;165:14;166:8;
  167:15;183:9,16;
  218:24;220:7;262:18;
  310:5;350:4
**calculation (11)**
  31:12,19;32:16;
  44:3;139:24;140:3,
  10;165:4;218:20;
  310:13;318:8
**calculations (8)**
  26:9;28:13;31:23;
  146:11;153:25;164:2;
  170:18;219:13
**calculator (8)**
  30:19;139:25;
  140:7;146:3,12;
  168:2;230:7;280:20
**California (3)**
  195:3,4,17
**call (5)**
  160:10;207:21;
  216:20;217:2;308:2;
  328:8
**call-back (1)**
  217:18
**called (3)**
  134:24;151:20;
  168:15
**calling (4)**
  29:20;76:11;213:4;
  243:19
**calls (8)**
  48:9;83:7;84:3;
  217:14;218:9,10;
  303:25;304:3
**came (6)**
  48:15;148:3;
  185:13;194:20;
  291:11;316:11
**campaign (2)**
  108:15,24
**can (113)**
  8:1;12:3;20:5,6;
  25:5;26:14;37:21;
  51:15;52:21;53:24;
  56:24;57:21,25;
  58:14;60:12;64:20;
  65:11,12;66:9,25;
  68:2;69:6;73:21;
  74:24;75:15;77:22;
  78:16;79:18;80:20;
  82:6;84:19,22;95:9;
  98:19;105:25;113:21;
  118:18,21;120:7;
  125:7;129:7,14;
  131:6;138:15;139:5,
  12,25;140:12,20;

  148:22;150:25;158:9;
  168:1;178:19;179:15;
  180:4,5,13;182:13,18,
  24;184:10,22;185:4;
  188:23;189:10,25;
  190:21,24;191:16,21;
  192:1,5;198:13,13;
  199:6,14;204:3;
  205:13;213:7;215:19;
  220:3;226:10,14;
  228:11,19,22;242:4;
  248:17;259:20;
  261:11;263:4,19;
  274:3,14;289:8;
  309:20,20;313:8;
  315:6,20;316:21;
  317:15;321:9;325:15;
  326:6;332:18;336:15;
  337:24;338:5,13;
  345:21;353:20
**candidate (2)**
  195:4;198:5
**candidates (5)**
  113:23;119:16,17,
  25;125:4
**capacity (7)**
  19:3;173:9;206:25;
  234:15;272:23;
  277:24;334:14
**capital (1)**
  25:20
**Capitol (3)**
  18:6;60:2,7
**caps (3)**
  122:24,24;123:25
**capture (1)**
  176:20
**card (2)**
  61:9;134:24
**cards (6)**
  225:8;226:15,18;
  227:21;228:3,14
**care (1)**
  124:21
**careful (3)**
  109:5;127:10;
  205:19
**carefully (1)**
  126:23
**Carolina (2)**
  115:14;116:25
**Carter-Baker (3)**
  185:8,12;186:22
**case (120)**
  8:14;9:20;10:5,12;
  11:4;17:2,4,5,9,19,22,
  25;18:2,6,13,16,19;
  21:11,14;22:18;
  23:20;24:5,5,10,15;
  27:3;28:24;33:21;
  37:1;38:17,24,24;
  40:17;41:23;42:1;
  47:12,21;50:6,10;

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

53:23;59:5;65:14;
74:1,23;75:21;87:11;
90:10;92:20;93:18;
102:1;110:4,13,16;
117:3,5;118:23;
131:21;136:14,17;
140:18;147:2;154:4;
161:14,20,24;162:24;
170:9,11;171:12;
175:21;183:19;184:2;
185:16,17;193:20;
195:1;196:16;198:1;
200:14,18;201:2,3,8,
12,15;206:23,24;
208:2;211:14,20;
214:18;222:7;223:13,
15,20,23;229:9,12;
234:14,25;235:3;
243:15;245:16;
246:11;247:6;249:2;
251:18;252:3;256:14;
258:18;272:17;
275:11;279:6;312:4;
316:1;328:13;332:16;
335:3;342:5;351:6
**cases (21)**
12:2;28:11;43:18,
19;77:16,18;93:17;
95:18;109:17;137:4;
152:1;192:9,11;
196:25;197:24;198:3;
202:18;232:21;
301:19;303:23;
324:25
**Caskey (7)**
239:21;300:25;
301:12;302:21;303:7,
19;306:10
**Caskey's (6)**
240:6,10,12;
301:16;303:22;
304:13
**cast (11)**
96:5,7;107:10,12;
119:18;135:22;187:5,
5;205:9;250:21;
346:12
**casts (1)**
189:25
**catalyst (1)**
89:16
**categories (12)**
49:9;207:19;
208:22;209:18;
218:19;277:8;331:12,
24,25;332:2,2,11
**category (9)**
135:6;197:1;241:2;
243:25;296:5;308:5;
324:16;325:25;
333:16
**cause (3)**
56:5;187:15;189:3

**caused (1)**
211:10
**caution (1)**
127:9
**cautious (1)**
125:8
**caveat (2)**
238:23;259:9
**caveats (1)**
153:23
**CCC (1)**
133:4
**CCES (114)**
21:2,18,20,22;80:4;
82:19,21,22;87:9;
98:23,25;99:5,9;
100:3,11,18;101:3,12;
106:24;110:21;
111:23;113:15;
119:24;124:20;
130:11;131:24;133:4;
166:20,23,25;167:4,
18;168:6;171:7,13;
172:16;173:1;176:23;
182:15;203:25;205:7;
226:3;244:15;246:15;
247:13;248:17;249:7,
20;250:4;251:23,25;
252:5,7,22;253:1,7,
13,15,21,25;254:16;
255:9,16;256:5,16;
258:17;260:13,19,21;
262:12;263:10,12,13;
264:17,21;265:10;
266:14;267:8,20,21,
22,25;268:8,10,21,22,
23;269:16,18,19;
270:4,6,8;271:25;
272:17;273:19;
275:24;276:10,18;
277:4,23;278:4,6,19,
22;279:9;342:23;
343:18;345:14;346:5;
347:2,25;348:18;
351:18
**CCES-based (7)**
245:8;246:24;
248:2;254:3;271:11,
18;272:13
**census (3)**
283:2,11;334:1
**Center (1)**
19:1
**century (1)**
192:1
**ceremonies (6)**
246:1;282:7;283:6;
285:23;286:16;
339:21
**ceremony (5)**
136:21;246:4;
281:19;282:2;287:11
**certain (26)**

11:17;50:22,24;
66:22;88:10;90:7;
98:17;114:16,17;
134:16,16;154:3;
177:3;182:17,23;
183:3;190:6;218:6;
227:17;269:8;270:1;
288:15;295:16;
311:21;328:16;347:1
**Certainly (10)**
25:12;29:4;107:2;
109:6;110:16;111:1;
129:16;254:15;
269:12;323:1
**certainty (5)**
72:1;190:12;
198:15;204:3;254:14
**certificate (13)**
311:13;312:10,14;
313:22;314:11,12;
315:4,4;317:10;
326:9,21,25;327:6
**certificates (2)**
325:15;326:3
**certify (2)**
355:1,3
**chain (1)**
348:7
**challenge (2)**
70:6;108:15
**challenges (3)**
129:2;198:11;234:8
**challenging (3)**
68:20;102:3;324:25
**chance (3)**
125:6;130:11;
294:17
**change (5)**
85:1;115:4;179:22;
230:20;355:11
**changed (4)**
69:24;114:23;
115:8;202:6
**changes (2)**
70:6;124:23
**changing (1)**
179:17
**characteristics (5)**
40:21;41:18;101:9;
214:6;221:4
**characterization (1)**
278:1
**characterize (1)**
285:2
**charge (3)**
10:23;11:6;135:24
**chart (3)**
158:6,14;159:2
**Chattha (4)**
82:10;275:12;
344:6;345:8
**check (12)**
14:23;30:2;239:11;

240:3;243:11;244:10;
255:14;267:24;
305:22;306:8;336:17;
353:21
**checked (2)**
204:9;305:20
**checking (2)**
110:8,11
**cherry (3)**
128:9;261:18;342:7
**cherry-pick (1)**
128:2
**choice (3)**
150:10,12;323:7
**choices (1)**
84:7
**choose (4)**
40:5;41:7,15;246:4
**choosing (1)**
36:16
**chose (3)**
40:11,12;245:25
**circulation (1)**
86:11
**circumstance (2)**
235:5;328:6
**circumstances (5)**
8:1,2;33:24;64:18;
134:18
**citations (3)**
63:6,9;150:7
**cite (12)**
105:25;185:8,11;
187:25;192:23;193:1;
194:25;226:19;
227:19,23;228:7,8
**cited (9)**
58:24;63:7;69:20;
126:15;129:14;
150:17;261:25;344:6;
352:8
**cites (2)**
169:1;273:24
**citing (3)**
129:10,19;131:4
**citizen (26)**
22:3;49:8,12;
109:19,21;110:11;
204:15;211:23;221:4;
264:25;265:1;275:24;
277:16;300:3;317:23,
25;318:25;319:15,18;
321:1,22;330:16;
338:23;339:5;340:18,
20
**citizens (85)**
34:21;61:2,9;72:20,
23;85:25,25;102:2,
18;107:7;109:8;
137:6;141:22;142:15,
15;195:9;241:21;
246:17,17;250:11;
258:9;259:8,13;

260:6,20;261:1;
262:13;263:15;
265:13;266:8,8,15,16;
267:7;273:20;276:3;
277:2,18;278:15;
308:24;310:23;311:1,
9;314:3,9;315:12,18;
316:20;317:2,9,14,21,
22;319:14,17;320:13,
21,25;321:8;322:11;
331:1,6,17,20;332:4,
6,9,23;333:1,19;
334:12;338:12;339:1;
340:25;341:6;345:11;
346:6,8,15,15,22;
351:22;352:5,17;
353:3
**citizenship (93)**
21:15;22:19;23:4,8,
21;24:1,7,12;33:7,17;
34:6,23;49:6,14;50:5;
51:1;87:18;102:20;
108:9;152:11;200:15,
21;203:19;210:15;
225:5;234:15;236:8;
238:14;239:7;241:10;
260:7;264:19;265:9;
268:1,8,13,14;270:13,
16;271:4;276:18,19;
277:4;278:20;279:8;
289:5;295:23;305:23;
311:2;315:7,14,19,20;
316:4,17,22;317:4,15,
16;318:1,2,14;319:6,
23;320:14;321:9,23;
322:14,22,24;323:14,
24;324:6,10;325:2;
326:8,10;327:19;
328:5;330:1,11;
331:3,10;332:8;
333:8,21;334:14;
337:10,14,24;341:1,
10;344:2
**City (4)**
194:15;195:3,7,18
**claim (13)**
27:7;86:8,21;
122:25;123:25;
124:16;157:7;168:24;
200:18;201:12;
275:25;276:3;346:1
**claimed (3)**
195:6;237:25;
277:21
**claiming (1)**
342:11
**claims (4)**
168:25;178:18;
342:15,18
**clarification (1)**
116:15
**clarify (7)**
32:6;33:3;80:21;

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

172:9;199:25;200:12;
232:22
**class (2)**
77:8;190:22
**classes (2)**
24:24;234:23
**classic (1)**
207:24
**clear (14)**
13:21;38:17;96:17;
100:10;110:13;119:7;
127:5;149:17;160:16;
177:15;181:23;
206:13;223:25;255:8
**clearly (3)**
95:19;180:9;184:20
**clicked (2)**
262:13;273:20
**clicking (2)**
263:14;265:14
**Clinton (3)**
117:17;118:10;
119:1
**Clinton's (1)**
118:16
**close (25)**
33:3;86:15;95:21;
114:10,21;120:18;
148:2;153:14;155:15;
159:21,22;180:6,9;
185:1;197:7,15;
198:22;199:5,14,17;
202:4,19;216:3;
257:19;288:23
**closely (1)**
42:10
**closeness (2)**
201:22;202:21
**closer (3)**
92:3;101:10;121:19
**closest (1)**
115:2
**clues (1)**
98:19
**co- (1)**
21:24
**coalitions (1)**
77:13
**co-associated (1)**
69:2
**coastal (1)**
75:3
**co-author (2)**
23:10;24:2
**co-authored (3)**
106:9;118:7;262:3
**co-authors (2)**
180:7;259:15
**co-counsel (2)**
336:17;341:13
**code (11)**
43:4,21,21;45:21,
24;48:12,16,19;298:5,

7;331:15
**coded (18)**
43:18,19,23,25;
44:2,4,5,5,6;45:9,10;
47:15,16,23,24;48:11,
14,23
**coders (1)**
47:16
**codes (2)**
298:4,4
**coding (9)**
43:16;44:20;45:12,
13;46:11,14,19;47:12,
22
**coefficient (1)**
94:2
**cogent (7)**
120:15;257:16;
258:3,12,15;262:6,7
**Coleman (1)**
116:11
**collaboration (1)**
35:25
**colleague (1)**
274:17
**colleagues (2)**
21:20;83:18
**collects (1)**
313:6
**College (8)**
51:15;52:24,25;
53:1;107:10,11;
109:19;115:15
**column (23)**
45:14,16;60:15;
62:17,24;84:22;85:6;
95:25;96:2;98:12;
101:16,25;103:1,7;
138:24;143:1,2,5;
160:3,10;217:14;
218:8;259:25
**columns (1)**
143:10
**combinations (1)**
279:6
**combine (1)**
124:9
**comfort (1)**
105:2
**comfortable (1)**
320:10
**coming (4)**
59:17;202:16;
259:1;268:19
**Commission (5)**
185:9,12;186:22;
194:3,5
**common (5)**
41:11;48:6;265:23;
311:12;347:15
**communicate (1)**
86:18
**Communication (2)**

129:1,3
**communities (1)**
79:11
**community (7)**
22:10;79:9;83:17;
100:20;137:24;
144:11;277:22
**company (2)**
206:16;308:4
**comparable (1)**
70:2
**comparatively (1)**
334:10
**comparators (1)**
346:9
**compare (4)**
21:4;69:14;283:20;
292:7
**compared (6)**
20:19;85:14,24;
281:7;282:24;330:22
**comparing (4)**
71:4;72:2;271:23;
290:2
**comparison (4)**
70:17;71:15;
239:17;302:10
**compensated (2)**
9:22,24
**compensation (2)**
10:14,22
**competing (1)**
187:10
**compiled (3)**
158:7;197:13;
202:25
**complete (5)**
34:4;152:3;241:9;
306:10;354:19
**completed (6)**
151:17;217:19;
218:15;237:21;
286:16;328:12
**completely (1)**
103:20
**completeness (2)**
181:19;306:3
**completing (4)**
104:14,18;181:25;
210:16
**comply (5)**
65:11;66:8,25;68:2;
326:10
**Complying (4)**
148:23;151:4;
184:23;324:21
**comported (1)**
96:25
**composed (2)**
221:22;301:18
**composition (1)**
38:13
**compound (1)**

161:25
**compromise (1)**
206:25
**Compton (2)**
195:17,17
**computed (1)**
178:3
**computer (1)**
219:1
**con (4)**
61:4;168:8;206:22;
276:15
**conceiving (1)**
270:4
**concentrated (3)**
67:19;319:7;343:22
**concept (1)**
90:14
**concern (13)**
31:8;43:7;71:19;
99:25;104:8,10;
127:25;186:5;213:21;
214:1;215:2;221:16;
293:18
**concerned (1)**
91:20
**concerning (13)**
15:7;17:6;20:16;
58:4;97:11;141:23;
184:21;210:14;
211:10;222:4;260:8,
23;266:1
**concerns (3)**
233:25;234:5;
293:19
**conclude (2)**
73:17;95:17
**concluded (2)**
9:10;354:20
**conclusion (19)**
57:13,17;71:11,14;
83:8;84:4;127:9;
147:24;176:17;
184:12;247:8,15,17;
268:18;269:16,22;
271:20;272:14,22
**conclusions (7)**
12:23;74:24;162:5;
169:18;175:5;263:1;
272:13
**conclusively (1)**
191:6
**concrete (2)**
111:6;226:2
**conditioned (1)**
176:23
**conduct (6)**
34:13;35:1,6;
104:20;226:22;
234:13
**conducted (13)**
19:2;21:2;24:18;
35:4;43:10,16;82:25;

83:1;203:24;235:7;
292:24;307:5;328:19
**conducting (3)**
93:25;142:17;
206:19
**conference (5)**
21:25;265:21;
328:8;347:9,10
**confidence (160)**
27:1,5,7,10,14,22,
24;28:2,6,8,13,17,21;
71:11,14;81:19,23;
85:18;88:2,9,11,13,
16,21,24,25;89:5,7,8;
90:11,12;92:15,16;
93:12,15,21,23;94:5,
6,13,15,16,17;95:2,
10,12,19;96:8;
125:10;143:11,11,15;
152:16;153:1;154:8,
9,13,13,15,15,20,23;
155:2,5,11,15;156:9;
157:2;159:3,7,13,16,
17,21,25;160:2,4,11,
18,24;161:6,8,10,13;
162:4,5,13,16,18,23;
163:1,4,5,8,9,24;
164:2,7;165:4,10,14,
16;166:14;167:15,16,
21;168:9;170:25;
171:3,16,17,21,21;
175:20;181:10,13,15,
22,24;182:3,7,11,14,
19,25;183:9,11,13,17,
20,24;205:10,14;
230:20,25;231:3,7;
244:24;245:7,9,14;
248:18,19,20,21;
262:19;308:20;
309:15;310:7,10;
334:21;342:8,9;
349:5,6,7,13,19;
350:4,5
**confident (8)**
12:3;29:22;91:13,
16;95:13;183:11;
214:21;255:2
**confidentiality (14)**
103:12,22;104:13,
16,20,22;105:5,9;
206:11,20;234:1,21;
235:11,20
**confirm (6)**
49:2;50:5;196:11;
233:18;235:19;
268:12
**confirmed (4)**
174:24;187:15;
189:3;343:2
**confirms (1)**
11:21
**confront (1)**
99:4

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

**confused (1)**
262:16
**confusing (1)**
140:6
**Congress (2)**
25:15,19
**Congressional (5)**
11:16;59:17;82:19;
83:1;118:15
**conjunction (2)**
25:22;36:9
**connected (1)**
300:23
**connection (2)**
17:18;179:7
**Connections (2)**
60:2,8
**consent (1)**
298:25
**consequently (8)**
154:5;170:24;
171:11;172:25;
175:20;179:23;
187:16;334:16
**conservative (17)**
89:14,20,22;90:7,
18;91:25;96:5;126:3,
5,9,10;162:18;163:2,
4;279:4;286:10,12
**consider (8)**
37:13;72:2;83:4,21,
25;214:19;292:1;
298:16
**considerations (2)**
236:3;271:22
**considered (4)**
179:13;215:11;
218:23;344:12
**consistent (9)**
130:16;206:18;
235:10,19;267:1,25;
268:7;269:18;323:2
**consists (3)**
142:14;223:5;
270:20
**constitute (5)**
128:11;129:12,22;
131:7;330:18
**constituted (1)**
71:6
**constitutes (2)**
32:10;325:2
**construct (4)**
94:13;252:11;
283:8,17
**constructed (2)**
93:8;127:6
**constructing (2)**
187:10;252:18
**construction (3)**
18:14;33:14;83:15
**constructive (1)**
344:24

**consulted (1)**
36:19
**consumers (1)**
127:11
**contact (4)**
72:23;151:16;
204:7;309:3
**contacted (12)**
132:3;133:6;152:3,
10;173:6;177:6;
181:17;242:13;
243:18;307:9,24;
308:1
**contacts (3)**
80:4;151:12;161:17
**contained (1)**
233:21
**content (2)**
265:24;347:16
**contest (1)**
116:25
**context (65)**
17:3,5;20:22;25:1;
26:24;35:6;49:13;
53:9;61:5,13;67:14;
68:9,13;73:20;74:8,
16;75:14;76:18,25;
77:21;79:24;80:2,6;
81:5,10;82:3;89:12;
93:6;95:15;103:18;
104:14;150:9;169:25;
173:19;174:15,20;
179:14;180:3;181:11;
186:4;189:4;190:3;
191:5;192:16;205:5,
12;206:22,24;225:15;
227:13;234:25;235:3;
251:14,15,17,22;
276:15;285:20,20;
292:4;294:14;299:10;
305:16;309:10;353:2
**context-dependent (2)**
64:17;79:15
**contexts (8)**
26:16;67:15,21;
74:22;86:4;129:16;
134:17;343:24
**contextualizing (1)**
129:18
**contextually (1)**
68:3
**contingent (1)**
67:3
**continue (3)**
23:15;188:10;
224:21
**continued (2)**
233:10,20
**continues (3)**
157:21;287:1;
327:14
**continuing (1)**
23:16

**contracted (2)**
36:7;206:16
**contradictory (2)**
90:2;208:10
**contrary (1)**
346:22
**contribute (5)**
110:2;199:14;
260:8,22;261:2
**contributed (1)**
198:16
**contributing (2)**
109:14;110:23
**contribution (1)**
344:24
**control (5)**
40:6;41:8;68:22;
71:23,24
**controlled (1)**
42:7
**controversy (1)**
108:2;299:6
**conventional (3)**
88:18;97:8,12
**Conventionally (1)**
94:19
**conventions (1)**
59:22
**conversation (3)**
210:20;270:11;
347:12
**conversations (3)**
35:20;317:6;328:3
**conversely (1)**
332:24
**convey (1)**
115:10
**cooperation (1)**
290:6
**Cooperative (3)**
11:16;82:18;118:15
**copies (3)**
9:18;14:14;22:14
**copy (9)**
22:4;60:7;130:10;
259:20;275:6;298:2;
303:22;347:17,18
**corollary (4)**
312:11,16;314:8;
315:17
**CORRECTION (1)**
355:11
**corrections (1)**
355:4
**correctly (31)**
31:24;42:3,9;52:18;
96:11;102:4,10;
107:15;111:20;114:2;
115:22;118:12;121:7;
128:5;159:24;181:6;
184:15;185:6;199:24;
203:16;207:8;222:1,
2;225:9;265:7;266:2,

10;276:4;293:12;
311:15;322:15
**correlated (1)**
68:21
**cost (7)**
53:4;55:1;65:12;
325:8;326:17,23;
330:22
**cost-of-voting (1)**
63:21
**costs (17)**
52:9,16,20,21;
53:15,16;54:7,10;
66:6,9,25;67:16;
102:2,12,13,18;
190:10
**Council (2)**
195:3,18
**counsel (6)**
6:4;9:6;22:24;92:8;
341:13;351:20
**count (6)**
14:6;19:8;89:14;
157:10;169:7;273:15
**counties (14)**
69:21,23,24;70:2,
18;108:5;132:14;
142:5,6;186:2;
282:23;283:4;307:6,
25
**countries (2)**
49:11;277:17
**country (9)**
49:11;53:11;79:11;
100:7,22;107:25;
181:1;267:23;277:17
**counts (2)**
179:4;287:10
**county (55)**
70:15;131:25;
132:10;133:4;136:17;
165:20;171:3;175:16;
176:10;177:11;183:1;
194:2;245:11,17,19,
21,24;246:9,13;
247:1;270:19,20;
271:3,5;280:13;
281:5,6,12,22;282:4,
7,16,23;283:4,5,10,
13,15,22;284:3,4,24;
285:5,13,22;286:16,
19;287:2,10,14,16,25;
301:19;339:8,20
**couple (18)**
8:25;19:23;34:15;
49:4;53:20;69:22;
108:5;112:15;115:1;
128:16;150:7;169:6;
174:21;186:2;215:1;
221:11;249:11;299:8
**couple-minute (1)**
279:17
**course (12)**

7:9;62:21;112:19;
115:1;151:15;180:19;
190:13;209:25;
248:13;269:6;299:14;
300:6
**courses (1)**
13:25
**Court (31)**
6:3,16;7:11,18;
15:22,24;17:24;
42:20;61:23;94:9;
103:25;117:11;
123:11;145:10;
154:11;163:15;
190:16;194:4,8;
195:11,18;200:9;
209:22;220:1;254:20;
268:3;337:12,15;
345:17;350:15;
352:13
**courts (2)**
187:17,20
**covariants (1)**
84:25
**coverage (3)**
177:14;178:8;
225:16
**covered (1)**
64:5
**create (1)**
93:22
**created (1)**
145:13
**creates (3)**
54:19,25;174:4
**credible (1)**
292:2
**criteria (5)**
29:21;46:1,6;77:2;
219:12;291:16,19,25
**critical (1)**
260:2
**criticism (9)**
21:19;97:13;
258:12,13,15,20,22;
274:23;340:15
**criticisms (6)**
120:15;257:16;
258:3;262:6,7;276:7
**criticizing (3)**
273:9;274:5,16
**critics (1)**
344:14
**critique (1)**
275:21
**critiques (1)**
344:18
**cross (1)**
130:14
**cross-sectional (2)**
261:11;267:14
**cross-talking (1)**
7:19

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

**CSA (1)**
286:14
**culture (1)**
69:3
**curious (1)**
45:20
**current (10)**
13:17;25:19;64:2;
78:24;79:3;100:17,
20;137:24;223:8;
309:6
**currently (6)**
156:3;210:13,23;
304:17,22;305:13
**Customs (1)**
232:17
**CV (4)**
13:6,7;14:2;15:14
**cycle (1)**
58:19
**cycles (1)**
115:1

**D**

**Dale (10)**
6:6;29:5;53:19;
55:3;80:20;120:20;
172:19;230:8;244:19;
280:17
**dangerous (1)**
335:1
**data (81)**
11:13;12:22;19:25;
21:2;25:3;36:5;38:3,
5;41:25;48:21;58:10,
15;73:24,25;74:5;
77:6,25;81:7;85:7;
87:9,12;99:4;100:21;
101:12;103:20;
104:23;111:23;
115:17;117:7;124:19;
130:6,13,18,23;
131:25;133:2,12;
134:14;135:12;
136:14;138:24;141:3;
143:8;144:20;149:18;
151:24;169:1;174:9;
175:16;176:10;180:1,
2;193:16;203:25;
204:7;217:7;243:20;
245:11;250:4;260:7;
261:8,9;267:14,20,21,
22;268:21;269:4;
270:7;272:9;284:4;
285:6,7,14,22;287:8,
10;334:1;339:9,11,18
**database (15)**
24:16;25:7;193:15;
240:7;285:5;289:13;
291:17,23,25;292:25;
331:22;333:15;
338:10,12,15

**databases (2)**
293:16;331:17
**date (9)**
16:20;63:15;
122:13,15;188:5,6,7;
233:22;295:2
**dated (10)**
106:13,15;113:10,
12;118:2;122:12;
168:20;216:14;
264:10;355:6
**dates (1)**
282:9
**David (4)**
24:3;234:18;344:6;
345:8
**day (16)**
55:22;63:3;64:14,
21,22;74:1;80:25;
81:6;284:19;295:1;
296:10,22;297:8,20;
321:18;355:6
**days (2)**
293:25;294:1
**DC (1)**
18:5
**deadline (10)**
58:13,20;59:6,9,13,
24;65:2,17;67:11;
292:17
**deadlines (6)**
57:21,25;59:19;
63:1;65:18;66:4
**deal (2)**
26:23;171:9
**dealing (3)**
28:12;246:11;
270:25
**debate (2)**
344:7,19
**debunk (1)**
128:19
**December (1)**
118:5
**Dechert (1)**
6:15
**decide (4)**
43:5;59:8;106:5;
326:2
**decided (9)**
37:21;40:25;116:1,
12,19;117:1;197:9;
203:1,5
**decision (6)**
27:3;36:12,13;
181:15;348:25;349:2
**decision' (1)**
181:5
**decisions (3)**
14:17;36:14;262:17
**declaration (3)**
147:3;301:1,5
**decrease (8)**

55:1;57:21,25;58:7;
65:13;66:10;67:1;
71:22
**decreases (1)**
59:6
**decrees (1)**
298:25
**deepened (1)**
129:1
**deeper (2)**
156:8;258:20
**defendants (1)**
6:9
**defendants' (1)**
201:2
**defends (1)**
169:18
**defense (2)**
9:5;25:20
**deficit (1)**
86:21
**define (1)**
131:10
**defined (1)**
331:15
**defines (1)**
189:16
**definitely (1)**
148:9
**definition (4)**
131:11;185:22;
186:7,11
**definitive (2)**
115:21;335:2
**degree (30)**
14:23;31:22;33:20;
34:21;39:6;41:20;
60:24;67:18;72:8;
84:8;87:20;88:10;
105:21,22;107:10,12;
133:22;141:23;
168:12;204:19;
205:17;248:21;251:3;
259:2;266:1;276:25;
294:4;326:19;329:11;
334:16
**degrees (3)**
87:16;214:4;335:6
**delay (1)**
61:10
**demands (1)**
206:24
**Democrat (1)**
198:5
**democratic (3)**
119:16,25;125:4
**Democrats (1)**
198:7
**demographic (11)**
40:20;41:4,18;
100:6;139:8;214:6;
221:3;282:5;283:20;
284:2;334:4

**demographics (3)**
39:25;100:23;139:3
**demonstrate (3)**
190:3;278:12;
327:18
**demonstrated (2)**
354:10,13
**demonstrates (1)**
93:18
**demonstrating (1)**
317:3
**demonstration (1)**
128:22
**demonstrative (6)**
158:5;170:14;
176:3;313:5;314:4,15
**denominator (2)**
218:24;286:14
**department (9)**
13:24;49:23;132:7;
134:11,20;288:12;
291:12,14,15
**depend (6)**
26:23;71:12;74:4;
129:13;189:4;227:12
**dependent (3)**
68:4;80:2;236:2
**depending (6)**
54:21;78:20;154:7;
163:3;189:16;292:3
**depends (6)**
19:8;75:13;77:6;
79:15;203:13;205:4
**depicts (1)**
349:18
**deposed (7)**
6:19;17:18;18:3,4,
6,11,20
**deposition (19)**
7:5;8:12,18,22;9:1,
3;10:24;18:7,17;
22:21;56:1,10;63:20;
159:19;214:17;277:7;
347:1;354:18,20
**depositions (1)**
8:17
**derive (2)**
141:4;263:19
**derived (2)**
141:21;259:13
**descent (1)**
37:14
**describe (20)**
29:10;129:22;
131:8;151:7;153:16;
155:2,4;173:22;
175:8,12,18;179:20;
187:19;229:4;262:5;
285:8;288:11;331:2;
333:7;334:13
**described (14)**
71:15;106:17;
133:12;136:10;

140:23;141:9;170:8;
174:11;175:24;176:7;
201:17;280:11;328:6;
333:20
**describes (1)**
264:24
**describing (4)**
88:13;128:8,9;
300:10
**description (3)**
35:23;141:3;291:20
**design (6)**
24:6;36:8,11;38:20;
39:2;348:21
**designating (1)**
62:3
**designed (17)**
19:7,9,15,17;21:9,
15;22:18;23:20,25;
24:4,7;38:22;40:25;
82:21,22;263:10;
317:5
**designing (1)**
23:6
**designs (1)**
348:17
**detail (2)**
84:5;105:12
**details (9)**
110:16;138:11;
201:7;233:14;238:7;
292:13;326:23;327:3;
330:2
**determination (1)**
117:10
**determine (11)**
80:10;115:18;
138:5;256:4,15;
264:21;267:11;
297:18;298:8;301:8;
305:12
**determined (6)**
113:25;114:6;
136:25;191:5;197:20;
198:19
**detour (1)**
251:9
**developed (1)**
292:12
**developing (2)**
24:9;234:19
**develops (1)**
108:18
**DHS (2)**
331:16;338:9
**dialogue (1)**
344:12
**difference (20)**
40:19;47:20;70:7;
87:5;89:7,9,9;119:9;
144:15;185:3;199:12;
246:8;248:16;269:10;
287:12,17;335:20;

