## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**STEVEN WAYNE FISH, et al.,**

     **Plaintiffs,**

     **v.**

**KRIS KOBACH, KANSAS SECRETARY OF STATE,**

     **Defendant.**

**Case No. 16-2105-JAR-JPO**

## MEMORANDUM AND ORDER

The individual Plaintiffs in this case are United States citizens who attempted to register to vote at the time they applied for a Kansas driver's license after January 1, 2013. They failed to present Documentary Proof of Citizenship ("DPOC") as required by the 2011 Kansas Secure and Fair Elections Act.[1] Under a 2015 regulation passed by Defendant Kansas Secretary of State Kris Kobach,[2] Plaintiffs' voter registration applications were deemed "incomplete," and some of these applications were cancelled in the Kansas voter registration database due to the failure to submit DPOC.

These Plaintiffs, along with the Kansas League of Women Voters, bring claims against Secretary Kobach for a Fourteenth Amendment violation under 42 U.S.C. § 1983, and for statutory violations of the National Voter Registration Act ("NVRA"). On May 17, 2016, the Court issued an extensive Memorandum and Order granting in part Plaintiffs' motion for a preliminary injunction barring enforcement of the Kansas DPOC law until this case could be

---

[1] K.S.A. § 25-2309(l).

[2] K.A.R. § 7-23-15.

decided on the merits.[3]  It was effective on June 14, 2016.[4]  The Tenth Circuit affirmed that

ruling on October 19, 2016, providing significant guidance on Plaintiffs' preemption claim that §

5 of the NVRA displaces the Kansas DPOC law.[5]

After the Tenth Circuit's decision, the Court reopened discovery, which is now complete.

According to the Pretrial Order, three claims remain in this matter: (1) Count 1 alleges a

violation of § 5 of the NVRA based on preemption under the Election Clause in Article 1 of the

United States Constitution; (2) Count 4 alleges a violation of § 10 of the NVRA; and (3) Count 6

alleges a violation of 42 U.S.C. § 1983, based on the Fourteenth Amendment's privileges or

immunities clause.  Before the Court are cross-motions for summary judgment (Docs. 366, 382),

and Plaintiffs' motions to exclude evidence related to defense experts Jesse T. Richman and

Hans von Spakovsky (Docs. 389 and 391), to the extent Defendant relies on those expert

opinions on summary judgment.  These motions are fully briefed, and the Court has considered

the parties' arguments and evidence.  As explained more fully below, the Court grants in part and

denies in part the motions to exclude.  The Court also grants in part and denies in in part the

parties' motions for summary judgment.

## I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no

genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[6]  In

applying this standard, the court views the evidence and all reasonable inferences therefrom in

the light most favorable to the nonmoving party.[7]  "There is no genuine issue of material fact

---

[3]189 F. Supp. 3d 1107 (D. Kan. 2016).

[4]Doc. 145.

[5]840 F.3d 710 (10th Cir. 2016).

[6]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[7]*City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[8]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[9]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[10]

To prevail on a motion for summary judgment on a claim upon which the moving party also bears the burden of proof at trial, the moving party must demonstrate "no reasonable trier of fact could find other than for the moving party."[11]  The facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[12]  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[13]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[14]  "Where, as here, the parties file cross-motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."[15]

---

[8]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[9]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[10]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[11]*Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015).

[12]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

[13]Fed. R. Civ. P. 56(c)(4).

[14]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[15]*James Barlow Family Ltd. P'ship v. David M Munson, Inc.*, 132 F.3d 1316, 1319 (10th Cir. 1997) (citation omitted).

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[16]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[17]

## II.    NVRA Claims

The parties have filed cross-motions on the remaining NVRA claims in this matter brought under §§ 5 and 10.  Shortly after this case was filed, Plaintiffs successfully moved for a preliminary injunction based on their likelihood of success on the merits of their § 5 claim. Defendant appealed, and the Tenth Circuit affirmed, providing guidance on whether the Kansas DPOC law is preempted by § 5's mandate that a motor-voter registration application contain the minimum-amount of information necessary for the state to exercise its eligibility-assessment and registration duties.  This is the first time this Court has been called upon to consider Plaintiffs' § 5 claim since the Tenth Circuit's remand.  Thus, before the Court addresses the uncontroverted facts or the *Daubert* motions, the Court finds it helpful to set forth the Kansas DPOC law, and the standards that will apply to the § 5 claim under the Tenth Circuit's binding precedent.[18]

---

[16]*Celotex Corp. v. Catrett*, 477 U.S. 317,  327 (quoting Fed. R. Civ. P. 1).

[17]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[18]For the first time in his reply brief, Defendant challenges the League of Women Voters' standing to raise claims in this case, and reasserts that Plaintiffs Boynton, Stricker, and Hutchinson's claims are moot because their citizenship documents have been confirmed or provided to the State.  Defendant raises these arguments with little to no analysis and without providing Plaintiff an opportunity to respond.  These arguments have been raised and rejected, and Defendant fails to point to any new evidence or argument that persuades the Court to reverse its prior rulings.  Therefore, the Court incorporates by reference its previous ruling that it need not consider Defendant's argument that the League of Women Voters lacks standing to raise claims in this matter because individual plaintiffs have standing to raise all claims asserted in the Amended Complaint.  Doc. 334 at 13–14.  The Court also incorporates by reference its previous ruling that Defendant failed to meet his burden of demonstrating that Plaintiffs Boynton, Stricker, and Hutchinson's claims are moot.  *Id.* at 14–19.

A.    **Preemption under the Elections Clause and § 5 of the NVRA**

Section 5 of the NVRA requires that every application for a driver's license, "shall serve

as an application for voter registration with respect to elections for Federal office."[19]  Subsection

(c)(2)(B)–(C) of section 5 provides:

> (2) The voter registration application portion of an application for a State motor
> vehicle driver's license—
>
> . . . .
>
> (B) may require only the minimum amount of information necessary to—
>
> (i) prevent duplicate voter registrations; and
> (ii) enable State election officials to assess the eligibility of the applicant and to
> administer voter registration and other parts of the election process;
>
> (C) shall include a statement that—
>
> (i) states each eligibility requirement (including citizenship);
> (ii) contains an attestation that the applicant meets each such requirement; and
> (iii) requires the signature of the applicant, under penalty of perjury.[20]

Under Kansas law, legally qualified voters must register in order to be eligible to vote,[21]

and only United States citizens over the age of eighteen may register to vote.[22]  Before January 1,

2013, Kansas voter registration applicants met the citizenship requirement by signing an

attestation of United States citizenship on the registration application.  The SAFE Act became

law in April 2011.  In addition to an attestation, the SAFE Act requires that voter registration

applicants submit DPOC at the time they apply to register to vote, and lists thirteen forms of

---

[19]52 U.S.C. § 20504(a)(1).  The Court refers to the sections of the NVRA as they appear  in Pub. Law No.
103-31, 107 Stat. 77, 77–89 (1993), but cites to the codified version of the Act.

[20]*Id.* § 20504(c).

[21]K.S.A. § 25-2302.

