IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| STEVEN WAYNE FISH, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 16-2105-JAR-JPO |
| ) | |
| KRIS KOBACH, in his official capacity as ) | |
| Secretary of State for the State of Kansas, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' SECOND MOTION TO EXCLUDE
DEFENDANT'S EXPERT DR. JESSE RICHMAN**

Comes now Defendant Kris Kobach, by and through his attorneys, and responds to Plaintiffs' renewed Motion to Exclude the Testimony of Dr. Richman. This is Plaintiffs' third bite at the apple after filing an initial motion, a lengthy reply brief and now a renewed motion on the exact same topics. Plaintiffs are rehashing the same motions. For reasons explained more fully below, Plaintiffs' motion should be denied.

**I. THE COURT ALREADY RULED THAT OPINIONS ON ULTIMATE LEGAL CONCLUSIONS ARE INADMISSIBLE**

On August 25, 2017, Plaintiffs filed a *Daubert* motion "to exclude the proposed testimony and report of Jesse Richman regarding noncitizen registration in Kansas." (Doc. 390, p. 1). On January 3, 2018, the Court ruled on Plaintiffs' motion as follows:

> [T]o the extent [Richman] testifies that noncitizen registration in Kansas is substantial, that is an ultimate legal conclusion. . . . *Both experts' opinions on ultimate legal conclusions are inadmissible*. The experts' opinions are otherwise admissible for purposes of summary judgment.

Order, Doc. 421, p. 19; FN 83.

Despite the clarity of the Court's order, Plaintiffs ignore it and move the Court to "*extend*[1] its summary judgment to trial and to preclude Richman from testifying as to *any* ultimate legal conclusion, including whether noncitizen registration in Kansas is substantial." Motion, Doc. 427, p. 1.

First, the Court has already held that no expert will be allowed to testify about ultimate legal conclusions, *supra*. Second, Plaintiffs' statement moving to exclude "any" ultimate legal conclusion is irrelevant because the Court has held that such will not be admitted. Third, Plaintiffs do not even identify any additional legal conclusions they are moving to exclude; indeed, this argument consists of one sentence. Arguments not supported must be rejected. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived."). In sum, this odd re-assertion of legal conclusion argument should be rejected as the Court has clearly already ruled that legal conclusions by an expert witness will not be admissible.

## II. PLAINTIFFS' ATTACK ON DR. RICHMAN'S "NEW" RESPONSE RATES CALCULATION IS DISINGENUOUS BECAUSE PLAINTIFFS ALREADY KNEW THE RESPONSE RATE RANGES BASED ON THE RAW DATA PROVIDED TO THEM

Although Plaintiffs assert that they are being "sandbagged" with new data and calculations, this is simply not true. Plaintiffs deposed Dr. Richman on response rates during his 10.5 hour long deposition on April 21, 2017. Nothing is new or different about the response rates. Dr. Richman testified that rather than merely providing a response rate, he produced the raw data from which rates can be calculated before applying various weighting methods and controls. *See* **Exhibit 1**, Dr. Richman Depo. p. 38-39. Dr. Richman further testified that the weighted number is more accurate than a non-weighted number:

---

[1]. The phrase "extend summary judgment to trial" is not a recognized motion or legal term.

> A: Weights are used very frequently in the survey field today to adjust as well for differences that arise, not from the sample design, but from differences in response rates. And so that's why I did weighting here, to adjust for differences in response rates from the survey.
> Q: So in your opinion as a political scientist, if I'm trying to assess how many non-citizens are on the suspense list, and I'm trying to use your survey to estimate that, do you believe that the weighted or unweighted number is more likely to be accurate?
> A: I think the weighted is more likely to be accurate.

Exhibit 1, pp 38-39.

Moreover, weighting takes into account fake negative responses such as disconnected phone numbers, answering machines, fax lines or a computer tone:

> A: [D]isconnected phones would not be considered in the denominator in calculating response rates . . . Same thing for a computer tone.

Exhibit 1, pp. 218-219.

Dr. Richman did not initially provide a response rate chart because he provided the raw data instead:

> Q: So you haven't provided a response rate for your survey?
> A: I did not. I provided this table, on which one could make some inference about response rates.
> Q: Is there any way to calculate the response rate for your surveys based on the information in this table?
> A: I believe there is.

Exhibit 1, p. 219.

> Q: If in political science research, you rely on a survey and fail to publish your response rate, would that be inconsistent with generally accepted standards in the field?
> A: Generally one would provide response rate. I provided a spreadsheet which gave a summary of the outcomes of calling as an attachment to my initial report.

Exhibit 1, pp. 212-213.

As Dr. Richman's testimony reveals, the response rate argument is simply a red-herring because response rates require context. Indeed, calculating a basic response rate is just simple math for which a Google search will bring up the "Response Rate Calculator" that anyone can use by plugging in raw data. *See* http://www.aapor.org/Education-Resources/For-Researchers/Poll-Survey-FAQ/Response-Rates-An-Overview.aspx. The fact that Dr. Richman did not include such a rudimentary calculation until being criticized for not doing so is of little bearing especially

because Dr. Richman provided all of the hard data showing the numbers of calls made and the numbers that responded. More importantly, Dr. Richman went beyond simply providing a response rate by utilizing weighting, which is more advanced than just providing what amounts to a crude hang-up rate.

Plaintiffs' own expert witness, Stephen Ansolabehere, cannot disagree. Ansolabehere has published numerous surveys *without including the response rates*. *E.g., see* Stephen Ansolabehere & Bernard L. Fraga, "Do Americans Prefer Coethnic Representation? The Impact of Race on House Incumbent Evaluations," 68 Stan. L. Rev. 1553 (2016). This may be because, as Dr. Richman testified, response rates are no longer considered to have as much accuracy or significance as they did decades ago. In fact, <u>lower response rates are becoming the norm</u>, as the American Association for Public Opinion Research confirms:

> **Response Rates and Survey Quality**
>
> However, two factors have now undermined the role of the response rate as the primary arbiter of survey quality. Largely due to increasing refusals, response rates across all modes of survey administration have declined, in some cases precipitously. As a result, organizations have had to put additional effort into administration, thus making all types of surveys more costly. <u>At the same time, studies that have compared survey estimates to benchmark data from the U.S. Census or very large governmental sample surveys have also questioned the positive association between response rates and quality</u>. Furthermore, a growing emphasis on total survey error has caused methodologists to examine surveys - even those with acceptably high response rates--for evidence of nonresponse bias.
>
> Results that show the least bias have turned out, in some cases, to come from surveys with less than optimal response rates. Experimental comparisons have also revealed few significant differences between estimates from surveys with low response rates and short field periods and surveys with high response rates and long field periods.

*See* **Exhibit 2**, "Response Rates: An Overview," *available at* http://www.aapor.org/Education-Resources/For-Researchers/Poll-Survey-FAQ/Response-Rates-An-Overview.aspx, last accessed February 5, 2018.

In sum, Plaintiffs have had the data and response rates for months and questioned Dr. Richman about the topic at length in his deposition. The idea that they are somehow surprised or

sandbagged is ludicrous.

## III. CONTRADICTORY EXPERT OPINIONS ON RESPONSE RATES GO TO THE WEIGHT, NOT THE ADMISSIBILITY, OF EXPERT TESTIMONY

Setting aside the minimal relevance a stand-alone response rate has, one thing is clear: dueling expert opinions over response rates go to the weight of the evidence and not admissibility. "[T]he factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *RMD, LLC v. Nitto Americas, Inc.*, No. 09-2056-JAR-DJW, 2012 WL 5398345, at *9 (D. Kan. Nov. 5, 2012). Indeed, before Dr. Richman was even deposed, Plaintiffs had their expert, Stephen Ansolabehere, use Dr. Richman's underlying data to calculate his own response rate of 5%. *See* **Exhibit 3,** Ansolabehere Expert Report, dated March 5, 2017, p. 24. Plaintiffs then questioned Dr. Richman about response rates, apparently using Ansolabehere's rate of 5% as their standard:

> Q: As a peer-reviewer, would you accept for publication an article that relied on a survey in which the response rate was 6 percent?
> A: Yes.
> Q: Can you give me an example of an article that was based on a response rate was 6 percent or lower that was accepted for peer-review publication?
> A: Frequently in published surveys- the published studies, rather, in the peer-reviewed journals, the response rates aren't discussed very much.

Depo p. 215.
> Q: So you can't think of an example, sitting her, of a peer-reviewed publication based on a survey where the response rate was 6 percent or lower
> A: No. Generally when I think about articles in the literature, I'm thinking about them on the basis of variety of other, other elements. I don't – I don't usually try to memorize response rates.

Depo. p. 216.

If Plaintiffs want to cross-examine Dr. Richman, again, on why he did not include a response rate (i.e., why he didn't use the Response Rate Calculator) in his first report, they may do so at trial because analysis of factors that affect Dr. Richman's survey results goes to the weight, not

the admissibility of evidence, as the Court noted in its Order: "As described later in this Order, the probative value of this evidence under the Tenth Circuit's § 5 test may be explored at trial, but goes to the weight and not the admissibility of this evidence." *See* Order, Doc. 421, p. 19, n. 83 (referring to the expert opinions of both Dr. Richman and Hans von Spakovsky with minimal exclusions noted). For example, in *Harolds Stores Inc. v. Dillard Dept. Stores, Inc.*, the Tenth Circuit held that, despite a concern that the sample of respondents was not representative of the universe it intended to reflect, that "any technical or methodological deficiencies in the manner in which Dr. Howard conducted the survey bear on the weight—not the admissibility—of the survey." *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1546 (10th Cir. 1996); *see also King v. Allstate Ins. Co.*, No. 11-CV-00103-WJM-BNB, 2013 WL 3943607, at *4 (D. Colo. July 31, 2013) (basis of expert opinions should be explored at trial). Elsewhere in the Tenth Circuit, dueling expert opinions are clearly viewed as subjects of cross-examination:

> Such matters may be and should be explored and highlighted through cross-examination of the expert and presentation of contrary evidence, not at the preliminary admissibility stage . . . so long as the expert possesses at least one of the qualifying attributes listed in Rule 702 (specialized knowledge, skill, education, experience or training), has employed a methodology recognized in the profession or by the courts, and can identify the source of the facts and data underlying the opinion (demonstrating a connection of the opinion to the facts of the case), a probing cross-examination and presentation of opposing experts and evidence will permit the fact-finder to judge the soundness of the expert's judgment, as well as the expert's credibility and potential bias, in order to assess how much weight to accord the expert's opinion. Even unpersuasive expert testimony is admissible if it is relevant (*i.e.,* it will assist the fact-finder in resolving a disputed factual issue) and is a product of a reasonable and reliable methodology.[3] *See Joy Recovery Technology,* 286 B.R. at 70 (as is often the case, dueling experts will assist the trier of fact in fully understanding an issue; thus, it is not the function of a *Daubert* hearing to exclude an expert merely because her conclusion ultimately may be rejected).

*In re Commercial Fin. Servs., Inc.*, No. 98-05162-R, 2005 WL 6499290, at *3 (Bankr. N.D. Okla. Sept. 14, 2005).

Because such expert opinions are to be weighed, not excluded, Plaintiffs' motion must be denied.

## IV. PRODUCTION OF DR. RICHMAN'S RESPONSE RATE CALCULATION SHEET WAS TIMELY

Defendant produced Dr. Richman's calculation sheet on September 14, 2017, to rebut the response rate formulated by Plaintiffs' expert Ansolabehere and cited in Plaintiffs' *Daubert* motion. *See* Doc. 399-12. Despite filing a lengthy reply memorandum on October 6, 2017, Plaintiffs failed to object to the supplemental disclosure of the calculation.[2] Doc. 407. Indeed, Defendant's supplemental disclosure of additional calculations was proper under Fed. R. Civ. P. 26(e) which requires that:

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report *and to information given during the expert's deposition.*

Given that the federal rules provide for supplementation after the expert's deposition, Plaintiffs' complaints that they cannot question Dr. Richman about his rates are unpersuasive, especially since Plaintiffs thoroughly questioned Dr. Richman about response rates during his deposition and even used their own expert's calculations to attack his method of applying contextual analysis to the underlying data rather than publishing a base response rate.

## V. CONCLUSION

Plaintiffs' motion is an impermissible third bite at the apple that merely pushes the Court to reconsider its previous rulings under the guise of a false claim of being "sandbagged" with "new" information. Plaintiffs' tactics are disingenuous at best and intended to harass the Defendant with pointless motion practice four weeks before trial at worst. Based on the legal arguments presented

---

[2] Defendant does not concede that the Google-run response rate calculation even constitutes a supplemental disclosure since the information contained therein was already made known to Plaintiffs.

above, Plaintiffs' renewed motion to exclude Dr. Richman's testimony should be denied.

Date:  February 5, 2018

Respectfully submitted,

/s/ *Sue Becker*
Kris W. Kobach, Kansas Bar No. 17280
Sue Becker, Kansas Bar No. 27806
Garrett Roe, Kansas Bar No. 26867
**KANSAS SECRETARY OF STATE'S OFFICE**
120 S.W. 10th Ave.
Topeka, KS 66612
Telephone: (785) 296-4575
Facsimile: (785) 368-8033
Email: kris.kobach@ks.gov
sue.becker@ks.gov
garrett.roe@ks.gov

*Attorneys for Defendant Kobach*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on the 5th day of February, 2018, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

/*s/ Sue Becker*
Sue Becker
*Attorney for Defendant Kobach*