1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF KANSAS
2

3    PARKER BEDNASEK,

4         Plaintiff,

5    v.                              Docket No. 15-9300-JAR

6    KRIS W. KOBACH,

7         Defendant.
     _____      _____
8
     STEVEN WAYNE FISH, et al.,
9
          Plaintiffs,
10
     v.                              Docket No. 16-2105-JAR
11
                                     Kansas City, Kansas
12   KRIS W. KOBACH,                 Date:  03/06/2018

13        Defendant.                 Day 1 (A.M. Session)
                                     Pages 1-129
14   .........................................................

15
                      TRANSCRIPT OF BENCH TRIAL
16        BEFORE THE HONORABLE JULIE A. ROBINSON
              UNITED STATES DISTRICT JUDGE
17

18   APPEARANCES:

19   For Case No. 15-9300 Plaintiffs:

20   Mr. Mark P. Johnson          Mr. Mark T. Emert
     Mr. Curtis E. Woods          Fagan, Emert & Davis, LLC
21   Dentons US LLP               730 New Hampshire
     4520 Main Street             Suite 210
22   Suite 1100                   Lawrence, Kansas 66044
     Kansas City, MO 64111
23

24

25   (Appearances continued on next page)

```
 1    APPEARANCES:

 2    (Continued)

 3    For Case No. 16-2105 Plaintiffs:

 4    Mr. Dale E. Ho                Mr. Stephen D. Bonney
      Mr. R. Orion Danjuma          ACLU Foundation of Kansas
 5    Ms. Sophia Lin Lakin          6701 West 64th Street
      Ms. Emily Zhang               Suite 200
 6    American Civil Liberties      Overland Park, KS 66202
      Union Foundation - NY
 7    125 Broad Street
      New York, NY 10004
 8
      Ms. Angela Liu
 9    Ms. Daphne T. Ha
      Mr. Neal A. Steiner
10    Ms. Rebecca Waldman
      Dechert, LLP - NY
11    1095 Avenue of the Americas
      New York NY 10036
12

13    For the Defendant Kris W. Kobach:

14    Mr. Garrett Roe
      Mr. Kris Kobach
15    Ms. Susan Becker
      Kansas Secretary of State
16    120 Southwest 10th Avenue
      Memorial Hall, First Floor
17    Topeka, KS 66612

18

19

20

21

22    _____

23          Kelli Stewart, CSR-KS, CCR-MO, RPR, CRR, RMR
                     Official Court Reporter
24        259 U.S. Courthouse, 500 State Avenue
                  Kansas City, Kansas 66101
25
```

```
 1                    I N D E X

 2
      Fish Plaintiffs' Witnesses:                    Page
 3
      CHARLES WILLIAM STRICKER, III
 4      Direct Examination By Mr. Danjuma              63
        Cross Examination By Mr. Kobach               82
 5
      DONNA BUCCI
 6      Direct Examination By Ms. Liu                  97
        Cross Examination By Ms. Becker              104
 7      Redirect Examination By Ms. Liu              115

 8    MICHAEL McDONALD
        Direct Examination By Mr. Danjuma            118
 9

10
                   E X H I B I T S
11
      Fish Plaintiffs'
12     Exhibits          Offered        Received

13          72            128            128
            73            128            128
14         139            119            119

15

16    Defendant's
       Exhibits          Offered        Received
17
           825            --             88
18         838            --             77

19

20

21

22

23

24

25
```

1                    (9:06 a.m., proceedings commenced).

2              THE COURT:  All right.  You can be seated.

3    All right.  We are here-- we are here in the case of

4    Parker Bednasek versus Kris Kobach.  That case number is

5    15-9300.  Your appearances in that case, please.

6              MR. JOHNSON:  Your Honor, on behalf of the

7    plaintiff, Parker Bednasek, Mark Johnson and Curtis

8    Woods of the Dentons law firm and Mark Emert of the

9    Fagan, Emert & Davis law firm of Lawrence.

10             THE COURT:  All right.  Thank you.  And then

11   in Case No. 16-2105 is Steven Wayne Fish, Donna Bucci,

12   Douglas Hutchinson, Thomas Boynton, Charles Stricker and

13   League of Women Voters of Kansas versus Kris Kobach.

14   Your appearances, please.

15             MR. HO:  Good morning, Your Honor.  Dale Ho

16   on behalf of the plaintiffs in the Fish matter.

17             MR. STEINER:  Neal Steiner from Dechert on

18   behalf of the plaintiffs in the Fish matter.

19             MS. LIU:  Angela Liu on behalf from Dechert

20   on behalf of the Fish plaintiffs.

21             MR. DANJUMA:  Orion Danjuma on behalf of the

22   Fish plaintiffs.

23             MR. BONNEY:  Doug Bonney on behalf of the

24   Fish plaintiffs.

25             MR. HO:  We have a few more counsel who may

1    be appearing later this week, Your Honor.  Would you

2    like them to enter their appearances now as well?

3                  THE COURT:  Please.

4                  MS. LAKIN:  Sophia Lakin with the ACLU on

5    behalf of Fish plaintiffs.

6                  MS. WALDMAN:  Rebecca Waldman of Dechert on

7    behalf of the Fish plaintiffs.

8                  MS. HA:  Daphne Ha from Dechert on behalf of

9    Fish plaintiffs.

10                 THE COURT:  All right.  Mr. Kobach.

11                 MR. KOBACH:  Your Honor, on behalf of the

12   defendants, I am Kris Kobach and with me are Sue Becker

13   and Garrett Roe on behalf of the Secretary of State's

14   Office.

15                 THE COURT:  All right.  Thank you.  Are the

16   parties ready for trial?

17                 MR. HO:  Yes, Your Honor.

18                 THE COURT:  All right.  That's probably an

19   unnecessary question.  All right.  There are-- you all

20   had indicated that you would like 15 minutes each for

21   opening statements, but there are some outstanding

22   motions that I thought I ought to rule on fairly

23   quickly.

24                 We can do that now, we can do that after

25   opening statements, but-- and some outstanding motions I

1  think are worth waiting on.  But here's what I think we

2  need to talk about.  Let's start with the Bednasek case,

3  I don't think I've been saying his name right, have I,

4  Mr. Johnson.

5            MR. JOHNSON:  Your Honor, it's Bednasek.

6            THE COURT:  Bednasek.

7            MR. JOHNSON:  Yes, Your Honor.

8            THE COURT:  All right.  In that case there

9  are no pending *limine* motions and the deposition

10 designations have all been rendered moot because the

11 witnesses are all live witnesses; is that correct?

12           MR. JOHNSON:  That is correct, Your Honor.

13           THE COURT:  All right.  So that's the easier

14 one to talk about at this point.  And then in the Fish

15 case, I want to talk to you about deposition

16 designations and pending *Daubert* motions and pending

17 *limine* motions.

18           The deposition designations.  It appears

19 that you all agree that with respect to the witnesses

20 that people are calling live, the designations should be

21 withdrawn.  One question I have, though, is about Marge

22 Ahrens.  I'm not clear on whether that deposition is

23 withdrawn or not and/or whether she's testifying live.

24           MR. HO:  She is testifying live, Your Honor.

25 The defendants have proffered some of her deposition

1    testimony through designations.  I'll leave it to them

2    as to whether or not they intend to withdraw that or

3    not.

4              THE COURT:  All right.

5              MS. BECKER:  Your Honor, we would withdraw

6    our designations.  We'll just do that through the cross

7    examination.

8              THE COURT:  All right.  So that's

9    essentially moot with respect to all the live witnesses.

10   And then there-- there's a category of witnesses where

11   we have designations for depositions, but they appear to

12   be available at least in the sense that they're within

13   the 100 miles or within the District of Kansas and

14   there's not been an unavailability showing.  We can talk

15   about that later, but I-- I think I'd like to at least

16   put you on notice and-- and I think primarily that's the

17   Kansas Department of Revenue of employees that are in

18   that universe.

19             And before we do the work on those

20   deposition designations, I need to know whether you all

21   are going to make a showing of unavailability or not on

22   those.  We can take that up now or just think about it

23   and we'll get to it after the openings or later on this

24   morning.

25             MS. BECKER:  Your Honor, we can take it up

1    later on this morning.

2              THE COURT:  All right.  Thank you, Ms.

3    Becker.  And then I don't want to take this up now but

4    just heads-up; on Brad Bryant, who's the former election

5    commissioner I think, there were a number of problems

6    with the designations, but I think we've worked through

7    most of that.  But one problem I have in trying to rule

8    on those is that you each gave me your own transcripts

9    and the transcripts are in different formats and it's

10   hard for me to rule without having all of that in one

11   transcript.

12             So heads-up to everybody, I'd like you all

13   to merge those, to work on putting all of your

14   designations, counter-designations and objections

15   thereto in one transcript so I can clearly be able to

16   see what's at issue there.  So just heads-up on that.

17             There are a number of pending *Daubert*

18   motions.  I can rule upon those piecemeal or up front.

19   Be thinking about that, I'll come back around.  I don't

20   imagine anyone is calling experts today; is that fair to

21   say?

22             MR. HO:  There's one exception to that, Your

23   Honor.  The plaintiffs are calling Michael McDonald

24   today.

25             THE COURT:  All right.  And I--

1           MR. HO:  There was no pending *Daubert*

2    motion.

3           THE COURT:  Okay.  All right.  So maybe this

4    is something we can take up at the close of the day to

5    prepare you all for tomorrow to the extent you're

6    calling experts tomorrow.  Okay.  So we'll come back

7    around to that.

8           And then there are *limine* motions.  There's

9    a *limine* motion filed by Mr. Kobach regarding his

10   deposition testimony, and this is the deposition that

11   was taken kind of late in the game and particularly on

12   the NVRA documents.  And Mr. Kobach has raised relevance

13   objections and I am prepared to rule on that.  And then

14   there's also a motion to take judicial notice that's

15   opposed.  I'm prepared to rule on that.  And we can do

16   that later this morning, if you think it makes sense to

17   do those rulings this morning.

18           MR. HO:  I think it would probably be

19   helpful for the parties for our trial prep to receive

20   Your Honor's rulings on those motions at some point

21   today.

22           THE COURT:  Okay.  So I'll plan on taking

23   those up.  And I think that's it.  Does anyone want to

24   invoke the rule on witness sequestration?

25           MR. HO:  We would like to invoke that rule,

1   Your Honor.

2           THE COURT: All right. All it takes is one

3   party saying yes, so I will invoke the rule on witness

4   sequestration. Meaning after the opening statements--

5   the witnesses can stay in the courtroom. But after the

6   opening statements, the witnesses cannot be present for

7   other witnesses' testimony. The exceptions being, of

8   course, parties.

9           So the named parties in the lawsuit on both

10  sides can be present, but otherwise anyone that's called

11  as a witness cannot be present for other witness

12  testimony and witnesses who testify cannot share the

13  substance of their testimony with other witnesses. Of

14  course, this rule being designed to not have witnesses

15  be influenced by hearing the testimony of other

16  witnesses.

17          The other exception to that, of course, are

18  expert witnesses. You all have experts, your experts

19  can be here for everything because, of course,

20  oftentimes experts' opinions at trial are based in part

21  on the testimony they hear. So that's the other

22  exception.

23          All right. Any concerns about that? I will

24  expect you all to police your own witnesses and your--

25  to make sure that they are complying with the letter and

1    spirit of the sequestration rule.

2                 Mr. Kobach, did you have a question?

3                 MR. KOBACH:  One clarification or question.

4    Would Mr. Caskey, the current Director of Elections,

5    since he is sort of the-- he is the 30(b)(6) witness for

6    the state, for the defendant, for the office, would he

7    be considered a-- sort of a party of sorts or would he

8    be prevented?  I know that many of the witnesses'--

9    other witnesses' testimonies rely on his statistics.

10   Either way is fine.

11                THE COURT:  I mean, generally I think it's

12   the named party, but he's designated as a 30(b)(6)

13   witness--

14                MR. KOBACH:  Yes.

15                THE COURT:  -- for those purposes?  Does

16   anybody have any objection to Mr. Caskey's presence?

17                MR. HO:  No objection to Mr. Caskey's

18   presence specifically, Your Honor.  But my understanding

19   of the rules is that each party can have one

20   representative in the court.  So if it's going to be Mr.

21   Caskey, then there can be no other-- my understanding of

22   the rule anyway is that there can be no other

23   representatives of the Secretary of State's Office who

24   are going to be fact witnesses in the case.

25                THE COURT:  All right.  Other than Mr.

1  Kobach, who's a named plaintiff.  Do you agree?

2          MR. HO:  He's also a witness in this case,

3  Your Honor.

4          THE COURT:  Mr. Kobach.

5          MR. KOBACH:  Well, I think this is a fairly

6  unusual case where I'm also serving as an attorney.  So

7  I would argue that I'm wearing an attorney's hat pretty

8  much during this entire proceeding unless otherwise

9  mentioned.

10          MR. JOHNSON:  Your Honor, it's fairly

11  unusual because that was the Secretary's choice.  The

12  Secretary could've gotten counsel, chose not to.  And so

13  to the extent there's an issue here, so it's the

14  Secretary's doing, I join with Mr. Ho on this point.

15          THE COURT:  Okay.  All right.  Please talk

16  in your microphones, there's an overflow courtroom or

17  room downstairs and we want to make sure those folks can

18  hear everything.  A number of members of the press have

19  chosen to use that room where they can have their

20  devices.  So we all need to be careful to use the

21  microphones.  Mr. Kobach.

22          MR. KOBACH:  I would just point out, Your

23  Honor, that each party has its opportunity to choose its

24  counsel of preference and the counsel it believes is

25  most qualified.  And also, I'm not serving as a witness

1    for the defendants.  And I believe, if I heard Mr. Ho
2    correctly, he did not object in any event, so maybe if
3    there's no objection to Mr. Caskey, we can just go with
4    that.
5                 THE COURT:  All right.  I'm going to allow
6    Mr. Caskey to be here as a 30(b)(6) representative.  I
7    think plaintiffs are right, that strict invocation of
8    the rule would allow otherwise, but-- or would not allow
9    that.  But given that Mr. Kobach is wearing two hats
10   here, he's entitled to be here as a lawyer.  He's chosen
11   to be pro se.  But I will allow Mr. Caskey to be present
12   as well.
13                All right.  15 minutes for opening
14   statements each.  Before we get started, is there
15   anything else we need to talk about as a preliminary
16   matter?
17                MR. JOHNSON:  Your Honor, we do have some
18   other preliminary issues that need to be hashed out.
19   First is the order of examination of the witnesses that
20   I think all three parties are going to have something to
21   say about.  I also have two motions or two requests that
22   I would like to put before the Court--
23                THE COURT:  Why don't you come to the
24   lectern.  I'm afraid that the microphones aren't
25   capturing all of these things, but...

1          MR. JOHNSON:  I'd be happy to, Your Honor.

2          THE COURT:  Yeah.

3          MR. JOHNSON:  Thank you, Your Honor.  The

4    first is that on behalf of Mr. Bednasek, we request-- we

5    move that the Court take judicial notice of the

6    stipulations of fact that were entered into between the

7    parties in the Fish case.  This is in their amended

8    pretrial order dated June 20th, 2017.  We believe this

9    will greatly reduce the-- the evidence that needs to be

10   presented.  These are stipulations that the other

11   parties in the case have already agreed to.

12         THE COURT:  All right.  I assume there's no

13   objection to that.  The parties have stipulated to these

14   facts in the pretrial order and the pretrial order is

15   the governing document for purposes of trial.  So I will

16   take judicial notice of the stipulated facts in the

17   June 20th, 2017 pretrial order.

18         MR. JOHNSON:  Thank you, Your Honor.  And

19   the second item is that the-- in the Bednasek case we

20   would like to adopt the expert testimony that's been

21   presented by the ACLU in the-- by the Fish plaintiffs.

22   Again, we believe that will greatly streamline the

23   presentation of evidence in this case.

24         It will eliminate the opportunity that the

25   Bednasek plaintiffs would have to engage in friendly

1    cross examination of the expert witnesses to give the

2    experts a second time to tell their story.  So I believe

3    that this is something that would be of benefit to the--

4    to the running of this trial.

5             THE COURT:  All right.  You still I believe

6    have at least one expert of your own, or two.

7             MR. JOHNSON:  We do.

8             THE COURT:  All right.  But you are wanting

9    to adopt and incorporate by reference in the Bednasek

10   case the plaintiffs' evidence--

11            MR. JOHNSON:  Yes, Your Honor.

12            THE COURT:  -- through their experts?

13            MR. JOHNSON:  Yes.

14            THE COURT:  All right.  That's acceptable.

15            MR. JOHNSON:  Thank you, Your Honor.  That's

16   all I have.

17            THE COURT:  So noted.  All right.  Mr. Ho,

18   anything from you?

19            MR. HO:  Just one item briefly, Your Honor.

20   I'm sorry, I didn't have the microphone on.  Just one

21   item briefly.  Your Honor, at 10:45 last night we

22   received a demonstrative exhibit from the defendants

23   which purports to show new numbers as to the number of

24   voters who are currently suspended or cancelled as a

25   result of not providing documentary proof of

1   citizenship.  I should say as of last Friday, not

2   current.  And there are two issues with this I think,

3   Your Honor.  The first-- one small and one a little bit

4   bigger.

5            The small one is Your Honor asked the

6   parties to share demonstratives with each other 24 hours

7   prior to use at trial.  And unless we're planning on

8   being here at 10:45 p.m. tonight, I don't think that's--

9   what the defendants did comports with that.  It doesn't

10  give us sufficient time under Your Honor's guidance to

11  examine that demonstrative.

12           But the second and most important issue

13  here, Your Honor, is that the underlying data which the

14  demonstrative refers to has never been produced to the

15  plaintiffs.  It falls clearly within discovery requests

16  that we made to the defendants two years ago.  And

17  there's no way for us to verify the accuracy of what is

18  represented in this one-page demonstrative, which I'm

19  not sure if they're planning on using on their opening

20  or through a witness like Mr. Caskey later today.

21           Now, obviously, I understand that the

22  numbers change every day, we're not asking the

23  defendants to disclose in real-time exactly how many

24  people are suspended or cancelled as a result of the

25  documentary proof-of-citizenship law, but we just have

1   no way of verifying the information that's being

2   presented in this demonstrative.  And it's just the

3   latest example of the defendant's efforts of trial by

4   ambush in this case.  We would move to exclude that

5   demonstrative.

6              THE COURT:  Is there an exhibit number

7   attached to that demonstrative?

8              MR. HO:  No, it was just a Word document

9   that was e-mailed to us last night at 10:45

10  approximately.  And it's-- I have a copy of it and I can

11  provide the Court with a copy.

12             MR. JOHNSON:  I verified that, it was

13  actually 10:43 p.m.  That's when I received it, but I

14  think that's a difference without a distinction.  And I

15  join Mr. Ho's motion.

16             THE COURT:  All right.  Mr. Kobach.

17             MR. KOBACH:  Your Honor, the-- the

18  demonstrative exhibit is simply a collection of six

19  numbers reflecting the ELVIS database totals as of the

20  end of the day on Friday, March 2nd.  As all the parties

21  are aware, ELVIS is a continuous database that is sort

22  of a living, breathing database and entries are going in

23  and out of it every day.

24             And it would be strange, indeed one might

25  even say foolish, for the Court to be relying on old

1    numbers when we have the new numbers.  And so this was

2    merely an attempt to update the parties and the Court

3    with the latest numbers of people in suspense, the

4    latest total number of concluded registrations since the

5    law went into effect, et cetera.

6              As far as Mr. Ho's objection that he doesn't

7    have more time to examine the numbers, the-- it's simply

8    the latest numbers.  You can examine them in less than a

9    minute.  He says, well, he would like to have-- and he

10   gets to the greater problem, you know, he wants to know

11   that they're real.

12             Well, we have the testimony of Mr. Caskey,

13   the elections director, who is the custodian of the

14   database.  It seems to me he's suggesting he wants to

15   get into-- at a keyboard and start going into the Kansas

16   voter registration database.  There are very strict

17   protocols as to who has access to that database, it's

18   not something that even when Mr. Caskey is here he could

19   remotely look at from a computer.  He has to be at a

20   specific terminal entering a specific access code to get

21   into that database.

22             So there's really no practical way for

23   opposing counsel to get into the ELVIS database and look

24   at all sorts of things on the database, such as last

25   four social and things that are not disclosed.  So I

1     think as a practical matter, unless they are objecting

2     on the basis that they believe Mr. Caskey is falsifying

3     the readouts from the database that he is continuously

4     presenting in his declarations, I don't think there's--

5     there's certainly no merit to their objection and

6     there's certainly no way around it.  They can't get into

7     the database themselves without having the required

8     secured protocols.

9             And, of course, the security of these

10    registration databases, as abundantly demonstrated in

11    the news, is that there have been efforts to hack into

12    to them.  And so all states are maintaining-- are taking

13    heightened security measures to keep these databases

14    from simply being open and accessible.

15            THE COURT:  The whole point of having

16    discovery and discovery deadlines and-- which typically

17    allow in this sort of scenario for some reasonable

18    attempt to supplement the record after the fact as long

19    as all parties have sufficient time to evaluate whatever

20    that supplemental evidence is, the whole point of that

21    is so that everybody knows what they're working with.

22    Everybody knows what the evidence is, everybody knows

23    what the numbers are.  I understand that this database

24    may change from day-to-day.

25            I'm not going to allow the defendants to

1    submit evidence that the plaintiffs have not had a

2    chance to review and evaluate.  And even if they don't

3    have direct access to the database, I think it's not

4    fair.  It's prejudicial, it's a surprise to them to get

5    new numbers literally on the eve of trial.  So I will

6    exclude this demonstrative exhibit at this point.  I'm

7    imagining this isn't going to completely resolve this

8    matter, because I don't know when Mr. Caskey is going to

9    testify, but...

10             As I sit here now my view is that we're

11   going to live and die by the numbers that have already

12   been disclosed and discovered and that the parties have

13   worked with.  Unless during the course of this trial you

14   can convince me that you've supplemented, plaintiffs

15   have had sufficient time to view the supplement and

16   can't stand up and say, this is a surprise to us, that's

17   going to be the way I'm going to treat this type of

18   evidence.

19             So I'm leaving the door if you, Mr. Kobach,

20   want to do some sort of formal supplemental and if I'm

21   convinced that it hasn't prejudiced the plaintiffs, then

22   I may allow it.  But it just concerns me because, you

23   know, five days from now when we're still in trial Mr.

24   Caskey could take the stand and say, well, the numbers

25   today are different than they were on the first day of

1    the trial.  And I don't think that's fair to plaintiffs.

2              So for now I'm going to exclude the

3    particular demonstrative.  Did you attach an exhibit

4    number so that we can make a record what I'm talking

5    about?

6              MR. KOBACH:  We don't have the latest

7    number.

8              THE COURT:  Okay.  All right.

9              MR. KOBACH:  Your Honor, may I suggest or at

10   least ask so that they may have 24 hours to look at

11   these numbers, is the Court open to the possibility of

12   us presenting the numbers now and then moving for their

13   admission later in this week-long trial?

14             THE COURT:  No.  I mean, you did violate the

15   24-hour rule as well for the demonstrative exhibits and

16   that rule is designed, the 24-hour rule is, so that they

17   can look at it and make sure the numbers are correct

18   based on the discovery that they've had thus far.  But

19   you're introducing another complication obviously in

20   giving them new numbers that you would-- everybody

21   admits are new numbers.

22             So the 24-hour rule would preclude me from

23   allowing you to present the demonstrative exhibit at

24   this point anyway.  And then I'm just saying the

25   underlying data I'm not convinced at this point should

1  be admissible because it's new and it surprises

2  plaintiff.  So for now, no, I won't allow the defendant

3  to submit this demonstrative exhibit.

4              All right.  Anything else?

5              MR. HO:  Nothing further from us, Your

6  Honor.

7              THE COURT:  All right.  Mr. Ho, are you

8  ready to present your opening?

9              MR. HO:  Yes, Your Honor.

10             THE COURT:  Proceed.

11             MR. HO:  Thank you, Your Honor.  This case

12 is about the most fundamental right in our democracy and

13 the law that has deprived thousands of United States

14 citizens in Kansas from exercising that right.  The law

15 at issue in this case was passed in 2013.  It was

16 implemented on January 1st of 2000-- it was passed in

17 2011 and it was implemented on January 1st of 2013.  It

18 requires voter registration applicants to show a

19 citizenship document like a birth certificate, passport

20 or naturalization certificate in order to register to

21 vote.

22             If such a document is not submitted, the

23 applicant's voter registration application is placed in

24 suspense.  And under an administrative rule promulgated

25 by the Kansas Secretary of State, if that document is

1   not presented within 90 days, that application is

2   cancelled.

3          Kansas is one of only two states in the

4   country that currently imposes such a requirement.  The

5   other state is Arizona, which lets voter registration

6   applicants satisfy its proof-of-citizenship requirement

7   with simply a driver's license number, not a physical

8   document.  That makes Kansas' law the strictest such law

9   in the country.

10          The documentary proof-of-citizenship law had

11   an immediate and dramatic effect on voter registration

12   in the state.  The parties have stipulated that as of

13   March 2016, a little more than three years after this

14   law was in effect, more than 16,000 in-person

15   motor-voter applicants saw their applications cancelled

16   or were in suspense at that time.

17          But the situation is actually even worse

18   than that.  You'll hear testimony from one of

19   plaintiffs' experts later today, Doctor Michael McDonald

20   from the University of Florida, one of the nation's

21   premier scholars on voter turnout.  He will testify that

22   when you take into account people who conducted a

23   transaction with the DMV online, that the number of

24   motor-voter applicants affected by this law was actually

25   more than 22,000 as of March 2016.

1          He'll also testify that in part because this

2     law only affects new voter registration applicants, it

3     has a disproportionate effect on precisely those voters

4     who are disproportionately represented amongst new

5     applicants.  That's voters under the age of 30 and

6     voters who are not affiliated with any political party.

7          Doctor McDonald will explain that those are

8     precisely the kinds of voters who are now most

9     susceptible to being deterred from voting as a result of

10    new barriers.

11         You'll also hear testimony from four of the

12    individual plaintiffs in this case, all of them are

13    United States citizens, all of them are qualified to

14    vote in the state of Kansas, all of them were

15    motor-voter applicants, all of them saw their

16    registration applications suspended and subsequently

17    cancelled.

18         Two of the plaintiffs will explain that they

19    didn't have citizenship documents in 2014 when they

20    applied to register to vote.  Wayne Fish was born on an

21    Air Force base in Illinois which has since been

22    decommissioned.  He couldn't locate his birth

23    certificate in 2014.  Donna Bucci, who's with us in the

24    courtroom today, was born in Maryland and couldn't

25    afford the $20 that her state requires in order to

1    obtain a birth certificate.  Neither of them were able

2    to complete their voter registrations in 2014.

3              The other two plaintiffs who you'll hear

4    from today, Tad Stricker, who's also in the courtroom

5    right now, and T.J. Boynton, they'll explain that they

6    actually brought their citizenship documents with them

7    to DMV when they applied to register to vote but no one

8    asked them for those citizenship documents during their

9    voter registration application, no one told them that

10   those documents were required.

11             They left the DMV thinking that they were

12   registered to vote.  And it wasn't until they showed up

13   at the polls in 2014 that they were told, sorry, you're

14   not on the list, did they realize that there was a

15   problem.  They left that day knowing that their votes

16   wouldn't count.

17             And I understand that there will be some

18   testimony from the defense that the DMV systems has

19   improved since 2014, but no improvements to those

20   systems can ever restore the votes that were lost in

21   that election.

22             You'll hear testimony also from another one

23   of our clients, the League of Women Voters of Kansas,

24   and specifically from their former president, Marge

25   Ahrens.  She'll explain how this law has been

1    devastating for the League's voter registration

2    activities.  The main reason for that is Kansans don't

3    usually walk around with copies of their birth

4    certificates or passports.  So voter registration drives

5    really have become impossible under this law.

6              She'll also testify that the League has had

7    to divert considerable resources away from other

8    activities in order to help voters complete the

9    application process.

10             In sum, the evidence that you'll hear from

11   our clients will prove correct Your Honor's preliminary

12   finding from 2016 that the documentary

13   proof-of-citizenship requirement at the DMV is

14   burdensome, confusing and inconsistently enforced and

15   has disenfranchised thousands of Kansans and should be

16   enjoined.

17             Now, that's, of course, not the end of the

18   story.  As we all know, the Tenth Circuit has set forth

19   a ruling affirming Your Honor's preliminary injunction,

20   holding that the only way that Secretary Kobach can

21   enforce this documentary proof-of-citizenship

22   requirement is if he can satisfy a two-part test.  First

23   he has to show that there's a substantial number of

24   non-citizens that have successfully registered to vote

25   in Kansas.  And as the Secretary acknowledged last week,

1   the burden of proof on this issue lies with him.

2            Second, the Secretary will have to show that

3   even if there was a problem of non-citizen registration

4   in the state, that nothing less than a documentary

5   proof-of-citizenship requirement would be adequate to

6   address that problem.

7            So I'd like to talk a little bit about what

8   the evidence is going to show at trial this week with

9   respect to these two prongs, starting with the first,

10  whether there's a substantial number of non-citizens who

11  have registered.

12           I'll start with the stipulated facts, which

13  you won't hear from any witnesses this week.  The

14  parties have stipulated that as of last year, Secretary

15  Kobach had identified a total of a possible 127

16  non-citizens who have registered or attempted to

17  register to vote since the year 2000.  And that phrase

18  "have attempted to register to vote" is really critical.

19  Because of those 127 people, the vast-- the majority of

20  them did not successfully register to vote.  Only 43 of

21  these supposed non-citizens successfully registered to

22  vote since the year 2000, which is fewer than about

23  three per year.  Of those individuals, only 11 have

24  voted.  So we're talking about an average of less than

25  one non-citizen voter in Kansas elections per year.

1          And the evidence will show that it's not

2     even clear that all 127 of these individuals remained

3     non-citizens at the time that they registered to vote.

4     But even if you credit everything, all of this evidence,

5     127 or so non-citizen registrants out of the 1.8 million

6     registered voters in the state of Kansas, we're talking

7     about 0.007 percent of registered voters in this state.

8          Now, you may hear some testimony from the

9     defendant's proffered expert, Mr. Hans von Spakovsky

10    from The Heritage Foundation.  He may testify about

11    various anecdotes of non-citizen registration in the

12    state of Kansas and elsewhere.

13          Here are three simple things you need to

14    know about Mr. von Spakovsky:  He's a long-time advocate

15    of restrictions on voting.  He has no advanced degree in

16    public policy, any social science or history, and he's

17    never published a single peer-reviewed study on voter

18    fraud, voter registration or any subject whatsoever.

19          You will hear some testimony from

20    plaintiffs' proffered expert Doctor Lorraine Minnite of

21    the University of Rutgers.  She's one of the nation's

22    foremost scholars on the issue of voter fraud.  And she

23    will testify that there's no evidence of a systemic

24    problem of non-citizen voter fraud in the state.  There

25    are, of course, isolated incidents of non-citizens who

1    happen to become registered to vote, but her testimony

2    will be that when you look at the records, they indicate

3    that these incidents are often the result of mistakes or

4    administrative errors.

5              We expect that you will also hear testimony

6    from defendant's proffered expert Jesse Richman from Old

7    Dominion University.  He has produced various

8    statistical estimates of non-citizen registration in the

9    state of Kansas.  Now, he doesn't give you a single best

10   estimate, his best guess as to the number of

11   non-citizens who are registered in the state.  He

12   provides various estimates, sometimes he says there are

13   1,000 non-citizens registered in Kansas, sometimes he

14   says there are 32,000 non-citizens registered in Kansas,

15   with no way to discern which number is in his view

16   likely to be more accurate.

17             But here's what you need to know about

18   Professor Richman, his estimates are based on relatively

19   small samples, one of them as small as 14 respondents to

20   an Internet survey called the Cooperative Congressional

21   Election Study.  His work has been widely rejected by

22   his peers, including in an open letter signed by 200

23   political scientists.  And his report of this case did

24   not even live up to the same standards that he employs

25   in his heavily criticized academic work.

1          In rebuttal, assuming that Professor Richman

2   testifies, you'll hear from Doctor Stephen Ansolabehere

3   of Harvard University.  He's the principal investigator

4   of the Cooperative Congressional Election Survey, the

5   CCES, he designed it, he implements it.  And that's the

6   exact same study that Professor Richman relied on in his

7   academic work and relied on for one of his estimates of

8   non-citizen registration in this case.

9          And Doctor Ansolabehere will testify about

10  various data errors that Professor Richman failed to

11  take into account, various other methodological flaws in

12  his analysis.  But most importantly, Doctor Ansolabehere

13  will testify that even if you assume that all of the

14  data that Professor Richmond uses is accurate, that

15  there are no methodological defects in his work, that

16  his sample of 14 Internet survey respondents are

17  representative of the non-citizen population of Kansas.

18  Even if you assume all of that, Richman's estimates are

19  statistically indistinguishable from zero.  And that

20  doesn't mean that no non-citizens have ever gotten

21  registered to vote in this state, what it means is that

22  Professor Richman's work can't show anything other than

23  a nominal amount of those incidents happening.

24          Now, that wouldn't be the end of the story.

25  Obviously there's a second prong to this test.  So even

1    if at the end of the evidence you don't believe anything

2    that I just said, the defendant still has to satisfy a

3    second prong, which is that there are no alternatives to

4    a documentary proof-of-citizenship requirement and the

5    evidence will as show that, in fact, there are many.

6              First, there could be better training of DMV

7    employees.  You'll hear evidence that Kansas Secretary

8    of State officials have acknowledged internally in

9    e-mails that the DMV has offered voter registration to

10   people that they know are non-citizens, people who

11   identify themselves as non-citizens in the course of

12   applying for a driver's license.  Now, that's not fraud.

13   All right?  That's a mistake.  It shouldn't happen.  But

14   it's a mistake that can be corrected.

15             But the parties have stipulated to a number

16   of important facts here, which is that the Kansas

17   Secretary of State's Office has not provided new

18   training manuals to the DMV since at least 2015, that

19   they haven't offered a written instruction to DMV clerks

20   in that time to not offer voter registration to people

21   who are identifying themselves as ineligible and that

22   they offer no attempts to assess or evaluate DMV workers

23   in terms of their performance of voter registration

24   duties.

25             There are other things the Secretary of

1    State could be doing as well.  There are administrative

2    records that they have access to that contain

3    information about whether or not people are citizens,

4    which could be compared to the voter rolls.  The DMV,

5    for instance, for most driver's license applicants

6    requests information that identifies those people

7    clearly as citizens or not.  And the Secretary of

8    State's Office could be making use of that resource.

9              There's something called the United States

10   Department of Homeland Security SAVE database, which a

11   number of states currently use to verify voter

12   registration information.  There are juror

13   questionnaires which contain answers from respondents to

14   those questionnaires as to whether or not people are

15   citizens.  All of this data could be used by the

16   Secretary of State's Office for further investigation

17   once someone is flagged as a potential non-citizen.

18              And after investigating, there is the

19   possibility of a criminal prosecution to deter unlawful

20   conduct.  The Deputy Secretary of State Eric Rucker,

21   whose deposition testimony has been designated and who

22   is an experienced prosecutor, he testified that in his

23   experience, vigorous criminal prosecutions can deter

24   unlawful activity.

25              Now, the defendant in this case, Secretary

1    Kobach, is, as far as we know, the only Secretary of

2    State in the country with prosecutorial authority over

3    criminal election law violations.  But as of June 2017,

4    he had obtained only a single conviction against a

5    non-citizen for voting, which begs the question if there

6    are, in fact, around 130 incidents of non-citizen

7    registration or attempted registration, why there

8    haven't, in fact, been more prosecutions?

9            Now, we expect that Secretary Kobach will

10   argue that none of these options are perfect.  That's

11   obviously true.  It's obviously also true of any kind of

12   security system designed to prevent unlawful activity.

13   What the evidence at trial will show is that he hasn't

14   even meaningful tried these options.

15           So in conclusion, Your Honor, the evidence

16   at trial will show three over-arching facts.  This

17   documentary proof-of-citizenship law has disenfranchised

18   thousands of Kansans.  There's no evidence of a systemic

19   problem of non-citizen registration in Kansas and there

20   are multiple alternatives to a documentary

21   proof-of-citizenship requirement.

22           Enforcing this law is like taking a bazooka

23   to a fly and the collateral damage in this case has been

24   thousands of Kansas voters.  Thank you.

25           THE COURT:  Mr. Johnson.

1              MR. JOHNSON:  May it please the Court.  It's

2    an honor to appear before you today in this trial, Judge

3    Robinson.

4              As noted before, I'm Mark Johnson, I'm here

5    today on behalf of Parker Bednasek.  Appearing with me

6    are my law partner Curtis Woods, and Mark Emert of the

7    Fagan, Emert & Davis law firm in Lawrence.  We are also

8    privileged to appear on behalf of Parker Bednasek, a

9    senior at the University of Kansas scheduled to graduate

10   in May.

11             Because of his commitment to prove the

12   fallacy of the law before the Court in this trial, Mr.

13   Bednasek has denied himself something that we all in

14   this courtroom take for granted, to vote.  He has never

15   voted because when he attempted to register to vote, he

16   refused to produce the piece of paper required by the

17   Kansas Safe and Fair Elections Act, the proof of U.S.

18   citizenship.

19             Under the SAFE Act and the regulations

20   promulgated by the Secretary of State to implement the

21   SAFE Act, Mr. Bednasek's application to register to vote

22   was cancelled.  A natural-born citizen of the United

23   States, he has never voted because of the SAFE Act's

24   so-called DPOC, documentary proof-of-citizenship

25   requirement.  He will so testify.

1            The SAFE Act violates the Constitution of

2    the United States made applicable to the state of Kansas

3    by the Fourteenth Amendment to the Constitution.  It

4    denies Mr. Bednasek and many other Kansans equal

5    protection under the law.  You may hear that the SAFE

6    Act was passed by both houses of the Kansas Legislature.

7    That is true.  In similar fashion, many legislatures in

8    the United States, including the U.S. Congress,

9    routinely pass anti-flag-burning laws.  But every

10   student of constitutional law knows that the Supreme

11   Court has declared flag-burning laws to be

12   unconstitutional violations of the First Amendment.  Yet

13   they are so politically popular that legislators live in

14   fear of having to defend votes against them.

15            However, just as flag-burning laws, the SAFE

16   Act is vulnerable to constitutional challenge.  It is to

17   the courts we must turn for relief in these matters to

18   declare such laws to be unconstitutional.  You are not

19   subject to electoral pressures so you can make the

20   correct decision without consequences at the ballot box.

21   That is why we are before you today.

22            Our case is different from the Fish case in

23   which the ACLU and the Dechert law firm are providing

24   such good representation to their clients because they

25   have a claim for statutory preemption under the National

1   Voter Registration Act.  In addition to the

2   constitutional claim based on equal protection, we had

3   also asserted a preemption claim in our initial

4   pleadings, but Your Honor dismissed that claim for

5   procedural reasons.  Although we respectfully disagree

6   with that conclusion, we are pleased that you will deal

7   with that argument in the Fish case.

8            Our goal is the same as that of the Fish

9   plaintiffs, a declaration that the DPOC requirement in

10  the SAFE Act is either preempted or unconstitutional,

11  preferably both.

12           We believe that the evidence will

13  demonstrate to you that the DPOC requirement of the SAFE

14  Act imposes a burden on the right to vote that is in no

15  way justified by any impact it may have on eliminating a

16  problem that does not exist, that of alien voting.

17           The Secretary will ask you to uphold the

18  SAFE Act even though its effect is to deprive thousands

19  of Kansans of their right to vote.  It has already had

20  that effect on Kansans like Parker Bednasek.  It will

21  continue to have that effect unless we are granted

22  relief.

23           We believe that you'll be impressed with Mr.

24  Bednasek.  His testimony will show you a young person

25  who is politically aware and politically active.  He

1   wanted to vote in 2015 when he attempted to register and

2   he wants to vote today.  However, he is willing to

3   sacrifice that basic right in pursuit of a greater good.

4          He will soon graduate from college to embark

5   on a career of civil service to our country.  We believe

6   that you will want to give him and all Kansans willing

7   to sign an oath that they are United States citizens the

8   right to vote.  We believe that you will do so by

9   invalidating the DPOC requirement of the SAFE Act.

10         THE COURT:  Thank you.  Mr. Kobach.

11         MR. KOBACH:  Thank you, Your Honor.  May it

12  please the Court.

13         The Secure and Fair Elections Act was passed

14  in the spring of 2011 by the Kansas Legislature to

15  prevent voter fraud in multiple forms, including

16  registration voter fraud and voting by non-citizens.

17  The Legislature was presented with a number of cases

18  that illustrated that voter fraud had occurred in

19  multiple counties throughout the state of Kansas, more

20  than 200 specific instances presented by county clerks

21  from the relevant counties.  And the instances included

22  cases of non-citizens who had successfully registered

23  under the old regime, the old system which is

24  attestation.

25         Under the attestation-only system, all you

1  had to do was check a box on the registration card that

2  says I'm over the age of 18, and another box, I'm a

3  citizen of the United States, and then sign at the

4  bottom, in addition to other information on the card.

5  But that was essentially it, it was a box you checked.

6  Or in some cases you didn't even check a box, it simply

7  had a bullet point, I affirm that I am over 18, I'm a

8  citizen of the United States, and then you sign at the

9  bottom.  And the other information on this card is

10  accurate, and then you sign your name.  That was it.

11        As Justice Scalia said before he passed in

12  the case of *Arizona versus Inter-Tribal Council*, he said

13  in oral argument:  That's all?  That statement?  That's

14  nothing.  And that's what we are arguing today.  And

15  that's what the Kansas Legislature intuitively or

16  reasoned when they passed the law.  Just having someone

17  sign something saying they're a United States citizen is

18  nothing.

19        During the-- deeming the system inadequate

20  to stop non-citizens from registering and seeing proof

21  that non-citizens had registered under the old

22  attestation-only system, the Legislature adopted the

23  proof-of-citizenship requirement, also sometimes called

24  POC, P-O-C, or DPOC, documentary proof of citizenship, I

25  imagine we'll be using those acronyms.  That requirement

1    became effective on January 1st, 2013.

2              Now, the act passed by a large bipartisan

3    majority, I think it's worth noting, 111 to 11 in the

4    state legislature.  This was not a partisan bill.  That

5    was in the state House.  And it was 36 to 3 in the state

6    Senate.

7              Virtually all of the Republicans voted in

8    favor and more than two-thirds of the Democrats voted in

9    favor in the House and more than three-quarters of the

10   Democrats voted in favor in the Senate.  So it was a

11   bipartisan bill to address what was clearly a problem

12   proven by the fact that non-citizens were simply

13   signing, even though they were not, in fact, U.S.

14   citizens.

15             There are two remaining legal challenges

16   that remain in this case after the motions for summary

17   judgment have been adjudicated by yourself.  And those

18   challenges are essentially; first, whether the

19   proof-of-citizenship requirement is preempted by the

20   National Voter Registration Act, or NVRA; and secondly,

21   in the Bednasek case, whether the proof-of-citizenship

22   requirement imposes an unconstitutional burden on the

23   right to vote.

24             The three principal factual inquiries in

25   this bench trial as we understand them that will be

1   addressed by this Court are, No. 1, whether a

2   substantial number of aliens have registered under the

3   attestation-only regime.  No. 2, whether tools other

4   than proof of citizenship can suffice to adequately

5   prevent non-citizens from registering and, No. 3,

6   whether verifying the citizenship of new registrants

7   through the proof-of-citizenship system or the DPOC

8   system imposes a constitutionally significant burden on

9   the right to vote.

10          The number of citizens registered, the first

11   of the three factual inquiries.  The evidence presented

12   will show that a substantial number of non-citizens have

13   indeed registered to vote or attempted to register to

14   vote.  Now, that number was the 127 number that Mr. Ho

15   referred to.  That number was 127 at the time of the

16   briefing of the motions for summary judgment.  It has

17   increased to 129 today.  And it indeed has continually

18   grown through the course of this trial.

19          Indeed, if you look at the number as known

20   at the start of this trial, it was a very small fraction

21   of what it is today.  One could say that the number has

22   actually grown exponentially as we have updated the

23   numbers through the trial.

24          Now, Mr. Ho claims that we have to-- he

25   tried to make a big deal about the fact that some of

1    them have attempted to register and not successfully

2    registered.  The reason that I would say most of the 84

3    that attempted to register did not register is because

4    they attempted after the documentary

5    proof-of-citizenship requirement went into effect.  So

6    they filled out the card and said-- and signed, I am a

7    U.S. citizen.  Under the old system they would have been

8    registered, but the documentary proof-of-citizenship

9    requirement stopped them.  It succeeded.  It caught

10   them.

11           And so we believe it is fair to count those

12   individuals, because those individuals would have been

13   registered if we didn't have the documentary

14   proof-of-citizenship system in place.  But what happened

15   is they weren't able to provide proof of citizenship.

16   And then in each case we explained what happened, that,

17   you know, either someone called them and they admitted

18   that they were not a citizen or they never responded and

19   never provided proof of citizenship.

20           But the bottom line is, those 129 cases - or

21   127 if you use the number at the time of the motions for

22   summary judgment - are a significant number.  And we

23   will show and the evidence will show that this is a

24   small subsection, a very small fraction of the total

25   number of non-citizens on the voter rolls because we

1   have no way of simply looking at the voter rolls,

2   examining the voter rolls and deducing this person is a

3   citizen, this person is a non-citizen.  There's no thing

4   you can do looking based on the person's name, date of

5   birth, address, and other basic information, last four

6   social in some cases.  There's nothing you can do to

7   deduce that that person is a citizen.

8           It's a common misperception, for example,

9   that if you have a Social Security number you are a

10  citizen.  That is not correct.  Lawful permanent

11  residents, that is green card holders, have Social

12  Security numbers.

13          And so the-- there's nothing you can do to

14  simply find out what the true number is.  And the way

15  we've identified these 129 is through external sources.

16  So if, for example, the person registers-- rather, goes

17  to a naturalization ceremony, becomes a citizen today

18  and then fills out a registration form today saying I

19  would like to register to vote, and then the county

20  election commissioner goes back to the office tomorrow

21  and finds out that the person has already been

22  registered to vote for the past ten years, we know that

23  that person registered to vote as a non-citizen.  That's

24  how we found approximately 38 of the 129 cases.

25          Another way we find out is if a person is

1    called to jury duty, something this Court is familiar

2    with.  And one of the-- in the jury questionnaire form

3    that is filled out in the state courts of Kansas, one of

4    the questions that one can answer and that one would--

5    that would disclude one from jury duty is, are you a

6    citizen-- are you not a citizen of the United States?

7         And individuals who indicate on those forms

8    that they are not citizens of the United States are

9    periodically-- the names are periodically sent to the

10   Secretary of State's Office and we check to see if those

11   people are registered.  That's how three of the cases

12   were discovered.

13        And so there are a number of ways to look at

14   external sources that basically identify the person as a

15   non-citizen and then check and see if the person is on

16   the voter rolls.  And using those very limited external

17   sources we've only been able to-- we can see a pretty

18   large number, 129.  But we can only see a tiny

19   percentage because a relatively small percentage of the

20   non-citizens in Kansas have or are about to naturalize

21   or have-- or are about to serve on a jury duty.

22        And so what is the true number?  Well, the

23   evidence will show that using statistically reliable

24   methods we can estimate the total number of non-citizens

25   on the Kansas voter rolls, and that number is in the

1   thousands.  Doctor Jesse Richman will provide expert

2   testimony on behalf of the defendants using several

3   statistical estimates.  And by his own concession, some

4   of the estimates are stronger than others because they

5   have different sample sizes.

6           But at the low end of his estimates, where

7   you take a subsection of people who are registered to

8   vote and deduce whether-- what percentage of that people

9   are non-citizens, or you go the opposite way and take a

10  subsection of people who are not non-citizens and deduce

11  what percentage of those people are registered to vote.

12  At the low end his estimates are above 1,000, and at the

13  high end they are above 18,000.  Indeed, there was even

14  one estimate that could go as high as 32,000, although

15  we are not relying on that one because it is such a

16  small sample size.  So the point is that the number is

17  in the thousands.

18          Now, Mr. Ho vaguely said that Jesse

19  Richman's work has been rejected by his peers.  That was

20  not work that is directly relevant to this case.  That

21  was the CCES study, a study that is a massive survey of

22  more than 30,000 people.  And Mr. Richman and other

23  academic colleagues wrote an article that said,

24  according to the numbers in that study, if you base it

25  on the respondents' own answers - because a large number

1    of non-citizens answered that study - approximately

2    11 percent of non-citizens living in the United States

3    indicated that they were registered in the 2008

4    election.  Sorry, that they voted in the 2008 election.

5             And then the basis of the criticism-- of the

6    academic criticism of that study was, well, you didn't

7    actually go back and confirm that their answer was

8    correct, that they really did vote and that they really

9    were non-citizens-- or sorry, that they really did vote.

10   And then in a subsequent rebuttal report, not in this

11   case but in that larger issue, it was still 5.6 percent

12   not only said they were non-citizens and voted but were

13   confirmed to be non-citizens and voted.

14            So it was a very significant study that, of

15   course, attracted a lot of academic and political and

16   general-- and general public interest.  Because if those

17   numbers are anywhere close to accurate, that is a very

18   large number of people voting nationally, a large

19   percentage, 5.6 verified as having voted in the 2008

20   election.

21            But we'll be looking at it-- not only

22   presenting Mr. Richman's estimates of the total number--

23   and you can think of it this way and we've used this

24   metaphor before.  The 129 is the tip of the iceberg.

25   That's just the ones that we have identified, but we

1   know that the iceberg is much larger because that number

2   keeps growing and growing and because we have such

3   limited ways of seeing the total iceberg.

4           And so we'll be suggesting the iceberg is--

5   we know that it is in the thousands and we believe that

6   the best estimate is that is over 18,000 people

7   currently on the Kansas voter rolls.

8           Now, the attorney-- opposing attorney, Mr.

9   Ho, also talked about various experts we didn't realize

10  that he was going to be getting into in his opening

11  statement.  There are things that are very specific

12  criticisms of experts, but I will say this as-- by way

13  of general statements about the plaintiffs' experts:

14  The plaintiffs brought forward a band of experts that

15  we've seen again and again in cases brought by the ACLU

16  and affiliated organizations across the country

17  challenging photo ID laws, challenging redistricting

18  cases.  And these experts are used over and over again

19  in various cases and have developed a track record.  And

20  it is not a good track record.

21          Indeed, in the case of Mr. McDonald, who we

22  will presumably hear from today, the District Court of

23  South Carolina found his expert opinion incomplete and

24  in-- unconvincing.  His testimony in that case was

25  fraught with assumptions and failures to consider

1    relevant factors.  The same is true here, as we will

2    show.

3              He will claim here, for example, that young

4    voters, 18 to 29 years of age, are disproportionately

5    affected by the proof-of-citizenship requirement.  As

6    his basis for that conclusion, he will show that a-- a

7    high percentage or what looks like a high percentage,

8    approximately 41 percent, of the people on the suspense

9    list are-- are young, in that 18 to 29 age category.

10             But what he didn't look at and what we will

11   show is that of the total number of people who

12   registered during that same time period, approximately

13   41 percent were young.  In other words, there's no

14   disproportionality.  The number-- the percentage of

15   young people on the suspense list is exactly the same as

16   the percentage of young people who registered at that

17   time.

18             The same is true with his claim that there

19   are disproportionately unaffiliated voters versus voters

20   in the Republican or Democrat or other parties.  The

21   same is true there.  The percentage who ended up on the

22   suspense list who are unaffiliated is almost identical

23   to the percentage of all people who registered or

24   attempted to register during that same time period.

25   There's nothing disproportional in the effect of the

1   proof-of-citizenship law.

2           Another expert that they will present,

3   Lorraine Minnite, will present testimony, including her

4   own definition of voter fraud which she created out of

5   whole cloth, which labels a large number of things that

6   constitute crimes as not constituting voter fraud under

7   her definition.

8           She does not dispute, for example, that

9   non-citizens have registered to vote, including

10  non-citizens in this case.  But according to her

11  definition, that would not constitute voter fraud.

12  There are multiple other problems with her testimony

13  that we will be going into further depth on later.

14          On the question of the number of

15  non-citizens who have registered to vote or attempt to

16  registered to vote, as the Court is well aware, the

17  Tenth Circuit has given us this test.  And at the center

18  of the test is the word "substantial."  A substantial

19  number of non-citizens.  This definition of substantial,

20  as the Court has correctly recognized in one of your

21  prior orders, is a legal question.  It's not a factual

22  question what the definition is, it's a legal question.

23          Unfortunately, the Tenth Circuit didn't lay

24  out for us what the legal definition is of the legal

25  word "substantial."  But the definition is decisive

1    because depending on which definition you select, that

2    will almost certainly have a bearing on whether the

3    facts meet the substantial threshold that is defined in

4    that definition.

5         Now to be perfectly frank, the defendants

6    and the plaintiffs have each suggested definitions to

7    you that are helpful to our respective sides.  And why

8    should we be surprised?  That's what attorneys do.  The

9    defendant has offered what I will call a consequential

10   definition.  The consequential definition of substantial

11   as this:  A substantial number is one that could have

12   the consequences of changing an election.  So if it's

13   substantial enough to change an election, it's

14   substantial.

15        That, of course, is a defendant-- is one--

16   is a definition that serves the defense position well,

17   I'm very candid about that, because since we have so

18   many close elections decided by fewer than ten votes,

19   then if you have ten non-citizens on the rolls, that's

20   substantial because it's enough to change the outcome of

21   an election.

22        In contrast, the plaintiffs have offered a

23   different definition.  They have offered a fractional

24   definition of the word "substantial."  And by that I

25   mean, under their definition a substantial number is one

1   that is a large fraction of the total electorate.  So

2   they take the number of non-citizens that we can find

3   and use that as the numerator then they use as the

4   denominator in the fraction the 1.8 million people,

5   total number of people registered to vote in Kansas,

6   give or take.

7           And the problem with that one is that when

8   you use 1.8 million as your denominator, no matter how

9   big your numerator is, it looks insubstantial.  Even the

10  number 18,000 which this Court concluded would be a

11  substantial number if it is correct, that looks tiny

12  using their definition because you have 18,000 over

13  1.8 million, which is merely 1 percent.

14          So I want to suggest to the Court that

15  although these definitions are certainly valid and

16  considerable by the Court, there is a third definition

17  of substantial that the Court may wish to keep in mind

18  as we evaluate these facts.  And that third possible

19  definition would be a functional failure definition of

20  substantial.  A functional failure definition.

21          And by that I mean the number is substantial

22  if it indicates that the attestation-only system is

23  failing to perform the function of preventing

24  non-citizens from registering.  If it is failing to

25  perform the function of preventing non-citizens from

1   registering.

2           Now, under this definition it's a little

3   harder for defendants.  We would not be able to say that

4   one or two aliens is enough, one or two non-citizens

5   registering is enough, because any system can have human

6   error, can have some very strange or unusual occurrence

7   where the system fails.

8           But if there are hundreds or thousands of

9   people registering under a particular system who should

10  not be registering and they are slipping through the

11  system, then a reasonable person might say that the

12  under that definition, the system is failing in its

13  principal function.  So one or two would not be enough

14  to satisfy the definition of substantial under that

15  definition, but if you could at some point reasonably

16  conclude that the system is failing to perform its

17  central function, then you would say the problem is

18  substantial.

19          I want to give a metaphor that illustrates

20  this third definition.  And the metaphor is the roof of

21  a house.  The central function of a roof of a house we

22  should say is to keep out the rain, to keep out the

23  precipitation.  That's the principal function.  Now, one

24  cheap and easy way to put up a roof, setting aside

25  building codes, one cheap and easy way is to simply put

1    plywood on top of the trusses of your house frame.  That

2    constitutes a roof and it would keep a lot of rain out

3    of your house.  But if only one or two drops find their

4    way through and the system was actually only keeping one

5    to two-- only one or two drops went through, we wouldn't

6    say that the system is failing.

7            But if hundreds of drops were coming

8    through, we would say that that plywood roof is failing

9    to perform its essential function.  Hundreds or

10   thousands of drops slipping through.

11           But under the definition proffered by the

12   plaintiffs, the fractional definition, the-- the plywood

13   roof would always pass the definition because there are

14   millions of drops of rain every hour hitting that roof.

15   And the thousands that slip through are a tiny fraction

16   of the millions that fall.

17           So the point is that we might want to look

18   at this functional failure definition because it is a

19   definition that reasonable people would use when they

20   say is there a substantial problem with the system.  I

21   present this third definition of substantial at the

22   opening statement not to argue the legal definition, of

23   which of these three definitions is correct, but simply

24   to put it on the table so that the Court may consider

25   this definition as the Court assesses the facts and

1    statistics that will be present in this bench trial and

2    so that we can at least have this third measuring stick

3    in our minds as we look at the facts.

4            The second factual inquiry:  The other tools

5    did not work to prevent non-citizens from registering.

6    The evidence will show that the state of Kansas has

7    tried each of the other systems extensively that Mr. Ho

8    referred to and that each of them is completely

9    ineffective and, indeed, none of them are designed to

10   stop non-citizens from voting.

11           To go through each very briefly.  Looking at

12   the issue of prosecuting crimes, the plaintiffs have

13   argued that if we just prosecute crimes of non-citizens

14   voting or registering that will deter people from voting

15   or registering.  Well, that technique has been in place

16   for more than 70 years and it has proven completely

17   ineffective in preventing the non-citizens, even looking

18   at the 129 we have, from registering.

19           The crime of voting without being qualified

20   and election perjury; those two crimes have been on the

21   books in Kansas since 1974.  They are found at 25-246 of

22   the Kansas Statutes Annotated and 25-2411 of the Kansas

23   Statutes Annotated.

24           The crime of false assertion of U.S.

25   citizenship, which is the crime one commits at the

1    federal level if one fills out a registration from and

2    attests to being a citizen, has been on the U.S. Code

3    since 1948, for 70 years.  It's found at 18 U.S.C. 911.

4    So that threat of prosecution has been there for a very

5    long time.

6              And before the Secretary of State and the

7    Attorney Generals of the state of Kansas got the power

8    to prosecute voter fraud in 2015, all of the 105

9    counties of Kansas had the power to prosecute voter

10   fraud.  Some did.  And the-- the U.S. Attorney's Office

11   had the power to prosecute the federal crimes involving

12   voter fraud.  It is empirically proven that that has not

13   sufficed to stop non-citizens from voting.

14             The evidence will also show, as far as their

15   second claim, that maybe a national database or some

16   database could be used to stop non-citizens from voting.

17   But that is-- is actually false, and we have tried

18   everything we can think of in that regard.  First of

19   all, there is no national database of U.S. citizens.  I

20   think many people assume that there is, but there is

21   not, that the federal government has.

22             And there is no national database of all

23   non-citizens residing in the United States either.  The

24   Department of Homeland Security does know the people who

25   have been issued a temporary visa and it does know the

1    people who have been issued a lawful permanent residence

2    card or green card, but it does not know the people

3    residing in the United States illegally.  And neither of

4    those existing databases are available to the states to

5    use.

6            The only system that is available to the

7    states to use in a completely different context is the

8    SAVE system, the Systematic Alien Verification for

9    Entitlements system, but that was never expected or

10   intended to be used for verifying citizenship.  As its

11   name implies - alien, verifying, entitlements - the

12   purpose of the system was to ensure that only lawfully

13   present non-citizens got public benefits and

14   entitlements and that illegal non-citizens did not get

15   public benefits and entitlements.

16           It was not meant to look at the U.S.

17   citizens or people claiming to be U.S. citizens and

18   assess whether or not their claim of citizenship was

19   true.  As a result, the evidence will show that the

20   state of Kansas, nevertheless, asked the Department of

21   Homeland Security, can we try using your SAVE system to

22   verify the citizenship or alien status of people

23   attempting to register to vote, and the state of Kansas

24   was denied unless we could provide for each person an

25   alien number and an alien document providing-- verifying

1    that alien number.

2              Well, of course, those are things that a

3    voter registration system doesn't have because a voter

4    registration presumes that the people are not aliens who

5    are registering to vote and certainly would never ask a

6    person, a United States citizen registering to vote,

7    could you please provide your alien documentation.  So

8    the SAVE system does not work and has been denied on

9    terms that the Kansas-- the state of Kansas could

10   actually use.

11             The evidence will also show that the

12   Electronic Verification of Vital Events or EVVE system

13   fails to work because the state must know the date of

14   birth of the applicant and even if that hurdle were

15   overcome-- sorry, the state of birth.  Even if that

16   hurdle were overcome, the system is cost prohibitive, as

17   the Court has already noted.

18             Another mechanism is the-- the third

19   possible alternative is comparing the state's voter

20   rolls to the temporary driver's license database.  We're

21   already using that and have been using that for

22   approximately a decade.  Periodically the state will

23   compare the temporary driver's license list, which is a

24   list of non-citizens who are here temporarily, not

25   permanent residents, but here temporarily and who get

1    these special licenses.  And we'll see if any of the

2    names on that list also appear on our voter lists.

3              And we have done that and we have identified

4    some.  And, indeed, some of the 129 were identified in

5    that manner.  But the problem with that system is it is

6    grossly inadequate in preventing non-citizens from

7    registering for two reasons.  No. 1, it only operates

8    after-- it only can be effectively used after the person

9    has already registered and then he's on the voter rolls

10   and then you compare it to the TDL list.

11             But, No. 2, and an even bigger problem, it

12   only covers a very small subsection of non-citizens

13   residing in Kansas.  It-- it includes those who are on

14   temporary visas and who choose to obtain a Kansas

15   driver's license.  It does not include any alien who

16   does not attempt to get a Kansas driver's license while

17   here and does not need to drive.  It does not include

18   any of the many green card holders, the lawful permanent

19   residents in the state of Kansas, and it does not

20   include the unlawfully present non-citizens in the state

21   of Kansas.

22             So even if that were an effective method

23   that could be used before the person registers, it is a

24   very tiny percentage of the non-citizens residing in the

25   state of Kansas.

1                 The fourth possible alternative suggested by

2      opposing counsel is, well, maybe we could just train

3      Department of Vehicles' employees better.  If we could

4      just train them better, they would stop non-citizens

5      from registering at the DMV.  But the defendant has

6      already shown that, No. 1, on numerous occasions the

7      Secretary of State's Office has provided abundant

8      written and verbal instruction to the Department of

9      Vehicles trainers.

10                No. 2, we've annually reviewed the annual

11     training content of the Department of Vehicle-- with

12     Department of Vehicle training staff, the content of

13     their training materials to ensure that it is accurate

14     and reflects any new statutes or regulations.

15                We have reviewed the training manuals

16     themselves and have suggested changes to them.  And

17     we've provided multiple-- on multiple occasions advice

18     and input whenever necessary on Department of Vehicle

19     procedures and the content of Department of Vehicle

20     communications with people attempting to register at the

21     end of the driver's license transaction.

22                We have done everything possible to improve

23     the training of the Department of Vehicles.  And it has

24     improved.  But as their own expert will concede, the--

25     you can't eliminate human error and there will always be

1    some human error in the interactions between individuals

2    at the Department of Vehicles.

3         The I believe fourth or fifth possible

4    approach they suggest is non-citizens' responses on jury

5    questionnaires.  As I've already mentioned, we've been

6    using that since 2013 but the problem again is it only

7    suffices to identify the very tiny percentage of

8    non-citizens who happen to get called for jury duty and

9    who happen to go ahead and admit on the form that they

10   are non-citizens in the first place.

11        The third factual inquiry of the day or of

12   the trial is that-- whether there's a significant burden

13   on those who are registered to vote and have to now

14   fulfill the proof-of-citizenship requirement.  The

15   evidence will show that the SAFE Act provides for

16   multiple easy methods of transferring one's proof of

17   citizenship to the relevant county office.  You can

18   bring it in in person, you can mail in a copy, you can

19   fax in a copy, you can e-mail in a copy, you can text in

20   a copy.  There are multiple ways to bring in your proof

21   of citizenship or an image of the document.

22        The evidence will show that there are 13

23   different documents that suffice to prove citizenship.

24   The evidence will show that the counties of Kansas make

25   extensive efforts to inform registration applicants how

1    to complete their registration and that applicants

2    receive both mail and telephone calls from the relevant

3    counties if they remain on the suspense list long

4    enough, in an effort from the county to help the person

5    realize how many ways they can provide their citizenship

6    and how easy it can be done, the proof of citizenship.

7            The evidence will also show that the

8    informal hearing method, which is a fall-back safety net

9    for those rare cases in which the documents do not

10   exist, has proven easy to use and has been used remotely

11   by multiple people seeking to prove their citizenship.

12           The evidence will show that the state of

13   Kansas provides free birth certificates to anyone who

14   was born in Kansas and who needs one for the purpose of

15   registering to vote.  The evidence will also show that

16   the state of Kansas verifies birth with the Kansas

17   Department of Vital Statistics for those people born in

18   the state and verifies other citizenship documents that

19   the person may have provided to the DOV when they were

20   getting the driver's license.

21           In other words, the state of Kansas makes

22   extensive efforts inter-agency to verify on that

23   person's behalf, to obtain from another state agency on

24   that person's behalf, the document that proves

25   citizenship so the person doesn't have to do it himself.

1            The evidence will show that with all of

2    these mechanisms, fully 95.4 percent of the applicants

3    who begin the process of getting a-- of registering to

4    vote and who may be on the suspense list for a temporary

5    period of time come off the temporary suspense list or

6    otherwise have their citizenship verified, their

7    registration completed and they are placed on the voter

8    rolls.

9            The evidence will show that the remaining

10   4.6 percent are either non-citizens or even more-- in

11   more instances people who move away, they simply change

12   residence, moving out of the county, either into a

13   different county in Kansas or to a different state

14   during the time after which they thought they sent in

15   their registration card.

16           The evidence will finally show that Kansas

17   has-- Kansans themselves do not report any significant

18   burden or any significant hardship in complying with the

19   proof-of-citizenship requirements when asked in a

20   survey.  Now, of course, the plaintiffs in this case

21   will assert that it's very difficult for them to provide

22   their citizenship document.  But when actually asked,

23   people who don't have a-- a motivation to lead the Court

24   to one conclusion or another, when asked, Kansans don't

25   state that they have any difficulty complying with this

```
 1   law.
 2              So for all of these reasons, the three
 3   factual tasks, the three factual inquiries before this
 4   Court all weigh strongly in favor of defendants and
 5   plaintiffs will not be able to meet the legal hurdles
 6   necessary to prevail either on their statutory
 7   preemption claim or on their constitutional burden
 8   claim.  Thank you.
 9              THE COURT:  Thank you.  All right.  Mr. Ho,
10   are you ready with your first witness?
11              MR. HO:  We are, Your Honor.
12              THE COURT:  Would you like to take about a
13   ten-minute break?
14              MR. HO:  Sure.
15              THE COURT:  All right.  Let's take a
16   ten-minute break and we'll reconvene at 10:30.
17              (Recess).
18              THE COURT:  All right.  You can be seated.
19   Mr. Ho.
20              MR. DANJUMA:  Your Honor, plaintiffs would
21   like to-- the Fish plaintiffs would like to call their
22   first witness, Charles Stricker.
23              CHARLES WILLIAM STRICKER, III,
24   called as a witness on behalf of the Fish Plaintiffs,
25   having first been duly sworn, testified as follows:
```

1                    DIRECT EXAMINATION

2    BY MR. DANJUMA:

3        Q.   Good morning, Mr. Stricker.  Could you please

4    state and spell your full name for the record?

5        A.   Yes.  Charles William Stricker III.

6    C-H-A-R-L-E-S.  W-I-L-L-I-A-M.  S-T-R-I-C-K-E-R.  Roman

7    numeral III.

8        Q.   Thank you.  Is there any other name that you're

9    known by?

10       A.   Yes.  I've always gone by the nickname of Tad,

11   T-A-D.

12       Q.   And how old are you?

13       A.   I'm 39 years old.

14       Q.   Can you tell the Court where you were born?

15       A.   I was born in Joplin, Missouri.

16       Q.   And where do you currently live?

17       A.   I currently live in Wichita, Kansas.

18       Q.   And can you tell us what county that's in?

19       A.   Yes, it's in Sedgwick County.

20       Q.   How long have you lived in Kansas?

21       A.   I've lived in Kansas since late 2013, so about

22   four-and-a-half years now.

23       Q.   And where did you live before that?

24       A.   Prior to Kansas I lived in Chicago.  I was there

25   for about five-and-a-half years.

1    Q.   Okay.  And why did you move back to Kansas in
2  2013?
3    A.   Yeah, I originally was here in Kansas from 2006
4  to 2008 for a work assignment and met what would become
5  my wife eventually here in Kansas and-- in Wichita.  And
6  we moved to Chicago, being young 20-something-year-olds
7  and explore life and live in the big city.
8        And as we started thinking about starting a
9  family, we couldn't think of a better place than to come
10  back to where she was from, from Kansas and where we
11  met.  And that's really what-- what brought us back was
12  starting a family, had a great career opportunity.
13  Everything that Kansas has to offer with a good cost of
14  living.
15    Q.   And you mentioned you want to start a family.  Do
16  you have any children?
17    A.   We do.  We actually have a two-year-old son and
18  another small one on the way this year.
19    Q.   Congratulations.
20    A.   Thank you.
21    Q.   Can I ask, are you currently employed?
22    A.   Yes, I am.
23    Q.   And can you tell the Court what your job is?
24    A.   Yes.  I'm a hotel manager for a very busy upscale
25  luxury hotel in Wichita.

1    Q.   And how long have you worked at that job?

2    A.   I've been there since late 2014.  I've been in

3  the hotel business for much longer and been-- so I guess

4  I've been there about three-and-a-half years.

5    Q.   Could you tell-- could you describe your typical

6  day at work?

7    A.   Yeah, a typical day for me, I usually get up

8  around 5:30, 6:00 in the morning, try to get to the

9  hotel by 7:00 for our guests that are departing.  So,

10  you know, I kind of have to be there before everybody

11  else is up and leaving.  And work very long hours and,

12  you know, typically leave the hotel around 6:00 or 7:00.

13  So it's usually a ten, 12-hour workday.

14    Q.   And could you tell us how many hours you worked

15  in the past week?

16    A.   Somewhere between 60 to 65 hours.

17    Q.   And are you taking any time off from work to be

18  with us today?

19    A.   I am.  I'm actually taking personal time off that

20  is used out of my vacation time to be here.

21    Q.   All right.  Now, I'd like to talk to you a bit

22  about your voting history.  Have you ever voted in an

23  election?

24    A.   Yes, I have.

25    Q.   Do you remember what years you voted?

1    A.  I do.  The first time that I voted was the first

2  opportunity that I could, which was in 1996.  And I also

3  voted in 2010, 2012.  I attempted to vote in 2014.  And

4  voted in 2016 as well.

5    Q.  And did you understand that you needed to

6  register to vote before you went to the polls?

7    A.  I did, yes.

8    Q.  And, Mr. Stricker, I'd like to ask you about

9  where you lived when you were previously registered to

10  vote.  When you voted in 1996, what state were you

11  living in?

12    A.  It was actually where I grew up, which was in

13  Missouri, and registered to vote there.

14    Q.  And did you have any problems registering to vote

15  in Missouri?

16    A.  I didn't.  It was actually a pretty uneventful

17  experience for registering the first time.  I was 18

18  years old and a high school student.  They had a group

19  that was there to help people register to vote and it

20  was pretty uneventful.  I think being the average

21  18-year-old probably all I had was a driver's license,

22  if that.

23    Q.  And is-- what state were you next registered to

24  vote in, if any?

25    A.  I-- being in the hotel business, I-- or

1   especially earlier on in my career, I moved several

2   times.  I was actually registered to vote in Kansas back

3   in 2006 or 2007.  And I was also registered to vote in,

4   of course, the state of Illinois when I lived in

5   Chicago.

6       Q.   And just to clarify the record.  This-- when you

7   lived in Kansas in-- you lived in Kansas in 2016 to

8   2008, is that right, previously?

9       A.   That is correct.

10      Q.   And you registered to vote while you were living

11  in the state at that time, or no?

12      A.   I did, yep.

13      Q.   And did you have any problems registering to vote

14  in Kansas at that time?

15      A.   Not that I recall.  It was very easy.  Went into

16  the DMV and got my driver's license and it was pretty

17  uneventful as well.

18      Q.   And when you moved to Illinois, you registered to

19  vote again?

20      A.   I did, uh-huh.

21      Q.   And did you have any problems registering to vote

22  in Illinois?

23      A.   I did not.  It was a very easy process.  Probably

24  the longest thing was just waiting in line.

25      Q.   And so when-- I understand from your prior

1    testimony that you moved back to Kansas in 2013.  Did

2    you have any problems trying to register to vote in

3    Kansas at that time?

4        A.   When I went to get my driver's license in 2014, I

5    don't recall being asked for anything extra, so it-- it

6    seemed pretty uneventful.

7        Q.   And, I'm sorry, can you-- when you-- when you

8    went to get your driver's license in 2014?

9        A.   Yeah.  Actually, when I went to get my driver's

10   license I did have actually issues.  When I first walked

11   in, I stopped at the information counter that they have

12   at the front where I got a number as well.  And they

13   looked over the documents that I had to try to get my

14   driver's license and they said, well, you don't have

15   enough information here.

16           And so they gave me a list of documents that I

17   needed to get.  And I had taken off work actually that

18   day as well and it was the last day to register to vote.

19   And so it was really important for me to participate in

20   the-- the 2014 election.  So I rushed home as quickly as

21   I could, literally grabbed every single document that I

22   could and started shoving them into a file folder to try

23   to get back before the DMV closed.  And so I went back

24   for a second time to try to get my driver's license and

25   try to register to vote.  So I made two trips in one

1    day.

2      Q.   And what happened-- and I just want to back up

3    for a second.  When you first went into the-- into the

4    DMV, they asked you-- they said you needed additional

5    documents, is that right, in order to get-- in order to

6    get your driver's license?

7      A.   They did.  Yeah, they wanted me-- I don't

8    remember the specific documents, but it was a pretty

9    long list of things that they needed.  And so I went

10   back and-- and literally grabbed everything that I could

11   possibly get out of my house.  I-- I went and I grabbed

12   tax documents, tax returns, W-2s.  I grabbed my birth

13   certificate, I grabbed mortgage statements.  Literally

14   everything I could find and just started putting it in

15   the folder to get back to the DMV as quickly as I could

16   because I-- I had to get it done, I couldn't take

17   another day off of work.

18     Q.   And do you have any record of what you brought to

19   the DMV when you returned the second time?

20     A.   I did leave all the documents just out of

21   convenience or not taking it apart, I just left that

22   folder together and just kind of threw it back into my

23   office.  And so all those were still gathered together

24   for quite some time afterwards.

25     Q.   And did you ever look inside it to see if it

1    contained a birth certificate or a passport?

2        A.   I did.  At some point later on I-- after I

3    discovered more about this proof of citizenship, I went

4    back and looked at the folder and I did have a birth

5    certificate in the folder.  Mine was there.

6        Q.   And when you returned to the DMV for the second

7    time, as you testified, what happened next?

8        A.   So I checked in with the front counter again, the

9    information counter.  And they said, okay, you know, go

10   ahead and grab a number.  And I proceeded up to the

11   window, started talking to the DMV agent and said I was

12   there to get a driver's license, that I had moved from

13   the state of Illinois and that-- I went through the

14   process.

15          It seemed relatively easy at that point.  I had

16   everything that I needed.  At some point during the

17   process the agent said, would you like to register to

18   vote?  And I said, yes, that's actually-- that's why I'm

19   here today, that's why I hurried back, I wanted to get

20   here before the deadline.  I've been very busy and

21   absolutely I-- I'd like to register.

22       Q.   Do you recall the DMV clerk ever telling you that

23   you'd have to provide any sort of document in order to

24   register to vote?

25       A.   No, I do not recall them asking for anything else

1   or telling me about that.

2       Q.   Did you-- did the DMV give you any papers or

3   documents when you left their offices?

4       A.   Yeah.  So I-- I was given what I thought at first

5   was a receipt.  It looked like a-- a fast-food receipt

6   and it had my picture on it.  And so I kind of-- I was

7   waiting there for the agent to hand me my driver's

8   license.  And, you know, they were kind of looking at me

9   like, is there anything else you need?

10           And I-- I said, well, do I get the driver's

11  license from you or do I need to go to a different

12  window?  And they explained that they don't actually

13  have the ability to print driver's licenses in the state

14  of Kansas onsite.  And that this slip of paper that came

15  out that looked like a fast-food receipt was actually my

16  driver's license.

17           I was really skeptical because I've lived in a

18  lot of other states and normally I get a physical

19  driver's license when I leave.  And I said, well, what

20  if I get stopped by an officer?  And they said, no, no,

21  no, rest assured, it's really a driver's license.

22  You'll get the real one in the mail.  It takes about 14

23  to 21 days I think is what they said.

24           And I said, okay, well, what else do I need?  Is

25  there anything else?  You know, what about, you know,

1    the voting, do I get a voting card?  Do you print

2    everything out for that?  No.  Everything comes in the

3    mail.  You'll get everything that you need, don't worry

4    about it.

5        Q.  And when you left the DMV, what did you think

6    about your voter registration status at that time?

7        A.  At that point I-- I thought I was registered to

8    vote and that I had done everything that I needed to,

9    that I accomplished why I went there that day.

10       Q.  Now, Mr. Stricker, you testified earlier that you

11   tried to vote in the 2014 midterm elections; is that

12   right?

13       A.  That is correct.

14       Q.  Can you tell us what happened when you tried to

15   vote that-- in that election?

16       A.  Yeah.  So I woke up early that morning to try to

17   get there right when the voter poll opened.  And I went

18   with my wife and we both waited in line, she was in

19   front of me.  And as soon as I got up to the table I

20   gave them-- by that point I had my real driver's license

21   and presented that and stated who I was and that I was

22   there to vote.

23           And the agent that was behind the counter, she

24   started looking, she had a stack of documents and was

25   looking through and said, well, we don't have you

1   registered to vote.  And I said, well, surely this has

2   to be a mistake, I mean, I-- I know I registered on the

3   last day and so maybe for some reason I'm-- you know,

4   that's why you don't have me on the list.  I don't know

5   when that was printed.  She said, no, this was printed

6   yesterday, you know, we don't have you registered to

7   vote.

8      Q.   And what happened-- what was the next thing that

9   happened at the polls?

10     A.   I asked to talk to the person that was in charge

11  of the polling station there and she said she wasn't

12  sure either why I wasn't registered to vote and she

13  ended up giving me a provisional ballot.  At the time I

14  really didn't understand what a provisional ballot was

15  so I asked some more questions about that.

16        And then by that point, my wife had already

17  gotten her ballot and was headed off to a private booth.

18  Meanwhile, I was given this provisional ballot.  And at

19  this time now there was a long line of-- of people that

20  were waiting to vote.  And, you know, I'm talking to the

21  person in charge of the polling station so everybody is

22  kind of looking.

23        But I ended up-- once I got the provisional

24  ballot, there was just a white plastic table that was

25  over by the line.  And there was another lady that was

1   sitting there filling out a provisional ballot as well

2   and I could see what she was filling out and I'm sure

3   she could see the same of me.  But it was kind of like I

4   was put on display at this table.

5       Q.   And what did it feel like to vote on-- with a

6   provisional ballot in that election?

7       A.   It-- it was confusing, I didn't understand why.

8   I-- I felt embarrassed by having to sit there on-- on

9   public display.  It was almost like I was the one that

10  did something wrong.  And I just-- I left very confused

11  about the whole experience.

12      Q.   Did anyone ever tell you at the polls why you

13  weren't registered to vote?

14      A.   No.  They didn't tell me any reason why other

15  than, sorry, we don't have you on the list.

16      Q.   Did you later learn why you weren't registered to

17  vote?

18      A.   I did.  I had first heard about this documentary

19  proof of citizenship actually on the radio.  I was

20  driving to work one day early in the morning, and I

21  started to think, well, you know, is this maybe why I

22  wasn't allowed to vote?  And it was later that I learned

23  that-- that they were claiming that-- that I wasn't--

24  you know, I hadn't given any proof of citizenship or

25  that I hadn't proved who I was, so...

1    Q.   Now, before the 2014 election, did you receive

2   any phone calls telling you that you weren't registered

3   to vote?

4    A.   No, I did not.

5    Q.   Do you remember receiving any notices in the mail

6   telling you you weren't registered to vote?

7    A.   I don't recall receiving any.

8    Q.   Okay.

9         MR. DANJUMA:  Now, Your Honor, may I please

10  approach the witness?

11        THE COURT:  Yes.  And you don't have to ask

12  again.

13        MR. DANJUMA:  And for the record, I have

14  just handed to Mr. Stricker a copy of an exhibit that

15  defendants have-- have marked for identification

16  purposes as Defendant's Exhibit 838, registration

17  detail, Stricker ELVIS file.

18        And, Your Honor, we would like to publish a

19  page of this document.  The document has been marked as

20  confidential because some information in the document is

21  confidential, but the page that we would like to publish

22  is a letter from Sedgwick County which-- election

23  officials that does not have any confidential

24  information in it.

25        THE COURT:  All right.  So 838, are you

1    offering the entire exhibit?

2          MR. DANJUMA:  No.  We are not seeking to

3    introduce the exhibit, we're only seeking to ask the

4    witness about the exhibit.

5          THE COURT:  Okay.  So when you say publish,

6    you don't mean publish in court, you mean publish to the

7    witness.

8          MR. DANJUMA:  I'm sorry.  Publish to the

9    witness and display to the witness.

10          THE COURT:  Okay.  I understand.  That's

11    fine.

12    Q.  (BY MR. DANJUMA)  Okay.  And can you tell me on

13    the first page of this document - and I'll advise our

14    trial tech not to display the first page - but could you

15    just read the first line at the top of the first page?

16    A.  Yes.  It says, "Registrant detail for Stricker,

17    Charles William, 104 Sedgwick."

18    Q.  And could you take a second to look through this

19    document.

20    A.  (Witness complies).

21    Q.  Have you had a moment to look through the

22    document?

23    A.  I have, I've glanced through it.

24    Q.  And apart from your deposition, have you ever

25    seen any document like this before?

1    A.  No, I have not.

2    Q.  To your knowledge, is this document anything

3  that-- something that you have access to?

4    A.  Not that I know of.

5    Q.  And do you know whether the information in the

6  document is accurate?

7    A.  I do not.  I mean, there are a lot of pages here,

8  so I-- I do not know.

9         MR. DANJUMA:  Now, I'd like to ask our trial

10  tech to display on the screen for the witness and for

11  the Court Page 9 of this document.

12         THE COURT:  All right.  Before it's

13  admitted, you shouldn't publish it that way.

14         MR. DANJUMA:  Oh.

15         THE COURT:  Page 9 of Exhibit 838.  Is it

16  admitted by stipulation?  Is this something that's

17  stipulated?

18         MR. DANJUMA:  I'm sorry, this exhibit has

19  been admitted by stipulation.

20         THE COURT:  All right.  838 admitted by

21  stipulation.  You can publish any of it, subject to the

22  redaction rules.

23         MR. DANJUMA:  Understood.

24    Q.  (BY MR. DANJUMA)  And do you see the top of the

25  page of this-- and could we just zoom out for a moment

1    to the full letter.  Can you read the date at the top of

2    this letter?

3        A.  October 26th of 2016.

4        Q.  And could you read for the record the first-- the

5    title of this letter?

6        A.  It says "Notice of Voter Registration Status."

7        Q.  And then I'd just like to direct you to the third

8    paragraph in the letter.

9        A.  Okay.

10       Q.  Could you just read the third paragraph into the

11   record?

12       A.  Yes.  It says, "Our records indicate that you've

13   submitted a voter registration application during the

14   above-mentioned time period but you did not provide

15   evidence of your U.S. citizenship.  We have since

16   received information from the Kansas Department of

17   Health and Environmental Office of Vital Statistics

18   indicating that you have a Kansas birth certificate on

19   file.  Based on that determination, your registration is

20   deemed complete, and we've granted you full voter

21   registration status."

22       Q.  Mr. Stricker, were you born in Kansas?

23       A.  No, I was not.

24       Q.  Do you have a Kansas birth certificate?

25       A.  No, I do not.

1    Q.   Is this information in your voter file accurate?

2    A.   It certainly does not seem to be if they're

3  saying I have a Kansas birth certificate, because mine

4  is from Missouri.

5    Q.   All right.  Mr. Stricker, have you followed the

6  legal developments in this case?

7    A.   I have somewhat, yes.

8    Q.   Do you know whether the judge has issued any

9  preliminary rulings in the case regarding whether you

10  could become registered to vote?

11    A.   Yes.  At some point the judge issued a

12  preliminary ruling that anybody that was on the

13  suspended list should be registered to vote and-- and

14  allowed to vote.

15    Q.   And you testified earlier that you voted in the

16  2016 election.  Did you take any steps to see if you

17  were registered to vote before the 2016 election?

18    A.   I did.  Certainly I didn't want to have the

19  embarrassing experience that I had again previously so I

20  actually called the Sedgwick County voter registration

21  office and had a long conversation and-- and asked if I

22  was registered to vote.

23    Q.   And what were you told?

24    A.   I was told, well, it's really complicated.  They

25  said there are a lot of legal issues that are up in the

1  air and we're not sure if you're going to be allowed to

2  vote in the upcoming presidential election and, you

3  know, there's some things that just haven't been decided

4  and so we're-- we're really not sure if you're going to

5  be allowed to vote at this point.

6      Q.  Did you check online to see if you were

7  registered to vote?

8      A.  I did.  So I-- I wanted to fact check that and

9  see if what the person was saying was true or maybe they

10  were mistaken.  And so I went online and I was kind of

11  shocked and surprised that it said I was not-- we had--

12  I had no record and that I was not registered.

13      Q.  And how did you-- what was your reaction-- what

14  did you understand about your registration status after

15  checking online and contacting the Sedgwick County

16  Election Office?

17      A.  Well, I was extremely confused by that point,

18  because it was my understanding that I was supposed to

19  be registered.  You know, I had been through the whole

20  process, the judge had ordered that.  I talked to a

21  person from the voter registration office, they said, we

22  don't know.  I look online, it says I'm not registered.

23  At that point I was really confused.  I was-- I was

24  probably a little frustrated and upset about the whole

25  process too.

1    Q.   Okay.   Now, Mr. Stricker, I just want to check

2   again, do you have a birth certificate or passport now?

3    A.   I do.  I have both.

4    Q.   Is there anything physically preventing you from

5   providing a birth certificate or passport to an official

6   in the state of Kansas?

7    A.   No, there's not.

8    Q.   So can you tell us why you are testifying as a

9   plaintiff in the case today?

10    A.   Well, you know, for me it's-- it's really about

11   the principle of the matter.  I don't think that the

12   average Kansan citizen should have to sue the Secretary

13   of State to get registered to vote.  And it's a very

14   confusing, convoluted process.

15        And, you know, I just-- I think about all the

16   other people like, you know, in my family that may-- you

17   know, don't have birth certificates or can't get them

18   and they've worked at the same job for years and years.

19   And, you know, the people that don't have a voice and

20   I'm able to do something that's impactful, and that's

21   why I'm part of this case.  And, you know, I-- I want to

22   make it easier for people to vote and, you know, I think

23   that's what we should be doing.

24        MR. DANJUMA:  Thank you very much, Mr.

25   Stricker.  No further questions at this time.

1          MR. JOHNSON:  I have nothing.

2                  CROSS EXAMINATION

3    BY MR. KOBACH:

4      Q.  Hi, Mr. Stricker.  We've spoken before, but just

5    to remind you, my name is Kris Kobach, I'm the defendant

6    in this case and also an attorney.

7          I have a few questions about the examination that

8    you just had and I want to expound on a few subjects.

9    Let's jump straight to the-- your trip to the DMV to get

10   your driver's license in 2014.  Did you-- did you say

11   that you took two trips to the DMV in 2014?

12     A.  That is correct, two.

13     Q.  And were you asked to provide documents by the

14   DMV clerk that you interacted with?

15     A.  Yes, I was.

16     Q.  And did you say that you took a file of documents

17   with you to the DMV?

18     A.  That is correct, yes.

19     Q.  And did you also say that the-- inside that file

20   of documents was your birth certificate; is that

21   correct?

22     A.  That is correct.

23     Q.  Do you remember exactly which documents the DMV

24   clerk looked at?

25     A.  I do not.

1    Q.   Is it possible that the DMV clerk looked at your

2  birth certificate among the documents that he or she was

3  looking at?

4    A.   That, I do not know.

5    Q.   Did you have your passport in the folder or the

6  file of documents you took as well?

7    A.   I do not recall having the passport.

8    Q.   So just to make sure I understand.  You think you

9  did not have the passport; is that correct?

10    A.   Yeah, I do not recall having the passport.

11    Q.   But you are sure you had the birth certificate;

12  is that correct?

13    A.   That is correct.

14    Q.   And did you have the birth certificate on both

15  occasions when you went to the DMV-- or DOV?

16    A.   I don't know in the first one.  I know in the

17  second one because that was the final file that I had

18  laying in my home office for quite some time.

19    Q.   And is it your testimony that on-- the reason you

20  took a second visit to the Department of Vehicles was

21  because there were certain documents missing on your

22  first visit to get your license; is that correct?

23    A.   That's correct.  I think it had something to do

24  specifically with the Kansas residency, like utility

25  bills and things.

1    Q.   Okay.  So is it-- so is it possible that on

2    either of the first or the second visit you may-- the

3    clerk at the DOV may have looked at your birth

4    certificate?

5    A.   I don't recall.

6    Q.   Okay.  You talked about a receipt you got from

7    the Department of Vehicles that I believe you said

8    looked like a fast-food receipt.  Do you recall that?

9    A.   Yes, which was what I found out was my temporary

10   driver's license.

11   Q.   Did you read every word on that receipt in full?

12   A.   I don't recall reading every word.

13   Q.   I'm going to show you--

14        MR. KOBACH:  May I approach the witness,

15   Your Honor?

16        THE COURT:  Yes.  And you don't need to ask

17   again.

18        MR. KOBACH:  Okay.

19   Q.   (BY MR. KOBACH)  I'm going to show you an exhibit

20   which is labeled Defendant's Exhibit 1047.  And, Mr.

21   Stricker, I'm going to represent to you that--

22        MR. DANJUMA:  Could we have a copy of this

23   document?

24        THE COURT:  All right.  Don't publish it

25   yet.  Is this admitted, 1047, by stipulation?  You know,

1   when-- before we break for lunch or right afterwards,

2   let's go ahead and make a record of all the exhibits

3   admitted by stipulation so we don't have to fumble and

4   find out.  But is this one-- anyone know?  1047.

5               MR. KOBACH:  It is in.

6               MR. ROE:  We do have one that's stipulated--

7               THE COURT:  We can't hear you.  Can't hear

8   you.

9               MR. ROE:  We do have one that's basically

10  the same copy that's for a joint stipulation and I

11  think-- am I correct on that?

12              MS. LIU:  Your Honor, we don't have a-- I

13  mean, Exhibit 1047 is not on the joint stipulation list.

14              THE COURT:  All right.  So it's not admitted

15  yet and so you need to make a record with this defendant

16  if you're going to offer it through him.

17              MR. KOBACH:  Okay.  Well, we may need to

18  offer it through a different witness.  Your Honor, just

19  for the Court's information, this is a copy of the

20  receipt that is sent to people who are registering at

21  the DOV.  However, I believe that I may need-- if you

22  want me to ask foundational questions, I may need to get

23  this in through a different witness, Mr. Caskey or

24  someone else.

25              THE COURT:  All right.  Well, you can try to

1   see if he can give you the foundation to admit it.  If

2   not, you'll have to wait.

3              MR. DANJUMA:  We need to have a copy of the

4   document before you-- okay.

5              MR. KOBACH:  May I approach the witness then

6   and read on his copy?  I'm sorry.

7              THE COURT:  Right.

8     Q.  (BY MR. KOBACH)  Mr. Stricker, could you read

9   the-- the first large paragraph there beginning "unless

10  you already submitted"?

11             THE COURT:  Not aloud.  Right?  All right.

12  So let's back up.  1047 is not admitted.  Is there going

13  to be an objection to 1047 being admitted by plaintiff?

14             MR. DANJUMA:  Yes.

15             THE COURT:  All right.  So you're going to

16  need to lay the foundation with this witness before he

17  can testify to any of the substance of it because you're

18  going to need to lay a foundation to get it admitted.

19  If he can't do it for you, then you're not going to be

20  able to ask him about-- to read into the record what the

21  document is.  You can't do that until it's admitted.

22             MR. KOBACH:  Right.

23    Q.  (BY MR. KOBACH)  Mr. Stricker, do you recall

24  anything of the text that was on the receipt that you

25  received from the Department of Vehicles?

1        MR. DANJUMA:  Objection.  Mischaracterizes

2  the witness' testimony.

3        THE COURT:  Overruled.  Answer it if you

4  can.

5    A.  Really the only thing that I remember, I remember

6  it had a-- a grainy picture of myself, had my name, I

7  think it had my date of birth, but I don't recall

8  anything else on the small slip of paper that printed

9  out.

10    Q.  (BY MR. KOBACH)  I'm not going to ask you to read

11  it, but does-- is there anything in Exhibit 1047 that

12  you recall or is it your memory that you just don't

13  recall what else was on there besides your name and date

14  of birth?

15        In other words, do you remember seeing anything

16  like the text from Exhibit 1047 in front of you on that

17  receipt?

18    A.  I-- I do not.  And we may be referring about

19  something different, because what I was given was

20  strictly a small slip of paper.  I was not given a full

21  page like this.

22    Q.  Okay.

23        MR. KOBACH:  Your Honor, we just have

24  obtained the joint exhibit, which is substantially

25  identical to what I just handed Mr. Stricker.

1        THE COURT:  What's that number?

2        MR. KOBACH:  This is Joint Exhibit No. 825,

3  presumably the plaintiff is not objecting to something

4  they've already allowed in.

5        THE COURT:  All right.  Just a minute.

6  Exhibit 825, Kansas DOV receipt is what it says.  Is

7  that stipulated?  Everybody agree to that?

8        MR. DANJUMA:  Yes.

9        THE COURT:  All right.  Exhibit 825 is

10  admitted by stipulation.  You can ask him-- you can

11  publish it, you can ask him to publish it by reading

12  aloud, et cetera.

13        MR. KOBACH:  Is there a way to zoom out on

14  this?

15    Q.  (BY MR. KOBACH)  Mr. Stricker, this should look

16  very much like what was just in front of you.  So this

17  is Exhibit No. 825, joint exhibit.

18        MR. KOBACH:  Which I'm introducing into

19  evidence, Your Honor, I don't-- or is it already in?

20        THE COURT:  It's admitted.

21        MR. KOBACH:  It's already admitted, okay.

22    Q.  (BY MR. KOBACH)  So looking at the paragraph that

23  begins "unless you already submitted."  That's the

24  paragraph where the word "unless" is partly obscured

25  there.  Do you see that?

1    A.   Yes.

2    Q.   Okay.  Could you read that paragraph?

3    A.   Sure.  "Unless you already submitted to the

4  Division of Vehicles a document proving U.S.

5  citizenship, you need to submit one to your county

6  election office before you will be added to the voter

7  registration list.  Visit www.gotvoterid.com for a list

8  of acceptable documents.  If you were a registered voter

9  in Kansas before 2013 and are still registered, you do

10  not need to provide a citizenship document."

11    Q.   Now that you've read that, does that refresh your

12  recollection at all?  Do you recall seeing those words

13  on the receipt that you received from the DOV?

14    A.   No.  And again, it was-- I didn't get a

15  eight-and-a-half-11 piece of paper, I got a-- it was

16  like a fast-food receipt size, but....

17    Q.   Do you recall receiving any other mail from the

18  Sedgwick County Election Office after you started your

19  registration process at the Department of Vehicles?

20    A.   Immediately after, no.

21    Q.   Do you recall receiving any phone calls or

22  anything from the Department of Vehicles-- sorry, from

23  the Sedgwick County Election Office?

24    A.   No, I do not.

25    Q.   Mr. Stricker, you-- I believe you just testified

1   you do have a passport in addition to a birth

2   certificate; is that correct?

3       A.   That is correct.

4       Q.   Do you possess a Smartphone?

5       A.   I do.

6       Q.   Do you get e-mail on your phone?

7       A.   I do.

8       Q.   Do you send text messages on your phone?

9       A.   I do.

10      Q.   Do you sometimes take pictures with your phone

11  and either text or e-mail them?

12      A.   I have on occasion.

13      Q.   If you had wanted to, could you have taken a

14  picture of your birth certificate and e-mailed it into

15  the Sedgwick County Election Office?

16      A.   Sure, I could've.  I don't think that's a very

17  secure way of transferring sensitive personal

18  information by text message.

19      Q.   Is-- so is it your testimony that you've never

20  transmitted anything by text message that might-- that

21  might be an identity document relating to you?

22      A.   An identity document, yeah, I-- I don't recall

23  ever sending any of that.  I-- I text pictures of my

24  son.

25      Q.   But during your deposition, as you may recall,

1   you-- you acknowledged that the Sedgwick County Election

2   Office was approximately five-and-a-half blocks from

3   your place of work; is that correct?

4       A.   That sounds about right.

5       Q.   So what time do you normally get to work?

6       A.   Usually between 7:00, 8:00.

7       Q.   And what time do you usually leave work?

8       A.   A lot of times it can be after 6:00, 6:30 p.m.

9       Q.   Okay.  Do you ever leave your place of work for

10  lunch?

11      A.   It's pretty rare.  I don't have a lot of time to

12  leave.

13      Q.   Do you sometimes leave your place of work for

14  lunch?

15      A.   Occasionally, yeah.

16      Q.   And when you go out for lunch, not at work, how

17  long do you typically spend at lunch?

18      A.   Usually five or ten minutes.  There's a popup

19  park where I can go and grab a sandwich real quick and

20  then bring it back to my office.

21      Q.   Would it have been possible at some point for you

22  to get in your car and drive five-and-a-half blocks to

23  the election office and drive back and provide your

24  proof of citizenship?

25      A.   Really, it-- it got to the point where it became

1  a burden for me to take time off.  I mean, I'm having to

2  take time off today, for instance.  So, you know, and

3  I-- I thought when I left the DMV that I had done

4  everything that I needed to and walked in to vote in

5  2014.  So at that point I didn't think it was really

6  necessary.

7      Q.  So my question is, would you have been able to

8  take 15 minutes to drive five-and-a-half blocks, present

9  a document and drive back over your lunch hour?

10     A.  At the time, no.  I had just started the job and

11 I was especially busy in 2014.

12     Q.  So is it your testimony that you had to remain at

13 your post, the desk where you work for the entirety of

14 the 12 hours that you were there from-- well, sorry, ten

15 hours that you would be there from 7:00 in the morning

16 until 5:00 in the evening?

17     A.  Well, I manage a very large building so I don't

18 sit at a desk all day, but I'm throughout the building.

19     Q.  So your testimony is that it's impossible for you

20 to leave during the day.  Unless you take a day off, you

21 could not leave for 15 minutes?

22     A.  It would've been very difficult.  And I-- again,

23 I didn't think it was necessary.  I thought I had

24 already done everything.  I had no reason to believe

25 that I wasn't a citizen and that I took everything I

1  needed to to the DMV so I thought surely it was an

2  error.

3      Q.  You stated that you work at an upscale hotel; is

4  that correct?

5      A.  Yeah.

6      Q.  Is it called the Ambassador Hotel?

7      A.  That's correct.

8      Q.  Is it owned by the Marriott Hotel chain?

9      A.  No, it's not.  It's affiliated.

10     Q.  Affiliated with Marriott?

11     A.  Uh-huh.

12     Q.  Does the Ambassador-- is it the policy of the

13  Ambassador Hotel that its employees cannot take 15

14  minutes to complete their voter registration?

15     A.  We don't have a policy regarding that.

16     Q.  So do you supervise any employees?

17     A.  I do.

18     Q.  If one of those employees asked you, could I take

19  15 minutes to go complete my voter registration, would

20  you say, no, you cannot?

21     A.  No.  I probably wouldn't deny them that.

22     Q.  Did you ever call the Sedgwick County Election

23  Office during this period after you received-- after

24  your second visit to the Department of Vehicles and then

25  election day of 2014?

1      A.   I'm not sure I understand the question.

2      Q.   Did you ever use a telephone and dial the number

3  to the Sedgwick County Election Office in order to speak

4  to them?

5      A.   You mentioned 2014 or--

6      Q.   From the time you got your-- your second-- the

7  second visit to the Department of Vehicles until the

8  time when you wanted to vote in that election.

9      A.   So when I went to the Department of Motor

10  Vehicles but before the 2014 election?

11     Q.   Yes.

12     A.   No, I did not call them.

13     Q.   Did you ever call them before the 2016 election

14  from the time you went to the Motor Vehicles until the

15  time of the 2016 elections, either August or November?

16     A.   Yes.  I did call, as I testified to earlier,

17  before the 2016.

18     Q.   And that was to confirm that you were registered?

19     A.   That's correct.

20     Q.   Fully registered.  And what was the answer that

21  you received?

22     A.   It was, as I testified to earlier, it was very

23  ambiguous.  They said, well, we don't know.  There are a

24  lot of things that are up in the air, there's some

25  things that are going on with the Court and we're just

1   not sure if you're going to be able to vote in the 2016

2   election.

3       Q.   You're testifying that someone from the Sedgwick

4   County Election Office said we are not sure if you're

5   going to be able to vote?

6       A.   Absolutely.

7       Q.   You testified that you were worried about your

8   family members being able to register.  Do all of your

9   family members have a birth certificate?

10      A.   That, I do not know.

11      Q.   Are you aware of any member of your family who

12  does not have a birth certificate?

13      A.   I'm-- actually helped my in-laws try to get a

14  passport for the first time.  They're in their 50s and

15  went on vacation.  I-- I helped them through that

16  process.  And it-- yeah, he-- my father-in-law didn't

17  know where his passport was, so--

18      Q.   To get that passport he had to present a birth

19  certificate, didn't he, or a prior passport?

20      A.   Uh-huh.

21      Q.   And he got the passport; is that correct?

22      A.   Yeah, after-- yeah, I helped him through the

23  process to get a birth certificate and request it and

24  helped him through that process.  But it was very

25  confusing for them and it was something that he really

 1    didn't understand how to do.

 2       Q.   Mr. Stricker, is there a film crew or a camera

 3    crew following you around here either yesterday or

 4    today?

 5                MR. DANJUMA:  Objection, Your Honor,

 6    relevance.

 7                THE COURT:  I don't know what the relevance

 8    is.

 9                MR. KOBACH:  Your Honor--

10                THE COURT:  I imagine there's lots of camera

11    crews following a lot of people around here.

12                MR. KOBACH:  It goes to-- goes to bias and

13    motive to exaggerate.

14                THE COURT:  I'll-- I'll sustain.  I don't

15    think it's relevant.

16                MR. KOBACH:  No further questions.

17                THE COURT:  Redirect, any?

18                MR. DANJUMA:  Nothing further from

19    plaintiffs.

20                THE COURT:  All right.  Mr. Stricker, you

21    can step down.  Is he released from his subpoena so he

22    can stay and watch the trial if he wants to?

23                MR. DANJUMA:  Yes.

24                THE COURT:  All right.  Call your next

25    witness.

1          MS. LIU:  Good morning, Your Honor.  I'm

2     Angela Liu on behalf of the Fish plaintiffs.  And the

3     Fish plaintiffs would like to call Donna Bucci.

4                    DONNA BUCCI,

5     called as a witness on behalf of the Fish Plaintiffs,

6     having first been duly sworn, testified as follows:

7                 DIRECT EXAMINATION

8     BY MS. LIU:

9       Q.  Good morning, Ms. Bucci.  I'm Angela Liu on

10    behalf of the Fish plaintiffs, as you know.

11         Could you please state and spell your full name

12    for the record?

13      A.  Donna Jean Bucci.  D-O-N-N-A.  J-E-A-N.

14    B-U-C-C-I.

15      Q.  And how old are you?

16      A.  59.

17      Q.  And where were you born?

18      A.  Baltimore, Maryland.

19      Q.  And where do you currently live?

20      A.  Sedgwick County, in Wichita.

21      Q.  And how long have you lived in Kansas?

22      A.  Approximately-- I'm not sure, six--

23          THE COURT:  Can you pull the microphone

24    down, I'm having difficulty hearing you.  Closer to you.

25          THE WITNESS:  Close to me.

1           THE COURT:  Yeah.

2      A.   Six to eight years now.

3      Q.   (BY MS. LIU)  And are you currently working, Ms.

4  Bucci?

5      A.   Yes, I am.

6      Q.   And where do you work?

7      A.   I work at the Kansas Department of Corrections.

8      Q.   And how long have you been there?

9      A.   Six years.

10     Q.   And what do you do?

11     A.   I work in the kitchen with the inmates preparing

12  food.

13     Q.   Can you explain your day-to-day tasks?

14     A.   I have to be there at 3:00 a.m. in the morning to

15  make sure breakfast is ready to serve online by 4:30.

16  And stay there and start working on lunch and making

17  sure all the product is pulled and once again put out

18  lunch and then usually get out around 12:00 p.m.

19     Q.   Are you able to take time off of work for

20  personal reasons?

21     A.   No.

22     Q.   And are you taking time off work to be here today

23  in court?

24     A.   Yes, with a two-week notice.

25     Q.   Are you over the age of 18?

1    A.   Yes.

2    Q.   And are you a resident of Kansas?

3    A.   Yes.

4    Q.   Are you a United States citizen?

5    A.   Yes.

6    Q.   And when did you first decide you wanted to vote?

7    A.   2016 I believe it was.

8    Q.   Did you decide anytime earlier than that?

9    A.   No, I had never registered to vote.  It was-- I

10   guess it was like-- it's when I went to have my license

11   renewed and he asked me if I wanted to register to vote.

12   Q.   And did you understand that you had to be

13   registered as a voter first in order to cast a vote?

14   A.   Yes, I did.

15   Q.   And why did you go to the DMV?

16   A.   To have my license renewed.

17   Q.   And-- and that's where you went to become a

18   registered voter.  Correct?

19   A.   Yes, I believe that was 2014.

20   Q.   And what document did you bring with you?

21   A.   I had to bring my license and then a bill with my

22   name on it showing my address and my name.

23   Q.   And did you have a conversation with someone at

24   the DMV about registering to vote?

25   A.   They just asked me if I wanted to register to

1    vote and I filled out the paper and I just assumed I was

2    registered.

3        Q.   Do you recall them telling you that you would

4    have to provide documentary proof of citizenship?

5        A.   No.

6        Q.   Did they tell you that you lacked any appropriate

7    documentation?

8        A.   No.

9        Q.   And when you left the DMV, did you believe that

10   you were registered to vote at that time?

11       A.   Yes, I did.

12       Q.   And did you believe you needed to provide any

13   additional documentation with respect to your

14   application then?

15       A.   No, I did not.

16       Q.   So was there any point in time-- or sorry, was

17   there a point in time later when you came to learn that

18   you were, in fact, not registered to vote?

19       A.   I received a letter in the mail stating I had to

20   show a birth certificate or a passport.

21       Q.   And were you ever previously informed of the

22   requirement to provide documentary proof of citizenship

23   prior to receiving that notice in the mail?

24       A.   No, I was not.

25       Q.   And did the notice mention any alternative

1    process to complete your registration without submitting

2    a copy of documentary proof of citizenship?

3         A.   No, it did not.

4         Q.   And outside of your deposition, did you ever

5    receive any information describing a way for you to

6    complete your registration application without providing

7    documentary proof of citizenship?

8         A.   No.

9         Q.   Did you have any further communications with

10   anyone at the election office about becoming registered

11   to vote?

12        A.   Somebody had called me.

13        Q.   And what happened then?

14        A.   They told me I needed a birth certificate or a

15   passport.

16        Q.   And did you come to understand that your

17   registration application was cancelled?

18        A.   If I didn't provide that, yes.

19        Q.   And you were then not a registered voter?

20        A.   According to them I guess not.

21        Q.   Did you ever find your birth certificate in your

22   belongings?

23        A.   No, I did not.

24        Q.   And to this day, have you ever found your birth

25   certificate?

1      A.   No.

2      Q.   Have you ever had a U.S. passport?

3      A.   No.

4      Q.   Why not?

5      A.   I've never left the U.S.

6      Q.   Have you ever had a U.S. naturalization document?

7      A.   No.

8      Q.   Have you ever served in the U.S. military?

9      A.   No.

10      Q.   Are you an American Indian?

11      A.   No.

12      Q.   Do you have any certificate of citizenship issued

13   by the United States Citizenship and Immigration

14   Services?

15      A.   No.

16      Q.   Do you have any other document or method of proof

17   of citizenship issued by the federal government?

18      A.   No.

19      Q.   Were you adopted?

20      A.   No.

21      Q.   Do you have any other hospital document showing

22   that you were born at a certain hospital at a certain

23   time?

24      A.   No.

25      Q.   Do you know where your birth certificate is, Ms.

1  Bucci?

2      A.  I guess in Baltimore, Maryland.

3      Q.  Have you ever made any effort to get a

4  replacement birth certificate?

5      A.  No.

6      Q.  And what have you done-- or you haven't.  How--

7  do you know how much it costs to get a birth

8  certificate?

9      A.  I-- I don't.  I mean--

10     Q.  Would you say approximately $27?

11     A.  Yeah, it was-- it was around that I guess.  Only

12 through my son who got one.

13     Q.  And how much is that in relation to your daily

14 expenses?

15     A.  At that time it was a lot.  I was only working

16 part-time.

17     Q.  So can you tell me a little bit about your daily

18 expenses?

19     A.  Well, you have your basics; your rent, your gas,

20 your insurance, just your regular bills.

21     Q.  So how would the cost of the replacement birth

22 certificate affect your life then?

23     A.  My share of the rent or no place to live, I

24 thought it was a lot.

25     Q.  So you testified earlier that you learned your

1   voter registration application had been cancelled.  How

2   did that make you feel, Ms. Bucci?

3       A.  I was pretty mad.

4       Q.  Anything else you'd like to add?

5       A.  Yeah.  There's just a lot of things that I see

6   going on in Kansas I would like to be able to be

7   involved in.

8       Q.  So after the preliminary injunction was issued in

9   this case in 2016, did you vote in the presidential

10  election?

11      A.  Yes, I did.

12      Q.  So you voted in November, 2016?

13      A.  Yes.

14      Q.  And do you intend to vote in future elections?

15      A.  I would like to.

16          MS. LIU:  No further questions at this time.

17          MR. JOHNSON:  Nothing, Your Honor.

18          THE COURT:  All right.

19                  CROSS EXAMINATION

20  BY MS. BECKER:

21      Q.  Good morning, Ms. Bucci.

22      A.  Good morning.

23      Q.  Good morning.  My name is Sue Becker, I don't

24  think I've met you, but I'm-- I'm glad that you're here

25  today to represent those that you feel are in a bad

1   situation.  And I want to ask you about that.

2        Has anyone ever told you that you weren't allowed

3   to vote, quote, like other people?

4     A.  I wouldn't say like other people, but I wasn't

5   allowed to vote unless I showed a birth certificate or a

6   U.S. passport.

7     Q.  Is it true that everyone, to your knowledge, has

8   to show a birth certificate or a passport or a proof of

9   citizenship of-- in some manner?

10             MS. LIU:  Objection.  She's asking a legal

11   conclusion.

12             THE COURT:  All right.  Reframe the

13   question.

14     Q.  (BY MS. BECKER)  Ms. Bucci, are you aware of any

15   other Kansas residents that do not have to follow the

16   law and provide a proof of citizenship when they go to

17   register?

18             MS. LIU:  Same objection, Your Honor.

19             THE COURT:  I'll overrule.  You can answer

20   it if you can.

21             MS. LIU:  It's not the law, Your Honor.

22             THE COURT:  All right.  I-- I understand

23   what the law says in part based on my injunction order,

24   which is what the operative law is at this time.  I

25   think the question is:  Are you aware of anyone else

1   that hasn't before the injunction-- before the

2   injunction did not have to provide this type of evidence

3   of citizenship.

4       A.  Other than-- I'm trying to think.  There was this

5   older lady across the street that couldn't afford to go

6   get her birth certificate as well.  I don't recall her

7   name.  It's where I was renting at.  You know, and it--

8   it's just not right.  You just want to, you know, go and

9   vote.  If they tell you you're allowed to vote and you

10  register to vote, that should be it.

11      Q.  (BY MS. LIU)  Ms. Bucci, do you feel like you're

12  in the same situation as far as all other Kansas

13  residents as far as being asked to provide proof of

14  citizenship?

15      A.  Can you repeat that?

16      Q.  Do you know what, that's okay.  I want to ask you

17  about your-- your birth certificate.

18      A.  Yes.

19      Q.  You testified that as of today, you still don't

20  have a copy of it; is that correct?

21      A.  Correct.

22      Q.  Okay.  Has anyone tried to help you get a copy of

23  it?

24      A.  No.

25      Q.  Okay.  Have you looked-- well, first, do you have

```
 1    access to a computer?
 2        A.  Yes.
 3        Q.  Okay.  Have you ever gone to the Maryland state
 4    health department website that-- that you could go to,
 5    have you ever done that to look for how you could get a
 6    copy of your birth certificate?
 7        A.  I started to and was-- it's-- just didn't get
 8    very far with it.
 9        Q.  Okay.  I would just like to show you something.
10              MS. BECKER:  May I approach the witness,
11    Your Honor?
12              THE COURT:  Yes.  You don't have to keep
13    asking.
14              MS. LIU:  Your Honor, can we get a copy of
15    it as well?
16        Q.  (BY MS. BECKER)  Ms. Bucci, does this appear to
17    be sort of like a website print-off for the--
18              MS. LIU:  Your Honor--
19              THE COURT:  All right.  Is this marked by an
20    exhibit number?
21              MS. BECKER:  It is not.  And I'm actually
22    not going to offer it into evidence.  I just wanted to
23    establish the cost of getting a birth certificate and
24    how easy it would be.
25              THE COURT:  She's already testified that she
```

1    thinks it's $27.

2              MS. BECKER:  Right, and--

3              THE COURT:  So, you know, unless you're

4    going to admit this document, you're not going to be

5    able to have her testify to something on the document

6    itself.

7              MS. BECKER:  Okay.

8              MR. STEINER:  Ms. Becker, out of politeness,

9    I think we'll tell you that you've given us a copy that

10   appears to have your notes on it.  So you might want to

11   switch copies.

12             THE COURT:  In any event, you know, it's

13   proper to show a witness a document or-- I always say

14   you can show them anything to refresh their

15   recollection, but she's testified that she has a

16   recollection.  So if that's what you're trying to do

17   with an un-- an inadmissible document at this point,

18   that's not proper.  And unless she can identify it and

19   unless it's marked with an exhibit, et cetera, I'm not

20   going to allow it to be admitted at this point and have

21   her testify to the contents of it.

22             MS. BECKER:  Your Honor, I'd just like to

23   proffer the evidence that you-- you're now not asking me

24   to ask the witness about, to show that it's a $10 cost.

25   That was merely the point of having her look at it.

1          THE COURT:  You haven't laid any foundation.

2  I mean, this witness cannot admit this document I don't

3  think, but you can try to lay the foundation.  You're

4  not at the proffer stage yet, you haven't even offered

5  it.  You haven't laid any foundation.  I'm not going to

6  allow anybody to testify to a document that's not in

7  evidence.  Evidence 101.  I'm not going to do it.

8          So if you want to try to lay the foundation

9  through this witness and then I determine that I think

10  the foundation is insufficient, then I might let you

11  make a proffer, but at this point you're not there yet.

12          MS. BECKER:  Okay.  Thank you, Your Honor.

13     Q.  (BY MS. BECKER)  Ms. Bucci, you can just ignore

14  that.  Do you recall testifying in a deposition in May

15  of 2016?

16     A.  Yes.

17     Q.  Do you recall being asked about a document that

18  was called your ELVIS record and the record stated

19  something about you unpacking, that you hadn't unpacked

20  yet.  And I was wondering if that sounds familiar to

21  you.

22          MS. LIU:  Objection, Your Honor.  This

23  isn't-- this is improper.  It's not an impeachment.  She

24  can't use her deposition testimony and then-- unless

25  it's impeachment.

1          THE COURT:  Well, I don't understand what

2   you're doing with the deposition.

3          MS. BECKER:  I was just going to refresh her

4   recollection and ask her questions about her testimony

5   with regard to her possession of-- of a birth

6   certificate at some time.

7          THE COURT:  All right.  But first you have

8   to establish she doesn't recall, that she needs her

9   recollection refreshed.  I haven't heard that yet.

10          MS. BECKER:  Well, that's what I asked and

11   they objected.

12          THE COURT:  So ask her-- ask her and we'll

13   go from there.

14   Q.  (BY MS. BECKER)  Do you recall-- do you recall

15   discussing the fact-- or discussing and being asked

16   about comments in your ELVIS record that stated that the

17   registrant had not yet unpacked from moving and was

18   going to search boxes for documentary proof of

19   citizenship?

20   A.  Yes.

21          MS. LIU:  Objection, lack of foundation.

22          THE COURT:  I'll overrule.  You say you do

23   recall that?

24          THE WITNESS:  I recall unpack-- telling them

25   I didn't know where my birth certificate was.

1          THE COURT:  All right.

2          THE WITNESS:  And I was unpacking.

3          THE COURT:  All right.  Then ask her about

4   that.  You don't need to show her the document, she

5   recalls.

6      Q.  (BY MS. BECKER)  So, Ms. Bucci, I guess I'm

7   unclear.  So is it your testimony that you do recall

8   telling them that you didn't know where your birth

9   certificate was because you had not yet unpacked?

10     A.  No, I-- what it was is I had moved and I didn't

11  know where my birth certificate was, but I would look

12  through all my stuff as I unpacked to see if I had it.

13     Q.  So did you at one point have a birth certificate

14  then that you were going to look for?

15     A.  Years ago.  I-- I don't know what happened to it.

16     Q.  Okay.  Thank you.  Ms. Bucci, are you aware of

17  any other ways to provide information to the Secretary

18  of State's Office about your citizenship in order to

19  become fully registered to vote?

20     A.  No.

21     Q.  Are you aware of the fact-- are you aware of

22  possibly making a phone call and do you recall

23  discussing that in your deposition?

24     A.  I recall them giving me a piece of paper.  I

25  don't-- it's been two years, I don't recall what all it

1    was.

2       Q.   Okay.  Did you have a chance to review your

3    deposition prior to testifying today?

4       A.   No, I didn't.

5       Q.   Okay.  And I would like to show you a portion of

6    your deposition just to refresh your recollection with

7    regard to the process of making a phone call.  And I'm

8    just going to go ahead and--

9            THE COURT:  All right.  Go ahead.  The

10   method is show her the deposition, point her to what

11   line number so plaintiffs can be following, knowing--

12   Ms. Bucci, don't read it aloud, just look at it.

13           MS. LIU:  Ms. Becker, can you--

14           THE COURT:  You have to tell her what you

15   want-- Ms. Becker, will you identify for her what it is,

16   have you tagged it or marked what you want her to look

17   it?

18           MS. BECKER:  I have.

19           THE COURT:  All right.  Do the same for

20   plaintiff.  Don't read it aloud, Ms. Bucci.  After

21   you've read it to yourself, then the next question

22   should be does this refresh your recollection.

23           MS. LIU:  Do you have a copy for us, Ms.

24   Becker?

25           MS. BECKER:  No, you all have the

1    deposition.

2              THE COURT:  All right.  Go up there and look

3    it.  Go up there and look at it.

4              THE WITNESS:  (Reads document).

5              THE COURT:  All right.  You've read it.

6    Does it refresh your recollection, yes or no?

7              THE WITNESS:  No, it don't.

8              THE COURT:  All right.  Do you know how to

9    do the next step, if that's what you're going to do?

10   We're going to follow the rules of evidence here.

11             MS. BECKER:  Of course, Your Honor.

12   Appreciate it.

13     Q.  (BY MS. BECKER)  Ms. Bucci, just-- do you recall

14   learning at your deposition that the Secretary of

15   State's Office for those who do not have access to their

16   paperwork may call and have a telephonic hearing and

17   explain your circumstances to the election staff?

18     A.  No, I don't recall that.

19     Q.  Okay.  Do you recall agreeing that that would be

20   much easier than having to produce a document that you

21   couldn't find?

22     A.  That was two years ago, I do not recall that.

23             MS. LIU:  Ms. Becker, what page are you on?

24             MS. BECKER:  115.

25     Q.  (BY MS. BECKER)  Ms. Bucci, and I apologize if I

1    forgot, do you own a cell phone or do you have access to

2    a telephone during the day?

3        A.   No.   I can't have it at work but I do have a cell

4    phone.

5        Q.   Are you allowed to use it on a break?

6        A.   Yes.

7        Q.   Or do you have-- I understand you have like maybe

8    a short break for lunch?

9        A.   Yep.

10       Q.   Okay.   Would a phone call to the Secretary of

11   State's Office to participate and explain why you don't

12   have documents, would that be something that you could

13   do on a break from work?

14       A.   No.

15       Q.   You can't use your cell phone on a break?

16       A.   Not-- not unless I leave the building.

17       Q.   Okay.   And you're not allowed to leave the

18   building; is that right?

19       A.   Well, I can, but it's just to run out to the car.

20       Q.   Okay.   But you-- if you really had to, Ms. Bucci,

21   if you were very interested in it, could you make a

22   phone call from your car on your cell phone during the

23   day?

24       A.   No.   You-- there's-- you have to be in there.

25   You--

1    Q.   Okay.  What I had shown you was a page from your

2  deposition and I have now taken it and I can show it

3  back to you, but-- (reporter interruption).

4              MS. BECKER:  I'm pointing her to-- she is

5  just looking at a line and then I'll ask her a question.

6              MS. LIU:  Ms. Becker, which line is that?

7              MS. BECKER:  On Page 115.

8              MS. LIU:  I'm sorry, I--

9              THE COURT:  115.  What line, please?  115,

10  what line?

11              MS. BECKER:  Line 9.

12    A.   Yes, I-- I must've said it if it's in there, but

13  I-- if you don't have access to it, you just don't.

14    Q.   (BY MS. BECKER)  But just to confirm, you said

15  you would not have a problem with doing that, as far as

16  making the phone call; is that correct?

17    A.   Yeah.

18    Q.   Okay.

19              MS. BECKER:  I believe that's all I have.

20              THE COURT:  Any redirect?

21                      REDIRECT EXAMINATION

22  BY MS. LIU:

23    Q.   Ms. Bucci--

24    A.   Yes.

25    Q.   -- do you even know how to call the Secretary of

1    State's Office if you even could leave the lunchroom to

2    take a break?

3        A.   Not really.

4        Q.   And do you even know how long that would even

5    take?

6        A.   No, I do not.

7                MS. LIU:  No further questions, Your Honor.

8                THE COURT:  Anything else?  All right.  May

9    Ms. Bucci-- are you finished with her?  So, in other

10   words, she can stay in the courtroom if she chooses to?

11               MS. LIU:  Yes, Your Honor.

12               THE COURT:  All right.  You can step down.

13   All right.  You can call your next witness.

14               MR. DANJUMA:  Your Honor, the plaintiffs

15   would like to call Michael McDonald as their next

16   witness.

17               Just a question.  What time will we be

18   breaking for lunch just in terms of how much-- how far

19   we should go?

20               THE COURT:  How long do you anticipate

21   having him on the stand?

22               MR. DANJUMA:  I assume he would be about a

23   little over an hour, and I'm sure there may be some

24   cross.  I don't know if it makes sense for us to do the

25   initial sort of qualifications portion of an expert, of

1  expert testimony and then plan to break.  We just wanted

2  to check with the Court on this case.

3           THE COURT:  I'm-- I'm happy with it either

4  way.  Are you ready to proceed or we can break now and

5  come back at say 1:00.

6           MR. DANJUMA:  Okay.  Yeah, we'll proceed

7  with the initial portion now.

8           THE COURT:  All right.  And we can go 15

9  minutes, we can go 30 minutes, whatever, just let me

10  know a natural breaking point.  All right.  If you'll

11  raise your right hand.

12                     MICHAEL McDONALD,

13  called as a witness on behalf of the Fish Plaintiffs,

14  having first been duly sworn, testified as follows:

15           THE COURT:  And there-- there was no *Daubert*

16  motion for the record, so I don't need to rule on that.

17  All right.  Let's proceed.

18           MR. DANJUMA:  And, Your Honor, I'll be

19  offering the witness a binder of exhibits.  Should I

20  distribute that to you now or-- or when I proffer it to

21  the-- to the witness?

22           THE COURT:  Why don't you give it to Ms.

23  Seymour here.

24           MR. DANJUMA:  Okay.  Sure.

25           THE COURT:  They're part of the larger

1   binder, but this is just for ease; is that correct?

2            MR. DANJUMA:  I'm sorry?

3            THE COURT:  These exhibits are in the larger

4   binder but this is just for the Court?

5            MR. DANJUMA:  Yes, this is just for this

6   specific witness.

7            THE COURT:  Okay.  I understand.

8                   DIRECT EXAMINATION

9   BY MR. DANJUMA:

10    Q.  Good morning, Mr. McDonald.  Could you please

11   state and spell your full name for the record?

12    A.   Michael, M-I-C-H-A-E-L.  McDonald,

13   M-C-D-O-N-A-L-D.

14            MR. DANJUMA:  And, Your Honor, may I

15   approach the witness?

16            THE COURT:  Yes.

17            MR. DANJUMA:  And for the record, I just

18   handed the witness a binder of documents.

19    Q.  (BY MR. DANJUMA)  Doctor McDonald, could you

20   please take a moment to review the document in the first

21   tab of your binder.

22            THE COURT:  What's the general range of

23   exhibit numbers you're going to be working from?

24            MR. DANJUMA:  It's 1 to 8.  Now, we've

25   included-- or do you mean the overall exhibit number?

1    I'm sorry, just to clarify.  The-- there's nine-- there

2    are four exhibits that we're introducing.  We put the

3    tabs for the overhead slides into this binder for

4    reference but those are not exhibits.

5             THE COURT:  Okay.  Go ahead.

6        Q.  (BY MR. DANJUMA)  And, Doctor McDonald, could you

7    review the first document in the-- in the first tab of

8    the binder that I provided?

9        A.  Yes, I did.

10       Q.  And do you know what this document is?

11       A.  Yes.  This is the updated CV that I provided last

12   week to counsel.

13            MR. DANJUMA:  And for the record, this--

14   this document is Plaintiffs' Fish Exhibit 139, Doctor

15   McDonald's curriculum vitae.  Your Honor, I'd like to

16   offer this exhibit into evidence.

17            THE COURT:  Any objection?

18            MR. KOBACH:  No objection.

19            THE COURT:  139 admitted.

20       Q.  (BY MR. HO)  Doctor McDonald, could you please

21   describe your educational background for the Court?

22       A.  I received my bachelor's of science degree in

23   economics from the California Institute of Technology, a

24   Ph.D. in political science from the University of

25   California-San Diego, and I did a one-year post doc at

1    Harvard.

2        Q.  And are you currently employed?

3        A.  Yes, I am.

4        Q.  Where are you employed?

5        A.  I'm an associate professor of political science

6    at the University of Florida.

7        Q.  And is that a tenured position?

8        A.  Yes, it is.

9        Q.  Where have you taught since receiving your Ph.D.?

10       A.  After Harvard I taught one year at Vanderbilt and

11   then two years at the University of

12   Illinois-Springfield.  That was a tenured track

13   position.  The Vanderbilt position was a non-tenured

14   track position.  And then ten years at George Mason

15   University in a tenured track position and then a

16   tenured-- I was tenured at George Mason.  And I've spent

17   the last-- this is now my fourth year at the University

18   of Florida in a tenured position.

19       Q.  And, Doctor McDonald, have you published

20   peer-reviewed academic research?

21       A.  Yes, I have.

22       Q.  And can you summarize approximately how many

23   articles or books you've published that are

24   peer-reviewed academic research?

25       A.  Well, two books and roughly 30 peer-reviewed

1   articles, yeah.

2       Q.   And have you ever served as a peer reviewer for

3   an academic journal?

4       A.   Several.  I've got reviews that I'm due right now

5   to do.

6       Q.   Well, thank you for taking time out with us.

7   Doctor McDonald, could you briefly tell us some of the

8   primary subjects your research focuses on?

9       A.   Well, I'm most-- best known for voter turnout.

10  Early in my career I published a piece in the top

11  journal in political science, *The American Political*

12  *Science Review,* which showed that voter turnout wasn't

13  declining, that the ineligible population was

14  increasing.

15       Since then I continue to publish the statistics

16  in voter turnout that are used widely in academia,

17  policymakers, in the public, by the media as well.  So

18  after a particular election you'll see a turnout rate

19  that's published and the media will be talking about,

20  that will be produced usually by myself as a national

21  turnout rate.  So turnout voting.

22       On behavior I've published several articles in

23  that genre.  I've also published articles on

24  redistricting, which is another area in which I actively

25  engage in and-- and have various research projects and

1    do litigation work as well.  And I've done other-- other

2    work in campaign finance.  I've done international work

3    on different electoral systems.  And I've-- more

4    specifically I'm-- in an area of methodology, I've done

5    work that's specific-- specific on serial methodology

6    and on just statistical methodology in particular.

7        Q.   And how-- do you have any experience researching

8    voter registration?

9        A.   Yes, I do.  I have published on voter

10   registration in a couple of my articles that were

11   peer-reviewed.  And I've done consulting work for

12   various entities that are research-oriented projects.

13   So I've twice consulted to the U.S. Election Assistance

14   Commission to assist in producing their-- what they now

15   call the Election Administration and Voting Survey,

16   which has as a component of it the NVRA, the National

17   Voter Registration Act, a required report to Congress.

18        And I've worked, consulted twice with the Federal

19   Voting Assistance Program to examine the voting behavior

20   and the experiences of our overseas military and

21   overseas civilians and try to improve their experience

22   and looked at the reliability of the data that was being

23   provided to the federal government on their experiences.

24        And I worked for the state of California early on

25   in my career doing voter registration work for the state

1   assembly.  And right now I am currently working on

2   projects with the Secretary of State of Colorado.

3       Q.   Have you received any professional awards or

4   grants for your research in your-- in your scholarship?

5       A.   Yes.  I've received a number of awards, they're

6   mostly related to the redistricting work that I do.  One

7   of the things that I did with collaborators was create

8   open source web accessible re-districting software that

9   allows people to draw their own districts through their

10  web browsers.  And that software has won numerous

11  awards.  That was funded work primarily from the Sloan

12  Foundation.  And I've received grants from other

13  charitable foundations and other entities as well,

14  totalling roughly about $2.5 million.

15      Q.   Have you ever served as an expert witness in

16  cases involving elections?

17      A.   Yes, I have.

18      Q.   Do you know approximately how many times you've

19  been retained as an expert witness?

20      A.   It's quite a few.  I'd have to count, but it's

21  roughly about 15 to 20 times.

22      Q.   Okay.  And more specifically, have you ever

23  served as an expert witness in cases involving voter

24  registration or the National Voter Registration Act?

25      A.   Yes, I have.

1     Q.   And are there any cases that you would identify

2   in that area?

3     A.   Right.  So the first case that I was involved

4   with that specifically involved voter registration was a

5   case in Florida, the *League of Women Voters versus*

6   *Florida*-- (reporter interruption).  Oh, I'm sorry.  The

7   first case that I was involved with was a case out of

8   Florida, *League of Women Voters of Florida versus*

9   *Browning*.

10         And the next case that I was involved with was

11   a-- well, that's actually out of order.  The first case

12   that I was involved with was the *Washington Association*

13   *of Churches versus Reed.*  That was a case that involved

14   matching procedures.  There was another case out of

15   Georgia that also involved matching procedures, and that

16   was a more recent case that was litigated in 2016 to the

17   run-up to the 2016 election.

18         The *League of Women Voters* case involved a

19   penalty that the League of Women Voters had been

20   assessed for every voter registration application that

21   they had turned in late.

22         The-- and then I have also been involved with a

23   case out of Massachusetts which involved the-- this is

24   *Delgado versus Galvin* and this was a case that involved

25   the-- the use or the-- under NVRA states are required to

1    provide voter registration opportunities for individuals

2    not only at DMV offices but also at low-income

3    assistance offices.  And the plaintiffs there in that

4    case alleged that the state of Massachusetts was not

5    providing those opportunities at low-income assistance

6    offices.

7        Q.   Have you ever been retained by Democrats to offer

8    an expert opinion in a case?

9        A.   Yes, I have.

10       Q.   Can you give the Court a couple examples?

11       A.   Well, recently I was involved in the Virginia

12   congressional re-districting case that's-- was litigated

13   on behalf of plaintiffs by essentially the lawyers who

14   were associated with the Democratic National Committee.

15   And in that case we made allegation-- the plaintiffs

16   were making allegations that the congressional districts

17   were a racial gerrymander.

18        The three-judge panel in that case agreed with my

19   testimony in that case and overturned the congressional

20   districts in Virginia as a racial gerrymander.

21       Q.   And what was the name of that case?

22       A.   This would be *Page versus State Board of*

23   *Elections*.

24       Q.   And have you ever been retained by Republicans to

25   offer expert opinion in a case?

1     A.   Yes, I have.  A couple cases.  So one that's
2   current is a case out of Maryland, *Benisek versus*
3   *Lamone*.  And that case is ongoing.  It will be heard--
4   this is a challenge by plaintiffs that the Maryland
5   congressional districts are a-- a partisan gerrymander.
6   And that case will be heard by the Supreme Court-- at
7   least an element of that will be heard by the Supreme
8   Court later this month.

9         And just last week, there-- a case, *Vesilind*
10   *versus Virginia State Board of Elections,* I was working
11   with a former Republican nominee for governor in the
12   state of Virginia, he was the lead counsel.  And we were
13   funded by a-- a group that was primarily funded by
14   Republican businessmen in the state of Virginia
15   challenging both the Senate districts which were drawn
16   by the Democrats and the House of Delegates districts
17   which were drawn by the Republicans, both in violation
18   of the compactness standard in Virginia.

19     Q.   Has any court ever found you unqualified to offer
20   an expert opinion?

21     A.   No, they have not.

22         MR. DANJUMA:  Your Honor, at this time
23   plaintiffs would like to offer Doctor McDonald as an
24   expert on political science, research and survey
25   methodology, election turnout, voter registration and

1   voter behavior.

2           THE COURT:  All right.  Doctor McDonald is

3   found by me to be qualified and I deem him to be an

4   expert in those areas.

5       Q.  (BY MR. DANJUMA)  Doctor McDonald, now I'd like

6   to ask you about your involvement in this case.  Did you

7   prepare any expert reports in this case?

8       A.  Yes, I did.

9       Q.  And does the binder contain your expert reports

10  in this case?  And I'd like to direct you to Tab 2 of

11  the binder.  Can you tell me what that document is in

12  Tab 2 of the binder?

13      A.  Tab 2 is my initial report in this case.

14      Q.  And was that report dated February 25th, 2016?

15      A.  I believe so, but I don't see the date on it.

16      Q.  If you want to check Page 23.

17      A.  Yes.

18           THE COURT:  What's the exhibit number also?

19           MR. DANJUMA:  Oh, I apologize.  This is

20  marked for the record as Plaintiffs' Exhibit 72.

21           THE COURT:  Thank you.

22      A.  Yes, February 25th.

23      Q.  (BY MR. DANJUMA)  And under Tab 3, is that your

24  supplemental report dated April 11th, 2016, marked as

25  Plaintiffs' Exhibit 73?

15-9300/16-2105     Bednasek/Fish v. Kobach     03.06.18 AM     128

1      A.   Yes, it is.

2      Q.   Did you sign each of these reports under oath?

3      A.   Yes, I did.

4      Q.   Do these reports accurately reflect your analysis

5   in this case?

6      A.   Yes, they do.

7           MR. DANJUMA:   Your Honor, I'd like to offer

8   Plaintiffs' Exhibit 72 and 73 into evidence.

9           THE COURT:   Any objection?

10          MR. KOBACH:   No objection.

11          THE COURT:   Exhibit-- I'm sorry?   Exhibit 72

12  and 73 admitted.

13          MR. DANJUMA:   And, Your Honor, I think now

14  may be a natural breaking point for lunch, if that's all

15  right.

16          THE COURT:   All right.   Let's take a break

17  then until 1:15.

18          (Recess).

19          (11:58 a.m., proceedings recessed).

20

21

22

23

24

25

1                    C E R T I F I C A T E
2
3
4        I, Kelli Stewart, a Certified Shorthand Reporter and
5    the regularly appointed, qualified and acting official
6    reporter of the United States District Court for the
7    District of Kansas, do hereby certify that as such
8    official reporter, I was present at and reported in
9    machine shorthand the above and foregoing proceedings.
10        I further certify that the foregoing transcript,
11    consisting of 128 pages, is a full, true, and correct
12    reproduction of my shorthand notes as reflected by this
13    transcript.
14        SIGNED March 13, 2018.
15
16
17
18            /s/ Kelli Stewart
19            Kelli Stewart, CSR, RPR, CCR, RMR
20
21
22
23
24
25