1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF KANSAS
2

3    PARKER BEDNASEK,

4        Plaintiff,

5    v.                            Docket No. 15-9300-JAR

6    KRIS W. KOBACH,

7        Defendant.
     _____      _____
8
     STEVEN WAYNE FISH, et al.,
9
         Plaintiffs,
10
     v.                            Docket No. 16-2105-JAR
11
                                   Kansas City, Kansas
12   KRIS W. KOBACH,               Date:  03/07/2018

13       Defendant.                Day 2 (P.M. Session)
                                   Pages 438-617
14   .........................................................

15
                    TRANSCRIPT OF BENCH TRIAL
16          BEFORE THE HONORABLE JULIE A. ROBINSON
              UNITED STATES DISTRICT JUDGE
17

18   APPEARANCES:

19   For Case No. 15-9300 Plaintiffs:

20   Mr. Mark P. Johnson          Mr. Mark T. Emert
     Mr. Curtis E. Woods          Fagan, Emert & Davis, LLC
21   Dentons US LLP               730 New Hampshire
     4520 Main Street             Suite 210
22   Suite 1100                   Lawrence, Kansas 66044
     Kansas City, MO 64111
23

24

25   (Appearances continued on next page)

```
 1    APPEARANCES:

 2    (Continued)

 3    For Case No. 16-2105 Plaintiffs:

 4    Mr. Dale E. Ho                Mr. Stephen D. Bonney
      Mr. R. Orion Danjuma         ACLU Foundation of Kansas
 5    Ms. Sophia Lin Lakin         6701 West 64th Street
      Ms. Emily Zhang              Suite 200
 6    American Civil Liberties     Overland Park, KS 66202
      Union Foundation - NY
 7    125 Broad Street
      New York, NY 10004
 8
      Ms. Angela Liu
 9    Ms. Daphne T. Ha
      Mr. Neal A. Steiner
10    Ms. Rebecca Waldman
      Dechert, LLP - NY
11    1095 Avenue of the Americas
      New York NY 10036
12

13    For the Defendant Kris W. Kobach:

14    Mr. Garrett Roe
      Mr. Kris Kobach
15    Ms. Susan Becker
      Kansas Secretary of State
16    120 Southwest 10th Avenue
      Memorial Hall, First Floor
17    Topeka, KS 66612

18

19

20

21

22    _____

23           Kelli Stewart, CSR-KS, CCR-MO, RPR, CRR, RMR
                     Official Court Reporter
24           259 U.S. Courthouse, 500 State Avenue
                  Kansas City, Kansas 66101
25
```

```
 1                    I N D E X

 2
      Bednasek Plaintiff's Witnesses:              Page
 3
      PARKER BEDNASEK
 4      Direct Examination by Mr. Johnson           456
        Cross Examination By Mr. Roe                474
 5
      Fish Plaintiffs' Witnesses:
 6
      STEVEN WAYNE FISH
 7      Direct Examination By Mr. Bonney            498
        Cross Examination By Mr. Roe                508
 8      Redirect Examination By Mr. Bonney          520
        Recross Examination By Mr. Roe              522
 9
      TABITHA LEHMAN
10      Direct Examination By Ms. Liu               524
        Cross Examination by Mr. Johnson            532
11      Consolidated Examination By Mr. Kobach      544
        Voir Dire Examination By Ms. Liu            549
12
      ERIC RUCKER (Deposition Read)                 565
13
      BRAD BRYANT (Deposition Read)                 577
14


15                  E X H I B I T S

16      Bednasek Plaintiff's
        Exhibits          Offered        Received
17
           303              470            471
18         305              460            460
           309              464            464
19
        Joint
20      Exhibits          Offered        Received

21         JT849            ---            493
           JT859            ---            493
22         JT860            ---            493

23      Defendant's
        Exhibits          Offered        Received
24         934              ---            579
           935              583            583
25        1133              548            ---
```

```
 1                    (1:32 p.m., proceedings commenced).

 2                    THE COURT:  All right.  You can be seated.

 3    All right.  As I understand it, plaintiffs intend to

 4    read their designations of Bradley Bryant this

 5    afternoon; is that correct?

 6                    MS. HA:  Your Honor, if time permits.

 7                    THE COURT:  Okay.  So with respect to that

 8    part of Mr. Bryant's deposition that plaintiffs have

 9    designated, there are I think only a couple of

10    objections, and those are plaintiffs' objections to

11    defendant's counter-designations of that deposition.

12                    But now the defendants have also designated

13    Mr. Bryant.  And I think I misunderstood, but I now

14    understand that plaintiffs are objecting to defendants

15    designating Mr. Bryant, absent a showing of

16    unavailability of Mr. Bryant for live testimony in

17    defendant's case; is that correct?

18                    MS. HA:  That's correct, Your Honor.

19    Defendant did not object to plaintiffs' designations of

20    Mr. Bryant.  They submitted their counter-designations

21    and, as you said, we objected to certain of the

22    counter-designations.

23                    Plaintiffs do object to defendant's

24    designation of Mr. Bryant in full because he's available

25    in Kansas.  He's within the 100-mile rule.  And they
```

 1  haven't made any showing of why his testimony should be

 2  allowed--

 3              THE COURT:  All right.

 4              MS. HA:  -- through a deposition.

 5              THE COURT:  All right.  So that's what I

 6  wanted to hear from you both about.  So plaintiff has

 7  designated part of Mr. Bryant.  The availability rule

 8  doesn't apply to plaintiff because Mr. Bryant is a

 9  30(b)(6) person, he's a party opponent, and so they--

10              MR. ROE:  No, he is not.

11              THE COURT:  -- plaintiff-- any party has a

12  right to use the deposition of a party opponent.  But

13  it's a different rule.  He's not a party opponent

14  obviously with respect to defendant.  So it's a

15  different showing that has to be made to use his

16  deposition testimony in lieu of live testimony in

17  defendant's case and that showing is whether he's

18  unavailable or not.

19              MS. BECKER:  Your Honor, Mr. Bryant is a

20  former employee and he's not a party-- not a 30(b)(6).

21              THE COURT:  He was at the time of his

22  deposition, was he not?

23              MS. BECKER:  No, he was not.

24              THE COURT:  But you didn't object to

25  plaintiff designating--

1          MS. BECKER:  Well, we only-- we didn't-- we

2  did not affirmatively designate any of Mr. Bryant's

3  testimony at all.  And the only reason we did so was as

4  counters to theirs.

5          MS. HA:  That's not true, Your Honor.  They

6  did affirmatively designate.

7          THE COURT:  Well, in looking at-- I mean,

8  counter-designations are usually contextual

9  designations.  It's not complete, whatever parts

10  plaintiff designated, you counter with, you need to read

11  this part around it to get the full picture.

12          But in looking at the transcript, it looks

13  like you've gone on to designate other portions that

14  plaintiff-- that aren't, you know, part of what

15  plaintiff has designated.

16          MS. BECKER:  Well, you know, I may have been

17  in error, but we expected the plaintiffs to subpoena

18  Mr. Bryant if they wanted him here, and we have no

19  problem not having the deposition testimony read at all,

20  but whatever-- whatever Your Honor wants to do.

21          THE COURT:  But I mean--

22          MS. BECKER:  We don't-- we don't have a

23  showing of unavailability.  We did not intend to bring

24  him here, and we didn't-- if we affirmatively designated

25  testimony, we can withdraw it.

1          THE COURT:  From Mr. Bryant?

2          MS. BECKER:  As long as-- if they're not

3    going to have any, yes.

4          MS. HA:  Your Honor, we think that there's

5    no reason for defendant to affirmatively designate.

6    They have done so.  We don't think that's permissible.

7    Plaintiffs' designations-- while Mr. Bryant was not a

8    30(b)(6) witness when he testified, it's not hearsay.

9    It's permissible under the rules.  It's statements being

10   offered against Secretary Kobach, who had not objected

11   to any of the statements he-- and by his lack of

12   objection, I think they're admissible, non-hearsay under

13   801(d)(2).

14         MS. BECKER:  No.

15         THE COURT:  So you're arguing that he is a

16   party opponent or he's not?

17         MS. HA:  He's a party opponent and, in

18   addition, the rules say it's not hearsay if Secretary

19   Kobach has adopted and believed the statements to be

20   true, if-- if Mr. Bryant was authorized to make

21   statements in regards to his time as the former

22   elections director.

23         THE COURT:  Right.  That's the party

24   opponent rule.  And so he wasn't in that capacity when

25   he gave this deposition, but he was testifying about

1    that capacity.  I mean, his testimony concerns when he

2    was a party opponent, when he was in the capacity of

3    director or whatever he was--

4                    MS. BECKER:  Your Honor--

5                    THE COURT:  -- of elections.

6                    MS. BECKER:  -- we've never been opponents

7    with our own election director.

8                    THE COURT:  No.  See, I'm making-- I have to

9    make two different determinations here because you're

10   both wanting to designate and not call him as a live

11   witness, except you're now saying you don't want to

12   designate him.  You don't-- so let me just show you.

13                   You all have given me separate transcripts.

14   This is the one that plaintiff gave me with their

15   designations, your counters, and I need to rule.

16   There's some objections, a couple.  And then this is the

17   one that you gave me which I thought was your

18   designations of what you-- what parts of the deposition

19   you wanted read in your case for Mr. Bryant.

20                   MS. BECKER:  (Shakes head from side to

21   side).

22                   THE COURT:  No?

23                   MS. BECKER:  No.  It was only if theirs were

24   going to be read.  That's what--

25                   THE COURT:  Well, theirs are going to be

1    read because there's no objection.  And I think they--

2             MS. BECKER:  But they didn't subpoena him,

3    though.

4             MS. HA:  Your Honor, if it's helpful, I want

5    to be clear.  We're-- to the extent we didn't object to

6    their counter-designations, we're reading those.  It's--

7    we're just talking about your affirmative designations

8    that we are saying should not be allowed.

9             THE COURT:  So going back to the smaller

10   subset of the transcript, plaintiffs' designations of

11   parts of Mr. Bryant's testimony which are being

12   designated under the party opponent rule because Mr.

13   Bryant at the time-- he was testifying about-- and I

14   haven't read his deposition, but he's testifying about

15   policy and the law or whatever, within the-- the

16   parameters of the job he used to have for the state of

17   Kansas in the Department of Elections.

18             Defendant has counter-designated.  Plaintiff

19   objects to a couple of those counter-designations.  I

20   need to rule on that.  Once I rule on that, this is how

21   plaintiff is going to submit testimony of Mr. Bryant,

22   through this deposition.  Okay?

23             So that will be settled once I rule on

24   plaintiffs' objections to your counter-designations.

25             MS. BECKER:  Okay.

1            THE COURT:  But then in your submission, Ms.

2    Becker, much-- much bigger subset of the transcript, it

3    looked like what you were wanting to do was designate

4    other portions of Mr. Bryant's testimony in your case.

5            MS. BECKER:  Your Honor, what happened was

6    plaintiffs listed Mr. Bryant by deposition testimony

7    only.  And then they filed an amendment I think the next

8    day and listed him live.  And so-- or, I'm sorry.  It

9    was the opposite.  They listed him live and then

10   deposition?  Deposition only and then live.

11           And that is why we ended up doing counters

12   because we didn't-- we were going to wait to see if they

13   could even subpoena him because they were the ones-- I'm

14   not making sense here, but...

15           THE COURT:  All right.  So as we sit here

16   now, are you wanting to in your case submit those

17   portions of the transcript that you countered with for

18   Mr. Bryant?

19           MS. BECKER:  Only for an effort of

20   completeness, if theirs are allowed to be-- to be read

21   and they have a showing of unavailability for him.

22           THE COURT:  They don't have to show

23   unavailability because they've satisfied the party

24   opponent rule to read, but they-- and they-- they have a

25   much more limited--

1          MS. BECKER:  He did not work for us at the

2    time this lawsuit started.  He was just a fact witness

3    testifying as a former employee.  So I actually don't

4    think--

5          THE COURT:  That was my first question.  I

6    thought he was in that capacity.

7          MS. BECKER:  No.

8          THE COURT:  But even if he wasn't, if he's

9    testifying about what he did and what he knew at the

10   time he was a party opponent, then it would still meet

11   the party opponent exception.

12          Because the whole point of the party

13   opponent exception is that when someone works for a

14   party as an agent for a party, is authorized by that

15   party to speak, it's the same thing as the party

16   speaking.  And so if he was testifying-- if the scope of

17   his testimony has to do with what he did in his official

18   capacity back when he did it, then he-- he's testifying

19   in the status of a party opponent, even though he may

20   have already left.

21          In other words, he's not testifying about

22   things that he's doing now that he's in retirement or

23   something, I assume.  Right?  He's testifying about what

24   he did when he worked for the state of Kansas?

25          MS. BECKER:  Right.  But that was before

1  Secretary Kobach-- before the lawsuit took effect,

2  before the lawsuit was filed.  So I-- but I guess that

3  doesn't matter.

4          THE COURT:  I don't know that that matters

5  if he's testifying about matters that are otherwise

6  relevant in this lawsuit.

7          MS. BECKER:  Well--

8          THE COURT:  So I guess what I'm trying to

9  figure out, do I need to make a determination-- all

10  right.  I know what I need to do in terms of what

11  plaintiff has designated.  I think that they are proper

12  in seeking to introduce him by deposition because I

13  think that, given the nature and substance of Mr.

14  Bryant's deposition testimony, it meets the party

15  opponent rule, even though by then he had left his

16  employ.

17          So now I turn to-- for your purposes,

18  obviously he can't be a party opponent because he was

19  part of the state-- he was part of your employ, even

20  though he no longer is.  So that rule is not what we

21  operate under.  What we operate under is if he's

22  available for live testimony in your case, then his

23  deposition testimony would be admissible under the rule.

24  So I thought we were going to have a hearing at this

25  point.  Tell me, is he unavailable?

1          MS. BECKER:  Your Honor, the plaintiffs

2   listed him as a live witness, and we did not.  I-- I

3   feel like they are the ones that should have to prove

4   that he's unavailable.

5          MS. HA:  Your Honor, I don't know what that

6   means.  We submitted our deposition designations.  We

7   said we're having him testify by deposition.

8          THE COURT:  All right.  I'm going to rule.

9   I'm going to rule on plaintiffs' designations.  I-- you

10  still need to make an unavailability showing if you want

11  to go beyond the testimony that plaintiff has

12  designated.

13         I am not quite understanding-- I mean, I

14  don't know when plaintiff first said they were going to

15  call him live, but for at least-- when were these

16  deposition designations first due?  21 days before trial

17  and then 14 days before trial, counters and objections.

18  So you all have been on notice at least 21 days that

19  plaintiff wanted to submit Mr. Bryant by deposition and

20  not live, just like--

21         MS. BECKER:  Your Honor, they amended--

22         THE COURT:  -- they have been on notice for

23  a number of days that you have a list of your employees

24  that you would like to submit by deposition and not

25  live.  And we need to, by the way, have a hearing on

1   that because they're objecting on the unavailability

2   rule on those as well, so...

3          MS. BECKER:  I understand, Your Honor.  But

4   at this point they amended their list and they

5   designated him as a live witness.  That's where it

6   stands.  At first he was by deposition only, which is

7   why we did counters, and then they changed it.  What's

8   the date of that?  It's Document No. 446, January 31st.

9   They amended their list and said they were calling him

10  live.  I-- I don't-- so--

11         THE COURT:  And when did you submit this

12  deposition designation?

13         MS. HA:  Our-- our deposition designations,

14  I don't have the original date, but the objections and

15  counter-designations on each side were filed

16  February 13th.  And then the objections to

17  counter-designations by each side was February 20th.  So

18  it's been clear since the 13th and 20th of last month

19  that we would be submitting his deposition designations.

20         MS. BECKER:  You had him listed as a live

21  witness, and so we did not want to-- we didn't feel like

22  we needed to designate depositions because we could just

23  cross-examine him.

24         MS. HA:  Your Honor, I just want to--

25         THE COURT:  But you did.  You did counter.

1   You did-- do you see all these orange tabs?  I mean,

2   this is all of the outstanding counter-designations and

3   objections that you submitted, but you're telling me you

4   thought he was going to be a live witness.  I'm not

5   buying that because you wouldn't have gone through this

6   exercise, and they wouldn't have gone through the

7   exercise of submitting a deposition.

8            For example, you-- all right.  You'll recall

9   that a few days before trial from both sides I got a

10  number of depositions.  And it's a lot of work for me to

11  figure out when there are counters and objections, a lot

12  of work for me to figure out what is the core of the

13  testimony that's going to be admissible at trial.

14           So we have this whole procedure of

15  highlighting, and I have to go through and determine,

16  you know, there's hearsay objections, et cetera, et

17  cetera.  I have to do that.  So one of my staff, I think

18  it was Ms. Seymour, reached out to you and said, tell me

19  who your live witnesses are before I go through all of

20  this.  And that was just a few days before trial.

21           And, in fact, we talked about it yesterday

22  at the beginning of this proceeding, and we winnowed

23  down and we understood that if they were live witnesses,

24  there wasn't going to be any deposition.  That was

25  yesterday.

1          But before that, everybody knew that

2     plaintiff was going to be designating Mr. Bryant by

3     deposition, you were going to be designating people by

4     your-- so I mean, there's no confusion here.  You were

5     on notice that this was the way that plaintiff wanted to

6     proceed.

7          So I still don't quite understand your

8     argument that you thought it was live and, therefore,

9     you designated-- you countered and you objected to

10    designations, but you still don't-- you still don't

11    think you should-- you still know think you should be

12    able to rely on that, is that what you're saying, on

13    your designations?

14         MS. BECKER:  Your Honor, I'm sorry for the

15    confusion.  It think it was just really much more

16    simpler than that, and that was that they listed him as

17    a live witness, and we were waiting for them to subpoena

18    him, and we designated cross testimony in the event that

19    they could show unavailability, and then we would want

20    to have something to read to-- for completeness.

21         THE COURT:  All right.  Plaintiffs don't

22    have to show unavailability for the reasons I've already

23    stated.

24         There are two objections to your

25    counter-designations that are the contextual

1    counter-designations.  I'll rule on those at this time

2    on Mr. Bryant's deposition, understanding he may be--

3    you may read his deposition, plaintiffs, this evening or

4    tomorrow morning or something.

5              All right.  So plaintiff objected to

6    defendant's counter-designation on Page 55, Line 8,

7    through 55, Line 25, as incomplete without adding in

8    Lines 56-- I'm sorry, Page 56, Line 1 through Line 7.

9    I'll sustain that objection.  I'll also read what

10   plaintiff wants as part of the context.  So we'll add in

11   Page 56, Lines 1 through 7.

12             And then the other objection is on Page 97,

13   Line 5 through 97, Line 7.  Plaintiff objects that it's

14   incomplete.  I'm overruling that, so we won't read those

15   two lines.

16             Okay.  And then there's another one.  It's

17   on Page 58, Line 6 through Page 60, Line 11.  Let's see.

18   Plaintiff objects that it's speculative and incomplete

19   without adding in Pages 58, Line 6 through Pages 60,

20   Line 11.  And this is to defendant's

21   counter-designations starting at Page 57, Line 23 until

22   58, Line 5.

23             Do you see why we don't want to do this

24   real-time, by the way, for those of you that are just

25   sitting there wondering what in the world is this.

 1  Okay.

 2          All right.  I'm going to sustain this

 3  objection and add in the additional lines because they

 4  go to the additional.  It does provide context for the

 5  additional lines defendant counter-designates which has

 6  to do with a process by which they-- they matched up a

 7  TDL list against a VR file and an e-mail that said there

 8  were 37 matches discovered.

 9          The rest of that as proposed by plaintiff

10  explains more about that process.  So I will sustain

11  that objection and allow those additional lines,

12  Pages 58, Line 6 through Pages 60, Line 11.

13          All right.  So that, I think, resolves the

14  issues about those portions of Mr. Bryant's deposition

15  that plaintiff has designated.  It includes defendant's

16  counter-designations, subject to the rulings I've just

17  given.  All right.  So we'll go from there.

18          If we need to return to this issue about the

19  rest of Mr. Bryant's deposition, we can take that up

20  at-- at whatever time in the defendant's case.  But

21  again, it will be subject to a showing of

22  unavailability.

23          MS. HA:  Thank you, Your Honor.

24          THE COURT:  All right.  Are you ready for

25  your next witness?  Mr. Johnson, your witness.

1      MR. JOHNSON:  Thank you, Your Honor.  I

2  apologize for standing off to the side.  Plaintiffs call

3  Parker Bednasek.

4                   PARKER BEDNASEK,

5  called as a witness on behalf of the Bednasek Plaintiff,

6  having first been duly sworn, testified as follows:

7                 DIRECT EXAMINATION

8  BY MR. JOHNSON:

9      Q.   Could you tell us your name, please?

10     A.   Parker Bednasek.

11     Q.   Could you spell your name for us?

12     A.   Parker, P-A-R-K-E-R.  Bednasek, B-E-D-N-A-S-E-K.

13     Q.   Mr. Bednasek, when were you born?

14     A.   ███████████████████.

15              THE COURT:  Let's strike the date of birth

16  from the record.  Just what year.

17     Q.   (BY MR. JOHNSON)  What year were you born?

18     A.   1995.

19     Q.   Where were you born?

20     A.   Tulsa, Oklahoma.

21     Q.   How long did you live in Tulsa?

22     A.   I lived there about a year.

23     Q.   What happened then?

24     A.   My family moved to Charlotte, North Carolina.

25     Q.   And you went with them?

```
 1      A.   Yes.

 2      Q.   How long did you live in Charlotte?

 3      A.   About 11 or 12 years.

 4      Q.   You started school there?

 5      A.   Yes.

 6      Q.   After Charlotte, did your family move again?

 7      A.   Yes, sir.

 8      Q.   Where did they move?

 9      A.   Back to Tulsa, Oklahoma.

10      Q.   About how old were you when you moved back to

11 Tulsa, if you can remember?

12      A.   I believe 13, sir.

13      Q.   Okay.  And did you attend school in Tulsa?

14      A.   Yes, sir.

15      Q.   Did you go to high school there?

16      A.   Yes, sir.

17      Q.   Did you graduate from high school?

18      A.   Yes, sir.

19      Q.   What high school did you go to?

20      A.   Broken Arrow High School in Broken Arrow,

21 Oklahoma.

22      Q.   After you finished high school, what did you do?

23      A.   I enrolled at the University of Kansas.

24      Q.   In Lawrence?

25      A.   Yes, sir.
```

```
 1      Q.   When was that, if you can remember?

 2      A.   August of 2014.

 3      Q.   Okay.  So about four years ago?

 4      A.   Correct.

 5      Q.   Have you been a student at KU since then?

 6      A.   Yes, sir.

 7      Q.   A-- have you been a full-time student?

 8      A.   Yes, sir.

 9      Q.   And that would include both fall and spring

10   semesters of each academic year?

11      A.   Correct.

12      Q.   What's your present status at KU?

13      A.   I'm a senior right now.

14      Q.   Going to be graduating?

15      A.   Yes, sir.

16      Q.   Can you tell us when?

17      A.   In May of 2018.

18      Q.   We all hope.  Now, what happened to your family;

19   do they still live in Tulsa?

20      A.   No, sir.

21      Q.   What happened?

22      A.   My family moved to Mansfield, Texas after my

23   freshman year of college.

24      Q.   Where is Mansfield, Texas?

25      A.   It is a suburb south of Dallas.
```

1    Q.   Does your family still live there?

2    A.   Yes, sir.

3    Q.   Now, when you were in Oklahoma, did you ever

4    register to vote there?

5    A.   No, sir.

6    Q.   Did you have an Oklahoma driver's license?

7    A.   Yes, sir.

8    Q.   Do you remember when you got that?  How old were

9    you when you got that?

10   A.   I think I was 17.

11   Q.   And after your family moved to Texas, did you get

12   a Texas driver's license?

13   A.   Eventually, yes.

14   Q.   Now, why did you do that?  Was something

15   happening with your Oklahoma license?

16   A.   Yes.  I was home on winter break and my Oklahoma

17   license was expiring.

18          MR. JOHNSON:  Okay.  Your Honor, may I

19   approach?

20          THE COURT:  Yes.

21   Q.   (BY MR. JOHNSON)  Mr. Bednasek, I'm going to hand

22   you a copy of a document that is marked as Exhibit 305.

23   I'm giving copies to counsel as well.

24          MR. JOHNSON:  And is one fine?  Do you want

25   two?

1    Q.   (BY MR. JOHNSON)  Mr. Bednasek, can you tell us

2    what this document is?

3    A.   It is a copy of my Texas driver's license.

4    Q.   And that's the one that you obtained after your

5    family had moved to Texas?

6    A.   Yes, sir.

7         MR. JOHNSON:  Okay.  Your Honor, I move the

8    admission of Exhibit 305.

9         THE COURT:  Any objection?  It will have to

10   be redacted of his date of birth and probably a good

11   idea to redact his driver's license number since those

12   are identifiers.  But any objection?

13        MR. ROE:  No objection.

14        THE COURT:  305 admitted.

15   Q.   (BY MR. JOHNSON)  Did you register to vote in

16   Texas?

17   A.   Yes, sir.

18   Q.   When did you do that?

19   A.   I believe it was the summer of 2015.

20   Q.   Did you ever vote in Texas?

21   A.   No, sir.

22   Q.   Did you ever attempt to vote in Texas?

23   A.   No, sir.

24   Q.   And that would be in either a state or a federal

25   election?

1    A.   That's correct.

2    Q.   Why didn't you vote in Texas?

3    A.   I never had the opportunity to do so.

4    Q.   Now, what do you mean-- when you say you didn't

5    have the opportunity.  So you registered in 2015, was

6    there an election?

7    A.   No, sir.

8    Q.   Okay.  Did you cancel your Texas voter

9    registration?

10   A.   Yes, sir.

11   Q.   When did you do that?

12   A.   I did that the fall of 2015.

13   Q.   Why did you do that?

14   A.   I considered myself to be a resident in Kansas,

15   and I wanted to vote in Kansas elections.

16   Q.   How did you go about cancelling your Texas

17   registration?

18   A.   I believe I sent a letter stating my intent to

19   cancel my Texas voters registration to the Tarrant

20   County, Texas clerk's office or something other.

21   Q.   To your knowledge, are you still registered to

22   vote in Texas?

23   A.   I am not.

24   Q.   Thank you.  Now, since you have been in Kansas,

25   have you lived at the same place the entire time or have

1    you moved?

2        A.  I have moved.

3        Q.  Tell us where you lived when you were a freshman

4    at KU.

5        A.  I lived at Oliver Hall, and the address of that

6    is 1815 Naismith Drive.

7        Q.  Did you live there for your entire freshman year?

8        A.  Yes, sir.

9        Q.  What about your sophomore year, where did you

10   live then?

11       A.  I moved to Gertrude Sellards Pearson Hall, and

12   the address of that is 500 West 11th Street.

13       Q.  Are both Oliver Hall and Gertrude-- I'm sorry, I

14   didn't get that full name.

15       A.  Gertrude Sellards Pearson.

16       Q.  That.  Are they both on campus?

17       A.  Yes, sir.

18       Q.  In Lawrence?

19       A.  Correct.

20       Q.  What about your junior year, where-- where did

21   you live?

22       A.  I was still at GSB, Gertrude Sellards Pearson,

23   yeah.

24       Q.  And then what about this year, your senior year,

25   where are you living?

1      A.   I am back at Oliver Hall.

2      Q.   Okay.  And that's the same address you gave us

3    here a moment ago?

4      A.   Correct.

5      Q.   Okay.  Thank you.  Have you had any

6    responsibilities in your residence halls while you've

7    been at KU?

8      A.   Yes, sir.  I hold the position of resident

9    assistant, which is kind of like a senior position in

10   the hall.  And I make sure rules are enforced, behavior

11   is safe and-- among other things.

12     Q.   Very good.  Thank you.  I'm going to hand you a

13   document which has been marked as Exhibit 309.  I'll

14   give two copies to the Court - oops, sorry - and copies

15   to counsel.

16          Mr. Bednasek, can you tell us what this document

17   is?

18     A.   Yes, it's my fall 2017-spring 2018 student

19   housing contract.

20     Q.   Does your name appear on this document somewhere?

21     A.   Yes, sir.

22     Q.   Where?

23     A.   Near the top of the first page.

24     Q.   All right.  And what, generally speaking, do you

25   understand this document to describe?

1    A.   It's an agreement between me and the Department

2    of Student Housing at the University of Kansas, agreeing

3    that I'll live in their residence hall.

4            MR. JOHNSON:  Your Honor, I move the

5    admission of Exhibit 309.

6            THE COURT:  Any objection?

7            MR. ROE:  No objection.

8            THE COURT:  309 admitted.

9    Q.   (BY MR. JOHNSON)  Now, Mr. Bednasek, I'm going to

10   hand you a copy of a document which has been marked as

11   Exhibit 308, two copies for the Court, and copies for

12   each counsel.  Can you tell us what this document is?

13   A.   It's a copy of my University of Kansas

14   transcript.

15   Q.   When did you obtain it?

16   A.   This transcript?

17   Q.   Yes.

18   A.   A few--

19   Q.   I mean within the last month, within the last--

20   A.   Yeah, within the past month.

21   Q.   What does the document reflect?  What information

22   does it contain?

23   A.   It's the courses that I've taken and the grades

24   I've received semester-by-semester.

25   Q.   So tell us, for example, when you say

1    semester-by-semester, what appears on the first page

2    that would reflect that?

3        A.   My first semester when I enrolled, 2014, that has

4    my courses and grades.  Second semester when I was

5    enrolled, 2015 of spring, has my courses and grades.

6    And then it also has a transfer credit that I had from

7    high school.

8        Q.   And does it reflect information that indicates

9    that you are presently enrolled as a student at KU?

10       A.   Yes, sir.

11       Q.   Where does that appear?

12       A.   I believe on the second page.  It says 2018 of

13   spring, near the bottom.

14       Q.   I don't see any grades there, do I?

15       A.   No, sir.

16       Q.   Because you haven't gotten any yet?

17       A.   That is correct.

18       Q.   Okay.  Tell us how you sign up for courses at KU.

19   Do you do so in advance?

20       A.   Yes, sir.

21       Q.   When do you do that?

22       A.   You usually-- if you intend to sign up for fall

23   classes, you do that in the spring.  And then if you

24   intend to sign up for spring classes, you do that in the

25   fall.

1     Q.   Did you go home during-- did you go back to Texas

2     during the summers?

3     A.   I did.

4     Q.   When you went to Texas-- and that was to be with

5     your family; is that fair?

6     A.   Yes, to visit with my parents.

7     Q.   All right.  So you're spending time with your

8     family in Texas.  But do you know you're going back to

9     KU?

10    A.   Yes.

11    Q.   And had-- and in each of the academic years when

12    you signed up for classes in the spring for the fall

13    semester, have you known that you would be returning to

14    KU, even though you would be spending time in Texas with

15    your family?

16    A.   Yes, sir.

17    Q.   And this-- would the same be true for spring

18    classes?  When do you sign up for the spring classes?

19    A.   You sign up for spring classes in fall-- yeah.

20    Q.   Okay.  Now, during your years at KU, have you

21    gone home or-- you know, gone to Texas for winter

22    breaks?

23    A.   Yes, sir.

24    Q.   But in each of those situations, did you know you

25    would be coming back to Lawrence for school?

15-9300/16-2105     Bednasek/Fish v. Kobach     03.07.18 PM     467

1      A.   Yes, sir.

2      Q.   When you went to Texas during the summers-- this

3  would be after your freshman and sophomore and junior

4  years, how long did you spend there?

5      A.   Roughly two months, two-and-a-half.

6      Q.   Did you have a job?

7      A.   Yes, sir.

8      Q.   What did you do?

9      A.   I worked at a gym.

10     Q.   And when the summer was over, you returned to

11  Lawrence?

12     A.   Yes, sir.

13     Q.   What have you majored in at KU?

14     A.   History and political science.

15     Q.   Have you been active politically?

16     A.   Yes, sir.

17     Q.   Tell us what you've done.

18     A.   I volunteered with the Kansas Democratic Party

19  over the course of four semesters.

20     Q.   Which four semesters?

21     A.   I think-- I believe it would be fall of 2015

22  through spring of 2017.

23     Q.   Now, what-- while you were volunteering for the

24  Democratic Party, did the issue of voter registration

25  ever come up?

1      A.   Yes, sir.

2      Q.   Do you remember when that happened?

3      A.   I believe it was the fall of 2015.

4      Q.   How did it come up?

5      A.   I was made aware of the law through the field and

6   political director at the Kansas Democratic Party.

7      Q.   What law are you referring to?

8      A.   The law that requires you to have proof of

9   citizenship when you're required to vote.

10     Q.   Now, were you at that time when this topic came

11  up registered to vote in Texas?

12     A.   Yes, sir.

13     Q.   Tell us after this conversation what you did.

14     A.   I did the necessary requirements to cancel my

15  Texas voter registration.

16     Q.   And then-- and then what did you do?

17     A.   I attempted to register to vote in Kansas.

18     Q.   And as a consequence of that, did you become

19  registered to vote?

20     A.   I did not.

21     Q.   Mr. Bednasek, had you become registered to vote,

22  did you intend to vote?

23     A.   Yes, sir.

24     Q.   And this was in the fall of 2015 when these

25  events occurred?

1    A.  Yes, sir.

2    Q.  When in your-- you know, from your memory, was

3  the next election in Kansas that you would have been

4  eligible to vote in?

5    A.  Probably the primaries for the 2016 election.

6    Q.  Now, you were spending-- spent time in the

7  summers at home-- you know, in Texas.  How could you

8  vote in the summer primary in 2016?

9    A.  I would have voted by absentee ballot.

10    Q.  And with the general election in November of

11  2016, how would you have voted at that point?

12    A.  I would have voted in person.

13    Q.  So did you attempt to register?

14    A.  Yes, sir.

15    Q.  I'm going to hand you a document which has been

16  marked as Exhibit 303.

17          MR. JOHNSON:  And, Your Honor, I understand

18  that some information will have to be redacted from this

19  document.  And I will hand copies of Exhibit 303 to

20  counsel as well.

21    Q.  (BY MR. JOHNSON)  Mr. Bednasek, can you tell us

22  what this document is?

23    A.  It is the form I filled out to register to vote,

24  become a registered voter in Kansas.

25    Q.  Did you fill this form out before you attempted

1   to register?

2       A.   Yes, sir.

3       Q.   Where did you go to attempt to register to vote?

4       A.   I went to the Douglas County Elections Office.

5       Q.   Do you remember-- do you know where that's

6   located?

7       A.   11th and Massachusetts Street in Lawrence,

8   Kansas.

9       Q.   Very good.  Thank you.  Did you know when you

10  went to the election office that you would have to

11  submit a documentary proof of citizenship?

12      A.   I did, yes.

13      Q.   How did you know that?

14      A.   I was made aware of the law that requires you to

15  provide that.

16           MR. JOHNSON:  Okay.  Your Honor-- oh, I move

17  the--

18      Q.   (BY MR. JOHNSON)  Let me ask you this:  Is all of

19  the information contained within Exhibit 303 accurate,

20  to the best of your knowledge?

21      A.   Yes, sir.

22      Q.   And did you personally fill this document out?

23      A.   Yes, sir.

24           MR. JOHNSON:  Your Honor, I move the

25  admission of Exhibit 303.

1            THE COURT:  Any objection?

2            MR. ROE:  No objections.

3            THE COURT:  303 admitted.

4            MR. JOHNSON:  Okay.  Thank you.

5      Q.  (BY MR. JOHNSON)  So you filled the document out.

6   You went to the election office.  Tell us what happened.

7      A.  I was told that I would need to provide a

8   proof-of-citizenship document if I wanted to complete my

9   voter registration.

10      Q.  Who told you that?

11      A.  The clerk who was working at the election office.

12      Q.  Were you surprised to hear that?

13      A.  No, sir.

14      Q.  Did you have a proof of citizenship with you?

15      A.  I did not.

16      Q.  Why not?

17      A.  It was not on my person.  Didn't have it on me.

18      Q.  You didn't have it, but did you have a reason not

19   to have it?  Why didn't you bring it with you?

20      A.  It's in the state of Texas, sir.

21      Q.  Had you had it with you, would you have submitted

22   it?

23      A.  No, sir.

24      Q.  Why not?

25      A.  I do not agree with the law.

1      Q.   Did you know that you would not be registered to

2   vote if you did not produce the document?

3      A.   Yes, sir.

4      Q.   But you went ahead and did it anyway.  You

5   refused to produce it?

6      A.   That is correct.

7      Q.   Were you made aware that you could produce it at

8   a later time?

9      A.   Yes, I believe I received two to three letters in

10   the mail saying I had been placed on a 90-day waiting

11   list.

12      Q.   And during that 90 days, you did not send in a

13   copy of the-- your birth certificate?

14      A.   That is correct, sir.

15      Q.   Okay.  Did you understand that your registration

16   would be cancelled?

17      A.   Yes, sir.

18      Q.   Do you know whether your registration was, in

19   fact, cancelled?

20      A.   I believe it was.

21      Q.   Have you ever attempted to vote in Kansas?

22      A.   No, sir.

23      Q.   In person or absentee?

24      A.   No, sir.

25      Q.   Have you ever, in fact, voted in Kansas?

1     A.   I have not.

2     Q.   Now, you said you're graduating in May; is that

3   correct?

4     A.   That's correct, sir.

5     Q.   Okay.  What are your plans after graduation?

6     A.   I recently received acceptance into officer

7   candidate school in the United States Navy, so I'll be

8   attending that in the fall 2018.

9     Q.   Where are you going to be going?

10     A.   Newport, Rhode Island.

11     Q.   How long will you be there?

12     A.   I'll be-- the course takes 13 weeks to complete.

13     Q.   And then what's after that?

14     A.   After that, I'll go on my first deployment.

15     Q.   What does that mean?  What's a deployment?

16     A.   The Navy will assign you to an active duty ship

17   to serve on, and you'll be there six to eight months.

18     Q.   Mr. Bednasek, if you are registered to vote this

19   year, do you intend to vote?

20     A.   Yes, sir.

21     Q.   Do you hope to vote?

22     A.   Yes, sir.

23     Q.   To date, have you ever voted anywhere at any

24   time?

25     A.   I have not.

1      Q.   When you were applying for your slot with the

2    Navy, did you have to produce some proof that you were a

3    U.S. citizen?

4      A.   I provided them with a copy of my birth

5    certificate and Social Security card.

6      Q.   So you have those.  Why didn't you produce those

7    when you went to register to vote in 2015?

8      A.   As I said before, I don't agree with the law

9    requirement.

10          MR. JOHNSON:  Your Honor, that's all I have.

11   Thank you, Mr. Bednasek.

12          THE WITNESS:  Thank you.

13          THE COURT:  Any questions from the Fish

14   team?

15          MR. HO:  No, Your Honor.

16          THE COURT:  All right.  Mr. Roe.

17                CROSS EXAMINATION

18   BY MR. ROE:

19     Q.   You still have those exhibits that were handed to

20   you?

21     A.   Yes, sir.

22     Q.   All right.  Earlier you said that you registered

23   in the fall of 2015 because you-- you decided you were a

24   resident; is that right?  You decided to register to

25   vote in Kansas because you decided you were a resident;

1    is that correct?

2        A.   Yes, sir.

3        Q.   But isn't it actually true in your deposition

4    that you said the field-- that the field director for

5    the Kansas Democratic Party, Cheyenne Davis, was the

6    first person to approach you about being a plaintiff in

7    this case?

8        A.   Yes, sir.

9        Q.   And that was before you had went to register to

10   vote?

11       A.   Yeah.

12       Q.   Okay.  And when you-- you also said in your

13   deposition that when you spoke to Cheyenne Davis, she

14   instructed you-- she instructed you you should-- when

15   you attempted to register to vote, you should just

16   attempt to register but not bring your proof of

17   citizenship.  Correct?

18            MR. JOHNSON:  Your Honor, may I object?

19   Rather than telling the witness what he testified to in

20   his deposition, I think it's proper to ask the questions

21   and if he gets an answer that's inconsistent with what

22   he testified to in the deposition, to attempt to impeach

23   him with the deposition.

24            THE COURT:  I agree.  So first you have to

25   establish--

```
 1              MR. ROE:  I'm sorry.
 2              THE COURT:  First you have to ask a
 3    question--
 4              MR. ROE:  That's fine.  I can do that, Your
 5    Honor.
 6              THE COURT:  All right.
 7       Q.  (BY MR. ROE)  All right.  Did you say at your
 8    deposition-- during your deposition--
 9              THE COURT:  No, no, no.
10              MR. ROE:  I'm sorry.
11              THE COURT:  I mean, the way it's supposed to
12    go-- I mean, because what we're talking about is
13    impeachment, whether it's by a document or--
14              MR. ROE:  Right.
15              THE COURT:  And you saw this play out with
16    Ms. Ahrens earlier this morning and Ms. Becker.  So ask
17    him a question.  If you think that he's testified
18    inconsistently before in a deposition or there's some
19    other document or evidence that would tend to show
20    inconsistency and you want to impeach him, then you--
21    then you turn to that document.  So-- and I don't-- so
22    you have to sort of ask the setup question, if you will
23    - that's probably not the right word - before you go to
24    the deposition.  All right?
25       Q.  (BY MR. ROE)  Did you speak to Cheyenne Davis
```

1    before registering to vote?

2        A.   In Kansas?

3        Q.   Yes.

4        A.   Yes, sir.

5        Q.   And is Cheyenne Davis the Kansas Democratic Party

6    chairman-- or director?  I'm sorry.

7        A.   I-- I believe she's the political and field

8    director--

9        Q.   Okay.

10       A.   -- of the Kansas Democratic Party.

11       Q.   And you spoke to Ms. Davis before-- I'm sorry.

12   You spoke to Ms. Davis before you registered to vote.

13   Correct?

14       A.   Yes, sir.

15       Q.   And she instructed you that when you attempted to

16   register to vote, you should just attempt to register

17   but not bring your proof of citizenship?

18       A.   She told me that if I tried to register to vote

19   without my proof of citizenship, then the-- what the

20   consequences would be.

21       Q.   So is that-- do you believe that's the same thing

22   you testified at your deposition?

23               MR. JOHNSON:  Your Honor, objection.

24               THE COURT:  The way to--

25               MR. JOHNSON:  If you recite testimony that's

1   inconsistent, have him do so rather than ask a roving

2   question as to whether the plaintiff-- the witness can

3   remember what he testified to in his deposition.

4            THE COURT:  All right.  So if you want to

5   impeach him with the deposition, show him the

6   deposition, that part of it.  Point him to it and then

7   ask him.  But at the same time, let them know what-- by

8   page number and line number.  We give them time so they

9   can find it, so everybody is on the same page.  So

10  that's the procedure.

11           MR. ROE:  Page 11, Line 5 through Line 9.

12           THE COURT:  Now, Mr. Bednasek, he's not

13  asking you to read it aloud, but he's going to point you

14  to part of your deposition and then, I imagine, ask you

15  if you testified inconsistently with what you just

16  testified to.

17  A.   Yep.

18  Q.   (BY MR. ROE)  Is that inconsistent with what you

19  just testified?

20  A.   Wait.  I'm sorry.  Could I see the document

21  again?

22           MR. JOHNSON:  Objection.  You don't ask the

23  witness whether the witness believes something is

24  inconsistent with what they've testified to.  That's for

25  the Court to decide.

1          THE COURT:  I understand.  Go ahead and show

2   it to him, and I'll allow that particular question.

3          THE WITNESS:  So this part right here?

4          MR. ROE:  I'm sorry.  Line 5.

5          THE COURT:  And you can be more pointed.  I

6   mean, in your cross examination say, didn't you testify

7   to such, such, and such.  Go ahead.

8      Q.  (BY MR. ROE)  Have you read your testimony?

9      A.  Yes.

10          MR. ROE:  Do I read it in the record now,

11  Your Honor?

12          THE COURT:  I'm sorry?

13          MR. ROE:  Should I read it into the record

14  now, Your Honor?  I'm sorry.

15          THE COURT:  No.  Just ask him, didn't you

16  testify to X, Y, and Z, now that he's seen it.

17      Q.  (BY MR. ROE)  Okay.  Yeah, didn't you testify--

18  didn't you testify that she instructed that when you

19  attempted to register to vote you should just attempt to

20  register but not bring your proof of citizenship?

21      A.  Yes.

22      Q.  Okay.  And she approached you, you said, on

23  approximately December 3rd, 2015?

24      A.  I-- to the best of my knowledge, yes.

25      Q.  Okay.  And you had never heard about this case

 1   prior to approaching you on December 3rd, 2015?

 2       A.  I-- I mean, I wasn't heavily knowledgeable about

 3   the law, but I'm sure I heard of it in passing.

 4       Q.  So now you're saying that you did hear about this

 5   case prior to her approaching you December 3rd, 2015?

 6       A.  I'm not-- it was two years ago.  I can't really

 7   remember for sure.

 8       Q.  If I showed you your deposition, would that help

 9   you remember?

10       A.  Yes.

11       Q.  Okay.

12            THE COURT:  And tell him the page and line

13   numbers so they can follow.

14            MR. ROE:  Page 42, Line 3 through 5.

15       A.  Okay.

16       Q.  (BY MR. ROE)  So had you-- you had never heard of

17   this case prior to her approaching you on December 3rd,

18   2015.  Correct?

19       A.  No, I've never heard of this case before that

20   date.

21       Q.  Okay.  And on November 17th, 2015, you had

22   never-- you had not spoken to anyone about this case.

23   Correct?

24       A.  I don't think so.

25       Q.  Okay.  Is that-- is that a you did not, or you

1   just don't remember?

2       A.  I-- it's a long time ago.  I don't really

3   remember.

4       Q.  If I showed you your transcript of your

5   deposition, would that help?

6       A.  Yes.

7       Q.  Line 47-- or Page 47, Lines 6 through 10.

8       A.  Okay.

9       Q.  So on November 17th, 2015, you had never spoken

10  to anyone about this case.  Right?

11      A.  No.

12      Q.  Okay.  And on November 17th, 2015, you had never

13  seen a-- a copy of the first amended complaint filed in

14  this case?

15      A.  No, sir.

16      Q.  And you also never saw that first amended

17  complaint before December 3rd, 2015.  Right?

18      A.  No, sir.

19      Q.  And no one had ever spoken to you about being a

20  named class plaintiff in any case on or before November

21  17th, 2015.  Correct?

22      A.  No, sir.

23      Q.  When you moved to Kansas your freshman year of

24  college, you registered-- you registered to vote in

25  Texas.  Right?

1      A.   Yes, sir.

2      Q.   And when you-- when you registered to vote in

3  Texas but you were at a-- it was a dormitory in Kansas;

4  is that where you were at?

5      A.   Residence hall, yes.

6      Q.   Residence hall, okay.

7      A.   Uh-huh.

8      Q.   When you registered to vote in Kansas to vote in

9  Texas, nobody told you to do that at that time?

10      A.   Sorry.  Could you repeat that?

11      Q.   Sorry.  Nobody told you to register to vote in

12  Texas.  Right?

13      A.   No, sir.

14      Q.   You just did that on your own?

15      A.   Yes, sir.

16      Q.   And when you registered to vote in Texas, you

17  filled out a form and mailed it to Texas.  Right?

18      A.   Yes, sir.

19      Q.   Okay.  Are you still at the same address as in

20  your deposition?  Do you know if you've moved in the

21  last two years?

22      A.   Could you repeat that address?

23      Q.   Yeah.

24           THE COURT:  Just the street maybe.  We're

25  not supposed to have home addresses.

1          MR. ROE:  Right.  I know.  I got to find it.

2     I'm sorry.

3     Q.  (BY MR. ROE)  Have you moved in the last two

4     years?

5     A.  I have, sir, yes.

6     Q.  Okay.  But you're still at a residence hall, I

7     take it?

8     A.  Yes, sir.

9     Q.  Okay.  And you still pay non-resident tuition?

10    A.  Yes, sir.

11    Q.  You still have a Texas driver's license?

12    A.  Yes, sir.

13    Q.  And you got that driver's license in January

14    2016?

15    A.  That's correct.

16    Q.  And that was after you applied to register to

17    vote in Kansas?

18    A.  Yes, sir.

19    Q.  Approximately a few weeks after you applied-- or

20    approximately a month after you applied to register to

21    vote in Kansas?

22    A.  Yes, sir.

23    Q.  And do you recall that you signed, under penalty

24    of perjury, that you had abandoned your former residence

25    in Texas when you applied to register to vote in Kansas?

1           MR. JOHNSON:  Objection.  Calls for a legal

2    conclusion.  Also, if there's best evidence--

3           THE COURT:  Okay.  I'll sustain to the

4    question.  Show him the document.

5    Q.  (BY MR. ROE)  Okay.  I have here Plaintiffs'

6    Exhibit 303.  You have a copy of it.  Right?

7    A.  Which one is that?

8    Q.  This is your voter registration application.

9    A.  Okay.

10   Q.  That's your signature at the bottom?

11   A.  Yes, sir.

12   Q.  And you-- that's your date?  You put the date

13   there?

14   A.  Yes, sir.

15   Q.  Okay.  And so you-- you swore in that document

16   you signed that, "I swear or affirm that I'm a citizen

17   of the United States and a Kansas resident; that I will

18   be 18 years old before the next election," but if--

19   but-- not if-- "if convicted of a felony, I have had my

20   civil rights restored--" I misread that.  Sorry.  Let me

21   start over.

22        "I swear or affirm that I'm a citizen of the

23   United States and I'm a Kansas resident; that I'll be 18

24   years old before the next election; that if convicted of

25   a felony, I have had my rights restored; that I've

1  abandoned my former residence and/or other name; and

2  that I have told the truth on this application."  Right?

3  You signed that?

4     A.  Yes, sir.

5        MR. JOHNSON:  Your Honor, if I might object

6  to this line of questioning.  Your Honor has already

7  dealt with this issue in-- in her order of-- in your

8  order, excuse me, of July 29, 2016, which is Document

9  No. 107 in our case, Pages 9 through 15.  This is a red

10 herring.  They are attempting to-- to prove to--

11       THE COURT:  What order is that?  Because I

12 do recall-- and I don't remember which order it was, was

13 that on a summary judgment order?  I don't remember.

14       MR. JOHNSON:  They were trying to disqualify

15 Mr. Bednasek.

16       THE COURT:  Yeah, I remember that.  And I

17 remember I think ruling - I don't have it in front of me

18 - that particularly when somebody is a student and their

19 parents are in one state and a car that their parents

20 provide might be licensed in that state and insurance

21 may be in that state, their driver's license may be in

22 that state, but that does not mean they're not qualified

23 to register in Kansas to vote.

24       MR. JOHNSON:  They're mixing three different

25 residency tests; for in-state tuition, for voting and

1   for a driver's license.

2          THE COURT:  All right.  I do recall ruling

3   on this issue, but proceed.

4          MR. ROE:  Okay.

5   Q.  (BY MR. ROE)  So just to go back.  So you signed

6   this document, and then one month later you-- you--

7   sorry.

8          So you signed this document, and then one month

9   later you went to Texas and you got a Texas driver's

10  license and used that Texas address.  Correct?

11  A.  Yes, sir.

12  Q.  And you've lived in Kansas for how long?

13  A.  For-- I've been at KU for four years, so...

14  Q.  Okay.  And have you gotten a Kansas driver's

15  license yet?

16  A.  No, sir.

17  Q.  And-- but you say you've lived in-- so you have

18  lived in Kansas for well over 90 days?

19  A.  Yes, sir.

20  Q.  Do you still live in the state?

21  A.  Yes, sir.

22  Q.  Do you still have a car?

23  A.  Yes, sir.

24  Q.  Is it still registered in Texas?

25  A.  Yes, sir.

1    Q.  Have you re-registered the car in Texas since

2  your deposition?

3    A.  I have not-- or, yes, sir.

4    Q.  Do you still have auto insurance on your truck in

5  Texas?

6    A.  Yes, sir.

7    Q.  And that's still registered at a Texas address?

8    A.  Yes, sir.

9    Q.  So you pay out-of-state tuition, your car is

10  registered in Texas, you bought insurance in Texas,

11  registered to a home in Texas, and you got your driver's

12  license after you were registered to vote in Kansas, but

13  you swear that you're a Kansas resident?

14    A.  Yes, sir.

15    Q.  Okay.

16         THE COURT:  I have ruled on this issue.  I

17  am trying to find it because I've ruled on so many

18  things.

19         MR. JOHNSON:  Your Honor, I think--

20         THE COURT:  What document number is it?

21         MR. JOHNSON:  107.

22         THE COURT:  Yeah, all right.  Here it is.

23         MR. ROE:  Your Honor, I-- I do have to

24  create a record for the appeal.

25         THE COURT:  All right.  Go ahead.  I told

1    you to proceed, but I just wanted to note that I had

2    ruled on this particular issue, whether he was qualified

3    to register to vote in Kansas and I ruled that he was.

4    But go ahead and make your record.

5            MS. BECKER:  Your Honor, before my

6    co-counsel makes a record, I would just like the record

7    to reflect that before the witness answered, three of us

8    saw him look at his counsel and then he responded.  And

9    I feel like the counsel was coaching the witness.

10            MR. JOHNSON:  Oh, for crying out loud.

11            MS. BECKER:  Well, we're sitting--

12            MR. JOHNSON:  He was seeing probably if I

13   was going to object.

14            MS. BECKER:  -- 15 feet in front of him.

15   I'm just making the record, but he should be instructed

16   not to--

17            THE COURT:  I don't know-- I don't know why

18   he would need to be coached on where his car is

19   registered and where his insurance is.  I've seen Mr.

20   Johnson stand up several times, and I've looked at him

21   because I think he was on the verge of objecting and

22   then decided not to.  So I did not witness what I

23   perceived to be coaching, but you've made your record.

24            MS. BECKER:  That's fine.  The record was

25   just-- the question was:  Are you swearing that you're

```
 1    not a-- that you are a Kansas resident.  That was the
 2    question, to which he paused.  So that's--
 3                THE COURT:  Is that still the open question?
 4                MS. BECKER:  I just wanted to make a record.
 5    Thank you.
 6                MR. JOHNSON:  I suppose I should've objected
 7    on the basis he was calling for a legal conclusion.
 8                THE COURT:  Is that-- is that a pending
 9    objection?  Is that a pending question?  Because I do
10    think that's calling for a legal conclusion, so I'll
11    sustain to that.
12                As you said, there are multiple tests for
13    registration, out-of-state tuition, et cetera.  But,
14    Mr. Roe, I understand you're making your record.
15    Proceed.
16                MR. ROE:  Okay.  Thank you, Your Honor.  And
17    just to be clear, so that last objection which was made
18    after he answered has been stricken; is that correct?
19                THE COURT:  I didn't-- I wasn't even sure
20    that question was on the floor.  But to the extent that
21    question was on the floor, I'm sustaining the objection.
22                MR. ROE:  Okay.  Okay.  Thank you.
23                THE COURT:  Because it called for a legal
24    conclusion.
25      Q.  (BY MR. ROE)  Mr. Bednasek, you did not apply to
```

1   register to vote at the Division of Motor Vehicles.

2   Right?

3       A.   No, sir.

4       Q.   Okay.  Do you know whether Kansas requires

5   individuals to present any documents when they get a new

6   driver's license?

7               MR. JOHNSON:  Objection.  Calls for a legal

8   conclusion.

9               MR. ROE:  I'm not asking for his legal

10  opinion.  I'm saying does he know whether there's any

11  documents that--

12              THE COURT:  All right.  I'll overrule.  You

13  can answer that if you can.

14      A.   I believe it does.  I'm not 100 percent sure,

15  though.

16      Q.   (BY MR. ROE)  Okay.  So do you know-- have you

17  ever heard of something-- have you ever heard of

18  something called a lawful presence document?

19      A.   No, sir.

20      Q.   Okay.  Have you ever heard that people need to

21  present a passport to the Division of Vehicles when they

22  get a driver's license?

23      A.   I have not heard of that, sir.

24              MR. ROE:  Hold on a second.

25      Q.   (BY MR. ROE)  Your parents have a copy of your

1  birth certificate, right, or do you have it now?

2      A.  My parents have it.

3      Q.  Okay.  So you have a copy of it?

4      A.  I mean, at my parents' house in Texas there's a

5  copy of it, yes.

6      Q.  Well, earlier you testified that you had to

7  submit it for purposes of your-- I think your-- you're

8  applying to the-- where were you--

9      A.  United States Navy.

10     Q.  Yeah.  So your parents provided it to the-- to

11 the Navy for you?

12     A.  No, I believe it was sent in the mail to me.

13     Q.  Okay.

14     A.  And I returned it when I visited them over winter

15 break.

16     Q.  Okay.  So your parents mailed you a copy of your

17 birth certificate, and then you returned it to them at

18 winter break; is that what you're saying?

19     A.  Yes.

20     Q.  Okay.  So you're-- okay.  And when you had your

21 birth certificate with you, you did not take it to a

22 Kansas-- you did not try to complete your registration?

23     A.  I did not, sir.

24     Q.  Okay.  Do you have any reason to believe your

25 parents couldn't mail it to you again?

1    A.   It takes some time and effort, but yes, I believe

2    they could.

3    Q.   It takes time-- by time and effort, do you mean

4    it takes time for them to place it in an envelope and

5    address it and put a stamp on it?

6    A.   Yeah, and drive to the post office and mail it,

7    find it, you know.

8    Q.   They can't mail something from their house?

9    A.   They can.

10   Q.   Oh, okay.

11   A.   Yeah.

12   Q.   And do your parents have a Smartphone still?

13   A.   Yes, sir.

14   Q.   And there's no reason why they couldn't take a

15   picture of it and send it to you via text message or

16   e-mail; is that right?

17   A.   Yeah, I suppose they could.

18   Q.   Okay.  Are you aware that a birth certificate

19   would constitute a-- an acceptable proof-of-citizenship

20   document in Kansas?

21   A.   Yes, sir.

22   Q.   Okay.  And you said earlier you had some-- you

23   had received some correspondence from the Johnson County

24   Election Office; is that right?

25   A.   Yes, sir.  Douglas County I believe.  Douglas

1    County.

2       Q.  I'm sorry, you're right.  Douglas County Election

3    Office.  Do you recall if any of those-- if any of those

4    exhibits-- or, I'm sorry, any of those-- hold on.

5            MR. ROE:  Hey, Mark, these have been marked

6    Joint Exhibit 849 in the Fish case.

7            MR. JOHNSON:  What's "these"?

8            MR. ROE:  These exhibits have been marked

9    Joint Exhibit 849 in the Fish case.  I have a copy for

10   you.

11           MR. JOHNSON:  Tell me what "these" is.

12           (Counsel confer).

13           THE COURT:  This is stipulated so it's

14   admitted.  It's Exhibit 849, correspondence from Johnson

15   County office with attachments, is what my table says.

16           MR. JOHNSON:  I don't know what Johnson

17   County has to do with this, Your Honor.  It was in

18   Douglas County.

19           THE COURT:  But it's admitted.  849 is

20   admitted.  Mr. Roe, you can ask the witness questions

21   about it.  It's already admitted by stipulation.

22           MR. ROE:  I'm sorry.  I meant Exhibit 859,

23   Joint Exhibit 859 and Joint Exhibit 860.

24           THE COURT:  Oh, okay.  Wait a minute.  859

25   and 860 are also admitted by stipulation, which have to

1   do with Douglas County.

2       Q.   (BY MR. ROE)   Do either of those look like the

3   correspondence you received from the Douglas County

4   Election Office?

5       A.   I believe the one from Jamie Shew.   That looks

6   accurate.

7       Q.   Okay.   The-- this Document No. 859, Joint

8   Exhibit 859, this-- when you would've received this, it

9   potentially would've been in a postcard form.   So this

10  essentially-- this exhibit is essentially four postcards

11  that would be split up.   Do you recall receiving

12  something more postcard-sized as well?

13      A.   I believe it was a letter.

14      Q.   Okay.

15      A.   I don't remember receiving any postcards.

16      Q.   Okay.   And the address that you have on here is

17  correct still you said on your voter registration

18  application, Exhibit No.--

19           MR. ROE:   Was it 301, Mark?   What was the

20  other exhibit number?   Here it is.   303.

21      A.   That was accurate at the time, yes, sir.

22      Q.   (BY MR. ROE)   Oh, it's not accurate now?

23      A.   I've moved since then, so...

24      Q.   Okay.   And you've not updated that address with

25  us, is that correct, or with the Douglas County Election

1    Office?

2        A.   No, sir.

3        Q.   Okay.  And if you-- do you know how to update

4    your address?

5        A.   I don't, no, but...

6        Q.   Well, I'm going to represent to you that you

7    could fill out one of these forms with a new address and

8    that would-- do you think you could fill out another one

9    of these forms?

10       A.   I could fill out another one of those forms, yes.

11       Q.   And put on your correct address?

12       A.   Yes, sir.

13       Q.   And if you did that, would you then produce your

14   birth certificate?

15       A.   No, sir.

16       Q.   Okay.  And you're aware that if you did that, you

17   would become registered to vote?

18       A.   Yes, sir.

19       Q.   Okay.  And you've never gone through a hearing

20   with the State Election Board; is that correct?

21       A.   No, sir.

22       Q.   And you've never filed-- filed any form to go

23   through a state election form-- a State Election Board

24   proceeding?

25       A.   No, sir.

1    Q.   Okay.  You said you had a job when you-- when you

2    went back to Texas; is that correct?

3    A.   Yes, sir.

4    Q.   You worked at a gym?

5    A.   Yeah.

6    Q.   Do you pay taxes to your Kansas residence?

7    A.   Yes, sir.

8    Q.   Okay.  So it's not-- so your parents don't claim

9    you on their taxes anymore?

10   A.   I'm not 100 percent sure on that.  My parents

11   help file my taxes, but I'm not sure if they count me.

12   I would assume they do.  I don't know.

13   Q.   Do you know when you pay taxes, are you paying

14   Kansas taxes or Texas taxes?

15   A.   I believe I paid both, because I have a job in

16   Kansas as well as Texas.

17   Q.   Okay.  So what is your job in Kansas?

18   A.   Resident assistant.

19   Q.   Oh, okay.

20   A.   Uh-huh.

21   Q.   The last question I have is, why didn't you have

22   a birth certificate when you went to the Kansas Election

23   Office?

24   A.   It was in the state of Texas.

25   Q.   I'm sorry, no.  Why didn't you have a birth

1  certificate when you went to the Kansas Election Office?

2  Oh, because it was in the state of Texas you said?

3      A.  Yes, sir.

4      Q.  Okay.  But when you said it was in the state of

5  Kansas, you were told, correct, that-- by Cheyenne Davis

6  that you should not bring it with you to the Kansas

7  Election Office?

8              MR. JOHNSON:  Objection, asked and answered.

9              MR. ROE:  Okay.

10             THE COURT:  Overruled.  You can answer it if

11  you can.

12     A.  She made me aware of the fact that if I

13  registered to vote without my birth certificate, then--

14  the consequences of what would happen.

15     Q.  (BY MR. ROE)  Would this help refresh your-- or

16  do you believe that's consistent with what you testified

17  previously?

18     A.  Yeah.  Can I see it, please?

19     Q.  Page 11-5.

20     A.  Yeah, I believe that's-- this one would be

21  accurate.

22     Q.  Which-- when you say "this one"?

23     A.  So as you say, she instructed me to not provide

24  my-- or proof of citizenship.

25     Q.  Okay.  So just-- and I'm finished.  There's

 1   nothing today physically that prevents you from

 2   presenting your birth certificate to the county election

 3   office if you chose to do so?

 4      A.  No, sir.

 5            MR. ROE:  Okay.  Thank you.

 6            MR. JOHNSON:  No redirect, Your Honor.  May

 7   the witness be excused?

 8            THE COURT:  Anything more from you either?

 9            MR. HO:  No, Your Honor.

10            THE COURT:  All right.  May Mr. Bednasek be

11   excused?  All right.  You're excused.  Okay.  You can

12   call your next witness.

13            MR. BONNEY:  Could I remove the exhibits

14   from the witness box, Your Honor?

15            THE COURT:  Yes.

16            MR. BONNEY:  I call Steven Wayne Fish, Your

17   Honor.

18                  STEVEN WAYNE FISH,

19   called as a witness on behalf of the Fish Plaintiffs,

20   having first been duly sworn, testified as follows:

21                  DIRECT EXAMINATION

22   BY MR. BONNEY:

23      Q.  Please tell the Court your name.

24      A.  Steven Wayne Fish.

25      Q.  How old are you?

1        A.   38.

2        Q.   Where were you born?

3        A.   I was born on Chanute Air Force Base in Champaign

4    County right outside of Rantoul, Illinois.

5        Q.   Were you born in a hospital run by the Air Force?

6        A.   I was born on the base.  I think so, but I can't

7    say for sure.

8        Q.   How did you happen to be born on an Air Force

9    base?

10        A.   My mother was in the service.

11        Q.   Does the Air Force base where you were born,

12    Chanute Air Force Base, still exist?

13        A.   No.  It was closed in the '90s during the Clinton

14    Administration.

15        Q.   Where do you currently live?

16        A.   Lawrence, Kansas.

17        Q.   And is Lawrence in Douglas County?

18        A.   Yes.

19        Q.   How long have you lived in Kansas?

20        A.   The entirety of my adult life.

21        Q.   Are you a United States citizen?

22        A.   Yes.

23        Q.   Do you have a family?

24        A.   Yes.

25        Q.   Who makes up your family?

1    A.   I've got my fiancée, Whitney, and our 4-year-old
2   son, ▮▮▮▮▮.
3    Q.   Are you currently working?
4    A.   Yes.
5    Q.   Where do you work?
6    A.   American Eagle Distribution Center, so warehouse.
7    Q.   What do you do there?
8    A.   I'm an overnight employee, primarily stock the
9   freight that's going to the stores.
10   Q.   What hours do you regularly work?
11   A.   I work from 4:30 in the afternoon until 3:00 in
12  the morning.
13   Q.   Since you work nights, when do you usually sleep?
14   A.   I wake up usually at the earliest around 1:00
15  p.m.
16   Q.   Are you taking time off today to be here in
17  court?
18   A.   Yes, I am.
19   Q.   And I'm going to ask you some questions about
20  your voter registration.  When did you first decide that
21  you wanted to vote?
22   A.   It was shortly after the-- the birth of my son.
23  I felt like I needed to get maybe a little more involved
24  in the way our country was working.
25   Q.   And did you understand that you had to be

1    registered before you could vote?

2        A.   Right, I knew I had to register.

3        Q.   Where did you go to register to vote?

4        A.   I went to the DMV in Lawrence.

5        Q.   And when did you do that?

6        A.   That would've been August of '14.  I was going

7    renew my driver's license and I figured I'd register to

8    vote at the same time.

9        Q.   Did you take any documents with you when you went

10   to the DMV to get your driver's license and to register?

11       A.   I mean, an old driver's license, utility bills, I

12   think, to provide my proof of residency.

13       Q.   And did the subject of registering to vote come

14   up while you were at the DMV?

15       A.   It did.  I don't remember if the clerk asked or

16   if I just volunteered the information.

17       Q.   Did the driver's license examiner mention that

18   you would have to provide documentary proof of

19   citizenship in order to complete your voter

20   registration?

21       A.   Not that I recall.

22       Q.   Did the driver's license examiner tell you that

23   you lacked any documentation required to register to

24   vote?

25       A.   Not that I recall.

1    Q.   When you left the DMV in August of 2014, did you

2   believe you had-- you needed to do anything else, to

3   provide any additional documentation in order to

4   complete your voter registration?

5    A.   No.

6    Q.   When you left the DMV in August of 2014, did you

7   believe you were registered to vote?

8    A.   Yes.

9    Q.   Was there a point sometime after you registered

10   to vote at the DMV in August of 2014 when you came to

11   learn that you were, in fact, not registered to vote?

12    A.   It was a couple months later, I think I received

13   a postcard in the mail.

14    Q.   And do you remember what the origination of that

15   postcard was, what office sent it to you?

16    A.   It would have been the Douglas County Clerk's

17   Office.

18    Q.   Was the-- was that mailing the first time you

19   learned that you needed to provide documentary proof of

20   citizenship in order to register to vote in Kansas?

21    A.   I think so.

22    Q.   After receiving that first mailing, did you have

23   any further written communication from the county

24   election office about becoming a registered voter?

25    A.   I think there was a letter.  It would have been

1    following that, but I think that was within 2015, early

2    2015 that a letter followed.

3        Q.   Okay.  When-- when did-- okay.  So early 2015.

4            Did the written notices you received from the

5    county clerk's office mention any way you could complete

6    your voter registration without submitting documentary

7    proof of citizenship, such as requesting a hearing

8    before any state board?

9        A.   Not that I recall.

10       Q.   Based on the written notices you received from

11   the county election office, what did you understand

12   about your registration status in the late summer or

13   early fall of 2014?

14       A.   That the registration was on hold until I could

15   provide documentation proving citizenship.

16       Q.   Did you try to vote in the general election that

17   would've been held in November of 2014?

18       A.   No.

19       Q.   Why not?

20       A.   I wasn't registered to vote.

21       Q.   Have you ever had a U.S. passport?

22       A.   No.

23       Q.   Have you ever had any U.S. naturalization

24   documents?

25       A.   No.

1    Q.   Have you ever served in the United States

2    military?

3    A.   No.

4    Q.   Are you an American Indian?

5    A.   No.

6    Q.   Do you have a certificate of citizenship issued

7    by the U.S. Citizenship and Immigration Service?

8    A.   No.

9    Q.   Do you have any other document or method of proof

10   of citizenship issued by the federal government?

11   A.   No.

12   Q.   Do you have any hospital document, other than a

13   birth certificate, that would show you were born at a

14   certain hospital at a certain place?

15   A.   No.

16   Q.   At the time you went to the DMV office in August

17   of 2014, did you-- did you personally possess a copy of

18   your birth certificate?

19   A.   No, I did not.

20   Q.   At the time you went to the DMV office in

21   August 2014, did you know where your birth certificate

22   was?

23   A.   Not exactly, no.

24   Q.   Did you try to figure out how to obtain a copy of

25   your birth certificate from a government agency at that

1   time?

2       A.  I mean, yeah, I went online.  I asked Google.

3   The majority of the responses seemed to be ads, most of

4   them money-driven, pay us, we'll provide the documents.

5   I didn't know if I needed to go to-- the state

6   department in Illinois might have it, or even with being

7   born on the federal property of the base if the state

8   keeps those records or if that's a federal matter.  So I

9   made an attempt, but I didn't get very far, no.

10      Q.  Were you ever able to figure out how to order a

11  copy of your birth certificate from a government agency?

12      A.  No.

13      Q.  When the Douglas County Clerk's Office advised

14  you that you needed documentary proof of citizenship to

15  complete your voter registration, did you believe that

16  anyone in your family might've had a copy of your birth

17  certificate?

18      A.  I knew there was a copy located at my

19  stepfather's house somewhere.  My mother had had it, but

20  she had passed in 2013, October of 2013.  And we didn't

21  really know if it was still contained out there with

22  some of the leftover items when I moved out or if it had

23  been given to me with some documents when she passed, or

24  originally given to me when I left the house.  I mean, I

25  searched my belongings and was unable to locate it.

1   Q.   What efforts did you make to find your birth

2   certificate?

3   A.   Well, I-- I went through, you know, the folders

4   that I had been given when I moved, documents,

5   Tupperware, storage containers I had been given when she

6   passed.  We also went through some storage sheds at my

7   stepfather's house, my old room, the basement, so forth.

8   Q.   Okay.  Did you eventually find your birth

9   certificate when you looked in 2014?

10   A.   No.  I didn't never-- I did not find it.

11   Q.   Did you personally ever find your birth

12   certificate?

13   A.   No, I-- I never actually located it.

14   Q.   Did anyone else find your birth certificate?

15   A.   Yes.  My sister was able to locate the document

16   in a fire safe in what had been my mother's closet, and

17   gave that to my fiancée, who then gave it to me.

18   Q.   Okay.  Were you present when your birth

19   certificate was found?

20   A.   No.

21   Q.   Do you remember approximately when your fiancée

22   presented you with the birth certificate that your

23   sister had found?

24   A.   No, I-- I don't have that date.

25   Q.   Do you recall being subject to a deposition in

1   this case?

2       A.   Yes.

3       Q.   Do you remember when that deposition was?

4       A.   I want to say spring of last year.

5       Q.   If I-- I'll represent to you that your deposition

6   was in May 10th of 2016, does that help you remember in

7   relation to your deposition when you were presented with

8   a copy of your birth certificate?

9       A.   I think it was a few weeks prior to the

10  deposition.  Maybe two or three.

11      Q.   Thank you.  Okay.  So to sum up today, at the

12  time you registered to vote at the DMV in August of

13  2014, you did not possess a copy of your birth

14  certificate; is that correct?

15      A.   Correct.

16      Q.   And at that time, in August of 2014, you did not

17  know where to find a copy of your birth certificate; is

18  that correct?

19      A.   Correct.

20      Q.   And at the time-- at that time you did not know

21  how to obtain a copy of your birth certificate because

22  you were born at a hospital on an Air Force base; is

23  that right?

24      A.   Yes.

25      Q.   And at that point, in August of 2014, when you

1    tried to register to vote, did you have any idea how you

2    could comply with Kansas' law requiring you to provide a

3    birth certificate to complete your voter registration?

4        A.    Short of providing the birth certificate, no.

5        Q.    Since the Court issued the preliminary injunction

6    in May of 2016, did you vote in the November 2016

7    presidential election?

8        A.    Yes.

9        Q.    And did you vote in any local elections in-- held

10   in Lawrence in 2017?

11       A.    Yeah, I voted in the local elections, City

12   Council, so forth.

13           MR. BONNEY:   No further questions, Your

14   Honor.   Thank you.

15           THE COURT:   Mr. Thompson-- Johnson.   I'm

16   sorry.   Mr. Johnson.

17           MR. JOHNSON:   Nothing, Your Honor.   Thank

18   you.

19           THE COURT:   All right.   Cross examination.

20                  CROSS EXAMINATION

21   BY MR. ROE:

22       Q.    Hello, Mr. Fish.

23       A.    Hello.

24       Q.    When you went to the DOV and applied to register

25   to vote, you were renewing your license; is that

1  correct?

2      A.  Yes.

3      Q.  And so you were able to obtain a renewed license

4  without providing like your birth certificate or

5  something?

6      A.  Yes.

7      Q.  Okay.  I have here-- and you said you-- you said

8  you did apply to-- you said you did want to register to

9  vote when you went to the DOV; is that correct?

10     A.  Yes.

11     Q.  Okay.  I have here a Joint Exhibit 825.

12             MR. BONNEY:  Do you have a copy for me?

13             MR. ROE:  No, I'm sorry.

14             MR. BONNEY:  Did you say 805?

15             MR. ROE:  825, the registration receipt.

16             MR. BONNEY:  Thank you.

17     Q.  (BY MR. ROE)  Do you-- have you seen that

18  document before?

19     A.  I can't say for sure.

20     Q.  Do you recall seeing a document that looks like

21  that at your deposition?

22     A.  I'm sorry.  I can't say for sure.

23     Q.  That's fine.  So you do not recall receiving one

24  of those when you left the Division of Vehicles; is that

25  correct?

```
 1      A.   That's correct.
 2      Q.   But do you know for sure-- I mean, do you-- could
 3   you have-- is it possible you've lost it-- lost it when
 4   you left, or that maybe you got one and you just
 5   misplaced it?  Is that possible?
 6           MR. BONNEY:  Objection, Your Honor.  Calls
 7   for speculation.  He said he didn't recall receiving it.
 8           THE COURT:  Overruled.  You can answer it if
 9   you can.
10      A.   I neither recall nor-- I don't remember getting
11   this one way or the other, sir.  I'm sorry.  I may have,
12   I may not.
13      Q.   (BY MR. ROE)  Do you recall if you said something
14   different at your deposition from that question?
15      A.   If I received this or not?
16      Q.   As to whether or not it was possible that you--
17   that you forgot it and-- sorry.  Is it possible that you
18   received one and forgot?
19      A.   That is a possibility.
20      Q.   Okay.
21      A.   As I stated, one way or the other I can't really
22   answer that question for you.  If you want me to confirm
23   that I got this, I can't confirm or deny.
24      Q.   Okay.  Thank you.
25      A.   This particular copy identifies gender as female,
```

1    so I doubt if it was given to me.

2        Q.   That's probably accurate.

3             MR. ROE:   Joint Exhibit 861, Your Honor.

4        Q.   (BY MR. ROE)  Do you recall seeing something like

5    this at your deposition?

6        A.   Yes.

7        Q.   Okay.  I'll represent to you that this is a copy

8    of your ELVIS file in the Kansas State's-- Kansas-- in

9    the Kansas ELVIS file-- ELVIS database, which is the

10   Kansas voter registration database.  Is that your name

11   at the top?

12       A.   Yes.

13       Q.   Okay.  And is that still your address?

14       A.   Yes.

15       Q.   So you've moved back to Lawrence?  I think at

16   your deposition you said you had moved to Tonganoxie; is

17   that correct?

18       A.   Yes.  We stayed in Tonganoxie briefly and we

19   moved back to Lawrence when housing was available.

20       Q.   Okay.  And you've not attempted to re-register to

21   vote since that date?

22       A.   No.  I would've registered to have voted in order

23   to be able to vote in primaries.

24       Q.   I'm sorry.  Could you repeat that?

25       A.   I said I believe I would've had to have

1   registered to vote and for that to go through in order

2   to be able to vote in the primaries.

3       Q.   I'm asking you, have you-- have you submitted

4   another Kansas voter registration application since you

5   applied to register to vote at the DMV?

6       A.   I believe so.  Upon moving back to Lawrence,

7   changing my address at the DMV, I would've filed

8   another-- registered again to vote, provided the

9   documentation required.  And I did vote, so...

10      Q.   It's your testimony today that you filed another

11  voter registration application in Kansas?

12      A.   I think so.

13      Q.   Do you know what date?

14      A.   -- unless providing the first one--

15      Q.   I'm sorry.  Do you know what date that would've

16  been?  I'm sorry.  Did you-- did you apply-- did you

17  fill out a-- a voter registration application, or did

18  you change your name online-- or did you change your

19  address online with the DMV?  Do you recall?

20      A.   I changed my address at the DMV in person.

21      Q.   Okay.  And that was when you--

22      A.   And I believe I registered to vote that-- when I

23  changed my address upon moving back to Lawrence.

24      Q.   Uh-huh.  And what date was that?

25      A.   It would've been in either September or October

1    of 2016, I believe.

2        Q.  So it's your testimony today that you submitted

3    another voter registration application in October 2016?

4        A.  When I relocated from Tonganoxie to Lawrence, I

5    changed my address to the Lawrence address we were

6    moving to.  And in doing so at the DMV, I would've

7    registered to vote.

8        Q.  So is that a second time that you applied to

9    register to vote at the DMV?  Are you sure you're not

10   thinking of August of 2014?

11       A.  I'm not positive.

12       Q.  Okay.  You look at that-- that document in front

13   of you.  Do you see where it says "federal data," the

14   right side?  Is it possible that's the date you're

15   thinking of approximately?  Let me put it this way--

16       A.  8-21 of '14?

17       Q.  Yes.

18       A.  That would've been the application that was

19   denied.

20       Q.  Right.  Let me put it this way:  Have you

21   registered to vote since your deposition?

22       A.  I believe so, as I have successfully voted, and

23   the first attempt to register to vote was denied.

24       Q.  Are you aware of the current preliminary

25   injunction in this case?

1    A.   I'm sorry, the what?

2    Q.   You're aware of the current preliminary

3  injunction in this case?

4    A.   No.

5    Q.   Okay.  It's fine.  We'll talk to somebody else

6  about this.

7         Okay.  Okay.  And did you present proof of

8  citizenship when you did that, when you went back to the

9  DMV?

10    A.   Yes.

11    Q.   You--

12    A.   The-- yes, the birth certificate had been

13  located.  It had been located as of the time of giving

14  the deposition, and I was able to provide proof of

15  citizenship and I was able to vote in the primaries.

16    Q.   It's your testimony today that you have provided

17  proof of citizenship to the DMV?

18    A.   Upon the-- the second-- that I recall, the second

19  registration to vote, yes.  I provided the birth

20  certificate at that time, was able to successfully

21  register to vote, and was able to vote in the primaries

22  that, you know, Trump versus Clinton--

23    Q.   Okay.

24    A.   -- primaries.

25    Q.   I understand that you-- you voted.  I'm not

1    disputing that you voted in the primaries.  I just want

2    to make sure that you are claiming today that you have

3    provided a proof-of-citizenship document, a birth

4    certificate, to the Division of Vehicles.

5        A.  Yes.  Not on the August 2014 date.  The birth

6    certificate was lost as of then, and then it was

7    located.  Once it was located--

8        Q.  I'm sorry.  You said August of 2016 is what

9    you're telling me, or approximately?

10       A.  I can't verify for the date approximately in 2016

11   that we moved.  We didn't get to move on our time

12   schedule, there was a change of plans.  So I may not

13   have it 100 percent correct in my head, but we moved in

14   2016.

15           When we moved, I changed my driver's license to

16   reflect the address.  When I did change the driver's

17   license, I registered to vote at that time, if I recall

18   correctly, and provided my birth certificate at that

19   time and was able to successfully vote.

20       Q.  Okay.  You have produced a copy of your birth

21   certificate in this case.  Right?

22       A.  Yes.

23       Q.  And you were-- do you recall that-- do you recall

24   a lot of questioning where you were offered the chance

25   to give the Secretary of State's Office a copy of that

1    birth certificate and get you to-- help you to complete

2    your registration at that time?

3        A.   I'm not sure I understand the question.  Could

4    you repeat that, please?

5        Q.   Do you recall-- do you recall being offered by

6    the Secretary of State's Office during your deposition

7    to-- to help you register to vote by sending your birth

8    certificate-- a copy of your birth certificate to the

9    county election office and you declining?

10       A.   And that would've taken place during the

11   deposition?

12       Q.   Yes.  Do you recall that?

13       A.   No.  The document had been located as of the time

14   of the deposition.

15       Q.   That's correct, right.

16            THE COURT:  Mr. Roe, if you need some time

17   to find it, we can take a break now.  It's about time

18   anyway.

19            MR. ROE:  Your Honor, I'm sorry.  Just a

20   couple of minutes.  Thank you.

21            THE COURT:  All right.  We'll be in recess

22   for 15 minutes.

23            (Recess).

24            THE COURT:  All right.  You can be seated.

25       Q.   (BY MR. ROE)  Do you recall we were-- we were

1    discussing, you know, the line of questioning where we

2    had offered to provide you-- or to help get you

3    registered to vote if you would, you know-- if you

4    wanted us to take your birth certificate, a copy of it

5    and send it to the election-- the Douglas County

6    Election Office and help you get registered to vote.  Do

7    you recall that line of questioning from your

8    deposition?

9        A.   No, I'm afraid I don't.

10       Q.   If I showed you a copy of your deposition, would

11   that help refresh your memory?

12       A.   Sure.

13            MR. ROE:  Okay.  It is Page 79, Line 12

14   through Page 80, Line 1.

15       Q.   (BY MR. ROE)  Is that your name?

16       A.   Yes.

17            MR. BONNEY:  Mr. Roe, would you tell me the

18   line number again?  I could not hear you.

19       A.   It starts at Line 12.

20            MR. ROE:  Line 12.

21            MR. BONNEY:  Thank you.  To what?

22       A.   25 is I believe what you have highlighted here,

23   sir.

24       Q.   (BY MR. ROE)  Yeah.  Do you recall that line of

25   questioning now?

1      A.   Yeah.

2      Q.   So do you remember that this office-- this office

3   offered to take your-- your copy of your birth

4   certificate and provide it to the Douglas County

5   Election Office previously.  Correct?

6      A.   Well, they asked in that statement there now that

7   the document has been found, you know, am I interested

8   in providing it or not.  And I replied that, you know, I

9   was as long as it didn't endanger my standing with this

10  case.

11     Q.   Right.  So at the time you said no, you didn't

12  want us to do that?  You said-- sorry, you said-- you

13  said you didn't have a desire to do that at the time.

14  Right?

15     A.   I believe it reads that-- it states that now that

16  the document has been located, there's a question as to

17  whether or not I'm going to submit it.  I don't believe

18  Mr. Kobach's office offered to directly take it and do

19  it for me in that statement there.  And I respond with

20  that I do intend on registering, but I need to make sure

21  that it's not going to endanger my standing, my ability

22  to follow this through with the ACLU before I do so.

23  And I believe that's what I read on the document you

24  gave me.

25     Q.   It's correct that this office offered to-- to

1    help you-- to register you to vote.  Correct?

2              MR. BONNEY:  Asked and answered, Your Honor,

3    object.

4              MR. ROE:  That was a different question.

5              THE COURT:  Proceed.  Overruled.

6    Q.   (BY MR. ROE)  This office offered to-- to-- now

7    that you have a copy of your birth certificate, to--

8    that you would like to register to vote.  Correct?

9    A.   They asked-- I believe the way it reads is they

10   asked if I'm going to register to vote.

11             MR. ROE:  Can I let him see it one more

12   time, Your Honor?

13             THE COURT:  Go ahead.

14             MR. ROE:  Page 79, Line 12 through Line 16.

15   A.   Well, they asked, "Would you like to register to

16   vote and be registered?"  There's no offer to do this

17   for me.  They... and my response is, as I've stated,

18   that I would like to do so, but I wanted to make sure it

19   wouldn't endanger my standing, my ability to see this

20   through with the ACLU.

21             MR. ROE:  Okay.  Thank you very much.

22             MR. BONNEY:  Are you done?

23             MR. ROE:  Yes.

24             MR. BONNEY:  Your Honor, I have two

25   questions I think on redirect.

1                    REDIRECT EXAMINATION
2    BY MR. BONNEY:
3        Q.   Mr. Fish, when you went to the DMV in October or
4    so of 2016 to change your address, is it possible that
5    you did not, in fact, take your birth certificate with
6    you?
7        A.   It's possible.  I mean, I'm-- it was-- it was a
8    while ago.  I'm sorry, I don't remember exactly, but
9    it's possible.
10       Q.   Okay.  And now, do you still have Defendant's
11   Exhibit 861 in front of you?
12       A.   Is that the voter report or the--
13       Q.   Yes.
14       A.   Okay.
15       Q.   The voter report.  It's a multi-page document.
16       A.   Yes.
17       Q.   Okay.  Now, the pages are not numbered, but I'm
18   going to ask you to-- they're double-sided, so I'm going
19   to ask you to go to the-- the backside of the third page
20   of Defendant's Exhibit 861.
21       A.   I'm sorry, mine is not double-sided.
22       Q.   Oh, okay.  Go to the-- well, let's see, the sixth
23   page then.
24            MR. BONNEY:  Your Honor, may I approach the
25   witness just to see if I'm on the same page?

1           THE COURT:  Yes.  Sure.

2      A.  Okay.

3      Q.  (BY MR. BONNEY)  And on the right-- or the left

4  side of the page on-- about midway down there's a box.

5  And at the top the headings are "jurisdiction,"

6  "description," "date modified" and "file type."  Do you

7  see that?

8      A.  Okay.

9      Q.  And below that in "jurisdiction," it says

10 "Douglas" and there are six lines; is that correct?

11     A.  I only see five lines.  But yeah, it's Douglas

12 jurisdiction.  I'm sorry, one is highlighted.  I

13 apologize.

14     Q.  One is highlighted.  So including the highlighted

15 line, do you see six lines there?

16     A.  Yes.

17     Q.  And if you look under "date modified," the first

18 three lines say 8-18-2016.  Did I read that correctly?

19     A.  10-18-2016?

20     Q.  I'm sorry, 10-18.  Yes, I did not read that

21 correctly.  So 10-18-2016.

22     A.  Yes.

23     Q.  I read that correctly this time?

24     A.  Yes.

25     Q.  Okay.  And the bottom three lines, the date is

1  8-21-2014.  Did I read that correctly?

2      A.  Yes.

3      Q.  All right.  If you look at the-- the second line

4  there and then the fifth line under the description, it

5  says "proof of citizenship."  Do you see that?

6      A.  Yes.

7      Q.  Now, when you went to the DMV to get your new

8  license and when you registered to vote in August of

9  2014, did you take your driver-- I mean your birth

10 certificate with you at that time?

11     A.  No.

12     Q.  Why not?

13     A.  I didn't have it in 2014.

14     Q.  Thank you.

15          MR. BONNEY:  Nothing further, Your Honor.

16          MR. ROE:  Cross?

17          THE COURT:  Anything more from the Fish--

18 or, I'm sorry, from Mr. Bednasek?  Mr. Johnson, anything

19 from you?

20          MR. JOHNSON:  Nothing, Your Honor.  Thank

21 you.

22          THE COURT:  Mr. Roe.

23                  RECROSS EXAMINATION

24 BY MR. ROE:

25     Q.  On that same box, same page, next to where it

1   says DMV COA, 10-18-2016, what time is that?

2       A.   I'm sorry, which line?

3       Q.   The first line and the second line, it looks to

4   me-- well, it's close to the same time.

5       A.   I just-- make sure we're on the same page.  So

6   the highlighted line and the one under it?

7       Q.   Correct.  What are the times?

8       A.   Okay.  Let's see.  The highlighted one is a

9   little difficult, but it looks like 7:35 p.m.

10      Q.   Okay.

11      A.   And directly underneath that would be 7:35 p.m.

12  as well.

13      Q.   Okay.  And-- okay.

14              MR. ROE:  That's all.  Thank you.

15              MR. BONNEY:  Nothing further, Your Honor.

16              THE COURT:  All right.  May Mr. Fish be

17  excused?

18              MR. BONNEY:  He may.

19              THE COURT:  All right.  You're excused.

20  Thank you.  Call your next witness.

21              MS. LIU:  Fish plaintiffs call Ms. Tabitha

22  Lehman.

23              MR. ROE:  Could we take five minutes to get

24  the witness?

25                  TABITHA LEHMAN,

1    called as a witness on behalf of the Fish Plaintiffs,

2    having first been duly sworn, testified as follows:

3                    DIRECT EXAMINATION

4    BY MS. LIU:

5        Q.   Good afternoon, Ms. Lehman.

6        A.   Hi.

7        Q.   I'm Angela Liu, counsel for Fish plaintiffs.

8    It's nice to see you again.  Could you please state your

9    name and spell it for the court reporter?

10       A.   Sure.  It's Tabitha Lehman.  That's

11   T-A-B-I-T-H-A.  L-E-H-M-A-N.

12       Q.   And, Ms. Lehman, you're currently the county

13   election commissioner for Sedgwick County.  Correct?

14       A.   Correct.

15       Q.   And you were appointed to this role by Secretary

16   Kobach.  Correct?

17       A.   Correct, yes.

18       Q.   You report directly to Secretary Kobach.

19   Correct?

20       A.   Correct.

21       Q.   He supervises you.  Correct?

22       A.   Correct.

23       Q.   Secretary Kobach is the chief election office

24   official of the state.  Correct?

25       A.   Correct.

 1     Q.   He's serving as your counsel and his own counsel
 2   today.   Correct?
 3     A.   Correct.
 4     Q.   In your role as Sedgwick County election
 5   commissioner you're responsible for conducting voter
 6   registration.   Correct?
 7     A.   Correct.
 8     Q.   Processing voter registrations you're also
 9   responsible for.   Correct?
10     A.   Correct.
11     Q.   You're also responsible for following up on
12   proof-of-citizenship documents as well.   Correct?
13     A.   Correct.
14     Q.   You've held the position since-- as Sedgwick
15   County election commissioner since November of 2011.
16   Correct?
17     A.   Yes.
18     Q.   And Sedgwick County is the second largest county
19   in Kansas.   Correct?
20     A.   Yes.
21     Q.   Sedgwick County has approximately a half million
22   people.   Correct?
23     A.   Yes.
24     Q.   And part of your responsibilities as Sedgwick
25   County commissioner is attempting to identify instances

1  of non-citizen registration.  Correct?

2      A.  Yes.

3      Q.  And you take that responsibility very seriously.

4  Correct?

5      A.  As I do all of my responsibilities, yes.

6      Q.  And you understand that Secretary Kobach takes

7  non-citizen registration seriously as well.  Correct?

8      A.  Yes.

9      Q.  And you understand that among Secretary Kobach's

10  powers is the power to prosecute non-citizen voting.

11  Correct?

12      A.  Correct.

13      Q.  Because that's something he takes very seriously.

14  Correct?

15      A.  Correct.

16      Q.  You're not the only employee in the Sedgwick

17  County Election Office.  Right?

18      A.  Correct.

19      Q.  You have a staff that works for you.  Correct?

20      A.  Yes, I do.

21      Q.  You instruct your staff that non-citizen

22  registration and voting is serious for Secretary Kobach

23  and, therefore, it's serious for your office.  Correct?

24      A.  I would say that's a generalization.  I instruct

25  them that every duty that we have is very serious and

1    there's not really a weight given to one over the other.

2    They're all very serious.

3        Q.   But non-citizen registration is serious for your

4    office.  Correct?

5        A.   Correct, as is everything.

6        Q.   You have approximately ten people who work for

7    you.  Correct?

8        A.   Correct.

9        Q.   And they help process registration forms.

10   Correct?

11       A.   Yes.

12       Q.   And in that process they discover instances they

13   suspect of non-citizen registration.  Correct?

14       A.   They have, yes.

15       Q.   And when staff members discover instances that

16   they suspect are non-citizens who are registering or

17   attempting to register, they report them to you.

18   Correct?

19       A.   That is correct.

20       Q.   And then you report those names to Secretary

21   Kobach.  Correct?

22       A.   Correct.

23       Q.   Since you've been the Sedgwick County election

24   commissioner, there's only been one prosecution of any

25   of the names you've passed along.  Correct?

1    A.   I'm not entirely sure if that's the case.  That

2   might be better directed to someone else.  I believe

3   that's true, but that may not be.

4    Q.   And you're the Sedgwick County election

5   commissioner.  Correct?

6    A.   Well, meaning-- can you define what type of

7   prosecution?

8    Q.   Whether there's a prosecution of non-citizen

9   registration.

10    A.   As of the time that I-- in the time that I have

11   been election commissioner, one case has been

12   prosecuted.  One was prosecuted prior to me being

13   election commissioner.

14    Q.   Before submitting the names to Secretary Kobach

15   then you examined the applicant's file.  Correct?

16    A.   That is correct.

17    Q.   You look at the applicant's DMV records,

18   naturalization papers, and whatever else you have in the

19   applicant's file.  Correct?

20    A.   That is correct.

21    Q.   Because you want to be careful before sending the

22   applicant's name over to Secretary Kobach.  Correct?

23    A.   Correct.

24    Q.   Because you want to be sure before sending the

25   applicant's name over that it's an improper attempt to

 1   register by a non-citizen.  Correct?

 2       A.  Yes.

 3       Q.  Because you want to be sure that it's an instance

 4   of impropriety or fraud.  Correct?

 5       A.  Correct.

 6       Q.  So let's talk about a woman who in court we'll

 7   refer to as E.E.

 8                   MS. LIU:  Your Honor, may I approach?

 9                   THE COURT:  Yes.

10                   MS. LIU:  Let the record reflect that I'm

11   handing opposing counsel a binder of exhibits.

12       Q.  (BY MS. LIU)  And, Ms. Lehman, if you could

13   please turn to Tab 9.  That is Plaintiffs' Exhibit 8,

14   which has been admitted into evidence.

15          And this applicant lives in Sedgwick County.

16   Correct?

17       A.  Correct.

18       Q.  So E.E. is a woman who was asked if she wanted to

19   register and answered with "no" to the question, "Are

20   you a citizen of the United States?"  Correct?

21       A.  Correct.

22       Q.  So notwithstanding that Ms. E.E. checked no,

23   she's not a citizen, your office received her form.

24   Correct?

25       A.  Correct.

1    Q.   And in your view, that is an instance of

2    non-citizen-- of a non-citizen who attempted to register

3    to vote.  Correct?

4    A.   I think because when you look at the oath above

5    the signature, it says, "I swear or affirm that I'm a

6    citizen of the United States and a resident of the state

7    of Kansas," and that E.E. signed that, then yes, that

8    would be.

9    Q.   And you see where it says, "Are you a citizen of

10   the United States of America?"  Correct?

11   A.   Yes.

12   Q.   And you see that she's checked "no."  Correct?

13   A.   Correct.  But it would be a case where it would

14   be something anomalous to report up.

15   Q.   So in your view, that's an instance of a

16   non-citizen who attempted to register to vote.  Correct?

17   A.   I think it's a dicey one so I send it on.  I'm

18   not sure how to answer that.  It's-- there is some

19   ambiguity there so I send it on.

20   Q.   So you sent it on--

21   A.   Correct.

22   Q.   -- to Secretary Kobach.

23        So let me show you a note from Ms. A.S.  If you

24   could please turn to Tab 7, Exhibit 99.  It's also

25   already been admitted into evidence.  And please turn to

1   Page 4.  And in this note A.S. told you that she is not

2   a citizen.  Correct?

3       A.  Correct.

4       Q.  And, in fact - and let's turn to the next page -

5   when you told Secretary Kobach and Brad Bryant about Ms.

6   A.S., Mr. Bryant, who's the former election director,

7   replied on March 28th, 2014 at 10:31 a.m., "I just wish

8   DMV would not register people who they know to be

9   non-citizens."  And you agreed with that.  Correct?

10      A.  Correct.

11      Q.  You agree with me that A.S. was not committing

12  fraud or attempting-- attempted fraud.  Correct?

13      A.  I would agree that I received a voter

14  registration application for A.S., and that is what I

15  would agree to.  That I received a voter registration

16  application, that is why we sent the notification to

17  A.S. and that is why she returned it to our office.

18  That notification was a request for proof-of-citizenship

19  document and it was returned to our office with a note

20  saying they were not a citizen.

21      Q.  So just a yes or no.  You agree with me that A.S.

22  was not committing fraud or attempted fraud in this

23  situation.  Correct?

24      A.  I don't think I can give you a yes or no on that,

25  because I was not standing there at the DMV when she

1    completed this process so I cannot answer that.

2                MR. KOBACH:  I want to register an

3    objection.  It calls for a legal conclusion.

4                THE COURT:  All right.  I'll sustain.

5        Q.  (BY MS. LIU)  Do you agree with me that this

6    wasn't someone who was trying to cheat the system.

7    Correct?

8        A.  As far as I know, correct.

9        Q.  This is someone who told the DMV that she is not

10    a citizen.  Correct?

11        A.  As far as I know.

12        Q.  And this was a mistake by the DMV.  Correct?

13        A.  It would appear to be.

14        Q.  Thank you.

15                THE COURT:  Mr. Johnson, do you have any

16    questions of this witness?

17                MR. JOHNSON:  That was fast.  Kind of caught

18    me unaware.

19                      CROSS EXAMINATION

20    BY MR. JOHNSON:

21        Q.  Ms. Lehman, my name is Mark Johnson.  We haven't

22    met before.  Pleasure to meet you.  I'm here as you

23    probably know on behalf of Parker Bednasek in a case

24    separate from the Fish case.

25                Some of the questions that I had intended to ask

1   have already been asked of you.  So I'm going to quickly

2   move through this thing, see if I can eliminate many of

3   the questions I had.  Your position, that of Sedgwick

4   County election commissioner, is an appointive, not an

5   elective position; is that correct?

6       A.   That is correct, and I already answered that,

7   yes.

8       Q.   Yes.  And you were first appointed in November of

9   2011?

10      A.   Correct.

11      Q.   And that was to fill an un-- two years of an

12  unexpired term; is that correct?

13      A.   That is correct.

14      Q.   And then in 2013, you were re-appointed for a

15  full four-year term; is that correct?

16      A.   That is correct.

17      Q.   And you were appointed by Secretary Kobach; is

18  that correct?

19      A.   Correct.

20      Q.   And then in 2017 you were re-appointed for

21  another four-year term; is that correct?

22      A.   That is correct.

23      Q.   Also you were-- at that time you were appointed

24  by Secretary Kobach--

25      A.   That is correct.

1    Q.   -- correct?  Do you serve at Secretary Kobach's

2    pleasure?  In other words, could he fire you if he

3    became dissatisfied with your performance?

4    A.   I believe the statute says something about I have

5    to basically break the law for him to fire me, but he

6    can certainly not re-appoint me.

7    Q.   Okay.

8    A.   I'd have to go back and look at the statute for

9    sure, though.

10   Q.   All right.  And so if you finish your-- the term

11   that you now are in, you will-- you will have been

12   Sedgwick County election commissioner for ten years; is

13   that right?

14   A.   Correct.

15   Q.   Now, you're aware of a rule called Kansas

16   Annotated Regulation 7-23-15, aren't you?

17   A.   Yes, I am.

18   Q.   Is it correct, as you understand it, that 7-23-15

19   is the rule under which individuals who have not

20   supplied all the necessary information with their voter

21   registration have 90 days to do so?

22   A.   Correct.

23   Q.   And if they fail to provide that information

24   within 90 days, their registrations are cancelled?

25   A.   Correct.

1    Q.   And in that period, that 90-day period, their

2    registration is considered incomplete?

3    A.   Correct.

4    Q.   They are put on a suspense or a suspended list;

5    is that right?

6    A.   Suspense, yes.  Correct.

7    Q.   Suspense list.  And during that period of time if

8    an election were to occur, they would not be allowed to

9    vote, they would not be registered voters?

10   A.   If they used the Kansas registration form, that

11   is correct.

12   Q.   Okay.  That's a good point.  There's the

13   distinction between--

14   A.   It's a very big distinction.

15   Q.   It's an important distinction, at least at this

16   point.

17   A.   Correct.

18   Q.   Okay.  Is it correct that you were-- your office

19   was instructed by the Secretary of State's Office to

20   move registrants from incomplete to cancelled if they

21   did not provide the necessary information within the

22   90-day period?

23   A.   If they used the Kansas form.  Well, I guess at

24   that point it was everyone.

25   Q.   Right.

```
 1        A.   It was prior to the preliminary injunction--

 2        Q.   Right.  Well, the instructions were issued--

 3             THE COURT:  Wait, you can't talk over.

 4             MR. JOHNSON:  I'm sorry.  That's my fault.

 5   Sorry, Your Honor.

 6        Q.   (BY MR. JOHNSON)  So when the instructions were

 7   issued by the Secretary of State, they applied to all

 8   applicants?

 9        A.   That is correct.

10        Q.   And included among the pieces of information that

11   an applicant has to provide is a documentary proof of

12   citizenship?

13        A.   That is correct.

14        Q.   And we've obviously spent a good deal of time

15   listing the numbers of-- the number of documents that

16   comply with that requirement, haven't we?

17        A.   I haven't been in here, so I don't know.

18        Q.   Well, would you agree that the documents that

19   comply with the DPOC requirement are listed in the

20   statute?

21        A.   Yes.

22        Q.   Okay.  The guidance which the Secretary of

23   State's Office supplied on the conversion, if you will,

24   of registrants from incomplete to cancelled you were

25   expected to follow?
```

1      A.   Correct.

2      Q.   And in the time since that guidance was issued,

3  have you followed that instruction to the letter?

4      A.   Barring any human error, yes.

5      Q.   That's a good point.

6      A.   I'm not going to guarantee it because we are

7  human.

8      Q.   Okay.  Now, there are, as I understand it, 105

9  county election officers in Kansas; is that right?

10      A.   Correct.

11      Q.   And you are one of four who are appointed by the

12  Secretary of State?

13      A.   That is correct.

14      Q.   The others being-- the other counties, other than

15  Sedgwick County of course, being - let me get this right

16  - Douglas, Johnson and Shawnee?

17      A.   No.

18      Q.   What did I miss?

19      A.   Johnson, Wyandotte and Shawnee.  Douglas is not.

20      Q.   Thank you.  Okay.  And the information concerning

21  registrants is maintained in the so-called ELVIS system?

22      A.   That is correct.

23      Q.   And, as I understand it, is it true that only the

24  counties have access to make changes in the ELVIS

25  system?

1      A.   That is my understanding, yes.

2      Q.   And is it your understanding that the Secretary

3  of State's Office does not have access to make changes

4  in the ELVIS system?

5      A.   That is correct.  It-- to registrant files.  They

6  can other things but not to a voter registration file is

7  my understanding.

8      Q.   Right.  So when a registrant's file designation

9  is changed from incomplete to cancelled, that's

10  something that the county election office has to do?

11      A.   That's correct.

12      Q.   That is not done by the Secretary of State's

13  Office?

14      A.   Correct.

15      Q.   And am I also correct in believing that the--

16  that the changes in the ELVIS system are not automatic,

17  they're manual?

18      A.   That is correct.

19      Q.   So if a registrant has failed to provide the DPOC

20  within the 90-day period specified under 7-23-15,

21  someone on your staff has to manually access that

22  registrant's file to make the change from incomplete to

23  cancelled?

24      A.   That is correct.

25      Q.   Now, I understand that you have had

1    representatives of your office at-- attend

2    naturalizations-- boy, naturalization ceremonies.  This

3    was my water, so don't worry about it.

4        A.   Yes, that is correct.

5        Q.   Naturalization ceremonies in Sedgwick County?

6        A.   That's correct.

7        Q.   Would you agree with me that the individuals who

8    become naturalized citizens in those ceremonies in

9    Sedgwick County are not all residents of Sedgwick

10   County?

11       A.   That is correct.

12       Q.   They're-- in fact, people in naturalization

13   ceremonies are drawn from throughout the state?

14       A.   Yes.

15       Q.   Probably if for no other reason than many of them

16   live in counties or towns that are simply too small in

17   population terms to have their individual-- you know,

18   have individual ceremonies?

19       A.   Probably.

20       Q.   Okay.  And you started, as I remember, sending

21   representatives to the naturalization ceremonies in

22   2013; is that right?

23       A.   Correct.  That's correct.

24       Q.   And you have had representatives of your office

25   attend these ceremonies since that time?

1     A.   Correct.

2     Q.   So now for five years or so?

3     A.   (Nods head up and down).

4     Q.   Okay.  And you send representatives of your

5  office to those ceremonies to attempt to register the

6  newly-naturalized citizens?

7     A.   That is correct.  And if I could expound for just

8  a moment, I'd like to give a little bit of background.

9  We did not first attend those immediately until we

10  started receiving calls with reports from--

11     Q.   Why don't-- why don't you handle that on cross

12  examination--

13     A.   Okay, that's fine.

14     Q.   -- on redirect examination because that exceeds

15  the scope of my question.

16     A.   Okay.

17     Q.   I believe last year, would you agree, that at

18  least in April of 2017 there was as many as three

19  naturalization ceremonies in Sedgwick County every week?

20     A.   There are some weeks where there are not, but

21  most weeks there are three a week, yes.

22     Q.   Can you tell us, if you know, how many

23  naturalization ceremonies your office has covered since

24  it started doing so in 2013?

25     A.   I can't off the top of my head, I'm sorry.

1      Q.   Would it be dozens, would it be hundreds?

2      A.   Well, I would say it might be a couple hundred,

3  probably be more than a couple hundred.

4      Q.   Okay.

5      A.   Because they did not start doing the weekly until

6  2016.  So prior to that it was quarterly.

7      Q.   Got it.  And you received notice from the

8  immigration office as to when they are going to hold

9  immigration ceremonies?

10     A.   Yes, we do.

11     Q.   And-- and to the best of your ability, you have

12  attended-- pardon me, attempted to have representatives

13  of your-- of your office at every naturalization

14  ceremony in Sedgwick County since you started in 2013?

15     A.   I believe we have if it has been in Sedgwick

16  County, yes.

17     Q.   Now, these-- at these ceremonies, they don't

18  naturalize just one or two people, they naturalize

19  dozens or hundreds, would you agree with that?

20     A.   The weekly ones might be ten or 20.

21     Q.   Okay.

22     A.   At each one.

23     Q.   But there have been-- there are some where they

24  have dozens or hundreds of citizens to naturalize?

25     A.   Absolutely.

1     Q.   Very good.  And are the people who come from your

2    office instructed to sort of affirmatively approach the

3    new citizens and ask if they wish to register?

4     A.   I believe we just have a presence that has a big

5    sign that says "register to vote here" and they can come

6    over to us if they would like to.

7     Q.   Okay.  And the-- the spreadsheet, you have-- you

8    started to generate a spreadsheet of individuals that

9    you believed had registered before they became citizens;

10   is that right?

11    A.   Correct.

12    Q.   And at some point the Secretary of State's Office

13   took over maintenance of that spreadsheet; is that

14   correct?

15    A.   Correct.

16    Q.   You provided the information about individuals

17   that you believed had been registered incorrectly or

18   unlawfully, but it was up to the Secretary of State's

19   Office to enter that information into the spreadsheet.

20   Correct?

21    A.   Correct.

22    Q.   How long ago did the Secretary of State's Office

23   start taking responsibility for maintaining that

24   spreadsheet?

25    A.   I don't know that I could give you a date at this

1   time.

2       Q.   Last year, two years ago, three years ago?

3       A.   I-- I will say I've been reporting the

4   information to them and they've been maintaining a

5   spreadsheet.  I was also maintaining a spreadsheet, and

6   then it just kind of morphed into one.  When that

7   happened, I cannot exactly give you a date.

8       Q.   And is it correct that you have done your best to

9   provide information about every case of improper

10   registration or improper attempts to register to the

11   Secretary of State's Office?

12      A.   Yes.

13      Q.   And is it your testimony that the spreadsheet in

14  whatever iteration it is - and it's been updated a

15  number of times over the years - that the latest

16  iteration of the spreadsheet is cumulative, it contains

17  every incident that you have reported to the Secretary

18  of State's Office; is that correct?

19      A.   Yes, every-- I-- every case that was felt to be

20  pertinent to this conversation, yes.

21      Q.   Going back to the time you started assembling the

22  information?  When I say it's cumulative, I mean that it

23  doesn't just contain the examples that you reported

24  let's say between July 1st of 2017 and December 31st of

25  2017.  It contains every example you've reported going

1   back to the time that you started to-- that you first

2   prepared the spreadsheet?

3       A.   Yes.  I had-- I did have a couple of cases on my

4   original spreadsheet that were not put on the-- the

5   secondary one for various reasons of-- and I don't

6   remember off the top of my head what they were.  But

7   there were a couple more that was not pertinent to this

8   conversation.

9       Q.   I think I'm finished, let me just ask one

10  question.

11                  (Counsel confer).

12                  MR. JOHNSON:  That's all I have.  Thanks

13  very much.  Thank you, Your Honor.

14                  CONSOLIDATED EXAMINATION

15  BY MR. KOBACH:

16      Q.   Hello, Ms. Lehman.

17      A.   Hi.

18      Q.   I'm going to ask you some additional background

19  information that the opposing counsel didn't get to.

20  What's your educational background?

21      A.   I'm sorry, what?

22      Q.   What is your educational background?

23      A.   I have a high school diploma and some college.

24      Q.   And where did you attend college?

25      A.   Right now I'm attending Minnesota University

1    Humphrey School of Public Affairs.

2        Q.   And what is your job experience?  What jobs have

3    you held, if you could just quickly summarize them.

4        A.   Well, prior to-- I worked at a financial service

5    early on in my teens and-- or teens or early adult.  And

6    then I was a stay-at-home for years, worked the

7    elections as a poll worker for many, many years.  And

8    then hired into the election office.

9        Q.   So how many years did you work as a poll worker

10   before you were hired into the election office?

11       A.   Oh, goodness, I'd say over ten.

12       Q.   And then how many years did you work at the

13   Sedgwick County Election Office prior to becoming--

14   being appointed the Sedgwick County election

15   commissioner?

16       A.   About two-and-a-half, maybe three.

17       Q.   And I believe opposing counsel may have asked you

18   this, but what was the month and year of your being

19   appointed Commissioner?

20       A.   November of 2011.  November 2011

21       Q.   So if you could do the math for me, how many

22   total years have you been working in the Sedgwick County

23   Election Office?

24       A.   Over nine years.

25       Q.   And how many total years have you been working in

1  election administration if you count the years as a poll

2  worker?

3       A.   Close to 20.  Do I have to admit that?

4       Q.   That's okay.  Do you have a-- any full-time

5  employees in the Sedgwick County Election Office?

6       A.   Yes.

7       Q.   How many do you have?

8       A.   Full-time we have-- other than myself, we have

9  eight.  And then we have two permanent part-time.

10      Q.   And does that fluctuate during election times at

11  all?

12      A.   Absolutely.  We hire in a great deal of

13  additional help.

14      Q.   And so how many additional employees would you

15  hire typically during a fall even-year election?

16      A.   Well, obviously that's going to vary between

17  gubernatorial and presidential.  In presidential we

18  would probably hire in at least 15 to 20 additional

19  staff who were on the actual side of processing voter

20  registration absentee ballot applications, but then

21  there would be over 1,000 people that we hired to work

22  the polls or do special boards of counting ballots and

23  that sort of thing.

24      Q.   So you're referring to hiring of the poll workers

25  as well?

 1    A.   Correct.

 2    Q.   Are they paid?

 3    A.   Yes.

 4    Q.   Do you have a-- anyone on the full-time staff of

 5    your office who handles voter registrations exclusively?

 6    A.   Yes.

 7    Q.   How many people do you have that do that?

 8    A.   One.

 9    Q.   Do others help with voter registration as well?

10    A.   Yes.  Pretty much we all help when necessary.

11    Q.   And do-- does everyone on your staff at one time

12    or another enter voter registration information into the

13    voter registration database?

14    A.   I would say maybe one person does not.  But other

15    than that, everyone else would.

16    Q.   And just for the sake of making it easier to say,

17    is that the ELVIS database?

18    A.   That's correct.

19    Q.   Have you-- has your office identified any

20    non-citizens residing in Sedgwick County who have become

21    registered to vote?

22    A.   Yes.

23    Q.   Has your-- has your office identified any

24    non-citizens who have attempted to become registered to

25    vote in Sedgwick County since the proof-of-citizenship

1    law went into effect?

2        A.   Yes.

3        Q.   I'm going to show the witness an exhibit from

4    plaintiffs' folder, Defense Exhibit 1133.  You've got

5    it?

6        A.   I've got it.

7        Q.   It's Tab 4.

8        A.   Tab 4.  Thank you.

9        Q.   Do you recognize this document?

10       A.   Yes.

11       Q.   Are you familiar with this document?

12       A.   Yes.

13       Q.   Did you provide the information that is in this

14   document?

15       A.   Yes.

16       Q.   Is the information in this document kept by your

17   office?

18       A.   Correct, yes.

19       Q.   Is the information in this document accurate?

20       A.   Yes.

21           MR. KOBACH:  Your Honor, I offer into

22   evidence Exhibit 1133.

23           MS. LIU:  Objection, Your Honor.

24           THE COURT:  Is this 1133?

25           MR. KOBACH:  Yeah, Defense Exhibit 1133.

 1          THE COURT:  Okay.  I had it struck off the

 2   exhibit list for some reason, but-- but it-- also the

 3   description on my exhibit list is different than what

 4   you've just said.  Oh, I'm sorry, I'm looking at the

 5   wrong one, Exhibit 1133.  Okay.

 6          MS. LIU:  Your Honor?

 7          THE COURT:  Yes.

 8          MS. LIU:  This exhibit is totally hearsay.

 9   She didn't personally discover each one of these entries

10   and they're based on what other people told her.  And on

11   top of that, we actually--

12          THE COURT:  Why don't you voir dire her

13   about this.  All right?

14          MS. LIU:  Okay.

15              VOIR DIRE EXAMINATION

16   BY MS. LIU:

17     Q.   Hello again, Ms. Lehman.  I just want to ask you

18   a few questions about the spreadsheet that Defendant

19   Kobach just asked you about.  This spreadsheet is a

20   compilation that you're in charge of that puts together

21   information that other people have collected.  Correct?

22     A.   Actually the-- my employees reported the

23   information to me and then I collected the data that was

24   then sent on to the Secretary of State's office.

25     Q.   So your employees collect the data.  Correct?

 1      A.   No.   The employees report it to me and I collect

 2   the data and send it on.

 3           Can you give me a little bit of definition to

 4   make sure I'm answering your question accurately.   When

 5   you say "collecting the data," what does that mean to

 6   you?

 7      Q.   Let's--

 8      A.   If that's appropriate for me to ask.

 9      Q.   -- just go through your transcript.   Do you

10   remember being asked questions under oath at your-- at a

11   preliminary injunction hearing on the 21st of September.

12   Correct?

13      A.   Yes.

14               MS. LIU:   Your Honor, may I approach?

15               THE COURT:   Yes.

16      Q.   (BY MS. LIU)   And just for clarification

17   purposes, this is the preliminary hearing transcript in

18   the *Brown v. Kobach* state court case.   If you could

19   please turn to Line 101-- or sorry, Page 101, Line 19 to

20   22.

21      A.   Give me just a moment.   You said Page 101?

22      Q.   Yes.

23      A.   Yes.

24      Q.   And when you were asked by Mr. Ho, "So this is a

25   compilation that you're in charge of that puts together

1  information that other people have collected.  Correct?"

2  Your answer was, "Correct.  That is correct."  And that

3  was your answer on-- at the preliminary hearing.

4  Correct?

5      A.  It appears so, yes.  I must not've understood the

6  question very well.  I apologize.

7      Q.  So you then send this data to Secretary Kobach.

8  Correct?

9      A.  Correct.

10     Q.  So before submitting this data to Secretary

11 Kobach, you examine-- strike that.

12         Your office provides all the information for the

13 spreadsheet, but you did not personally create the

14 spreadsheet.  Correct?

15     A.  Correct.

16     Q.  Someone at the Secretary of State's Office

17 ultimately created this spreadsheet.  Correct?

18     A.  Correct.

19     Q.  And you personally don't have a conversation with

20 each applicant on this chart.  Correct?

21     A.  Correct.

22     Q.  When you supervised the collection of this data

23 to put in this spreadsheet, this isn't because there's

24 something in a manual that requires you to do this.

25 Correct?

1    A.   Correct.

2         MS. LIU:   Your Honor, I would like to renew

3    my objection that this spreadsheet is totally hearsay.

4    Again, she didn't personally discover each of these

5    entries, they're based on what other people have told

6    her.

7         And on top of that, Your Honor, we've

8    received so many versions of this spreadsheet and we've

9    repeatedly requested from defense counsel the underlying

10   documents for the additional-- for all the additions in

11   the spreadsheet and we haven't received all of them yet.

12   And I also can put on as a demonstrative, if you'd like,

13   that shows all the variations of the spreadsheet that we

14   have.

15        MR. JOHNSON:   Your Honor, under Rule of

16   Evidence 1006, this is a summary.  And the information--

17   the underlying information has not been provided, as--

18   as Ms. Liu just indicated.  Plaintiffs have requested

19   the information, it's not been provided.  So under

20   Rule 1006 it should be excluded.

21        MR. KOBACH:   Your Honor, the witness has

22   testified that she provides the exact information that

23   is presented on this and that she, herself, created the

24   table and all of its earlier versions and that the

25   information is the information that she provided.  She

1   stated that she collects the data and sends it on.

2        And I would also point out that this-- if

3   the hearsay is the objection they're attempting to stand

4   on right now, then they should look at Rule 803(6),

5   records of a regularly conducted activity.  "Record of

6   an act, event, condition, opinion, diagnosis--"

7   (reporter interruption).

8        Oh, I'm sorry, which would constitute-- "a

9   record of a regularly conducted activity.  A record of

10   an act, event, condition, opinion, or diagnosis if--"

11   and then I'll just skip to the relevant parts, (A), it

12   was made at or near the time; (B), the record was kept

13   in the course of regularly conducted activity of an

14   organization--

15        THE COURT:  Slow down, she can't take it

16   down.

17        MR. KOBACH:  I'm so sorry.

18        THE COURT:  I'll look at 803(6).

19        MR. KOBACH:  Okay.

20        MS. LIU:  Your Honor, she also--

21        THE COURT:  All right.  Can I see this

22   exhibit to start with?  I have binders up here of the

23   defendant's exhibits, but for some reason mine only go

24   to 1096.  Am I missing a binder of exhibits?  These only

25   go through-- in any event, let me look at this.  Okay.

1              Okay.  So this is a spreadsheet that has the

2    date of the original registration application submitted

3    and some sort of ID number, I guess it's a registration

4    ID number, the source of registration, meaning paper,

5    DMV paper address change, in office at DMV, et cetera.

6    Current citizenship status, date of naturalization,

7    whether the person voted and then a note that seems--

8    note section that seems to be based on somebody having a

9    conversation with the person.

10              Well, let me see.  Maybe not.  Yeah, it

11    relates to some conversations with the person.  My

12    understanding of this witness' testimony is that she's

13    not the one that had the conversations with the persons

14    but people in her office did, and she compiled that

15    information into this document.

16              It's-- it seems to me that this is a summary

17    under Rule 1006.  And the rule under 1006 is you can

18    admit a summary if it summarizes documents that are and

19    have been made available to the other side, the

20    documents that support this.  And it's a common sense

21    rule so that they can, in fact, have time to review the

22    documents and make sure that this summary is, in fact,

23    accurate.

24              Another concern of the plaintiffs, however,

25    is I guess it goes to the accuracy of the summary

1   because they've received multiple versions of this

2   summary.

3                At this point I'm not going to admit the

4   summary for several reasons:  One, it sounds like the

5   plaintiffs don't have all the underlying documents, and

6   perhaps never had; two, they need-- if-- you need to

7   produce the documents to them under Rule 1006, give--

8   give them a chance to review them and to confirm that

9   this-- this summary is correct; and then, three, there's

10  still an issue with respect to this third column to the

11  extent it's based on hearsay statements made by

12  individuals to people that interviewed them because

13  this-- unless this witness interviewed them herself,

14  it's really double hearsay.  So there's several

15  problems.  So at this point I-- I'm not going to admit

16  this.

17               Do you have the underlying documents here

18  available in the courtroom?

19               MR. KOBACH:  We can get them.  The

20  underlying documents-- we have many of them.  The

21  underlying documents are just the ELVIS files.  These

22  are summaries of information in the ELVIS files and

23  summaries of information collected by Ms. Lehman's

24  office and her staff on each of these individuals.

25               And I would note that these-- it is not a

1  changing-- it's not that anything is different.  There

2  have been lines added as her staff has discovered more

3  cases.  Everything [sic] has changed about each prior

4  case, it's just cumulative, so more have been added and

5  they have been attached to the motions for summary

6  judgment.

7          Opposing counsel has seen these all along

8  and this is the first time they have raised-- these were

9  attached to the depositions.  They have been looking at

10  this document or the earlier versions that had fewer

11  names on it for more than two years now.  And all of the

12  information can be substantiated by underlying files.

13  We'd be happy to provide them with all of the underlying

14  ELVIS files.  It's just a lot--

15          THE COURT:  So--

16          MR. KOBACH:  -- less tedious than going

17  through each file.

18          THE COURT:  All right.  So in discovery did

19  the plaintiffs discover all the underlying ELVIS files?

20  I mean, aren't there like 36,000 ELVIS files as the big

21  universe of--

22          MR. KOBACH:  No, no.  The plaintiffs-- we

23  provided this information to the plaintiffs based on the

24  ELVIS file.

25          THE COURT:  Okay.

```
 1            MR. KOBACH:  I don't know if-- I think some
 2   of these may have been provided to plaintiffs because
 3   they just--
 4            MS. LIU:  Your Honor--
 5            THE COURT:  So they-- unless they've
 6   discovered the underlying data that is in ELVIS files
 7   for all of these things that are part of this summary,
 8   the summary is not admissible, because they're entitled
 9   to be able to discover that and compare it to make sure
10   the summary is accurate.
11            So at this point it's not admissible unless
12   you're telling me they've discovered the underlying data
13   and that they've discovered it in a way that they can
14   match it up by-- I don't know if that would be--
15   probably by ID number.
16            MR. KOBACH:  By registration number, yes.
17            THE COURT:  Yeah.
18            MS. LIU:  Your Honor, I'd also like to add
19   that this exhibit we received on February 28th and--
20            MR. KOBACH:  That's incorrect.
21   February 12th was when you received it.
22            MS. LIU:  No, February 28th for one of the
23   other exhibits that's exactly the same as this one,
24   but-- but we did receive it February-- in February.
25            MR. KOBACH:  Yes.
```

1              MS. LIU:  And we still don't have the

2     underlying documents.  We've been asking for the

3     underlying documents, we don't have all of them.  And,

4     quite frankly-- and Ms. Lehman just testified that she

5     has not prepared this-- this spreadsheet, someone at the

6     Secretary of State's Office has prepared it.  It's just

7     not allowed.

8              THE COURT:  All right.  So I think under

9     Rule 1000-- well, she says that she compiled information

10    given to her by others, it might've been a group effort,

11    I don't know.  But I do think there's a valid concern

12    about to the extent this is-- this summary is based on

13    conversations, interviews with people, because that

14    would be hearsay.  But maybe we can resolve that by

15    redacting that from the exhibit, I don't know.  But at

16    this point-- I'm not there yet.

17             At this point it's not admissible because

18    the plaintiffs have not seen the documents that underlie

19    this, and Rule 1006 requires that.

20             So, you know, maybe this can-- you can

21    recall Ms. Lehman or however you want to do this.

22    They're going to need-- I mean, I don't know how many

23    entries there are.

24             MR. KOBACH:  38.

25             THE COURT:  38.  So probably the most

1    efficient way to do this would be to just give them the

2    ELVIS data on these 38 files so they're not trying to

3    cull through a volume of it, which is going to cost a

4    lot more time.

5          If you can do that tonight, then, you know,

6    we can revisit the admission of this or maybe you can

7    recall Ms. Lehman and try to admit it at that point.

8          MR. KOBACH:  In the interim, may we use it

9    as a demonstrative since they've had this document for

10   almost a month and we--

11         THE COURT:  No.

12         MR. KOBACH:  -- they've had the underlying

13   versions for years?

14         THE COURT:  No, because they haven't had the

15   underlying data for this.

16         MR. ROE:  Your Honor--

17         THE COURT:  And similar to the demonstrative

18   exhibit that the plaintiffs wanted to use during

19   opening, which I did not let them because you hadn't

20   seen the underlying data at that point or hadn't had

21   enough notice, I didn't let them use it.  So, no, not at

22   this point.

23         Because even using it demonstratively,

24   plaintiffs are not in a position to challenge it on

25   cross examination even until they can see the underlying

1    data.

2              MR. KOBACH:  So are you ruling on the

3    Rule 803 exception to hearsay or are you going to hold

4    that in--

5              THE COURT:  I'm going to hold that, because

6    at this point it's just a matter of procedurally--

7    this-- this has to be offered under 1006.  That's what

8    this is, it's a summary.

9              The 803 is a hearsay exception which might

10   go to content of this if there's part of the content of

11   this that would be inadmissible.  It's a double layer

12   analysis.

13             But the document itself is a summary under

14   Rule 1006 and the rules are that the underlying data has

15   to be provided to the other parties in a way that's

16   accessible, common sense, so that they can make sure the

17   summary is, in fact, a summary and that it's accurate.

18             Okay.  The-- the hearsay objections will be

19   pertinent if I decide, okay, you've satisfied that

20   requirement and then I've heard a hearsay objection and

21   then your response is it fits within a hearsay

22   exception, I'll consider that at that time.  But we're

23   not there yet.  You first got to give them the

24   underlying data so that--

25             MR. KOBACH:  It will be--

1          THE COURT:  -- we get past that hoop.

2          MR. KOBACH:  This examination will take

3    approximately three times-- no, twice as long without--

4    if I do it without this summary and we go through each

5    of the files or I go through each case.  So do we want

6    to-- well, we can start doing that.

7          THE COURT:  All right.  So are the ELVIS

8    files marked as exhibits?  The underlying data, is it

9    marked as exhibits?

10          MR. KOBACH:  I don't know which ones are and

11    which ones aren't.  Some of them are, but I don't know

12    if all 38 are.

13          THE COURT:  I'm confused.  So have the

14    plaintiffs discovered the underlying data or not?

15    Because you're not going to be able to examine the

16    witness about the underlying data and they haven't seen

17    that either.

18          MS. LIU:  Your Honor, we're still missing

19    three of the entries.

20          MR. ROE:  Your Honor, can I speak for a

21    second?  I'm sorry.

22          THE COURT:  Yeah.

23          MR. ROE:  My understanding was that they

24    received all the ELVIS files.  If that's not correct, I

25    can-- I can work with them to find out which ones they

```
1    do not have.  I thought that they received all the
2    underlying ELVIS files before.
3              MS. LIU:  It's not correct.
4              MR. ROE:  Okay.  And I apologize for that.
5    I know that they've received a number of them.  We can
6    work with them and get the ones that they don't have.
7              THE COURT:  Okay.  This is an overnight
8    project for everybody.
9              MR. ROE:  That's fine.
10             THE COURT:  Overnight-- so you have--  you
11   have received some ELVIS files but you don't think
12   you've seen all of the ones underlying this, you're
13   missing three?
14             MS. LIU:  Yes.  Correct.
15             THE COURT:  Okay.  So it's not as bad as it
16   sounded initially.  Overnight I want you to figure out
17   what those three are, provide plaintiff with those.
18             Plaintiff, you'll have a chance to review
19   this overnight and then tomorrow you can tell me whether
20   you have any further objection to this being admitted as
21   a summary under Rule 1006.  Okay.
22             MS. LIU:  Thank you, Your Honor.
23             THE COURT:  All right.  I'll give this back
24   to whoever.
25             MR. KOBACH:  I suppose it would make sense
```

1    so as not to waste time, Your Honor, to go ahead and try

2    to ask the witness about things I can without this

3    exhibit, although--

4            THE COURT:  Okay.

5            MR. KOBACH:  -- to be frank, this exhibit--

6            THE COURT:  I don't know, I mean, it could

7    be that you won't be able to--

8            MR. KOBACH:  And then I assume if we don't

9    finish, we'll just bring the witness back in the

10    morning?

11            THE COURT:  Yeah.  We could also let her go

12    and recall her and plaintiff could call their next

13    witness, recall her later in the case.  Is that

14    acceptable?

15            MR. KOBACH:  I think their next witness is

16    one that will go over-- will be more or less-- will be

17    more than 45 minutes as well, so it probably doesn't

18    matter.

19            THE COURT:  Does anybody have an objection

20    to that?  We release Ms. Lehman until we can resolve the

21    issue of the summary, recall her tomorrow sometime.

22            MR. KOBACH:  I think we won't save any time

23    because theirs is going to be one of their experts,

24    which would certainly take more than 45 minutes.  So we

25    may as well keep Ms. Lehman on the stand.

1          THE COURT:  Okay.  That's fine.  I just-- I

2   thought what you were saying, Mr. Kobach, is that you

3   didn't have a lot of other questions anyway--

4          MR. KOBACH:  Oh, I do have other questions.

5          THE COURT:  -- you weren't going to be able

6   to go 'til 5:00.  But if you can go 'til 5:00 with her

7   without the summary, then that's fine, let's just keep

8   going.

9          MR. STEINER:  Right.  That's certainly fine

10  with us.  The other option is, if you think you need to

11  do this now and you want to recall her tomorrow, we can

12  do deposition designations.  I don't think we want to

13  start with our expert and have two witnesses who are in

14  the middle.

15         THE COURT:  Understood.  All right.  You can

16  call--

17         MR. STEINER:  So we'll do either of those

18  things.

19         THE COURT:  Would you rather continue with

20  your cross?

21         MR. KOBACH:  We can do the deposition

22  designations now and we'll just start in the morning.

23         THE COURT:  Okay.  So what time should we

24  have Ms. Lehman return tomorrow?

25         MR. KOBACH:  I assume first thing.

 1              THE COURT:  Okay.  So will we finish the
 2   deposition that you're going to read tonight?  So we'll
 3   have you return at 9:00, Ms. Lehman.
 4              THE WITNESS:  All right.  Thank you.
 5              THE COURT:  Okay.  Actually, come at 9:15.
 6   We'll take up this hearing at 9:00 about the summary.
 7   Okay.
 8              MR. STEINER:  Thank you, Your Honor.
 9              THE COURT:  All right.  So call your next
10   witness.  And it's a deposition.  Correct?
11              MR. STEINER:  Yes, Your Honor.  We'll be
12   putting on two of the depositions.  First we call Eric
13   Rucker by deposition.
14              THE COURT:  Okay.  The way we're going to
15   handle this, you're going to read it-- okay.  So there
16   are some objections that I'm going to rule on
17   contemporaneously.  Do you have the objections marked in
18   your transcript?
19              MS. HA:  I do.
20              THE COURT:  Okay.  All right.  Okay.
21              MS. HA:  So starting on Page 9.
22              (The deposition of ERIC RUCKER was read as
23   follows:).
24      Q.  What is your current employment?
25      A.  I'm assistant secretary.

1              MS. HA: Page 13.

2       Q.   Where did you work after you left your role as

3  commissioner?

4       A.   I was Dickinson County Attorney in Abilene,

5  Kansas.

6       Q.   What time frame was that?

7       A.   From 1993 to January of '03.

8       Q.   What were your responsibilities?

9       A.   I was the chief prosecutor for the county and for

10  a time I was also county counselor for the county

11  commission.

12      Q.   Did you deal with any election-related crimes?

13      A.   Not that I recall.

14      Q.   And based on your experience as a prosecutor, do

15  you believe that the enforcement of criminal laws deter

16  individuals from violating the law?

17      A.   Yes.

18      Q.   Why is that?

19      A.   I believe that anytime that there is punishment

20  associated with a criminal proceeding, the potential

21  exists to deter bad acts.

22      Q.   And as the Dickinson County Attorney, did you

23  encounter any concerns about non-citizens who were

24  registering to vote in Kansas?

25      A.   Not that I recall.

1          MS. HA:  Your Honor, there's an objection to

2     Page 16.  I think we have a solution, which is just-- we

3     can add testimony from Page 16, Lines 3 to 6, which

4     explains what Mr. Rucker's next role was.

5          THE COURT:  Does that cure the objection?

6     The objection was lacks foundation without-- yeah, 16-3

7     through 18, so you're going to add that back in?

8          MS. HA:  Not 3 through 6, just to show what

9     the next position he had was.  And then 18 to 22, which

10    we objected to just "during your time there," I think

11    we're fine with that testimony, there's just no context

12    for what "during your time there" refers to.

13         THE COURT:  All right.  So read Lines 16--

14    Page 16, Line 3 through Page 16, Line 22.  That cures

15    the objection, does it not, Ms. Becker?  Or I'm not

16    sure, who's doing this one?

17         MS. HA:  It's Daphne Ha.

18         THE COURT:  Ms. Ha.

19         MS. BECKER:  That sounds fine, Your Honor,

20    to us if you're asking defendant.

21         THE COURT:  Okay.  Proceed by reading all of

22    this.

23    Q.   Okay.  Where did you go in 2007 when you left?

24    A.   Became the chief deputy district attorney in

25    Johnson County, Kansas.

1      Q.   And what were your responsibilities there?

2      A.   I was the chief administrative officer in the

3  district attorney's office.

4      Q.   Is that also a prosecutorial role?

5      A.   It is.  I also handled a caseload, did several

6  jury trials, general administrative responsibility and

7  oversight for the attorneys.

8      Q.   Did you work on any election-related crimes?

9      A.   Not that I recall.

10     Q.   And during your time there did you also find that

11 prosecutions of criminal laws would deter violations of

12 the law?

13     A.   Yes.  I didn't change my mind about what it is

14 that I said earlier.

15     Q.   Have you changed your mind about that at any

16 time?

17     A.   Up to and including today's date, I still think

18 that criminal laws have a tendency to deter bad acts.

19          MS. HA:  Okay.  Page 32.

20     Q.   And how would you have used the responses

21 retained by the courts to weed out non-citizens who

22 illegally vote?

23     A.   Making a determination whether or not they're

24 registered to vote.

25     Q.   How would you make that determination?

1     A.   I believe I answered your question.  I would

2   probably, but it's a probability, I would probably make

3   inquiry of the deputy of elections.  But, again, the

4   information is also available for individual county

5   clerks as to whether or not a person is registered to

6   vote or not.

7     Q.   Do you recall any instance where you received

8   information about a non-citizen who identified

9   themselves on a juror questionnaire?

10    A.   I would rather have my memory refreshed so that I

11  could give you an accurate answer.  I can tell you what

12  I suppose, but I would only be asking-- or pardon me,

13  answering something I do not know directly.

14    Q.   That's fine.  You can tell me what you suppose.

15    A.   I think that it did occur on one or more

16  occasions.

17    Q.   Right.  And can you read the last sentence of

18  your e-mail for the record?

19         MS. HA:  On 39.

20    A.   Certainly.  "If this bill is passed, our office

21  will identify those who are inappropriately on the voter

22  registration rolls in order that they may be removed."

23    Q.   What did you mean by that sentence?

24    A.   That if we found individuals that were not United

25  States citizens, the purpose of the legislation would be

1   that if they were inappropriately on the voter

2   registration rolls and not qualified to be on the voter

3   registration rolls, a process would begin in some way,

4   shape or form in order to correct that mistake.

5      Q.   What process would this office use to identify

6   those who are inappropriately on the voter registration

7   rolls?

8      A.   We didn't have legislative authority to prosecute

9   at that point in time, nor did we even two years after

10  that.   And so it would've been by notifying the

11  appropriate officials in the state of Kansas that could

12  not-- that could do such a thing.

13     Q.   And not focusing on the prosecution right now,

14  but you write that, "Our office will identify those who

15  are inappropriately on the rolls."   How would the office

16  do that?

17     A.   Through the information that was received by

18  the-- transmitted to our office by the OJA.

19     Q.   And that information as to jury forms you're

20  asking about?

21     A.   It would have been identifying individuals who

22  had answered their jury questionnaires in such a manner

23  as to indicate they were not United States citizens and

24  were yet found on our voter registration rolls.

25     Q.   And after this bill was passed, has this office

 1  moved forward with this process?

 2     A.  It's my recollection that we have on one or more

 3  occasions.

 4     Q.  And on those occasions people were identified

 5  from juror forms; is that correct?

 6     A.  That would be my recollection.

 7            MS. HA:  Page 69.

 8     Q.  Okay.  Did this office play a role in drafting

 9  the legislation?

10     A.  We played a role.

11     Q.  What was that role?

12     A.  We assisted in the drafting of the legislation

13  along with others in the Legislature and with the

14  Revisor of Statutes.  There are always a number of hands

15  that are in play in the drafting of legislation.

16     Q.  Were you involved in the drafting process?

17     A.  To the best of my recollection, in a cursory way,

18  yes.

19     Q.  And what is that cursory way?

20     A.  I was asked my opinion and I, when asked,

21  provided my opinion.

22     Q.  Has the Secretary of State's Office brought

23  prosecutions against non-citizens who are registering to

24  vote besides the prosecution that's brought against Mr.

25  Garcia Babeck?

1      A.   This is the sole case that currently we have on

2   file.

3      Q.   Is that also the case where for prosecutions

4   against non-citizens who have voted?

5      A.   I believe that this is the sole case at the

6   current time.

7      Q.   So from 2015 to today, have there been any

8   prosecutions besides the one against Mr. Garcia Babeck

9   that has been brought by the Secretary of State's Office

10  against a non-citizen?

11     A.   I believe that this is the sole case.

12          MS. HA:   Your Honor, we had objections

13  generally and specific objections to the rest of the

14  testimony.  They're essentially almost all from the

15  direct examination at the deposition.  They're outside

16  the scope, they talk about the SAFE Act, the Sedgwick

17  County policies, SAVE programs and things that were in

18  the designations we originally-- we just read now.

19          THE COURT:   Okay.  Just a minute.  Overrule

20  the objection to Page 105, Line 4 through Line 7.

21          And then with respect to Page 108, Lines 2

22  through Page 109-21, overrule.  You can read that as

23  well.

24          And then on Page 112, Line 17 through

25  Page 113, Line 5, overrule.  You can read that as well.

1          MS. HA:  Okay.

2     Q.   So starting on 104.  Prior to the SAFE Act, were

3     non-citizens likely to get caught registering and

4     voting?

5     A.   No.  We don't have a great deal of evidence that

6     many were getting caught.  No.

7     Q.   And do you believe the threat of prosecution

8     serves as a deterrent to non-citizen registration

9     specifically?

10    A.   Well, it hasn't or we would have more evidence of

11    it.  And so the answer is no.

12    Q.   Do you regard the juror questionnaire as a

13    satisfactory method of locating non-citizens on the

14    voter rolls?

15    A.   No.

16    Q.   Why not?

17    A.   Because voter registration assumes that the

18    individuals being registered are citizens or otherwise

19    qualified to vote.

20    Q.   Does the Sedgwick County policy of asking a

21    potential juror to document his non-citizen status

22    reflect the fact that potential jurors may lie when they

23    assert their citizenship status?

24    A.   Yes.

25    Q.   What has your experience been regarding the

1    willingness of county attorneys to prosecute individuals

2    for voting crimes?

3        A.   Well, having been a prosecutor myself for a long

4    period of time, we just don't have much participation by

5    a county or district attorneys in the prosecution of

6    election crimes.  And there's reasons for that.

7            I testified earlier today that I didn't have a

8    lot of exposure to, didn't have any that I recall, and I

9    still don't recall any election issues even being

10   presented to me for prosecution.

11           But, again, having been a long time member of the

12   Kansas County and District Attorneys Association, those

13   who have been confronted with elections-related

14   allegations of criminal conduct have oftentimes not

15   prosecuted these cases because of the mere press.  And I

16   shouldn't say "mere," because of the press of criminal

17   litigation that is violent in nature or is-- deems to be

18   more serious by the criminal code by classification of

19   crime.  And that's why we sought the ability to litigate

20   criminal elections conduct in Kansas.

21       Q.   I'm going to take you back to Exhibit 9.  This is

22   in regards to the SAVE program and the letter from the

23   director of U.S. Citizenship and Immigration Services.

24       A.   Uh-huh, okay.

25       Q.   In that letter in the middle paragraph do you see

1   where DHS demands both, one, a number on an

2   immigration-related documented possessed by an alien

3   and, two, a copy of the immigration and related

4   documents?

5       A.   Yes.

6       Q.   Does the Kansas Voter Registration Form require

7   this information and documentation?

8       A.   No, it does not.

9       Q.   Would it make any sense to do so?

10      A.   Well, it certainly would be more burdensome to

11  the voter registration process if it was required.  And,

12  no, it wouldn't make sense because voter registration is

13  required and you have to be a citizen to register to

14  vote.

15      Q.   And therefore, it wouldn't be feasible for

16  someone to list an alien number on a voter registration

17  form?

18      A.   Right.  Yes.  And a copy of the

19  immigration-related documentation and questions to

20  complete the verification process, again, it's not part

21  of-- neither of them are part of the voter registration

22  process and so, yeah, it wouldn't make sense that we

23  have that data.

24      Q.   And could that be why Mr. Kriegshauser says the

25  SAVE program won't work and we will not have the

1   information requested in his e-mail on the first page?

2         MS. HA:  And there's an objection on the

3   transcript calling for speculation.

4         THE COURT:  Overruled.

5   A.   Well, to the degree that this is required, you

6   know, by the SAFE Act or the SAVE program, yeah, I

7   believe if that's-- if that's required and Mr.

8   Kriegshauser is indicating that it is, the SAVE program

9   won't work and we will not have information requested.

10  I believe that's what-- what he may be striking at.

11  Q.   I believe you said that in your response.

12  A.   Okay.  If I did, yeah.  When you asked me earlier

13  whether punishment was a deterrent or I responded that

14  punishment was a deterrent, I certainly believed that

15  if, in fact, we're talking in a prosecutorial sense of

16  there being conviction and punishment and if there is

17  the reality of punishment, I believe it to be a

18  deterrent.

19        But as it relates to crimes that are not punished

20  because they're not prosecuted in the first place,

21  punishment is not a deterrent because there's no

22  punishment.

23        THE COURT:  All right.  Does that complete

24  the deposition?

25        MS. HA:  Yes, it does.  And we can read Mr.

1    Brad Bryant's deposition designations next.

2              THE COURT:  All right.  All right.  Just to

3    be clear, we had a hearing on this earlier this

4    afternoon.  Defendant had not objected to plaintiffs'

5    designation of its portions of this deposition.

6    Defendant had counter-designated to those portions that

7    plaintiff had designated.  Defendant separately

8    designated other-- other portions, which I'll take up

9    that later if need be in defendant's case.

10             There are two objections in the course of

11   this deposition, and I'll get to those as you read them.

12   These are plaintiffs' objections actually to those

13   portions that defendant has counter-designated--

14   actually I've already ruled.

15             MS. HA:  Yeah.

16             THE COURT:  I've already ruled, I'm sorry.

17   So you can just read it consistent with my ruling.

18             MS. HA:  Okay.  Page 15.

19             (The deposition of BRAD BRYANT was read as

20   follows:)

21      A.  The next title I had was deputy assistant

22   Secretary of State for elections and legislation

23   matters, which is an election director position that I

24   held then from February of 1993 to February of 2015.

25      Q.  And when did you leave the Secretary of State's

1    Office?

2       A.   The last day was February 13th, 2015.

3       Q.   And when you left, you were the election

4    director?

5       A.   Yes, ma'am.

6       Q.   So you retired from the Secretary of State's

7    Office?

8       A.   Uh-huh.  Yes, I'm sorry.

9       Q.   I'm going to hand you Exhibit 2 to your

10   deposition.  This is a document marked Fish fifth RFP

11   022551.  Have you had a chance to review this document?

12      A.   I skimmed it.

13      Q.   Can we go to the earliest in time e-mail, it

14   starts on the bottom of Page 3 and it's from Eric

15   Rucker.

16      A.   Uh-huh.

17           THE COURT:  Okay.  Let me stop you.  Is this

18   exhibit-- what-- this exhibit should be marked for the

19   trial record.

20           MS. HA:  Oh.  I'm not sure.

21           THE COURT:  I mean, anything that the

22   witness in the deposition is testifying to in terms of

23   an exhibit needs to be marked for purposes of the trial

24   and married up.

25           MS. HA:  Okay.  There's a Bates stamp

1    number.  It looks like it's 022551.

2              MR. STEINER:  Your Honor, we should be able

3    with just a minute to be able to cross-reference what

4    Exhibit 2 to this deposition is in terms of the volume.

5              THE COURT:  Great.  Thank you.

6              MR. STEINER:  Apologize for that.

7              (Plaintiffs' counsel confer).

8              MS. HA:  Your Honor, it's-- it's exhibit--

9    Defendant's 934.

10             THE COURT:  All right.  Exhibit 934,

11   Defendant's Exhibit 934.  So I need to admit it at this

12   time because the deposition witness is testifying to it.

13   Is there any objection by the defendant to admission of

14   Exhibit 934?

15             MS. BECKER:  No.  No, Your Honor.

16             THE COURT:  I'm sorry?

17             MS. BECKER:  No, Your Honor.

18             THE COURT:  Okay.  Exhibit 934 admitted.

19        Q.  Have you had a chance to review this document?

20        A.  I skimmed it.

21        Q.  Can you go to the earliest in time e-mail, it

22   starts on the bottom of Page 3 and it's from Eric

23   Rucker.

24        A.  Uh-huh.

25        Q.  Who's Mr. Rucker?

1       A.   He's the Assistant Secretary of State.

2       Q.   Did you report to him while you were here?

3       A.   Yes.

4       Q.   And given your experience as election director,

5   do you agree with Mr. Rucker's statement in this e-mail

6   that receiving the responses the courts retain from

7   these non-citizens may be helpful to weed out

8   non-citizens who illegally vote?

9       A.   I agree with that.

10      Q.   And given your experience as election director,

11  do you agree with Mr. Rucker's statement in his e-mail

12  that the response of non-citizens received by the courts

13  may be evidence necessary to prove criminal conduct?

14      A.   Yes.

15      Q.   And was there a written policy in place in

16  regards to what the Secretary of State's Office should

17  do upon receipt of those juror lists?

18      A.   I don't remember specifically whether there was a

19  policy, a written policy.

20      Q.   And if this office, if the Secretary of State's

21  Office identified a potential non-citizen who had

22  registered to vote from the juror form, were there other

23  courses of action that were taken besides referring them

24  to the counties?

25      A.   I'm not aware of any.

1      Q.   Was there any way that the Secretary of State's

2   Office could independently verify citizenship status?

3      A.   Regarding the jury questionnaires?

4      Q.   Yes, when names are identified on the juror

5   forms.

6      A.   No.

7      Q.   And were you aware of any instances where the

8   Secretary of State's Office referred non-citizens

9   identified on the juror forms to law enforcement for

10  potential prosecution?

11     A.   I can't say specifically, I don't know of any

12  cases like that.

13          MS. HA:  Your Honor, there's another--

14  there's a Deposition Exhibit 3.  And this is part of

15  defendant's counter-designations, so I'm not sure if

16  it's an exhibit.

17          THE COURT:  Oh.  It's an e-mail.  The Bates

18  stamp number, fifth RFP 17.  Do you know what that

19  exhibit is, Ms. Becker?

20          MS. BECKER:  Yes, and I'm-- I am looking at

21  it, Your Honor, and it is an e-mail from another witness

22  and the current witness, Mr. Bryant, was copied on it.

23  So I would-- I would object to its admission on-- based

24  on hearsay.

25          MR. HO:  It's the defendant's exhibit and

1  it's in their counter-designation.

2          THE COURT:  Right.

3          MR. HO:  We found it as-- identified it as

4  Defendant's Exhibit 935.  We don't want it in the

5  record.

6          THE COURT:  It's Exhibit 935 and you used it

7  during your examination-- or rather, you designated

8  this.  So I don't think it's proper for you to object to

9  it at this point.

10          MS. HA:  But, Your Honor, we don't have it

11  on our exhibit list and we do object to it.

12          THE COURT:  You object to it.

13          MS. HA:  We didn't designate this.

14          THE COURT:  Oh, I see.  So-- so defendant

15  has counter-designated this testimony that includes an

16  exhibit, it's 935.  You're objecting to this exhibit?

17          MS. HA:  Yes, Your Honor.

18          THE COURT:  But you didn't object to the

19  counter-designation that included the discussion of the

20  exhibit.

21          MS. HA:  Yes, but we didn't agree to the--

22  we didn't stipulate to the exhibit.

23          THE COURT:  Well, you should've-- you

24  should've objected to this part of the testimony to

25  preserve an objection to the admission of this exhibit.

1   But separately, it needs to be moved for admission.  So,

2   Ms. Becker, are you moving for admission of Exhibit 935?

3           MS. BECKER:  Yes, Your Honor.

4           THE COURT:  And what is your objection to

5   its admission?

6           MS. HA:  We'll withdraw the objection.

7           THE COURT:  All right.  Exhibit 935 is

8   admitted.

9   Q.   Okay.  I'm handing you Defendant's Exhibit 935.

10  Have you had a chance to review this document?

11  A.   Yes.

12  Q.   The first sentence of the second paragraph says,

13  in about the middle of the line, "Our office has

14  discovered five individuals in Riley County who

15  indicated to the Riley County District Court that they

16  are not qualified to serve as jurors because they are

17  not U.S. citizens."  Did I read that correctly?

18  A.   Yes.

19  Q.   Do you recall this Riley County incident?

20  A.   Reading this now I have a vague recollection of

21  it.  I was not directly involved.

22  Q.   Do you know-- if you weren't directly involved,

23  do you know why you were cc'd on this e-mail?

24  A.   As the election director I was involved in voter

25  registration and election administration and all

1    programs to keep voter legislation lists updated.  I was

2    involved in communications with county election offices,

3    so it makes sense that I was copied on it.

4        Q.  Do you recall if there was any follow-up done by

5    the Secretary of State's Office to-- to determine if

6    these five people were non-citizens?

7        A.  I don't recall, no.

8        Q.  Was there a standard practice in place for

9    instances like this when it came to the Secretary of

10   State's attention that non-citizens may have registered

11   to vote?

12       A.  There were cases where a member of the office

13   would make a phone call to follow up with either the

14   prosecutor or an election officer to see if the matter

15   had been disposed of generally.

16       Q.  Has the Secretary of State's Office in your

17   experience used information on the TDL list?

18       A.  Yes.

19       Q.  And how?

20       A.  As the third paragraph here explains, I think

21   maybe twice we obtained the list from DMV and after that

22   we were unable to obtain it.  But we compared it through

23   a computer program to the voter registration file to

24   determine if any of those non-citizen TDL holders were

25   registered to vote or had voted.

1     Q.   Do you remember approximately when those two

2   comparisons were done?

3     A.   Well, this says 2010.  That makes sense.  I wrote

4   that, so it must be true.  I think that may be 2011

5   again or 2009 and 2010.  Two consecutive years.  Either

6   '09 and '10 or-- I think it was '09 and '10.

7     Q.   Do you know why the Secretary of State's Office

8   was unable to obtain the lists subsequent to that?

9     A.   I don't know the reason, but I do know that-- I

10   believe in the beginning, in 2011 or '12, I made a

11   request, as I had in the past, to the Director of

12   Vehicles who was a new person with the change of

13   gubernatorial administration, and they had a new

14   process.  Frankly, a little bit more bureaucratic.  They

15   had a form to fill out to ask for the records, which I

16   did, and sent it to her and it never came back.

17     Q.   Do you recall follow-up with her after sending

18   the form?

19     A.   I recall sending an e-mail at some point I

20   believe, just didn't really get a response.

21     Q.   And did you try again in subsequent years?

22     A.   I don't recall.

23     Q.   Do you recall directing or do you recall if

24   anyone in the Secretary of State's Office had tried in

25   subsequent years?

1      A.   I'm not aware.

2      Q.   In those two years when you did receive the TDL

3  list, how was the comparison made against the VR file?

4  Can you walk me through the process?

5      A.   A person in the Secretary of State's IT

6  department wrote a program to compare the two databases

7  or the two lists and then reported back to the election

8  division the results of potential matches.

9      Q.   And what was done with the list of potential

10  matches?

11      A.   We would review them line-by-line to determine,

12  gain some more certainty whether they were actual

13  matches, and then we would use the normal process under

14  Kansas law.  As I said, county election officers

15  maintained the data.  We would refer back to them.

16  There were cases-- there were cases where we may have

17  referred them.  We did refer them to county prosecutors.

18      Q.   And what was your role in the cross-check and

19  referral process?

20      A.   My role?  I was one of several people in the

21  election office who reviewed the records or obtained the

22  records, reviewed the results and communicated them to

23  election offices in the counties or to the legal

24  division here if there was a case of potential

25  prosecution.

1      Q.   And do you recall approximately how many results

2   came up when the IT person ran the TDL list against the

3   VR file?

4      A.   I don't.  It may have been more than 37.  This

5   e-mail says 37 matches were discovered.  I don't know.

6   But we usually started with the computer program,

7   usually produced a longer list that would have to be--

8   that would've-- that would have to be winnowed.

9      Q.   And what do you recall-- do you recall how many

10   people were on the list as potential non-citizens who

11   registered to vote after winnowing it down?

12      A.   After winnowing it?

13      Q.   Yes.

14      A.   Yes.

15      Q.   Yes.

16            THE COURT:  I'm sorry, are you outside the

17   designation at this point?

18            MS. HA:  I thought this was the objection

19   that was sustained, unless I have it wrong in my notes.

20            THE COURT:  Let me look back at that.  I-- I

21   allowed that additional testimony, so you can go ahead.

22   So, yeah, 56-1 through 7.

23      A.   Okay.  Based on this, I would say 37.  I don't

24   recall that, but I was aware of it at the time I wrote

25   that.

1      Q.   Here it says, "Of those 37, 15 were still on the

2   VR list at the time of the comparison.  22 have been

3   registered to vote but were in the cancelled file."  Is

4   that correct?

5      A.   Yes.

6      Q.   What does it mean to be in the cancelled file?

7      A.   There are various reasons listed in Kansas law

8   where a person who's registered to vote may have their

9   registration cancelled.  Most often mean not with the

10   comparison of the TDL list?

11             MS. HA:  I think you skipped a page.

12             MS. JAYARAMAN:  I'm sorry.

13      A.   It's because of the change of residence, so those

14   cancelled records are maintained.  They're not deleted

15   forever.

16      Q.   And so in terms of the matches that you would

17   continue to review and potentially refer to prosecution,

18   would you include in your review the 22 people

19   registered to vote but in the cancelled file?

20      A.   I don't recall specifically.  I don't recall.

21      Q.   And after getting matches from checking the TDL

22   lists against the VR file, would you or anyone else at

23   the Secretary of State's Office make a request of the

24   DMV for the underlying documents for those matches?

25      A.   I don't remember doing that, no.

1      Q.   Do you remember getting the underlying documents

2   for those matches from the DMV?

3      A.   Not in 2010, no.

4      Q.   Or at any time based--

5      A.   That goes back to the earlier discussion about

6   obtaining documents that were produced as a result of

7   the Real ID Act, but not with this.

8      Q.   And when you say "not with this," do you mean not

9   with the comparison of the TDL lists?

10      A.   Not with the 2010 TDL comparison.

11      Q.   What about the subsequent TDL comparison that you

12   talked about?

13      A.   I believe the other TDL was before this in '09, I

14   can't remember specifically.  But no, I don't remember

15   getting documents from DMV in association with the TDL

16   comparison.

17      Q.   And do you remember making a request from the DMV

18   for underlying documents?

19      A.   I don't.

20      Q.   Did you send other letters referring alleged

21   non-citizens for potential prosecution?

22      A.   Yes.

23      Q.   About how many letters did you send?

24      A.   In all of the years?

25      Q.   Yes.

1    A.   A dozen or more.

2    Q.   And do you remember approximately how many

3  non-citizens who were the subject of those dozen or so

4  letters?

5    A.   I don't recall.  The TDL program we discussed

6  produced some and the others were anecdotal, individual

7  ones here and there.  This letter had three individuals.

8  So I don't remember with any specificity.

9    Q.   Do you recall how these three individuals came to

10  your attention?

11    A.   Without being certain, I think they came out of

12  the TDL program.

13    Q.   In your role as the state election director when

14  you were here, did you interact with individuals from

15  the Department of Revenue or the DMV regarding training

16  of DMV employees?

17    A.   Yes.

18    Q.   Tell me about your role-- tell me what your role

19  was in regards to DMV training.

20    A.   We produced guides and posters, things like that,

21  that they could use in training their driver's license

22  officials statewide.  And I can remember two occasions

23  where I personally went to training programs that they

24  conduct and actually helped train driver's license

25  officials on their voter registration duties under the

1    NVRA and to some extent HAVA federal laws.

2        Q.   When did those two occasions occur?

3        A.   I can't remember the years.  I think that one was

4    probably in 2010 and one program was a few years before

5    that.  I don't remember specifically.

6        Q.   How many people did you train during those two

7    instances?

8        A.   Personally?

9        Q.   Yes.

10       A.   There were rooms-- there were rooms of-- there

11   were probably 150 people in the room, guess.

12       Q.   And you said earlier that the Secretary of

13   State's Office provides guides to the DMV.  Tell me

14   about those guides.

15       A.   We would provide a little document that lays out

16   in simple terms what their duties are under the National

17   Voter Registration Act, federal law or any relevant

18   Kansas laws, try to boil it down to some bullet points

19   that are easy to digest and make it clear to them that

20   their duties are to offer registration to driver's

21   license applicants.

22       Q.   And what exactly did those bullet points say that

23   you recall?

24       A.   I can't recall exactly, but things like each

25   applicant for driver's license or renewal must be

1    offered the opportunity to register to vote.  They would

2    have the words quoted from the federal law that are

3    supposed to be included in the process and information

4    about determining eligibility.  And that's pretty much

5    it.  That was just the application process at the

6    counter.

7        Q.   And how long is that document?

8        A.   Two or three pages.

9        Q.   When was this provided to DMV?

10       A.   Probably several times over the last 20 years.

11   The NVRA passed in 1993.  We did various types of things

12   over the years after that.  I can't specifically recall.

13       Q.   By "several times," do you mean less than five

14   times?

15       A.   I mean more than five times.  Two instances that

16   I personally went that I can remember.

17       Q.   I'm talking about the training manuals.

18       A.   More than five times because we would update

19   things when things changed.

20       Q.   So approximately how often were they updated and

21   provided to the DMV?

22       A.   Two to three years.  But there would be at least

23   annual discussion with DMV officials about whether there

24   was a need for an update, a new one.

25       Q.   And the two instances of training that you

1    remember conducting, you said those were both around

2    2010.  Do I recall that correctly?

3        A.   I remember one was about 2010, I can't recall

4    when the other one was.

5        Q.   Was it close in time?

6        A.   Probably a few years apart before that.

7        Q.   When, to your knowledge, was the last time that

8    someone at the Secretary of State's Office conducted a

9    training session of DMV employees?

10       A.   I would say that if I'm accurate on the 2010,

11   that was probably the last one.

12       Q.   And to your knowledge, when was the last time

13   that the Secretary of State's Office provided training,

14   written training materials to the DMV?

15       A.   About 2013.

16       Q.   Do you know--

17       A.   Let me change that to 2012, because I know that

18   we did some as a part of the implementation of the SAFE

19   Act that was passed in 2011.

20       Q.   Have you heard that DMV employees have given

21   voter registration forms to non-citizens?

22       A.   Yes.

23       Q.   Where have you heard that from?

24       A.   If we would find someone through any of these

25   programs that we discussed, we would look at and see the

1    source of the registration.  Sometimes it was a DMV

2    office and we can inquire with state level DMV officials

3    and they could discuss it with the locals.  If somebody

4    registered at the DMV, that would come to light during

5    the review of it.  We didn't do investigations, per se.

6        Q.   And do you recall approximately how many

7    instances you came across where a DMV employee offered a

8    non-citizen a voter registration form?

9        A.   I can't recall a number.  For the first half of

10   the life of NVRA, citizenship wasn't really part of the

11   discussion.  Only-- and only 2009 or '10 is when it

12   became part of the discussion with Real ID and other

13   factors.

14        But the NVRA simply said when somebody applies or

15   renews, they're offered the registration and it didn't

16   say unless they are not a citizen.  And so it was much

17   easier and there was no one telling DMV officials that

18   at that time, say 1995 to late 1990s at least, or 2000s,

19   there was nobody telling them, be careful if somebody is

20   not a citizen.  So it happened more often in those days.

21        Q.   What level of involvement was there, if any,

22   between the Secretary of State's Office and the DMV?

23        A.   Implementing programs, providing training

24   materials and researching instances where there was a

25   complaint because someone's registration hadn't gone

1   through or somebody was wrongly registered or wrongly

2   cancelled researching those things.

3       Q.   Who created the training manuals that you were

4   talking about before?

5       A.   I did.

6       Q.   Did you have any help?

7       A.   Yes.  I never worked in a vacuum.

8       Q.   Who else participated in that?

9       A.   I would've had others in the election office.  I

10  would've had an attorney help review things because we

11  provide copies of laws that they were carrying out at

12  DMV to show the importance of it.  So we work with

13  attorneys and other officials in the election office.

14      Q.   And did anyone have to approve the training

15  manuals before you sent them to the DMV?

16      A.   Usually if the attorney agreed they were ready to

17  go, they would go.  DMV, of course, could offer edits.

18      Q.   Which attorneys do you recall working with in

19  terms of the training materials?

20      A.   I recall work with Jenny Chaulk-Wentz, Melissa

21  Wangemann, John Wine, up to the era of Ryan

22  Kriegshauser.  There was some in between there.  I have

23  to think about it a while, but there are others.

24      Q.   Do you recall having any discussions with anyone

25  at the DMV about non-citizens offering-- about, I'm

1    sorry, about DMV employees offering non-citizens voter

2    registration forms?

3        A.   Yes.

4        Q.   What were those discussions?

5        A.   The ones I recall were in 2010.   Secretary of

6    State Chris Biggs was aware that there were people who

7    had been offered registrations.   He believed that the

8    MVRA language didn't require everyone to be offered an

9    opportunity to register to vote.   Although I think you

10   could argue that it did.

11       So I helped coordinate a program under his

12   direction where we worked with DMV to produce some

13   posters that would be placed at each driver's license

14   site around the state, trying to clarify that for

15   applicants.

16       Q.   And were those posters created and placed in

17   DMVs?

18       A.   They were created and sent.   I don't know if-- I

19   mean, I trust that they were deployed.

20       Q.   And approximately when was that?

21       A.   That was 2010.

22       Q.   Did you send any additional posters after 2010?

23       A.   I didn't.

24       Q.   We've talked about different methods of trying to

25   identify or prevent non-citizens who have registered to

1    vote.   Other than the methods we talked about this

2    morning, are there any that jump out at you right now

3    for where in your experience at the Secretary of State's

4    Office you've used to identify potential non-citizens?

5        A.   No programs.   I mean, the training materials and

6    things that we would-- that we talked about with the

7    DMV.   We would also have meetings with other agencies

8    that were involved in voter registration because of the

9    Motor-Voter Act, NVRA, like Medicaid, WIC, AFDC, food

10   stamps.   Most of those have new names now and I can't

11   remember them.

12        So we would meet with those agencies once every

13   or year or two to update them on things like the SAFE

14   Act.   So I mean-- but that would be done with an

15   emphasis on citizenship after the SAFE Act was passed.

16   But we didn't really have anything other than programs

17   comparing records or anything.

18        Q.   In your discussions with those agencies, did they

19   include discussions about non-citizens who registered to

20   vote?

21        A.   No, they were applications agencies.   The

22   discussion would be about preventing attempts, to

23   prevent non-citizens from registering to vote even

24   though they might be in the application process for

25   other things.   Those programs.   It would be like

1    preventing them from mistakenly being included in the

2    voter registration process.

3        Q.   Moving on to the KDHE records, vital statistics

4    records.  You were asked if the MOA between the

5    Secretary of State's Office and the KDHE allowed the

6    Secretary of State's Office to determine if an alleged

7    non-citizen was registered-- determine if a person

8    registered to vote was a non-citizen.

9            If a person's citizenship was in doubt, could the

10   Secretary of State's Office include that person's name

11   in the batch of names sent to KDHE in a given month to

12   see if a Kansas birth certificate existed?

13       A.   Yes.  Yeah, we could do that, yes.

14       Q.   You were also asked about the DMV and training

15   materials.  The subject of posters came up that were

16   sent to-- let me ask you about it.  Who produced those

17   posters that were sent to the DMV?  Were they produced

18   by the Secretary of State's Office or by the DMV?

19       A.   We did.  The posters were to inform driver's

20   license applicants who were also going to be given the

21   opportunity to register to vote pursuant to NVRA, to

22   inform them of the citizenship requirement and the fact

23   that you can't register to vote if you're not a citizen.

24           So, as I recall, I provided the content, worked

25   with our publications office here and had them approved

1  by DMV officials.

2      Q.   And how many posters were produced, if you

3  remember?

4      A.   A few hundred, enough to put two or more in each

5  local office, DMV office.

6      Q.   And did the DMV training sessions also include a

7  direction to the DMV people that only citizens should be

8  permitted to register to vote?

9      A.   As I recall, yes, they did.

10     Q.   Okay.  So we've got the poster, the training

11  materials and the written training materials.  Were

12  there any other written communications or spoken

13  communications with the DMV, such as a supplemental

14  e-mail or a phone conversation telling DMV officials

15  make sure this happens?  Were any other directions and

16  training given?

17     A.   Yeah, there were several of us in this office who

18  could and often did make phone calls or send e-mails to

19  people at DMV saying, here's the situation we've come up

20  with, or we've had a rash of incorrect applications.

21  This doesn't always mean citizenship was involved but

22  just a problem in the application process.

23          So it was very common for us to contact them and

24  say the office in Johnson County or in Augusta needs to

25  be retrained in some way, they need to be-- have it

1    emphasized to them this is part of their duties, just to

2    clean it up.

3        Q.   So looking at those types of communications, did

4    those occur via e-mail or via phone or both?

5        A.   Both.

6        Q.   In any given year, how many of those corrective

7    communications about a particular DMV office would

8    happen?

9        A.   I would say communications involving a particular

10   office or a particular applicant would be probably in

11   the dozens in an election year, maybe fewer in a

12   non-election year.

13       Q.   Do you recall any posters like the one you

14   described provided from the Secretary of State's Office

15   to the DMV after approximately 2012?

16       A.   No.  The only instance I can recall of that I

17   think-- the only instance I can recall of that was I

18   think in 2010.

19       Q.   Do you recall any instances after 2010 of posters

20   being provided?

21       A.   I don't recall any.

22       Q.   And do you recall any instances where a training

23   session was given by the Secretary of State's Office to

24   the DMV after 2012?

25       A.   To the state DMV office?

1    Q.   Yes.

2    A.   As I recall, we had at least one meeting with

3  them to discuss the SAFE Act and how it might change

4  things.

5    Q.   And in that meeting, do you recall discussing

6  non-citizen voter registrations at the DMV?

7    A.   I don't recall discussing that specifically, no.

8    Q.   When was the last training session that you

9  recall where the Secretary of State trained DMV

10  employees about the provision of voter registration

11  forms to non-citizens?

12    A.   You say the Secretary of State trained DMV

13  employees, that would have been the two that I recall.

14  I don't recall going to one of those personally after

15  2010 or so.

16    Q.   And you testified that you would've been aware if

17  anyone else at the Secretary of State's Office went to a

18  training session or provided training to the DMV.

19  Correct?

20    A.   Yes.

21    Q.   And in terms of the corrective materials that you

22  were talking about earlier, was there anyone else at the

23  Secretary of State's Office who would've been involved

24  in making those phone calls or e-mails?

25    A.   Yes.

1      Q.   Who would they be?

2      A.   Mostly it would've been Bryan Caskey other than

3   me.

4              MS. HA:  That's all we have on designations.

5              THE COURT:  Thank you.  All right.

6              MR. STEINER:  Your Honor, just one

7   administrative question I think really for Your Honor

8   before we break, which is:  We're in a somewhat unique

9   situation with Ms. Lehman because we called her, so

10  she's on cross but she's their witness.  And I think it

11  would just provide all of us clarity as to whether they

12  can or cannot consult with her overnight.

13             THE COURT:  Mr. Kobach.

14             MR. KOBACH:  I'd also add that we might be

15  able to resolve this.  Did you guys get the thumb drive

16  yet?

17             MS. WALDMAN:  We're still missing one, but

18  we trust we will get the ELVIS file tonight if you want

19  to address that.

20             MR. KOBACH:  I mean, if we can-- if we want

21  to address the admissibility of it so we can know if

22  it's coming in or not, because it will change

23  dramatically how the examination occurs tomorrow if it's

24  not.

25             THE COURT:  Okay.  I don't have a copy of

1    that.  I think I handed it back.  I don't know,

2    somebody's-- am I missing a binder?  I-- because my-- I

3    had defendant's exhibits that go up to 1086.  This was

4    1133 I believe.

5                 MR. KOBACH:  Yeah, 1133.

6                 MR. BONNEY:  There should be a small binder

7    for Ms. Lehman's testimony.  We thought we had it.

8                 THE COURT:  Okay.  I just-- I think she had

9    it, not me, but-- okay.  Okay.  So it sounds like you're

10   close to providing the underlying documents.

11                Plaintiff, have you already reviewed them

12   and at least-- you're missing one, but have you reviewed

13   the ones that you received and are satisfied that it

14   matches with the summary or do you need to do that

15   tonight?

16                MR. HO:  We need to do that tonight, Your

17   Honor.  I mean, we don't have any reason to think that

18   they don't match, but the numbers look right, we just

19   want to take a-- have an opportunity to take a look at

20   it.

21                MR. KOBACH:  Your Honor, I just want to

22   clarify.  He's had 38-- 35 of the 38 for more than a

23   year.  So there's only three persons in that, three.

24                THE COURT:  But he hasn't had the summary,

25   has he?

 1              MR. KOBACH:  He's had the summary, the

 2    versions of the summary all through this time.  And the

 3    latest summary was produced to them on the 12th of

 4    February.

 5              MS. LIU:  Your Honor--

 6              MR. KOBACH:  It just has two additional

 7    entries.  It was the same as the summary they've had

 8    months and months before that.

 9              MS. LIU:  Your Honor, that's not true.  We

10    hadn't received all the different-- different entries at

11    all, the underlying records, apart from the three that

12    we're missing.  And so--

13              MR. KOBACH:  So you're saying you don't have

14    the other 35?

15              MS. LIU:  We have them today.

16              MR. STEINER:  We've been getting them

17    gradually over the course of the last couple of weeks--

18              MR. KOBACH:  But you agree you've had--

19    you've had them for at least a month, the other 35?

20              THE COURT:  Okay.  I'm going to give you

21    tonight--

22              MS. LIU:  Not--

23              THE COURT:  I'm going to give you tonight to

24    review these.

25              MS. LIU:  Thank you, Your Honor.

1          THE COURT:  And so I will rule tomorrow

2    after I hear whether there's any further objection to

3    the admission of this as a summary.  And my ruling will

4    be based on whether there's an objection to the accuracy

5    of this, which is curable of course.

6          If you review records and determine there's

7    something on here that doesn't seem to match with its

8    underlying data, talk to each other about it.  It's

9    something that can be cured.

10          The other objection, though, I think was

11   that there's-- there's a hearsay objection.  And tell me

12   what on the summary you contend is hearsay.

13          MS. LIU:  It's actually hearsay within

14   hearsay, Your Honor.  She just testified that she-- oh,

15   it's the "notes" column of the exhibit.  She--

16          THE COURT:  Okay.  Because the other columns

17   are the data, the underlying records.  Right?

18          MS. LIU:  Correct.

19          THE COURT:  Okay.  And if those records are,

20   I mean, available to you and they're-- you know, they're

21   public records, you've used ELVIS records, you've

22   admitted some of them I think, I'm not so much concerned

23   about that.

24          So the first columns that show the

25   registration ID, the date of the application, the

1   source, I mean, where the application was done, their

2   current citizenship status, their date of

3   naturalization, if any, and whether or not they voted

4   are all based on the ELVIS database.  Correct?

5           MS. LIU:  That's correct, Your Honor.

6           THE COURT:  Okay.  So I think it's

7   appropriate for this witness who's testified that she

8   was involved in the compilation of this, although she

9   might not have done all of the underlying footwork, she

10  was the one that ensured that it was compiled and she's

11  the one that transmitted it.  So those columns don't

12  concern me.

13          Now, the last thing, though, to talk about

14  is this final column, which I haven't read every one of

15  these entries, but it has things like they were

16  registered for over however many years prior to being a

17  citizen.  That sounds like something that is not based

18  on an interview but is based on the records.

19          MR. KOBACH:  Your Honor, I can explain that.

20          THE COURT:  They were registered under a

21  different name, that sounds like perhaps something that

22  comes from-- I can't tell.  But there are things in here

23  that look like-- I mean, I thought I saw something--

24  like she cancelled her registration and then

25  re-registered after being sworn in as a citizen sounds

 1   like it's based on something that person said.

 2           And then there are quotations from what some

 3   of these folks said.  Like, for example, this on the

 4   bottom of Page 1 of the summary, it says, "Her statement

 5   was that she, quote, was a permanent resident of the

 6   U.S. and did not know she wasn't allowed to vote until

 7   after 2008 when one of her friends told her she

 8   couldn't.  She then stopped voting, unquote."  That's a

 9   hearsay statement.

10           MR. KOBACH:  Your Honor, could I--

11           THE COURT:  So anyway--

12           MR. KOBACH:  -- can I introduce that-- refer

13   to that?  So each of the column seven entries was

14   drafted by Ms. Lehman herself.  Those are-- those are

15   her drafts of what-- and each of the content of those

16   column seven entries is deducible, except for that one

17   you just mentioned where-- the quote of what she said,

18   although that one might even be in the notes field, I'm

19   not sure.

20           But each one of-- an expert or a person who

21   is experienced in looking at the ELVIS database could

22   deduce all of column seven by looking at the ELVIS

23   field.  Okay.  There might be one or two cases where

24   she-- where a conversation with the actual non-citizen

25   is referred in there which might not be in the ELVIS.

1    But the point is that Ms. Lehman herself is the author

2    of the content, so it's not hearsay.

3              And then, of course, we would argue that

4    even if somehow it could be considered hearsay, we have

5    the 803(6) records of regularly conducted activity

6    exception which it fits perfectly, as well as 803(8)

7    public records exception.

8              This would be a document that we would be

9    releasing on KORA if a person would seek an Open Records

10   Act access to this document.  We regard it as a public

11   record contained by our office.  So it fits both of

12   those exceptions to hearsay, but we don't think it even

13   comes close to hearsay itself.

14             MS. LIU:  Your Honor, may I respond to that?

15             THE COURT:  Are you finished, Mr. Kobach?

16             MR. KOBACH:  Yes.

17             THE COURT:  Okay.

18             MS. LIU:  It is hearsay within hearsay.

19   First of all, she did not testify to what Mr. Kobach

20   just said.  She testified to the fact that she did not

21   personally create the spreadsheet.  Someone at the

22   Secretary of State's Office, not even her office,

23   ultimately created the spreadsheet.  The notes

24   incorporated information received by Ms. Lehman from

25   others.

1          She also personally doesn't have a

2    conversation with each applicant.  She also just

3    testified that in supervising the collection of the data

4    to put in the spreadsheet, she isn't doing it pursuant

5    to a manual.  So it-- it's just plainly hearsay within

6    hearsay.

7          MR. KOBACH:  Your Honor, can I respond to

8    that?

9          THE COURT:  All right.  Several things--

10   several things come to mind.  The first is, there's some

11   confusion in my mind, because I recall that she

12   testified that for a period of time she created these

13   summaries and transmitted them to Secretary Kobach and

14   then at some point-- and then they were creating their

15   own summaries and at some point they merged.  I'm a

16   little bit unclear on that.  I can go back and look on

17   my notes.

18          But I do think she testified that she was

19   involved in compiling-- you know, people under her

20   direction, people in her office, were taking this data

21   and-- and working on this spreadsheet and that she was

22   sort of the final person that oversaw this and

23   transmitted it to the Secretary.  So I think she is the

24   proper person to introduce this summary, given that she

25   was involved with it, she oversaw it.  Again, assuming

1    that the underlying data match up with what's in here.

2    So that's the first six columns.

3           In Column No. 7, I agree with Mr. Kobach,

4    there are-- and I haven't gone through every one of

5    these entries, there's 35 or 38 you said.  Some of the

6    information in here looks on its face to be deducible

7    from records.  So, in other words, they're just a

8    reiteration of more information from records and

9    admissible.  Some of it, though, seems to come from

10   out-of-court statements made by these particular

11   registrants.  And I have not heard a foundation that--

12   that satisfies me that those hearsay statements are

13   admissible.

14          First of all, under the business records

15   exception, which is 803(6) - the summary may or may not

16   be a business record - but that business records, even

17   if they're admissible, if there's hearsay imbedded

18   within them I still have to find an independent basis to

19   admit the hearsay.

20          So I'm satisfied that it became a course of

21   action in the Sedgwick County office to compile this

22   information and send it to the Secretary of State and

23   that they did this in the regular course of their

24   business beginning at some point.  So in that sense it

25   fits the business records exception, but that still

1   doesn't resolve the issue of these-- those parts of

2   column seven that come from out-of-court statements by

3   these registrants--

4                    MR. KOBACH:  Your Honor, if you--

5                    THE COURT:  -- because those in and of

6   themselves are hearsay.  So the business records

7   exception does not-- does not make admissible those

8   particular statements.

9                    The other section, public records, again,

10  doesn't-- I don't think applies to these-- these hearsay

11  statements of the registrants because the public records

12  exception is a record or statement of a public office.

13  And this is not a record or statement of a public

14  office.  It's a record-- it's a statement of somebody

15  that was interviewed by somebody in a public office.

16                   That-- this particular exception requires

17  that this record or statement of a public office set out

18  the office's activities or set out a matter observed

19  while under a legal duty to report, but not including,

20  in a criminal case, a matter observed by law enforcement

21  personnel.

22                   Another way to do this under public records

23  is in a civil case or against the government in a

24  criminal case, factual findings from a

25  legally-authorized investigation.  That doesn't apply.

 1           So I don't think either one of these

 2    exceptions really cures the hearsay nature of those

 3    statements that come from the interviews.

 4           So the way to handle this is, again, lay

 5    your foundation with Ms. Lehman, get the summary in,

 6    redact-- redact those hearsay statements.  Only allow

 7    into the summary those that are-- that information

 8    that's deducible from the records that underlie this.

 9           MR. KOBACH:  And that's just what I was

10    going to suggest, Your Honor.  We can redact-- I think

11    there's only two or three quoted statements from the

12    applicant themselves.

13           I just have a question though.  If any of

14    those statements are on-- in some cases-- I believe in

15    one case the applicant wrote the statement on a card

16    that was received by the Sedgwick County Election

17    Office.  Would you want that to come in or should we

18    redact that one as well?

19           THE COURT:  Written or oral I think is a

20    problem because there's a reliability issue which, of

21    course, is what underlies all hearsay.  So I think oral

22    or written statement.  It's an out-of-court statement,

23    it's not a business record, it's not a public record.

24           MR. KOBACH:  Just one thought, Your Honor.

25    If it-- if in a particular case it is a statement

 1  against interest, would we-- would you still--

 2          THE COURT:  The statement-- no, because

 3  it's-- that's a statement against the interest of a

 4  declarant, but we don't even-- well, no.  I mean, the

 5  statement of interest rule really has to do with parties

 6  that make a statement against their own interest.  The

 7  party is the declarant.  So that doesn't apply because

 8  these folks aren't the party to this litigation.

 9          MR. KOBACH:  We can just go ahead and redact

10  all of them then.

11          MR. JOHNSON:  Your Honor, I hate to be--

12          THE COURT:  Okay.  All right.  You all are

13  making me work triple time, I must say.

14          MR. JOHNSON:  -- the tail that wags the dog

15  here.

16          THE COURT:  I'm sorry?

17          MR. JOHNSON:  I hate to be the tail that

18  wags the dog here.  I haven't gotten any of this

19  information.  I haven't gotten any of these ELVIS files.

20  I'm sorry, the defendant seems to forget that the Parker

21  Bednasek case is another case.  They provide the

22  information to the Fish plaintiffs, they don't provide

23  it to us.

24          THE COURT:  All right.  So--

25          MR. JOHNSON:  We have none of these 38 files

1    and now we're-- and if they can get them to us, we're

2    supposed to look at them tonight.

3              MR. KOBACH:  It wasn't part of his request

4    for production, but we can certainly get him--

5              MR. JOHNSON:  Your Honor, request for

6    production has nothing to do with it.  It has to do with

7    the foundation for this document.  Under Rule 1006, they

8    have to provide that information, they haven't, even if

9    we didn't ask for it.

10             THE COURT:  I agree.  So you're going to

11   have to provide it to Mr. Bednasek's counsel tonight so

12   he has an opportunity to compare it for accuracy as well

13   because he has a right to object to offered evidence as

14   well.  So that needs to be accomplished tonight as well.

15             Okay.  What other things can we handle

16   tonight that will hopefully make tomorrow go a little

17   more smoothly?

18             MR. STEINER:  And in terms of consultation

19   between Ms. Lehman and her counsel in the current state

20   of affairs?

21             THE COURT:  Right.  Right.  Since she is in

22   the middle of cross examination, I do think it would be

23   inappropriate for counsel to confer with her about her

24   cross examination because she's their witness at this

25   point.  Okay?

 1              MR. STEINER:  Thank you, Your Honor.

 2              THE COURT:  All right.  Anything else?

 3              MR. KOBACH:  I assume, Your Honor, we can

 4    tell her just that she will be in in the morning and

 5    that what-- not conferring about the content of her

 6    testimony, just give her the details of when she has to

 7    be here, what's going to happen?

 8              THE COURT:  Which I already did, I told her

 9    to be here at 9:00.

10              MR. KOBACH:  Okay.  Great.

11              THE COURT:  Or maybe I amended that to 9:15

12    because I wanted to take up things with you at 9:00

13    which we've now taken up.  But we'll leave the time

14    between 9:00 and 9:15 if anything else comes up

15    overnight.

16              Actually, I'm going to have to finally rule

17    on this summary in the morning.  So we'll meet at 9:00

18    and then we'll look for Ms. Lehman to start at 9:15.

19    Okay?  Is there something else?

20              (The Court and courtroom deputy confer).

21              THE COURT:  So I have another hearing at

22    8:30, but it shouldn't take more than 30 minutes

23    downstairs.  I should be ready to go at 9:00 here.

24    Okay?

25              It's after 5:00.  Another thing I should

1   caution you is the courthouse closes at 5:00 and so try

2   to leave as quickly as you can only because the

3   courthouse security is not supposed to staff after 5:00

4   unless they're paid overtime.

5           And given the state of the third branch of

6   the government, which our budget is less than a half

7   percent of-- less than one-half percent of the entire

8   federal budget, yet we're constantly harangued and

9   harassed to cost contain.  We're supposed to stop trials

10  at 5:00 so that we don't have to pay overtime to

11  security.  I'm not very happy about that.  I think that

12  we should be able to have trials as late as we want to,

13  but that's kind of the world we live in these days,

14  so...

15          MR. STEINER:  Thank you, Your Honor.

16          THE COURT:  All right.  Thank you.  We'll

17  see you back at 9:00.

18          (5:16 p.m., proceedings recessed).

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4       I, Kelli Stewart, a Certified Shorthand Reporter and

5   the regularly appointed, qualified and acting official

6   reporter of the United States District Court for the

7   District of Kansas, do hereby certify that as such

8   official reporter, I was present at and reported in

9   machine shorthand the above and foregoing proceedings.

10      I further certify that the foregoing transcript,

11   consisting of 179 pages, is a full, true, and correct

12   reproduction of my shorthand notes as reflected by this

13   transcript.

14      SIGNED March 14, 2018.

15

16

17

18          /s/ Kelli Stewart

19          Kelli Stewart, CSR, RPR, CCR, RMR

20

21

22

23

24

25