1                     UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF KANSAS
2

3     PARKER BEDNASEK,

4          Plaintiff,

5     v.                              Docket No. 15-9300-JAR

6     KRIS W. KOBACH,

7          Defendant.
      _____     _____
8
      STEVEN WAYNE FISH, et al.,
9
           Plaintiffs,
10
      v.                              Docket No. 16-2105-JAR
11
                                      Kansas City, Kansas
12    KRIS W. KOBACH,                 Date:  03/09/2018

13         Defendant.                 Day 4 (P.M. Session)
                                      Pages 1039-1212
14    .................................................

15                    TRANSCRIPT OF BENCH TRIAL
16          BEFORE THE HONORABLE JULIE A. ROBINSON
                   UNITED STATES DISTRICT JUDGE
17

18    APPEARANCES:

19    For Case No. 15-9300 Plaintiffs:

20    Mr. Mark P. Johnson           Mr. Mark T. Emert
      Mr. Curtis E. Woods           Fagan, Emert & Davis, LLC
21    Dentons US LLP                730 New Hampshire
      4520 Main Street              Suite 210
22    Suite 1100                    Lawrence, Kansas 66044
      Kansas City, MO 64111
23

24

25    (Appearances continued on next page)

```
 1   APPEARANCES:

 2   (Continued)

 3   For Case No. 16-2105 Plaintiffs:

 4   Mr. Dale E. Ho                Mr. Stephen D. Bonney
     Mr. R. Orion Danjuma         ACLU Foundation of Kansas
 5   Ms. Sophia Lin Lakin         6701 West 64th Street
     Ms. Emily Zhang              Suite 200
 6   American Civil Liberties     Overland Park, KS 66202
     Union Foundation - NY
 7   125 Broad Street
     New York, NY 10004

 8
     Ms. Angela Liu
 9   Ms. Daphne T. Ha
     Mr. Neal A. Steiner
10   Ms. Rebecca Waldman
     Dechert, LLP - NY
11   1095 Avenue of the Americas
     New York NY 10036

12

13   For the Defendant Kris W. Kobach:

14   Mr. Garrett Roe
     Mr. Kris Kobach
15   Ms. Susan Becker
     Kansas Secretary of State
16   120 Southwest 10th Avenue
     Memorial Hall, First Floor
17   Topeka, KS 66612

18

19

20

21

22   _____

23          Kelli Stewart, CSR-KS, CCR-MO, RPR, CRR, RMR
                      Official Court Reporter
24          259 U.S. Courthouse, 500 State Avenue
                    Kansas City, Kansas 66101

25
```

```
 1                    I N D E X

 2
     Fish Plaintiffs' Witnesses:                    Page
 3
     LORRAINE MINNITE
 4     Cross Examination By Mr. Roe                  1042

 5   KRIS KOBACH (Videotaped Deposition played)     1200

 6

 7   Defendant's Witnesses:                          Page

 8   HANS von SPAKOVSKY
       Direct Examination By Mr. Kobach             1055
 9     Cross Examination By Mr. Ho                   1093
       Cross Examination By Mr. Johnson             1171
10     Redirect Examination By Mr. Kobach           1175
       Recross Examination By Mr. Ho               1189
11

12

13                  E X H I B I T S

14     Fish Plaintiffs'
       Exhibits          Offered        Received
15
            67            1201           1201
16          68            1201           1201
            69            1201           1201
17         127            1164           1164
           144            1118           1118
18         145            1126           1126
           147            1156           1156
19         148            1202           1202

20

21     Defendant's
       Exhibits          Offered        Received
22
           864            1056           1056
23         865            1065           1066

24

25
```

 1                  (1:18 p.m., proceedings commenced).

 2                  THE COURT:  All right.  You can be seated.

 3                        LORRAINE MINNITE,

 4      called as a witness on behalf of the Fish Plaintiffs,

 5      having first been duly sworn, testified as follows:

 6                        CROSS EXAMINATION

 7      BY MR. ROE:

 8      (Continued)

 9         Q.   Doctor Minnite, I just have a few more questions.

10      Do you remember we were talking about voter fraud

11      earlier?

12         A.   Yes.

13         Q.   Okay.  So if thousands of non-citizens all voted

14      in an election by accident, no willful violation, you

15      would say there was no voter fraud?

16         A.   Say that again.

17         Q.   If a thousand non-citizens all voted in an

18      election, it was all totally by accident, none of them

19      had any willful behavior, you would look at that and you

20      would say there was no voter fraud by those people?

21         A.   Well, I-- I don't know how you'd know that it was

22      all by accident, but we could take it as a hypothetical.

23      I would say that that was a very flawed election and

24      that people voted illegally in it.

25         Q.   So-- I'm sorry.  Your-- your position now is

1   that-- are you saying it might be voter fraud even if

2   they do it without any willful or by accident?

3       A.  Well, if you want to--

4               MS. LAKIN:  Objection to the extent it

5   mischaracterizes Doctor Minnite's testimony.

6               THE COURT:  Sustained.

7       Q.  (BY MR. ROE)  Okay.  So you're just saying it's a

8   problem that we should look into, but you're not stating

9   that it's voter fraud?

10      A.  I'm-- I'm stating what I just said, which is that

11  it was a flawed election, there were illegal votes

12  apparently cast in that election.  And it-- it's a

13  serious issue.

14      Q.  But it's not voter fraud?

15      A.  Well, I don't know.

16      Q.  I'm giving you a hypothetical under your

17  definition.  It's all by accident, they didn't know they

18  weren't supposed to do it.  That's all-- that's the

19  information.  That's it.

20      A.  Well, you're representing that as the truth.

21  Right?

22      Q.  Yes, for the purposes of this hypothetical.

23      A.  It may not be fraud but it's still illegal.

24      Q.  So it's--

25      A.  I don't-- I keep the two things very close

 1    together.

 2       Q.  I agree with you on that, it's definitely

 3    illegal.  I just want to make sure it's not voter fraud

 4    under your definition.

 5       A.  If it's not the intentional corruption of the

 6    electoral process by voters, then I don't technically

 7    call it voter fraud for purposes of measurement.

 8       Q.  Okay.  And if--

 9       A.  But that doesn't that--

10       Q.  I know--

11       A.  -- I don't take into account the context.  That's

12    the whole point.

13       Q.  Okay.

14       A.  And that I ignore illegality.

15       Q.  Okay.  So you-- okay.  So you admit it's illegal,

16    it's just not voter fraud.  Right?  That's your

17    testimony?

18       A.  If that's what you're representing to me, that

19    there's an election and there are a thousand

20    non-citizens who voted and none of them did it

21    intentionally, then it wouldn't be fraud by my

22    definition, that's correct.

23       Q.  Okay.  Do you recall talking about the-- do you

24    recall the chart of the DOJ indictments that you have in

25    your expert report?

1     A.   Where?

2     Q.   In your first expert report.

3     A.   Can you show me where that is?

4     Q.   I think it's Page 12.

5     A.   Yes.

6     Q.   Okay.   On the chart there is various different

7   crimes there, right, there's voter fraud, there's-- I'm

8   sorry, is it voter fraud, there's-- I'm sorry, it's

9   election fraud.   Correct?

10    A.   It says election fraud violations.

11    Q.   Okay.   And there's-- there's other ones, there's

12   tax evasion?

13    A.   Yes.

14    Q.   Okay.   That chart, you understand it to be

15   indictments of all-- to be all the-- the indictments in

16   2005 by the Bush Administration; is that correct?

17    A.   This is data taken from a database that is not

18   produced by the Bush Administration, it was produced by

19   the Administrative Office of U.S. Courts.

20    Q.   I'm not asking if the Bush Administration

21   produced the data, I'm asking if that's what the data

22   represents is the number-- the indictments for those

23   sets of crimes in 2005.

24    A.   It's for fiscal year 2005.

25    Q.   Okay.   And you'd agree that a prosecutor-- so

1    these are indictments, correct, do you know what an

2    indictment is?

3        A.  Yes.

4        Q.  Okay.  So you agree, though, that even if a

5    prosecutor has some kind of evidence for an indictment,

6    he may not file an indictment?

7        A.  Yes.

8        Q.  Okay.  So you're not-- you're not representing

9    that that chart is all of those crimes that were known

10   in 2005?

11       A.  That's correct.

12       Q.  Okay.  In the Washington case you mention, the--

13   the governor's race, do you remember that in your

14   report?

15       A.  You'd have to show it to me.  I write it-- I

16   write about it in my book as well.

17       Q.  Okay.  Do you recall-- here we go.  Page 12 and

18   13.

19       A.  Okay.

20       Q.  Do you recall this, the-- the election-- the

21   governor's race in Washington in 2004?

22       A.  Yes.

23       Q.  Okay.  You state that, correct me if I'm wrong,

24   that-- that some 25 ballots or .009 percent of the

25   total-- of the total 2.8 million cast were invalid

1  because they were cast in the names of deceased voters

2  or double votes.  Right?

3      A.  Where are you there?

4      Q.  On Page 13.

5      A.  Okay.  Yes.

6      Q.  Okay.  You know the range-- the margin of victory

7  in this case was 129 votes.  Right?  You don't include

8  that in your-- in your report, do you?

9      A.  I don't know.  I-- I include-- I'm looking.  But

10  I certainly include it in my book, which I cite as the

11  information for this case.

12      Q.  This is the court case you cite, correct, the

13  court opinion from the--

14      A.  It looks like it.

15      Q.  It's the report of the proceedings?  Okay.

16      A.  Yeah, which I cite in the-- in the-- in my

17  report.

18      Q.  Okay.

19      A.  Footnote 38.

20      Q.  Turn to Page 18 and 19, please.  Can you read

21  that that's highlighted?

22      A.  Where do you want me to start?

23      Q.  So-- so you're saying you don't recall if the

24  margin of victory in this case was 129 votes; is that

25  what you're saying?

1    A.   I'm not-- I know it was very small.  I don't

2  remember.

3    Q.   Okay.  Well, I'm going to represent to you--

4    A.   Well, actually I do remember.

5    Q.   Okay.

6    A.   There was a certified number.

7    Q.   Uh-huh.

8    A.   And it ended up having to be changed because of--

9  I think this is the case that there were-- there had to

10  be a few ballots deducted at the end of it.

11    Q.   Yes, yes.

12    A.   So the number changed a little bit, that's why

13  I'm having trouble remembering.

14    Q.   You would agree it was approximately 129, right,

15  that was the approximate margin of victory?  I'm going

16  to represent to you that was the approximate margin of

17  victory, okay, just for time sake.  All right?

18        Now, in this case in which the margin of victory

19  was approximately 129 votes, the court found that 1,401

20  votes were cast by convicted felons.

21    A.   Where are you reading?

22    Q.   In these highlighted areas.

23    A.   Right.  But where?

24    Q.   Should I read it into the record?

25    A.   I'm just not following you.

1    Q.  Okay.  Okay.  "Here, petitioners have established

2  by clear and convincing evidence that 754 felons

3  voted--"

4              THE COURT:  Wait a minute.

5              MS. LARKIN:  Objection.

6              MR. ROE:  I'm sorry.  I'm trying to help

7  her, Your Honor.  So I cannot-- I cannot read it in the

8  record?

9              THE COURT:  Point her to the page and

10  paragraph without reading it, but--

11              MR. ROE:  Okay.

12    A.  You had me on the wrong page.  That's why.

13    Q.  (BY MR. ROE)  Page 18.

14    A.  I know.  Yeah, but I was looking here.

15    Q.  Oh, okay, I'm sorry.

16    A.  Yeah.  Okay.

17    Q.  Okay.

18    A.  All right.

19    Q.  So--

20              THE COURT:  Counsel, I feel like we're

21  really getting into the weeds on--

22              MR. ROE:  Your Honor, I will direct her to

23  the question--

24              THE COURT:  No, no, no, just let me finish.

25  I feel like we're getting in the weeds.  I know she

1   testified about voting, but I just want to remind

2   everybody that the standard is successful registrations,

3   it's not even attempted registrations.  It's-- it's--

4   ultimately it's a matter of successful registrations and

5   whether that's substantial.

6          I understand-- I've heard of evidence beyond

7   that by both sides, but I just feel compelled to point

8   that out because we are getting in the weeds on other

9   cases that had to do with actual numbers of votes cast,

10  et cetera.

11          MR. ROE:  Well, I'm just-- she brings it up

12  in her expert report.

13          THE COURT:  I agree, I agree.

14          MR. ROE:  I mean, it's the majority of her

15  expert report is talking about, you know, other cases of

16  voter fraud like this.  I mean, I just want to point it

17  out.  Anyway.

18          THE COURT:  Okay.  Go ahead.

19  Q.  (BY MR. ROE)  So again, 1,401 votes were cast by

20  convicted felons in that case, was found by that court?

21  A.  "Here, petitioners have established by clear and

22  convincing evidence that 754 felons voted at the general

23  election in 2004."

24  Q.  Yes.  And then the next one.

25  A.  "Intervenors have established that 647 felons

1    voted at the same election."

2      Q.  All right.  I will represent to you that if you

3    add those numbers together they equal 1,401.  Okay?

4      A.  Okay.

5          MS. LAKIN:  Objection, Your Honor.  It's not

6    entirely clear from this what the-- Mr. Roe has stated

7    here from this information that that-- those aren't

8    duplicate votes, for instance.

9          MR. ROE:  Okay.  Fine, Your Honor.

10          THE COURT:  Why don't you-- well, you can--

11    you can clear that up on redirect.

12      Q.  (BY MR. ROE)  Okay.  So assuming it's 1,401,

13    that's approximately seven times the number of that

14    margin of victory.  Right?

15      A.  If you say so.

16      Q.  And you don't think this is-- you don't think

17    that's a problem?

18      A.  No, you're-- you're really distorting my views.

19      Q.  Okay.  Sorry, let me rephrase.  You don't think

20    that's substantiated evidence of voter fraud?

21      A.  That's not what the judge found.

22      Q.  Okay.

23      A.  The-- what the judge found in this case was that

24    many of these people had been mailed ballots by the

25    election board, which was a mistake.  And when you get a

1   ballot in the mail and you don't understand if you're on

2   parole maybe you're not allowed to vote, and you send it

3   back in, then that vote--

4           MR. ROE:  Your Honor--

5       A.  -- gets counted.

6           MR. ROE:  If Ms. Lakin would like to cross

7   her or redirect on the explanation, I just want to make

8   sure we're clear.  You know, it's fine.

9           THE COURT:  I think the answer was no, she

10  doesn't-- she doesn't agree with the premise of your

11  question.

12          MR. ROE:  Okay.

13      Q.  (BY MR. ROE)  All right.  Last set of questions.

14  The *Sanchez versus Dornan* case--

15      A.  Yes.

16      Q.  -- which you mentioned and you're familiar with

17  that?

18      A.  Yes.

19      Q.  Okay.  I believe in your report that they

20  ultimately found no evidence of fraud, right, on Page 13

21  of your report.

22      A.  The initial report?

23      Q.  Yes.

24      A.  Because I--

25      Q.  Yes, it is.  Yes.

1     A.   -- speak about that a couple times, so-- yes.

2     Q.   Okay.  You're not disputing that the House

3   Administrative Committee which investigated that

4   election contest filed by the Dornan against-- the

5   Dornan campaign against Loretta Sanchez in the contest

6   where she won by less than 1,000 votes, that the

7   committee in its official report on its investigation

8   found that more than 600 votes were cast by

9   non-citizens?  You're not disputing that?

10    A.   No.

11    Q.   Okay.

12              MR. ROE:  Thank you.  That's all.

13              MS. LAKIN:  No further questions, Your

14  Honor.

15              THE COURT:  Mr. Johnson.

16              MR. JOHNSON:  I have nothing.  Thank you,

17  Your Honor.

18              THE COURT:  May Doctor Minnite be excused?

19              MS. LAKIN:  Yes.

20              THE COURT:  All right.  Thank you.  You may

21  call your next witness.

22              MR. HO:  Your Honor, at this time the only

23  witness that the plaintiffs would call is Secretary

24  Kobach via video deposition.  But we've discussed this

25  with Secretary Kobach and there's been a request that

1    the defense has made to allow them to put on some of

2    their witnesses in the hopes that they can get back to--

3    they've come in from out of town, in the hopes that they

4    can get back.  And the concern that Secretary Kobach has

5    is that if we play the deposition, we may not have

6    enough time to get his witnesses on and off the stand so

7    that they can go home.

8                We don't have an objection to it.  But, you

9    know, we would put on Secretary Kobach's deposition if

10   it were our choice.  But out of courtesy to the defense,

11   if the Court is fine with it when he makes this request

12   to put on some of his witnesses out of order, we don't

13   object to that.

14               THE COURT:  Okay.  Okay.  So let me--

15   because there's some work to be done with respect to

16   some of your witnesses, Mr. Kobach.  So which witnesses

17   are you wanting to call this afternoon?

18               MR. KOBACH:  We were wanting to call Mr. von

19   Spakovsky and Mr. Camarota, both of whom are hoping to

20   fly back to Washington, D.C., this evening.

21               THE COURT:  Oh, these are your two experts

22   and you're planning to call them live?

23               MR. KOBACH:  Yes.

24               THE COURT:  Okay.

25               MR. JOHNSON:  Your Honor, I don't have any

1  objection to this also.

2           THE COURT:  Okay.  Let's proceed.

3           MR. HO:  I guess what I would just say

4  briefly, though, Your Honor, is that we would like to

5  make a decision after Mr. von Spakovsky testifies

6  whether to go forward with the video deposition or with

7  Mr.-- or with Doctor Camarota, depending on how much

8  time there is left.

9           THE COURT:  Okay.  I understand.  All right.

10  Let's proceed.  You're going to call Doctor von

11  Spakovsky.  I'm sure I'm butchering your name, I'm

12  sorry.

13                    HANS von SPAKOVSKY,

14  called as a witness on behalf of the Defendant, having

15  first been duly sworn, testified as follows:

16                    DIRECT EXAMINATION

17  BY MR. KOBACH:

18    Q.  Mr. von Spakovsky, could you spell your name for

19  the Court?

20    A.  Sure.  It's Hans, H-A-N-S.  von, v, and that's a

21  small v, O-N.  Spakovsky, S-P-A-K-O-V-S-K-Y.

22    Q.  Mr. von Spakovsky, is this your-- does this

23  appear to be your resume that I just handed to you?

24    A.  Yes, it is.

25           MR. KOBACH:  Your Honor, I'd like to

1  introduce Mr. von Spakovsky's resume into evidence.

2              THE COURT:  The exhibit number, please.

3              MR. KOBACH:  Exhibit No. 864.

4              THE COURT:  Any objection?

5              MR. HO:  No objection, Your Honor.

6              MR. JOHNSON:  No objection, Your Honor.

7              THE COURT:  Exhibit 864 admitted.

8      Q.  (BY MR. KOBACH)  Mr. von Spakovsky, what is your

9  occupation?

10     A.  I'm an attorney and currently a senior legal

11 fellow at The Heritage Foundation and manager of their

12 election Law Reform Initiative.

13     Q.  And do you teach any classes on the side?

14     A.  I'm an adjunct at the Scalia Law School where I

15 teach a class on election law.

16     Q.  And the Scalia Law School is affiliated with

17 which university?

18     A.  George Mason University.

19     Q.  And again, which class do you teach?

20     A.  Election law.

21     Q.  Please tell us about your own educational

22 background.

23     A.  I have a undergraduate degree from the

24 Massachusetts Institute of Technology and a law degree

25 from Vanderbilt University.

1    Q.  And what is your work history I guess beginning

2  with your legal work?

3    A.  I was in private practice for two years.  When I

4  got out, then I was an in-house corporate counsel in

5  Atlanta.  I moved to Washington in 2001 to take a job in

6  the U.S. Department of Justice, the civil rights

7  division.  I started off as a trial attorney in the

8  voting section, which is responsible for enforcement of

9  all federal voting rights laws, the Voting Rights Act,

10  the Help America Vote Act, the National Voter

11  Registration Act and the UOCAVA, the Uniformed and

12  Overseas Citizens Absentee Voting Act.

13      I was then promoted to counsel to the Assistant

14  Attorney General for civil rights.  I was in that

15  position for three years providing advice to the

16  Assistant Attorney General and helping coordinate

17  enforcement of federal voting rights laws.  I then spent

18  two years on the federal--

19    Q.  Well, let's-- before we get there, I just want to

20  talk more about your Department of Justice.

21    A.  Sure.

22    Q.  So what were the years that you were at the

23  Department of Justice?

24    A.  I was there from 2001 to 2005.  And while I was

25  there, I'm sorry, I should've mentioned that I was the

1   Department of Justice representative on the first Board

2   of Advisors to the U.S. Election Assistance Commission.

3   I also served on two different committees, one a-- a

4   committee for IEEE, that's the Institute of Electronics

5   and Electrical Engineers.  They had a committee that was

6   working on trying to establish standards for voting

7   equipment.

8        I also served on another committee for OASIS.

9   You know, Washington is full of acronyms.  OASIS is the

10  Organization for the Advancement of Structured

11  Information Systems.  And they were also trying to work

12  on standards for the software and other such devices

13  used in the-- in the voting field.

14      Q.  And is it correct that you were the Department of

15  Justice's representative on those committees?

16      A.  Yes.

17      Q.  And, I'm sorry, I interrupted you.  Then after

18  you left the Justice Department in 2005, what did you

19  do?

20      A.  I spent two years at the Federal Election

21  Commission as a commissioner.  Our responsibility was to

22  enforce the Federal Election Campaign Act which governs

23  campaign financing for anyone running for Congress for

24  the presidency.

25      Q.  How many commissioners are there on the Federal

1   Election Commission?

2       A.   There are six commissioners.

3       Q.   What do the commissioners do?

4       A.   We formulated and issued regulations to enforce

5   the Federal Election Campaign Act.  We also did audits

6   of federal campaigns as well as enforcement matters.  So

7   if-- if someone had a complaint that a congressional

8   candidate or a presidential campaign had violated the

9   law, we would investigate that and make a decision as to

10  whether they had violated the law and whether or not

11  some kind of a fine or penalty was appropriate for that.

12      Q.   Is it correct that prior to becoming a federal

13  election commissioner you served as a location election

14  board member; is that correct?

15      A.   Yes.  When I was a practicing lawyer in Atlanta,

16  I spent five years on the Fulton County Registration

17  Election Board.  This was-- the election board was

18  responsible for all processing of voter registrations

19  and the running of elections in Fulton County, which is

20  the metropolitan-- metropolitan Atlanta area and was the

21  largest county in Georgia.

22          I also spent three years as the vice chairman of

23  the Fairfax County Electoral Board.  That's in Virginia.

24  Fairfax County also is the largest county in the state

25  of Virginia and had the same responsibilities;

1    processing all voter registrations, administering the

2    voter registration system, and also running the polling

3    places on election day.  And then, of course, you know,

4    counting ballots and also making decisions on things

5    like provisional ballots that had been filed on election

6    day.

7        Q.   Would the Fairfax County Election Board have a

8    staff that works under it?

9        A.   Yes.  There were three members of the electoral

10   board.  We had a general registrar who was a full-time

11   employee of the county and took direction from us on the

12   running of elections and the processing, administering

13   of the voter administration system.

14       Q.   So would the election board in Fairfax County be

15   roughly analogous to the election commissioner in-- like

16   of Sedgwick County in Kansas or of Johnson County?

17   Would that be a rough analogy?

18       A.   Well, we're the board that's running-- I mean,

19   the general registrar worked for the Board.  So we would

20   set policy and also make all decisions on-- on whatever

21   issues came up, including, you know, final issues on the

22   hiring of personnel, how much equipment-- how much

23   voting equipment should be at various precincts, any

24   issues arising over voter registration, things like

25   that.

1    Q.   And where were you working when you served on the

2  Fairfax County Election Board?

3    A.   I was working at The Heritage Foundation.

4    Q.   Okay.  So let's go back to your career timeline.

5  After leaving the Federal Election Commission, what did

6  you do?

7    A.   That's when I went to The Heritage Foundation and

8  went to work in their legal center.

9    Q.   And have you been there ever since?

10    A.   I have, yes.

11    Q.   And that was in what year?

12    A.   2008.

13    Q.   Your CV also mentions the Public Interest Legal

14  Foundation.  What work have you done there?

15    A.   I'm on the Board of the Public Interest Legal

16  Foundation.  It's a non-profit group whose mission is

17  improving election integrity across the country.

18    Q.   Have you published any books on voter fraud?

19    A.   Yes.  I've published-- I co-authored a book

20  called "Who's Counting?  How Fraudsters and Bureaucrats

21  Put Your Vote At Risk."  I also contributed a chapter to

22  a book put out by the American Bar Association.  They

23  asked me to do a history summary and the effects of the

24  National Voter Registration Act.  "America Votes," the

25  name of the book.  I've also-- I also did a chapter on

1    election issues for another book published recently

2    called Liberty's-- "Liberty's Nemesis."

3        Q.  So in addition to the book you co-authored, the

4    two chapters that you just described, have you written

5    any articles or other publications on voter fraud?

6        A.  Yes.  I-- I've published an extensive list of

7    studies and reports for The Heritage Foundation.  I've

8    also done other reports.  For example, I recently

9    co-authored a-- a manual on-- with Don Palmer, who's the

10   former chief election official for the state of Virginia

11   and the state of Florida, on best practices for election

12   officials to improve the integrity of the voter

13   registration system.

14       Q.  And is that a book that is intended to advise

15   election administrators nationally or is that just

16   limited to Virginia?

17       A.  Well, it's not a book, it's like a-- I don't

18   know, it's like a 20-page manual that goes through all

19   the different ways that election-- local election

20   officials can improve the integrity of the voter

21   registration process and voter lists.  And it was

22   distributed to election officials all over the country.

23       Q.  Have you been asked to serve on any boards or

24   committees dealing with elections other than the ones

25   you've already mentioned?

1    A.   Yes.   Last year I was appointed by President

2  Donald Trump to his Advisory Commission on Election

3  Integrity.

4    Q.   Have you been appointed to serve on any ABA

5  committees or boards?

6    A.   Well, I-- I haven't been-- I haven't been

7  appointed to a ABA committee, but it was the ABA

8  committee, I think it was on state and local government,

9  that contacted me.   Ben Ginsberg I think was the

10  chairman and he asked me to contribute a chapter to the

11  book that the ABA was putting out on the American

12  election process.

13    Q.   Have you done any studies of election turnout?

14    A.   I have.   I've done a series of reports for The

15  Heritage Foundation where I would take a look at states

16  like Georgia, Kansas, Texas, and some others where I

17  would get the official and other turnout data from those

18  states and look at what the turnout was both before and

19  after they passed, for example, a-- a voter ID law to

20  see what effect it-- it might have.

21    Q.   Have you ever been invited to testify before

22  Congress?

23    A.   Yes, in the last ten years numerous times.

24    Q.   Roughly how many times?

25    A.   Well, I-- I've kind of lost count, at least a

1    dozen times, probably-- maybe a dozen-and-a-half or

2    more.

3        Q.  And was your testimony about elections?

4        A.  Most of it-- most of the time, but I've also been

5    asked to testify about-- about other issues, such as

6    most recently I-- I testified about federal district

7    court judges issuing injunctions with national scope.

8            MR. KOBACH:  Your Honor, I offer Mr. von

9    Spakovsky as an expert witness in the subjects of

10   elections, election administration and voter fraud.

11           MR. HO:  Your Honor, just to preserve the

12   record, we note our objections made in our *Daubert*

13   motion.

14           MR. JOHNSON:  And, Your Honor, for the

15   record, the Plaintiff Bednasek joins in that objection.

16           THE COURT:  All right.  Your objections are

17   noted for the record.  Consistent with my *Daubert*

18   ruling, I overrule those objections and allow-- and

19   recognize Mr. von Spakovsky as an expert in the fields

20   of elections, election administration and voter fraud.

21       Q.  (BY MR. KOBACH)  Mr. von Spakovsky, I'm going to

22   show you Exhibit 865.  Is this your expert report that

23   you submitted for this case?

24       A.  Yes, it is.

25           MR. KOBACH:  Your Honor, I'd like to offer

1    into evidence Mr. von Spakovsky's expert report,

2    Exhibit 865.

3            MR. HO:  Your Honor, we object.  The expert

4    report in its unredacted form as it exists - and it has

5    been submitted to the Court - contains numerous passages

6    which Your Honor excluded Mr. von Spakovsky-- numerous

7    passages addressing topics which Your Honor excluded Mr.

8    von Spakovsky from testifying about, including about

9    three pages worth of text about survey research on Pages

10   15 through 17 of the report.  There were also various

11   legal conclusions about the word "substantial" sort of

12   sprinkled throughout the report which Your Honor also

13   excluded.

14           MR. KOBACH:  Your Honor, if you wish, I can

15   amend my motion and move the admission of his report

16   with the exception of the portion dealing with the

17   survey.  And I believe that starts on Page 15 in the

18   first full paragraph and ends on Page 16 at the end of

19   the first three paragraphs.

20           MR. HO:  Your Honor, we would still object.

21   Your Honor clearly found that Mr. von Spakovsky is not

22   qualified to testify on survey research.  Beyond the

23   portions that Mr. Kobach identified at the bottom of

24   Page 16, Mr. von Spakovsky offers opinions based on a

25   Rasmussen poll.  On Page 17, he offers opinions based on

1  a Brennan Center survey, so we would move for the

2  exclusion of those pages as well.

3         If Mr. Kobach is willing to agree to that,

4  then we're fine with him using portions of the report in

5  order to expedite the testimony of Mr. von Spakovsky.

6  But we would also ask that when it's formally moved into

7  evidence that references to "substantial" in relation to

8  the number of non-citizen registrations in Kansas also

9  be redacted from his report.

10         MR. KOBACH:  Your Honor, I would agree with

11  redacting Page 15 from the word "Kansas voters" through

12  the end of the paragraph before "Conclusion" on Page 17.

13  However, I don't think redacting the word "substantial"

14  would be appropriate since many of the expert reports

15  include the word "substantial."

16         THE COURT:  All right.  So I will admit

17  Exhibit 865 subject to redaction of any references to

18  those matters that I excluded in the-- in the *Daubert*

19  ruling.  That includes the McFerron survey, it includes

20  other surveys.  It's probably not practical to exclude

21  if he mentions substantial, but I will disregard.  As I

22  cautioned you with respect to every witness, I'll

23  disregard anything that I consider to be a legal

24  opinion.  But subject to those redactions, 865 admitted.

25         MR. HO:  Thank you, Your Honor.

1          MR. JOHNSON:  And for the record, I'd join

2     in Mr. Ho's objections.  And thank you, Your Honor.

3          THE COURT:  So noted.

4     Q.  (BY MR. KOBACH)  Mr. von Spakovsky, is this your

5     expert report?

6     A.  Yes, sir, it is.

7     Q.  Are the sources that you used in your expert

8     report contained or noted in your expert report?

9     A.  They are.

10     Q.  Do you think this country has a problem with

11     non-citizens being able to easily register and vote?

12     A.  Yes, I do.  It's because we have mostly an honor

13     system throughout the country and there are numerous

14     examples of non-citizens registering and voting, whether

15     intentionally or-- or through accident.  A few examples

16     show that, that it's an ongoing problem.

17          In the early 1980s, a federal grand jury in

18     Chicago publicly released its report, something very

19     unusual since federal grand juries normally operate

20     under a veil of secrecy.  And their grand jury report

21     noted the results of their investigation of a very large

22     voter fraud case in-- in Chicago.

23          One of the-- amongst the various kinds of fraud

24     that they noted was the problem of aliens registering

25     and voting in the city for various reasons, including

1    the fact that a voter ID card can be used to obtain

2    other kinds of-- of ID.  And I believe in that case the

3    Justice Department actually ended up prosecuting and

4    convicting around two dozen aliens.

5        If you move to the 1990s; this subject has

6    already been mentioned.  In 1996, Bob Dornan, who was

7    the incumbent Republican congressman from a district in

8    California, filed an election contest against the winner

9    of his re-election contest, Loretta Sanchez.  She won by

10   less than 1,000 votes.  His contest was investigated by

11   the House Administration Committee which has

12   jurisdiction over those kind of contests.

13       One of the things they did in the case was they

14   compared the voter registration list and those who had

15   voted against INS records and their official report

16   concluded that over 600, I believe 624, individuals who

17   had voted in that election were not U.S. citizens.

18   There was circumstantial evidence they said of another

19   196.

20       So they didn't overturn the election because

21   there was still a small margin of the victory, but the

22   point was that literally hundreds of non-citizens had

23   voted in that election.  And we would never have known

24   about it except for the fact an election contest was

25   filed.

1      If you move to the 2000s, in 2005, as another

2   example, the legislative auditor in the state of Utah

3   did a sampling audit of driver's licenses which had been

4   issued to illegal aliens.  Utah was one of the few

5   states that did that.  And the audit turned up the fact

6   that a couple of hundred illegal aliens had actually

7   registered in the state.  And there was an estimate put

8   out by a state senator that if this sample audit was

9   extended to the entire population of driver's license

10  holders, that there might be 5 to 7,000 individuals--

11  aliens with licenses.

12      There are many more examples, including last year

13  when officials in Virginia admitted that they had

14  removed 5,500 non-citizens from the voter rolls but not

15  before they had cast 7,500 ballots.

16      MR. HO:  Your Honor, I'm going to lodge an

17  objection.  This testimony about some incident in

18  Virginia that occurred last year does not appear

19  anywhere in Mr. von Spakovsky' expert disclosures.  I

20  think he just testified that it happened last year,

21  which is 2017.  His disclosures were in 2016.  I also

22  don't believe that the 2005 incident in Utah is in his

23  expert report, although I can't-- I'd like to

24  double-check that to be 100 percent sure about it.

25      THE COURT:  All right.  He is limited to

 1   testify to what's in his expert report.  Is the Utah in

 2   your expert report?

 3              THE WITNESS:  Yes, ma'am, it is.

 4              MR. HO:  Yeah, I apologize, Your Honor, I

 5   just looked at it and saw that it is.

 6              THE COURT:  I'll disregard the testimony

 7   about Virginia.

 8   Q.   (BY MR. KOBACH)  Mr. von Spakovsky, looking at

 9   the *Dornan-Sanchez* case investigated by the

10   congressional committee, was that investigated because

11   Congressman Dornan filed a contest?

12   A.   That's correct.

13   Q.   In your opinion, has voting by aliens--

14   non-citizens occurred in other congressional races as

15   well?

16   A.   Yeah.  When we-- we have-- we have cases that

17   have been prosecuted in many different places.  A couple

18   of cases, for example, that I cite in my expert report,

19   there are two opinions from the Seventh Circuit Court of

20   Appeals.  And the Seventh Circuit Court of Appeals'

21   opinions detail two separate aliens who came to the

22   United States, both of them to Illinois.

23        Almost as soon as they got here, they went and

24   got driver's licenses and also registered to vote.  They

25   then promptly voted, including in a federal election.

1   So they would've been voting for individuals for

2   Congress.

3          And the-- again, the only reason those cases came

4   to light-- they were not discovered by election

5   officials.  According to the Seventh Circuit opinions,

6   they were discovered when these individuals-- they were

7   aliens who had come here legally, but they applied for a

8   change of status with the INS.  And that's the point at

9   which it was discovered that they had, in violation of

10  federal law, illegally registered and voted.  But the

11  election officials in Illinois did not discover that.

12  Q.   Is it your view that election officials are

13  limited in the tools they have to discover aliens on the

14  rolls?

15  A.   Yes.  Yes, they are.

16  Q.   In your opinion, is the signature or affirmation

17  on a voter application a sufficient way to stop a

18  non-citizen from registering either intentionally or

19  accidentally?

20  A.   No, because there are numerous cases-- again, for

21  example, the two Seventh Circuit cases where the

22  individuals-- where they filled out the registration

23  forms, according to the opinions, they checked "yes"

24  that they were citizens and signed the affirmation form

25  swearing that they were citizens despite the fact that

1  they were not.

2     Q.  Are you familiar with the non-citizens discovered

3  by the Sedgwick County, Kansas Election Office which you

4  describe I believe in your report?

5     A.  Yes.  I-- I was given that to review when I was

6  preparing my expert report.

7     Q.  I'm going to ask you to take a look at

8  Exhibit 1133, the exhibit I think we have all almost

9  memorized by now.

10        Do you-- do you-- were you in the courtroom when

11  the plaintiffs' expert, Ms. Minnite, went through some

12  of those cases?

13     A.  I was, yes.

14     Q.  Is it your opinion as you looked at those cases

15  that the individuals in those cases did not commit

16  something that can be described as fraud?

17     A.  No, I think anytime a non-citizen registers,

18  anytime a non-citizen votes, they are-- whether

19  intentionally or-- or by accident, I mean, they are

20  defrauding legitimate citizens from a fair election.

21     Q.  Is it your opinion that in many of these cases

22  the fact that the non-citizen was registered would not

23  have been discovered but for the fact that the

24  non-citizen registered again at the naturalization

25  ceremony?

1      A.  Yes, that's my opinion.

2      Q.  Is it your expert opinion that Sedgwick County

3   has discovered a significant fraction of the

4   non-citizens on the voter rolls in Sedgwick County?

5      A.  I think they've probably only--

6           MR. HO:  Objection.  Leading, Your Honor,

7   and also gets to the ultimate legal conclusion in the

8   case.

9           THE COURT:  I'll overrule.  Significant.

10  I'll hear his opinion on that but, as you know,

11  ultimately I'll decide what's substantial and what's

12  significant.

13          MR. HO:  Thank you.

14     Q.  (BY MR. KOBACH)  You may answer.

15     A.  Well, I'll answer that by saying that it's highly

16  unlikely that they have discovered whatever the number

17  is of non-citizens who have registered to vote in the

18  county.  The last figures I saw, and I believe it's in

19  my expert report, is that less than half of the

20  individual aliens who are in the United States become

21  citizens.

22          So that means a large number of aliens who are

23  here, you know, legally are not going to be caught at

24  naturalization ceremonies.  Certainly illegal aliens are

25  not going to be caught at naturalization ceremonies.  So

1  if that's your only source of being able to determine

2  whether an alien has registered, you are not going to

3  find all of them just through naturalization ceremonies.

4     Q.  Could you catalog for us the states that you

5  describe in your expert report where what you would

6  regard as conclusive evidence of registering by

7  non-citizens has occurred?  I know you just mentioned

8  California, the *Dornan* case, but could you go through

9  the other states that you've talked about?

10     A.  Well, I think I mentioned Utah.  Illinois is

11  certainly mentioned in those Seventh Circuit decisions.

12  And in a third case, a decision from the Board of

13  Immigration Appeals at the Justice Department of a third

14  alien who also registered to vote in-- in Illinois.

15        The Justice Department while I was there,

16  although it was not my division, prosecuted aliens in

17  the state of Florida not just for registering and voting

18  but also including an alien who tried to run for the

19  state legislature, even though that, of course, was

20  illegal under the law.  And there are various other

21  cases in-- in other states that are documented in a-- in

22  a database we maintain at The Heritage Foundation.

23     Q.  So you've mentioned specific cases out of

24  California, Utah, Illinois, Florida.  And I think you

25  also mentioned Virginia during your tenure at the Board

1    of Elections; is that right?

2       A.   Yes.  I should say when I-- and I mentioned this

3    in my expert report.  When I was on the Fairfax County

4    Electoral Board, we discovered more than 270

5    non-citizens who were not only registered to vote but

6    over 100 of them had cast ballots in prior elections.

7          We-- after investigating the cases and

8    determining that these individuals really were

9    non-citizens, we took them off the voter rolls.  We also

10   forwarded information about these individuals to both

11   the commonwealth's attorney for Fairfax County, that's

12   the equivalent of the county district attorney in other

13   states.

14          And we also forwarded it to the U.S. Justice

15   Department because for an alien to register and vote

16   was-- was not only a violation of Virginia state law, as

17   it is in all states, but it's also a violation of

18   federal law.  Unfortunately, although we took them off

19   the rolls, neither the commonwealth's attorney nor the

20   Justice Department did anything about those cases.

21      Q.   And how were those 270 cases discovered in

22   Fairfax County?

23      A.   They were discovered by checking with the DMV.

24   And what had happened with these individuals was a

25   combination of two things.  They were either

1    individuals-- well, some of them were individuals who

2    had I believe contacted the general registrar because

3    they were now trying to apply for citizenship.  And

4    there is a question on the citizenship application

5    asking an alien whether they have registered or voted.

6          So these were people who wanted to-- you know, in

7    that-- in the citizen application process and wanted to

8    make sure that they were taken off the voter

9    registration lists.

10          Others were individuals who when they went to

11   renew their driver's license said that they were not

12   U.S. citizens, despite the fact that the first time they

13   went to get their driver's licenses they had asserted

14   they were U.S. citizens.  So that's how we discovered

15   them.  Most basically by accident.

16   Q.   And you mentioned cases discovered while you were

17   at the Justice Department in the state of Florida.  How

18   many such cases were there?

19   A.   I think there were about a dozen prosecutions.

20   Q.   All right.  You also mentioned in your expert

21   report the Government Accountability Office study of

22   2005.  What did the GAO study find?

23   A.   Well, the GAO was looking at information that

24   might be able to be gathered that would help state

25   election officials.  They took a look at I think eight

1    federal district courts, at the jury-- jury lists since

2    most federal district courts summon their juries from

3    voter registration lists.

4         And in that GAO report, I think they-- four of

5    the district courts said that they didn't have anyone

6    who was excused from jury duty for being a non-citizen,

7    but then four of the courts said they had had

8    individuals excused from jury duty for not being U.S.

9    citizens.  And the numbers range-- I think the maximum

10   from one of the courts was up to 3 percent of

11   individuals who had been called for jury duty and had

12   been excused because they were not U.S. citizens.

13   Q.   In the *Reyes* case in the Florida, is it correct

14   that that concerned someone who did not realize that she

15   could not register to vote?

16   A.   Yeah.  The Anailin Reyes case is a-- this is a

17   case and an order issued by the federal immigration

18   courts at the U.S. Justice Department.  Ms. Reyes was a

19   alien who came legally to the United States from Cuba.

20   She was at the-- I think it was the Duval County

21   courthouse with her mother and another-- and I think her

22   sister.  And as she came out of the courthouse,

23   according to the judge, they were stopped by a group

24   that was engaging in a voter registration drive, wanted

25   them to register to vote.

1          She told the individual that she was not a U.S.

2     citizen and, according to the judge, was told that that

3     didn't matter, that she should register to vote anyway.

4     And that case again ended up in front of the immigration

5     court, and it was clear that-- that the judge believed

6     that she had been told by this voter registration group,

7     which she-- she couldn't remember who it was or

8     identify, that it was okay for her to register to vote.

9     Q.   In your experience at the Justice Department,

10    do-- does it sometimes occur that a person who

11    accidentally or believing the representation of others

12    registers to vote despite being a non-citizen sometimes

13    end up being prosecuted or deported?

14    A.   Well, for example, 18 U.S.C. 611, which is the

15    federal statute that bars aliens from voting, is a

16    strict liability statute.  It does not-- if you read it

17    carefully, it doesn't have any intent or knowledge of--

18    of the law, you know, knowledge that you're doing wrong

19    as-- as a part of the statute.

20         So there are certain federal laws where-- like if

21    you register or you vote as an alien, you're-- you're

22    going to be in big trouble, including the fact that it

23    may bar you from being able to apply for a

24    naturalization to become a citizen.

25    Q.   So in your opinion, does the proof-of-citizenship

1  requirement serve as a safety net for those aliens to

2  help them avoid inadvertently breaking the law?

3      A.   Oh, yes, I think so, particularly if they're in a

4  situation where someone such as in the Anailin Reyes

5  case mistakenly tells them, no, it's okay for you to

6  register to vote.

7          Or in another case, it was another good example

8  of this which I mentioned in my expert report; and that

9  is, in the early 2000s there was an election contest in

10  Compton, California.  The mayor there lost his

11  re-election by I think about 300 votes.

12          There was testimony in that case by aliens on the

13  stand that they had registered and voted in that case.

14  And the Court eventually barred an individual who had

15  been elected to the City Council from ever holding

16  public office again in California under a-- a state

17  statute that allows that to be done because of the fact

18  that the Court found that she had solicited and

19  convinced aliens to register to vote in the election.

20      Q.   In your opinion, do you believe voting by

21  non-citizens can affect the outcome of elections?

22      A.   Well, what I would say about that is I-- and I

23  agree with what the-- the Supreme Court said in the

24  *Crawford* case, which was the case involving Indiana's

25  voter ID law.  And, you know, the Court said - and I

1    think it's correct - is that the United States has a

2    long history of voter fraud.  It's been documented by

3    journalists and historians and it can make the

4    difference in a close election.  And that's the key.

5         You know, making a comparison to how many votes

6    are cast statewide is not the right comparison.  What

7    you have to realize is that we have hundreds of

8    elections in this country at the state and local level.

9    And many of those elections are decided by a very small

10   number of votes.  And that's why even a relatively small

11   number of non-citizens could make the difference in a

12   race that's decided by a small number of votes.  And we

13   have cases like that all the time.

14        Q.   And do you believe, in your opinion, that that

15   risk warrants a proof-of-citizenship requirement?

16        A.   Yes, I do.

17        Q.   Are you aware of any other states other than

18   Kansas that have a proof-of-citizenship requirement?

19        A.   Yes.  My understanding is there are three other

20   states.  Alabama has put in a proof-of-citizenship

21   requirement.  Also Georgia and Arizona have both-- both

22   laws of which were pre-cleared by the Justice Department

23   as non-discriminatory as part of the Section 5 process

24   when that was still in place.

25        Q.   Which two were pre-cleared by the Justice

1   Department?

2        A.   Arizona and Georgia.

3        Q.   Do you have an opinion on the alternatives to

4   requiring proof of citizenship suggested by plaintiffs

5   in this case?

6        A.   Well, the alternatives aren't very good.

7        Q.   Well, let's go through them one-by-one.

8        A.   Sure.

9        Q.   Let's look at comparing voter rolls to TDL,

10  temporary driver's license lists, what is your problem

11  about the utility of doing so?

12       A.   Well, the problem with that, as I understand it,

13  is that that list does not contain permanent resident

14  aliens, which make up a fair portion of the alien

15  population.  So you're going to miss those.

16            You're also going to miss aliens who are in the

17  country perhaps legally but who do not have a driver's

18  license and don't apply for a driver's license.  And

19  you're certainly not going to pick up aliens who are in

20  the country illegally.

21       Q.   What about jury duty questionnaires as a

22  mechanism to prevent non-citizens from registering to

23  vote?

24       A.   Well, jury questionnaires in which individuals

25  excuse themselves from jury duty because they assert

1   they're not a U.S. citizen, that might help you find a

2   small number of non-citizens who are registered to vote.

3   But the number of individuals called for jury duty is a

4   very small percentage of the number of registered voters

5   in most states.

6        And you're assuming that the non-citizen answers

7   the jury form truthfully when they say-- you know, most

8   non-citizens if they're on the voter registration list

9   may not want to admit that they're not a U.S. citizen

10  when they're called to a courtroom.

11  Q.   And I'm going to ask you next about the SAVE

12  database which you talk about in your report, but I want

13  to put up on the screen for you Exhibit 882, which is

14  the letter.

15       While she's doing that, let's jump ahead.  Let's

16  look at the fourth alternative, which is the EVVE

17  database.  Do you have any opinion on that database's

18  effectiveness as a means of preventing non-citizens from

19  registering?

20  A.   Well, EVVE is the Electronic Verification of

21  Vital Events.  It's a system used by state agencies and

22  I think the federal government.  But the problem with

23  that system is that in order to check an individual's

24  name on it, you have to have their mother's maiden name

25  and their state of birth.  And that information is not

1   collected by any election officials anywhere in the

2   country for voter registration purposes.

3      Q.   And what about the I guess fifth alternative

4   offered by plaintiffs, prosecution as a deterrent.  What

5   is your opinion of that as a mechanism for preventing

6   non-citizens from registering?

7      A.   Well, it's hard to do prosecutions when-- unless

8   you can find the problem.  And as some of the cases I

9   cited show, since we basically have an honor system in

10  most of our voter registration process, you can't

11  prosecute cases if you can't discover them.  And often

12  we only find non-citizens when there's an election

13  contest and we-- they actually do an examination of the

14  individual voters.

15       So that's just-- that's not enough of a deterrent

16  to prevent individuals from registering to vote,

17  particularly if it's people who mistakenly believe that

18  they-- they can register to vote, perhaps a permanent

19  resident alien who doesn't understand that they're not

20  allowed to register to vote.

21       And as I've said before, and I think it's very

22  important to understand, is that if a-- if an alien

23  votes, whether they do it accidentally or intentionally,

24  that negates the vote of an eligible citizen and that is

25  defrauding the American public of a fair election.

1    Q.   And I'm not sure if it was mentioned while you

2    were in the courtroom, but I'll represent to you that in

3    recent years Kansas has prosecuted or in the process of

4    prosecuting two non-citizens for registering or voting.

5         Do you think that those prosecutions will be

6    sufficient to deter future non-citizens from registering

7    to vote?

8    A.   I have no idea.  I would hope so, but I don't

9    think there's any guarantee that they will.

10                   MR. KOBACH:  Do you have Exhibit 818?

11   Q.   (BY MR. KOBACH)  This is returning back to the

12   SAVE database subject as an alleged alternative.  Okay.

13   If we could scroll down.  As you'll see, this is a

14   letter-- no, I'm sorry, it's the answer to this letter.

15   Is it the same exhibit?  Okay.  There we go.

16        You'll see that this is an answer to-- is a

17   letter to my office from-- dated August 20th, 2012.  And

18   you'll see in the second paragraph-- could you review

19   that second paragraph there?

20   A.   Sure.  (Reads document).  I've reviewed it.

21   Thank you, yes.

22   Q.   So you see-- do you see the two requirements that

23   the Department of Homeland Security imposes on an agency

24   wishing to use the SAVE database?

25   A.   Yes.  And I-- even without reviewing this, I'm

1    aware that the SAVE database, for example, requires

2    the-- the A number, what's known as the alien number

3    that's assigned to aliens who are legally in the United

4    States in order to search the SAVE databases.

5        Q.   And is there an additional requirement in this

6    letter?

7        A.   Yes.   In this letter they're also saying that

8    they want a copy of the immigration document in question

9    to complete the verification process.

10       Q.   And in your experience and expertise as an

11   election administrator and one who studies elections, is

12   that a practical or even possible thing for a state to

13   do in its voter registration database?

14       A.   No, it's not.

15       Q.   Are you aware of any other states that have

16   attempted to gain access to the SAVE database in a

17   meaningful way?

18       A.   Well, I think I heard yesterday and-- a claim

19   that Virginia, for example, was using the SAVE system.

20   That's not correct.   Don Palmer, the former state

21   election official, chief state election official for

22   Virginia, did sign an agreement with the Department of

23   Homeland Security to use the SAVE system, but my

24   understanding is that it's never actually been

25   implemented because of these kind of requirements making

1  it too difficult to use.

2          MR. HO:  Your Honor, I'm going to object and

3  move to strike that answer.  This is not in Mr. von

4  Spakovsky's report and he's contradicting the testimony

5  of Secretary Kobach's own witness.  So it's not

6  impeaching any of our witness testimony.

7          THE COURT:  I'll disregard this testimony.

8  It's not in the witness report.

9      Q.  (BY MR. KOBACH)  Mr. von Spakovsky, I'd finally

10  like to address the last section of your report

11  regarding the burden allegedly caused by the

12  proof-of-citizenship requirement.

13          Are you familiar with the Kansas law at issue in

14  this case?

15      A.  Yes.  I've reviewed it and I took a look at the

16  13 different ways-- 13 different types of documents that

17  can be used to satisfy the requirement, plus the fact

18  that Kansas also has basically a-- an escape clause at

19  the end that allows an individual to provide any other

20  documentation that he or she believes could prove that

21  they are a U.S. citizen.

22      Q.  Is this a relatively large list of qualifying

23  documents, the 13 you just mentioned?

24      A.  Yeah, it's a very broad list.  In fact, it's a--

25  it's a broader list than what most states are using, for

1    example, for their-- their voter ID laws.

2        Q.   And what is the importance of the-- I can't

3    remember how you described it, but the clause where a

4    person does not possess their documents but may,

5    nevertheless, request a hearing, why do you think that's

6    important?

7        A.   Well, it's important because there may be other

8    documents that are not specifically listed that could be

9    used to-- to prove citizenship.  And the fact that the

10   individual has the ability to submit that to the, you

11   know, Kansas Secretary of State so that there can be a

12   review of that, I think it provides all the flexibility

13   needed to ensure that people who are eligible will be

14   able to register and vote.

15       Q.   Based on what you observed in other states with

16   respect to voter ID laws and the documents to satisfy

17   that, how would you compare the burden in Kansas for

18   providing proof of citizenship?

19       A.   I think it's a very tangential burden, one that's

20   not any different from the other things you have to do

21   to be able to register to vote.

22       Q.   How about the 90-day rule where the individual

23   has 90 days to proof of citizenship, what effect do you

24   think that has?

25       A.   Well, that gives folks plenty of time to meet the

1    requirements, and particularly the fact that even if the

2    90 days expires, then you can re-register and a new

3    90-day period starts up.

4       Q.  And what effect do you think the Kansas efforts

5    to obtain citizenship documents from Vital Statistics or

6    the Division of Vehicles have on the law?

7       A.  Well, I mean, that's also a very good step

8    because that-- that has automated the process.  My

9    understanding is that the state of Kansas checks on a

10   monthly and regular basis with both DMV and your Vital

11   Statistics agency to check for birth certificates of

12   individuals born in Kansas and with DMV to-- to see if

13   they have documents indicating your-- your citizenship.

14           So that-- that kind of automates the process and

15   takes the burden off of the individual registration

16   applicant.

17      Q.  In your experience at the Department of Justice

18   and as a voter-- voting administrator in Virginia and

19   Florida and in your experience analyzing cases of voter

20   fraud, is it common for people who are found guilty of

21   willfully voting or registering illegally to claim when

22   first confronted that their behavior was just a mistake?

23      A.  That seems to be a--

24           MR. HO:  Objection, Your Honor.  I don't

25   believe this is in Mr. von Spakovsky' expert report.

1          THE COURT:  I don't know what the foundation

2    would be for him to render such an opinion, so I'll

3    sustain.

4       Q.  (BY MR. KOBACH)  Mr. von Spakovsky, do you have

5    direct knowledge of cases that were filed by the Justice

6    Department during your tenure?

7       A.  Yes, I-- I do.

8       Q.  In your experience, did individuals who were

9    charged initially respond by saying it was just a

10   mistake?

11          MR. HO:  Same objection, Your Honor.

12          THE COURT:  With the limited number of cases

13   that you were involved at the Justice Department, I'll

14   allow you to answer if you have independent recollection

15   of what happened in those cases.

16      A.  I-- I think that's usually what defendants claim

17   in cases, including the civil rights cases that we

18   would-- we would file.  The defendant always said that

19   they either hadn't done the activity or it was a

20   mistake, that it was not intentional.

21          MR. KOBACH:  No further questions.

22          THE WITNESS:  Thank you.

23          THE COURT:  I want to ask you something just

24   for clarification because I just-- I've heard from Ms.

25   Minnite this morning and I've just heard from you, and I

1   think it's fair to say there's a pretty good distinction

2   in terms of how the two of you define voter fraud.

3            She focused on looking at the mens rea,

4   which one typically does when you use the word fraud,

5   the intent, the perhaps knowledge, but definitely

6   intent.

7            But you-- as I understand it, anytime

8   someone who's not qualified and eligible to vote or

9   register in fact does, be they a non-citizen or perhaps

10  some other reason, even if it's one person, you consider

11  that to be defrauding the American-- you consider that

12  defrauding the electoral process; would that be fair to

13  say?

14           THE WITNESS:  Yes, ma'am.

15           THE COURT:  Well, conversely, when there are

16  thousands of otherwise qualified United States citizens

17  over the age 18, no disqualifying status, are denied the

18  right to register, much less vote, would that not also

19  be defrauding the electoral process?

20           THE WITNESS:  I would liken this to the many

21  cases and state laws, Your Honor, that have been passed

22  with voter ID laws.  And the-- the view that-- that I

23  have and that I think the view of many of the courts who

24  have looked at this is that as long as you have an open

25  process that allows a potential voter to, for example,

1    obtain the ID that's needed to vote, that's neither

2    discriminatory nor unconstitutional.  And the same is

3    true with proof-of-citizenship requirements.  I think

4    this is something that every eligible voter can fairly

5    easily meet and, therefore, it's a tangential burden

6    that is not--

7              THE COURT:  Well, that doesn't really answer

8    my question.  But I take it from the way you've answered

9    my question that when you consider whether denying the

10   right to register and denying the right to vote to

11   someone that is an American citizen and meets the

12   electoral requirements, you want to consider that in the

13   context of what the burdens are.

14              But conversely, when you're talking about

15   one non-citizen voting, you don't want to consider that

16   in context whether that person made a mistake, whether a

17   DMV person convinced them they should vote.  Is that

18   fair to say?  We don't look at it contextually that way,

19   we only look at it contextually when we're talking about

20   citizens?

21              THE WITNESS:  No, I don't think that's fair

22   to say.  What I would say about a non-citizen is if-- if

23   you are-- if state or federal authorities are

24   considering whether or not to criminally prosecute a

25   non-citizen, well, then, of course, the context matters

1    and whether or not they did so accidentally or whether

2    it was a mistake by state officials.

3              The best example of that, of course, is if--

4    if a non-citizen truthfully answers the voter

5    registration form, they checked that they are not a U.S.

6    citizen, but then an election official registers them

7    anyway, obviously I don't think they should be

8    criminally prosecuted.  But the question--

9              THE COURT:  I'm not asking about

10   prosecution.

11             THE WITNESS:  Right.

12             THE COURT:  I'm asking about the way you

13   characterize what is fraud on the electoral process.

14             THE WITNESS:  Yeah.

15             THE COURT:  I'm asking about the differences

16   in the way you perceive that based on whether we're

17   talking about citizens who are-- should be eligible to

18   vote versus non-citizens who clearly are not eligible to

19   vote.

20             THE WITNESS:  Right.  Well, the second half

21   of my answer is that criminal prosecution is different

22   from the integrity of the election process.  And that's

23   why if non-citizens are easily registering and voting

24   without detection, it doesn't matter whether or not

25   that's the-- each of those non-citizens is doing that

1    intentionally or because they don't realize they're not

2    supposed to be registering and voting.

3              The fact that they are registering and

4    voting means that individuals who are ineligible are

5    casting ballots.  And each ballot they cast takes away

6    the vote of and dilutes the vote of actual citizens who

7    are voting.  And that's--

8              THE COURT:  So thousands of actual citizens

9    that should be able to vote but who are not because of

10   the system, because of the law, that's not diluting the

11   vote and that's not-- that's not impairing the integrity

12   of the electoral process, I take it?

13             THE WITNESS:  No, what I-- what I'm saying

14   is that I don't believe that this requirement prevents

15   individuals who are eligible to register and vote from

16   doing so.

17             THE COURT:  All right.  Mr. Ho.

18                  CROSS EXAMINATION

19   BY MR. HO:

20       Q.  Are you ready, Mr. von Spakovsky?

21       A.  I am.

22       Q.  Mr. von Spakovsky, you would agree with me that

23   an expert witness should provide objective, unbiased

24   opinion testimony.  Correct?

25       A.  Yes.

 1     Q.   And you would agree that an objective opinion is
 2  one that tends-- that is one that considers evidence
 3  that tends to support one conclusion as well as evidence
 4  that tends to detract from that conclusion.   Correct?
 5     A.   Yes.
 6     Q.   And you would agree that it would be inconsistent
 7  with providing an objective expert opinion to provide
 8  evidence that only supports one side of an opinion-- of
 9  a conclusion.   Correct?
10     A.   Yes.
11     Q.   Okay.   Now, other than in this case, you have
12  never before testified as an expert in litigation.
13  Correct?
14     A.   That's correct.
15     Q.   You do not have a graduate degree in political
16  science.   Correct?
17     A.   No, I have a-- I have a law degree.
18     Q.   So that is-- it's correct that you do not have a
19  graduate degree in political science.   Correct?
20     A.   Not in political science.
21     Q.   And you do not have a graduate degree in public
22  policy.   Correct?
23     A.   No.
24     Q.   Now, back at MIT when you were an undergrad, you
25  minored in history.   Correct?

1    A.  Correct.

2    Q.  You consider yourself an historian when it comes

3  to issues of voter fraud.  Correct?

4    A.  Based on more than two decades of work in that

5  area, yes.

6    Q.  So you consider yourself an historian.  Correct?

7    A.  I consider myself an expert on election

8  administration and also on voter fraud in the U.S.

9    Q.  Mr. von Spakovsky, I didn't ask you whether you

10  consider yourself an expert on election administration,

11  I asked whether you consider yourself an historian.  You

12  consider yourself an historian.  Correct?

13    A.  I know the history of voter fraud.

14    Q.  You--

15        MR. KOBACH:  Objection, Your Honor.  This is

16  argumentative.

17        THE COURT:  Overruled.

18    Q.  (BY MR. HO)  Mr. von Spakovsky, you sat for a

19  videotaped deposition in this case.  Correct?

20    A.  Yes, I did.

21    Q.  And you were under oath during that deposition?

22    A.  Of course.

23    Q.  And you answered all of your questions truthfully

24  during that deposition.  Correct?

25    A.  Yes.

 1      Q.  Okay.  I'm going to hand you a copy of your

 2   deposition transcript.  Could you please turn to Page 26

 3   in your transcript, Line 5, and we're going to play a

 4   video clip from your deposition.

 5              (Video began).

 6              (MR. HO:  You also refer to historians.  Are

 7   you an historian, Mr. von Spakovsky?

 8              THE WITNESS:  I'm an historian when it comes

 9   to election fraud issues.  I've done a lot of research,

10   published a lot of papers and written a book on various

11   voter fraud cases around the country.")

12              MR. KOBACH:  Your Honor, I would like to

13   object to the--

14              THE COURT:  Just a minute, stop it.  Yes.

15              MR. KOBACH:  I'd like to object.  I don't

16   understand the basis for using a video as opposed to a

17   transcript to just move quickly here.

18              MR. HO:  I think I'm entitled to use-- it's

19   a videotaped deposition, Your Honor.  As Your Honor

20   noted with Secretary Kobach's deposition--

21              THE COURT:  Yeah, but I think the proper

22   procedure is showing the transcript and-- and if he

23   admits he said that during his deposition, there's no

24   reason to play it.

25              MR. HO:  Okay.  I was--

1          THE COURT:  Okay.

2      Q.  (BY MR. HO)  You consider yourself an historian

3  when it comes to election fraud issues, correct, Mr. von

4  Spakovsky?

5      A.  Yes, I believe I already said that.

6      Q.  Okay.  You do not have a graduate degree in

7  history.  Correct?

8      A.  I do not.

9      Q.  You have not published any peer-reviewed research

10  as an historian.  Correct?

11      A.  That's correct.

12      Q.  Now, you would say that outside of this case

13  you've written extensively about the issue of voter

14  fraud.  Correct?

15      A.  Yes.

16      Q.  And some of that extensive writing you've done

17  addresses the issue of non-citizen registration.

18  Correct?

19      A.  Yes.

20      Q.  And as an example of that, you would point to

21  your 2012 book co-written with John Fund called "Who's

22  Voting?  How Fraudsters and Bureaucrats Put Your Vote At

23  Risk."  Correct?

24      A.  Correct.

25      Q.  That book was not published by a university

1  press.  Correct?

2      A.  That's correct.

3      Q.  It was published by a company called Encounter

4  Books.  Correct?

5      A.  That's correct.

6      Q.  That book was not peer-reviewed.  Correct?

7      A.  No.

8      Q.  In fact, you have published no peer-reviewed

9  research on voter fraud.  Correct?

10     A.  I'm not in academics so I don't use the

11  peer-review process.

12     Q.  So my question was:  You have published no

13  peer-reviewed research on the issue of voter fraud.

14  Correct?

15     A.  Yeah, I'm not in academics so I don't use the

16  peer-review process.

17     Q.  So your answer to my question is that you have

18  not published any peer-reviewed research on voter fraud?

19         MR. KOBACH:  Your Honor, asked and answered.

20         THE COURT:  Is your answer no?

21         THE WITNESS:  The answer is no.

22     Q.  (BY MR. HO)  Okay.  And you haven't published any

23  peer-reviewed research on voting.  Correct?

24     A.  No.  My publications on that, The Heritage

25  Foundation go through an editing process there.

1      Q.   And that editing process is not a blind

2   peer-review process.  Correct?

3      A.   No, it is not.

4      Q.   So you have not published any research on voting

5   that has been peer-reviewed, correct, Mr. von Spakovsky?

6      A.   Yes.

7      Q.   Yes, you have?  Or yes, you haven't?

8      A.   No, I have not.

9      Q.   Okay.  You have not published anything that's

10  peer-reviewed.  Correct?

11     A.   That's correct.

12     Q.   You're an adjunct professor at the Law School of

13  George Mason University?

14     A.   Yes.

15     Q.   You're not a tenured professor at the Law School

16  of George Mason University.  Correct?

17     A.   No.

18     Q.   And one of the bases on which you hold yourself

19  out as an expert in this case is that you're a manager

20  of the Law Reform Initiative at The Heritage Foundation.

21  Correct?

22     A.   Yes.

23     Q.   And you've been there about ten years?

24     A.   Yes.

25     Q.   And The Heritage Foundation is a think tank whose

1    mission to his formulate and promote conservative public

2    policies.  Correct?

3        A.   Correct.

4        Q.   You've heard of plaintiffs' expert witness in

5    this case, Doctor Michael McDonald.  Correct?

6        A.   I was not here when he testified.

7        Q.   But you've heard of Doctor Michael McDonald.

8    Correct?

9        A.   Yes.

10        Q.   And you know that Doctor McDonald has a project

11    where he keeps track of turnout around the country.

12    Right?

13        A.   Yes.

14        Q.   And you have relied on Doctor McDonald's turnout

15    research in your own work.  Correct?

16        A.   I've relied on the turnout numbers that he has

17    collected.

18        Q.   And to the extent that you rely on Doctor

19    McDonald's turnout data, you consider that work to be

20    reliable.  Correct?

21        A.   Well, he's one of the only experts that includes

22    the-- that uses turnout data that takes account of

23    citizenship and also of other individuals who may be

24    ineligible to vote.

25        Q.   And you consider Doctor McDonald's turnout data

1  to be accurate and reliable.  Correct?  Otherwise you

2  wouldn't rely on it, right, Mr. von Spakovsky?

3      A.  I have used that, amongst other turnout data

4  also.

5      Q.  I don't think I answered my question about

6  whether you consider Doctor McDonald's turnout data to

7  be reliable and accurate.  Do you, Mr. von Spakovsky?

8      A.  When I have used it, yes.

9      Q.  Okay.  And you don't have any reason to believe

10  that Doctor McDonald's other work apart from his turnout

11  research is flawed in any way.  Correct?

12      A.  That's not correct.

13      Q.  Okay.  Could you turn to Page 55 in your

14  deposition and Line 19.

15          MR. HO:  And in this case, Your Honor, I'm

16  not trying to refresh his recollection, I'm trying to

17  impeach him so I'd like to read directly from the

18  transcript, if I may.

19          THE COURT:  All right.  Proceed, you can.

20      Q.  (BY MR. HO)  Question:  You don't have any reason

21  to think that his other work is inaccurate, do you?

22          Answer:  I haven't reviewed any of it so I

23  have no idea.

24          Was that my question and was that your

25  answer?

 1     A.   Yes.

 2     Q.   Okay.  You answered truthfully.  Right?

 3     A.   As far as I recall, yes.

 4     Q.   Okay.  Now, you submitted an expert report in

 5   this case.  Right?

 6     A.   Yes.

 7     Q.   Prior to submitting your expert report, you

 8   reviewed the initial expert report of Doctor McDonald in

 9   this case.  Correct?

10     A.   I believe I did.

11     Q.   Your expert report contains no critique of Doctor

12   McDonald's expert reports in this case.  Correct?

13     A.   I was not asked to critique his report.

14     Q.   And because-- leaving aside what you were asked

15   to do, your expert report in this case contains no

16   criticism of Doctor McDonald's report in this case.

17   Correct?

18     A.   That's correct, because I was not asked to

19   critique his report.

20     Q.   Okay.  You've obviously also heard of plaintiffs'

21   other expert witness, Doctor Lorraine Minnite.  Correct?

22     A.   Yes.

23     Q.   You don't dispute Doctor Minnite's qualifications

24   as a political scientist, do you?

25     A.   I really don't have an opinion about that.

1    Q.   So you don't dispute her qualifications as a

2  political scientist?

3    A.   I don't have an opinion one way or the other.

4    Q.   Prior to submitting your expert report in this

5  case, you reviewed the initial expert report of Doctor

6  Minnite in this case.  Correct?

7    A.   I did take a look at it, yes.

8    Q.   Your expert report contains no criticisms of

9  Doctor Minnite's expert reports in this case.  Correct?

10    A.   I was not asked by the state of Kansas to review

11  or critique her report.

12    Q.   But you did review her report and your report

13  contains no criticism of her report.  Correct?

14    A.   I was not asked to critique her report.

15    Q.   So your answer to my question is no, your report

16  does not contain any criticism of Doctor Minnite's

17  reports, is that right, Mr. von Spakovsky, or am I

18  mistaken?

19    A.   I was not asked to provide critiques of any of

20  the expert reports provided by the plaintiff.  I was

21  simply asked to provide my opinion on the issue of

22  non-citizens registering and voting and what I thought

23  the Kansas statute did and did not do.

24    Q.   Okay.  So let's talk about your expert report,

25  which I believe is Defendant's Exhibit 865.  Do you

1   still have it up there?

2      A.  I do.

3      Q.  There are a total of 59 footnotes in your report;

4   is that right?

5      A.  I don't know.

6      Q.  Why don't you take a look.

7      A.  Yes, there are 59 footnotes.

8      Q.  Okay.  Now, you believe that everything in your

9   expert report in this case is true to the best of your

10  knowledge.  Right?

11     A.  As far as I know, yes.

12     Q.  And you swear that under oath, under penalty of

13  perjury.  Right?

14     A.  As far as I know, yes, the citations are correct.

15     Q.  And there's-- this report is a complete statement

16  of your opinions in this case.  Right?

17     A.  Well, it was my opinion two years ago when the

18  deposition was taken.

19     Q.  Okay.  There's nothing that you left out in your

20  expert report that you're relying on today.  Right?

21     A.  No.

22     Q.  Now, you understand that you're being offered as

23  an expert on whether voter registration requirements are

24  burdensome.  Right?

25     A.  I'm also being asked to present my opinion on the

1    problem of non-citizens registering and voting.

2        Q.  And we'll talk about that in a second, but I just

3    want to talk about your opinion about whether or not

4    voter registration requirements are burdensome.  Your

5    opinion is being offered as an expert opinion.  You

6    understand that.  Right?

7        A.  I understand that.

8        Q.  Okay.  After you were retained-- I'm sorry, let

9    me start that again.  Before you were retained to be an

10   expert in this case, you did not have an opinion either

11   way about whether Kansas' documentary

12   proof-of-citizenship law is burdensome for voters.

13   Correct?

14       A.  I-- I probably looked at the law when it was--

15   when it was first passed.

16       Q.  Mr. von Spakovsky, my question was:  At the time

17   that you were retained as an expert witness in this

18   case, at that time, you did not yet have an opinion as

19   to whether or not the Kansas law was burdensome for

20   voters.  And by Kansas law, I mean the documentary

21   proof-of-citizenship law at issue in this case; is that

22   correct?

23       A.  I-- I don't recall if I had-- how much review I

24   had done of the Kansas law before I was retained.

25       Q.  Mr. von Spakovsky--

1    A.  I keep track-- I keep track of new laws that are

2  passed in the election area all over the country and I

3  usually take a look at that, you know, to review what

4  they do.

5    Q.  Mr. von Spakovsky, I'd like to ask you to take a

6  peek at your deposition transcript on Page 206.  It's

7  the binder to your right.

8    A.  I'm sorry, is it right here?

9    Q.  Yes.  No, it's the binder that you're holding I

10  believe.  Page 206 of your deposition transcript, Line 8

11  through 17.

12    Question:  Did you have a view prior to your

13  engagement as an expert in this case as to whether or

14  not the documentary proof-of-citizenship law is

15  burdensome?

16    Answer:  I had not.  I knew about the Kansas law,

17  but I had not reviewed it in depth and I had not yet

18  seen the survey information showing the overwhelming

19  majority of individuals already have the data that they

20  need.

21    Was that my question and was that your answer?

22    A.  Yes.

23    Q.  Okay.  And you answered truthfully.  Correct?

24    A.  As far as I knew at the time, yes.

25    Q.  Okay.  Now, as an expert on whether voter

1    registration requirements are burdensome, your opinion

2    is that there are no current voter registration

3    requirements that are burdensome.  Correct?

4        A.  Are you talking about in Kansas?

5        Q.  Talking about in the entire United States of

6    America.  Your opinion as an expert on voter

7    registration requirements is that there are no voter

8    registration requirements in the United States of

9    America that are burdensome.  Correct?

10       A.  What I know about the registration requirements

11   under both federal law and state laws is that all of the

12   registration laws in the country right now have been

13   found to be legal and constitutional, therefore,

14   they're-- they're not a burden.

15       Q.  I didn't ask you about the legality of voter

16   registration requirements, Mr. von Spakovsky.  I asked

17   you as an expert on whether voter registration

18   requirements are burdensome for people, your opinion is

19   that no voter registration requirements currently in

20   force in the United States are burdensome.  Correct?

21   That's your opinion?

22       A.  I have not reviewed the registration laws of

23   every single state.  If you want to ask me about a

24   particular state and what the registration requirement

25   is, I can then provide you with my opinion as to whether

1  I think it's burdensome or not.  But I'm not going to

2  answer a--

3     Q.   Mr. von Spakovsky--

4     A.   -- a general question about the registration

5  requirements in 50 states plus the District of Columbia.

6     Q.   Mr. von Spakovsky, would you turn to Page 55 in

7  your deposition, please.  And specifically to Line 24

8  through Page 56, Line 6.

9        As an expert on whether voter registration

10 requirements are burdensome, can you give me an example

11 of a voter registration requirement somewhere in the

12 country today that you consider to be burdensome?

13       Answer:  I don't think any of the current voter

14 registration laws are burdensome.

15       Was that my question and was that your answer?

16    A.   That was my answer two years ago, but I have no

17 idea what changes, if any, have been made in voter

18 registration laws since that date that might change that

19 opinion.

20    Q.   So as of today you can't think of a voter

21 registration requirement that you would consider

22 burdensome.  Right?

23    A.   Yes.  But as I've said, I'm not-- I cannot claim

24 that I know the exact requirements of every single

25 state.

1    Q.   But you can't think of any requirement that you

2   would consider a burdensome voter registration

3   requirement that's currently in force today; is that

4   right?

5    A.   With the limitations I've just given you, yes.

6    Q.   You understand that this case is being heard

7   under the National Voter Registration Act or NVRA.

8   Correct?

9    A.   I do.

10    Q.   And you consider yourself an expert on the NVRA.

11   Right?

12    A.   Yes.

13    Q.   And you know that the text of the NVRA includes a

14   congressional finding that states have used

15   discriminatory and unfair registration laws and

16   procedures.  Right?

17    A.   Yes.

18    Q.   But you don't know and can't identify one example

19   of a law that Congress was referring to in the text of

20   the NVRA in 1993 when it found that states used

21   discriminatory and unfair registration laws.  Correct?

22    A.   You haven't asked me about what the status of the

23   law was in 1993.  You've asked me about current

24   registration laws.

25    Q.   That was my question a few seconds ago, Mr. von

 1   Spakovsky.  My question was-- as an expert here now was:

 2   As an expert on the NVRA, which you hold yourself out to

 3   be, you can't think of an example of what Congress was

 4   referring to when in the text of the statute it found

 5   that states were engaging in discriminatory and unfair

 6   registration practices.  Correct?

 7       A.   That's not correct.  I mean, for example, if

 8   Congress in the past and the courts have said that if

 9   you have, for example, a durational requirement beyond

10   30 days, states can't put in a registration requirement

11   that says you have to register more than 30 days prior

12   to an election.

13          So if a state tried to put in a requirement that

14   you had to register six months before an election, that

15   obviously would be a burdensome requirement that would

16   not stand up.

17       Q.   Your testimony is that a durational-- a

18   durational residency requirement of six months is what

19   Congress was referring to when it found that states had

20   engaged in discriminatory and unfair voting practices,

21   Mr. von Spakovsky?

22       A.   I'm saying that that would be-- I don't know if

23   that's what Congress was referring to because I wasn't

24   there when they passed that statute, but that would be

25   an example of a burdensome requirement.

1    Q.   Now, your opinion in this case is that the law at

2    issue in this case is not burdensome.   Right?

3    A.   That's correct.

4    Q.   And one of the reasons that you site for this law

5    not being burdensome is the fact that there are 13

6    different documents that can be used to satisfy it.

7    Correct?

8    A.   Correct.

9    Q.   But you would agree with me, wouldn't you, Mr.

10   von Spakovsky, that the documentary proof-of-citizenship

11   law requires additional effort for a person who is

12   denied registration if he or she does not have a copy of

13   one of those documents?

14   A.   Yes, unless the state is able to automatically

15   get their birth certificate or another document from DMV

16   under the process they've set up, in which case they're

17   not going to have to take another step.

18   Q.   Okay.   You understand, though, Mr. von Spakovsky,

19   that under regulations promulgated by the Secretary of

20   State if an individual's registration is suspended

21   because of failure to provide documentary proof of

22   citizenship, that if that proof of citizenship is not

23   provided or found within 90 days, that that registration

24   is cancelled.   Correct?

25   A.   I understand that.

1    Q.   Okay.  And when you opined in your report that

2  the documentary proof-of-citizenship requirement is not

3  burdensome for voters, at that time when you offered

4  that opinion you were not aware of how many Kansans had

5  been cancelled because they hadn't provided documentary

6  proof of citizenship.  Correct?

7    A.   I don't recall if-- if I had that information.

8    Q.   Okay.  Could you please turn to Page 303 in your

9  deposition, Mr. von Spakovsky, Line 24.

10        MR. HO:  We don't have to bring this one up

11  on the screen, Stephen.  Thank you.

12    Q.   (BY MR. HO)  If you could just read the question

13  and answer starting at Page 303, Line 24 through 304,

14  Line 11.

15        THE COURT:  Read it to yourself, not aloud.

16    A.   I'm sorry, where-- where do you want me to start?

17    Q.   (BY MR. HO)  Page 303, Line 24.

18    A.   303, Line 24.

19    Q.   Through Page 304, Line 11.  Read that and see if

20  it refreshes your recollection.

21    A.   "Have you determined how many--"

22        THE COURT:  No, just--

23    Q.   (BY MR. HO)  Don't read it aloud.

24        THE COURT:  Just read it to yourself.

25    Q.   (BY MR. HO)  Read it to yourself.

1    A.   Okay.  (Reads document).

2         THE COURT:  The next question will be:  Does

3    it refresh your recollection?

4    A.   Okay.  I've read it.

5    Q.   (BY MR. HO)  Does that refresh your recollection

6    as to whether or not at the time that you offered your

7    opinion in this case that the documentary

8    proof-of-citizenship law was not burdensome whether you

9    knew how many Kansans had their applications cancelled

10   for failure to provide documentary proof of citizenship?

11   A.   I-- well, according to the deposition which

12   occurred two years ago, I believe I had read Mr.

13   Caskey's affidavit which indicated that a majority of

14   the individuals had provided the proof of citizenship

15   that they needed to register to vote.

16   Q.   But that wasn't my question, Mr. von Spakovsky.

17   A.   I'm sorry, what was your question?

18   Q.   My question was:  At the time that you offered

19   your opinion that the proof-of-citizenship law was not

20   burdensome, you were not aware of how many Kansans had

21   seen their voter registration applications cancelled for

22   failure to comply with the documentary

23   proof-of-citizenship requirement.  Correct?

24   A.   I-- I don't recall if I was-- had that

25   information.

1    Q.   Okay.  So the number of Kansans whose

2    applications were cancelled under the documentary

3    proof-of-citizenship law, that did not factor into your

4    analysis when you determined that the law was not

5    burdensome.  Correct?

6    A.   I don't recall having that information.

7    Q.   Now, one of the other reasons that you identify

8    for opining that the law is not burdensome is because of

9    the hearing option for people who don't have one of the

10   documents.  Right?

11   A.   Correct.

12   Q.   Okay.  And when you offered your opinion about

13   the hearing option in this case, you did not know how

14   often that hearing procedure had been used in Kansas.

15   Correct?

16   A.   I don't believe I had that information.

17   Q.   Okay.  And when you offered your opinion about

18   the hearing option in this case, you didn't know how the

19   hearing option is publicized to Kansans who might want

20   to make use of it.  Correct?

21   A.   I-- I don't recall.

22   Q.   Okay.  And when you offered your opinion in this

23   case about the hearing option, you did so without even

24   having any information about whether Kansans are ever

25   informed that the hearing option exists.  Correct?

1    A.   I was going off the regulations and the statute

2   which provide the option for the hearing.

3    Q.   So the answer to my question is, yes, right, Mr.

4   von Spakovsky?  That you offered an opinion about the

5   hearing option without any information about whether or

6   not Kansans who might want to use it actually know about

7   it.  Right?

8    A.   I-- I don't-- I didn't have that information at

9   the time.

10    Q.   And because you didn't have information about

11   whether Kansans know about the hearing option, that--

12   the level of knowledge about the hearing option that

13   Kansans may or may not have is not something that

14   factored into your opinion about the hearing option.

15   Correct?

16    A.   What factored into my opinion was the fact that

17   a-- a hearing option was offered and it was very easy to

18   comply with.

19    Q.   Okay.  When you offered your opinion about the

20   hearing option, you were not aware of the existence of

21   any evidence that Kansans were even aware of the

22   existence of the hearing option, correct, Mr. von

23   Spakovsky?

24    A.   I don't have a way of knowing how the citizens--

25   how aware the citizens of Kansas are of laws and

1    regulations passed by the state.

2        Q.  So the answer to my question is you did not know

3    anything about how much Kansans were aware of the

4    hearing option.  Correct?

5        A.  My answer is, there's no way I could know how

6    much every individual Kansan knows about a Kansas

7    statute or regulation.

8        Q.  Now, you testified earlier that at the time that

9    you were retained as an expert in this case, you had not

10   yet formed an opinion-- actually, I'm sorry, I

11   apologize.  Let me retract that question.

12           Now, at the time that you wrote your book "Who's

13   Counting" in the year 2012, you were already an advocate

14   for documentary proof-of-citizenship requirements like

15   the one at issue in this case, right, Mr. von Spakovsky?

16       A.  That's correct.  I've made that recommendation on

17   a number of occasions.

18       Q.  And if we go back even farther to the year 2009,

19   you were already of the view that the National Voter

20   Registration Act is a failure.  Correct?

21       A.  You need to say that in the context of what I

22   said.  What I've said is that the purpose of the law was

23   to supposedly increase turnout in elections.  As I wrote

24   in the chapter of the book that I wrote for the ABA,

25   turnout numbers actually show that while registration

1   increased, it did not seem to increase turnout in

2   elections.

3       And while there are some provisions in the law

4   that I think are-- restrict the ability of election

5   officials beyond what is necessary, there are other

6   parts of the law that are good, such as the ability to

7   register to vote at-- at DMV offices, the ability to

8   register to vote at welfare offices.  Those are all good

9   parts of the law.

10  Q.   Okay.  Mr. von Spakovsky, I'm going to hand you

11  an exhibit that we're marking as Plaintiffs'

12  Exhibit 144.  This was Exhibit 4 during your deposition

13  in this case, it's your testimony before the Senate

14  Rules Committee in 2001; is that right?

15  A.   Yes.

16  Q.   Okay.  So this is your written testimony before

17  the United States Senate Rules Committee.  Correct?

18  A.   Yes.

19       MR. KOBACH:  Before the opposing counsel--

20  is this on the exhibit list?

21       MR. HO:  No, it's not.  It's an impeachment

22  exhibit.

23  A.   Yes, this was my testimony 17 years ago.

24  Q.   (BY MR. HO)  And when you testified to Congress,

25  you offered your opinions truthfully and under oath.

1    Correct?

2        A.  Yes.

3            MR. HO:  Your Honor, we'd like to offer

4    Plaintiffs' 144 into evidence, please.

5            MR. KOBACH:  Objection.  We think it's

6    hearsay and we haven't-- it's an out-of-court statement.

7            THE COURT:  Of this declarant.  Overruled on

8    hearsay grounds.  Exhibit 144 admitted.

9        Q.  (BY MR. HO)  Okay.  Let's bring it up on the

10   screen.  Thank you.

11           So let's take a look at the first paragraph.

12   Last sentence in the first paragraph reads,

13   "Motor-voter's attempt to make registration universal is

14   instead a universal failure because it was so flawed as

15   to actually undermine our registration system."

16           You wrote those words.  Correct?

17       A.  Yes.  Yes.

18       Q.  And the first sentence, the topic sentence of

19   this paragraph is, "One of the biggest threats to voter

20   rights and election integrity today is the condition of

21   our voter registration rules."  Those are your words.

22   Right?

23       A.  Correct.

24       Q.  Okay.  In your expert report that you submitted

25   in this case, which is being held under the NVRA, you

1    did not disclose that you had regarded the NVRA as a

2    universal failure.  Correct?

3        A.   I don't remember if I-- what I said about it in

4    the deposition.  But as I have mentioned, I wrote an

5    entire chapter of it, which you are well aware of, in

6    the book the ABA put out.  And I talked about both the

7    problems with it and the benefits of it.

8             And as I've said, the failure is the fact that

9    Congress believed when it passed it and those who were

10   pushing the law forward said that this would be the

11   answer to declining voter turnout in the United States.

12   The law was passed but the turnout after the law became

13   effective, it did not increase turnout.

14       Q.   Now, in this paragraph in your testimony to the

15   United States Congress where you opine that motor-voter

16   is a universal failure, you do not say anything about

17   motor-voter-- motor-voter failing to increase turnout,

18   correct, Mr. von Spakovsky?

19       A.   Not in this short testimony, but I've written

20   that on many other occasions, including the one that

21   I've just told you about.

22       Q.   Okay.  Let's shift gears and talk about your

23   opinion on non-citizen registration and voting.  You

24   consider yourself an expert on those topics, right, Mr.

25   von Spakovsky?

1      A.   Yes.

2      Q.   You have not in your experience ever attempted to

3    match state voter registration records with information

4    about non-citizens in any other databases in order to

5    identify possible non-citizens on their voter rolls; is

6    that right?

7      A.   I don't have access to state voter rolls.

8      Q.   You were an election official in the state of

9    Georgia at one point.  Right?

10     A.   I was a member of a five-member board.

11     Q.   And you were an election official in the state of

12   Virginia at one point.  Right?

13     A.   I was a member of a three-member board.

14     Q.   And in your capacity on the member-- as a member

15   of those two boards of election, you never in your

16   experience ever tried to, say, match voter registration

17   records to information in other databases containing

18   information about non-citizens in an attempt to identify

19   possible non-citizens on the voter rolls; is that

20   correct?

21     A.   That is not correct.

22     Q.   Okay.  Where did you do that?

23     A.   When I was on the Board in Fairfax County, that's

24   when I urged that we check DMV lists for individuals who

25   when they got their driver's license said they were

1  non-citizens to see whether they were registered to

2  vote.

3      Q.   Okay.  We'll come back to that in a second, Mr.

4  von Spakovsky.  Now, as an expert in non-citizen

5  registration, you cannot identify a single other expert

6  who's your peer on non-citizen registration.  Correct?

7      A.   I know about my expertise.  I'm not going to give

8  an opinion about the expertise of others.

9      Q.   So as an expert on non-citizen registration, you

10  cannot identify a single other expert on non-citizen

11  registration.  Correct?

12      A.   No, that's not correct.  It's not up to me to

13  determine the expertise or qualifications of other

14  individuals in this area.  I know what I know.  I don't

15  know what others do.

16      Q.   I didn't ask you to determine other people's

17  expertise or read other people's minds, Mr. von

18  Spakovsky.  I just asked you as an expert on non-citizen

19  registration who else you regard as an expert on

20  non-citizen registration like yourself.  And your answer

21  is there's no one.  Right?

22      A.   No, that is not my answer.  And you are asking me

23  to determine who the other experts are, and I'm telling

24  you that it's not up to me to determine the expertise of

25  other individuals in this area.

1    Q.  Mr. von Spakovsky, could you turn to Page 37 in

2  your deposition transcript, Line 24.  And we're going to

3  actually play a clip from your deposition.

4              THE COURT:  This is for impeachment?

5              MR. KOBACH:  Objection.

6              MR. HO:  Yes, Your Honor.

7              MR. KOBACH:  It's unclear why the transcript

8  is not sufficient.

9              MR. HO:  I don't have to use the transcript,

10  it's a videotaped deposition.  I'm not trying to refresh

11  his recollection, I'm trying to impeach his testimony.

12              THE COURT:  How long--

13              MR. KOBACH:  You tried to impeach him

14  earlier.

15              THE COURT:  How long is the excerpt?  I

16  mean, you can do it either way, but I think it's more

17  efficient to read from the transcript.  If you have it--

18              MR. HO:  We have it.

19              THE COURT:  -- cued up, how long is it?

20              MR. HO:  It's 15 seconds, Your Honor.

21              MR. KOBACH:  Counsel, you used the

22  transcript to try to impeach others.  Why is a

23  transcript not sufficient to impeach Mr. von Spakovsky?

24              THE COURT:  I think it's counsel's choice.

25  I mean, it's a matter of discretion.  I-- I counseled

1   him before to use the transcript because oftentimes it

2   results in a delay when people are going to use a video,

3   but it seems like, I mean, this counsel is going to have

4   their act together and they're ready to play it right

5   away.  So as long as we're not going to sit around and

6   wait for them to cue it up, I'm okay with that.  So are

7   you ready?

8           MR. HO:  We'll try to be judicious about it,

9   Your Honor.

10          MR. KOBACH:  Can we just have the page

11  number and lines?

12          MR. HO:  I announced the page number and

13  lines, but for your benefit I'll read them again.  It's

14  Line 37-- Page 37, Line 24.

15          (Video was played).

16          (MR. HO:  As an expert on non-citizen

17  voting, can you identify some other experts in the

18  field?

19          THE WITNESS:  I-- you know, I-- I-- no.  I

20  mean, I don't know if there are other experts who

21  believe they're experts on this subject or not, I-- I

22  don't know.

23          MR. HO:  So as far as you know--).

24  Q.   (BY MR. HO)  Mr. von Spakovsky, was that my

25  question--

1           MR. KOBACH:  Objection, we need the

2    follow-up.

3           THE COURT:  I'm sorry?

4           MR. KOBACH:  We're deprived of context, he

5    obviously was starting to say--

6           MR. HO:  That was me.

7           MR. KOBACH:  Could we see the remaining

8    questions after that one?

9           MR. HO:  You have the transcript.  Right?

10   We gave you-- Emily, did we give him a copy?

11          THE COURT:  Mr. Kobach, you can redirect him

12   if you think that question was out of context.

13          MR. KOBACH:  Okay, Your Honor.

14   Q.  (BY MR. HO)  Was that my question and was that

15   your answer, Mr. von Spakovsky?

16   A.  It was.

17   Q.  Now, Mr. von Spakovsky, in your view there are no

18   mainstream Republican officials or academics that know

19   anything about voter fraud; is that correct?

20   A.  If I may, I'd like to provide an answer to your

21   last question.  You left out my following answer in the

22   deposition, which is the exact answer I gave today.

23   You--

24          THE WITNESS:  May I read that, Your Honor,

25   to the Court?

1          THE COURT:  Go ahead.

2          THE WITNESS:  I think it's very relevant to

3    the question that he asked me.

4          THE COURT:  All right.  In the interest of

5    time, go ahead and read it.  Go ahead.

6    A.   Your follow-up question was:  As far as you know,

7    you are the only expert in existence on non-citizen

8    registration?

9          My answer was:  I did not say that.  What I said

10   was that I am not going to speculate on who is or who is

11   not an expert or consider themselves to be an expert.  I

12   know what my expertise is and not that of others.

13         That's the exact answer I gave you today.

14   Q.   (BY MR. HO)  Okay.  So let's not talk about

15   speculation, Mr. von Spakovsky, let's talk about your

16   actual opinion.  And one of your actual opinions is

17   there are no mainstream Republican officials or

18   academics that know anything about voter fraud.

19   Correct?

20   A.   That is not correct.

21   Q.   Okay.  I'm going to hand you an exhibit that's

22   been marked as Plaintiffs' Exhibit 145.  Please turn to

23   the second page of that exhibit, Mr. von Spakovsky.

24   This is a redacted version of an e-mail that you wrote

25   from your Heritage Foundation e-mail address dated

 1    February 22nd, 2017.  Correct?

 2        A.   That's correct.

 3        Q.   Okay.

 4             MR. HO:  Your Honor, we'd like to offer

 5    Plaintiffs' Exhibit 145 into evidence, please.

 6             THE COURT:  Any objection?

 7             MR. KOBACH:  No objection.

 8             MR. HO:  Okay.  Can we please put that up on

 9    the screen, Stephen?

10             THE COURT:  145 admitted.

11        Q.   (BY MR. HO)  And let's turn to the second page

12    and let's look at the second paragraph.  About halfway

13    down you write, "If they are picking mainstream

14    Republican officials and/or academics to man this

15    commission, it will be an abject failure because there

16    aren't any that know anything about this or who have

17    paid any attention to this issue over the years."  You

18    wrote that, right, Mr. von Spakovsky?

19        A.   That is correct, although I was speaking about

20    voter fraud in general.  The question you just asked me

21    and that was in the deposition was about non-citizen

22    voting, which is just one aspect of that.

23        Q.   Mr. von Spakovsky, the question that I've just

24    asked you was not about non-citizens registration, it

25    was about voter fraud.  And you wrote in reference to

1    voter fraud that there are no Republican officials

2    and/or academics that know anything about that topic.

3    Correct?

4        A.  I didn't say Republican officials, I said

5    mainstream Republican officials and academics.

6        Q.  Thank you for that correction.  This e-mail was

7    in reference to the Presidential Commission on Elections

8    Integrity.  Correct?

9        A.  Yes.

10       Q.  Okay.  And you identified your work on the

11   Presidential Commission on Elections Integrity

12   previously as one of the bases for your qualifications

13   to offer an opinion in this case.  Correct?

14       A.  I didn't offer it as a basis, I was asked if I

15   had served on the Commission.

16       Q.  You worked with Secretary Kobach when you were on

17   the Election Integrity Commission.  Correct?

18              MR. KOBACH:  Objection, relevance.

19              THE COURT:  Overruled.

20       A.  I worked with Commissioner Kobach and other

21   members of the Commission.

22       Q.  (BY MR. HO)  Okay.  That Commission has been

23   disbanded.  Correct?

24       A.  That's correct.

25       Q.  Now, after one of the meetings-- can we keep that

1  e-mail on the screen, Stephen, please?

2        Now, after one of the meetings of the Commission,

3  you were asked about this e-mail in which you expressed

4  your opinion about mainstream Republican officials and

5  their knowledge of voter fraud by a reporter and you

6  denied writing this e-mail, correct, Mr. von Spakovsky?

7     A.   No.   What I was asked was about an e-mail that I

8  had sent to the Attorney General about the Commission.

9  I did not send an e-mail to the Attorney General.   This

10  e-mail was not sent by me to the Attorney General.

11     Q.   Okay.   I'm going to hand out what's been marked

12  as the transcript for Plaintiffs' Exhibit 146.

13        MR. KOBACH:   Your Honor, we've seen several

14  documents allegedly impeaching him which counsel has

15  misrepresented.   We'd like to see this before it is

16  presented, before he asks any further questions about

17  it.

18        THE COURT:   Well, all right.   You've been

19  handing him copies as you've been handing the others

20  copies.   This is a several-page transcript, so let's let

21  Mr. Kobach review it.   In fact, it's 3:00, why don't we

22  take about a 15-minute break.

23        MR. HO:   If I may just-- Your Honor.

24        THE COURT:   Yes.

25        MR. HO:   Mr. Kobach did say that I was

1    misrepresenting about impeachment exhibits, and I'd just

2    like to clarify the record. I don't believe I've

3    misrepresented anything. That every exhibit that I've

4    offered has been properly offered as an impeachment

5    exhibit. And as far as I know, there have been no

6    objections to those exhibits or they've been admitted--

7    maybe there have been objections but they've all been

8    admitted into evidence.

9            MR. KOBACH: Your Honor, he very

10   specifically misrepresented in the case where he tried

11   to cut the witness off from his video testimony when the

12   second question clarified and was exactly what he said

13   in this case. It was clearly misrepresenting.

14           THE COURT: All right. I understand. I

15   understand. And that was clarified with Mr. von

16   Spakovsky's additional testimony. But I mean, as far as

17   just the procedure of presenting impeachment evidence

18   against this witness, I think you're doing it properly.

19   But if it's something of any length, you need to give

20   the other side an opportunity to look at it before you

21   actually point-- and actually now that I look at it,

22   it's just two pages, maybe three. Two pages. So, you

23   know, a minute or so would be enough.

24           I just want to-- you know, as I've made

25   clear all along, when you're showing somebody something,

```
 1   make sure the other side has it and is pointed to it and
 2   has a chance to be on the same page and understand what
 3   the question is going to be about.  Okay?  So let's
 4   reconvene at 20 after.
 5              (Recess).
 6              THE COURT:  All right.  You can be seated.
 7              MR. KOBACH:  Your Honor, before we-- before
 8   we proceed, we're going to object to the use of this
 9   transcript for three reasons.
10              No. 1, it's produced by an organization that
11   identifies itself as ProPublica.  That organization has
12   in the past misrepresented itself to me personally.  The
13   individuals did not represent themselves to be
14   reporters-- or the individual, singular, did not
15   represent himself to be a reporter and then published
16   something that was deceptive.  Secondly, this--
17              THE COURT:  Now wait.  Are you talking about
18   the court reporting company?
19              MR. KOBACH:  No, no, no.  This purports to
20   be a transcript between a ProPublica reporter and Mr.--
21   actually two reporters and Mr. von Spakovsky.  No. 2, it
22   doesn't identify the unnamed person.
23              THE COURT:  Wait, wait, wait.  I'm sorry, I
24   thought you meant the transcript of his deposition.
25   What are you talking about?
```

```
 1                    MR. KOBACH:  I'm sorry.  No, no, no.  I'm

 2   objecting to this document that was just handed to us.

 3                    THE COURT:  And on the basis of?

 4                    MR. KOBACH:  The-- the ProPublica-- the

 5   organization ProPublica has in my own personal

 6   experience concealed their identity as reporters and has

 7   deceptively reported on what they found, so I have grave

 8   doubts as to the veracity of this.  Secondly, it doesn't

 9   identify--

10                    THE COURT:  Is this an-- what is this, an

11   audio or a video?

12                    MR. KOBACH:  It appears to be an audio of

13   some sort of interview or conversation between two

14   journalists, unnamed, and Mr. von Spakovsky.  That's my

15   second objection.  They are unnamed.

16                    And third, it doesn't provide a context.

17   Just like what Mr. Ho did a moment ago, it's a-- it

18   appears to start abruptly in the middle of a

19   conversation and then ends abruptly.  And just as we saw

20   with Mr. Ho a moment ago on the video clip, what was

21   excluded afterward was contradictory to the conclusion

22   Mr. Ho wished to draw.  And so similarly, we don't have

23   context here.

24                    THE COURT:  All right.  Mr. Ho, do you have

25   the complete transcript?
```

1            MR. HO:  That is the complete transcript of

2     the audio-recording, Your Honor.  The question that I

3     posed to Mr. von Spakovsky was whether or not after a

4     meeting of the Election Integrity Commission, which Mr.

5     Kobach adduced testimony about, he denied writing the

6     e-mail that we just discussed during his testimony.

7            The audio is a recording of a reporter-- of

8     two reporters asking questions of Mr. von Spakovsky

9     after that meeting about this e-mail.  And as the

10    transcript shows, he denies writing the e-mail, which he

11    has now just admitted that he wrote it.  And it goes to

12    the credibility of this witness, Your Honor, on the

13    issues in this case.

14            THE COURT:  All right.  So I think the first

15    thing you're going to have to do is play enough of this

16    and ask him if this, in fact, is him because I think

17    what Mr. Kobach is raising is an authenticity question.

18    So let's do that and then go from there.

19            MR. HO:  And if I may, Your Honor, just to

20    keep the record very clear.  This is now the second time

21    that Mr. Kobach has accused me of doing something

22    deceptive or misrepresenting something about Mr. von

23    Spakovsky's deposition testimony.  And, you know, Mr.

24    Kobach is free to redirect Mr. von Spakovsky on

25    anything, but I 'd like to make the record very clear

1   that I take issue with these accusations of

2   misrepresentation.  They're not true.

3              THE COURT:  So noted.

4              MR. KOBACH:  Your Honor, it's my

5   understanding that it's not my responsibility to respond

6   to deceptive tactics by redirecting but, rather, we all

7   have an obligation to try not to deceive the Court.

8              THE COURT:  Well, you know what, deception

9   is not the right word.  This happens all the time

10  between lawyers, they-- they play something, the other

11  side says you're not-- you're not giving us the whole

12  context of this, they object.  And typically the

13  judicial response to that is clear it up when you get

14  back with this witness and examine.

15             I mean, my gosh, I have these deposition

16  transcripts that you all want to admit primarily-- do

17  you see all these orange tags?  These are the disputes,

18  most of them about context.  It's not deception.  It's

19  just that, you know, people have different interests

20  about what they want played because of what supports

21  their case and what doesn't.

22             So I don't think Mr. Ho has acted with

23  deception, and I understand why he takes issue with

24  that.  And I find that he hasn't acted in a deceiving

25  way because he hasn't perhaps offered the full context

1    of Mr. von Spakovsky's answer.  I allowed Mr. von

2    Spakovsky to go ahead and read the rest of that

3    deposition and it-- it became clear to me that when he

4    did that, his testimony was largely consistent with what

5    he said today.  So, you know, I understood that.

6              All right.  So let's go forward.  You want

7    to impeach him with this tape.  And if there's an

8    authenticity question about whether it's him, let's make

9    sure it's his voice.  He'll admit it or I'll figure it

10   out from listening.

11             MR. HO:  Thank you, Your Honor.  Stephen,

12   could we maybe play just the first--

13             (Audio was played).

14   Q.  (BY MR. HO)  Mr. von Spakovsky, was that your

15   voice on the tape saying "I have no idea"?

16   A.  Yes.  But what I was asked was whether I had sent

17   an e-mail to Jeff Sessions, I did not.

18             THE COURT:  That's not the question.

19   Q.  (BY MR. HO)  That's not the question.

20             THE COURT:  That's not the question, I'm

21   just trying to determine whether that's your voice.

22             THE WITNESS:  It is.

23             THE COURT:  If that's your voice, then I'll

24   allow you to impeach.  If you take issue with the

25   context of this, as I said before, Mr. Kobach can ask

1    you questions to clarify or to clear it up.

2              MR. HO:  Thank you, Your Honor.

3              MR. KOBACH:  Your Honor, can we just be

4    clear--

5              THE COURT:  Yes.

6              MR. KOBACH:  -- what is the specific

7    statement he's impeaching?

8              MR. HO:  I asked Mr. von Spakovsky if when

9    he was asked about The Heritage Foundation e-mail in

10   which he stated that there were no mainstream Republican

11   officials who knew anything about voter fraud, if he

12   denied writing that e-mail when asked about it by a

13   reporter after a meeting of the Election Integrity

14   Commission.

15             Mr. von Spakovsky stated that he did not

16   deny writing the e-mail and offered an explanation for

17   what he had to say.  I am playing a video-- an audio of

18   what he actually said in order to impeach him.

19             THE COURT:  All right.  I-- I think that's

20   fine.  If it's inconsistent with what he said or you

21   think it is, then go ahead and play it.

22             (Audio was played).

23   Q.  (BY MR. HO)  Mr. von Spakovsky, that's your voice

24   on the recording throughout answering the questions of

25   those reporters.  Correct?

1    A.   That's correct.

2    Q.   Okay.  Mr. von Spakovsky, let's turn now to the

3  methodology that you use when trying to ascertain

4  whether there is a problem of non-citizen registration

5  in Kansas.

6    A.   But I would like to explain.  You have

7  mischaracterized the answer that I gave in that-- that

8  recording.  I was--

9    Q.   Mr. von Spakovsky, I haven't posed a question to

10  you and I haven't characterized it.  I asked you a

11  question if that was--

12         THE COURT:  All right.  Mr. Kobach can clear

13  this up on redirect.  That's the standard practice.  You

14  can ask him about this and then he can explain.

15         MR. KOBACH:  All right.

16    Q.   (BY MR. HO)  So let's talk about your methodology

17  for trying to ascertain whether or not there is, in

18  fact, a problem of non-citizen registration in Kansas.

19  The methodology that you employ in trying to answer that

20  question, Mr. von Spakovsky, it doesn't have any kind of

21  name, does it?

22    A.   I'm not sure what you mean.

23    Q.   There's no shorthand name for the methodology

24  that you employ in trying to ascertain whether or not

25  there's a problem of non-citizen registration in Kansas.

1    Correct?

2       A.   I'm not aware of a short-term-- a short-term

3    name.

4       Q.   You're also not aware of whether or not the

5    methodology that you employ comports with

6    generally-accepted standards in the social sciences,

7    correct, Mr. von Spakovsky?

8       A.   What I do is collect information on prosecutions

9    and reports of non-citizens across the country and put

10   that information together and summarize it.

11      Q.   Okay.   That wasn't my question, Mr. von

12   Spakovsky.

13              MR. HO:   Your Honor, I'd like if I could

14   get-- to get an answer to my question, which was whether

15   or not his method comports-- for ascertaining whether or

16   not there's a problem of non-citizen registration in

17   Kansas comports with generally-accepted standards in the

18   social sciences.

19              THE COURT:   All right.   That's the question.

20   You can answer that question.

21      A.   I don't know what the-- I-- I have no idea

22   whether or not this would go with whatever academics do

23   in their social science research.

24      Q.   (BY MR. HO)   Okay.   Let's talk about your

25   opinions about preventing non-citizens from registering

1  to vote.  You would agree, Mr. von Spakovsky, that it is

2  impossible to have a perfect security system that

3  prevents all non-citizens from registering to vote.

4  Correct?

5     A.  I'm sorry, can you repeat the question?

6     Q.  Sure.  You would agree with me, Mr. von

7  Spakovsky, that it's impossible to have a perfect

8  security system that prevents all non-citizens from

9  registering to vote.  Correct?

10     A.  Right.  There's no such thing as a perfect

11  security system.

12     Q.  Okay.  And you would also agree with the

13  statement that state DMVs must train their employees to

14  prevent non-citizens to apply for-- excuse me.  Let me

15  start that again.

16        You would also agree with the statement that

17  state DMVs must train their employees to prevent

18  non-citizens who apply for driver's licenses from

19  registering to vote.  Right?

20     A.  I believe they should do so.

21     Q.  Now, I believe you discussed on your direct

22  examination a couple of cases from the Seventh Circuit.

23  Do you remember that?

24     A.  Yes.

25     Q.  Okay.  And I believe you testified that the

1    individuals in those Seventh Circuit cases were

2    non-citizens who checked "yes" on their voter

3    registration forms.  Do you remember that?  Checked

4    "yes" in response to the citizenship question.  Do you

5    remember testifying to that effect?

6       A.  Yes.

7       Q.  Okay.  Let's talk about that and let's bring up

8    your expert report, Defendant's Exhibit 865, back up

9    onto the screen.  And let's look at Page 9 of your

10   report.  The last paragraph on the page.

11       Now, in this paragraph you're describing one of

12   those Seventh Circuit cases about a non-citizen who

13   ended up registered to vote.  Correct?

14      A.  I'm sorry.  Which paragraph are you referring to?

15      Q.  The last paragraph on Page 9 of your report.  You

16   are describing one of those Seventh Circuit cases about

17   a non-citizen who ended up registered to vote.  Correct?

18      A.  Yes.

19      Q.  Okay.  And when we look here, this non-citizen

20   left the citizenship box unchecked on her driver's

21   license application form.  Correct?

22      A.  No, the second-- she says that, but then she says

23   she couldn't remember whether she checked the box or the

24   state employee did so.

25      Q.  You haven't actually looked at that person's

1    voter registration form.  Correct?

2        A.  I was citing directly from the Seventh Circuit

3    opinion which went through the facts of the case.

4        Q.  Okay.  But in your description of this case,

5    you'd agree that despite knowing that this driver's

6    license applicant was a non-citizen, the DMV employee

7    still asked her if she would like to register to vote.

8    Correct?

9        A.  That is what she claimed in the case.

10       Q.  Okay.  Mr. von Spakovsky, would you turn to

11   Page 81 in your deposition, please.  Line 18 through

12   Line 22.  Just let me know when you're there.

13       A.  I'm sorry, what lines?

14       Q.  18 through 22.

15       A.  Yes.

16       Q.  Question:  Despite knowing that the driver's

17   license applicant was a non-citizen, the DMV employee

18   still asked the applicant if she would like to register

19   to vote.  Correct?

20            Answer:  Correct.

21            Was that my question and was that your answer?

22       A.  It was.  And that's what it said in the Seventh

23   Circuit opinion.

24       Q.  Okay.  Now, you would agree that there seems to

25   be a problem that occurs in a number of cases that a DMV

1    worker, despite not knowing-- excuse me, despite knowing

2    that a driver's license applicant is a non-citizen,

3    still asks the applicant if she would like to register

4    to vote.  Correct?

5        A.  Yes.

6        Q.  And you believe that when this happens, the

7    non-citizen is likely to believe that she is permitted

8    to register to vote and ends up registering.  Correct?

9        A.  Correct.

10       Q.  And you would agree that when this happens, a DMV

11   employee asking someone whom the DMV employee knows is

12   not a citizen whether or not that person would like to

13   register to vote, that the non-citizen does not intend

14   to violate the law.  Correct?

15       A.  Well, I can't judge all of these cases, that

16   would depend on the circumstances of the case.  And in

17   that kind of situation I would want to ask the

18   registrant whether or not they actually read the oath of

19   affirmation before they signed it in which they affirm

20   that they are a U.S. citizen.

21       Q.  You'd agree that better training for DMV workers

22   could in some instances prevent non-citizens from

23   becoming registered to vote.  Correct?

24       A.  Yes.  If DMV officials are willing to allow their

25   clerks to make the decision to not offer the opportunity

 1    to register to vote.

 2        Q.   Now, I believe you testified a moment ago before

 3    the break that when you were an elections official in

 4    Fairfax County, you identified some non-citizens who

 5    were registered to vote.  Right?

 6        A.   Yes.

 7        Q.   And you did so I believe you said by looking at

 8    DMV records.  Correct?

 9        A.   I said those were some of the records we

10    identified.

11        Q.   Okay.  But you used some DMV records to identify

12    some non-citizens on the voter rolls.  Correct?

13        A.   Correct.

14        Q.   Okay.  I want to talk about a section in your

15    report, Page 10.  Defendant's 865.  Now, you have you a

16    header about halfway through this page that reads, "The

17    Alternatives to Requiring Proof of Citizenship."  Let me

18    know when you're there.

19        A.   I have the page, thank you.

20        Q.   All right.  The first bullet on this page and the

21    ensuing paragraph address the practice of comparing a

22    statewide voter registration list to the state DMV

23    files.  Correct?

24        A.   I-- I'm sorry.  Could you say that again?

25        Q.   Sure.  This bullet, the first bullet under the

1   header "Alternatives to Requiring Proof of Citizenship"

2   describes the practice of comparing statewide voter

3   files to a state DMV list to try to identify

4   non-citizens on the rolls.  Correct?

5       A.  Right.

6       Q.  And you expressed the opinion in your report that

7   this method of comparison is inadequate in Kansas

8   because, in your understanding, the DMV database in

9   Kansas does not distinguish green card holders, that is

10  lawful permanent residents who are non-citizens, from

11  citizens.  Correct?

12      A.  My understanding is when a data comparison is

13  done, it only turns up the temporary driver's license

14  holders--

15      Q.  And the reason-- I'm sorry.

16      A.  -- not the permanent resident aliens.

17      Q.  Have you finished your answer?

18      A.  Yes.

19      Q.  Okay.  And the reason why the comparison only

20  turns up temporary visa holders is because your

21  understanding is that in the DMV database there's no way

22  to distinguish legal permanent residents, that is green

23  card holders, from citizens.  Correct?

24      A.  Correct.

25      Q.  Okay.  Now, Mr. von Spakovsky, I just want to be

1    clear.  Are you saying that you're not aware that

2    Secretary Kobach is relying on an expert report from

3    another expert in this case, Doctor Jesse Richman, that

4    incorporates an analysis that compares driver's license

5    records about lawful permanent residents, green card

6    holders, to the state voter file in order to identify

7    lawful permanent residents potentially in the voter

8    file?  You're not aware of that?

9         A.  I haven't reviewed that report.

10        Q.  Okay.  Because you certainly wouldn't say that

11   the DMV records don't have green card information,

12   despite knowing that that was false, right, Mr. von

13   Spakovsky?

14        A.  My understanding was that if you do a data

15   comparison, it only picks up the TDLs.

16        Q.  Okay.  So your testimony is that Secretary

17   Kobach, who's relying on an expert report that

18   incorporates information from DMV files on green cards,

19   did not tell you when you wrote that in your expert

20   report that the DMV files do not contain green card

21   information and allowed you to submit this report with

22   that incorrect statement, right, Mr. von Spakovsky?

23              MR. KOBACH:  Objection.  Objection, Your

24   Honor, the counsel is providing information that is not

25   true as a condition to the question being answered to

1    the witness.

2         THE COURT:  Let me review the question.

3    Just a minute.  Just a minute.  I think the question is

4    somewhat confusing and compound.  Why don't you reframe

5    it.

6         MR. HO:  I'll do my best, Your Honor.

7    Q.   (BY MR. HO)  So I'm going to represent to you

8    that Doctor Jesse Richman, one of the other experts for

9    Secretary Kobach in this case, has submitted an expert

10   report that contains an analysis that compares green

11   card information in DMV files to the state voter lists

12   to ascertain whether or not there are potentially some

13   legal permanent residents, green card holders, who might

14   be in the voter file.  Okay?  Do you understand me, Mr.

15   von Spakovsky, when I make that representation to you?

16   A.   Yes.

17   Q.   Okay.  Now, you wrote in your report that the DMV

18   doesn't have information on green card holders, that

19   that was your understanding.  Right?

20        MR. KOBACH:  Your Honor, objection.  Again,

21   I think he's mischaracterizing it.  I believe his report

22   was referring to TDLs, not to all-- not to all driver's.

23        MR. HO:  That's just wrong.

24        THE COURT:  All right.  I'm going to

25   overrule.  There's a factual dispute between the two of

1    you as to what it says, but you can clarify and

2    redirect, Mr. Kobach.

3        A.  Okay.  I'm sorry, I lost the track of the

4    question in the arguments going on.

5        Q.  (BY MR. HO)  In your report--

6        A.  Yes.

7        Q.  -- your understanding was there was no

8    information on green card holders, lawful permanent

9    resident non-citizens, in the DMV files.  Correct?

10       A.  My understanding was that when you do a

11   comparison, that information doesn't come up.

12       Q.  Okay.  And Secretary Kobach reviewed your expert

13   report before you submitted it in this case.  Correct?

14       A.  I don't recall if I sent it to them before I

15   finalized it.

16       Q.  Okay.  Now, you believe that non-citizens who

17   register to vote in violation of state law should be

18   prosecuted.  Correct?

19       A.  No, I think I answered before that that depended

20   on the-- the facts and circumstances of each-- each

21   case.

22       Q.  Okay.  Could you open up your deposition

23   transcript, Mr. von Spakovsky, to Page 313.  And could

24   you go to Line 7 through 10.  Let me know when you're

25   there.  Are you there?

1        A.   Yes.

2        Q.   Okay.  Question:  Do you believe that non-- the

3   non-citizens who register are in violation of federal

4   law - there I go - state law should be prosecuted?

5             Answer:  I believe they should, yes.

6             Was that the question that was posed to you and

7   was that your answer?

8        A.   Yes, it was.  But I would qualify that by saying

9   that if it was intentional, yes, they should be

10  prosecuted.  If it was a mistake-- accidental or a

11  mistake of DMV officials, then that's-- those are facts

12  and circumstances that any prosecutor would take into

13  account.

14       Q.   (BY MR. HO)  Now, but you believe that

15  prosecutions are not a solution to the problem of

16  non-citizen registration for reasons that include

17  prosecutors sometimes don't want to bring cases?  That's

18  one reason why prosecutions are inadequate, right, Mr.

19  von Spakovsky, in your view?

20       A.   That's correct.

21       Q.   And another reason is you think that illegal

22  registrations is-- are difficult to detect, right, Mr.

23  von Spakovsky?

24       A.   That's correct.

25       Q.   Okay.  Let's talk about those two reasons.  The

1    first reason, the lack of desire of prosecutors.  You're

2    aware that Secretary Kobach has criminal prosecutorial

3    authority over election crimes.  Right?

4        A.  Correct.

5        Q.  Do you think that Secretary Kobach lacks a desire

6    to prosecute election crimes?

7        A.  No.  I don't know if he has the resources to do

8    it.

9        Q.  Now, let's talk about the second reason, the

10   difficulty of detection.  You described in your report

11   in this case 30 incidents of non-citizen registration in

12   Sedgwick County.  Right?

13       A.  Yes, relying on the information I received from

14   the state.

15       Q.  And you're not aware of any reason why those

16   specific 30 instances of non-citizen registration that

17   the Kansas Secretary of State informed you about

18   couldn't be prosecuted by the Kansas Secretary of State.

19   Correct?

20       A.  I don't know the facts and circumstances of each

21   case and whether the registration was intentional or

22   accidental or whether it was a-- an administrative

23   error.

24       Q.  And at the time that you offered your opinion in

25   this case that prosecutions were at-- inadequate to

1    address the problem of non-citizen registration, you

2    were unaware of how many prosecutions of non-citizens

3    for registering or voting Secretary Kobach had brought.

4    Correct?

5        A.  I was aware of prosecutions throughout the

6    country on this issue.

7        Q.  That wasn't my question, Mr. von Spakovsky.  I'd

8    like an answer to my question.

9            At the time that you offered the opinion that

10   prosecutions were inadequate to address the problem of

11   non-citizen registration in Kansas, you offered that

12   opinion without being aware of how many prosecutions

13   Secretary Kobach had brought against non-citizens for

14   registering to vote.  Correct?

15       A.  I was not aware of how many prosecutions had

16   actually been conducted.

17       Q.  Now, let's talk about the evidence of non-citizen

18   registration in Kansas in your report in a little bit

19   more detail.  And let's start-- well, in your report we

20   discussed earlier you mentioned 30 instances of possible

21   non-citizen registration in Sedgwick County.  Right?

22       A.  Yes.

23       Q.  Now, you're aware that there are more than

24   1.7 million registered voters in the state of Kansas?

25       A.  Yes.

1    Q.   And of the more than 1.7 million registered

2    voters in the state of Kansas, at the time of your

3    report you were not aware of any other instances of

4    non-citizen registration in Kansas other than the 30 in

5    Sedgwick County that you described.  Correct?

6    A.   That's correct.

7    Q.   Now, the factual basis for your assertion that

8    there were 30 non-citizens registered to vote in

9    Sedgwick County, you said I believe a moment ago, was

10   information that Secretary Kobach gave to you.  Correct?

11   A.   Correct.

12   Q.   Okay.  Now, you don't know the intent of any of

13   those individuals in Sedgwick County when they

14   registered to vote.  Correct?

15   A.   I do not because I've not examined the facts and

16   circumstances of each case.

17   Q.   So you offered an opinion in this case about the

18   extent of non-citizen registration in Kansas and relied

19   exclusively on information that Secretary Kobach gave

20   you without investigating the circumstances of those

21   cases.  Correct?

22   A.   Well, the problem I was asked to investigate was

23   the problem of non-citizens registering and voting.  And

24   as I've said this afternoon in my testimony, I believe

25   it's a problem if non-citizens register, whether they do

1   so intentionally or without realizing that they're

2   violating the law.

3       Q.   Okay.  I'm going to look at your report,

4   Defendant's Exhibit 865, which has been admitted into

5   evidence, and Page 3.  And let's look at the first full

6   paragraph.

7       A.   I have it.

8       Q.   Are you there?

9       A.   Yes.

10      Q.   Okay.  Second to last sentence you write,

11  "Clearly aliens who applied to register at the DMV were

12  not dissuaded from falsely asserting U.S. citizenship by

13  the oath requirement."  Did I read that correctly?

14      A.   Yes.

15      Q.   Okay.  Those are your words?

16      A.   That's correct.

17      Q.   But you have not investigated these individual

18  cases and, therefore, you don't know whether or not

19  these individuals falsely asserted U.S. citizenship,

20  correct, Mr. von Spakovsky?

21      A.   No, I'm relying on the state and their indication

22  that these individuals were all non-citizens.

23      Q.   That wasn't my question, Mr. von Spakovsky.  It

24  was whether or not you had personal knowledge of whether

25  or not these individuals falsely asserted U.S.

1   citizenship when they became registered to vote.  The

2   answer to that question is no.  Right?

3       A.   If they were non-citizens at the time they filled

4   out the registration application form and-- and signed

5   the oath requirement, then they falsely asserted they

6   were U.S. citizens.  That is my answer.

7            MR. HO:  Your Honor, I would like an answer

8   to my question, which was whether or not he knew if

9   these individuals had, in fact, falsely asserted U.S.

10  citizenship when he made that representation in his

11  report.

12           THE COURT:  All right.  Can you answer that

13  question, that specific question?

14      A.   Well, I don't know it personally.  I was relying

15  on the evidence-- the facts that I was given, that they

16  were aliens at the time they submitted the registration

17  form.

18      Q.   (BY MR. HO)  But you don't know if they swore

19  falsely that they were U.S. citizens, right, Mr. von

20  Spakovsky?

21      A.   I did not personally examine each registration

22  form.

23      Q.   Now, when you formed your opinion about

24  non-citizen registration in Kansas, other than the

25  Sedgwick County spreadsheet which was provided to you by

1    your client, you did not have any other information that

2    you independently sought about the problem of

3    non-citizen registration in Kansas.  Correct?

4        A.  Correct.

5        Q.  And in your opinion, it is methodologically

6    appropriate to arrive at an objective expert opinion

7    about the extent of non-citizen registration in Kansas

8    by relying exclusively on a spreadsheet given to you by

9    your client, Secretary Kobach.  Correct?

10       A.  I relied on the information I received from

11   Secretary Kobach in Kansas and also my knowledge of

12   non-citizen registration and voting in many other cases

13   throughout the country.

14       Q.  And that knowledge of non-citizen registration

15   and voting that you referred to in many other cases

16   throughout the country, there's not a single one of them

17   in the state of Kansas.  Correct?

18       A.  There is now I believe a conviction and

19   prosecution in Kansas.

20       Q.  At the time that you offered your opinion in this

21   report, the extent of your knowledge of non-citizen

22   registration in Kansas was a single spreadsheet offered

23   to you by your client, Secretary Kobach.  Correct?

24       A.  As I've answered repeatedly, yes.

25       Q.  Now, we established that this case is not your

1   first time collaborating with Secretary Kobach.  Right?

2       A.   What do you mean by collaborating?

3       Q.   Well, you worked with him on the Presidential

4   Commission on Election Integrity.  Right?

5       A.   I was a commission member, along with a number of

6   other individuals who were on the Commission.

7       Q.   And if we go back to 2010, you also worked with

8   Secretary Kobach then supporting his first campaign for

9   Secretary of State.  Right?

10      A.   I did send him a contribution, yes.

11      Q.   And in addition to contributing to his campaign

12  for Secretary of State, you also wrote an e-mail

13  promoting a fundraiser for Secretary Kobach's first

14  campaign for Secretary of State.  Correct?

15      A.   I believe I did.

16      Q.   Okay.  You didn't mention the fact in your expert

17  report that you had contributed to Secretary Kobach's

18  campaign and that you had written fundraising e-mails

19  for him.  Correct?

20      A.   I did not.

21      Q.   Now, let's go back to your expert report, Page 3.

22  And let's look at the second full paragraph.  And I want

23  to look at that first sentence.  "The number of aliens

24  discovered in just one county in Kansas may be the tip

25  of the iceberg."  Did I read that right?

 1     A.   Yes.

 2     Q.   Okay.  Did you write those words, Mr. von

 3 Spakovsky?

 4     A.   I did.

 5     Q.   Why did you choose the phrase "the tip of the

 6 iceberg"?

 7     A.   I've used that before in other things that I've

 8 written.

 9     Q.   But I mean, the reason you used that phrase is

10 because, in your view, the 30 instances of non-citizen

11 registration in Sedgwick County, those could be

12 indicative of a larger problem.  Right?

13     A.   Correct.

14     Q.   The date of your report, remind me again, it's

15 May 16th, 2016; is that right?

16     A.   Correct.

17     Q.   Now, you're aware, Mr. von Spakovsky, aren't you,

18 that just a few months before you used this phrase "tip

19 of the iceberg" in your report to describe the 30

20 incidents of non-citizen registration in Sedgwick

21 County, your client, Secretary Kobach, used the exact

22 same phrase in a press release, "the tip of the

23 iceberg," to describe the same 30 incidents of

24 non-citizen registration in Sedgwick County, Mr. von

25 Spakovsky?

 1              MR. KOBACH:  Objection.

 2       A.  No, I was not aware of that.  "Tip of the

 3   iceberg" is a phrase that's used very often.

 4       Q.  (BY MR. HO)  This has been marked as Plaintiffs'

 5   Exhibit 147.

 6              MR. KOBACH:  Your Honor, this is a waste of

 7   the Court's time.  He's already said that his answer is

 8   that it's-- it's an often used phrase.

 9              MR. HO:  I'd like to impeach that answer,

10   Your Honor.

11              THE COURT:  All right.  Proceed.

12              MR. ROE:  Your Honor, this is--

13              THE COURT:  His answer I think was that it's

14   a commonly used phrase.  All right.

15              MR. HO:  Now, this is a press release from

16   the Secretary of State's Office which is dated

17   October 15th, 2015.  Your Honor, we'd like to admit this

18   into evidence as a statement from Secretary Kobach,

19   who's a party opponent.

20              THE COURT:  This is a press release dated

21   October 16th, 2015.  Any objection?

22              MR. KOBACH:  No objection.

23              THE COURT:  147 admitted.

24       Q.  (BY MR. HO)  Can you bring up Plaintiffs' 147 on

25   the screen.  And specifically let's look at the second

1    paragraph four lines down, towards the end of the fourth

2    line, the fifth sentence.

3        "We have already identified more than 30 aliens

4    who either successfully registered before our law went

5    into effect or who attempted to register and were

6    stopped after the law went into effect.  And that's just

7    the tip of the iceberg."  Did you read that correctly?

8      A.  Yes.

9      Q.  Okay.  Mr. von Spakovsky, do you believe it is

10   methodologically appropriate as an expert witness to

11   copy language used by your client in a press release?

12              MR. KOBACH:  Objection, harasses the

13   witness.

14              THE COURT:  Overruled.  You can answer it if

15   you can.

16     A.  I have never seen this press release before

17   today.

18     Q.  (BY MR. HO)  Okay.  Just so we're clear; your

19   testimony is that when you used the phrase "tip of the

20   iceberg" to describe 30 incidents of non-citizen

21   registration in Sedgwick County in your expert report in

22   2016, it's just a coincidence that Secretary Kobach used

23   the exact same expression to describe the exact same 30

24   incidents of non-citizen registration in Sedgwick County

25   in a press release just a few months earlier?

1      A.   I've already answered that question.  I've never

2   seen that press release before today.

3      Q.   Okay.  Let's talk about the size of the iceberg.

4   You can't offer any kind of percentage about the-- you

5   can't offer any estimate about the percentage of

6   non-citizens who are registered to vote who have been

7   discovered, can you?

8      A.   Are you talking about for Kansas or--

9      Q.   For Kansas.

10     A.   No.

11     Q.   You don't have any estimate about the size of the

12  iceberg, right, Mr. von Spakovsky?

13     A.   That's correct.

14     Q.   Okay.  Let's talk a little bit more about your

15  expert report.  I believe you testified earlier today

16  describing some of the work in your expert report that

17  the outcome of a close election could be affected by

18  non-citizens voting, right, Mr. von Spakovsky?

19     A.   Correct.

20     Q.   You cannot identify a single federal election the

21  outcome of which was decided by non-citizen voting,

22  right, Mr. von Spakovsky?

23     A.   I can't cite a single case where it changed the

24  outcome, but there was cases like the *Dornan* case where

25  it came within I think 200 votes of changing the

1    outcome.

2        Q.  Okay.  But you can't identify a single case where

3    the outcome was decided by non-citizen voting.  Right?

4        A.  No.

5        Q.  Let's talk about some of the examples you do talk

6    about in your report.  So let's go back to your report,

7    Defendant's Exhibit 865, Page 4.  Let's look at the

8    fourth paragraph on this page.

9            Now, in this paragraph in your report you

10   describe a situation in which an NBC station in Florida

11   identified 100 individuals who were excused from jury

12   duty who were possible non-citizens on the voter rolls.

13   Right?

14       A.  Yes.

15       Q.  Now, you know, Mr. von Spakovsky, don't you, that

16   after this NBC report there was a follow-up by the same

17   NBC station that determined that at least 35 of those

18   100 individuals had documentation to prove that they

19   were, in fact, United States citizens.  Correct?

20       A.  I'm aware of it now, yes.

21       Q.  Okay.  In your expert report, though, you did not

22   mention the fact that at least 35 of these individuals

23   in fact had documents to demonstrate that they were

24   United States citizens.  Correct?

25       A.  Well, as you know from my deposition, I was not

1    aware of that at the time I wrote the expert report.

2        Q.   Right.  Because at the time that you wrote about

3    these 100 individuals in your expert report, you didn't

4    bother to see that there was follow-up by the same NBC

5    station determining that at least a third of these

6    people were not non-citizens, right, Mr. von Spakovsky?

7        A.   I was not aware of the follow-up, although

8    apparently they-- the follow-up did find that a

9    significant number were not U.S. citizens.

10       Q.   You're aware that this expert report has been

11   submitted to the Court, right, Mr. von Spakovsky?

12       A.   I am.

13       Q.   Okay.  And you never sought to correct or

14   supplement your expert report to caveat that 100 number

15   and say that at least a third of these people were

16   actually citizens, right, Mr. von Spakovsky?

17       A.   It was corrected in the deposition that you took

18   of me two years ago.

19       Q.   Okay.  So if I hadn't stood up and asked you

20   these questions on cross examination, that report

21   would've gone into evidence to the federal judge without

22   any correction about those 100 individuals, correct, Mr.

23   von Spakovsky?

24       A.   No, because I-- if I had found out about it, I

25   would've corrected it.  But I wasn't aware of it, as you

1   know, when you took my deposition.  So I wasn't aware of

2   it so I couldn't correct it.  If I knew of that--

3       Q.  You're aware that--

4       A.  -- I would.

5       Q.  Are you finished with your answer?

6       A.  I think so.

7       Q.  Okay.  You were aware of that mistake in your

8   expert-- I'm sorry, I'm not going to call it a mistake.

9   You were aware of that inaccurate representation in your

10  report at the time you gave your direct testimony,

11  right, Mr. von Spakovsky?

12      A.  Yes.

13      Q.  And you didn't--

14      A.  That mistake had already been-- I had been made

15  aware of it in your deposition so, therefore, the Court

16  would be aware of it.

17      Q.  And you didn't bother to explain to the Court

18  that that representation in your report--

19          MR. KOBACH:  Objection, asked and answered

20  and harassing.

21          MR. HO:  I'll move along.

22      Q.  (BY MR. HO)  Let's talk about the GAO report--

23          MR. KOBACH:  I would also like to--

24          THE COURT:  Wait a minute.  Wait a minute.

25  One person at a time.  Mr. Kobach.

1          MR. KOBACH:  And I would also like the

2    record to reflect that Mr. Ho is pointing aggressively

3    at the witness throughout this entire interchange.

4          THE COURT:  All right.  So noted.  Mr. Ho, I

5    think you should tone it down.

6          MR. HO:  Yes, Your Honor.

7    Q.   (BY MR. HO)  You testified about a GAO study in

8    your report, right, Mr. von Spakovsky?

9    A.   I did.

10   Q.   Okay.  And you mentioned in your report that

11   according to this GAO study, one federal district court

12   reported that 1 to 3 percent of the people who were

13   called for jury duty indicated that they were

14   non-citizens registered to vote.  Correct?

15   A.   That's correct.

16   Q.   Okay.  Now, in your testimony today, you

17   acknowledge that the GAO report cites statistics from

18   eight U.S. district courts.  Correct?

19   A.   That's correct.

20   Q.   And four out of those eight U.S. district courts

21   reported that there was not a single non-citizen who had

22   been called for jury duty off of-- off of the voter

23   rolls in those districts.  Correct?

24   A.   Correct.

25   Q.   And you did not mention in your expert report

1    that four out of the eight district courts cited by the

2    GAO found not a single non-citizen registered to vote.

3    Correct?

4       A.   That's correct.  But I also did not mention the

5    other three federal district courts out of the four that

6    did find.  I simply cited one of the federal district

7    courts as an example and then I gave a full citation to

8    the GAO report, which is over 70 pages of data and

9    information, all of which I could not put into the

10   report.

11      Q.   Okay.  The three other district courts that had

12   non-citizens reported from their jury rolls-- for jury

13   duty from their voter rolls, all three of those reported

14   that fewer than 1 percent of the people called for jury

15   duty indicated that they were not U.S. citizens.

16   Correct?

17      A.   I don't recall the exact details of all of the

18   district courts.

19      Q.   Okay.  This is Plaintiffs' Exhibit 127.  This is

20   the GAO report that you relied on in your expert report

21   in this case, Mr. von Spakovsky.  Does that look correct

22   to you?

23      A.   This is the GAO report I cited.

24      Q.   Okay.  You read that report.  Right?

25      A.   I did, at the time I wrote the expert report.

1    Q.  Okay.

2         MR. HO:  I'd like to move Plaintiffs'

3    Exhibit 127 into evidence, Your Honor.

4         MR. KOBACH:  No objection.

5         THE COURT:  Any objection?

6         MR. KOBACH:  No.

7         THE COURT:  127 admitted.

8    Q.  (BY MR. HO)  Okay.  Let's look at Page 42 of the

9    GAO report, which is Page 47 of the pdf, Stephen.

10        Okay.  I see three bullets here describing the

11   percentage of people called for jury duty who reported

12   that they were-- they were not U.S. citizens.  Do you

13   see that, Mr. von Spakovsky?

14   A.  I do.

15   Q.  Okay.  The first bullet there is the one that

16   says that there's a federal district court where 1 to

17   3 percent of the people called for jury duty reported

18   that they were not U.S. citizens.  Right?

19   A.  Correct.

20   Q.  And that is the one district court that you

21   described in your expert report when you talked about

22   the GAO study.  Right?

23   A.  Yes.

24   Q.  Okay.  Now let's talk about the other two-- the

25   other two bullets on this page.  The second bullet is a

1    federal district court in which less than 1 percent of

2    the jury pool reported that they were not U.S. citizens.

3    Right?

4        A.  Yes.

5        Q.  Okay.  You didn't mention that jury pool in your

6    expert report.  Right?

7        A.  That's correct.

8        Q.  Okay.  Third bullet here is a third U.S. District

9    Court in which 150 people out of the 95,000 stated that

10   they were not U.S. citizens.  Right?

11       A.  Correct.

12       Q.  Okay.  And you would agree with me that that's

13   less than 1 percent of the people from that jury pool.

14   Correct?

15       A.  Yes.

16       Q.  Okay.  And you didn't mention that jury pool in

17   your expert report, right, Mr. von Spakovsky?

18       A.  That's correct.

19       Q.  Okay.  Let's look at the next page, the top

20   bullet.  A fourth U.S. District Court said that five

21   people out of 50,000 claimed that they were non-citizens

22   in response to jury questionnaires, right, Mr. von

23   Spakovsky?

24       A.  That's correct.

25       Q.  And you'd agree that's less than 1 percent of the

1   people in that jury pool, right, Mr. von Spakovsky?

2       A.   Yes.

3       Q.   Okay.  You didn't mention that district court in

4   your expert report.  Right?

5       A.   I was giving only one example from this report.

6   I didn't mention all eight.  I mentioned one and I

7   clearly said it was up to 3 percent, that court said it

8   was 1 to 3 percent.  So I represented correctly that

9   they had said it could've been up to 3 percent.

10      Q.   Mr. von Spakovsky, do you remember at the

11  beginning of our conversation you agreed with me that an

12  expert should present evidence that both supports and

13  detracts from a particular conclusion?

14      A.   Sure.

15      Q.   The one federal district court from the eight

16  cited in the U.S. GAO report that you cited in your

17  expert report was the one with the highest percentage of

18  people reporting that they were non-citizens, right, Mr.

19  von Spakovsky?

20      A.   That's correct.

21      Q.   Mr. von Spakovsky, in 2011 you wrote an op-ed

22  asserting that a 2010 election in Missouri that ended in

23  a one-vote margin of victory included 50 votes cast

24  illegally by the citizens of Somalia.  Correct?

25      A.   Correct.  But it turned out apparently that was

1  incorrect, which is why I did not include it in my

2  expert report.

3    Q.  Okay.  Not talking about your expert report.  I

4  just want to talk about that op-ed for a second.

5        You wrote that op-ed claiming that 50

6  non-citizens from Somalia voted in an election in

7  Missouri, despite the fact that a month earlier there

8  had been an election challenge-- there had been an

9  election contest in that case and a state court in

10  Missouri issued an opinion, *Royster versus Rizzo*,

11  finding that no fraud had taken place in that election.

12  Correct?

13    A.  I don't know when that opinion was issued.  I

14  wasn't aware of that when I wrote the piece, which was

15  based on other reports.

16    Q.  You're aware of that now, right, Mr. von

17  Spakovsky?

18    A.  I'm aware of that now.

19    Q.  You never published a written retraction of your

20  assertion about Somalia voters illegally participating

21  in that election, right, Mr. von Spakovsky?

22    A.  I don't believe so, but I don't recall when I

23  discovered that.

24    Q.  Okay.  Mr. von Spakovsky, you mentioned your time

25  on the FEC earlier today.  Do you remember that?

1     A.   Yes.

2     Q.   Okay.  You were never confirmed to be a

3     commissioner on the FEC by the United States Senate.

4     Right?

5     A.   That's correct, I served in a recess appointment

6     for two years.

7     Q.   Okay.  Congressman John Lewis opposed your

8     nomination to the FEC, right, Mr. von Spakovsky?

9     A.   I believe that's correct.

10    Q.   You're not aware in his entire career of

11    Congressman Lewis ever opposing any other nominee to the

12    FEC, right, Mr. von Spakovsky?

13    A.   I have no idea.

14    Q.   Mr. von Spakovsky, you understand that under the

15    documentary proof-of-citizenship law, a birth

16    certificate is considered satisfactory evidence of

17    United States citizenship because anyone born in the

18    United States is a U.S. citizen, right, Mr. von

19    Spakovsky?

20    A.   Yes.

21    Q.   You do not believe, though, Mr. von Spakovsky, do

22    you, that that is a correct interpretation of the

23    Fourteenth Amendment, right, Mr. von Spakovsky?

24    A.   I have written analyses of the legislative

25    history of the Fourteenth Amendment and I don't believe

1   that's a correct interpretation, but that's the

2   interpretation of the State Department and the courts.

3      Q.   Right.  Just so the record is clear, you do not

4   believe that under the Fourteenth Amendment everyone

5   born on United States soil is, in fact, a U.S. citizen,

6   right, Mr. von Spakovsky?

7                MR. KOBACH:  Objection.  It's unclear what

8   the relevance of the meaning of the Fourteenth Amendment

9   clause here on--

10                MR. HO:  It goes to bias, Your Honor.

11                THE COURT:  All right.  I'll overrule.

12   Answer if you can.

13      A.   Well, if you're saying that I have a bias towards

14   immigrants, I have no bias towards immigrants.  In fact,

15   I'm a first-generation American and I'm a son of

16   immigrants, in fact refugees who came to the United

17   States.  So I don't have a bias against non-citizens.

18      Q.   (BY MR. HO)  Wasn't my question, Mr. von

19   Spakovsky.

20      A.   Well, that's my answer, sir.

21      Q.   I'd like an answer to my question, Mr. von

22   Spakovsky, which was:  You do not believe that everyone

23   born on United States soil is, in fact, a United States

24   citizen, right, Mr. von Spakovsky?

25      A.   Well, the courts themselves have said that that's

1    correct.  For example, sons and daughters of diplomats

2    and others are not considered citizens of the United

3    States.

4         I think the interpretation of that, if you look

5    at the legislative history, is that to be a U.S. citizen

6    at least one of your parents has to be a U.S. citizen.

7    But, you know, that's not what the State Department

8    believes and that's not what-- that's not the way the

9    Supreme Court has interpreted the law.

10             MR. HO:  I don't have any more questions for

11   you, Mr. von Spakovsky.  Thank you.

12             THE WITNESS:  Thank you.

13             MR. JOHNSON:  May it please the Court.  Your

14   Honor, before commencing my cross examination I'd like

15   to ask the Court to take judicial notice of the official

16   citation of the *Rizzo versus Royster* [sic] case to which

17   reference has been made on a number of occasions and

18   which is referred to on Page 25 of Ms. Minnite's initial

19   report, the number of which I can't remember, but I'm

20   sure it's in the record somewhere.

21             THE COURT:  And what's the citation?

22             MR. JOHNSON:  The official citation of the

23   *Rizzo versus Royster* case is 326 S.W.2d [sic] 104.  It's

24   a decision of the Missouri Court of Appeals in 2010.

25             THE COURT:  This is something that I can

 1  take judicial notice of.

 2          MR. JOHNSON:  Thank you.

 3          THE COURT:  I so notice.

 4          MR. JOHNSON:  Okay.  I don't think anybody

 5  can-- can dispute that.

 6                  CROSS EXAMINATION

 7  BY MR. JOHNSON:

 8      Q.  Mr. von Spakovsky, my name is Mark Johnson.  I'm

 9  a partner with the Dentons law firm.  It's a pleasure to

10  meet you.  I was on the telephone--

11      A.  Right.

12      Q.  -- when your deposition was taken, so I asked

13  some of the questions and, in fact, I was honored that

14  Mr. Ho actually used some of my questions in your cross

15  examination.

16          Let me sort of complete the circle on the e-mail

17  of February the 22nd.  And I don't have the exhibit

18  number because it's not on here, but 144, 145, something

19  like that.  Just to make sure we're clear on the record.

20          MS. CARPENTER:  145.

21      Q.  (BY MR. JOHNSON)  145, okay.  It's Exhibit 145,

22  you have a copy of it in front of you.

23      A.  I do.

24      Q.  Thank you.  And I would just like to-- in his

25  excerpt from your e-mail, Mr. Ho read a certain part of

1    it.  I'd like to read another passage from it, it's in

2    the first paragraph and it's on the second page of the

3    exhibit beginning with the third full sentence.  And

4    I'll just read it and ask you if you-- if you agree this

5    is what it says.

6          "We're also hearing that they are going to make

7    this bipartisan and include Democrats.  There isn't a

8    single Democratic official that will do anything other

9    than obstruct any investigation of voter fraud and issue

10   constant public announcements criticizing the Commission

11   and what it is doing, making claims that it is engaged

12   in voter suppression."  Is that a correct recitation of

13   what you wrote?

14       A.  It is.

15       Q.  Thank you.  Now, let me ask you a couple of

16   questions about some of the content of your expert

17   witness report which has been admitted into evidence.

18   And I'd refer you to the second and third pages, Mr. Ho

19   already asked you some questions about that.  These are

20   references to the Sedgwick County spreadsheet that about

21   which there has been an extensive amount of testimony.

22   Do you have that material in front of you?

23       A.  I-- I have my expert report.

24       Q.  Thank you.  Would you agree with me that the

25   references to the Sedgwick County report appearing on

1    Pages 2 and 3 of your expert witness report are the only

2    Kansas-specific evidence that you recite in your expert

3    report relating to the issue of the phenomenon of

4    non-citizen registration?

5        A.   Yes.

6            MR. JOHNSON:   That's all I have.   Thanks

7    very much.

8            THE WITNESS:   All right.

9            MR. KOBACH:   Your Honor, before I begin the

10   redirect, we've been researching a question at our desk

11   here about the-- whether an expert is strictly limited

12   to only the statements or opinions in his report or

13   whether the expert may stay on the same subject but

14   offer an opinion that goes beyond the four corners of

15   the report.

16           And it seems to be that there's some case

17   law in the Tenth Circuit that he can go beyond as long

18   as he's staying on the same subject matter.   And so I'd

19   like to request that the Court allow me to-- you'll

20   recall I was asking about some cases that occurred after

21   his report was written about I think it was in Virginia

22   in one and might've-- the other might be in

23   Pennsylvania.   I was asking about cases and you said,

24   well, stick to the ones in your report.

25           In light of that what I think appears to be

1    an open question or we're still trying to do the

2    research, would the Court permit me to ask about those

3    cases that occurred after his report was written?

4              THE COURT:  And what's the context of

5    getting into-- what are you going to ask him about this

6    other one?

7              MR. KOBACH:  I'm going to ask him to

8    describe about what he knows about cases of voter fraud

9    after his report was written.  In other words, it's on

10   the same subject but it's continuing forward in time.

11   And so I think it is permissible to do that, but I

12   understand that Your Honor said to keep it only to what

13   was in the report.  So I was wondering if I may at least

14   continue forward in time in a couple of areas and do

15   that.  If not, we can just proffer it.

16             THE COURT:  All right.  Mr. Ho.

17             MR. HO:  Your Honor, we would object to

18   that.  If Secretary Kobach wanted to offer evidence on

19   those incidents that took place after Mr. von

20   Spakovsky's report, he could've requested to supplement

21   that report and asked us about it, maybe then we

22   would've asked to supplement our reports.  But this is

23   trial by ambush.

24             THE COURT:  All right.  I'll allow you to do

25   it as a proffer because, again, as we've talked about

1    before, each side needs to have-- know the universe of

2    what the opinions are of the experts so that they will

3    have the opportunity to supplement.  I mean, we had a

4    good example of that with Doctor Minnite's testimony,

5    she supplemented twice to add additional information.

6              So I'll let you go into this line of

7    questioning as a proffer only at this point.

8              MR. KOBACH:  Okay.  So as a proffer, I'm

9    going to ask I think three questions here.

10                  REDIRECT EXAMINATION

11   BY MR. KOBACH:

12   Q.   Mr. von Spakovsky, I'm going to ask you first

13   about any additional cases, in particular I think you

14   might've started to say something about Virginia when

15   opposing counsel objected, but additional cases of voter

16   fraud that have occurred in the last two years since you

17   wrote your report.

18   A.   Sure.  I'll talk specifically about non-citizens.

19   The Public Interest Legal Foundation used a provision of

20   the National Voter Registration Act to obtain voter

21   registration records from almost all of the counties in

22   Virginia.  They had to sue a number of the counties to

23   force them to comply.  But this is a provision of the

24   NVRA that gives the public, any member of the public,

25   access to voter registration records.

1          As a result of that, what they were asking for

2     was the voter registration records on all registered

3     voters who had been removed from the voter rolls by

4     election officials because they were non-citizens.

5          The result of that statewide investigation was

6     that they discovered approximately 5,500 non-citizens

7     who had been removed from the voter rolls in Virginia in

8     the last I think five years but not before they had cast

9     7,500 ballots.  And I found that very significant

10    because, you know, in the last dozen years Virginia has

11    had two statewide attorney general's races decided by

12    less than 1,000 votes.

13         And in the 2017 election, there were a number of

14    state House races decided by a very small number of

15    votes, including one district, state House district, in

16    which there was a tied vote.  And the winner of that

17    election was determined by drawing a name and which

18    candidate won that election determined which political

19    party would control the state legislature.

20         That particular district, the 94th District, is

21    mostly made up of Newport News.  And that was one of the

22    cities that the Public Interest Legal Foundation had

23    obtained records from and they had removed more than 200

24    non-citizens from the rolls there.

25    Q.   And any cases-- any other cases?  I think

1    Pennsylvania may have been one, but I'm not sure.

2       A.   The Public Interest Legal Foundation did a

3    similar request under the NVRA in New Jersey.  In New

4    Jersey they found I think in 11 counties over 1,000

5    non-citizens who had been removed from the voter rolls,

6    about a third of whom had cast ballots.

7            And in Pennsylvania, there's been a state

8    legislative committee there investigating this issue.

9    Al Schmidt I think it is, election official from

10   Philadelphia, testified not too long ago that he

11   estimated that there were 100,000 non-citizens on the--

12   that had been on the voter rolls in Pennsylvania.

13   There's currently a lawsuit to try to get the internal

14   information from DMV and the Secretary of State turned

15   over and made public.

16      Q.   The second question of my proffer.  In-- we

17   talked about cases on which you had personal knowledge

18   at the DOJ in Florida where those who were charged with

19   voter fraud crimes said that it was just a mistake,

20   claimed that it was just a mistake.

21           Are there other cases beyond your personal

22   knowledge where you would claim-- you believe that

23   aliens say that it's just a mistake when they are--

24   there's alleged to be--

25               MR. HO:  Objection, Your Honor.  He hasn't

1    laid a foundation for it.  In fact, he specified that

2    these are instances beyond Mr. von Spakovsky's

3    knowledge.

4              THE COURT:  All right.  So there's--

5              MR. KOBACH:  That's correct.

6              THE COURT:  -- a second basis to-- this is

7    just a proffer.  This information is not something I'm

8    going to consider because I've said it wasn't properly

9    disclosed under the federal rules.  But there is a

10   separate basis; if it's not something within his

11   personal knowledge, research study, then it's also not

12   admissible.  But proceed.

13   Q.   (BY MR. KOBACH)  You can answer.  The question

14   was beyond those cases, is it common for non-citizens to

15   claim it's just a mistake when it's discovered they have

16   registered?

17   A.   Well, that's-- that's-- you can see that in many

18   of the reported cases, such as the Seventh Circuit case,

19   one of the ones that I mentioned in my expert report.

20   Q.   And then the last question, and that is:  Has

21   your-- have you done any research on the-- on the total

22   number of convictions for voter fraud obtained or

23   maintained a database in that regard?

24   A.   About two years ago The Heritage Foundation

25   started a-- a database.  Now, this is not-- this is not

1   a comprehensive review of all the records across the

2   country, court records, media records, et cetera.  But--

3   but basically we have gathered up information on cases

4   as we have run across them.

5        The rules for this database are very strict.

6   There are no cases in there in which people simply

7   allege voter fraud.  The only cases in the database are

8   cases in which someone has actually been convicted in a

9   court of law of engaging in election fraud or there's

10  been a judicial finding or also in some states there are

11  some state election boards that have the ability to

12  impose administrative fines like in fraud cases.  We--

13  that database is now up to over 1,100 cases and we're in

14  the process of adding some more into that.

15        MR. KOBACH:  That ends my proffer.  So now

16  I'll continue with the redirect.

17  Q.   (BY MR. KOBACH)  Mr. von Spakovsky, you've

18  testified before Congress more than a dozen times you

19  said.  In your experience, does-- do congressional

20  committees invite people to testify that the committee

21  does not deem to be an expert?

22  A.   Well, I don't know, but I know that I was invited

23  specifically to comment on various kinds of election

24  issues, including the Voting Rights Act, because the

25  committee believed I had expertise on that issue.

1        I should mention that I've also testified in

2   front of the U.S. Commission on Civil Rights on these

3   issues, in fact just recently, about less than a month

4   ago.

5       Q.   Does the ABA or American Bar Association usually

6   ask non-experts to write chapters in its books?

7       A.   I don't believe so.

8       Q.   Do-- do most people who study-- well, let me

9   rephrase that.  Do all experts in election

10  administration publish only in peer-reviewed journals?

11      A.   I don't believe so.

12            MR. HO:  Objection, Your Honor.  It sounds

13  like he's trying to get at the legal definition of

14  expert, which is not the proper subject testimony of--

15  not the proper subject of testimony.

16            THE COURT:  I'll sustain to the form of the

17  question.  I don't know how he has personal knowledge

18  of-- unless he studied every expert in the country.

19      Q.   (BY MR. KOBACH)  Do most people-- not looking at

20  the legal definition of a-- an expert witness but just

21  the-- your understanding of the word "expert," do most

22  experts in election administration publish in

23  peer-reviewed journals?

24      A.   I don't know the answer to that.  I know that

25  I've had a number of election experts that I've gotten

1  to write studies for The Heritage Foundation.  Those

2  have not been peer-reviewed, they've gone through our

3  extensive editing process.  And that includes, for

4  example, the former chief election official for Virginia

5  and Florida who has written for us on election

6  administration issues.

7     Q.   Do you regard the members of the Federal Election

8  Commission to be experts in the common understanding of

9  the word in elections?

10    A.   Well, certainly the commissioners are experts on

11 the Federal Election Campaign Act.

12    Q.   And are you aware of any other federal election

13 commissioners in your experience who publish regularly

14 in peer-reviewed journals?

15    A.   No.

16    Q.   In the common sense of the word, do you regard

17 members of the Election Assistance Commission appointed

18 by the President and confirmed by the Senate to be

19 experts in elections?

20    A.   Well, yes, in particular because one of the

21 duties given to the EAC and those commissioners by the

22 federal statute that established the EAC is to provide

23 best practices guidelines to election administrators

24 across the country.  And that was one of the jobs of the

25 Board of Advisors when I served on it, to help them with

 1    that.

 2        Q.   To your knowledge, do any of the current members

 3    of the Election Assistance Commission publish in

 4    peer-reviewed journals?

 5        A.   I'm not aware that they do.

 6        Q.   Are you aware of any past members of the Election

 7    Assistance Commission who publish in peer-reviewed

 8    journals?

 9        A.   No.

10        Q.   Do you recall the interchange regarding the

11    recording-- recording, the audio-recording, from a

12    purported reporter from ProPublica?

13        A.   Yes.

14        Q.   Mr. Ho did not allow you to explain your answer,

15    you started to explain what was going on.  Could you

16    please give the context in your answer?

17        A.   Sure.  We had just completed I think an

18    eight-hour hearing in New Hampshire of the Presidential

19    Commission-- Advisory Commission on Election Integrity.

20    During that time, you know, I had no access to e-mail or

21    anything like that, just like you do in a federal court.

22            And at the end of the hearing, a reporter came up

23    to me and asked me if someone from The Heritage

24    Foundation had sent Mr. Sessions an e-mail saying that

25    they were concerned that Democrats were being appointed

1     to this Commission, do you know who that was?

2          I said, I have no idea.  And I was answering

3     truthfully.  First of all, I had not seen this e-mail.

4     I was simply asked, in essence, had I sent an e-mail to

5     Jeff Sessions.  The answer to that is no.  It was no at

6     the time, it's no today.

7          This e-mail was sent to a private party in-- a

8     lawyer that I know in Washington, D.C., who does not

9     work for the government-- didn't work for the government

10    then, doesn't work for the government now.  Apparently

11    unbeknownst to me--

12       Q.   Before you-- before you go on.  When you said

13    "this e-mail," could you tell me what the exhibit number

14    is?

15       A.   There was not an exhibit number on it.

16       Q.   What are the first words at the top of the page?

17       A.   Well, the first-- it says "from" but then it's--

18    there's a-- it's blacked out and it says (b)(6),

19    Attorney General's e-mail address.

20       Q.   Okay.  I'm sorry.  And then-- I interrupted you.

21    And you said "unbeknownst to me," you may continue.

22       A.   The lawyer who I sent it to who, as I said,

23    didn't work for the federal government then, doesn't

24    work for the federal government now, unbeknownst to me

25    he apparently had forwarded it to Jeff Sessions.

1        So this was a private discussion that was not

2   sent to the Attorney General.  In fact, I've never sent

3   an e-mail to the Attorney General.

4        Q.   Mr. Ho asked you about DMV employees offering

5   non-citizens opportunities to vote.  Do you recall that?

6        A.   Yes.

7        Q.   Does this happen in states all across the

8   country, in your opinion?

9        A.   Yes, it does.

10       Q.   In your opinion, is this the result of human

11  error?

12       A.   Well, in some places I think it's the result of

13  human error.  But when I was at the Justice Department,

14  I spoke to election officials and to some DMV officials,

15  and it was very clear to me that many DMV officials

16  resented the fact that the NVRA had placed on them the

17  responsibility for voter registration.

18       You know, they're-- they saw their job as taking

19  care of licensing, and they did not want their clerks

20  making decisions on whether someone should be offered

21  the right to vote or not.

22       So the people that I talked to basically told

23  their clerks, no matter what, offer the individual the

24  right to vote.  We'll let the election officials decide

25  what to do about it when they get it.

1    Q.  So now looking specifically at Kansas.  Do you

2    have any reason to regard the training provided by the

3    Kansas Secretary of State's Office to the Kansas

4    Department of Vehicles as inadequate?

5    A.  No.

6    Q.  Do you agree with the plaintiffs' assertion in

7    this case that just giving more training to DMV

8    officials would be preferable to proof of citizenship to

9    stop non-citizens from registering?

10   A.  No, because there are too many non-citizens that

11   you're not going to find, people who are here illegally,

12   people who don't get driver's licenses, even if you can

13   get DMV to-- to take care of this.

14   Q.  You were also asked about comparisons, computer

15   comparisons of databases involving driver's licenses.

16   Do you remember that?

17   A.  Yes.

18   Q.  Would a database of temporary driver's licenses

19   given to non-citizens temporarily living in the country,

20   would that-- would that database include green cards

21   which are only given to lawful permanent residents?

22   A.  No, because they're-- they're permanent

23   residents, they're not here temporarily.

24   Q.  So if green card holders in a state-- and I'll

25   represent to you in Kansas they do.  If green card

1    holders obtain normal driver's licenses along with U.S.

2    citizens, would a comparison of people who have normal

3    driver's licenses with the voter rolls reveal which

4    people are non-citizens on the voter rolls?

5        A.   No, not-- no, not that I'm aware.

6        Q.   Mr. Ho also asked you about prosecutions and how

7    many my office has brought.  Do you remember that?

8        A.   Yes.

9        Q.   I don't know if you were in the courtroom when

10   the number was stated, but I'll-- I'll just represent it

11   to you; that our office has to date only been able to

12   prosecute two cases of non-citizens for voting or

13   registering, despite the fact that we know of all the

14   129 cases at issue in this litigation.

15            Given that fact, do you think prosecution is an

16   effective deterrent to preventing non-citizens from

17   voting?

18       A.   No, because those kind of cases don't get a lot

19   of publicity and not everyone knows about them, so you

20   know, you would need that to deter non-citizens from

21   registering.

22       Q.   In your expertise both as-- in elections and as a

23   person who formerly worked at the Department of Justice,

24   are there often barriers to prosecuting cases of

25   non-citizens registering and/or voting?

1      A.   Yes, there are.  I mean, for example, I know the

2   Department of Justice has never taken advantage of

3   several things.  For example, they have never gone to

4   the Department of Homeland Security to ask for the files

5   of individuals applying-- aliens applying for

6   citizenship to get those files where individuals

7   answered "yes" that they had registered and voted.

8   Those are the easy files for them to obtain and

9   prosecute, yet they haven't done that.

10          Neither have the U.S. Attorney's Offices across

11   the country, and there are 93 of them.  I'm not aware

12   that a single one of them has gone to the clerk of the

13   federal courts where they are located to ask for the

14   files on individuals who were excused from jury duty

15   from-- for being non-citizens so that they could easily

16   check, see whether that individual is registered to

17   vote.  And that might be a very easy case to investigate

18   and potentially prosecute.  But none-- none of the U.S.

19   Attorney's Offices have ever done that.

20      Q.   Mr. Ho also asked you about individuals falsely

21   swearing that they are U.S. citizens.  I think he was

22   principally asking about at the DMV.

23          Is it your understanding that every DMV in the

24   country, every state's Departments of Motor Vehicles in

25   the country asks voter registration applicants to either

1   swear or sign an affirmation that they are U.S.

2   citizens?

3       A.  Yes, that is also a standard part, of course, of

4   the federal voter registration form.

5       Q.  And is it your understanding that that happened

6   in Kansas as well?

7       A.  Yes.

8       Q.  Is it your understanding based on your experience

9   and expertise that some non-citizens will knowingly

10  swear that they are non-citizens?

11      A.  Yes, I've seen cases-- I've seen cases like that

12  prosecuted.

13      Q.  I'm sorry, I misstated it.  That some

14  non-citizens will knowingly swear that they are U.S.

15  citizens.

16      A.  Yes, there have been many cases like that.

17      Q.  Oh, Mr. von Spakovsky, I-- I was just wondering,

18  did I teach you the English phrase "tip of the iceberg"?

19      A.  No.

20      Q.  Had you ever used it in writings or conversation

21  prior to meeting me?

22      A.  Yes.  I give many speeches on the election fraud

23  issue and I've used that term for years.

24      Q.  Are all of the instances of voter fraud you know

25  of included in your expert report?

1    A.   No.

2              MR. KOBACH:  No further questions.

3              MR. HO:  A very brief recross, Your Honor.

4              THE COURT:  Yes.

5                   RECROSS EXAMINATION

6    BY MR. HO:

7    Q.   Mr. von Spakovsky, do you remember just a second

8    ago Secretary Kobach asked you a question about whether

9    or not you agreed with the contention that DMV training

10   practices in Kansas are inadequate, and you said no.

11   Right?

12   A.   I have not been presented with any evidence that

13   they're inadequate.

14   Q.   Have you reviewed the training materials that DMV

15   workers in Kansas receive concerning voter registration,

16   Mr. von Spakovsky?

17   A.   No.

18   Q.   Have you reviewed the training practices of DMV

19   workers in Kansas regarding voter registration, Mr. von

20   Spakovsky?

21   A.   No.

22   Q.   So you don't know anything about DMV training in

23   Kansas with respect to voter registration, right, Mr.

24   von Spakovsky?

25   A.   I've not been presented with any materials on

1  that.

2          MR. HO:  Okay.  Your Honor, the only other

3  questions that I would have at this time relate to the

4  proffer that Secretary Kobach had.  Now, we-- we, you

5  know, maintain our objection and appreciate Your Honor's

6  ruling.  For purposes of the record I could ask a few

7  brief questions, excuse me, related to the proffer.  But

8  if Your Honor prefers that we simply move on, that's--

9  that's fine.

10          THE COURT:  It's up to you.

11          MR. HO:  I'll ask just a couple of quick

12  questions.

13     Q.  (BY MR. HO)  Mr. von Spakovsky, you testified--

14          MR. HO:  And this is without waiving our

15  objection and obviously respecting Your Honor's ruling

16  that this evidence is not admitted.

17          THE COURT:  I understand.

18     Q.  (BY MR. HO)  Mr. von Spakovsky, you testified

19  about some non-citizens who ended up on the voter rolls

20  in Pennsylvania.  Do you remember that?

21     A.  Yes.

22     Q.  Okay.  You're aware, are you not, that that issue

23  in Pennsylvania has been attributed to a glitch in the

24  Pennsylvania DMV computer system.  Right?

25     A.  Right.

1       Q.   I'm sorry?

2       A.   Yes.

3       Q.   And you're aware, are you not, that the problem

4   in Pennsylvania stemmed from the fact that even when

5   non-citizens provided documentation at Pennsylvania DMV

6   offices showing that they are non-citizens, that they

7   were still as a matter of course taken into the

8   motor-voter process?

9       A.   I believe that was the assertion made in the

10  legislative testimony.

11      Q.   You don't have any reason to doubt that

12  assertion, do you, Mr. von Spakovsky?

13      A.   No.

14           MR. HO:  No further questions, Your Honor.

15           MR. JOHNSON:  Nothing, Your Honor.  Thank

16  you.

17           THE COURT:  Anything more?  All right.  May

18  Mr. von Spakovsky be excused?

19           THE WITNESS:  Thank you very much.

20           MR. HO:  Well, Your Honor, at this time I

21  think it's highly unlikely that we would be able to

22  finish Doctor Camarota before 5:00 p.m.

23           The other option would be to play the

24  deposition transcript, which is about 45 minutes, so

25  that would take it beyond 5:00 p.m. as well.  We could

1  start one or the other.  We're happy to do whatever Your

2  Honor prefers at this point.

3          MR. KOBACH:  Your Honor, Mr.-- Mr. Camarota

4  deduced that we would not be able to finish and so he

5  hopped on a plane to go home for the-- oh, no.

6          MR. CAMAROTA:  No, no, I'm staying.

7          MR. KOBACH:  Oh, you're staying.  Okay.  I

8  was passed a note that you hopped on a plane.  Well,

9  then I guess we could do either one.

10          THE COURT:  It sounds like he might take

11  longer than 45 minutes from start to finish, though, Mr.

12  Camarota?

13          MR. HO:  And, I'm sorry, just so that the--

14  Your Honor knows, with the defendant's

15  counter-designations added in, it's about 49 minutes.

16          THE COURT:  Okay.  I mean, I'm willing to

17  stay, I just-- we need to be done by 5:30.  I actually

18  have another appointment for work.  My workday continues

19  after we finish this.

20          MR. KOBACH:  And, Your Honor--

21          THE COURT:  If you think we're going to be

22  finished by 5:30.

23          MR. KOBACH:  We just have a real brief legal

24  issue we'd like to raise before we start the video, if

25  that's okay.

1           THE COURT:  Okay.

2           MR. KOBACH:  And I'm going to let my

3   colleague.

4           MS. BECKER:  Your Honor, Sue Becker for the

5   defendant.  With regard to the playing of the videotaped

6   deposition portion, we request that the video itself not

7   be made publicly available.  Rule 83.2.1 prohibits the

8   videotaping of witness testimony at trial.  This

9   evidence is offered in lieu of live testimony and it is

10  not an exhibit, therefore it is not a judicial record

11  that can be publicly available after the trial.  To

12  allow public access to the video would circumvent

13  Rule 83.2.1.

14          The Eighth Circuit has squarely addressed

15  this question, it held, quote, "As a matter of law, the

16  deposition videotape itself is not a judicial record to

17  which the common-law right of public access attaches.

18  And even if the defendant had moved for the admission of

19  the videotape into evidence, the videotape itself would

20  not necessarily have become a judicial record subject to

21  public review."

22          THE COURT:  I tend to agree because-- I tend

23  to agree because, as you know, there's a rule against

24  broadcasting and-- outside of the courthouse testimony.

25  So I agree that this particular testimony that's being

1   presented by video is-- while it should be marked as an

2   exhibit, it's not actually made a part of the-- the

3   record.

4             And it-- well, in fact, exhibits in general

5   are returned to the parties at the close of the trial,

6   so I don't know that it's an issue anyway.  But I agree

7   with you, it shouldn't be a public record for purposes

8   of our docket.

9             MS. BECKER:  Thank you, Your Honor.  So I

10  just want to clarify, that was *U.S. versus McDougal,* 103

11  F.3d. 651.

12            THE COURT:  Okay.  You won, you don't need

13  to give me more argument.

14            MS. BECKER:  All right.  Well, so to

15  clarify, Your Honor, so the videotape itself is not

16  available to be publicly disseminated, whereas the trial

17  transcript that may contain the testimony is the

18  judicial record.  Is that my understanding as well?

19            THE COURT:  That's correct.  And I-- well,

20  the transcript of the video-- oftentimes the court

21  reporter doesn't take down the transcript of the

22  deposition that's played, but the transcript suffices.

23  All right?  So-- isn't that right, Kelli, the transcript

24  of the deposition will be incorporated into the trial

25  transcript.  And if that trial transcript is ever made

1   public, then this transcript would be but not the video

2   itself.

3           Okay.  Okay.  So Local Rule 32.1 says that

4   if depositions, et cetera, are to be used at trial, the

5   parties seeking to use them must file the portions to be

6   used at the beginning of trial insofar as their use

7   reasonably can be anticipated, which I think has

8   happened.  But the question here now is, does it

9   become-- unlike any other exhibit, does it become part

10  of the public docket?  It does not.

11          MS. BECKER:  Okay.  Thank you, Your Honor.

12  The second issue I'd like to make a record on with--

13  still with regard to the videotaped deposition is that

14  the-- the designations provided by the plaintiff

15  contains all of the pages that are under seal currently

16  from Your Honor's order of 10-27-17 when we argued all

17  of the unsealing of the judicial record when the

18  plaintiffs attached Mr. Kobach's entire deposition to a

19  motion.

20          And then we went through-- we had a hearing

21  and we discussed the exhibits that they wanted to unseal

22  and then Your Honor agreed to unseal portions of the

23  deposition that was, you know, contextual and so forth.

24  And we've gone through and compared, and all the pages

25  that are completely under seal are in the videotape.

1          THE COURT:  But they're no longer under

2    seal.  I mean, that's-- my order *in limine* resolved

3    that.  They're no longer under seal with respect to--

4          MS. BECKER:  So, Your Honor, so you

5    released--

6          THE COURT:  -- with respect to those

7    portions that plaintiff has designated and you have

8    counter-designated.  I understand you have a continuing

9    objection.  You object to the video at all, but you also

10   counter-designated.  So those portions which I think is

11   what's going to be played are no longer under seal.

12          MS. BECKER:  Well, and with regard to the

13   counter-designations, those were only if Your Honor

14   overruled our objections.  And as Mr. Ho stated, I did

15   watch the video, it's-- you know, it was-- it was a

16   limited one-hour discovery deposition.  And the

17   videotape is 49 minutes and defendant's designations,

18   our counter-designations, consist of about 60 lines.  I

19   mean, a few-- like ten pages.

20          So the majority-- I just want to make sure

21   you know the majority are the redacted things, and it's

22   my understanding that you're now unsealing most of them?

23          THE COURT:  I'm unsealing those parts that

24   I've ruled upon as designations and

25   counter-designations.  And you are not waiving your

1    objection to this being played by countering-- by

2    counter-designating.  I mean, you're not waiving.  Your

3    objection is preserved for the record.

4              MS. BECKER:  Okay.  And then I would also

5    like to preserve and re-assert our motion *in limine*

6    which-- on the basis of relevance, which I would also

7    argue that nothing has changed other than we're in a

8    trial setting because earlier the redactions, the

9    redacted portions were based on relevance.  So now

10   they're being unredacted and unsealed apparently.

11             The argument with regard to the motion *in*

12   *limine* is that the--

13             THE COURT:  I'm not going to-- I'm not going

14   to revisit.  You can make your-- I mean, you don't need

15   to make a record.  Your objection, your-- your position

16   on the *limine* motion is preserved for the record.  I'm

17   not going to change my ruling, so we don't need to hear

18   argument and go through that anymore.

19             So your objections to the video, your *limine*

20   positions are-- are preserved for the record.  Your

21   objections to the extent you've objected in the-- at the

22   earlier stage of the litigation to the unsealing of this

23   document, those objections are preserved for the record

24   as well.

25             MS. BECKER:  All right.  And I have one

1    additional point with regard to that.  And that is that

2    Your Honor stated earlier with regard to plaintiffs'

3    argument about something being contained in the pretrial

4    order and that was the basis for getting it in.  I

5    believe it was a stipulation.  But Your Honor stated

6    that it was more important that the pretrial order

7    contained the stipulations and that the pretrial order

8    controlled the evidence in this case.

9         And defendant agrees that the pretrial order

10   controls in this case, and we argued this when we filed

11   this motion *in limine* and asked the Court to follow the

12   pretrial order and exclude the evidence of these

13   allegations of lobbying efforts, which is nowhere in the

14   pretrial order.  It is not in the plaintiffs'

15   contentions.  At most, it was in a footnote in the

16   motion for summary judgment that they did not rely on.

17        So I would just like to point out for the

18   record that the alleged lobbying efforts to amend the

19   NVRA and the President Trump stuff and all the other

20   things and its lack of relevance to the issues-- still

21   have lack of relevance to the issues to be tried.

22        And the Court earlier said that the pretrial

23   order was not controlling when defendant's requested the

24   pretrial order to be held as the final parameters of

25   the-- of the evidence when you overruled defendant's

1    motion *in limine* to exclude that evidence.

2         So on that basis, on that new basis, I'm

3    re-asserting defendant's motion *in limine* to exclude

4    reference to efforts to amend the NVRA on the basis that

5    plaintiffs did not include this issue in their plaintiff

6    contentions in their pretrial order.  I think that's it.

7         THE COURT:  Okay.  I overrule the objection

8    to relevance.  I overrule your objection to the extent

9    you're complaining about the pretrial order not

10   addressing this because pretrial orders never contain

11   the-- an exhaustive account of all of the evidence.  It

12   doesn't include all the exhaustive evidence of the

13   defendant nor of the plaintiff.

14        The pretrial order does control in terms of

15   the claims, in terms of stipulations.  Although if you

16   reach additional stipulations later, that's added to the

17   record.

18        So when I was ruling about the pretrial

19   order controlling, I was talking about the stipulations

20   and deadlines or other sorts of rules in the pretrial

21   order.  I was not talking about the scope of the

22   evidence mentioned in the pretrial order.

23        I've never seen a pretrial order that-- that

24   provides a recitation of all of the evidence.  You can

25   imagine how long a pretrial order that did that would

 1   be.

 2              All right.  So those are my rulings, let's

 3   proceed.

 4              MR. DANJUMA:  Your Honor, just before we

 5   proceed, just a logistical question.  When we read the

 6   prior deposition designations for Mr. Rucker and Mr.

 7   Bryant, you asked for admission of the underlying

 8   evidence, the-- the exhibits during the reading.

 9              Is it all right if we do that at the close

10   of the video just to-- to move into evidence each of the

11   underlying exhibits?

12              THE COURT:  Yes.

13              MR. DANJUMA:  Okay.

14              THE COURT:  Yes, that's probably more

15   efficient, rather than stopping the video repeatedly.

16              MR. DANJUMA:  And just so you know, this

17   might take us a little bit beyond 5:30.  I know you have

18   another appointment, I'm just noting that.

19              THE COURT:  All right.  I'm telling them

20   that right now.  Go ahead.

21              MR. DANJUMA:  Oh, and I'll hand a copy of

22   the transcript with the highlighted depositions [sic] to

23   opposing counsel and to the Court.

24              (The videotaped deposition of KRIS KOBACH

25   was played).

1          MR. DANJUMA:  So, Your Honor, that's the

2    completion of the videotape.  And at this time

3    plaintiffs would like to move for the admission of

4    Plaintiffs' Exhibit 67, the draft NVRA amendments which

5    were marked as Exhibit 1 in Defendant's Kobach's August

6    1st, 2017 deposition.

7          THE COURT:  Well, I understand you have a

8    continuing objection to Exhibit 67, which I've already

9    ruled on.  I'll admit it, but your objection is

10   preserved for the record.

11         MR. DANJUMA:  And Plaintiffs' Exhibit 68,

12   Kobach e-mail to Hamilton, which was marked as Exhibit 4

13   in Defendant Kobach's August 1, 2017 deposition.

14         MS. BECKER:  Continuing objection, Your

15   Honor.

16         THE COURT:  All right.  Continuing objection

17   overruled.  Exhibit 68 admitted.

18         MR. DANJUMA:  And Plaintiffs' Exhibit 69,

19   the Kobach memo for Trump transition meeting, which was

20   marked as Exhibit 5 in Defendant Kobach's August 1st,

21   2017 deposition.

22         THE COURT:  All right.  Overruling

23   defendant's continuing objection to that.  I'll admit

24   Exhibit 69.

25         MR. DANJUMA:  And finally, we would move to

1    admit as Plaintiffs' Exhibit 148 the videotaped

2    deposition of Defendant Kobach on August 1st, 2017,

3    pursuant to the-- the Court's prior recommendation.

4              THE COURT:  All right.  Exhibit 148, the

5    video deposition is admitted, but it can be-- it will be

6    withdrawn at the close of the trial.  And for purposes

7    of the record, the written transcript of this will be

8    part-- just like the deposition transcripts are part--

9    you know, the oral deposition transcripts are part of

10   the trial transcript but not the actual tape itself.

11             MR. DANJUMA:  Understood.  And just very

12   quickly for the record, Exhibit-- the Exhibit 2 that was

13   referenced is plaintiffs'-- in the deposition was

14   plaintiffs' consolidated reply memorandum in support of

15   plaintiffs' motion for preliminary injunction, which was

16   filed on April 21st, 2016, ECF No. 94.

17             And the exhibit that was marked as Exhibit 3

18   in the-- in Secretary Kobach's deposition was

19   defendant's emergency motion for a stay pending appeal

20   in the Tenth Circuit, which was filed August 2nd, 2017.

21             THE COURT:  Okay.  So noted.

22             MS. BECKER:  And, Your Honor, I would like

23   to just note my continuing objection to the admission of

24   the videotape even as an exhibit.  And I would like to

25   move to strike all of the previous testimony from the

1    record as part of my continuing objection that the Court

2    has noted.

3              THE COURT:  All right.  Understood.  The

4    motion to strike is denied and continuing objection is

5    overruled, preserved for the record.  All right.

6              MR. KOBACH:  Your Honor, could I add just

7    one quick thing?

8              THE COURT:  Yes.

9              MR. KOBACH:  One benefit of playing that

10   video is I did discover an error in the transcript.

11   There was one word that was in the transcript that was

12   not in the video.  Can I present that to your clerk?

13             THE COURT:  Yes.  Well, what's the page and

14   line number?

15             MR. KOBACH:  Page 54, Line 19.  I think the

16   word "accident" was added by the transcriber but was not

17   stated in the video.

18             THE COURT:  Okay.  You know, the

19   transcription is certified by another court reporter,

20   not this one, but I think we need to make a record of

21   this.  So Page 54, tell me again what line.

22             MR. KOBACH:  Line 19.

23             THE COURT:  Line 19.  And then what's--

24   what's the correction?

25             MR. KOBACH:  The word-- I think the word

 1    "accident" was inadvertently inserted.  I didn't--

 2              THE COURT:  54, Line 19.  Mine says, "Do you

 3    ever rely on his--"

 4              MR. KOBACH:  Oh, maybe I'm looking at a

 5    different--

 6              THE COURT:  Am I not looking at the right--

 7    no, I'm sorry.  I'm looking at the-- I'm sorry.  My

 8    fault.  I've got too much paper up here.  Okay.  54,

 9    Line 19.  So what was the word that you heard?

10              MR. KOBACH:  The word that was inserted I

11    believe incorrectly by the transcriber was "accident."

12    I think the correct reading is just, "It would be more,

13    you know--" and then I was cut off by the question.

14              THE COURT:  Okay.  We've made a record of

15    that.  You can review it over the weekend.  If you take

16    issue with it, Mr. Ho--

17              MR. HO:  We don't take issue with that, Your

18    Honor.

19              THE COURT:  Okay.  So the-- I don't know how

20    you do this, Kelli, but I suppose there needs to be some

21    sort of annotation in the record that the certified

22    transcript-- there was an error determined upon playing.

23    Of course, this whole soliloquy is in the record so

24    maybe that's all we really need.

25              Okay.  We're going to recess for the

1    weekend.  I think this closes your case, but I'll have

2    you rest on Monday after you make sure that you've got

3    everything, whether it's stipulations or whatever.

4              And then Mr. Camarota will be here, Mr.

5    Kobach, on Monday to testify?

6              MR. KOBACH:  Yes.  Mr. Camarota will be back

7    and I believe Mr. McFerron will be here as well on

8    Monday.  And-- oh, yes, and Doctor Richman will also be

9    here on Monday.

10             And we wanted to inquire at this point, Your

11   Honor, we-- we're only intending to bring originally the

12   witnesses we listed.  However, during the testimony of

13   Marge Ahrens, the League of Women Voters witness brought

14   by plaintiffs, she testified about something that wasn't

15   in the pretrial order at some length.  And we wanted to

16   ask the Court leave to bring an additional lay witness

17   to-- a fact witness to-- to rebut what Ms. Marge Ahrens

18   said.

19             She testified at great length about her view

20   that the method of verifying citizenship through the

21   hearing would be extremely inconvenient, would be

22   difficult for people to do, and-- and went on and on

23   about that.  And we propose - if you-- if the Court is

24   willing to exercise its discretion - bringing one of the

25   people who have actually been through the hearing to do

```
1   a very brief testimony saying what happened.

2               THE COURT:  All right.  Mr. Ho.

3               MR. HO:  Your Honor, if they would make this

4   person available for deposition prior to their

5   testimony, we'd consider that.

6               THE COURT:  I don't know if there's time for

7   a deposition, but if you can let plaintiffs know who

8   this person is and how to contact them so they can at

9   least interview them over the weekend, I'll allow you

10  to.  What's the name of this person?

11              MR. KOBACH:  Her name is Jo French.  And I

12  don't know if Jo is short for Josephine or what it's

13  short for.

14              MR. HO:  I mean, Your Honor, our position

15  about the inadequacy of this hearing alternative has

16  been clear throughout this entire litigation.  I mean,

17  we've submitted testimony on this, evidence on this,

18  it's in your preliminary injunction ruling.

19              I think it's a little bit disingenuous for

20  them to suggest that they had no idea that the ease of

21  the hearing process would come up during trial.  And--

22  and so I-- we object to this witness.

23              THE COURT:  All right.  Objection is

24  overruled.  Ms. Ahrens was allowed to go and-- I'm not

25  sure they objected at that point, but was allowed to go
```

1    into some great detail about in her view, based on her

2    conversations with people and her own observations, the

3    burden I guess of the hearing process.  And I don't know

4    that that-- that that would've been evident to anyone

5    that she was going to-- that she was going to testify

6    about that.

7              So I'm going to grant leave for that limited

8    purpose for them to call somebody who's been through the

9    hearing.  I think that's-- that's appropriate.

10             Mr. Johnson, you want to preserve your

11   objection for the record?

12             MR. JOHNSON:  Well, I'd like to preserve my

13   objection.  But perhaps as a matter of fairness, the--

14   the defendants could provide the names of all

15   individuals who have gone through this process, dates of

16   the hearings, details as to whether the hearings were

17   in-- we've heard that this can be done from somebody

18   sitting in a truck, for example.  Has that, in fact,

19   happened?  They talk about it in-- as some sort of

20   hypothetical possibility.  Has it happened?  Could they

21   provide us details of how all of these hearings have

22   occurred?

23             THE COURT:  All right.  I'm going to allow

24   this, but I think that's a fair request.  So I'm going

25   to have the defendants disclose the names and contact

1    information for all-- is it five or six people that have

2    gone through the hearing?

3              MR. KOBACH:  I think-- I believe it is six.

4    I don't know what contact information we have.  We may

5    not have phone numbers, but we certainly do have names

6    and all the information that was provided at the

7    hearing.  We probably have phone numbers.

8              THE COURT:  You would have to have contact

9    information if they filled out a form and made--

10             MR. KOBACH:  Yes.  I just don't know if we

11   have phone numbers for all, because I know we were

12   trying to get some just in the last day.  But we

13   certainly have names and addresses and we can give all

14   the information we have.

15             THE COURT:  But each one of these people

16   filled out a form?

17             MR. KOBACH:  Yes, they did.

18             THE COURT:  Well, I think you need to give

19   those forms to them, the actual forms--

20             MR. KOBACH:  Okay.

21             THE COURT:  -- which presumably will have

22   enough so they can contact them.

23             Okay.  The other big issue, and I know

24   everyone is ready to go, but you've designated a number

25   of depositions, and in particular there's a number of

1   Kansas Department of Revenue employees that plaintiff

2   has objected to on a hearsay basis I think because

3   they're, you know, your employees, they're within the

4   100 miles and they're-- you didn't-- you did not respond

5   to that objection.

6            So as I sit here now, I don't know what the

7   status of that is.  Are you calling these people live or

8   are you going to be prepared to show unavailability and

9   proceed with them by deposition?  And I ask because

10  there's a lot of, you know, objections - I kind of waved

11  the stack of papers around at you a little bit - that I

12  need to resolve if we're going to go by-- if we're going

13  to go by deposition and if I'm going to allow you to go

14  by deposition.

15            MS. BECKER:  Your Honor, given the-- the

16  time constraints of our trial, we'd agree to withdraw

17  all the-- the designations and just bring one live

18  witness in place of the-- I think we had five or six

19  deposition designation witnesses.  So we could bring one

20  from-- one or two at the most, very short, from the

21  Department of Vehicles.

22            THE COURT:  Okay.

23            MS. BECKER:  And we could contact them

24  tonight and try to get them here hopefully Monday or

25  Tuesday.

```
 1                THE COURT:  And who are they?
 2                MS. BECKER:  It would probably be Julie
 3    Earnest and Michaela Butterworth.
 4                THE COURT:  All right.
 5                MS. BECKER:  And there's not a lot of
 6    testimony from them, which is why perhaps, you know,
 7    erroneously we didn't plan to bring them live, but we
 8    will.
 9                THE COURT:  Okay.  Mr. Ho.
10                MR. HO:  Your Honor, we may be able to save
11    everyone a whole lot of time here.  One thing that we
12    have proposed to the defendants on multiple occasions
13    was-- the DOV witness testimony is pretty rote stuff,
14    that if we could just get some stipulations done, we
15    might not even need to bring any of these folks in.
16                I got something mailed to me very late in
17    the day on Monday.  And with the hubbub of trial, we
18    haven't had a chance to really look at it.  But, you
19    know, we're willing to consider those stipulations and
20    work with the defendants over the weekend if that could
21    obviate the need to bring in the DOV witnesses to save
22    everyone a whole lot of time.
23                THE COURT:  All right.  Well, work together
24    and see if you can do that.  If not, then we prepared--
25    so from my standpoint, I don't need to worry about any
```

1   more designations of depositions, you're not planning to

2   present any more depositions other than-- what about Mr.

3   Bryant?

4               MS. BECKER:  I believe we've already sort of

5   taken care of him because he was already read by the

6   plaintiffs and I don't--

7               THE COURT:  You had designated-- you had

8   designated other parts of his deposition.

9               MS. BECKER:  Your Honor, how about we--

10  we're not going to-- we won't deal with the deposition

11  designations.  If we decide to present him, we'll bring

12  him live and we'll let plaintiffs know--

13              THE COURT:  Okay.

14              MS. BECKER:  -- this weekend.

15              THE COURT:  Okay.  All right.  That-- that

16  answers all my questions I believe.  All right.  Well,

17  everyone have a good weekend and we'll be back here

18  Monday--

19              (The Court and courtroom deputy confer).

20              THE COURT:  9:00 a.m. on Monday.

21              (5:49 p.m., proceedings recessed).

22

23

24

25

1                   C E R T I F I C A T E

2

3

4      I, Kelli Stewart, a Certified Shorthand Reporter and

5    the regularly appointed, qualified and acting official

6    reporter of the United States District Court for the

7    District of Kansas, do hereby certify that as such

8    official reporter, I was present at and reported in

9    machine shorthand the above and foregoing proceedings.

10     I further certify that the foregoing transcript,

11   consisting of 173 pages, is a full, true, and correct

12   reproduction of my shorthand notes as reflected by this

13   transcript.

14     SIGNED March 15, 2018.

15

16

17

18          /s/ Kelli Stewart

19          Kelli Stewart, CSR, RPR, CCR, RMR

20

21

22

23

24

25