```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF KANSAS
 2

 3

    STEVEN WAYNE FISH, et al.,
 4

         Plaintiffs,
 5

    v.                              Docket No. 16-2105-JAR
 6
                                    Kansas City, Kansas
 7  KRIS W. KOBACH,                 Date:  03/20/2018

 8      Defendant.
    ...............................................
 9

10              TRANSCRIPT OF MOTIONS HEARING
           BEFORE THE HONORABLE JULIE A. ROBINSON
11              UNITED STATES DISTRICT JUDGE

12
    APPEARANCES:
13
    Mr. Dale E. Ho              Mr. Stephen D. Bonney
14  Mr. R. Orion Danjuma        ACLU Foundation of Kansas
    Ms. Sophia Lin Lakin        6701 West 64th Street
15  Ms. Emily Zhang             Suite 200
    American Civil Liberties    Overland Park, KS 66202
16  Union Foundation - NY
    125 Broad Street
17  New York, NY 10004

18  Ms. Angela Liu
    Mr. Neal A. Steiner
19  Dechert, LLP - NY
    1095 Avenue of the Americas
20  New York NY 10036

21  For the Defendant Kris W. Kobach:

22  Mr. Garrett Roe
    Mr. Kris Kobach
23  Ms. Susan Becker
    Kansas Secretary of State
24  120 Southwest 10th Avenue
    Memorial Hall, First Floor
25  Topeka, KS 66612
```

```
 1                        I N D E X

 2      Argument by Mr. Ho                              3
        Argument by Ms. Becker                         12
 3

 4      Defendant's Witnesses:                        Page

 5      BRYAN CASKEY
          Direct Examination By Mr. Kobach            24
 6        Cross Examination By Mr. Steiner            69
          Redirect Examination By Mr. Kobach         103
 7

 8      Argument by Mr. HO                            113
        Argument by Mr. Kobach                        119
 9
                        E X H I B I T S
10
        Plaintiffs Fish, et al.
11      Exhibits              Offered        Received

12          A                  113            113
            B                  113            113
13          C                  113            113
            D                  113            113
14          E                  113            113
            F                  113            113
15          G                  113            113
            H                  108         108, 113
16          I                  108         108, 113
            J                  108         108, 113
17

18      Defendant's
        Exhibits              Offered        Received
19
            1                   40             41
20          2                 55, 63           63

21

22

23      ----------------------------------------------------

24           Kimberly R. Greiner, CRR, RMR, RDR, CRC
                     Official Court Reporter
25          259 U.S. Courthouse, 500 State Avenue
                   Kansas City, Kansas 66101
```

```
 1                 (9:19 a.m., proceedings commenced.)
 2            THE COURT:  All right.  We are on the record
 3    in Fish, et al versus Kobach, and this is the motion
 4    filed by the plaintiff to enforce court orders and order
 5    to show cause why Defendant Kobach should not be held in
 6    contempt.  It's Document 423.  State your appearances,
 7    please.
 8            MR. HO:  Dale Ho of the American Civil
 9    Liberties Union for the plaintiffs, Your Honor.
10            MR. STEINER:  Neal Steiner and Angela Liu
11    from Dechert for the plaintiffs.
12            MR. DANJUMA:  Orion Danjuma of the ACLU on
13    of behalf of the plaintiffs.
14            MR. BONNEY:  Doug Bonney on behalf of the
15    ACLU for plaintiffs.
16            MS. BECKER:  Sue Becker on behalf of
17    Defendant Secretary Kobach.
18            MR. KOBACH:  Kris Kobach.
19            MR. ROE:  Garrett Roe on behalf of the
20    Secretary Kobach.
21            THE COURT:  All right.  Mr. Ho, Mr. Steiner,
22    whoever's taking the lead on this motion.
23            MR. HO:  Thank you, Your Honor.  Good
24    morning, Your Honor.  It's with some regret that we
25    appear before you today.  We apologize for having to
```

1    take the court's time for what really ought to be some

2    very simple issues that, in our view, the defendant

3    should have and could have addressed very simply to

4    ensure that all voters and local elections officials are

5    aware of the registration requirements of the State

6    under Your Honor's preliminary injunction ruling.  And

7    in particular there are two issues that we're here to

8    address today.

9         The first is the defendant's failure to

10   update the on-line county elections manual to reflect

11   the fact that, under Your Honor's ruling, motor-voter

12   applicants who do not provide documentary proof of

13   citizenship are to be registered to vote.

14        The second issue has to do with certificates

15   of registration, what we've referred to often during the

16   trial as postcards, that get sent to registered voters

17   and provide them with a variety of information,

18   including their polling place.

19        To back up for a moment, Your Honor, your

20   preliminary injunction order directed defendant to

21   register all motor-voter applicants whose applications

22   are complete except for the documentary proof of

23   citizenship.  That instruction is set out on page 1152

24   of the official reporter version of your order.  The

25   order does not provide for any kind of second class

 1    status for registrants who are covered by the

 2    preliminary injunction ruling.  Those voters under Your

 3    Honor's ruling, our understanding is that they are to be

 4    treated identically to all other registrants in the

 5    state.

 6         Subsequent to that ruling, Your Honor

 7    entered an order, what we refer to sometimes as the

 8    public notice order, Document 241 on ECF, which, among

 9    other things, directed the defendant to correct

10    Secretary Kobach's website and to provide consistent

11    information to voters.

12         The record, Your Honor, demonstrates, as I

13    alluded to earlier, that Secretary Kobach is continuing

14    -- continues to be in violation of those directives in

15    two respects.  The first, as I mentioned, is with

16    respect to the county elections manual.  There's no

17    dispute between the parties that the county elections

18    manual is available on-line, that it's the definitive

19    resource guide for local elections workers.  There's no

20    dispute that the manual erroneously instructs elections

21    workers that documentary proof of citizenship is

22    required for all voter registration applicants.  It

23    mentions one exception for that and that is voters who

24    registered before 2013, which is what the statute

25    provides.  So the simple fact that the manual identifies

1    an exception but then doesn't identify the exception

2    that Your Honor's injunction established, let alone the

3    one that the D.C. Circuit established in a separate

4    decision, the *Newby*, case.  For the people who used the

5    federal voter registration form, we think that omission

6    is particularly striking.

7              The manual, although it is intended for

8    local election workers, it's available on-line to the

9    general public.  And what that means is incorrect

10   information is continually distributed to the general

11   public on an ongoing basis in direct violation of the

12   public notice order.

13             The manual, according to the defendant, is

14   scheduled for revision later this year.  But what we

15   learned, during correspondence with the defendant, is

16   even if Your Honor were to issue a final judgment at

17   trial, the defendant would not update the manual.

18   That's set forth in our briefing and in some of the

19   correspondence with defendant's counsel, Miss Becker.

20             Their view is that the manual will not be

21   updated unless and until the Supreme Court either

22   renders a decision on the merits or denies cert from a

23   ruling of the Tenth Circuit affirming a final judgment

24   from the court, which obviously could take years which

25   means years of misinformation being distributed to the

1    public.

2            The second issue is the certificates of

3    registration, or the postcards.  And we introduced one

4    of these postcards as an exhibit during trial.  It was

5    Plaintiffs' Exhibit 66.  As Your Honor I think can see

6    here, that postcard contains a variety of information.

7    The voter's various districts that they vote for, their

8    precinct, and of course their polling location.

9            Now, during a telephonic status conference

10   in 2016, in October of 2016, the defendant promised that

11   voters who were covered by the preliminary injunction

12   would get the same notice that other voters get, the

13   notice that informs you of your polling place.

14           And as I'm sure Your Honor recalls, the

15   whole reason we had that telephonic conference in the

16   first place was we filed a motion about a year and a

17   half ago for contempt on a wide range of issues.  After

18   Your Honor's preliminary injunction ruling, the

19   defendant was refusing to give any information

20   whatsoever to voters who were covered by the injunction

21   other than a piece of paper that told them that they

22   were not registered to vote, that they had to submit

23   documentary proof of citizenship in order to be

24   registered.  He was refusing to correct any information

25   on the websites, and we had to file a motion for

1    contempt a year and a half ago just to get him to change

2    some of those practices.  He did at the last minute

3    before the hearing and we withdrew the motion based on

4    -- in part on representations that the Secretary made,

5    and he made this representation during the hearing.

6              Now, we agreed to certain corrective notices

7    that would inform the voters who were covered by the

8    injunction that they were considered registered, that

9    they would not have to do anything else before the 2016

10   general election.  And I believe Secretary Kobach's

11   position is that that is all that the court required.

12             But I think that's -- I don't think that

13   that's right, Your Honor.  I think that that corrective

14   notice was necessary because of the misinformation that

15   Secretary Kobach was continuing to disseminate after the

16   preliminary injunction order.  And correcting that

17   misinformation did not relieve him of the obligation to

18   send the same notices to voters covered by the

19   injunction to inform them of their polling locations and

20   that he -- that indeed he promised he would make -- that

21   he promised he would -- he would do during the

22   telephonic status conference.

23             Now, the next slide, Your Honor, is just

24   some of the testimony from trial.  This is trial

25   transcript page 494, at line 7 to 15.  The lead

1    plaintiff in this case, Mr. Fish, testified that he

2    never received one of these postcards.

3              There was also testimony, which I'm not

4    going to put up on the screen, from Marge Ahrens, the

5    president -- former president of the League of Women

6    Voters -- I believe it's at page 372 of the trial

7    transcript -- that not all voters covered by the

8    preliminary injunction, the league's knowledge is that

9    they're not all receiving postcards.  That some voters

10   are.  Some county election officials are sending them

11   out, which obviously is a good thing.  But their

12   understanding is that those postcards are not being sent

13   to everyone.

14             And we sought to confirm that understanding

15   with the defendants in the fall of last year.  In

16   November and December, there were a series of letters

17   exchanged between the parties where we asked for

18   information as to what directives have been sent to

19   county elections officials with respect to these

20   postcards and requested that the defendant inform county

21   elections officials that those postcards should be sent.

22             And -- I'm sorry, can we go to the next one

23   after this.

24             This is the first letter that we got from

25   the defendants.  It's Exhibit H to our contempt motion.

1   When we raised these issues, Miss Becker responded by

2   saying that people who do not provide documentary proof

3   of citizenship, motor-voter applicants who do not do so,

4   they get the court-approved letters, the corrective

5   letters and that's -- that's it.  She didn't respond to

6   our request for information about what directives have

7   been issued to the counties, just a simple

8   representation that they're getting the court-ordered

9   corrective notices.

10          I think the implication there is that

11  there's no obligation for them to get -- to make sure

12  that the postcards are being sent to everyone and that

13  they have not issued such an instruction.

14          We had a second letter from the defendants.

15  This was Exhibit J, a letter again from Miss Becker

16  dated December of 2011, which again stated that covered

17  registrants under the preliminary injunction get the DMV

18  receipt and the corrective notice that Your Honor

19  approved, but that certificates of registration are sent

20  to registrants who are not covered voters.

21          Now, what I believe, based on an e-mail

22  exchange with the defendants over the weekend, the

23  defendants may represent today for the first time, after

24  months of correspondence about this issue and after

25  simple requests for information, I believe the

1    defendants may stand up here today, Your Honor, and

2    represent that they, in fact, have given such an

3    instruction to county elections officials to send the

4    postcard.

5              I think the facts here today, Your Honor,

6    support a different inference.  If that were, in fact,

7    true, then this issue could have been put to bed very

8    easily and very simply four months ago with a simple

9    representation to that fact and some documentation

10   behind it.

11             There's no mention of any such instruction

12   in Miss Becker's letters from November and December of

13   last year or in Mr. Caskey's testimony, as I'm sure Your

14   Honor recalls, when you sort of point blank asked him

15   are these postcards going to voters and Mr. Caskey could

16   not make a representation that those postcards were, in

17   fact, going to all registered voters.

18             Mr. Fish's testimony, I think, also clearly

19   demonstrates some voters are not getting them.

20             Your Honor, in conclusion, we do not take

21   this step lightly.  We do not file a motion like this

22   without a strong belief that the facts support it.  But

23   there is a record here not only with respect to these

24   two issues but dating back to 2016 and the failure to

25   fix the various notice issues that required our original

1   contempt motion.  There are -- there's a record of the

2   many discovery disputes, including the sanctions that

3   were imposed by Magistrate Judge O'Hara finding that the

4   defendant had engaged in making patently misleading

5   representations to the court.

6            The only conclusion I think that can be

7   drawn from this pattern and from the failure to correct

8   these very, very simple issues is that the purpose of

9   the failure to address these problems, Your Honor, is to

10  undermine the effectiveness of the preliminary

11  injunction by not ensuring that all voters have accurate

12  information.

13           And based on that, we request that Your

14  Honor exercise the court's discretion to find not only

15  -- to not only order defendant to correct these things

16  but to find him in contempt for violating the

17  preliminary injunction order.

18           Thank you, Your Honor.

19           MS. BECKER:  Your Honor, there are three

20  parts to this motion.  First, there is the court's

21  written order of October 14th, 2016, concerning the

22  special notices that were to be sent to all suspense

23  voters covered by the court's preliminary injunction.

24  The defendant complied with the court's order in which

25  it laid out the language we were to post on our website

1   and the language that was to be sent in a notice to all

2   covered registrants.

3              Defendant complied with the order in the

4   weeks before the 2016 election.  And when plaintiff

5   subsequently requested that the outdated language

6   referring to the November 2016 election be removed, I

7   personally worked with counsel and we came up with an

8   agreed to language modification that would not be in

9   violation of the court's order on the language and we

10  implemented them.

11             The second issue involves an issue first

12  raised in plaintiffs' reply to which they attached not

13  the court's written order but a transcript of the

14  telephonic hearing that was held before the court issued

15  its order.  That telephonic hearing occurred on October

16  5th, 2016.  Plaintiffs' reply dated January 28th was the

17  first time that plaintiffs stated that they were basing

18  their motion on something other than the court's written

19  order that we had been following.

20             When I read the transcript section cited by

21  the plaintiffs, I found the two conversations regarding

22  the standard postcards regarding the polling place.  And

23  then I inquired of Bryan Caskey what the instructions

24  given to the counties were.  Mr. Caskey confirmed that

25  the following -- that following the telephonic hearing

1    on October 5th, 2016, the counties received verbal

2    instruction in a statewide conference call later that

3    same day to send out the standard postcards with the

4    polling addresses on them to all voters affected by the

5    court's preliminary injunction.

6              After the court's order was filed on October

7    14th, 2016, Mr. Caskey then e-mailed all of the counties

8    the exact phrasing of the special notice that the court

9    had approved.

10             In light of the pending motion, I asked him

11   to follow up with some of the county clerks and see if

12   they had followed his verbal instructions regarding the

13   standard notices of polling places.  He learned that at

14   least three counties just sent the special notice and

15   the court's written order which doesn't mention the

16   special polling address but does provide a toll-free

17   number to call and to find a specific polling place for

18   that person's address.

19             It appears that those counties interpreted

20   the written e-mail from Bryan as superseding any verbal

21   instruction given the previous week.  I have since

22   learned he also typically ends his e-mails to the

23   counties with a notation that the present e-mail

24   supersedes all previous instructions from him on that

25   issue.  So this, I believe, explains why at least three

1    counties interpreted the court's written order that was

2    forwarded to them as superseding the earlier instruction

3    on sending the standard postcards with the polling

4    locations to all covered registrants.

5           Clearly the Secretary of State's Office

6    complied with the court's statement that the standard

7    postcard should be sent.  The office immediately

8    instructed the counties to do so in a weekly conference

9    call with the county clerks.  The fact that some

10   counties did not comply with this instruction, perhaps

11   because they assumed that the special notice was a

12   substitute for the standard postcard, cannot be the

13   basis for the contempt of court.  The Secretary of

14   State's Office conveyed the court's understanding to the

15   counties.

16          In addition, if the transcript of the

17   telephonic hearing is now going to be considered part of

18   the court's order, then it must be noted that the

19   transcript is not consistent.  When the entire hearing

20   transcript is reviewed, it shows that there was some

21   ambiguity injected into the conversation near the end.

22   On page 21, which is after the court's discussion of the

23   issue with Secretary Kobach, Mr. Danjuma summed it up by

24   stating that either he wanted a representation that the

25   covered registrants would receive "the same notice that

1    every other registered voter receives, or that we'll see

2    a copy of that notice before its issued".  The court

3    said, "Okay, I think that is fair."  That's pages 21 and

4    22 of the transcript.

5              I checked into it further and saw that our

6    office sent the drafts of everything to the court and to

7    the plaintiffs' counsel on October 12th, 2016.  This

8    appears to be consistent with the parties' understanding

9    that drafts of everything would be e-mailed to

10   plaintiffs' counsel and to the court for final approval.

11             But, regardless, the counties were still

12   verbally instructed to send the standard postcards.

13             THE COURT:  And when did that happen?

14             MS. BECKER:  That happened on October 12th,

15   2016.

16             THE COURT:  And how were they instructed?

17             MR. KOBACH:  Instructed on the 5th.

18             MS. BECKER:  They were instructed on the 5th

19   in the -- in the --

20             THE COURT:  Is that in evidence?  You're

21   going to present evidence to that effect or am I just

22   supposed to accept your statement?

23             MS. BECKER:  Well, we can -- we can bring in

24   someone who was on the telephonic conference if that's

25   what you would like?  I wasn't there.

16-2105    Bednasek/Fish v. Kobach    03.20.18                    17

1              THE COURT:  I want evidence.  I'm not going

2    to accept anyone's statement about what happened here in

3    light of everything that's happened, in light of all of

4    the phone conferences and all of the communications and

5    all of the e-mails that I've been privy to that

6    repeatedly demonstrated that you all have engaged in

7    gamesmanship with this court about my questions, about

8    what you had done, your responses to those.  We're here

9    for an evidentiary hearing.  I'm not -- I'm just --

10   that's why I asked you yesterday how long is it going to

11   take.

12             Mr. Caskey sat on the stand when I asked him

13   directly.  You didn't bother to ask him.  When I asked

14   him directly during the trial had the postcards been

15   sent?  "Well, I don't know.  I don't know."

16             You all had no problem with giving very

17   clear direction to these people to not comply with my

18   preliminary injunction order because it wasn't a final

19   order.  Apparently only the Supreme Court renders final

20   orders in your view.  You had no problem with giving

21   that kind of clear direction.

22             But now for the first time today you're

23   going to stand here and tell me we gave direction to the

24   counties to send the postcards.  Mr. Caskey didn't tell

25   me that and he was under oath.

1           MS. BECKER:  Moving forward we are in a much

2    better position today --

3           THE COURT:  No, no, don't move forward.

4    Answer the question I just posed to you.  Are you going

5    to present evidence?

6           MS. BECKER:  Yes.

7           THE COURT:  All right.  Fine.

8           MS. BECKER:  Moving forward we are in a much

9    better position today to ensure that the counties

10   understand our instructions and comply with our

11   instructions.  It is not three weeks to the next federal

12   election as it was in October 2016.  It is five months

13   until the August primary.

14          Assuming that either there is no decision

15   from the court by the August primary or that the court

16   finds in plaintiffs' favor, we are in a position to

17   reiterate to the county clerks in a written directive

18   they should be sending both postcards with polling

19   addresses as well as court-ordered notices.  We have an

20   annual training session coming up in May during which we

21   can make sure they're doing this.  Obviously if the

22   court wants more directives to be given.  We will do

23   that as well.

24          Now, I turn to the third issue.  With regard

25   to the county election manual, that is not a document

```
 1   intended for voters.  The manual was available on-line.
 2   However, it was taken off the website in response to
 3   plaintiffs' complaint it might confuse the voters.
 4             The manual itself was last finalized in
 5   2012.  However, updates to the manual occur frequently
 6   in the form of e-mail messages from Bryan Caskey to all
 7   the county election officials so the county clerks have
 8   instructions that bring their practices into full
 9   compliance with all of the court's orders.
10             Finally, the finding of contempt is a very
11   serious thing and opposing counsel cannot point to any
12   specific part of your written order that was in any way
13   disregarded.  The appropriate action at this point is a
14   modification of your written order from October 2016 if
15   the court chooses.
16             And, Your Honor, I understand that
17   Mr. Caskey may be available here shortly.  I believe
18   there was some sort of a traffic accident on Highway 70.
19             THE COURT:  All right.
20             MS. BECKER:  I'll consult with counsel.
21             THE COURT:  Do you have any other witnesses
22   other than him?
23             MS. BECKER:  Just a moment, please.  No,
24   Your Honor, it's just Mr. Caskey.
25             THE COURT:  All right.  When do you all
```

1    typically send postcards out ahead of the primary

2    election?  We're approaching the primary August 5.  So

3    when will the postcards go out?  Because people move, of

4    course, they get new postcards; correct?

5                    MS. BECKER:  Correct.

6                    THE COURT:  I haven't got mine yet, that's

7    one reason I want to know.  What's the typical cycle?

8    When do the postcards go out?

9                    MS. BECKER:  Your Honor, I'm going to defer

10    to Secretary Kobach who understands the cycle better

11    than I do.

12                    THE COURT:  All right.

13                    MR. KOBACH:  Your Honor, we can --

14    Mr. Caskey should be here momentarily.

15                    My understanding is it varies county to

16    county.  My understanding is some counties send a

17    postcard at the time of registration saying here's your

18    polling place, here's your confirmation of registration.

19    I understand some counties also send additional

20    postcards prior to the election too, so in the months

21    preceding the election.  But Mr. Caskey can give

22    specifics on that.

23                    THE COURT:  And what prevented you from

24    sending the postcards out to these people on the

25    suspense and canceled list so they would know their

1    polling place and the other information that's on the

2    postcards and that they can show up and show the poll

3    workers that I'm at the right place, which is the way

4    most of us use these postcards?  This is proof that

5    we're voter registrants, that we're registered to vote.

6          So what prevented you from putting that in

7    these people's hands so they would be treated like every

8    other registered voter in the state of Kansas?

9          MR. KOBACH:  The Director of Elections,

10   Bryan Caskey, will testify as soon as he gets here.

11         THE COURT:  All right.

12         MR. KOBACH:  Just to be clear, the Secretary

13   of State's Office doesn't send any material to any of

14   the voters.  The county sends them.  We have to direct

15   the counties.

16         THE COURT:  All right.  You direct them what

17   to do.  All right.  You're the litigant in this case.

18   You're the one that brought this litigation.  You're the

19   one that the -- that the order was directed to.  The

20   county election officials weren't litigants in this

21   case.  It's your duty to make sure they do what they're

22   supposed to do and abide by the law; right?

23         MR. KOBACH:  That's a legal --

24         THE COURT:  You're Secretary of State.  It

25   is your duty to make sure that each county election

1   official abides by the law.  You had no problem making

2   sure they abided by the DPOC requirement when it was

3   operative.  But it's no longer operative because my

4   order -- my preliminary injunction order says it's not.

5   And, of course, that's subject to my order, you know, on

6   this trial, which you may prevail, you may not prevail.

7   But right now the preliminary injunction is operative

8   and that's why we have this contempt hearing.

9          I don't understand why you have taken the

10  position that, you know, you're in charge to make sure

11  they comply with one law but you're not in charge to

12  make sure they comply with my order, which is also the

13  law.

14         MR. KOBACH:  One of the greatest surprises I

15  learned, upon becoming Secretary of State, is that they

16  have no legal duty to follow any direction I give them

17  unless it is a duty in the law.  In other words, the law

18  says this --

19         THE COURT:  This is the law.  My preliminary

20  injunction is the law.  They have a duty and you as

21  Secretary of State have a duty to tell them that and to

22  assure me that they complied.

23         MR. KOBACH:  We did tell them that as we

24  will momentarily --

25         THE COURT:  Let's get Mr. Caskey on the

1   stand.

2            MR. KOBACH:  I want to make clear, Your

3   Honor, I don't have the authority to fire anyone.  I

4   don't have the authority to tell county clerks their pay

5   will be docked.  County clerks routinely get instruction

6   from us and then drag their feet.

7            So, for example, one of the things we

8   instructed, keep up voter maintenance so they don't have

9   more people on the voter rolls in their county than

10  alive.  Several of our counties came under national

11  criticism they weren't keeping up their lists.  We

12  specifically told these counties please do this now.

13  They -- I have no ability to say you're going to be

14  fired to an independently elected county clerk.

15           THE COURT:  You have the duty to tell them

16  these people are registered.

17           MR. KOBACH:  Which we did.

18           THE COURT:  They are to be treated like

19  every other registrant.

20           MR. KOBACH:  Which we did.

21           THE COURT:  All right.  Let's put Mr. Caskey

22  on the stand if he's your first and only witness.

23                        BRYAN CASKEY,

24  called as a witness on behalf of the Defendant, having

25  first been duly sworn, testified as follows:

1          THE WITNESS:  My apologies, Your Honor, for

2  my delay.

3          THE COURT:  No, I understand there was an

4  accident on I- 70.  No problem.

5                    DIRECT EXAMINATION

6  BY MR. KOBACH:

7     Q.  Mr. Caskey, I'm going to ask you a few questions

8  about the events of October 2016 and then more generally

9  about the practices of the Secretary of State's Office

10  and the counties.

11          Let's first talk about the county election

12  manual.  When was the last time the manual was revised,

13  the manual itself?

14     A.  The complete manual was last revised, I believe,

15  in 2013 and 2014.

16     Q.  And do you update the manual by sending e-mails

17  or some other written communication?

18     A.  I routinely send e-mail communication to the

19  counties almost weekly in election years, less often in

20  non-election years, by providing instruction and

21  guidance that supplements what's in the county election

22  officer manual.

23     Q.  And how long have you been in the Elections

24  Division at the Secretary of State's Office?

25     A.  Since early 1998.

16-2105     Bednasek/Fish v. Kobach     03.20.18                    25

1     Q.   And when -- could you explain the relationship

2    between the Secretary of State's Office and both prior

3    to my becoming Secretary of State and during my tenure?

4    What is the -- what is your understanding of the

5    relationship, in terms of when you offer directions to

6    the counties?

7     A.   Well, by both state and federal law, the

8    Secretary of State's Office is the chief election

9    official for the state.  So we are responsible for

10   administering elections.

11           How that's done is each county has their own

12   county election officer.  In 101 counties, it's an

13   elected county clerk.  In the largest four counties,

14   it's an appointee of the Secretary of State.  Although

15   it's funded by the county, it's an employee -- not an

16   employee.  It's not an employee of the Secretary of

17   State.  It's an appointee of the Secretary of State.

18           So we provide instruction and training and

19   directives and to each of the counties.  I don't have

20   the ability to force them to do anything.  We don't have

21   -- I'm not their boss.  If they don't listen to what I

22   say, I can't make them do anything, but -- but we do

23   provide instruction and training.  We have -- during my

24   entire tenure in the Secretary of State's Office, and by

25   and large most -- when I say something or when my

1    predecessor said something, they generally follow that

2    to the best of their ability.

3        Q.    Do they sometimes delay in following whatever the

4    direction is?

5        A.    Well, over the last 20 years, I can probably

6    recount several times where I've said things and haven't

7    been done as quickly or as expeditiously as I would have

8    liked.  But, again, you know, I can't force them to do

9    anything.  I just tell them what the law is and that

10   needs to be done.

11       Q.    Were you present during the telephone conference

12   with the court and opposing counsel on October 5th,

13   2016, where this special notice was discussed?

14       A.    I'll take your word for it that's the date.  I

15   thought the date was the 6th.

16       Q.    I think it was the 5th, but whichever anyway.

17       A.    Was it Wednesday or Thursday?

18       Q.    It was Wednesday -- I think it was Wednesday.

19       A.    Then I probably was on it periodically because I

20   was doing several other things that day, including

21   having a conference call with the counties on that same

22   day I believe.  This was 18 months ago.  So I know I was

23   in the room some of the time.  I can't swear that I was

24   in there start to finish.

25       Q.    After the conference call, were the counties

1  directed -- after the telephone conference call with the

2  court, were the counties directed to send the standard

3  postcards, and by that I mean the certificate of

4  registration postcards, in your conference call with the

5  counties?

6      A.   So the written instructions I sent to the

7  counties ordered the counties to comply with the written

8  notice issued by the court.  And I provided written

9  instruction that spelled out exactly what the court

10  wanted in the notice and as well as everything that was

11  contained in the written notice that was sent to the

12  counties.  It was provided to my legal counsel.  It was

13  provided to opposing legal counsel.  And to my knowledge

14  it was provided to both Judge O'Hara and Judge Robinson

15  prior to it being sent.

16      Q.   Aside from the written notices, was verbal

17  instruction given to the counties regarding the standard

18  postcards?

19      A.   There was a conference call.  I believe it was

20  also on the same day I had a statewide conference call,

21  either the same day or the next day -- I don't have my

22  calendar in front of me -- with the counties where we

23  discussed sending out notices and what notices to send

24  out, and we discussed sending out the same notice that

25  we send to everyone else.

1         And there was a lot of discussion about how

2    to treat persons classified by the injunction.  And we

3    made it crystal clear in the conversations and in

4    writing that persons who have applied at DMV and had not

5    provided proof of citizenship were treated just like

6    every other registered to voter.  They were deemed by

7    the court as being fully registered to vote and they

8    should be treated as such.

9        Q.  And you made that crystal clear to them in the

10   conference call?

11       A.  And writing, both.

12       Q.  And when did the subsequent written message to

13   the counties occur?

14       A.  I believe it was sent out either October 12th or

15   shortly thereafter.  I remember there was some back and

16   forth between attorneys on both sides of this case on

17   October 12th.  I don't have my e-mail in front of me,

18   but it was either October 12th or very shortly

19   thereafter.

20       Q.  And did you confer with Tabitha Lehman more

21   recently to refresh your recollection about what the

22   counties were directed to do?

23       A.  I've talked to her once about --

24            MR. STEINER:  Objection, Your Honor.  If

25   he's now going to testify as to what --

1          MR. KOBACH:  I'm not offering -- I haven't

2     said anything what Miss Lehman said.

3          THE COURT:  All right.  It's hearsay if he's

4     going -- if you're eliciting what Miss Lehman said.  You

5     can elicit what he said to her but not what she said,

6     that would be hearsay.

7     BY MR. KOBACH:

8      Q.  Did you have a conversation with Miss Lehman

9     recently about the events of the November 2016 election?

10     A.  Yes, I have.

11     Q.  And did -- after your conversation with

12    Miss Lehman, was -- was it confirmed in your mind that

13    instructions had been given to send out -- oral

14    instructions had been given on the conference call to

15    send out the standard postcards and that Sedgwick County

16    complied?

17          MR. STEINER:  Objection, Your Honor.  I

18    mean, this is -- he's now asking him as a result of

19    hearsay did that -- did that confirm.

20          THE COURT:  Sustained.

21          MR. STEINER:  He can't do that.

22          THE COURT:  Sustained.  Sustained.  It's

23    hearsay.

24    BY MR. KOBACH:

25     Q.  Is it your understanding that Sedgwick County

1    sent out the standard postcards?

2        A.  Yes.

3            MR. STEINER:  Objection, Your Honor.

4            THE COURT:  All right.  I'll disregard.

5    It's eliciting hearsay.  I mean, there's a way -- I'm

6    not here to instruct anybody.  But what you're asking

7    him to do is to essentially elicit hearsay in what was

8    your understanding based on your conversation with

9    Miss Lehman.  That's -- that's asking him essentially to

10   relate what she said to him.

11   BY MR. KOBACH:

12       Q.  Do you frequently determine what the counties are

13   doing after the fact?  In other words, if you've given

14   an order, do you sometimes confirm, yes, afterward the

15   order was followed?

16       A.  Yes, there are many, many times where myself or

17   members of my staff will follow up with counties.  We

18   have the ability to track certain activities within the

19   ELVIS database on what they're doing and not doing.  And

20   I consider that almost a routine part of my job is to

21   follow up with counties and gauge their compliance with

22   directives or e-mails or conversations.

23       Q.  Did you confirm through your own investigation

24   that Sedgwick County did indeed send out the standard

25   postcard as you instructed them to?

1        A.   Yes, I have done that.

2        Q.   And when I say "send out the standard postcard,"

3   I mean, send it out to everyone, including the affected

4   voters at issue in this case?

5        A.   Yes, I understand.

6        Q.   Do all the counties send all the postcards at the

7   same time or do the practices of when they send that

8   postcard confirmation of here's where you vote, does

9   that vary from county to county?

10       A.   The -- the procedure is the same.  The time frame

11  is slightly different.  So the way the sending that

12  postcard --

13            I want to make sure we're talking about what

14  we call the notice of disposition.  I think there's some

15  confusion on what the word postcard means and I want to

16  make sure that we're all talking about the same mailing

17  that's going.

18            So assuming we're talking about the notice

19  of disposition that confirms someone has applied to

20  register to vote, usually comes in a postcard size

21  mailer, contains name, address, party affiliation, name

22  of the precinct, list of polling place and district

23  assignments.  So if that's the notice that we're talking

24  about, then that generally is sent by each county

25  election officer once the voter registration application

1    in process is active.

2            That can take anywhere from, you know, two

3    to four weeks depending on county process and workflow.

4    It also depends on upcoming elections.  If someone

5    applies to register to vote, you know, at the deadline

6    three weeks prior to an election, those notices go out

7    quicker so the notices are received prior to election

8    day.  But that's generally the time frame.

9            Other than that, if you are currently

10   registered to vote, counties generally don't keep

11   sending those notices if nothing's changed.  Although

12   that's county discretion.  There's no law that requires

13   that.  There is a law that requires those notices to go

14   out if a polling place has changed, you know, 30 days

15   prior to an election.

16           Some counties will send that out yearly to

17   help with some list maintenance activities.  So once the

18   very initial notice goes, after that there's quite a bit

19   of discretion and leeway when that goes out to voters.

20      Q.  Do the counties change -- do some of the counties

21   change the number of polling places that the counties

22   operate from election to election?

23      A.  Yes, I would consider that routine election

24   administration.

25      Q.  And when counties change the number and/or

1    location of polling places, do they typically send out

2    another set of these postcards that tell people where

3    their polling places are?

4        A.   Any time a polling place is changed, our

5    directive to the counties is to send the voter a new

6    card notifying them of the change of polling place.

7        Q.   You said a moment ago that the -- most counties

8    will send it after the status of the voter becomes

9    active in the ELVIS system; is that correct?

10       A.   That is correct.

11       Q.   The -- the voters covered by the court's

12   preliminary injunction, do they have a special category?

13   How are they designated in the ELVIS system?

14       A.   So within the ELVIS system they are designated

15   separately so that we can maintain and identify who the

16   class of people that are affected by the injunction.

17   But all the procedures and orders to the counties have

18   been consistent since October 16.  Our instructions are

19   you treat these -- this class of applicants the same as

20   a legally registered voter.  They appear on poll books

21   just like a legally registered voter.  They participate

22   on on-line voter look-up just like every other

23   registered voter.  They appear on a ballot just like

24   every registered voter.  In every sense they are treated

25   like a legally registered voter.  That's been the

1    court's directive and that's been our instruction.

2         Within the background of the system, they

3    are listed differently so that we can identify who they

4    are pending the outcome of this trial.  So within the

5    system they have a separate designation.  The counties

6    are aware of that.  They've been trained on that and it

7    exists within the system to identify them.

8         But from every interaction between the

9    election office and the public, they are treated

10   identically to every other registered voter not affected

11   by the injunction.

12   Q.   Plaintiffs counsel -- I don't believe you were in

13   the courtroom, but plaintiffs counsel insinuated that

14   either the Secretary of State's Office or the counties

15   have been giving information to voters suggesting that

16   they are not registered or somehow undermining the

17   court's direction and information given to voters.  Are

18   you aware of any message at all that suggests to the

19   voters that they may not vote like any other voter?

20   A.   I am not aware and I spend a lot of time talking

21   to counties over -- over the course of this injunction.

22   And after the election in November of '16, in a couple

23   verbal statewide conference calls I asked if any person

24   had been denied their right to vote who was classified

25   -- who fell under the injunction and I have yet to find

1    anyone provide evidence to me that a person who was

2    affected by the injunction was treated differently than

3    anyone else.

4        Q.   Are you aware of any communications that you have

5    had with the counties verbal or written that is in any

6    way contrary to any order of this court?

7        A.   No.   I've been extraordinarily cautious and

8    careful in making sure that I've complied with every

9    written order by the court.   I've shared every

10   communication, both with not only own legal counsel and

11   opposing legal counsel, exactly what we're sending at

12   all times.   I believe I've over-shared, extraordinarily

13   careful in what we tell the counties, especially with

14   regards to any ruling issued by the court.

15       Q.   Are you the person who gives the orders to the

16   county election officers on behalf of the Secretary of

17   State's Office?

18       A.   Yes.

19       Q.   Let's talk about the written notice that you sent

20   to the -- the written e-mail directions that you sent to

21   the counties after this court's order following the

22   telephonic conference.   And I think the order was dated

23   October 14th -- 12th or 14th of 2016.   Do you recall the

24   court's written order that came out after the opposing

25   side -- the opposing attorneys hashed out the language?

1    A.   I know I've read it before, yes.  I don't have it

2    committed to memory.

3    Q.   Did you direct the counties to send out written

4    notices that were specifically the same wording that had

5    been approved by the attorneys and the court?

6    A.   Yes.  We were very careful with that notice.

7    There was some discussion between the court and opposing

8    counsel and own legal counsel on the exact wording.  I

9    think there was several responses back and forth and I

10   think we even got into what should be highlighted and

11   put in bold and what shouldn't be highlighted and put

12   into bold.  And it is my belief the notice reflects

13   exactly what the court ordered.

14   Q.   I'll get a copy and put it up on the screen in a

15   moment.  To your recollection, does the notice inform

16   voters that they can find out their polling place by

17   going to the Secretary of State's Office website?

18   A.   Yes, it does.

19   Q.   Does it also provide a toll-free number that

20   counties can call to find out their polling place --

21   sorry, that voters can call to find out their polling

22   place?

23   A.   Yes, it does.

24   Q.   And would that be in addition to a -- any

25   postcard they received from the county indicating their

1   polling place?

2       A.   Yes.

3       Q.   So would they have -- would that person have

4   three ways then to determine polling place; the

5   postcard, the toll-free number and the Internet website?

6       A.   There actually would be more than that but

7   that's --

8       Q.   What other ways would the person have?

9       A.   There are lots of -- I won't say lots.  That's

10  probably too strong a word.  There are several

11  third-party groups that provide on-line tools for our

12  person to look up their address and find the location of

13  their polling place.

14           Specifically our office has worked with

15  Google with the Voter Information Project where we

16  provide information to Google and Google will publicize

17  a tool prior to the November 16 election where anyone

18  can type in their address and find the location of their

19  polling place.  We've done that since 2008 I believe and

20  that was in effect in 2016.  Google is just one group we

21  partnered with.  There are other third-party groups that

22  do similar type activity that we worked with in the

23  past.

24      Q.   When you send out e-mail updates of your

25  instructions to the counties, like the one you sent on

1    October 15, do your e-mails contain any notation saying

2    this instruction supersedes prior instructions on this

3    topic?

4        A.   Yes, I will routinely say that to ensure that as

5    -- as directives change and letters and the language on

6    letters change, I always -- I say that when applicable

7    to ensure that previous drafts and previous language

8    contained in notes and training materials is discarded

9    to alleviate any potential discrepancy based on what

10   version and what point in time instructions were

11   released.

12            Instructions routinely change between -- for

13   example, in 2016 there were instructions issued prior to

14   the August election that were different by the time the

15   November election happened.  And so I will say disregard

16   previous instructions because the rules are slightly

17   different between the August 16 election and the

18   November 16 election.

19       Q.   Okay.  You'll see on the screen --

20            MR. KOBACH:  Your Honor, could we give this

21   an exhibit number or could we just --

22            THE COURT:  If you want it part of the

23   record it needs to be.

24            MR. KOBACH:  We'll call this Exhibit No. 1.

25   BY MR. KOBACH:

16-2105    Bednasek/Fish v. Kobach    03.20.18    39

1    Q.   What is this, Mr. Caskey?

2    A.   It's an e-mail I sent to the counties on

3    Wednesday, October 12th at 12:11 p.m.

4    Q.   And the language -- the final sentence of the

5    first paragraph, could you read that?

6    A.   "This document replaces all documents previously

7    issued by this office concerning this topic."

8         MR. STEINER:   Your Honor, I don't think

9    we've ever been provided with this e-mail out to the

10   counties.   I could be mistaken about that.   It may have

11   been given somewhere in discovery but I don't know

12   where.

13        MR. KOBACH:   If I understand what my

14   co-counsel's saying, I think that we did provide a draft

15   before it was sent.

16        MR. STEINER:   I'm talking about what was --

17   I'm talking about this e-mail, what was after he sent --

18        MR. ROE:   Neal, you guys have -- do you guys

19   have October -- it was October 12th.   I think -- I

20   thought it was this exact e-mail that was sent to the

21   court and to you guys again.

22        MR. STEINER:   At a minimum, I would think if

23   they're introducing or using an exhibit --

24        THE COURT:   All right.   Do you have another

25   copy to provide to plaintiff?   It's marked as Exhibit 1.

1    You're going to need to offer it into evidence.

2          MR. KOBACH:  Your Honor, I will -- I offer

3    into evidence Exhibit 1, which is this e-mail.  I'll

4    include the attachments to the e-mail and the exhibit

5    with permission of the court unless you want them

6    separate.

7          THE COURT:  All right.  And the attachments

8    are an Implementation Guide, which sounds like

9    plaintiffs did receive that.  But you didn't receive

10   this cover e-mail to your recollection?

11         MR. DANJUMA:  Implementation Guide?

12         THE COURT:  It says, "Attached is an

13   Implementation Guide for processing persons who apply to

14   register to vote using federal form or DMV."

15         MR. DANJUMA:  No, I don't believe.

16         MR. STEINER:  We need to see the attachments

17   in order to -- yes, I think we do.

18         MR. KOBACH:  Just to clarify, you did

19   receive the e-mail.

20         THE COURT:  Two different things;

21   Implementation Guide, cover e-mail.  You received the

22   Implementation Guide.  Have you received this cover

23   e-mail?  In any event, give them a copy of it now.  It's

24   going to be an exhibit.  I'm going to admit it but they

25   need to have a copy.  That's the procedure for admitting

1   exhibits at any trial or evidentiary hearing.

2            MR. STEINER:  Assuming that this is the same

3   -- I think what we were copied on was something that was

4   submitted to the court on October 13th of 2016.  So

5   assuming these are the same documents -- it's not the

6   same cover e-mail, but assuming it's the same documents,

7   then we do have them.

8            THE COURT:  All right.  But you're wanting

9   to introduce the cover e-mail.  It sounds like you

10  haven't seen this particular cover e-mail.

11           MR. STEINER:  Correct.

12           THE COURT:  Provide him with a copy and I

13  will admit Exhibit 1, which is the October 12, '16

14  e-mail from Mr. Caskey to election officials with

15  attachments.

16           MR. STEINER:  Right.  From what I saw on the

17  screen, I don't object to that, to the cover e-mail

18  itself.

19           THE COURT:  All right.  Exhibit 1 admitted.

20  Why don't you put it back up on the screen if you can.

21           MR. KOBACH:  Your Honor, my staff just left,

22  I think to make copies for that.  And as a result, I

23  would like to go back to the screen, but they're not

24  here.  But we can -- we can continue on another line of

25  questions until they get back.

1    BY MR. KOBACH:

2        Q.   Mr. Caskey, if the -- if, as a result of this

3    hearing today, the court issues another written order or

4    modifies any orders in this regard, what opportunities

5    exist between now and the August federal election in

6    Kansas to ensure that the counties to the -- to a "T"

7    confirm -- comply exactly with any instructions you give

8    them regarding what is to go to the affected voters at

9    issue in this case?

10       A.   Well, first of all, whatever the court issues we

11   will follow immediately.  I can -- I can rattle off a

12   list of potential solutions off the top of my head.  If

13   the court so ordered, we would immediately, today even,

14   send a directive to the counties concerning any and all

15   notices and order them to comply immediately.  And I

16   could even require counties to respond back

17   affirmatively that they have complied if that's what's

18   needed.

19              Counties have regional meetings in the

20   spring.  The first one I went to last Thursday.  I'm

21   about to attend the other regional meetings.  We will

22   talk at length about several things, including the

23   orders issued by the court as relates to this case.  So

24   I will talk about it there.

25              The counties have -- election officials have

1  a statewide conference.  It's the first full week of May

2  I believe.  Generally speaking, we have -- the Secretary

3  of State's Office has about a day of instruction

4  included in that conference.  I will be discussing this

5  case at length and we will discuss any potential rulings

6  or directives from the court at that conference.  And

7  that's just in the next few weeks.

8            We will send out continual reminders between

9  now and August.  And two weeks ago I started our weekly

10 conference call series for 2018 and I will be in contact

11 with the counties on a weekly basis via phone from now

12 until virtually December.  So there's several

13 opportunities I will have to talk with counties and

14 follow up.

15     Q.  You described your weekly conference call series.

16 Was it during that weekly conference call series of 2016

17 that the verbal instruction was given to the counties to

18 send the standard postcard?

19     A.  Yes.

20     Q.  And I assume, by the way you describe it, it

21 is -- once a week a telephone conference call is had

22 with the counties to convey any additional instructions

23 to them?

24     A.  Yes.

25     Q.  Do you also answer questions from counties if

1   they aren't clear what their instructions are?

2       A.   Yes, that's, quite frankly, the content of what

3   the conference call is.  I will lead off and have

4   anywhere from two to ten items I need to address up

5   front.  Then the remainder of the conference call spend

6   answering questions from counties to clarify directives

7   or questions about policy and procedure.

8       Q.   Was October 2016 an exceptionally busy period for

9   the counties?

10      A.   Yes, that's the month before presidential

11  election.  I believe it was the second biggest turnout

12  in the history of our state.  So October 16 was

13  extraordinarily busy for all county election offices.

14      Q.   In contrast, if you sent out a written directive

15  to the counties today, are you more confident that you

16  could follow up and ensure that each and every one of

17  the 105 counties has complied with your directive?

18      A.   Yes.  I would include a notation in the directive

19  to mandate that all counties report back to me that they

20  have complied.  And then I would get -- solicit

21  responses from all 105 until we received responses from

22  all 105.

23      Q.   If the court so orders or if you are so directed,

24  could your written direction to the counties and the

25  follow-up specify that -- that the special notice for

1    the covered voters does not replace the normal postcard

2    but rather the voter is to receive both the special

3    notice and the normal postcard?

4        A.   Yes, I would word it along the lines of that

5    everyone who is registered to vote receives the notice

6    of disposition.  Covered voters -- voters covered by the

7    injunction would receive an additional notice at the

8    same time as notice of disposition.  So, in fact,

9    covered voters would receive two pieces of paper in the

10   same mailing as opposed to one for non-covered voters.

11       Q.   And could -- with this much lead time, could the

12   counties be -- are you confident that you could ensure

13   that each and every one of the 105 counties had complied

14   between now and the August primary?

15       A.   I'm confident I could have it done within a

16   matter of a few weeks.

17       Q.   And then you referred to the regional meetings.

18   What occurs at these regional meetings?

19       A.   There's six regions among the county election

20   officials.  We meet either once or twice a year and they

21   routinely invite me to come speak about relevant topics.

22   This court case and rulings issued by the court have

23   been a routine topic at those regional meetings and they

24   will be again this spring I'm sure.

25       Q.   Do -- at each region -- do all of the counties in

1    the region normally attend or are there lots of

2    absences?

3        A.   It depends on the timing of the meeting.  There's

4    not 100 percent attendance.  But the one I went to last

5    week in more central Kansas, there were approximately 15

6    to 17 persons in attendance.  Most counties send one.

7    It's possible a couple counties may have had two

8    representatives at that meeting.

9        Q.   And at the May meeting of the entire state of

10   county clerks and county election offices, is it normal

11   to have hundred percent attendance or close to hundred

12   percent attendance?

13       A.   It's close.  The Help America Vote Act passed in

14   2002 required states to provide instruction to counties

15   and Kansas adopted a law that mirrored that I think in

16   2004-2005.  And so we basically mandated that counties

17   attend the May conference.  And we've had, I would say,

18   over 90 percent attendance of at least one person from

19   every county at that May conference since probably the

20   middle 2000s to present.

21            In those instances where a county is not

22   present, we take -- take roll every day that we're

23   there.  And for counties that are not there, we provide

24   them a copy of everything provided in writing to the

25   persons who were at the conference.  So even those who

16-2105     Bednasek/Fish v. Kobach     03.20.18          47

1  are not in attendance receive a complete set of

2  materials that were discussed at the conference.  So

3  from my view all 105 get the same written documentation

4  every single May.

5     Q.  So in addition to the written documentation that

6  happens at the time of the May conference and in

7  addition to the written documentation that you may issue

8  today or tomorrow or at any time clarifying or expanding

9  upon the court's orders, are you confident that you will

10  have the opportunity to have an in-person meeting with

11  any county between the regional meetings and the May

12  meeting to clarify any questions any counties may have?

13     A.  I believe I will touch almost every single county

14  election office between now and May in person.  And I'm

15  going to say "almost" because I can't guarantee won't be

16  a handful, but I'll come close to being in front of

17  physically every single county between now and May.

18     Q.  And do you believe this ensures a much higher

19  rate of county compliance with your instructions than

20  giving direction only a few weeks before the election?

21     A.  I'd like to believe that I can magically say

22  things and there's hundred percent compliance.  I don't

23  think that's possible.  But I always prefer an in-person

24  touch if I could.  You can get your point across much

25  more effectively sometimes and you can get the reaction

1    for the person receiving it than by e-mail.  But

2    e-mail's much more efficient.

3        Q.   With regard to the -- I'm going to jump around

4    one more topic, then we'll go to this e-mail.  With

5    regard to the election manual, has the manual been taken

6    off the Secretary of State's website?

7        A.   Yes, it was weeks -- several weeks ago.  I don't

8    remember the exact date.  But, yes, it has been.

9        Q.   Is it your understanding it was taken off because

10   of communications between opposing counsel and counsel

11   for the Secretary of State's Office?

12       A.   I believe I've heard that, yes.

13       Q.   Is the election manual intended to be

14   communication to voters?

15       A.   I want to -- to -- the document called the County

16   Election Manual is not intended for the public

17   specifically, although we've always provided it to the

18   public so the public knows the type of instruction we

19   give to county election officers.

20       Q.   So if a person asks for it, they can still come

21   in to the Secretary of State's Office and get a copy?

22       A.   Oh, yes, absolutely.

23       Q.   Let's look at these attachments now.  I assume

24   the one that says Federal Form and DMV Implementation

25   Guide for November 8th, 2016 Election, is that the

1   implementation guide you're referring to in the text of

2   your e-mail?

3       A.  Yes, that is correct.

4       Q.  Can we open that, please.

5           Okay.  Mr. Caskey, what is this document?

6       A.  It was a set of updated instructions that I

7   issued to all of county election officials on October

8   12th, 2016, after the court issued its written ruling --

9   written instruction in October of '16.

10      Q.  And is this your effort to translate the content

11  of the written order to the county clerks?

12      A.  Yes, it is.

13      Q.  And -- okay.  Under Part 1 it talks about "a

14  notice must be provided to covered voters that

15  unequivocally advises covered voters they are deemed

16  registered and qualified for vote."  Do you see that?

17      A.  Yes, I do.

18      Q.  And is this the notice that contains the language

19  discussed by the attorneys involved in this case and

20  approved by the court in this case?

21      A.  Yes, it does.

22      Q.  And can we go back to the principal e-mail.  Is

23  the language on one of these attachments?  I see old --

24  I see Voter Registration Applicant Notice Old Applicants

25  and I see Voter Registration Application Notice to New

1   Applicants?

2      A.   They received a slightly differently worded

3   notice.

4      Q.   Can you go ahead and open the old application as

5   well?

6            MR. ROE:  Can I just say something?  What

7   this e-mail is, Your Honor, is the e-mail that we sent

8   to the court.  If you recall, back in October of 2016,

9   there was back and forth and there was a joint status

10  conference, joint status report and we sent varying

11  language back and -- you know, to the court and the

12  court issued a subsequent order.  This is the e-mail

13  that has the various different language notice -- the

14  competing languages of the notice.

15           So this does not have the -- this e-mail

16  here does not have that final notice that you're talking

17  about, I don't think.  This was the instructions that

18  were going out to the county.  I have to go find that,

19  the actual final.

20           MR. KOBACH:  Final one after this?

21           MR. ROE:  Yes.  I was just looking for the

22  one that went to the court and opposing counsel had this

23  specific e-mail.

24           THE COURT:  All right.  Is this Exhibit 1

25  we're talking about?

1            MR. ROE:  Yes, well, this is -- this is the

2   e-mail that went to the court and to opposing counsel.

3   We were talking earlier they said they didn't get a copy

4   of that e-mail.  This was part of that chain that went

5   to the court with opposing counsel is all I was bringing

6   that up for purposes this is what Exhibit 1 would be,

7   but Exhibit 1's the actual e-mail.  This is the chain

8   that was provided to the court previously.

9            THE COURT:  Okay.  But then the -- what was

10  just up a minute ago?  The Implementation Guide --

11            MR. ROE:  Right.

12            THE COURT:  -- is that the final?

13            MR. ROE:  My understanding, that was the

14  final one that was sent to the court.  So it's the other

15  notices in here that had some varying language.  And the

16  court, if you recall, we had a separate conference, I

17  think a teleconference after that perhaps and the court

18  went through and -- went through the different notices

19  and issued a separate order that had the language that

20  the court wanted us to use for those notices.

21            THE COURT:  So, in other words -- so the

22  attachments include the Implementation Guide, which is

23  the final of the Implementation Guide, but also include

24  Voter Registration Application Notice, actually notices

25  but those aren't the final?

1          MR. ROE:  No, those would be in a separate

2   -- a separate e-mail which I think I'd have to find at

3   this point.

4          THE COURT:  Does that mean that this

5   particular e-mail, which went out to county election

6   officials, included drafts that weren't final?

7          MR. ROE:  No, not to my -- you have to ask

8   Bryan on that.  My understanding no.  This was an e-mail

9   that I was providing to the court per your instructions

10  during the conference -- I think after the conference

11  call or the conference call, whatever.  You asked us to

12  submit what we were going to be sending to the counties.

13  So I submitted them to you, to the court, and to

14  opposing counsel.  And you can see up here we could --

15  yeah, it should be in here.  Might still be in here.

16  You can see here Your Honor's e-mail address in that

17  chain.

18          THE COURT:  Okay.  Then I'm going to need

19  some clarity.  I appreciate that clarity from you,

20  Mr. Roe.  I'm going to need clarity in this e-mail

21  chain.  It looks like there were attachments going to

22  county election officials.  I need clarity if what they

23  received in October 12 was a final or a draft?

24          MR. ROE:  You can ask Bryan.  My

25  understanding -- you can ask Bryan.  Up to you, Your

1    Honor.  My understanding was that we were sending this

2    so the court knew what the counties were going to be

3    getting.  So it was only the ones that were not final,

4    the notices we went back and forth with opposing counsel

5    on were not final at that time.  That's why Bryan would

6    be a better person to ask if he recalls.

7              THE COURT:  Okay.  Understood.

8    BY MR. KOBACH:

9    Q.  Mr. Caskey, I'll ask you that question.  So does

10   this appear to be the e-mail that was not sent to the

11   counties that had multiple versions we were still going

12   over, or is it your understanding that this -- that all

13   of the attachments and this e-mail that we were just

14   looking at was sent to the counties?

15   A.  This exact e-mail was not sent to the counties

16   containing all of those attachments.  This wording right

17   here was.  But there are several drafts and revisions of

18   notices that -- on the attachments.  I did not send

19   different drafts and revisions.

20              There was one final notice per type of

21   notice.  And so there were fewer -- and I -- I've got

22   the e-mail and I've sent it to many people.  The exact

23   e-mail with the exact attachments exists.  But, no, we

24   did not send drafts.  I believe that would have been too

25   confusing for the county election officers to decipher

1   what was a draft and what should have been used.

2              MR. KOBACH:  Okay.  I think we've located

3   that subsequent e-mail, which we will call as Exhibit

4   No. 2.

5              MR. ROE:  Your Honor, if I could just make

6   one clarification on that.  This is kind of starting to

7   refresh my memory what happened back then.  As we were

8   trying to alert the court and opposing counsel what we

9   would be sending to the counties, so that was what was

10  sent to the counties, I think that e-mail.  But then

11  subsequently we -- we sent, I think, the same e-mail

12  with the final notices.

13             THE COURT:  Okay.

14             MR. ROE:  I'm trying -- it was a year and a

15  half ago, Your Honor.  I'm trying to piece that

16  together.  Apologize.

17             THE COURT:  I understand.

18  BY MR. KOBACH:

19    Q.  Okay.  So could we put that up.  Mr. Caskey, you

20  will see this is a very similar e-mail, indeed virtually

21  identical in terms of your text to the county election

22  officers.  Just take a look at it from "dear county

23  election officers" onward.

24    A.  Yes, I'm familiar with this e-mail.

25    Q.  Okay.  Does this appear to be the one that was

1  finally sent to the counties notifying them of the

2  content of the court's written order?

3      A.  Yes, I believe that to be true.  I would probably

4  want to read the entire Implementation Guide because the

5  Implementation Guide references several attachments.  I

6  believe there were just three attachments referenced in

7  the Implementation Guide which is consistent with this

8  e-mail.  So I feel confident without having read every

9  word in the Implementation Guide recently.

10     Q.  Okay.  And can we scroll upward, please.  And see

11  when -- do we have the exact date that this was sent?

12  October 12th?

13     A.  This e-mail went to the counties on Wednesday,

14  October 12th, 2016 at 12:11 p.m.

15     Q.  Okay.  And let's go now into the --

16             MR. KOBACH:  Your Honor, I offer into

17  evidence Exhibit 2, which is the e-mail that actually

18  went to the counties and the four attachments to it.

19             MR. STEINER:  Your Honor, I believe that

20  that's already Exhibit 1.  I think what Mr. Kobach wants

21  to do perhaps, or perhaps not, is introduce Exhibit 2,

22  which was the e-mail to the court that had -- I think

23  later that day that had additional drafts attached to

24  it.  I think this already is Exhibit 1.

25             THE COURT:  Is Exhibit 1 what actually went

 1  to the county officials?

 2             MR. KOBACH:  Not Exhibit 1.

 3             MS. TALIAFERRO:  Yes.

 4             MR. KOBACH:  Exhibit 1 includes the seven

 5  attachments.

 6             MR. STEINER:  No, this is Exhibit 1.

 7             MR. KOBACH:  Well, this is Exhibit 1 again.

 8             MR. STEINER:  Exhibit 2 is what subsequently

 9  went to the court and includes additional drafts that

10  apparently does not go to the counties.

11             MR. KOBACH:  Did we pull up the e-mail that

12  actually went to the counties?

13             MS. TALIAFERRO:  You're looking at it.

14             MR. KOBACH:  Your Honor, can we take a

15  five-minute recess so we can find all these different

16  e-mails?

17             THE COURT:  That's fine.  Let's be in recess

18  for 10 minutes.

19             (Recess.)

20             THE COURT:  Let the record reflect we've

21  been on a 20-minute break, the defense counsel is not

22  here.  Mr. Caskey is here.  We'll wait.  I got tired of

23  standing outside the courtroom and waiting.  Where is

24  Mr. Kobach?

25             MS. BECKER:  Your Honor, the Secretary and

16-2105    Bednasek/Fish v. Kobach    03.20.18           57

1   his co-counsel are coming in.  We were just making

2   copies.  It will be one minute.  Thank you.

3                THE COURT:  All right.

4                MR. KOBACH:  Apologize for the delay, Your

5   Honor.  I think we've now got exactly the e-mail chain

6   in the order it went.  So I'm going to use the Elmo

7   instead.  I think it might be a little easier.

8   BY MR. KOBACH:

9       Q.  So Exhibit 1 is the e-mail that went out on

10  October 12th, 2016.  Let's see right there.  And the

11  four attachments are noted.  Okay.  Mr. Caskey, do you

12  recognize this e-mail dated October 12th, 2016,

13  12:11 p.m.?

14      A.  Yes, that is an e-mail that I transmitted to the

15  county election officers.

16      Q.  So this one did go to the counties; is that

17  correct?

18      A.  Yes, it is.

19      Q.  Okay.  And I've got -- can you take a look at the

20  four attachments that are listed above?

21      A.  Yes, I see them.

22      Q.  And I just want to make sure that we have exactly

23  what these attachments are.  And we will provide copies

24  of all this to opposing counsel.

25                Okay.  So I'm going to show you this one,

1  which has the title Rules Concerning Voter Registration

2  Application Submitted Without Proof of Citizenship.  Is

3  this one of those attachments?

4      A.   Could you let me see the top of it too?  No.

5      Q.   Top of this?

6      A.   Yeah, that.  Yes, this -- this notice is

7  reflected in the e-mail.  If you could go back to the

8  e-mail now and I'll tell you which one it is.

9      Q.   Okay.

10     A.   It's the Voter Registration Application Notice

11 for New Applicants I believe.

12          THE COURT:  Can you leave it up a minute so

13 I can read it.

14          THE WITNESS:  Hang on just a second.  I

15 believe this is the website notice.

16 BY MR. KOBACH:

17     Q.   That's the website notice?

18     A.   Yes.

19     Q.   Okay.

20     A.   So on the -- this e-mail, it's a document

21 entitled Website Notice.

22     Q.   Okay.  And let's now look at this document.

23 Maybe you can -- this is also -- I'm going to represent

24 to you I believe this is one of the attachments.  Can

25 you tell us which attachment this is?

1      A.   Yes.  It is the voter registration application

2  that's sent to new applicants.

3      Q.   Was this the notice that was sent -- the special

4  notice that was sent to covered voters in this

5  litigation?

6      A.   Yes, that is correct, to some of the covered

7  voters.  If you'll recall, the injunction covered both

8  -- so there's two notices, one that went to everyone who

9  applied moving forward and then there was a separate

10  notice which is also on here that applied to persons who

11  previously had been canceled, but due to the judicial

12  ruling were removed from canceled status and added to

13  the list and were eligible to vote.  So they received

14  the other notice.  And so there's two classifications of

15  people that got separate notices depending on how they

16  were covered by the injunction.  So this one was sent to

17  persons moving forward who were new applicants.

18      Q.   And were -- and was the boldface and all caps,

19  was that pursuant to direction from counsel and the

20  court?

21      A.   This notice reflected exactly what the judge said

22  needed to be included in the notice including

23  punctuation, bold, capitalization.  It was designed to

24  reflect exactly what the judge ordered.

25      Q.   It's your understanding this is the notice that

1    the counties sent to the relevant voters?

2        A.   Yes, that's correct.

3        Q.   Now, I'm going to show you another one of the

4    attachments.  Can you identify which one this is?

5        A.   Yes.  This notice was sent to the persons who

6    previously had applied to register to vote at DMV or

7    with the federal form and had not provided proof of

8    citizenship.  Some of these persons may have been

9    canceled.  This notice was sent to them to inform them

10   of their status due to the judicial ruling and to inform

11   them they were fully registered to vote and eligible to

12   participate in the November general election in 2016.

13       Q.   And is it your understanding that the county --

14   that all the counties sent this notice to the relevant

15   voters?

16       A.   Yes, that is my understanding.

17       Q.   Have you heard from any county that said to you

18   subsequently we didn't get the notice out or indicated

19   subsequently we didn't get the notice out?

20       A.   I have not heard from any county that either one

21   of these two notices have not been transmitted to the

22   applicable voters.

23       Q.   And then show you the fourth attachment which I

24   believe we saw before the break.  What is this?

25       A.   Updated instructions I had transmitted to the

1    counties to comply with the court rulings in this case.

2    Q.   Okay.   Then I'm going to represent to you that,

3    as I'm sure you're aware, counsel and opposing counsel

4    had some conversations and there was some -- there were

5    some -- there was another e-mail.   This one is

6    11:57 p.m. sent to the court and to the counsel in this

7    case.   Are you familiar with this e-mail?

8    A.   I don't believe I've seen this exact e-mail.

9    Q.   Let's go back to the -- if you go down below, is

10   that your original?

11   A.   So the text of this e-mail is what was included

12   in the text of the e-mail I sent to the counties on

13   October 12th at 12:11.   So this body reflects what I

14   told the counties.   The language above that in this

15   e-mail thread, I'm not -- I don't believe I've read all

16   of that e-mail thread.

17          MR. KOBACH:   Okay.   And we'll call this

18   Exhibit 2, Your Honor, just to make sure we're all on

19   the same page.

20          THE COURT:   All right.   And I've admitted

21   that.   So this is -- it's the same e-mail but a later

22   string that went to the court and parties and included

23   different attachments or the same attachments?

24          MR. KOBACH:   This is a different attachment

25   -- well, I can let -- I can have the witness identify

1    them, but this included the seven attachments that we

2    saw in the previous -- before the break.

3              MR. ROE:  Your Honor, for the court's

4    clarification, again, I think you'll recall it has some

5    of those attachments.  Then there was a competing

6    version of, I think, the website notice and the DMV

7    notice.  If my memory serves correct, then Your Honor

8    submitted a separate order after that.

9              So the seven attachments you're going to

10   have the competing notices there, but then you've got

11   the other notices.  The court already ruled on those

12   specific ones being the -- the letters that went out

13   from the counties.  So that's what those attachments

14   reflect.  Again, I think you should -- I don't know what

15   your e-mail practices are.  You may still have this

16   e-mail in your.

17             THE COURT:  I do.  I do.

18             MR. ROE:  Okay.

19             THE COURT:  Okay.  Thank you.

20   BY MR. KOBACH:

21     Q.  Okay.  And then, Mr. Caskey, finally, we have

22   this e-mail which we'll call Exhibit --

23             MR. KOBACH:  Your Honor, I move, if we

24   haven't already, for the admission of Exhibit 2 and

25   attachments into evidence.

1           MR. STEINER:  No objection, Your Honor.

2           THE COURT:  Exhibit 2 admitted.

3   BY MR. KOBACH:

4      Q.  Then, Mr. Caskey, I'm going to show you what

5   we're calling Exhibit 3.  Can you take a look at that?

6      A.  Yes.  It's a e-mail I sent to all the counties on

7   Friday, October 14th at 5:30 p.m.

8      Q.  Okay.  And could you explain what the web notice

9   paragraph refers to?

10     A.  Sure.  After -- on Wednesday, October 12th, as

11  evidenced in Exhibit No. 2, there was e-mail traffic

12  between both opposing -- both plaintiffs' counsels and

13  defendant's counsels and the court over the wording of

14  the notices.  I believe the judge updated -- issued a

15  ruling Friday at some point changing the language on the

16  web notice.

17          And so this e-mail was designed to inform

18  the counties of the updated language ordered by the

19  court on the web notice.  And so this e-mail ordered the

20  counties to replace the version that I sent on Wednesday

21  with the updated version complying with the court's

22  orders on Friday afternoon.

23          And then there's another section that deals

24  with how to use electronic poll books in processing

25  persons covered by the injunctive order to ensure that

 1   they were treated like everyone else.

 2            THE COURT:  And that -- the updated notice

 3   removed the language that basically told them you may

 4   not be registered after the November 16th election --

 5   November 2016 election; right?

 6            THE WITNESS:  Yes, that is correct.

 7   BY MR. KOBACH:

 8       Q.   And so is it your understanding that what was

 9   modified after the interchange between counsel and the

10   court over specific language on the notices was the web

11   notice; correct?

12       A.   Yes, that is correct.

13       Q.   And so the -- is it your understanding that the

14   directive on Exhibit 1, the written notices we just went

15   to, those were not subsequently changed prior to the

16   election, were they?

17       A.   That is correct.

18       Q.   Okay.  Now, let's look at the three attachments

19   to Exhibit 3.  Which one of the attachments is this one?

20   Do you recognize this?

21       A.   It deals with processing covered voters within

22   the electronic poll book system.

23       Q.   Okay.  So what are you explaining to counties in

24   this -- in this attachment?

25       A.   Could you -- --

1      Q.  Yeah.

2      A.  -- flip through it a little bit more?

3           So basically the purpose of this document

4   was to again show counties how we're processing covered

5   voters within the system and then how to export the

6   covered voters into their electronic poll books to

7   ensure that, on the electronic poll books, the covered

8   voters would appear just like non-covered voters and

9   would be treated exactly the same, both covered and

10  non-covered voters.  And so this document outlines those

11  procedures.

12          MR. STEINER:  Mr. Kobach, is it possible to

13  get copies of the attachments?

14          MR. KOBACH:  Yes, we're actually trying to

15  get the other versions, too.

16  BY MR. KOBACH:

17     Q.  So it appears to me -- can you confirm, does this

18  go in step-by-step of how you open each screen and what

19  you do in each screen in the ELVIS database?

20     A.  Yes, that is correct.

21     Q.  I'm just going to flip through the --

22     A.  Also provides procedures on how to print paper

23  poll books in the counties that provide paper poll books

24  in addition to electronic poll books.  So it covers both

25  electronic poll books and paper poll books in the

 1   procedure to ensure covered voters were treated

 2   identically to non-covered voters.

 3       Q.   You testified before the break, but is it your

 4   understanding the counties did, in fact, treat the

 5   covered voters identically to other voters at the time

 6   of election with respect to poll books?

 7       A.   Yes.  Today I have not been informed of any

 8   non-covered voter -- or any covered voter being treated

 9   differently than non-covered voters.

10            MR. KOBACH:  Okay.  And I'm waiting on our

11   printout of the -- do we have the two other exhibits --

12   two other attachments to exhibits?

13   BY MR. KOBACH:

14       Q.   Okay.  And, Mr. Caskey, do you recognize this to

15   be one of the attachments to that e-mail?

16       A.   Yes.  This attachment again explains the

17   procedure for using electronic poll books and to ensure

18   that covered voters were treated identically to

19   non-covered voters.  This procedure deals with counties

20   that have Knowink electronic poll books.  The first one

21   was for customers that use ES&S as the vendor for their

22   electronic poll books.  So the instructions have the

23   same goal.  They're specific depending on the type of

24   vendor you had for electronic poll books.

25       Q.   Can you give the court a rough estimate of how

1   many counties in the 2016 November election used

2   electronic poll books versus paper poll books?

3       A.   Assuming -- I mean, acknowledging that this is a

4   guesstimate, I believe somewhere between 65 and 75

5   counties used electronic poll books.  Most of those

6   counties also had paper poll books on the ready in

7   addition to electronic poll books.

8       Q.   Okay.  And then I'm going to show you what I may

9   look at here.  Is this the third attachment to that

10  e-mail?

11      A.   Yes.  This is the revised notice ordered by the

12  judge on October 14th.

13      Q.   And is this the one that went on the website?

14      A.   Yes, that is correct.

15      Q.   And can you explain what this notice conveys?

16      A.   It covers persons who have applied to register to

17  vote and have not yet provided proof of citizenship.  It

18  states that, "Due to recent court rulings, if you've

19  applied at a Department of Motor Vehicles office or have

20  applied using the federal form and have not yet provided

21  proof of citizenship, that you are registered to vote

22  for the November 8th, 2016 general election.  Your name

23  will appear on the poll book.  You will be given a

24  standard ballot.  There is nothing further you need to

25  do subject only to further official notice."

1            Then it states that you can contact the

2   Secretary of State's Office on our toll-free line or

3   local county election office for additional information.

4            It is my belief this is exactly what Judge

5   Robinson ordered on October the 14th.

6       Q.   So is this the -- the direction that you gave to

7   the counties pursuant to the court's written order on

8   that date?

9       A.   Yes, we ordered the -- I ordered the counties in

10  the e-mail dated October 14th to replace the notice that

11  was issued on Wednesday, October 12th with the new

12  notice and required them to update the website notice on

13  their websites and also the Secretary of State's

14  websites.

15      Q.   And just to clarify again, the October 12th

16  notice was updated by October 14th -- this October 14th

17  e-mail, is that correct, on the website?

18      A.   Yes, that is correct.

19      Q.   But the October 12th written notices that went

20  out were not changed on October 14th; is that correct?

21      A.   Notices to voters were not affected by the

22  October 14th ruling.

23      Q.   And, in conclusion, Mr. Caskey, are you aware of

24  any respect in which your communications with the

25  counties did not convey the intentions of this court?

1    A.   I am not.   It is my belief that I have attempted

2   to comply with every single order issued by the judge to

3   the best of my ability.

4            MR. KOBACH:   No further questions, Your

5   Honor.

6            MR. STEINER:   May I proceed, Your Honor?

7            THE COURT:   Yes.

8                    CROSS EXAMINATION

9   BY MR. STEINER:

10    Q.   Good morning, Mr. Caskey.   It's nice to see you

11   again.

12    A.   Good morning, happy to be here.

13    Q.   Now, just a couple of questions to make sure that

14   my understanding of things is correct.   With respect to

15   the ELVIS system and the coding in the ELVIS system, the

16   data's input by the counties when someone registers or

17   attempts to register; right?

18    A.   Yes, that is correct.

19    Q.   And once it's input by the counties, control of

20   the data is by the Secretary or by your office?

21    A.   The Secretary of State's Office does not modify

22   any data.   The Secretary of State's Office purchased a

23   database.   So I'm not sure how you want to explain it.

24   We own the database but the data itself is managed

25   exclusively by the counties.   We don't touch a piece of

1   data.  We don't manipulate data.  I can view it.  I can

2   query it.  I can run reports.  But as far as touching

3   it, the Secretary of State's Office doesn't touch it.

4   Just looks at it.

5       Q.  And, for example, the postcards that are mailed

6   out by the counties are generated automatically from a

7   run of the ELVIS database; right?

8       A.  Yes, that is correct.

9       Q.  And that's because the Secretary's Office says

10  run all -- run postcards for all active voters; right?

11      A.  That's a feature that is included in the system

12  across all states.  So, yes, that's -- it comes with the

13  system, yes.

14      Q.  Right.  And while the counties do the mailing and

15  control the exact timing of the mailing, it's your

16  office that says print the postcards for the counties to

17  mail; right?

18      A.  Actually, I think it's state and federal law that

19  requires that notice of disposition to be sent to all

20  registered voters.

21      Q.  Postcards -- the formal name of the postcards is

22  formal notice of disposition?

23      A.  Assuming we're talking about the same notice.

24  That gets confusing sometimes.  That's correct.

25      Q.  You've seen some of the postcards put up on the

1   screen shows the name and precinct, address, and things

2   like that?

3       A.   Yes, that is correct.

4       Q.   And the official name is a notice of disposition;

5   right?

6       A.   Yes.

7       Q.   Okay.  Now, what I want to understand is from --

8   you were -- I think you testified that you were in and

9   out of the Secretary's Office during the telephonic

10  court conference on October 5th, 2016; is that right?

11      A.   Yes, that is correct.  I know that I was there

12  for part of it.  I also do not believe I was there for

13  every word of the entire conversation.

14      Q.   Well, were you there when Secretary Kobach

15  represented to the court that voters covered by the

16  preliminary injunction would receive the postcard or the

17  disposition notice?

18      A.   I did not remember that conversation having taken

19  place.

20      Q.   Now, and you understand that the court then

21  issued a written order; right?

22      A.   Yes, I am familiar with that.

23      Q.   In your view -- and I think you've testified that

24  following that court conference you now remember that

25  there was a telephone call you told the counties to send

1    out notices; is that right?

2        A.   Yes.  I went back and looked at my calendar.  I

3    know I talked about notices repeatedly on several calls

4    with the counties.  So I just needed to look at the

5    calendar to look at the last time I'd done that.

6        Q.   So from the time of the telephonic court

7    conference on October 5th of 2016 until you testified in

8    this court about a week and a half ago, it was your

9    understanding that postcards were required to be sent;

10   right?

11       A.   It is my understanding that in the written orders

12   there was a notice required to be sent to the counties,

13   yes.  And so I've provided to everyone, including the

14   court, my understanding of what the notice looked like.

15       Q.   I'd like an answer to my question, which is

16   following October 5th, 2016, telephonic conference, from

17   then until when you testified in this court on -- I

18   don't remember if it was March 8th or March 9th, but

19   thereabouts, maybe both days, it was your understanding

20   that what needed to be sent was also the disposition

21   notice or the postcard; right, sir?

22       A.   I think I've been unsure of that from time to

23   time.

24       Q.   Well --

25       A.   I am positive that a notice was required to be

1    sent to the voters and that notice included the ability

2    to find where your polling place is and an ability to

3    know that you were considered registered to vote.  And

4    the court drafted the notice and so I am positive that

5    that notice reflects the court's decision.

6              I personally have been unsure at times if

7    there was an additional notice required by the court

8    based on my review of written orders.  For the time

9    period that you speak, during that entire time period, I

10   have not always been sure exactly what the court's

11   directive is as regarded two pieces of paper instead of

12   one.

13   Q.  So from October -- so I want to make sure I

14   understand this.  So from October 2016 up until a week

15   and a half ago, it's your testimony that you weren't

16   sure whether a postcard or disposition notice was

17   required; is that right?

18   A.  I have not always been sure during that period of

19   time, that is correct.

20   Q.  And you're the director of elections for the

21   state?

22   A.  Yes, I am.

23   Q.  And Secretary Kobach is the -- as the Secretary

24   of State, is the chief elections officer of the state;

25   right?

1      A.   Yes, that is correct.

2      Q.   And his duties -- and that involves duties under

3  federal law; right?

4      A.   That is correct.

5      Q.   And his duties under federal law under the

6  National Voter Registration Act is to ensure compliance

7  by all of the county election officers with the federal

8  law; correct?

9      A.   Yes.

10          MR. KOBACH:   Objection.   Calls for a legal

11  conclusion.

12          THE COURT:   Overruled.

13  BY MR. STEINER:

14      Q.   And I think you testified, in response to

15  Secretary Kobach's questioning, that it also has

16  requirements under state law; right?

17      A.   Yes, there are requirements under state law.

18      Q.   And the Secretary's implementation of the law

19  runs through you; right?

20      A.   You want to ask that differently?

21      Q.   Sure.   The Secretary, in discharging his duties

22  under federal law and state law, those fall, as respect

23  to elections, on you as director of elections; right,

24  sir?

25      A.   Yes, that is correct.

1      Q.  And you now testified that you weren't sure

2  whether this court's order required a disposition notice

3  to be sent or didn't require a disposition notice to be

4  sent; is that right?

5      A.  It is my belief that I have complied with Judge

6  Robinson's written orders on this.

7      Q.  Can you answer my question?

8           You don't -- your testimony today is you

9  don't know whether that required the disposition notice

10  to be sent; right, sir?

11     A.  My answer is I believe that I've complied with

12  the court's order on this.

13          MR. STEINER:  Your Honor, could you ask the

14  witness to respond to my question?

15          THE COURT:  I would like a response.  I

16  asked you about this very matter during your trial

17  testimony and what I heard was very different than what

18  you said on direct testimony.  And now on cross

19  examination it seems to be even more different.  So I

20  need some clarity here.  Answer the question.

21          THE WITNESS:  Would you repeat the question,

22  please?

23  BY MR. STEINER:

24     Q.  Sure.  You're not sure -- well, from October of

25  2016, when there was a telephone conference with the

1    court and representations by Secretary Kobach and the

2    subsequent orders up until your testimony a week and a

3    half ago, you weren't sure whether that required a

4    disposition notice to be sent or didn't; right, sir?

5        A.  That is a correct statement, yes.

6        Q.  And as the director of elections of the state,

7    you didn't bother to come back to the court or to get

8    clarity from the Secretary's Office as to whether

9    disposition notices were required to be sent; right?

10       A.  That is not true.  In October of 2016, I provided

11   communication to all legal counsels and the court on

12   exactly what our instructions were to the court

13   specifically as it pertained to the notices to the

14   voter.  On October 12th, that information was provided

15   to my counsel, opposing counsel and the court and that

16   language clearly contained very specific instructions on

17   what I believe to follow the court.

18            In addition to answering your question, I

19   believe opposing counsel in 2017 asked our office the

20   same questions about this and again I provided exactly

21   what my understanding was of complying with the court.

22   So I do not think that the way you characterize my

23   information on that is accurate.

24       Q.  So as of October 14th of 2016, which I think was

25   the last of the orders in the notices that you sent out,

1    is it your -- from October 14th of 2016 up until your

2    testimony on March 8th and 9th of 2016 (sic), were

3    disposition notices required to be sent to people who

4    were subject to the court's preliminary injunction

5    order?

6        A.   Could you clarify the dates?  I think you may

7    have --

8        Q.   Yep.

9             From October 14th of 2016, which I think was

10   the last of the correction notices that you sent out to

11   the counties --

12       A.   Yes.

13       Q.   -- from that date until -- until November --

14   sorry, until March 8th or 9th of 2018, during that time

15   period were your instructions to the counties to send

16   disposition notices?

17       A.   I have not changed my written instructions I had

18   sent since October 14th, 2016.

19       Q.   So as of those written instructions, sir, were

20   the counties instructed to send disposition notices or

21   not to?

22       A.   Not in writing.

23       Q.   Could you answer my question?  Were they -- were

24   they instructed to send them or were they not instructed

25   to send them?

1      A.   From October 14th through March 8th, they were

2  not instructed to specifically.  They were instructed to

3  send notices.  Not that specific instruction, not that

4  specific notice, that is correct.

5      Q.   They -- from October 14th, 2016 until today, the

6  instruction has been not to send postcards; right?

7      A.   I have not said anything about the postcards in

8  my instructions.  It was not do not send it, as what you

9  said.  The -- my written instructions did not reference

10 that postcard in -- just did not.

11     Q.   Your written instructions are the official

12 instructions out to county election officials; right?

13     A.   Yes, that is correct.

14     Q.   So your official instructions didn't instruct

15 people to send postcards; right?

16     A.   They did not reference a separate postcard, that

17 is correct.

18     Q.   And that's what you expected people to follow;

19 right?

20     A.   I expect them to follow my written instruction,

21 yes, that is correct.

22     Q.   And you expect them to follow your written

23 instruction and not what you may or may not have said on

24 a telephone call; right?

25     A.   I expect them to follow all my instructions

 1   written and verbal.

 2     Q.  Well, then I think you've now testified you gave

 3   a verbal instruction to send and not a written

 4   instruction to send.  So could you tell the court,

 5   during that time period, was the instruction to send

 6   postcards, to not send postcards, or to do whatever you

 7   want as the county official?

 8     A.  From the dates that you specified, from October

 9   14th through today, the instructions on this have

10   strictly been written and the written instructions do

11   not separately reference a postcard, just the notice

12   approved by the court.

13     Q.  And you didn't tell the court, contrary to what

14   Secretary Kobach represented to -- you were not

15   instructing people to send a postcard; right?

16     A.  I believe I informed the court clearly and

17   exactly what I was instructing the counties.  I did not

18   leave anything out.  I was very clear in exactly what I

19   instructed the counties to send.

20     Q.  So -- and the basis for that, I believe, is this

21   updated instructions concerning federal form applicants

22   and persons applying in person at DMV office, which was

23   the first attachment to Exhibit 1, is that what you're

24   talking about?

25     A.  Yes, that is correct.

1     Q.  And so your testimony is that because that form

2   doesn't mention postcards or disposition notices one way

3   or the other, you believe that that was telling the

4   court we're retracting Secretary Kobach's representation

5   made during the telephone conference and we're not

6   sending disposition notices or postcards; is that right?

7     A.  All I can speak to is what I put on that piece of

8   paper.  I can't speak to any other conversations that

9   didn't include me and I may have or may not have even

10   been in the room.  I believe that I have been very clear

11   with the court exactly what instructions I have given to

12   the counties in writing.

13     Q.  So you think that this notice told plaintiffs'

14   counsel and told the court who -- who Secretary Kobach

15   had made representations to that we're no longer

16   complying with the representations that we made a week

17   earlier, is that your testimony?

18     A.  You're asking me what I was personally involved

19   in.  And so, again, I'm going to repeat I was not privy

20   or in the room for exactly what was said.

21          I received the judge's written order and I

22   have been very clear this is what my belief on the

23   written order was and here's what the instructions say.

24   You have it.  Our counsel has it.  The chambers had it.

25   There have been multiple -- there's been no secret on

1    exactly what I've told the -- told the court, told the

2    counties -- on exactly what I'm telling the counties to

3    send.  I'm not -- there's no hide the football here.

4    It's exactly what -- and --

5        Q.  So I'd like to know from October 5th, when

6    Secretary Kobach made the representation to the court,

7    until March 8th of 2018, what conversations you've had

8    with him about the postcards?

9        A.  In the last 18 months, quite frankly, I don't

10   know.  I've had a million conversations in that time

11   period.  Quite frankly, I can't think of any specific.

12       Q.  You can't think of anything about the postcards;

13   right?

14       A.  Since that period of time?  I know that we've

15   talked about it.  Because in the fall of 2017 there was

16   quite a bit of communication back and forth between

17   counsel on both sides and with Judge O'Hara I believe

18   and maybe even Judge Robinson.  So there was quite a bit

19   of conversation about notices during the fall of 2017.

20   So I feel positive we talked about that.

21            Again, I provided information to both

22   counsels and the judge in 2017 reiterating exactly what

23   was being sent and my belief we were complying with the

24   judge's orders.

25       Q.  So when you told Secretary Kobach in the fall of

1   2017, did you tell him that the instruction was that

2   counties should be sending postcards or should not be

3   sending postcards?

4       A.   I reiterated the instructions I sent in October

5   2016.  Those instructions do not reference a separate

6   postcard.

7       Q.   And the written instructions are what county

8   officials are supposed to follow; right?

9       A.   Yes.

10      Q.   And so the written instructions don't say send

11  postcards?

12      A.   The written instructions say nothing about the

13  postcards.

14      Q.   And the written instructions -- let me go back to

15  a couple things.

16           The weekly calls, that's a regular part of

17  election cycles; right?

18      A.   It's a -- something that I've done, yes.  We

19  routinely have phone conversations with the counties

20  just so I can better do my job.

21      Q.   Updates in the time period leading up to the

22  elections, the e-mail updates, you do that to ensure

23  that elections are run efficiently and in compliance

24  with the law; right?

25      A.   Yes, that is my intent.

1    Q.  And in 2016 there were no problems with counties

2    complying with the instructions that you sent; right?

3    A.  When you say -- so let me make sure I understand

4    your question.

5    Q.  I'll be more specific.  With respect to the

6    October 12th and then supplemented by the October 14th

7    notices that you sent out, I think your testimony is,

8    even though it was in the three weeks or so before the

9    election, no problem, the counties got the instructions

10   and they complied with what I told them in writing;

11   right?

12   A.  So I think my answer was as of today I'm not

13   aware of any person covered by the court's injunction

14   that was negatively impacted and not treated like a --

15   treated like a non-covered voter in this by the

16   injunction.

17   Q.  And you have no reason to doubt that if you would

18   have told the counties send the postcards, that that

19   instruction also could have been complied with; right?

20   A.  Would you say that again?  I want to make sure.

21   Q.  Sure.  I think there's been a suggestion that,

22   well, back then it was three weeks and it was really

23   busy because this would be a presidential election.  But

24   between now and August it's five months.  And so it

25   would have been really hard to comply with sending the

1    postcards back then.  But don't worry, Your Honor, we

2    can do it if you tell us to now.  That's sort of been

3    the implication of your direct testimony?

4        A.  No, I think that overstates what I said.

5            When a court issues an order, we will move

6    heaven and earth to comply with the order as we

7    understand it.  And on October 12th, there was lots of

8    discussion between both legal counsels and the court on

9    the contents of her written order.  And it is my

10   understanding that, to the best of my knowledge, we

11   complied fully with the court's order during that period

12   of time.

13           THE COURT:  There was also -- there was also

14   an assurance during that phone conversation.  I asked

15   Mr. Kobach a couple of times directly have the postcards

16   been sent out?  Are the postcards being sent out?  And I

17   got an assurance that the postcards would be sent out.

18           So that wasn't in the written order because

19   I already had an assurance on the record by an officer

20   of the court in lawyer Kobach that that had or would be

21   accomplished, a verbal order like you give the county

22   election officials.

23           And so I'm clear, did you or did you not

24   learn from Mr. Kobach that I had been assured by him,

25   meaning I didn't need to order it directly, he'd already

1    told me that it was going to be done, did you or did you

2    not learn that from Mr. Kobach that these registered

3    voters pursuant to the PI order were going to receive

4    postcards just like everybody else?

5                THE WITNESS:  So my discussion with the

6    counties on the postcard --

7                THE COURT:  That's a yes or no answer.  Did

8    Mr. Kobach tell you that or not?

9                THE WITNESS:  My belief is no because it's

10   not included in my written instructions on October 12th.

11   BY MR. STEINER:

12       Q.  And between October 5th of 2016 and October 12th

13   of 2016, did you have any conversations with Secretary

14   Kobach about postcards?

15       A.  I feel quite certain that we could have talked

16   about a lot of things during that period of time.  Quite

17   honestly, I have no idea.  That was in -- you know, four

18   weeks before a presidential election.  This court case

19   was going on.  There was a lot of communication.  I

20   can't swear one way or the other.

21       Q.  So you don't know whether you had a conversation

22   with Secretary Kobach about his representations to the

23   court about postcards; right?

24       A.  I really do not remember.

25       Q.  And you don't remember whether you were there

1    when he made the representations to the court; right?

2       A.   I really don't.  You're asking me to recount

3    several hour-long conference calls in the four weeks

4    prior to a presidential election.  There was a lot going

5    on.  I absolutely can't sit here and go, oh, yes, I have

6    a crystal clear memory of exactly what was said.

7       Q.   And when Judge Robinson asked you a week and a

8    half ago whether postcards had been sent you said you

9    weren't really sure, you'd have to go back and check?

10      A.   Right.

11      Q.   And you didn't say at that point, "But I told the

12   county officials on a telephone call to send the

13   postcards, I'm just not sure that everyone, in fact,

14   did;" right?  That wasn't your testimony a week and a

15   half ago to the judge; right?

16      A.   No, because I honestly didn't remember.  I

17   haven't thought about that in many, many months, so...

18      Q.   Right.  But you now suddenly remember, in

19   response to the Secretary's questioning, that you did

20   give such an instruction verbally in a call with no

21   notes, no agenda, just a calendar entry; right?

22      A.   Well, I followed up because the judge asked me to

23   ascertain that.  And so I went back and had

24   conversations with other people to try and recreate my

25   memory from that period of time; so, yes.

 1    Q.   And you found out at least three counties -- how

 2    many people did you talk to?

 3    A.   Specifically about the notice, I've talked to

 4    four.

 5    Q.   Okay.  And three of the four didn't send them;

 6    right?

 7    A.   Yes, that is correct.

 8    Q.   Okay.  And which three are those?

 9    A.   Douglas, Shawnee and Riley.

10    Q.   And Douglas is -- and you haven't talked to

11    Johnson one way or the other?

12    A.   Not specifically about postcards, no.

13    Q.   So you don't know whether Johnson County is

14    sending postcards?

15    A.   I have not yet had a personal conversation with

16    Johnson County; correct.

17    Q.   And Johnson County is the largest county in the

18    state?

19    A.   Yes, it is.

20    Q.   And would it surprise you if Johnson County was

21    not sending postcards?

22    A.   Not -- on this, nothing would surprise me as far

23    as their answer goes.

24    Q.   And you haven't bothered to ask, in the week

25    since you testified and told the judge you need to go

16-2105    Bednasek/Fish v. Kobach    03.20.18                    88

1    figure it out, you didn't bother to call the largest

2    county in the state to find out whether they were

3    complying with the representation by Secretary Kobach

4    that postcards would be sent; is that right?

5        A.   I talked to the second, the third, the fourth and

6    the seventh biggest counties because I had the

7    opportunity to do so.  I did not have the opportunity to

8    talk to the largest.  I have been extraordinarily busy

9    with my job and so I did not have the opportunity.  But

10   I talked to the second, fourth, fifth and seventh

11   biggest counties.

12       Q.   And three of those weren't complying with the

13   supposed verbal instruction that there's no

14   documentation of; right?

15       A.   Yes, that is correct.

16       Q.   Sir, isn't it a fact that you were asked on one

17   of the calls whether to -- whether postcards were to be

18   sent -- or I think disposition notices were to be sent

19   and you responded no; isn't that right?

20       A.   Quite frankly, you would have to give me a little

21   more context what period of time it was in.  I've talked

22   about those notices in the last three years multiple

23   times.  Yes, I believe I could have said that depending

24   on what point in time in the judicial proceeding, yes.

25       Q.   And you acknowledge it's possible, "No, don't

1   send those disposition notices," at some point between

2   October 5th of 2016 and today; right?

3       A.   I don't believe we've had much discussion on

4   sending out notices after my written instruction on

5   October 12th and October 14th.

6       Q.   But it's certainly possible at some point between

7   October of 2016 and today you've said to counties, no,

8   don't send disposition notices; right?

9       A.   No, I believe we would have said we stand by the

10  written instructions.  I generally say follow the

11  written instruction.

12      Q.   And -- and you were asked whether there would be

13  written instruction on whether or not to send

14  disposition notices and you said, no, I'm not putting

15  anything in writing; right?

16      A.   I don't recall that but I've had lots of

17  conversations.  I'd need more context what period of

18  time.  This has been litigated for the last three years.

19  And so at some point in the last three years could I

20  have said that?  Yes, that's possible.

21      Q.   And it's certainly possible that from between

22  October of 2016 and today you were specifically asked by

23  county clerks whether you would be issuing written

24  instructions and you said, no, I'm not putting anything

25  in writing; right?

1    A.   Because we have written instructions already in

2    existence.

3    Q.   And you were asked for guidance -- during the

4    period of the preliminary injunction and Secretary

5    Kobach's representation about postcards, you were asked

6    for guidance about sending postcards and you told

7    counties I'm not putting anything in writing; right?

8    A.   No.  I said we've already issued something in

9    writing.  I didn't say we weren't going to put something

10   else additional in writing.  I said we already have

11   written instructions for you to comply with.

12   Q.   When you put it in writing, it doesn't say one

13   way or the other about postcards; right?

14   A.   The written instructions do not reference the

15   postcards either way, shape or form.

16   Q.   And if we can talk for a minute about the

17   election manual, right.  That's the on-line manual?

18   A.   Are you talking about the election standards, the

19   manual specific to county election officers?

20   Q.   The County Election Officer Manual; right?

21   A.   Yes, we can talk about that.

22   Q.   And that was last updated after the documentary

23   proof of citizenship law went into effect; right?

24   A.   Yes, I believe that's true.

25   Q.   Okay.  And -- and it's next scheduled to be

16-2105    Bednasek/Fish v. Kobach    03.20.18                91

1    updated in another year or two; is that right?

2        A.  Yes, that is correct.

3        Q.  Okay.  But there's nothing in Kansas law that

4    stops you from updating that manual in advance of the

5    next scheduled update; right?

6        A.  There's nothing in Kansas law that requires any

7    updates to the manual in any way, shape or form.  It's

8    silent on that.  So if you're asking me is there a legal

9    requirement to do so?  No, there is not.

10       Q.  I'm asking the opposite.  There's no legal

11   prohibition on you updating the manual to comply with

12   Judge Robinson's orders and Secretary Kobach's

13   representations to the court; right?

14       A.  I think it's -- in regards to the manual, the law

15   is silent in either direction.

16       Q.  So you certainly could have done that if you

17   wanted to?

18       A.  Hypothetically, yes.

19       Q.  Practically, not just hypothetically.  If you

20   said update the manual, as the director of elections, it

21   would have been updated; right?

22       A.  If I wanted to do so, yes, that's true.

23       Q.  You didn't want to do so; right?

24       A.  I had other priorities that needed to be done

25   that I felt was a better use of my time.

1    Q.   So what was a better use of your time and more

2    important priority than ensuring that Secretary Kobach's

3    representations to this court were complied with?

4    A.   I believe I've been overly transparent with all

5    attorneys and the court on exactly what my instructions

6    are to the counties on complying with the written order.

7    Q.   I'd like an answer to my question as to what it

8    was that was -- that had you too busy and was a higher

9    priority than complying with Secretary Kobach's

10   representations to this court on October 5th of 2016?

11   A.   Nothing.  I always attempt to comply with any

12   judicial order as I understand it.

13   Q.   And you've testified that a regular part of your

14   job is communicating with counties to make sure that

15   they are complying with whatever laws and instructions

16   you send out; right?

17   A.   Yes, that is correct.

18   Q.   And, for example, you -- since last week's or the

19   testimony a week and a half ago, you went and asked four

20   of the counties whether they were or weren't sending

21   postcards; right?

22   A.   Yes.  I've had four discussions, yes.

23   Q.   But in the 18 months from October 2016 up until

24   your testimony a week and a half ago, that wasn't part

25   -- you never asked that in your regular communications

1   to see if the law was being complied with; right?

2       A.   Oh, I've had discussions about whether or not the

3   law's being complied with.  I've had hundreds of

4   discussions about whether the law was being complied

5   with.

6       Q.   Right.  It's a part of your job; right?

7       A.   Right.

8       Q.   And it's part of what you do to talk to the

9   counties to see if they're complying with the law;

10  right?

11      A.   Yes, I do that all the time.

12      Q.   In those 18 months, you probably had a couple

13  hundred conversations with counties?

14      A.   Couple thousand conversations with counties.

15      Q.   I say a couple hundred.  But I'll certainly take

16  a couple thousand; is that right?

17      A.   Sure.  In 18 months I've easily had a couple

18  thousand conversations with counties.

19      Q.   In those few thousand conversations with counties

20  from October 16 -- from October of 2016 until your

21  testimony last week when you were asked about this by

22  Judge Robinson, you hadn't had a -- in not one of those

23  thousands of conversations with counties did you ask a

24  county whether they were sending postcards; right?

25      A.   No, because there are thousands of laws that I

1   haven't asked any county, hey, are you complying with

2   that?  It is impractical to believe that I have the

3   ability to answer -- ask all 105 counties, hey, are you

4   complying with every one of the thousand federal-state

5   laws, regulations.  I think that's impracticably that I

6   would have the ability to do so.

7       Q.  Right.  Just so the record is clear, I think we

8   might have a double negative.  The answer to my

9   question, that's correct you didn't ask any county in

10  any of those thousands of conversations about sending

11  postcards or not sending postcards; right?

12      A.  I don't recall having a separate conversation

13  about postcards during that period of time.  I don't

14  recall one.  As I said, I've literally had thousands of

15  conversations.  So I can't say it didn't exist but I

16  certainly don't recall one.

17              MR. STEINER:  Stephen, can we put up

18  Exhibit H to the contempt motion.  And do you have the

19  first page of that letter or you don't?  Exhibit H.

20              THE COURT:  Are you going to mark this as a

21  hearing exhibit?

22              MR. STEINER:  I think it's attached.  I'll

23  move it in.  May I approach the witness?

24              THE COURT:  Yes.

25              THE WITNESS:  Thank you.

1           THE COURT:  I will consider them if they're

2    attached to, but I think for the record it's cleaner to

3    include them as exhibits as well.

4    BY MR. STEINER:

5       Q.  So, sir, you've been -- I've handed you what was

6    Exhibit H to our contempt motion which is -- -- which is

7    a letter dated November 21st of 2017 from Miss Becker to

8    Mr. Ho.  Have you seen that letter before?

9       A.  I have not seen this version of the letter.

10      Q.  You saw a draft of the letter?

11      A.  I've seen a draft of this letter but I have not

12   seen this.

13      Q.  And you provided input on the draft of the

14   letter?

15      A.  I provided input into the response.  I do not

16   know what happened to that input.

17      Q.  So if you go to the second page of it says page 3

18   of the document because the cover sheet is page 1, but

19   the second page of the letter, the top paragraph.  Do

20   you see that?

21      A.  The -- where it says "regarding issue No. 3"?

22      Q.  Correct.  "Those who register to vote using the

23   federal form or motor-voter form but do not provide DPOC

24   receive the court-ordered notices.  The court's order

25   fully addressed what was to be sent to 'covered past

1    registrants' and 'covered new registrants' and ordered

2    that the agreed to notices be sent."  Do you see that?

3        A.  Yes, I do.

4        Q.  Okay.  And -- and that was saying -- that was in

5    response to the question of whether postcards were being

6    sent?

7        A.  I don't know what the question was.

8        Q.  So you don't know one way or the other whether

9    this was a response to the question of whether the

10   Secretary's Office was sending postcards?

11       A.  I don't know what the question was.  I just see a

12   reference to notices and I know there are multiple

13   notices that were -- that I've communicated to the

14   counties about depending on the status of the covered

15   voter.

16       Q.  All right.  Why don't I show you what was marked

17   as Exhibit J.

18       A.  Thank you.

19       Q.  This is a December 7th, 2017 letter.

20       A.  Yes, I see that.

21       Q.  Okay.  And the paragraph 4 of that letter, if I

22   could direct your attention to that, have you seen this

23   letter before today?

24       A.  I don't believe so.

25       Q.  Did you provide input into a letter in December

1    of 2017?

2        A.   I don't remember providing input.  On this letter

3    I'm not -- I honestly don't remember providing input on

4    this.  It's possible I did.  It's just --

5        Q.   Then if you look at paragraph 4, it's talking

6    about people covered by the order or not covered by the

7    order; is that right?

8        A.   Yes, that is what it says.

9        Q.   Okay.  And that's saying people who are covered

10   by the order only get the ordered notice, they don't get

11   the postcards; right?

12       A.   Well, I don't know what the question was, so I

13   see what is stated as the response on No. 4.  But I

14   don't see what the question was to elicit that response.

15       Q.   So you don't know one way or another from that

16   whether that was saying we're not sending postcards to

17   people who are covered by the preliminary injunction

18   order?

19       A.   Well, I don't know what the question was on No. 4

20   because it's not contained here.  So, no, I don't know

21   the answer.

22       Q.   Did you have conversations with Secretary Kobach

23   or Mr. Roe or Miss Becker in November-December of 2017

24   as to whether or not postcards were being sent?

25       A.   I had conversations in November concerning this

1   letter because there were discussions about covered

2   notices.  So, yes, in November.  I don't recall there

3   being any December.  I just know I specifically remember

4   November.

5       Q.  So in November of 2017, what did you say was the

6   status of postcards being sent or not being sent?

7       A.  I don't know if that -- that specific word was

8   included in the conversations I had.  I know they were

9   discussed but...

10      Q.  All right.  How about the official word,

11  "disposition notices," what did you say about

12  disposition notices?

13      A.  We talked about them.  I -- what question are you

14  asking me?

15      Q.  Well, did you tell --

16          In response to the inquires from plaintiffs'

17  counsel whether Secretary Kobach's representations to

18  the court were being complied with, did you tell

19  Secretary Kobach or the people working with him in the

20  Secretary's Office that postcards were being sent by

21  counties or were not being sent by counties?

22      A.  I don't think I was asked that question.

23      Q.  Okay.  Well, what were you asked?

24      A.  I don't remember.  You asked me if I remember

25  there being conversations.  Yes.  But did I commit them

1    to memory?  No, I --

2        Q.   And you didn't keep any records of it; right?

3        A.   No, I did not.

4        Q.   Okay.  So you know you had a conversation before

5    these letters were sent back to -- to plaintiffs'

6    counsel?

7        A.   On November 1 I feel confident that I was

8    involved in discussions on the entirety of the --

9    entirety of the letter and provided some input.  I don't

10   remember being involved in the December letter.

11       Q.   And you -- and so you know you had conversations

12   but you don't know whether you told Secretary Kobach and

13   the rest of the staff that notices were being sent or

14   were not being sent?  As you sit here today, you're just

15   not sure?

16       A.   Well, this is -- to be fair, this is a three-page

17   response.  I haven't seen the letter that elicited this

18   three-page response, and so I'm going to assume that

19   there's a lot of information contained in this letter.

20   You're asking me was this specific question asked?  I

21   don't believe that specific question was asked.

22            But being truthful in answering my question,

23   yes, I had discussions about some of the things in this

24   letter.  But, no, I don't recall anyone point blank

25   asking me did you send a notice of disposition or

1   postcard related to those discussions.

2          So I want to be fair what you're asking me.

3      Q.   Putting aside the letters in November and/or

4   December of 2017 or even in advance of that in October

5   of 2017, in that time period was there a discussion

6   about postcards or notices of disposition or was there

7   not?

8      A.   I don't recall directly being asked are we

9   sending postcards during that period of time.

10     Q.   Was there any discussion about postcards during

11  that period of time?

12     A.   I don't remember there being -- we talked about

13  notices.  I don't remember there being questions asked

14  specifically about postcards.  Just don't remember.

15  That was also in the weeks leading up to our first

16  statewide municipal election in the fall, so I'm pretty

17  sure I was preoccupied with other things as well.

18     Q.   And with respect to the ELVIS system, the ELVIS

19  system could be set so that people who are

20  coded that they're in suspense because of the proof of

21  citizenship could be coded that postcards would print;

22  right?

23     A.   Could that be done?  I want to say theoretically,

24  yes.  Any kind of programming of the database that

25  excludes what I would consider a standard report,

1   generally there's a time and effort cost associated with

2   our vendor.  So since this is a category of people who

3   are covered by injunction and need to be treated

4   differently for purposes of tracking, I don't know that

5   I could have just created a standard report at no cost

6   during that period of time.

7       Q.   Putting aside -- I assume the cost is a few

8   thousand dollars?  Maybe less?

9       A.   I'm not sure.  I would say less but we'll, for

10  argument sake, say a few thousand dollars.

11      Q.   So for a few thousand dollars it could have been

12  coded so postcards would print for the people coded

13  covered by the court's injunction?

14      A.   Is that technically feasible?  I believe the

15  answer is yes.

16      Q.   And feasible based on an instruction from your

17  office; right?

18      A.   We would have to negotiate with our vendor to do

19  something like that.  That would require a change order,

20  a process.

21      Q.   But that would be done by your office; right,

22  sir?

23      A.   Yes, that is correct.

24      Q.   That wouldn't be left to the 105 counties to run

25  the report, print the cards.  That would be done by your

1   office?

2       A.   Yes, that would be correct.

3       Q.   And we've talked about the upcoming May

4   conference.  Was there also a conference in May of last

5   year or only even year conference?

6       A.   It's every year.

7       Q.   So you had the conference.  You had -- one of the

8   things I think you said you could do if you were now

9   told to comply with Secretary Kobach's representations

10  from 18 months ago, is that you could talk about it in

11  May at the conference that 90 percent of the counties

12  attend; right?

13      A.   Absolutely.

14      Q.   Okay.  You could have done that last May;

15  right --

16      A.   I could have last May --

17      Q.   -- but you didn't?

18      A.   No, because I talked about, for the first time in

19  150-plus years, of moving elections from the fall to

20  the -- spring to the fall in 2017.  So the time spent in

21  the May conference of 2017 was moving municipal

22  elections to the fall.

23      Q.   Right.  So you had other things to talk about

24  last year so you didn't talk about it.  But you could

25  talk about it this year if -- if you have to comply with

1    Secretary Kobach's representations; right?

2        A.  Whatever the court decides, we will do.

3            MR. STEINER:  No further questions, Your

4    Honor.

5                    REDIRECT EXAMINATION

6    BY MR. KOBACH:

7        Q.  Mr. Caskey, do you recall opposing counsel asking

8    you about instructions that you e-mailed to the counties

9    between October 14th and today?

10       A.  Yes, I do.

11       Q.  And do you recall that he repeatedly said between

12   October 14th and today, referring to several questions?

13       A.  Yes, I do.

14       Q.  But on October 5th -- on October 5th, the day of

15   the telephonic conference, you referred earlier to

16   verbal instructions that were given to the counties;

17   right?

18       A.  I had a conference call where we discussed a

19   variety of things that day, yes.

20       Q.  Including the standard postcard disposition;

21   right?

22       A.  Yes, I believe we talked about that to some

23   extent.

24       Q.  And your communications from October 14th onward,

25   were they about implementing the court's written order?

1    A.   It was about complying with the judicial orders

2   in the case, and from my perspective that always means

3   written.

4    Q.   I'm sorry, I didn't hear you.

5    A.   From my perspective that means written.

6    Q.   In your understanding, does the court's written

7   order make any mention of the standard postcards?

8    A.   No, it does not.  I relied heavily and

9   exclusively -- almost exclusively on -- on the written

10  order to make sure that I understood completely what was

11  said.  There was a lot of confusion sometimes, and

12  acknowledging that I was not present for many parts of

13  the oral conversations, so I relied on the written

14  order.

15   Q.   Is it fair to say that after October 14th, you

16  were focused on making sure that the written order was

17  complied with?

18   A.   Yes, that is correct.

19   Q.   We talked about Sedgwick County and the notice of

20  disposition postcards.  Would Sedgwick County normally

21  have sent out notice of disposition postcards to the

22  affected voters without being directed to do so from

23  you?

24   A.   I don't believe so.

25   Q.   In the context of this case, do you always get

1    direction about what you should or shouldn't do from me

2    personally?

3        A.   No, I do not.

4        Q.   Do you sometimes get direction from other

5    attorneys in the office who have been involved in this

6    case?

7        A.   Yes, I do.

8        Q.   Would those other attorneys include Garrett Roe,

9    Bethany Lee, Jesse Burris, Sue Becker and Bryan Brown?

10       A.   Yes, that is correct.

11       Q.   Is it possible one of the other attorneys in the

12   Office of the Secretary of State, or possibly our

13   paralegal, Des Taliaferro, related to you what was said

14   on the conference call regarding the notice of

15   disposition postcards that should be sent out by the

16   counties?

17       A.   It's possible.

18       Q.   Were you present during the -- I'm going to show

19   you another part of the telephonic conference call by

20   the court and this is -- I'll represent to you it's

21   later than the earlier one talking about.

22              It's on page 21 and I'll just -- right where

23   the highlighting -- highlighted text is I'm going to

24   read this and ask you if you recall this.  Mr. Danjuma

25   says, "Well, Your Honor, we just -- I'm sorry, this is

1    Orion Danjuma again.  We just wanted to check the -- to

2    ensure that we were in agreement about what new voters

3    will -- new DMV registrants will receive, the notice

4    they'd receive.  And I guess -- I guess the better way

5    to resolve that is either to have a representation from

6    Mr. Kobach that they'll receive the same notice that

7    every other registered voter receives or we'll see a

8    copy of that notice before it's issued."

9              And the court:  "Okay.  I think that's fair.

10   Mr. Kobach."

11             As you read that, does that suggest that

12   there is an alternative, the way Mr. Danjuma presents

13   it, the same notice, a notice of which the court could

14   be -- or the plaintiffs would receive -- or receive a

15   copy?

16      A.  Me reading that I believe, yes, there would be

17   multiple answers to that.

18      Q.  Were you present -- do you know -- if you don't

19   you can -- during -- do you recall this part of the

20   conversation?

21      A.  I don't recall.  Again, it's possible I was there

22   or not there.  But, again, I was in and out on that --

23   that phone call.  I just don't remember when I was there

24   and when I was --

25             THE COURT:  So, in other words, you're

1    relying on Secretary Kobach who was there for the entire

2    conversation with me to relate to you what the -- what

3    my directives were based on the entire phone hearing,

4    not just perhaps on this one piece of the transcript

5    that he's directed you to; would that be fair to say?

6              THE WITNESS:  I believe there were multiple

7    conversations with attorneys in our office, not just the

8    Secretary.  But, yes, that is correct.  I readily admit

9    that I was not physically present during the entire

10   conversation and could not speak to exactly what you

11   said and didn't say during that phone call.

12             THE COURT:  Has anyone ever showed you those

13   parts of the transcript where Mr. Kobach and I discussed

14   the fact that -- or discussed the postcards and his

15   assurance that the postcards -- that these folks would

16   receive the postcards as well?  Anyone showed you those

17   parts of the transcript?

18             THE WITNESS:  I haven't seen this transcript

19   until the last two weeks.

20             THE COURT:  Anyone showed you those parts of

21   the transcript?

22             THE WITNESS:  In the last two weeks, yes,

23   both parts.

24             THE COURT:  Only in the last two weeks?

25             THE WITNESS:  I didn't know this transcript

1    existed until, I forget which day, within the last two

2    weeks.

3        THE COURT:  All right.  Thanks, Mr. Caskey.

4    BY MR. KOBACH:

5    Q.  Mr. Caskey, do you recall being questioned about

6    this letter by Sue Becker of our office to Dale Ho

7    plaintiffs' counsel?

8    A.  Yes, I do.

9    Q.  And you were asked about the paragraph No. 4 that

10   Miss Becker drafted.  Do you recall that?

11   A.  I do recall being questioned about that, yes.

12   Q.  And had you seen the letter to which this is

13   responding?

14   A.  I don't believe so.

15   Q.  Well, let me ask you if you've seen it.

16       MR. KOBACH:  Your Honor, this is already --

17   it's Document 424, Exhibit I, I believe.

18       THE COURT:  All right.  I think for the

19   record these need to be admitted.  H, J and now I, I'm

20   going to admit for the record.  They were attached to

21   the briefs, so technically they don't have to be, but I

22   think it makes a cleaner record.  So Exhibits H, J and I

23   are admitted.

24   BY MR. KOBACH:

25   Q.  So do you have any understanding about whether --

1    let's go back to this.  This is J I believe.  This is

2    the one you were just looking at.

3              Do you have any understanding about whether

4    paragraph 4 here represents an exclusive statement of

5    all information that is given to different categories of

6    voters or whether just a statement something is given?

7       A.   I don't.  Quite frankly, I don't remember being

8    involved in discussing this letter with our counsel or

9    with anyone else.  It's possible but I -- this letter

10   dated December 11th, I don't recall talking to anyone

11   about it.  But so short answer is, no, I just don't

12   remember any interplay back and forth on -- during this

13   time period.

14      Q.   And to conclude, are you aware of any

15   communication within the Secretary of State's Office

16   where you were present directing you not to comply with

17   any order of the court?

18      A.   No, never.  I've always tried to comply with

19   every -- every piece of the court order as I knew it and

20   understood it.

21      Q.   And are you aware of any other activities in the

22   Secretary of State's Office by anyone else you may have

23   contact with that would suggest that the Secretary of

24   State's Office was not trying to comply to the absolute

25   dotting every "I" and crossing every "T" with the orders

```
 1    of the court and the directions of the court verbal or
 2    written or otherwise?
 3        A.   No, I am not.
 4             MR. KOBACH:  No further questions.
 5             MR. STEINER:  Nothing further, Your Honor.
 6             THE COURT:  All right.  Mr. Caskey, can step
 7    down.
 8             THE WITNESS:  Thank you, Your Honor.
 9             THE COURT:  Mr. Kobach, is there any more
10    testimony or any more exhibits you want made part of
11    this record before you rest your case?
12             MR. KOBACH:  No further exhibits, Your
13    Honor.  We would just add at the end though with respect
14    to what the court does with the pending motion, the --
15    in the briefing of the motion we didn't get the
16    transcript until the reply brief that opposing counsel
17    sent to us.
18             So the transcript wasn't in their original
19    -- wasn't attached to their original motion and so that
20    led to some confusion in our office as to what they were
21    talking about when they referred to -- our office was
22    focused on the written order.  And the -- the briefing
23    didn't specifically mention the transcript until the
24    reply.  So I want to be clear that that's why, although
25    I didn't do the briefing of this memo, my understanding
```

1   is that's why it was drafted focused on the written

2   order.

3             To the extent that this counsel -- that this

4   court is going to look at the transcript and the oral

5   representations during the -- during the oral hearing of

6   October 5th as somehow being part of the court's written

7   order or a basis for --

8             THE COURT:  Why would I order something that

9   you'd already told me that you'd taken care of?  Why

10  would I order that?  As an officer of the court, as a

11  lawyer that's licensed in this state or in some other

12  state and has been allowed to practice in front of me

13  tells me, as an officer of the court, that they've done

14  something, I feel no reason to order it because you are

15  under an ethical obligation to tell me the truth.  And

16  if you tell me you've done something, you're going to do

17  something, I trust that.  That's the way -- that's why

18  lawyers are licensed.  That's why judges honor and

19  accept what they say without them taking the stand when

20  we're talking about issues, you know, other than

21  evidence.  So I would not have ordered that.

22            If -- if I had asked you if you had sent,

23  you know, voter ID cards to everyone and you told me,

24  yes, or you were going to -- not that that is an issue

25  in this case -- in other words, I honored and trusted

1    what you told me, Mr. Kobach.

2             MR. KOBACH:  And you're --

3             THE COURT:  Why would I then order it?

4             MR. KOBACH:  I understand what you're

5    saying, Your Honor.  I'm telling you now that I directed

6    the staff to make sure that that would happen.  It

7    appears that I had a greater deal of confidence in what

8    the counties would do when instructed immediately over

9    the telephone than what they actually did.

10            As we began this morning, one of the great

11   surprises of this office --

12            THE COURT:  This -- let's not have argument

13   -- let's not have argument.  I haven't asked them if

14   they're putting evidence on.  I'll come back around if

15   you want to make argument about what the evidence -- how

16   I should look at this evidence.  Don't sit down because

17   maybe I won't be calling --

18            Do you have any evidence, Mr. Ho?

19            MR. HO:  We just wanted to clarify the

20   record, Your Honor.  The Exhibits A through J that were

21   attached to our opening brief were in the record for

22   your consideration for purposes of the motion.

23            THE COURT:  All right.  They're part of the

24   record.  But for purposes of this evidentiary hearing, I

25   admit Exhibits A through J as well.

1            MR. HO:  Thank you, Your Honor.

2            THE COURT:  Nothing more for the plaintiff?

3            MR. HO:  No further evidence, but we would

4    appreciate an opportunity to address the court with

5    argument.

6            THE COURT:  Okay.  All right.  So actually

7    it's your motion, so I suppose the argument -- you

8    should have the first crack at the argument.  And then,

9    Mr. Kobach, you can argue your position.  Go ahead.

10           MR. HO:  Very briefly, Your Honor.  I think

11   the evidence today clearly supports a finding of

12   contempt.

13           With respect to the county elections manual,

14   there's no dispute that the information in the manual is

15   incorrect when it states that every voter registration

16   applicant must provide documentary proof of citizenship.

17   It lists one exception for that, people who registered

18   to vote before 2013.

19           It's the simplest thing in the world, Your

20   Honor, to add one more sentence to add an additional

21   exception to that people who register to vote at the DMV

22   consistent with Your Honor's preliminary injunction

23   ruling.  Also simplest thing in the world to add a

24   phrase about the people who use the federal voter

25   registration form consistent with the D.C. Circuit 's

1  ruling in the *Newby* case.  Instead of making that

2  correction, Secretary Kobach simply took the manual

3  down.  He took his ball and went home.

4              Now, even though that manual was no longer

5  on-line, and that's the first we heard about that fact

6  when that representation was made today, counties still

7  have hard copies of those manuals.  They still use it as

8  their definitive resource guide.  And I think it begs

9  the question why -- why would Secretary Kobach let

10  inconsistent information continue to exist out there

11  when the simplest thing in the world is to simply print

12  off a new version of this with a sentence or two and

13  disseminate it to the counties.

14              The second issue, Your Honor, the postcards.

15  Let's just -- there's been a lot of representations made

16  and I think it's just helpful to just identify what the

17  evidentiary record today actually shows.  All right.

18              First is the timeline of when the first

19  written directive -- or when a written directive about

20  compliance with the preliminary injunction came out from

21  Mr. Caskey.  Now, remember the preliminary injunction

22  was issued in May of 2016, so several months before the

23  November '16 election.  There's no written directive

24  from Mr. Caskey about compliance with the injunction

25  until October 12th of 2016 and that only happened, I

1    remind the court, in response to our first motion for

2    contempt that we filed against Secretary Kobach.

3              There was a long period in which he was

4    refusing to disseminate any information about the

5    preliminary injunction order when people were going to

6    the motor -- to the DMV registering to vote in

7    compliance with the preliminary injunction and receiving

8    an incorrect notice telling them you are not registered

9    to vote, you will not be able to vote in November unless

10   you provide documentary proof of citizenship.  So we're

11   not writing on a blank slate here.

12             Second point, what do those written

13   instructions actually show?  Well, Secretary Kobach

14   entered them into the record and there's no reference

15   whatsoever to the notices of disposition or to the

16   postcards.  There is a line that this supersedes any

17   previous instructions that they've -- that the county

18   elections officers have received.  And Mr. Caskey

19   testified there have been no other instructions with

20   respect to the postcards or the notices of disposition

21   since then.

22             Now, he did make reference to some supposed

23   verbal instructions which went out before this October

24   12th e-mail.  But remember, Your Honor, Mr. Caskey did

25   not remember those instructions previously.  He had to

1    go away after he testified a week or so ago -- a week

2    and a half or so ago, jog his memory.  And what he

3    learned was that three of the four counties that he

4    spoke to were not sending out the postcards.  So that

5    hardly seems like strong evidence that an instruction

6    was given.  And, in any event, any such instruction

7    would have been superseded by the written instructions,

8    the only thing that we have memorialized in any way.

9         Third thing, Your Honor, there is undisputed

10   evidence that at least some voters are not receiving the

11   postcards, Mr. Fish and also the evidence -- the

12   testimony of the League of Women Voters former president

13   Marge Ahrens.  That's not disputed by the defendants.

14        The only thing that we have from them is the

15   verbal instructions that Mr. Caskey supposedly gave and

16   the representation that Mr. Kobach just made for the

17   first time that he directed that the postcards be sent.

18        And, Your Honor, I have to say, and I don't

19   say this lightly, this is a remarkable story.  I mean, I

20   sent a letter to the defense on November 10th of last

21   year, that's Plaintiffs' Exhibit F, where we identified

22   this issue specifically.  A response came from

23   Ms. Becker on November 21st.  That's Exhibit J.  That

24   letter makes no reference to any kind of instruction

25   being sent to the counties about the postcard.

1          I followed up with that on this issue on

2    November 30th with a second letter.  That's Exhibit B.

3    We had a meet and confer on the 7th -- on December 7th.

4    Set forth in our opening brief, Miss Becker's position

5    was that -- and this was what was relayed to us during

6    the meet and confer -- that "the postcards were

7    "unnecessary" -- that's their word, not mine, Your Honor

8    -- because covered voters were already receiving the

9    court-approved corrective notices that, again, remember

10   only went out to correct the misinformation that

11   Secretary Kobach was continuing to disseminate after the

12   preliminary injunction ruling.

13          On December 11th we got a second response

14   from Miss Becker.  That's Exhibit K.  It makes no

15   mention of any instruction whatsoever about the

16   postcards to county elections officials.  What it does

17   say about the postcards is that voters who are not

18   covered by the preliminary injunction are receiving the

19   postcards and that voters who are covered by the

20   injunction are receiving the court-approved corrective

21   notices.

22          And I just have to say, Your Honor, if it

23   were, in fact, the case that Secretary Kobach had given

24   this direction and that Mr. Caskey had given this verbal

25   instruction and that everyone in the Secretary of

1    State's Office believed that those instructions were

2    being followed, none of this back and forth would have

3    been necessary over the last few months.  All it would

4    have taken was one sentence from Miss Becker in one of

5    her letters to me to say we gave that instruction, we'll

6    do it again, problem solved.  But instead we fought

7    about this issue for months.  And only after that did we

8    file this motion for a preliminary -- for sanctions,

9    Your Honor.

10               So I just have to say it really begs the

11   question what were the last few months for?  What are we

12   even doing here today if these representations about

13   these instructions were actually correct?

14               One side note before I wrap up, Your Honor,

15   and it's that it seems like in large measure the problem

16   stems from how they're coding these voters in the ELVIS

17   system.  If they simply coded these voters covered by

18   injunction as active voters, Mr. Caskey's testimony was

19   that a postcard would be generated and it would be sent

20   to them.  They could also have reprogrammed the system

21   so that voters who were coded as being covered by the

22   preliminary injunction would similarly have postcards

23   automatically sent to them and they made no such efforts

24   to do those things.

25               In conclusion, Your Honor, it's not our job

 1    or the court's job to police every last detail of

 2    Secretary Kobach's interactions with covered motor-voter

 3    applicants.  Under Your Honor's ruling, those

 4    individuals are registered voters in Kansas.  They

 5    should be treated as registered voters in Kansas.  It's

 6    an election year this year, Your Honor, and there's no

 7    more time -- there's no more time for games.  This

 8    court's orders and the voting rights of the citizens of

 9    Kansas must be respected.  Thank you.

10              THE COURT:  Mr. Kobach, and you'd already

11    begun your argument and you can definitely reiterate

12    everything you said or however you want to proceed.

13              But I did note that you mentioned before

14    that until the plaintiffs' replied to this line of

15    motions back and forth about the contempt, plaintiffs'

16    contempt motion, you weren't aware of the transcript or

17    you didn't have the transcript of the phone hearing that

18    you all have with you.  But that transcript was filed on

19    the docket in 2016.  It was filed on the docket in this

20    case.  You should have been on notice of it and it was

21    there free to the world, including to the parties at

22    that point.  So, anyway, proceed.

23              MR. KOBACH:  Your Honor, just a

24    clarification of what Mr. Ho represented.  He --

25    Mr. Caskey did not testify that we never sent

1    instructions after the preliminary injunction.  He did

2    send them and his testimony was about the --

3    specifically October.  And so I think there was some --

4    the way Mr. Ho represented it, perhaps inadvertently,

5    was perhaps not exactly what Mr. Caskey said.

6           With respect to the standard postcards,

7    direction was given to staff to ensure that the

8    postcards to the in turn direct -- Mr. Caskey to in turn

9    direct the counties to send the postcards.  It appears

10   that some counties fail to send the standard postcards

11   in that brief three-week period running up to the

12   federal election of November.  They, of course, all did

13   send the special notice that gives the person -- gives

14   the person the option of going to the website or going

15   to the toll-free number to learn the specific polling

16   place.

17           So that then raises the question, well, if

18   the statements of the verbal conference are to be

19   incorporated into the written order, then that brings in

20   several legal -- first of all, we -- our office made a

21   good faith effort to comply with the court's verbal

22   statement during the order.  And we absolutely did and

23   it appears some of the counties failed to carry out the

24   instructions on their end.

25           But in terms of the law of whether a

1   contempt is appropriate here, we would say it's not

2   because you have several doctrines at work here.  One is

3   that any ambiguities in a written order must be

4   construed in favor of the target of the motion.  And

5   that's from the Tenth Circuit and it's 8 F.3rd, 377.  In

6   my haste to write it down, I forgot to write the case

7   name.

8              Secondly, the county officials are not my

9   agents and that's where we began here.  We asked them to

10  do things.  We plead with them to do things.  But we are

11  often frustrated when they don't do them on time or they

12  do them incompletely or in some instances they don't do

13  them at all.

14             Thirdly, there is the doctrine of mistake

15  which comes into play in contempt motions where if the

16  counties did fail, it was their mistake in not following

17  the verbal instructions given to them on the conference

18  call of October 5th.

19             And then, fourth, there's the legal doctrine

20  of substantial compliance.  And that is that certainly

21  the state was doing its best to substantially comply

22  with everything that was coming at us in terms of the

23  written orders, in terms of the directions, in terms of

24  suggestions from plaintiffs' counsel that orders should

25  be changed, modified, and the e-mail that went back and

1    forth about the varying definitions of what should be on

2    the website.  So we have -- we have been substantially

3    in compliance with respect to the written orders.

4    There's no question it has been exactly in compliance.

5            So the -- the legal doctrines of ambiguity,

6    lack of clear agency, mistake on the part of the

7    counties in failing to comply within a timely manner and

8    then substantial compliance are four legal doctrines

9    that would weigh against a contempt, which, of course,

10   is a very heavy order in this instance.  So legally we

11   don't think the contempt is warranted.  We have shown an

12   absolute willingness to do whatever the court wants us

13   to do in terms of ensuring that the counties get

14   whatever message the court wants to give them out to the

15   voters.

16           We can ensure going forward that all of the

17   -- whatever this court wants to do, a very express

18   direction that every person receives the postcard, the

19   standard postcard at a specific time, perhaps closer to

20   the election or it can be right now, we're certainly

21   willing to do that.  I think, frankly, people will pay

22   more attention to someone telling them where their

23   polling place is at the time the election approaches

24   than when the election is five months out.  Whenever the

25   court wants, we can ensure all these covered people

1    receive the special notice and postcard.

2          We can also ensure at the training in May

3    and regional meetings in April there is face-to-face

4    insistence by our office, please, counties, we want you

5    to do this.  This is very important to the court.  So

6    there is ample time to ensure that going forward there

7    is no lack of clarity on the part of the counties.

8          We do concede that the notation that

9    Mr. Caskey habitually puts in his e-mails may have led

10   to their mistake.  His notation "this supersedes all

11   prior orders" on this subject may have caused some

12   counties to make that mistake.

13          And, finally, with regard to the election

14   manual, the reason the election manual was taken down,

15   is that the election manual isn't updated every -- the

16   rules, especially in the context of this litigation do

17   change on a fairly frequent basis, because we've had

18   multiple -- we've had a preliminary injunction, then

19   we've had discussions about what notices should be sent.

20   And the manuals go into exacting detail what you send,

21   how you do it, how the election and the run up to the

22   elections is to be conducted.  Mr. Caskey doesn't revise

23   the entire manual.  Rather, he sends -- these e-mail

24   updates can be taken as revisions or supplements to the

25   manual.

1        And his plan, as he has told the rest of our

2   office, is to rewrite the whole manual again in the

3   coming year.  Is he still here?  My understanding some

4   time -- that that is in the near future.

5        THE COURT:  Isn't one of the advantages of

6   having something like this on-line you can readily make

7   changes to it and the county officials can be directed

8   by Mr. Caskey that the on-line version is going to be

9   more current than the -- than the written manuals

10  obviously, and the fact that you have a preliminary

11  injunction that affects a lot of provisions?  So I would

12  imagine the election manual, it would seem like you

13  would make it imperative to make modifications to the

14  on-line version and direct the counties to go to the

15  on-line version.

16       MR. KOBACH:  Your Honor, that would make

17  sense to me too.  Over the years I've been in the

18  office, I have deferred to Mr. Caskey on how he does

19  those directions and when he makes modifications to the

20  manual.

21       My guess -- he's not here.  My guess is that

22  he would -- that our office would say or he would say

23  that it focuses the attention of the county on the

24  specific change that's being made.  But certainly -- if

25  you send an e-mail about here's the change, here's the

1    new change in policy rather than just saying, okay,

2    here's version 25 of our manual, you know, please, see

3    page 13 for the -- for the revisions.

4         But if the court wishes us to more

5    frequently update the manuals, we can certainly pass

6    that direction -- the manual, singular, I should say not

7    manuals -- we can pass that direction on to Mr. Caskey

8    as well.

9         We are willing to do whatever the court

10   orders us to do in all these regards and we have the

11   luxury now of five months before the next federal

12   election to do that.  So if you want the manuals put

13   back on the website -- the manual put back on the

14   website --

15        THE COURT:  I certainly didn't order them to

16   come down.  It's news to me they came down.  Just

17   repeatedly it's been news to me things that you have

18   done and things that you haven't done.

19        I tell you that I want these special notices

20   to go out to tell people guess what, you are registered.

21   Because of the judge's preliminary injunction you are

22   registered.  So what you do is you draft a notice that

23   says you are registered for 2016 but going forward not.

24   I never told you that.

25        So when you talk about, oh, you know, it's

 1   been hard to keep up with all the different rules that

 2   change, there have been no rules that have changed.  My

 3   preliminary injunction has not changed.  The

 4   interpretation of that preliminary injunction has not

 5   changed.

 6           In my view, you have chosen to interpret it

 7   in a way to avoid, for whatever reason, being fully

 8   compliant with the preliminary injunction order.  You

 9   never should have put that language in there.  We

10   shouldn't have had to have a hearing where I told you

11   take it out, or I told you in e-mails to take it out

12   because it just introduced confusion.

13           Then we have a telephone conference.  We had

14   others, but we had a phone conference.  And I'm

15   concerned because I don't want these people to just get

16   the special notice.  I want the people to get the same

17   thing everybody else does because they're fully

18   registered.  And that's been another thing that

19   repeatedly you all have pushed back against the concept

20   that because of my preliminary injunction these folks

21   are not second class registered voters.  They are fully

22   registered voters to be treated the same as everyone

23   else.  That means they get the same postcards.

24           So I asked you that and you said -- you

25   assured me that they had or they would get the

1    postcards.  So it didn't find its way into the order

2    correcting the language that should be going out to them

3    as a special notice because these are a class of people

4    that have showed up at the polling place or they've been

5    given some sort of notice saying you're not registered.

6    We know you might have -- you know, maybe they thought,

7    when they left DMV, they were but now they get something

8    in the mail goes you're not registered.  So they're

9    confused.  They don't understand what happens.

10              So I had directed a special notice to cure

11   that problem but also I'd made it clear they're fully

12   registered voters.  And so when you start talking about,

13   oh, the rules have changed, we can't keep up with the

14   rules that come out of this court because they're just

15   dynamic and they are fluid, that is not true.

16              Every action that I've taken since the

17   preliminary injunction has been in response to

18   plaintiffs filing a motion with me to say the

19   Secretary's not fully compliant with your preliminary

20   injunction, now we found something else on the website,

21   now we found a different notice.

22              As Mr. Ho said, it's not plaintiffs' job to

23   figure out every one of your communications and every

24   one of your websites and every one of your notices.

25   It's your job to be fully compliant with the court's

1    order.  It's not my job to go rooting around trying to

2    figure out have you fully complied, changed the language

3    of something everyone might see out in the voting

4    public.

5              But we've had to police this.  I've had to

6    police this over and over again.  As things come to

7    plaintiffs' attention, they bring it to my attention.

8    And the pattern has been, oh, we'll fix it, we'll fix

9    it.  But we don't know what we don't know, Mr. Kobach.

10             So I just want the record to be clear this

11   isn't a situation where the Secretary of State has been

12   at a disadvantage because you're not clear on what the

13   rules are, I keep changing the rules.  I haven't changed

14   any rules.  The preliminary injunction says the same

15   thing today as it said back then.  It's still operative.

16             The real question here is why the Secretary

17   of State repeatedly has not complied with it until he's

18   called on it and then he fixes it and then finally we're

19   here today for a hearing about two other -- two more

20   components of something that seems like it hasn't been

21   fixed.  So I just want that to be clear.  There has been

22   no change of rules.  There's been no confusion and

23   there's been no ambiguity.

24             MR. KOBACH:  Your Honor, I do want to

25   clarify something.  I did not say that our office cannot

1    keep up with the changes in the court's orders.  I said

2    that Mr. Caskey does not change the manual every time

3    there is an applicable change in the rules or regs

4    governing elections because there are legal changes,

5    regulatory changes, changes from this court, changes

6    from other courts.

7              THE COURT:  Well, you should have changed

8    the manual about this because it affected initially over

9    35,000 people that wanted to register to vote.  Pretty

10   important that they've been told you're suspended or

11   canceled and now the court is telling them, no, you're

12   not, you're registered to vote.  That is a change that

13   should have found its way into every mailing, every

14   notice, every publication, every on-site informational

15   site that you put out there to supposedly educate the

16   voting public and supposedly to educate the people that

17   administer the election system at the county level.

18             MR. KOBACH:  And that, Your Honor, is why

19   the manual was taken down because it has not been

20   revised, the manual itself hasn't been revised since

21   2012.  So my guess is it will probably take Mr. Caskey

22   multiple months to bring the manual up to date.

23             THE COURT:  So as we sit here now the county

24   election officials -- Mr. Caskey, did an investigation.

25   The county election officials he talked to, three of

1    them in the, what did he say, second and fourth or

2    second, fourth and seventh largest counties, Sedgwick,

3    Shawnee, Riley, he talked to them; they didn't send out

4    the postcards.

5              MR. KOBACH:  Sedgwick did, Your Honor.

6              THE COURT:  Election manual, everybody is

7    operating with the election manual.  The on-line has

8    disappeared.  There's no dispute the election manual is

9    not up to date and not in compliance with the PI order.

10             MR. KOBACH:  What Mr. Caskey tells every

11   election officer, when they take office, here is a

12   written manual but there is a long chain of

13   supplementary e-mails you need to treat as amendments to

14   the manual.  So he would have to incorporate -- when he

15   does update the manual, he's going to have to

16   incorporate seven years of e-mail updates reflecting

17   changes in statute, changes in law and preliminary

18   injunctions and things like that.

19             I was not attempting to say at all the State

20   isn't able to keep up with the preliminary injunction,

21   just that that was why it was taken down.  Making it

22   accurate and up to date is going to be a many months

23   project by Mr. Caskey and his staff.

24             THE COURT:  Well, that's ridiculous.  It's a

25   ridiculous process an on-line publication can't be

1     updated except every seven years.  Anyway, so be it.

2          MR. KOBACH:  Your Honor, the State has

3     endeavored to treat these individuals as fully

4     registered from the perception of everywhere except in

5     the ELVIS system, from the perspective they are on the

6     poll book, from the perspective of the voter, from the

7     perspective of the notices they receive that they are

8     fully registered to vote.  And indeed court's -- the one

9     the court ordered that we went painstakingly through

10    with opposing counsel and the court makes it very clear

11    that they are fully registered to vote.

12          The voters and public see they are

13    registered.  The only distinction is inside -- the ELVIS

14    notations inside the database.  We explained this during

15    one of the teleconference hearings.  The classification

16    given to these affected voters is a separate

17    classification.

18          Whatever happens to this case on appeal, we

19    can say these are the individual voters, okay.  Now,

20    because of the Tenth Circuit confirming whatever

21    decision, they are now to be treated as -- you know,

22    there no longer is proof of citizenship at the DMV, so

23    therefore they should just go to standard active.  That

24    -- it's just an administrative thing on the inside of

25    the system so that -- so that we are able in the future

1   to comply with whatever court orders come down.

2   Otherwise, it would be nearly impossible to find these.

3             From the voters' perspective, they are fully

4   registered.  We have told them they are fully

5   registered.  We have repeatedly told them they are fully

6   registered.  Again, they are given multiple

7   opportunities to find their polling place in addition to

8   the postcard.

9             I just want to correct one statement.  While

10  Your Honor was rattling off counties, Sedgwick County

11  did send postcards in compliance with the verbal order

12  of Mr. Caskey.  They are, of course, the second largest

13  county in the state.

14            And so we will endeavor absolutely to

15  expressly do whatever this court tells us to do.  If you

16  want us to update the manual and put it back on the

17  website, I will direct Mr. Caskey to do it as quickly as

18  possible.  If you want us to direct every county in

19  writing to send both the postcard and the special notice

20  for affected voters, we will do that as well.  If you

21  want to direct us to do anything else sending to the

22  voters, we can do that as well.

23            And because we have the luxury of five

24  months of time until the next federal election, we can

25  absolutely follow up with each of the 105 counties and

1    confirm with them that they have done what we've

2    instructed them to do.

3           Again, because they -- they drag their feet,

4    because I can't fire them, because I can't technically

5    order them, I can only tell them what we believe the law

6    requires them to do, we don't always get -- if it's on a

7    short time frame, we don't always get complete

8    compliance.  But on a longer time frame like this, we

9    will have ample time to follow up, to harasses and

10   harangue any county that's dragging its feet and ensure

11   every single piece of information this court wants to

12   give is given to the counties.

13          And I want to represent my office has been

14   absolutely 100 percent complying with this court's

15   orders doing everything we can think of to do.  So I

16   acknowledge some of them didn't follow the verbal

17   instructions given by Mr. Caskey regarding the

18   postcards.  But I certainly would have no interest in

19   failure to comply with any court's order.

20          And our only issue that we have ever raised,

21   in terms of all the orders, is just that we want to have

22   these voters separately designated inside the system,

23   not -- just on the inside, on the back end, not where

24   people can see, but inside the system so that whenever

25   this case goes on appeal the future Secretary of State

1  will have the ability to do whatever the courts rule --

2  go whichever way the courts rule.

3            So we have these voters separately tracked

4  so that there is an ability to respond to the court's

5  order.  That's ultimately why we even insist on that.

6  It's just all about being able to comply with the

7  court's orders and do whatever the court wishes that we

8  do here.  So thank you.  We now rest.

9            THE COURT:  Plaintiff can have the last word

10  if he so choose.

11            MR. HO:  Nothing further from us, Your

12  Honor.

13            THE COURT:  All right.  I'll consider this

14  under submission, issue a written decision.  All right.

15  We'll be in recess until 1:30.

16            (Proceedings adjourned.)

17

18                     CERTIFICATE

19      I certify that the foregoing is a correct

20  transcript from the record of proceedings in the

21  above-entitled matter.

22      DATE:  March 26, 2018

23

24            /s/Kimberly R. Greiner
            KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
            United States Court Reporter

25