## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **STEVEN WAYNE FISH, ET AL.,** | |
| **Plaintiffs,** | |
| **v.** | **Case No. 16-2105-JAR** |
| **KRIS KOBACH, KANSAS SECRETARY OF STATE,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

This matter comes before the Court on Plaintiffs' Motion to Enforce Court Orders and for Order to Show Cause Why Defendant Kobach Should Not be Held in Contempt (Doc. 423).  The motion is fully briefed, and the Court conducted an evidentiary show cause hearing on this motion after the conclusion of trial on March 20, 2018.  In addition to the briefing and the evidence and argument presented at the hearing, the Court has considered Defendant's March 22, 2018 supplemental response, and Mr. Bryan Caskey's April 3, 2018 affidavit.[1]  For the reasons explained below, the Court grants Plaintiffs' motion for contempt and awards them reasonable attorney fees expended litigating this motion.  Any further remedies shall be deferred until after the Court issues its post-trial findings of fact and conclusions of law.

### I.      Background

On May 17, 2016, the Court issued an extensive Memorandum and Order granting in part Plaintiffs' motion for a preliminary injunction barring enforcement of the Kansas Documentary Proof of Citizenship ("DPOC") law until this case alleging a violation of § 5 of the National

---

[1]Doc. 499.

Voter Registration Act ("NVRA") could be decided on the merits.[2]  The preliminary injunction order became effective June 14, 2016,[3] and provides in relevant part:

> Defendants are hereby enjoined from enforcing K.S.A. § 25-2309(l) as to individuals who apply to register to vote in federal elections at the same time they apply for or renew a driver's license. The Secretary of State is directed to register for federal elections all otherwise eligible motor voter registration applicants that have been cancelled or are in suspense due solely to their failure to provide DPOC.[4]

Defendant sought and was denied a stay pending appeal.  On September 23, 2016, Shawnee County District Court Judge Larry D. Hendricks ordered Defendant to provide notice to all voters impacted by this Court's preliminary injunction ruling that they would be "deemed registered and qualified to vote for the appropriate local, state, and federal elections for purposes of the November 8, 2016 general election, subject only to further official notice."[5]

Also on September 23, 2016, while the appeal in this case was still pending, Plaintiffs filed a Motion to Enforce Preliminary Injunction; for Order to Show Cause Why Defendant Kobach Should not be Held in Contempt; and for Expedited Briefing and Hearing.[6]  The motion set forth compelling evidence that Defendant was in violation of the Court's preliminary injunction by: (1) failing to add covered voters to the official registration list and poll books; (2) forcing covered voters to use provisional ballots; and (3) issuing confusing and misleading notices to voters regarding their registration status.  Indeed, at the recent trial, Plaintiff Charles

---

[2]189 F. Supp. 3d 1107 (D. Kan. 2016).

[3]Doc. 145.

[4]189 F. Supp. 3d at 1152.  In addition to the Court's order in this case requiring Defendant to register all motor voter registrants who had been deemed incomplete or cancelled for failure to provide DPOC, there is a preliminary injunction in place prohibiting state-specific instructions on the Federal mail-in form that would require an applicant to produce DPOC.  *League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016), *rev'g* 195 F. Supp. 80 (D.D.C. 2016).

[5]*Brown v. Kobach*, No. 2016-CV-550, slip op. at 3–4 (Shawnee Cty. Dist. Ct. Sept. 23, 2016).

[6]Doc. 220.

Stricker testified that he took steps in September 2016 to make sure he was registered in time for the upcoming general election.  He called the Sedgwick County, Kansas election office and the person with whom Mr. Stricker spoke stated that he was not sure whether Mr. Stricker would be allowed to vote.  Mr. Stricker was told it was complicated because there were legal issues "up in the air."  When Mr. Stricker checked online to see if he was registered, there was no record of his registration.[7]

The Court ordered Defendant to appear in person on Friday, September 30, 2016, to show cause why he should not be held in contempt given the allegations set forth in Plaintiffs' motion that he was not in compliance with the Court's preliminary injunction order.  Among other things, Plaintiffs submitted evidence that the official notices received by registration applicants covered by the order, Defendant's websites, and the DMV receipt continued to suggest applicants must submit DPOC to vote in the general election, or that their status was unclear.  On September 29, 2016, the parties filed a Joint Status Report setting forth an interim agreement on the matters raised in Plaintiffs' motion for contempt.  Part of this agreement was that Defendant:

> will instruct the county election officials to send out a new notice that unequivocally advises covered voters that they "are deemed registered and qualified to vote for the appropriate local, state, and federal elections for purposes of the November 8, 2016 general election, subject only to further official notice." The parties will prepare a draft notice for this Court's review, revision, and approval. Upon approval by this Court, Defendant will direct county election officials to send the approved notice to covered voters on or before October 12, 2016.[8]

---

[7]Neither party established with Mr. Stricker during trial whether he in fact received the three separate and inconsistent notices in his ELVIS record from 2016: (1) a notice telling him that while the Court's preliminary injunction entitled him to vote for federal office in November, he could not vote for other offices until he submitted DPOC; (2) a notice stating that he was fully registered because the Sedgwick County election office had located a Kansas birth certificate, despite the fact that Mr. Stricker was born in Missouri; and (3) the Court-approved notice stating that he should disregard prior notices that may have been confusing and that he is deemed fully registered subject only to official notice.  Ex. 838.

[8]Doc. 225 at 2 ¶ 1.

The Court cancelled the show cause hearing, but ordered the parties to submit to the Court a draft of the proposed notice referenced in the joint status report that would be sent to those Kansas voter registrants affected by the Court's preliminary injunction order and a related state court matter.  On October 3, 2016, the parties submitted their proposed curative notices to the Court by e-mail.  The following day, the Court sent the parties by e-mail its revised notice. The Court discussed this notice with the parties at an October 5, 2016 telephone conference, and reached agreement as to its language.  Again, this notice was written to remedy prior notices sent by Defendant that incorrectly suggested to voters that their registration status was uncertain.

During the October 5 status conference, Plaintiffs also expressed concern about notice language on the Secretary of State's websites and at the DMV in advance of the November 2016 general election.  The Court made clear that it held Secretary Kobach responsible for correcting the information on the State's website to provide guidance to Kansas citizens seeking registration information, and that the notices at the DMV given to new motor voter registrants also must be modified.  The Court asked Defendant, who appeared on his own behalf, questions about his compliance with the preliminary injunction order.  The Court specifically addressed whether voters covered by the preliminary injunction order would receive the official Kansas postcards confirming their registration, and providing their polling place:

> The Court: . . . here's . . . another question I have.  Most of us receive these postcards through the mail that tells us where our precinct is and where to go vote.  And I was wondering what— so the— 17,000 people, or however many it is, that are going to get the notice, are they going to also receive the postcard?  I mean, how will they know where to go vote?
>
> Mr. Kobach: Your Honor, this is Kris Kobach.  They will get the same notice that others— that other voters get, that it notifies you of your polling place.

> The Court: Okay. Great.  And it doesn't matter that this is happening at this point in October, they should— they should still be on track for getting the postcards in the mail; is that correct?
>
> Mr. Kobach: Your Honor, you mentioned a moment ago to update county websites too. . . .[9]

Defendant never answered the Court's second, confirmatory question directly.[10]

The Court heard evidence at trial and at the show cause hearing that a certificate of registration, sometimes referred to as a notice of disposition, is a postcard mailed to those who successfully register to vote in Kansas, which contains the voter's voting precinct, party affiliation, polling location, and the voter's districts for various offices, including for the United States House of Representatives ("postcards").  The postcards are typically sent two to four weeks after a person's voter registration application becomes "active" in the Kansas voter registration database.  Other than the initial postcard after registration, and when a voter's polling place changes, the frequency with which these postcards are sent to registered voters varies by county and is left to each county's discretion.  Kansans traditionally consider these postcards as confirmation that they are successfully registered to vote.

The Court followed up the status conference with an Order on October 14, 2016,[11] addressing certain issues raised at the status conference, and addressing an October 13, 2016

---

[9]Doc. 232 at 15:4–21.

[10]At the end of the hearing, Plaintiffs' counsel asked for clarification about what notice "new DMV registrants will receive."  Specifically, he wanted to know whether they would "receive the same notice that every other registered voter receives or that we'll see a copy of that notice before it's issued."  Doc. 232 at 21:20–22:1. Defendant replied that Plaintiffs were seeking a DMV-issued notice and he would provide revised wording to counsel.  This exchange referred to the notice provided to new registrants at the DMV, and adds no ambiguity to whether standard postcards should have been sent to covered registrants confirming their registration status just like all other registered voters. In its October 14, 2016 Order, this Court set forth approved language for the DMV receipt provided to voter registration applicants when they apply to register when obtaining a driver's license.

[11]Doc. 241.

Joint Status Report filed by the parties, which presented three more notices in dispute.  The Court recounted the issues discussed at the October 5 status conference, and reiterated that "Secretary Kobach was responsible for correcting the information on the State's website to provide clear guidance to Kansas citizens seeking registration information."[12]  Because the Court was satisfied by Defendant's assurance at the October 5 status conference that the standard postcards would be sent to all registrants covered by the Court's order, no specific mandate to send notice of disposition postcards was included in the October 14 order.

Since the election, Plaintiffs' counsel has continued to monitor Defendant's compliance with the Court's preliminary injunction, and has submitted evidence of its repeated efforts beginning in July 2017 to seek removal of language from the Kansas Secretary of State's website suggesting that covered applicants' registration status is unknown for elections that take place after November 2016.  The parties were ultimately able to resolve most of these issues.

In late 2017, Plaintiffs' counsel learned that motor voter and federal form registrants covered by this Court's preliminary injunction and other courts' orders had not received notice of disposition postcards.  Plaintiffs' counsel first notified Defendant on November 10, 2017, that they believed he was required to send these postcards under the preliminary injunction order.[13] The letter therefore asked Defendant to "instruct all local elections authorities to send certificates of registration to all voters registered pursuant to th[o]se court orders immediately."[14]  On behalf of Defendant, counsel Sue Becker responded to this letter on November 21, 2017, stating that the postcards are unnecessary because "those who register to vote using the federal form or the

---

[12]*Id.* at 3.

[13]Doc. 424 Ex. F.

[14]*Id.*

6

motor-voter form but do not provide DPOC receive the court ordered notices" instead.[15]

Plaintiffs' counsel's November 10 letter also addressed concerns with the County Election Manual.  At the time counsel sent this letter, the County Election Manual was publicly available on the Kansas Secretary of State's website at https://www.kssos.org/forms/elections/ County% 20Election%20Manual%20(Combined).pdf.  It is a reference guide for Kansas county election officials containing the policies and directives of the Secretary of State's office.  The November 10 letter explained to Defendant that the chapter on voter registration in the County Election Manual incorrectly states that "[a]ny person who registers to vote for the first time in Kansas must provide DPOC," and asked Defendant to revise the identified language immediately.  In Ms. Becker's November 21 response letter, she declined to correct the County Election Manual, claiming that it is only an internal document currently scheduled for revision in 2018, and that it is only revised to reflect "permanent" changes in the law.  She stated that any modifications to the manual are communicated to the counties in "real time email or telephonic communications."[16]

The parties met and conferred on December 7, 2017.  During the meet-and-confer, Defendant's counsel stated that Defendant would not instruct local elections authorities to send postcards to individuals who registered to vote at the DMV or who registered to vote using the Federal Form, but who failed to provide DPOC.  Defendant's counsel claimed that these postcards are unnecessary because covered voters receive the notices that this Court approved in October 2016.  Defendant's counsel also refused to make modifications to the County Election Manual, reiterating that it is scheduled to be revised by June 2018, but that even if this Court

---

[15]Doc. 424, Ex. H.

[16]*Id.*

were to issue final judgment against Defendant, he would not modify the language in the County Elections Manual to reflect such a judgment unless and until all appeals were exhausted. Ms. Becker reiterated these positions in a December 11, 2017 letter to Plaintiffs' counsel: Defendant will not send the postcards to "covered individuals," and will not change the County Election Manual until there is a change in the law.

Plaintiffs then filed the instant motion asking the Court to direct Defendant to show cause why he should not be held in contempt for failing to abide by this Court's preliminary injunction order, and its October 14, 2016 order on noticing. Defendant responded and took the same position he took in Ms. Becker's letters to Plaintiffs—that Defendant was not required to send postcards and instead was only required to send the Court-approved notices in October 2016, and that the County Election Manual is only periodically revised, with interim emails to the counties informing them of the correct procedure to comply with the Court's orders. Defendant submitted no evidence to the Court with his response. In reply, Plaintiffs pointed to the Court's colloquy with Defendant at the October 5, 2016 status conference where he represented that the postcards would be sent.

The Court scheduled the show cause hearing to immediately follow the bench trial in this case. During her opening statement at the March 20 hearing, Ms. Becker for the first time claimed that Defendant in fact sent postcards to covered individuals before the November 2016 election, a position not taken in any of the letters Ms. Becker sent at the end of 2017, nor in her response to the motion. It also quickly became apparent that Defendant had no intention of putting evidence of his compliance before the Court until prompted to do so. Defendant eventually produced Mr. Caskey, the Assistant Secretary of State, Elections and Legislative Matters for the State of Kansas. Mr. Caskey had testified several days earlier at trial about the

issue of the postcards.  His trial testimony was consistent with Ms. Becker's 2017 letters to

Plaintiffs' counsel: that individuals covered by the Court's preliminary injunction order receive

the notice approved by the Court at the October 5, 2016 status conference.[17]  After repeatedly

refusing to directly answer Plaintiffs' counsel's yes or no questions on this subject at trial, the

Court eventually intervened and reworded the question, "In other words, when you say that you

have instructed them to provide all of the notices and information that this court has ordered, is

that the same universe of information that other voters that were not on the suspense list received

from the state of Kansas?"[18]  After what the Court recounts was a lengthy pause, the following

exchange ensued:

> THE WITNESS: It is not the same information. We have complied
> with every court order that has been issued regarding this class of
> individuals, but we have said explicitly that we have to track this
> group of persons differently than we track every other registered
> voter for purposes of this litigation. And we have complied with
> every court order as relates to that and no one has told me we
> haven't.  I mean, we -- there have been lots of discussions about
> notices and -- notices on websites and notices to voters and notices
> provided to DMV.  And, to the best of my knowledge, everyone's
> in agreement on what's being sent and what hasn't so --
>
> THE COURT: All right. Let me get some clarification. When you
> say "court orders," you're including oral orders, are you not?
>
> THE WITNESS: Yes.
>
> THE COURT: So you are sending postcards to all of these people?
> Because I ordered Mr. Kobach to do that in a status hearing that I
> had with him probably well more than a year ago.
>
> THE WITNESS: All persons receive a notice, yes.

---

[17]*See* Doc. 508 at 29:14–15 ("He would receive the notice that's been required by the court in the course of
this litigation); 942:8–9, 17–18 (indicating that he has complied with the court orders when asked if he has
instructed county election officials to provide the same information to covered individuals as to other registrants).

[18]*Id.* at 943:5–10.

THE COURT: Postcards, the same postcards that you and I receive, those -- the standard postcard notices that tell them where to go vote and what their precinct number is, et cetera, does everybody receive those, all the people involved in this case on this suspense list?

THE WITNESS: I would have to verify that. Off the top of my head, I just don't want to say positively for all 105 counties. I just would need to check before I can say that definitively. And I can do so before the end of this litigation.

THE COURT: Okay.

THE WITNESS: Before the end of this trial, I can do that.[19]

The Court was not provided with a verification from Mr. Caskey before the end of trial, but at the show cause hearing, he again testified on this subject. Mr. Caskey testified that he now recalls giving an oral instruction to county election officials on October 5 or 6, 2016, the day after the Court's status conference, to send out standard postcards to all individuals covered by the Court's preliminary injunction order. He claimed that after his trial testimony, he consulted his calendar and determined that he instructed the counties about notices on that date. Nonetheless, when pressed, Mr. Caskey admitted:

I am positive that a notice was required to be sent to the voters and that notice included the ability to find where your polling place is and an ability to know that you were considered registered to vote. And the court drafted the notice and so I am positive that that notice reflects the court's decision.

I personally have been unsure at times if there was an additional notice required by the court based on my review of written orders. For the time period that you speak, during that entire time period, I have not always been sure exactly what the court's directive is as regarded two pieces of paper instead of one.[20]

Mr. Caskey testified that on October 12, 2016, he sent an e-mail to the counties

---

[19]*Id.* at 943:24–944:22.

[20]Doc. 516 at 72:25–73:12.

explaining the special notice language they were to send to covered applicants making clear they were fully registered to vote, and eliminating Defendant's proposed language suggesting their status was uncertain and temporary.  Mr. Caskey pointed to language at the end of his email stating that "[t]his document replaces all documents previously issued by this office concerning this topic."[21]  Defendant suggests that this language may have inadvertently communicated to the county election officials that Mr. Caskey's previous oral directive to send standard postcards to covered individuals was superseded by this directive to send the specific notices approved by the Court.  Mr. Caskey testified that since the time of his trial testimony on March 8–9, he asked four county election officials whether they sent standard postcards when directed in October 2016, and received confirmation that three out of four had not.  Sedgwick County was the only county that Mr. Caskey could confirm sent the standard postcards.

In addition to Mr. Caskey's testimony, Defendant addressed the Court and represented that he directed his staff to ensure that the counties sent standard postcards before the 2016 general election: "I'm telling you now that I directed the staff to make sure that that would happen.  It appears that I had a greater deal of confidence in what the counties would do when instructed immediately over, the telephone than what they actually did."[22]

Defendant explained at the hearing that the County Election Manual has been taken offline.  Mr. Caskey testified that this document was last revised in 2012 to reflect the DPOC law, and that it is not his office's practice to update the document as procedures change.  Mr. Caskey testified that he instead sends regular emails to the counties providing guidance, with the same standard language in Exhibit 1 instructing them that his email directive supersedes prior

---

[21]Def. Ex. 1 & attach. at 2.

[22]Doc. 516 at 112:5–9.

written documents on a subject.

After the hearing, Defendant supplemented the record with two affidavits by Mr. Caskey. In his March 22, 2018 Affidavit, Mr. Caskey attests that he sent the following written directive by email to all county election officials in Kansas:

> Dear County Election Officers:
> In the event that your county is not already doing so, every person who applies to register to vote at a Division of Motor Vehicles office and does not provide proof of citizenship and every person who applies to register to vote using the federal voter registration application and does not provide proof of citizenship must be sent TWO notices. The first notice should be the attached notice that has been sent since October 2016 and was subsequently modified in December of 2017. The second notice is the standard postcard informing the voter of his or her polling place and district assignments. These two notices should be sent at the same time. In addition, every person who is currently in suspense with a reason of applying to register to vote at a Division of Motor Vehicles office or with the federal form and has not provided proof of citizenship, must be sent the standard postcard, even if one has already been sent. Thus, although each person should have already received notices, our office would like the postcard and the attached notice to be sent again. The deadline for this to be completed is Friday, April 6th, 2018. Once every person has been sent these notices, please inform me.[23]

On April 3, 2018, Mr. Caskey filed another affidavit explaining that he has received confirmation from 49 counties that they have sent standard postcards to all covered residents. He states that he will be reminding the counties during a weekly conference call the week of April 9, and that he will call the individual counties that have not complied.[24]

## II.    Discussion

Plaintiffs' January 8, 2018 motion argues that Defendant violated the preliminary

---

[23]Doc. 499.  The Court notes that Mr. Caskey's language in this notice suggests that the counties continue to treat the voters affected by this Court's order as "in suspense," instead of registered per the Court's preliminary injunction order, and in violation of the Court's preliminary injunction order.

[24]Doc. 517.

injunction order, and the October 14, 2016 order governing notices.  Plaintiffs ask the Court to impose sanctions, including an order directing Defendant to: (1) instruct local elections authorities to send certificates of registration, i.e. registration postcards, to individuals who registered to vote at the DMV or using the Federal Form, regardless of whether such registrants have submitted DPOC; and (2) correct the County Election Manual to make clear that individuals who apply to register to vote through the DMV or using the Federal Form need not submit DPOC.  Plaintiffs also seek attorney fees they incurred in preparing the motion.

Civil contempt sanctions are considered coercive and are "designed to compel future compliance with a court order," or to be compensatory.[25]  To prove civil contempt, Plaintiffs must show by clear and convincing evidence that (1) a valid court order existed; (2) Defendant had knowledge of the order; and (3) Defendant disobeyed the order.[26]

### A.    Valid Court Order and Defendant's Knowledge

The Court finds by clear and convincing evidence that a valid court order existed requiring Defendant to "register for federal elections all otherwise eligible motor voter registration applicants that have been cancelled or are in suspense due solely to their failure to provide DPOC" and that Defendant had knowledge of the order.  The term "register" is not ambiguous, nor should there have been any question that these voters were to be treated just like any other registered voter prior to the 2016 election, particularly after the state court decision requiring him to register them for state and local elections as well.

Defendant argues that the Court's orders were not clear that standard postcards must be sent, or that the County Election Manual must be updated.  The Court disagrees.  First,

---

[25] *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827–29 (1994).

[26] *E.g., Phone Directories Co. v. Clark*, 209 F. App'x 808, 813 (10th Cir. 2006); *FTC v. Kuykendall*, 371 F.3d 745, 756 (10th Cir. 2004).

Defendant's acknowledgments in open court belie this argument.  He admitted several times during the hearing that he understood the Court's order meant he was to treat those covered by the preliminary injunction the same as all other registered voters, which included sending the standard postcard upon registration.  Second, it would be impossible for Defendant to fully comply with this Court's orders unless he provided clear and unambiguous direction to the counties, and ensured their compliance.  He is the chief election official for the State of Kansas, charged with enforcing the NVRA.  The Court made clear to him at the October 5 conference that it expected him to ensure the counties' compliance:

> Well, I'm holding you responsible for directing them to and mandating them to, because you're the Secretary of State. And you are the-- you are the No. 1 authority and-- and it is your responsibility to manage elections in Kansas.  So I know a lot of it is administered at the county level, but I think you have the authority to mandate that they do it.  And then-- and then tell them to tell you that they've complied, so that you can share that with the Court. I know you can't physically go perhaps to the county election office and do it yourself, but you certainly can direct and mandate them to do it, just like you did tell them what to do when the, you know, DPOC law came into being. I mean, you directed them what to do in response to that.  So I think you have to direct them what to do in response to this as well.
>
> . . . .
>
> They have-- they take their direction from you on this.  And I think it's your responsibility to give them that direction. I understand some of them may be able to change it tomorrow and some it may take longer.  But they've got to do it. And for sure when people are calling in, because people are confused-- I mean, we've had calls to this office. And I'm not in a position to take calls and answer questions.  But if people are calling their county election offices, they need to get the right information.  And the only way apparently that's going to happen in some counties is if you set them straight.  So I expect you to do that, Mr. Kobach, that's your job obviously.  All right.[27]

---

[27]Doc. 232 at 16:4–20.

If there was any confusion about Defendant's responsibilities after the Court issued its clearly worded preliminary injunction order in May 2016,[28] the Court's oral directives should have left Defendant without question about his duties after October 5, 2016.  Mr. Caskey was not on the entire call and is not an attorney; he certainly is not the chief election official for the State of Kansas.  The Court holds Defendant responsible for complying with the Court's Orders.

At the show cause hearing, Defendant disingenuously suggested that he had insufficient time in 2016 to make changes to comply with the Court's orders.  But the curative actions necessitated by the first motion for contempt and the Court's October 14, 2016 notice order were the result of confusing and inconsistent information published to the public by Defendant between May and October 2016.  Defendant also disingenuously argued at the show cause hearing that the Court's orders were ambiguous, dynamic or fluid, and represented continuing changes in rules.  On the contrary, the status conference and notice order were corrective and curative measures taken in response to Plaintiffs' seriatim discoveries that Defendant was not complying with the preliminary injunction in various publications meant to inform the county election officials, the registrants affected by the order, and the voting population at large. Defendant's confusing notices, and his patent failure to fully inform and monitor compliance with the preliminary injunction order caused confusion and misinformation.  Among the plethora of evidence demonstrating this confusion is the trial testimony of Mr. Stricker, who called the Sedgwick County Election office prior to the election, and was told they did not know whether he was registered because of the complicated legal issues involved.  Defendant should have been well aware of this concern, given Plaintiffs' report at the October 5, 2016 status conference that

---

[28]The Court incorporates by reference its admonishment to Defendant at the show cause hearing regarding his claims of confusion.  Doc. 516 at 125:15–128:23 (stating, in part, "The preliminary injunction says the same thing today as it said back then.  It's still operative. . . .  There has been no change of rules.  There's been no confusion and there's been no ambiguity.").

county election officials had been giving incorrect information to callers asking about their registration status, and this Court's report that it had received calls from confused citizens.

Defendant has a history of noncompliance with the preliminary injunction order.  He not only willfully failed to comply with the preliminary injunction for five months, but then only partially complied in October 2016 upon the threat of contempt.  After that, Defendant failed to ensure that registered voters received the standard notification of disposition postcards, despite his assurance to this Court at the October 5 status conference that they would be sent.  To the extent Defendant had any question about the scope of the Court's unambiguous directive to register covered applicants, there could be no confusion after the October 5, 2016 status conference when the Court made plain its expectation that those covered by the Court's preliminary injunction should be treated like all other registered voters, which included receiving those standard postcards.  Defendant himself admitted at the March 20 hearing that he understood that individuals covered by the preliminary injunction order should be treated no different from all other registered voters.  And he indicated he understood the Court's expectations when he represented to the Court that he personally directed his staff to ensure that the postcards would be sent, and that he would "continue to notify the counties of what their responsibilities are and what the rules are."[29]  The Court finds by clear and convincing evidence that Defendant had knowledge of this Court's valid court orders.

### B.    Violations of Court Order

#### 1.    Certificates of Registration

Up until March 20, 2018, Defendant took the position that the Court's orders directed him to send only the notices containing the Court-approved curative language about the change

---

[29]Doc. 232:18:17–19.

in covered registrants' status for purposes of the November 2016 election.  He argued that by approving these notices, the Court implicitly excused him from sending the standard postcards that are otherwise sent to all registered voters to confirm their registration and provide their polling place.  It was only on March 20, 2018, at the show cause hearing, that defense counsel for the first time informed the Court that Defendant instructed his staff to ensure that the standard postcards were sent to covered registrants, and that Mr. Caskey in fact orally instructed the counties to send standard postcards in October 2016.  Also at the March 20 hearing, Defendant offered to direct the counties to resend the standard postcards.

While the Court recognizes Mr. Caskey's hearing testimony, and his recently-filed affidavits demonstrating that he has now directed the counties to send standard postcards, the Court finds that this effort is "too little, too late" to avoid a contempt finding.  Plaintiffs first notified Defendant that they believed the postcards had not been and should be sent to covered registrants on November 10, 2017.  Ms. Becker adamantly denied that this was required by the Court's preliminary injunction order, and repeatedly refused on Defendant's behalf to send out the postcards.  The motion for contempt was filed on January 8, 2018.  Again, in response to the motion, Ms. Becker insisted Defendant was not required to send these postcards.  It was not until the hearing on the motion more than two months later that Defendant changed course and (1) claimed he had personally directed his staff to ensure that postcards be sent; (2) claimed that Mr. Caskey had in fact directed the counties to send standard postcards, but that the directive was inadvertently superseded by his later instruction about the Court-approved special notices; and (3) promised to send the standard postcards now.[30]

---

[30]Even at the show cause hearing, Ms. Becker began her opening statement by arguing that the Court's orders did not require that postcards be sent to affected voters.

Defendant's three new claims are insufficient to avoid contempt for several reasons.  First and foremost, the Court does not find Mr. Caskey's testimony to be credible.  It strains credulity to believe that Mr. Caskey, after months of denying that the Court's orders required him to send standard postcards to covered registrants, remembered a few days before the show cause hearing that he had in fact orally instructed the counties to send them.  At trial, Mr. Caskey had no recollection of sending those postcards and repeatedly avoided directly answering questions about whether they were sent.  He testified that he believed he had complied with the Court's orders, which he understood only required the notice language the Court had helped draft back in October 2016.  Mr. Caskey did not recall specifically whether he had directed that the standard postcards be sent.  And at the show cause hearing, despite his newfound recollection about his oral instruction in October 2016, Mr. Caskey contradicted himself on cross-examination and admitted that he had not been sure whether both the standard postcards and the Court-approved notices must be sent to covered registrants, that his written instructions to the counties never instructed them to send the standard postcards, and that in the "million conversations" he has had with Defendant over the last eighteen months, he cannot recall Defendant ever telling him that he had assured the Court that the standard postcards must be sent.

Moreover, even if Mr. Caskey's eleventh hour recollection is to be believed, he offered no further proof to corroborate it.  He claimed that his recollection was refreshed by reviewing his calendar, but that was not in evidence.  He claimed he informally spoke to four county officials about whether they sent the standard postcards in October 2016 after this oral instruction, but did not offer evidence from those counties about what they were instructed to send.  In fact, his testimony that three out of the four counties he informally polled told him that they *did not* send the standard postcards is persuasive evidence that Mr. Caskey did not ensure

that the counties understood they were to be sent.  Mr. Caskey's inconsistent and evasive testimony does not persuade the Court that he treated the registration applicants covered by this Court's preliminary injunction order the same as all other registrants by the Secretary of State's Office; they were not sent the documentary confirmation that all other Kansas registrants receive, and have come to expect, to be assured that they are registered and where they are to vote.

Finally, the Court is troubled by Defendant's failure to take responsibility for violating this Court's orders, and for failing to ensure compliance over an issue that he explicitly represented to the Court had been accomplished.  For the first time since this dispute arose, Defendant told the Court at the show cause hearing that he personally directed his staff to ensure that the counties sent the standard postcards to registrants covered by the preliminary injunction order.  Assuming this statement is true, as the Court must given Defendant's status as an officer of the Court, he apparently took no steps to personally ensure compliance with this directive, despite his status as chief election official for the State of Kansas.  Instead, Defendant deflected blame for his failure to comply onto county officials, and onto his own staff, some of whom are not licensed attorneys.[31]  The letters from Plaintiffs seeking compliance with these issues were directed to Defendant.  The motion for contempt was directed to Defendant.  It was Defendant's duty to ensure that the counties complied with the Court's Orders, a duty this Court made crystal clear to him back on October 5, 2016.  As such, Defendant and not his staff, should bear the burden of sanctions for the lengthy delay in compliance.

---

[31]During his redirect examination of Mr. Caskey, Defendant asked him if he received direction from Sue Becker, Garret Roe, another attorney in his office, or from his paralegal.  This line of questioning was meant to suggest that if Mr. Caskey did not learn from Defendant about the need to send out postcards, then the fault must lay with someone else in his office.  Doc. 516 at 104:8–105:17.

### 2.  County Election Manual

It appears plain to the Court that to comply with the Court's preliminary injunction, Defendant was required to work closely with county election officials to ensure they were properly trained and informed so that they could execute the law as modified by the Court in that order.  It also required Defendant to take steps to ensure that the public understood the law as modified by the Court—that they may register to vote at the DMV without accompanying DPOC.  It is undisputed that the online document maintained by Defendant's office and used to communicate policy and training to the counties was not updated to reflect the Court's ruling.  Instead, the County Election Manual continued to advise the counties that DPOC was required of all voter registration applicants.  According to Mr. Caskey, this document was last revised in 2012, but he communicated interim updates to the counties by e-mail, including updates based on the Court's orders.  Mr. Caskey intends to revise the document again sometime this year.  If this document was only available internally, the Court would be persuaded that Defendant did not disobey the Court's order.  But it was publicly available; the e-mails updating the document were not.

For the first time at the show cause hearing, Defendant shared with the Court that the manual had been taken offline "several weeks ago" in response to Plaintiffs' complaints.[32]  Yet, as with the postcard issue, Defendant waited until Plaintiffs exhausted informal channels to remedy the problem, and allowed Plaintiffs to fully brief a contempt motion and prepare for a show cause hearing before taking this step.

Moreover, Defendant's basis for failing to update an *online* document is nonsensical.  He maintains that Mr. Caskey's policy is to revise the manual every six years, and that interim

---

[32]Doc. 516 at 48:7–8.

updates are made by e-mail to the 105 county election officials whose offices rely on it.

Apparently, rather than update a centralized online training document for the counties' reference,

each of the 105 counties are expected to archive and search for updates in the many emails they

receive from the Secretary of State's Office over a six-year period until a revision is completed.

Mr. Caskey, who is charged with this document's maintenance, testified that he was "too busy"

to update the manual in 2016.

Defendant's rationale for this inefficient procedure is that the County Election Manual

only includes "permanent" changes in the law, whereas the Court's order was merely a

temporary injunction.  This is part of the general theme of Defendant's compliance with the

preliminary injunction order—that this Court's order is not "the law."  Apparently, at the parties'

meet and confer session, Defendant represented that an update to the manual was not warranted

unless and until the Supreme Court either rules against Defendant on the merits, or denies a

petition for certiorari from an unfavorable decision before the Tenth Circuit Court of Appeals, a

process that could take years.[33]  Likewise, Defendant argued at the hearing that he had no control

over the county election officials, except to ensure that they complied with "the law," which he

apparently interprets to only mean the DPOC law.

This publication is the policy and training Bible for the 105 county election officials.  As

a result, Defendant ensured that the manual was amended to reflect the SAFE Act and its new

DPOC requirement for voting registrations in 2012.  Given that the Court's preliminary

injunction was issued almost two years ago in May 2016, four years after the last revision, the

Court does not find credible Defendant's rationale for not amending the document.  Moreover,

taking the manual offline, almost two years later, means that the counties' only resource is the

---

[33]Doc. 424, Ex. B at 1.

written, unmodified manual; as well as verbal or written direction Mr. Caskey gave them on regular statewide phone calls and/or e-mails.  The result of Defendant's willful failure to direct and ensure that Mr. Caskey modified the election manual was confusion.  Registrants affected by the preliminary injunction order were confused.  And the county election officials, who should have informed and assured these registrants that they were fully registered, were also confused, as demonstrated by Mr. Stricker's phone call to the Sedgwick County election office in September 2016.

The Court finds by clear and convincing evidence that Defendant disobeyed this Court's preliminary injunction order when he failed to ensure that voter registration applicants covered by the preliminary injunction order became fully registered, a process that required accurate and consistent information be provided to county election officials, individuals impacted by the preliminary injunction, and the public.  The Court heard evidence at trial that fully registered voters in Kansas receive a standard postcard from their counties, confirming their registration and instructing them of their polling place.  Kansans have come to expect these postcards to confirm their registration status, and Defendant ensured the Court on the record that they had been sent prior to the 2016 general election.  They were not, and the fact that he sent a different notice to those voters does not wholly remove the contempt, nor does his attempt to resend postcards eighteen months after the election and five months after Plaintiffs notified him of the issue.  The Court also heard evidence that Defendant willfully failed to make sure that the county election officials were clearly and effectively trained to enforce this Court's orders.  The official training manual for the counties continued to instruct that all voter registration applicants were required to submit DPOC, and his efforts to revise these instructions informally and in a

piecemeal way led to confusion and misinformation.  Plaintiffs have met their burden of demonstrating the requirements of civil contempt by clear and convincing evidence.

### C.      Sanctions

Sanctions for civil contempt may be used for two purposes: "(1) to compel or coerce obedience to a court order . . . ; and (2) to compensate the contemnor's adversary for injuries resulting from the contemnor's noncompliance[.]"[34]  Where a fine is compensatory, "the amount of the fine must be based upon the complainant's actual losses sustained as a result of the contumacy."[35]  At this time, there appears to be no need for an order compelling compliance with the preliminary injunction order as to the postcard issue because Defendant is now in the process of sending the standard postcards to all registered voters.  Defendant has removed the election manual from public view and has submitted evidence it updated the election manual by email. However, as the Court has explained, this potentially worsens the problem because the county election officials are reliant on a hard copy document that has not been updated to reflect the Court's orders.  Although the Court may not need to coerce compliance with its unambiguous preliminary injunction order, Defendant's history of noncompliance and disrespect for the Court's decisions in this case as set forth above signals that specific, verifiable directives will be necessary if a permanent injunction is warranted by the Court's ultimate decision in this case. Any such relief is deferred until the Court issues its findings of fact and conclusions of law under Fed. R. Civ. P. 52.

Although the Court does not impose coercive sanctions at this time for Defendant's contempt, it finds that compensatory relief is in order to make Plaintiffs whole for their actual

---

[34]*O'Connor v. Midwest Pipe Fabrications, Inc.*, 972 F.2d 1204, 1211 (10th Cir. 1992) (quoting *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1147 (9th Cir. 1983)).

[35]*Id.* (quoting *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800, 810 (2d Cir. 1981)).

losses sustained during the lengthy period before Defendant purged the contempt.  They are entitled to their reasonable attorneys' fees expended drafting their November and December letters to Defendant, participating in the meet-and-confer session in December, drafting their contempt motion and reply, and participating in the show cause hearing.[36]  Had Defendant or Ms. Becker revealed to Plaintiffs in November that (1) Defendant and Mr. Caskey had directed the standard postcards be sent in October 2016, (2) they were willing to immediately resend the standard postcards, and (3) they would remove the County Election Manual from the public website, the Court is confident that Plaintiffs (and the Court) could have avoided significant time and expense in litigating this motion.  This actual loss can be measured by assessing Defendant the reasonable attorney fees expended by Plaintiffs' counsel on those matters.  Plaintiffs shall submit to the Court an application for attorney fees by no later than April 30, 2018, in compliance with D. Kan. Local Rule 54.2.

**IT IS THEREFORE ORDERED BY THE COURT** that Plaintiffs' Motion to Enforce Court Orders and for Order to Show Cause Why Defendant Kobach Should Not be Held in Contempt (Doc. 423) is **granted**.  Defendant Secretary of State Kobach is assessed the reasonable attorney fees expended by Plaintiffs' counsel on this motion.  Plaintiffs shall submit to the Court an application for attorney fees by no later than April 30, 2018, in compliance with D. Kan. Local Rule 54.2.  Any further remedial measures are deferred until the Court's decision on the merits of this case.

**IT IS SO ORDERED.**

Dated: April 18, 2018

---

[36]*Hutto v. Finney*, 437 U.S. 678, 690 n.14 (1978) ("Of course, fees can also be awarded as part of a civil contempt penalty.").

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE