## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| STEVEN WAYNE FISH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **Case No. 16-2105-JAR-JPO** |
| v. | ) | |
| | ) | |
| KRIS KOBACH, in his official capacity as | ) | |
| Secretary of State for the State of Kansas, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

PROPOSED FINDINGS OF FACT ........................................................................... 1

   I.   BACKGROUND ON VOTER REGISTRATION AND the MOTOR-VOTER
       REGISTRATION PROCESS IN KANSAS ....................................................... 1

     A.  Kansas's Proof of Citizenship Requirements ............................................ 1

     B.  Voter Registration Application Process at DOV Offices ............................. 3

     C.  Kansas's Election Voter Information System Database ............................... 5

     D.  Tallies of Registered Voters, Votes Cast, and Turnout in Kansas ................ 7

  II.  STATEWIDE EFFECTS OF THE DOCUMENTARY PROOF-OF-CITIZENSHIP
       LAW. ................................................................................................................ 8

 III.  EFFECTS OF THE DOCUMENTARY PROOF-OF-CITIZENSHIP LAW ON THE
       INDIVIDUAL PLAINTIFFS ........................................................................ 15

     A.  Steven Wayne Fish ................................................................................. 15

     B.  Donna Bucci ........................................................................................... 16

     C.  Charles Stricker ...................................................................................... 17

     D.  Thomas Boynton ..................................................................................... 18

     E.  Douglas Hutchinson ............................................................................... 19

     F.  The Cancellation of the Individual Plaintiffs' Registration Applications ...... 20

 IV.  EFFECTS OF THE DOCUMENTARY PROOF-OF-CITIZENSHIP LAW ON
       PLAINTIFF LEAGUE OF WOMEN VOTERS OF KANSAS ......................... 21

  V.  DEFENDANT'S EVIDENCE AS TO THE BURDENS OF THE DPOC
       REQUIREMENT ............................................................................................ 28

     A.  DPOC Law Hearings .............................................................................. 28

     B.  Defendant's Evidence Regarding DPOC Possession Rates ........................ 33

     C.  Defendant's Proffered Evidence Regarding Turnout and Registration Rates ...... 41

     D.  Defendant's Proffered Evidence About the Number of Suspended and Canceled
        Voters After the Preliminary Injunction Went Into Effect ........................... 46

VI. PURPORTED INCIDENTS OF NONCITIZEN REGISTRATION.................................. 47

   A. Lay Testimony Concerning Purported Incidents of Noncitizen Registration................. 47

   B. Defendant's Proffered Expert Testimony Concerning Purported Incidents of
      Noncitizen Registration ........................................................................................ 57

   C. Assessment of Defendant's Evidence of Specific Incidents of Possible Noncitizen
      Registration by Plaintiffs' Experts ...................................................................... 66

VII.    DEFENDANT'S STATISTICAL ESTIMATES OF NONCITIZEN
        REGISTRATION ........................................................................................... 72

   A. Dr. Richman's Statistical Estimates of Noncitizen Registration or Attempted
      Registration in Kansas ......................................................................................... 72

   B. Dr. Richman's Estimates of the Number of Noncitizens on the Suspense List .............. 90

VIII.   ALTERNATIVES TO DPOC REQUIREMENT ........................................................ 92

   A. Training at DOVs.................................................................................................... 92

   B. Driver's License List Comparisons ........................................................................ 93

   C. Jury List Questionnaires ....................................................................................... 94

   D. DHS Confirmation and the Systematic Alien Verification for Entitlements
      ("SAVE") Database .............................................................................................. 95

   E. Criminal Investigations and Prosecutions........................................................... 97

IX. DEFENDANT SECRETARY KOBACH LACKS CREDIBILITY ON THE ISSUE
      OF NONCITIZEN REGISTRATION ................................................................. 98

   A. Defendant Kobach's false assertions concerning Somali noncitizen voting .................. 98

   B. Defendant Kobach's misrepresentations of Richman's findings.................................. 99

   C. Defendant Kobach's Efforts to Amend the NVRA Due to Insufficient Evidence of
      Noncitizen Voter Registration ............................................................................. 99

**PROPOSED CONCLUSIONS OF LAW** ............................................................................ **102**

 I.   STANDING.................................................................................................................. 102

 II. DEFENDANT'S PROFFERED EXPERTS, DR. CAMAROTA AND MR.
      MCFERRON .......................................................................................................... 104

 III. MERITS.................................................................................................................... 106

A.  Section 5 of the NVRA Presumptively Preempts a DPOC Requirement ..................... 106

B.  The DPOC Requirement is Burdensome and Contravenes the Express Statutory Purposes of the NVRA.................................................................................................. 107

C.  The Presumptive Invalidity of a DPOC Requirement Can Be Rebutted Only if Defendant Can Satisfy a Two-Part Test........................................................................ 110

D.  Defendant Has Not Established the First Prong of the Tenth Circuit's Two-Part Test, that Substantial Numbers of Noncitizens Have Successfully Registered to Vote in Kansas ............................................................................................................................ 111

E.  Defendant Has Not Established the Second Prong of the Tenth Circuit's Two-Part Test, that Nothing Less than a DPOC Requirement Is Sufficient to Address Noncitizen Registration ............................................................................................... 113

IV. REMEDY.......................................................................................................................... 116

**CERTIFICATE OF SERVICE** ............................................................................................... **122**

Plaintiffs Steven Wayne Fish, Donna Bucci, Charles Stricker, Thomas Boynton, Douglas Hutchinson, and League of Women Voters of Kansas (collectively, "Plaintiffs") respectfully submit the following Proposed Findings of Fact and Conclusions of Law.

## PROPOSED FINDINGS OF FACT

### I.   BACKGROUND ON VOTER REGISTRATION AND THE MOTOR-VOTER REGISTRATION PROCESS IN KANSAS

#### A.  Kansas's Proof of Citizenship Requirements

1.     To register to vote in Kansas, a voter registration applicant must submit under the penalty of perjury a written attestation that the applicant meets the requisite Kansas voter qualifications, including U.S. citizenship.  (*See* K.S.A. § 25-2309(b); Mar. 8, 2018 PM Trial Tr. 771:7-14 (Caskey Testimony).)  Prior to 2013, this attestation of citizenship constituted sufficient evidence for individuals to prove they were U.S. citizens for purposes of registering to vote under Kansas law.  (Mar. 8, 2018 PM Trial Tr. 771:7-14 (Caskey Testimony).)

2.     Beginning in 2013, a new requirement was added to this process.  (Mar. 8, 2018 PM Trial Tr. 791:23 – 792:7 (Caskey Testimony).)  The Secure and Fair Elections ("SAFE") Act, K.S.A. § 25-2309(l), requires that Kansas voter registration applicants submit documentary proof of citizenship ("DPOC") in order to become registered to vote.  (*See* Am. Prop. Trial Order, ECF No. 353 ("PTO"), Stip. ¶ 7; Mar. 6, 2018 PM Trial Tr. 142:15-17 (McDonald Testimony).)

3.     The SAFE Act provides that the DPOC requirement "will be satisfied by presenting" one of the following documents:

(1)   the applicant's driver's license or nondriver's identification card issued by the division of vehicles or the equivalent governmental agency of another state within the United States if the agency indicates on the applicant's driver's license or nondriver's identification card that the person has provided satisfactory proof of United States citizenship;

(2)   the applicant's birth certificate that verifies United States citizenship to the satisfaction of the county election officer or secretary of state;

(3)   pertinent pages of the applicant's United States valid or expired passport identifying the applicant and the applicant's passport number, or presentation to the county election officer of the applicant's United States passport;

(4)   the applicant's United States naturalization documents or the number of the certificate of naturalization. If only the number of the certificate of naturalization is provided, the applicant shall not be included in the registration rolls until the number of the certificate of naturalization is verified with the United States bureau of citizenship and immigration services by the county election officer or the secretary of state, pursuant to 8 U.S.C. § 1373(c);

(5)   other documents or methods of proof of United States citizenship issued by the federal government pursuant to the immigration and nationality act of 1952, and amendments thereto;

(6)   the applicant's bureau of Indian affairs card number, tribal treaty card number or tribal enrollment number;

(7)   the applicant's consular report of birth abroad of a citizen of the United States of America;

(8)   the applicant's certificate of citizenship issued by the United States citizenship and immigration services;

(9)   the applicant's certification of report of birth issued by the United States department of state;

(10)  the applicant's American Indian card, with KIC classification, issued by the United States department of homeland security;

(11)  the applicant's final adoption decree showing the applicant's name and United States birthplace;

(12)  the applicant's official United States military record of service showing the applicant's place of birth in the United States; or

(13)  an extract from a United States hospital record of birth created at the time of the applicant's birth indicating the applicant's place of birth in the United States.

(K.S.A. § 25-2309(l).)

4.     Voters who applied to register to vote before 2013 are not subject to the DPOC requirement.  (K.S.A. § 25-2309(n).)

2

5.      Defendant Kansas Secretary of State Kris Kobach is the Chief Election Office for the State of Kansas.  (PTO Stip. ¶ 2.)

6.      Pursuant to an administrative rule promulgated by Defendant Kansas Secretary of State Kris Kobach, if an individual does not provide DPOC when submitting a voter registration application, the application is deemed incomplete. (*See* Mar. 8, 2018 PM Trial Tr. 743:14-22 (Caskey Testimony).)  If that individual then does not provide DPOC within 90 days, the application will be canceled, and the individual must submit a new voter registration application to reinitiate the voter registration application process.  (*See* PTO Stip. ¶ 8; K.A.R. § 7-23-15.) The rule became effective on October 2, 2015.  (PTO Stip. ¶ 8.)

7.      On May 17, 2016, this Court entered a preliminarily injunction barring Defendant from enforcing the DPOC requirement with respect to Kansans who apply to register to vote at the Division of Vehicles ("DOV").  (Mem. & Order, ECF No. 129.)  That order was affirmed by the Tenth Circuit in an initial order and judgment dated September 30, 2016, (*Fish v. Kobach*, 691 F. App'x 900 (10th Cir. 2016)), followed by a detailed opinion issued on October 19, 2016, (*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016)).

8.      Prior to the preliminary injunction in this case, Kansas was one of only two states that enforced a DPOC requirement for voter registration.  The only other state was Arizona, whose requirement is more liberal, insofar as it can be satisfied with a driver's license number, rather than a copy of an actual document.  (*See* A.R.S. § 16–166(F)(1).)

**B.  Voter Registration Application Process at DOV Offices**

9.      An eligible Kansas voter may apply to register to vote while applying for or renewing a Kansas driver's license or non-driver identification card at the DOV ("motor-voter registrant").  (52 U.S.C. § 20504(c); K.S.A. § 25-2352.)

10.      Between January 1, 2006 and March 23, 2016, 43.7% of Kansas voters applied to

3

register to vote at the DOV.  (PTO Stip. ¶ 34.)

11.      Under Kansas law, a driver's license applicant must show a document that demonstrates the applicant's lawful status or presence in the United States in order to obtain a driver's license.  (*See* PTO Stip. ¶¶ 116, 117.)

12.      The DOV website identifies 5 documents that U.S. citizens can present to demonstrate lawful presence: a U.S. birth certificate, U.S. passport or Passport Card, U.S. Consular Report of Birth Abroad, a Certificate of Naturalization, and a Certificate of Citizenship. (PTO Stip. ¶ 116.)

13.      Noncitizen legal permanent residents typically present a green card (*i.e.*, a noncitizen legal permanent resident document) to demonstrate lawful presence, and may receive a standard Kansas driver's license.  (PTO Stip. ¶¶ 61-62.)

14.      Noncitizens with time-limited visas (*e.g.*, students) typically present a document identifying them as noncitizens (*e.g.*, their time-limited visa) to demonstrate lawful presence, and may receive a special Temporary Driver's License ("TDL"), that expires on the same date as their lawful presence document.  (PTO Stip. ¶ 60.)

15.      Although proof of lawful presence is a legal requirement for all driver's license applicants in Kansas, the DOV does not request proof of lawful presence for renewal applicants. (*See* PTO Stip. ¶¶ 71, 116-17; Notice of Joint Stipulations, ECF No. 494 ("DOV") Stip. ¶ 11.)

16.      Pursuant to DOV procedures, the opportunity to register to vote is offered after the prospective applicant completes the process for applying for or renewing a driver's license or non-driver identification card.  (PTO Stip. ¶¶ 66-67; DOV Stip. ¶ 1; Mar. 8, 2018 PM Trial Tr. 838:20 – 840:1 (Caskey Testimony).)

17.      The DOV has a policy of not offering voter registration to driver's license

applicants who self-identify as noncitizens, such as TDL applicants or driver's license applicants who show a green card to demonstrate lawful presence in the course of applying for a regular driver's license.  (PTO Stip. ¶¶ 73, 74, 122; Mar. 8, 2018 PM Trial Tr. 884:9 – 885:4 (Caskey Testimony).)

18.     Pursuant to DOV procedures, if driver's license applicants, either first-time or renewal, verbally confirm that they would like to register to vote, the DOV employee prompts them to read a voter oath located on the DOV counter in front of them and to indicate verbally if they agree.  (PTO Stip. ¶ 68; DOV Stip. ¶¶ 3, 5.)   Customers are not required to provide a signature after reading the voter oath.  (DOV Stip. ¶ 6.)

19.     These motor-voter applicants are then asked several questions including: "Are you a U.S. citizen?"   (PTO Stip. ¶ 69; DOV Stip. ¶ 7.)   After the applicant answer these questions, the driver's license examiner is supposed to record their responses.  (DOV Stip. ¶ 7.) Thereafter, a voter registration receipt is printed, the applicants pay the appropriate fees, and gets their photo taken.  (DOV Stip. ¶¶ 7-8.)  At that point, they have finished the voter registration application process at the DOV.  (*See* PTO Stip. ¶ 70; DOV Stip. ¶¶ 7-8.)

20.     The DOV electronically transmits voter registration applications to the appropriate elections official and into ELVIS system.  (PTO Stip. ¶ 72.)

### C.  Kansas's Election Voter Information System Database

21.     The Election Voter Information System ("ELVIS") is a statewide voter registration database that is maintained by the Kansas Secretary of State ("KSOS").  (PTO Stip. ¶¶ 51-52.)

22.     When a voter registration application is received by the relevant election office, a record is created in ELVIS.  (PTO Stip. ¶¶ 51, 55; Mar. 8, 2018 PM Trial Tr. 743:1-9 (Caskey Testimony).)  The ELVIS system assigns a unique identification number for each applicant.

5

(PTO Stip. ¶ 54.)

23.     A record is created in ELVIS regardless of whether a voter registration application is complete (*e.g.*, whether it is accompanied by DPOC), and/or whether the application is ultimately successful.  (PTO Stip. ¶ 56; Mar. 8, 2018 PM Trial Tr. 741:19 – 742:3; 742:9-11 (Caskey Testimony).)

24.     County elections officers have responsibility for maintaining the database for their own counties, including creating and updating records for each voter registration applicant. (PTO Stip. ¶¶ 53, 55, 56; Mar. 8, 2018 PM Trial Tr. 743:1-9 (Caskey Testimony).)

25.     ELVIS records contain codes to indicate the status of a voter registration application, including whether an application was successful and is currently active or inactive, (PTO Stip. ¶ 57; Mar. 8, 2018 PM Trial Tr. 744:21 – 745:1 (Caskey Testimony); Ex. 135, List of ELVIS Codes.); whether the application was incomplete and designated as "in suspense"; and whether the application was canceled.  (Ex. 135; Mar. 8, 2018 PM Trial Tr. 743:14 – 745:11 (Caskey Testimony).)

26.     If a voter registration application is incomplete, the application will be given the code "S" for "suspense."  ELVIS uses the code "R" to indicate someone whose voter registration application has been canceled.  (Ex. 135, List of ELVIS Codes; Mar. 8, 2018 PM Trial Tr. 748:9 – 749:4 (Caskey Testimony).)

27.     If there is no record that a voter registration applicant has provided DPOC, or in the case of motor-voter registrants, if DOV employees have listed the application as missing DPOC, the application is considered incomplete, and given the code "S" for "suspense," and the code "CITZ" to indicate lack of DPOC as the reason for placing the application in suspense. (PTO Stip. ¶¶ 55-58; Mar. 8, 2018 PM Trial Tr. 743:23 – 744:17 (Caskey Testimony); Ex.135,

List of ELVIS Codes.)

28.     Shortly after it began enforcing the DPOC law in January 2013, the KSOS entered into an interagency agreement with the Kansas Department of Health and Environment ("KDHE"), under which KDHE would cross-reference applications suspended for lack of DPOC to determine whether the agency had a Kansas birth certificate on file.  (Ex. 1027, KDHE Mem. of Agreement; Mar. 8, 2018 PM Trial Tr. 749:13-750:16 (Caskey Testimony); Mar. 7, 2018 PM Trial Tr. 598:3-13 (Rucker Dep.).)  The KSOS does not check with agencies outside of Kansas to verify whether suspended applicants have DPOC on file.  (PTO Stip. ¶ 33.)

29.     ELVIS records also document, among other things, how the applicant submitted a voter registration application.  (PTO Stip. ¶ 59.)  "MV" is the code recorded in ELVIS to indicate that an applicant has applied to register to vote at the DOV.  (PTO Stip. ¶ 59; Ex. 135, List of ELVIS Codes.)

### D.  Tallies of Registered Voters, Votes Cast, and Turnout in Kansas

30.     According to ELVIS, there were more than 1.8 million registered voters in Kansas as of the 2016 general election.  (PTO Stip. ¶ 50.)

31.     The total number of votes cast for the highest statewide office on the ballot in each of the following general elections dating back to the year 2000 is as follows:

| Federal Election Year | Highest Statewide Office on Ballot | Official Results - Total Votes Cast |
|---|---|---|
| 2000 | President | 1,072,216 |
| 2002 | U.S. Senate | 776,850 |
| 2004 | President | 1,187,756 |
| 2006 | Governor | 849,700 |
| 2008 | President | 1,235,872 |
| 2010 | U.S. Senate | 837,692 |
| 2012 | President | 1,159,971 |
| 2014 | U.S. Senate | 866,191 |
| 2016 | President | 1,184,402 |
| **Total Votes for Highest Statewide Office** | | **9,170,650** |

| in Federal Election Years 2000 - 2016 | |
|---|---|

(Notice of Joint Stipulations ("Election Nos. Stip."), ECF No. 495, ¶ 1)

32.     The official turnout in each of the listed elections in Sedgwick County, Kansas is as follows:

| Federal Election Year | Official Turnout |
|---|---|
| 2004 General Election | 181,626 |
| 2006 Primary Election | 37,757 |
| 2006 General Election | 118,674 |
| 2008 Primary Election | 36,844 |
| 2008 General Election | 197,044 |
| 2010 Primary Election | 65,826 |
| 2010 General Election | 136,828 |
| 2012 Primary Election | 54,923 |
| 2012 General Election | 187,286 |
| 2014 Primary Election | 52,598 |
| 2014 General Election | 145,073 |
| 2016 Primary Election | Data not available |
| 2016 General Election | 195,746 |
| **Cumulative Official Turnout** | **1,410,225** |

(Election Nos. Stip., ECF No. 495, ¶ 2.)

## II.     STATEWIDE EFFECTS OF THE DOCUMENTARY PROOF-OF-CITIZENSHIP LAW.

33.     The DPOC requirement has prevented large numbers of applicants from registering to vote in Kansas.  (PTO Stip. ¶¶ 36, 38; Mar. 6, 2018 PM Trial Tr. 156:20-157:8.)

34.     The parties have stipulated that as of March 28, 2016, more than 16,000 applicants who applied to register to vote in person at DOV offices were blocked from registering to vote because of the DPOC requirement. (PTO Stip. ¶ 36 (As of March 28, 2016, there were 5,655 in-person motor-voter applicants who were placed in "suspense" status for failure to provide DPOC); PTO Stip. ¶ 38 (As of March 23, 2016, there were 11,147 motor-voter applicants whose applications were canceled under K.A.R. § 7-23-15 for failure to produce

8

DPOC.).)

35.     Plaintiffs offered the testimony of Dr. Michael McDonald to provide additional information about the effects of the DPOC requirement.  Dr. McDonald is an Associate Professor of Political Science at the University of Florida and a leading scholar on American elections, voter registration, and factors affecting voter behavior and turnout.  (Mar. 6, 2018 AM Trial Tr. 120:5-127:4; Ex. 139, McDonald Updated CV.)  He has received numerous research grants and honors for his academic work.  (Mar. 6, 2018 AM Trial Tr. 123:3-14; Ex. 139.)

36.     Dr. McDonald has offered expert testimony in numerous election law cases, (*see* Ex. 139, McDonald Updated CV, at 12-13), including cases involving voter registration and the NVRA.  *See, e.g.*, *League of Women Voters v. Browning*, 575 F. Supp. 2d 1298, 1308 (S.D. Fla. 2008); *see also Page v. Va. State Bd. of Elections*, No. 3:13CV678, 2015 WL 3604029, at \*9 n.16 (E.D. Va. June 5, 2015); *Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n*, 121 P.3d 843, 861 (Ariz. Ct. App. 2005).[1]

37.     Defendant's proffered expert Hans von Spakovsky has relied on Dr. McDonald's election turnout data in his own work.  (Mar. 9, 2018 PM Trial Tr. 1100:4-1101:4 (von Spakovsky Testimony).)

38.     Dr. McDonald examined data extracts from the ELVIS database to evaluate the number of individuals whose voter registration applications were canceled or suspended for lack of DPOC, and offered opinions about the effect of the DPOC requirement based on that analysis. (Mar. 6, 2018 PM Trial Tr. 140:13 – 141:2.)  He relied on three sources of voter registration data obtained from the KSOS prior to the preliminary injunction entered in this case: (1) a list of suspended applicants as of September 24, 2015, (2) a voter registration file dated December 11,

---

[1] The Court takes judicial notice of these decisions.

2015, and (3) a list of canceled and suspended applicants as of March 31, 2016 disclosed by Defendant in discovery after Plaintiffs filed suit.  (Mar. 6, 2018 PM Trial Tr. 142:6-143:24, 146:9-13, 147:9-148:14; Ex. 72, McDonald Expert Rep., at 5; Ex. 73, Suppl. McDonald Rep., at 1.)[2]

39.     Dr. McDonald opined that the DPOC law had imposed a "widespread" burden on voter registration applicants that had prevented "large" numbers of individuals from becoming registered to vote.  (Mar. 6, 2018 PM Trial Tr. 156:20 – 157:8).

40.     First, Dr. McDonald analyzed the total number of voter registration applicants—regardless of method of registration—who had been placed in suspense due to failure to provide DPOC at various points in time.  Dr. McDonald found that, as of September 24, 2015, 32,171 voter registration applicants were suspended for failure to produce DPOC.  (Ex. 72, McDonald Expert Rep., at 16-17; Mar. 6, 2018 PM Trial Tr. 142:6 – 143:11.)  Dr. McDonald identified more than 3,000 additional voter registration applicants who, as of December 11, 2015, were placed in suspense.  He calculated that a total of 35,314 individuals whose applications were suspended as of September 24, 2015 and/or December 11, 2015 for failure to provide DPOC. (Mar. 6, 2018 PM Trial Tr. 153:1-15; Ex 72 at 2-3.)  This number does not include individuals who were initially suspended for lack of DPOC but whose status was resolved before September

---

[2] For the September 24, 2015, and December 11, 2015 data files, Dr. McDonald was not given access to the ELVIS codes indicating whether an applicant had applied at a DOV office or whether the applicant's voter registration file had been suspended based on a lack of DPOC. (Mar. 6, 2018 PM Trial Tr. 143:12-24.)  But Dr. McDonald was able to reliably evaluate the number of applicants suspended for failure to provide DPOC by eliminating other reasons why an applicant may have been suspended.  (Mar. 6, 2018 PM Trial Tr. 144:8 – 145:16.; Ex. 72, McDonald Expert Rep., at 8-10.)  For the March 31, 2016 voter registration data produced pursuant to the protective order, Dr. McDonald was provided with the ELVIS codes designating an individual's method of registration and the reason why an application had been placed in suspense.  (Mar. 6, 2018 PM Trial Tr. 145:17-146:16, 147:9 – 148:10.)

24, 2015, either by affirmatively submitting DPOC to the KSOS, or by being passively cleared due to having a Kansas birth certificate on file.  (Mar. 6, 2018 PM Trial Tr. 177:1-15.)

41.     Second, Dr. McDonald evaluated individual-level voter registration information to determine whether individuals whose applications were suspended subsequently became registered, and found that, over a roughly three-month period, a majority of them did not.  Dr. McDonald used the unique voter registration identification number assigned to each applicant to track individuals designated as in suspense as of September 24, 2015 and determined whether these voters' applications were later registered, canceled, or remained in suspense as of December 11, 2015.  (PTO Stip. ¶ 54; Mar. 6, 2018 PM Trial Tr. 148:15 – 149:20.)[3]

42.     Of the 32,171 individuals whose voter registration applications were suspended as of September 24, 2015 for failure to provide DPOC, most did not become registered to vote by December 11, 2015.  (Ex. 72, McDonald Expert Rep., at 16-17; Mar. 6, 2018 PM Trial Tr. 148:15 – 150:11.)   As of December 11, 2015, 70.9% of these applicants—a total 22,814 individuals—either remained suspended or had their applications canceled.  (Ex. 72 at 16-17; Mar. 6, 2018 PM Trial Tr. 148:15-150:11.)   As of that date, 10,587 individuals remained suspended, while 12,227 individuals had their applications canceled altogether.[4] (Ex. 72 at 16-17.)

43.     Of the 32,171 applicants whose registrations were suspended as of September 24, 2015, only approximately one-quarter were successfully registered by December 11, 2015.

_____

[3] On October 2, 2015, shortly after the date of the September 24, 2015 suspense list obtained by Dr. McDonald, the KSOS began to cancel applications that remained in suspense for more than 90 days pursuant to K.A.R. § 7-23-15 (*see* PTO Stip. ¶ 8; K.A.R. § 7-23-15).

[4] Dr. McDonald's initial report described individuals whose voter registration application had become canceled pursuant to K.A.R. § 7-23-15 as "purged."  (Mar. 6, 2018 PM Trial Tr. 219:3-10.)

(Mar. 6, 2018 PM Trial Tr. 150:8-11; Ex. 72, McDonald Expert Rep., at 16-17.)   While this group of applicants did eventually become registered, they were blocked for a period of time due to the DPOC requirement, and could not vote during that period.   Additional steps were ultimately necessary for these individuals to become registered to vote.  (Mar. 6, 2018 PM Trial Tr. 151:18 – 152:12.)

44.     Third, Dr. McDonald analyzed the total number of voter registration applications suspended or canceled as of March 31, 2016—and specifically, the number of motor-voter applicants whose applications were impeded by the DPOC requirement.  (Mar. 6, 2018 PM Trial Tr. 153:23 – 154:9.)   As of that date, a total of 30,732 applicants were blocked by the DPOC requirement—16,749 applicants who had their applications canceled, and 13,983 applicants who were suspended.  (Ex. 73, Suppl. McDonald Rep., at 5, 8; Mar. 6, 2018 PM Trial Tr. 154:10-18.) The 30,732 applicants blocked by the DPOC requirement as of March 31, 2016 represented approximately 12% of the total voter registration applications submitted since the law was implemented in 2013.  (Mar. 6, 2018 PM Trial Tr. 155:5 – 156:19.)

45.     Of the 30,732 applicants whose applications were, as of March 31, 2016, suspended or canceled due to failure to provide DPOC, approximately 75% were motor-voter applicants.  A total of 22,888 of the individuals suspended or canceled for lack of DPOC as of March 31, 2016 had submitted a registration application through a motor-vehicle transaction— either online or in-person.[5]  (Ex. 73, Suppl. McDonald Rep., at 1, 9-10; Mar. 6, 2018 PM Trial Tr. 159:7-16; 165:9-166:14.)

---

[5] This number includes any voter registration application marked as a motor-vehicle transaction within the ELVIS system, including the "MV" code for in-person DOV transactions, "MVO" for online DOV registration applications, and "MVC" for registration applications submitted with an online driver's license change of address.  (Ex. 73, Suppl. McDonald Rep., at 5-6; Mar. 6, 2018 PM Trial Tr. 159:17 – 160:9.)

46.     The total number of applicants blocked by the DPOC requirement would likely have increased and escalated further before the 2016 presidential election without a preliminary injunction.  (Mar. 6, 2018 PM Trial Tr. 157:9-25.)  This is partly because, as Dr. McDonald explained, voter registration activity typically increases in the months leading up to a presidential election.  (*Id.* at 157:13-16.)

47.     Dr. McDonald also examined the composition of the pool of applicants blocked by the DPOC requirement, and found that it is disproportionately young compared to the population of registered voters.  Roughly 15% of registered voters in Kansas are between the ages of 18 and 29.  (Mar. 6, 2018 PM Trial Tr. 160:23-162:16; Ex. 72, McDonald Expert Rep., at 7.)  In contrast, 43.2% of suspended or canceled motor-voter applicants as of March 31, 2016 were between the ages of 18-29—a rate nearly three times higher than the population of active and inactive registrants.  (Mar. 6, 2018 PM Trial Tr. 160:23-162:16; Ex. 73, Suppl. McDonald Rep., at 10.)

48.     The pool of voters blocked by the DPOC requirement is also disproportionately unaffiliated with a political party.  Approximately 31% of registered voters are unaffiliated with a political party in Kansas.  (Mar. 6, 2018 PM Trial Tr. 160:23-163:4; Ex. 72, McDonald Expert Rep., at 7.)  Yet, 53.4% of suspended and canceled motor-voter applicants were unaffiliated with a political party.  (Mar. 6, 2018 PM Trial Tr. 160:23-163:4; Ex. 73, Suppl. McDonald Rep., at 10.)

49.     The disproportionate impact of the law on these subpopulations (young and unaffiliated voters) derives in part from the fact that the DPOC requirement applies only to new voter registration applicants—who are disproportionately young and unaffiliated with a political party.  (Mar. 6, 2018 PM Trial Tr. 175:7-12 (McDonald Testimony).)

50.     The consensus in social science research is that barriers to voter registration increase the cost of voting and dissuade individuals from participating in the political process.[6] (Mar. 6, 2018 PM Trial Tr. 163:5 – 164:20 (McDonald Testimony); Ex. 72, McDonald Expert Rep., at 18-22.)   Furthermore, the burdens imposed by the DPOC law are disproportionately borne by young applicants and those unaffiliated with a political party: demographic groups that already have a lower propensity to participate in the political process and are less inclined to shoulder costs associated with voter registration.   (Mar. 6, 2018 PM Trial Tr. 164:12 – 165:8 ("[I]f there is even a slight burden, . . . young voters won't show up to vote at all"); Ex. 72 at 18-22.)   The fact that the law affects only new applicants means that it disproportionately affects certain demographic groups who are already among the most vulnerable to voting barriers. (Mar. 6, 2018 PM Trial Tr. 172:24-175:6, 175:13-176:10.)

51.     It is likely that nearly all individuals identified in his report as suspended or canceled for failure to provide DPOC are, in fact, qualified citizens who were blocked from voting.   Dr. McDonald noted that while some noncitizens may find their way onto registration rolls, the numbers are likely to be very small.   (Mar. 6, 2018 PM Trial Tr. 177:6-22.)

52.     The KSOS's policy of clearing nearly half the applicants suspended each month after finding a Kansas birth certificate on file tends to support the fact that the vast majority of canceled and suspended applicants are qualified citizens.   (Mar. 6, 2018 PM Trial Tr. 177:6 – 178:6 (McDonald Testimony).)   The applicants who were cleared through this policy did not affirmatively provide DPOC; they were passively approved after the KSOS later independently

---

[6] Defendant's proffered expert, Dr. Jesse Richman, has relied on the same "cost of voting" social science research in his peer-reviewed article titled "Can the College Vote Turn Out," where he noted that "[e]lectoral rules that increase the costs of voting are expected to diminish voter participation."   (Mar. 13, 2018 AM Trial Tr. 1567:24 – 1570:11 (Richman Testimony); Ex. 153, Article by Dr. Richman "Can the College Vote Turnout.")

obtained a Kansas birth certificate on file with the KDHE.  (*See supra* ¶ 28; Mar. 6, 2018 PM Trial Tr. 177:6 – 178:6.)  Since Kansas is only one state and many Americans move between states, it is most likely that other suspended and canceled applicants were simply born in other states.  (*Id.* at 177:6 – 178:20.)

## III.  EFFECTS OF THE DOCUMENTARY PROOF-OF-CITIZENSHIP LAW ON THE INDIVIDUAL PLAINTIFFS

### A.  Steven Wayne Fish

53.     Steven Wayne Fish is a U.S. Citizen, a resident of Kansas, and over eighteen years old, and is therefore a qualified Kansas voter.  (PTO Stip. ¶ 10; Mar. 7, 2018 PM Trial Tr. 498:23 – 499:22.)  He is an overnight employee at an American Eagle distribution center.  (Mar. 7, 2018 PM Trial Tr. 500:5-12.)

54.     In August 2014, Mr. Fish attempted to register to vote while renewing his Kansas driver's license at the DOV.  (Mar. 7, 2018 PM Trial Tr. 501:3-8.)

55.     Mr. Fish was not told about the DPOC requirement and left the DOV office believing that he was registered to vote.  (Mar. 7, 2018 PM Trial Tr. 501:17-25; 502:6-8.)  Mr. Fish only learned that he was not registered when he subsequently received a notice in the mail telling him that he needed to show DPOC.  (*Id.* at 502:9-21.)

56.     After receiving this notice, Mr. Fish searched for his birth certificate but could not find it.  (Mar. 7, 2018 PM Trial Tr. 502:16-21; 506:1-10.)  He also attempted to obtain a replacement birth certificate but could not figure out how to do so, because he was born on a decommissioned Air Force Base in Illinois.  (*Id.* at 499:3-14; 504:24 – 505:12.)

57.     Mr. Fish was unable to vote in the 2014 general election, and his voter registration application was subsequently canceled due to his failure to provide DPOC.  (Mar. 7, 2018 PM Trial Tr. 503:16-20; PTO Stip. ¶ 39; Ex. 1, Fish ELVIS Registrant Details.)

15

58.     In May 2016, Mr. Fish's sister located a copy of his birth certificate that had apparently been placed in the safe by Mr. Fish's now-deceased mother.  (Mar. 7, 2018 PM Trial Tr. 505:18 – 507:10.)  Although Mr. Fish's DPOC was ultimately located, it took nearly two years to find it—during which time Mr. Fish could not satisfy the DPOC requirement.  (*Id.* at 505:18 – 507:10.)

**B.  Donna Bucci**

59.     Donna Bucci is a U.S. citizen, a resident of Kansas, and over eighteen years old, and is therefore a qualified Kansas voter.  (PTO Stip. ¶ 16; Mar. 6, 2018 AM Trial Tr. 98:25 – 99:5.)  Ms. Bucci is a food service supervisor with the Kansas Department of Corrections.  (Mar. 6, 2018 AM Trial Tr. 98:7-12.)

60.     In 2014, Ms. Bucci attempted to register to vote while renewing a Kansas driver's license at the DOV.  (Mar. 6, 2018 AM Trial Tr. 99:15-19.)

61.     Ms. Bucci was not told about the DPOC requirement and left the driver's license office believing that she was registered to vote.  (Mar. 6, 2018 AM Trial Tr. 100:3-11.)  Ms. Bucci only learned that she was not registered when she subsequently received a notice in the mail telling her that she needed to show DPOC.  (*Id.* at 100:16-20.)

62.     Ms. Bucci does not have a copy of her birth certificate and does not possess a passport; she cannot afford the cost of a replacement birth certificate from Maryland, where she was born.  (Mar. 6, 2018 AM Trial Tr. 101:24-103:24.)  She testified that the cost of a replacement birth certificate would affect her life significantly—it would be either her "share of the rent or no place to live."  (*Id.* at 103:21-24.)

63.     Ms. Bucci's voter registration application was subsequently canceled due to her failure to provide DPOC.  (PTO Stip. ¶¶ 19, 43; Ex. 2, Bucci ELVIS Registrant Details.)

### C.  Charles Stricker

64.     Charles Stricker is a U.S. citizen, a resident of Kansas, and over eighteen years old, and is therefore a qualified Kansas voter. (PTO Stip. ¶ 21; Mar. 6, 2018 AM Trial Tr. 63:13-17.)  Mr. Stricker is the manager of a hotel in Wichita.  (Mar. 6, 2018 AM Trial Tr. 64:23-25.)

65.     In 2014, Mr. Stricker attempted to register to vote at the DOV while renewing his driver's license. (PTO Stip. ¶ 22; Mar. 6, 2018 AM Trial Tr. 67:25 – 68:6.)

66.     Mr. Stricker was told he had insufficient documentation to obtain a driver's license and was sent home to obtain the necessary documents.  (Mar. 6, 2018 AM Trial Tr. 68:9 – 69:1.)  Mr. Stricker returned with "literally . . . everything that [he] could possibly get out of [his] house," including his birth certificate, mortgage statements, tax documents, tax returns, and W-2s.  (*Id.* at 69:9-17.)  He responded in the affirmative when the DOV clerk asked him if he wanted to register.  (*Id.* at 70:16-21.)  The only document Mr. Stricker received when he left DOV was a temporary driver's license that he remembers looking like "a fast-food receipt" with his picture on it.  (*Id.* at 71:2-23.)  He did not receive a full-page notice regarding the DPOC requirement.  (*Id.* at 89:11-16, 86:23-87:21 ("[W]hat I was given was strictly a small slip of paper.  I was not given a full page like this.").)

67.     Mr. Stricker asked the DOV clerk whether he needed to do anything else to register and was told that he had completed the process and that a voter card would later be mailed to him.  (Mar. 6, 2018 AM Trial Tr. 71:2-72:4.)  Mr. Stricker was not advised at any time about a DPOC requirement for voter registration and left the DOV believing he was registered to vote.  (*Id.* at 70:22-71:1; 72:5-9.)

68.     On Election Day in November 2014, Mr. Stricker went to his polling place to vote.  (Mar. 6, 2018 AM Trial Tr. 72:14-22.)  The volunteer could not find Mr. Stricker's name on the voting roll, and he was required to cast a provisional ballot.  (*Id.* at 72:14 – 74:4.)  He felt

confused, publicly exposed, and embarrassed by how he was treated.  (*Id.* at 73:8 – 74:11 ("It was almost like I was the one that did something wrong.").)  This was the first time that Mr. Stricker learned that he was not, in fact, registered to vote.  (*Id.* at 74:12-25.)

69.    Mr. Stricker's voter registration application was subsequently canceled on the grounds that he had not presented DPOC.  (PTO Stip. ¶¶ 23, 45; Ex. 4, Stricker ELVIS Registrant Details.)

70.    In advance of the 2016 election, Mr. Stricker called the Sedgwick County Election Office to ensure that he was registered as a result of the preliminary injunction and would be permitted to vote.  (Mar. 6, 2018 AM Trial Tr. 79:8-22.)  Mr. Stricker was told by election officials that they were not sure if he would be permitted to vote in the 2016 election due to unresolved legal issues.  (*Id.* at 79:23 – 80:5.)  Mr. Stricker also checked the KSOS's online voter database, but the database did not return a record of him being registered.  (*Id.* at 80:6-12.)  He was left confused and frustrated about his voter registration status.  (*Id.* at 80:13-25.)

**D.  Thomas Boynton**

71.    Thomas Boynton is a U.S citizen, a resident of Kansas, and over eighteen years old, and is therefore a qualified Kansas voter.  (PTO Stip. ¶ 26; Mar. 6, 2018 PM Trial Tr. 262:18-263:2.)  Mr. Boynton moved to Kansas for the first time in July 2014 to begin teaching as professor of English at Wichita State University.  (Mar. 6, 2018 PM Trial Tr. 263:1-11.)

72.    In early August 2014, Mr. Boynton went to a driver's license office to obtain a Kansas driver's license.  (Mar. 6, 2018 PM Trial Tr. 263:24 – 264:15.)  Although his ELVIS records do not indicate that he applied to register to vote at the DOV, Mr. Boynton testified credibly that, after he completed his driver's license transaction, the DOV examiner asked Mr. Boynton if he wanted to register to vote, and he responded yes.  (*Id.* at 264:10-15.)

73.    Mr. Boynton brought several documents with him to the DOV office that day: his

out-of-state license, social security card, original birth certificate, and utility bills. (Mar. 6, 2018 PM Trial Tr. 264:23 – 265:1.) He does not recall which of these documents the DOV clerk asked to see, but he provided the clerk with each document that she requested. (*Id.* at 265:5-10.) Mr. Boynton was not told about the DPOC requirement and left the DOV believing he was registered to vote. (*Id.* at 264:10-18; 265:18-20.)

74. On Election Day in November 2014, Mr. Boynton went to his polling place to vote, but the poll volunteer did not find him on the voter roll. (Mar. 6, 2018 PM Trial Tr. 266:4-13.) At the volunteer's direction, Mr. Boynton cast a provisional ballot and hoped it would be counted. (*Id.* at 266:7-17; 267:15-22.) This was the first time that Mr. Boynton learned that he was not, in fact, registered to vote. (*Id.* at 265:18 – 266:17.)

75. Around December or January of 2014-15, Mr. Boynton received a notice informing him that he needed to provide DPOC in order to register to vote. (Mar. 6, 2018 PM Trial Tr. 267:23 – 268:10.) Even though Mr. Boynton had previously provided DPOC at a DOV office, (*id.* at 264:24 – 265:1), the ELVIS system erroneously had failed to successfully register him as a voter, (*id.* at 266:24 – 267:4.)

76. Mr. Boynton's voter registration application was subsequently canceled on the grounds that he had not presented DPOC. (PTO Stip. ¶¶ 27, 41; Ex. 3, Boynton ELVIS Registrant Details.)

77. On subsequent visits to the DOV, Mr. Boynton declined to register to vote, because his past experience had led him to conclude that such an effort would be futile. (Mar. 6, 2018 PM Trial Tr. 269:10 – 271:5.)

**E. Douglas Hutchinson**

78. Douglas Hutchinson is a U.S. citizen, a resident of Kansas, and over eighteen years old, and is therefore a qualified Kansas voter. (PTO Stip. ¶ 30.)

79.     Mr. Hutchinson attempted to register to vote at the DOV while renewing his driver's license.  (PTO Stip. ¶ 31.)

80.     Mr. Hutchinson's voter registration application was subsequently canceled on the grounds that he had not presented DPOC.  (PTO Stip. ¶¶ 32, 47; Ex. 5, Hutchinson ELVIS Registrant Details.)

### F.  The Cancellation of the Individual Plaintiffs' Registration Applications

81.     Pursuant to K.A.R. § 7-23-15, the voter registration of each of the Individual Plaintiffs was canceled for failure to provide DPOC.  (PTO Stip. ¶¶ 39, 43, 45, 47; Mar. 6, 2018 PM Trial Tr. 269:2-5 (Boynton Testimony); Ex. 3, Boynton ELVIS Registrant Details.) Pursuant to that rule, each of the Individual Plaintiffs was required to submit a new voter registration application in order to become registered to vote.

82.     After the Court's preliminary injunction went into effect, however, all motor-voter applicants whose applications had been in suspense solely due to the failure to provide DPOC—including the Individual Plaintiffs—were removed from "canceled" status.  (Mar. 9, 2018 AM Trial Tr. 945:16 – 946:2 (Caskey Testimony).)  After that time, the KSOS asserts that it located the DPOC of some of the Individual Plaintiffs—including Mr. Stricker, Mr. Boynton, and Mr. Hutchinson—and switched those Plaintiffs to active status.  (Mar. 8, 2018 PM Trial Tr. 832:16-20; 840:9 – 841:18 (Caskey Testimony); Ex. 838, Stricker ELVIS File, at 4; Ex. 829, Boynton ELVIS file, at 4; Mar. 6, 2018 PM Trial Tr. 272:2-5 (Boynton Testimony); Ex. 848, Hutchinson ELVIS file, at 4.)   But for the preliminary injunction, the voter registration applications of these three Individuals Plaintiffs would have remained "canceled," and could not have been switched to "active" status.

83.     The Individual Plaintiffs' experiences illustrate the burden the DPOC requirement places on voter registration applicants generally.  As their testimony demonstrates, Mr. Fish, Ms.

Bucci, Mr. Stricker, and Mr. Boynton each faced bureaucratic and/or financial barriers that prevented them from complying with DPOC requirement and, as a result, were prevented from voting. (PTO Stip. ¶¶ 11, 17, 22, 31; Mar. 7, 2018 PM Trial Tr. 502:9 – 503:15 (Fish Testimony); Mar. 6, 2018 AM Trial Tr. 101:24 – 103:24 Bucci Testimony); Mar. 6, 2018 AM Trial Tr. 70:22 – 73:7 (Stricker Testimony)); Mar. 6, 2018 PM Trial Tr. 267:23 – 268:9 (Boynton Testimony).)

## IV.   EFFECTS OF THE DOCUMENTARY PROOF-OF-CITIZENSHIP LAW ON PLAINTIFF LEAGUE OF WOMEN VOTERS OF KANSAS

84.   Margaret Ahrens, the immediate past co-president of Plaintiff League of Women Voters of Kansas (the "Kansas League") and an advisor and mentor to the current leadership, testified on behalf of the Kansas League. (Mar. 7, 2018 AM Trial Tr. 326:18-25.) Ms. Ahrens first joined the League of Women Voters in Minnesota over 50 years ago and has been a continuous member of the Kansas League for 14 years. (*Id.* at 325:13-24; 325:24 – 326:9.)

85.   The Kansas League is a nonpartisan, nonprofit volunteer organization that encourages informed and active participation of citizens in government and works to influence public policy through education and advocacy. (Mar. 7, 2018 AM Trial Tr. 337:1-4; 329:8-13 (Ahrens Testimony).) Founded almost 100 years ago, the Kansas League is active throughout Kansas, with nine local affiliates and more than 800 members. (*Id.* at 328:12 – 329: 7; Ex. 1200, Convention Booklet for 2017, at 5, 10-11.)

86.   The Kansas League was established in order to encourage and assist voters to access the vote, register, and "participate in the vote" in an informed manner. (Mar. 7, 2018 AM Trial Tr. 328:17 – 329:7; 330:12-22 (Ahrens Testimony).) As Ms. Ahrens testified, "[t]he biggest passion of the [Kansas L]eague is to engage every possible citizen in the vote . . . ." (*Id.* at 330:12 – 16.) To accomplish this mission, the Kansas League provides educational resources

and holds voter registration drives at various locations including schools, libraries, grocery stores, nursing homes, naturalization ceremonies and community events.  (*Id.* at 330:6-9; 330:23 – 331:11; 332:16 – 333:2; 333:16-19; 343:19-23.)  The Kansas League also performs studies on a variety of public policy issues to inform membership action and advocacy efforts as well as to educate its members and the public on these issues.  (*Id.* at 328:17 – 329:7; 330:2-11; 334:25 – 336:25; 361:22 – 362:10.)  The Kansas League assists all prospective voters, but it is particularly committed to engaging individuals who are "underrepresented in the vote," including the first time voter, the elderly, and individuals with limited resources and time.  (*Id.* at 332:7 – 333:19.)

87.     The Kansas League has opposed the SAFE Act since before its passage.  (Mar. 7, 2018 AM Trial Tr. 337:10 – 338:7 (Ahrens Testimony).)  The Kansas League opposed the law when it was before the Kansas legislature because the Kansas League "saw [the law] as a complex network of hoops and jumps for the average Kansas citizen" that would "create barriers to the vote," including the DPOC requirement, that the Kansas League had "never seen."  (*Id.* at 337:21 – 338:7.)

88.     Once it went into effect, the DPOC requirement affected the Kansas League's work detrimentally and substantially in at least three respects.

89.     First, the DPOC requirement significantly hampered the Kansas League's voter registration work.  Ms. Ahrens described the impact of the DPOC Law on the Kansas League's ability to fulfill its mission as "huge" and "absolutely a blow" and stated that the Kansas League "was really knocked off its feet."  (Mar. 7, 2018 AM Trial Tr. 338:12 – 339:9.)

90.     When the law came into effect, the Kansas League initially stopped all registration activity in every county but one, in order to protect volunteer members from any liability that could arise from handling or copying other people's personal documents.  (Mar. 7,

2018 AM Trial Tr. 339:10 – 340:5, 341:12 – 16, 342:5-16; Ex. 14, LWVK Policy of Copying Proof of Citizenship Records.)  The Kansas League leadership spent considerable resources on developing a copying policy to mitigate the risks associated with handling DPOC.  (Mar. 7, 2018 AM Trial Tr. at 341:9-11 ("Q: And what went into creating this policy?  A: Well, a lot of experience and effort and lots of volunteer time.").)

91.     Once the copying policy was in place, the Kansas League re-initiated registration efforts, but the number of individuals the Kansas League could successfully register declined significantly.  (Mar. 7, 2018 AM Trial Tr. 343:16 – 344:20; 346:7-12; 346:19 – 347:17 (Ahrens Testimony); Ex. 7, Ahrens-Neal Email re: Wichita Voter Reg. (reporting a drop from 4000 successful registrations in 2012 to 400 in 2014 in Sedgwick County); Ex. 8, Ahrens-Neal Email re Registration efforts in Emporia (reporting that successful registrations in Emporia "has dropped at least 75% if not more because of the [DPOC] law").)

92.     This decline was due to the fact that many individuals do not have the necessary documents at hand—or are not willing to provide such documents—to satisfy the DPOC requirement.  (Mar. 7, 2018 AM Trial Tr. 346:19 – 347:17 (Ahrens Testimony) (stating that "[w]e did not find people willing and eager or knowledgeable about the necessity for bringing in a birth certificate or . . . proof of citizenship to a voter registration table or a place where they could expect to register to vote with help.  That was not something people had."); *id.* at 426:8 – 427:1 (Court: "But in terms of maintaining these important documents in their residence or somewhere they have access to, what has been your experience about those populations?  A: That's a really big issue.  They don't have their documents at hand.  And as a rule . . . I think that people in poverty and young people . . . that's the last thing they're about to think about . . . . [T]he poor move more often.  They don't have locked cases . . . and it's just asking a great

deal."); Ex. 8 (noting "problem" of drop in successful registrations in Emporia after DPOC law went into effect "since people do not carry their birth certificates around with them").)

93.     Kansas League members also had to invest more time and resources into helping people register to vote.   (Mar. 7, 2018 AM Trial Tr. 355:4 – 356:20; 384:7-16 (Ahrens Testimony); Ex. 17, LWV "How to Get Voters in Suspense Fully Registered").)

94.     In one registration effort, Kansas League volunteers in Douglas County went to high schools to register voters but returned with such "large numbers of incomplete voter registrations" due to the fact that the students did not have DPOC at hand that the volunteers called the students' families and schools and went back three times "to try to get as many young people registered."  (Mar. 7, 2018 AM Trial Tr. 346:19 – 349:17 (Ahrens Testimony).)

95.     During another voter registration effort at Washburn University, Kansas League volunteers provided multiple opportunities for students to complete their voter registration applications and to provide DPOC, by maintaining a voter registration table at the university over multiple weeks.   Despite this concerted effort, out of approximately 400 students who attempted to register to vote, only about 75 students successfully completed their registration applications.  (Mar. 7, 2018 AM Trial Tr. 424:20 – 425:19; 433:25 – 434:5.)

96.     Ms. Ahrens described the DPOC law's effect on the Kansas League's ability to successfully assist voters with their registrations as "devastating."   (Mar. 7, 2018 AM Trial Tr. 344:5-12.)

97.     Second, the DPOC requirement has forced the Kansas League to devote substantial resources to assist voters whose applications are in "suspense" due to the failure to provide DPOC.   To reach these suspended voters, the Kansas League has purchased from the KSOS both the list of voters whose applications are incomplete (the "suspense list") as well as

the full voter file several times.   (Mar. 7, 2018 AM Trial Tr. 350:22 – 351:24 (Ahrens Testimony).)  It has then used a variety of means to encourage and assist those suspended voters to satisfy the DPOC requirement in order to complete their registrations.  For example, the Kansas League has published the suspense list on the Kansas League website and circulated the list to local newspapers to do the same in order to notify applicants that their registrations are not complete.  (*Id.* at 350:22 – 353:12.)

98.   Kansas League volunteers also spent considerable time and effort to reach individuals on the suspense list directly in order to assist them in completing their registration applications.  (Mar. 7, 2018 AM Trial Tr. 352:3 – 355:3; 381:19 – 383:6 (Ahrens Testimony); Ex. 17, LWV "How to Get Voters in Suspense Fully Registered.")   For example, after unsuccessful attempts to reach individuals on the suspense list by phone and email, Kansas League volunteers in Douglas County, carrying a copier, visited the residences of 115 people whose voter registration applications were on the suspense list.   (Mar. 7, 2018 AM Trial Tr. 352:3 – 355:3; Ex. 17 at 2.)  Of those 115 people, only 30 ultimately registered.  (Mar. 7, 2018 AM Trial Tr. 354:16 – 355:3; Ex. 17 at 2.)  At least half of these 30 individuals who completed their registrations did not personally possess or were not able to provide DPOC to the Kansas League volunteers and were unable to complete their registrations immediately on-site.  (Mar. 7, 2018 AM Trial Tr. 352:3 – 355:3; 422:10 – 424:17.)

99.   Since the DPOC Law went into effect, the Kansas League has devoted thousands of hours to contacting the tens of thousands of voters on the suspense list and attempting to help them satisfy the DPOC requirement.  (Mar. 7, 2018 AM Trial Tr. 347:18 – 350:8.)

100.   Third, the DPOC requirement has forced the Kansas League to spend a considerable amount of member resources—including volunteer time—and money to educate the

public about registering under the DPOC law.  (Mar. 7, 2018 AM Trial Tr. 350:22 – 353:16; 356:21 – 361:18 (Ahrens Testimony); Ex. 13, LWV Flyers for Public Distribution; Ex. 17, LWV "How to Get Voters in Suspense Fully Registered.")

101.    The Kansas League created thousands of informational trifolds "to help people understand the changes in the law and how to participate in the vote" that volunteers distributed to community colleges, public libraries, and high schools across the state.  (Mar. 7, 2018 AM Trial Tr. 357:2 – 359:6 (Ahrens Testimony); Ex. 13, LWV Flyers for Public Distribution.)  The Kansas League had in the past developed written educational materials to assist voters in registering in the past but "not to this extent."  (Mar. 7, 2018 AM Trial Tr. 413:3-6.)

102.    The Kansas League also developed a teaching module and an accompanying instructional video to distribute on its website and to universities, community colleges, vocational and technical schools, and high schools throughout the state in order to reach new voters in particular regarding how to register to vote under the SAFE Act.  (Mar. 7, 2018 AM Trial Tr. 356:21 – 361:18 (Ahrens Testimony).)

103.    Following the Court's preliminary injunction in this case, the Kansas League learned that some county elections officials were not sending out "postcards" or "certificates of registration" to individuals who were registered to vote pursuant to court orders but had not provided DPOC.  (Mar. 7, 2018 AM Trial Tr. 372:23 – 375:25, 396:15 – 398:24 (Ahrens Testimony); Ex. 66, Shawnee County Voter Reg. Certificate.)  These "postcards" inform registrants of their state and local voting districts as well where their polling location is, and is traditionally the way Kansans are informed that they are registered to vote.  (Mar. 7, 2018 AM Trial Tr. 372:23 – 375:25; Ex. 66)  The letter received by individuals registered to vote pursuant to court orders did not provide them with their voting district or polling location information.

26

(Mar. 7, 2018 AM Trial Tr. 372:23 – 373:17; 397:6 – 398:2.)

104.   Upon learning that some county elections officials were not sending out "postcards" to all individuals registered pursuant to court orders, Kansas League volunteers devoted time to surveying other local elections officials in order to determine their practices in regards to sending postcards.  (Mar. 7, 2018 AM Trial Tr. 373:18-23 (Ahrens Testimony).)

105.   Following the Court's preliminary injunction in this case, the Kansas League again obtained a copy of the suspense list from the KSOS.  (Mar. 7, 2018 AM Trial Tr. 365:13 – 367:16 (Ahrens Testimony).)  This list included the names of voters who were registered and who could vote under court orders, including this Court's preliminary injunction ruling.  (*Id.* at 365:13 – 367:16.)  The KSOS refused the Kansas League's request for a list of suspended applicants that did not include voters registered under court orders.  (*Id.* at 365:13 – 367:16.)  As a result, the Kansas League is no longer able to effectively use the suspense list to inform and reach voters who are unable to vote because their registration applications are incomplete.  (*Id.* at 365:13 – 367:16.)

106.   Because of the need to combat the effects of the DPOC requirement, the Kansas League has had to divert its limited resources and focus away from other initiatives, such as studies and advocacy on taxation, public education funding, and mental health services, among other issues, in order to focus on the barriers to voter registration imposed by the DPOC requirement.  (Mar. 7, 2018 AM Trial Tr. 361:22 – 363:5 (Ahrens Testimony).)  Even within the realm of its primary work to protect the vote, the Kansas League "had no resources" to address concerns it had with respect to the barriers to the vote imposed by the SAFE Act's new photo ID requirement despite the fact that this was a "major issue."  (*Id.* at 362:20 – 363:5.)  Ms. Ahrens testified credibly that the activities that the Kansas League undertook in response to the DPOC

requirement "totally drained our resources . . . both in terms of volunteerism and also in terms of money."  (*Id.* at 362:16-19.)

## V.    DEFENDANT'S EVIDENCE AS TO THE BURDENS OF THE DPOC REQUIREMENT

107.    Defendant offered four kinds of evidence to suggest that the DPOC requirement is not burdensome: (1) the existence of an alternative hearing process for voter registration applicants to establish citizenship without DPOC, by requesting a hearing before the State Election Board (K.S.A. § 25-2309(m); Mar. 8, 2018 PM Trial Tr. 773:23 – 775:5 (Caskey Testimony); Ex. 837, Request for Consideration Form ("RCD Form")); (2) two surveys of DPOC possession rates; (3) turnout evidence; and (4) post-preliminary injunction evidence.  This evidence either supports Plaintiffs' claims or is methodologically flawed or legally irrelevant.

### A.  DPOC Law Hearings

108.    The State Election Board is comprised of the Secretary of State, the Lieutenant Governor and the Attorney General.  (Mar. 8, 2018 PM Trial Tr. 780:10 – 781:8 (Caskey Testimony); Ex. 837, RCD Form, at 2.)

109.    An individual must submit an RCD Form in order to schedule a hearing to establish citizenship for purposes of voter registration.  (Mar. 8, 2018 PM Trial Tr. 775:2-20 (Caskey Testimony); Ex. 837, RCD Form.)  The RCD Form states that a false statement on this affirmation is a severity level 9 felony and then requires applicants to declare under penalty of perjury that they "do not possess any of the documents . . . that may be used for proof of citizenship according to Kansas law."  (Ex. 837 at 1; Mar. 8, 2018 PM Trial Tr. 776:9-13; 777:8 – 778:9 (Caskey Testimony).)

110.    After submitting an RCD Form, an applicant schedules a hearing with the State

Election Board.[7]  (Mar. 8, 2018 PM Trial Tr. 774:5-14 (Caskey Testimony); Ex. 837, RCD Form.)  The only information provided by the Form RCD regarding scheduling is that "the Board will give the applicant at least five days notice of the date, time and location of the hearing." (Ex. 837 at 2; Mar. 8, 2018 PM Trial Tr. 774:5-21.)  In scheduling the hearing, the applicant's availability is not the only relevant consideration for the State Election Board.  (Mar. 8, 2018 PM Trial Tr. 781:22-25 .)

111.    The KSOS provides no guidance as to how one may go about proving citizenship at a hearing.  The Form RCD states only that the applicant may "provide supporting evidence of his/her U.S. citizenship" and lists no examples.  (Ex. 837, RCD Form, at 2.)  The KSOS does not provide an exhaustive list of evidence or alternative forms of documentation sufficient to establish citizenship though this process.    (Mar. 8, 2018 PM Trial Tr. 786:8-10 (Caskey Testimony); Ex. 837.)

112.    Defendant offered no evidence that most Kansas voter registration applicants who might need to use the hearing process are aware of its existence.  Several of the Individual Plaintiffs testified that they were not informed of the hearing process at the time that they registered to vote, or at the time that they learned that their registration applications were suspended.  (Mar. 7, 2018 PM Trial Tr. 503:4-9 (Fish Testimony); Mar. 6, 2018 AM Trial Tr. 101:4-8 (Bucci Testimony); Mar. 6, 2018 PM Trial Tr. 268:22 – 269:1 (Boynton Testimony).) For example, Ms. Bucci only learned about the hearing process after she initiated this litigation, by being informed about the existence of the hearing process during her deposition.  (Mar. 6, 2018 AM Trial Tr. 101:4-8.)

---

[7] While Defendant suggested at trial that the designees of the State Election Board members could participate in the hearings in their stead, the RCD Form does not indicate that to prospective applicants.  (Ex. 837, RCD Form, at 2.)

113.    Ms. Ahrens testified that the Kansas League had not encountered anyone who was "willing to go as far as to try to" go through the hearing process and that she could not recall "anyone who would have had the – patience and the gumption and the personal resources to wade through" this alternative process.  (Mar. 7, 2018 AM Trial Tr. 363:12-24; *see also id.* 414:19-24 ("It is my testimony that for someone . . . to have the confidence and time to walk through the system, make the application, fill the form and make a conference call with the Secretary of State and other leaders in our state is more than almost anyone would do.")

114.    Ms. Bucci testified that she would not be able to participate in even a telephonic hearing of this nature, because she is not allowed to take a break from work to use her cell phone.  (Mar. 6, 2018 AM Trial Tr. 114:3-14; 115:25 – 116:6.)

115.    Although Defendant's proffered expert witness Dr. Richman referenced the hearing process as evidence that the DPOC requirement is not burdensome, he acknowledged that he does not know whether eligible voters in Kansas are aware of the hearing, (Mar. 13, 2018 AM Trial Tr. 1594:21 – 1595:1), or how many people in Kansas had access to the hearing, (*Id.* at 1595:2 – 6).  He also testified that the process of obtaining a hearing constitutes an additional step that increases the marginal cost of registering to vote.  (*Id.* at 1595:7-13.).  As Dr. Richman acknowledged in a peer-reviewed article called "Can the College Vote Turn Out," "[e]lectoral rules that increase the costs of voting are expected to diminish voter participation."  (*Id.* at 1567:24 – 1570:11; Ex. 153, Article by Dr. Richman "Can the College Vote Turnout".)

116.    Another of Defendant's proffered expert witnesses, Hans von Spakovsky, also offered the opinion that the DPOC requirement in Kansas is not burdensome because of the existence of the alternative hearing option.  (Mar. 9, 2018 PM, Trial Tr. 1114:7-11.)  However, at the time that he offered this opinion, Mr. von Spakovsky did not know how often the hearing

procedure had been used in Kansas or to what extent Kansans are informed or are aware of this procedure.  (Mar. 9, 2018 PM, Trial Tr. 1114:12 – 1116:7.)

117.    Since the effective date of the DPOC requirement, only five individuals have utilized the hearing process to establish that they are U.S. citizens in order to register to vote. (Mar. 12, 2018 AM Trial Tr. 1239:12 – 23; Ex. 150, Hearing Records (hearing records of only 5 individuals).)

118.    Defendant Kobach proffered the testimony of one of these five individuals, Jo French.   Ms. French testified that the hearing process was "very relaxed," but she also acknowledged that she "worked very hard to get [it] done," (Mar. 12, 2018 PM Trial Tr. 1410:5-22), and her purpose in offering her testimony was to make Defendant Kobach "look good," (*Id.* at 1423:5-15; 1429:22 – 1430:3).   As a result of the hearing process, Ms. French described herself and Deputy Secretary of State Eric Rucker as her "friends."  (*Id.* at 1424:10 – 1425:3.)

119.    The substance of Ms. French's testimony suggests that the hearing procedure does not mitigate the burdens of the DPOC requirement.  First, Ms. French had to pay $8 for the state of Arkansas to search for her birth certificate—which she already knew it could not locate as she had requested the document twice before—in order to obtain official confirmation that her birth certificate did not exist.  (Mar. 12, 2018 PM Trial Tr. 1415:17 – 1416:4.)  She then had to collect various other documents, and enlisted the help of four individuals to do so: (1) Deputy Secretary of State Rucker, who reached out to Ms. French's friends; (2) Kay Huggins, a friend in Arkansas who helped locate Ms. French's baptism record and wrote a letter on her behalf; (3) the school secretary at Rector's School District in Arkansas who helped locate Ms. French's school records; and (4) Ms. Sherry Doles, Ms. French's cousin, who spoke with Mr. Rucker.  (*Id.* at. 1416:5 – 1419:4, 1424:15 – 1425:5; Ex. 150, Hearing Records, at 55-73.)  Next, Ms. French had to enlist

31

the assistance of another friend, Ms. Susan, who drove her to and from the hearing, which was 40 minutes from her home, on a rainy day which are difficult travel days for Ms. French due to a knee replacement. (*Mar. 12, 2018 PM Trial Tr.* 1419:10-22.) Ms. French testified that the entire process, from her initial voter registration attempt until completion of her hearing, took her over 5 months. (*Id.* at 1412:19-21; 1419:10-13; Ex. 150.)

120.   Present during Ms. French's hearing was Defendant Kobach, the Kansas Lieutenant Governor, and a representative from the Attorney General's Office. (Ex. 150, Hearing Records, at 55.) Also in attendance were at least two personnel from the KSOS, and members of the media. (Mar. 12, 2018 PM Trial Tr. 1419:23 – 1421:15.) The hearing lasted 30-35 minutes. (*Id* at 1410:14-20.)

121.   Following the hearing Ms. French stated: "I just thought it was strange that I had to go through this procedure to be able to vote. And any other state you go in, throw down your driver's license and that gives you the right to vote. So this was totally off the wall for me." (Mar. 12, 2018 PM Trial Tr. 1421:20 – 1422:4.) She also stated, "I don't look funny. I don't talk funny, I've been here all my life," and that she couldn't imagine having to go through so much to prove she could vote. (*Id.* at 1421:16 – 1422:10.)

122.   The record contains information about four other individuals who utilized the hearing process, and their experiences provide further evidence as to the DPOC requirement's burdens. (Ex. 150, Hearing Records.) One individual who established citizenship through a hearing, with the initials T.C., was represented by counsel at the hearing. (Ex. 150 2). Another individual who used the hearing process, Dale Weber, stated that he did not possess citizenship documents and procuring such documents was cost prohibitive. (Ex. 150 at 46.) A third individual was born in the Philippines illegitimately, came to the United States as a young girl

with her mother, who was a green card holder and later naturalized while her daughter was under the age of 18, which automatically rendered the daughter a U.S. citizen as well; but the applicant lacked any documentation of these events, and was forced to appear before three high-ranking government officials in order to register to vote.  (Mar. 12, 2018 AM Trial Tr. 1228:2-21; Ex. 150 at 50-53.)

123.    During Mr. Weber's hearing, the State Election Board accepted an affidavit that Mr. Weber executed on his own behalf as proof of his citizenship.  (Ex. 150, Hearing Records, at 46.)  That is consistent with Defendant Kobach's past representation, as a member of the State Election Board, that a declaration and nothing more would be sufficient to establish citizenship at a hearing.  (Mar. 8, 2018 PM Trial Tr. 787:20 – 788:9 (Caskey Testimony).)

### B.  Defendant's Evidence Regarding DPOC Possession Rates

124.    Defendant proffered the testimony of two expert witnesses, Patrick McFerron and Dr. Richman, regarding the rate of DPOC possession in Kansas, derived from two separate surveys.

### i.  *McFerron's Survey Regarding Document Possession Rates Among Eligible Kansas Voters*

125.    At Defendant's request, the polling firm of Defendant's proffered expert Patrick McFerron conducted a telephone survey regarding "the rates of possession of . .  documentary proof of citizenship in Kansas (the "McFerron Survey").  (Mar. 19, 2018 AM Trial Tr. 1885:21-24, 1903:20 – 1904:8.)

126.    Mr. McFerron is a pollster, not a statistician.  (Mar. 19, 2018 AM Trial Tr. 1951:9.)  Mr. McFerron took one statistics course as an undergraduate and one statistics course while he was a master's student, though he cannot recall the name of the graduate statistics course.  (*Id.* at 1961:6-1962:1.)  Although Mr. McFerron has heard of the common statistics term

"T Statistic," he does not know what it means nor does he know how to calculate it. (*Id.* at 1962:19-1963:3.)  Mr. McFerron has never written a peer-reviewed article.  (*Id.* at 1955:2-4.) Nor has he ever served as a peer reviewer for a journal.  (*Id.* at 1955:5-7.)  Mr. McFerron has not published anything on survey methodology or polling methodology.  (*Id.* at 1954:14-16.)  At the time of deposition, Mr. McFerron was not familiar with the American Association of Public Opinion Research.  (*Id.* at 1957:18-22.)  He is not familiar with the basic concept of social desirability as it relates to survey research.  (*Id.* at 1946:12-19.)  Mr. McFerron has never previously testified as an expert witness.  (*Id.* at 1950:5-7.)

127.    While Mr. McFerron was proffered as Defendant's expert,[8] his submission in this case fails to conform to the requirements of Federal Rules of Civil Procedure Rule 26(a)(2)(B). The two-page summary that purports to summarize the results of the McFerron Survey does not contain a statement of Mr. McFerron's compensation,[9] a statement of his qualifications, or a list of all publications that he has either authored or co-authored in the past ten years. (Mar. 19, 2018

---

[8] Throughout Mr. McFerron's direct examination, Defendant vacillated between treating Mr. McFerron as a lay witness and treating him as an expert witness.  (*See, e.g.*, Mar. 19, 2018 AM Trial Tr. 1933:8-17) ("Ms. Becker: And I would like to just state for the record that defendant listed [Mr. McFerron] as a fact witness. He did not provide an expert report . . . Court: Well, you're being schizophrenic because you say that but then, on the other hand, you continue to elicit testimony that really sounds like the testimony that you elicit from an expert witness.")) At the end of the direct examination, it appeared that Defendant settled on proffering Mr. McFerron as an expert witness.  (*Id.* at 1936:25 – 1937:17) ("Court: Ms. Becker, it would really help me in analyzing this if you would tell me. Is [Mr. McFerron] being offered as an expert . . . someone offering lay opinion? What is [Mr. McFerron] being offered for? A: . . . he's being offered as an expert . . . Court: All right. Because you not more than a few minutes ago told me the opposite . . . . A: We're electing expert.")) Plaintiffs have preserved their objection that Mr. McFerron is not qualified to testify in this case. (*See id. at* 1896:7 – 1898:22.)

[9] On direct examination, Mr. McFerron testified that he had charged Defendant $9,000 for the McFerron Survey, (Mar. 19 AM Trial Tr. 1904:9-11), but he did not disclose until cross examination that Defendant had two weeks earlier promised—through "email traffic" that was not produced—to pay him additional compensation for "research" and for "testimony," (*id.* at 1959:14 – 1960:13).

AM Trial Tr. 1953:10 – 1954:2; *see* Ex. 863, Survey of Noncitizens and Executive Summary,[10] at 1-2.)  Mr. McFerron did not sign the two-page report that purports to summarize the results of the McFerron Survey.  (Mar. 19. 2018 AM Trial Tr. 1953:1-9; *see* Ex. 863 at 1-2.)  At the time that he conducted the McFerron Survey, Mr. McFerron himself did not know whether he was being paid to be a fact witness or to be an expert witness.  (Mar. 19 2018 AM Trial Tr. 1949:5-13.)

128.    The McFerron Survey purportedly found that 98% of "legal residents surveyed . . . have either a birth certificate showing citizenship or a US passport readily available" and that "[t]his increases to 99% when including other hospital records or military records."  (Ex. 863, Survey of Noncitizens and Executive Summary, at 1.)

129.    Plaintiffs' rebuttal expert Dr. Matthew Barreto evaluated the McFerron Survey and testified credibly as to the survey's flaws.  Dr. Barreto is a Professor of Political Science in Chicano Studies at the University of California, Los Angeles.  (Mar. 19, 2018 PM Trial Tr. 2046:18-20, 2047:18 – 2048:5.)  He has taught several classes on research methodology and survey methodologies, as well as classes on statistical analysis.  (*Id.* at 2047:21 – 2048:5.)  He has authored four books and about 60 articles and book chapters—all of which have been subject to peer review.  *Id.* at 2048:10-16.)  He is also the co-founder of the research and polling firm Latino Decisions.  (*Id.* at 2051:20-22.)  In addition, Dr. Barreto's expert testimony has been credited by several courts in voting rights cases.  *See, e.g.*, *Frank v. Walker*, 17 F. Supp. 3d 837 (E.D. Wis. 2014), *rev'd on other grounds*; *Veasey v. Perry*, 71 F. Supp. 3d 627 (S.D. Tex. 2014), *aff'd in part, rev'd in part on other grounds*, *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en

---

[10] Ex. 863, Survey of Noncitizens and Executive Summary has not been officially admitted by the Court.  At trial, the Court permitted admission of this survey under advisement.  (Mar. 19. 2018 AM Trial Tr. 1906:5-6.)

banc).[11]

130.    The McFerron Survey suffers from at least six flaws that render it unreliable as to DPOC possession rates.  First, the McFerron Survey does not contain a large enough sample for reliable estimates about individuals who might be burdened by the DPOC requirement.  The McFerron Survey targeted eligible Kansas voters generally, rather than the pool of individuals who are actually subject to the DPOC requirement: eligible Kansas voters who are not yet registered to vote.  (Ex. 863, Survey of Noncitizens and Executive Summary, at 8; *see also* Mar. 19. 2018 AM Trial Tr. 1984:13-15 (McFerron Testimony).)  The McFerron Survey contained a sample of only 65 individuals who were not yet registered to vote.  (Ex. 863 at 8.)  This is substantially less than the sample size of 300-500 people that Mr. McFerron testified would be necessary for reliable statistical results at the statewide level.  (Mar. 19. 2018 AM Trial Tr. 1983:14-1984: 25.)

131.    Second, even with respect to the eligible population generally, the sample of 500 Kansas adults in the McFerron Survey was not a representative sample of the entire eligible voting population.  (Mar. 19, 2018 PM Trial Tr. 2056:18-21 (Barreto Testimony).)  The "most important and single first principle" one considers in a survey is whether the survey sample is representative of the population as a whole.  (*Id.* at 2057:12 – 2058:1.)  The McFerron Survey did not look at respondents' educational attainment, household income categories, and homeownership or renter status in order to ensure representativeness.  (*Id.* at 2058:8 – 2059:5.)

132.    Rather than using weights, as is typical of most survey researchers, the McFerron Survey relied on a quota-based approach.  (Mar. 19, 2018 AM Trial Tr. 1964:10-11 (McFerron Testimony); Mar. 19, 2018 PM Trial Tr. 2063:10-24 (Barreto Testimony).)   Most survey

---

[11] The Court takes judicial notice of these decisions.

researchers use a weighting system to account for differences between a survey sample and the larger population.  (Mar. 19, 2018 AM Trial Tr. 1964:7-9, 1965:15-17 (McFerron Testimony).) By contrast, quota sampling is a method of sampling that sets quotas for respondents who satisfy given criteria, in this case geography, age, and gender. (Mar. 19, 2018 AM Trial Tr. 1934:7-12 (McFerron Testimony).)  Mr. McFerron provides no citation to support his use of the quota system. (*Id.* at 1964:14-17.)  His use of quota sampling resulted in demographic inconsistences between his survey and the Kansas citizen voting age population as a whole.  (Mar. 19, 2018 PM Trial Tr. 2067:15-20 (Barreto Testimony).)  For example, Mr. McFerron reported in his survey that 39% of households were below $50,000, while the census reports that this figure was 48%. (*Id.* at 2067:21 – 2068:2.)

133.    With respect to income, the McFerron Survey simply asked respondents a binary question of whether their income is over or under $50,000 a year, (Mar. 19, 2018 AM Trial Tr. 1977:23 – 1978:3 (McFerron Testimony); Mar. 19, 2018 PM Trial Tr. 2061:8-14 (Barreto Testimony)), which is insufficient to ensure that the survey sample matches the Kansas population in terms of income stratification.  (*See* Mar. 19, 2018 AM Trial Tr. 1972:15-19 (McFerron Testimony).)  In particular, Mr. McFerron made no effort to ensure that his survey sample was representative of the Kansas population in terms of the percentage of people living below the poverty line, (*id.* at 1972:12-14), which is a critical omission given that poverty might affect the probability that a person possesses a citizenship document like a passport.  (Mar. 19, 2017 PM Trial Tr. 2060:13-19 (Barreto Testimony).)

134.    The McFerron Survey was further biased in that the sample of those polled differed from the Kansas population in other ways.  For example, 50% of the McFerron Survey respondents had a U.S. passport, but when checked against other records and documents

provided by the State Department, only about 30% of Kansas households actually had a U.S. passport.  (Mar. 19, 2018 PM Trial Tr. 2068:14-24 (Barreto Testimony).)  In addition, 83% of the McFerron Survey respondents were registered to vote, but Census data—on which Defendant's other expert, Dr. Steven Camarota, relied when measuring registration rates, (Ex. 1140, Camarota Expert Rep., at 10)[12]—indicated that only approximately 68% of Kansans were registered to vote.  (Mar. 19, 2018 PM Trial Tr. 2069:22 – 2070:2 (Barreto Testimony).)

135.    Third, the McFerron Survey was also implemented contrary to generally accepted survey practices.  (Mar. 19, 2018 PM Trial Tr. 2057:1-5 (Barreto Testimony).)  The survey was only conducted in the evening hours between Monday to Wednesday, (*id.* at 2081:2-14), and not administered on any Sunday.  (Mar. 19, 2018 AM Trial Tr. 1981:4-6 (McFerron Testimony).)  This sampling schedule precluded participation from individuals who, due to their work schedule, may not have been available during those hours.  (Mar. 19, 2018 PM Trial Tr. 2083:1-7 (Barreto Testimony).)  The implementation of the McFerron Survey was performed in violation of norms in the field of survey research.  (Mar. 19, 2018 PM Trial Tr. 2057:1-5 (Barreto Testimony).)

136.    Fourth, when reporting these results, Mr. McFerron did not include a response rate, which makes it impossible to assess the reliability and the generalizability of the data collected.  (Mar. 19, 2018 AM Trial Tr. 1958:5-7, 1969:15-19 (McFerron Testimony); Mar. 19, 2018 PM Trial Tr. 2062:10-21 (Barreto Testimony).)

137.    Fifth, the critical questions on the McFerron Survey about DPOC possession are contaminated by bias, because their wording primed respondents to state that they possessed

---

[12] Ex. 1140, Camarota Expert Report, was provisionally admitted at trial under advisement by the Court.  (Mar. 12, 2018 AM Trial Tr. 1265:10-22.)

DPOC even if they did not.   Before any questions about possession of DPOC are asked, respondents were asked a series of nine questions that were prefaced with the following:

> Now I want to read you a short list of documents.  Only one of these documents is needed in order to register to vote in Kansas. For each of these, please let me know if you have that document at your home, office, or other location or if someone else keeps the document for you and could get it to you if necessary, or if the document does not exist.

(Ex. 863, Survey of Noncitizens and Executive Summary, at 3; Mar. 19, 2018 AM Trial Tr. 1943:22 – 1944:16 (McFerron Testimony).)  The nine questions that followed then asked about the types of documents that can be used to meet the DPOC requirement (*e.g.*, birth certificates). (Ex. 863 at 3; Mar. 19, 2018 AM Trial Tr. 1913:8-18.)  The initial prefatory statement, however, primed the respondent that one of the documents on a list he/she would hear was needed in order to register to vote in Kansas.  (Mar. 19, 2018 PM Trial Tr. 2075:4 – 2076:14; *see also* 2079:3 – 2080:11 (Barreto Testimony).)  Extensive political science research suggests that such priming will lead to overreporting of whether individuals have access to documents.  (*Id.* at 2076:15-2077:20.)

138.    Sixth, the McFerron Survey is also of limited value in determining the burdens of the DPOC requirement, because it did not ask important follow-up questions. The individuals who conducted the McFerron Survey did not break the preface into sub-parts, *e.g.*, they did not wait until after the respondent said that they did not have the particular document to ask whether someone else keeps the document for them. (Mar. 19, 2018 AM Trial Tr. 1947:6-10 (McFerron Testimony).)  Respondents were not asked how long it would take for them to get a copy of their birth certificates.  (*Id.* at 1947:11-13.)  Nor were they asked how much it would cost them to obtain a birth certificate.  (*Id.* at 1947:14-17.)  Respondents were also not asked whether the name on their birth certificate matches their current name.  (*Id.* at 1947:18-21.)  They were not

asked whether the name on any document that could have been used to meet the DPOC requirement matches their current name.  (*Id.* at 1947:18 – 1948:2.)   Mr. McFerron acknowledged that people sometimes change their names, and thus, a person who answered that they do possess DPOC might still be unable to satisfy the DPOC requirement because of a name mismatch.  (*Id.* at 1948:3-6).)

### ii.  Dr. Richman's Survey of Document Possession Rates Among Voters on the Suspense List

139.    Defendant's proffered expert Dr. Richman conducted a survey of individuals on the Suspense Voter List, to assess the degree to which suspended voters have access to DPOC. He estimated that 2.2% of self-identified citizens on the Suspense List do not possess DPOC, do not have someone else who keeps such a document for them, and were not born in Kansas (and thus, cannot rely on the KSOS's efforts to locate the birth certificates of native Kansans).  (Mar. 13, 2018 AM Trial Tr. 1586:25 – 1587:7.)  Dr. Richman thus concludes that 97.8% of citizens on the suspense list have what he describes as "immediate access" to DPOC. (*Id.* at 1586:15-24; 1591:22 – 1592:3.)

140.    Dr. Richman's estimate as to the DPOC possession rate among suspended citizens is based on a total of 32 respondents who self-identified as U.S. citizens.  (Mar. 13, 2018 AM Trial Tr. 1590:15-24.)  Concerned that these 32 individuals may have misstated their citizenship status on the survey, Dr. Richman sought (but did not receive) confirmation through the Department of Homeland Security that they were, in fact, U.S. citizens.  (*Id.* at 1590:25 – 1591:10.)

141.    While Dr. Richman claimed to estimate the number of individuals who had "immediate access" to DPOC, his estimate includes individuals who do not personally possess DPOC, but have someone who "keeps" such a document for them.  (Mar. 13, 2018 AM Trial Tr.

1586:25 – 1587:16, 1591:22 – 1592:25.)  Obtaining a document from another person constitutes an "additional step" in the voter registration process, which increases the costs of voting (*id.* at 1594:2-8 (Richman Testimony).)  As Dr. Richman himself has written in his published articles: "Electoral rules that increase the costs of voting are expected to diminish voter participation." (*Id.* at 1568:2 – 1570:11.)

142.    Although Dr. Richman speculated that it would be relatively easy for a registration applicant to obtain a citizenship document from another person who "keeps" the document for them, his survey provides no information as to where the person who keeps the document is, (Mar. 13, 2018 AM Trial Tr. 1592:21-25), for instance in another state, (*id.* at 1593:1-3), or how difficult it would be for the respondent to obtain the documents from the person who keeps it, (*id.* at 1593:4-12).  As such, Richman conceded that it was an overstatement to say that a respondent has "immediate access" to DPOC when answering yes to the survey question, (*id.* at 1593:13 – 1594:1).

143.    Dr. Richman's estimate of the DPOC possession rate concerns only people on the Suspense List; it does not purport to assess the percentage of all eligible Kansas voters generally, or the percentage of *eligible but unregistered* voters, who (1) do not have documents that would satisfy the DPOC requirement, (2) do not have someone who keeps such a document for them, and (3) were not born in the state of Kansas.  (Mar. 13, 2018 AM Trial Tr. 1587:11-16, 1588:25 – 1589:5.)  Dr. Richman testified that he sought to obtain information from the KSOS that would allow him to calculate such an estimate, but that this information was not provided to him.  (*Id.* at 1589:6-12.)

### C.  Defendant's Proffered Evidence Regarding Turnout and Registration Rates

144.    Defendant's proffered expert Dr. Camarota offered testimony concerning registration and turnout rates in Kansas, and opined that this evidence suggested that the DPOC

requirement is not burdensome.

145.    Dr. Camarota is the Director of Research at the Center for Immigration Studies ("CIS"), a position that he held since 2000; he has worked at CIS since 1996.  (Mar. 12, 2018 AM Trial Tr. 1308:13-24.)  As the Director of Research at CIS, Dr. Camarota compiles reports that generally concern immigration and citizenship topics.  (*Id.* at 1336:12-15.)  These reports are not subject to the academic peer review process.  (*Id.* at 1308:25 – 1309:7.)  Dr. Camarota's dissertation was not about voter registration, voter turnout, or even voting generally.  (*Id.* at 1307:23 – 1308:9.)  He has never published a peer-reviewed publication related to the effect of voter registration requirements on voter participation rates, voter registration requirements, voter registration, voter turnout, or anything related to voting.  (*Id.* at 1311:15 – 1312:8.)

146.    Dr. Camarota believes that the current "level of immigration" is placing a strain on one of the "glue[s] that holds the country together"—the English language.  (Mar. 12, 2018 AM Trial Tr. 1339:11-21.)  Dr. Camarota also believes that at the federal level, noncitizens are more likely to commit crimes than citizens.  (*Id.* at 1339:5-10).  Further, as Director of Research for CIS, Dr. Camarota has written: "It is almost certain that a majority of the non-citizens convicted of federal crimes are illegal immigrants," (Ex. 151, Center for Immigration Studies: "Non-Citizens Committed a Disproportionate Share of Federal Crimes, 2011-16" at 1; *see* Mar. 12, 2018 AM Trial Tr. 1338:2-20), even though, by his own admission, "we cannot say for sure [that a majority of non-citizens convicted of federal crimes are illegal immigrants] because that information is not provided."  (Ex. 151 at 1.)

147.    Dr. Camarota has testified in one case concerning voting.  In this case, Dr. Camarota's testimony was first limited based on his lack of qualifications, and then ultimately rejected as misleading.  In *Bellitto v. Snipes*, No. 16-CV-61474, 2017 WL 2972837, at *9 (S.D.

42

Fla. July 12, 2017), the court initially issued a pretrial ruling finding that Dr. Camarota was "not qualified to offer testimony as to the degree of accuracy of . . rates [of voter registration from the Census Bureau's American Community Survey ("ACS")]."  (Mar. 12, 2018 AM Trial Tr. 1306:18 – 1307:8.)  Following trial, the court conclusively rejected Dr. Camarota's testimony and analysis of ACS data, finding them to be "misleading" and "inaccurate" because he cherry picked survey results, which does "not allow for an accurate comparison."  *Bellitto v. Snipes*, No. 16-61474, slip op. at 18, 19-20 (S.D. Fla. Mar. 30, 2018), ECF No. 244.

148.    In this case, Dr. Camarota evaluated ACS data regarding overall voter registration and turnout rates in Kansas between the 2010 and 2014 midterm elections, as well as similar data from two neighboring states, Nebraska and Oklahoma, and national data from the United States as a whole.[13]  (Mar. 12, 2018 AM Trial Tr. 1270:2 – 1271:10.)  He testified that, in Kansas, the ACS registered a small decrease in the overall voter registration rate but a small increase in overall voter turnout in 2014 versus 2010.  (*Id.* at 1320:12-16, 1270:2 – 1271:10; Ex. 1140, Camarota Expert Rep., at 10.)  Dr. Camarota relies on this survey information to conclude that "there is no indication that Kansas's proof of citizenship requirement has negatively affected registration and voting rates of U.S. citizens in the state."  (Ex. 1140 at 8.)

149.    Dr. Camarota does not provide a breakdown of the people who registered to vote before the DPOC law went into effect on January 1, 2013 and the people who registered to vote after it went into effect.  (Mar. 12, 2018 AM Trial Tr. 1270:2 – 1271:10) ("The Court: In other words, there's not a breakdown between the people that registered to vote before DPOC became

---

[13] Dr. Camarota also drew conclusions based on administrative data provided to him by State Elections Director Bryan Caskey.  (Mar. 12, 2018 AM Trial Tr. 1312:20 – 1313:1.)  Despite not knowing how Mr. Caskey maintained the data and knowing that administrative data can often have inconsistencies, (*id.* at 1313:2-7), Dr. Camarota asked Mr. Caskey for whatever data he had because "time was of the essence."  (*Id.* at 1315:17 – 1316:2.)

effective on January 1, 2013 and after . . . . No breakdown. Correct? A. Yeah, this is just who was registered at each point in time.")  Likewise, Dr. Camarota did not supplement his July 1, 2016 expert report with comparisons of voter registration data and voter turnout data from the 2012 presidential election (*i.e.*, the presidential election before the DPOC law went into effect) with voter registration data and voter turnout data from the 2016 presidential election (*i.e.*, the presidential election after the DPOC law went into effect).  (*Id.* at 1323:22 – 1324:4; Ex. 1140, Camarota Expert Rep., at 15.)

150.    Dr. McDonald, who has substantial experience analyzing and publishing research on voter registration and turnout, credibly testified that measuring a change in overall registration and voting rates in Kansas between two midterm elections does not meaningfully assist in evaluating the law's impact on voter registration for at least three reasons.

151.    First, because the DPOC law applies only to new applicants, it would not reasonably be expected to have a major impact on total registration and turnout rates in Kansas, as measured by survey data.  (Mar. 6, 2018 PM Trial Tr. 158:1-21.)  The large majority of voters in Kansas registered before 2013, and were exempt from the DPOC requirement. (K.S.A. § 25-2309(n); PTO Stip. ¶ 50; Mar. 6, 2018 PM Trial Tr. 154:24 – 156:2.)  Comparatively speaking, the total of approximately 30,000 Kansas voters blocked by the DPOC requirement is "a small number relative to the overall number of [1.8 million] registrants in Kansas . . . [a]nd so it would be difficult to tease out with an aggregate analysis what the effect of a law like that is" on overall registration and turnout in the state.  (Mar. 6, 2018 PM Trial Tr. 240:23-24:18 (McDonald Testimony).)

152.    Second, Dr. Camarota's opinion is not a reliable basis for assessing the effect of the DPOC requirement because Dr. Camarota failed to control for differences in the electoral

environments in 2010 and 2014.  In concluding that "Kansas saw no significant change in the share of voting-age citizens who voted" based on a comparison of data from the 2010 and 2014 elections, (Ex. 1140, Camarota Expert Rep., at 3), Dr. Camarota assumed that the only difference between those two elections was the implementation of the DPOC requirement.  (Mar. 6, 2018 PM Trial Tr. 179:13-19 (McDonald Testimony) ("And the reason why I call [Dr. Camarota's approach] indirect evidence is because in order to make a valid comparison of that nature, I have to assume that the only thing that has changed, say, from the 2010 election to the 2014 election in Kansas, is the documentary proof of citizenship law. That is just not true. There are other election effects that are going on.").)

153.    Dr. Camarota did not control for any differences between the 2010 and 2014 elections that could have affected overall registration and turnout levels, such as differences in the level of competitiveness or in the particular tactics that various campaigns used. (Ex. 1140, Camarota Expert Rep. at 3; Mar. 12, 2018 AM Trial Tr. 1328:11 – 1330:11 (Camarota Testimony).)  The electoral environment in Kansas in 2010 and 2014 was very different because the senate and gubernatorial races were much more competitive in 2014 than in 2010 and those differences—among other factors—frequently affect overall turnout levels.  (Mar. 6, 2018 PM Trial Tr. 179:20 – 180:25 (McDonald Testimony); *see* Mar. 12, 2018 PM Trial Tr. 1366:9 – 1367:22 (Camarota Testimony).)  Dr. Camarota conceded that these factors could affect turnout rates in Kansas and that he did not control for them.  (Mar. 12, 2018 AM Trial Tr. 1329:8-20.)

154.    In arriving at his conclusion that Kansas "bucked the national trend" of a decline in voter registration between 2010 and 2014, (Mar. 12, 2018 AM Trial Tr. 1277:23 – 1278:17; Ex. 1140, Camarota Expert Rep., at 13)), Dr. Camarota did not control for any differences in state laws between 2010 and 2014. (*See* Mar. 12, 2018 AM Trial Tr. 1345:16 – 1345:19 ("Q: So

assuming that Texas didn't have a voter ID [law] in 2010 and it did have one in 2014, you didn't control for that. Correct? . . . A: [N]o, I did not.")) Nor did Dr. Camarota assess whether the 2010 and 2014 elections in Nebraska or Oklahoma were comparable to those in Kansas during the same years, thereby hindering any attempt to draw comparisons between the 2010 and 2014 elections in these states.  (*Id.* at 1330:6-11.)

155.    Third, Dr. Camarota's analysis relies unnecessarily on survey data—rather than direct data regarding individuals whose applications were blocked—and thus introduces a range of variables and uncertainty to the analysis.  (Mar. 6, 2018 PM Trial Tr. 181:19 – 183:14 (McDonald Testimony); *see* Mar. 12, 2018 AM Trial Tr. 1316:20 – 1317:11 (Camarota Testimony).) It is more reliable to use direct, individual-level data from the Kansas voter file regarding actual voter registration applicants who were suspended or canceled—which is what Plaintiffs' expert Dr. McDonald did—rather than relying on survey evidence about aggregate levels of turnout.  (Mar. 6, 2018 PM Trial Tr. 181:1-18, 183:15-24 (McDonald Testimony).)

156.    Regardless of whether, according to survey data, overall registration or turnout rates went up or down in Kansas between 2010 to 2014, more than 30,000 applicants were prevented from registering to vote because of the DPOC requirement.  (*Id.* at 154:10-24.)

### D.  Defendant's Proffered Evidence About the Number of Suspended and Canceled Voters After the Preliminary Injunction Went Into Effect

157.    Defendant also proffered evidence about the number of suspended or canceled voters after the Court's May 17, 2016 preliminary injunction.  (Mar. 8, 2018 PM Trial Tr. 892:10-24, 896:2-11 (Caskey Testimony).)  The Court excluded this evidence because it was not timely disclosed to Plaintiffs, despite Defendant's continuing duty to disclose evidence responsive to discovery requests concerning the number of voter registration applicants who were suspended or canceled due to the DPOC requirement.  (*Id.* at 894:19 – 895:8, 896:13 –

899:11, 901:2 – 902:11.)   Nevertheless, the evidence at trial indicated that, even if this post-preliminary injunction evidence had been admitted, it would have little probative value.

158.    First, the evidence proffered by Defendant indicated that thousands of voter registration applicants continue to be suspended or canceled due to the DPOC requirement, which is not materially different from the evidence that was admitted concerning the effect of the DPOC requirement.   (Mar. 8, 2018 PM Trial Tr. 892:10-24, 896:2-11, 899:5-11 (Caskey Testimony).)

159.    Second, and more importantly, reductions in the numbers of canceled and suspended applicants are due to the Court's preliminary injunction order.   As a result of the Court's preliminary injunction, the KSOS has not canceled any motor-voter applications for failure to provide DPOC.  (Mar. 9, 2018 AM Trial Tr. 945:16 – 946:3 (Caskey Testimony).) Therefore, as Defendant's expert Dr. Camarota acknowledged, the preliminary injunction is a "confounding factor that would not allow us to evaluate the likely impact of the [SAFE Act]." (Mar. 12, 2018 PM Trial Tr. 1377:22-25 (Camarota Testimony).)

## VI.    PURPORTED INCIDENTS OF NONCITIZEN REGISTRATION

### A.  Lay Testimony Concerning Purported Incidents of Noncitizen Registration

#### i.  *Defendant's Pre-Trial Assertions Regarding Incidents of Noncitizen Registration*

160.    Prior to trial, Defendant asserted that, dating back to the year 2000, State Elections Director Bryan Caskey and Sedgwick County Election Officer Tabitha Lehman had collectively identified 127 individuals who they believe were noncitizens at the time that they registered to vote or attempted to register to vote.  (PTO Stip. ¶¶ 83-84.)

161.    127 individuals equal approximately .007% of the 1.8 million registered voters in Kansas.  (PTO Stip. ¶¶ 80-81.)

162.    Most of these 127 individuals were not confirmed to be noncitizens at the time of their registration applications.   A majority (79) of these 127 individuals were identified by comparing the voter file to the TDL list, (PTO Stip. ¶ 94), but the KSOS did not take steps to confirm that these TDL holders were still noncitizens (and had not obtained citizenship) at the time that they registered to vote.  (Mar. 13, 2018 AM Trial Tr. 1574:2-10, 1576:4-16 (Richman Testimony); Mar. 13, 2018 PM Trial Tr. 1718:19-25 (Hersh Testimony).)

163.    Most of these 127 individuals did not successfully register to vote.  Of these 127 individuals, only 43 successfully registered to vote.  (PTO Stip. ¶ 85.)

164.    Only 11 of these 43 successful registrants have ever voted.  (PTO Stip. ¶ 87.)  For context, in general elections from 2000 through 2016, a total of more than 9 million votes were recorded for the highest statewide office on the ballot.  (*See* Election Nos. Stip., ECF No. 495, ¶ 1.)

165.    Of the 127 individuals Defendant believed were noncitizens at the time they registered or attempted to register to vote, only 47 were marked in ELVIS as having failed to provide DPOC (as opposed to being prevented from successfully registering for other reasons). (PTO Stip. ¶ 86.)

166.    Of these 127 individuals, only 88 are motor-voter applicants.  (PTO Stip. ¶ 88.) Of those 88 motor-voter applicants, only 25 successfully registered to vote.  (PTO ¶ 89.)  Only 5 of these 25 successful motor-voter registrants have ever voted.  (PTO Stip. ¶ 91.)  Only 32 were marked in ELVIS as having failed to provide DPOC (as opposed to being prevented from successfully registering for other reasons).  (PTO ¶ 90.)

167.    At trial, Defendant did not present evidence concerning all 127 of these purported incidents.  Rather, his evidence, taken at face value, amounts to at most 120 purported incidents

of noncitizen registration *or* attempted registration: (1) 38 incidents of purported noncitizen registration or attempted registration found on a spreadsheet of individuals in Sedgwick County; (2) 79 possible noncitizens on the voter rolls identified by comparing the voter rolls with a list of TDL holders; and (3) 3 possible noncitizens on the voter rolls identified by comparing the voter rolls with jury questionnaire responses.

168.    A majority of these 120 individuals were identified through a TDL match, and thus, as explained above, were not confirmed to be noncitizens at the time of their registration applications.

169.    Of these 120 individuals, Defendant presented evidence at trial of at most 35 instances of successful registrations by noncitizens.  Of the 120 purported incidents of noncitizen registration or attempted registration there were 38 are from the spreadsheet of individuals in Sedgwick County.  *See infra* ¶ 171.  Of those 38 cases, only 18 successfully registered to vote. *See infra* ¶ 172.  With respect to the remaining 82 incidents—79 of which were identified by TDL match, and 3 by examining juror questionnaires—at most 17 of them represented successful registrations (14 from the TDL match, and 3 from the jury questionnaires).  *See infra* ¶¶ 179, 186.  When combined with the 18 successful cases from Sedgwick County, this amounts to a total of 35 possible successful noncitizen registrations dating back to the year 1999.

170.    Of these 35 incidents identified, only 6 voted (5 from the Sedgwick County spreadsheet, and 1 from the TDL match).  *See infra* ¶¶ 173, 181.

### ii.   *Testimony of Tabitha Lehman Regarding Sedgwick County Individuals*

171.    A spreadsheet originally created by Ms. Lehman—but now maintained and edited by the KSOS—lists 38 individuals whom she believes were noncitizens at the time that they were registered to vote or attempted to register to vote over a 18-year period (1999 – 2017). (Mar. 8, 2018 AM Trial Tr. 682:13-20 (Lehman Testimony; Ex. 1133, Updated Sedgwick Cty.

Chart.)   The spreadsheet compiles information concerning purported incidents of noncitizen registration or attempted registration that Ms. Lehman collects based on reports provided by her employees.  (Mar. 7, 2018 PM Trial Tr. 549:17-24.)  Ms. Lehman did not personally discover the purported incidents on the spreadsheet or have personal contact with each applicant on the spreadsheet.  (Mar. 7, 2018 PM Trial Tr. 549:17 – 550:2, 551:19-21.)

172.    Of the 38 individuals collected by Ms. Lehman, only 18 successfully registered to vote in Kansas.  (Mar. 8, 2018 AM Trial Tr. 681:7-10; Ex. 1133, Updated Sedgwick Cty. Chart, at 1-3.)  These 18 individuals registered to vote over a 12-year period.  (Ex. 1133 at 1-3; Mar. 8, 2018 AM Trial Tr. 681:7-15 (Lehman Testimony).)

173.    Of these 18 individuals, 5 voted.  (Mar. 8, 2018 AM Trial Tr. 685:5-15; Ex. 1133, Updated Sedgwick Cty. Chart, at 1-3.)

174.    Of the 18 alleged noncitizens who successfully registered in Sedgwick County, 9 registered to vote through the DOV.  (Mar. 8, 2018 AM Trial Tr. 681:16-22 (Lehman Testimony); Ex. 1133, Updated Sedgwick Cty. Chart, at 1-3.)  Of the 9 alleged noncitizens who were successfully registered to vote in Sedgwick County through the DOV, 2 individuals voted. (Mar. 8, 2018 AM Trial Tr. 681:23 – 682:1; Ex. 1133 at 2-3.)

175.    A closer look at the information in Ms. Lehman's spreadsheet and the underlying voter registration records for these applicants shows that several of the 18 alleged noncitizens who were successfully registered in Sedgwick County were on the rolls due to administrative error and/or registrant mistake or confusion.  For example:

a. Thirteen of the 18 alleged noncitizens who successfully registered in Sedgwick County were on the voter registration rolls for extended periods of time, but never voted, indicating their registration was most likely unintentional and the result of

error or mistake.  (Ex. 1133, Updated Sedgwick Cty. Chart, at 1-3 (alleged noncitizen registrant 1424962 registered for nearly 12 years but never voted as a noncitizen; (alleged noncitizen registrant 5053234 registered for 8 years but never voted as a noncitizen; alleged noncitizen registrant 5055911 registered for 8 years but never voted as a noncitizen; alleged noncitizen registrant 5063593 registered for 7 years but never voted as a noncitizen; alleged noncitizen registrant 5291075 registered for 6 years but never voted as a noncitizen; alleged noncitizen registrant 5399277 registered for 5 years but never voted as a noncitizen; alleged noncitizen registrant 5401038 registered for 5 years but never voted as a noncitizen; alleged noncitizen registrant 5381681 registered for 5 years but never voted as a noncitizen); Mar. 8, 2018 AM Trial Tr. 683:7-16 (alleged noncitizen registrant 1373536 registered for 18 years but never voted as a noncitizen); *id.* at 683:17-21 (alleged noncitizen registrant 4296515 was registered for 12 years but never voted as a noncitizen); *id.* at 683:22 – 684:1 (alleged noncitizen registrant 5217728 was registered for 6 years but never voted as a noncitizen); *id.* at 684:2-8; alleged noncitizen registrant 5407885 was registered for 7 years but never voted as a noncitizen); *id.* at 684:9-12 (alleged noncitizen registrant 5408582 was registered for 7 years but never voted as a noncitizen).

b. The individual identified by the KSOS as noncitizen registrant 5407885 listed an "A number" or "Alien number" in the field for "Naturalization number (if applicable)" on her voter registration form evidencing the registrant's confusion about voter qualifications.  (Mar. 8, 2018 AM Trial Tr. 689:8 – 690:16 (Lehman Testimony); Ex. 143, ELVIS Registrant Details for "MB," at 29; *see also* Ex. 74, 2017.03.15

Minnite Expert Rep., at 18 (opining that an applicant's use of an alien registration number of voter registration application "suggest[s] voter confusion rather than an intent to deceive").)

c. The individual identified by the KSOS as noncitizen registrant 1447321 voted 4 times between 2004 and 2008 but stated that she "was a permanent resident of the U.S. and did not know she wasn't allowed to vote until after 2008 when one of her friends told her she couldn't, she then stopped voting."  (Ex. 1133, Updated Sedgwick Cty. Chart, at 1; Ex. 1292, Underlying Documents for Ex. 1133, at 25.)

176.    Ms. Lehman's spreadsheet and the underlying voter registration records for these applicants likewise show that several of the 20 alleged noncitizens who attempted to register also did so as a result of administrative error and/or applicant mistake or confusion.  For example:

177.    Alleged noncitizen applicant 5657157 indicated to the DOV that she was not a citizen, but the DOV had nonetheless processed a voter registration application for this individual.  (Ex. 1133, Updated Sedgwick Cty. Chart, at 3; Ex. 22, Lehman email re: noncitizen attempting to register; Ex. 99, ELVIS Registrant Details for "AS," at 5; Mar. 9, 2018 AM Trial Tr. 1004:20-25, 1005:17-22 (Minnite Testimony); Mar. 7, 2018 PM Trial Tr. 531:4 – 532:13 (Lehman Testimony).)  As Ms. Lehman stated in an email with the former election director, Brad Bryant, "I think you did the right thing cancelling the registration [of registrant 5657157]. I just wish DMV would not register people who they know to be noncitizens."  (Ex. 22, Lehman email re: noncitizen attempting to register; Ex. 99 at 5.)  And upon learning about her voter application, the applicant wrote to the DOV "Please put on your record that I am not a citizen.  I cannot vote."  The applicant underlined "am not" and "I cannot vote."  (Ex. 99 at 4; Mar. 9, 2018 AM Trial Tr. 1005:9-16 (Minnite Testimony).)

178.    Alleged noncitizen applicant 5772434 also indicated to the DOV that she was not a citizen, but the DOV had nonetheless processed a voter registration application for this individual.  The notes field in the applicant's ELVIS file states that the applicant "came into the office with a POC notification letter and stated that her registration was a mistake on the part of the DMV when she renewed her license.  She is not a U.S. citizen.  She filled out a cancellation form."  (Ex. 1133, Updated Sedgwick Cty. Chart, at 5; Ex. 101, ELVIS Registrant Details for "GR," at 4; Mar. 8, 2018 AM Trial Tr. 692:6-16 (Lehman Testimony); Mar. 9, 2018 AM Trial Tr. 996:4 – 998:5 (Minnite Testimony).)  There is no evidence that this applicant signed an oath indicating that she was a U.S. citizen.  (Mar. 8, 2018 AM Trial Tr. 692:22-693:4 (Lehman Testimony); Ex. 101; Mar. 9, 2018 AM Trial Tr. 998:6-18 (Minnite Testimony).)

179.    The DOV processed a voter registration application for the individual identified by the KSOS as noncitizen applicant 5642186 even though this applicant later produced a "Resident Alien" as proof of U.S. citizenship and responded in the negative when asked by the Sedgwick County Election Office if the applicant was a U.S. citizen.  (Mar. 9, 2018 AM Trial Tr. at 1001:12 – 1002:9; 1003:2 – 21 (Minnite Testimony); Ex. 1133, Updated Sedgwick Cty. Chart, at 4; Ex. 100, ELVIS Registrant Details, at 4, 7.)  The applicant completed a request to cancel his registration.  (Ex. 100, ELVIS Registrant Details, at 4-5, 7.)

180.    Also included among the 20 purported instances of attempted noncitizen registrations in Ms. Lehman's spreadsheet are alleged noncitizens who did not respond to the question "Are you a citizen of the United States of America" on the voter registration form and thus their applications should have been rejected as incomplete on their face.  (Mar. 8, 2018 AM Trial Tr. 691:12-21 (Lehman Testimony) (acknowledging that application without response to citizenship question is incomplete).)  For example:

a.  The individual identified by the KSOS as noncitizen applicant 5733764, submitted a voter registration form without responding to the question "Are you a citizen of the United States of America" on the voter registration form.  (Mar. 8, 2018 AM Trial Tr. 690:20 – 691:21 (Lehman Testimony); Mar. 9, 2018 AM Trial Tr. 1005:23 – 1007:12 (Minnite Testimony); Ex. 1133, Updated Sedgwick Cty. Chart, at 4; Ex. 98, ELVIS Registrant Details for "MM," at 2.)  Notably, this applicant later responded "Yes" to this same question on the voter registration form that the applicant completed on the day she became a U.S. citizen.  (Ex. 98 at 3-5.)

b.  Alleged noncitizen applicant 5660352 also submitted a voter registration form without responding to the question "Are you a citizen of the United States of America" on the voter registration form.  (Mar. 9, 2018 AM Trial Tr. 999:3 – 1001:11 (Minnite Testimony); Ex. 1133, Updated Sedgwick Cty. Chart, at 3-4; Ex. 97, ELVIS Registrant Details for "BC," at 3-4.)  The notes field in the applicant's ELVIS file states the applicant "informed [the election official] that she is not a citizen" and that she would send a cancellation form "ASAP."  (Mar. 9, 2018 AM Trial Tr. 1000:2 – 1001:12 (Minnite Testimony); Ex. 97 at 2; Ex. 1133 at 3-4.)

181.   Ms. Lehman also testified that she had sent on to Defendant Kobach as an instance of a noncitizen who attempted to register an applicant who had checked "No" in response to the question "Are you a citizen of the United States of America" on the voter registration form.   (Mar. 7, 2018 PM Trial Tr. 529:18 – 530:22; Ex. 80, Kansas Voter Registration Application for "EE"; *see also* Mar. 9, 2018 PM Trial Tr. 1004:7-19 (Minnite Testimony).)  This is additional evidence that some of the identified incidents of noncitizen registration or attempted registration identified by Defendant likely reflect administrative error

and/or voter confusion.   (Mar. 9, 2018 PM Trial Tr. 1004:7-19; 1006:13-24 (Minnite Testimony).)   In fact, Ms. Lehman herself acknowledged that the DOV makes mistakes.  (Mar. 7, 2018 PM Trial Tr. 532:9-13 ("Q: This is someone who told the DMV that she is not a citizen. Correct? A: As far as I know. Q And this was a mistake by the DMV. Correct? A: It would appear to be").)

### iii.  Testimony of Bryan Caskey Regarding TDL Holders

182.    Mr. Caskey testified that by comparing the TDL lists to the voter rolls, the KSOS identified 79 individuals who were registered to vote and had once held a TDL.  (Mar. 8, 2018 PM Trial Tr. 752:23 – 753:5.)

183.    Plaintiff's rebuttal expert, Dr. Eitan Hersh, provided credible testimony that this number, like those offered by Ms. Lehman in Sedgwick County, is misleading.  Dr. Hersh is an expert in voter registration records and matching analysis.  He is a tenured professor of political science at Tufts University, (Mar. 13, 2018 PM Trial Tr. 1710:13-17), whose academic research is focused on studying large-scale individual databases, like voter registration files, and matching those databases to other sources of individual-level data, (*id.* at 1711:1-13) (noting that Dr. Hersh has published peer-reviewed research on the topic).  Dr. Hersh performed his own matching analysis, finding 82 matches in total—substantially similar to the 79 matches identified by Mr. Caskey.  (*id.* at 1724:3-12.)

184.    Dr. Hersh analyzed the 79 individuals identified by Mr. Caskey and provided additional information on these individuals based on ELVIS records.[14]  He found that only 14

---

[14] Dr. Hersh's second supplemental report provides information from the ELVIS file for 80 matched individuals, not 79.  (Ex. 107, 2d Suppl. to Hersh Expert Rep., at 3.)  This is because Mr. Caskey, in his affidavit dated Jan. 30, 2017, indicated that he had found 80 matches in his comparison of the TDL list to the ELVIS file.  (*See* Caskey Decl. (1/30/17), ECF No. 384-9,

successfully registered to vote in Kansas.  (Ex. 107, 2d Suppl. to Hersh Expert Rep., at 3 (11 Active, 3 Inactive).)  12 currently have or had the "CITZ" code in their ELVIS records at one point.  (Ex. 107 at 3.)   In other words, of these 79 individuals a total of only 26 either successfully registered to vote or were blocked from registering because of the DPOC requirement.  Only one of these 79 individuals ever voted in Kansas.  (Ex. 107 at 3.)

185.    Of these 79 individuals, 25 were motor-voter applicants.  (Ex. 107, 2d Suppl. to Hersh Expert Rep., at 3.)  Nine are motor-voter applicants who successfully registered to vote in Kansas.  (Ex. 107 at 3 (8 Active, 1 Inactive).)   One is a motor-voter applicant whose ELVIS record has or had the "CITZ" code at one point.  (Ex. 107 at 3.)  Only 1 motor-voter applicant from the TDL match ever voted in Kansas.  (Ex. 107 at 3.)

186.    As Dr. Hersh explained, matches from the TDL list to the voter file do not necessarily represent noncitizens who are registered or who attempted to register to vote, for at least two reasons.  First, there is the problem of false positives—that is, records that appear to be a match but in fact represent two different people.  (Mar. 13, 2018 PM Trial Tr. 1717:21 – 1718:18.)  For example, two different individuals with the same common name and birth date may have been matched incorrectly as a false positive.  (*Id.* at 1718:8-18.)

187.    Second, even in the event of a correct match, the mere fact that someone appears on both the TDL list and the voter file does not mean that the person was a noncitizen at the time that person applied to register to vote.  It is possible that someone could obtain a TDL, and then naturalize prior to registering to vote.  (Mar. 13, 2018 PM Trial Tr. 1718:19-25; *see also* Ex. 74, 2017.03.15 Minnite Expert Rep., at 17.)   Defendant's expert Dr. Jesse Richman similarly

at 1.).)  As Mr. Caskey clarified in his affidavit dated Mar. 24, 2017, one of the matches is a duplicate, and the corrected total is hence 79.  (Caskey Decl. (3/24/17), ECF No. 367-3, at 2.)

testified that, for the same reason, he does not believe that someone is a noncitizen simply by virtue of appearing on the TDL list.  (Mar. 13, 2018 AM Trial Tr. 1574:2-10, 1576:4-16.)

188.    Defendant did not establish that the 79 individuals from Mr. Caskey's TDL match were in fact noncitizens at the time that they registered to vote.

### iv.  *Testimony of Bryan Caskey Regarding Juror Questionnaires*

189.    Mr. Caskey testified that by comparing citizenship responses on juror questionnaires to the voter rolls, the KSOS identified 3 individuals who self-identified as noncitizens on juror questionnaires who were also registered to vote.  (Mar. 8, 2018 PM Trial Tr. 754:22 – 755:13).

190.    Defendant did not offer any supporting evidence that these individuals were in fact noncitizens at the time they registered to vote.

191.    Individuals who state on a jury questionnaire that they are noncitizens are not necessarily noncitizens, because citizens sometimes claim to be noncitizens in order to evade jury duty.  (Mar. 8, 2018 PM Trial Tr. 754:14 – 755:13, 757:20-25 (Caskey Testimony); Mar. 9, 2018 PM Trial Tr. 1081:21 – 1082:10 (von Spakovsky Testimony).)

### B.  Defendant's Proffered Expert Testimony Concerning Purported Incidents of Noncitizen Registration

192.    In addition to the lay testimony described above, Defendant proffered expert testimony concerning specific incidents of purported noncitizen registration in the form of: (1) a TDL-suspense list match performed by Dr. Jesse Richman; (2) a match of green card records in DOV files to the voter file presented by Richman; and (3) the testimony of Hans von Spakovsky.

###### *i.  Dr. Richman's TDL-Suspense List Match*

193.     Defendant  proffered  Dr.  Jesse  Richman [15]  as  an  expert  to  conduct  matching between the TDL list and the suspense list.  The suspense list that he used is a subset of the voter file,  consisting  of  individuals  who  have  attempted  to  register  to  vote  but  whose  form  is incomplete because they have not provided documentary proof of citizenship, (Mar. 13, 2018 AM Trial Tr. 1570:25 – 1571:7), or for reasons other than documentary proof of citizenship, (*id.* at 1571:11-14).

194.     Dr.  Richman  has  never  been  qualified  as  an  expert  witness  in  any  other  case. (Mar. 13, 2018 AM Trial Tr. 1555:3-18.) He has never published any peer-reviewed research based on matching analysis of databases to a state's voter registration file. (*Id.* at 1561:3-7.)

195.     Dr. Richman identified 16 people who are purportedly on both the suspense list and the TDL list.  (Mar. 13, 2018 AM Trial Tr. 1570:12-24.) As noted, Richman acknowledged that a match between the TDL list and the ELVIS file does not necessarily indicate that the applicant was a noncitizen at the time that they applied to register to vote.  (*Id.* at 1574:2-10, 1576:4-16.)

196.     Based on his TDL match, Dr. Richman estimated that, assuming all 16 people he identified are in fact noncitizens, 88 out of about 18,000 individuals on the suspense list are noncitizens.  (Mar. 13, 2018 AM Trial Tr. 1573:11-14.)  Taking Dr. Richman's estimate at face value, noncitizens constitute less than one half of one percent of the Suspense List.  (*Id.* at

---

[15] Dr. Jesse Richman was proffered as an expert in elections, voter registrations, survey construction and analysis and political methodology.  Plaintiffs objected and sought to exclude Dr. Richman under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  (Pls.' Mot. to Exclude the Test. and Rep. of Jesse Richman, ECF No. 389; Pls.' 2d Mot. to Exclude the Test. and Rep. of Jesse Richman, ECF No. 427.)  This Court denied that motion except with respect to Dr. Richman's proffered testimony on legal conclusions, which this Court excluded.

1573:15-21.)

### ii. *Regular Driver's License / Voter Registration List Match*

194.     Dr. Richman presented, in his initial report, a match conducted by DOV staff between the ELVIS file and people who are listed in the driver's license database as having shown a noncitizen permanent resident document (*i.e.*, a "green card") while obtaining a regular driver's license.  (Mar. 13, 2018 AM Trial Tr. 1577:2-14; Ex. 952, Richman Expert Rep. at 6-7.)   Dr. Richman did not request or perform this match; it was simply provided to him.  (*Id.* at 1577:25 – 1578:11.)  He does not know what criteria were used in the matching analysis that was performed by the DOV, (*id.* at 1582:13-20), nor did he take any steps before he submitted his reports in this case to assess the accuracy of the matching analysis, (*id.* at 1582:21 – 1583:4).

195.     The DOV match does not indicate why an individual is on the Suspense List, whether it was due to failure to provide DPOC or for some other reason. (Mar. 13, 2018 AM Trial Tr. 1581:9-14.)

196.     Dr. Richman's supplemental report included additional analysis and identified 12 people who applied to register to vote on the same day that they obtained a driver's license using a green card.  (Mar. 13, 2018 AM Trial Tr. 1579:21 – 1580:1.)   Although it is likely that these individuals were in fact noncitizens at the time that they applied to register to vote, Dr. Richman acknowledged that, given that these individuals applied to register to vote on the same day that they showed a green card in the course of obtaining their driver's license, it is likely that they self-identified as noncitizens—but were nevertheless erroneously offered voter registration by a DOV employee in violation of DOV

policy.  (*Id.* at 1580:17-23.)

### iii. *The Testimony of Defendant's Expert Hans von Spakovsky*

197.    Defendant also offered the testimony of Hans von Spakovsky[16] to support his contention that there is a substantial problem of noncitizen voter registration in Kansas.  (Mar. 9, 2018 PM Trial Tr. 1064:8 – 1089:20.)   Mr. von Spakovsky is a senior legal fellow at The Heritage Foundation, which he acknowledged is "a think tank whose mission [is to] formulate and promote conservative public policies."  (*Id.* at 1099:25 – 1100:3; Ex. 864, von Spakovsky Resume, at 1.)   He is an adjunct, non-tenured professor at the Law School of George Mason University.  (*Id.* at 1056:8-18, 1099:12-14.)   He has never testified as an expert witness before. (Ex. 864 at 1-9.)   He has no advanced degree in any social science, (Mar. 9, 2018 PM Trial Tr. 1094:18-23, 1097:6-8; Ex. 864 at 4), and has not published or conducted any peer-reviewed research on any subject, including voter fraud or voting, (Mar. 9, 2018 PM Trial Tr. 1094:18-23, 1097:6-8).   Mr. von Spakovsky would not identify any individual other than himself whom he would consider an expert on noncitizen registration.   (Mar. 9, 2018 PM Trial Tr. 1123:16-22, 1124:6-13.)

198.    Mr. von Spakovsky testified that it is his opinion that there is a problem with noncitizens being able to easily register to vote in the United States, (Mar. 9, 2018 PM, Trial Tr. 1067:10-16), and that the attestation regime is not a sufficient means to prevent noncitizens from

---

[16] Mr. von Spakovsky was proffered as an expert in elections, election administration and voter fraud.  Plaintiffs objected and sought to exclude Mr. von Spakovsky under *Daubert*.  (Pls.' Mot. to Exclude the Test. & Rep. of Hans von Spakovsky, ECF No. 428.)  This Court denied that motion except with respect to Mr. von Spakovsky's proffered testimony on surveys, which this Court excluded.  (Mar. 6, 2018 PM Trial Tr. 299:6 – 300:11 (*Daubert* and Expert Rulings by the Court).)  Relatedly, Mr. von Spakovsky's expert report in this case was admitted subject to redactions of any references to these topics.  (Mar. 9, 2018 PM Trial Tr. 1066:16-24; Ex. 865, von Spakovsky Expert Rep.)

registering to vote, (*Id.* at 1071:16-1072:1; Ex. 865, von Spakovsky Rep., at 2).   Mr. von

Spakovsky bases this opinion on "[a] few examples"[17] of non-citizen registration over the last

three decades that he believes shows that non-citizen registration is "an ongoing problem."   (*Id.*

at 1067:10 – 1069:11.)   Many of the examples "catalogue[d]" by Mr. von Spakovsky involved

non-citizen registration in states other than Kansas.   (*Id.* at 1074:4 – 1075:2; Ex. 865 at 3-10.)

199.   With respect to Kansas specifically, Mr. von Spakovsky opined that, prior to the

DPOC law going into effect, "Kansas clearly has had a problem with noncitizens registering to

vote despite the citizenship question and oath on the voter registration forms."   (Ex. 865, von

Spakovsky Rep., at 2.)   In forming this opinion,   Mr. von Spakovsky testified that, out of the

approximately 1.7 million registered voters in Kansas, he was not aware of any instances of

noncitizen registration in Kansas other than 30 instances of possible noncitizen registration or

attempted registration in Sedgwick County listed on a spreadsheet provided to him by Defendant

Kobach.   (Mar. 9, 2018 PM Trial Tr. 1148:24 – 1149:6; Ex. 865 at 2-3.)   He did not

independently seek any other information about noncitizen registration in Kansas.   (*Id.* at

1152:23 – 1153:4, 1172:24 – 1173:5 (agreeing that references to the Sedgwick County

spreadsheet is the only Kansas-specific evidence he cites in his report relating to the issue of

noncitizen registration).)

200.   Mr. von Spakovsky acknowledged that noncitizens who become registered often

do so as a result of a mistake, but testified that, in his opinion, whether or not a noncitizen

---

[17] The Court excluded testimony from Mr. von Spakovsky regarding purported examples of
noncitizen registration in Pennsylvania, Virginia, and New Jersey because these examples were
not included in his report.   (Mar. 9, 2018 PM Trial Tr. 1069:16 – 1070:7, 1174:17 – 1178:12.)
With respect to Pennsylvania, Mr. von Spakovsky conceded that the instance he had identified of
noncitizens being added to the voter rolls in Pennsylvania had actually arisen due to a "glitch" in
the Pennsylvania DMV's electronic registration system.   (*Id.* at 1190:18 – 1191:13.)

registration is the product of a mistake is irrelevant, based on the premise that "anytime a non-citizen registers, anytime a non-citizen votes, they are—whether intentionally or—or by accident, I mean, they are defrauding legitimate citizens from a fair election." (Mar. 9, 2018 PM Trial Tr. 1072:17-20.)   In other words, with respect to noncitizen registration, Mr. von Spakovsky treated the mere fact that 30 noncitizens had registered or attempted to register to vote as "defrauding legitimate citizens from a fair election"; their intent was largely irrelevant.

201.   By contrast, when assessing the burdens of the DPOC requirement, von Spakovsky opined that the fact that thousands of registration applications had been suspended because of the requirement was irrelevant, because, in his view, individuals who truly intended to become registered to vote could do so if they make an effort.  (Mar. 9, 2018 PM Trial Tr. 1093:8-16.)  Intent—or Mr. von Spakovsky's perception of it—was irrelevant in his assessment noncitizen registration, but it was the touchstone of his evaluation of the burdens of the DPOC requirement.[18]

202.   Mr. von Spakovsky further opined that the mere possibility that noncitizen voting could affect the outcome of a close election justifies a DPOC requirement.  (Mar. 9, 2018 PM Trial Tr. 1079:20 – 1080:16.)  He admitted, however, that he was unable to identify a single election whose outcome was affected by noncitizen voting.  (*Id.* at 1159:2-4.)

203.   Mr. von Spakovsky employed no discernible methodology in forming his conclusions.  He admitted that he has "no idea" whether his analytical approach, which has no

---

[18] Mr. von Spakovasky's opinion as to the burdens of the DPOC requirement has little probative value.  He acknowledged that, at the time that he offered this opinion, he was not even aware of how many Kansans had their registrations canceled because they had not provided DPOC.  (Mar. 9, 2018 PM, Trial Tr. 1112:1 – 1114:6.)  Moreover, Mr. von Spakovsky testified that he cannot think of any voter registration requirements in the United States that are a burden.  (*Id.* at 1108:6 – 1109:5.)

name, comports with generally-accepted standards in the social sciences.  (Mar. 9, 2018 PM

Trial Tr. 1136:16 – 1137:3, 1137:13-23.)

204.    Mr. von Spakovsky did not present as an objective witness, but as an advocate.

He acknowledged that it would be inconsistent with providing an objective expert opinion to

provide evidence that only supports one side.  (Mar. 9, 2018 PM Trial Tr. 1094:6-10.)  However,

in describing examples of noncitizen registration, Mr. von Spakovsky frequently misrepresented

facts or omitted details that did not support his opinion.  (*Id.* at 1152:7-22, 1159:15 – 1161:18,

1162:7 – 1166:20; Ex. 865, von Spakovsky Rep., at 3-4.)  For example, Mr. von Spakovsky

opined that "[c]learly aliens [in Sedgwick County] who applied to register at the DMV were not

dissuaded from falsely asserting U.S. citizenship by the oath requirement," (*id.* at 1151:10-16;

Ex. 865 at 3), but he admitted that he had no personal knowledge as to whether or not any of

these individuals had in fact falsely asserted U.S. citizenship when they became registered to

vote.  (*Id.* at 1152:7-17.)  He acknowledged on cross-examination that he did not examine the

facts of these individual cases.  (*Id.* at 1152:18-22.)

205.    In another example of misleading testimony, Mr. von Spakovsky stated in his

report that a local NBC television station in Florida identified 100 individuals excused from jury

duty who were possible noncitizens on the voter rolls; but on cross-examination, he admitted that

he did not mention the fact that there was a follow-up story by the same NBC station that

determined that at least 35 of those 100 individuals had documentation to prove that they were,

in fact, U.S. citizens.  (Mar. 9, 2018 PM Trial Tr. 1159:15 – 1161:18; Ex. 865, von Spakovsky

Rep., at 4.)  He claimed that, at the time of his expert report, he was unaware of the NBC follow-

up report, and only learned about it at his deposition.  (*Id.* at 1159:15 – 1160:9.)  However, Mr.

von Spakovsky never submitted a supplement or correction to his expert report to acknowledge

this omission.  (*See id.* at 1160:10 – 18, 1161:7-18.)

206.    In another example from his expert report, Mr. von Spakovsky cited a U.S. GAO study for the proposition that the GAO "found that up to 3 percent of the 30,000 individuals called for jury duty from voter registration rolls over a two-year period in just one U.S. district court were not U.S. citizens."  (Ex. 865, von Spakovsky Rep., at 5.)  On cross-examination, however, he acknowledged that he omitted the following facts: the GAO study contained information on a total of eight district courts; four of the eight reported that there was not a single-noncitizen who had been called for jury duty; and the three remaining district courts reported that fewer than 1% of people called for jury duty from voter rolls were noncitizens. (Mar. 9, 2018 PM Trial Tr. 1162:7 – 1166:9; Ex. 865 at 5; Ex. 127, GAO Report: "Additional Data Could Help State & Local Elections Officials Maintain Accurate Voter Reg. Lists," at 47-48.)  In sum, his report misleadingly described only the district court with the highest percentage of people reporting that they were noncitizens, while omitting any mention of the seven other courts described in the GAO report, including those that had no incidents of noncitizens on the rolls.  (Mar. 9, 2018 PM Trial Tr. 1166:10-20)

207.    Mr. von Spakovsky further admitted that he wrote an op-ed in 2011 claiming that 50 noncitizens from Somalia voted in an election in Missouri, despite the fact that nearly one year earlier the Missouri Court of Appeals issued an opinion, *Royster v. Rizzo*, 326 S.W.3d 104 (Mo. Ct. App. 2010),[19] finding that no fraud had taken place in that election.  (Mar. 9, 2018 PM Trial Tr. 1167:3-23.)  While he testified that he was not aware of the court opinion at the time he wrote the op-ed, Mr. von Spakovsky admitted that he never published a written retraction of his

---

[19] The Court took judicial notice of this court decision.  (Mar. 9, 2018 PM Trial Tr. 1170:13 – 1171:3.)

assertion about Somalian voters illegally participating in that election.  (Mar. 9, 2018 PM Trial Tr. 1167:19-23.)

208.    Given his extensive research and commentary on voter fraud, it is implausible that Mr. von Spakovsky's repeated omissions were inadvertent.  Rather, the record supports an inference that Mr. von Spakovsky purposefully presented incomplete and misleading testimony to advance his policy agenda.

209.    For example, although Mr. von Spakovsky testified that, at the time he was retained as an expert in this case in 2016, he had not yet formed an opinion about whether the DPOC law was burdensome for voters, (Mar. 9, 2018 PM, Trial Tr. 1106:5-22.), he also admitted that, at least as early as 2012, he was already an advocate for DPOC requirements like the one at issue in this case.  (*Id.* at 1116:12-17.)  Moreover, as early as 2001, Mr. von Spakovsky was already of the view that the NVRA was "a universal failure," and testified that the NVRA "was so flawed as to actually undermine our registration system."  (*Id.* at 1117:10 – 1118:23; Ex. 144, von Spakovsky Test. before Senate Rules Comm., at 1.)

210.    Mr. von Spakovsky's bias is also demonstrated by his long record of collaborating with Defendant Kobach—which he did not disclose to the Court until he was cross-examined about it. (Mar. 9, 2018 PM Trial Tr. 1055:18 – 1089:22 (von Spakovsky direct examination); Ex. 865, von Spakovsky Rep., at 1-19.)  For example, Mr. von Spakovsky contributed to Defendant Kobach's first campaign for Secretary of State and wrote an email promoting a fundraiser for that campaign.  (Mar. 9, 2018 PM Trial Tr. 1154:7-15.)  He did not mention this support in his report.  (*Id.* at 1154:16-20; Ex. 865, von Spakovsky Rep., at 1-19.)

211.    When Mr. von Spakovsky opined in his report that the incidents of noncitizen registration collected by Ms. Lehman in Sedgwick County are likely just the "tip of the iceberg,"

(Mar. 9, 2018 PM Trial Tr. 1072:2 – 1074:3; 1154:21 – 1155:1; Ex. 865, von Spakovsky Rep., at 2-3), he used the exact same phrase employed by Defendant Kobach to describe the same 30 incidents of noncitizen registration in Sedgwick County in a press release issued just a few months earlier, (*id.* at 1155:17 – 1157:81; Ex. 147, Press Release).

212.    More recently, Mr. von Spakovsky was also a member of the now-defunct Presidential Commission on Election Integrity alongside Defendant Kobach.  (Mar. 9, 2018 PM Trial Tr. 1154:7-15.)  Regarding the formation of that Commission, Mr. von Spakovsky wrote an email in 2017 stating that it is his opinion that there are no "mainstream Republican officials and academics" that "know anything about" the issue of voter fraud.  (*Id.* at 1126:11 – 1127:5; Ex. 145, von Spakovsky 2/2017 Heritage Foundation Email, at 2.)  After a meeting of the Commission, he falsely denied that he was the author of that email and claimed to be satisfied with the bipartisan composition of the Commission.  (Mar. 9, 2018 PM Trial Tr. 1128:11-12, 1131:24 – 1132:13, 1135:8 – 1136:1; Ex. 146, von Spakovsky 9/2017 ProPublica Audio Tr.)

213.    The preponderance of evidence in this case supports a finding that Mr. von Spakovsky is not an unbiased objective expert, that he attempted to conceal his bias, that he intentionally presented misleading testimony, and is not a credible witness.

### C.  Assessment of Defendant's Evidence of Specific Incidents of Possible Noncitizen Registration by Plaintiffs' Experts

#### i.  *The Testimony of Plaintiffs' Expert Dr. Lorraine Minnite*

214.    To assess Defendant Kobach's claims about specific incidents of noncitizen registration, Plaintiffs offered the testimony of Dr. Lorraine C. Minnite.  Dr. Minnite is an associate professor at Rutgers University-Camden, a tenured position, where her research focuses on American politics and elections.  (Mar. 9, 2018 AM Trial Tr. 956:25 – 957:17; Ex. 140, Minnite Updated CV, at 1.)  She currently serves as the Chair of the Department of

Public Policy and Administration and was previously the Director of the Rutgers University-Camden Urban Studies Program.  (*Id.* at 958:18-24; Ex. 140, at 12.)  Dr. Minnite's teaching portfolio includes classes on social science research methodologies, among others.  (*Id.* at 957:15 – 958:17.)  She is the recipient of numerous research grants and honors.  (Mar. 6, 2018 PM Trial Tr. 292:3-7; Ex. 140 at 2, 11-12.)

215.    Dr. Minnite has extensively researched and studied the incidence and effect of voter fraud in American elections.  Her published research on the topic spans over a decade and includes her full-length, peer reviewed book, *The Myth of Voter Fraud*, for which Dr. Minnite has received grants and professional distinction, and numerous articles and chapters in edited volumes.  (Mar. 9, 2018 AM Trial Tr. 961:10-20, 961:24 – 962:23; Ex. 140, Minnite Updated CV, at 3-10; Ex. 77, 2016.02.25 Minnite Expert Rep., at 2.)  This topic has been the focus of her work and research for the past seventeen years.  (Mar. 9, 2018 AM Trial Tr. 959:18 – 960:1.)

216.    Dr. Minnite has been offered and accepted as an expert on the incidence and effect of voter fraud in numerous cases, including in *One Wisconsin Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 911 (W.D. Wis. 2016); *Ohio Org. Collaborative v. Husted*, 189 F. Supp. 3d 708, 720 (S.D. Ohio 2016), *rev'd on other grounds sub nom.*, *Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016); *Lee v. Virginia State Bd. of Elections*, 188 F. Supp. 3d 577, 596-97 (E.D. Va. 2016), *aff'd*, 843 F.3d 592 (4th Cir. 2016); *N.C. State Conference of the NAACP v. McCrory*, 182 F. Supp. 3d 320, 441-43 (M.D.N.C. 2016), *aff'd in part*, *rev'd and remanded on other grounds*, 831 F.3d 204 (4th Cir. 2016), *cert denied*, U.S., 137 S. Ct. 1399 (2017); *Veasey v. Perry*, 71 F. Supp. 3d 627, 640 (S.D. Tex. 2014), *aff'd in part, vacated in part*; *rev'd in part on other grounds sub nom*, *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016), *cert denied*, U.S., 137 S. Ct. 612 (2017); *Frank v. Walker*, 17 F. Supp. 3d 837, 848 (E.D. Wis. 2014), *rev'd on other*

*grounds*, 768 F.3d 744 (7th Cir. 2014); *Applewhite v. Commonwealth of Pennsylvania*, No. 330 M.D. 2012, 2014 WL 184988, at \*57 (Pa. Commonwealth Ct. Jan. 17, 2014), and *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 591-93 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012).  (Mar. 9, 2018 AM Trial Tr. 966:15 – 967:18; Ex. 140, Minnite Updated CV, at 10-11, 14-15.). [20]

217.    For purposes of her research, Dr. Minnite defines voter fraud as "the intentional corruption of the electoral process by voters."  (Mar. 9, 2018 AM Trial Tr. 970:18 – 971:13; Ex. 77, 2016.02.25 Minnite Expert Rep., at 7-8.)  This focus on mens rea in Dr. Minnite's definition is "typical[]" in the context of fraud.  (Mar. 9, 2018 PM Trial Tr. 1089:23-6 (Court contrasting Dr. Minnite's definition of voter fraud with Mr. von Spakovsky's).)

218.    In forming her opinions on the incidence of voter fraud and noncitizen registration in Kansas, Dr Minnite relied on numerous quantitative, qualitative and archival sources.  These include, among other sources, thousands of news reports, publically available reports, court opinions, and various documents relied on by Defendant as evidence of noncitizen registration, including various iterations of Ms. Lehman's spreadsheet and underlying voter registration records.  (Mar. 9, 2018 AM Trial Tr. 985:1 – 988:22; *see also, e.g.*, Ex. 77, 2016.02.25 Minnite Expert Rep., at 2-3; Ex. 76, 2016.04.12 Minnite Suppl. Rep., at 1-5, Ex. 75, 2016.06.10 Minnite Rebuttal Rep., at 1-15; Ex. 74, 2017.03.15 Minnite Expert Rep., at 1-3, 8-9, 15-19.)  To evaluate these sources, Dr. Minnite employed a "mixed methods" research approach, in which data from different data sources is triangulated in order to identify patterns across the sources.  (Mar. 9, 2018 AM Trial Tr. 964:18 – 965:17; 988:4 – 989:3; Ex. 77 at 8-9.)  This methodology is generally accepted in the social sciences and is the method of analysis that Dr. Minnite has

[20] The Court takes judicial notice of these decisions.

utilized in her peer-reviewed research on voter fraud and in each of the cases in which she has testified as an expert on this topic.  (Mar. 9, 2018 AM Trial Tr. 964:18 – 965:17; 988:4 – 989:3; Ex. 77 at 8.)

219.    As Dr. Minnite testified, there is no empirical evidence to support Secretary Kobach's claims in the media that voter fraud and noncitizen registration and voting were "massive" or "pervasive" problems.  (Mar. 9, 2018 AM Trial Tr. 982:13-21; 991:5; Ex. 77, 2016.02.25 Minnite Expert Rep., at 15-28; 30, 32-33; Ex. 76, 2016.04.12 Minnite Suppl. Rep., at 1-5; Ex. 75, 2016.06.10 Minnite Rebuttal Rep., at 3-7; Ex. 74, 2017.03.15 Minnite Expert Rep., at 1-12; 15-20; *see also* Mar. 9, 2018 AM Trial Tr. 978:1 – 979:8 (describing Ballot Access and Voting Integrity Initiative, a federal initiative whose "high priority . . . was to find voter fraud and voter intimidation" and testifying that in first 3 years of program, there were 40 indictments brought involving voters but no indictments of noncitizen voting in Kansas); Ex. 77 at 10 (noting further that more than 250 million votes were cast in federal elections during the first 3 years of BAVII program and that while 20 of the 40 cases of election crimes committed by voters involved noncitizens  none were in Kansas.)

220.    Instead, while a handful of noncitizens have appeared on the registration rolls in Kansas over the last twenty years, many of these cases reflect isolated instances of avoidable administrative errors on the part of government employees and/or misunderstanding on the part of applicants.  (Mar. 9, 2018 AM Trial Tr. 994:5-12; 995:5-22; 1006:13-24 (Minnite Testimony); Ex. 77, 2016.02.25 Minnite Expert Rep., at 28-33; Ex. 76, 2016.04.12 Minnite Suppl. Rep., at 2-5; Ex. 74, 2017.03.15 Minnite Expert Rep., at 18-19.)  This includes many of the cases of purported noncitizen registration or attempted registration collected in Ms. Lehman's spreadsheet.  (*See supra* ¶¶ 171-78.)  This finding is consistent with and supported by the

testimony of Ms. Lehman, who acknowledged that Kansans have been registered in error due to administrative mistakes.  (Mar. 9, 2018 AM 1007:1 – 1008:8 (Minnite Testimony); Mar. 7, 2018 PM Trial Tr. 531:4-10, 532:5-13, 675:5-13 (Lehman Testimony).)

221.    Defendant Kobach's "most significant allegations" of voter fraud in the news and in other public statements are false or unsubstantiated or the result of administrative error and/or voter confusion.  (Mar. 9, 2018 AM Trial Tr. 990:11 – 994:12 (Minnite Testimony); Ex. 77, 2016.02.25 Minnite Expert Rep., at 17-26.)  For example, like his proffered expert Mr. von Spakovsky, Defendant Kobach has repeatedly claimed that approximately 50 noncitizens from Somalia voted in the 2010 Democratic primary race in Kansas City, Missouri for the 40th District of the Missouri House of Representatives.  (Mar. 9, 2018 AM Trial Tr. 991:14- 993:5 (Minnite Testimony); Ex. 77 at 24-25.)  The Missouri Court of Appeals in *Royster*, 326 S.W.3d 104, however, found no evidence of voter fraud in that election.  (Mar. 9, 2018 AM Trial Tr. 991:6- 993:5 (Minnite Testimony); Ex. 77 at 24-25.)

222.    Rather than an accurate characterization of the evidence, Defendant Kobach's repeated claims of pervasive voter fraud represent a successful case of "agenda setting" by Defendant Kobach, as reflected by the dramatic increase in stories referencing voter fraud in the Kansas news media that coincided with Defendant Kobach's first campaign for Secretary of State in 2010.  (Mar. 9, 2018 AM Trial Tr. 989: 3 – 990:22 (Minnite Testimony); Ex. 77, 2016.02.25 Minnite Expert Rep., at 16.)

223.    In addition, Defendant Kobach has, as of the time of trial, prosecuted only two cases of noncitizen voting since obtaining prosecutorial powers in 2015.  (PTO Stip. ¶¶ 107; 113-14.)  This evidence further undermines Defendant Kobach's claims of "massive" noncitizen voter fraud and is consistent with the pattern revealed by other sources that there are only a

handful of instances of noncitizen registration and voting.  (Mar. 9, 2018 AM Trial Tr. 994:13 –
995:22 (Minnite Testimony); Ex. 77, 2016.02.25 Minnite Expert Rep., at 26-28.)

### ii.   The Testimony of Plaintiffs' Expert Dr. Eitan Hersh

224.    Plaintiffs' expert Dr. Eitan Hersh also offered an assessment of some of the
evidence of specific incidents of possible noncitizen registration offered by Defendant Secretary
Kobach.

225.    The number of purported incidents of noncitizen registration found by Defendant
is consistent with the quantity of other low-incidence idiosyncrasies in ELVIS and in voter files
more generally, and is suggestive of administrative errors. (Mar. 13, 2018 PM Trial Tr. 1727:3 –
1728:16.)   For example, 100 individuals in ELVIS have birth dates in the 1800s, and 400
individuals have birth dates before their date of registration.  (*Id.* at 1727:15-20.)  In a state with
1.8 million registered voters, issues of this magnitude are generally understood as administrative
mistakes, rather than as efforts to corrupt the electoral process.  (*Id.* at 1727:3 – 1728:16.)
Accidental registrations could have occurred as a result of clerks' administrative errors in
inputting handwritten data from paper forms.  (*Id.* at 1729:17 – 1730:4.)

226.    The very low incidence of voting among purported noncitizen registrants suggests
that those individuals ended up in ELVIS due to accidents, as opposed to intentional unlawful
registrations.   (Mar. 13, 2018 PM Trial Tr. 1728:17 – 1729:16.)   The voting rate among
purported noncitizen registrations on Mr. Caskey's TDL match list is around 1%, whereas the
voting rate among registrants in Kansas more generally is around 70%.  (Mar. 13, 2018 PM Trial
Tr. 1729:7-16.)  If these purported noncitizen registrations were intentional, one would expect
these individuals to vote more frequently; the fact that they do not suggests that these
registrations are the product of administrative mistakes by government employees or by the
applicants themselves. (Mar. 13, 2018 PM Trial Tr. 1728:20-1729:16.)

## VII.   DEFENDANT'S   STATISTICAL   ESTIMATES   OF   NONCITIZEN REGISTRATION

227.    In addition to the various matching analyses described above, Defendant's expert Dr. Richman also produced various statistical estimates as to the number of noncitizens who have registered or have attempted to register to vote in Kansas, based primarily on surveys and other samples.

228.    Dr. Richman has published one peer-reviewed article on noncitizen registration, in the British Journal *Electoral Studies*.  (Mar. 13, 2018 AM Trial Tr. 1561:8-15)  The article was based on data collected through a survey known as the Cooperative Congressional Elections Study ("CCES"), a large online survey concerning American voting behavior.  (Mar. 12, 2018 PM Trial Tr. 1449:20-1450:9.)  Dr. Richman is not and has never been involved in designing or implementing the CCES.  (Mar. 13, 2018 AM Trial Tr. 1561:20-24.)  In fact, Dr. Richman himself has limited direct experience with respect to conducting original survey research.  He has published only one peer-reviewed paper based on a survey that he designed.  (Mar. 13, 2018 AM Trial Tr. 1556:6-12.)  He has never published any peer-reviewed research addressing the accuracy of survey responses for a survey that he designed, (Mar. 13, 2018 AM Trial Tr. 1559:23-1560:3), or any peer-reviewed research involving his own efforts to compare survey responses to government records in order to assess the validity of those survey responses, (Mar. 13, 2018 AM Trial Tr. 1560:4-9).  He has never, other than in this case, designed or implemented any survey to measure citizenship rates of survey respondents.  (Mar. 13, 2018 AM Trial Tr. 1560:12-23.)

### A.  Dr. Richman's Statistical Estimates of Noncitizen Registration or Attempted Registration in Kansas

229.    Dr. Richman offers four different estimates for the rate at which noncitizens in Kansas have registered or have attempted to register to vote without identifying a single "best

estimate among them.  (Mar. 13, 2018 AM Trial Tr. 1615:23-1616:2.)  They are based on four different data sources: (i) 14 Kansas respondents in the CCES who stated that they were noncitizens, out of which 4 stated that they were registered to vote, (Ex. 952, Richman Expert Rep., at 5); (ii) records of approximately 800 newly-naturalized citizens in Sedgwick County, 8 of whom had records of pre-existing registration applications, (Ex. 952 at 5); (iii) a survey of 37 TDL holders, 6 of whom stated that they were registered or had attempted to register to vote, (Ex. 952 at 10); and (iv) 19 survey responses from a group of "incidentally-contacted" noncitizens, 1 of whom stated that they were registered or had attempted to register to vote, (Ex. 952 at 11-12).  Dr. Richman also conducted a survey of more than 500 registered voters in 4 counties, of whom zero indicated that they were noncitizens, but Richman did not calculate an estimate of noncitizen registration based on this particular survey.  (Ex. 952 at 11.)

230.    Dr. Richman does not provide an estimate of the number of noncitizens in Kansas who registered or attempted to register to vote specifically through a DMV office in Kansas.  (Mar. 13, 2018 AM Trial Tr. 1603:20-1604:1.)  He also does not provide an estimate of noncitizens in Kansas who have actually voted.  (Mar. 13, 2018 AM Trial Tr. 1604:2-7.)

231.    Dr. Richman's four estimates of noncitizen registration and the margins of error associated with each estimate, along with an estimate derived from Richman's survey of 500 registered voters, can be summarized as follows:[21]

| Summary of Dr. Richman's Estimates of Non-Citizens Registered (or Attempted to Register) |
|---|

---

[21] All estimates and margin of error calculations, with the exception of the estimate based on the survey of registered voters, are listed in Ex. 958, Richman Suppl. Rep., at 8-9, Tbl. 2.  The estimate and margin of error calculation based on Richman's survey of registered voters is described in Ex. 102, Ansolabehere Expert Rep., at 36, Tbl. 2.

| Data Source | Richman Estimate of % of Non-Citizens Registered (or Attempted to Register) | Richman Calculation of Error Margin (Wilson (Score) Method) | Ansolabehere Calculation of Error Margin |
|---|---|---|---|
| **CCES (2006-2012)** **4 of 14** | 28.6% | 11.7% - 54.6% 32.9 percentage points | 0.9% - 56.3% 55.4 percentage points |
| **Sedgwick County Naturalization** **8 of 791** | 1.0% | 0.5% - 2.0% 1.5 percentage points | -2.6% - 4.6% 7.2 percentage points |
| **TDL Survey** **6 of 37** | 16.5% | 7.7% - 31.1% 23.4 percentage points | 0.1% - 32.9% 32.8 percentage points |
| **Incidentally Contacted Non-Citizens** **1 of 19** | 5.3% | 0.9% - 24.6% 23.7 percentage points | -4.84% - 15.36% 20.2 percentage points |
| **Registered Voters** **0 of 576** | 0% | Not Calculated By Richman | -4.2% - 4.2% 8.4 percentage points |

232.     Plaintiffs offered the testimony of their rebuttal expert, Dr. Stephen Ansolabehere, to assess Dr. Richman's various statistical estimates.   Dr. Ansolabehere opined that Dr. Richman's various estimates—either collectively or individually—did not provide statistically valid evidence of noncitizen registration in Kansas.  Dr. Ansolabehere is the Frank G. Thompson Chair at Harvard University in the Department of Government.  (Mar. 13, 2018 PM Trial Tr. 1760:12-20.)  He has been on the board of American National Election Studies for 12 years, which is the longest running political science research project, (Mar. 13, 2018 PM Trial Tr. 1761:9-12), has been the founding director of the Caltech/MIT voting technology project, (Mar.

13, 2018 PM Trial Tr.1761:12-16), and has worked for CBS News since 2006 on the election night decision desk that designs the surveys used and the data collection process, (Mar. 13, 2018 PM Trial Tr. 1761:17-21).  He has published five books and approximately 80 articles in a variety of disciplines but primarily in political science, and on a variety of topics, including survey research methods, statistics for analyzing large sample data, and for matching large surveys.  (Mar. 13, 2018 PM Trial Tr. 1762:1-10.)  He has received a variety of research grants. (Ex. 136, Ansolabehere Updated CV, at 12-13.)

233.  Dr. Ansolabehere has testified in numerous voting rights cases, including *Cooper v. Harris*, _U.S._, 137 S. Ct. 1455, 1477 (2017),[22] *League of Women Voters v. Detzner*, 172 So. 3d 363, 445 (Fla. 2010),[23] and *Veasey v. Abbott*, 830 F.3d 216, 259 (5th Cir. 2016) (en banc), *cert denied*, _U.S._, 137 S. Ct. 612 (2017),[24] which all cited Dr. Ansolabehere's testimony favorably.  (Mar. 13, 2018 PM Trial Tr. 1763:14-1765:8; 1767:5-10.)

234.  Dr. Ansolabehere is the creator and principal investigator of the CCES, the survey on which Richman relied in his single published article on noncitizen registration.  (Mar. 13, 2018 PM Trial Tr. 1761:2-8; Mar. 13, 2018 AM Trial Tr. 1561:25-1562:3.)  Dr. Richman considers Dr. Ansolabehere to be knowledgeable about survey research, (Mar. 13, 2018 AM Trial Tr. 1563:5-16 (Richman Testimony)), and believes that Dr. Ansolabehere has a good reputation as a political scientist among other political scientists, (Mar. 13, 2018 AM Trial Tr. 1563:17-20 (Richman Testimony)).

---

[22] The Court took judicial notice of this opinion.  (Mar. 13, 2018 PM Trial Tr. 1764:10-14.)

[23] The Court took judicial notice of this opinion.  (Mar. 13, 2018 PM Trial Tr. 1765:3-8.)

[24] The Court took judicial notice of this opinion.  (Mar. 13, 2018 PM Trial Tr. 1767:5-10.)

### i. *Dr. Ansolabehere's Meta-Analysis of Dr. Richman's Data*

235.     Dr. Ansolabehere produced a "meta-analysis" of Dr. Richman's various data and estimates of noncitizen registration.  (Ex. 102, Ansolabehere Expert Rep., at 36-37, Tbl. 2.)  The meta-analysis aggregates all of Dr. Richman's data of possible noncitizen registration, and takes it at face value, assuming that the data are accurate and that Dr. Richman's samples are representative of Kansas's adult noncitizen population.  (Mar. 13, 2018 PM Trial Tr. 1772:9-21; 1774:6-15.)

236.     Dr. Ansolabehere's meta-analysis includes Dr. Richman's survey of over 500 registered voters in 4 counties.  (Mar. 13, 2018 PM Trial Tr. 1796:3-7.)  As Dr. Ansolabehere explained, there is no valid reason for excluding this data from the meta-analysis.  (Mar. 13, 2018 PM Trial Tr. 1796:2-6.)

237.     The meta-analysis produces a single estimate that 1.3% of noncitizens in Kansas are registered or have attempted to register to vote.  (Mar. 13, 2018 PM Trial Tr. 1774:16-20; Ex. 102, Ansolabehere Expert Rep., at 36-37, Tbl. 2.)

238.     The meta-analysis reveals that Dr. Richman's data do not provide persuasive evidence of a statistically significant rate of noncitizen registration in Kansas for two reasons.  First, the meta-analysis demonstrates that "there's a great amount of variation" among Richman's various estimates of noncitizen registration, (Mar. 13, 2018 PM Trial Tr. 1775:14-15), which are inconsistent with each other, ranging from approximately 1,000 noncitizens registered to vote in Kansas, to approximately 32,000 noncitizens registered.  This "variation reflects our uncertainty about the actual estimate."  (Mar. 13, 2018 PM Trial Tr. 1775:15-16.).

239.     Second, the meta-analysis reveals that Dr. Richman's findings about noncitizen registration, taken as a whole, are not statistically significant.  The meta-analysis produced an estimate that 1.3% of noncitizens in Kansas are registered or have attempted to register to vote,

with a margin of error of 7.6 percentage points.  (Mar. 13, 2018 PM Trial Tr. 1775:5-1776:17.)
Thus, even assuming that Richman's data are valid, collectively they produce an estimate of
noncitizen registration that is not statistically distinct from zero.  (Mar. 13, 2018 PM Trial Tr.
1776:18-1777:1.)

240.    In calculating the margin of error for this estimate and for Dr. Richman's other
various estimates of noncitizen registration, Dr. Ansolabehere used the conventional method
employed by political scientists.  (Mar. 13, 2018 AM Trial Tr. 1616:9-19 (Richman Testimony).)
Although Dr. Richman criticized this method of calculating the margin of error, Dr. Richman
himself used the same method in his peer-reviewed article on noncitizen registration, and for the
one margin of error calculation that he included in his initial expert report.  (Mar. 13, 2018 AM
Trial Tr. 1616:16-19.)  Dr. Richman also conceded that, in calculating margins of error in his
peer-reviewed article on noncitizen registration, he employed the conventional method because it
is the most widely-used approach among political scientists, and that he believed that it was
methodologically appropriate to do so.  (Mar. 13, 2018 AM Trial Tr. 1609:6-11; 1610:1-12.)

241.    Notably, in his initial report, Dr. Richman failed to report margins of error for all
but one of his estimates of noncitizen registration in Kansas, the estimate based on noncitizens
who were incidentally contacted.  (Mar. 13, 2018 AM Trial Tr. 1610:21-1611:4 (Richman
Testimony).)  As Dr. Richman himself acknowledged, this failure to report margins of error in
his initial report does not conform to peer-review standards.  Dr. Richman himself admitted that
when publishing academic articles featuring statistical estimates, he typically includes standard
error calculations.  (Mar. 13, 2018 AM Trial Tr. 1607:17-25.)  For example, in Dr. Richman's
peer-reviewed article on noncitizen registration, he calculated and reported margins of error for
his various estimates of noncitizen registration, and stated that he would not have submitted the

article for publication without first calculating the margins of error, (Mar. 13, 2018 AM Trial Tr. 1608:1-7, 1608:19-25), because it would not have comported with accepted standards in political science, (Mar. 13, 2018 AM Trial Tr. 1609:1-5).  Yet Dr. Richman offered no explanation as to why he failed to do so for his initial report in this case.

242.   Although Dr. Richman did eventually include margin of error calculations for his various estimates, he did so using various alternative methods that he had never used before. (Mar. 13, 2018 AM Trial Tr. 1616:20-25, 1617:1-13.)  It was not methodologically appropriate to use these unconventional methods for calculating margins of error for the estimates in this case.  (Mar. 13, 2018 PM Trial Tr. 1874:15-1875:2.)

243.   As explained below, Dr. Richman's various individual estimates also fail to provide statistically reliable evidence of noncitizen registration in Kansas.

### ii.  CCES

244.   Dr. Richman produced an estimate that approximately 32,000 noncitizen are registered to vote in Kansas, based on data from the Cooperative Congressional Election Study or CCES.  Dr. Richman's estimate in this case based on CCES data is similar to the research on noncitizen registration that he performed for his peer-reviewed article on the subject, which also relied on CCES data.  (Mar. 13, 2018 AM Trial Tr. 1561:8-19.)

245.   Dr. Richman identified 14 Kansas-based CCES respondents from 2006 through 2012 who self-identified as noncitizens, 4 of whom stated that they were registered to vote. (Mar. 13, 2018 AM Trial Tr. 1617:14-1618:10.)  Because 4 divided by 14 equals 28.6%, Dr. Richman estimates that 28.6% of noncitizens in Kansas are registered to vote, and then multiplied that percentage by the total noncitizen population in Kansas, to arrive at an estimate that approximately 32,000 noncitizens in Kansas could be registered to vote.  (Mar. 13, 2018 AM Trial Tr. 1618:11-17.)

246.    Dr. Richman's estimate of noncitizen registration based on CCES suffers from at least four flaws, and does not provide persuasive or credible evidence of noncitizen registration for several reasons.

247.    First, the sample size of 14 is too small to have sufficient statistical precision for reliable estimates of the adult noncitizen population in Kansas as a whole.  (Mar. 13, 2018 PM Trial Tr. 1779:6-20; Mar. 13, 2018 AM Trial Tr. 1621:6-9 (Richman conceding that the sample size was small.).)  *See Blackwell v. Strain*, 496 F. App'x. 836, 843 (10th Cir. 2012) (finding seven data points unreliable due to the small sample size); *United States v. James*, 257 F.3d 1173, 1180 (10th Cir. 2001) (statistical evidence must be based on adequate sample size).  Even Defendant himself admitted during opening statements that he is "not relying on that [estimate] because it is [based on] such a small sample size."  (Mar. 6, 2018 AM Trial Tr. 44:15-16.) Estimates based on such small samples have large margins of error, and do not amount to reliable or probative statistical evidence.  *See Nat'l Credit Union Admin. Bd. v. RBS Securities, Inc.*, Nos. 11-2340-JWL, 11-2649-JWL, 12-2591-JWL, 12-2648-JWL, 13-2418-JWL, 2014 WL 1745448, at *6 (D. Kan. Apr. 30, 2014) (pointing to small sample sizes, large margins of errors and unreliable stratification as examples of unreliable methodology); *Opal Fin. Grp., Inc. v. Opalesque, Ltd.*, 634 F. App'x 26, 29 (2d Cir. 2015) (affirming district court's decision to accord "little to no weight" to an estimate of 17.6% with error margin of plus or minus 10%).

248.    Second, Dr. Richman's estimate based on the CCES is unreliable because he has not established that his sample of 14 CCES respondents were actually noncitizens.  As Dr. Ansolabehere explained in a peer-reviewed article, individuals who are in fact U.S. citizens sometimes mistakenly click the wrong box when responding to the CCES, and erroneously self-identify as noncitizens. (Mar. 13, 2018 PM Trial Tr. 1782:4-8; 1782:9-14)  Even though this

"citizenship misreporting" error occurs relatively infrequently, the number of errors is large when compared to the number of individuals who identify themselves as noncitizens on CCES, and thus fatally contaminates any attempt to use the CCES to make statistical estimates about noncitizens.  (Mar. 13, 2018 PM Trial Tr. 1780:23-1782:3.)  Indeed, Dr. Richman's published findings about noncitizen voting can be accounted for entirely by citizenship misreporting. (Mar. 13, 2018 PM Trial Tr. 1782:21-1783:2; Mar. 13, 2018 AM Trial Tr. 1626:22-25) (Richman is aware of the argument and Ansolabehere's article in *Electoral Studies*).   A group of approximately 200 political scientists signed an open letter criticizing Richman's work on essentially the same grounds. (Mar. 13, 2018 AM Trial Tr. 1727:15-19.) Richman acknowledged that, at the time of his deposition, he could not recall a single instance in which something similar had occurred. (Mar. 13, 2018 AM Trial Tr. 1628:4-10)

249.    Dr. Richman acknowledged that he considers this a cogent criticism of his paper, (Mar. 13, 2018 AM Trial Tr. 1625:4-1626:20), and agreed that if this critique regarding citizenship misreporting is correct, it would "significantly reduce" his estimates based on the CCES, (Mar. 13, 2018 AM Trial Tr. 1627:1-7).  Although Dr. Richman purported to respond to Dr. Ansolabehere's criticisms regarding citizenship misreporting in a working paper, that working paper has not been published in a peer-reviewed journal, but rather is available only on Dr. Richman's personal webpage.  (Mar. 13, 2018 AM Trial Tr. 1628:11-1629:6.)

250.    Given the well-documented problem of citizenship misreporting in the CCES, Dr. Ansolabehere testified that, as the designer of the CCES, he did not have confidence that the 14 CCES respondents on whom Dr. Richman based his estimate were in fact noncitizens.  (Mar. 13, 2018 PM Trial Tr. 15-20.)

251.    Third, Dr. Richman's CCES estimate is inflated due to registration overreporting.

Registration over-reporting occurs when individuals respond to a survey question that they are registered to vote when, in fact, they are not.  (Mar. 13, 2018 AM Trial Tr. 1566:10-14.)  As Dr. Hersh explained, this occurs due to social desirability bias: respondents misreport behaviors that they believe are socially desirable, for instance, charitable giving, blood donation or voter registration.  (Mar. 13, 2018 PM Trial Tr. 1726:9-1727:2.)

252.   In a peer-reviewed article, Drs. Ansolabehere and Hersh have documented overreporting of registration in the CCES—that is, CCES respondents saying that they are registered to vote when in fact they are not.  (Mar. 13, 2018 PM Trial Tr. 1784:2-1785:4) (Dr. Ansolabehere discussing his findings of registration overreporting in a peer-reviewed article entitled "Validation.")  Dr. Richman does not dispute the existence of registration over-reporting, (Mar. 13, 2018 AM Trial Tr. 1566:15-17), acknowledged that Dr. Ansolabehere has documented registration over-reporting in the CCES, (Mar. 13, 2018 AM Trial Tr. 1566:18-21), and stated that he has no reason to doubt Dr. Ansolabehere's findings in this regard, (Mar. 13, 2018 AM Trial Tr. 1566:22-1567:1).

253.   Here, the evidence indicates that Dr. Richman's CCES-based estimate of noncitizen registration is substantially inflated due to registration overreporting on the CCES.  Although 4 of the respondents in the CCES sample stated that they were registered to vote, only 1 of the 4 self-reported registrations can be validated to an actual voter file—which means that 3 of the 4 did not in fact register to vote in Kansas.  (Mar. 13, 2018 PM Trial Tr. 1780:8-16; 1785:5-11.)  These three misreported their registration status, accounting for 75% of Dr. Richman's estimate. (Mar. 13, 2018 PM Trial Tr. 1785:13-16).

254.   Dr. Richman did not dispute that this was the case.  (Mar. 13, 2018 AM Trial Tr. 1624:5-10 (Richman acknowledging Ansolabehere's validation findings.))  In fact, in his peer-

reviewed article on noncitizen registration, Richman accounted for registration over-reporting by conducting a "validation" analysis based on individuals who could be linked to an actual voter registration record.  (Mar. 13, 2018 AM Trial Tr. 1567:2-17.)  In his supplemental report, Dr. Richman produced an estimate of noncitizen registration based on validated voter registration records from the CCES; the estimate had a confidence interval of more than 20 percentage points, (Mar. 13, 2018 AM Trial Tr. 1624:11-1625:3), and was therefore not statistically reliable.

255.    Fourth, the CCES is not representative of the noncitizen population generally, and cannot form the basis for reliable statistical estimates about that population; because the CCES is designed to study elections, it is designed to be a sample of only citizens and not of noncitizens. (Mar. 13, 2018 PM Trial Tr. 1778:5-12.)  Self-identified noncitizens in the CCES tend to be better educated, older, and whiter, all characteristics that are correlated with higher rates of registration and a higher likelihood of misreporting registration.  (Mar. 13, 2018 PM Trial Tr. 1783:10-1784:1.)

256.    Dr. Richman did not weight the sample to accurately reflect the noncitizen population of Kansas.  Even though Dr. Richman weighted his estimates of noncitizen registration using CCES data in his *Electoral Studies* article, among other things, by race and Hispanic ethnicity, (Mar. 13, 2018 AM Trial Tr. 1622:5-22), he did not conduct any weighting for his estimates of noncitizen registration based on the same underlying data in his reports, (Mar. 13, 2018 AM Trial Tr. 1565:21-1566:6; 1622:24-1623:3).

### ii.  *Sedgwick County Naturalization Data*

257.    Dr. Richman produced another estimate that approximately 1,100 noncitizens in Kansas are registered to vote, based on information on newly-naturalized citizens in Sedgwick County.  Dr. Richman had information on 789 newly naturalized citizens in Sedgwick County, (Mar. 13, 2018 AM Trial Tr. 1631:7-11), 8 of whom already had records in the Kansas voter file,

(Mar. 13, 2018 AM Trial Tr. 1631:12-15).  Because 8 divided by 789 equals about 1%, Richman estimates that 1% of noncitizens in Kansas are registered to vote, and after multiplying that percentage by the total noncitizen population in Kansas, produces an estimate that approximately 1,100 noncitizens in Kansas could be registered to vote.  (Mar. 13, 2018 AM Trial Tr. 1631:19-24.)

258.   The estimate of noncitizen registration based on Sedgwick County Naturalization Data suffers from numerous flaws and does not provide persuasive or credible evidence of noncitizen registration, for at least three reasons.

259.   First, the estimate is not statistically significant.  Although this estimate is based on the largest sample size of any of Dr. Richman's estimates of noncitizen registration in Kansas, and therefore has the smallest confidence interval and greatest statistical certainty of any of these estimates, (Mar. 13, 2018 AM Trial Tr. 1632:8-20), it is not statistically distinguishable from zero, (Mar. 13, 2018 PM Trial Tr. 1787:20-1788:18).

260.   Second, the estimate of noncitizen registration based on Sedgwick County naturalization data is not based on a representative sample of noncitizen adults in Kansas.  This sample includes only newly-naturalized citizens, and categorically excludes undocumented immigrants and legally present noncitizens who have not naturalized.  (Mar. 13, 2018 AM Trial Tr. 1634:17-21 (Ansolabehere Testimony); *see also* Ex. 74, 2017.03.15 Minnite Expert Rep., at 6-8.)  Noncitizens who naturalize tend to be older, more stable in their living situations and better-educated than noncitizens who do not.  (Mar. 13, 2018 PM Trial Tr. 1786:21-1787:2).  All of these factors tend to correlate with higher registration rates.  (Ex. 102, Ansolabehere Expert Rep., at 23.)  As a result, an estimate of noncitizens based on naturalized citizens is likely to overestimate the number of noncitizens who are registered to vote in Kansas.  (Mar. 13, 2018

PM Trial Tr. 1787:3-12.)

261.    Dr. Richman did not weight the sample of newly-naturalized citizens to accurately reflect the noncitizen population of Kansas. Even though Dr. Richman weighted his estimates of noncitizen registration in his published research by, among other things, race and Hispanic ethnicity, (Mar. 13, 2018 AM Trial Tr. 1622:5-22), and he weighted his Suspense List survey by age and gender, he did not conduct any weighting for his estimates of noncitizen registration based on the Sedgwick County data in his reports, (Mar. 13, 2018 AM Trial Tr. 1633:18-23; 1634:5-9). Dr. Richman did not collect information from the voter registration applications of these individuals that, for example, could have enabled him to weight his sample by age.  (Mar. 13, 2018 AM Trial Tr. 1633:24 – 1634:2.)

262.    Dr. Richman speculated that registration rates among those about to naturalize are likely to be lower than registration rates among other noncitizens, (Mar. 13, 2018 AM Trial Tr. 1636:12-17), but he acknowledged that he has never done any research that attempts to quantify or compare registration rates among those noncitizens who naturalize and those who do not, (Mar. 13, 2018 AM Trial Tr. 1636:3-7); and the only authority he cites in support of that proposition is an interview with a single former Immigration and Customs Enforcement officer on FOX News, (Mar. 13, 2018 AM Trial Tr. 1637:25-1639:4).

263.    Third, Defendant did not establish that this estimate is based on noncitizens who had *successfully registered* to vote prior to naturalizing. In his initial report in this case, quoting Tabitha Lehman, Richman noted that the 8 supposed noncitizen registrants "were already in ELVIS."  (Ex. 952, Richman Expert Rep., at 5.)  But as Richman admitted himself, individuals who merely attempt to register to vote can be found in ELVIS, even if they *never successfully registered*.  (Mar. 13, 2018 AM Trial Tr. 1570:15-1571:14) (noting that individuals may be in

ELVIS because they failed to provide DPOC or for other reasons).  Defendant has failed to demonstrate that this estimate is based on successful registrants.

### iii.   TDL Survey

264.    Dr. Richman produced another estimate that approximately 18,000 noncitizens in Kansas are registered to vote, based on a survey of temporary driver's license (TDL) holders.  A total of 37 TDL holders responded to the survey; of these 37 individuals, 6 self-reported that they had registered to vote or had attempted to register to vote.  (Mar. 13, 2018 AM Trial Tr. 1639:8-23.)  Because 6 divided by 37 equals about 16.5%, Richman estimates that about 16% of noncitizens in Kansas are registered to vote, and after multiplying that percentage by the total noncitizen population in Kansas, he estimates that approximately 18,000 noncitizens are registered or have attempted to register to vote in the state of Kansas.  (Mar. 13, 2018 AM Trial Tr. 1640:2-7.)

265.    In his opening statement, Defendant Kobach cited this figure of 18,000, and described it as the  "best estimate" of noncitizen registration in the state of Kansas.  (Mar. 6, 2018 AM Trial Tr. 46:4-7)

266.    Dr. Richman did not agree with Defendant's assessment.  Unlike with his other estimates of noncitizen registration, Dr. Richman weighted his estimate based on the TDL survey sample to match the overall noncitizen population in Kansas along various demographic characteristics.  (Mar. 13, 2018 AM Trial Tr. 1643:2-8.)  This had the effect of reducing his initial estimate of noncitizen registration based on the TDL by about a third, from about 18,000 to around 13,000 noncitizens registered to vote in Kansas.  (Mar. 13, 2018 AM Trial Tr. 1643:2-11.)  Dr. Richman testified that, as a political scientist, he considers this weighted estimate of 13,000 to be more reliable than the unweighted estimate of 18,000.  (Mar. 13, 2018 AM Trial Tr. 1643:12-17.)

267.    The estimate of noncitizen registration based on the TDL Survey suffers from at least four flaws, and thus does not provide persuasive or credible evidence of noncitizen registration.

268.    First, the sample size of 37 is too small to draw credible estimates. (Mar. 13, 2018 PM Trial Tr. 1768:22-1769:13.)  Dr. Richman himself admitted that the TDL sample has a very "modest sample size," and that the estimate therefore has "substantial uncertainty."  (Mar. 13, 2018 AM Trial Tr. 1640:22-1642:7).  As calculated by Dr. Richman, the confidence interval for this estimate is quite large, over 20 percentage points (Mar. 13, 2018 AM Trial Tr. 1640:8-13), which is too uncertain to form a reliable basis for an estimate of noncitizen registration.  *See Nat'l Credit Union Admin. Bd.*, 2014 WL 1745448, at *6; *Opal Fin. Grp., Inc.*, 634 F. App'x at 29.

269.    Second, Dr. Richman's TDL survey does not provide information as to the number of noncitizens who successfully registered to vote, as opposed to merely attempting to register but failing.  Dr. Richman's survey instrument for the TDL survey used a "double-barreled" question—asking people whether they registered to vote or "attempted to register," which obscures the difference between those who successfully registered to vote and those who merely attempted to do so.  (Mar. 13, 2018 AM Trial Tr. 1645:14-1646:3; Mar. 13, 2018 PM Trial Tr. 1789:25-1790:12.)  As Dr. Richman acknowledged, when a respondent answers yes to this question, it is impossible to determine whether the respondent successfully registered to vote or merely attempted to register to vote and failed.  (Mar. 13, 2018 AM Trial Tr. 1646:4-9, 1647:1-7; Mar. 13, 2018 PM Trial Tr. 1790:13-17.)

270.    Dr. Richman's survey provides no information as to why a noncitizen who attempted to register to vote was unsuccessful, or when that attempt occurred.  That is, if a

respondent attempted to register to vote but was unsuccessful, the survey does not indicate whether that was because of the DPOC requirement or for some other reason, for example, being informed of the citizenship requirement for voter registration.  (Mar. 13, 2018 AM Trial Tr. 1647:81648:7.)  Incidents of "attempted registration" in this survey are therefore not probative of whether the DPOC requirement is necessary to prevent noncitizen registration.

271.    Third, Dr. Richman's estimate of noncitizen registration based on the TDL is attributable entirely to registration overreporting, *i.e.*, individuals who said that they had registered or had attempted to register, but who in fact had done neither.  Dr. Hersh looked for the 6 individuals who self-reported as being registered to vote or having attempted to register to vote in the ELVIS database of individuals who have registered to vote or who have submitted a voter registration form, but was unable to find them.  (Mar. 13, 2018 PM Trial Tr.1725:17-1726:8; Mar. 13, 2018 PM Trial Tr. 1653:16-1654:10) (Richman testifying that he was aware of Hersh's findings).  Dr. Richman did not conduct a similar analysis, and did not dispute Dr. Hersh's findings in this regard.  (Mar. 13, 2018 PM Trial Tr. 1654:18-1655:9.)

272.    Fourth, Dr. Richman did not provide a response rate for his TDL survey, making it impossible to assess the statistical reliability of the survey.   (Mar. 13, 2018 PM Trial Tr.1655:10-25; Mar. 13, 2018 PM Trial Tr. 1791:18-1792:19.)  The response rate to a survey is the percentage of individuals who answer a survey. (Mar. 13, 2018 PM Trial Tr. 1790:25-1791:14.)  A survey with a particularly low response rate may be unreliable due to "non-response bias," a problem in which the survey sample is not representative of the larger population.  (Mar. 13, 2018 PM Trial Tr. 1790:25-1791:14.)  It is standard in political science journals to publish a response rate alongside the survey in order to evaluate whether a survey might suffer for non-response bias.  (Mar. 13, 2018 PM Trial Tr. 1790:25-1792:10.)

273.   Although Dr. Richman provided an estimate for the overall response rate for all of his surveys aggregated together, he was unable to provide a response rate for his survey of TDL holders.  (Mar. 13, 2018 PM Trial Tr. 1655:10-25.)  It is therefore impossible to assess the statistical reliability of the TDL survey.

### iv.   Incidental Contacts

274.   Dr. Richman produced another estimate that approximately 6,000 noncitizens in Kansas are registered or have attempted to register to vote, based on survey responses from "incidentally-contacted" noncitizens.  In the course of conducting his various surveys, Dr. Richman encountered individuals he did not intend to contact, but accidentally communicated with.  (Mar. 13, 2018 AM Trial Tr. 1611:5-11.) Nineteen of these individuals self-reported as noncitizens, 1 of whom stated on the survey that he/she had registered to vote or attempted to register to vote.  (Mar. 13, 2018 PM Trial Tr. 1656:1-10.)  Because 1 divided by 19 equals 5.3%, Dr. Richman estimates that 5.3% of noncitizens in Kansas are registered to vote or have attempted to register to vote, and after multiplying that percentage by the total noncitizen population in Kansas, estimates that about 6,000 noncitizens are registered to vote or have attempted to do so.  (Mar. 13, 2018 PM Trial Tr. 1656:18-1657:2.)

275.   The estimate of noncitizen registration based on those incidentally contacted noncitizens suffers from at least five flaws and does not provide persuasive or credible evidence of noncitizen registration for several reasons.

276.   First, Dr. Richman himself acknowledged in his initial report that, using the conventional method for calculating a margin of error, the estimate is not statistically distinguishable from zero.  (Mar. 13, 2018 PM Trial Tr. 1798:18-23.)

277.   Second, regardless of the method used for calculating the margin of error, this estimate is derived from an "extremely small" sample of 19 survey respondents, and therefore

has a low statistical power.  (Mar. 13, 2018 PM Trial Tr. 1798:7-23).  The estimate is based on a single individual stating that he/she was registered or had attempted to register to vote and also stating that he/she was a noncitizen.  (Mar. 13, 2018 AM Trial Tr. 1611:12-23.)  Dr. Richman himself acknowledged that the estimate is "very uncertain."  (Mar. 13, 2018 AM Trial Tr. 1612:5-13.)  Using any of the methods of calculating margins of error that Dr. Richman employs in his supplemental report, the confidence interval for his estimate based on those who were incidentally contacted is more 20 percentage points, (Mar. 13, 2018 PM Trial Tr. 1657:5-9), which is too large to form a reliable or probative estimate of noncitizen registration in Kansas. *See Nat'l Credit Union Admin. Bd.*, 2014 WL 1745448, at *6; *Opal Fin. Grp., Inc.*, 634 F. App'x at 29.

278.    Third, the survey sample is arbitrary. It is not based on any conceptualization or design that is based in any statistical foundation.  (Mar. 13, 2018 PM Trial Tr. 1798:24-1799:8.)  The respondents are individuals that the designers of other surveys did not seek to encounter. (Mar. 13, 2018 PM Trial Tr. 1798:24-1799:8.)  It cannot be described as a representative sample of noncitizens in Kansas.

279.    Fourth, the estimate is based on the same double-barreled survey question that rendered the TDL survey estimate unreliable as a measure of registration or attempted registration in Kansas.  There is no way to know whether the lone individual in the sample who answered affirmatively to the registration question successfully registered to vote or simply attempted to register to vote.  (Mar. 13, 2018 PM Trial Tr. 1656:11-14; 1797:6-9.)  And if the individual attempted to register to vote, there is no way to know what prevented the individual from doing so.  (Mar. 13, 2018 PM Trial Tr. 1656:15-17.)

280.    Fifth, the sample was not weighted to adjust the sample to accurately reflect the

noncitizen population of Kansas. Even though Dr. Richman had age, race and ethnicity information from the sample, he did not weight the sample on those variables to match the larger adult noncitizen population in Kansas.  (Mar. 13, 2018 PM Trial Tr. 1657:10-18.)

### iii. Survey of Registered Voters

281.    Dr. Richman also conducted a survey of more than 500 registered voters in four counties in Kansas.  None of the respondents to this survey self-identified as a noncitizen.  (Mar. 13, 2018 AM Trial Tr. 1604:8-17.)

282.    Dr. Richman did not produce an estimate of noncitizen registration based on this survey, omitting its results from his analysis.  He acknowledged, however, that if he were to calculate an estimate of noncitizen registration in Kansas based on this survey, the estimate would be zero.  (Mar. 13, 2018 PM Trial Tr. 1794:25-1795:11; Mar. 13, 2018 AM Trial Tr. 1605:19-24 (same).)

283.    Because this estimate is based on a sample of more than 500 observations, it has significantly more statistical power than any of Dr. Richman's estimates of noncitizen registration, with the exception of his estimate based on Sedgwick County naturalization data.  (Mar. 13, 2018 PM Trial Tr. 1795:12-1796:2.)

### B. Dr. Richman's Estimates of the Number of Noncitizens on the Suspense List

284.    Dr. Richman conducted a survey of more than 1,300 individuals on the Suspense List, and 7 respondents (or approximately 0.5%) self-reported that they were noncitizens.  (Mar. 13, 2018 AM Trial Tr. 1584:1-6.)

285.    Dr. Richman did not conclude, based on this survey sample of approximately 1,300 people, that 0.5% of all people on his version of the suspense list containing approximately 18,000 individuals were noncitizens.  Instead, Dr. Richman weighted his sample by various characteristics that, in his view, could correlate with citizenship status, including age, gender,

party identification, geographic region, year of registration and "foreign name," in order to adjust for differences between the sample and the Suspense List as a whole.  (Mar. 13, 2018 AM Trial Tr. 1584:7 – 1585:5; 1585:12 – 1586:6.)  After weighting his sample, he estimated that 0.7% of the people on the suspense list—or around 117 people—are noncitizens.  (Ex. 952, Richman Expert Rep., at 8; Mar. 13, 2018 AM Trial Tr. 1511:18-1512:7.)  Dr. Richman explained that he considers the weighted estimate to be more likely to be accurate than the unweighted one.  (Mar. 13, 2018 AM Trial Tr. 1585:6-11.)

286.    Although Dr. Richman did not provide a margin of error for his estimate of the percentage of individuals on the suspense list who are noncitizens, Dr. Ansolabehere did do so, and determined that Dr. Richman's estimate that 0.7% of the people on the suspense list are noncitizens is statistically indistinguishable from zero.  (Mar. 13, 2018 PM Trial Tr. 1800:17-25.)  Dr. Richman did not dispute Dr. Ansolabehere's finding in this regard.

287.    Even if taken at face value, the corollary to Dr. Richman's estimate that 0.7% of people on the Suspense List are noncitizens, is that more than 99% of the individuals on the Suspense List are actually United States citizens whose registrations have been impeded by the DPOC requirement.  (Mar. 13, 2018 PM Trial Tr. 1800:11-16 (Ansolabehere Testimony).)

288.    The weighting process employed by Richman is not credible. Dr. Richman and a graduate student assistant went through the suspense list and determined which names were, in their view, foreign.  (Mar. 13, 2018 AM Trial Tr. 1595:23-1596:7.)  Neither Dr. Richman nor his assistant had any experience in identifying foreign names.  (Mar. 13, 2018 AM Trial Tr. 1596:8-20).  By Richman's own admission, their determinations were subjective and based primarily on whether the name was anglophone.  (Mar. 13, 2018 AM Trial Tr. 1597:14-1598:10.)  Dr. Richman also testified that their work was performed quickly, and that they made many mistakes

91

along the way.  (Mar. 13, 2018 AM Trial Tr. 1599:15-21.)  A review of their coding revealed inconsistencies; for example, of five individuals with the last name of "Lopez," two were coded as foreign and three were coded as non-foreign.  (Mar. 13, 2018 AM Trial Tr. 1600:3-23.)  Dr. Richman also testified that he would have coded Carlos Murguia, a District Judge sitting in this Court, as foreign.  (Mar. 13, 2018 AM Trial Tr. 1600:24-1601:11.)

## VIII.   ALTERNATIVES TO DPOC REQUIREMENT

289.    The evidence at trial indicated, and the KSOS acknowledged, that there are several ways other than a DPOC requirement to verify the citizenship of voters.  (Mar. 8, 2018 PM Trial Tr. 749:8-12.)

### A.  Training at DOVs

290.    Defendant has not sought to improve training procedures to ensure compliance with DOV policy against offering noncitizens voter registration.

291.    Despite DOV policy of not offering voter registration to driver's license applicants who self-identify as non-citizens, *see supra* __, DOV employees have offered voter registration to individuals who have self-identified at noncitizens.  (Mar. 7, 2018 PM Trial Tr. 531:4-532:13 (Lehman Testimony); *see also* Mar. 9, 2018 PM Trial Tr. 1140:16 – 1141:5 von Spakovsky Testimony (agreeing that "there seems to be a problem that occurs in a number of cases that a DMV worker" offers voter registration to an applicant despite knowing that the individual is a noncitizen).)  As Ms. Lehman stated in an email with the former election director, Brad Bryant, "I just wish DMV would not register people who they know to be non-citizens." (Ex. 22, Lehman email re: noncitizen attempting to register; Ex. 99, ELVIS Registrant Detail for "AS," at 5.)

292.    Defendant's expert witness Mr. von Spakovsky opined that DOV employees should be trained not to offer voter registration to noncitizens.  (Mar. 9, 2018 PM Trial Tr.

1138:16-20.)

293.    Kansas DOV employees, however receive very little training or guidance. Driver's license clerks in Kansas receive, on average, no more than thirty minutes of training regarding motor voter registration laws during their two-day in classroom training. (PTO Stip. ¶ 76.)

294.    The KSOS has not undertaken any efforts in recent years to improve training processes for DOV clerks. Bryan Caskey became the Elections Director at the KSOS in 2015 and remains in that position today. (PTO Stip. ¶¶ 78; 119.) Prior to 2015, the KSOS regularly produced guides and posters for DOV training, and on at least two occasions provided training to over 150 driver's license officials on their voter registration duties, including direction that only citizens should be permitted to register to vote. (Mar. 7, 2018 PM Trial Tr. 590:18 – 591:5; 599:6-9 (Bryant Dep.).) The last time the KSOS provided such training was in 2010 and the last time the KSOS provided written training materials was 2012. (Mar. 7, 2018 PM Trial Tr. 592:7 – 593:19; 595:24 – 596:21; 598:14 – 599:9 Bryant Dep.).) Since Mr. Caskey became Elections Director in 2015, the KSOS has not provided training or promulgated a training manual about voter registration to DOV personnel. (*See* PTO Stip. ¶¶ 119-120.) Between February 2015 and June 2016, the KSOS did not provide any new written training materials to the DOV concerning motor voter registration laws. (PTO Stip. ¶ 77.) The KSOS has not even drafted in written form an instruction to DOV clerks to not offer voter registration applications to noncitizens since Mr. Caskey became Elections Director. (PTO Stip. ¶ 121.) Nor does KSOS assess or evaluate DOV employees on their voter registration practices. (PTO Stip. ¶ 123.)

## B. Driver's License List Comparisons

295.    Defendant has identified possible noncitizens on the voter rolls who registered to vote through the motor-voter process, by comparing the voter file to DOV records.

296.    The KSOS has compared the TDL list to the ELVIS database in recent years, including 2009, 2010, and 2011, and 2017.  (PTO Stip. ¶ 93; Mar. 7, 2018 PM Trial Tr. 584:16 - 585:6; 586:2-17 (Bryant Dep.); Mar. 8, 2018 PM Trial Tr. 752:19-22 (Caskey Testimony).) While generating false positives (because some driver's license applicants may show a noncitizen document at DOV, and then subsequently naturalize before applying to register to vote), these comparisons provide the KSOS with information about possible noncitizens who have become registered to vote.  (PTO Stip. ¶ 92; Mar. 7, 2018 PM Trial Tr. 587:1-8 (Bryant Dep.) (reporting 37 possible matches).)

297.    As of January 30, 2017, the KSOS had identified 79 individuals on the TDL List who were also on the voter rolls.  (PTO Stip. ¶ 94.)  Several individuals identified by comparing the TDL list to the voter rolls were referred for prosecution.  (PTO Stip. ¶ 95; Mar. 7, 2018 PM Trial Tr. 586:9-17; 589:20 – 590:12 (Bryant Dep.).)

298.    The DOV has also compared the voter registration file to information in the driver's license database to identify individuals in the voter registration file who presented noncitizen legal permanent resident documents (green cards) in the course of applying for driver's licenses.  (PTO Stip. ¶ 96; Mar. 8, 2018 PM Trial Tr. 750:17 – 751:13.)

299.    Defendant has offered no evidence that the KSOS has conducted vigorous follow-up investigations of individuals who presented a green card to DOV after or around the same time as applying to register to vote.

**C.  Jury List Questionnaires**

300.    Defendant has identified possible noncitizens on the voter rolls by examining responses to jury questionnaires.  (*See, e.g.*, PTO Stip. ¶ 126; Mar. 8, 2018 PM Trial Tr. 754:22 – 755:13.)

301.    On an at least monthly basis, Kansas District Court Clerks send to the KSOS the

lists of individuals who requested to be excused from jury service based on their claims that they are not U.S. citizens, a requirement that stems from a bill that Secretary Kobach helped draft. (PTO Stip. ¶¶ 98, 124; Mar. 8, 2018 PM Trial Tr. 753:15 – 754:13; Mar. 7, 2018 PM Trial Tr. 583:7-584:15 (Brant deposition).)   The KSOS uses this information to identify possible noncitizens on the voter rolls by comparing these lists to the voter rolls; and while this method may generate some false positives (because some people may falsely claim to be noncitizens in order to escape jury duty) it provides some information about possible noncitizen registration that could be used for further investigation.  (PTO Stip. ¶¶ 99, 100, 126; Mar. 7, 2018 PM Trial Tr. 569:17 – 571:6; 580:4-14 (Rucker Dep.); Mar. 8, 2018 PM Trial Tr. 754:14 – 755:13; 757:20-25 (Caskey Testimony).)

302.   Based on these jury questionnaires, the KSOS identified three possible noncitizens on the voter rolls. (PTO Stip. ¶ 126; Mar. 8, 2018 PM Trial Tr. 754:22 – 755:13.) An investigator employed by the KSOS provided the full names and dates of birth of these three individuals to the U.S. Department of Homeland Security ("DHS") via email.  (PTO Stip. ¶ 127; Mar. 8, 2018 PM Trial Tr. 767:17-21; Mar. 9, 2018 Trial Tr. 938:1 – 939:14 (Caskey Testimony); Ex. 55, McCullah email re POC.)   DHS responded with an email describing information known to DHS about the immigration and citizenship status of these three individuals.  (PTO Stip. ¶ 128; Mar. 9, 2018 Trial Tr. 938:1 – 939:14; Ex. 55.)

### D.  DHS Confirmation and the Systematic Alien Verification for Entitlements ("SAVE") Database

303.   Defendant has not meaningfully attempted to use DHS data to identify possible noncitizens on the voter rolls.

304.   The KSOS has directly confirmed the noncitizenship status of some registrants through DHS on at least two occasions. In one instance, KSOS obtained information regarding

several individuals' citizenship status from DHS via email; KSOS provided basic information to DHS including name and birthdate, and did not provide Alien Verification Numbers ("AVN" or "A-Numbers").  (Mar. 8, 2018 PM Trial Tr. 767:17-21; Mar. 9, 2018 Trial Tr. 938:1 – 939:14; Ex. 55.)  In a second instance, the KSOS verified the noncitizenship status of 6 respondents to Dr. Richman's TDL survey.  (Ex. 952, Richman Expert Rep., at 10.)  It is unclear why Defendant cannot attempt to confirm other possible instances of noncitizen registration through DHS.

305.    Besides obtaining direct assistance from DHS, Defendant can also utilize the Systematic Alien Verification for Entitlements ("SAVE") program, which is overseen by the United States Citizenship and Immigration Services ("USCIS"), a division of DHS.  (PTO Stip. ¶ 104; Ex. 50.)  USCIS offers SAVE for the purpose of verifying citizenship status for voter registration.  (PTO Stip. ¶ 106.)  Some states, including Florida, Virginia, and Colorado use, or have attempted to use, SAVE for voter registration purposes.  (Mar. 8, 2018 PM Trial Tr. 762:14 – 763:20.)

306.    KSOS Elections Director Caskey is aware of the fact that other states use or have attempted to use SAVE for voter registration purposes, but has not contacted any of such state's election officials to learn how they have utilized SAVE. (Mar. 8, 2018 PM Trial Tr. 762:14 – 763:20.)

307.    Other agencies in Kansas have access to noncitizen documentation that could be used for SAVE searches.  For example, DOV collects noncitizen documents in connection with issuing TDLs. (Mar. 8, 2018 PM Trial Tr. 766:2-10; 886:9-15.) While KSOS obtains information from the DOV to confirm whether a driver's license applicant has provided DPOC, (Mar. 8, 2018 PM Trial Tr. 750:17 – 751:13.), it does not obtain A-number information or copies of noncitizen documents from the DOV.  (Mar. 7, 2018 PM Trial Tr. 588:21 – 589:19 (Bryant

depo.); Mar. 8, 2018 PM Trial Tr. 764:23 – 765:4 (no steps taken to gain access to A numbers)). The KSOS has not sought to have a law enacted that would enable it to obtain A-number information or copies of noncitizen documents from the DOV, (Mar. 8, 2018 PM Trial Tr. 765:22 – 766:1), and has not investigated whether other agencies in Kansas (such as KDHE) have AVN information that could be used for SAVE searches.  (Mar. 8, 2018 PM Trial Tr. 765:5-9.)

308.    While the SAVE Program does not offer a comprehensive list of noncitizens in the United States, it can be employed to attempt to verify the noncitizenship status of suspected noncitizens identified through alternatives means, such as matches against DMV lists and juror questionnaires.  As with other methods, the SAVE program has its limitations, insofar as it may generate false positives because the citizenship information in the database is not updated in real-time.  But SAVE data searches could, in theory, be used as a starting point for additional investigation.

### E.  Criminal Investigations and Prosecutions

309.    Defendant has not meaningfully attempted to utilize criminal investigations and prosecutions to prevent and deter noncitizen registration.

310.    Deputy Secretary of State Eric Rucker, an experienced prosecutor, (Mar. 7, 2018 PM Trial Tr. 566:2-13; 567:23-568:14), testified that criminal prosecutions can prevent and deter criminal conduct, (Mar. 7, 2018 PM Trial Tr. 566:14-21; 568:15-18).

311.    Since July 1, 2015, the KSOS has had the independent authority to prosecute any person who has committed or attempted to commit any act that constitutes a Kansas elections crime.  (PTO Stip. ¶ 107; Kan. Stat. Ann. § 24-2435; Mar. 8, 2018 PM Trial Tr. 755:14- 31:7-18.)  Secretary Kobach was involved in the drafting of, and advocacy in favor of, the bill that granted the KSOS this authority.  (PTO Stip. ¶ 132; Mar. 7, 2018 PM Trial Tr. 571:8-15 (Rucker

depo. on KSOS assisting in drafting the legislation).)

312.    Despite claiming to have identified more than 120 incidents of noncitizen registration or attempted registration, as of May 25, 2017, the KSOS had filed no criminal complaints and obtained no convictions against a noncitizen for allegedly registering to vote. (PTO Stip. ¶¶ 110, 112.)

313.    As of June 20, 2017, the KSOS had filed one criminal complaint against an individual who voted while being a noncitizen.  (PTO Stip. ¶ 111; Mar. 8, 2018 PM Trial Tr. 756:5 – 757:1 (Caskey Testimony); Mar. 7, 2018 PM Trial Tr. 571:22-572:10 (Rucker Dep.).)

314.    As of June 20, 2017, the KSOS had obtained one conviction against an individual for voting as a noncitizen.  (PTO Stip. ¶ 114; Mar. 8, 2018 PM Trial Tr. 756:5 – 757:1 (Caskey Testimony).)

## IX.    DEFENDANT SECRETARY KOBACH LACKS CREDIBILITY ON THE ISSUE OF NONCITIZEN REGISTRATION

### A.  Defendant Kobach's false assertions concerning Somali noncitizen voting

315.    Defendant Kobach continued to make the false claim that approximately 50 noncitizens from Somalia voted in a 2010 election in Kansas City, even after the Missouri Court of Appeals' 2010 decision in *Royster*, 326 S.W.3d 104, finding no evidence of voter fraud in that election.  (Mar. 9, 2018 AM Trial Tr. 991:14- 993:24 (Minnite Testimony); Ex. 77, 2016.02.25 Minnite Expert Rep., at 24-25.)  Defendant Kobach relied on this false claim as an example of noncitizen voter fraud in op-eds in the *Wall Street Journal* and the *Washington Post* in 2011; an op-ed in the *Topeka-Capital Journal* and an article in the *Syracuse Law* Review in 2012; an op-ed in the *Wichita Eagle* in 2013; and as recently as in 2015 during testimony before a subcommittee of the U.S. House Committee on Oversight and Government Reform and in an interview with a nationally syndicated radio host.  (Mar. 9, 2018 Trial Tr. 993:9 – 24 (Minnite

Testimony); Ex. 77 at 25.)

### B.  Defendant Kobach's misrepresentations of Richman's findings

316.    Defendant Secretary Kobach cited Dr. Richman's work on noncitizen registration and voting to support the notion that the entire vote margin in the 2016 Presidential Election can be attributed to noncitizen voting. (Ex. 133, Video of Kobach Interview with Kansas City Star.)

317.    Professor Richman, however, disavowed that characterization.  He testified that he does not believe that his *Electoral Studies* article supports the claim that millions of noncitizens voted in the 2016 Election.  (Mar. 13, 2018 PM Trial Tr. 1658:6-9; Ex. 154, Richman's blog post article "Why I would sign the open letter if it were true.") ("My study DOES NOT support Trump's claim that millions of non-citizens voted in the 2016 election.") He further testified that he is not aware of any research supporting the notion that the entire margin in the popular vote for president in 2016 can be attributed to noncitizen voting.  (Mar. 13, 2018 PM Trial Tr. 1664:19-1665:24.)

### C.  Defendant Kobach's Efforts to Amend the NVRA Due to Insufficient Evidence of Noncitizen Voter Registration

318.    On October 28, 2016, this Court granted Defendant's motion to reopen discovery in light of the Tenth Circuit's affirmance of the Court's preliminary injunction.  ECF No. 254 at 6.  The Court stated: "fairness dictates that Secretary Kobach be permitted some additional time to marshal evidence [of noncitizen registration] that could rebut the attestation presumption under § 5."  ECF No. 254 at 6.

319.    At some point after this Court's preliminary injunction decision and before the November 7, 2016 election, Defendant drafted an amendment to Section 5 of the NVRA that would permit him to impose a DPOC requirement without proving that substantial numbers of noncitizens had registered to vote in Kansas.  (Ex. 67, Draft Amendments to the NVRA

(replacing "minimum amount of information necessary" text in Section 5 of the NVRA with text permitting elections officials to "require any information the State deems necessary"); August 3, 2017 Deposition of Kris Kobach, ECF No. 491, at 30:7-23.)

320.    On November 9, 2016, the day after the 2016 election, Defendant responded to an e-mail from Gene Hamilton, a member of President-Elect Trump's transition team, regarding the "Day One Book" of priorities for the incoming administration. (Ex. 68, Kobach Email to Hamilton; *see* Kobach Dep. Tr., ECF No. 491 at 32:13-22, 37:9-19, 39:15-40:19.)   Defendant referenced plans to compile "legislation drafts for submission to Congress early in the administration," and stated: "I have some already started regarding amendments to the NVRA to make clear that proof of citizenship requirements are permitted (based on my ongoing litigation with the ACLU over this), as well as legislation . . . [regarding] 8 USC 1623."  (Ex. 68.).

321.    On November 20, 2016, Defendant met with President-Elect Donald Trump and a group of his advisors and discussed, among other matters, the risk of noncitizens registering to vote and potentially swinging the results of elections.  (Kobach Dep. Tr., ECF No. 491 at  47:8-49:13, 57:13-58:23.)   Defendant distributed at this meeting an agenda titled, "First 365 days of the Trump administration." The agenda included a bullet point proposing "Draft Amendments to the National Voter Registration Act to promote proof-of-citizenship requirements."   (Ex. 69, Kobach Memo for Trump Transition Meeting; Kobach Dep. Tr., ECF No. 491 at 47:8-49:13, 57:13)

322.    President Trump subsequently named Defendant vice chairman of the White House's Commission on Election Integrity.  (Kobach Dep. Tr., ECF No. 491 at 62:7-18.)  In his capacity as vice chairman of the Commission, Defendant continued to highlight "the issue of noncitizen voting" and documentary proof of citizenship requirements with the staff of the

commission.  (Kobach Dep. Tr., ECF No. 491 at 66:9-67:25.)

323.   Defendant further testified that he had contacted Iowa congressman Steve King to ask "would he be willing to carry [an NVRA] amendment if I ever gave one to him, and he said yes."  (Kobach Dep. Tr., ECF No. 491 at 69:15-71:8.)

324.   Defendant testified during his deposition that he intended the draft NVRA amendment only as a remote "contingency if the plaintiffs prevail in the 10th Circuit and if the Supreme Court denies cert."  (Kobach Dep. Tr., ECF No. 491 at 69:15-71:8.)   However, this explanation is not credible because Defendant's deposition testimony is inconsistent with the timing of his written communications and actions during the Fall of 2016.

325.   Defendant contacted the President-elect's transition team about his NVRA amendment the day after the November 8, 2016 election.  His e-mail states that the draft is "for submission to Congress early in the administration."  Kobach Dep. Tr., ECF No. 491 at 37:12-13. Two weeks later, Defendant met personally with the President-elect and discussed the threat of noncitizens voting and provided him with an agenda for the "First 365 days of the Trump administration," which proposed amending the NVRA to permit DPOC requirements. Ex. 69, Kobach Memo for Trump Transition Meeting. The President subsequently appointed Defendant as vice chairman of his Commission on Election Integrity.[25]

---

[25] Other aspects of Defendant's deposition testimony, including internal inconsistencies and evasiveness, also suggest a lack of truthfulness.  For instance, Defendant refused to provide direct answers about the effect his draft amendment would have on Plaintiff's lawsuit if it were enacted.  (*See* Kobach Dep. Tr., ECF No. 491 at  22:11-26:10, 28:19-29:21.)  It is difficult to credit Defendant's purported ignorance of the impact of his amendment given what he communicated about the amendment to the President-elect's transition team.  It is further difficult to credit Defendant's testimony that he did not consider the argument Plaintiffs advanced in briefing that the NVRA would need to be amended in order for Defendant to prevail. (*See* Kobach Dep. Tr., ECF No. 491 at 15:5-17:4.)  The language of Defendant's draft amendment mirrors virtually word-for-word the amendment referenced in Plaintiffs' reply brief.

326.    In sum, following the preliminary injunction in this case, Defendant prepared a draft NVRA amendment that, if enacted, would grant him blanket authority to impose a DPOC requirement without proving that substantial numbers of noncitizens had registered to vote. After the Tenth Circuit affirmed the preliminary injunction, this Court reopened discovery to give Defendant an opportunity to marshal any additional evidence needed to prove his case. Immediately thereafter, Defendant urged the incoming Trump administration to take up his draft NVRA amendment and met with the President-elect personally to try to emphasize the threat of noncitizens voting. Defendant's efforts to eliminate the evidentiary showing required by the Tenth Circuit contradicts his assertion that substantial numbers of noncitizens are registering to vote in Kansas.  The steps Defendant took to alter the legal standard governing this case suggest that he cannot produce credible evidence that noncitizen voter registration is a substantial problem.

## PROPOSED CONCLUSIONS OF LAW

I.    STANDING

327.    Individual Plaintiffs Fish, Bucci, Stricker, Boynton, and Hutchinson are all eligible Kansas voters who applied to register to vote during a DOV transaction, but whose applications were suspended and subsequently canceled due to the DPOC requirement.  *See* Proposed Findings of Fact ("PFOF") ¶¶ 53-83.  They therefore all have standing to assert claims

---

*Compare* Ex. 67 *with* Pls.' Reply Br. Supp. Prelim. Inj. at 17, ECF No. 88-1.  Defendant further testified that the reference in his transition memo to draft NVRA amendments was not intended to refer to the purported "contingency plan" amendment he had actually drafted.  (*See* Kobach Dep. Tr., ECF No. 491 at 49:9-50:23.)  But then Defendant later admitted that the reference to draft amendments in the transition memo was indeed directed at Plaintiff's lawsuit.  (*See* Kobach Dep. Tr., ECF No. 491 at49:9-50:23 ("[W]e wouldn't have any finality in this litigation. So you wouldn't know whether you guys in the ACLU had succeeded in changing the meaning of theNVRA."))  The self-serving aspects of Defendant's testimony lack credibility.

under Section 5 of the NVRA.  *Fish v. Kobach*, 840 F.3d 710, 716 n.5 (10th Cir. 2016) ("*Fish II*") ("We are confident on the current record that Plaintiffs-Appellees have standing to sue."), *order enforced*, 16-2105, 2018 WL 1847032 (D. Kan. Apr. 18, 2018); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Fish v. Kobach*, 259 F. Supp. 3d 1218, 1229 (D. Kan. 2017).

328.    To the extent Defendant asserts that he has rendered Plaintiffs Stricker, Boynton, and Hutchinson's claims moot by subsequently verifying their DPOC, this contention is invalid. Plaintiffs Stricker Boynton and Hutchinson's applications were canceled and were only verified later as a result of the preliminary injunction order.  *See* Mem. & Order, ECF No.  334, at 15, 17 ("The Court will not allow Defendant to use its preliminary injunction order as a justiciability sword to pick off Plaintiffs whose citizenship he would not have verified otherwise. . . . Plaintiffs' cancelled applications were revived and registered by operation of the Court's preliminary injunction order").  Their claims are not moot because, if permanent relief is denied and the preliminary injunction dissolved, these Plaintiffs could be returned to their caneled status at the time the complaint was filed.  Absent permanent relief, Plaintiffs Stricker, Boynton, and Hutchinson would need to submit new voter registration applications in order to register to vote.  The Plaintiffs therefore have standing to seek a final order that they may remain registered to vote pursuant to their original registration applications.  *See Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992) (case is moot only where "it [is] impossible for the court to grant any effectual relief whatever to a prevailing party") (internal quotation marks and citation omitted).

329.    Organizational Plaintiff the Kansas League also has standing.  Because of the DPOC requirement, the Kansas League's ability to carry out its mission of encouraging and

assisting citizens to register, vote, and participate in democracy in an informed manner has been substantially and detrimentally impacted.  *See* PFOF ¶¶ 85-106.  In particular, the DPOC requirement has significantly hampered the Kansas League's voter registration activities.  *See* PFOF ¶¶ 89-96.  The DPOC requirement has also forced the organization to devote substantial time and monetary resources to combat the DPOC requirement's harmful effects on its programs and activities.  *See* PFOF ¶¶ 93-102.  The League has committed thousands of hours of volunteer time to engage in door-to-door and campus campaigns to help voters on the suspense list complete their registrations.  *See* PFOF ¶¶ 94, 95, 98, 99.  As a result, the Kansas League has had to divert its limited resources and focus away from other important initiatives and work that advance its mission.  *See* PFOF ¶ 106.  Because the DPOC requirement has "'perceptibly impaired'" the Kansas League's mission, programs, and activities, it has standing to assert claims under Section 5 of the NVRA.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see also Warth v. Seldin*, 422 U.S. 490, 511 (1975); *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (concluding Kansas League has standing to challenge addition of DPOC requirement to Kansas' state-specific instructions to the national mail voter registration form because new obstacles created by DPOC requirement "unquestionably make it more difficult for the [Kansas and other] Leagues to accomplish their primary mission of registering voters").

## II.   DEFENDANT'S PROFFERED EXPERTS, DR. CAMAROTA AND MR. MCFERRON

330.   Dr. Camarota is not qualified to provide expert testimony on the subjects on which he has been proffered as an expert by Defendant.  To the extent that Dr. Camarota is an expert on any topic, he is an expert on immigration, not on voting or on statistics.  *See* PFOF ¶¶ 145-46.  Dr. Camarota has never published a peer-reviewed publication about anything related to voting (let alone on the specific topics of voter registration requirements, the effect of voter

registration requirements on voter participation rates, voter registration, and voter turnout). *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593 (1993) ("[S]ubmission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected."); *see also Koch v. Shell Oil Co.*, 49 F. Supp. 2d 1262, 1268 (D. Kan. 1999) (finding the fact that the purported expert's methodology "had not ever [been] submitted … for peer review to determine its validity, reliability, and reproducibility" weighed against the admissibility of the purported expert's opinion). Further, the United States District Court for the District of Florida has found him to be "not qualified to offer testimony as to the degree of accuracy of . . . rates [of voter registration from the Census Bureau's American Community Survey ("ACS")]" and has found his testimony and analysis of ACS data to be both "misleading" and "inaccurate." *Bellitto v. Snipes*, 16-61474, 2017 WL 2972837, at *9 (S.D. Fla. July 12, 2017); PFOF ¶ 147. Likewise, Dr. Camarota's failure in the instant matter to take the basic steps necessary to control for the impact of confounding factors of which he was aware, *see* PFOF ¶¶ 152-54, belies any notion that he "employs . . . the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *United States v. Medina-Copete*, 757 F.3d 1092, 1101 (10th Cir. 2014) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)); *see also Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 252 (6th Cir. 2001) (affirming district court's exclusion of the testimony of two expert witnesses because, *inter alia*, they failed to "account for 'confounding factors'").

      331.    Mr. McFerron is not qualified to provide expert testimony because he is a pollster,

not a statistician.[26]  The facts that: (i) his background in statistics is limited to two courses (though he cannot even recall then name of one of them); (ii) he does not know what a "T Statistic" is (let alone how to calculate it); (iii) he is not familiar to with the American Association of Public Opinion Research, and (iv)  he is not familiar with the concept of social desirability as it relates to survey research, PFOF ¶ 126 make clear that he does not employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Medina-Copete*, 757 F.3d at 1101   (quoting *Kumho Tire*, 526 U.S. at 152).   Further, Mr. McFerron has never published a peer-reviewed publication on any topic. *See Daubert*, 509 U.S. at 593   *see also Koch*, 49 F. Supp. 2d at 1268   (finding the fact that the purported expert's methodology "had not ever [been] submitted . . . for peer review to determine its validity, reliability, and reproducibility" weighed against the admissibility of the purported expert's opinion); PFOF ¶ 126.

332.    Defendant's confused and inconsistent treatment of Mr. McFerron, *see* PFOF ¶ 127 n.7, coupled with the fact that Mr. McFerron's proffered submission does not comply with the basic requirements of the Federal Rules of Civil Procedure Rule 26(a)(2)(B), PFOF ¶ 127, suggest that Defendant himself  knows that Mr. McFerron is not qualified to be an expert witness.

## III.    MERITS

### A. Section 5 of the NVRA Presumptively Preempts a DPOC Requirement

333.    Under Section 5 of the NVRA, states may require of individuals registering to

---

[26] Defendant failed to timely disclose Mr. McFerron as an expert witness pursuant to Federal Rules of Civil Procedure Rule 26(a)(2)(B).  At trial, the Court permitted Mr. McFerron to testimony under advisement and permitted Plaintiffs to preserve their objection that he is not qualified to testify as an expert in this case.  (*See* Mar. 19, 2018 AM Trial Tr. 1896:7 – 1898:22).

vote at motor vehicle agencies "only the minimum amount of information necessary to . . . enable State election officials to assess the eligibility of the applicant . . ."   52 U.S.C. § 20504(c)(2)(B)(ii).

334.   On October 19, 2016, the Tenth Circuit issued a detailed decision affirming this Court's preliminary injunction and providing guidance regarding the legal test governing this case.  The Tenth Circuit concluded that an "attestation [of citizenship] under penalty of perjury is the *presumptive* minimum amount of information" state election officials can demand of motor-voter registrants, and that the DPOC requirement is therefore presumptively barred under Section 5.  *Fish II*, 840 F.3d at 716-17  (emphasis in original).

### B.  The DPOC Requirement is Burdensome and Contravenes the Express Statutory Purposes of the NVRA

335.   The DPOC requirement contravenes not only the plain meaning of Section 5's text, it also obstructs the NVRA's express statutory purposes of "establish[ing] procedures that will increase the number of eligible citizens who register to vote" and "enhanc[ing] the participation of eligible citizens as voters."   52 U.S.C. § 20501(b)(1)-(2).   This Court preliminarily found that "the process of submitting DPOC for motor voter applicants is burdensome, confusing, and inconsistently enforced."  *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1134 (D. Kan. 2016) ("*Fish I*"), *aff'd*, 691 F. App'x 900 (10th Cir.), *op. in support of order*, 840 F.3d 710 (10th Cir. 2016).   The evidence at trial supports that finding.   The testimony of Plaintiffs' expert Dr. McDonald confirms this Court's preliminary determination that "[t]he sheer number of people cancelled or held in suspense because of the DPOC . . . evidences the difficulty of complying with the law as it is currently enforced."  *Id.* at 1136.   As Dr. McDonald testified, as of March 31, 2016, more than 22,000 motor-voter applicants had been stymied by the DPOC requirement.  *See* PFOF ¶ 45.   As the Tenth Circuit held, this constitutes "the mass denial of a

fundamental constitutional right." *Fish II*, 840 F.3d at 755.

336.    The testimony of the Plaintiffs further illustrates that the DPOC requirement is burdensome and inconsistent with the NVRA's purposes of increasing registration.  52 U.S.C. § 20501(b)(1).  The experiences of Plaintiffs Fish and Bucci demonstrate that, for some voters, significant practical barriers—such as the expense of obtaining a birth certificate or the difficulty of locating a missing document, *see* PFOF ¶¶ 56-57, 62-63—make the DPOC requirement particularly burdensome.  Furthermore, the experiences of Plaintiffs Stricker and Boynton confirm that, even for voters who possess and have brought citizenship documents with them to a DOV office, *see* PFOF ¶¶ 66-69, 73-77, the DPOC requirement constitutes an "administrative maze," that haphazardly disenfranchises even some voters who bring DPOC to a DOV office. *Fish I*, 189 F. Supp. 3d at 1137.  And the testimony of Ms. Ahrens, the former President of the Kansas League, that the DPOC requirement has significantly reduced the effectiveness of voter registration drives in Kansas because many voters do not have DPOC at hand, *see* PFOF ¶¶ 91-96, further illustrates that the added burden of compliance has prevented many would-be voters from registering.  *See Newby*, 838 F.3d at 13 ("It does not matter whether that is because they lack access to the requisite documentary proof or simply because the process of obtaining that proof is so onerous that they give up. . . . The outcome is the same—the abridgment of the right to vote.").

337.    The DPOC requirement is also inconsistent with the NVRA's express purpose of enhancing participation.  52 U.S.C. § 20501(b)(2).  This Court preliminarily found that "the DPOC law has caused a chilling effect, dissuading those who try and fail at navigating the motor voter registration process from reapplying in the future." *Fish I*, 189 F. Supp. 3d at 1145.  The evidence at trial bears out that preliminary conclusion.  The DPOC requirement had precisely

that chilling effect on Plaintiff Boynton, who simply gave up on attempting to register after his initial motor-voter application was not processed.  *See* PFOF ¶ 77.  And Plaintiffs' expert Dr. McDonald credibly testified more broadly that the deterrent effect of the DPOC requirement is magnified because it only applies to first-time voter registration applicants, who are disproportionately those voters who are most sensitive to the costs of voting—that is, young and unaffiliated voters.  *See* PFOF ¶¶ 47-50.

338.    Defendant's various evidentiary submissions as to the burdens of the DPOC requirement are unavailing.  The evidence concerning the hearing alternative showed that it is in fact a cumbersome process, of which voters are largely unaware and rarely use.  *See* PFOF ¶¶ 108-123.  Defendant's expert evidence as to document possession rates was not statistically reliable, PFOF ¶¶ 225-284; and, in any event, document possession rates are not very probative as to the burdens of the DPOC requirement, which is best assessed by the number of voters whose applications have been blocked by the law.  *See Newby*, 838 F.3d at 13 (holding regarding 17,000 suspended registration applications that "[i]t does not matter whether that is because they lack access to the requisite documentary proof or simply because the process of obtaining that proof is so onerous that they give up. . . . The outcome is the same—the abridgment of the right to vote.").  Defendant's expert evidence on turnout rates was similarly unreliable, and was not probative about the effect of the law.  *See Veasey v. Abbott*, 830 F.3d 216, 260 (5th Cir. 2016) (en banc) ("An election law may keep some voters from going to the polls, but in the same election, turnout by different voters might increase for some other reason. . . . That does not mean the voters kept away were any less disenfranchised."), *cert. denied*, U.S., 137 S. Ct. 612 (2017).

339.    Defendant's post-injunction evidence was excluded given the tardiness of the

disclosure and the prejudice of presenting new data to Plaintiffs mid-trial without affording any opportunity for review.  But even if the evidence were admitted, as Defendant's own expert opined, this data is not probative of the effect of the DPOC requirement.  *see* PFOF ¶¶ 157-59. To the extent the burden of the DPOC law has decreased, it is likely due to the Court's intervention barring Defendant from enforcing the requirement against motor-voter applicants.

340.    Finally, while the NVRA's other express statutory purposes are "to protect the integrity of the electoral process" and "to ensure that accurate and current voter registration rolls are maintained," 52 U.S.C. § 20501(b)(3)-(4), neither goal is furthered by the DPOC requirement.  Election integrity is not protected when so many voter registration applicants— approximately 12% of all registration applications from 2013 through early 2016, *see* PFOF ¶¶ 33-46—are prevented from registering, and thus participating in elections.   And voter registration rolls are rendered *inaccurate* when so many eligible Kansans' voter registration applications are unnecessarily held in suspense or canceled.

## C.  The Presumptive Invalidity of a DPOC Requirement Can Be Rebutted Only if Defendant Can Satisfy a Two-Part Test

341.    As this Court previously noted, under the Tenth Circuit's guidance, the presumption that Section 5 of the NVRA prohibits states from requiring more than an attestation from motor-voter applicants "is rebuttable if the state can demonstrate 'that the attestation requirement is insufficient for it to carry out its eligibility-assessment and registration duties." *Fish v. Kobach*, No. 16-2105, 2018 WL 276767, at *4 (D. Kan. Jan. 3, 2018) ("*Fish III*") (quoting *Fish II*, 840 F.3d at 738); *see also Fish II*, 840 F.3d at 738 (discussing *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 19-20 (2013)).

342.    The Tenth Circuit further explained that a State may only impose additional requirements on motor-voter applicants beyond an attestation if it can satisfy a two-part test.

First, the state must make "a factual showing that substantial numbers of noncitizens have successfully registered to vote under the NVRA's attestation requirement." *Fish II*, 840 F.3d at 717.  Second, even if the State makes such a showing, it cannot impose a DPOC requirement unless it also demonstrates that it has exhausted alternative, less burdensome measures and determined that "nothing less than DPOC is sufficient" to address the problem of noncitizen registration.  *Id*. at 738 n.14.  As explained below, Defendant has failed to satisfy either prong of the Tenth Circuit's test.

### D.  Defendant Has Not Established the First Prong of the Tenth Circuit's Two-Part Test, that Substantial Numbers of Noncitizens Have Successfully Registered to Vote in Kansas

343.   Defendant has not established that substantial numbers of noncitizens have successfully registered to vote under the NVRA's attestation requirement.  As an initial matter, this Court and the Tenth Circuit have already rejected Defendant's "one is too many" theory.  *See Fish III*, 2018 WL 276767, at *13 (discussing *Fish II*, at 840 F.3d at 748).  Rather, "[t]he Court will view the number of noncitizen registrations in relation to the number of registered voters in Kansas as of January 1, 2013, and will otherwise be guided by this legal authority when determining whether Defendant's evidence meets the threshold of 'substantial.'"  *Id.* at *14.

344.   At trial, Defendant presented evidence of a maximum of 35 successful registrations by noncitizens dating back to the year 1999. *See* PFOF ¶ 169.  This is not materially different from the 14 incidents presented by Defendant at the preliminary injunction phase, *see Fish III*, 2018 WL 276767, at *13 (citing *Fish II*, 840 F.3d at 748), which the Tenth Circuit found was "well short of the showing necessary."  *Fish II*, 840 F.3d at 747.

345.   Moreover, even if Defendant had demonstrated that all of the 127 noncitizen registrations or attempted registrations proffered by Defendant in the Amended Pretrial Order had successfully registered to vote in Kansas—which he did not do—that number "would

represent .007 percent of registered voters, PFOF ¶ 161, an 'exceedingly small' percentage that does not meet the test of substantiality." *Fish III*, 2018 WL 276767, at *15.  It would be roughly the same percentage of registered voters that Arizona claimed were noncitizens during the *Kobach v. EAC* litigation, which the "Tenth Circuit found insubstantial." *Id.  See also id.* at *14 ("Arizona made a showing that at the time its DPOC law went into effect, at most 196 out of 2,706,223 registered voters were unlawfully registered noncitizens, or .007 percent of all registered voters") (citing, *inter alia*, *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1196-98 (10th Cir. 2014) ("*EAC*")).  As Plaintiffs' experts Dr. Minnite and Dr. Hersh explained, a total of 127 cases in a state with more than 1.8 million registered voters would be consistent with minor administrative errors or scattered misunderstanding by applicants.  *See* PFOF ¶¶ 217, 222.  Thus, even if the Court were to credit all of the purported cases on noncitizen registration identified by Defendant, he would still fail to meet his burden on the first prong of the Tenth Circuit's two–part test.

346.    Finally, in light of the testimony of Plaintiffs' expert Dr. Ansolabehere, Defendant's various statistical estimates of noncitizen registration are not credible and cannot satisfy Defendant's burden under the first prong of the Tenth Circuit's two-part test.  This Court previously noted that, if Defendant proved that 18,000 noncitizens had successfully registered to vote in Kansas, this would constitute a "substantial" number of noncitizens registering under an attestation regime.  *Fish III*, 2018 WL 276767, at *16.  However, Dr. Richman's data do not provide statistically useful information concerning the number of noncitizens registered to vote in Kansas, because, as Dr. Ansolabehere's meta-analysis demonstrates, Dr. Richman's estimates of noncitizen registration are, collectively, statistically indistinguishable from zero.  *See* PFOF ¶ 282.  And Dr. Richman's estimate of 18,000 noncitizen registrations—like his various other

estimates of noncitizen registration—"contain serious methodological and probative limitations," such that the Court should give "little to no weight to Richman's opinions." *Id.*

347.    In sum, because Defendant has failed to make a credible factual showing that substantial numbers of noncitizens have successfully registered in Kansas under an attestation regime, the DPOC law exceeds the minimum amount of information necessary for Kansas election officials to assess the eligibility of motor-voter registrants, and is thus preempted by Section 5 of the NVRA. *See Fish II*, 840 F.3d at 716-17.

### E.  Defendant Has Not Established the Second Prong of the Tenth Circuit's Two-Part Test, that Nothing Less than a DPOC Requirement Is Sufficient to Address Noncitizen Registration

348.    Even if Defendant had established that a substantial number of noncitizens had registered to vote in Kansas, Defendant has failed to demonstrate that alternatives to DPOC are insufficient to address any potential problem with noncitizen registration.

349.    Despite evidence that DOV employees have erroneously offered voter registration to self-identified noncitizens in direct contravention of DOV policy, Defendant has made no effort to improve the training of DOV employees, distribute revised training materials, or take any other corrective action since at least 2015.  *See* PFOF ¶ 285.  That failure is striking in light of the admission by Defendant's own witnesses, as well as the credible testimony of Plaintiffs' experts Dr. Minnite and Dr. Hersh, that incidents of noncitizen registration are often attributable to mistaken understandings and/or administrative errors.  *See* PFOF ¶¶ 217, 222.  Given Defendant's failure even to attempt to improve training processes for DOV employees, he has failed to establish that nothing less than a DPOC requirement is sufficient to address the possibility of noncitizen registration.

350.    The evidence at trial also supports the conclusion that a DPOC requirement is unnecessary because Defendant already exercises two additional alternative means for

identifying possible noncitizens on the voter rolls that have been recognized by the Tenth Circuit: comparing voter registration lists to information about noncitizens contained in driver's license databases, and examining jury questionnaires for self-identified noncitizens who are called to jury duty from the voter rolls.  *See EAC*, 772 F.3d at 1189 (citing memorandum by EAC Executive Director Alice Miller (the "Miller Memo") regarding alternatives to a DPOC requirement); Miller Memo, ECF No. 269-37) at 38-39 (describing information in driver's license databases and juror questionnaires as sources of information for addressing noncitizen registration).  KSOS Elections Director Caskey has used these methods to identify 82 possible noncitizens who have registered to vote or who attempted to register to vote.  *See* PFOF ¶ 169. While these methods may generate false positives (because individuals listed as noncitizens in the DOV database may have naturalized prior to applying to register to vote, and because people may falsely identify as noncitizens on jury questionnaires in order to escape jury duty), they may provide a starting point for further investigation, confirmation, and removal of noncitizens from the voter rolls.  Given that the Plaintiffs' claims involve the imposition of the DPOC requirement at the DOV, it is unclear why, in particular, examining noncitizen information in DOV records is insufficient for the task at hand.  Accordingly, in light of the fact that Defendant currently uses these alternative means for detecting and addressing noncitizen registration, Defendant has failed to establish that nothing less than a DPOC requirement is sufficient to address the problem of noncitizen registration.

351.   The evidence at trial also supports the conclusion that a DPOC requirement is unnecessary because Defendant has not meaningfully attempted to utilize information from the Department of Homeland Security, which the Tenth Circuit has recognized as a means of preventing noncitizen registration.  *See EAC*, 772 F.3d at 1189 (citing the Miller Memo

regarding alternatives to a DPOC requirement); Miller Memo, ECF No. 269-37 at 39 (describing SAVE database as means to address noncitizen registration).[27]  Although Defendant protests that he cannot use the DHS SAVE database, he has previously confirmed the noncitizenship status of registrants through DHS directly, without using the SAVE program.  *See* PFOF ¶ 295.  Defendant's own actions thus demonstrate that, to the extent that information from DOV databases and jury questionnaires generate false positives in the search for noncitizen registrants, DHS information could be a useful source of additional information.  And, even if direct confirmation of noncitizenship status through DHS is not available in the future, Defendant has not attempted to learn how other states have used the DHS SAVE database in the voter registration process, or tried to obtain the information that would be necessary to use SAVE.  *See* PFOF ¶¶ 297-98.  Given that Defendant has not meaningfully sought to utilize DHS information as an alternative to a DPOC requirement, he has failed to establish that nothing less than such a requirement is sufficient to address the problem of noncitizen registration.

352.    The evidence at trial also supports the conclusion that a DPOC requirement is unnecessary because Defendant has not meaningfully attempted to use criminal prosecutions, which the Tenth Circuit has recognized as a means of preventing noncitizens from registering to vote.  *See EAC*, 772 F.3d at 1189 (citing the Miller Memo regarding alternatives to a DPOC requirement); Miller Memo,ECF No. 269-37) at 37-38 (describing criminal prosecutions as a means to address noncitizen registration).  Indeed, despite claiming that there are thousands of noncitizens registered to vote in Kansas and acknowledging that criminal prosecutions can deter unlawful conduct, Defendant has obtained only a single conviction for noncitizen voting since he

---

[27] Also publicly-available at https://www.eac.gov/assets/1/28/20140117%20EAC%20Final%20Decision%20on%20Proof%2 0of%20Citizenship%20Requests%20-%20FINAL.pdf.

obtained prosecutorial authority over elections-related crimes in 2015. *See* PFOF ¶ 305. Given that Defendant has not meaningfully sought to utilize criminal prosecution as an alternative to a DPOC requirement, he has failed to establish that nothing less than such a requirement is sufficient to address the problem of noncitizen registration.

353.   In sum, because Defendant has failed to demonstrate that various alternatives to a DPOC requirement that he currently employs (DOV database matching and juror questionnaires) are inadequate, and has also failed to engage in meaningful efforts to utilize other alternatives to a DPOC requirement (improving DOV training, utilizing DHS data, or prosecuting noncitizen registration), he has failed to establish that nothing less than a DPOC requirement is sufficient to address noncitizen registration. *Fish II*, 840 F.3d at 738 n.14.

## IV.   REMEDY

354.   To remedy Defendant's violation of the NVRA, Plaintiffs seek a declaration that the DPOC requirement may not be enforced against motor-voter applicants, and an order permanently enjoining the DPOC requirement, Kan. Stat. Ann. § 25-2309(l), and the administrative rule, K.A.R. § 7-23-15, "as to individuals who apply to register to vote in federal elections at the same time they apply for or renew a driver's license." *Fish I*, 189 F. Supp. 3d at 1152. Plaintiffs further seek an order re-directing Defendant "to register for federal elections all otherwise eligible motor voter registration applicants that have been cancelled or are in suspense due solely to their failure to provide DPOC." *Id.*

355.   In light of ongoing concerns regarding Defendant's failure to comply with this Court's orders, *see* Pls.' Mot. to Enforce & for Contempt, ECF No. 220; Ord. to Show Cause, ECF No. 222; Ord. Finding Mot. for Contempt Moot, ECF No. 226; Pls.' Mot. for Contempt; ECF No. 423; Mem. & Ord., ECF No. 520, Plaintiffs seek further relief to ensure Kansas voters

covered by the injunction are treated equitably.[28]   The Court has broad equitable authority to enjoin Defendant to ensure effective relief.  *See, e.g.*, *Bd. of Ed. of Oklahoma City Pub. Schs. v. Dowell*, 375 F.2d 158, 168 (10th Cir. 1967).  Specifically, Plaintiffs request an order directing Defendant to add all otherwise eligible motor voter registration applicants ("covered voters") to the official voter registration list and directing Defendant to designate covered voters as "active" in the ELVIS database.  *See* 52 U.S.C. § 20507(a)(1) (requiring state election officials to "ensure that any eligible applicant is registered to vote in an election"); *see also* Kan. Stat. Ann. § 25-2309(g) ("A person who completes an application for voter registration shall be considered a registered voter when the county election officer adds the applicant's name to the county voter registration list.").[29]

---

[28] On April 18, 2018, the Court issued a ruling describing Defendant's "history of noncompliance with the preliminary injunction order" and holding Defendant in contempt for willfully and repeatedly disobeying the Court.  Mem. and Ord., ECF No. 520 at 16, 24.  Defendant's public statements regarding the contempt ruling underscore ongoing concerns regarding the likelihood of his future compliance with this Court's orders.  Defendant stated in an interview with Breitbart News that he considers the Court's contempt ruling "just ridiculous" and that he anticipates he will "prevail on the contempt issue in the 10th Circuit Court of Appeals."  *See* "EXCLUSIVE – Kris Kobach on Being Held in Contempt During Fight Against Voter Fraud: 'It's Just Ridiculous,'" Breitbart News, Apr. 22, 2018, http://www.breitbart.com/big-government/2018/04/22/kris-kobach-contempt-of-court-ridiculous/.  Defendant further stated his belief that the preliminary injunction was based on "an utter nonsense way of reading the statutes and the constitution."  *Id*.  While Defendant is entitled to his opinion, his history of disobeying judgments he disagrees with suggests that specific steps to monitor and verify compliance with a final injunction may be necessary.

[29] Defendant has objected that adding covered voters to the official voter registration list would make it impossible for a higher court to reverse this Court's judgment in light of the NVRA's protections against purging active voters.  Prelim. Injun. Hr'g Tr., ECF No. 367-6, at 87:3-89:17.  Defendant's position is meritless and incompatible with the express provisions for injunctive relief outlined in the statute.  *See* 52 U.S.C. § 20510(b)(2) (providing private right of action "for declaratory or injunctive relief").  Injunctive relief necessarily includes preliminary and final injunctions which are appealable and reversible by a higher court.  The injunctive relief available under the NVRA would be deeply undermined if defendants could defer registering prevailing plaintiffs until every appeal in a case had been exhausted.

356.     Effective relief requires that covered voters be informed about their registration status and receive accurate voting-related information.   Inaccurate information risks "voter confusion and [a] consequent incentive to remain away from the polls."   *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006).   Here, after the Preliminary Injunction was issued, Defendant initially refused to provide accurate information, and only provided such information under threat of a contempt finding. (*See* ECF No. 520 at 16 ("[Defendant] not only willfully failed to comply with the preliminary injunction for five months, but then only partially complied in October 2016 upon the threat of contempt.")   Defendant subsequently failed to instruct local county elections officials to provide voters covered by the preliminary injunction with the same postcards about polling locations that all other registered voters in the state receive, despite promising on the record that the postcard notices would be sent (*see* ECF No. 520 4-5).   Plaintiffs therefore seek an order directing Defendant to ensure that covered voters receive the same information as that received by other active voters, including:

a.   an order directing Defendant to provide covered voters with the same information provided to other registrants (including but not limited to certificates of registration); and to ensure that all elections-related public education materials (including but not limited to voter-aimed notices and websites, in all languages in which those documents are available, including English and Spanish) make clear that motor-voter applicants do not need to provide DPOC in order to be registered to vote, and need not provide any additional information in order to complete their voter registration applications.   *See* Joint Status Report, ECF No. 225; Order, ECF No.  226;

b.   an order directing Defendant to instruct all state and county elections officers, and

to ensure that all training and reference materials for elections officials in Kansas (including but not limited to the KSOS County Elections Manual) make clear, that motor-voter applicants do not need to provide DPOC in order to be registered to vote, and need not provide any additional information in order to complete their voter registration applications.  *See* Joint Status Report, ECF No. 225; Order, ECF No.  226;

c.  an order directing Defendant to maintain the "Voter View" website "so that covered voters [registrants] are listed as registered to vote in the same way that other registered voters are displayed."  *See* Joint Status Report, ECF No. 225; Order, ECF No.  226;

357.  Effective relief also requires that covered voters have the same voting experience as other active voters, and not be segregated into any kind of second-class status at the polls. Plaintiffs therefore request relief including:

358.  an order directing Defendant to ensure that, in counties that use paper poll books, the names of all motor-voter registrants appear in the same manner and in the same list as all other registered voters' names.  *See* Joint Status Report, ECF No. 225; Order, ECF No.  226;

359.  an order directing that all motor voter applicants shall be "entitled to vote using standard ballots rather than provisional ballots at polling places on Election Day or when they request advance mail-in ballots."  *See* Joint Status Report, ECF No. 225; Order, ECF No.  226;

360.  Plaintiffs request that the order specify that relief should apply to all people who apply to register to vote through an "NVRA-covered driver's license transaction," regardless of whether it is conducted in-person or online.  *See Stringer v. Pablos*, 274 F. Supp. 3d 588, 601 (W.D. Tex. 2017).  There are almost 6,000 registration applications submitted via the DOV's

website that have been suspended or canceled due to the DPOC requirement.  *See* PFOF ¶ 34 (parties stipulated that, as of March 28, 2016, more than 17,000 in-person motor-voter applicants were blocked from registering to vote because of the DPOC requirement); PFOF ¶ 45 (Plaintiffs' expert Dr. McDonald testified that, as of March 31, 2016, a total of 22,888 motor-voter applicants were suspended or canceled for lack of DPOC, if both in-person and online applicants are included).  Excluding online motor-voter applicants from relief would be inconsistent with the NVRA's express purposes of "establish[ing] procedures that will increase the number of eligible citizens who register to vote" and "enhanc[ing] the participation of eligible citizens as voters."   52 U.S.C. § 20501(b)(1)-(2).   It would also render the statute ineffective as governmental transactions are increasingly conducted online.  For these reasons, any and all relief ordered by the Court should apply to online as well as in-person motor-voter applicants.

361.   Given Defendant's record of noncompliance with the preliminary injunction, Plaintiffs further request that the Court direct the parties to meet, confer, and file a joint status report [45 days] before the next [primary and/or general] election scheduled in Kansas to verify compliance with the final injunction.  Following this joint status report, the Court may determine whether modification of its final order is warranted or whether any additional steps may be necessary to ensure that effective relief for covered voters is not denied or otherwise undermined by Defendant.

362.   Finally, Plaintiffs seek an award of Plaintiffs' attorneys' fees and costs, as authorized by the NVRA, *see* 52 U.S.C. § 20510(c), and all other relief deemed appropriate.


Dated this 23rd day of April, 2018

Respectfully submitted,

/s/ Stephen Douglas Bonney
STEPHEN DOUGLAS BONNEY (#12322)
ACLU Foundation of Kansas
6701 W. 64th Street, Suite 210
Overland Park, Kansas 66202
(913) 490-4102
dbonney@aclukansas.org


NEIL A. STEINER*
REBECCA KAHAN WALDMAN*
DAPHNE HA*
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Phone: (212) 698-3500
Fax: (212) 698-3599
neil.steiner@dechert.com
rebecca.waldman@dechert.com
daphne.ha@dechert.com


*Attorneys for Plaintiffs*

/s/ Dale E. Ho
DALE E. HO*
R. ORION DANJUMA*
SOPHIA LIN LAKIN*
American Civil Liberties Union Foundation,
Inc.
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2693
dale.ho@aclu.org
odanjuma@aclu.org
slakin@aclu.org


ANGELA M. LIU*
Dechert LLP
35 West Wacker Drive
Suite 3400
Chicago, IL 60601-1608
Phone: (312) 646-5800
Fax: (312) 646-5858
angela.liu@dechert.com


*admitted *pro hac vice*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on the 23rd day of April, 2018, I electronically filed the foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

/s/ Stephen Douglas Bonney

STEPHEN DOUGLAS BONNEY (#12322)

Attorney for Plaintiffs