## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

STEVEN WAYNE FISH, et al.,     )
                                        )
       Plaintiffs,           )
                                        )
v.                              )     Case No. 16-2105-JAR-JPO
                                        )
KRIS KOBACH, in his official capacity as  )
Secretary of State for the State of Kansas, et )
al.,                             )
                                        )
       Defendants.         )
_____ )

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN *FISH* AND

### DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**I.**    **Findings of Fact**

Defendant incorporates the following material facts that are either uncontroverted or stipulated by the parties that were included in the Court's Order Memorandum[1] on the parties' motions for summary judgment:

1.    Defendant Kansas Secretary of State Kris Kobach does business in and is an elected official of the State of Kansas. Defendant is considered the Chief Election Officer for the State of Kansas.

2.    Kansans may apply to register to vote in person, by mail, through a voter registration agency, in conjunction with applying for a Kansas driver's license, or "by delivery to a county election officer to be registered."

3.    The individual Fish Plaintiffs all applied to register to vote at the time they applied for a Kansas driver's license.

---

[1] See Doc. 421.

4.      The Kansas Election Voter Information System ("ELVIS") is a statewide voter registration database, maintained by Defendant. The central database reflects data that is entered by the counties. ELVIS assigns a unique identification number to all voters.

5.      Each county election officer is responsible for maintaining the voter lists for their own counties. When a voter registration application is received by the relevant county election office, a record is created in the ELVIS database.  County election officers have been instructed to enter into ELVIS all people who submit voter registration applications regardless of whether they provided  proof of citizenship.  ELVIS contains codes that demonstrate whether a person has registered successfully.  "CITZ" is the code recorded in ELVIS to indicate that an applicant has failed to  provide documentary proof of citizenship.  "MV" is the code recorded in ELVIS to indicate that  an applicant has applied to register to vote at the Kansas Division of Vehicles ("DOV") in conjunction with a driver's license application.

6.      If an applicant has not provided DPOC, or if the application is otherwise missing required information, the record is deemed "incomplete," until  the application is completed.

7.      After 90 days, an incomplete application is cancelled under K.A.R. § 7-23-15.

8.      Noncitizens who apply for a driver's license may receive a temporary driver's license ("TDL"), the duration of which is tied to the length of time that the documentation they provided to the DOV permits their presence in the United States.  Noncitizen legal permanent residents who apply for a driver's license receive a regular driver's license.

9.      As of January 1, 2013, there were 1,762,330 registered voters in Kansas.

10.     As of March 23, 2017, Caskey had identified 125 non-citizens who either attempted to register to vote or successfully registered to  vote prior to the proof-of-citizenship requirement's implementation, or attempted to register after  the requirement was implemented. This figure is

equal to approximately .0007% of registered voters in Kansas.

11.    Tabitha Lehman is the County Election Officer of Sedgwick County. She has identified an additional 2 noncitizens who registered to vote before January 1, 2013, in Sedgwick County.

12.    Of the 127 individuals identified by Caskey and Lehman, 43 successfully registered to vote in Kansas, 47 currently have or have had the "CITZ" code in their ELVIS record at one point, and 11 have voted in an election. Eighty-eight of these individuals are motor-voter applicants, 25 of whom successfully registered to vote in Kansas, 32 have or have had the "CITZ" code in their ELVIS records at some point, and 5 have voted in an election.

13.    Defendant has also identified possible noncitizens who registered to vote by comparing the TDL list with the ELVIS database. Defendant compared the TDL list to the voter registration list in 2009, 2010, 2011, and 2017. As of January 30, 2017, Kansas had identified 79 TDL holders on the voter rolls, several of whom have been referred for prosecution.

14.    One of Plaintiffs' experts, Eitan Hersh, also compared the TDL list to the voter registration list. He found 82 matches. The DMV has compared the list of individuals on the suspense list to information in the driver's licenses database concerning driver's license holders who presented proof of permanent residency (or "green cards") in the course of applying for a driver's license, and identified some possible noncitizens.

15.    In Kansas, people who are called for jury service are sent jury duty questionnaires that include a question about United States citizenship. Monthly, district courts send Defendant lists of individuals who requested to be excused from jury service based on their claims of noncitizenship.

16.    Defendant has compared lists of individuals who indicated on their jury questionnaires that they were not citizens, to his list of registrants and identified at least 5 individuals who were

potentially noncitizens.  In November 2013, Defendant referred these five individuals to a local county police department for investigation and possibly prosecution.

17.     Defense expert von Spakovsky opined that Kansas has no access to information about who is in the United States legally or otherwise, so most discoveries of noncitizens on registration rolls are accidental.

18.     Defense expert Jesse Richman evaluated several pieces of data to try to determine the prevalence of noncitizen registration in Kansas.  In one method, Richman compared the Kansas list of TDL holders to the list of individuals held in "suspense" in ELVIS for failure to submit DPOC at the time they registered to vote.  He identified 16 people on both lists, although he does not believe that everyone matched from the list is a noncitizen.

19.     He did not compare this list of matches with the 127 names identified by Caskey and Lehman to determine if there was overlap.  None of these 16 individuals registered to vote, and there is no information about whether they attempted to register at the DOV.

20.     Richman also found that 27 people on the suspense list attempted to register to vote close in time to when they obtained a driver's license using a green card or a noncitizen permanent resident document.  He did not compare this list of matches with the 127 names identified by Caskey and Lehman to determine if there was overlap. There is no information about whether these individuals attempted to register to vote at the DOV.

21.     Richman utilized multiple sampling methods based on the results of a January 2017 telephone survey commissioned by the State of Kansas, and conducted by a national polling firm, of (1) TDL holders; (2) individuals on the suspense list; (3) registered voters in Ford, Seward, Finney, and Grant counties; and (4) "incidentally contacted" individuals.  Of the 1300 people surveyed from the suspense list, Richman estimates that .65% are noncitizens.

22.     The registered voters survey sampled individuals registered to vote between 2007 and 2012 in Ford, Finney, Grant, and Seward counties.  All of the individuals contacted indicated that they were citizens of the United States.

23.     Richman provides four estimates of noncitizens in Kansas who have registered or attempted to register to vote, not limited to DOV registrations.  These estimates are based on the following sources: (1) the CCES survey; (2) records of newly naturalized Sedgwick County citizens who were discovered to have been registered to vote at the time of naturalization; (3) a survey of TDL holders; and (4) survey responses from a group of incidentally contacted noncitizens.  Richman does not identify a single "best" estimate.

24.     Richman also produced a "meta-analysis" of the rate of noncitizen registration by aggregating these four estimates. The information provided to Richman reflected that out of 791 newly-naturalized citizens in Sedgwick County since January 1, 2016, 8, or roughly 1%, had already submitted voter registration forms.  The Sedgwick County Election Office discovered these individuals when entering their registration information into the ELVIS database.

25.     Extrapolating this percentage to  the number of naturalized citizens in Kansas between 2008 and 2015, Richman estimates 1,153  noncitizens registered to vote.  Richman updated this estimate in his rebuttal report, in order to respond to Plaintiffs' expert's criticism, and the number rose to 1,169.

26.     Richman also analyzed results from a telephonic survey that attempted to identify noncitizens on the TDL list.  Out of 104 individuals contacted, 38 were reached that matched the name and age of an individual on file.  Those names then were provided to the Department of Homeland Security ("DHS") to determine their citizenship status.  In total, 37 individuals were determined to be noncitizens based on the most recent information available to DHS, 6 of whom

responded to the survey that they had either registered or attempted to register to vote, although none have an ELVIS record.

27.    Based on this sample, Richman concludes "if the small sample analyzed can be generalized to the broader TDL list . . . then it suggests that . . . 3,480[] individuals on that list have registered or attempted to register to vote in Kansas."  Richman observes that the TDL list does not include all Kansas noncitizens—the list excludes unlawfully present noncitizens and noncitizens who choose not to obtain a driver's license.  He opines that if the survey results are applied to the broader noncitizen population, it would suggest that more than 18,000 noncitizens have registered or attempted to register to vote.

28.    Finally, Richman looked at 165 "incidentally-contacted" individuals from the three different lists in the telephonic survey who were asked about their citizenship status and whether or not they were registered to vote.  Nineteen of these individuals indicated that they were noncitizens, one of whom indicated that they had registered or attempted to register to vote, although there is no evidence of this person's name appearing in ELVIS.  Richman concludes: Although the sample size is extremely small and any estimates are accordingly very uncertain (the margin of error is 10.1 points), the estimate from this data suggests a registration/attempted registration rate of 5.3 percent.  If extrapolated (and again the uncertainty here is very high) to the Kansas non-citizen population as a whole, this implies that about 6,000 may have registered to vote or attempted to register to vote.

29.    Richman's meta-analysis aggregating all four of these estimates produced a midpoint estimate that 1.1% of noncitizens in Kansas have registered or attempted to register to vote. Because there are approximately 115,000 noncitizen adults in Kansas, this midpoint estimate equals 1,265 noncitizens statewide who have registered or attempted to register to vote in Kansas.

This figure is equal to approximately .07% of the approximately 1.8 million registered voters in Kansas.

30.     Close elections can be decided by a few votes.  In Kansas elections over the past 17 years, there have been 33 elections decided by fewer than 100 votes.  For example, there were  two general election races for the Kansas House of Representatives that were decided by .04%  and .036% of the two-party vote, respectively, and both were won by Democratic candidates  who held a three-vote advantage.

31.     As of March 28, 2016, there were 5,655 applicants on the "suspense list" who had applied to register at the DOV.  As of March 23, 2016, there were 11,147 applicants who applied  to register at the DOV whose applications were canceled under K.A.R. § 7-23-15 due to lack of DPOC.

        In addition to the above, the parties stipulated to the following facts during trial:

32.     The  population  of  noncitizens  over  the  age  of  18  residing  in  Kansas  was  114,459 according to the 2016 American Community Survey 1-Year Estimates as published by the U.S. Census Bureau.  Doc. 496-1, p. 2.

33.     The population of noncitizens over the age of 18 residing in Sedgwick County Kansas was 23,472 according to the 2016 American Community Survey 1-Year Estimates as published by the U.S. Census Bureau.  Doc. 496-1, p. 2.

34.     As part of the driver's license application and renewal processes, DOV procedure provides that the driver's license examiners are to ask customers if they want to register to vote. Doc. 494.

35.     DOV procedure provides that the examiners are to enter a "Y" in the appropriate field of the computer interface if a customer answers "yes" to the voter registration question. Doc. 494.

36.     DOV procedure provides that the examiners are to direct customers to read a voter oath

located on the counter in front of the customers and to ask the customer to read that oath.  Doc. 494.

37.     A true and correct copy of the voter oath located on the counter in front of the customer is attached to this stipulation as Exhibit A. Doc. 494.

38.     After a customer reads the voter oath, DOV procedure provides that the examiner is to ask the customer if he/she affirms the voter oath. Doc. 494.

39.     Customers are not required to provide a signature after reading the voter oath.  The signature occurs during the photo and signature portion of driver's licensing process before the voter registration part of the process begins. Doc. 494.

40.     DOV procedure provides that the examiners are to ask customers who affirm the voter oath a series of questions including whether the customers are citizens of the United States, whether the customers will be 18 years of age before the next election, whether the customers want to register with a political party, and whether the customers want to provide their telephone numbers.  DOV procedure also provides that the examiners are to record the customers' answers to these questions in the computer interface. Doc. 494.

41.     The voter registration receipt prints automatically when someone applies to register to vote at the DOV.  Doc. 494.

42.     Under DOV procedure, it is mandatory that the DOV clerk provide the applicant with the voter registration receipt.  Doc. 494.

43.     DOV procedure and training provides that the examiners are to scan all documents an applicant provides during a renewal.  Doc. 494.

44.     Lawful permanent residents are not required to provide a lawful presence document when they renew their driver's license. Doc. 494.

45.     Lawful Permanent Residents obtain a standard six-year license.  Doc. 494.

46.     The DOV does not keep statistics on the number of driver's licenses issued to permanent residents.  Doc. 494.

47.     If a proof of citizenship document has been scanned into the DOV system during a prior transaction and a voter applies to register to vote during a renewal, the DOV informs KSOS that such document is on file.  Doc. 494.

48.     The DOV only has documents scanned into the system since 2013. Doc. 494.

49.     When a person applies for a driver's license or a renewal at the DOV but does not apply to register to vote at that time, a file is not created to be sent to the Secretary of State's Office for that person.  Doc. 494.

50.     The DOV also does manual checks for proof of citizenship documents when the Secretary of State's office provides names of individuals who the Secretary provides to the DOV.  Doc. 494.

51.     In order to renew a Kansas driver's license, a driver's licensee must provide the Kansas Division of Vehicles with proof of identity (such as an expiring Kansas driver's license), a Social Security number, and proof of Kansas residency. Doc. 494.

52.     The total number of votes reported for the highest federal (or state) office on the ballot in each of the listed general elections is as follows:

| Federal Election Year | Highest Federal (or State) Office on the Ballot | Total Votes Reported |
|---|---|---|
| 2000 | President | 1,072,216 |
| 2002 | U.S. Senate | 776,850 |
| 2004 | President | 1,187,756 |

| 2006 | Governor | 849,700 |
|---|---|---|
| 2008 | President | 1,235,872 |
| 2010 | U.S. Senate | 837,692 |
| 2012 | President | 1,159,971 |
| 2014 | U.S. Senate | 866,191 |
| 2016 | President | 1,184,402 |
| **Cumulative Votes Reported** | | **9,170,650** |

Doc. 496-1.

53.     The official turnout in the listed elections in Sedgwick County, Kansas in each of the listed elections is as follows:

| Federal Election Year | Official Turnout |
|---|---|
| 2004 General Election | 181,626 |
| 2006 Primary Election | 37,757 |
| 2006 General Election | 118,674 |
| 2008 Primary Election | 36,844 |
| 2008 General Election | 197,044 |
| 2010 Primary Election | 65,826 |
| 2010 General Election | 136,828 |
| 2012 Primary Election | 54,923 |
| 2012 General Election | 187,286 |
| 2014 Primary Election | 52,598 |
| 2014 General Election | 145,073 |
| 2016 Primary Election | Data not available |
| 2016 General Election | 195,746 |
| **Cumulative Official Turnout** | **1,410,225** |

Doc. 496-1.

54.     There were 1,817,927 registered voters (including voters listed as "active", "inactive", and voters who are covered by the preliminary injunction) as of October 2016.  There were 1,744,866 registered voters (including voters listed as "active", "inactive", and voters who are covered by the preliminary injunction) as of October 2014.  Doc. 496-1.

**Evidence at Trial**

Defendant submits the following evidence that was addressed at trial.

**Current Status of Individual Plaintiffs**

***Parker Bednasek***

1.   When Mr. Bednasek moved to Kansas as a freshman, he declared Texas to be his residence when he registered to vote in Texas. Tr. 481:23-482:1

2.   Mr. Bednasek later applied to register to vote in Kansas and swore under penalty of perjury that he had "abandoned his former residence," yet Mr. Bednasek then used his Texas address he claimed to have abandoned to obtain a Texas driver's license. Tr. 486:5-11.  Mr. Bednasek has never obtained a Kansas driver's license, despite having been physically present in Kansas for more than 90 days.  Tr. 486:17-19.

3.   Mr. Bednasek pays non-resident tuition and has a Texas driver's license; Mr. Bednasek obtained a Texas driver's license *after* he applied to register to vote in Kansas.  483:9-483:17. Mr. Bednasek does not have a Kansas driver's license yet has had what he claims to be his residence in Kansas for well over 90 days.  486:17-19.  Mr. Bedansek's car is registered in Texas and he even re-registered his car in Texas after he applied to register to vote in Kansas; he also maintains insurance in Texas.  486:22-487:14.

4.   Parker Bednasek lacks standing because he stated that he would not comply with the law because he disagreed with it; the law itself is not causing his claimed injury.  Tr. Trans. 471:5-472:17.

5.   When the class action complaint was filed with this Court in the *Bednasek* case with "an unnamed class plaintiff" on November 17, 2015, Mr. Bednasek had not heard of this case or spoken to anyone about this case.  Tr. 480:21-481:22.  The first time Mr. Bendasek spoke to anyone about this case was when he was approached by the Kansas Democratic political and field director weeks after the First Amended Complaint with the unnamed class plaintiff was filed.  474:22-475:11.  Mr. Bednasek was instructed not to provide his proof of citizenship when registering to vote by the Democratic political and field director.  496:21-497:24.  Mr. Bednasek acknowledges that there is nothing physically that prevents him from presenting his birth certificate to the county election office if he chose to do so.  497:25-498:4.

6.   Mr. Bednasek's voter registration address is no longer accurate and he could update his address by re-registering to vote, but nevertheless will still refuse to provide the same citizenship document that he has already provided to another government agency.  Tr. 494:16-495:18.

7.   Bednasek's parents have a copy of his birth certificate.  490:25-491:2.  Bednasek's parents previously provided him a copy of his birth certificate for purpose of submitting that document to another government entity—the United States Navy.  491:10-491:19.

8.   Bednasek stated that he could have them send it to the county clerk on his behalf or text a copy of it to him so that he could provide it to the clerk.

9.   Bednasek has provided a copy of his birth certificate to another government entity—the United States Navy—but refuses to provide a copy of the same document to the State of Kansas.  Tr. 474:1-474:5.

**Providing a birth certificate or other citizenship document to register to vote is not more burdensome than what Individuals Must do to obtain a Kansas driver's license or What Bednasek Did to Apply to the Navy**

10. In Kansas, one must provide evidence of lawful presence to obtain a driver's license. Doc. 353, PTO Stipulated Facts, ¶¶ 116, 117.  Such lawful presence includes, among other things, a birth certificate.  Doc. 353, ¶ 116.

11. Mr. Bednasek has already demonstrated it was not burdensome for him to provide a citizenship document to another government agency—the US Navy—when he wanted to.  Tr. 474:1-474:5.

12. Mr. Bednasek admits that nothing physically prevents him from presenting his proof of citizenship document.  Tr. 497:25-498:4.

13. Indeed, the various types of documents that one can provide to prove U.S. citizenship, including under a section (m) hearing, is much broader than the documents that one can provide to obtain a driver's license for purposes of voter ID laws.  Von Spakovsky Testimony 1086:9-1087:21

### *Fish* Plaintiffs

**Boynton**

14. Mr. Boynton did not apply to register to vote at the DOV.  Caskey Testimony 833:15-833:23; Joint Exhibit 829, pp 3-4.  According to Mr. Boynton's registration file, he originally applied to register to vote utilizing a voter registration application dated on November 4, 2014, and submitted to the Sedgwick County election office.  Caskey Testimony 834:8-834:15; Joint Ex. 829, pg 13.

15. After KSOS obtained the web portal access from the DOV, a citizenship document was found in the DOV database.  Caskey Testimony, 829:10-830:8; 831:16-832:20; Joint Exhibit

829, p 8.  Mr. Boynton has a reason code of active within the ELVIS system, indicating that he is fully registered to vote, independent of rulings made by this Court.  Caskey Testimony 828:18-829:9 compare Caskey Testimony841:21-842:10 (discussing reason code of an individual subject to the preliminary injunction).  Mr. Boynton's voter registration is not subject to this Court's preliminary injunction.  Caskey testimony 843:14-843:18.   Even if Defendant eventually won this case, Mr. Boynton's registration would not be affected.  Caskey 843:24-844:6.

**Hutchinson**

16.  Mr. Hutchinson has submitted documentary proof of citizenship which was scanned into his ELVIS file with the Johnson County Election Office.  Caskey 840:12-841:7; Joint Ex. 848, pp 10-11.  Mr. Hutchinson's voter registration file indicates that he is "Active," Caskey 837:19-838:5; Joint Ex. 848, p.1, and thus is a fully registered to vote, outside of any rulings by this Court.  Caskey Testimony 841:2-841:7 compare Caskey Testimony841:21-842:10 (discussing reason code of an individual subject to the preliminary injunction).  Mr. Hutchinson's voter registration is not subject to this Court's preliminary injunction.  Caskey testimony 843:14-843:18.  Even if Defendant eventually won this case, Mr. Hutchinson's registration would not be affected.  Caskey testimony 843:24-844:6.

**Stricker**

17.  According to Mr. Stricker's ELVIS file, he is currently a fully registered voter.  Caskey Testimony 841:10-841:19; Joint Ex. 838; Lehman 666:19-667:3; 667:24-670:9.  Mr. Stricker's voter registration is not subject to this Court's preliminary injunction.  Caskey testimony 843:14-843:18.  Even if Defendant eventually won this case, Mr. Stricker's registration would not be affected.  Caskey 843:24-844:6.

**Fish**

18. Mr. Fish has a copy of his birth certificate.  Fish testimony 506:14-506:20.

**Bucci**

19. Although Plaintiff Bucci cannot find her Maryland-issued birth certificate, she has not explained how she could not proceed under a section (m) hearing.  Ms. Bucci gets off work at around 12:00 p.m. and she has a cell phone.  Bucci Testimony 98:13-18; 113:25-114:4.  Thus, Ms. Bucci could participate via a telephone call at any point after that.  *See* Caskey 855:3-855:8.

**The Proof of Citizenship Law is Less Burdensome than a Voter ID Law**

20. Unlike when someone is required to show photo identification at a polling place, a person who registers to vote for the first time in Kansas only is required to provide that information one time.  Caskey Testimony 792:15-792:21.

21. An individual is not required to present his proof of citizenship at the same time he applies to register to vote; instead, the individual has 90 days after the individual's application is processed to submit his evidence of citizenship and can complete his or her registration up and until midnight before an election.  Caskey testimony 794:10-794:16; 801:4-801:15, 809:2-809:16

22. Additionally, an individual does not have to physically appear at a location to provide a document.  They can provide it by mail, in person, by e-mail, by text, by fact, whatever the applicant is comfortable with and the county election officer makes every reasonable effort to accommodate that.  Caskey Testimony 814:16-815:7

23. In fact, unlike a voter ID law, the Kansas Secretary of State and County election offices have procedures to confirm proof of citizenship without voters actually needing to present them through (1) matching with Kansas Department of Health and Environment records, (2) utilizing a

web portal provided by Kansas Division of Vehicles to check documents scanned into their

system, and (3) by sending over lists of individuals for manual checks of DOV records.  Caskey

749:8-750:3, 750:17-751:13; 916:15-918:15Lehman 667:4-668:11; 670:10-670:19; 831:10-

832:3; Def. Ex. 933 (instructions regarding web portal); Joint Ex. 1027 (KDHE MOU); von

Spakovsky 1087:22-1088:16.

24.  Indeed, when an application is received that does not include a proof of citizenship

document, the first thing a county does after a record has been processed and entered is to utilize

the DOV web portal. Caskey Testimony 846:1-847:16.  Additionally, when the office receives

specific instances of individuals stating that they did provide evidence of citizenship to a Kansas

agency, this office investigates and helps to complete those individuals' registrations as well.

Caskey Testimony 740:14-741:15.  Kansas election offices also repeatedly alert individuals, both

through notices and by telephone, who have not yet provided evidence of citizenship.  Lehman

652:1-652:17; Caskey testimony 815:21-816:8, 817:16-818:10 *see also* Joint Exhibits 862.

25.  And, if an individual's application is canceled under K.A.R. 7-23-15, an individual can

reapply on-line or by mail, or wherever else voter registration is offered, Caskey Testimony

818:11-18, and if the person has provided evidence of citizenship, the individual does not need to

present that again.  Caskey Testimony 792:10-792:21; 798:16-798:24.

26.  Under these processes, approximately 95% of individuals who begin the voter

registration process are registered to vote and only about 0.1% of individuals on the suspense list

are United States citizens who lack requisite documentation.  While Dr. Ansolabehere estimates

that approximately 2.2% of Kansans lack a document, that number lacks foundation.  Dr.

Ansolabehere bases that number on a survey of individuals on the suspense list and applies it to

the population as a whole, despite admitting that the suspense list may not representative of the

Kansas population as a whole.  Ansolabehere 1846:13-1847:2.  *See also* Richman 1533:18-1538:14; Richman 1687:21-1688:12.  Dr. Ansolabehere also does not take into account that many individuals in Kansas were already registered to vote and so the law would not impact them.  Thus, it is likely that there are more noncitizens in Kansas registered to vote than there are citizens who lack access to a document.  Richman 1538:23-1540:13.  And, of those self-identified individuals on the suspense list itself, 97.8% have access to documents.  Richman testimony 1592:4-1592:20.  And, Dr. Ansolabehere agrees that if 95% of individuals who apply to register to vote end up registering to vote, that the suspense list is likely not representative of the state.  Ansolabehere testimony 1847:3-1847:9.

27. Furthermore, it is likely that numerous individuals who are on the suspense list have moved and would not be registered voters anyway.  Lehman 677:17-678:9 (30% of the records reviewed received a "bounce back" from the post office because the individual no longer lived at the address where the individual was registered); *see also* McDonald Testimony 222:5-225:9

### KSA 25-2309(m) availability

28. Even if someone does not have proof of citizenship readily available to them, the statute provides for an alternative measure.  If an individual lacks documentary proof of citizenship and Kansas does not otherwise have a copy of the individual's document at a state agency, an individual can proceed under a hearing with the state election board.  Caskey testimony 773:23-775:5.  An applicant needs to submit a form with the Secretary of State's office and then a hearing is scheduled.  Caskey testimony 853:16-853:25; Joint Ex. 837.  This office has never had problems getting a hearing scheduled, which is required by statute.  Caskey 854:7-854:18.  A hearing can be held with just two of the three state election board members represented and a representative of an agency, as opposed to the agency head, may attend.  Caskey 780:10-781:18;

854:7-855:2; see also Jo French Testimony 1419:23-1420:5.  Personal attendance by the voter

registration applicant is not required.  Caskey 855:3-855:8.

29. The procedure does not require any specific documents, but instead permits the applicant

to provide whatever evidence the applicant has.  782:11-786:10.  Depending on the

circumstances, it could include an individual providing a declaration explaining his or her

circumstances and why he or she does not possess a document.  Caskey testimony 787:20-788:9.

30. Since the law has gone into effect, five or six individuals have completed a hearing and

all have had their citizenship approved.  Caskey testimony 813:6-813:12; 855: 9-855:13.

31. Unlike the Plaintiffs who have never undergone a section (m) hearing, Ms. Jo French has.

She said it was not a burden and that she did not feel intimidated.  French testimony 1428:1-

1428:5.  She picked a date that would be convenient for her.  French testimony 1409:5-1409:15.

The hearing was "very relaxed" and not difficult.  French testimony 1410:14-1410:22.  The

Secretary of State's office even assisted Ms. French in finding additional information for her.

French 1408:6-1409:4.  In fact, Ms. French's testimony demonstrates that it is less burdensome

to proceed under a section (m) hearing than to get a driver's license in Kansas.  Without a birth

certificate, Ms. French could not get a Kansas driver's license.  Yet, she was able to present

alternative documents under a section (m) hearing and she was allowed to get her driver's license

as a result as well.  French testimony 1426:9-1426:22.  After going through the section (m)

process, Ms. French believes that requiring proof of citizenship is good and that every state

should have a law like this.  French testimony 1411:11-1411:25.

### *McFerron's Survey provides further evidence that the law is not burdensome*

32. The Court took under advisement whether to admit the survey of one of the premier

polling firms in the Midwest.  Tr. 1901:16-1904:8; Ex. 863.  Mr. Pat McFerron, the designer of

the survey has been conducting polls for 25 years.  Tr. 1886:7-14.  Mr. McFerron has spoken to numerous university classes regarding polling and has had the firm he works for recognized with a Reed award.  Tr. 1887:6-1888:2.  Mr. McFerron's firm conducts approximately 50 to 70 studies in any given year.  1889:8-1889:13.  Mr. McFerron has an undergraduate degree in political science has has taken graudate studies statics from American University.  Tr. 1890:2-1890:9.  But primarily, Mr. McFerron relies upon his 25-years and over one thousand statewide studies.  Tr. 180:10-1890:17; see also Tr. 1902:14-1903:3.  Mr. McFerron is also familiar with Kansas, doing 15 to 20 surveys a year in the state since 1993. Tr. 1903:10-1903:19.  The court finds that Mr. McFerron is an expert in his field and that Ex. 863 satisfies the standards under Daubert.

33. The conclusions within the survey are reliable.  In his survey of 500 adults living in Kansas, Mr. McFerron found that 98 percent have either a birth certificate or a U.S. passport available.  1907:18-1908:25.  That number increases to 99 percent when other records are included.  Tr. 1907:25-1908:5.  Mr. McFerron testified that his survey numbers fit within the normal standard of 500 to 600.  Tr. 1923:17-1923:22.

34. Plaintiffs' are wrong to claim that bias had been introduced into the survey due to one question. 1939:1-1939:7.  The question plaintiffs take issue was at the end of the survey and could not have introduced bias to the remainder.  Tr. 1939:1-1939:25.  The survey is reliable evidence that the proof of citizenship law is not a burden on the right to vote.

### *Noncitizens have registered to vote in Kansas despite an attestation requirement*

35. This office has identified 129 specific instances of noncitizens who registered or attempted to register to vote.  Caskey 735:15-735:20; 855:20-856:9; 865:16-865:20.  That number has grown even throughout this litigation.  Caskey 865:21-865:23.  These include

individuals who were matched between the TDL and voter registration files, individuals who claimed to not be citizens on jury questionnaires, individuals identified after they have naturalized and had an existing ELVIS file, self-reporting, usually in conjunction with their naturalizing, and other means.  Caskey 860:6-860:15; 863:16-864:15. 872:15-872:19; 874:9-874:12.  There have also been additional reports of noncitizens registering to vote that this office has not been able to specifically identify a person.  Caskey 856:7-856:16.

36. Beyond these instances, the office has also had other reports from the public and county election offices as well.  Caskey testimony, 856:7-856:16.  856:19-856:24

37. Since approximately 2013, the Sedgwick County election office in coordination with the Secretary of State's office has maintained a chart of noncitizens who previously registered or applied to register to vote.  Lehman Testimony 636:8-636:14; 705:21-707:21; Def. Ex. 1133; Def. Ex. 1202.  The chart introduced at trial includes 38 entries of (1) noncitizens who registered prior to the SAFE Act going into effect, (2) individuals who applied to register but were prevented from registering as a result of the SAFE Act, and (3) individuals who were prevented from registering due to the SAFE Act and then subsequently registered under the preliminary injunction in this case.  636:8-636:14; 645:9-646:2; Def. Ex. 1133; Def. Ex. 1202**.** Six of those individuals voted, some more than once.  Def. Ex. 1133; *but see* Tabitha testimony at 646:3-646:7.  In addition to voting one also signed a petition and another requested an absentee ballot, but did not return it.  Def. Ex. 1133, at 2, 3.

38. This evidence indicates that it usually takes years until noncitizens can even be identified—many times not until after they have become citizens.  *See e.g.* Ex. 1133; Lehman Testimony 641:3-642:19.  For example, the Sedgwick County election office attends naturalization ceremonies where individuals apply to register to vote.  Tabitha Tr. 538:25-542:6.

The chart introduced by the Sedgwick County Election officer included 27 individuals who were registered to vote prior to their naturalization ceremony. Tabitha 636:8-636:21. Many of these noncitizen registrations were only discovered when an employee of the county election office processes the subsequent application and finds an existing record in the ELVIS database, predating the individual's naturalization date. Lehman testimony 640:17-641:2. In fact, at least one noncitizens voted four times prior to Kansas being able to identify her. Lehman Testimony, 643:17-644:17. When an illegal vote is cast and counted years ago, it is not possible for Kansas to correct that vote. Lehman testimony, 644:18-645:8. The Chart also illustrates that the law did successfully prevent noncitizens from registering to vote, but that noncitizens later became registered as a result of this Court's preliminary injunction. Def. Ex. 1133.

39. Nearly every noncitizen that was prevented from registering to vote by the DPOC law, would have been registered to vote, absent the DPOC law, meaning the former mere attestation requirement would not have stopped noncitizens from registering to vote. *See* Tabitha 654:7-654:22 (fifteen out of sixteen in second section would have been permitted to register to vote under the mere attestation requirement and all four in the third category would have been permitted to register to vote under the mere attestation requirement). In fact, there was at least one additional noncitizen who had been identified as attesting to being a citizen as part of the registration process, but was not ultimately submitted as evidence of noncitizen registration. Lehman Testimony 704:1-704:13.

40. However, it is likely that mere evidence of noncitizens being registered to vote prior to naturalizing addresses the extent of noncitizen registration in Kansas. The adult noncitizen voting population in Kansas is approximately 115,000, Richman testimony 1456:6-1457:3, but only approximately half of those will likely naturalize. Von Spakovsky 1073:15-10. Although

the Secretary of State's office have identified some noncitizens at naturalization ceremonies who were previously registered to vote, the office likely has not identified all non-citizens, particularly the ones that did not naturalize at those ceremonies and also not illegal aliens.  Von Spakovsky 1073:15-1074:3.

41. Plaintiffs' purported experts also agree that noncitizens have registered to vote in Kansas. Minnite Testimony, 970:5-17; 1011:14-1011:20; Ansolabehere testimony 1777:2-1777:12; 1835:1-1835:14; *see also* McDonald testimony 177:6-177:9 (hypothesizing that it is possible non-citizens are on the suspense and canceled lists).

### *Defendant's Expert Testimony regarding noncitizens registering and voting*

### *Richman Evidence*

42. Dr. Richman was qualified as an expert in the areas of elections, voter registrations, survey construction and analysis and political methodology.  1444:15-1444:25.  Dr. Richman produced two reports which were introduced at trial, the initial one subject to this Court's motion in limine ruling.  Ex. 952, Ex. 958; Trial Tr. 1145:14-1446:17

43. Dr. Richman has a B. Phil. In history and political science from the University of Pittsburgh as well as an M.A. and a Ph. D. in Political Science from Carnegie Mellon University. Richman testimony 1435:18-1435:25.  Dr. Richman is an associate professor at Old Dominion University and was the Director of University Social Science Research Center for three years. Richman testimony 1436:6-1436:9.  Dr. Richman teaches on subjects that include research, research design, and advanced statistics, including statistical analysis.  Richman testimony 1436:14-1436:6.  Dr. Richman teaches margin of error calculations and confidence interval calculations.  Richman 1441:23-1443:11.  Dr. Richman's academic research includes, among other topics, voting and participation, and he has published 12 or 13 peer-reviewed articles,

several of which involve elections or voting.  Richman testimony 1437:7-1438:16.  Dr. Richman has published peer-reviewed research on non-citizen voting.  Richman testimony 1438:17-1438:24.  Richman has likewise published peer-reviewed research that involves margins of error or confidence interval calculations.  Richman testimony 1443:12-1443:17.

44. Dr. Richman also has extensive experience in survey research and design.  Richman testimony 1439:4-1439:18.  Dr. Richman has peer-reviewed research that includes a survey he designed.  Richman testimony 1440:15-1441:4 (correcting misstatement in deposition).  Dr. Richman also has experience in matching government databases and has published peer-reviewed research on that subject.  Richman 1441:5-1441:22.

45.      Dr. Richman's reports and testimony indicate that substantial number of noncitizens have registered to vote in Kansas.  In his report, Dr. Richman addresses noncitizen registration both nationally and in Kansas.  In 2014, Dr. Richman and colleagues did a study on a national scale using the Cooperative Congressional Election Study.  Richman testimony 1448:4-1453:14.  As part of that study, Dr. Richman and his colleagues looked at individuals who said that they were registered to vote and had a voter file match.  Those individuals there was a high degree of confidence were registered to vote.  Richman testimony 1452:15-1452:22.  That review indicated a potential 3.3% of noncitizens in the United States being registered to vote.  Richman Testimony 1452:24-1453:10; Ex. 952, p. 3. When applying that 3.3% estimate to the Kansas adult non-citizen population estimated by the Census Bureau, an estimate of 3,813 noncitizens would be registered to vote in Kansas.  Richman testimony and proffer 1452:23-1463:22.

46. Although Plaintiffs' expert has criticized Dr. Richman's study, arguing that some of this can be attributed to sampling error based on over reporting voter registration status, Plaintiffs'

expert does not disagree that the CCES indicated that some noncitizens likely registered to vote. Ansolabehere 1835:1-1835:14.  In fact, research indicates that some noncitizens tend to over-report citizenship status, although Ansolabehere was unaware of this research.  Ansolabehere testimony 1853:19-1854:10; see also Camarota testimony 1297:8-1299:25.

47. In fact, even taking into account Ansolabehere's criticisms, of the individuals in the initial CCES study that twice said in two different years that they were noncitizens, five had a validated registration file, indicating noncitizens had registered to vote.  Richman testimony 1552:19-1554:23.

48. Additional problems with Dr. Ansolabehere's criticisms of Richman's CCES work is that Ansolabehere does not attempt to explain why the phenomena of noncitizens over reporting being citizens would not address the issue of individuals who first claimed to be citizens and then later claimed to be noncitizens.  1479:6-1480:19.  In fact, the observations in this case tend to discredit this theory by Ansolabehere.  In the work Dr. Richman did in this case, he took efforts to validate citizenship status reports of individuals surveyed and what was observed was that non-citizens were claiming to be citizens, not the inverse.  1526:11-1527:9; 1531:10-1533:1. Additionally, when one looks more in depth at the individuals claiming to be noncitizens in the CCES survey, Dr. Ansolabehere's theory does not hold up.  Some of the responses indicated consistencies that could not be disputed and the demographics of those claiming to be noncitizens tend to support that conclusion as well.  Richman testimony 1527:9-1529:9.  Indeed, Dr. Richman has even approached the constructors of the CCES survey about including questions that would address these concerns in the future, they chose not to include them. Richman testimony 1529:10-1531:8.

49. Even if giving some credence to some of Dr. Ansolabehere's speculation, when reviewing those individuals who twice stated they were noncitizens with voter files, the registration rate nationally arrives at 2.4%  Richman testimony 1479:7-1480:16; Ex. 952, p.3, Ex. 958, ¶ 35.  Applying that percentage to the Kansas adult noncitizen population, approximately 115,000, Ex. 958 p. 27-28, one arrives at a number of 2,719. Richman proffer 1474:24-1475:4; 1477:24-1478:5.

50. Taking a more broad approach utilizing the CCES data and taking into account all individuals who indicated that they were noncitizens, the estimate in Kansas increases to 32,000 or 33,000 noncitizens—albeit with an extremely large sample size.  Ex. 952, p. 5; Richman testimony, 1506:21-1507:24.

51. Looking more specifically at Kansas data, Dr. Richman estimates, based on evidence from Sedgwick County, that approximately 1,169 noncitizens may be registered to vote in Kansas.  Richman testimony 1483, 15-1486:15.  This number derived from lawful permanent residents re-registering to vote at naturalization ceremonies in one county.  Therefore, it is likely an undercount of true noncitizen registration, as there may be additional lawful permanent residents who naturalized and were already registered to vote but did not reregister.   Richman 1486:16-1487:11.  These statistics were based on every naturalization ceremony in Sedgwick County in the relevant year and the demographics for noncitizens in Sedgwick County are consistent with the rest of Kansas.  Richman 1487:15-1489:22; see also Richman testimony 1542:2-1544:18; see also Richman testimony 1697:19-1699:8; Doc. 496.  Finally, even if one took into account Dr. Minnite's criticisms, which one should not as she is not qualified to render opinions as a statistician (Minnite Testimony 1010:20-1010:25), the estimate is still approximately 1%, or 1,067.  Richman testimony 1491:16-1492:25.  This 1% rate is consistent

with data from other states.  For instance, in North Carolina, looking solely at individuals who were on the "DACA" list when comparing those names to the State's TDL list, approximately 0.75% of DACA recipients with individuals who held temporary drivers licenses in North Carolina were registered to vote.  Richman 1489:23-1491:11, Ex. 952, p. 4.

52. Utilizing another data source, individuals who have a Kansas Temporary Driver's License ("TDL"), Richman estimated that 13,000 to 18,000 noncitizens could be registered to vote in Kansas.  Richman 1494:16-1495; 1644:2-1644:17; Richman Testimony 1703:15-1704:22.  TDL holders are not naturalized citizens and it takes some time for one to become naturalized, if ever.  Richman 1495:8-1495:15; 1675:21-24.  There was a secondary verification with ICE with some of those individuals.  Richman 1676:19-24.  But, this list only represents about one-fifth of the total noncitizen adult population.  1508:20-15092. To be sure, that estimate also has a large confidence interval, but even on the lowest end of the confidence interval, the result would yield a registration rate of approximately 7.7 percent, or 8,000 noncitizens. Richman Testimony, 1496:10-1497:4; 1640:14-1642:7.  And, while Dr. Ansolabehere claims that perhaps this is not representative due to education levels of TDL holders, he also admits that he has no research to substantiate this and instead admits that he is just speculating this to be the case given what it takes to get a driver's license.  1866:20-1867:17.

53. Mr. Caskey also performed a broader matching of the voter registration file against the TDL list, as did Professor Eitan Hersh.  Dr. Hersh essentially validates the matching done by Mr. Caskey and Dr. Richman, linking more individuals finding more matches than those two.  See Hersh testimony 1724:3-1724:12; Hersh testimony 1737:12-1739:18.  Because Dr. Hersh found more individuals than Mr. Caskey and Dr. Richman, his testimony regarding the fear of false

positives is mostly irrelevant.  Dr. Hersh even admits that it is possible he has undercounted the number of noncitizens due to a possibility of false negatives.  Hersh testimony 1735:3-1735:10.

54. And although Dr. Hersh also discussed an issue in his testimony of "active" or "inactive" registrants on direct, Hersh Testimony 1720:22-1721, Ex. 107, p. 5, that testimony ignores that an individual who is canceled or in suspense has an ELVIS file created.  Hersh Testimony 1732:1-1732:11.  As Mr. Caskey explained, the ELVIS database is a real-time database that is constantly changing.  Caskey 900:20-901:1.

55. In attempting to criticize Dr. Richman's findings, Plaintiffs' expert Professor Ansolabehere misapplied the relevant formula he utilized.  Richman testimony 1512:13-1515:3.  But, utilizing a correct meta-analysis of all of Dr. Richman's data sources, the estimate for the noncitizen population in Kansas is approximately 1.1%.  Richman testimony 1515:3-1516:7.  But, replicating Dr. Ansolabehere's meta-analysis the correct way Dr. Richman arrives at an estimate of a 1.1% registration rate of noncitizens in Kansas.  When multiplying that registration rate by the adult noncitizen population of Kansas of 115,050 and utilizing his meta-analysis resulting in a 1.1% registration rate, the result is that approximately 1,265 noncitizens registered to vote in the State of Kansas under that meta-analysis of his data sources.  See Richman 1515:10-1516:18.  This estimate is consistent with other findings in Richman's report.  See Richman 1540:14-1541:11; Ex. 952, pp. 5-6; Ex. 958, pp 20-29; see also Richman testimony 1633:6-1633:10.  But, this is a modest estimate based on observations made by Dr. Richman regarding non-citizen responses.  Richman 1531:10-1533:17.  Dr. Ansolabehere offers a similar estimate of 1.3% of non-citizens in Kansas having registered or attempted to register to vote.  Ansolabehere 1174:6-1175:4.

56. Overall, Dr. Ansolabehere's criticisms of Dr. Richman are unreliable.  Dr. Ansolabehere used confidence intervals which were much higher than those offered by Dr. Richman and his attempts were inconsistent with the recommended methods for calculating confidence intervals of a binomial proportion.  Richman testimony 1518:11-1519:18.  Specifically, Dr. Ansolabehere used a much larger "P" value than Dr. Richman, specifically 0.5, essentially assuming that half of all noncitizens in Kansas registered to vote.  Richman testimony 1519:11-1523:18; see also Ansolabehere 1814:4-1815:25 (answering that despite having evidence of noncitizens registering to vote in Kansas, he proceeded as if he had no evidence of noncitizens registering to vote in Kansas).  As a result, Dr. Ansolabehere misapplied the method he utilized.  Richman testimony 1523:4-1524:12; 1692:15-1694:15.  Dr. Ansolabehere's approach permitted him to produce the largest margin of error possible using the method he chose.  Ansolabehere 1816:22-1817:8.  Ansolabehere's own prior research indicates that he should have chosen a much smaller P value, as he argued the registration rate was much smaller than 50 percent.  Ansolabehere 1827:8-1827:19.  And specifically looking at the Sedgwick County estimates, Dr. Ansolabehere chose a method that yielded a margin of error six times greater than a different method in order to arrive at a margin of error that could include zero.  Ansolabehere 1830:22-1831:10.  Finally, despite repeatedly arguing that he could not reject the possibility of zero, two of his estimates were greater than zero.  Ex. 102, Table 2; see also Ansolabehere 1835:15-1835:21.  Dr. Ansolabehere also does not disagree with Dr. Richman's subsequent calculations that all come to a lower margin of error than Dr. Ansolabehere's.  Ansolabehere testimony 1844:11-184514; Ex. 958, pp. 6-7, Table 1, Table 2.

## *Von Spakovsky Identifies Noncitizen Registration Both In Kansas and in other States*

57. Mr. Hans von Spakovsky was also admitted as an expert at trial on the subjects of elections, election administration and voter fraud.  Mr. von Spakovsky is an attorney and a senior legal fellow at The Heritage Foundation and Manager of the Election Law Reform Initiative. Mr. von Spakovsky teaches election law at the Scalia Law School, affiliated with George Mason University.  Mr. von Spakovsky has an undergraduate degree from the Massachusetts Institute of Technology and a law degree from Vanderbilt University.  Mr. von Spakovsky has worked in the civil rights division for the U.S. Department of Justice, including as a trial attorney in the voting section and as counsel to the Assistant Attorney General for civil rights.  Mr. von Spakovsky was the DOJ's representative to the first Board of Advisors to the U.S. Election Assistance Commission.  Mr. von Spakovsky has worked on two committees involving standards for voting equipment and software.  Mr. von Spakovsky has also served on the Federal Election Commission. Mr. von Spakovsky served on the Fairfax County Electoral Board.  Mr. von Spakovsky has co-authored a book and written chapters on election issues in others.  Mr. von Spakovsky has also written numerous studies and reports for The Heritage Foundation on election issues and has done studies on election turnout.  Mr. von Spakovsky has testified before Congress more than a dozen times and was appointed to serve on the President's Advisory Commission on Election Integrity.  1056:18-1064:20; Ex. 864.

58. As part of his report and testimony, Mr. von Spakovsky submitted evidence of noncitizens registering to vote and voting in the United States, including evidence identified in a grand jury report, a Congressional investigation, and a license sampling audit of a State's driver's license, as well as numerous federal court cases.  In addition to Kansas, von Spakovsky cited evidence that noncitizens had registered to vote in many other states, including California, Utah, Illinois, Florida and Virginia.  Von Spakovsky Testimony 1074:23-1075:20; Ex. 865.  Von

Spakovsky Testimony 1067:10-1070:7; Ex. 865 2-9; see also von Spakovsky testimony 1159:5-1159:20 (follow-up regarding a Florida report indicated that a number of the individuals excused from jury duty in Florida that claimed to be noncitizens ultimately were citizens).

59. More recently, as Mr. von Spakovsky addressed in his proffer, approximately 5,500 non-citizens were removed from the voter rolls in Virginia in the last five years, but had cast 7,500 ballots by then.  Von Spakovsky proffer 1175:12-1176:9.  And, during the last twelve years, Virginia had many close races that could have been affected by those votes.  Von Spakovsky proffer 1175:9-1175:24.  Also in a proffer, Mr. von Spakovsky identified eleven counties in New Jersey with over 1,000 non-citizens who had been removed from the voter rolls, a third of whom had voted.  Von Spakovsky 1177:2-1177:6.  And finally in his proffer, Mr. von Spakovsky identified a Pennsylvania election official that estimated there were over 100,000 non-citizens on the voter rolls.  Von Spakovsky 1177:7-1177:15.

60. The reason noncitizens are able to register to vote, absent a proof of citizenship law, is that the registration process is mostly an honor system in which noncitizens attest to being citizens, whether intentionally or by accident.  Von Spakovsky Testimony 1067:10-1671:11. Unlike United States citizens, non-citizens are not able to complete their voter registration under a proof of citizenship law as they lack the necessary citizenship documents.  Caskey 911:5-911:7

61. Thus, the evidence produced at trial, both for purposes of the Sedgwick County evidence as well as the evidence nationally demonstrates that the signature or affirmation of a voter is not sufficient to prevent noncitizens rom registering to vote.  In evidence both in Kansas and outside of Kansas, noncitizens have registered to vote under that process.  Von Spakovsky 1071:16-1072:1.

***Dr. Camarota and Dr. McDonald's Own Testimony Show the Law is not Burdensome***

62. Dr. Camarota has an undergraduate degree from Juniata College and a master's degree in political science from the University of Virginia.  He also has a Ph. D. in American government with a focus on policy analysis from the University of Virginia.  Camarota 1251:1:7.  He has also received statistical training at the University of Michigan as part of their summer statistics program there, Inter-University Consortium for Political and Social Research.  Camarota 1251:7-11.

63. Dr. Camarota is the Director of Research at the Center for Immigration Studies where he primarily focuses on analyzing demographic data.  Camarota 1251:15-18.  Dr. Camarota has used and analyzed Census Bureau voter registration and election data as part of his career and has utilized it in other cases where he served as an expert as well.  Camarota 1251:19-1252:22; 1258:19-1259:5.

64. Dr. Camarota has written reports and articles analyzing registration and voting using census data as part of his career and testified before Congress 26 times.  1259:6-1259:21.  Dr. Camarota is familiar with Census Bureau data and its quality from his time as the lead researcher for the United States Census Bureau.  Dr. Camarota co-authored numerous reports while working for the Census Bureau and has presented numerous conference papers as well. Camarota 1252:23-1253:10; 1258:1-18.  Dr. Camarota directed the Census Bureau project when it implemented the American Community Survey, comparing its quality to the Current Population Survey.  Camarota 1253:8-1254:25.  Indeed, the Census Bureau contacted Dr. Camarota to see if he would like to participate in that project.  Camarota 1255:1-1255:5.  Finally, as part of Dr. Camarota' s experience working with the Census Bureau, he utilized both citizenship data and voter registration data.  Camarota 1255:11-1255:22.

65. Dr. Camarota has also published a peer-review article and a peer-reviewed book chapter based on Census Bureau data. Camarota 1256:4-1256:22. Dr. Camarota has also served as a peer-reviewer for multiple peer-reviewed journals and for the National Academy of Sciences. Camarota 1256:23-1257:25. Dr. Camarota has been qualified as an expert to testify in other cases, at least one of which involved analyzing voter registration data as well. See Camarota testimony 1260:1—1261:24. Dr. Camarota has also provided analysis on voting trends as part of an Amici brief in federal court. Camarota Testimony 1262:19-1263:3. Dr. Camarota is qualified to serve as an expert in the fields of demography, census data, voter registration statistics and voter participation statistics. Camarota Testimony 1264:5-1264:8. Dr. Camarota is qualified to testify as an expert in the fields of demography, census data, voter registration statistics, and voter participation statistics. Camarota Testimony 1264:5-1264:8.

66. Dr. McDonald is biased against the Defendant in this case, illustrated by numerous incendiary Tweets, and thus his testimony should not be given weight. McDonald Testimony 194:11-197:23.

67. Additionally, Dr. McDonald's testimony should not be given weight because it is incomplete for having excluded numerous relevant facts. See McDonald Testimony 205:5-205:9. 206:24-207:13; see also 211:13-213:16 (acknowledging that additional analysis could potentially corroborate his analysis). Other courts have found criticized Dr. McDonald for similar issues. See e.g. McDonald 186:12-189:23.

68. Dr. McDonald's claim that the proof of citizenship law disproportionately affects the youth and unaffiliated voters is unreliable because it focuses on meaningless comparisons. See McDonald testimony, 161:9-163:4. As Dr. Camarota points out, Dr. McDonald does not actually analyze the registration rates among new registrants—the ones that actually have to provide

evidence of citizenship under the law—but instead looks at the entire population, which includes individuals who were registered to vote prior to 2013.  Camarota testimony 1292:2-1295:10, Ex. p.5.  McDonald acknowledges that new registrants tend to be younger and that in reality, the law affects new registrants, not necessarily younger voters.  McDonald 244:9-245:9.  Indeed, the percentage of younger voters on the suspense list is almost identical to the percentage of younger voters who are new registrants.  Camarota testimony 1292:23-1296:12.  The same analysis holds true for the unaffiliated voters.  Camarota testimony 1296:16-1296:18.

69. Dr. Camarota also made empirical comparisons that Dr. McDonald did not do, which illustrated that the proof of citizenship law has not affected voter turnout or voter registration. As Dr. Camarota explained voter registration and participation fluctuates between presidential and non-presidential elections, so any meaningful comparison would have to be to the same election cycle.  Camarota 1268:12-1270:1; 1353:15-1354:25; 1381:19-1382:7.  Using relevant data, there is not a significant difference in the number of registered voters and voter participation. Camarota 1270:2-1273:14.  Dr. Camarota utilized Census data that even Plaintiffs' purported expert recognizes as data one should have confidence in and it is regularly utilized by experts in Dr. Camarota' s field.  Camarota 1273:18-1275:17.

70. Similarly, when comparing States that neighbor Kansas with similar elections but which do not have a proof of citizenship law to Kansas, the same analysis holds true.  There is no significant difference in registration and turnout rates.  The rates for Kansas in years 2010 and 2014 are essentially unchanged, just like the rates in Oklahoma and Nebraska for years 2010 and 2014 are essentially unchanged.  Camarota Testimony 1275:18-1278:17; Ex. 1140, Fig. 2; see also 1282:16-1283:3; see also 1333:12-1333:19 (Dr. Camarota is comparing each state to itself— namely, Kansas statistics for 2010 vs 2014, Nebraska statistics for 2010 vs 2014, etc.); 1378:3-

1379:15.  And unlike compared to the nation as a whole which dropped in voter turnout between the 2010 and 2014 elections, Kansas's voter turnout increased despite the new proof of citizenship law.  Camarota Testimony 1278:18-12780:24; Ex. 1140, Fig. 3.  While Dr. McDonald criticizes Dr. Camarota, Dr. McDonald acknowledges that the GAO undertook a similar analysis and confirmed that it was a "valid method."  McDonald Testimony 207:14-209:7.    Thus, based on the available empirical data, Kansas' proof of citizenship law has not decreased turnout or registration when compared to neighboring states or the United States as a whole.

71. Additionally, had Dr. McDonald analyzed registration or voter turnout rates among 18 to 29 year olds across different years, he would have seen that the registration rates in Kansas, Nebraska, and Oklahoma were not significantly different between 2010 and 2014, but nationally, there was a significant decline.  Camarota 1283:4-1284:6; 1379:16-1380:10; Fig. 4 He also would have seen that the differences in turnout for that age groups between 2010 and 2014 were not statistically significant, but across the nation there was a significant decline.  Camarota testimony 1284:7-1285:2; 1380:11-1381:4; Fig. 5.  This also undercuts his theory that the law imposes any sort of a disproportionate burden on younger Kansas voters.

72. There was not a statistically significant change in voter turnout or registration rates among non-white voters between the 2010 and 2014 elections.  Camarota testimony 1285:3-1287:20; Fig. 1.

73. Dr. McDonald's claims about who is on the suspense list and how long they remain should also not be given weight.  The suspense list is constantly changing and in flux.  As Mr. Caskey explained, the ELVIS database is a real-time database that is constantly changing.  Caskey 900:20-901:1.  The numbers and records are not static, but instead can change second by

second.  Caskey 903:10-12.  If the numbers on the suspense list were to be run at one point and then the same query were run later, the resulting number of records in any category, such as those on the suspense list, would change.  Caskey 903:13-904:11.  So if someone at the Secretary of State's office ran a query in the ELVIS database on March 23, 2016 and received one number of those on the suspense list for not providing evidence of citizenship, and then ran the same query in March of 2018, the results would be different.  905:20-905:24.  Such a number could be higher or lower.  905:25-906:3.

74. Although he did not include it in his analysis, Dr. McDonald acknowledges that it is possible that some of the individuals he is counting came off the list after the snapshot which he reviewed.  McDonald Testimony 219:15-220:10.  Dr. McDonald also acknowledges that some of the individuals on the list may have moved out of state and did not attempt to determine whether all were citizens.  McDonald Testimony 222:5-225:23.  He also failed to consider other factors that may have undercut his findings, such as individuals registering and canceling their registrations in the snapshot of times he reviewed or completing their registration after the snapshot he reviewed.  McDonald testimony 229:15-232:11.  Indeed, Dr. McDonald's estimates are entirely unreliable because they are based off of registration data compiled prior to the Secretary of State's office's additional agreements with KDOR which began in May of 2016.  McDonald testimony 234:18-235:7.  As Mr. Caskey testified, a suspense list query taken in after May or 2016 would be lower than one in March of 2016 after KSOS and the counties received web portal access from the Division of Vehicles to further assist in completing registrations.  Caskey 906:7-906:21; see also id. at 906:21-907:6.

75. Finally, to the extent McDonald claims that this law imposes a burden, the claim is not credible or at best should not be given weight.  To Dr. McDonald things like cold weather, rain,

voter registration laws in and of themselves, the length one must drive to a polling place, and whether one is employed to also be burdens.  McDonald Testimony238:21-240:12.

76. In a proffer, Mr. Caskey also demonstrated that Dr. McDonald relied upon faulty numbers.  Mr. Caskey, as the director of elections, on almost daily basis reviews the state's registration database.  Caskey proffer 891:14-17.  The KSOS is the custodian and owner of the database.  891:18-891:23.  As part of Mr. Caskey's daily duties, he looks at individual records and runs statistical information, reports, and queries.  Caskey proffer 891:24-892:3.  He provides the results of these queries and reports to third party-groups, including providing the results to plaintiffs in this case.  Caskey proffer 892:4-892:9.  Mr. Caskey ran a query the weekend before trial to verify some information.  Mr. Caskey looked at the number of persons who had not yet provided proof of citizenship and who had applied at the Division of Motor Vehicles.  That number was 11,718.  Caskey proffer 892:10-892:17.  Mr. Caskey also reviewed the number of records that were canceled due to lack of proof of citizenship within 90 days; that number was 6,530.  Caskey proffer 892:18-892:19.  The total number of records that had not provided proof of citizenship as of that date was 15,970.  Caskey proffer 896:4-896:7.  And, Mr. Caskey also reviewed the number of total registrations who applied to successfully register to vote between January 1, 2013 when the proof of citizenship law went into effect and March 2nd, 2018; that number was 467,121.  Caskey proffer 896:8-896:11.  Thus, from the date the law went into effect through March 2nd, 2018, approximately 95.4% of the individuals who applied to register to vote, ultimately finished their registration.

### *Dr. Minnite's Claims of Voter Fraud are Irrelevant and Unreliable*

77. One basis for justifying this law is to protect the integrity of the election process, namely preventing noncitizens from registering to vote.  And Dr. Minnite acknowledges that it is "very

important to maintain confidence in the electoral system." Minnite testimony 980:23-981:1.
The legislature heard testimony when it enacted the SAFE Act that non-citizens had registered
and voted in Kansas. Tr. Trans. 924:15-924:21; See also Trial Tr. 2040:4-2040:21; Ex. 1209
SAFE Act Legislative Record (Kobach testimony and testimony of Seward county clerk
indicating that noncitizen registration and voting in Kansas; chart of incidents)

78. Rather than focus on noncitizen registration, Dr. Minnite provides testimony about voter
fraud which is largely irrelevant to this case and her analysis is unreliable. For instance, Dr.
Minnite bases some of her testimony regarding voter fraud in general on a lack of criminal
indictments at the federal level in 2005. Minnite Testimony 977:3-979:5; 1044:23-1045:5. Yet,
Dr. Minnite has never been a prosecutor, Minnite testimony 1011:12-1011:13. And Dr. Minnite
admits that these indictments do not represent the totality of election crimes that occurred in
2005 and that all prosecutable crimes are not actually prosecuted. Minnite 1045:25-1046:11; see
also 981:12-981:20 (use of criminal indictments to estimate voter fraud is "under-inclusive" and
"somewhat incomplete"). Indeed, Defendant's expert identified 270 noncitizens who were
removed from the registration rolls in one Virginia county, but no federal or state criminal
charges were brought against them. Von Spakovsky Testimony 1074:23-1075:20. Additionally,
Defendant's expert pointed out that the Department of Justice has not searched through DHS
records or obtained information on individuals who were excused from jury duty for being non-
citizens. Von Spakovsky 1186:22-1187:19.

79. And, despite Dr. Minnite's theory that much of the illegal activity identified through the
Sedgwick County spreadsheet was not fraud because it was likely a mistake, see e.g. Minnite
Testimony 998:20-1001:11, Defendant's expert testified that it was his experience when working

at the Justice Department, that individuals typically who have engaged in criminal activity often claim they were mistaken or that it was not intentional.  Von Spakovsky 1089:12-1090:21.

80. And, despite Dr. Minnite's assertions regarding voter fraud, she has conceded that the risk of voter fraud is real in a sense that it could happen.  Minnite Testimony 1019:14-1019:18.

81. Dr. Minnite's testimony regarding voter fraud is entirely irrelevant as it is based on a limited a definition she created which only includes actions that she deems to be "the intentional corruption of the electoral process by voters."  Minnite Testimony, 970:18-971:13; 1021:24-1022:6.   Multiple instances in her report and testimony indicate the flaw in her definition as it applies to noncitizen registration.  For example, Dr. Minnite discusses the Sanchez v. Dornan case in her expert report and indicates that there was not voter fraud, Pls. Ex. 77, p. 13, yet she acknowledges that the House Administrative Committee found that over 600 votes were cast by non-citizens, in an election decided by less than 1,000 votes.  Minnite 1052:13-1054:10. Similarly, Dr. Minnite opines that a judge did not find voter fraud took place in the 2004 Washington Governor's race decided by approximately 129 votes when over 1,400 ineligible felons voted in that election, because "when you get a ballot in the mail and you don't understand if you're on parole maybe you're not allowed to vote, and you send it back I, then that vote . . . gets counted."  Minnite testimony 1046:12-1052:5.

82. In other words, Dr. Minnite's definition of voter fraud is based on actions that she deems to show an "intention to deceive," which effectively rules out many illegal election acts.  Minnite Testimony, 972:14-974:9; 1022:10-1022:20.  According to Dr. Minnite, to meet her definition of voter fraud a non-citizen has to be "knowingly and willingly breaking the rules by trying to get on the registration rolls, or . . . casting ballots, and knowing that doing that and that it's wrong to do that" for voter fraud under her definition to occur.  Minnite Testimony 975:10-975:20.  In a

posed hypothetical where a thousand non-citizens voted in an election, by accident and not with any willful behavior, Dr. Minnite testified that she would not count those votes as "voter fraud," while acknowledging the votes would be illegal.  Minnite 1042:13-1044:22.

83. Furthermore, Dr. Minnite acknowledges the irrelevance of her definition to these cases. Under Minnite's narrow definition of voter fraud, the fact that a non-citizen registers to vote in Kansas by itself is not voter fraud, despite the act being illegal.  Minnite Testimony 1022:21-10233; see also 974:21-975:20.  The same is true for a noncitizen voting in Kansas, it is illegal, but it would not be voter fraud under her definition.  1023:4-1023:21. Dr. Minnite's definition is not relevant to the Fish case which addresses noncitizen registration, not limiting such registration to instances of fraud.  Similarly in *Bednasek*, the law addresses and prevents registration, whether the registration is fraudulent under Dr. Minnite's definition is not relevant.

84. Dr. Minnite's review of ELVIS files likewise is not credible.  Despite lacking any experience as an election administrator a DMV clerk, or from working in an election office at all, Minnite Testimony 1011:1-1011:11, Dr. Minnite testified to what she perceived ELVIS records to mean and speculated about what may or may not have occurred at the DOV.  She then relied upon that speculation to claim that non-citizens registering to vote must have been "an administrative mistake."  See Minnite testimony 988:20-999:2.

85. Dr. Minnite's testimony to this case is not credible because she engaged in speculation to reach her conclusions.  Dr. Minnite reached most of her conclusions by reading news reports but did not follow up by contacting any Kansas legislators, prosecutors, or election administrators to verify the accuracy of these reports.  Minnite Testimony 1013:24-1014:3.  Dr. Minnite's report and testimony is more accurately described as lay testimony than expert testimony, as it basically involves read and regurgitate articles and documents that this Court could have read itself, the

same reasoning utilized as another court to permit Dr. Minnite testify as a fact witness.  Minnite

Testimony 1011:21-1017:13

86. Dr. Minnite's own analysis at trial indicates the irrelevancy of her testimony and her lack

of knowledge as to what she testified.  In reviewing Exhibit 101, Dr. Minnite claimed it was

unknown, based on the ELVIS file, whether a noncitizen had signed an oath indicating that he or

she was a citizen when she submitted the application.  Minnite 997:22-998:10.  Yet, it is a

stipulated fact in this case that when an individual applies to register to vote at the DOV, they

indicate that they are United States citizens, once orally and once in reading the voter oath.  Doc.

353, ¶¶ 68-69;  It is standard practice in every DMV in the country that individuals attest to

being citizens to apply to register to vote, as well as part of the federal voter registration form.

Von Spakvosky Testimony 1187:23-1188:4.

87. Regarding Exhibit 97, while Dr. Minnite claims this was a "mistake," she does not take

into account that the individual was not deterred from attesting to United States citizenship in

registering to vote.  See Minnite Testimony 1100:2-1001:11; Pl. Ex. 97, p. 3.

88. Regarding other exhibits Dr. Minnite reviewed, similar flaws are present which

demonstrate the lack of relevance her testimony has in this case. Dr. Minnite concludes that

"voter confusion" or "administrative error" likely are the result of other registrations, but

individuals ultimately had to claim to be United States citizens to register to vote.  See Ex. 101,

Minnite 1001:18-100:21; Ex. 99, Minnite 1004:20-22;  1003:18-1003:21; see also Minnite

1006:13-1006:24.  Thus, these individuals would have been registered to vote but for the

citizenship document requirement.

***Alternative Methods have been tried and failed***

89. Even if Plaintiff could demonstrate a burden, Defendant has no viable alternatives to requiring proof of citizenship to prevent noncitizens from registering to vote. Plaintiff has not even attempted to identify any. The ones that were addressed in trial were wholly inadequate to preventing noncitizens from registering to vote.

***Sworn Attestation***

90. First, the evidence in this case illustrates that a sworn statement alone is not preventing noncitizens from registering to vote. See e.g. Ex. 1133; see also Pls. Ex. 143; Lehman 712:9-713:22 (individual who included an "A number" on their voter registration application would have been registered to vote because they swore to being a United States citizen).

91. Any individual who applies to register to vote at the DOV must twice assert to being a United States citizen when they check the box and sign their name as a citizen, and when they repeat the voter oath administered by the DOV employee. Thus, there is conclusive evidence that noncitizens are registering to vote despite an attestation requirement. Indeed, the attestation scheme itself is premised on individuals at the DOV attesting to citizenship. See Lehman 715:9-716:21.

***SAVE system***

92. There is no national database that the KSOS is aware of that contains the names of all United States citizens. 874:16-874:19. Although there has been suggestions that Defendant could utilize the Systematic Alien Verification for Entitlements ("SAVE") database, Defendant has inquired with DHS and DHS has informed this office that it cannot use SAVE unless the office possesses both an alien registration number and a copy of the relevant alien document for the individual being queried. Joint Exhibit 50; Caskey Testimony 874:16-877:7. Indeed, there

have been multiple conversations this office has had with DHS regarding SAVE.  Pls Ex. 60 (Kriegshauser memo about A Numbers); Joint Ex. 50 (Kriegshasuer Memos); Joint Ex. 882 (Krieghasuer Memos and SAVE correspondence); Caskey Testimony 758:6-761:25.  The response was signed by the director of USCIS, the department tasked with maintaining the SAVE system.  Joint Ex. 50; See also Doc. 353, ¶ 106.  The Secretary of State's Office does not have either of those required items as a voter registration agency.  Caskey 876:5-876:7.

93. It would make no sense for this office to require noncitizens applying to register to vote to present their alien numbers and alien documents, as those individuals are not supposed to apply to register to vote in the first place leading to confusion about registration requirements for citizens.  Rucker Testimony 574:21-575:23; Caskey 876:5-876:7; von Spakovsky testimony, 1084:22-1085:14.

94. Furthermore, although Plaintiffs inquired as to Mr. Caskey about whether he was "aware," of certain states, they have provided no evidence that such states are actually using the system.  See Caskey testimony 762:1-764:1.  But regardless, this office has received a definitive response from the head of USCIS itself, the agency charged with administering the program, informing this office that it cannot be used because this office lacks the required pieces of information.  Joint Ex. 50, p. 6; Caskey Testimony 874:20-877:25; Ex. 882.

### *EVVE System*

95. This office has also looked into utilizing the Electronic Verification of Vital Events ("EVVE") database as well.  Caskey 878:1-878:10.  However, EVVE proved to be both cost prohibitive as well as effectively useless to the agency, given a lack of a mother's maiden name as well as state of birth.  Caskey Testimony 878:11-878:21; von Spakovsky Testimony 1082:15-1083:2.

*Discussions with other states*

96. This office has attempted to get other states to verify whether they have birth records for individuals who have not provided evidence of citizenship.  However, that has either not been possible due to legal reasons or it was cost prohibitive.  See 820:20-821:23.

*Prosecutions*

97. It has been illegal in Kansas to register to vote for years.  See Caskey testimony 878:22-879:5.  Defendant has referred non-citizens to prosecutors.  Bryant Testimony, 589:20-590:8; Caskey 879:6-879:13.  Yet, noncitizens continue to register to vote.  See e.g. Def. Ex. 1133 (Sedgwick County Chart).

98. And, while Defendant has prosecuted multiple noncitizens since he obtained prosecutorial discretion (Caskey Testimony 756:5-757:2; Caskey 879:21-880:2; Lehman 649:6-649:15), such prosecutions can only occur after an individual has registered to vote and is then later identified.  See Von Spakovsky 1083:3-1083:20.  And, even when they have been identified in Kansas, this identification often does not occur until after the statute of limitations has already passed.  Lehman 649:20-650:5.

## Juror Questionnaires

99. This office has been utilizing juror questionnaires in an attempt to ascertain which individuals currently on the voter rolls are noncitizens.  Caskey, TR. 754-55. Under Kansas law, the courts provide the Secretary of State's office lists of individuals who indicated they were not US citizens when they were called for jury duty.  Caskey, TR. 754-55.  However, here again, these noncitizens have already registered to vote, thus this method does not prevent registration.

Additionally, this method only identifies those noncitizens who are called for jury duty and answer truthfully that they are not U.S. citizens.  Von Spakovsky testimony 1081:21-108210.

### *ELVIS Comparison with TDL*

100.     Defendant has utilized the Temporary Driver's License ("TDL") list to identify individuals who have both a temporary driver's license, something only noncitizens can obtain, and who have an ELVIS file.  Bryant Testimony 584:16-585: Caskey 917:16-918:7.  The office manually reviews the data and then refers matches to the county election officers and prosecutors.  Bryant Testimony 586:2-586:17.  But here again, this only catches noncitizens after they have registered to vote.  Bryant Testimony 584-585.  The TDL list also does not contain lawful permanent residents, illegal aliens, and aliens who do not have a driver's license.  Thus, even if the office could identify some noncitizens after they had already registered to vote, the office still would not be able to identify all of the noncitizens registered to vote in Kansas. 1081:9-1081:21.

### *Better Training at DOV*

101.     The KSOS is familiar with the DOV program, having routine discussions with executive staff and training requirements for compliance with the NVRA's motor voter requirements.  880:25-881:19.  This office has reviewed changes to federal and state law with the DOV as well as review their training materials.  Caskey 881:20-23.  DOV uses a train-a-trainer approach to train their staff.  Caskey 881:23-881:25.  The KSOS has produced guides and posters regarding voter registration to DOV officials for training.  Bryant 589:18-591:5; Caskey 882:1-3.  The KSOS has been involved in implementing programs and providing training materials.  Bryant 594:21-595:2. The KSOS provides updated guides as laws change.  Bryant

591:12-592:19; see also Caskey 882:4-13.  KSOS has annual discussions with DOV officials

about whether any updates may be needed.  Bryant 592:22-592:24; see also Caskey 882:4-882:9

(KSOS periodically suggests changes and review changes with executive staff on a regular

basis).  KSOS representatives have observed DOV training and conducted training as well.

Bryant 590:18-591:9; 592:25-592:6.  KSOS also provides materials for DOV offices instructing

that non-citizens should not be registered to vote in addition to the instructions received from

DOV.  See Bryant Testimony 595:24-596:21; 598:14-599:1.  Enough posters were created so

that multiple posters could be placed in each DOV office.  Bryant 599:2-599:9.  This office has

provided similar discussions with other state agencies that provide voter registration

opportunities.  Bryant 597:5-598:2.  In addition to the training materials, the posters, and written

training manuals provided by this office, other conversations were often made to follow up if

there were problems this office learned of, including indicating whether our office believed

additional training was needed.  Bryant testimony 599:10-599:22.

102.     Any improved training at the DOV suggested by Plaintiffs could not have any

effect on individuals applying to register to vote outside of the DOV, such as utilizing a Kansas

state voter registration form at a county clerk's office, such as how Mr. Bednasek applied to

register to vote.  See Joint Ex 801, 802; Caskey testimony 845:2-845:25. It also would not

prevent noncitizens who do not obtain driver's licenses from registering to vote, such as illegal

aliens and other non-driving noncitizens.  Von Spakovsky 1185:6-1185:13.

103.     Second, it is already this office's policy that noncitizens not be offered voter

registration at the DOV and that is DOV's current practice.  Caskey 884:9-885:4. DOV is also

trained on inspecting and scanning documents. Doc. 494, p. 2.  Yet, despite this training,

Plaintiffs' own purported expert states in her expert report that "[h]uman error is part of the

spectrum of human behavior.  Pls. Ex. 74, p. 11.  Indeed, evidence that human error occasionally

occurs despite this training exists in this case.  See Lehman Testimony 674:1-675:13; Minnite

Testimony 1007:1-1007:8.   This office has reviewed that training and it is unclear what

additional training could even be provided that would overcome the human error that Plaintiffs'

own purported expert claims cannot be stopped.

104.     Finally, Kansas DOV does not require evidence of lawful status for all individuals

renewing their driver's licenses.  Doc. 494, p. 2. See also Caskey 886:17-887:11.  Plaintiffs have

not provided evidence of what sort of training could prevent a noncitizen from applying to

register to vote when the individual presents no document as part of a renewal.

105.     When an individual applies to register to vote at the DOV, the individual is

provided a computer generated receipt informing them that they may need to provide evidence of

citizenship for registration purposes as an additional way of reminding individuals of the

citizenship requirement.  Caskey 887:12-887:23; Joint Ex. 825.

### _Close races can be affected by noncitizens registering to vote_

106.     Defendant produced evidence of thirty-three elections that occurred in Kansas

between 2000 and 2016 with a margin of victory less than 100 votes.  Caskey testimony 889:20-

891:7; Def Ex. 1068.  Indeed, there were eight decided by less than ten votes and even one

election that ended in a tie.  Caskey 891:11-891:13.

107.     Evidence was also provided where noncitizen voting outside of Kansas where

aliens were proven to have voted in close elections.  See von Spakovsky Testimony 1079:7-

1079:19; see also Ex. 865, p 6-7.

## CONCLUSIONS OF LAW

### PROPOSED CONCLUSIONS OF LAW- *KEENER* PLAINTIFF (Bednasek)

**I.       Introduction and Background**

Plaintiff Parker Bednasek tried his only claim, Equal Protection as pled in Count I, alleging that his constitutional right to vote was burdened by K.S.A. § 25-2309(l).  Plaintiff was not representing a class.  Doc. 107.

**II.      Proposed Legal Conclusions**

1. Standing requires a Plaintiff to have suffered an "injury in fact," there must be a causal connection between the injury Plaintiff has suffered and the conduct about which he complains, and it is likely that his injury will be redressed by a decision in his favor. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  Parker Bednasek lacks standing.

2. Parker Bednasek lacks standing because he is not a Kansas resident within the meaning of K.S.A. § 25-409.

3. Parker Bednasek is a Texas resident.

4. To obtain a Texas driver's license, a person must be domiciled in Texas and must present two acceptable documents verifying the applicant's residential address in Texas or provide a Texas residency affidavit.  37 Tex. Admin. Code § 15.49(a)-(b), (g).

5. Only individuals who are domiciled in Texas can obtain a Texas driver's license.  Tex. Transp. Code § 521.1426.  Yet, under Texas law, "[a] person may establish only one domicile, whereas he or she may have several residences."  *In re Estate of Steed*, 152 S.W.3d 797, 803 (Tex. Ct. App. 2004).

6. Under Kansas law, "residence" is defined as "the place adopted by a person as such person's place of habitation, and to which, whenever such person is absent, such person has the intention of returning."  K.S.A. § 25-407.  One must be a resident in the county in which he attempts to register to vote.  K.S.A. § 25-2309(b)(9).

7. To prevail on an Equal Protection claim, "proof of a racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

8. Plaintiff presented no evidence whatsoever of a racially discriminatory intent on the part of the Kansas legislature in passing K.S.A. 25-2309(l).

9. To violate the Fourteenth Amendment on a disproportionate impact claim, "the disproportionate impact must be traced to a purpose to discriminate on the basis of race." *Washington v. Davis*, 426 U.S. 229, 242 (1976).

10. "The unlawful administration by state officers of a state statute is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination." *SECSYS LLC v. Vigil*, 666 F.3d 678, 689 (10th Cir. 2012).

11. "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn is rationally related to a legitimate state interest." *ACLU v. Praeger*, 863 F. Supp. 2d 1125, 1132 (D. Kan. 2012).

12. Because Bednasek failed to present any evidence of a discriminatory intent, his claim must fail.  *Vill. Of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

13. The Court finds that Bednasek failed to meet his burden and thus finds for the Defendant on Plaintiff's Equal Protection claim.

**14.** Plaintiff has not met the required unconstitutional burden requirement under *Crawford*. *Crawford*, 553 U.S. at 200.

15. Intermediate or rational basis scrutiny applies. *Burdick*k, 504 U.S. at 432-433.

16. Defendant has shown noncitizens registering to vote but the Supreme court does not require any showing that the law would prevent actual instances that the law sought to stop. *Santillanes*, 546 F.3d at 1321 (10th Cir. 2008).

**17.** The law is not invidious. *Crawford v. Marion County*, 553 U.S. 181 (2008); *The American Civil Liberties Union of New Mexico v. Santillanes*, 546 F.3d 1313 (10th Cir. 2008)

## DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.    Findings of Fact

Defendant incorporates the following material facts that are either uncontroverted or stipulated by the parties that were included in the Court's Order Memorandum[2] on the parties' motions for summary judgment:

55.    Defendant Kansas Secretary of State Kris Kobach does business in and is an elected official of the State of Kansas. Defendant is considered the Chief Election Officer for the State of Kansas.

56.    Kansans may apply to register to vote in person, by mail, through a voter registration agency, in conjunction with applying for a Kansas driver's license, or "by delivery to a county election officer to be registered."

57.    The individual Fish Plaintiffs all applied to register to vote at the time they applied for a Kansas driver's license.

---

[2] See Doc. 421.

58.     The Kansas Election Voter Information System ("ELVIS") is a statewide voter registration database, maintained by Defendant. The central database reflects data that is entered by the counties. ELVIS assigns a unique identification number to all voters.

59.     Each county election officer is responsible for maintaining the voter lists for their own counties. When a voter registration application is received by the relevant county election office, a record is created in the ELVIS database.  County election officers have been instructed to enter into ELVIS all people who submit voter registration applications regardless of whether they provided proof of citizenship.  ELVIS contains codes that demonstrate whether a person has registered successfully.  "CITZ" is the code recorded in ELVIS to indicate that an applicant has failed to provide documentary proof of citizenship.  "MV" is the code recorded in ELVIS to indicate that an applicant has applied to register to vote at the Kansas Division of Vehicles ("DOV") in conjunction with a driver's license application.

60.     If an applicant has not provided DPOC, or if the application is otherwise missing required information, the record is deemed "incomplete," until the application is completed.

61.     After 90 days, an incomplete application is cancelled under K.A.R. § 7-23-15.

62.     Noncitizens who apply for a driver's license may receive a temporary driver's license ("TDL"), the duration of which is tied to the length of time that the documentation they provided to the DOV permits their presence in the United States.  Noncitizen legal permanent residents who apply for a driver's license receive a regular driver's license.

63.     As of January 1, 2013, there were 1,762,330 registered voters in Kansas.

64.     As of March 23, 2017, Caskey had identified 125 non-citizens who either attempted to register to vote or successfully registered to vote prior to the proof-of-citizenship requirement's implementation, or attempted to register after the requirement was implemented. This figure is

equal to approximately .0007% of registered voters in Kansas.

65.     Tabitha Lehman is the County Election Officer of Sedgwick County. She has identified an additional 2 noncitizens who registered to vote before January 1, 2013, in Sedgwick County.

66.     Of the 127 individuals identified by Caskey and Lehman, 43 successfully registered to vote in Kansas, 47 currently have or have had the "CITZ" code in their ELVIS record at one point, and 11 have voted in an election. Eighty-eight of these individuals are motor-voter applicants, 25 of whom successfully registered to vote in Kansas, 32 have or have had the "CITZ" code in their ELVIS records at some point, and 5 have voted in an election.

67.     Defendant has also identified possible noncitizens who registered to vote by comparing the TDL list with the ELVIS database. Defendant compared the TDL list to the voter registration list in 2009, 2010, 2011, and 2017. As of January 30, 2017, Kansas had identified 79 TDL holders on the voter rolls, several of whom have been referred for prosecution.

68.     One of Plaintiffs' experts, Eitan Hersh, also compared the TDL list to the voter registration list. He found 82 matches. The DMV has compared the list of individuals on the suspense list to information in the driver's licenses database concerning driver's license holders who presented proof of permanent residency (or "green cards") in the course of applying for a driver's license, and identified some possible noncitizens.

69.      In Kansas, people who are called for jury service are sent jury duty questionnaires that include a question about United States citizenship. Monthly, district courts send Defendant lists of individuals who requested to be excused from jury service based on their claims of noncitizenship.

70.     Defendant has compared lists of individuals who indicated on their jury questionnaires that they were not citizens, to his list of registrants and identified at least 5 individuals who were

potentially noncitizens.  In November 2013, Defendant referred these five individuals to a local county police department for investigation and possibly prosecution.

71.     Defense expert von Spakovsky opined that Kansas has no access to information about who is in the United States legally or otherwise, so most discoveries of noncitizens on registration rolls are accidental.

72.     Defense expert Jesse Richman evaluated several pieces of data to try to determine the prevalence of noncitizen registration in Kansas.  In one method, Richman compared the Kansas list of TDL holders to the list of individuals held in "suspense" in ELVIS for failure to submit DPOC at the time they registered to vote.  He identified 16 people on both lists, although he does not believe that everyone matched from the list is a noncitizen.

73.     He did not compare this list of matches with the 127 names identified by Caskey and Lehman to determine if there was overlap.  None of these 16 individuals registered to vote, and there is no information about whether they attempted to register at the DOV.

74.     Richman also found that 27 people on the suspense list attempted to register to vote close in time to when they obtained a driver's license using a green card or a noncitizen permanent resident document.  He did not compare this list of matches with the 127 names identified by Caskey and Lehman to determine if there was overlap. There is no information about whether these individuals attempted to register to vote at the DOV.

75.     Richman utilized multiple sampling methods based on the results of a January 2017 telephone survey commissioned by the State of Kansas, and conducted by a national polling firm, of (1) TDL holders; (2) individuals on the suspense list; (3) registered voters in Ford, Seward, Finney, and Grant counties; and (4) "incidentally contacted" individuals.  Of the 1300 people surveyed from the suspense list, Richman estimates that .65% are noncitizens.

76.     The registered voters survey sampled individuals registered to vote between 2007 and 2012 in Ford, Finney, Grant, and Seward counties.  All of the individuals contacted indicated that they were citizens of the United States.

77.     Richman provides four estimates of noncitizens in Kansas who have registered or attempted to register to vote, not limited to DOV registrations.  These estimates are based on the following sources: (1) the CCES survey; (2) records of newly naturalized Sedgwick County citizens who were discovered to have been registered to vote at the time of naturalization; (3) a survey of TDL holders; and (4) survey responses from a group of incidentally contacted noncitizens.  Richman does not identify a single "best" estimate.

78.     Richman also produced a "meta-analysis" of the rate of noncitizen registration by aggregating these four estimates. The information provided to Richman reflected that out of 791 newly-naturalized citizens in Sedgwick County since January 1, 2016, 8, or roughly 1%, had already submitted voter registration forms.  The Sedgwick County Election Office discovered these individuals when entering their registration information into the ELVIS database.

79.     Extrapolating this percentage to  the number of naturalized citizens in Kansas between 2008 and 2015, Richman estimates 1,153  noncitizens registered to vote.  Richman updated this estimate in his rebuttal report, in order to respond to Plaintiffs' expert's criticism, and the number rose to 1,169.

80.     Richman also analyzed results from a telephonic survey that attempted to identify noncitizens on the TDL list.  Out of 104 individuals contacted, 38 were reached that matched the name and age of an individual on file.  Those names then were provided to the Department of Homeland Security ("DHS") to determine their citizenship status.  In total, 37 individuals were determined to be noncitizens based on the most recent information available to DHS, 6 of whom

responded to the survey that they had either registered or attempted to register to vote, although none have an ELVIS record.

81.     Based on this sample, Richman concludes "if the small sample analyzed can be generalized to the broader TDL list . . . then it suggests that . . . 3,480[] individuals on that list have registered or attempted to register to vote in Kansas."  Richman observes that the TDL list does not include all Kansas noncitizens—the list excludes unlawfully present noncitizens and noncitizens who choose not to obtain a driver's license.  He opines that if the survey results are applied to the broader noncitizen population, it would suggest that more than 18,000 noncitizens have registered or attempted to register to vote.

82.     Finally, Richman looked at 165 "incidentally-contacted" individuals from the three different lists in the telephonic survey who were asked about their citizenship status and whether or not they were registered to vote.  Nineteen of these individuals indicated that they were noncitizens, one of whom indicated that they had registered or attempted to register to vote, although there is no evidence of this person's name appearing in ELVIS.  Richman concludes: Although the sample size is extremely small and any estimates are accordingly very uncertain (the margin of error is 10.1 points), the estimate from this data suggests a registration/attempted registration rate of 5.3 percent.  If extrapolated (and again the uncertainty here is very high) to the Kansas non-citizen population as a whole, this implies that about 6,000 may have registered to vote or attempted to register to vote.

83.     Richman's meta-analysis aggregating all four of these estimates produced a midpoint estimate that 1.1% of noncitizens in Kansas have registered or attempted to register to vote.  Because there are approximately 115,000 noncitizen adults in Kansas, this midpoint estimate equals 1,265 noncitizens statewide who have registered or attempted to register to vote in Kansas.

This figure is equal to approximately .07% of the approximately 1.8 million registered voters in Kansas.

84.     Close elections can be decided by a few votes.  In Kansas elections over the past 17 years, there have been 33 elections decided by fewer than 100 votes.  For example, there were  two general election races for the Kansas House of Representatives that were decided by .04%  and .036% of the two-party vote, respectively, and both were won by Democratic candidates  who held a three-vote advantage.

85.     As of March 28, 2016, there were 5,655 applicants on the "suspense list" who had applied to register at the DOV.  As of March 23, 2016, there were 11,147 applicants who applied  to register at the DOV whose applications were canceled under K.A.R. § 7-23-15 due to lack of DPOC.

        In addition to the above, the parties stipulated to the following facts during trial:

86.     The population of noncitizens over the age of 18 residing in Kansas was  114,459 according to the 2016 American Community Survey 1-Year Estimates as published by the U.S. Census Bureau.  Doc. 496-1, p. 2.

87.     The population of noncitizens over the age of 18 residing in Sedgwick County Kansas was 23,472 according to the 2016 American Community Survey 1-Year Estimates as published by the U.S. Census Bureau.  Doc. 496-1, p. 2.

88.     As part of the driver's license application and renewal processes, DOV procedure provides that the driver's license examiners are to ask customers if they want to register to vote. Doc. 494.

89.     DOV procedure provides that the examiners are to enter a "Y" in the appropriate field of the computer interface if a customer answers "yes" to the voter registration question. Doc. 494.

90.     DOV procedure provides that the examiners are to direct customers to read a voter oath

located on the counter in front of the customers and to ask the customer to read that oath. Doc. 494.

91.     A true and correct copy of the voter oath located on the counter in front of the customer is attached to this stipulation as Exhibit A. Doc. 494.

92.     After a customer reads the voter oath, DOV procedure provides that the examiner is to ask the customer if he/she affirms the voter oath. Doc. 494.

93.     Customers are not required to provide a signature after reading the voter oath. The signature occurs during the photo and signature portion of driver's licensing process before the voter registration part of the process begins. Doc. 494.

94.     DOV procedure provides that the examiners are to ask customers who affirm the voter oath a series of questions including whether the customers are citizens of the United States, whether the customers will be 18 years of age before the next election, whether the customers want to register with a political party, and whether the customers want to provide their telephone numbers. DOV procedure also provides that the examiners are to record the customers' answers to these questions in the computer interface. Doc. 494.

95.     The voter registration receipt prints automatically when someone applies to register to vote at the DOV. Doc. 494.

96.     Under DOV procedure, it is mandatory that the DOV clerk provide the applicant with the voter registration receipt. Doc. 494.

97.     DOV procedure and training provides that the examiners are to scan all documents an applicant provides during a renewal. Doc. 494.

98.     Lawful permanent residents are not required to provide a lawful presence document when they renew their driver's license. Doc. 494.

99.     Lawful Permanent Residents obtain a standard six-year license.  Doc. 494.

100.    The DOV does not keep statistics on the number of driver's licenses issued to permanent residents.  Doc. 494.

101.    If a proof of citizenship document has been scanned into the DOV system during a prior transaction and a voter applies to register to vote during a renewal, the DOV informs KSOS that such document is on file.  Doc. 494.

102.    The DOV only has documents scanned into the system since 2013. Doc. 494.

103.    When a person applies for a driver's license or a renewal at the DOV but does not apply to register to vote at that time, a file is not created to be sent to the Secretary of State's Office for that person.  Doc. 494.

104.    The DOV also does manual checks for proof of citizenship documents when the Secretary of State's office provides names of individuals who the Secretary provides to the DOV.  Doc. 494.

105.    In order to renew a Kansas driver's license, a driver's licensee must provide the Kansas Division of Vehicles with proof of identity (such as an expiring Kansas driver's license), a Social Security number, and proof of Kansas residency. Doc. 494.

106.    The total number of votes reported for the highest federal (or state) office on the ballot in each of the listed general elections is as follows:

| Federal Election Year | Highest Federal (or State) Office on the Ballot | Total Votes Reported |
|---|---|---|
| 2000 | President | 1,072,216 |
| 2002 | U.S. Senate | 776,850 |
| 2004 | President | 1,187,756 |

| 2006 | Governor | 849,700 |
|---|---|---|
| 2008 | President | 1,235,872 |
| 2010 | U.S. Senate | 837,692 |
| 2012 | President | 1,159,971 |
| 2014 | U.S. Senate | 866,191 |
| 2016 | President | 1,184,402 |
| **Cumulative Votes Reported** | | **9,170,650** |

Doc. 496-1.

107.    The official turnout in the listed elections in Sedgwick County, Kansas in each of the

listed elections is as follows:

| Federal Election Year | Official Turnout |
|---|---|
| 2004 General Election | 181,626 |
| 2006 Primary Election | 37,757 |
| 2006 General Election | 118,674 |
| 2008 Primary Election | 36,844 |
| 2008 General Election | 197,044 |
| 2010 Primary Election | 65,826 |
| 2010 General Election | 136,828 |
| 2012 Primary Election | 54,923 |
| 2012 General Election | 187,286 |
| 2014 Primary Election | 52,598 |
| 2014 General Election | 145,073 |
| 2016 Primary Election | Data not available |
| 2016 General Election | 195,746 |
| **Cumulative Official Turnout** | **1,410,225** |

Doc. 496-1.

108.    There were 1,817,927 registered voters (including voters listed as "active", "inactive",

and voters who are covered by the preliminary injunction) as of October 2016.  There were

1,744,866 registered voters (including voters listed as "active", "inactive", and voters who are

covered by the preliminary injunction) as of October 2014.  Doc. 496-1.

## PROPOSED CONCLUSIONS OF LAW- *FISH* PLAINTIFFS

**I.    Introduction and Background**

Plaintiffs tried their only remaining claim, Count I, in which they alleged that K.S.A. §

25-2309(l) violated Section 5 of the NVRA.[3]  Section 5 requires that all states offer an

application to register to vote to all eligible citizens when they apply for a driver's license.[4]

Kansas law requires that a motor voter registration applicant provide documentary proof of

citizenship ("DPOC") when applying to register to vote.[5]  The DPOC requirement is not

contained on the federal voter application form.  Prior to trial, the Court ordered a preliminary

injunction prohibiting Kansas from enforcing its law.[6]  Defendant appealed the order to the

Tenth Circuit who affirmed the Court's order on October 19, 2016.[7]  The Tenth Circuit held that

the attestation of citizenship that is included on the federal voter application form creates a

rebuttable presumption that attestation alone is sufficient for a voter registration applicant to

prove United States citizenship.[8]  The Tenth Circuit stated that in order to overcome this

presumption the Defendant must present evidence that a "substantial" number of noncitizens

were able to register to vote under attestation alone.[9]

---

[3] Doc. 39, Plaintiffs' Amended Complaint.
[4] NVRA, 52 U.S.C. § 20504(a)(1).
[5] K.S.A. § 25-2309(l).
[6] Doc. 129.
[7] *Fish v. Kobach*, 840 F.3d 710, 738 (10th Cir. 2016).
[8] *Id.*
[9] *Id.*

On August 4, 2017, Defendant filed a motion for summary judgment in which it argued that the statutory language and legislative history did not support the Tenth Circuit's holding that this presumption existed.[10]  Defendant argued that the Kansas law was not preempted by the NVRA because the NVRA expressly mandates to the states the authority to determine the eligibility of each state's electors in whatever manner each state deems sufficient.[11]  Defendant further argued that preemption cannot be dependent upon facts of individual cases because federal preemption cannot vary.  Last, Defendant argued that a substantial number of noncitizens had registered to vote in Kansas and that no alternatives to requiring DPOC have been sufficiently able to prevent them from doing so.[12]

On January 3, 2018, the Court denied Defendant's motion for summary judgment and held that although the estimate of "18,000 noncitizen registrants under an attestation regime is substantial," Plaintiffs' allegations that Defendant's expert's estimates contained "serious methodological and probative limitations" left a "genuine issue of material fact as to whether substantial noncitizens registered to vote under the attestation regime," which necessitated trial on Count I.[13]  The Court also determined that it was bound by the Tenth Circuit's October 19, 2016 Order which affirmed its grant of a preliminary injunction to Plaintiffs.[14]  The Court then adopted the Tenth Circuit's substantial numbers test as the "framework within which Plaintiffs' Count I preemption claim under § 5 of the NVRA must proceed."  To wit,

> Under that straightforward test, a genuine issue of material fact exists on this
> record as to whether a substantial number of noncitizens successfully registered to

---

[10] Doc. 421, pp. 7-8.
[11] NVRA, 52 U.S.C. § 20504(a)(1); Doc. 383.
[12] Doc. 383.
[13] Doc. 421, p. 32.
[14] *Fish*, 840 F.3d at 738.

vote under the attestation regime that preceded the Kansas DPOC law, based

solely on the testimony and report by Defendant's expert, Professor Jesse

Richman.[15]


Notably, the Tenth Circuit is the only court to have held that a signature attestation is

sufficient to prove United States citizenship.  The Court denied Defendant's renewed motion for

summary judgment on these same issues at the close of evidence.[16]

## II.      Proposed Legal Conclusions

1.  Courts recognize two kinds of mootness:  constitutional mootness and prudential

    mootness.  *Rio Grande Silvery minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1121

    (10th Cir. 2010).  Under constitutional mootness, when a case or controversy no longer

    exists, at any "stag[e] of review, not merely at the time the complaint is filed," the

    Plaintiff must be dismissed.  *Id.* (citation ommitted).  "[T]he suit must present a real and

    substantial controversy with respect to which relief may befashioned."  *Jordan v. Sosa*,

    654 F.3d 1012, 1024 (10th Cir. 2011).

2.  Plaintiffs Stricker, Boynton, and Hutchinson's claims are all moot as they are fully

    registered to vote and no decision by this Court or subsequent courts will have any

    effect on their voter registration status.  CITE.

3.  A plaintiff bears the burden of demonstrating standing and must show (1) an injury in

    fact that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or

    hypothetical, (2) that the injury is fairly traceable to the challenged conduct, and (3) that

---

[15] Doc. 421, p. 35.
[16] TR. pp. 2042-43.

a favorable decision would redress the injury. *Cache Valley Elec. Co. v. State of Utah Dept. of Transp.*, 149 F.3d 1119, 1122 (10th Cir. 1998) (citations omitted).  A plaintiff must establish the "proper jurisdictional [basis] for each and every claim—particularly when courts are called upon to review a state or local legislative enactment." *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 300 (3rd Cir. 2003).

4. Plaintiffs Fish, Bucci and the League of Women Voters lack standing?  PROBABLY NOT WORTH ARGUING?

5.

6. Under the Tenth Circuit's holding in *Fish v. Kobach*, Defendant bears the burden to prove that a substantial number of noncitizens registered to vote prior to the effective date of K.S.A. § 25-2309(l).  *Fish v. Kobach*, 840 F.3d 710, 738 (10th Cir. 2016).

7. Under the Tenth Circuit's holding, Plaintiffs have no burden of proof.  *Fish v. Kobach*, 840 F.3d 710, 738 (10th Cir. 2016).

8. Under this Court's ruling on the parties' summary judgment motions, the question of what constitutes a "substantial number" of noncitizens is a legal question that no witness can address because it is a legal question for the Court alone to decide. Doc. 421, p. 18.

9. Substantial evidence of noncitizens registering to vote cannot be compared between registration rates of noncitizens vs the entire registration population of Kansas.  Even if 10% of the entire 115,000 non-citizen population of Kansas registered to vote, or 11,500 noncitizens registered to vote, that would still only represent 0.6% of the 1.8 million registered voters.  Thus, the Tenth Circuit's "substantial numbers" has to be interpreted in light of the effect noncitizen registration could have.  *See Trimiar v. Sullivan,* 966

F.2d 1326, 1330 (10th Cir.1992) (upholding under an ALJ's ruling that "650 to 900 jobs" in the state constituted is a substantial number under a "significant number" test).

10.   The evidence presented by Defendant through Dr. Richman that, at the low end, 1.1% of all Kansas noncitizens had successfully registered to vote equates to 1,265 noncitizens, which is legally substantial under Tenth Circuit precedent addressing what constitutes a substantial number. Def. Exh. 952 and 958; TR. 1515; *Trimiar,* 966 F.2d at 1330.

11.   The evidence presented by Defendant through Dr. Richman that, at the low end, 1.1% of all Kansas noncitizens had successfully registered to vote equates to 1,265 noncitizens, which is legally substantial number as held by the 8th, 9th and 11th Circuit Courts.  Def. Exh. 952 and 958; TR. 1515; *Barker v. Secretary,* 882 F.2d 1474, 1478–79 (9th Cir.1989) (citing cases where as few as 500 and 600 jobs constituted a "significant number"); *Long v. Chater,* 108 F.3d 185, 188–89 (8th Cir.1997) (upholding an ALJ finding that 650 surveillance monitoring jobs was a significant number); *Jenkins v. Bowen,* 861 F.2d 1083, 1087 (8th Cir.1988) (500 sedentary security guard jobs in region was a significant number); *Allen v. Bowen,* 816 F.2d 600, 602 (11th Cir.1987) (174 jobs in the local economy was a significant  number).

12.   The evidence presented by Defendant through Dr. Richman that, at the low end, 1.1% of all Kansas noncitizens had successfully registered to vote equates to 1,265 noncitizens, which is legally substantial number because it can change the outcome of an election. Def. Exh. 952; Def. Exh. 1068 (evidence of 33 elections in Kansas between 2000 and 2016 where the results were decided by less than 100 votes was stipulated to).

13.   The right to vote is denied by the dilution of the weight of one citizen's vote just as much as by prohibiting one vote.  *Bush v. Gore*, 531 U.S. 98, 104–05, 121 S. Ct. 525,

529–30, 148 L. Ed. 2d 388 (2000) (citing *Reynolds v. Sims,* 377 U.S. 533, 555, 84 S. Ct. 1362, 12 L.Ed.2d 506 (1964)).

14.   One person's vote cannot be arbitrarily valued more than another's (*Bush v. Gore*, 531 U.S. 98, 104–05, 121 S. Ct. 525, 529–30, 148 L. Ed. 2d 388 (2000)); thus, establishing an arbitrary number of acceptable illegal votes as enough to be "substantial" goes against the United States Supreme Court's holding in *Bush v. Gore* in that it discards a correlating number of legal votes until an arbitrary threshold of "substantial" is reached.

15.   The NVRA does not preempt K.S.A. § 25-2309(l) because the "state legislature's power to select the manner for appointing electors is plenary." *Bush v. Gore*, 531 U.S. 98, 104–05, 121 S. Ct. 525, 529–30, 148 L. Ed. 2d 388 (2000).

16.   K.S.A. § 25-2309(l) does not violate the NVRA because the United States Supreme Court's holding in *Young v. Fordice* confirms that Section 5 of the NVRA "still leaves room for policy choice" and "does not list, for example, all the other information the State may—or may not—provide or request." *Young v. Fordice*, 520 U.S. 273, 286 (1997).

17.   The NVRA does not preempt K.S.A. § 25-2309(l) by virtue of the Plain Statement Rule, which states that "the States will retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere." *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991).

18.   The Plain Statement rule indicates that the phrase "may require only the minimum amount of information necessary" only describes what information must be written on the face of the form as opposed to outside of the form. 52 U.S.C. § 20504(c)(2). The next clause which discusses information "in" the form further compels this reading and

merely was designed to prevent excessively long or duplicative forms. *Id.* at (c)(2)(A). Other provisions also indicate the statute is referring to information "in" the form. *Id.* at (c)(2)(C).

19.    Statutory interpretation indicates that if Congress seeks to preempt a state law, it does not do so through silence, but instead must do so "unmistakably clear in the language of the state." *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 65 (1989) (internal citation omitted).

20.    Further, the NVRA does not preempt K.S.A. § 25-2309(l) under another Supreme Court case which held that powers inherent with the State apply to the qualifications of voters. *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973).

21.    When a statute seeks to preempt a state voting law, the Court is limited to the "reasonable assumption . . . that the statutory text accurately communicates the scope of Congress' pre-emptive intent." 133 S. Ct. 2257; *see also id.* at 2256-2257 (although there is not a presumption against preemption in this case, Congress still must state its preemptive intent within the statute).

22.    Finding preemption to prohibit proof of citizenship law in Kansas violates the cannon of congressional silence not being read to create a statutory command. *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 341-342 (2005); see also *United States v. Wells*, 519 U.S. 482, 496 (1997)("It is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law.") (citation omitted). Like the Sixth Circuit's reading that the NVRA does not prohibit requiring social security numbers, the NVRA likewise does not prohibit requiring proof of citizenship. *McKay v. Thompson*, 226 F.3d 752, 755-756 (6th Cir. 2000).

23.   The term "necessary" under the NVRA requires an objective view, as to what is required by state law, as opposed to a subjective view regarding policy to avoid Courts making decisions that legislatures should make.  *See Swallow v. UniteD States*, 325 F.2d 97, 98 (10th Cir. 1963).

24.   Even if a subjective meaning is used, Kansas's proof of citizenship law is not preempted because Kansas has shown that the attestation requirement has not prevented noncitizens from registering to vote.  *Fish v. Kobach*, 840 F.3d at 734-736 (citing *M'Cullough v. Maryland*, 17 U.S. (4 Wheat) 316, 414-15 (1819).  The fact that noncitizens have been shown to register to vote indicates that an attestation requirement is not the "least possible amount of information," *Fish*, 840 F.3d at 736, to "enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the election process[.]"  52 U.S.C. § 20504(c)(2)(B)(ii). The Kansas statute itself defines what the least possible amount of information is. K.S.A. 25-2309(I).

25.   When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter. The State, of course, after granting the franchise in the special context of Article II, can take back the power to appoint electors. [T]here is no doubt of the right of the legislature to resume the power at any time, for it can neither be taken away nor abdicated. *Bush v. Gore*, 531 U.S. 98, 104–05, 121 S. Ct. 525, 529–30, 148 L. Ed. 2d 388 (2000).

26. An Act of Congress must not be construed in a manner that raises doubts as to its

constitutionality.  *Clark v. Martinez*, 543 U.S. 381 (2005); *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009).  Construing the NVRA to allow Congress to set elector qualifications—as Plaintiffs do—raises constitutional doubt and obliterates the plain meaning of the Qualifications Clause and the Seventeenth Amendment.

27. The Constitution gives the States the exclusive power to determine who may vote in federal elections.  *ITCA*, 133 S. Ct. at 2251, 2257.  In contrast, the Constitution only gives the Congress the authority to regulate how elections are held.  *Id.* at 2257.  Thus, "voter qualifications in federal elections are [not] to be set by Congress."  *Id.* at 2258. The states retain this power.  *Id.* at 2258-59.  States also retain the authority to enforce their qualification.  *Id.* at 2258-59.

28. Registration itself is a qualification to vote in Kansas because one may not vote without completing the registration process.  "It is well settled in this state that the legislature may require registration as a prerequisite to the right to vote."  *Dunn v. Bd. Of Com'rs of Morton Cty.*, 165 Kan. 314, 327-28 (1948)(citing *State v. Butts*, 31 Kan. 537 (1884)). Qualified electors means "persons who have the constitutional (Const., art. 5, §§ 1, 4) qualifications of an elector *and who are duly and properly registered*."  *Id*. at 328 (emphasis added).

29. The states also possess "broad powers to determine the conditions under which the right of suffrage may be exercised.  *Shelby County*, 133 S. Ct. at 2623 (quotation omitted). "The privilege to vote in a state *is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as to it may seem proper*, provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution."  *Carrington v. Rash*, 380 U.S. 89, 91 (1965) (emphasis added);

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 834 (1995) (states possess authority to enact evenhanded restrictions that protect the integrity and reliability of the electoral process).  Interpreting the NVRA to prevent Kansas from requiring proof of citizenship to register to vote would raise serious constitutional doubt under these doctrines.  *See ITCA*, 1333 S. Ct. at 2259 (raise serious constitutional doubt to give the EAC the authority to reject a proof of citizenship requirement).

30.   The Constitution prohibits an interpretation of a federal statute which would create qualifications for voting in federal elections in Kansas to differ from qualifications for voting in State elections.  *Wiley v. Sinkler*, 179 U.S. 58, 63-64 (1900) (citation omitted); U.S. Const. Art. I, § 2, cl. 1; U.S. Const. Amen. XVII.  Thus, an interpretation that the NVRA does not permit requiring evidence of citizenship for federal elections violates this principle the interpretation could create two distinct electorates.  *See ITCA*, 133 S. Ct. at 2258 ("voting qualifications in federal elections are [not] set by Congress."); *See also Gray v. Sanders*, 372 U.S. 368, 379 (1968) ("States can within limits specify the qualifications of voters in both state and federal elections; *the Constitution indeed makes voters' qualifications rest on state law even in federal elections.*") (emphasis added).

31.   A statutory interpretation cannot come to an absurd result.  *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982); *see also United States v. Am. Trucking Ass'ns., Inc.*, 310 U.S., 534, 542–543 (1940).  Permitting a reading that a State may not require proof of citizenship at the DOV but can require it for other purposes is an absurd result that is not supported by the NVRA's text.  *See* 52 U.S..C  20501(b)."[I]t is well settled that the Elections Clause grants Congress 'the power to override state

regulations' *by establishing uniform rules* for federal elections, binding on the
States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Terms Limits, Inc. v.*
*Thornton*, 514 U.S. 779, 832-833 (1995) (emphasis added)).  An interpretation of a
statute which results in a fact-based inquiry where the same statutory language would
come to opposite conclusions of preemption violates this principle.  And, even where
Congress has done so and a Court permitted, it cautioned that treating states differently
was in tension with the federalist structure of the Constitution.  *Shelby County, Ala. v.*
*Holder*, 133 S. Ct. 2612, 2621 (2013) (quoting *Northwest Austin Mun. Util. Dist. No.*
*One v. Holder*, 557 U. S. 193, 202, 203 (2009)).  And, where there is not express
language permitting differing treatments, a Court should avoid such an interpretation
lest the Court engage in a "'freewheeling judicial inquiry into whether a state statute is
in tension with federal objectives'; such an endeavor 'would undercut the principle that
it is Congress rather than the courts that preempts state law.'"  *Chamber of Commerce*
*of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (*quoting Gade v. Nat'l Solid Wastes Mgmt.*
*Assn.*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring)).

32.  Under the Tenth Circuit's two-part substantial number test, after Defendant presents
evidence that a substantial number of noncitizens registered to vote, Defendant must
also prove that nothing less than DPOC can satisfy the State's obligation to carry out its
duties in ensuring that all registrants are eligible to vote. Doc. 421.

33.  Defendant presented sufficient evidence that additional training at the DMV would not
prevent noncitizens from registering to vote through the testimony of Tabitha Lehman.
TR 675.

34.  Defendant also presented sufficient evidence through defense expert Hans von

Spakovsky that prosecution and enforcement of perjury that would accompany a false attestation was not sufficient to prevent noncitizens from registering to vote because it can only occur after the crime has already been committed and is difficult to discover. TR 1083.

35. Defendant also presented sufficient evidence through defense expert Hans von Spakovsky that the EVVE program does not work to prevent noncitizens from registering to vote because in order to be used, the state must have both the applicant's mother's maiden name and his or her state of birth.  TR 1082.

36. Defendant also presented sufficient evidence through defense expert Hans von Spakovsky that the SAVE program does not work to prevent noncitizens from registering to vote because in order to be used, the state must have the alien number assigned to a legal noncitizen and illegal noncitizens do not have alien number assignments. TR 1084-5; Def. Exh. 1061.

37. Defendant also presented sufficient evidence through State Elections Director Bryan Caskey that although the agency receives copies of juror questionnaires in which a person states that they are a noncitizen, the pool of potential jurors is derived primarily from voter registration and from federal databases which would inherently not include noncitizens. TR. 753-755, 872-874.

38. Because the Defendant presented sufficient evidence that nothing less than DPOC can ensure that noncitizens are being prevented from registering to vote, Defendant has met the second prong of the substantial number test as mandated by the Tenth Circuit.

39. Having satisfied the substantial number test, the Court finds that Defendant has rebutted the presumption established by the Tenth Circuit that attestation alone is sufficient to

prevent noncitizens from registering to vote in Kansas.

40.    The Court finds for the Defendant on Count I of Plaintiffs Amended Complaint and holds that Kansas statute, K.S.A. § 25-2309(l) does not violate the requirements of the NVRA.

41.  This Court lacks jurisdiction to issue the relief sought in requests for relief 6-9.  A plaintiff "bears the burden of showing that he has standing for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493-94 (2009); *Bond v. U.S.*, 131 S. Ct. 2355, 2361 (2011).  Plaintiffs' request for relief is brought under the NVRA. Nothing in the NVRA requires a website, educational materials, or particular ballot type be provided by a State.

Respectfully submitted this 23rd day of April, 2018:

By:  __/s/ Garrett Roe____

Garrett Roe, #26867

Office of the Kansas Secretary of State

Memorial Hall, 1st Floor

120 SW 10th Avenue

Topeka, KS 66612-1594

(785) 296-4564 (telephone)

(785) 368-8032 (facsimile)

Email: Garrett.Roe@ks.gov

Email: Kris.Kobach@ks.gov

***Attorneys for Defendant***

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that, on this 23rd day of April, 2018, I submitted the above

Defendant's Proposed Findings of Fact and Conclusions of Law to the Court's electronic

filing system and provided copies by electronic mail of the foregoing motion to counsel in

this case.


 /s/ Garrett Roe_____

Garrett Roe, #26867

***Attorney for Defendant***