# UNITED STATES CODE

*Congressional and Administrative News*

## 94th Congress—Second Session

## 1976

Convened January 19, 1976
Adjourned October 2, 1976

## Volume 5

LEGISLATIVE HISTORY
PROCLAMATIONS
EXECUTIVE ORDERS
TABLES and INDEX

ST. PAUL, MINN.
WEST PUBLISHING CO.

EXHIBIT F

defective, suppressed, and fallen trees that are merchantable. Subsequent harvests will use selection, thinning, and shelterwood methods. Clearcut methods, if used at all, will be limited to 5 acres, and they will be shaped in naturalistic patterns. All timber management activities will be carried out so as to retain the scenic continuity of the area facing Huntington Lake.

Within the Aspen-Horsethief portion, the initial harvest will primarily use the shelterwood method to obtain natural regeneration from residual seed trees on 14 small areas totaling about 1,000 acres. Subsequent harvests will apply the shelterwood method to unharvested areas, remove residual seed trees after young trees are established, and maintain optimum growing conditions through salvage logging and commercial thinning.

We recognize that the "need" for additional designated wilderness within any general region is a very subjective question. However, in the case of Kaiser Ridge, we believe it is important to point out that management options are already limited to favor wilderness and recreation on almost 2.3 million acres of Federal land within the Sierra Nevada of central California. To the north of Kaiser Ridge are Yosemite National Park (757,991 acres), the Minarets Wilderness (109,484 acres), and the San Joaquin Wilderness Study Areas (39,080 acres). To the east is the John Muir Wilderness (503,478 acres). To the south are the Sequoia and Kings Canyon National Parks (838,976 acres) and the proposed Monarch Wilderness (30,689 acres).

# THE CIVIL RIGHTS ATTORNEY'S FEES AWARDS ACT OF 1976

*P.L. 94-559, see page 90 Stat. 2641*

Senate Report (Judiciary Committee) No. 94-1011,
June 29, 1976 [To accompany S. 2278]

House Report (Judiciary Committee) No. 94-1558,
Sept. 15, 1976 [To accompany H.R. 15460]

Cong. Record Vol. 122 (1976)

## DATES OF CONSIDERATION AND PASSAGE
Senate September 29, 1976

House October 1, 1976

The Senate bill was passed in lieu of the House bill.
The Senate Report is set out.

## SENATE REPORT NO. 94-1011

[page 1]

The Committee on the Judiciary, to which was referred the bill (S. 2278) to amend Revised Statutes section 722 (42 U.S.C. § 1988) to allow a court, in its discretion, to award attorneys' fees to a prevailing party in suits brought to enforce certain civil rights acts, having

# ATTORNEY'S FEES AWARDS ACT
## P.L. 94-559

considered the same, reports favorably thereon and recommends that the bill do pass.

\* \* \* \* \* \* \* \* \* \* \*

### PURPOSE

This amendment to the Civil Rights Act of 1866, Revised Statutes Section 722, gives the Federal courts discretion to award attorneys' fees to prevailing parties in suits brought to enforce the civil rights acts which Congress has passed since 1866. The purpose of this amendment is to remedy anomalous gaps in our civil rights laws created by the United States Supreme Court's recent decision in *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U.S. 240 (1975),[1] and to achieve consistency in our civil rights laws.

---

[1] 95 S.Ct. 1612, 4 L.Ed.2d 141.

[page 2]

### HISTORY OF THE LEGISLATION

The bill grows out of six days of hearings on legal fees held before the Subcommittee on the Representation of Citizen Interests of this Committee in 1973. There were more than thirty witnesses, including Federal and State public officials, scholars, practicing attorneys from many areas of expertise, and private citizens. Those who did not appear were given the opportunity to submit material for the record, and many did so, including the representatives of the American Bar Association and the Bar Associations of 22 States and the District of Columbia. The hearings, when published, included not only the testimony and exhibits, but numerous statutory provisions, proposed legislation, case reports and scholarly articles.

In 1975, the provisions of S. 2278 were incorporated in a proposed amendment to S. 1279, extending the Voting Rights Act of 1965. The Subcommittee on Constitutional Rights specifically approved the amendment on June 11, 1975, by a vote of 8-2, and the full Committee favorably reported it on July 18, 1975, as part of S. 1279. Because of time pressure to pass the Voting Rights Amendments, the Senate took action on the House-passed version of the legislation. S. 1279 was not taken up on the Senate floor; hence, the attorneys' fees amendment was never considered.

On July 31, 1975, Senator Tunney introduced S. 2278, which is identical to the amendment to S. 1279 which was reported favorably by this Committee last summer.

Shortly thereafter, similar legislation was introduced in the House of Representatives, including H.R. 9552, which is identical to S. 2278 except for one minor technical difference. The Subcommittee on Courts, Civil Liberties and the Administration of Justice of the House Judiciary Committee has conducted three days of hearings at which the witnesses have generally confirmed the record presented to this Committee in 1973. H.R. 9552, the counterpart of S. 2278, has received widespread support by the witnesses appearing before the House Subcommittee.

### STATEMENT

The purpose and effect of S. 2278 are simple—it is designed to allow courts to provide the familiar remedy of reasonable counsel fees to

prevailing parties in suits to enforce the civil rights acts which Congress has passed since 1866. S. 2278 follows the language of Titles II and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a-3(b) and 2000e-5(k), and section 402 of the Voting Rights Act Amendments of 1975, 42 U.S.C. § 1973*l*(e). All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.

In many cases arising under our civil rights laws, the citizen who must sue to enforce the law has little or no money with which to hire a lawyer. If private citizens are to be able to assert their civil rights, and if those who violate the Nation's fundamental laws are not to proceed with impunity, then citizens must have the opportunity to recover what it costs them to vindicate these rights in court.

[page 3]

Congress recognized this need when it made specific provision for such fee shifting in Titles II and VII of the Civil Rights Act of 1964:

> When a plaintiff brings an action under [Title II] he cannot recover damages. If he obtains an injunction, he does so not for himself alone but also as a "private attorney general," vindicating a policy that Congress considered of the highest priority. If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the Federal courts. Congress therefore enacted the provision for counsel fees—* * * to encourage individuals injured by racial discrimination to seek judicial relief under Title II." *Newman* v. *Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968).[2]

The idea of the "private attorney general" is not a new one, nor are attorneys' fees a new remedy. Congress has commonly authorized attorneys' fees in laws under which "private attorneys general" play a significant role in enforcing our policies. We have, since 1870, authorized fee shifting under more than 50 laws, including, among others, the Securities Exchange Act of 1934, 15 U.S.C. §§ 78i(c) and 78r(a), the Servicemen's Readjustment Act of 1958, 38 U.S.C. § 1822(b), the Communications Act of 1934, 42 U.S.C. § 206, and the Organized Crime Control Act of 1970, 18 U.S.C. § 1964(c). In cases under these laws, fees are an integral part of the remedy necessary to achieve compliance with our statutory policies. As former Justice Tom Clark found, in a union democracy suit under the Labor-Management Reporting and Disclosure Act (Landrum-Griffin),

> Not to award counsel fees in cases such as this would be tantamount to repealing the Act itself by frustrating its basic purpose. * * * Without counsel fees the grant of Federal jurisdiction is but an empty gesture * * *. *Hall* v. *Cole*, 412 U.S. 1 (1973),[3] quoting 462 F. 2d 777, 780-81 (2d Cir. 1972).

The remedy of attorneys' fees has always been recognized as particularly appropriate in the civil rights area, and civil rights and attorneys' fees have always been closely interwoven. In the civil rights area, Congress has instructed the courts to use the broadest and most effective remedies available to achieve the goals of our civil rights

## ATTORNEY'S FEES AWARDS ACT
### P.L. 94-559

laws.[1] The very first attorneys' fee statute was a civil rights law, the Enforcement Act of 1870, 16 Stat. 140, which provided for attorneys' fees in three separate provisions protecting voting rights.[2]

Modern civil rights legislation reflects a heavy reliance on attorneys' fees as well. In 1964, seeking to assure full compliance with the Civil Rights Act of that year, we authorized fee shifting for private suits establishing violations of the public accommodations and equal employment provisions. 42 U.S.C. §§ 2000a–3(b) and 2000e–5(k). Since 1964, every major civil rights law passed by the Congress has included, or has been amended to include, one or more fee provisions.

---

[1] For example, the Civil Rights Act of 1866 directed Federal courts to "use that combination of Federal law, common law and State law as will be best adapted to the object of the civil rights laws." *Brown v. City of Meridian, Mississippi*, 356 F. 2d 602, 605 (5th Cir. 1966). See 42 U.S.C. § 1988; *Lefton v. City of Hattiesburg, Mississippi*, 333 F. 2d 280 (5th Cir. 1964).
[2] The causes of action established by these provisions were eliminated in 1894. 28 Stat. 36.

[2] 88 S.Ct. 964, 19 L.Ed.2d 1263.
[3] 93 S.Ct. 193, 36 L.Ed.2d 702.

[page 4]

E.g., Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3612(c); the Emergency School Aid Act of 1972, 20 U.S.C. § 1617; the Equal Employment Amendments of 1972, 42 U.S.C. § 2000e–16(b); and the Voting Rights Act Extension of 1975, 42 U.S.C. § 1973*l*(e).

These fee shifting provisions have been successful in enabling vigorous enforcement of modern civil rights legislation, while at the same time limiting the growth of the enforcement bureaucracy. Before May 12, 1975, when the Supreme Court handed down its decision in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240 (1975)[4], many lower Federal courts throughout the Nation had drawn the obvious analogy between the Reconstruction Civil Rights Acts and these modern civil rights acts, and, following Congressional recognition in the newer statutes of the "private attorney general" concept, were exercising their traditional equity powers to award attorneys' fees under early civil rights laws as well.[3]

These pre-*Alyeska* decisions remedied a gap in the specific statutory provisions and restored an important historic remedy for civil rights violations. However, in *Alyeska*, the United States Supreme Court, while referring to the desirability of fees in a variety of circumstances, ruled that only Congress, and not the courts, could specify which laws were important enough to merit fee shifting under the "private attorney general" theory. The Court expressed the view, in dictum, that the Reconstruction Acts did not contain the necessary congressional authorization. This decision and dictum created anomalous gaps in our civil rights laws whereby awards of fees are, according to *Alyeska*, suddenly unavailable in the most fundamental civil rights cases. For instance, fees are now authorized in an employment discrimination suit under Title VII of the 1964 Civil Rights Act, but not in the same suit brought under 42 U.S.C. § 1981, which protects similar rights but involves fewer technical prerequisites to the filing of an action. Fees are allowed in a housing discrimination suit brought under Title VIII of the Civil Rights Act of 1968, but not in the same suit brought under 42 U.S.C. § 1982, a Reconstruction Act protecting the same rights. Likewise, fees are allowed in a suit under Title II of the 1964 Civil Rights Act challenging discrimination in a private restaurant, but not in suits under 42 U.S.C. § 1983 redressing violations of the Federal Constitution or laws by officials sworn to uphold the laws.

## LEGISLATIVE HISTORY
P.L. 94-559

This bill, S. 2278, is an appropriate response to the *Alyeska* decision. It is limited to cases arising under our civil rights laws, a category of cases in which attorneys fees have been traditionally regarded as appropriate. It remedies gaps in the language of these civil rights laws by providing the specific authorization required by the Court in *Alyeska*, and makes our civil rights laws consistent.

It is intended that the standards for awarding fees be generally the same as under the fee provisions of the 1964 Civil Rights Act. A party seeking to enforce the rights protected by the statutes covered by S. 2278, if successful, "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Newman* v. *Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 (1968).[4]

---

[3] These civil rights cases are too numerous to cite here. See, e. g., *Sims* v. *Amos*, 340 F. Supp. 691 (M.D.Ala.1972), aff'd, 93 S.Ct. 290, 409 U.S. 942, 34 L.Ed.2d 215 (1972); *Sanford Daily* v. *Zurcher*, 366 F.Supp. 18 (N.D.Cal.1973); and cases cited in *Alyeska Pipeline, supra*, at n. 46. Many of the relevant cases are collected in "Hearings on the Effect of Legal Fees on the Adequacy of Representation Before the Subcom. on Representation of Citizen Interests of the Senate Comm. on the Judiciary," 93d Cong., 1st sess., pt. III, at pp. 888–1024, and 1060-62.

[4] 88 S.Ct. 964, 19 L.Ed.2d 1263. In the large majority of cases the party or parties seeking to enforce such rights will be the plaintiffs and/or plaintiff-intervenors. However, in the procedural posture of some cases, the parties seeking to enforce such rights may be the defendants and/or defendant-intervenors. See, e. g., *Shelley* v. *Kraemer*, 334 U.S. 1 (1948).

[4] 95 S.Ct. 1612, 44 L.Ed.2d 141.

[page 5]

Such "private attorneys general" should not be deterred from bringing good faith actions to vindicate the fundamental rights here involved by the prospect of having to pay their opponent's counsel fees should they lose. *Richardson* v. *Hotel Corporation of America*, 332 F. Supp. 519 (E.D. La. 1971), aff'd, 468 F. 2d 951 (5th Cir. 1972). (A fee award to a defendant's employer, was held unjustified where a claim of racial discrimination, though meritless, was made in good faith.) Such a party, if unsuccessful, could be assessed his opponent's fee only where it is shown that his suit was clearly frivolous, vexatious, or brought for harassment purposes. *United States Steel Corp.* v. *United States*, 385 F. Supp. 346 (W.D. Pa. 1974), aff'd, 9 E.P.D. ¶ 10,225 (3d Cir. 1975). This bill thus deters frivolous suits by authorizing an award of attorneys' fees against a party shown to have litigated in "bad faith" under the guise of attempting to enforce the Federal rights created by the statutes listed in S. 2278. Similar standards have been followed not only in the Civil Rights Act of 1964, but in other statutes providing for attorneys' fees. E.g., the Water Pollution Control Act, 1972 U.S. Code Cong. & Adm. News 3747; the Marine Protection Act, Id. at 4249–50; and the Clean Air Act, Senate Report No. 91–1196, 91st Cong., 2d Sess., p. 483 (1970). See also *Hutchinson* v. *William Barry, Inc.*, 50 F. Supp. 292, 298 (D. Mass. 1943) (Fair Labor Standards Act).

In appropriate circumstances, counsel fees under S. 2278 may be awarded pendente lite. See *Bradley* v. *School Board of the City of Richmond*, 416 U.S. 696 (1974).[5] Such awards are especially appropriate where a party has prevailed on an important matter in the course of litigation, even when he ultimately does not prevail on all issues. See *Bradley, supra*; *Mills* v. *Electric Auto-Lite Co.*, 396 U.S. 375 (1970). Moreover, for purposes of the award of counsel fees, parties may be considered to have prevailed when they vindicate rights through a consent judgment or without formally obtaining relief. *Kopet* v. *Esquire Realty Co.*, 523 F. 2d 1005 (2d Cir. 1975), and cases cited therein; *Parham* v. *Southwestern Bell Telephone Co.*, 433 F. 2d

## ATTORNEY'S FEES AWARDS ACT
P.L. 94-559

421 (8th Cir. 1970); *Richards* v. *Griffith Rubber Mills*, 300 F. Supp. 338 (D. Ore. 1969); *Thomas* v. *Honeybrook Mines, Inc.*, 428 F. 2d 981 (3d Cir. 1970); *Aspira of New York, Inc.* v. *Board of Education of the City of New York*, 65 F.R.D. 541 (S.D.N.Y. 1975).

In several hearings held over a period of years, the Committee has found that fee awards are essential if the Federal statutes to which S. 2278 applies are to be fully enforced.[5] We find that the effects of such fee awards are ancillary and incident to securing compliance with these laws, and that fee awards are an integral part of the remedies necessary to obtain such compliance. Fee awards are therefore provided in cases covered by S. 2278 in accordance with Congress' powers under, inter alia, the Fourteenth Amendment, Section 5. As with cases brought under 20 U.S.C. § 1617, the Emergency School Aid Act of 1972, defendants in these cases are often State or local bodies or State or local officials. In such cases it is intended that the attorneys' fees, like other items of costs,[6] will be collected either directly from the official, in his official capacity,[7] from funds of his agency or under his control, or from the State or local government (whether or not the agency or government is a named party).

---

[5] See, e.g., "Hearings on the Effect of Legal Fees," supra.
[6] *Fairmont Creamery Co.* v. *Minnesota*, 275 U.S. 168 (1927).
[7] Proof that an official had acted in bad faith could also render him liable for fees in his individual capacity, under the traditional bad faith standard recognized by the Supreme Court in *Alyeska*. See *Class* v. *Norton*, 505 F. 2d 123 (2d Cir. 1974); *Doe* v. *Poelker*, 515 F. 2d 541 (8th Cir. 1975).
[5] 94 S.Ct. 2006, 40 L.Ed.2d 476.

[page 6]

It is intended that the amount of fees awarded under S. 2278 be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases and not be reduced because the rights involved may be nonpecuniary in nature. The appropriate standards, see *Johnson* v. *Georgia Highway Express*, 488 F. 2d 714 (5th Cir. 1974), are correctly applied in such cases as *Stanford Daily* v. *Zurcher*, 64 F.R.D. 680 (N.D. Cal. 1974); *Davis* v. *County of Los Angeles*, 8 E.P.D. ¶ 9444 (C.D. Cal. 1974); and *Swann* v. *Charlotte-Mecklenburg Board of Education*, 66 F.R.D. 483 (W.D.N.C. 1975). These cases have resulted in fees which are adequate to attract competent counsel, but which do not produce windfalls to attorneys. In computing the fee, counsel for prevailing parties should be paid, as is traditional with attorneys compensated by a fee-paying client, "for all time reasonably expended on a matter." *Davis, supra; Stanford Daily, supra*, at 684.

This bill creates no startling new remedy—it only meets the technical requirements that the Supreme Court has laid down if the Federal courts are to continue the practice of awarding attorneys' fees which had been going on for years prior to the Court's May decision. It does not change the statutory provisions regarding the protection of civil rights except as it provides the fee awards which are necessary if citizens are to be able to effectively secure compliance with these existing statutes. There are very few provisions in our Federal laws which are self-executing. Enforcement of the laws depends on governmental action and, in some cases, on private action through the courts. If the cost of private enforcement actions becomes too great, there will be no private enforcement. If our civil rights laws are not to become mere hollow pronouncements which the average citizen cannot enforce, we must maintain the traditionally effective remedy of fee shifting in these cases.

\* \* \* \* \* \* \* \* \* \*

LEGISLATIVE HISTORY
P.L. 94–559
[page 7]

Cost of Legislation

The Congressional Budget Office, in a letter dated March 1, 1976, has advised the Judiciary Committee that: "Pursuant to Section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has reviewed S. 2278, a bill to award attorneys' fees to prevailing parties in civil rights suits.

"Based on this review, it appears that no additional costs to the government would be incurred as a result of the enactment of this bill."

## MANGANESE ORE—EXTENDED DUTY SUSPENSION

*P.L. 94–560, see page 90 Stat. 2642*

House Report (Ways and Means Committee) No. 94–1067, Apr. 29, 1976 [To accompany H.R. 12033]

Senate Report (Finance Committee) No. 94–994, June 25, 1976 [To accompany H.R. 12033]

Cong. Record Vol. 122 (1976)

DATES OF CONSIDERATION AND PASSAGE

House May 17, September 29, 1976

Senate July 1, October 1, 1976

The Senate Report is set out.

### SENATE REPORT NO. 94–994
[page 1]

The Committee on Finance, to which was referred the bill (H.R. 12033) to continue until the close of June 30, 1979, the existing suspension of duties on manganese ore (including ferruginous ore) and related products, having considered the same, reports favorably thereon without amendment and recommends that the bill do pass.

I. Background

The existing suspension of duties on manganese ore and related products has been extended by various public laws since it was originally enacted by Public Law 88–338 on June 30, 1964. The most recent extension was enacted on August 16, 1973 by Public Law 93–99 for a three-year period from June 30, 1973 to June 30, 1976.

Only the column 1 rate of duty (applicable to imports from countries accorded nondiscriminatory (MFN) tariff treatment) is suspended. The column 2 rate is not changed. The column 1 rate of duty on manganese (including ferruginous manganese ore) and manganeferous iron ore under TSUS item 601.27 is 0.12¢ per pound on manganese content. Imports from eligible developing countries are subject to