ZAHN COURT REPORTING
NORFOLK  (757) 627-6554     RICHMOND (804) 788-8899

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

336:6,10,11
**differences (36)**
38:6,6,13,18;39:1,3,
4,6,9,13,24;40:2,3,22;
41:10,19;48:2;52:23;
68:25;99:21;100:13;
101:2;126:12;139:7;
178:8;202:20;214:5;
245:17,18;246:7;
249:18;282:22;
336:12;351:21;353:5,
9
**different (82)**
11:5;16:9;25:4,4;
27:13,23;28:14;31:9,
21;34:16;35:5;41:10,
20;46:16;50:8;67:20;
79:11;80:4;81:23,24;
82:3,4;85:21;90:9,13,
13,16;92:22;93:9;
95:14;108:22;109:23;
130:4,20;133:12;
139:7;143:8;150:14,
20;158:1;161:8;
162:3;176:24;177:8,
8,9,13,13,16;178:9;
179:24,25;190:23;
202:12;204:2;207:12;
213:20;217:9;219:12;
221:11;226:4;235:5;
246:16;248:14;
249:12;255:24;
267:22;269:13;277:8;
285:4;286:9;287:19;
290:6;302:13;319:17;
331:11;337:23;
339:25;342:4;346:10;
349:20;352:4
**differential (2)**
43:8,12
**difficult (11)**
53:2;109:1;180:3;
189:22;190:2,6;
191:4;252:12,19;
269:8;324:19
**difficult-to-detect (1)**
189:15
**difficulty (1)**
328:4
**digits (1)**
43:3
**dimension (1)**
208:4
**diminish (2)**
52:17;54:11
**diminishing (1)**
87:20
**direct (1)**
36:15
**direction (3)**
250:18,19;353:17
**directions (1)**
35:16

**directly (5)**
103:13;197:1;
201:13;300:22;
346:22
**director (5)**
18:25;147:1;238:9;
239:22;301:1
**disaggregation (1)**
202:2
**disclose (1)**
189:21
**disclosure (1)**
206:25
**disconnected (2)**
218:22;219:20
**discover (1)**
189:18
**discovered (1)**
195:5
**discovery (2)**
53:22;55:16
**discuss (13)**
29:18;55:18;62:16;
85:22;99:5;132:18;
203:25;204:4;205:6;
232:20;247:8;288:21;
339:9
**discussed (39)**
11:5,20;23:10;28:8;
35:19;87:8;97:10;
102:14;106:22;
114:25;132:8;136:12;
141:9;142:19;148:5;
154:2;155:8;170:24;
180:7,8;188:20;
192:9;215:25;221:10;
248:15;255:18;
269:22;290:17;
293:19,22;303:8;
310:15;313:10;332:8,
13;338:9;339:10;
345:7;353:5
**discusses (2)**
106:21;148:1
**discussing (8)**
34:19;63:8;126:1;
179:3;180:3;241:1;
285:21;334:20
**Discussion (17)**
6:13;42:15;50:20;
54:14;60:5;94:10;
156:14;181:8;185:14;
241:23;256:7;267:20;
271:25;283:24;299:4;
305:16;348:2
**discussions (3)**
35:13;274:6;301:6
**disproportionate (1)**
40:16
**dispute (1)**
237:2
**disputed (1)**
185:1

**disqualified (1)**
195:18
**dissent (1)**
37:10
**dissenting (1)**
274:11
**distinct (7)**
92:18,21,24;179:6;
207:25;246:14;
346:14
**distinctive (2)**
202:10;283:14
**distinguish (6)**
89:2;95:10;209:16,
18,21;226:3
**distinguishable (1)**
89:6
**distinguished (1)**
26:14
**distorting (1)**
312:1
**distortions (1)**
128:18
**distribution (1)**
343:5
**district (1)**
111:17
**districts (1)**
202:14
**divided (2)**
30:21,23
**dividing (1)**
287:20
**DM (1)**
288:25
**DMV (23)**
33:9;134:3;135:17;
288:19;289:2;290:3;
295:3,11;296:19,23;
297:4,9,21,22,23;
298:12,20;299:7,9;
300:7,14;301:10;
335:25
**DMVs (3)**
34:8,10;299:2
**document (67)**
34:23;108:9;112:7;
121:22;187:23,25;
192:23;194:21;197:3;
223:11,18;225:4;
226:12;241:5;273:5;
288:19,23;289:1,2,14;
292:15;294:8;295:3,
10;296:19,23;297:3,9,
21;301:10;311:14;
312:11,14,25;313:23,
24;314:12;315:9,14,
19,21;316:23;317:15,
17;318:1,3;321:9,10,
23,24;322:22,24;
323:9,11,14;324:7,10,
20;325:2,9,10;326:6,
8,14;334:14;338:19;

339:3
**documentary (12)**
33:7;102:20;
200:15;211:16;
212:10,15;238:13;
239:7;241:10;289:5;
315:7;320:6
**documentation (19)**
102:3;134:21;
135:8;210:14;211:10;
293:10,20;294:1,6,11,
14,22;295:22;296:11,
13;314:23;318:20,22;
322:13
**documented (4)**
175:2;177:4;
253:12;320:20
**documenting (1)**
328:5
**documents (28)**
8:14;34:22,24;
272:1;290:3;311:2,
13,21;315:5,6,14;
316:12,14,15,21;
323:25;324:15,18;
325:4;331:3,10;
333:2,8,21;337:11,13,
14,24
**Dodge (1)**
194:2,15
**Dominion (3)**
13:19;19:1;234:17
**Dominion's (1)**
206:14
**Donald (2)**
118:17;125:1
**done (46)**
8:19;15:19;16:7;
18:24;22:12;24:20;
26:3,15;31:24;33:17;
36:8,15;46:5,18;
50:25;61:7;63:16,17;
69:6;77:5;79:2;83:16;
121:13;130:7,22,23;
139:2;209:14;214:24;
215:13;239:17;
242:21;290:10;
292:23;293:2;301:15,
23;302:4;312:23;
313:7;325:24;343:19;
345:25;348:19;
353:21;354:16
**door (1)**
58:9
**DOR (1)**
293:7
**double-barreled (3)**
207:21,25;208:8
**double-check (2)**
219:18;316:5
**doubt (5)**
27:12;77:3;105:24;
181:22;253:20

**DOV (12)**
134:18;288:13,16,
25;289:13,20,22;
290:22;292:7,24;
293:7,15
**down (18)**
7:12;15:25;32:5;
60:16;62:9;72:21;
81:2;94:7;102:25;
135:7;144:11;193:18;
195:12,13;288:21;
296:16;311:8;344:21
**downloaded (2)**
188:6;193:20
**Downs (1)**
54:4
**downwards (1)**
231:4
**dozen (1)**
14:3
**Dr (4)**
51:5;230:6;264:3;
293:5
**draft (1)**
207:10
**dramatically (1)**
267:22
dramatically-inappropriate (1)
156:7
**draw (3)**
74:24;82:6;127:9;
175:6;179:7;262:25
**drawing (1)**
333:4
**drawn (3)**
19:25;71:15;81:10
**drew (1)**
12:23
**driver's (27)**
61:1;132:1;134:19;
135:1;220:22;221:19,
25;222:8;223:7,10,
24;224:5;288:17;
291:5,17;292:7,25;
293:16;294:19;
295:21,24;298:19;
299:14;300:6,23;
335:16,19
**driving (1)**
351:16
**drop (1)**
300:22
**dropped (2)**
215:14;233:6
**drove (3)**
71:21;198:15;
351:12
**drug (1)**
234:24
**due (9)**
69:1,1;86:22;
118:10;119:14;120:2,
4;139:1;187:20

**during (4)**
131:17;274:9;
298:19;318:11

# E

**earlier (32)**
58:3;80:17,22;
102:14;111:13;118:3;
124:7;134:6;141:10;
155:8;181:8;229:5;
231:24;244:5;245:13;
250:16,24;251:21;
256:7;268:17,25;
270:15;273:8;304:16;
316:3;325:24;332:14;
337:8;338:16;349:4;
351:1,24
**early (8)**
18:12;21:25;59:15,
22;181:8;265:21;
274:8;347:10
**Earnest (7)**
24:3;82:10;106:6;
234:19;275:12;344:6;
345:8
**easier (2)**
228:17;259:21
**easily (1)**
211:19
**easy (2)**
66:8,24
**Eaton (3)**
157:8;168:17;169:4
**edge (1)**
159:15
**edition (1)**
60:3
**editorial (1)**
15:17
**educated (1)**
108:2
**education (23)**
98:20;101:2,3,6;
107:7,18;108:11,21;
111:2;249:18,23;
250:6,9,21,25;251:12;
351:2,19,21,25;
352:25;353:14,18
**effect (15)**
26:14;52:13;68:5;
69:12;70:24;71:7;
72:14;78:6;87:20;
94:3;143:1;173:10,
16;212:11;250:19
**effective (2)**
69:5;108:12
**effectiveness (1)**
81:6
**effects (5)**
54:24;68:24;74:2;
179:16;230:22
**effort (4)**

14:24;43:13;124:9;
271:2
**efforts (9)**
12:22;21:1,4;83:18;
128:19;134:12;204:5,
10,12
**eg (2)**
224:19;225:2
**Eight (1)**
265:6
**either (23)**
18:8;34:11;47:3;
64:13,20;86:19;91:3;
125:23;126:2;186:9;
207:18;237:20;241:2;
295:1;297:7;301:3;
315:13;331:18,25;
332:1,3,4;353:16
**elected (1)**
195:17
**Election (97)**
11:16;54:20;55:22;
58:19;59:17,18,20;
64:14,21,22;65:16;
67:13,16;69:15,16;
70:7;71:1,5;72:2,3;
73:1;75:6;76:7;80:25;
81:6;82:19;83:2;85:2;
91:24;106:6;111:18;
113:22;115:1;118:8,
8,15,18;119:6;123:1,
19,23;124:1,14,25;
125:15;126:18;
129:21;130:1,1,8;
131:6;167:4;179:17,
22,25;180:18;185:1,
24;187:2,7,10,15,16;
189:3,11,17;190:7,8,
24;191:5,17,18,18,24;
192:1;194:2,24;
195:3,10,16,23;196:5,
7,19;198:8,16,25;
199:10,13,24;202:4;
203:5;227:17;282:3;
337:17,21,25
**election-day (1)**
80:11
**Elections (93)**
17:17;59:13;68:7;
82:10;84:24;85:13;
86:2,16;87:3;96:10;
99:1;108:7;112:4;
113:21,24;114:5,8,10,
20,25;115:8,9;119:16,
23;121:10;128:8;
130:4,20;147:2;
148:2,5,6,10;178:20;
179:11,19;180:9,13,
20;186:6;187:19;
190:18;191:10,14,23;
192:11,12,13,16,16,
25;194:16;197:8,9,15,
17,20;198:18,22;

199:1,5,16,17,17,19;
200:1,4,7,9,11,20;
201:5,14,16,19,22,24,
25;202:2,11,17,24,24,
25;238:10;239:22;
251:5,17;263:2;
301:1;342:12;349:25;
350:17
**Electoral (42)**
16:14,16;20:25;
52:11,16;54:1,5,9,13;
65:21;66:1;67:9;
82:14;86:21;106:17;
107:20;108:12;
109:15;110:3,24;
114:24;115:15;
121:11;130:19;
175:23;177:19;
179:14;185:4;197:21;
251:22;255:20;256:3;
257:23;258:2;259:18,
24;263:22,23;273:10,
24;328:1;341:5
**element (1)**
225:18
**elements (4)**
208:10;216:11;
258:24;278:8
**eligibility (1)**
232:11
**eligible (6)**
62:3,4;64:13;187:6;
199:3;329:8
**eliminate (1)**
137:5
**eliminates (1)**
60:17,20
**Ellie (1)**
47:25
**else (25)**
25:3;34:11;44:10,
13;71:21;193:21;
248:13;261:6;270:2;
306:3;312:18;313:16,
24;314:12;315:9,14,
21;322:21;323:9,24;
324:14,18;325:2,9;
338:5
**else's (1)**
35:11
**email (14)**
22:1,4,14;169:9,10;
265:22;291:9;347:11,
24;348:4,6,7,9,9
**emails (4)**
347:17,18;348:10,
12
**emphasis (1)**
69:3
**emphasize (2)**
107:6;339:17
**emphasizes (1)**
175:2

**empirical (8)**
68:18;69:5;83:11;
105:20;110:1;225:21;
226:5;290:8
**employed (1)**
235:11
**enacted (4)**
69:15,17;71:3,5
**encounter (3)**
192:15;332:23;
335:5
**encountered (5)**
225:7;331:16;
332:21,22,25
**encourage (1)**
344:17
**end (29)**
27:6;68:5,10;89:14,
16,19;120:17,19;
121:11,20;122:24;
124:10;130:25;
159:24,25;169:17;
171:15;172:5;218:3;
228:14;257:18,19;
268:4;269:4,12,13;
270:9;321:5;350:17
**ended (6)**
18:9,15;32:5;
151:16;217:19;308:5
**ends (1)**
130:5
**enforcement (2)**
87:17;232:17
**engage (3)**
272:23;305:18;
325:5
**engaged (2)**
20:12;31:8
**engagement (2)**
277:11;278:10
**English (2)**
43:9,11
**enough (9)**
86:14;94:20;
114:10,21;155:14;
180:9;198:22;202:4;
296:1
**ensure (5)**
14:24;101:1;
138:19;281:4;344:13
**entered (3)**
104:17;238:6,14
**entire (15)**
48:21;117:16;
118:9,20;119:10;
120:3,6;123:5;131:5;
196:10,12;221:12;
231:18;239:25;321:1
**entirely (5)**
38:24;120:1;
130:10;320:10;
345:21
**environment (2)**

70:7;86:18
**equal (7)**
30:21;147:12,18;
248:13;288:6;308:25;
309:8
**equivalent (5)**
147:9;148:24;
149:13;230:14;288:3
**ERRATA (1)**
355:10
**erroneously (1)**
259:13
**error (61)**
26:9;31:18,22;32:2,
13,15,15,19,21;33:1;
81:17;96:9,18,23;
97:2,5,16,21;98:3,8;
149:24;150:5,13;
154:25;155:18,20;
156:2,4;158:2;159:9,
12,14;166:8;168:7;
170:19;181:4;259:3,
5;261:10;263:5,6,12;
264:18;271:3;273:18;
276:1;278:4,14,15,15,
19;279:8;309:14,22;
310:4,6;343:17,20,24;
345:21;354:10
**errors (3)**
276:2;343:21,23
**especially (2)**
12:2;24:23
**essential (2)**
24:24;180:23
**essentially (3)**
136:10;237:5;
273:16
**establish (3)**
329:25;330:11,15
**established (5)**
231:24;244:5;
245:13;251:21;
304:16
**establishing (1)**
225:4
**estimate (231)**
12:7,8;27:11,16,17;
29:18,21,24;30:17;
31:4,13,25;32:6,18;
39:17;62:21;74:2;
76:23;79:12;82:12;
81:10;88:12;89:17,
19,20,21,22;90:7,8,
17;91:1,2,11,25;92:4,
4;93:8,11,12,14;
94:13;95:1;96:6,16;
97:6;99:18;100:11;
124:8,10,12,16;125:9,
23;126:5,9,10,11,24,
25;127:3,4,5,13;
128:9;134:1;135:15,
21;139:5;141:5,21;
143:6,12,18;144:21;

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

145:19;146:17;
147:13;148:3,12;
149:3,21;151:7,11;
152:14,17,18,23;
153:23;154:19,24;
155:4,10,11,14;
158:12,23;159:4,15,
16,22;163:9;164:7,
25;165:15;166:3,20;
167:10,22;168:6;
171:7,17;172:1,16;
173:5,10,20,24;174:8,
11,13;175:11,15,16;
181:20;182:15,19,25;
183:15;203:11,13;
204:20;225:20,20;
229:8,11,19,24;
230:21;231:8,11,17,
20,21;237:10;244:15;
245:8,10;246:22,24;
247:1,12,20;248:2,3,
18,24;251:24;252:7;
253:3,6;254:3;269:5,
7,16;271:11,19,22;
272:11,12,14;279:4,
10,15;280:6,12,22;
281:4;284:24;285:5,
9,12,14,15,21;286:1,
2,5,6,13,18,22,24;
287:3,7,13,24;308:16,
18;309:12,14,23;
310:6;311:19,19,22;
312:9,12,25;314:8,9;
315:15,16,17,19;
316:19,24;317:1,13,
21,24;320:7,25;321:5,
13,22;322:6;334:15,
22;340:2,3;342:10

**estimated (9)**
30:8,14;118:25;
119:2;138:20;160:23;
184:12;259:5;342:22

**estimates (157)**
12:5;26:5,8,19,24;
27:15,22;31:11;
38:11,23;79:6,14;
81:24;82:17;85:15,
22;86:23;88:24;89:2,
13;90:9,13;91:8;
92:16,17,20,22,23,25;
93:10;100:6,23;
112:3;114:11,22;
115:3;120:18;121:11,
18;124:9;125:8,18;
126:2,13;127:6;
128:3,10;131:23;
132:21;133:2,11,14;
136:5,13,22;137:23,
25;138:12;139:9,15;
140:25;141:4,8,16,18;
143:19,25;144:12,12,
24;145:6,21;146:20;
147:15,22;148:15;

149:6;150:5,13;
152:25;153:2,21;
154:3;155:13;156:5,
7;157:3,24;158:2;
159:20;161:6,14;
162:13,23;164:14;
169:17;170:7,16,21,
22;171:8;172:6,11,13,
14;173:3,22;175:8,
12;176:8,19;177:8,9,
12,17;178:2,5;180:5,
8;181:4,16,19,25;
182:3;183:12,24;
204:11,16,24;205:2,
16,20;241:15;244:24;
245:14;247:9,18,21;
248:22;249:21;
252:23;255:4,5;
257:18;258:16;
269:19,24;279:5,13;
286:9;311:24;312:6;
313:2;321:7;325:12;
343:12;350:6

**et (5)**
128:1;275:21,25;
350:13;354:12

**ethical (4)**
103:13;104:7;
233:25;234:5

**ethically (2)**
103:13;206:23

**ethnicities (1)**
41:21

**ethnicity (12)**
41:15;42:6;206:6;
229:15;243:5,8;
251:24;252:6;282:22;
283:3,11,13

**evaluate (2)**
268:22;277:25

**evaluated (1)**
49:14

**even (14)**
31:1;115:6;185:5;
186:19,20,24;191:4;
261:9;278:2,11,12;
294:4;308:24;309:9

**event (1)**
202:3

**events (1)**
261:19

**everybody (1)**
69:4

**everyone (8)**
241:8;289:12,16;
300:11,12;304:17,20;
305:10

**evidence (61)**
11:6,12,15,15,21;
12:20;51:16;58:4;
59:2;62:16;68:12;
69:8,9;71:6,10,10,12,
13,24;72:2,4,5,9,12;

87:13;90:2;94:20;
108:21,23;119:14,22,
24;132:4;137:15;
141:23;155:9;170:2;
172:3,7;174:17;
178:16,22;198:5;
202:20;225:22;226:2,
5;240:25;259:10;
263:11;266:1;272:8;
275:24;279:2;289:10;
294:7;298:22;320:9;
323:3;341:8;347:19

**evident (1)**
12:7

**ex (1)**
78:22

**exact (13)**
14:6;28:5;35:20;
160:19,20;161:4,23;
162:12,15,21;233:13;
273:15;303:5

**Exactly (24)**
9:7;10:1;18:9;20:9;
33:23;35:12,21;44:4;
100:21;107:21;
131:10;134:6,17;
151:19;169:8;174:5;
180:6;223:14;232:10;
274:7;304:9,15;
342:23;343:10

**EXAMINATION (5)**
6:21;70:1;98:20;
325:24;337:4

**examine (4)**
68:13;71:11,17;
72:5;94:15;135:25;
137:20

**examined (4)**
132:5;133:8;192:7;
327:8

**examining (1)**
77:9

**example (42)**
13:13;25:5,11;
54:14;60:25;61:3;
64:6,25;67:6;68:4,24;
70:12,16;79:21;86:8;
89:12;101:16;102:19;
109:18;114:13;
119:17;134:24;
162:12;189:10;
193:13;194:1;196:19;
207:20;215:8,19;
216:6;226:7;234:24;
238:13;262:18;272:1;
274:3,15;342:6;
345:4;346:13;350:22

**examples (8)**
115:15;129:7;
187:18,19;190:18;
191:9;192:24;216:5

**Excel (1)**
146:11

except (1)
190:3

**exception (4)**
108:5;171:23;
341:17,21

**exceptions (2)**
114:1;186:2

**excluded (1)**
328:1

**excludes (1)**
224:1

**exclusive (2)**
10:25;168:23

**exclusively (1)**
314:2

**Excuse (4)**
15:22;92:8;123:11;
352:13

**exercise (2)**
31:8;316:25

**exhaustively (1)**
64:7

**Exhibit (94)**
9:13;13:4;28:23;
29:5;36:22;44:17;
51:8,14,18;59:25;
60:1,3;81:21;82:8,11;
106:4,7;112:8,10;
113:3;117:14,18;
120:20,24,24;121:23;
122:1;125:21;127:16;
131:14;140:13,15,17;
145:5,8;151:2;157:4,
8,11,17;158:6,6,8;
168:14;170:13;184:2;
193:4,5;197:3,5;
205:21;210:9;216:16,
19;221:18;224:12;
233:12;244:20,20,21;
247:6;256:23;259:19,
22;261:16,22;264:2,
5;272:25;273:3;
275:9,13;280:9;
284:8,11;309:18,20;
311:5;312:23;313:3;
314:5;316:6,8;322:8;
340:4,8;341:12,23,24;
347:20,23;348:1;
350:7;354:5

**exhibits (4)**
38:4;273:8;341:18;
345:7

**exist (1)**
95:7

**existence (1)**
237:2

**exists (1)**
236:25

**expect (14)**
208:13,17;248:8;
250:20;255:4;304:11;
309:9;319:7;323:3;
341:4;342:24;346:7,

16,23

**expectation (2)**
105:16;294:12

**expectations (1)**
104:17

**expected (8)**
52:17;54:10;246:14

**expenses (1)**
10:25

**experience (6)**
19:3;46:22;47:2;
129:4;274:2;330:9

**experiment (1)**
69:20

**experiments (1)**
54:15

**expert (32)**
9:20;10:23;16:22,
25;17:1,10,12;18:20,
23;33:13;53:23;
55:18;64:2;83:5;
110:16;140:14;
161:19;185:15,17,21;
195:1;196:21;201:9;
223:23;225:11;
241:13;256:14;264:3,
10;337:11,17,20

**expertise (2)**
17:2;138:7

**explain (6)**
20:5;147:21;
174:21;278:4,6;328:6

**explained (3)**
200:24;201:11;
328:9

**explaining (1)**
271:18

**explains (1)**
354:11

**explore (1)**
139:13

**expressed (1)**
263:21

**expressing (2)**
115:25;331:8

**expression (3)**
81:12;101:14;
214:10

**expressions (1)**
81:14

**extensive (1)**
39:8

**extensively (1)**
52:12

**extent (6)**
74:24;111:4;
137:19;178:4,5;
205:19

**external (1)**
14:13

**extra (1)**
326:11

**extrapolate (7)**

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

78:6;124:8;125:7;
138:18;144:3;287:1;
319:13
**extrapolated (1)**
137:23
**extrapolates (1)**
221:2
**extrapolating (3)**
253:2;284:3;320:11
**extrapolation (14)**
78:9;111:17,22,23,
25;112:2;118:7;
120:14;127:12;138:9,
15;257:15;284:6;
322:19
**extrapolations (1)**
221:11
**extremely (7)**
79:15;86:7;153:17,
21;154:1;189:22;
248:19
**eyeballing (1)**
168:3

**F**

**face (4)**
49:19;50:7,17;
268:14
**facilitate (2)**
38:23;64:23
**facilitated (1)**
52:24
**fact (61)**
21:22;27:9;29:22;
45:23;49:3;64:1;
69:19;75:1;95:7;
107:18;115:18,19;
116:1,12,19,25;
124:25;154:17;
173:17,18;174:15,21;
175:2;181:24;198:19;
202:22;204:15;
205:11,15;222:22;
232:2;234:1;237:7;
239:14;243:13;
253:16,22;254:9;
260:6,14,17;261:1;
262:13;263:15;
267:11;273:20;
286:11;293:23;296:1;
299:18,21;305:13;
320:16;322:20;331:6,
10;333:9;335:24;
342:12;346:9;354:14
**factor (4)**
109:14,16,17;
110:23
**factors (9)**
40:4;69:2;110:1;
111:3;113:21;124:22;
199:7,7;229:18
**facts (1)**

73:12
**faculty (2)**
18:25;83:13
**fade (1)**
309:7
**fail (1)**
212:24
**failed (6)**
209:2;211:15,21;
212:4,9;254:8
**failure (4)**
33:7;34:6;212:10;
289:4
**failures (1)**
309:2
**fair (2)**
35:23;262:9
**fairly (6)**
70:3;173:18;
221:13;272:8;274:10;
309:11
**fall (9)**
114:14;207:18;
208:23;220:24;225:7;
241:2;274:8;296:5;
304:12
**false (1)**
173:16
**falsely (1)**
195:6
**familiar (4)**
44:23;105:13;
236:15;261:24
**famous (1)**
54:3
**far (7)**
38:16;47:22;50:19;
134:4;159:14;168:1;
305:13
**farcical (1)**
178:15
**farcical' (2)**
157:6;168:23
**fast (1)**
15:23
**father (1)**
109:18
**faulty (1)**
196:10
**favor (5)**
61:12,15;62:5;
119:16,24
**favorable (1)**
312:3
**featuring (1)**
26:8
**February (1)**
144:22
**federal (18)**
191:16,18;192:1;
199:19,24;200:5,8,11,
20;201:5,14,24;
202:10,24;203:4;

234:22;338:11,24
**Feel (2)**
72:21;206:23
**feeling (1)**
27:4
**fell (1)**
92:9
**fellow (1)**
273:13
**few (9)**
42:21;252:10;
301:19;303:15;
306:23,25;312:20;
337:6;346:25
**fewer (5)**
197:9;203:1,5;
281:23;303:3
**field (13)**
14:15,20,22;16:9;
39:1;58:4;111:7;
156:10;163:1;213:1,
21;214:3,23
**fifth (5)**
62:8,23;142:14,19,
20
**fight (1)**
128:17
**fighting (1)**
77:14
**figure (11)**
64:25;75:8;144:8,
13;146:20,24;147:7,
16;230:2,3;309:19
**file (50)**
11:25;12:21;26:2;
90:5,19;91:14,15;
125:24;132:12;
151:24;237:24;238:6,
15,21,23,24;239:2,3,
8,15,16,19;240:1,8,
18;241:11;244:11;
246:12;254:4;255:12,
17,23;256:1,6,18;
289:20;292:8;293:1;
298:3,5;302:15,18;
303:9,13,19;304:5,14;
308:7,25;309:3
**filed (1)**
132:6
**files (4)**
134:15,20;237:18;
293:16
**filibuster (1)**
13:13
**fill (3)**
66:20;300:20,21
**filled (2)**
136:19;146:6
**filtering (1)**
137:4
**final (6)**
10:18;317:13;
327:13,17;344:3,4

**finally (3)**
111:14,16;166:19
**find (18)**
45:12;58:16;68:22;
75:5;84:23;127:18;
131:15;150:25;
187:14,19;189:2;
190:18;191:9;192:24;
202:7;203:1;245:1;
305:7;307:13,16;
309:9;329:19;341:22
**finding (7)**
26:14;85:3;102:5;
142:11;170:2;173:16,
17
**findings (3)**
278:21;339:14,23
**finds (1)**
174:16
**fine (4)**
7:21;145:1,18;
279:21
**finish (2)**
7:14;123:12;
209:23;220:3
**finished (4)**
23:17;78:25;
123:14;138:25
**first (50)**
7:7;10:9;43:3,9;
45:8;49:7;52:5;57:19;
82:25;101:17,25;
102:8,9;103:1,4;
111:16;113:18;118:5;
122:20;131:22,24;
137:2,4;138:11;
141:17;142:22;
145:15;148:9;153:18;
169:15,15;183:19;
184:10;209:9;210:11,
19;260:1;261:6;
276:6;277:15;285:8;
290:24;296:7;311:7;
313:10;314:19;321:3;
322:9;337:9;340:15
**five (6)**
47:14;123:21;
145:15;195:5;265:5;
292:16
**five-year (3)**
79:12;137:25;
144:12
**flaws (2)**
93:9;262:8
**flipped (1)**
195:2
**flipping (1)**
194:20
**flood (1)**
75:5
**focus (9)**
21:18;87:11;136:2;
201:9;262:23;276:6;

279:23;295:4;312:5
**focused (8)**
11:10;27:15;
135:23;136:3;176:18;
180:21;293:25;314:2
**focuses (2)**
273:25;279:1
**follow (2)**
64:7;304:23
**followed (2)**
22:1;348:14
**following (4)**
43:1;201:7;277:16;
286:25
**follows (1)**
6:19
**follow-up (7)**
79:1;265:22;
277:24;347:2,11,11,
25
**follow-ups (1)**
292:20
**footnote (1)**
159:19
**footnotes (1)**
193:23
**forced (1)**
69:24
**foregoing (1)**
355:2
**foreign (23)**
43:4,6,15;44:19;
45:9,10,13,16,25;
46:8,8,10,20,20;47:1,
16,23,24;48:11,12,16,
20,23
**forget (1)**
78:1
**forgotten (1)**
256:21
**form (18)**
56:17;66:21;
223:11;238:3,4,12;
239:6;241:9;286:17;
300:21;327:19;328:5,
8;329:24,25;330:3;
338:24,25
**former (3)**
225:6;226:19;
272:15
**forms (7)**
95:9;136:20;
281:24;282:1,6;
299:10;300:20
**forth (13)**
25:21;61:20;63:15;
81:1;110:12;176:14;
192:12;198:12;204:9;
206:25;217:24;301:6;
309:9
**forums (1)**
344:23
**found (15)**

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

54:23;59:10;
114:15;127:21;
174:23;203:4;227:18;
250:14;302:23;
303:12,17,19;316:7;
329:17;351:7
**Foundation (10)**
157:11;188:1,12,
13,16,25;189:6;
192:21;193:19;
194:25
**four (28)**
124:24;131:23;
133:2,11,12;136:10;
137:9;141:8,15,18;
142:4,18;143:19;
145:16,17,21;153:2;
157:2;167:7;195:4;
253:24;254:3;255:15;
256:15;265:3;307:6,
25;311:8
**fourth (5)**
60:15;132:2;
160:14;314:15;354:8
**Fox (5)**
227:1,4,14,22;
228:12
**fraction (3)**
120:1;147:23;303:5
**frame (6)**
38:9,18;136:15,16,
18;142:23
**framework (5)**
53:16;54:6;66:6;
102:13,16
**frameworks (1)**
54:3
**Franken/Coleman (2)**
116:1,18
**Franklin (1)**
116:11
**Frankly (2)**
252:10;285:17
**fraud (29)**
111:7;185:2,5,19,
22;186:7,11,12,13,14,
19,20;187:15,20;
189:2,15,16;190:19,
23,25;191:11,15,17,
23;192:3,17,25;
194:17,18
**fraudulent (2)**
168:25;344:7
**fraught (3)**
111:18,21;112:4
**free (8)**
39:9;72:21;317:9;
325:15;326:3,9,25;
327:5
**French (1)**
109:19
**frequency (15)**
34:19,19;38:6,7,8;

139:7;202:3;231:15;
260:8,23;261:19;
262:25;278:9;308:25;
344:20
**frequently (4)**
38:25;175:24;
215:23;344:10
**friend (2)**
109:19;324:6
**front (1)**
113:3
**full (33)**
27:20,21;52:9;75:9;
84:23;85:6;96:1,1;
98:16;101:25;102:8,
9;109:22;111:13;
128:10;153:18;169:7;
180:20;181:13,18;
193:9,16;210:11;
221:20;224:17,22;
240:9,11;304:4;
311:7;322:9;331:13;
339:18
**fully (4)**
93:18;100:6;
200:25;278:20
**function (1)**
54:7
**functions (1)**
330:5
**further (8)**
135:7;139:5;
153:23;215:14;266:1;
268:18;348:12;355:3
**Furthermore (2)**
189:24;245:24
**future (1)**
22:22
**fuzzy (1)**
308:8

**G**

**gained (1)**
98:20
**gains (1)**
25:20
**Garrett (9)**
6:9;8:24;9:5;35:15;
55:14;325:19;328:3;
329:6;330:8
**Gary (1)**
6:2
**gave (13)**
30:17;67:6;78:5;
79:21;80:22;89:22;
114:12;129:25;137:5;
213:3;229:10;233:2;
267:25
**gender (20)**
37:3,7;40:5,7,9,14,
17,18,24;41:1;43:2;
206:5;229:14,16;

241:21;242:6,14;
252:21,22;282:16
**genders (1)**
282:12
**general (16)**
8:3;11:6;34:12;
68:8;93:25;105:16;
111:7;171:16;189:8;
223:17;234:9;251:18;
262:15;292:1;304:10;
330:16
**generalization (1)**
320:2
**generalize (3)**
93:4;231:18;319:25
**generally (14)**
20:3;26:7;38:14;
48:19;66:18,23;
171:22;212:25;213:2,
17;216:9;238:11;
303:9;304:11
**generate (1)**
165:16
**geographic (1)**
43:3
**geography (1)**
13:24
**Georgia (1)**
194:2
**gesticulation (1)**
7:10
**gets (6)**
147:21;252:16;
255:3;259:18;268:24;
300:17
**given (22)**
11:6;87:14;103:2,
12,22;114:21;135:24;
142:11;161:2;169:25;
171:20;173:21;
174:10;188:6;201:11;
206:10;218:5;237:15;
269:7;302:2;309:1;
344:1
**gives (7)**
143:6;164:25;
166:3,13;167:10;
320:2,4
**giving (1)**
342:10
**globally (1)**
134:24
**goal (3)**
46:15;118:6;316:25
**goes (4)**
50:19;193:15,15;
351:25
**Good (17)**
6:23,24;38:14;65:4;
70:4;73:24,25;77:22;
79:25;84:16;92:15;
109:19;112:19;
156:13;181:5,15;

306:6
**government (7)**
20:20;21:5;186:9;
234:22;236:20;324:9;
331:4
**Governor (1)**
330:17
**grad (2)**
18:12;44:7
**grading (1)**
131:1
**graduate (4)**
13:25;24:23;43:17;
77:8
**grandparents (2)**
265:4,5
**graph (1)**
349:18
**Great (10)**
11:1;12:24;26:23;
73:11;83:16;145:3;
151:2;171:9;257:9;
316:18
**greater (1)**
163:25
**green (1)**
134:24
**ground (1)**
7:5
**group (25)**
37:19;43:2;49:21,
24;82:22;136:18,18;
152:6;176:19;181:20;
220:21,25;249:8;
272:21,22;274:3;
285:4;305:18,19;
309:5;312:17;332:12,
14,14;348:20
**groups (14)**
29:13;31:9;38:22,
23;46:17;49:21;
85:15;100:7;139:8;
176:20;220:23;
236:10;336:11;
352:25
**guarantee (1)**
206:20
**guaranteed (2)**
104:13;206:11
**guess (23)**
8:18;18:17;47:12;
50:20;76:25;87:18;
101:15,20;134:22;
136:18;146:25;
175:24;176:4;177:19,
22;178:3;202:9,22;
242:24,25;295:18;
298:24;334:21
**Gulshan (2)**
344:6;345:8

**H**

**half (3)**
72:24;160:24,25
**halfway (1)**
53:10
**Hampton (1)**
19:18
**hand (21)**
30:18;61:4;91:18;
128:19,22;142:2;
145:4;147:24;177:12;
214:9;216:4;224:18,
25;228:6,10;232:7;
264:1;275:6;303:24;
312:22;334:19
**handed (2)**
113:2;194:21
**handle (2)**
92:7;93:21
**happen (3)**
40:24;173:19;
351:17
**happened (8)**
32:4;59:12,23;65:2;
71:21;173:21;197:23;
212:10
**happening (1)**
151:14
**happens (5)**
38:17;59:4;77:13;
238:3;274:20
**happy (1)**
22:13
**hard (8)**
86:17;180:2;
187:14,19;189:2;
190:18;191:9;192:24
**hard-and-fast (1)**
215:3
**hardly (1)**
92:21
**harm (1)**
104:10
**harmed (1)**
104:23
**Harvard (1)**
83:12
**Hasen's (2)**
227:17;299:5
**head (6)**
7:10;63:10;129:9;
187:22;192:5;334:5
**header (5)**
57:13,17,19;85:7;
178:14
**heading (1)**
183:16
**hear (2)**
80:17;148:9
**heard (1)**
53:17
**hearing (1)**
328:7
**held (2)**

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

33:6;35:13
**help (5)**
  43:17;92:6;107:19;
  183:23;232:22
**helped (1)**
  18:5
**helps (1)**
  200:19
**Hence (2)**
  185:3;210:11
**Henrique (3)**
  47:23,25;48:5
**hereby (1)**
  355:1
**here's (3)**
  72:17;194:1;259:24
**Heritage (10)**
  157:10;188:1,12,
  13,16,25;189:6;
  192:21;193:19;
  194:25
**Hernandez (3)**
  45:6;47:5,6
**Hernandez's (4)**
  45:8,10,24,25
**Hersh (7)**
  55:21;237:14,23;
  238:24;239:17;
  253:12;303:14
**Hersh's (1)**
  239:1
**hey (1)**
  76:4
**high (27)**
  11:3;86:4,14;91:12;
  119:1;120:19;121:20;
  124:10;125:17;
  126:11,13,24,25;
  130:4;141:25;147:22;
  168:11;171:15;
  173:18;174:7;234:21;
  257:19;269:4,12;
  270:9;309:11;321:6
**high- (1)**
  126:2
**high-end (9)**
  90:7;91:2,11;92:4;
  125:22;126:5;127:3,
  5;128:9
**Higher (27)**
  52:9,20;53:5,15;
  107:8,12;117:5;
  118:24;119:2;148:4;
  198:1,14;225:20;
  236:20;248:24;250:9,
  10,20;259:6;267:1;
  269:5,9;278:9;309:1;
  334:18,23;342:11
**highest (1)**
  126:11
**highlighted (2)**
  45:2;198:2
**highly (2)**

110:4;152:23
**Highton (1)**
  63:16
**Hill (1)**
  18:6
**Hillary (1)**
  118:16
**himself (1)**
  325:21
**hints (1)**
  107:12
**hired (2)**
  43:17;337:20
**Hispanic (8)**
  37:9,14;42:6;
  229:16,17;243:3;
  251:24;252:6
**history (1)**
  191:22
**hitting (1)**
  146:14
**HO (88)**
  6:6,6,22;20:6,14;
  29:6,8;36:10;51:13,
  20;54:8;55:9,13,19;
  56:2,8;57:1,7;60:6;
  80:23;81:8;82:13;
  83:20;84:12;92:10,
  13;94:22;104:2,5;
  106:8;112:14,16,19;
  113:1;117:20;120:24;
  121:1,5,6;122:3,19;
  123:15;140:16;145:4,
  9,11,12;154:22;
  156:12;157:15;162:7;
  163:20;173:2;193:2,
  5,6;194:12;195:21;
  197:6;209:23;210:1;
  213:9,15;216:17;
  220:2;230:10,13;
  244:23;245:3,6;
  255:7;261:23;264:7;
  268:6;273:4;275:14;
  279:18,21;280:4,18,
  19;312:24;313:4;
  336:13,19,25;337:7;
  354:17
**Hold (2)**
  184:4;265:19
**holders (5)**
  132:1,2;164:16;
  220:19,21
**holding (1)**
  195:19
**holds (2)**
  316:22;322:21
**hole (1)**
  81:2
**home (3)**
  13:23;306:24;
  311:11
**Homeland (2)**
  49:23;204:7

hone (1)
  246:20
**honest (1)**
  105:23
**honestly (1)**
  105:18
**hope (4)**
  105:24;108:18;
  140:3;180:1
**hopefully (3)**
  92:6;180:4;217:19
**hoping (2)**
  58:9;234:20
**hour (3)**
  9:25;10:22,24
**hours (9)**
  10:1,3,10,10,11;
  154:2;228:16;292:16,
  16
**house (4)**
  114:25;191:19;
  202:14,15
**hundred (12)**
  72:19;73:16;75:10,
  18;78:8;79:5;115:6;
  197:9;203:2,5;
  273:12;274:4
**hundreds (1)**
  274:16
**hurricane (2)**
  75:2;76:5
**hurry (1)**
  51:10
**hypo (1)**
  73:9
**hypoth (1)**
  345:15
**hypotheses (1)**
  345:9
**hypothesis (12)**
  26:13,15,21;94:1,
  20,23;95:3,5,6,8;
  334:25;345:15
**hypothesize (1)**
  211:8
**hypothetical (13)**
  72:11,17;73:10,22;
  74:6,16,18;75:2;77:3;
  78:2,5;80:21;81:3

**I**

**ICE (33)**
  225:6;226:19,23;
  232:17;233:2,9,17,18,
  20;234:4;235:10,14,
  18;236:6;305:12,13,
  21,23;306:7,12,21;
  332:9,12,13,15,15,20,
  22,23,25;333:2,13,15
**ID (13)**
  17:15;18:2,19;
  60:16,20;61:5,9,12,

15,15,20,22;62:1
**idea (9)**
  15:4;26:12;35:1,10,
  11;38:14;185:11;
  306:6;329:2
**Ideally (1)**
  75:15
**ideas (1)**
  15:3
**Identification (7)**
  60:12,25;62:1;
  70:11,13;229:17;
  293:9
**identified (11)**
  93:17;116:5,7;
  142:1;165:25;198:23;
  245:21;246:21;
  281:12;303:14;
  320:23
**identify (16)**
  43:15;58:11;
  173:10;190:4,12;
  197:8,17;199:16;
  234:10;235:8;263:13;
  289:8;301:2,12;
  317:9;353:15
**identifying (8)**
  46:25;104:11;
  134:25;198:12;
  243:16;244:13;
  311:12;332:17
**identity (2)**
  244:1,2
**ignore (1)**
  145:14
**ignores (1)**
  178:8
**ill (1)**
  51:11
**illegal (4)**
  118:10;186:5;
  189:16,17
**illegally (3)**
  157:7;168:25;
  234:11
**illuminating (1)**
  332:16
**illustrate (1)**
  311:23
**illustrating (1)**
  162:2
**imagine (5)**
  8:2;81:21;188:9;
  330:3;349:1
**immediate (7)**
  322:13,17,18,23;
  323:6,22;337:10
**immediately (3)**
  228:6,10,22
**immigrant (5)**
  176:24;264:25;
  265:1,3,5
**immigrants (15)**

15,15,20,22;62:1
176:14;224:7;
  225:2,8,12,23;226:9,
  11,15,18;227:5,21;
  228:2,13;332:10
**immigration (5)**
  125:2;232:17;
  343:21;346:11;347:2
**IMMSTAT (3)**
  258:8;259:3,12
**impact (1)**
  68:10
**imperfect (5)**
  15:1;74:14;78:20;
  91:18;225:16
**implausible (1)**
  74:6
**implementation (6)**
  24:5;54:16;61:5,20;
  70:13;309:6
**implemented (11)**
  21:9,15;22:18;
  23:20,25;24:11;
  61:14,22,25;87:10;
  300:18
**implementing (1)**
  24:6
**implications (2)**
  83:11;131:12
**imply (1)**
  340:24
**important (8)**
  41:12,17;77:2,24;
  85:1;89:11;176:8;
  256:9
**impossible (4)**
  98:17;266:9,19;
  340:20
**impression (27)**
  37:6;84:16;105:20;
  110:15;129:25;
  188:17;196:25;
  221:22;222:18;254:5;
  255:13;262:15;
  263:25;268:9;270:7;
  281:25;288:14;289:6;
  292:9;299:7;304:6;
  317:5;331:21;335:18;
  338:14;348:19;
  351:16
**improper (1)**
  56:21
**improve (1)**
  205:16
**inaccurate (3)**
  147:5;204:13;342:3
**inaccurately (1)**
  204:25
**inadvertent (1)**
  51:9
**inadvertently (1)**
  134:9
**inappropriate (8)**
  84:8;97:25;189:7;

318:7;320:24;344:1;
349:8,12
**inappropriately (1)**
153:1
**inappropriateness (1)**
251:1
**inattention (1)**
67:9
**inaudible (4)**
42:18;154:10;
163:14;345:16
**incendiary (1)**
125:2
**incentive (1)**
104:25
**incentives (2)**
176:22;225:2
**incidence (6)**
39:9;40:3;308:22;
345:16,18,20
**incidental (1)**
151:12
**incidentally (9)**
132:2;133:6;152:9;
173:6;177:6;181:16;
242:13;243:17;
247:25
**incidentally-contacted (17)**
151:9;158:13;
164:9;171:23;206:2,
7;241:15,21;242:5,
19;243:2,7,12;244:6;
247:19;272:21;308:6
**include (48)**
10:17;26:8,20,25;
27:1,14;41:12;76:17;
88:4,5;93:22;94:5,15;
142:20;154:9,16,20;
162:9;171:22;173:5,
23;181:12,15;182:10;
186:8;193:19;196:4;
219:16,17;221:21;
222:23;223:3;228:4;
247:2;265:19,25;
268:17,20;269:15,21;
272:13;277:23;
306:11;310:13;326:2;
327:17,22;329:2
**included (33)**
21:12;26:19;88:3;
162:1;181:18,19,22;
219:20;222:19;
242:10,24;258:25;
266:22;271:20,23;
272:11;277:14;
285:22;291:7,9;
293:9;302:6;303:18;
306:2,6;310:1;
311:23;313:17;
317:11;325:12,25;
328:23;348:23
**includes (13)**
94:6,16;95:12,20;

152:17;153:1;154:14;
155:15;172:25;
176:25;246:15;
310:12;338:12
**including (20)**
11:15;40:14;64:9;
69:2;76:18;80:15;
107:7;142:19;160:18;
172:15;176:20;182:7;
219:24;220:6;246:16;
267:19;268:21;
281:19;339:19;
349:22
**inclusion (1)**
348:15
**incompatible (1)**
245:15
**incomplete (7)**
237:15,16,23;
238:4,12,25;239:6
**inconsistent (1)**
212:25
**incorporate (1)**
284:1
**incorrect (8)**
23:24;36:4;134:9;
158:10;159:11;218:1;
238:16;318:5
**incorrectly (2)**
203:20;265:14
**increase (13)**
52:16;54:10;60:12;
62:13;65:12;66:9,25;
71:22;204:3,11;
277:24;325:8;326:17
**increases (3)**
205:10;213:18;
330:22
**increasing (3)**
108:3;205:14;
213:21
**increasingly (2)**
64:9;180:4
**Indeed (2)**
187:14;210:13
**independent (2)**
271:6;272:15
**independently (1)**
197:16
**index (1)**
248:18
**indicate (9)**
74:11;95:22;
171:12;195:22;
207:18;235:8;236:21;
249:7;294:9
**indicated (28)**
31:2;49:1,17;
137:13;152:10,19;
153:6;164:21;166:24;
181:12;204:1;233:5;
235:16;244:6;255:10;
260:5,19;267:9;

274:19;308:13;
313:16;314:21;315:3;
322:12;331:1,24;
333:6,19
**indicates (2)**
212:3;264:21
**indicating (9)**
37:22;50:14;110:8;
119:4;248:6;251:16;
259:13;265:15;
346:20
**indication (4)**
89:23;126:7;127:1;
137:5
**indications (2)**
343:23;346:6
**indicator (2)**
151:23;293:20
**individual (16)**
141:4,8;147:15;
148:14;149:6;151:22;
152:2,19;233:6;
277:15;291:11,12;
308:3;326:6,18;339:2
**individual- (1)**
64:17
**individually (1)**
197:16
**individuals (172)**
21:21;29:11,17,23,
25;30:5,9,15;32:1;
33:3,16,24;35:4;38:7;
43:8;45:6;48:25;49:4;
50:21;62:3;103:14;
104:11,22;125:23;
134:6,8,14,15,19,23;
135:4,6;136:16,19;
137:5;142:4;148:24;
149:13;152:6,7,9,21;
153:17;165:24;167:3,
7;176:11,12,13;177:1,
4;189:19;190:5;
203:14;204:1,6;
205:8,10,13;220:21;
223:22;234:11;
235:15;237:17,20;
239:19;243:17,21,24;
245:20,21,25;246:11;
252:12,13,25;254:3,7;
255:15,17;256:15;
259:6,7;261:12;
266:24;267:2,5;
268:2,10;272:3;
277:18;279:1;281:12,
15;282:1,5,10;
286:15;287:10,21;
288:22;289:8,20,22;
293:9;295:13,22;
296:3,9,17,21;297:1,
6,19;298:12,17;
299:1;301:9,11,12,20,
25;302:24;303:12,15,
17,18;305:1,3,3;

306:15;308:3,5;
309:3;316:2;317:7,
10;318:10,19,19,21;
320:5,16,19;324:23,
24;327:18;328:1,4;
330:25;331:5,9,15,18;
332:17,20,21,25;
333:14,21;335:3;
336:2;338:9,25;
340:17;343:2,11;
346:3,4,13,20;349:15
**ineligible (1)**
61:2
**infer (1)**
296:24
**inference (7)**
219:5;231:15;
331:23;332:18;333:4,
9,11
**inferior (1)**
145:16
**influence (3)**
72:7;185:5;201:22
**influenced (1)**
204:21
**inform (1)**
108:21
**information (110)**
25:4;41:25;53:9;
58:12,16;59:15;61:6;
65:22;66:22;73:3,20;
74:7,9,14,15,17,23,
25;77:2;78:20,21;
79:16;81:4;82:6;
103:19;104:4;107:6;
108:15,16,24;109:1,2;
110:1;116:8;117:8;
121:16;133:5,21;
134:13,18,21;158:7;
160:14;165:20;
166:16;167:24;
175:22;183:1;188:15,
19;204:14;210:6;
211:5,6,7;212:5;
219:8,11;233:8,24;
234:3;235:14;236:13;
243:16;244:13;269:2;
270:19;271:5;276:19;
280:13;281:5,11,11,
15,21;282:5;283:3,7,
9,12,14,16,20;284:2,
24;286:19;287:25;
288:11,16;292:3,18,
21,22;301:18;305:21,
23;313:6;320:2,4,5;
321:12,17,21;322:1;
324:19;325:18;327:4;
331:5,17;339:22
**informationally (1)**
53:7
**informed (5)**
110:14,17;210:13;
211:9,22

**initial (50)**
9:19;27:2;32:13,17;
120:18;121:14;
139:11,18,24;143:24;
147:25;150:24;
152:17;154:24;
155:17;156:1;179:2;
181:25;182:16;184:1;
210:8;213:5;216:23;
221:10,18;229:9;
257:18;266:23;280:8,
11;285:15;286:7,20;
287:13,15;288:20;
290:13;293:14,23;
307:3,6,14;310:22;
311:5;322:7;328:12;
338:8;339:9,23;348:8
**initially (2)**
197:14;258:22
**initiate (1)**
204:8
**innovation (1)**
261:7
**innovations (1)**
261:3
**inquire (1)**
293:7
**instance (25)**
20:23;23:6;38:21;
48:8;62:5;71:16;77:9;
78:22;85:24;90:3;
110:17;151:20;
152:24;194:18,23;
196:5;217:9,18;
218:22;239:6;281:17;
289:23;290:24;343:4;
346:10
**instances (13)**
40:21;187:14,23;
188:20;189:2,13;
192:10;194:16;202:7;
214:9;217:22;289:21;
325:11
**institutional (1)**
52:13
**instrument (6)**
36:25;83:16;
205:22,25;322:18;
326:4
**instruments (1)**
24:8
**insubstantial (2)**
179:20;184:19
**insufficient (1)**
278:16
**intend (1)**
130:12
**intended (2)**
31:16;51:12
**intending (1)**
29:23
**intensity (2)**
59:15,22

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

**intentional (1)**
276:2
**interaction (1)**
335:25;336:3
**interest (2)**
94:14;177:14
**interested (4)**
65:4;94:3;294:3,15
**interesting (3)**
77:23;108:17;129:3
**interests (2)**
65:20;187:10
**intermixed (1)**
190:11
**intern (1)**
18:5
**international (2)**
13:23,25
**internet (4)**
65:7;263:14;
273:21;276:18
**interpret (1)**
322:22
**intersect (1)**
90:11
**intersection (1)**
250:24
**interval (92)**
27:14,22;28:2,6,17,
21;88:13,16;89:7,8;
93:12,15;94:5,6,13,
15,16;95:2,12,19;
96:8;143:16;152:16;
153:1;154:8,13,14,15,
15,20,23;155:2,5,12,
15;159:3,7,16,25;
160:2,4,11,18,24;
161:6,11,13;162:4,6,
13,18;163:4,5,8,25;
164:7;165:5,10,14,16;
166:14;167:15,16,21;
168:9;171:3,16,18;
174:5;181:22;182:7,
14,19,25;183:9,17;
231:1,3,7;245:7,9;
248:18,19,20;308:20;
309:15;310:8,10,12;
342:9;349:7,19
**intervals (61)**
27:1,5,7,11,24;28:8,
13;81:19,23;85:18;
88:3,9,21,25,25;89:5;
90:11,12;92:15,16;
93:21,23;150:21;
154:9;156:9;157:2;
159:13,17,21;161:8;
162:16,23;163:2,9;
164:3;170:25;171:21,
22;175:20;181:10,13,
15,24;182:3,11;
183:11,13,20,24;
230:20;244:25;
245:14;248:21;

262:19;334:21;342:8;
349:5,7,14;350:4,5
**intervener (1)**
44:3
**interview (10)**
169:7;216:14;
226:19,22,25;227:1,4,
15,22;228:12
**interviewed (1)**
169:4
**interviewer (1)**
37:6,8
**interviews (3)**
217:20;218:15;
225:7
**into (20)**
29:9;40:4;104:17;
148:18;149:9;168:2;
183:16;207:18;
208:23;209:9;212:11;
238:6,15;241:2,6;
258:20;296:5;298:15;
340:17;347:19
**introduce (1)**
6:4
**investigate (4)**
11:7;98:24;108:19;
346:1
**investigating (2)**
24:9;35:9
**investigation (1)**
11:10
**investigator (1)**
18:15
**investigators (3)**
21:25;82:24;348:22
**involve (3)**
87:7;192:14;343:25
**involved (7)**
21:20;25:7;46:19;
104:8;277:9;299:2;
317:9
**involvement (4)**
120:17;121:10;
180:20;257:17
**involves (4)**
54:5;104:9;278:9;
343:17
**involving (10)**
18:13,24;35:8;
54:16;56:14;105:17;
110:5;152:11;300:23;
337:12
**IRB (4)**
206:14;234:17;
235:12,21
**isolated (1)**
166:24
**issue (50)**
18:13;21:8,18,19;
22:2,7;23:7;41:11;
43:11,14;65:17,19;
76:20;77:12,24;78:4;

80:16;87:15;99:4;
135:25;136:4;141:20;
150:17;179:9;180:19,
22;185:21;201:22;
208:8;215:1;221:7,
15;226:2;250:2;
253:19;254:24;
258:24;259:2,19;
263:6;270:5;322:5;
324:12;343:20;
344:20;348:13,15;
349:16;351:25;353:4
**issued (1)**
62:2
**issues (33)**
11:11;17:6;23:4;
26:13;35:8;36:7,19;
58:5;63:18,21,22,23;
103:12,22;104:7;
125:16;133:17,18;
142:7;156:9;204:19,
21;205:18;206:17;
218:5;224:11;246:10;
268:24;290:5;342:16;
343:17;345:2,3
**issues-and-answers (1)**
36:9
**item (1)**
257:13
**items (2)**
42:16;314:22

**J**

**January (4)**
118:2;179:3;181:9;
348:11
**Jeffreys (5)**
28:19;160:19,21;
161:4,24
**JESSE (4)**
6:18;7:2;347:15;
355:1
**J-E-S-S-E (1)**
7:2
**job (1)**
13:17
**jogged (1)**
271:21
**joint (2)**
13:22;35:25
**jointly (1)**
43:25
**Joshua (2)**
157:8;168:17
**Journal (8)**
15:21;16:2,7;77:10,
20;79:21,23;275:1
**journalist (1)**
179:1
**journals (9)**
14:12,12;15:10,14;
16:6,9;19:22;77:11;

215:24
**Jr (1)**
6:2
**judgment (3)**
48:9;303:25;304:3
**judgments (1)**
48:3
**jurisdiction (2)**
110:6,7
**justifications (2)**
60:17,21

**K**

**Kansas (218)**
11:10;12:20;17:8;
29:12;33:6,21;34:5;
35:14;36:6;56:10;
87:3,10,13,22;107:24;
108:1;132:7,14,22;
133:4,24;134:2,11;
135:15,22;136:6,23;
137:11;138:1,7;
139:4,23;143:7,20,21;
144:4,9;145:1,22;
146:1,19,23;147:2,4,
11,14,16,19;148:2,15,
19;149:1,5,11,15,19,
22;151:8;157:4;
158:1;166:24;167:12,
18;171:15;172:3,8,
18;173:25;176:5;
177:3,24;179:12;
184:14;197:8;202:11,
14,15,16;203:1;
206:16;207:6;209:7;
210:14;211:9;220:20,
23,24;221:5,14,22;
223:10,19,22,24;
230:5,16;231:19;
233:8,15,18;234:4;
237:24;238:4,6,8,10,
15,20;239:2,15,22,25;
240:17;241:11;
244:11,17,18;245:9;
247:10,13,21;248:9;
252:8,24;253:4,24;
255:9;256:17;258:17;
267:9,20,21,25;
268:21,23;269:3,3,17,
23;270:6,8,8;271:19;
280:14,25;281:7;
282:4,19;283:23;
284:5;285:1;287:2,3;
288:1,5,12,25;289:8,
13;290:1,7;291:12;
292:7,24;293:6,7;
295:21,25;299:12,19,
23;301:2,14;308:16;
309:7;315:8,20;
317:9,11,17,21,24,25;
318:3,11;319:1,4,10,
15,18;320:18;321:1,4,

8,11,22,25;322:14;
324:21;325:13,15;
326:3,11,25;327:7;
328:20;329:8;330:12,
17;337:18;338:25;
351:2,3,10,12,14,15,
16
**Kansas's (2)**
334:1,9
**Kansas-specific (2)**
136:3;269:23
**keep (6)**
113:20;131:9;
146:14;178:11;216:3;
312:16
**keeps (7)**
313:17;314:12;
315:21;317:16;318:2;
324:15,18
**kept (1)**
312:18
**key (4)**
15:3;245:18;
342:19;349:1
**kind (47)**
11:21;15:7;35:17;
54:6;61:5,6;65:20;
68:1;71:10,19,19,24;
72:5,11;74:5,7,19;
93:6;103:23;104:1,4;
106:21;108:14,23;
116:8;117:8,11;
124:8;139:12,13;
150:9;177:4,7;
189:15;190:25;
198:14,22;204:21;
234:13;244:1;247:2;
266:21;274:9;290:1;
292:10;320:2;324:15
**kinds (26)**
20:12;24:19,20;
26:11;34:22;54:13;
63:18,21,23;68:6;
72:9;77:25;108:11;
114:21;125:11;177:9,
13;190:23;191:11;
192:16;204:2;235:1;
246:16;277:11;
278:19;298:25
**knew (2)**
233:20;246:3
**knowledge (5)**
17:2,24;84:13;
289:25;291:24
**knowledgeable (3)**
83:21,23;84:1
**known (4)**
79:16;83:10;163:2;
264:18
**knows (1)**
305:13
**Kobach (1)**
168:25

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

**Kris (1)**
168:25

## L

**labeled (2)**
158:6;164:13
**lack (14)**
107:13;109:13;
110:2,21,25;239:7;
281:5;315:3;316:20;
320:5,6;321:23;
331:9,17
**lacking (2)**
238:13;334:13
**lacks (1)**
312:10
**laid (1)**
71:20
**Lakin (2)**
6:7,7
**language (9)**
22:2;43:9;185:13;
285:16;286:1;323:21;
324:14;332:3;344:4
**large (20)**
11:17;63:22;79:17;
85:24;86:7,14;
155:12;162:16;163:4;
170:25;171:21;172:5,
25;185:3;213:24;
248:20;261:19;
334:21;335:2,6
**largely (3)**
121:13;142:15;
150:21
**larger (20)**
38:12;59:11;68:5,
11;75:16;78:22;
85:17;89:9;154:3;
163:10;164:10;171:4;
213:20;214:1;218:4;
296:4;318:18;320:1,
3;341:3
**last (53)**
45:6;52:8,9;72:4;
73:1;75:6;76:6;77:8;
80:7;84:23;85:9,10;
95:25;101:16;102:25;
103:1,4,9;111:13;
113:18;120:13;
122:15,20;124:24;
127:23,24;128:16;
131:2;160:3,10;
184:25;186:16;
221:20;224:17,22;
225:7;257:13;260:1;
274:8;316:24;319:10;
320:17;322:9;325:25;
328:20;329:7;333:17;
335:8;344:25;347:20;
350:11,12;354:4
**late (1)**

**Kris (1)**
321:18
**lately (1)**
127:15
**later (6)**
13:1;34:25;99:3;
228:23;266:15;
301:10
**Latino (2)**
37:9,14
**latter (1)**
321:7
**law (25)**
17:15;61:15;68:14,
16;69:15,16;108:1,4,
8;109:22;110:18;
177:3;185:24;199:2;
212:11,15;223:24;
295:25;309:7;315:20;
317:16;318:2;321:10;
351:3,10
**lawfully (1)**
331:21
**laws (3)**
64:3;91:24;187:11
**lead (11)**
52:10;85:18,21;
162:4;187:1;202:11;
208:11;222:9;259:11;
309:2;336:12
**leaders (1)**
348:20
**leading (5)**
77:11,20;79:23;
139:14,15
**leads (3)**
55:1;120:16;257:16
**leafed (1)**
8:17
**leaked (1)**
170:11
**learn (3)**
77:23,25;299:20
**learned (1)**
329:5
**learning (1)**
81:5
**least (19)**
17:11;46:7;65:4;
89:22;90:6,6,7;
176:16;218:17;262:1,
22;265:2,4;273:25;
282:17;292:11;
305:13;311:12;
314:21
**leave (4)**
76:21;139:16;
148:8;164:1
**Leaving (4)**
78:4;80:9,15;142:7
**led (5)**
31:22;109:8;
110:12;139:9;156:7
**Lee (2)**

17:16;185:15
**left (9)**
51:2,11;75:20;85:5,
6;98:12;310:2;
311:25;323:22
**left-hand (5)**
60:15;62:24;84:22;
101:25;103:6
**legal (26)**
83:7;84:3;103:12,
22;107:14;110:15;
134:21;176:12;
221:23;222:4,8,12;
223:3,11,18;224:2;
232:8;289:1;295:2,
10,23;297:3,8,20,24;
298:17
**legally (8)**
222:13,20;225:13,
24;297:23;335:23;
336:7,9
**Legislative (3)**
15:18;16:5;25:24
**less (25)**
31:10;40:13;48:6;
53:3;62:6;69:3;74:22;
79:22;82:2,5;88:14;
93:3;107:9;108:4,6;
124:5;126:4;136:9;
163:5;246:23;271:1;
277:1;286:11;342:10;
346:8
**Letter (17)**
273:1,9,16;274:5,
10,12,15;341:12,16,
20;342:2,20,21;
343:15;344:9;350:8;
354:6
**letter' (4)**
121:24;122:8;
127:17;341:25
**letting (3)**
56:3,4;127:10
**level (30)**
11:3;86:13;87:4;
95:11,13;96:13;
100:22;111:9,17,17,
25;117:4;118:24;
119:25;124:23;130:6;
137:19,21;179:18,21,
23;190:6,12;249:18;
252:16;269:11;
271:24;272:9;278:16;
352:22
**levels (16)**
98:20;101:3,10;
128:23;138:13;
179:15,24;198:23;
234:21;235:1;250:9,
20;251:12;267:1;
278:9;351:21
**library (1)**
8:17

**license (22)**
132:1;134:20;
135:1;220:22;221:19,
25;223:7,10,24;
288:17;291:5,17;
292:8,25;293:16;
294:20;298:19;
299:14;300:6,24;
335:16,19
**licenses (6)**
61:1;222:9;223:21;
224:5;295:21,24
**lied (1)**
312:23
**lies (1)**
88:12
**Lieutenant (1)**
330:17
**Life (2)**
19:18,19
**liked (1)**
41:22
**likelihood (1)**
213:18
**likely (41)**
31:10,10;39:19,20,
23;48:5;53:3,8;59:16;
64:16;65:5;73:24;
91:8,10;95:22;96:5;
105:8,14,18;107:10;
142:11;176:22;182:8;
183:13;192:15;
196:23;198:9;225:12,
23;241:1;246:18,23;
250:21;259:7;263:1;
295:20;331:22;341:9;
348:24;350:13,16
**limit (1)**
191:25
**limitations (8)**
35:7;93:9;97:11;
176:9;201:1;286:9;
299:1;341:20
**limited (8)**
33:8,10;34:7,9;
139:1;176:11;189:18;
226:5
**limits (3)**
351:11,13,15
**line (15)**
53:25;141:7,14,17;
164:12;165:19;
166:16,20;167:25;
181:3;314:5,15,18,19;
355:11
**lines (5)**
12:19;121:3;
249:12;262:22;311:8
**link (13)**
107:13;187:22;
193:1,19,21;226:24;
227:16;327:20;
329:14,15,16,17,20

**linked (10)**
90:19;91:4;188:19;
254:4;255:11,17,23;
256:1,5,17
**list (172)**
15:16;29:14,17,20;
30:1,9,16;31:4,5,9,13;
32:1,7,11;33:2,4,5,15,
15,15,25;34:7,14,20,
22;35:2,8,11,19,24;
36:5,13,37:25;39:7,
10,16;40:9,9;41:6,14,
24,25;42:5,9,13,15,
24;43:1,22;44:19;
47:4;48:25;49:17;
50:4,17;63:9;132:6;
134:7,9;135:5;142:8;
160:17;197:13,14;
217:10;221:12,19,21;
222:10,18;223:2;
224:1;225:17;231:16,
17;233:1,3,16,18,21;
237:15,16,23,23;
239:18,20;240:6,9,11;
241:7;243:19;288:25;
289:3,9,15;290:4;
295:11;297:14;
301:16,17,21,24,25;
302:1,2,6,11,14,24;
25;303:2,4,9,17,22;
304:1,2,4,8,12,21;
305:17,24;306:7,12,
14,14;308:2,10;
310:23;311:1,9,20;
312:10,12;313:1,25;
314:3,10,22;315:13,
19;316:20;317:2,14,
22;318:12,15,20,24;
319:3,4,8,14,14,16;
320:8,9,11,13,18,19,
25;322:12;328:10;
331:1;332:13;333:5,
19;334:13,18;335:19
**listed (9)**
10:15,16,21;14:8,9;
15:14;70:16;160:21;
163:8
**listing (1)**
63:14
**lists (8)**
29:11;142:4;
157:22,24;170:16;
232:25;289:17;
304:10
**literature (18)**
38:15;52:12;54:1,
23;58:3;63:23;68:18;
69:9;97:10;105:20;
108:18;150:8,17;
156:8;199:11,13;
216:10;344:24
**litigation (4)**
17:14;87:11;

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

110:12;328:21

**little (23)**
8:13,19;10:9,10;
29:1;60:23;61:10;
83:14;87:8;93:24;
105:1;131:19;140:11;
161:15;162:16;
189:20;203:9;205:4;
211:6;226:1;258:20;
279:14;326:22

**live (1)**
72:18

**lived (1)**
18:15

**lives (1)**
323:19

**living (2)**
53:6,8

**local (7)**
13:14;19:19;53:9;
56:10;178:20;192:11;
201:24

**located (1)**
6:3

**location (2)**
43:3;311:11

**locations (1)**
25:23

**log (3)**
216:20;217:2;
227:17

**logic (1)**
226:6

**lone (1)**
97:14

**long (9)**
9:8;53:25;57:21,24;
169:8;232:11;284:19;
314:22;329:19

**longer (1)**
222:3

**look (53)**
35:16;42:14,14;
44:22;50:10;52:5,8;
64:24;68:4;71:16,18,
23;72:6;76:4;84:22;
93:6;121:17;122:20;
124:20;125:6,20;
130:15;160:14,16;
164:12;165:13;168:4,
5;170:13;176:3;
184:10,24;202:8;
205:13;221:17;247:5;
266:13;267:16;280:8;
284:7;287:23;294:25;
295:7;296:3;300:4;
305:5;307:14;313:11;
314:4;316:10,10;
318:10;346:7

**looked (17)**
42:10;46:12;54:13;
59:11,23;110:17;
127:15;162:6;166:23;

182:6;197:16;239:17;
267:21;295:5;301:24;
305:3;346:10

**looking (39)**
11:13;14:2;50:12;
70:5;77:12;81:7;87:7;
120:21;126:3,5;
127:14;130:15;140:7;
151:22,25;153:18;
163:13,17;176:8;
193:10;194:6;215:1;
250:17;254:17;261:7,
8;266:5;267:8;270:5;
278:9;294:15;296:7;
307:19;308:4;311:4;
323:21;333:17;
339:18;353:13

**looks (11)**
9:21;14:2;44:23;
158:10;159:23;
167:25;193:12;
197:11;266:23;314:5;
349:19

**Lopez (4)**
47:15,24,25,25

**loss (1)**
117:17

**lost (1)**
30:11

**lot (27)**
22:16;59:21,22;
63:20;65:1;68:9;74:4,
17;75:13;76:19,19,22,
22;77:6;80:1,3;87:15;
108:22;130:25;
132:16;154:5,18;
155:12;178:6;248:25;
260:12;310:3

**lots (2)**
55:20;67:17

**love (1)**
111:6

**low (30)**
84:24;85:13;86:2,4;
89:13,16,19;92:1;
120:17;121:11;
124:10;126:13;130:5;
142:12;154:19,21;
155:11,14;173:15;
174:6;197:25;202:3;
213:17;214:12,25;
215:10;257:18;
261:18;262:24;
269:13

**low-end (4)**
91:25;92:3;121:17;
126:2

**lower (17)**
52:10;59:14;
107:24;117:3;143:10;
148:12;159:25;
192:11;198:14;202:8;
213:25;215:21;216:8;

225:20;231:21;259:7,
14

**lowest (1)**
271:3

**Luks (8)**
258:5;261:21;
275:20;342:15,25;
344:22;346:23;354:9

**L-U-K-S (1)**
275:20

**lunch (2)**
156:13,17

## M

**machine (1)**
217:21

**magazine (1)**
60:8

**Magdolyn (2)**
47:6,13

**magnify (2)**
179:15;185:4

**magnitude (1)**
114:18

**magnitudes (1)**
111:5

**mail (6)**
63:25;64:10,11,14,
20;65:6

**mail-in (1)**
108:5

**main (2)**
13:15;268:20

**makes (8)**
199:12;234:22;
258:6;273:16,22,22;
286:10;350:23

**making (17)**
56:4;9;98:22;118:9;
249:7,17;251:24;
252:7,23;286:8;
318:23;319:2;333:8,
11;343:24;345:24;
349:2

**manner (2)**
234:17;243:8

**manuscripts (1)**
14:14

**many (54)**
10:1,2;15:13,19;
16:7;18:11;19:6;
24:19;26:11,25;
39:15;44:4;46:3,14;
62:25;63:2;73:24,25;
75:5;76:5;80:12;
86:20;88:4;96:4;
109:20;114:20;115:9;
135:25;148:18;
156:10;169:16;
170:20;172:13;
175:19;185:2;192:10,
12;199:14;201:23;

202:13,19,25;210:3,6;
217:19;218:9,10;
228:16;230:5;267:4;
297:19;298:8,11;
330:10

**March (2)**
122:16;264:10

**Margaret (1)**
6:14

**margin (40)**
96:18,22;97:2,5,16,
21;98:3,7;117:16;
118:10,17,20,22;
119:5,10,12,13;120:2,
3,6;123:5;131:5;
149:24;154:25;
155:18,20;156:2,4;
158:1;159:9,12,12,14;
166:8;181:4;196:6;
198:4;309:14,22;
310:5

**marginal (4)**
325:8;326:17,22;
330:22

**margins (9)**
148:5;150:4,12;
168:7;170:18;178:18;
263:5;303:25;310:3

**Maria (1)**
47:24;48:8,11,12

**mark (11)**
51:7,13;60:1;82:7;
106:3;112:8;117:14;
121:22;140:12;197:3;
312:24

**marked (32)**
9:12;13:3;36:21;
44:16;51:17;60:3;
82:11;106:6;112:10;
117:18;121:25;
140:14;145:7;157:4,
8,11;168:14;193:2,5;
197:4;216:15,18;
239:8;261:16,21;
264:4;272:25;273:2;
275:7,13;313:2;348:1

**marking (1)**
264:2

**marshaling (1)**
69:7

**Marston (1)**
216:15

**Maryland (1)**
186:2

**match (35)**
12:1;25:3;42:19;
43:1;90:5;91:14,15;
99:11;100:6,19,22;
125:24;132:5;134:14;
139:3;221:3;237:17;
239:22,23;291:4,11,
23,25;292:6;296:4;
297:15;302:14,21,21;

303:8;304:7;305:24,
25;306:13;333:14

**matched (7)**
25:14;239:18,20;
240:7;289:2;293:15;
304:21

**matches (8)**
49:22;50:1;124:19;
246:11;292:15;
301:18;304:11,13

**matching (23)**
12:22;21:1;24:17,
18,21,24;25:7;26:1;
91:18;237:13;240:10,
12;244:1;247:3;
254:8;291:17,20;
292:10,14,24;303:24;
305:4,19

**matchings (1)**
301:23

**material (1)**
327:8

**materials (1)**
291:8

**mathematical (1)**
78:9

**matter (11)**
56:15;65:15;95:9;
105:19,21;117:11;
129:17;154:17;208:3;
223:17;290:8

**mattered (1)**
315:25

**matters (2)**
68:9;105:17

**may (44)**
20:4;39:7;56:15,21;
59:2;62:2;67:10;
98:23;108:5;126:7;
128:15;138:23;
176:21;177:13;182:2;
198:15;199:7;205:20;
210:15;211:10;222:7,
7;225:19;226:9,11;
234:2,2;239:17;
246:13;252:11;255:6;
269:25;280:14;
289:23;293:22;
298:17;299:9;316:14;
319:17;325:23,25;
326:21;328:25;
340:17

**maybe (14)**
15:15;68:23,24;
131:17;142:15;
153:13;158:9;199:10;
228:19;269:1;274:8;
283:4;329:21;347:6

**mayor's (2)**
195:10,16

**mean (29)**
9:5;10:5;36:12;
46:9,10;52:20;53:14;

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

54:11;57:25;59:19;
79:7;81:15;85:12;
88:9,23;93:13;104:6;
111:23;163:19;
180:14;181:14;
198:13;254:7,7,8;
260:20;322:23;323:5;
329:14
**meaning (1)**
263:13
**meanings (1)**
61:19
**means (23)**
51:1;54:19;87:24;
89:1;92:20,21;93:15,
16;94:19;95:2,4,5;
159:9;167:20;173:9;
174:2;189:18;237:5;
245:15;320:1,9,13;
344:25
**meant (5)**
10:17;31:20;85:23;
114:17;326:1
**measure (12)**
21:10,15;22:19;
23:21;24:1,11;93:6;
203:13,21;214:20,21;
278:25
**measured (1)**
128:3
**measurement (7)**
263:6,12;264:18;
273:18;278:3,19;
279:8
**measures (5)**
41:4;102:1,17;
108:11;204:22
**measuring (2)**
23:7;319:21
**mechanics (1)**
326:20
**mechanism (4)**
297:16;319:20,20,
22
**mechanisms (2)**
317:8;319:23
**media (3)**
33:20;86:18;170:11
**meet (2)**
8:21;9:8
**meeting (1)**
9:2
**members (4)**
25:15,19;83:13;
231:16
**memorize (1)**
216:12
**memorized (1)**
220:9
**memory (3)**
41:6;42:11;271:21
**men (1)**
40:22

**mention (5)**
247:12;272:20;
328:15,17;344:10
**mentioned (22)**
16:3,5;82:1;129:5;
133:8;172:23;181:7;
194:2;196:21;215:9;
274:19;293:23;
321:14;328:25;330:6;
339:13,14;347:1,5;
349:6;352:7;353:2
**mentions (1)**
340:14
**mere (1)**
173:13
**merely (3)**
23:15;115:13;127:2
**merits (3)**
14:16;15:6;177:16
**met (1)**
97:8
**meta (3)**
142:17;176:6;178:6
**meta-analyses (1)**
143:6
**meta-analysis (13)**
140:24;141:3,10,
16;142:17;145:6;
146:19;147:14;
148:14;149:5,18,25;
150:19
**method (43)**
28:1,5,16,19;97:4,
15,21,24;98:2,7;
150:1,2,4,14;155:19,
22,23,24,25;156:4;
159:3,8;160:19,19,21;
161:9,10,12,18,20,22;
162:12,15,21,22;
163:2;166:7;167:14;
183:8,21;309:15,23;
310:5
**methodological (2)**
150:10,12
**methodologically (15)**
69:13;70:24;75:7;
78:9;80:11,19;97:20,
25;133:14;141:16;
142:16;145:16;
162:22;164:4;320:24
**methodology (1)**
154:7
**methods (21)**
24:23;81:24;93:20,
21,22;150:19,20;
160:17;161:5,5,8,24;
162:2,10,25;163:7;
164:6;165:13,15;
316:3;337:23
**microphone (1)**
92:9
**middle (1)**
124:8

**midnight (1)**
292:17
**mid-term (1)**
59:13
**might (54)**
8:2;13:12;17:2;
31:10;35:16;43:11;
51:11;58:24;62:18;
68:10,14;69:2;70:7;
74:2;75:16;81:1;87:6;
91:20;99:14,21;
105:4;107:6;109:1;
130:3;134:9;136:13;
139:14;140:6;142:8;
147:5;153:13;155:22;
174:6,7;178:9;190:4;
211:5;215:18;217:16;
220:24;227:18;
234:10;246:14;
277:10;278:4;286:11;
292:19;294:10;
295:17;306:20;323:6;
333:2;336:16;346:7
**million (14)**
79:12,13;86:10;
118:22;123:22;
146:23;147:4,7,10;
149:1;230:15;280:25;
288:4;317:20
**millions (11)**
86:20;122:25;
123:8,18;124:1,3,5;
129:11;157:7;168:24;
169:1
**mind (7)**
50:12;63:11,13;
113:20;310:18;
312:17;350:21
**mine (1)**
109:19
**minimum (1)**
60:16
**Minnesota (4)**
115:14,25;116:11,
18
**Minnitte (2)**
283:25;293:5
**minor (3)**
19:13;306:1,9
**minority (1)**
38:22
**minus (1)**
293:25
**minute (2)**
112:14;329:21
**minutes (5)**
8:25;56:25;112:15;
336:13,18
**mischaracterizes (1)**
172:20
**misimpression (1)**
109:9
**misinterpreted (1)**

114:15
**mislead (1)**
128:13
**misleading (3)**
127:4;131:12;342:2
**miss (1)**
63:14
**missed (3)**
42:20;48:22;59:19
**missing (1)**
14:8
**misstate (1)**
341:9
**misstated (2)**
260:6;340:25
**mistake (7)**
27:20;32:5;186:8,9;
266:19,21;341:7
**mistakenly (2)**
258:9;265:15
**mistakes (3)**
46:2,14;267:1
**mistranslated (1)**
109:7
**mix (1)**
109:23
**mixed (1)**
128:20
**mobile (1)**
142:10
**mobility (2)**
142:7;309:1
**models (1)**
83:12
**modest (9)**
12:17;40:18;85:14,
23;86:4;114:19;
173:11;174:1;250:15
**modest-sized (1)**
54:24
**moment (11)**
16:5;84:19;116:14;
139:17;150:25;
178:12;184:4;187:22;
191:4;256:24;288:22
**Monkey (2)**
106:10;261:5
**month (2)**
8:16;79:5
**months (3)**
35:20;42:10;44:24
**more (131)**
19:13,17,21;29:19;
31:10;34:12;38:23;
39:12,18,20,23;40:13;
48:5;53:2,8,14;56:20;
59:4,15,21,22;62:6;
66:5,16;73:20;75:1;
76:11;79:13,13;
85:17;88:14;91:8;
93:3,5;95:9,21;99:25;
105:2,8,17,19,23;
107:10;108:4,6;

111:6;112:14;115:21;
117:11;119:19;
121:16;128:3;136:9;
138:23;142:10,16;
144:13;150:14;154:3;
163:5;168:9;175:19,
22;176:19,22;177:11;
178:6,7;180:5;
183:15;188:18;
192:12,15;196:14;
198:6;201:24;202:1,
2,7,13;208:2;217:23;
225:12,23;227:11;
230:23;231:8,12,21;
232:24;241:2;250:21;
263:18;268:10;271:1;
272:1;275:25;285:9,
14,18,19;286:1,6,10,
11,20;292:18;293:24;
294:13,24;299:25;
303:9;306:10;309:2;
310:3,12,21;311:18,
22;312:3,20,22;
319:7;324:25;339:15;
341:9;342:11;346:8;
348:10;350:1;354:17
**more-detailed (1)**
193:14
**morning (3)**
6:23,24;9:8
**MORTIMER (2)**
6:14,14
**most (48)**
8:1;12:10,14,15;
26:16;40:8;63:24;
64:3,3,7,15,20;65:7,
11;66:8,24;68:2;74:3;
83:3;89:14,20;96:5;
108:25;114:10;115:5,
5;138:16;150:11;
170:23;180:25,25;
183:13;197:24;198:9;
201:19;258:4;259:6;
260:4,24;262:21;
278:25;279:3;303:23;
311:12;325:11;
330:19,23;331:22
**mostly (2)**
8:24;170:2
**motive (1)**
189:21
**motives (1)**
186:25
**motor (3)**
200:21;298:7;
300:17
**move (3)**
56:21;112:7;202:1
**moved (2)**
79:8;110:6
**Moving (1)**
165:19
**much (47)**

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

9:22;40:17;41:22;
63:21;74:15;77:1,5;
79:16,17;81:3;94:25;
111:6;126:4,22,25;
128:16;130:11,12,23;
142:10;144:15;171:2,
4,13;175:6,20;
177:18;186:10;189:9;
215:25;251:5;259:6,
6,7;261:2;267:1,16;
269:6;276:1;277:1;
306:3;319:7;330:6;
341:3;342:11;346:20,
21
**mugger (1)**
   18:5
**multiple (3)**
   70:17;150:18;
   261:13
**must (1)**
   96:12
**myself (3)**
   35:14;43:17;344:5

# N

**naive (1)**
   78:14
**name (25)**
   6:2,25;7:2;43:4,6;
   44:9,19;45:6,9,10,13,
   16;46:12,13,23;47:4;
   48:11,13,15,16,20,23;
   243:23;244:13;291:8
**named (3)**
   151:21;308:3,10
**names (31)**
   43:15,22,23;45:2;
   46:3,7,8,19;47:1;48:3,
   6,6,22;204:9;233:16,
   22;235:6,9,15,18;
   236:11;237:17;
   239:18,20;240:7;
   243:18;244:3;302:10;
   306:7,11,21
**narratives (1)**
   86:6
**national (9)**
   87:4;111:25;
   118:16;130:6;254:18;
   269:19;270:5,10;
   272:7
**nationalization (1)**
   281:19
**national-level (2)**
   11:13;112:3
**nationally (3)**
   175:25;251:25;
   268:23
**nationwide (11)**
   11:19;12:4,6,10;
   78:17;79:4;108:4,6;
   269:5;271:24,24

**natural (1)**
   54:15
**naturalization (26)**
   131:25;133:5;
   136:20;165:20;166:1;
   175:16;183:1;232:12;
   245:11;281:18;282:2,
   7;283:5;285:23;
   287:8,9,11,24;294:20;
   311:14;312:11,14;
   313:23;314:11;315:4;
   339:21
**naturalizations (2)**
   286:13;287:21
**naturalize (2)**
   246:19;293:22
**naturalized (21)**
   85:25;107:7;109:8,
   20,21;136:19;232:5,
   13;245:20;250:11;
   264:25;286:15;
   289:24;294:11,12,21;
   346:15;351:22;352:4,
   17;353:3
**naturalizing (5)**
   176:11;224:19;
   225:1;270:22;289:21
**nature (5)**
   142:22;179:14;
   206:20;225:15;
   258:20
**near (1)**
   121:1
**nearby (2)**
   69:23;71:17
**nearly (7)**
   60:17,20;62:6;
   262:11;345:11;346:4;
   354:11
**neatly (1)**
   25:2
**necessarily (5)**
   90:10;210:12,22;
   286:19;289:20
**necessary (2)**
   102:2;330:19
**need (14)**
   9:16;25:3;55:12;
   78:21;79:13;92:11;
   94:7;116:15;185:3;
   194:8;195:11;318:9;
   321:13,21
**needed (4)**
   46:1,6;281:15;
   321:17
**needs (2)**
   86:20;109:1
**negative (1)**
   173:16
**neglects (1)**
   320:16
**neither (2)**
   65:7;208:6

**Nevada (3)**
   299:5,6;300:10
**nevertheless (1)**
   351:8
**new (6)**
   69:12;70:25;77:1;
   129:25;189:9;229:19
**newer (1)**
   144:19
**news (6)**
   110:15;227:1,4,14,
   22;228:12
**newspaper (1)**
   13:14
**next (9)**
   52:11;62:8,24;
   143:10;181:3;249:14;
   266:3;313:13;327:14
**Nice (1)**
   44:18
**nine (2)**
   19:10;195:9
**Nixon (3)**
   44:9,11;46:23
**nobody (3)**
   22:10;189:25;
   277:21
**nod (1)**
   7:11
**non (3)**
   236:4;262:20;353:3
**non- (1)**
   319:7
**noncitizen (1)**
   350:17
**non-citizen (206)**
   11:14;16:11;84:24;
   85:13;90:14;91:21;
   92:3;96:4;97:6,15,16,
   22;98:22;99:2,12;
   100:11,14,19;101:4,
   20;106:18;107:5,13,
   20,23;108:12;109:15;
   110:2,5,9,22,23;
   111:8;112:3,9;
   113:15,25;114:6,11,
   18,23;115:4,16,20;
   116:2,12,19;117:1,4,
   15;118:19,24;119:6;
   120:8;17;121:10;
   123:6;124:24;125:5;
   128:8,23;130:7,18;
   131:7,23;137:11,25;
   138:6;139:4,23;
   140:25;141:9;142:5,
   13;143:13,19;144:4,9,
   25;145:7,20;147:14,
   16,17;148:13;149:4;
   150:5,13;151:7;
   155:10;157:3,25;
   164:8,15;165:5;
   167:1;170:2,8;172:2,
   8,16;173:13,24;

174:17;175:17,24;
177:20;179:18,21;
180:10,12,14,17,24;
185:18,23;186:8,24;
189:12,14;191:1;
194:24;196:16,20,22;
197:20;198:7,19,23;
199:8;203:12,22,24;
204:17,24;221:14,21;
224:1;229:10,19,24;
231:15,18;232:2,4,15;
237:10;243:7;245:8;
247:9;249:19;250:25;
251:2,14,25;252:8,23;
253:6;255:21;256:10;
257:2,17;258:16;
260:8,23;262:22,24;
263:2,11;271:19;
272:9;273:18;275:11;
278:21;279:10;
280:12;281:7;283:10,
22;284:2,4;287:2;
288:18;289:14,17;
294:10;295:2;297:8;
298:18;299:23;300:6,
11;301:10;304:18,22;
305:11;338:19;
340:18,21;342:12,22;
344:20;347:25;
349:16;350:13;
353:17
**noncitizens (2)**
   331:18;351:7
**non-citizens (299)**
   11:8,19,23,24;12:4,
   6,9,10,14,15;16:18,
   20;17:7;21:22,23;
   30:6,10,16;31:2,5,14;
   32:8;34:20;37:23,25;
   39:16;49:1,18;62:5;
   82:9,15,17;86:2,7,13,
   22;87:15,21,23;
   90:18;91:3;96:10;
   98:17,19,23;100:7,23;
   103:15;106:5;107:9,
   9,11,19;108:3,6;
   109:14,23;114:16,17;
   115:7;116:6;118:11,
   25;119:14,15,18,18,
   23,24;120:2;121:18;
   122:25;123:9,19,22;
   124:1,4,13,17;125:14;
   126:17;129:11,21;
   132:3,13,22;133:3,6,
   23;134:1;135:15,21;
   136:1,6,23;137:3,9,
   12;138:3;139:20;
   141:24;142:1,9,10;
   143:7,21;145:22;
   146:1,18;148:15,19;
   149:7,10,19;151:9,12,
   17;152:12;158:13,23;
   160:25;164:9;165:1;

166:4,9;167:11,17;
171:14,24;173:6,17;
174:23,24;176:4,17,
20;177:6,21,23;
178:17,22;179:10;
181:17;184:13,17;
185:25;189:20,20;
190:9;191:6,7;
195:15,19,24,25;
196:6;198:6,12;
203:15;204:1,6;
205:14,15;206:2,7;
209:5;220:19,23;
221:21;222:19,23;
224:18;225:1,13,24;
226:4;230:5;233:11,
20;234:2,11;235:8;
241:15;242:6,13,19;
243:2,12,13;244:6;
245:22;246:3,16;
247:12,19,21;248:9,
10;249:8,9,20,22,23;
251:4;253:3;254:19,
23;255:10;256:16;
258:7,7;259:7,14;
260:3,5,13,14,14,19,
25,25;261:12;262:12,
20;263:13;264:22;
265:15;266:9;267:3,
6,10,12;270:8,21,25;
271:7,15;272:4,17,21;
276:3;277:2;278:5,7;
280:14,23;281:13;
282:18;283:3,20;
284:25;285:4;287:3,
25;297:25;299:14;
300:1;301:2,13;
305:14,22;306:16;
308:13,17,24;309:1,
10,13,24;310:7;
331:10;333:6,9;
335:15,22;336:7,8;
341:7,9;343:3,11,22;
345:10;346:5,8,12,14,
21;349:24;351:2,4;
352:1,7,17,19;353:4,
6,9;354:11
**non-citizens' (5)**
   87:2,4;202:5,6;
   260:4
**non-citizenship (13)**
   49:3,16;50:6,15;
   110:8;234:16;235:19;
   236:6,8;270:16;
   289:1;290:3;339:3
**none (3)**
   86:19;161:3;268:9
**nonetheless (3)**
   43:11;84:9;110:18
**non-federal (2)**
   192:11;199:17
**non-foreign (3)**
   45:24;47:1,16

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

**nonimmigrant (1)**
221:24
**non-political (1)**
94:24
**non-response (2)**
214:10,22
**nonresponsive (1)**
80:8
**non-US (1)**
332:4
**non-zero (5)**
84:25;87:24;94:4,
18;172:10
**Nope (1)**
140:8
**Norfolk (1)**
6:3
**norms (1)**
206:18
**North (2)**
115:14;116:25
**notation (2)**
62:2,4
**note (6)**
32:21;100:5;101:8;
160:22;327:16;
331:14
**noted (12)**
154:6;201:23;
270:15;285:22;
289:19;312:18;
316:16;331:11;
333:23;343:4;344:9;
355:4
**notes (2)**
8:20;50:11
**notice (3)**
10:14;56:21;138:23
**noticed (1)**
247:11
**notion (11)**
12:14;86:12;
118:16;120:6;123:8,
18;125:14;126:16;
129:11,20;131:5
**novelty (6)**
76:18;77:2,4;78:1,
4;80:9
**November (1)**
106:5
**nuances (2)**
33:23;201:19
**null (10)**
26:12,15,21;94:20,
23;95:3,5,8;334:24;
343:6
**number (114)**
11:8;12:17;19:2,12,
19;29:21,21;30:3;
31:13,24,25;32:1;
39:18,23;51:18;60:4;
64:6;65:5;73:14;
82:11;84:21;89:17;

106:7;112:11;113:21;
117:19;118:5;120:11;
121:3;122:1;124:12,
17;125:19,22;132:22;
133:3,18;134:1;
135:15,21;136:6,23;
140:15;142:12;
144:17,19;145:8;
149:19,22;150:19;
151:21;152:21;157:5,
9,12;158:20;171:4;
179:10;184:13,17;
185:3;187:5;197:5,
17;202:17,18;207:2;
209:5;216:16;217:14;
218:3,4,8;243:21;
248:8,10;252:12;
253:3;255:22,24;
257:13;259:19;
260:18;261:22;264:5;
273:3;275:13;280:17;
296:5;307:22;308:1;
311:20;313:3,15;
315:11;316:6,20,25;
317:1;318:10,15;
321:8;341:19;342:4,
16;343:14,14;345:5,
8;346:10,18;348:1;
349:22;353:13
**numbers (36)**
29:20;38:2;39:10;
40:3;69:14,16;71:7;
74:21;86:7;142:3,8;
145:14,18,25;148:9;
149:10;172:24;
192:14;217:13,23;
218:3,4,7,17;219:16;
220:7;245:25;246:9,
13;247:9;255:21;
259:22;308:2;309:3;
313:21;333:23
**numerical (1)**
144:1
**NVRA (1)**
200:20

**O**

**oath (4)**
8:5;190:17;195:10,
16
**Obama (1)**
119:20
**object (5)**
8:2;53:20;55:10;
129:24;172:19
**objected (3)**
129:14;343:15;
344:3
**Objection (10)**
20:4;36:2;55:5,14;
56:9,16,21;83:7;84:3;
161:25

**objections (9)**
53:20;55:8,12;56:5,
7,11,12,13,20
**obscured (1)**
89:18
**observation (2)**
37:5;247:3
**observations (6)**
79:20,22;171:5;
175:19;178:7;230:24
**observe (4)**
58:15;95:7;266:25;
319:9
**observed (4)**
98:9,10;278:16;
350:3
**observing (2)**
68:25;202:3
**obtain (9)**
222:13;223:10,19;
226:12;234:20;
324:20;325:15;326:6;
335:9
**obtained (2)**
29:16;335:24
**obtaining (2)**
326:25;327:5
**obvious (1)**
172:7
**obviously (10)**
15:1;48:9;74:11;
79:25;108:22;132:13;
180:1;187:8;189:5;
199:4
**occasional (1)**
114:1
**occur (2)**
178:19;352:25
**occurred (1)**
187:3
**October (2)**
106:13;113:10
**odd (6)**
73:22;93:24;95:17;
161:1;349:21,25
**off (22)**
6:13;53:7;57:1,2;
60:5;63:9;92:9;94:10;
112:21;114:18;129:9;
156:14,15;213:10;
272:2;279:24;300:22;
328:10;336:20;337:9;
348:2;353:23
**offer (6)**
84:1;104:19;126:2;
131:11;207:1;338:17
**offered (9)**
21:19;105:19;
186:12;221:9;283:24;
286:2;297:21;298:20;
336:1
**offering (5)**
104:21;198:17,21;

225:11;299:21
**offers (1)**
300:7
**office (23)**
33:9;35:15;36:1,7;
49:22;134:3,13;
135:17,25;195:19,25;
197:15;200:5,8;
233:9,16,19;293:7;
311:11;317:7;321:15,
20;325:20
**officer (2)**
226:19,23
**official (3)**
91:4;291:24;324:9
**officials (5)**
189:18;282:3;
292:2;328:9;337:25
**official's (1)**
186:9
**often (10)**
15:4;225:7;226:14,
18,21;227:5,21;228:3,
14;274:10
**Old (4)**
13:18;18:25;
206:13;234:17
**omitted (3)**
247:14,16;310:16
**once (10)**
17:13;36:4,4;
124:18;143:8;190:10;
217:23;229:18,23;
231:3
**one (302)**
10:9,10;13:12;15:3;
16:4,10;17:11;18:16;
20:10;25:5,11;27:11;
33:12;34:18;35:18;
38:4,16;40:9,18,20;
41:1,4,21;44:18;
45:17,20;47:15;
48:10;50:14;53:20;
54:3;59:8,10;68:11;
69:14,19,19;70:6;
71:9,10,16,17;72:3,5;
74:17,23,24,24;75:1,
15,16;77:11,22;81:1,
9;83:13;86:20,21;
87:7;89:10;90:17;
91:20;94:3,11;95:17;
99:7;104:8;105:14;
109:5,6;110:6;111:3;
113:20;114:11;116:4;
124:6,18,22;125:7,8,
16;128:4,18;130:3,
14;131:2,22;137:18;
138:4,15,15;140:5;
141:18,18,20,21,25;
142:19,20,20;146:7,8;
152:19,24;153:5;
158:21;162:25;163:3,
22;165:19;168:2,8;

170:15;171:2;173:17;
175:19;176:6,9,18,18;
179:7;181:4;182:5,6,
13,18,24;183:6;
185:21;189:16,25;
190:1,4,13,24;191:7;
194:13,21;195:2;
197:9,19;199:7,7,21,
23;201:8,15;202:11,
22;203:2,4,5;204:18;
205:6,13,15,18;208:2,
4;211:13,23;212:1;
213:2;219:5,16;
221:6,11,15,16;
225:18,22;226:2;
230:22;231:13;
232:14;233:3,4;
234:8;237:19,22;
244:5,10,17,18,23;
245:16;246:17,20;
248:13;249:3,13,17;
250:19;252:16;
253:18;254:6,11;
255:5,10,22;257:7,7;
258:24;261:3,8,11,25;
264:24;265:2,4;
267:19;268:11,18,19,
24;269:1,20,25;
270:3;271:21;272:10;
273:7;277:7,15;
278:8,11,12,24;279:1;
286:9,12,20,20;
287:13,13,14;290:14,
14,20;293:19;294:3;
298:7;300:9;302:5;
304:1;306:4,14;
310:21;311:12,25;
312:3,22;314:12,21;
315:5,6,13,21;316:3,
14,15,20;317:2,8,12;
319:22;320:15,20;
321:13;324:3;325:22;
326:5;330:7,9;
331:23;332:18;
333:23;334:22,24;
335:8,20;340:1;
341:4;342:7,19,21,24;
343:5,6,7,9,16,16,16;
344:8;345:4,6;
346:22;352:14;
353:21;354:4,7
**one-minute (1)**
112:13
**ones (15)**
15:12;25:10;40:13;
115:2;133:7;139:10;
198:9;218:19;219:17;
221:9;254:2;274:18;
312:7;342:19;345:3
**one's (2)**
205:14
**one-sided (1)**
159:14

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

**ongoing (2)**
121:16;290:4
**online (1)**
64:9,14,21
**only (47)**
7:23;9:2;12:16;
18:20;27:10,11;33:8;
34:7;56:13;71:10;
72:4;74:7;75:19;
77:15,16;78:15,15;
96:1;152:19;155:12;
171:2;175:16;181:3,
19;192:22,22;198:13;
199:23;200:11;201:3,
12;223:5;227:19,23;
238:23;240:20;
245:25;255:10;270:1;
278:24;281:10;
294:21;316:2;322:10;
332:18;339:20;342:7
**onto (1)**
157:21
**op-ed (1)**
13:13
**open (12)**
121:24;122:7;
127:17;194:21;273:9,
16;274:4,10,15;
341:25;342:2,2
**open-ended (2)**
49:10;277:17
**operate (1)**
300:17
**operates (3)**
25:24;241:13;
300:24
**operation (3)**
186:6;317:8;318:12
**operationalized (1)**
93:7
**operationalizing (1)**
90:14
**opining (1)**
197:19
**opinion (23)**
17:25;39:14;84:1;
114:5;115:25;116:11,
18;118:14;153:24;
184:19;188:24;
198:17,21;214:4,24;
219:14;225:11;
260:15;263:16,18,21;
319:24;331:8
**opinions (1)**
11:4
**opportunities (3)**
75:16;299:13;
300:12
**opportunity (3)**
297:22;300:8;
338:18
**opposed (4)**
15:7;210:6;286:14;

287:21
**opposing (1)**
341:13
**opposite (2)**
250:19;251:19
**opted (1)**
228:3
**option (5)**
65:6,8;317:10;
327:18;328:4
**order (21)**
10:13;20:2,20;21:5;
25:15;38:22;71:14;
74:2;99:11;100:13;
211:23;214:21;223:9;
233:9;267:10;281:14;
299:7;315:25;326:9,
12;327:18
**orders (2)**
114:18;235:4
**Ordeshook (1)**
54:5
**organize (1)**
131:18
**orig (1)**
185:13
**origin (1)**
46:8
**original (4)**
242:2;247:5;
290:13;343:12
**originates (1)**
54:4
**others (11)**
9:18;19:12;27:14;
48:7;54:22;133:19;
161:9;182:11;230:24;
281:16;324:25
**otherwise (3)**
17:3;187:3;349:15
**ought (1)**
38:16
**out (46)**
14:14;30:9,15;
31:14,15;36:6;51:2,
12,15;53:21;58:9,18;
66:20;67:10,20;
71:20;75:3,5;108:16;
120:5;124:20;130:13;
136:19;144:13,20;
146:6;169:24;174:20;
181:11;199:12;200:4;
201:16;202:22;217:8;
227:18;255:1,10;
274:11;275:22;294:4;
300:21,21;310:2;
322:5;323:22;345:12
**outcome (13)**
115:4,8,15;180:18;
187:6,16;189:3,11;
190:7;198:24;199:10,
14;202:6
**outcomes (15)**

85:2;111:18;
114:23;115:18;
179:17,23,25;180:11,
13;187:2,16;191:24;
198:16;200:8;213:4
**outside (9)**
18:14;22:18;24:15;
51:2;53:21,22;55:16;
109:25;234:25
**over (25)**
7:4,19;10:9;17:14;
30:12;45:16;71:23;
79:5;94:12;115:1;
118:17;119:1,16;
124:24;140:7;165:16;
218:8;233:16;259:21;
308:22;317:24;
319:10;320:16;344:7;
352:12
**overall (23)**
12:18,23;42:19;
43:1;65:13;66:10;
70:6;77:15;99:18;
100:22;114:19;
152:22;218:15;
267:19;306:1,9;
311:25;318:10;319:9;
321:4;327:25;334:12,
23
**overlap (7)**
88:25;89:5;92:17;
217:17;245:9,14;
248:20
**overlaps (3)**
93:12,15;95:2
**over-reporters (1)**
254:12
**over-reporting (5)**
236:16;237:12;
246:10,24;253:13
**over-represented (1)**
100:8
**over-sample (1)**
38:22
**overstated (1)**
258:23
**overstatement (2)**
322:25;323:4
**overstatements (1)**
181:11
**overturn (1)**
190:7
**overturned (18)**
187:17,20;189:11;
190:19,25;191:10,14,
17;192:2,17,25;
194:17,18,24;195:5,
23;196:5,20
**own (6)**
21:4;186:9;250:3;
251:10;303:8;322:6

**P**

**packaged (1)**
25:2
**page (98)**
10:18,19;29:2,9,10;
42:25;44:25;45:1,3,5;
47:14;52:5,8;57:8;
60:9;84:19,20,21;
89:17,17;95:25;
98:12,13,14;101:16,
24;103:9;107:1;
111:11,13;113:18;
115:11;118:4;120:10,
25;121:1;122:15,20;
127:20,23;140:20;
148:1;151:3,6,6;
153:18;157:18,21;
160:17;169:13,16;
178:13;184:7,22;
186:15;187:12;
201:16;210:9;221:17;
224:12,20,22,23;
228:24;229:1;230:8;
244:19;257:10;
259:25;264:11,15;
266:3,4;275:18;
280:9,17;284:10,20;
286:25;288:8;293:3;
295:7;296:6;305:6;
307:14,19;311:4;
313:14;314:20;322:8;
327:13,14,15;331:13;
333:17;338:8,16;
355:11
**pages (3)**
194:21;197:4;273:2
**paid (1)**
206:15
**pain (2)**
55:4,6
**panel (8)**
205:7;259:5;261:7,
9;266:14,25;272:9;
276:9
**paneled (1)**
267:16
**paper (39)**
20:24;52:22;58:3,9,
25;59:11;63:5,8;
82:18;85:22;86:15;
100:4;101:19;114:24;
125:19;127:7;180:7;
250:16;258:5,23,25;
259:1,11,16;262:23;
266:22;274:23,25;
340:9,16;341:6;
342:16,18;343:12;
345:4,7;352:10;
354:10,13
**papers (2)**
184:6;253:19

**paragraph (68)**
42:25;52:9;60:16;
62:8,9,23;84:23;85:4,
6;96:1,1;98:16;99:3;
101:16;102:7,22,25;
103:1,4,9;107:4;
111:13;113:18;
122:21;127:23;
140:20,23;148:1;
153:18;169:15;
178:14;184:24;
186:15;187:13;
221:20;224:13,17;
228:25;229:3;230:10;
231:2;260:1;264:15;
266:5;275:19;284:22,
23;285:9,20,21;
286:3;288:9,10;
293:3;305:8,9,15;
311:7;313:14;314:20;
322:10;327:13;
331:13;333:17;342:6;
344:4;350:12;354:7
**paragraphs (1)**
273:25
**paraphrasing (2)**
186:21;226:20
**parentheses (1)**
221:24
**parents (3)**
265:2,3,5
**part (18)**
34:25;42:3;55:25;
80:16;107:21;129:18;
152:6;163:13,18,19;
188:21,22;249:25;
250:1;289:8;291:15;
308:6;328:21
**partial (1)**
103:9
**participants (1)**
104:10
**participate (7)**
57:22,25;62:19;
104:25;119:23;251:4;
349:24
**participated (1)**
99:1
**participating (3)**
68:7;96:10;179:10
**participation (68)**
52:12,17;53:4;54:2,
6,11,25;55:2;58:7;
59:6;64:23;65:13;
66:11;67:1,10,24;
68:15;84:24;85:1,13,
15;86:2,13,22;87:3,5,
24;101:20;107:8,20;
108:13;109:15;110:3,
24;112:4;113:25;
114:6,12,23;115:7,17,
20;116:2,13;117:1,4;
124:24;128:23;

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

130:19;131:7;142:13;
155:10;172:2;179:15,
19,22,24;180:11,13,
14;186:25;187:1;
197:21;198:8,23;
199:8;202:5;342:12
**participations (1)**
128:8
**particular (50)**
17:5;21:18;33:11;
39:25;40:15;42:1,2,
16,16;52:22;58:12;
64:18;65:16;66:20,
21,22;67:12,15,15;
69:4;79:24;87:13;
91:20;111:8;113:23;
117:9;127:12;135:3,
5;173:20;180:21;
181:20,21;182:5;
188:20;197:20;
198:15,16,19;201:20;
251:13;268:17;273:6;
274:18;288:9;295:15,
17;296:2;319:19;
335:11
**particularly (15)**
17:8;27:11;105:17;
129:24;131:22;142:9;
150:9;162:17;163:3,
18;172:1;198:2;
274:13;332:16;
343:23
**parties (1)**
113:23
**partly (8)**
63:6;79:16;270:4,5;
271:23;311:23;
321:17;325:23
**parts (4)**
180:25;267:23;
274:21;288:10
**partway (2)**
285:23;339:21
**party (1)**
43:2
**pass (1)**
234:17
**passage (2)**
60:16;294:19
**passed (5)**
58:13;59:9;65:17;
67:11;134:15
**Passport (6)**
311:13;312:10,13;
313:22;314:11;315:4
**Pate (4)**
51:17;52:1;57:10;
64:6
**pattern (4)**
250:8;251:19;
266:25;270:10
**patterns (3)**
268:22;270:6;

352:22
**pay (1)**
216:3
**paying (1)**
201:18
**Payne (1)**
6:2
**peer-review (11)**
14:11,17,19,21;
15:3;76:17;77:3;98:4;
189:1,8;215:24
**peer-reviewed (27)**
14:3,7,12;16:10;
19:14,22;20:15;21:3;
24:16;25:6,25;27:25;
28:4,15,20;46:19;
52:2;97:14;177:20;
188:12,14;215:22;
216:7;227:7;256:10;
263:22;275:1
**peer-reviewer (6)**
15:9,13;26:18;76:4;
215:4;291:22
**penalty (2)**
8:6;190:17
**people (168)**
11:22;12:13;27:6;
29:22;30:9,15;31:5,
13;32:7;33:5,8;34:4,
7,10,14;35:2,11;
36:12;39:7;41:20;
54:18;58:11,15;59:3,
8,16;61:1,8;62:4;
63:17;64:20;65:3,11,
15;66:8,10,24;67:1,8,
15,18,19;68:6,7;
72:19,25;73:5,17,25;
74:12;75:5,10;76:6,
12;78:8,16,17,23;
80:10;86:9;87:17;
89:14,22;91:2,19;
102:20;104:19,23,25;
105:18,21;108:9;
114:13;117:9;124:15;
125:3;126:25;127:4;
128:14,22;129:7;
131:12;147:9,22;
153:5;156:10;164:21;
166:24;176:15;199:3;
206:10;211:11;
213:19;222:23;223:5;
224:4;230:5;232:8,8;
233:19;235:7,10;
236:21;237:6;248:3;
250:9;253:15,21;
254:12;255:11,22,25;
258:7;263:13;266:14;
267:5;270:21;271:7,
14;281:23,23;282:16;
283:5;289:1,3,15;
290:2;293:22;294:21,
25;295:4,6,9,20;
296:21;297:11;298:6;

299:13;300:20,21;
302:25;303:2;308:6;
309:4;311:20;312:21;
313:21,23;315:6,12;
316:13;317:9;318:13;
319:5,9;320:8,12;
325:12,14;333:9;
335:8,20,21,24;
344:13,18;346:11;
348:20
**per (4)**
9:24;10:22,24;79:5
**perceive (1)**
25:19
**percent (117)**
12:9;30:22,24;31:1,
3,20;32:10;73:4,14;
75:8;79:8;88:16,19;
94:17;95:11,13;96:9,
9,13;115:6;119:19;
121:18;20;125:14,22;
126:17;129:20;142:6;
143:15,20;145:21;
146:17;147:12,18;
148:4,15;149:2,7,16,
21;153:10;158:25;
159:4,4;165:1,6,7;
166:4,9,9;167:11,16,
17;171:14,18;173:13,
14,14;174:7,7;
213:23;215:6,17,21;
216:8;229:11,21;
230:4,17,18;231:1,2,
4,4;262:19;263:2;
269:4,7;281:2;288:7;
303:3;308:23,23;
309:10,12,24;311:10,
10;312:9,12;313:15,
15,25;314:10,21;
315:2,12,18;317:14,
22;322:10,11;331:2;
333:7,22;334:2,9;
340:2,3;343:6,8;
349:14,17;350:1,13,
16,23
**percentage (46)**
12:18;37:24;95:18;
98:25;114:16,17;
132:22;133:3;136:25;
137:3,8,10,12,17;
138:3;139:19,22;
143:7;147:10;148:25;
149:14;154:25;155:5,
18;159:10;164:10;
165:10,17;166:14;
167:22;168:10;176:4;
177:21,23;230:15;
231:9;247:21;280:24;
284:25;288:4;311:20;
318:8,17;320:24;
321:8,22
**percentages (2)**
197:18;215:16

**perceptions (2)**
25:16;121:15
**perform (5)**
149:18;256:9,13;
290:22;293:8
**performed (19)**
24:17;25:8;26:2;
130:17;237:14;
239:22;242:12;
260:21;290:12,24;
291:4,24;292:10,14;
293:15;302:13,21;
303:8;305:12
**performing (5)**
26:11;151:15;
153:25;258:17;290:1
**perhaps (14)**
43:9;71:20;105:1;
108:25;134:16;163:5;
179:7;190:3,7;238:1;
302:9;312:2;322:2;
333:14
**perils (1)**
261:18
**period (5)**
87:7;138:25;
232:10;318:11;323:1
**perjury (2)**
8:6;190:17
**permanent (24)**
176:12;221:23;
222:4,8,12;223:3;
224:2;232:9;288:18;
289:2,14,22;293:10,
21;295:3,10;296:11,
19,23;297:3,9,21,24;
298:18
**permanently (1)**
195:18
**permit (1)**
63:24
**permitted (3)**
107:19;185:25;
200:21
**permitting (1)**
60:21
**person (27)**
19:11;91:17;
126:18;139:24;
151:24;169:9;208:25;
209:1;211:2;232:2;
238:5,14;244:10,14;
255:2;291:16;292:7;
300:8;308:10;322:23;
323:14,17;326:12;
332:7;337:24;338:3,6
**personal (1)**
93:18
**person's (2)**
64:18;201:4
**perspective (1)**
141:13
**Pew (3)**

214:25;215:9,11
**P-H (2)**
47:7,11
**PhD (3)**
6:18;329:22;355:1
**phenom (1)**
95:10
**phenomena (2)**
174:18;274:20
**phenomenon (9)**
92:24;95:6;175:3;
236:15,18,23,24;
237:3;262:25
**phone (6)**
76:7;142:8;151:25;
217:23;219:20;
243:21
**phones (3)**
75:20,22;218:22
**Photo (6)**
60:11,16,20,25;
61:15;70:11
**phrased (2)**
109:6,7
**physical (1)**
108:9
**physically (1)**
290:9
**pick (1)**
342:7
**picking (1)**
261:18
**picks (1)**
128:9
**piece (12)**
15:8;25:13;71:9;
72:3;84:7;114:14;
213:22;261:6;263:24;
273:24;306:1,9
**pieces (9)**
19:25;25:4;86:10;
124:7;127:15;132:4;
209:9;299:8;344:16
**pivoted (1)**
271:18
**place (10)**
18:14;53:6;66:22;
70:8;108:4;140:5;
227:1;307:21;330:11;
335:11
**places (4)**
86:5;161:2;204:4;
349:23
**Plaintiff (1)**
6:19
**plaintiffs (2)**
6:6,8
**plaintiffs' (2)**
200:18;201:1
**plans (2)**
24:9;234:19
**plaus (1)**
119:21

**plausible (12)**
114:22;116:3,20;
117:15;120:1,3;
123:5;180:10;183:15;
202:4;246:2;257:2
**plausible' (1)**
115:21
**plausibly (1)**
119:11
**play (3)**
40:4;124:22;349:1
**played (2)**
19:13;108:2
**plays (1)**
67:20
**please (8)**
6:4,12;7:1,8;22:25;
169:13;284:20;
351:23
**plenty (1)**
22:23
**plus (1)**
293:25
**pm (14)**
156:16,17,17;
157:14;213:11,14;
279:25;280:3;336:21,
24;353:24;354:2,19,
21
**point (61)**
27:15;48:10;51:11;
54:15;65:5;81:9,22;
87:19;97:9;98:22;
130:6,18;143:6,18,25;
147:13,21;155:5,11,
14;159:22;164:25;
174:19;180:15;
183:15;215:15;226:1;
230:9,21;233:13;
236:14;241:5;244:24;
246:5;248:24;249:7,
11;270:12;275:4,22;
279:22;288:19;
293:20;295:8,9;
296:18;297:2;302:4,
9,12;306:8;308:18;
309:12,23;310:6;
318:23;319:2,5,12;
322:2;351:20
**pointed (1)**
322:5
**points (14)**
88:3;154:25;
155:19;159:10;
163:10;164:10;
165:10,17;166:14;
167:22;168:10;231:9;
249:17;273:17
**policies (1)**
52:23
**Policy (11)**
15:20;16:4;25:16,
20;51:24;125:2;

299:12,21,25;326:23;
346:11
**political (55)**
13:18,21,24;14:20,
22;15:10,20,21;16:2,
3,9;19:20;25:14;
39:14;54:1;67:22;
69:3,11;77:12;80:19;
83:10,17;84:14,15;
88:15;91:7;97:1;
114:4;133:13;138:7;
141:14;144:16;
188:24;191:22;
206:19;212:19,23;
213:24;227:7;231:11;
234:6;273:1,13;
274:2,4,5,16,17;
277:11;278:10;
311:17;341:14;347:9;
350:8;354:6
**Politics (9)**
15:19;16:4,7,8;
25:17;51:24;77:11;
79:22;250:8
**poll (1)**
78:15
**polling (1)**
78:12
**polls (5)**
19:20;60:18,22;
78:11;213:24
**pool (4)**
282:5,16;295:4,6
**pooled (2)**
141:4;143:1
**pooling (2)**
167:4,4
**pools (1)**
38:13
**popular (9)**
19:18;106:21;
117:17;118:10,17,22;
119:5;120:7;131:5
**population (56)**
38:8,12,19;73:16;
75:9;78:8,13,24;79:3;
80:12;81:11;98:19;
99:2,12,18;100:14,20;
101:4;108:25;114:19;
125:5;137:11;138:1,
6,17;139:4,9,23;
142:10;174:6;177:14;
213:20;221:4,14;
231:19;251:15;281:7;
283:10,23;284:3,4;
287:2;317:23;318:18,
25;319:3,9,15,18;
320:1,3;321:1;334:1,
10,12;335:2
**populations (4)**
79:10;107:7;178:9;
224:1
**portion (12)**

11:18;59:23;74:12;
78:13;96:10;119:13;
134:19;135:4;320:8,
12;341:6;343:1
**pose (1)**
8:9
**posed (2)**
7:24;354:11
**position (4)**
11:18;201:2;
246:18;350:2
**positive (1)**
173:10
**possess (4)**
312:13;313:22;
314:10;317:25
**possesses (2)**
176:9;325:4
**possessing (2)**
221:23;311:11
**possession (2)**
311:1;313:1
**possibilities (2)**
35:18;333:12
**possibility (6)**
199:4;232:15;
237:12;254:15;271:3;
298:16
**possible (25)**
51:10;64:13,16;
103:13,22;108:14;
110:25;119:13;134:7;
171:23;196:9;211:25;
243:15;251:17;
256:20;298:23;
306:20;308:21;
323:17,20,23;324:24;
331:16;333:13;
339:17
**post (22)**
70:3;106:9,16,20;
107:3;111:12;113:5,
8,14;115:12;117:23,
25;118:3;120:10,23;
122:4,10;127:17;
142:21;256:22;
257:11;261:5
**posts (2)**
128:15;269:1
**Post's (1)**
106:10
**potential (9)**
85:1;93:9;114:1;
133:17;176:19;
179:22;187:1,9;258:6
**potentially (37)**
11:17;12:17;41:17;
53:10;54:20;55:1;
62:18;70:3;72:3,9;
77:24;79:18;89:4;
105:7;115:4,7;127:3;
128:13;130:3;137:20;
139:13;172:4;178:8;

179:16;205:17;214:2,
12;232:7;234:10;
246:16;250:23;
252:18;254:24;
267:18;298:1;326:19;
344:23
**power (16)**
169:17,23;170:1,5,
21;171:7;172:14,15;
173:4,9,23;174:14;
175:9,13,18;177:12
**powerful (1)**
74:3
**practical (1)**
290:8
**practice (4)**
68:17;300:14,15;
338:17
**practices (1)**
295:25
**precedence (1)**
134:22
**precise (13)**
33:22;78:21;79:6,
14;82:2,5;142:3;
172:1;180:2;220:15;
310:11;342:10,11
**precisely (4)**
215:13;220:12;
319:20;342:24
**preciseness (1)**
263:19
**precision (1)**
111:10
**precondition (1)**
180:24
**predisposition (1)**
15:7
**preelection (2)**
63:1,3
**pre-election (2)**
57:21,24
**pre-examination (1)**
68:12
**prefer (2)**
144:17;231:19
**preference (1)**
346:17
**preferred (2)**
312:7;323:22
**preparation (2)**
8:18;9:3
**prepare (2)**
8:11,21
**prepared (1)**
10:8
**preparing (2)**
10:23;321:15
**presence (4)**
58:15;223:11,18;
295:23
**present (13)**
56:15;141:10;

225:13,24;284:23;
285:3;286:20;331:19,
22;332:5;334:17;
336:7,8
**presented (4)**
56:16;289:13;
290:3;294:22
**presents (1)**
275:23
**president (3)**
120:7;123:9;191:19
**presidential (13)**
59:20;116:25;
118:18;119:5,25;
123:19,22;124:14;
125:15;126:18;
129:21;131:6;346:16
**Presumably (8)**
65:3;74:19;176:12;
232:9;292:11;294:11;
297:16;298:7
**presume (1)**
303:23
**pretty (9)**
40:18;63:22;79:6;
110:13;125:2;140:9;
214:8;255:2;261:11
**prevalence (3)**
11:14;12:5;174:18
**prevalent (1)**
343:24
**prevent (3)**
59:3;107:20;290:2
**prevented (2)**
210:15;297:16
**preventing (2)**
108:12;187:4
**prevents (3)**
199:2;290:1;351:3
**previous (16)**
23:17,19;26:4;
98:11,13;125:8;
130:4,16,20;185:15;
285:5,20,21;286:2;
315:24;328:15
**previously (10)**
16:3;17:13;26:3;
28:5;63:8;70:2;81:14;
136:12;201:19;
281:13
**primarily (10)**
8:19;11:11;39:24;
46:13;99:4;138:18;
141:22;169:10;285:6;
287:15
**primary (14)**
15:1;19:21;39:11,
11;132:4;133:7;
199:21;250:1;273:23;
287:17;307:21
**principal (4)**
19:11;21:24;82:24;
348:22

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

**Principally (4)**
19:16;28:7;36:18;
340:25
**principles (1)**
104:9
**print (1)**
349:23
**printout (1)**
115:11
**prior (10)**
31:8;46:18;87:9;
166:1;172:20;181:25;
246:4;281:20;296:12;
309:6
**private (2)**
189:24;190:10
**privilege (1)**
56:14
**probabilities (3)**
179:25;198:14;
202:12
**probability (14)**
88:17,19;117:3,6;
171:18;173:15;
197:23,24;198:1;
202:2,5;309:11;
343:9;350:5
**probably (25)**
19:10;27:19,19,20;
55:5;63:7;74:17;92:1;
96:14;119:1;124:5;
126:9,23;142:1;
182:10;202:23;218:1,
3;223:20;267:15;
271:2;288:21;289:7;
322:25;328:21
**problem (8)**
214:12,16,22;
246:23;264:16;
319:16,25;320:22
**problematic (6)**
109:11;142:9;
156:11;161:15;208:9;
261:10
**problems (3)**
56:6;341:20;342:17
**procedures (1)**
289:11
**proceeding (1)**
117:12
**process (32)**
14:17;25:24;31:7;
36:16;65:21;67:9;
69:7;104:18;234:17;
235:12,21;254:8;
277:12;278:10;292:6,
12,24;312:1;325:3;
326:24;327:3;328:1,
3,11,14,18,21;329:3,
9;330:5,21,23
**processes (2)**
33:14;330:11
**processing (1)**

142:21
**produce (5)**
20:3;132:21;133:2;
162:15;175:17
**produced (2)**
131:22;215:11
**produces (3)**
146:20;147:16;
276:18
**product (2)**
35:24;56:14
**professional (3)**
206:18;273:1;
292:13
**Professor (82)**
6:23;13:18;22:15,
20;23:12;55:21,21;
57:8;63:19,25;80:13;
81:20;83:4,9,13,25;
84:14;125:13;131:2;
132:17;135:9;156:6;
157:16;159:18;
160:23;164:2;175:4;
183:14;190:15;
193:21;194:14;
195:11;198:18;
203:10;205:24;
207:24;208:15;
213:16;239:1;249:1,
6;255:18;262:3,10,
17;263:10;264:9,16,
17,20;265:13;266:4,6,
13,18;275:16;277:6;
278:3;279:7;280:6;
310:4;313:11;318:6;
335:4;337:1,6;340:5,
14;341:5;347:7,11;
348:5,7,8,9,11,24,25;
349:5,6,13,23
**Professors (3)**
253:11;347:6;
348:21
**program (2)**
14:1;83:11
**prohibited (1)**
56:9
**project (8)**
26:21;35:6;44:8,14;
46:18;83:19;234:9;
260:2
**projects (1)**
19:23
**prominent (1)**
191:23
**promise (3)**
105:5,9;206:23
**promised (1)**
104:15
**proof (26)**
33:7,17;34:6;87:17;
102:20;200:15,20;
238:13;239:7;241:10;
289:5,22;315:7,20;

316:16,21;317:15;
318:1,14;319:6,8,23;
320:6;326:10;337:10,
14
**proof-of-citizenship (3)**
211:16;212:11,15
**proper (1)**
318:17
**proportion (9)**
93:24;95:16,20;
98:10,10;161:16;
341:3;350:3,3
**proportions (5)**
28:12;100:5,5;
125:3;183:16
**proposed (2)**
24:4;347:24
**proposing (3)**
22:1;23:6;347:12
**proposition (7)**
185:9;189:1;
192:24;227:5,20;
228:2,13
**prospect (2)**
224:19;225:1
**protect (1)**
104:22
**protection (2)**
56:14;235:2
**protections (4)**
105:19;234:22;
235:11,20
**protective (1)**
235:4
**prove (4)**
189:23;191:6;
320:14;322:13
**proven (1)**
189:14
**provide (36)**
14:23;33:7,16;34:6;
61:6;66:22;74:20;
77:1;87:17;101:19;
102:3;117:8;133:21;
134:12;139:5;210:5;
211:5,7;213:2;
228:22;235:14;266:1;
289:4;294:14;295:22;
299:9;302:10;318:13,
21;320:9;322:2,6;
323:2;337:24;338:3,6
**provided (54)**
8:14;9:20;12:5;
27:5,20,21;38:4;
65:22;81:22;132:7;
134:9,22,24;135:8;
138:11;150:7;197:14;
213:3;216:21;217:8;
219:2,4,13;233:12;
236:12;258:9;288:12,
17,22;289:1,10,22;
290:15;291:2,9,20;
293:9,21;294:1;

295:2,10;296:10,18,
22;297:3,8,20;
302:12;318:14,20;
319:6;328:8;339:22;
342:8
**provides (12)**
78:19;100:4;105:1;
106:21;115:17;
141:23;181:4;225:3;
272:7;326:22;339:2;
344:23
**providing (8)**
134:1;135:14,21;
294:5;296:12;299:12;
316:16;319:22
**proving (1)**
316:4
**provision (1)**
319:8
**proximity (1)**
288:23
**public (17)**
19:21;78:15;86:18;
107:6,18;108:10,11,
15,24;109:2;195:19;
214:4,24;219:14;
344:12,19;351:1
**publication (15)**
19:22;26:22;27:25;
28:4,15,20;76:16;
77:4;96:22;215:5,22;
216:7;227:7;275:1,3
**publications (2)**
14:8;26:4
**publicity (1)**
87:15
**publicized (1)**
110:5
**publish (5)**
14:18;26:5,7;76:12;
212:24
**publishability (1)**
80:16
**publishable (1)**
79:20
**published (36)**
13:13;14:3,25;
16:10,13,17,19;19:14;
20:15,24;21:3,7;
24:16,20;25:6,13,25;
26:17;51:23,25;
70:10;77:10,20;
79:23;96:18;97:19;
213:22;215:23,24;
253:19;255:20,21,22,
24;256:3,9
**punched (1)**
168:2
**purely (5)**
49:7;70:5;100:16;
245:18,19
**purported (1)**
301:12

**purportedly (1)**
300:12
**purporting (1)**
301:2
**purpose (7)**
38:5;39:11;42:2;
87:25;162:2;268:20;
277:13
**purposes (14)**
82:4;153:24;
161:19;200:11,19;
201:5,13;209:24;
227:6;267:19;269:20;
324:21;327:1,6
**pursue (1)**
235:1
**pursued (1)**
110:18
**push (4)**
12:13;86:5,11,25
**put (13)**
12:12;81:19;
105:22;113:23;168:1;
178:5;193:23;202:15;
299:8;306:7;313:5;
321:18;347:19
**puts (2)**
69:3;178:6
**putting (1)**
230:23

## Q

**qual (1)**
24:25
**qualified (1)**
84:1
**quality (3)**
14:23,25;19:19
**quantify (2)**
81:25;226:14
**quantitative (2)**
24:23,25
**quantity (2)**
31:21;160:2
**Quarterly (6)**
15:18,20;16:4,5;
51:24;60:8
**quasi-experimental (1)**
69:21
**queries (1)**
324:13
**query (3)**
151:23;338:13;
348:16
**quick (3)**
53:19;55:3;80:20
**quickly (2)**
7:4;46:4
**quite (25)**
12:3;61:17,17;
78:25;79:2;119:2,13,
21;139:10;142:11;

153:14;155:11,12;
159:21;172:4;182:8;
202:3;221:8;246:2;
251:2,6;315:23;
343:9;346:14;349:5
**quo (2)**
25:16,23
**quote (14)**
169:17,18,22;
174:19;228:14,14;
260:22;263:24;342:7,
7;344:16;349:7;
350:13,18
**quoted (2)**
127:3;173:4
**quotes (2)**
260:5;350:12
**quoting (1)**
268:25

### R

**rabbit (1)**
81:2
**race (32)**
37:16;41:15;42:1,2,
4;99:9,15,22;100:7,9,
13,16;101:9,12;
115:14;116:1,6,12,18;
194:3,18;206:5;
229:14,16;243:2,7;
251:23;252:6;282:22;
283:3,11,13
**races (5)**
41:20;53:9,10;
115:16,19
**racial (2)**
100:6,23
**rain (1)**
199:11
**raise (5)**
55:12;221:15;
234:5;258:5;345:2
**raised (8)**
133:18;180:23;
185:21;221:15;
268:25;342:4,17;
345:3
**raising (1)**
115:13
**range (31)**
11:5;16:8;27:16,21,
22;63:17;81:22;
88:10,20;115:3,5,6,9;
128:10;135:12;
159:23;161:7;162:2,
3;166:8;174:4,9;
176:20;180:10,20;
181:18;222:19;236:3;
246:15;255:4;346:9
**rapidly (1)**
46:5
**rare (2)**

25:1;114:1
**rate (52)**
9:24;10:22,23;43:8;
79:7;87:4;105:5;
119:1;120:16;121:10;
141:25;142:5,13;
172:2;173:13;202:20;
212:21,25;213:3,18;
214:1,20;215:6,20;
216:8;217:10,10;
218:12,14,17;219:2,8,
13;220:8,10,13,16;
236:20;249:21;
257:17;259:12;
261:10,10;278:14,15;
319:7;321:4;334:12,
18,23;342:11;353:5
**rater (2)**
45:17,18
**rates (50)**
21:10,16;22:19;
23:4,8,21;24:1,12;
39:3,5,13,24;40:2,22;
41:10;43:12;46:16;
101:20;107:23,24;
130:8,15;144:5;
203:21;204:17;
213:23,25;214:12,21,
25;215:10,14,25;
216:13;217:8;218:21,
24;219:6;250:5,10,
17;251:12;252:8;
270:9;271:24;309:8;
342:22;352:4;353:9,
14
**rather (27)**
7:10;24:4;27:4;
31:14;32:1;37:23;
47:13;53:4;91:15;
115:21;120:18;
126:22;142:19;
146:11;156:7;157:19;
174:20;181:10;
198:14;215:24;
225:20;253:8;257:18;
276:7;294:9;297:24;
325:9
**rating (1)**
46:4
**ratio (1)**
202:23
**re (1)**
347:24
**reach (3)**
29:23;31:4;232:11
**reached (3)**
29:19;114:22;
151:21;218:17;
243:21
**reaching (1)**
241:5
**read (50)**
33:20;52:18;96:11,

11;102:4,10;103:16;
107:15;111:20;114:2;
115:22;118:12;121:7;
123:2;126:23;128:5;
169:19;181:6;184:15;
185:6;186:18;188:18;
196:9,10,12,14;207:8;
210:17;211:9;222:1,
2;225:9;249:1;
253:18;257:20;
260:10;263:24;265:7;
266:10;274:8;276:4,
22;293:12;296:14;
311:15;313:18;
314:24;322:15;
344:18;355:2
**readers (1)**
115:13
**readily (1)**
216:4
**reading (9)**
42:25;98:21;
147:22;156:8;195:12;
199:22,24;262:10;
299:8
**reads (20)**
57:20;60:16;62:24;
96:4;98:16;107:4;
111:16;113:20;
120:13;143:1;169:16;
181:3;184:12;187:13;
221:20;224:18,25;
313:14,14;322:10
**ready (3)**
63:9;333:20;334:13
**real (11)**
53:19;55:3,16;61:5,
15,20,22,25;80:20;
175:2;352:9
**realize (5)**
59:16;60:24;65:15;
67:11;156:10
**realized (3)**
32:2,25;321:17
**really (14)**
7:4;8:23;12:3,13;
24:24;79:14;89:2;
150:16;202:9;208:2;
211:7;232:22;251:8;
290:18
**reason (23)**
8:8;10:15;23:5;
39:22;61:2,10;74:9;
75:15;147:3;188:18;
226:10;228:9;238:16;
246:17;247:14;
253:20;254:16;270:1;
296:1;299:11;332:23;
339:19;355:11
**reasonable (7)**
8:3;70:8;74:19;
84:10;117:3;160:8;
221:12

**reasonably (1)**
320:7
**reasoned (1)**
128:20
**reasons (13)**
109:23;126:9;
130:3;172:7;186:25;
192:15;250:13;
268:20;269:25;270:3;
272:11;277:7;349:22
**rebut (1)**
340:10
**rebuttal (31)**
32:22;138:22;
139:16;140:12,17;
154:6;157:17;183:7,
19;224:11;228:25;
242:3,11;249:18;
284:7;285:13;290:16,
20;293:4;301:7;
305:5;327:10,23;
329:3;338:16;339:10,
13,24;340:5,16;
353:12
**recall (20)**
34:10;42:9;44:4;
49:25;58:24;155:21;
183:4;188:17;192:8,
19;196:9;216:2;
233:2;236:14;242:23;
247:16;249:6;256:19;
308:8;310:11
**recalling (2)**
192:19;228:17
**receive (3)**
290:18,19;321:16
**received (15)**
26:18;29:25;
220:22;236:13;
237:24;238:24;
291:10;292:15,18,22;
328:22;331:12,14;
348:10,12
**recent (5)**
119:16;124:13;
263:2;333:25;350:17
**recently (8)**
70:10;83:3;110:4;
130:10,23;294:12;
299:4;348:14
**Recess (7)**
57:4;112:23;
156:17;213:12;280:1;
336:22;353:25
**recognize (7)**
9:15,19;13:6;36:24;
51:21;117:21;264:8
**recollection (4)**
34:3;50:3,8;309:19
**recommend (2)**
150:18,18
**record (26)**
6:11,13;7:1,19;

41:2;57:1,2,6;60:5;
91:5;94:10;112:21,
24;148:22;156:14,15;
157:13;213:11,13;
279:24;280:2;336:20,
23;348:2;353:23;
354:1
**recorded (7)**
37:3,5,6,8,11;42:4;
206:5
**recordkeeping (1)**
74:20
**records (11)**
20:20;21:5;25:15,
22;75:4;236:20;
281:20;291:5,6,18;
292:8
**reduce (5)**
29:21;63:1,3;
204:19;279:10,13
**reduced (2)**
229:24;230:2
**reducing (1)**
107:5
**refer (3)**
102:17;104:6;
140:24
**reference (5)**
34:1;53:15;63:2;
102:13,15;170:7;
329:2
**referred (1)**
12:8
**referring (17)**
63:4;68:14;102:19;
114:9;132:24;170:22;
186:11;190:22;
193:17;214:11;
257:23;258:3,4;
286:2;323:19,25;
332:2
**refers (2)**
106:16;113:14
**reflected (1)**
13:22
**reflection (3)**
158:8;268:19;
323:20
**reflects (5)**
168:11;170:25;
209:3;210:20;250:23
**regarding (5)**
337:10;339:8;
345:14;351:18,19
**register (109)**
11:9,19;33:9;34:8;
53:1,3,20;54:18,20;
58:17;59:8;64:8,13,
20;65:1,16;67:12;
73:18;75:11;87:18,
21;108:7;109:24;
110:10;133:23;134:2;
135:16;136:2,7;

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

137:1,14,15;138:6;
139:21;143:22;
146:18;148:20;
149:20;152:20;153:9;
158:21,24;164:22;
165:2;166:1,5,10;
174:25;176:22;
179:11;184:14,18;
185:25;195:20;201:4;
207:5,14,17;208:5,6,
18;209:1,6,11;210:7,
25;211:11,15,21,23;
212:4,6,9;225:3;
226:9,11;237:21;
238:1;239:5,14;
240:6,16,24;241:4;
244:7;247:22;248:11;
250:9;280:15,23;
285:1;287:4;288:1;
289:3,16,18;297:7,11,
12;298:12;300:3;
301:3,14;306:16;
326:12;330:19;
338:18,22;339:5
**registered (184)**
11:24;12:4,11,15,
16;72:24;73:1,25;
76:13;85:21;86:8;
89:15,23,25;90:4,15,
22;91:3,14,16,22;
109:20;110:6;121:19;
132:14,23;133:3,23;
134:2;135:16;136:1,
6,23;137:1,13,13,16;
138:5;139:20;141:24;
143:7,21;146:18,23;
147:4,10,18;148:19;
149:1,14,19,22;
152:20;153:6,8;
158:20,24;161:1;
164:22;165:1,25;
166:4,10,25;167:8,11,
17;171:14;174:25;
176:5;177:21,23;
180:25;184:13;195:6,
7;205:1,9,11;207:5,
13,16;208:5,7,14,19;
209:1,10;210:3,6,13,
23;225:13,24;227:6;
230:16;234:3,12;
235:9,16;236:20,21;
237:6,25;239:13;
240:5,16,21,22,24;
241:3;244:7;246:3;
247:12,22;248:3,7,9,
11;253:3,16,17,22,25;
254:9,13;255:3,16,24,
25;256:17;262:20;
272:5;278:7;280:15,
23,25;281:13,17,18;
284:25;287:4,11,22;
288:1,4;289:4;
293:11;294:8;295:1;

296:9,12,18,22;297:1,
19;298:6;301:3,9,13;
307:1,5,10,24;308:7,
12,12,16,22;309:4,6,
10,13,24;310:6,17;
318:11,13,16,19,21;
319:10;320:17;
349:16
**registering (23)**
11:8;59:3;65:4,6;
87:21;102:21;108:10;
179:11;184:17;199:3;
200:10,19;208:4;
209:6;251:1;294:23;
295:21;297:17;300:2;
327:6;351:4,7;353:9
**registers (4)**
186:8;238:19,20,22
**registrants (2)**
65:22;255:22
**registration (277)**
11:14;12:6;16:18,
20;17:6,7;21:10,13;
26:2;33:11;43:4;
52:24;54:17,24;
55:22;57:20,21,23,24;
58:6,12;59:2,5,12,19;
60:18,21;61:11,13,16;
62:7,10,13,19,25;
63:1,3,25;64:3,4,9,22;
65:2,9,11,18;66:4,7,
16,17,23;67:10,23;
68:23;69:1,12,22,25;
70:18,25;71:5,8;
72:15,18;73:2,6,18,
24;74:13,19;75:4,6,
12;76:6,14,20;78:6;
80:11,13;81:7;82:15,
18;89:13,16;90:1,19;
91:5;92:3;97:15,17,
22;99:15,21;100:11;
106:18;107:24;
110:18,23;113:16;
116:19;126:1;131:24;
135:23;136:20;
137:19,21;140:25;
141:9,25;142:4,5;
143:13,20;144:5;
145:7,20,20;147:14,
16,17,17;148:13,13;
149:4,4;150:6,13;
151:8,8;157:3,25,25;
164:8,8,15;165:5,6;
170:3,8;172:8,16;
173:13,24,25;174:17;
175:1,17,25;177:20;
180:17,22,23;185:19,
24;196:17;200:16;
201:13;203:12,22;
204:17,24;210:16;
214:21;225:3,8;
226:15,18;227:21;
228:3,14;229:10,19,

20,24,25;231:16;
236:16;237:10,12,22;
238:3,6,8,12,15,21;
239:3,15;240:1,8,17;
241:7,9;245:8,22,23;
246:1,10,23;247:2,9;
249:21,22;250:5;
251:11,25;252:8,24;
253:7,8,9,12;254:4,
10;255:12;256:10;
258:16;262:24;270:9;
271:19;272:5,9;
275:11;278:17;
279:11;280:12,13;
281:24;282:1,6;
283:16;286:17;
288:24;291:6,18;
292:8;293:1,16;
294:2,6,20;297:22;
298:20;299:2,9,13,22;
300:8,11,12,20,21;
302:15,20;303:9,19;
304:5,14;308:10,23;
315:8;321:4;324:22;
325:3,8;326:11,17;
327:1,5;330:23;
335:25;343:25;
344:20;349:16;
352:23;353:14,17
**registrations (2)**
33:6;34:5
**regression (4)**
26:12;28:10;94:1,
12
**regret (1)**
27:3
**regular (3)**
100:17,17;290:10
**regularity (2)**
274:21;292:11
**reject (3)**
94:20;95:3;334:24
**relabel (1)**
160:3
**relabeling (1)**
160:13
**related (3)**
18:17;20:13;28:10
**relating (1)**
352:18
**relative (6)**
67:9;139:7;152:18;
174:22;177:16;
323:25
**relatively (9)**
66:8;111:8;125:17;
159:22;173:15;
174:16;189:15;292:2;
294:7
**relevance (3)**
53:21;55:14,15
**relevant (11)**
23:8;71:9;87:6;

201:21;213:20;
249:21;319:17;326:6;
327:24;328:9;350:3
**reliability (11)**
203:13,21;204:11,
16,19,21;205:2,16,18;
277:25;292:6
**reliable (4)**
215:11;231:12;
261:12;272:8
**relied (3)**
193:22;215:5;
291:23
**reluctant (1)**
172:6
**rely (8)**
17:25;74:24,25;
133:1;188:24;212:20,
24;254:2
**relying (3)**
156:11;227:4;294:8
**remains (2)**
97:12;121:13
**remarkable (1)**
170:1
**remarkably (1)**
214:24
**remedied (1)**
56:15
**remember (37)**
9:25;18:8;32:23;
35:12,19,21;42:3;
49:20;55:20;81:12;
100:21;142:3;143:24;
144:2,6;169:8;176:1;
178:25;182:4,12,13,
18,24;193:9;215:13,
16,18;228:15;233:13;
236:10;242:8;274:7;
291:8;303:5;338:19;
345:5;349:9
**remind (1)**
115:13
**removed (3)**
33:24;218:20;289:9
**repeat (2)**
194:9;276:10
**rephrase (1)**
340:12
**replied (2)**
22:5;265:23
**reply (3)**
306:21;348:8,9
**report (223)**
9:20,23,25;10:6,7,
15,23;11:10,20;
12:21;13:8,10;27:2,
21;28:24;29:3,19;
30:2,8,14;31:20;32:3,
14,17,20,22;36:25;
50:12,14,19;51:3,10;
87:8;89:12;95:16;
131:14,20;132:5,9;

133:19;135:13;136:2;
138:10,11,19,22,25;
139:11,17,18,24;
140:12,14,17;143:24;
147:25;150:6,19,21,
24;152:17;153:17;
154:6,24;155:17;
156:1;157:17;159:19;
162:14;176:21;179:2,
13;182:1,16,21;183:2,
8,19;184:2,21,22;
185:9,12,15,17;
186:18;187:12,25;
188:3,5,7,11,16,18,22,
25;189:6;190:16,20;
192:7,22,23;193:9,19,
20,22,23;194:25;
195:1;196:4,11,12,14,
22;197:8;198:2;
203:15,19;204:5;
207:24;210:8;213:5;
214:25;215:9,10,11;
216:23;221:1,10,18,
18;224:11;227:20;
228:4,25;229:9;
231:2,6;232:20;
233:2;236:19;242:2,
3,11;244:16;247:5;
249:2,3;252:3;253:7;
255:19;256:14;259:1;
262:1;264:3,10,12,13;
266:4,23;280:8,11;
283:25;284:7;285:15;
286:7,21;287:13,15;
288:8;289:19;290:14,
16,17,21;292:17;
293:3,4,23;296:7;
305:5;306:2;307:3,6,
15,16;310:14,22;
311:5,5;313:14;
318:6;321:16;322:7,
8;327:10,23;328:12,
22;329:3;331:12;
332:3,8;335:12;
338:8;339:9,10,13,18,
24,24;340:1,2,5,6,7,
11,16,19;345:16,20;
349:18;353:12
**reported (19)**
27:10;30:6;31:19,
20;32:2;38:2,3;89:24;
112:1;119:19;139:10;
152:16;156:2;205:13;
229:9;256:16;311:10;
340:18;342:23
**REPORTER (25)**
6:16;7:11,18;15:22,
24;42:20;61:23;94:9;
103:25;123:11;
145:10;154:11;
163:15;194:4,8;
195:11;209:22;220:1;
254:20;268:3;337:12,

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

15;345:17;350:15;
352:13
**Reporting (4)**
6:3;28:9;204:25;
247:2
**reports (17)**
8:15;10:8;24:7;
49:2;131:21;132:17;
133:25;135:14,20;
170:9,11;176:21;
188:14;203:25;
271:25;288:11;301:7
**representation (2)**
125:12;249:24
**representative (8)**
98:18,23;138:17;
220:19;221:13;249:9;
282:18;318:25
**representativeness (3)**
100:1;224:11;281:6
**Representatives (2)**
202:14,16
**represented (1)**
334:11
**representing (1)**
126:19
**Republican (2)**
119:17;125:3
**Republicans (3)**
157:6;168:24;198:7
**reputation (2)**
84:14,17
**request (4)**
291:2;306:22;
317:10;326:20
**requested (3)**
33:16;34:23;290:23
**requests (1)**
261:13
**require (3)**
54:18;61:10;338:25
**required (7)**
117:10;190:7;
251:9;299:2,7,9;
322:13
**requirement (21)**
60:20;65:11;66:7,9,
17,24;67:17;68:1;
70:11,14;71:5;81:7;
200:15,21;211:17,23;
300:10;315:8;316:22;
324:22;326:10
**requirements (21)**
54:17;55:22;57:20,
24;58:6;59:3;62:25;
63:3;66:16,23;67:4;
69:23,25;70:19;
87:10,17,19;102:19;
200:10;210:14;
211:10
**requires (2)**
108:8;227:11
**requiring (2)**

54:24;295:22
**requisite (2)**
298:3,4
**rerecord (1)**
92:11
**reregister (2)**
110:7;246:5
**reregistered (1)**
110:11
**Research (63)**
16:8;18:23,25;19:1,
4,14;20:16;21:4,7;
22:10:24:16;28:9;
41:11;46:19;58:21;
79:24;83:5,22,24;
84:10;92:6;104:9,23;
105:1,13,25;106:17,
17,23;110:21;113:15;
116:9;117:12;118:14;
119:4;120:5;123:8,
18,24;125:13;128:12,
14,14,17;131:4;
133:16;192:5;207:21;
212:23;213:22;214:4,
24;215:15;219:14;
250:3,4;251:10,11,16;
262:6;274:17;277:21;
351:6
**researcher (1)**
24:25
**researchers (2)**
82:23;207:21
**residence (1)**
295:3
**residency (13)**
288:18;289:2,14,
23;293:10,21;295:10;
296:11,19,23;297:3,9,
21
**resident (2)**
221:23;298:18
**residents (10)**
75:19;176:13;
195:7;222:4,8,12;
223:3;224:2;232:9;
297:24
**resolves (1)**
26:13
**resources (1)**
35:7
**respect (6)**
48:24;79:1;238:4,
12;272:14;278:19
**respond (7)**
22:25;23:2;31:10;
41:21;105:18;261:13;
268:10
**responded (6)**
98:18;213:19;
214:6;266:24;274:22;
316:13
**respondent (9)**
37:7,9,16,19;323:9,

15,18;324:17,20
**respondents (78)**
31:2;37:4,22,24;
38:19;41:2;42:24;
45:7;46:17;47:15;
49:16;50:5,16;78:7;
81:11;98:25;99:9;
103:19;166:21,23;
167:18;168:7;203:19;
204:24;206:6,21;
207:18;209:20;210:2,
12;211:15,20;221:3;
232:16;233:4,10,17;
234:2,16,21,23;235:7;
236:5,9,19;239:12;
240:4,15,21;243:4;
249:7,19;251:23;
252:6,10;253:24;
255:9;256:5;258:17;
260:18;264:23;266:7,
14;267:9,25;269:18;
270:17;272:16;
273:19;276:10,13;
278:4,6;305:21;
307:22;315:3;333:5,
18
**respondents' (2)**
260:3;276:19
**responding (3)**
261:5;263:22;
308:24
**response (93)**
23:13;39:3,5,13,24;
40:2,16,22;41:10;
42:18;43:8,12;46:16;
49:8;75:23;81:20;
84:7;93:4;97:10;
105:5;139:14;208:14;
212:21,24;213:2,17,
23,25;214:1,12,20,25;
215:6,10,14,20,25;
216:8,12;217:8,10,10;
218:12,14,17,21,24;
219:2,6,8,13;220:7,
10,13,16;232:21;
240:22;249:3;258:9,
24;259:2,5,12;261:9,
10;273:8;275:15,20;
277:17;278:14;
283:25;290:18;309:8;
315:24;322:4;323:18;
331:12;332:12,15;
340:9;341:19,22;
342:3,20,20;343:17,
20,20,24;344:9;
345:21;347:14;
354:10
**responses (26)**
20:3,16,19,21;21:5,
6;25:14,18,22;29:17,
25;49:19;50:7,17;
76:10;128:4;208:12;
230:20;232:25;

243:22;258:11;276:7;
277:25;278:17;279:6;
342:24
**responsible (2)**
36:17,18
**responsive (1)**
194:13
**responsiveness (1)**
56:17
**rest (4)**
44:6;199:19,19;
336:17
**restate (1)**
351:23
**restricted (2)**
295:16,17
**restrictive (2)**
278:25;293:24
**result (15)**
14:16;79:19;95:16;
171:9;190:19,25;
191:10,17;192:2,25;
194:24;195:23;
196:20;211:16;
263:12
**resulting (1)**
214:12
**results (21)**
20:11;28:9;37:22;
105:9;106:22;113:22,
24;128:24;139:9;
195:23;196:5;215:12;
221:8;229:23;231:3;
250:14;312:2,3;
315:2;336:12;343:10
**retained (2)**
53:22;55:17
**rethinking (1)**
315:24
**rethought (1)**
60:23
**return (1)**
256:23
**returning (1)**
125:20
**Revenue (1)**
291:15
**review (6)**
8:20;14:13;15:20;
16:3;25:14;58:3
**reviewed (3)**
233:1;259:11;
264:13
**reviewing (2)**
8:13;11:12
**reviews (3)**
15:19;16:7;274:8
**revise (1)**
22:6
**revised (3)**
54:4;284:23;291:10
**reweight (1)**
101:5

**reweighted (2)**
101:9,12
**re-weighted (1)**
100:18
**re-weighting (1)**
100:9
**RICHMAN (83)**
6:18,23;7:3;9:13;
13:4;22:15,16;23:12;
36:22;44:17;51:5,8,
14,17,17;57:8,10;
60:1,3;63:25;80:14;
82:8,10,11;106:4,6,7;
112:8,10,10;113:3;
117:14,18,18;121:25;
122:1;125:13;128:1;
131:3;132:17;135:9;
140:15;145:8;157:4,
8,11,16;169:18;
175:5;181:5;190:15;
193:21;194:14;197:3,
4;198:18;203:10;
205:24;208:15;
213:16;216:15;230:6;
261:16,22;264:2,4,20;
272:25;273:2;275:9,
12,13,21;280:6;
310:4;312:24;313:3,
11;335:4;337:1,6;
348:1;355:1
**R-I-C-H-M-A-N (1)**
7:3
**Richman's (6)**
145:6;157:2;
178:17;264:17;
312:25;354:12
**Richmond (1)**
121:23
**Rick (2)**
227:17;299:5
**right (226)**
14:4,5,6;16:15,22,
23;17:11,12;26:5;
29:12;30:10,16,18,22;
31:6;32:19;37:4,19;
41:3;45:11;47:23;
50:23;57:12;58:22;
60:9,10;63:9,25;
64:10;65:24;68:2,17;
70:20,21,22;73:8;
75:2,24;76:2;82:1;
84:18;88:17;89:3;
91:6;94:4;95:3;96:19;
98:1,21;99:10,19;
101:21;102:14;
103:16;106:19,20;
112:5,6;123:2,3;
124:2;136:8,11;
139:25;141:19;144:9,
10;145:22,23;146:2;
151:1,9;152:15;
153:19;158:25;159:5,
6;160:20;165:11;

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

167:2,22;168:4;
170:10;171:18;
172:17;180:14,16;
181:7;185:9;186:21;
190:19;196:13;197:2;
204:9;207:13,14;
208:15,16,23;209:13;
210:17;211:24;
212:13;213:10;
214:17;215:17;
216:25;217:4,11,12,
15;222:4,24,25;
223:11;225:5;226:13,
24;229:2;230:1,21;
232:6,19;233:14,21;
235:13,23;236:25;
237:3;239:21;242:6,
14,16,22;243:4;244:8,
9;245:1,11,15;248:4,
5,12;251:7;252:2,14;
256:25;257:4,20;
259:25;260:14;263:7;
264:13;265:16;
266:16,17,19;268:15;
269:19;270:13,17,18,
22,23,25;271:15,20;
273:14,21;274:24;
278:13,14,18;282:13;
283:6,11;287:23;
289:5;295:8,11,12;
296:14,20;301:25;
302:8,16,22;303:6,10,
11;304:19,22;305:25;
306:18;307:8;310:14;
311:3,4;312:19;
313:11,18;314:1,16,
24;315:9,11,15;
317:19;319:16;
323:19,21;324:1,4,7;
325:10;327:21;
329:22;334:4;335:3;
336:15;337:1;342:24;
343:12;346:3;348:6;
352:6

**right-hand (4)**
  62:17;95:25;96:2;
  101:16
**Riker (1)**
  54:4
**rises (1)**
  313:15
**road (1)**
  18:14
**Roads (1)**
  19:18
**Roberts (3)**
  44:12;46:24,25
**robust (1)**
  199:13
**ROE (48)**
  6:9,9;20:4;29:5,7;
  35:15;36:2;53:19;
  55:3,10,15,25;56:3,

24;80:20,24;83:7;
84:3;112:15,17;
120:20,25;121:4;
122:17;161:25;
172:19;193:3;213:7;
230:8;244:19;280:17;
325:19;328:3;329:6;
330:8;336:18;337:5,
14,16;345:19;347:22;
348:3;350:16,19;
352:15;353:20;354:3,
16
**role (9)**
  14:21;15:1;16:24;
  17:1,8;19:13;108:2;
  111:1;349:2
**rolls (1)**
  189:19
**room (1)**
  9:6
**rough (1)**
  10:2
**roughly (7)**
  14:5;19:6;281:1;
  292:16,16;303:6;
  329:19
**round (2)**
  32:9;82:25
**rounding (1)**
  144:10
**row (3)**
  145:15;158:14;
  160:14
**rows (4)**
  45:5;220:7;313:10,
  11
**rule (10)**
  56:11;67:16,23;
  69:12;70:25;71:3,8;
  92:15;109:13;110:22
**rules (16)**
  7:5;52:16;54:9,13,
  22;55:7;56:6,8,10;
  68:4,6,24;69:1,5,23;
  299:19
**ruling (5)**
  200:9;201:3,12,14,
  21
**run (2)**
  130:14;341:3
**Ryan (3)**
  44:9,11,11

**S**

**sacrosanct (1)**
  190:9
**safe (1)**
  315:20
**sales (1)**
  146:5
**sam (1)**
  173:8

**Samantha (2)**
  261:21;354:9
**same (39)**
  7:16;55:5;67:18;
  71:4;74:1;80:21,24;
  86:14,24;88:24;
  90:21;92:23;106:17,
  23;111:11;119:8;
  120:24;150:21;
  205:25;208:3,3;
  219:1;243:3,8,13;
  258:15;261:14;
  273:17;277:3;295:1;
  296:10,22;297:8,20,
  23;298:20;341:6;
  345:2;346:19
**same-day (23)**
  60:18,21;61:13,16;
  62:9,13,19;65:8;
  72:14,18;73:2,5,18,
  23;74:12,18;75:6,11;
  76:6,13,20;78:6;
  80:13
**same-day-of-registration (1)**
  54:22
**sample (124)**
  29:11;38:11;39:2,
  25;73:4,7,15;75:8,12,
  14,15,16;76:7,24;
  77:15,19,22;78:7,13,
  13,22;79:4,12,18,22,
  25;80:1,10,12;82:2,5;
  98:22;99:16;100:1,3,
  12,14,19;101:3;
  132:2;136:8,24,25;
  138:16;139:6,8;
  141:22,23;142:1,2,12,
  14;152:14;153:5,11,
  16,20,21,25;154:3,4,
  8,18;158:17,24;
  164:18;165:21;
  168:12;170:23;171:1,
  20;172:24;173:8,12,
  21;174:1,9,16,22;
  176:23;214:13;217:9;
  221:13;229:5,13;
  231:8;241:18,20;
  242:5,18;243:1,7,9;
  246:15;248:1,17;
  252:17,21,22,25;
  253:2;254:17,18,18,
  21,22,25;261:19;
  267:8,17;269:7;
  270:20;276:13;281:6,
  22;287:2;308:15,21;
  310:22;320:1,11;
  334:19;335:3;354:12
**sampled (1)**
  152:22
**samples (18)**
  82:4;85:17,18;
  136:11;137:9,24;
  138:4,21;139:22;

142:18;145:15,17;
171:9;174:23;178:10;
217:9;248:14;270:24
**sampling (10)**
  38:9,18;81:17;82:2;
  96:8;136:15,16,18;
  139:14;142:23
**sanctions (1)**
  56:22
**satisfied (1)**
  294:24
**satisfy (5)**
  315:7;316:21;
  317:15;318:1;321:9
**saw (3)**
  227:16;274:12;
  309:25
**saying (21)**
  27:8,16;42:23;59:1;
  71:6;116:10,17,24;
  125:1;129:10,19;
  131:4;147:3;173:4;
  181:23;194:10;
  266:13;269:17;286:5;
  305:9;313:20
**Schaffner (21)**
  21:24;22:5;82:23;
  258:5;261:4,21;
  265:21,22;272:3;
  342:15,25;344:22;
  346:23;347:6,12;
  348:5,7,11,21,24;
  354:9
**Schaffner's (3)**
  275:21;348:8,9
**scholarly (1)**
  14:24
**scholars (1)**
  14:15
**school (1)**
  18:13
**science (24)**
  13:18,21,24;14:20,
  22,22;15:10,20;16:2,
  3,9;19:1;25:14;54:1;
  77:12;83:17;88:15;
  97:1;133:16;206:19;
  212:23;227:7;274:17;
  347:9
**scientific (1)**
  129:2
**scientist (18)**
  39:15;67:22;69:11;
  80:19;83:10;84:15;
  91:7;114:4;133:13;
  138:8;141:14;144:16;
  188:24;212:19;
  231:11;234:6;274:3;
  311:17
**scientists (9)**
  84:15;94:24;273:2,
  13;274:4,16;341:14;
  350:9;354:6

**scientist's (1)**
  274:5
**scope (1)**
  53:21;55:15,16;
  201:20
**Score (15)**
  28:1;149:25;150:3;
  155:24;159:3,8;
  161:20;166:7;167:14;
  183:8,21,23;309:15,
  23;310:5
**Scratch (2)**
  350:20
**search (2)**
  58:10,15
**searches (4)**
  59:12,23;64:25;
  65:1
**searching (2)**
  58:11,17
**season (1)**
  59:15
**second (42)**
  10:10;27:21;30:12;
  45:9,14,16;49:10;
  50:13;53:14;78:3;
  84:20,23;85:6;98:16;
  107:1;115:11;131:24;
  132:9;133:19;138:10;
  139:17;141:7,14;
  143:2;148:7;164:12;
  166:16;178:14;
  184:24;186:15;
  187:13;209:11;221:1;
  259:25;275:23;
  277:16;293:24;
  306:20;331:13;342:6;
  349:18;350:11
**secondary (1)**
  39:12
**Secretary (24)**
  35:14,15,25;36:6;
  49:22;134:13;135:24;
  197:15;204:8;233:9,
  16,18;234:4;282:4;
  293:6;306:19;317:7;
  321:14,20;325:20,21;
  329:10,12;330:16
**section (2)**
  179:3;275:23
**sections (1)**
  275:22
**secure (1)**
  66:1
**Security (3)**
  49:23;65:21;204:7
**Sed (1)**
  245:10
**Sedgwick (54)**
  131:25;132:10;
  133:4;136:17;165:19;
  171:3;175:15;176:10;
  177:11;183:1;245:10,

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

17,19,20,24;246:8,13;
247:1,24;270:19,20;
271:3,5;280:13;
281:5,6,12,22;282:4,
7,16,23;283:4,5,10,
13,15,22;284:3,4,24;
285:4,13,22;286:16,
19;287:1,10,14,16,25;
301:19;339:8,20
**Sedgwick-County-based (8)**
246:22;247:20;
272:12;279:15;280:6,
22;285:15;286:6
**seeing (1)**
81:22
**seem (10)**
40:17;71:9;118:9;
201:20;290:9;294:6,
9;299:25;310:16;
349:25
**seemed (8)**
22:10;48:5;84:8;
101:9;182:8;262:21;
268:23;270:6
**seems (13)**
74:6;170:12;180:9;
221:12;227:12;
263:16,25;269:11;
273:23;303:6;308:25;
345:15,23
**select (2)**
132:14;319:20
**selected (2)**
319:3,5
**selection (8)**
214:15,18;296:2;
319:15,19,22,25;
320:22
**self-ident (1)**
229:17
**self-identification (1)**
260:3
**self-identified (7)**
151:17;249:19;
262:11;298:17;
305:10;310:23,25
**self-identifies (2)**
299:22;300:5
**self-identify (1)**
299:13
**self-report (5)**
91:22;271:8,12;
272:16,18
**self-reported (9)**
126:4;130:15;
253:8;260:13,25;
311:9;314:3;317:1;
322:11
**self-reporting (1)**
119:18
**self-reports (1)**
22:3
**semester (1)**

130:25
**Senate (7)**
114:25;115:14;
116:1,12,18;191:19;
202:15
**send (3)**
14:14;53:6;332:13
**sending (3)**
235:6,9,18
**sense (34)**
10:2;19:4;33:13,15,
18,19,21;40:15;
46:15;53:5;58:14;
68:16;73:23;77:17;
78:14;87:12;91:12;
111:6;128:15;137:22;
141:24;147:22;180:6;
185:25;189:8;213:20;
245:15;261:12;
286:12;301:17;
326:22;342:1,10;
344:15
**sensible (1)**
299:25
**sensitive (2)**
105:17,19
**sent (12)**
32:3;36:5;233:8,16;
235:16;236:11,13;
265:22;306:21;
332:15;347:10,11
**sentence (39)**
52:9,11;57:19;
62:24;84:23;85:9,10;
101:17,25;102:8,9;
103:1,4;111:16;
113:19;118:6;120:13;
122:21,22;127:24;
169:15;184:10;
186:18;187:13;
210:11,19;224:17,22;
257:13;260:1;285:9;
296:8;311:8;313:13;
322:9;327:14,22;
350:11;354:8
**sentences (3)**
184:25;186:16;
211:8
**separated (1)**
209:8
**separately (2)**
43:19;44:5
**sequence (2)**
35:21;324:12
**series (3)**
24:6;38:15;110:12
**serve (1)**
15:9
**served (2)**
15:13,17
**serves (1)**
41:6
**service (2)**

19:22;83:16
**Session (1)**
157:1
**set (30)**
21:2;22:1;25:3;
36:5;38:4,18;41:25;
48:21;64:3,4;84:25;
100:21;103:20;
104:23;138:24;
152:24;181:13;192:8;
193:16;236:12;
243:20;269:4;270:7;
281:18;300:19;
306:20;316:11;
339:18;343:5,7
**sets (2)**
12:22;136:15
**seven (4)**
48:24;49:16;121:3;
292:16
**several (18)**
12:19,22;15:18;
35:20;42:10;44:24;
79:12;86:9;87:14;
124:22;150:20;
155:13;162:25;
172:23;274:4;319:10;
320:17;333:12
**shades (2)**
71:25;72:1
**shaped (1)**
36:20
**share (3)**
59:12;114:19;
127:25
**shared (1)**
330:8
**sheet (2)**
200:1;355:10
**Sherenovossen (2)**
48:16,17
**shift (2)**
279:22;349:20
**shifted (1)**
121:15
**Shifting (2)**
62:9,12
**shifts (1)**
231:4
**short (1)**
138:25
**shorter (1)**
15:15
**show (20)**
9:12;13:3;22:13;
36:21;44:16;59:25;
62:25;82:7;102:20;
106:3;108:9;117:13;
118:6;121:22;158:5;
168:13;197:2;223:10;
261:15;272:24
**showed (4)**
315:2;338:19;

341:13;353:15
**showing (2)**
63:2;297:23
**Shree (2)**
48:15,17
**shuffling (1)**
184:6
**shut (3)**
67:10;274:11;
344:21
**sic (2)**
116:11;261:4
**side (12)**
18:16;39:12;85:5;
93:23;185:22;197:18;
199:12;201:8;281:16;
294:5,16;312:3
**sides (1)**
344:12
**sign (4)**
121:24;122:7;
127:17;341:25
**signed (2)**
273:12;350:8
**significance (5)**
14:19;26:20;87:25;
172:10;179:5
**significant (12)**
11:18;14:25;102:1,
12,18;155:9;178:17,
23;214:22;260:18;
269:11;353:16
**significantly (6)**
27:13;107:10;
130:20;269:13;
279:10;334:23
**similar (12)**
69:16;71:18;87:3;
139:10;162:5;221:8;
227:24;273:22;
311:24;339:25;340:1;
346:13
**Similarly (3)**
205:12;336:2;
346:16
**simple (4)**
135:13;162:24;
172:12;251:8
**simpler (3)**
22:16;175:6;177:18
**simply (16)**
27:15;42:22;69:14;
70:25;109:2;114:21;
117:7;181:19;189:5;
201:23;211:22;
277:15,22;291:2;
300:19;325:10
**single (7)**
25:3;141:4;178:3;
191:16;192:1;193:11;
194:23
**sitting (7)**
105:25;106:2;

216:6;220:11;228:11;
328:7;330:9
**situated (1)**
336:2
**situation (6)**
59:24;160:25;
300:1,9,13;328:9
**situations (2)**
26:25;59:14
**six (5)**
45:5;164:21;
239:12;240:4,15
**sixth (1)**
47:4
**size (40)**
77:19;78:22;79:5,
12;82:4;137:21;
142:12;143:1;153:20,
21;154:3,4;158:17;
160:1,4,5,11;163:9;
164:10,18;165:9,17,
21;166:13;167:20;
168:9,12;171:1,20;
172:24;173:8,12,21;
174:1,16;267:17;
279:13;334:20,20;
349:19
**sizes (3)**
79:18;170:24;
174:22
**skill (1)**
24:24
**skip (3)**
310:20;314:18,19
**skipped (1)**
265:6
**slight (1)**
144:10
**slightly (1)**
281:23
**slope (5)**
94:3,11,14,18,21
**slow (4)**
15:24;94:7;195:12,
13
**small (39)**
67:18;76:24;77:17,
19;78:14;80:1;85:17;
147:23;150:22;
152:21;153:17,21;
154:1;161:16;168:12;
170:23;171:1,9,20;
172:24;173:8;174:16,
22;178:18;179:15;
185:2,5;186:19,20,24;
187:5;198:4;252:12,
17;254:18,21,22;
269:7;275:10
**smaller (7)**
59:23;68:11;82:2,5;
192:14;248:10;
267:16
**Social (2)**

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

19:1;133:16
**sociological (1)**
277:9
**soliciting (2)**
195:19,25
**somebody (13)**
129:24;170:10;
190:13;232:12;
238:22;261:6;294:7;
304:1;328:7;338:2,5,
21;340:20
**somehow (5)**
32:4;81:3;116:7;
310:2;312:1
**someone (65)**
25:2;35:11;76:3,4;
78:5;85:20;91:13,21;
110:14,17;126:15;
127:2;128:7;151:21;
190:10;195:24;
204:14;207:13;208:9,
13,17,22;209:9;
210:21,25;212:3,8;
223:17;232:1,4;
238:3,11,19;239:5;
294:18;298:4;299:22;
300:5;312:18;313:16,
24;315:8,14;316:22;
317:16;318:2;321:10,
23;322:20,21;323:8,
10,19,23,24;324:14,
18;325:2,4,9;326:8,
13;330:14;335:10;
338:18
**sometime (2)**
58:10;329:7
**sometimes (16)**
26:5;38:21;41:9,19;
67:16;68:19,21;89:4;
104:20;128:19,20;
151:24;178:19,19;
214:7;300:17
**somewhat (6)**
105:23;121:15;
169:24;215:14;
262:16;308:8
**somewhere (4)**
91:11;174:9;263:1;
284:12
**soon (1)**
58:10
**Sophia (6)**
6:7;47:4,6,7,10,13
**sorry (49)**
10:16;16:1;23:9;
30:11;42:20,22;
44:11;46:9,24;61:23,
24;78:25;85:3;94:7;
99:20;102:5;103:25;
104:2;106:14;116:22;
121:4;123:13;127:18;
135:11;155:3;157:19,
23;163:15;194:4;

195:13,14;199:22;
205:7;209:22;220:1;
228:19;248:2;254:20;
268:3;280:16;307:16;
337:12;340:5,12;
345:17;350:15;
351:23;352:9,11
**sort (15)**
8:19;27:7;39:10;
46:13;48:22;59:16;
66:5;74:2;78:11;
127:12;134:21;
139:15;234:24;
279:20;305:11
**sought (3)**
21:10;128:21;331:3
**sound (11)**
14:4;69:14;70:24;
75:8;78:10;80:11,19;
133:14;215:17;
273:13;334:6
**sounds (6)**
8:3;14:5,6;68:1;
279:19;283:18
**source (3)**
33:11;325:18,19
**sources (15)**
11:6;119:22;
125:11;133:2,13;
143:8;204:7;227:24;
228:1,4,6,12,21;
292:2;341:8
**Southern (1)**
347:9
**Spanish (3)**
43:10;47:11;217:18
**spanning (1)**
307:25
**speak (5)**
8:25;23:12;198:13;
263:18;352:14
**speaking (7)**
23:3;66:18;89:1;
213:17;233:15;
238:11;334:10
**speaks (1)**
174:17
**specific (47)**
11:15;12:25;26:24;
30:2;33:14;36:8;
37:12;46:14;47:2;
67:3,14,21;69:5;
74:20;93:7;105:25;
111:17;112:4;116:6;
117:8;132:18;137:23;
146:24;162:3;180:6;
186:25;190:25;192:8;
201:9;205:5;215:16;
218:14;219:18;269:2;
274:15;283:14;
289:11;291:20;292:3;
300:16;324:14;
326:20;333:2;334:3;

347:12;350:5;351:20
**specifically (43)**
21:8,23;22:2,7,12;
23:7;34:11;42:14;
53:13;55:23;56:11;
58:23;66:5;81:13;
101:5;104:11;108:23;
123:7,17;129:7;
130:1,8;132:12;
134:3,12;135:17;
157:18;182:4;204:13;
218:10;228:25;
231:16;232:22;233:3;
248:2,6;258:4;
268:21;286:1;319:4;
324:11;341:19;
348:16
**specifics (4)**
58:8;64:15;223:23;
299:19
**speculate (2)**
226:8,10
**speculating (1)**
225:14
**speculative (1)**
225:19
**speed (3)**
351:10,13,14
**spell (1)**
6:25
**spelled (2)**
47:7,10
**spending (2)**
25:20;35:9
**spent (2)**
8:13;24:3
**spite (1)**
97:13
**spoke (3)**
21:23;265:20;347:8
**spoken (1)**
347:6
**Spreadsheet (6)**
197:4,7,11;198:3;
213:3;290:19
**Spring (2)**
60:2,8
**stacks (1)**
307:17
**staff (2)**
36:9,19
**staffer (1)**
225:6
**stand (3)**
209:19;210:2;
344:17
**standard (3)**
26:8;41:3;88:15
**standards (8)**
76:17;97:1;213:1;
219:15,19,21;220:5,6
**standing (1)**
55:7

**start (12)**
7:15;29:14;63:13;
77:13;136:8,11,24;
138:2;157:16;183:5;
231:25;336:15
**started (2)**
9:9;136:15
**starting (2)**
295:8;350:2
**starts (5)**
103:2;111:14;
257:1;354:7,8
**state (82)**
6:25;11:9;12:20;
15:19;16:4;17:7,16;
19:20;51:24;52:23;
58:19;61:7,9,14,21,
25;64:3;69:3;71:4;
72:18,20,23;73:17;
74:20;75:3,18,18;
76:13;87:22;90:19;
111:17;112:4;133:24;
138:1;139:4;144:4;
147:2;148:2;149:1,7;
167:12;172:2,8;
178:19;179:12;
192:11;201:24;
202:11,24;204:8;
206:16;207:6;209:7;
220:20,22,24;221:5;
223:14;231:19;234:4;
237:24;238:10;270:6;
282:4,24;289:8;
290:1,4,22;291:24;
292:1;293:7;306:20;
320:17;322:14;
323:19;325:21;
328:20;330:12,17;
334:24;336:4
**stated (8)**
167:7;172:7;225:6;
228:9;258:22;266:7;
327:2;340:22
**state-issued (1)**
60:25
**state-level (1)**
269:2
**Statement (7)**
10:21;107:17;
109:12;138:12;
178:21;226:20;
276:22
**statements (3)**
262:21;264:24;
335:2
**States (39)**
49:8;51:16;54:21,
21;58:12;59:18;
63:24;64:1,8;65:8;
68:23;69:22;70:5;
71:17;100:24;177:22;
186:1;187:9;199:21;
222:13,20;223:21;

225:5;232:17;235:10;
249:10,20;251:2,5;
277:10;330:19,23;
331:19,20;332:5,6;
335:23;338:12,23
**states' (1)**
65:20
**state's (19)**
26:1;35:14;36:1,7;
49:22;75:3,9;134:13;
135:24;197:15;233:9,
16,19;317:7;321:15,
20;325:20;329:10,13
**statewide (1)**
71:1
**statistical (28)**
26:5,8,19,20;27:23;
84:11;87:25;88:11;
110:20;156:8;169:17,
23;170:1,5,21;171:7;
172:10,14,15;173:4,9,
23;174:14;175:9,13,
18;177:11;179:5
**statistically (9)**
26:14;27:13;89:1,6;
92:18,24;155:9;
269:11;353:16
**statistics (4)**
24:23;77:8;84:2,6
**stats (2)**
157:6;168:24
**status (66)**
22:3;24:7;25:16,23;
49:3,6,14,16;50:5,6,
16;51:1;64:4,5;89:16;
90:1;110:9;152:11;
176:24;177:1,5,7;
189:21;203:15,19,24;
210:15;232:15,22;
233:2,4;234:15,16;
235:19;236:6,8,8;
247:2;249:22;260:7;
264:19;268:13;
270:13,16;271:4;
272:6;275:24;276:20;
278:20;279:3,9;
289:23;293:10,21;
305:2,24;317:4;
322:14;328:5;332:8,
17;341:1,10;343:21;
344:2;347:3
**stay (2)**
138:2;178:13
**Staying (3)**
111:11;181:2;
187:12
**step (5)**
137:2;325:3;
326:11;330:18,24
**Stephen (7)**
21:19,23;22:9;
82:23;261:20;264:3;
354:8

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

stick (1)
78:2
sticker (1)
9:16
still (23)
13:17;60:19;62:12,
15,23;65:12;66:9,25;
86:1;89:5;103:6;
111:8;114:4;120:22;
121:9;231:8;260:17,
24;261:11;294:8,10;
305:13;339:4
stop (1)
251:7
stopped (2)
212:14,17
storage (1)
144:20
straight (2)
37:24;78:9
straightforward (1)
140:9
strategy (1)
69:19
Street (1)
58:21
strengths (2)
177:9;178:2
stretch (2)
112:17;306:24
string (1)
347:24
strong (8)
150:16;176:22;
225:2;294:7;295:19;
323:6;342:14,18
stronger (1)
92:7
strongly (1)
294:9
struck (1)
84:6
student (2)
43:17;44:7
students (5)
24:22;52:24,25;
53:2,3
studied (3)
52:12;259:5;338:1
studies (41)
13:23;14:1;15:18;
16:5,14,17;19:21;
20:25;24:19;26:11;
54:12;62:25;63:2,7,
14,16,17;82:14;
106:18;114:24;
121:11;130:19;
175:23;177:19;178:7;
215:24;251:22;
255:21;256:4;257:23;
258:2;259:18,24;
261:11;263:22,23;
267:15;273:10,25;

Study (46)
11:16;14:15;20:22;
21:22,25;24:2;25:2;
27:5;63:15;64:5;
70:10;76:19;77:3,10;
80:5;82:19,24;86:6;
89:12;112:1;118:15;
120:14;122:23;
127:10;128:1;129:25;
180:21;198:24;205:7;
257:14,22;261:8,9;
266:25;267:16;342:9;
344:5,5,10,14,17,21,
22;345:14;348:22;
352:7
studying (2)
52:22;111:7
sub (1)
14:25
subject (4)
14:13;120:15;
257:15;258:2
subjective (2)
46:11;48:3
submission (1)
241:10
submit (2)
97:1;189:7
submits (3)
238:3,11;241:9
submitted (15)
96:21;147:3;
182:15,20;183:2,5;
190:16;241:5;256:14;
281:24;282:1,6;
288:18;301:1;330:1
submitting (1)
189:1
subparagraph (2)
266:5;296:7
sub-population (3)
250:7;251:13,18
sub-populations (2)
250:12;251:15
Subsample (1)
275:10
subsequent (5)
92:6;237:13;295:2;
297:2;316:1
Subsequently (7)
110:10;181:1;
289:23;297:8;298:19;
300:7;306:19
subset (7)
132:18,20;254:17;
266:23;304:4;318:15;
319:3
substantial (31)
11:8;18;12:17;19:3,
5;97:13;111:18,21;
112:5;125:10;133:22;
137:20;172:4,4;

174:2,10,16;179:4,4,
6,10,16,24;184:14,20;
185:4;209:5;262:8;
276:25;343:1,9
substantially (5)
117:5;118:24;
175:22;259:14;
279:12
substitute (1)
62:7
subtracted (1)
159:25
subtractions (1)
168:3
succeeding (1)
297:17
success (1)
214:4
successfully (4)
29:25;238:19,22;
297:12
succinct (1)
138:12
suffice (1)
25:11
sufficient (3)
77:4;245:4;283:8
sufficiently (1)
86:15
suggest (10)
22:10;113:24;
115:3;119:15;125:13;
130:18;150:8;218:18;
232:23;237:19
suggested (7)
21:17;70:12;99:20;
237:14;250:18;
259:15;265:20
suggesting (9)
11:17;110:1;
114:15;213:23;
225:18,22;250:5;
251:11;283:18
suggestion (1)
345:10
suggests (12)
95:20;105:14;
110:21,25;111:3;
171:25;174:8;198:6;
199:11;218:15;343:8,
20
summarize (2)
11:3;179:1
summarizes (1)
187:23
summarizing (2)
115:2;189:6
summary (2)
106:21;213:3
summer (1)
83:11
superior (1)
141:16

Supplemental (1)
140:14
supplemented (1)
99:6
supplied (3)
13:7,9;301:10
support (6)
118:8,15;122:24;
123:25;181:11;228:2
supporters (1)
199:12
supporting (3)
119:20;120:6;125:3
supports (7)
123:8,18;125:14;
126:16;129:11,20;
131:5
suppose (4)
48:4;64:17;324:13;
333:15
supposed (5)
96:6;108:7;238:14;
241:11;300:1
sure (43)
13:2;20:8;28:25;
30:13;32:25;46:2,14;
50:9;57:1;96:17;
99:16;112:16;116:4,
5;117:7;119:7;121:5;
131:10;134:17;145:2;
146:4,13;153:13;
158:7;174:5,8;184:5;
194:11;222:3;233:23;
242:7;248:24;256:4;
279:18;282:17;
284:21;286:10;
301:21;304:25;
307:12;313:7;316:6;
329:1
surely (2)
91:12;196:21
surprise (3)
92:22;299:20,24
surprised (7)
22:12;48:10,20;
84:8;274:13;285:16;
299:16
surprising (1)
350:24
surrounding (2)
108:2;282:23
survey (255)
12:22;18:23,25;
19:4,12,15,19,25;
20:1,11,13,16,17,19;
21:4,6,10,15;22:19;
23:20;24:1,8,11;
25:14,18,21;29:10;
31:1;34:13,25;35:1,3,
10,17,24;36:4,8,11,
12,24,25;37:4,16,19,
22,24;39:1,5,17,25;
40:25;41:11;43:10;

45:7;48:25;49:5,13,
16,17,18;50:4,7,16,
17;51:2,7;72:22;73:3,4;
74:1;76:5,8;78:7,24;
79:3,9;81:10;83:5,16,
22,24;84:10;98:10,
18;99:16;100:20,20;
103:18,19,20;104:14,
18,23;105:6,10;
111:23;112:1;115:17;
116:9;117:7,12;
132:1,12,13,13;133:5;
136:14;137:25;
138:24;144:11;
151:18,24;152:4;
164:13,15;165:6,15;
173:25;174:11,13;
175:6,11;176:25;
182:20;183:15;
203:12,15,19,21,24;
204:2,14,16;205:13,
17,22,25;206:1,7,10,
13,15,19,20;207:3,12,
20;208:21;209:19;
210:21;211:1,4,7,14,
20;212:3,20,21,24;
213:17,19,22;214:20;
215:5,15,20;216:7;
218:13;219:3;220:14,
17;221:19;226:3;
229:5,20,23;230:19;
231:1;232:16;233:10,
17;234:1,6,14,16;
235:6,7;236:9,19;
237:6,11;239:12;
240:4,4,15,21,22;
243:4,14,20;247:13,
19;248:1;252:14,21;
258:8;260:18;262:14;
263:14;264:19;269:4;
271:6;272:12;273:21;
276:10,13,18;277:4,9;
278:15;305:4,10,17,
20;307:1,5;308:3,11,
23;310:17,21,22;
313:2,7;315:2;316:1,
8;317:6;322:18,21;
323:14;324:17,20;
325:24;326:4;327:17;
328:16,17,18,19,23;
333:5,18;348:17,20,
24
survey-based (1)
248:22
surveyed (2)
78:15;136:15
surveyor (3)
151:20;152:2;
239:13
surveyors (2)
41:1;151:16
surveys (26)
19:2,6,16;21:13;

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

35:6;36:15;38:21;
40:23;41:21;50:2;
91:19;104:20;151:15;
167:4;203:9;205:2;
215:23;216:24;217:3;
218:9;219:8;234:20,
23,24;236:19;261:20

**sus (1)**
  34:21
**suspect (1)**
  108:1
**suspended (1)**
  34:5
**suspense (106)**
  29:11,14,17,20;
30:1,9,16;31:4,5,9,13;
32:1,7,11;33:2,6,15;
34:14,20,22;35:2,8,
11,19,24;36:13;
37:25;39:7,16;40:9;
41:5,13,24,25;42:4,9,
24;43:22;48:25;
49:17;50:4,16;52:6,
12;134:7,8;135:4;
217:10;239:8,18;
289:3,9,15;295:11;
297:14;298:2;302:18,
25;303:2,17;304:4,7,
12,21;306:13;310:23;
311:1,9,20;312:10,12;
313:1,25;314:3,9;
315:13,18;316:20;
317:2,14,22;318:12,
15,20,24;319:2,4,8,
13,14,16;320:8,8,11,
13,18,19,25;322:12;
328:10;330:25;
332:13;333:5,19;
334:13,18
**suspense-list (2)**
  35:4;236:9
**swayed (3)**
  113:21;115:16,19
**swear (1)**
  6:12
**swing (1)**
  101:10
**sworn (1)**
  6:18
**symmetric (2)**
  159:16,20
**symmetrical (1)**
  159:13
**system (3)**
  66:1;179:14;185:4
**systems (1)**
  238:8

**T**

**table (31)**
  89:17;115:2;
125:20,21;126:1;

132:7;134:11,23;
135:3;141:7,15,17;
143:1,2;146:5;
157:19,22,24;160:17;
163:8,18,19;168:5;
219:4,9,11;286:25;
288:20;295:7;307:22;
310:1
**tables (1)**
  291:10
**tabs (1)**
  130:14
**tactic (1)**
  274:10
**tactics (1)**
  35:5
**talk (30)**
  12:25;28:23;36:11;
50:1;62:17;84:18;
127:16;131:13;135:2;
136:14;139:18;
140:11;148:6;150:24;
166:19;186:10;203:9;
204:12;220:17;
221:18;222:6;244:15;
258:11;263:4,6;
266:3;280:5;286:23;
312:21;353:12
**talked (20)**
  8:24;12:19;22:24;
63:19;82:3;85:17;
108:20;111:1;134:5,
6;158:12;159:18;
169:8;170:14;219:19;
233:25;241:17;
250:16;252:20;
256:22
**talking (30)**
  12:16;18:15;59:7;
66:15,16;67:4;77:9;
93:2,5;111:12;119:8;
123:4;124:7;128:10;
152:25;157:17;
178:11,25;214:16;
225:17;229:5;239:1,
2;250:24;270:12;
274:9;335:22;339:16;
350:23;352:12
**tank (2)**
  188:13,14
**targeted (1)**
  19:17
**targeting (1)**
  22:2
**tasks (2)**
  28:12;290:22
**taxation (1)**
  25:21
**TDL (98)**
  132:1,6;133:5;
164:13,15;165:6,15;
173:25;174:11,13;
175:6,11;176:25;

182:20;206:1,6;
209:19;210:2;217:9;
220:17,19,21;221:3,
12,21;222:10,22,24;
223:2,5,19;224:1;
225:16;229:5,10,13,
20;230:19;231:1,8,16,
17;232:1,5,8,16;
233:3,10,17;236:4;
237:10;239:12,18,23,
23;240:4,7,15,21;
241:18;243:4,8,14;
247:18,24;252:14,20;
270:17;271:1,6;
272:12;301:18;
302:14,18,24;303:4,8,
13,18,20;304:12,14,
17,21;305:1,10,17,20,
24,25;306:14;335:16,
21,21,24;336:3,8,9
**TDLs (2)**
  222:14;335:9
**teach (1)**
  13:25
**teaching (1)**
  131:1
**team (1)**
  86:9
**techniques (1)**
  27:23
**technology (1)**
  78:12
**telephone (5)**
  29:10;34:13;39:10;
40:3;328:7
**telling (2)**
  50:13;93:1
**temporarily (4)**
  335:15,23;336:7,8
**temporary (11)**
  132:1;176:16;
220:22;221:19,24,25;
222:12;223:6,6;
224:4;335:18
**ten (2)**
  19:11;336:18
**tend (11)**
  119:15,24;142:10;
192:13;198:6;203:20;
204:15;205:1;309:2;
343:21,21
**tends (2)**
  86:19;162:15
**term (7)**
  14:10;131:9;
159:12;202:24;
337:10;339:14;
340:19
**terminology (1)**
  94:24
**terms (51)**
  11:22;35:5,16;39:6,
12;65:21;68:9;70:8;

72:7;77:2;86:11;
87:20;90:3;93:1,20;
99:15;104:12;107:22;
108:3;111:5;115:20;
126:3,24;138:15;
142:22;144:4;145:24;
149:10;155:8;173:16;
179:16;198:13;
202:18,23;254:7;
267:20;271:4,23;
279:22;281:3;287:20;
288:22;290:6;298:25;
306:3;320:12;330:8;
332:16;333:12;
346:19;348:8
**terribly (1)**
  48:20
**test (3)**
  25:23;276:8;334:22
**tested (2)**
  20:1,5
**testified (3)**
  195:9,15;238:10
**testify (1)**
  17:21
**testifying (1)**
  18:9
**testimony (8)**
  10:25;22:9;171:6;
172:20;191:11,13;
355:3,5
**testing (3)**
  26:13;94:1;277:9
**tests (2)**
  26:20;275:22
**Texas (1)**
  110:5
**thanks (1)**
  347:15
**theoretical (1)**
  83:12
**theories (2)**
  25:24;277:9
**theory (1)**
  40:16
**thereby (2)**
  66:10;67:1
**therefore (3)**
  65:13;98:24;331:18
**thick (1)**
  44:18
**thinking (9)**
  54:5;75:17;105:4;
216:10;225:15;
228:18;240:20;
271:14;285:19
**ThinkProgress (4)**
  168:15;173:5;
178:12;181:2
**third (13)**
  107:4;113:19;
118:6;122:21,22;
131:25;187:13;

229:25;264:16;
275:19;311:7;314:5;
354:6
**though (13)**
  31:1;50:22;65:8;
133:21;171:12;177:1,
2;223:13,23;227:23;
232:7;262:16;324:4
**thought (19)**
  10:16;23:8;34:16;
35:4,7;41:12;68:11;
73:7;97:24;99:21;
105:11;107:23;234:8;
252:11;256:8;309:25;
310:15;327:24;342:4
**thoughts (1)**
  112:9
**thousand (8)**
  72:19;73:16;75:10,
18;78:8,16;79:5;
144:14
**thousands (4)**
  62:10,14;199:3;
318:13
**three (24)**
  43:3;45:8,8,9,24,
24;47:15;53:22;
55:15,17;123:21;
171:8;199:20,20;
237:22;254:3;259:4,
4,4;265:1;275:21;
311:12;334:11;354:8
**threshold (1)**
  215:3
**throughout (2)**
  101:19;214:16
**thumb (1)**
  92:15
**Thus (1)**
  322:10
**tight (1)**
  294:19
**tighter (3)**
  85:18;171:2;175:21
**times (8)**
  67:18;114:14;
129:5,6;150:20;
174:21;334:11;
346:25
**timing (5)**
  65:15;66:4,13,15;
67:8
**tip (1)**
  86:15
**tipped (3)**
  198:24;199:6,10
**tired (1)**
  181:10
**title (5)**
  13:17;60:11;160:9;
168:23;257:1
**titled (3)**
  122:7;341:22,24

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

**today (12)**
8:6;9:9;6;13:1;
16:22;39:1;81:22;
106:1,2;181:8;
220:11;228:11
**today's (3)**
8:12,22;9:3
**together (7)**
90:24;178:5;
202:15;217:5;306:7;
313:6;321:19
**told (12)**
33:20;34:2,3,9,11;
66:13;80:3;110:9;
147:1;209:4;238:9;
239:13
**tone (1)**
219:1
**took (7)**
10:1,3,9;100:17;
227:1;288:25;341:21
**top (14)**
27:6;45:5,5;63:9;
121:1;129:9;166:19;
167:25;171:16;172:5;
187:21;192:5;198:3;
334:4
**total (42)**
10:11;30:4;44:6;
69:14,15;73:15;
137:10;138:6;149:10,
21;154:24;159:9,23;
160:1,5,11;163:8,24;
165:9,17;166:13;
167:20;168:8,9;
202:16,18;217:14;
218:3,4,16;287:20,21;
288:3;297:6;307:9,
24;308:1,12;313:25;
317:23;318:15;
319:14
**totally (1)**
38:17
**tougher (1)**
68:23
**toward (2)**
113:22;225:19
**town (2)**
52:25;53:1
**train (1)**
22:14
**transaction (4)**
298:20;299:15;
300:7,23
**transcript (4)**
209:24;355:2,3,5
**translate (2)**
145:24;149:9
**translates (3)**
148:18;149:21;
153:10
**transmitted (1)**
234:4

**travel (1)**
10:25
**tremendous (1)**
83:18
**trial (3)**
17:21;18:9,10
**tried (17)**
12:13;76:10;78:5;
86:5,6,25;124:16;
127:14;174:20;209:1;
211:15;289:3,15,17;
301:8;332:19;344:13
**trouble (3)**
85:3;102:5;192:18
**true (19)**
88:11;92:2;93:1;
95:11,14,18;121:25;
122:8;130:10;171:19;
174:6;237:20;242:2;
250:10;277:22;336:5;
341:25;345:9;355:4
**Trump (4)**
118:17;119:1;
125:1;129:15
**Trump's (4)**
86:9;117:16;
122:24;123:25
**trust (2)**
104:12;105:21
**truth (1)**
91:19
**truthful (1)**
8:9
**try (36)**
7:15;38:12;45:12,
22;58:10;68:22;
71:17,18,22;75:17;
77:23;101:1;116:23;
119:7;123:16;131:17;
138:19;145:14;179:7;
190:15;204:19;
205:19;216:12;
232:14;235:18;
265:23;267:10;
274:11;281:4;282:17,
21;284:1;319:13,25;
335:1;347:15
**trying (29)**
35:5;39:15,16;55:4,
6,11;56:5;58:16;
64:19;67:23;70:8;
86:11;88:12;95:6;
115:10;127:9;128:17;
147:21;211:22;
228:15;231:14,18;
236:10;242:8,23;
276:16;319:12;325:9;
340:23
**turn (30)**
29:2;44:25;51:15;
57:8;84:19;98:11;
107:1;118:4;127:20,
23;137:10;140:20;

151:3;169:13;184:3,
7,22;199:12;210:9;
228:24;257:10;
259:21;264:11;
275:18;280:9;284:10,
20;288:8;296:6;327:9
**turnout (12)**
52:10,14;60:12;
63:1,4;68:25;69:14,
15;70:12,25;71:4;
107:5
**twice (7)**
11:22,23;174:23;
205:13;272:3;343:2,
11
**twisted (1)**
27:6
**two (64)**
10:8;13:12,14;
38:13;40:4;45:18;
46:7;47:16,23,24;
49:5;53:21;56:24;
59:17;71:7,25;82:24;
88:23;89:2;90:9,13;
91:8;92:16,20,23;
124:9,25;130:14;
143:10;148:5;152:10;
176:21;184:25;
186:16;198:3;199:18;
203:23;204:2;207:12,
19,25;208:3,10,10,22;
209:9;237:19;245:14,
18,18;264:25;266:7,
15;270:24;272:15;
273:12,25;277:14;
282:17;293:19;
313:10,11;336:13;
354:8
**two-front (1)**
128:18
**two-minute (2)**
213:7;353:20
**type (2)**
177:7;272:23
**types (6)**
28:10;115:15;
176:24;191:15;226:4;
314:22
**typical (1)**
250:8
**typically (21)**
14:13;26:10;27:1;
28:11;46:2;78:14;
92:19;95:4,5;159:12,
13;162:17;188:14;
189:17,20;218:20;
235:11,20;236:19;
250:20;350:6
**typo (7)**
31:22;96:12,14

**U**

**ultimate (1)**
180:19
**ultimately (10)**
30:14;36:14;65:25;
68:3;72:6;108:18;
110:12;137:18;180:1;
344:11
**Um-hum (22)**
30:20;44:21;52:15;
57:11;66:19;67:5;
71:2;73:13;76:9;
99:13;101:18;111:15;
143:4;146:21;151:5;
170:17;176:2;241:19;
254:1;284:18;307:4;
313:19
**un (1)**
233:5
**unable (1)**
223:18
**unambiguous (2)**
38:16,24
**uncertain (12)**
74:11;76:22;81:12,
16;86:24;152:15,18,
23;153:22;155:6,7;
248:19
**uncertainties (1)**
172:25
**uncertainty (24)**
27:17;76:23;77:1;
79:25;81:14;82:1;
111:19;112:5;125:11;
133:22;154:5,19,21;
155:13;168:12;171:1,
10;174:3,4,10;233:6;
269:6;334:17;335:6
**uncomfortable (1)**
320:15
**under (20)**
8:5,6;10:10;33:23;
55:7;56:6,8;57:19;
118:4;134:17;178:14;
190:17,17;195:9,15;
200:20;220:24;
284:16;291:8;299:3
**undergraduate (1)**
24:22
**underlying (4)**
33:14;120:14;
257:14,22
**undermine (3)**
203:20;204:15;
205:1
**underneath (1)**
284:15
**underpowered (3)**
275:23;276:8,14
**understood (1)**
135:10
**undocumented (17)**
176:13;223:17;
224:7;225:2,8,12,23;

226:8,11,14,17;227:5,
20;228:2,13;246:17;
332:10
**Undoubtedly (1)**
7:13
**unemployment (2)**
79:4,7
**unequal (1)**
46:16
**unethical (1)**
104:15
**unfortunate (2)**
265:18,18
**Unfortunately (3)**
22:8;281:10;321:16
**unintentional (1)**
276:2
**unintentionally (1)**
151:16
**unique (1)**
87:13
**unit (1)**
291:15
**United (21)**
49:8;100:24;
177:22;186:1;199:21;
222:13,19;225:5;
232:16;235:10;249:9,
20;251:2,5;277:10;
331:19,20;332:5,5;
335:22;338:23
**universe (2)**
34:4;77:18
**University (3)**
13:19;235:12,21
**unknown (1)**
232:21,25;331:15
**unlawfully (2)**
331:19;332:4
**Unless (1)**
51:9
**Unlike (2)**
107:6;183:14
**unlikely (4)**
118:21;119:3;
246:9;308:25
**unmask (1)**
104:14
**unpack (3)**
90:16;94:23;153:3
**unreliable (1)**
208:11
**unsatisfied (2)**
293:5,14
**unsuccessful (2)**
211:1,2
**unsuccessfully (1)**
277:20
**unusual (3)**
84:25;269:3,3
**unweighted (10)**
39:18;100:4;229:8;
231:1,13;311:10,19,

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

24;313:16;322:11

**up (35)**
18:9,15;19:24;22:1;
23:5;32:5,9;53:13;
59:17;68:5,10;70:12;
86:20;88:6;99:11;
120:11;121:15;
151:16;165:19;169:1;
197:16;217:13,19;
218:2,3,7;270:11;
277:16;289:3;299:8;
304:23;308:5;321:5;
347:10;348:14
**update (5)**
13:16;118:3,5;
188:10;289:20
**updated (3)**
13:9,12;144:21
**upon (21)**
26:23;33:19;71:12;
74:4;75:13;77:6;
79:16;89:13;90:13;
129:13;156:11;
160:23;163:3;189:4;
236:3;268:18;292:3;
318:18;319:22;
323:20;332:11
**upper (5)**
96:13;143:11;
149:3,20;159:24
**upper-end (1)**
128:2
**upper-ends (1)**
181:10
**up-to-date (1)**
64:3
**USA (4)**
264:25;265:1,2,4
**USA' (1)**
265:6
**use (44)**
39:17;42:2,6;72:12;
73:5;74:18;81:13;
86:6;88:16,19;97:5,
24;98:6;99:5;101:14;
112:17;115:17;
143:15;144:17,19,19;
147:7;154:7;155:19,
24,25;156:3;157:6;
159:11;165:16;
168:24;186:13,14;
214:10;230:7;231:17;
234:24;244:23;
259:20;277:3;280:20;
310:4;311:18;322:17
**used (50)**
25:21,23;28:5,16,
19;29:20;31:14;
38:25;75:5;76:6;79:4,
10;80:11,13;97:7,15;
98:2,7,9;105:3;
115:20;119:12;
129:15;132:21;144:8;

149:25;150:2;159:12;
163:1;164:6;183:8;
206:1;227:13;269:17;
274:10;277:6;285:16,
25;289:7;291:17,19,
25;292:6;315:6;
316:21;339:14;
349:10;344:7;349:7,7
**useful (7)**
34:16;69:18;72:3;
225:4;261:8;267:18;
283:18
**usefully (1)**
177:13
**uses (2)**
264:20;277:4
**using (26)**
33:2;58:10,14;62:6;
74:1;76:13;77:5;
81:12,23;100:22;
104:23;131:9;145:17;
159:3,8;165:6;166:7;
167:14;183:20;
252:22;259:4;308:15;
309:15,22;313:20;
337:9
**usually (4)**
64:18;95:9;146:11;
216:12
**utility (1)**
54:6
**utilized (2)**
28:1;36:25

**V**

**V263 (1)**
264:20
**vague (3)**
20:4;36:2;293:21
**vaguely (1)**
44:23
**valid (13)**
93:18;95:17;
133:21;275:10;285:9,
14,19;286:1,6,11,11,
20;339:15
**validate (3)**
236:5,7;271:2
**validated (13)**
51:1;107:11,12;
119:19;130:13;205:9;
250:17,21;253:8;
270:16;272:5;279:3;
346:12
**validating (1)**
20:11
**validation (3)**
20:12;270:13;
272:23
**validity (1)**
21:6
**value (22)**

15:2;49:19;50:7,18;
88:11;91:9,10;92:2;
93:1,19;95:11,11,14;
98:6,9;160:22;
171:19;173:15;174:6;
178:9;268:14;343:6
**values (2)**
144:1;154:21
**variability (2)**
67:20;276:25
**variable (11)**
41:4,7,13,16;42:7;
87:16;94:4,4,11,12;
275:24
**variables (10)**
40:8,11,12,14;41:1;
43:2;52:13;64:4;
101:11;282:18
**variation (3)**
99:15;251:3,6
**variations (3)**
150:22;197:22;
298:25
**varies (2)**
65:8;216:1
**variety (39)**
16:6;18:24;20:10;
21:13;24:19,20;
26:16;27:23;35:5;
52:21;61:19;64:8;
68:19;69:6,8;71:12;
76:18;81:23;95:8;
119:22;136:13;139:2;
177:1;187:23;188:19;
191:13,22;192:14;
199:6,9;216:11;
227:8;246:12;248:14;
259:10;341:2,8;
342:1;346:7
**various (53)**
12:5,21;15:4;20:12;
24:3,7,9;25:10;26:11;
35:16;54:12,13;
63:16;65:20;69:1,10;
71:23;72:1;79:10;
81:24;85:20;86:3,5;
93:22;124:15;137:4;
138:14,20;140:24;
143:12;146:20;
147:15;150:5;151:15;
157:22,24;165:13;
191:15;204:4,6;
219:12;234:9;240:25;
247:8;274:11,21;
277:9,11;300:18;
317:3;341:13;344:23;
350:8
**vary (5)**
58:8;85:15;249:22;
250:6;251:12
**varying (1)**
214:4
**Vehicles (5)**

132:7;134:12,20;
288:12;291:13
**vein (1)**
115:12
**verbal (1)**
7:8
**verbally (1)**
27:16
**verification (1)**
305:11
**verified (8)**
11:25;89:15;90:1;
96:7;126:4;232:16;
305:2;332:9
**verify (5)**
90:4;103:14;233:9;
240:14;331:17
**verifying (1)**
65:22;234:15
**Vernon (1)**
195:3
**versa (1)**
91:16
**version (3)**
15:15;214:15;273:7
**versions (5)**
15:4;154:8,9,11,12
**versus (3)**
17:16;125:4;185:15
**vice (1)**
91:16
**victory (2)**
178:18;196:7
**video (1)**
226:25
**VIDEOGRAPHER (17)**
6:10;57:2,5;92:8;
112:21,24;156:15;
157:13;213:10,13;
279:24;280:2;336:20,
23;353:23;354:1,18
**view (30)**
23:9;60:19;62:12,
15;86:1,7;87:2;93:18;
108:10;112:2;121:9,
13;128:7;133:11,13;
141:14;142:15;150:3,
16;174:12;185:18,20,
23;246:25;249:24;
262:11;263:11;
276:12;285:12;332:7
**views (7)**
55:22;107:18;
109:13;148:10;
178:22;274:12;278:2
**vignette (1)**
330:8
**violate (1)**
104:12
**violated (1)**
351:15
**violation (3)**
91:24;104:16;

185:24
**Virginia (11)**
6:3;17:16;18:2,19;
19:20;60:2,7;62:14,
18;70:11;185:15
**Virginian-Pilot (1)**
13:14
**Virginians (1)**
62:11
**Virginia's (1)**
17:15
**visa (2)**
176:16;177:1
**visas (4)**
221:24;223:6;
224:4;333:2
**visitors (1)**
222:12
**vote (270)**
11:9,9,15,19,25;
12:4,6,11,15,16;33:9;
34:8,10;51:15;53:3,5;
54:19,20;58:17;59:3,
9,12;61:2;62:4;64:20;
65:1,4,6,16;67:12;
72:25;73:1,18;75:11;
76:13;82:9;85:21;
87:16,18,22;89:23,25;
90:4,15,22;91:4,23;
96:8;102:21;107:11,
12,19;108:7,10;109:9,
14,21,24;110:6,7,10;
117:17;118:10,17;
119:5,19;120:7;
121:19;131:5;132:23;
133:3,24;134:3;
135:16,16;136:1,2,7,
24;137:1,14,14,16,16;
138:6;139:20,21;
143:7,22;146:19;
148:20;149:20;
152:20,20;153:6,8,9;
157:10;161:1;164:23;
165:2;166:1,5,10,10,
25;167:8,12,17;
171:15;174:25;175:1;
176:5,23;177:21,23;
180:25;181:1;184:13,
14,18,18;186:1,8;
189:25;190:10,10;
194:17,18;195:8,20;
198:4,6;199:3;
200:10,20;201:4;
202:5;203:22;205:1,
9,9,11;207:5,5,14,16,
17;208:5,5,6,7,15,18,
19;209:1,2,6,7,10,12;
210:4,23;211:1,11,15,
21,24;212:4;246:9;
225:3,13,24;226:9,11;
227:6;234:3,12;
235:9,17;236:21;
237:7,21,25;238:1,20,

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

23;239:5,14;240:5,6,
16,17,22,25;241:3,4;
244:8;246:4;247:13,
22;248:4,9,11,11;
250:10,22;251:1;
253:4,16,17,22,25;
254:13;255:3,16,24,
25;256:17;262:20;
272:5;278:7;280:15,
24;285:1;287:5,11;
288:2;289:4,16,18;
293:11;294:23;295:1;
296:10,12,18,22;
297:2,7,12,12,17,20;
298:6,12;300:2,3;
301:4,9,14;306:17;
318:11,14,16,19,21;
319:10;320:17;
326:13;327:6;330:19;
338:18,22;339:5;
351:4,7;352:22;
353:10
**voted (41)**
91:17,23;96:7;
103:14;114:16;116:6,
7;117:9;122:25;
123:9,19,22;124:1,4,
13,17;125:15,24;
126:7,17;127:1;
129:12,21;157:7;
168:24;190:1,5,13;
191:8;195:10,16;
198:12;260:5;261:1;
262:12;273:19;278:5;
279:2;345:10;346:6;
354:12
**voter (111)**
11:25;17:15;18:2,
19;21:10,12;26:1;
52:13;54:16,24;
58:11;62:7,25;67:24;
68:15,23;69:22;
73:23;90:5,19;91:4,
14,15;110:18;125:24;
126:1;136:20;189:19;
200:16,22;225:3,7;
226:15,18;227:21;
228:3,14;237:18,22,
24;238:3,6,8,11,15,
21;239:2,15,25;240:7,
17;241:6,9,11;
244:11;246:1,12;
254:4;255:11,17,23;
256:1,6,17;279:3;
281:24;282:1,6;
283:15;286:16;
288:23;291:5,18;
292:8,25;293:15;
294:6,20;297:22;
298:5,7,20;299:2,9,
12,21;300:8,17,20,21;
302:14,20;303:9,13,
19;304:5,13;308:7;

309:3;311:9;315:8;
324:21;325:3,8;
326:11,17;327:1,5;
330:23;335:25;
338:24
**voter-fraud (1)**
63:22
**voters (40)**
55:1;62:14,18;64:8,
13;68:2,16;114:17;
132:14;146:23;147:4,
10,19;149:1,14,22;
168:25;187:6;192:14;
195:6;230:16;263:2;
280:25;288:5;290:4;
307:1,6,10,25;308:12,
13,16,22;309:13,24;
310:7,17;329:8;
350:14,17
**voter-verified (1)**
124:19
**votes (23)**
96:4;115:4;117:15;
118:11,22;119:14;
120:2,4;123:6;187:5;
190:8,11;191:5;
194:3;195:4,25;
197:9,17;202:6;
203:2,6;257:2;346:12
**voting (74)**
16:11,18,20;25:15,
22;52:17;53:16;54:7,
10;65:12;66:6,9,25;
69:4,13;86:8;97:6;
102:13;106:19;
107:13,23;111:8;
112:9;113:16;117:9;
118:19,24;119:1,6;
120:8;130:8,13,15;
178:17,22;180:14,15,
17,24;189:12,14;
191:1;194:24;195:24;
196:17,20,22;198:20;
201:5,13;250:17,18;
251:1;260:9,23;
262:22,24;263:12;
275:12;278:21,25;
330:22;342:22;344:1,
7,21;349:25;351:21;
352:4,7,16,19,22;
353:5
**voting-age (5)**
72:19,20,23;73:5,
16

**W**

**Wait (8)**
57:14;73:7;127:21;
199:21;209:22;220:3;
284:11;304:24
**waited (1)**
42:18

**waiting (3)**
31:7;42:3;139:3
**Wald (7)**
97:8,11,15;98:7;
155:22;156:11;
183:13
**walk (1)**
145:17
**walked (1)**
124:6
**wants (2)**
86:21;163:3
**warrant (2)**
77:4;128:24
**wars (2)**
77:13;80:5
**Washington (5)**
106:10;111:12;
114:14;129:5,6
**wave (1)**
259:5
**way (78)**
27:4;33:12;50:14;
59:8;61:22;62:1;
67:20;70:24;88:13;
93:7;99:5;104:15,24;
105:14;109:8;113:23;
115:17;126:3,5;
127:5;128:1;129:13,
15;133:14;137:22;
139:6,12;159:11;
160:8;161:13;162:3,
12;176:23;182:13,18,
24;190:12;201:15,17;
204:20;211:13;212:1;
217:7;219:7;221:6,
16;225:22;226:2;
227:18;243:3,13;
244:1,12;246:9;
254:11,14;255:5,6;
270:12;274:9;277:19;
285:2,18;292:13;
297:18;298:1,16;
300:22;302:5;306:14;
312:2;316:16;319:17;
320:20;324:3;329:17,
20;346:19
**ways (27)**
64:8;68:19,22;69:6,
10;71:23;85:20;
90:13;93:22;105:2;
108:18;127:13;
154:12;157:22;158:1;
175:1;232:14;246:13;
248:14;283:14;
300:16,18;317:3;
326:5;342:1,4;346:7
**weak (16)**
128:19;169:17,23;
170:1,4,21;171:7;
172:13,15;173:4,9,23;
174:13;175:9,12,18
**weaknesses (2)**

177:10;178:2
**website (5)**
168:15;329:10,13,
18,20
**week (2)**
59:17;77:9
**weeks (2)**
13:15;59:18
**weigh (1)**
187:9
**weighing (1)**
177:16
**weight (21)**
37:21;40:18;41:22;
43:5,13;100:13,25;
178:6,7;230:19,23;
231:3;241:20;242:5,
18;243:6;252:5,22;
253:1;282:15,21
**weighted (30)**
39:18,20,22;40:7,
13;42:12,16;43:1;
99:9,17;221:1;
229:13,14,18,23;
231:12,17,20;241:17;
242:11;243:1;251:23;
252:21;311:18,22,24;
312:6;313:2,20,21
**weighting (19)**
38:5,17;39:4;40:6;
42:15;99:4,6;100:16;
138:19;139:12;221:2,
16;229:4;230:23;
242:12;281:4,14;
282:25;312:1
**weights (19)**
38:3,25,25;99:5,7;
100:18;214:5;252:11,
13,15,18;283:8,17
**were/are (1)**
103:14
**weren't (7)**
87:1;90:3;100:16;
202:18;228:16;
237:23;241:4
**what's (7)**
9:12;13:3;14:19;
16:24;33:18;36:21;
44:16;77:7;118:22;
134:24;142:25;
151:14;216:18;238:2;
261:15
**whenever (1)**
7:22
**whereas (3)**
59:20;230:25;336:1
**Whereupon (1)**
354:20
**white (1)**
71:25
**whole (25)**
31:4;38:1;83:23;
84:9;98:24;99:2,12;

100:15;101:4;107:25;
133:20;138:7;139:23;
214:8;248:25;249:9,
20;281:8,18;282:18,
24;283:23;284:5;
319:18;320:12
**whose (5)**
33:5;34:3;36:13;
235:15;332:8
**Wichita (1)**
286:14
**wide (2)**
63:17;246:15
**widely (1)**
85:16
**wider (1)**
176:20
**wildly (2)**
349:8,11
**willing (2)**
152:3;293:8
**Wilson (17)**
28:1;149:25;150:3;
155:24;159:3,8;
161:20;166:7;167:14;
183:8,20,21,24;
309:15,23;310:5,5
**win (1)**
77:13
**window (2)**
294:5,18
**winner (1)**
197:18
**winning (2)**
118:16;198:4
**winter (2)**
274:9;329:7
**wipes (1)**
75:3
**WIRED (1)**
213:22
**wish (2)**
228:23;306:6
**withdrawing (1)**
55:23
**within (13)**
31:9;46:14;70:5;
88:10;139:8;180:10;
293:25;294:1,18;
304:12;323:1;331:2;
353:6
**without (7)**
96:22;97:2;128:9;
180:17;241:4;320:9;
321:3
**witness (47)**
6:12;15:23;16:1,22,
25;17:1,10,13;18:18;
20:8;36:3;42:22;
51:19;53:25;61:24;
80:25;82:12;83:9;
84:5;92:11;94:11;
104:3;112:12;120:22;

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

121:2;122:2,18;
123:13;154:12;162:1;
163:17;172:21;194:6,
11;195:13;201:9;
209:25;230:11;
244:21;245:1,5;
254:22;264:6;279:16,
19,22;337:2
**witnesses (1)**
185:21
**woman (1)**
40:23
**won (2)**
194:3;195:4
**wondering (1)**
247:14
**word (10)**
111:14;146:25;
163:16;186:7,13,14;
322:17;323:7,22;
344:25
**wording (3)**
36:16,20;277:3
**words (7)**
42:21;52:18;
119:12;185:6;260:22;
322:18;331:9
**work (36)**
10:5,22;14:24,24;
15:2;18:24;19:25;
35:17;56:14;58:18,
24;63:20,21;77:5;
83:19;114:15;118:7;
126:16,19;129:8,10,
12,19,23;131:8,12;
142:17;158:8;181:12;
205:17;225:5;238:8;
274:5;299:3;344:14,
14
**worked (4)**
36:6;183:7;214:8;
219:23
**worker (4)**
297:22,23;298:21;
300:7
**working (17)**
24:3,8;58:9;63:5;
80:1;234:19;257:3;
258:24;259:11;
266:22;274:23,25;
321:15;329:17,20;
345:4,7
**works (3)**
14:13,16;214:7
**worksheet (1)**
145:13
**world (2)**
78:16;251:3
**worry (2)**
75:21,22
**worth (1)**
35:8
**wrap (1)**

19:24
**wrenched (1)**
181:11
**write (14)**
57:23;62:9;72:21;
101:25;115:12;118:6;
122:23;123:24;
127:25;260:1;275:19;
311:8;314:20;327:16
**writes (2)**
264:16;266:6
**writing (5)**
9:25;19:11;51:10;
58:4;274:4
**written (6)**
20:2,17;161:2;
168:17;188:8;263:20
**wrong (19)**
62:22;63:15;99:8;
101:1;109:7;146:14;
199:22;242:1,4;
249:16;260:16;
262:13;263:14;
265:14;273:20;
309:21;313:9;318:24;
334:6
**wrote (10)**
27:2;60:24;86:10;
113:8;117:25;188:3;
222:11;259:18;273:7;
344:17

**Y**

**year (17)**
43:4;134:16;
188:18;192:2;196:15;
213:22;259:4;268:1,
1,5,5,8,8,11;325:25;
328:20;339:21
**years (19)**
15:19;64:6;87:14;
109:20,21;124:24;
128:16;130:16;135:5;
142:6;204:2;215:1;
266:15;295:15,16,17,
20;319:11;320:17
**yields (2)**
96:8;165:9
**you' (1)**
313:17
**young (1)**
111:9
**yup (8)**
113:13;121:8;
122:9;158:19;166:6;
257:8;270:14;280:16

**Z**

**Zahn (1)**
6:3
**zero (39)**

27:13;93:13,15,19,
23;94:6,14,16,16,21;
95:2,13,14,18,18,20,
21;142:11;152:17;
153:2;154:9,14,16;
155:16;159:22;
171:22;179:19;
181:22;182:7;263:3;
308:12,16;309:9,13,
23;310:6,8,12;350:17
**zip (1)**
43:3

**0**

**0.026 (1)**
149:2
**0.07 (2)**
147:12,18
**0.1 (1)**
303:3
**0.115 (2)**
149:16,21
**0.2 (2)**
96:9,13
**0.4 (1)**
148:15
**0.5 (2)**
98:8;166:9
**0.65 (1)**
32:10
**0.7 (2)**
314:21;315:2
**0.9 (1)**
159:4
**005 (1)**
30:23
**009 (1)**
31:20
**036 (1)**
148:4
**04 (1)**
148:4
**05 (1)**
269:11
**059 (1)**
288:7
**064 (1)**
281:2
**07 (1)**
148:4

**1**

**1 (24)**
9:13;28:23;29:5;
89:17;118:5;126:1;
131:14;142:6;151:2;
166:4;173:13;184:2;
210:9;213:23;221:18;
244:20;247:6;255:1;
280:9;308:23;309:10;
311:5;322:8;340:2

**1,067 (3)**
287:3,25;288:3
**1,153 (2)**
280:14,23
**1,265 (2)**
146:20;147:9
**1,380 (5)**
29:17,25;30:21;
31:14,15
**1.1 (3)**
143:20;145:21;
146:17
**1.5 (1)**
166:14
**1.8 (9)**
146:23;147:4,7,10;
149:1,7;230:15;
280:25;288:4
**1/13/16 (1)**
347:24
**1/20/17 (1)**
216:14
**1:17 (2)**
156:17;157:14
**10 (12)**
60:9;73:4,14;75:8;
79:13;117:14,19;
120:24;122:16;
221:17;256:23;
316:11
**10,000 (3)**
73:17;75:10;76:12
**10.1 (3)**
154:25;155:4,18
**10:01 (1)**
57:6
**100,000 (2)**
80:13;81:11
**1017 (1)**
122:16
**11 (9)**
121:23;122:1;
127:16;151:3,6;
210:9;307:14,19;
341:24
**11.3 (4)**
125:14,22;126:17;
129:20
**11.4 (3)**
229:21;230:3,4
**11.5 (1)**
312:12
**11.7 (1)**
167:16
**11:13 (1)**
112:22
**11:23 (1)**
112:25
**114,000 (2)**
144:9,17
**115,000 (6)**
144:14,18,25;
146:1;149:10;230:5

**116.7 (1)**
31:25
**116.77 (1)**
32:9
**117 (3)**
32:7,9,18
**12 (18)**
121:2;140:13,15,
17,20;148:1;151:7;
153:18;157:17;
224:12;244:20;284:8,
11;296:9,21;297:19;
309:18,20
**12:25 (2)**
156:16,17
**120 (1)**
10:11
**125 (3)**
301:2,11;302:7
**1265 (1)**
146:16
**13 (5)**
145:8,10,11;184:7;
348:11
**13,110 (2)**
230:11,14
**1380 (3)**
30:4,5,23
**14 (14)**
10:19;157:5;158:6,
8;167:3,7;170:13;
176:3;244:24;252:25;
255:2,9,11;267:8
**15 (8)**
157:9;163:10,25;
168:14;264:11,15;
296:11;297:1
**150 (3)**
84:19,21;259:25
**151 (2)**
98:14;101:16
**152 (2)**
89:18;95:25
**155 (4)**
101:24;102:7,8;
103:6
**15th (1)**
264:10
**16 (6)**
157:12;193:5;
266:4;302:23;303:16;
327:13
**16.5 (3)**
165:1;229:11;230:2
**161 (3)**
30:8,15;32:17
**17 (6)**
197:3,5;228:24;
229:1;230:10;305:6
**17,905 (2)**
30:9,15
**18 (2)**
216:16,19

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

**18,000 (2)**
33:3;302:25
**18.8 (1)**
333:22
**19 (20)**
121:20;151:11,17;
152:7,9,14;153:5,16;
154:1,4,18;158:17;
163:22;173:12;
241:20;242:5;243:12;
244:6;261:16,22
**1998 (1)**
18:5
**1st (1)**
118:5

**2**

**2 (15)**
12:9;13:4;79:8,8;
118:4;125:21;157:19;
160:17;166:9;168:6;
173:14;197:4;308:23;
316:14;317:20
**2,070 (2)**
149:12,13
**2.2 (5)**
317:14,22;322:10;
331:2;333:7
**2.3 (1)**
322:11
**2.8 (3)**
96:9,12,16
**2:29 (1)**
213:11
**2:38 (1)**
213:14
**20 (10)**
164:10;165:16;
231:9;264:2,5;266:7,
14;267:5;340:10;
347:10
**2000 (2)**
18:12;192:2
**2000-08 (1)**
51:16
**2002 (3)**
83:12;195:9,15
**2006 (8)**
83:1,2;166:21;
167:5;168:6;171:13;
173:1;255:9
**2007 (1)**
309:4
**2008 (7)**
83:2;96:5;107:9;
116:25;118:7;264:21;
309:5
**2010 (9)**
64:25;83:2;144:11;
205:7;266:8,15,24;
267:6;340:20
**2011 (1)**

144:12
**2012 (19)**
19:1;83:2;87:9;
119:17;124:25;
166:21;167:5;168:6;
171:13,13;173:1;
195:3;205:7;215:14;
255:9;266:9,24;
309:5;340:21
**2013 (7)**
60:3,8;212:11;
285:22,24;339:19,20
**2014 (18)**
24:2;27:5;83:2;
106:14;128:1;144:11;
180:7;205:7;250:16;
266:25;268:25;
275:21;285:7;287:7,
14,24;344:5;352:10
**2014/2015 (2)**
287:9;339:10
**2015 (10)**
19:2;144:12;
275:25;285:6;287:8,
14,24;339:19;351:12;
354:10
**2016 (35)**
22:1;83:3;106:13;
113:10;118:8,17;
119:5;120:7;122:25;
123:9,19;124:1,17,19;
125:10,15;126:17,20;
129:12,21;130:1,3,5,
8,11,19;131:6;265:21,
23;285:6;287:15;
339:9;347:10,15;
348:11
**2017 (6)**
6:1;118:2;144:22;
168:20;264:10;355:7
**21 (5)**
272:25;273:3;
341:12;350:7;354:5
**213 (1)**
295:13
**21st (1)**
191:25
**22 (4)**
275:9,13;340:4,8
**23 (8)**
140:21;284:20;
312:24;313:3;314:5;
345:5,6;347:21
**23.4 (1)**
165:10
**23.7 (2)**
159:9;160:2
**2300 (1)**
218:15
**24 (2)**
347:23;348:1
**24.6 (1)**
159:4

**24th (2)**
106:13;118:2
**25 (1)**
72:24
**25.3 (1)**
231:4
**26 (4)**
77:16;224:12,22,23
**27 (8)**
297:6,11;298:12;
301:9,11,25;302:6,10
**28 (1)**
269:4
**28.6 (2)**
167:11;269:7
**2nd (1)**
144:22

**3**

**3 (17)**
12:9;36:22;118:22;
120:10,11,25;121:1,2,
3;205:21;207:3;
210:21;257:10,14;
273:2;275:18;316:8
**3.3 (2)**
96:16;121:18
**3/15/17 (1)**
264:4
**30 (1)**
79:22
**30th (1)**
179:3
**31 (5)**
113:10;194:3;
264:15;288:8;293:3
**31.1 (3)**
165:7;174:7;231:2
**32 (10)**
199:17;200:4,8;
201:15,16;202:23;
295:7;330:25;331:9;
335:3
**32,000 (1)**
247:12
**32.9 (1)**
167:22
**33 (7)**
197:9;199:16;
200:1,4,8;201:16;
266:5
**34 (2)**
296:6;338:16
**36 (1)**
327:13
**37 (4)**
164:18,21;252:13,
15
**38 (4)**
228:25;229:3;
230:10;231:2
**39 (1)**

305:8

**4**

**4 (5)**
44:17;127:23;
184:22;186:15;
187:12
**4.4 (1)**
231:4
**4:07 (1)**
279:25
**4:17 (1)**
280:3
**40 (1)**
168:9
**40,000 (4)**
62:18;218:8,16;
317:24
**45 (2)**
293:25;294:1
**459 (3)**
296:9,17,21
**45-day (2)**
294:5,18
**460 (2)**
148:21,24

**5**

**5 (14)**
30:22,24;31:1,3;
51:14,18;72:25;
169:13,16;173:14;
178:13;280:9,18;
338:8
**5,000 (3)**
43:18,25;44:2
**5.1 (2)**
153:10,14
**5.3 (2)**
153:13;158:25
**5:35 (1)**
336:21
**50 (18)**
72:23;73:7,15;75:9,
12,14,19;76:7;78:7,
23;79:19;80:10;
81:10;262:19;349:14,
17;350:1,23
**500 (1)**
308:22
**51 (1)**
52:8
**530 (3)**
142:3;308:9,11
**54.5 (1)**
171:14
**54.6 (1)**
167:17
**57 (1)**
286:3
**57.4 (1)**

343:6
**576 (2)**
307:9,24
**58 (2)**
284:22;285:9
**5A (1)**
56:11

**6**

**6 (6)**
60:1,4;215:6,21;
216:8;334:2
**6.3 (1)**
334:9
**6:27 (1)**
336:24
**6:51 (1)**
353:24
**6:53 (3)**
354:2,19,21
**60 (2)**
10:9,10
**64 (5)**
57:9,14,15;224:13,
20
**65 (2)**
31:20;57:14

**7**

**7 (11)**
29:2;30:5,21,23;
31:15;50:16;82:8,11;
125:21;168:20;
259:19
**7.7 (3)**
165:6;174:7;231:1
**7:45 (1)**
9:9
**72.4 (1)**
343:8
**728 (1)**
230:18
**73 (1)**
230:17
**76 (2)**
288:9;293:4
**77 (4)**
44:25;45:1,3,5
**789 (2)**
165:21,24
**79 (2)**
303:12,18
**791 (1)**
281:16

**8**

**8 (8)**
29:10;42:25;106:4,
7;157:18;165:24;
295:7;315:18

Steven Wayne Fish, et al. v.
Kris Kobach

Jesse T. Richman, Ph.D.
April 21, 2017

**8.7 (1)**
  314:10
**8:15 (1)**
  9:10
**8:20 (1)**
  9:10
**800 (1)**
  281:23
**800,000 (1)**
  124:11
**85 (2)**
  276:10,13
**88.5 (2)**
  311:10;312:9
**89.7 (1)**
  311:10

### 9

**9 (17)**
  31:14;32:4,4;112:8,
  11;113:3;157:18,21;
  160:17;215:17;311:4;
  313:14;314:20;322:8;
  331:13;333:17;340:3
**9,000 (1)**
  44:6
**9:45 (1)**
  57:3
**90 (1)**
  119:19
**91.3 (2)**
  313:15,25
**92 (1)**
  315:12
**93 (1)**
  313:15
**95 (6)**
  88:16,19;94:17;
  95:11,13;143:15
**96 (1)**
  194:1
**97.5 (1)**
  171:18
**97-point (1)**
  171:17
**98 (1)**
  18:8
**99 (1)**
  18:8