[22]Kansas Constitution art. 5, § 1.

acceptable documentation, including a birth certificate and a passport.[23]  The DPOC requirement was made effective on January 1, 2013.[24]

If an applicant is a United States citizen but unable to provide one of the thirteen forms of identification listed in subsection (l), the statute allows that applicant to submit another form of citizenship documentation by directly contacting the Secretary of State's ("SOS") Office.  In these cases, the state election board shall give the applicant an opportunity for a hearing before assessing the evidence of citizenship to determine whether it is satisfactory.[25]  The state election board is composed of the Secretary of State, the Attorney General, and the Lieutenant Governor.[26]

If a voter registration applicant fails to submit the requisite DPOC before the registration deadline in Kansas, that applicant can still submit DPOC to the county election office in person, by mail, or electronically (including by text message) before midnight on the day before an election.[27]

On June 25, 2015, Defendant Kobach promulgated K.A.R. § 7-23-15, which became effective on October 2, 2015.  The regulation applies to registration applications that have been deemed "incomplete."  Such applications are "cancelled" if they do not produce DPOC, or otherwise cure the deficiency in the application, within 90 days of application.  The applicant must submit a new, compliant voter registration application in order to register to vote.

---

[23] K.S.A. § 25-2309(l).

[24] *Id.* § 25-2309(u) (repealed 2016).

[25] *Id.* § 25-2309(m).

[26] K.S.A. § 25-2203(a).

[27] K.A.R. § 7-23-14(b).

On October 19, 2016, the Tenth Circuit Court of Appeals issued a lengthy decision in this case affirming the Court's preliminary injunction ruling.[28]  In its opinion, the Tenth Circuit set forth the applicable rules of statutory interpretation and preemption under the Elections Clause, interpreted the NVRA's requirements under § 5, and applied that interpretation to the facts as found by this Court in its preliminary injunction order.

In the course of its detailed analysis, the Tenth Circuit "rejected Secretary Kobach's readings of the NVRA."[29]  Defendant spends significant time in his summary judgment briefs rearguing the legal issues resolved by the Tenth Circuit, and suggests that they may not be binding on this Court since they were issued upon review of a preliminary injunction order.  This argument has no merit.  To be sure, the legal standard at the preliminary injunction stage of the proceedings is different than the standard that applies on summary judgment, and the findings of fact at the preliminary injunction phase are not binding.[30]  But these different standards of proof do not change the binding nature of the Tenth Circuit's legal holdings about the correct way to interpret and apply § 5 of the NVRA, and the extent to which it preempts state law.   At the preliminary injunction phase, the Court evaluated Plaintiffs' likelihood of success on the merits of their § 5 claim.  Here, the Court determines whether there is a genuine issue of material fact, based on a more developed record, about whether Defendant has satisfied the test formulated by the Tenth Circuit in its October 2016 opinion.

The Tenth Circuit's mandate in this case remanded "for further proceedings not inconsistent with this opinion."[31]  Under both the law of the case doctrine, and the mandate rule,

---

[28]840 F.3d 710 (10th Cir. 2016).

[29]*Id.* at 746.

[30]*See Brunson v. Provident Funding Assocs.*, 608 F. App'x 602, 607 n.17 (10th Cir. 2015); *Comm'cns Maintenance, Inc. v. Motorola, Inc.*, 761 F.2d 1202, 1205–06 (7th Cir. 1985).

[31]*Fish*, 840 F.3d at 755.

the Tenth Circuit's opinion with regard to issues of law governs at all subsequent stages of the litigation.[32]  The Court therefore proceeds to apply the standards announced by the Tenth Circuit in its October 19, 2016 published opinion in this case to the summary judgment record.[33]  The Court declines to revisit Defendant's arguments that were resolved by that opinion.

On appeal, the Tenth Circuit held that the attestation requirement in subsection (c)(2)(C) of § 5 presumptively satisfies the minimum-information requirement for motor voter registration in subsection (c)(2)(B).[34]  However, this presumption is rebuttable if the state can demonstrate "that the attestation requirement is insufficient for it to carry out its eligibility-assessment and registration duties."[35]  The court went on:

> More specifically, in order to rebut the presumption as it relates to the citizenship criterion, we interpret the NVRA as obliging a state to show that "a substantial number of noncitizens have successfully registered" notwithstanding the attestation requirement.  In *EAC*, we held that the EAC was not under a nondiscretionary duty to add state-specific DPOC instructions to the Federal Form at two states' behest.  We reached this conclusion because "[t]he states have failed to meet their evidentiary burden of proving that they cannot enforce their voter qualifications because a substantial number of noncitizens have successfully registered using the Federal Form."  The failure to make such an evidentiary showing was seemingly dispositive there of Secretary Kobach's Qualifications Clause challenge.
>
> . . .
>
> This results in the preemption analysis here being quite straightforward: if Kansas fails to rebut this presumption that attends the attestation regime, then DPOC necessarily requires more information than federal law presumes necessary for state officials to meet their eligibility-assessment and registration duties (that is,

---

[32]*See, e.g.*, *Dish Network Corp. v. Arrowwood Indem. Co.*, 772 F.3d 856, 864 (10th Cir. 2014).

[33]Indeed, the circuit court acknowledged that its finding on likelihood of success on the merits was based only on the preliminary injunction record, and it fully expected further discovery to ensue.  It explained: "If evidence comes to light that a substantial number of noncitizens have registered to vote in Kansas during a relevant time period, inquiry into whether DPOC is the minimum amount of information necessary for Kansas to carry out its eligibility-assessment and registration duties would then be appropriate."  *Fish*, 840 F.3d at 750–51.

[34]*Id.* at 738.

[35]*Id.*

the attestation requirement).  Consequently, Kansas's DPOC law would be preempted.[36]

In a footnote, the court explained that if a state could show that attestation does not satisfy the minimum-information standard by demonstrating that substantial noncitizens are able to register to vote notwithstanding attestation of citizenship, then the court would need to consider whether DPOC should be deemed "adequate to satisfy" the minimum-information standard.[37]  This second inquiry would require the state to "show that nothing less than DPOC is sufficient to meet those duties."[38]

At the preliminary injunction phase, this Court found that between 2003 and the effective date of the DPOC law, fourteen noncitizens had registered or attempted to register to vote in Sedgwick County, Kansas.  The Tenth Circuit found that this number "fall[s] well short of the showing necessary to rebut the presumption that attestation constitutes the minimum amount of information necessary for Kansas to carry out its eligibility-assessment and registration duties."[39]  In addressing this evidence, the court considered and rejected Defendant's argument that "even if one noncitizen successfully registers under the attestation regime, then DPOC is necessary to ensure applicant eligibility."[40]  This is because in adopting the NVRA registration procedures, Congress intended "to ensure that whatever else the states do, 'simple means of registering to vote in federal elections will be available.'"[41]  If one vote by a noncitizen is too many, then states

---

[36]*Fish*, 840 F.3d at 738–39 (quoting and citing *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183 (10th Cir. 2014)).

[37]*Id.* at 738 n.14.

[38]*Id.*

[39]*Id.* at 747.

[40]*Id.* at 747–48.

[41]*Id.* at 748 (quoting *Arizona v. Inter Tribal Council of Arizona, Inc. ("ITCA")*, 133 S. Ct. 2247 (2013)).

would be able to justify even harsher means of verifying citizenship.[42]  The court explained, "[t]he NVRA does not require the least amount of information necessary to prevent even a single noncitizen from voting."[43]

Therefore, in deciding the parties' motion for summary judgment on the NVRA claims, this Court confines its analysis to the test set forth in the Tenth Circuit's October 19, 2016 decision: whether Defendant has submitted evidence that, if assumed to be true, would meet his burden of showing that a substantial number of noncitizens successfully registered to vote under the prior attestation regime.

### B.    Motions to Exclude under *Daubert*, and Rule 702

Before setting forth a summary of uncontroverted facts, the Court must rule on Plaintiffs' motions to exclude defense experts Hans von Spakovsky and Jesse Richman, whose opinions are submitted in support of Defendant's claim that a substantial number noncitizens registered under the attestation regime, and nothing less than DPOC is sufficient to meet its eligibility-assessment and registration duties.

The Court has broad discretion in deciding whether to admit expert testimony.[44]  The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation."[45]  First, the Court must determine whether the expert is "qualified by 'knowledge, skill, experience, training, or education' to render an opinion."[46]  "[A] district court must [next] determine if the

---

[42]*Id.*

[43]*Id.*

[44]*Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996).

[45]*Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999).

[46]*Milne v. USA Cycling, Inc.*, 575 F.3d 1120, 1133 (10th Cir. 2009) (quoting *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001)).

expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his discipline.'"[47]  To determine reliability, the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid."[48]  The district court must further inquire into whether the proposed testimony is sufficiently "relevant to the task at hand."[49]

It is within the discretion of the trial court to determine how to perform its gatekeeping function under *Daubert*.[50]  The most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated.[51]  In this case, the parties do not request a hearing.  The Court has carefully reviewed the submissions filed with the motions, which include deposition testimony by both experts, and believes this review is sufficient to render a decision for purposes of summary judgment.

### 1.     Hans von Spakovsky

For purposes of summary judgment, Defendant relies on expert Hans von Spakovsky, and the third-party survey attached to his report, to support the following assertions: (1) that the State of Kansas conducted a survey to determine the extent to which the DPOC law placed a burden on Kansas citizens when registering to vote; (2) that the survey produced certain results relevant to determining whether the DPOC law imposes a burden on Kansas citizens registering to vote; (3) that the DPOC law is not a burden; (4) that most discoveries of noncitizen registration by Defendant are accidental; and (5) that noncitizens are registered to vote in states other than Kansas.

---

[47]*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

[48]*BG Tech., Inc. v. Ensil Int'l Corp.*, 464 F. App'x 689, 703 (10th Cir. 2012).

[49]*Id.* (quoting *Daubert*, 509 U.S. at 597).

[50]*Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000).

[51]*Id.*

Plaintiffs challenge the admissibility of both von Spakovsky's expert report and the attached survey on the grounds that he is unqualified and his opinion is based on unreliable methodology.

### a.    Survey

The survey appended to the expert report was completed by Cole Hargrave Snodgrass & Associates in May 2016, and is directly cited by Defendant in support of his statements of fact 76, and 78–81.[52]  It was not written or administered by von Spakovsky.  This Court has "'wide discretion' in determining whether a witness's experience is sufficient to qualify him as an expert."[53]  "As long as an expert stays 'within the reasonable confines of his subject area,' our case law establishes 'a lack of specialization does not affect the admissibility of [the expert] opinion, but only its weight.'"[54]

Although the survey is attached to von Spakovsky's report, he did not take part in designing or conducting this survey—he does not offer himself up as an expert witness on polling or surveying.[55]  Instead, he testified that he "can read the results of a survey or poll and see what it means on a particular subject.  For example, I cite a polling survey that was done in Kansas that shows an overwhelming number of Kansas residents in fact have access to birth certificates and passports."[56]  When asked what expertise he employs to read a poll or survey, von Spakovsky responded that "I believe I can read them the way any other individual who is

---

[52]Doc. 383 at 36–37.

[53]*Ronwin v. Bayer Corp.*, 332 F. App'x 508, 513 (10th Cir. 2009) (citing *United States v. Arney,* 248 F.3d 984, 991 (10th Cir. 2001)).

[54]*Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (quoting *Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1519–20 (10th Cir. 1996)).

[55]Plaintiffs have not lodged hearsay or foundation objections to the survey.  The Court therefore confines its analysis of the survey to discussing von Spakovsky's qualifications to relay and opine on its veracity and methodology.

[56]Doc. 392-2 at 25:7–14.

either a social scientist or historian or anything else can look at survey results."[57]  The witness

then admitted he is neither a social scientist, nor a historian, although he has significant

experience researching the issue of voter fraud.[58]  He testified that he took a class in statistics as

an undergraduate student at MIT, and that he has published work "some years ago" critical of

another survey on this topic.[59]

It is clear that von Spakovsky is not qualified to testify as an expert about this survey.

Defendant has not demonstrated that von Spakovsky possesses any special skill or experience

required to testify about the survey results; indeed, all but one paragraph simply recites the

survey's findings, rather than any opinion.[60]  "[T]he persons conducting the survey must be

experts."[61]  Von Spakovsky did not participate in designing or conducting this survey, and he has

failed to demonstrate that he has even general experience with survey design or methodology

that would qualify him to testify about this survey.[62]  A single undergraduate class thirty years

ago and a policy paper critical of another survey is simply insufficient.[63]  The person conducting

the survey has not been offered as a witness.  Because von Spakovsky is not qualified to testify

about the survey's methodology, the Court finds that the survey itself must be excluded for

purposes of summary judgment.

---

[57]*Id.* at 25:20–23.

[58]*Id.* at 26:3–27:16.

[59]*Id.* at 29:8–30:18.

[60]Again, Plaintiffs do not object to the survey on the basis of hearsay, or lack of foundation.

[61]*Allstates Air Cargo, Inc. v. United States*, 42 Fed. Cl. 118, 122 (1998) (quoting *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 516 n.14 (3d Cir. 1998)).

[62]*See Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1545 (10th Cir. 1996) (admitting survey evidence after person who conducted survey testified that it was conducted according to generally accepted principles) (citing *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988)).

[63]*See Icon Health & Fitness, Inc. v. Nautilus Grp., Inc.*, No. 1:02CV00109TC, 2005 WL 615496, at *3 (D. Utah Aug. 29, 2005) (finding expert's general expertise as to surveys in general, which included teaching a survey methodology at the undergraduate and graduate level fo several years, and helping prepare and administer several surveys himself, was sufficient general expertise to qualify him to testify about copy test surveys).

### b.    Expert Opinion

To the extent von Spakovsky offers a *legal* opinion about the meaning of the survey results, or any other matter, it is also inadmissible under Fed. R. Evid. 704(a).  That rule provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."[64]  Still, "testimony on ultimate questions of law, i.e., legal opinions or conclusions, is not favored."[65]  Nor may a witness "state legal conclusions drawn by applying the law to the facts."[66]  Therefore, legal conclusions asserted by von Spakovsky about the survey or any other matter are inadmissible.[67]

Only two of Defendant's remaining statements of fact rely on von Spakovsky's expert report: that most discoveries of noncitizen registration by Defendant are accidental, and that noncitizens are registered to vote in states other than Kansas.  Defendant responds that von Spakovsky's experience qualifies him to testify about these matters.  The Court has reviewed von Spakovsky's extensive experience working in the area of election law, and finds that he is qualified by that experience to testify about these remaining facts.  To the extent Plaintiffs argue that this expert is biased, that issue goes the weight, and not the admissibility of his opinion.[68]  Similarly, Plaintiffs' arguments as to the reliability of von Spakovsky's statements based on the underlying evidentiary support go to the weight and not the admissibility of his statements.  Plaintiffs will be able to effectively explore any remaining alleged deficiencies in von Spakovsky's opinion through cross-examination at trial.

---

[64]Fed. R. Evid. 704(a).

[65]*Anderson v. Suiters*, 499 F.3d 1228, 1237 (10th Cir. 2007); *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988) (en banc).

[66]*Christiansen v. City of Tulsa*, 332 F.3d 1270, 1283 (10th Cir. 2003).

[67]This ruling applies to the statement in paragraph 77 of Defendant's brief.

[68]*See, e.g.*, *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., LLC*, 858  F. Supp. 2d 505, 580 (D. Md. 2012).  Doc. 383 at 14.

### 2.    Jesse T. Richman

Defendant relies on Richman's expert report to support his estimates of the numbers of noncitizens that have registered or attempted to register to vote in Kansas, and to support his assertion that these numbers are substantial because they could make a difference in a close election.  Richman analyzes several pieces of data to determine how many noncitizens in Kansas registered or attempted to register to vote prior to the DPOC law.  He points to four types of data in his report to extrapolate statewide estimates and to reach his meta analysis: (1) an internet-based Cooperative Congressional Elections Study ("CCES");[69] (2) pre-existing registration by newly naturalized citizens;[70] (3) matching of temporary driver's license ("TDL") holders and voter registration lists;[71] and (4) a January 2017 telephone survey commissioned by the State of Kansas, and conducted by a national polling firm, of TDL holders, individuals on the suspense list, registered voters in Ford, Seward, Finney, and Grant counties, and "incidentally contacted" individuals.[72]  He considers the strengths and weaknesses of each piece of data in determining rates of noncitizen registration, and he extrapolates the data to estimate statewide noncitizen registration rates.  He also includes a "meta-analysis" of four of his estimates in his rebuttal report to support his opinion that a substantial number of registrants in Kansas are noncitizens. Plaintiffs argue that Richman is not qualified to offer an opinion on the survey data appended to his report, and that methodological flaws in those surveys and in his analysis of the surveys render his opinions unreliable.

---

[69]Doc. 384-13 at 5.

[70]*Id.* at 45–46.

[71]*Id.* at 6–7.

[72]*Id.* at 7–12.

Like von Spakovsky, and contrary to the parties' repeated assertions in the *Daubert* and summary judgment briefs, Richman did not personally conduct the surveys upon which he relies in forming an opinion about the prevalence of noncitizen voter registration in Kansas. But unlike the von Spakovsky report, Defendant does not submit the underlying data itself in support of his motion for summary judgment; he only submits Richman's opinion and extrapolations based on these data sources.[73]

Plaintiffs first argue that Richman is not qualified as an expert on this survey data. Defendant responds that Richman will testify as an expert on survey analysis, not design, for which he has published peer-reviewed work, and that he is duly qualified to testify about this data. Richman is an associate professor in the Department of Political Science and Geography at Old Dominion University. He has designed nine or ten surveys as a principal drafter, and has assisted in designing many others. He has experience in the field of public opinion, having supervised several public opinion and evaluation studies. He has published one peer-reviewed study on the issue of noncitizen voting in 2014, which he also relies on in this expert report. The Court is satisfied that Richman's general experience designing and analyzing surveys qualify him to testify about the surveys he discusses in his report. To the extent his experience is too generalized, it is an issue that goes to the weight and not the admissibility of his opinion.

Plaintiffs next argue that Richman's analyses contain serious methodological flaws that render his opinions completely unreliable. An expert opinion "must be based on facts which enable [him] to express a reasonably accurate conclusion as opposed to conjecture or speculation . . . absolute certainty is not required."[74] It is not necessary to prove that the expert is

---

[73] The surveys were not attached to the motion for summary judgment, despite being listed as attachments at the end of each of Richman's reports. Docs. 384-13 at 15; 184-14 at 41.

[74] *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

"indisputably correct," but only that the "method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements."[75]

Daubert sets forth a non-exhaustive list of four factors that the trial court may consider when conducting its inquiry under Rule 702: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community.[76] But "the gatekeeping inquiry must be tied to the facts of a particular case."[77] With regard to nontechnical expert testimony, "these factors are 'neither definitive nor exhaustive and . . . a trial judge has wide discretion both in deciding how to assess an expert's reliability and in making a determination of that reliability.'"[78] "Regardless of the specific factors at issue, the purpose of the Daubert inquiry is always 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"[79]

Plaintiffs argue that Richman's opinions are unreliable for three reasons: (1) his estimates of noncitizen registration are based on unreliable data in both the CCES and Kansas surveys;[80]

---

[75]*Id.*

[76]*Daubert*, 509 U.S. at 593–94.

[77]*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1998) (quotations omitted).

[78]*Hatfield v. Wal-Mart Stores, Inc.*, 335 F. App'x 796, 800 (10th Cir. 2009) (quoting *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2005)).

[79]*Hoffman v. Ford Motor Co.*, 493 F. App'x 962, 974–75 (10th Cir. 2012) (quoting *Dodge*, 328 F.3d at 1222–23).

[80]Plaintiffs offer a rebuttal report by Ansolabehere and Hersh, explaining that the CCES and State of Kansas surveys rely on self-reported registration rates that are not validated against public records, and are thus subject to overreporting. Plaintiffs' experts attempted to validate the results in these surveys, finding different figures. Likewise, Plaintiffs point to evidence that some of the survey participants misstated their citizenship status, and highlight ways by which Richman could have addressed this measurement error. These are all areas that may be appropriately addressed at trial.

(2) both surveys rely on sample sizes that are too small to generate statistically reliable results; and (3) the surveys' samples are not representative of noncitizens in Kansas. The Court agrees that the flaws identified by Plaintiffs raise serious questions about the weight that should be afforded Richman's opinion in this matter. Nonetheless, after reviewing the parties' submissions, the Court has determined that because "a logical basis exists for [the] expert's opinion . . . the weaknesses in the underpinnings of the opinion[ ] go to the weight and not the admissibility of the testimony."[81]

There is one exception to the Court's ruling deeming Richman's opinion admissible: to the extent he testifies that noncitizen registration in Kansas is substantial, that is an ultimate legal conclusion. Defendant is free to argue, based on Richman's opinion, about the proper way to determine the meaning of "substantial" in the Tenth Circuit's opinion affirming this Court's preliminary injunction order. But, testimony about the ultimate legal issue of how many noncitizens registrants is substantial is an ultimate legal question, which the Court addresses *infra*. As with von Spakovsky, the Court will disregard any conclusory legal assertions by Richman in his report.

Accordingly, the Court grants in part and denies in part the motions to exclude Defendant's experts. The survey attached to von Spakovsky's expert report is inadmissible,[82] but von Spakovsky's opinions based on other data are admissible. Both experts' opinions on

---

[81]*Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1519–20 (10th Cir. 1996), *overruled in part by Kumho*, 526 U.S. at 145; *see also, e.g., Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 232–33 (S.D.N.Y. 2004) (explaining small sample size and selection go to the weight and not the admissibility of testimony); *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1079–80 (C.D. Cal. 2015) (same).

[82]The Court notes for the record that admitting the survey would not impact the Court's summary judgment ruling that there is a genuine issue of material fact about whether substantial noncitizens successfully registered to vote under the attestation regime.

ultimate legal conclusions are inadmissible.  The experts' opinions are otherwise admissible for purposes of summary judgment.[83]

### C.    Uncontroverted Facts

The Court incorporates the facts set forth in its May 4, 2017 Memorandum and Order denying Plaintiffs' motion for summary judgment on the Fourteenth Amendment privileges or immunities clause "right to travel" claim alleged in Count 6.  The following additional facts are material to the remaining NVRA claims and are either uncontroverted or stipulated by the parties.

Defendant Kansas Secretary of State Kris Kobach does business in and is an elected official of the State of Kansas.  Defendant is considered the Chief Election Officer for the State of Kansas.

Kansans may apply to register to vote in person, by mail, through a voter registration agency, in conjunction with applying for a Kansas driver's license, or "by delivery to a county election officer to be registered."[84]  The individual Plaintiffs in this case all applied to register to vote at the time they applied for a Kansas driver's license.

The Kansas Election Voter Information System ("ELVIS") is a statewide voter registration database, maintained by Defendant.  Each county election officer is responsible for maintaining the voter lists for their own counties. The central database reflects data that is entered by the counties.  ELVIS assigns a unique identification number to all voters.  When a voter registration application is received by the relevant county election office, a record is

---

[83]Although Plaintiffs' motions are styled as arising under Rules 401, 402, and 403, in addition to Rule 702 and *Daubert*, they do not address relevance or Rule 403 balancing in these motions.  As described later in this Order, the probative value of this evidence under the Tenth Circuit's § 5 test may be explored at trial, but goes to the weight and not the admissibility of this evidence.  Given this finding, and the fact that this matter will be tried to the bench, the Court finds it highly unlikely that the evidence could be inadmissible under Rule 403.

[84]K.S.A. §§ 25-2309(a), -2352(a)(1).

created in the ELVIS database.  County election officers have been instructed to enter into ELVIS all people who submit voter registration applications regardless of whether they provided proof of citizenship.  ELVIS contains codes that demonstrate whether a person has registered successfully.  "CITZ" is the code recorded in ELVIS to indicate that an applicant has failed to provide documentary proof of citizenship.  "MV" is the code recorded in ELVIS to indicate that an applicant has applied to register to vote at the Kansas Division of Vehicles ("DOV") in conjunction with a driver's license application.  If an applicant has not provided DPOC, or if the application is otherwise missing required information, the record is deemed "incomplete," until the application is completed.  After  90 days, an incomplete application is cancelled under K.A.R. § 7-23-15.

Noncitizens who apply for a driver's license may receive a temporary driver's license ("TDL"), the duration of which is tied to the length of time that the documentation they provided to the DOV permits their presence in the United States.  Noncitizen legal permanent residents who apply for a driver's license receive a regular driver's license.  Bryan Caskey, the Director of Elections in the Kansas Secretary of State's Office, believes that green card holders apply for regular driver's licenses using their green cards as legal presence documents.

### 1.     Direct Evidence of Noncitizen Registration as of January 1, 2013

 As of January 1, 2013, there were 1,762,330 registered voters in Kansas.  Caskey has identified 125 non-citizens who "either attempted to register to vote or successfully registered to vote prior to the proof-of-citizenship requirement's implementation, or attempted to register after the requirement was implemented."[85]  This figure is equal to approximately .0007% of registered voters in Kansas.  Tabitha Lehman is the County Election Officer of Sedgwick County.  She has

---

[85] Doc. 349 ¶ 81.

identified an additional 2 noncitizens who registered to vote before January 1, 2013, in Sedgwick County.

Of the 127 individuals identified by Caskey and Lehman, 43 successfully registered to vote in Kansas, 47 currently have or have had the "CITZ" code in their ELVIS record at one point, and 11 have voted in an election. Eighty-eight of these individuals are motor-voter applicants, 25 of whom successfully registered to vote in Kansas, 32 have or have had the "CITZ" code in their ELVIS records at some point, and 5 have voted in an election.

Defendant has also identified possible noncitizens who registered to vote by comparing the TDL list with the ELVIS database. Defendant compared the TDL list to the voter registration list in 2009, 2010, 2011, and 2017. As of January 30, 2017, Kansas had identified 79 TDL holders on the voter rolls, several of whom have been referred for prosecution. One of Plaintiffs' experts, Eitan Hersh, also compared the TDL list to the voter registration list. He found 82 matches.

The DMV has compared the list of individuals on the suspense list to information in the driver's licenses database concerning driver's license holders who presented proof of permanent residency (or "green cards") in the course of applying for a driver's license, and identified some possible noncitizens.

In Kansas, people who are called for jury service are sent jury duty questionnaires that include a question about United States citizenship. Monthly, district courts send Defendant lists of individuals who requested to be excused from jury service based on their claims of noncitizenship. Defendant has compared lists of individuals who indicated on their jury questionnaires that they were not citizens, to his list of registrants and identified at least 5

individuals who were potentially noncitizens.  In November 2013, Defendant referred these five individuals to a local county police department for investigation and possibly prosecution.

Defense expert von Spakovsky surmises that Kansas has no access to information about who is in the United States legally or otherwise, so most discoveries of noncitizens on registration rolls are accidental.

### 2.    Expert Testimony Regarding Extent of Noncitizen Registration

As already briefly described, defense expert Jesse Richman evaluated several pieces of data to try to determine the prevalence of noncitizen registration in Kansas.  In one method, Richman compared the Kansas list of TDL holders to the list of individuals held in "suspense" in ELVIS for failure to submit DPOC at the time they registered to vote.  He identified 16 people on both lists, although he does not believe that everyone matched from the list is a noncitizen. He did not compare this list of matches with the 127 names identified by Caskey and Lehman to determine if there was overlap.  None of these 16 individuals registered to vote, and there is no information about whether they attempted to register at the DOV.

Richman also found that 27 people on the suspense list attempted to register to vote close in time to when they obtained a driver's license using a green card or a noncitizen permanent resident document.  He did not compare this list of matches with the 127 names identified by Caskey and Lehman to determine if there was overlap. There is no information about whether these individuals attempted to register to vote at the DOV.

Richman utilized multiple sampling methods based on the results of a January 2017 telephone survey commissioned by the State of Kansas, and conducted by a national polling firm, of (1) TDL holders; (2) individuals on the suspense list; (3) registered voters in Ford,

Seward, Finney, and Grant counties; and (4) "incidentally contacted" individuals.  Of the 1300 people surveyed from the suspense list, Richman estimates that .65% are noncitizens. The registered voters survey sampled individuals registered to vote between 2007 and 2012 in Ford, Finney, Grant, and Seward counties.  All of the individuals contacted indicated that they were citizens of the United States.

Richman provides four estimates of noncitizens in Kansas who have registered or attempted to register to vote, not limited to DOV registrations.  These estimates are based on the following sources: (1) the CCES survey; (2) records of newly naturalized Sedgwick County citizens who were discovered to have been registered to vote at the time of naturalization; (3) a survey of TDL holders; and (4) survey responses from a group of incidentally contacted noncitizens.  He does not identify a single "best" estimate.  Richman also produced a "meta-analysis" of the rate of noncitizen registration by aggregating these four estimates.

The information provided to Richman reflected that out of 791 newly-naturalized citizens in Sedgwick County since January 1, 2016, 8, or roughly 1%, had already submitted voter registration forms.  The Sedgwick County Election Office discovered these individuals when entering their registration information into the ELVIS database.  Extrapolating this percentage to the number of naturalized citizens in Kansas between 2008 and 2015, Richman estimates 1,153 noncitizens registered to vote.  Richman updated this estimate in his rebuttal report, in order to respond to Plaintiffs' expert's criticism, and the number rose to 1,169.

Next, Richman analyzed results from a telephonic survey that attempted to identify noncitizens on the TDL list.  Out of 104 individuals contacted, 38 were reached that matched the name and age of an individual on file.  Those names then were provided to the Department of Homeland Security ("DHS") to determine their citizenship status.  In total, 37 individuals were

determined to be noncitizens based on the most recent information available to DHS, 6 of whom responded to the survey that they had either registered or attempted to register to vote, although none have an ELVIS record.  Based on this sample, Richman concludes "if the small sample analyzed can be generalized to the broader TDL list . . . then it suggests that . . . 3,480[] individuals on that list have registered or attempted to register to vote in Kansas."[86]  Richman observes that the TDL list does not include all Kansas noncitizens—the list excludes unlawfully present noncitizens and noncitizens who choose not to obtain a driver's license.  He opines that if the survey results are applied to the broader noncitizen population, it would suggest that more than 18,000 noncitizens have registered or attempted to register to vote.

Finally, Richman looked at 165 "incidentally-contacted" individuals from the three different lists in the telephonic survey who were asked about their citizenship status and whether or not they were registered to vote.  Nineteen of these individuals indicated that they were noncitizens, one of whom indicated that they had registered or attempted to register to vote, although there is no evidence of this person's name appearing in ELVIS.  Richman concludes:

> Although the sample size is extremely small and any estimates are accordingly very uncertain (the margin of error is 10.1 points), the estimate from this data suggests a registration/attempted registration rate of 5.3 percent.  If extrapolated (and again the uncertainty here is very high) to the Kansas non-citizen population as a whole, this implies that about 6,000 may have registered to vote or attempted to register to vote.[87]

Richman's meta analysis aggregating all four of these estimates, produced a midpoint estimate that 1.1% of noncitizens in Kansas have registered or attempted to register to vote.  Because there are approximately 115,000 noncitizen adults in Kansas, this midpoint estimate equals 1,265 noncitizens statewide who have registered or attempted to register to vote in Kanas.

---

[86]Doc. 384-13 at 10.

[87]Doc. 384-13 at 12.

This figure is equal to approximately .07% of the approximately 1.8 million registered voters in Kansas.

Close elections can be decided by a few votes. In Kansas elections over the past 17 years, there have been 33 elections decided by fewer than 100 votes. For example, there were two general election races for the Kansas House of Representatives that were decided by .04% and .036% of the two-party vote, respectively, and both were won by Democratic candidates who held a three-vote advantage.

As of March 28, 2016, there were 5,655 applicants on the "suspense list" who had applied to register at the DOV. As of March 23, 2016, there were 11,147 applicants who applied to register at the DOV whose applications were canceled under K.A.R. § 7-23-15 due to lack of DPOC.

D.    **Application of the Tenth Circuit's Standard to Summary Judgment Evidence**

In order to survive summary judgment on the § 5 claim, Defendant must show that "a substantial number of noncitizens have successfully registered to vote under the attestation requirement."[88]  Defendant has come forward with two forms of evidence to meet this burden: (1) 127 recorded instances of noncitizens registering or attempting to register to vote prior to the DPOC law's effective date; and (2) Richman's opinion that somewhere between 1,169 and 18,000 noncitizens have registered or attempted to register to vote.   The Court must therefore determine whether this evidence is sufficient to overcome the presumption that attestation meets the minimum-information principle in § 5 of the NVRA.

---

[88] *Fish*, 840 F.3d at 739.

### 1.    Meaning of Substantial

As an initial matter, the parties dispute the meaning of "substantial" under the Tenth Circuit's standard.  Plaintiffs urge the Court to evaluate the number of noncitizen registrations as a percentage of the total number of registered voters.  Defendant urges that substantial should be defined as any number that could impact a close election.  The Court disagrees with Defendant's characterization of the inquiry.  His argument that any number that could change an election outcome is substantial ignores the guidance provided by the Tenth Circuit's decision in this case, rejecting his previous argument that "one vote is too many."  The court found that Defendant failed on the preliminary injunction record to establish that a substantial number of noncitizens had registered to vote under the attestation regime when he showed that 14 noncitizens had registered or attempted to register to vote under the attestation regime.  Certainly, if the Tenth Circuit had agreed that any number that could swing an election would be deemed substantial, it would have set forth that standard in its opinion and not made patently clear that one noncitizen registration would not suffice.  Instead, the court made clear that the minimum-information principle under § 5 of the NVRA does not require a fool-proof method of ensuring citizenship eligibility is met.[89]  "The NVRA does not require the least amount of information necessary to prevent even a single noncitizen from voting."[90]  Congress intended to create a simplified form for registration, which "would be thwarted if a single noncitizen's registration would be sufficient to cause the rejection of the attestation regime."[91]

According to Richman, a mere three votes could change an election outcome, which is not materially different from Defendant's previous argument that one vote is too many.  If the

[89]*Id.* at 748.

[90]*Id.*

[91]*Id.*

Court measures substantiality by whether the number could decide an election, even one noncitizen registration could be deemed substantial.  Using election outcome as a benchmark for determining substantiality is thus not in keeping with the standard established by the Tenth Circuit.

Moreover, Defendant's argument runs afoul of the guidance provided by *Arizona v. ITCA*,[92] and *Kobach v. EAC*,[93] cases upon which the Tenth Circuit relied in formulating its standard in this case that Defendant must prove that a substantial number of noncitizens registered to vote under the attestation regime in order to overcome the presumption that attestation meets the minimum-information standard in § 5.[94]  The court found that the standards governing the content of the federal form under § 9 of the NVRA, discussed in *ITCA* and *EAC*, and the state motor voter form under § 5 of the NVRA, are analogous.[95]  The court drew support from *ITCA*, where the Supreme Court "construed the requirements of section 9 to avoid constitutional doubt by giving states the opportunity—after failing to obtain relief from the EAC—to obtain state-specific, DPOC instructions by making a factual showing to a court that the attestation requirement ('a mere oath') is not sufficient."[96]  The court also relied on its holding in *EAC*, that the EAC  "was not under a nondiscretionary duty to add state-specific DPOC instructions to the Federal Form at two states' behest" because "[t]he states have failed to meet their evidentiary burden of proving that they cannot enforce their voter qualifications

---

[92]*Arizona v. Inter Tribal Council of Arizona, Inc. ("ITCA")*, 133 S. Ct. 2247 (2013).

[93]*Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183 (10th Cir. 2014).

[94]*Fish*, 840 F.3d at 738 (explaining that its holding is "guided by *Inter Tribal* and our decision in *EAC*").
[95]*Id.*

[96]*Id.* (discussing *ITCA*, 133 S. Ct. at 2260).

because a substantial number of noncitizens have successfully registered using the Federal Form"[97]

In *EAC*, after concluding that the challenged EAC decision was a final action and was procedurally valid, the Tenth Circuit held that the EAC was not required to approve the states' requests for state-specific changes to the federal voter registration form under the NVRA.[98]   It then proceeded to consider whether the EAC's January 17, 2014 decision rejecting Kansas and Arizona's request "precluded them from obtaining information that is 'necessary' to enforce their respective state's voter qualifications."[99]   It concluded that the states had not met their burden— "the states simply did not provide the EAC enough factual evidence to support their preferred outcome."[100]   The EAC's decision found that Kansas had made a showing that as of January 2013, at most 21 noncitizens had registered to vote, out of 1,762,339 registered voters, or .001 percent of all registered voters.[101]   Arizona made a showing that at the time its DPOC law went into effect, at most 196 out of 2,706,223 registered voters were unlawfully registered noncitizens, or .007 percent of all registered voters.[102]   The EAC explained:

> By any measure, these percentages are exceedingly small.  Certainly, the administration of elections, like all other complex functions performed by human beings, can never be completely free of human error.  In the context of voter registration systems containing millions of voters, the EAC finds that the small number of registered noncitizens that Arizona and Kansas point to is not cause to conclude that additional proof of citizenship must be required of applicants for

---

[97]*Id.* at 739 (quoting *EAC*, 772 F.3d at 1197–98).

[98]*EAC*, 772 F.3d at 1189–96.

[99]*Id.* at 1196–97.

[100]*Id.* at 1197–98.

[101]Doc. 367-25 at 34.

[102]Georgia also applied to the EAC to change its state-specific instructions, and thus the EAC also made findings as to Georgia's proof of noncitizen registration.  *Id.* at 34.  However, Georgia did not join Kansas and Arizona in challenging the EAC's decision before the Tenth Circuit.

either state to assess their eligibility, or that the Federal Form precludes those states from enforcing their voter qualifications.[103]

The Court finds instructive the Tenth Circuit's holding in *EAC* that the states' evidence before the EAC of 196 and 21 noncitizen registrations, respectively, was insufficient to demonstrate that they could not enforce their voter qualifications because a "substantial number of noncitizens have successfully registered using the Federal Form."[104] The court agreed that the states had failed to make the requisite showing of substantial noncitizen registration based on a record below that relied on such registrations in relation to the total registered voter population.[105] Therefore, under applicable Supreme Court and Tenth Circuit authority, Defendant's showing must go beyond the number of registrations that would impact the outcome of an election in order to be substantial. The Court will view the number of noncitizen registrations in relation to the number of registered voters in Kansas as of January 1, 2013, and will otherwise be guided by this legal authority when determining whether Defendant's evidence meets the threshold of "substantial."

## 2.    Raw Data

To the extent Defendant relies on raw data of noncitizens registrations before January 1, 2013, to support his claim that substantial numbers of noncitizens registered to vote under the attestation regime, he fails to meet his burden. Defendant argues that the relevant number in terms of the raw data is 127 noncitizens who registered or attempted to register to vote prior to January 1, 2013. But Defendant is required to show that a "substantial number of noncitizens have *successfully registered to vote* under the attestation requirement."[106] One hundred twenty-

---

[103] *Id.* at 34–35.

[104] *EAC*, 772 F.3d at 1198.

[105] *Id.*

[106] *Fish*, 840 F.3d at 746 (emphasis added).

seven is not the relevant number to evaluate because it includes both registrations and attempted registrations, and it is not specific to motor voter registrations. The stipulated facts establish that out of the universe of 127 applicants identified by Defendant, 88 are motor-voter applicants, of which 25 successfully registered to vote. The Court has no trouble finding that this number fails to nudge Defendant into the territory of substantiality for the same reasons the Tenth Circuit found that 14 noncitizen registrations/attempted registrations fell "well short of the showing necessary to rebut the presumption that attestation constitutes the minimum amount of information necessary."[107]

And, even if the Court considers all types of voter registrations and attempted registrations, the stipulated facts demonstrate that out of the 127 applicants identified by Defendant, 43 individuals successfully registered to vote under an attestation regime. The Court does not find that 43 instances out of 1,762,339 (.002 percent) is substantial under the guidance set forth above. Even assuming 127 noncitizens successfully registered to vote prior to January 12, 2013, this would represent .007 percent of registered voters, an "exceedingly small" percentage that does not meet the test of substantiality. Notably, this is the same percentage rejected by the EAC and Tenth Circuit found insubstantial in 2014. The Court finds that the raw data submitted by Defendant about noncitizen registration does not fulfill his burden to demonstrate that substantial noncitizens successfully registered to vote before the DPOC law passed.

### 3.    Expert Evidence

Defendant attempts to avoid summary judgment by arguing that it is impossible for him to capture the extent of the problem of noncitizen voter registration without "external evidence,"

---

[107]*Id.* at 747.

pointing the Court to Richman's expert opinion on noncitizen registration rates in Kansas. Richman's opinion relays various statistics and surveys he examined to determine the prevalence of noncitizen registration, and then extrapolates the data statewide. Richman chooses four of these extrapolation methods, and aggregates them to produce a "meta analysis" showing that between 460 and 2,070 noncitizens have either registered to vote or attempted to register under an attestation regime, with a midpoint confidence estimate of 1,265. Richman's meta analysis is based on the following four estimates: (1) 32,000 extrapolated from the CCES;[108] (2) 1,169 extrapolated from statistics about pre-existing registrations by newly naturalized citizens in Sedgwick County; (3) between 3,480 and 18,000 extrapolated from the results of a survey of TDL holders who were asked whether they had registered or attempted to register to vote; and (4) 6,000 extrapolated from the survey results of individuals incidentally contacted during the surveys of the suspense voter list, TDL holders, and registered voters in Ford, Seward, Finney, and Grant counties, who responded that they were noncitizens who registered or attempted to register to vote.

Richman's opinion fails to point the Court to a single estimate of noncitizen voter registration in Kansas that he believes is accurate. Instead, he maintains:

> I think all of the estimates have strengths and weaknesses. I have not computed a single best guess.
>
> To the extent—as I said already, to the extent I put the estimates together, it was in the meta analysis. That puts a lot of weight, more weight on studies with more observations. But that ignores differences potentially in the coverage of different populations, which might add to the value of some of the other samples.[109]

---

[108]Defendant submits no information about this survey in his statement of uncontroverted facts, and does not argue in his briefing that this figure is probative of the noncitizen registration rate in Kansas.

[109]Doc. 367-8 at 178:1–10.

Because the Court cannot rely on a single estimate provided by Richman given this testimony, it must evaluate all of the estimates upon which Defendant relies, which range from 1,169 to 18,000.   The Court agrees that, without weighing the evidence, 18,000 noncitizen registrants under an attestation regime is substantial.  It far surpasses any estimates the Tenth Circuit has previously found to be insubstantial.  And, this number is almost identical to the amount of voter registration applicants cancelled or placed on the suspense list after K.A.R. § 7-23-15 passed. Assuming the validity of this estimate, Defendant can overcome the presumption that attestation is sufficient for the state to perform its eligibility-assessment and registration duties under the NVRA.  On the other hand, viewing the evidence in the light most favorable to Plaintiffs, Richman's estimates contain serious methodological and probative limitations, not to mention the fact that one of the surveys discussed by Richman found evidence of no noncitizen registrations.  If the Court believes Plaintiffs' experts, it should give little to no weight to Richman's opinions.  Thus, there is a genuine issue of material fact as to whether substantial noncitizens registered to vote under the attestation regime, which necessitates trial on Count 1. The Court thus declines to consider whether under a second step of the § 5 test, Defendant has demonstrated that DPOC is necessary for Kansas to fulfill its eligibility-assessment duties.

### E.    Section 10 of the NVRA

In Count 4, Plaintiffs allege a violation of § 10 of the NVRA, which provides: "Each State shall designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under this chapter."[110]  Plaintiffs allege that Defendant has failed in his duty to coordinate Kansas's responsibilities under the NVRA. Defendant moves for summary judgment, arguing that (1) Plaintiffs did not include this claim in

---

[110]52 U.S.C. § 20509.

their notice letter required under the NVRA; (2) this provision places no duty upon the chief election official of a State to do anything; and (3) Defendant does coordinate state responsibilities under the Act.

The Court agrees with Plaintiffs that they plainly provided him with the requisite 90-day notice of this claim before filing suit.[111]  But the Court agrees with Defendant that summary judgment is otherwise appropriate in his favor on this claim.  It is true that § 10 provides grounds upon which Defendant can be held responsible for a state's NVRA violations.[112]  But Plaintiffs point the Court to no authority supporting the proposition that a violation of coordination duties can be a predicate violation under § 10.  The Act requires only that the State designate a State officer or employee to be responsible for coordination duties, and the parties stipulate that Defendant is considered the chief election official for the State of Kansas under the NVRA.  While this designation makes him a proper party to this lawsuit to enforce § 5 of the NVRA, it does not give rise to a separate cause of action under § 10 for violation of such duties.

## III.    Right to Travel Claim

Previously, this Court denied Plaintiffs' motion for summary judgment on the Fourteenth Amendment right to travel claim.[113]  In the related case of *Bednasek v. Kobach*, where cross-motions for summary judgment were filed, the Court granted Defendant's motion for summary judgment on this claim.[114]  Now, the Court has before it for the first time in this case a motion for summary judgment by Defendant on this claim.  Plaintiff concedes in the Pretrial Order that, "as a practical matter, this claim already has been fully adjudicated by" the undersigned, but

---

[111]Doc. 1-1 ("in light of the violations described above, your office is in violation of its responsibility to coordinate the state's responsibilities under the NVRA.").

[112]*See Harkless v. Brunner*, 545 F.3d 445, 451–55 (6th Cir. 2008).

[113]Doc. 334.

[114]*Bednasek v. Kobach*, Case No. 15-9300-JAR-JPO, Doc. 165 (May 4, 2017).

nonetheless, they argue in their summary judgment response that the Court should deny Defendant's summary judgment motion on Count 6, despite its earlier rulings, because: (1) a consolidated trial would promote judicial efficiency; and (2) there are contested, issues of material fact.  Plaintiffs' position is not well-taken.

First, the Court is not persuaded by Plaintiffs' judicial efficiency argument.  Given the Court's ruling on the NVRA claims in this matter, trial will proceed on the limited factual questions presented upon remand from the Tenth Circuit about the extent of noncitizen registration under the attestation regime, and the extent to which alternatives to DPOC may be sufficient to meet the minimum-information principle in § 5.  The Court granted summary judgment to Defendant on the right to travel claim in *Bednasek*, so that claim will not be tried.  Trial will proceed only on the Fourteenth Amendment right to vote claim, which calls for a balancing test between the State's interests in the DPOC law and the burden it imposes on the right to vote.[115]  Denying Defendant's motion on the right to travel claim in this case presents separate issues regarding how the law treats Kansas-born residents, and thus would not promote judicial efficiency.  Instead, it would multiply these proceedings.

With respect to Plaintiffs' second argument, the Court disagrees that material factual disputes remain that require this claim to proceed to trial.  The Court has already considered Plaintiffs' arguments in the context of summary judgment in detail, and Plaintiffs do not present new evidence or argument that persuades the Court to change its ruling.  For the same reasons discussed in detail in the Court's Order denying Plaintiffs' motion for summary judgment in this case, and in its Order granting Defendant's motion for summary judgment on this claim in *Bednasek*, the Court grants summary judgment to Defendant on the right to travel claim.

---

[115]*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190 (2008).

**IV.    Conclusion**

The scope of this Court's summary judgment Order is narrower than the parties sought in their briefing.  The Tenth Circuit provided the framework within which Plaintiffs' Count 1 preemption claim under § 5 of the NVRA must proceed.  Under that straightforward test, a genuine issue of material fact exists on this record as to whether a substantial number of noncitizens successfully registered to vote under the attestation regime that preceded the Kansas DPOC law, based solely on the testimony and report by Defendant's expert, Professor Jesse Richman.  Although Plaintiffs raise several serious questions about the methodology behind Professor Richman's estimates of noncitizen registration rates, they all go to the weight and not the admissibility of his testimony.  Plaintiffs will be able to fully test that methodology, and the probative value of his opinion, through cross-examination at trial, and through the presentation of their own experts.

The Court does somewhat narrow the claims to be tried in this case.  Summary judgment is warranted in Defendant's favor on Counts 4 and 6.  The Court does not interpret § 10 of the NVRA as creating a separate cause of action against a state's chief election official for failure to coordinate state responsibilities under the Act.  And the Court incorporates by reference its analysis from its May 4, 2017 summary judgment orders in this case on Count 6, and in *Bednasek*.  For the same reasons explained in those orders, summary judgment is warranted on the right to travel claim.

The Court declines at this time to definitively rule on the various prayers for relief sought in Plaintiffs' motion for summary judgment.  If the Court rules in Plaintiffs' favor at the conclusion of the bench trial in this matter, it will address the appropriate relief at that time.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 382) is **granted in part and denied in part**.  The motion is **granted** as to Counts 4 and 6.  It is otherwise **denied**.

**IT IS FURTHER ORDERED BY THE COURT** that Plaintiffs' Motion for Summary Judgment (Doc. 366) is **denied**.

**IT IS FURTHER ORDERED BY THE COURT** that Plaintiffs' motions to exclude the testimony and reports of Jesse T. Richman (Doc. 389) and Hans von Spakovsky (Doc. 391) are **granted in part and denied in part** as described in this Order.

**IT IS SO ORDERED.**

Dated: January 3, 2018

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE
